JMG/JKMcD: USAO2018R00117

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2021 FEB 25 PM 5: 20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. ELH-21-036 |
| | ) | |
| v. | ) | (Submitting False Claims, 18 U.S.C. § 287; |
| | ) | Making False Statements, 18 U.S.C. |
| JACKY LYNN MCCOMBER, | ) | § 1001(a)(2); Aiding and Abetting and |
| formerly known as | ) | Causing an Act to Be Done, |
| Jacky Lynn Kimmel, | ) | 18 U.S.C. § 2) |
| | ) | |
| *Defendant.* | ) | |

## INDICTMENT

The Grand Jury for the District of Maryland charges that:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1. The National Security Agency (NSA) was a component of the United States Department of Defense, which was part of the executive branch of the United States government. The NSA's functions include, among other things, conducting signals intelligence operations and providing cybersecurity products and services for the purpose of protecting the infrastructure and people of the United States. Its main facility was located on the grounds of Fort George G. Meade, just off the Baltimore-Washington Parkway in Anne Arundel County, Maryland.

2. InfoTeK Corporation ("InfoTeK") was a company that was in the business of providing information technology, engineering, and security management services to government agencies and commercial companies. Its principal place of business was located in Howard County, Maryland.

3. Defendant **JACKY LYNN MCCOMBER (MCCOMBER)** was the Chief Executive Officer, President, and first the controlling and then later (after in or about the summer of 2016) the sole shareholder of InfoTeK.

## COUNTS ONE THROUGH NINETEEN
## (Submission of False Claims)

1. The Introductory Allegations are realleged and incorporated here.

2. From in or about July 2011 and continuing thereafter through in or about February 2018, the NSA had an ongoing contract with InfoTeK identified as Prime Contract # H98230-11-C-1496, which was known as the IRONBRIDGE contract. The Statement of Work (SOW) associated with the IRONBRIDGE contract required InfoTeK to provide maintenance and enhancement support for the information technology and software requirements of the NSA's National Security Operations Center (NSOC) and the Counter Terrorism Mission Management Center (CTMMC). The contract established fixed labor rates (which were periodically reviewed and adjusted) for the various positions held by each InfoTeK employee or contractor who worked on IRONBRIDGE. InfoTeK billed the NSA on a monthly basis based upon the level of effort expended (hours worked) by its employees and contractors in each position.

3. The IRONBRIDGE SOW required InfoTeK to identify a program manager (PM) who would be responsible for managing all aspects of the contract and the Technical Task Orders (TTOs) issued under it. The PM was to be responsible for overseeing InfoTek's performance of its contractual obligations and serving as InfoTek's point of contact in dealing with government personnel on matters relating to its contract performance. During the first two years the contract was in effect, from 2011-13, several

individuals served as the PM on the IRONBRIDGE contract, including **MCCOMBER**. Starting in the summer of 2013, Individual A held the position of Senior Program Manager on the IRONBRIDGE contract until she was replaced by **MCCOMBER** in mid-March, 2016. **MCCOMBER** then held that position through September 2017.

4. Because the subject matter of the IRONBRIDGE contract involved classified information, Clause F.6 of the contract provided that "Unless the written approval of the Contracting Officer is obtained in advance, the work herein shall not be performed at any facility, other than the Government site." For the IRONBRIDGE contract, that worksite was a secure, access-controlled location that housed the National Security Operations Center (NSOC) at the NSA's Fort Meade facility.

5. No written authorization was ever obtained by InfoTeK or **MCCOMBER** from the NSA authorizing her to carry out her functions or those of any of the other employees or contractors working on the IRONBRIDGE contract at any location other than the NSOC.

6. InfoTek's personnel (including **MCCOMBER**) used a web-based timesheet software program provided by Unanet, Inc., to record their billable time on the matters on which they worked. In the case of IRONBRIDGE, an invoice was then generated by InfoTeK's Chief Financial Officer (CFO) at the start of each month that included a table listing the name of each individual who worked for InfoTeK on the IRONBRIDGE contract; whether they were employed by InfoTeK (as either an employee or a contractor) or another firm; the title of their position or labor category; the period covered by the invoice; their hourly billing rate; the hours they had worked in the previous month; the amount InfoTeK was billing for their services for the previous month; and then their cumulative hours and the cumulative amount billed for their

services for the year to date. Each invoice then listed the total hours worked and the total dollar amount that InfoTeK was submitting for payment.

7.  At the bottom of each of the monthly invoices it submitted on the IRONBRIDGE contract from at least the fall of 2013 through the fall of 2017, InfoTeK provided the following certification of the accuracy of the hours and charges it was presenting:

> I, [electronic signature of InfoTeK's CFO], being an authorized official of Infotek Corporation certify that the amounts listed in this invoice are true and accurate and that Infotek Corporation has in its possession records that substantiate these amounts.

8.  During the period that Individual A held the Senior Program Manager position on the IRONBRIDGE contract between the summer of 2013 and March 2016, she found that although the contract contemplated that this would be a full-time position, there was actually not enough work for the Program Manager to do to support this. Although Individual A made this known to company officials and requested additional work, InfoTeK nevertheless billed an average of 130 hours a month to the NSA for the IRONBRIDGE Program Manager's position throughout the period Individual A held that position.

9.  In mid-March 2016, **MCCOMBER** again assumed the Senior Program Manager position on the IRONBRIDGE contract and Individual A left for another company. From then until NSA asked that she be removed from the Program Manager position in the fall of 2017, **MCCOMBER** recorded the time she purportedly spent working as InfoTeK's Program Manager on the IRONBRIDGE contract on the Unanet timesheet software. With only occasional exceptions, if **MCCOMBER** billed time to the IRONBRIDGE contract on a particular day, she typically billed a full 8 hours. Over the

17 complete months that **MCCOMBER** held the Senior Program Manager position in 2016-17, InfoTeK billed an average of 144 hours a month to the NSA for her supposed work in that capacity on the IRONBRIDGE contract.

10. **MCCOMBER's** reported time, along with that of other InfoTeK employees and sub-contractors who were hired by InfoTeK to assist with the IRONBRIDGE contract, was then combined into the monthly invoice that InfoTeK submitted electronically to the NSA's Maryland Procurement Office (MPO). **MCCOMBER's** time on the IRONBRIDGE contract was charged to the NSA at a rate of $148.13 an hour from March 14 through October 31, 2016, and then at a rate of $150.35 an hour starting November 1, 2016 and continuing through September 30, 2017.

11. In all, between March 14, 2016 and September 8, 2017, InfoTeK billed NSA for 2,603.5 hours of work on the IRONBRIDGE contract supposedly performed by **MCCOMBER** in her role as Senior Program Manager. NSA paid these charges in full, at a total cost of $388,878.78.

12. A subsequent review and comparison by the NSA in the fall of 2017 of **MCCOMBER's** access control (key card) information with the time InfoTeK billed for her work on the IRONBRIDGE contract established that **MCCOMBER** was not actually present at her contractually assigned duty station at the NSOC for 2,342.5 (90%) of the 2,603.5 hours she had recorded on her timesheets and that InfoTeK subsequently billed to the NSA. In all, out of the 326 days between March 15, 2016 and September 8, 2017 on which **MCCOMBER** billed time to NSA on the IRONBRIDGE contract as the Senior Program Manager, her billings exceeded the amount of time she was actually in access control at the NSOC on 322 of them. On 218 of those 326 days, **MCCOMBER** did not access her assigned work station at the NSOC at all – but she recorded, and InfoTeK

5

billed, 8 hours for her as the Senior Program Manager on the IRONBRIDGE contract on 204 of those days.

13. In addition to not being physically present at the NSOC worksite for the vast majority hours she billed to the IRONBRIDGE contract, **MCCOMBER** did not in fact work the number of hours on the IRONBRIDGE contract that she recorded on her time records and that InfoTeK subsequently billed for her services on the invoices it submitted to the NSA each month between April 2016 and September 2017.

14. On various occasions when **MCCOMBER** billed a full eight-hour day to the IRONBRIDGE contract, **MCCOMBER** played in charity golf tournaments; participated in a charity event sponsored by a former Washington Redskins player in northern Virginia; attended her high school reunion in Virginia Beach, Virginia; vacationed in Texas and in Ocean City; and traveled to and was present in Augusta, Georgia as part of business development efforts for InfoTeK that were unrelated to the IRONBRIDGE contract. On other occasions when she billed an eight-hour day to the IRONBRIDGE contract, **MCCOMBER** was drafting proposals to obtain other business for InfoTeK or was doing work related to other government contracts or administrative work for the company in her capacity as its CEO.

15. Based upon the materially false, fictitious, and fraudulent invoices submitted by InfoTeK to NSA for **MCCOMBER's** time, between April 2016 and September 2017, the NSA substantially overpaid InfoTeK for time that **MCCOMBER** falsely claimed she had worked on the IRONBRIDGE contract.

## The Charge

16.     On or about the dates indicated below, in the District of Maryland, the defendant,

**JACKY LYNN MCCOMBER,**
formerly known as Jacky Lynn Kimmel,

did knowingly cause to be submitted materially false, fictitious and fraudulent claims upon and against the NSA, an agency of the United States, for services that were not in fact performed by **MCCOMBER** in connection with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices set forth below:

| COUNT | INVOICE DATE | HOURS BILLED FOR MCCOMBER BY INFOTEK ON THE IRONBRIDGE CONTRACT, AND AMOUNT CHARGED TO AND PAID BY THE NSA |
|---|---|---|
| 1 | April 4, 2016 | 64 hours @ $148.13 hourly = $9,480.32 |
| 2 | May 4, 2016 | 168 hours @ $148.13 hourly = $24,885.84 |
| 3 | June 2, 2016 | 142 hours @ $148.13 hourly = $21,034.46 |
| 4 | July 11, 2016 | 172 hours @ $148.13 hourly = $25,478.36 |
| 5 | July 31, 2016 | 156 hours @ $148.13 hourly = $23,108.28 |
| 6 | August 31, 2016 | 144 hours @ $148.13 hourly = $$21,330.72 |
| 7 | September 30, 2016 | 168 hours @ $148.13 hourly = $24,885.84 |
| 8 | October 31, 2016 | 138 hours @ $148.13 hourly = $20,441.94 |
| 9 | November 30, 2016 | 136 hours @ $150.35 hourly = $20,447.50 |
| 10 | December 31, 2016 | 128 hours @ $150.35 hourly = $19,244.80 |
| 11 | January 31, 2017 | 146 hours @ $150.35 hourly = $21,951.10 |
| 12 | February 28, 2017 | 144 hours @ $150.35 hourly = $21,650.40 |
| 13 | March 31, 2017 | 146.50 hours @ $150.35 hourly = $22,026.28 |
| 14 | May 4, 2017 | 120 hours @ $150.35 hourly = $18,042.00 |
| 15 | June 7, 2017 | 170 hours @ $150.35 hourly = $25,559.50 |
| 16 | July 11, 2017 | 170 hours @ $150.35 hourly = $25,559.50 |
| 17 | August 7, 2017 | 109 hours @ $150.35 hourly = $16,388.15 |
| 18 | September 5, 2017 | 94 hours @ $150.35 hourly = $14,132.90 |
| 19 | October 9, 2017 | 88 hours @ $150.35 hourly = $13,230.80 |

18 U.S.C. § 287
18 U.S.C. § 2(b)

7

## COUNT TWENTY

### (False Statements)

1. The allegations of Paragraphs 1 through 15 of Counts One through Nineteen are realleged and incorporated here by reference.

2. On October 2, 2017, investigators from the National Security Agency, Office of the Inspector General (NSA OIG), contacted defendant **MCCOMBER** and advised her that their office had received an allegation concerning her involvement with labor mischarging during the period from August 2016 through July 2017 and asked her to schedule an interview to discuss these allegations. **MCCOMBER** agreed to do so, interview, and she appeared for an interview that was conducted by two NSA OIG investigators at an NSA OIG office on the premises of Fort Meade on October 3, 2017.

3. Prior to the commencement of the interview, which was recorded and subsequently transcribed, **MCCOMBER** was provided with an NSA OIG form entitled **WARNING AND ASSURANCES TO A CONTRACTOR REQUESTED TO PROVIDE INFORMATION ON A VOLUNTARY BASIS.** Among other things, this form advised her that "You are being asked to provide information as part of an investigation being conducted by the Office of the Inspector General into alleged misconduct and/or improper performance of official duties." The form further advised her that the subject matter of the investigation was "Labor mischarging – submitting timesheets for hours not worked." The form further advised her of the following:

> This is a voluntary interview. Accordingly, you do not have to answer questions. NSA will not take action against you solely for refusing to answer the Office of the Inspector General's questions in this matter. If you do decide to answer questions or make a statement, you may stop answering at any time. Any statement you furnish may be used as evidence in any future criminal or administrative proceeding, or both.

4.  Before proceeding with the interview, **MCCOMBER** signed an

**ACKNOWLEDGEMENT** on the "Warning And Assurances" form, which stated that:

> I understand the warning and assurances stated above and I am willing to make a statement and answer questions. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

5.  At the start of the interview, **MCCOMBER** was advised on the record that the interview related to an allegation that she had charged the government for hours that she did not actually work. She was further advised that the interview was being recorded. **MCCOMBER** acknowledged on the record that she had read and understood the "Warning and Assurances" form, and then was placed under oath and swore to tell the truth before the questioning about the mischarging allegation began.

### The Charge

6.  On or about October 3, 2017, in the District of Maryland, defendant

**JACKY LYNN MCCOMBER,**
formerly known as Jacky Lynn Kimmel,

did knowingly and willfully make materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the NSA, an agency of the executive branch of the Government of the United States, in that she made the following statements during an interview with investigators from the NSA's Office of the Inspector General, when she then and there knew that these statements were not true:

- p. 30: After **MCCOMBER** stated that she filled out a timesheet every day, she answered "No" in response to both of the questions, "At any time, did you ever falsely fill out that timesheet?" and "Put any false information on it?"

- p. 32: When one of the investigators noted that **MCCOMBER** had billed a full 8 hours on almost all of the days she had billed time to the IRONBRIDGE contract and asked "So, that's accurate?", **MCCOMBER** responded:

  "Yes, that is accurate, because I – I monitor my time throughout the day on what I'm doing for Ironbridge and what's against Ironbridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it."

18 U.S.C. § 1001(a)(2)

_____
JONATHAN F. LENZNER
Acting United States Attorney for the
District of Maryland

A TRUE BILL:

_____
Foreperson

Date: 2/25/2021