IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JACKY LYNN McCOMBER,
   Formerly known as
   Jacky Lynn Kimmel,

   *Defendant*.

Criminal Action No. ELH-21-36

**MEMORANDUM OPINION**

Defendant Jacky McComber, formerly known as Jacky Lynn Kimmel, was indicted on February 25, 2021, and charged with multiple offenses in connection with a government contract. ECF 1 (the "Indictment").  In particular, the Indictment is rooted in McComber's billing practices as program manager with respect to a contract between the National Security Agency ("NSA" or "Agency") and her company, InfoTeK Corporation ("InfoTeK").  From 2011 through February 2018, InfoTeK had a contract with NSA, known as the Ironbridge Contract.  McComber, the Chief Executive Officer, President, and later the sole shareholder of InfoTeK, is charged with submitting inflated timesheets and fraudulent invoices to NSA during the period of April 2016 to October 2017.

The Indictment contains twenty counts.  Counts One through Nineteen each charge "Submission of False Claim," in violation of 18 U.S.C. § 287 and 18 U.S.C. § 2(b).  *Id.* at 2, 7. Count Twenty charges defendant with "False Statements" on October 3, 2017, in violation of 18 U.S.C. § 1001(a)(2).  *Id.* at 8, 10.

As to Counts One through Nineteen, defendant has filed a "Motion for Bill of Particulars" (ECF 20), pursuant to Fed. R. Crim. P. 7(f).  It is supported by a memorandum of law.  ECF 20-1

(collectively with ECF 20, the "Motion").  The government opposes the Motion.  ECF 21 (the "Opposition"). The Opposition is supported by four exhibits.  These include two transmittal letters reflecting the government's discovery productions (ECF 21-2; ECF 21-3), and a document titled "Excerpt from Government Spreadsheet Reflecting Hours When Defendant was Present at NSA and other available information about her activities" (ECF 21-4).  Defendant has replied.  ECF 22 (the "Reply").

A Motion hearing was held on December 1, 2021, at which argument was presented.[1]  For the reasons that follow, I shall deny the Motion.

## I.      Summary of Allegations

The NSA's functions include intelligence operations.  ECF 1 at 1, ¶ 1.[2]  InfoTeK provided, *inter alia*, information technology, engineering, and security management services to government agencies, including NSA.  *Id.* ¶ 2.  At the relevant time, McComber served as "the Chief Executive Officer, President, and first the controlling and then later . . . the sole shareholder of InfoTeK."  *Id.* at 2, ⁋ 3.

Between July 2011 and February 2018, the NSA "had an ongoing contract" with InfoTeK, "known as the IRONBRIDGE contract" (the "Contract").  ECF 1 at 2, ⁋ 2.  Under the Contract, InfoTeK was required "to provide maintenance and enhancement support for the information technology and software for requirements of the NSA's National Security Operations Center (the 'NSOC') and the Counter Terrorism Mission Management Center . . . ."  *Id.*

---

[1] The Court does not have a transcript from the hearing.

[2] The Indictment includes duplicate numbering of paragraphs 1, 2, and 3.  Therefore, for clarity, I sometimes cite to page numbers.

According to the Indictment, the Contract "established fixed labor rates . . . for the various positions held by each InfoTeK employee or contractor who worked on IRONBRIDGE." *Id.* at 2, ⁋ 2.  And, "InfoTeK billed the NSA on a monthly basis based upon the level of effort expended (hours worked) by its employees and contractors in each position." *Id.*  Further, the Contract required InfoTeK to "identify a program manager . . . who would be responsible for managing all aspects of the contract and the Technical Task Orders . . . issued under it." *Id.* at 2, ⁋ 3.  The program manager was charged with "overseeing InfoTeK's performance of its contractual obligations and serving as InfoTeK's point of contact in dealing with government personnel on matters relating to its contract performance." *Id.*

The parties agreed at the hearing that the Contract itself is not classified.  But, "[b]ecause the subject matter of the IRONBRIDGE contract involved classified information," the Contract provided that all work was required to be performed at "the Government site," unless advance written permission to do otherwise was provided by "the Contracting Officer." ECF 1, ⁋ 4 (citation and internal quotation marks omitted). The Indictment alleges that neither InfoTeK nor McComber ever obtained permission "from the NSA authorizing [defendant] to carry out her functions . . . at any location other than the NSOC." *Id.* ⁋ 5.

While working on the Contract, InfoTeK personnel used a timesheet software program to report their billable time. *Id.* ⁋ 6.  At the beginning of each month, an InfoTeK official generated an invoice that reflected all the billing information submitted under the Contract for the prior month, which was then presented to the Agency. *Id.*  Each invoice included a table showing the "hourly billing rate" for InfoTeK's personnel, as well as "the hours they had worked" on the Contract "in the previous month; the amount InfoTeK was billing for their services for the previous month, and . . . their cumulative hours and the cumulative amount billed for their services for the

year to date." *Id.*  According to the Indictment, every monthly invoice submitted by InfoTeK between the fall of 2013 and the fall of 2017 included a certification of the accuracy of the hours and charges presented.  *Id.* ¶ 7.

Defendant intermittently served as InfoTeK's program manager for the first two years of the Contract.  *Id.* at 2-3, ¶ 3.  In the summer of 2013, another InfoTeK official, referred to as Individual A in the Indictment, assumed that role, which she held until mid March of 2016.  *Id.* at 3, ¶ 3.  At some point during Individual A's tenure as Senior Program Manager, Individual A allegedly indicated to other InfoTeK officials that "there was actually not enough work for the Program Manager to do" to support a full-time position.  *Id.* ¶ 8.

Individual A left her position with InfoTeK in March 2016.  Thereafter, McComber again assumed the position of Senior Program Manager.  *Id.* ¶ 9.  The defendant retained this role "until NSA asked that she be removed . . . in the fall of 2017 . . . ."  *Id.*  The Indictment provides that throughout this roughly eighteen-month period, defendant frequently "billed time to the IRONBRIDGE contract" in the amount of 8 hours per day.  ECF 1, ¶ 9.

From March 14, 2016 through October 31, 2016, defendant had an hourly rate of $148.13.  *Id.* ¶ 10.  Her hourly rate increased to $150.35 for the period November 1, 2016 through September 30, 2017.  *Id.*  In total, from March 14, 2016 through September 8, 2017, InfoTeK billed NSA for 2,603.5 hours of McComber's time, in the sum of $388,878.78, and NSA "paid these charges in full . . . ."  *Id.* ¶ 11.

In 2017, NSA conducted a review of McComber's "access control (key card) information with the time InfoTeK billed for her work" and found that defendant "was not actually present at her contractually assigned duty station at the NSOC" for approximately ninety percent of the total hours that "she had recorded on her timesheets and that InfoTeK subsequently billed to the NSA."

4

*Id.* ¶ 12.  As the Indictment summarizes, there were 326 days between March 15, 2016 and September 8, 2017, and on 322 of the days, defendant's "billings exceeded the amount of time she was actually in access control at the NSOC . . . ."  *Id.*  Moreover, the Agency's review purportedly found that on 218 of the 326 days that McComber claimed to have worked, she "did not access her assigned work station at the NSOC at all."  *Id.*  And, InfoTeK billed 8 hours for the defendant on 204 of those days.  *Id.*

Further, the Indictment alleges: "In addition to not being physically present at the NSOC worksite for the vast majority [of] hours she billed to the IRONBRIDGE contract, McComber did not in fact work the number of hours on the IRONBRIDGE contract that she recorded on her time records . . . ."  *Id.* ¶ 13.  Specifically, the Indictment states that "on various occasions when [defendant] billed a full eight-hour day," McComber went on vacations, attended charity events, and completed work outside the scope of the Contract.  *Id.* ¶ 14.  As a result, according to the Indictment, defendant caused InfoTeK to submit "materially false, fictitious, and fraudulent invoices" to the NSA.  *Id.* ¶ 15.

Paragraph 16 of the Indictment contains a list of nineteen counts.  For each, it specifies the invoice date; defendant's hours billed on that date; defendant's hourly rate; and the total amount charged to NSA and paid by the Agency.  Further, it states that defendant submitted false and fraudulent claims "for services that were not in fact performed by [defendant] in connection with the IRONBRIDGE contract, to wit, the *full* amount of the hours listed in the invoices set forth . . . ." (Emphasis added).

Of relevance to the Motion, the Indictment does not specify the number of hours billed to the NSA that the government believes McComber actually performed pursuant to the Contract. However, the government has produced voluminous discovery.  *See* ECF 21-2; ECF 21-3.

Specifically, since April 2021, the government has provided the defense with more than 18,000 pages of discovery material that includes "46 witness interview [sic] and other investigative reports and 26 complete transcripts of witness interviews." ECF 21 at 10. It has also provided materials subject to the Jencks Act, 18 U.S.C. § 3500, "much earlier than" such materials "are normally turned over by the government." *Id.* And, it has prepared a spread sheet that documents, by date, the defendant's location, alleged "discrepant hours" in billing, and other information. *See* ECF 21-4.

## II.  Discussion

### A.

In the Motion, defendant specifies eight requests for particulars, applicable to Counts One through Nineteen of the Indictment. ECF 20 at 1-2. Defendant's first request asks the government to identify the "number of hours that . . . were worked by Ms. McComber . . . and properly paid by the NSA." *Id.* ⁋ 1. The remaining seven requests ask the government to state whether defendant failed to fully perform various aspects of her job as the program manager, pursuant to the terms of the Contract and associated task orders. ECF 20, ⁋⁋ 2-8.

The requests in the Motion are set forth below, *id.* ⁋⁋ 1-8:

1. Identify the number of hours that the Government agrees were worked by Ms. McComber on the Ironbridge Contract, and properly paid by the NSA.

2. State whether the Contract Program Manager, Ms. McComber, failed to manage any aspect of the Ironbridge contract and, if so, the aspect of the Ironbridge contract left unmanaged.

3. State whether the Contract Program Manager, Ms. McComber, failed to manage any aspect of any Technical Task Order, and, if so, the aspect of the Ironbridge Technical Task Order left unmanaged.

4. State whether the Contract Program Manager, Ms. McComber, failed to function as the official Point of Contact with the Government Contract Officer Representative.

5. State whether the Contract Program Manager, Ms. McComber, failed to assist in updating program plans and documentation.

6. State whether the Contract Program Manager, Ms. McComber, failed to create or maintain program schedules.

7. State whether the Contract Program Manager, Ms. McComber, failed to notify the Government Contract Officer Representative of any changes in the personnel assigned to Ironbridge.

8. State whether the Contract Program Manager, Ms. McComber, failed to provide the corresponding credentials of proposed personnel replacements.

Defendant contends that obtaining this information is necessary to clarify the charges she faces. *See* ECF 20-1 at 2-3. Specifically, she argues that the Indictment, standing alone, is inadequate because it "charges that the program manager did no work," yet also "avers that the defendant was present on campus for 261 hours of time billed." *Id.* at 1. Moreover, defendant points out that the Indictment does not allege that InfoTeK failed to "perform any aspect of the contract to the complete satisfaction of the Government." *Id.* at 2. This contradiction, according to defendant, is problematic because it "effectively shifts the burden of production and the burden of persuasion from the Government to the defendant." *Id.* In other words, because the Indictment "charg[es] the defendant with [a] false claim for every hour billed," the defendant claims she is required "to prove that she did not file a false claim for every hour worked," and this shift in the burden of proof "is unconstitutional." *Id.* (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975)).

The requested particulars would, in defendant's view, "correct this problem," by instructing the government to "identify the number of hours that the Government agrees Ms. McComber worked on the Ironbridge contract . . . and to specify the 'statement of work' not performed under the contract during the relevant period of the individual Counts." ECF 20-1 at 2. Defendant concludes that this "information would permit [her] to prepare for trial" and would

"have the collateral benefit . . . of focusing prosecution and defense efforts on the specific quarrels surrounding hours in dispute." *Id.* at 2-3.

In response, the government argues that the Indictment clearly passes constitutional muster. *See* ECF 21 at 4-8. Specifically, it contends that the Indictment's allegations are sufficiently specific to "apprise the defendant and her counsel of the charges against which she must defend," as well as to "enable her to plead an acquittal or conviction as a bar to future prosecutions for these same offenses." *Id.* at 7-8.

In particular, the government notes that the Indictment "details the results of an NSA investigation into Ms. McComber's billings and work practices which disclosed that she was not present at the NSA's secure worksite for some 90% of the time she had billed to the Ironbridge [sic] contract; details some of the other things she was doing on dates when she billed a full eight hours to the IRONBRIDGE contract; alleges that she 'did not in fact work the number of hours on the IRONBRIDGE contract that she recorded on her time records . . .'; and concludes that the NSA substantially overpaid [InfoTeK] for the hours billed by Ms. McComber as a result. . . ." *Id.* at 7.

Further, the government argues that its "extensive discovery . . . further eliminates any need for a bill of particulars." *Id.* at 8. It recounts that in April 2021 it produced its initial discovery to the defense. The discovery consisted of 15,543 pages of material and included "cell-site locator records," "investigative and interview reports," and "grand jury subpoenas from 13 different sources, as well as the 56-page transcript and audio recording of defendant's own interview with the investigators in early October 2017." ECF 21 at 8*; see* ECF 21-2

The government made another discovery production in August 2021. At that time, the government supplied defendant with an additional 2,745 pages of material as well as "172 pages of emails sent by the defendant" from the computer that McComber "actually used when she was

8

present" at the "worksite."  ECF 21 at 9; *see* ECF 21-3.  According to the government, an analysis

of these emails revealed that they largely "concerned . . . a second NSA contract that [InfoTeK]

held known as SILENT ROAR."  ECF 21 at 9.  In addition, the government provided defendant

with an "extensive spreadsheet prepared by the government's principal investigator . . . that details

how much time (if any) the defendant actually spent within access control at the NSA on each day

throughout her second tenure" as well as all "underlying documentary support."  *Id.*; *see* ECF 21-

4.

At the Motion hearing, the government characterized the defendant's requests as

tantamount to requests for admission in a civil case.  It also pointed to paragraph 16 of the

Indictment, in which the defendant is charged with failing to work the "full amount" of the hours

for which she billed.  And, it notes that its discovery, including the exhibits excerpted at ECF 21-

4, provides the details known to the government and sought by the defense.  Given the facts alleged

in the Indictment and the discovery materials that the government has supplied to defendant, the

government argues that it need not provide the information defendant seeks in the Motion.

### B.

An indictment implicates a defendant's constitutional due process right to reasonable notice

of the charges. *See, e.g.*, *Stroud v. Polk*, 466 F.3d 291, 296 (4th Cir. 2006), *cert. denied*, 551 U.S.

1134 (2007).  It is defective if it fails to apprise the defendant, with reasonable certainty, of the

accusation.  *Russell v. United States*, 369 U.S. 749, 765 (1962).

For an indictment to be legally sufficient, it "must contain the elements of the offense

charged'" and "'fairly inform a defendant of the charge[.]'"  *United States v. Kingrea*, 573 F.3d

186, 191 (4th Cir. 2009) (citations omitted); *see Hamling v. United States*, 418 U.S. 87, 117 (1974);

*United States v. Janati*, 374 F.3d 263, 271 (4th Cir. 2004); *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998); *see also United States v. ReSendiz-Ponce*, 548 U.S. 102, 108 (2007).

The requirement that an indictment include all elements of an offense derives from the Fifth Amendment, which provides, in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"  Thus, the grand jury must have considered and found all elements to be present.  *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988).   The notice requirement also derives from the Sixth Amendment, which states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." *See Hooker*, 841 F.2d at 1230; *see also Russell*, 369 U.S. at 763.

Fed. R. Crim. P. 7(c)(1) governs the required contents and form of an indictment.  It provides that an indictment must set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ."  Notably, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000).   And, an indictment may allege "the means by which the defendant committed the offense . . . ."  *Id.*  Moreover, "[a] count may incorporate by reference an allegation made in another count." *Id.*

Ordinarily, an indictment that tracks the statutory language is constitutionally sufficient if "'accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense' . . . with which he is charged." *Hamling*, 418 U.S. at 117-18 (citation omitted). "More specifically, an indictment is legally sufficient (1) if it alleges the essential

elements of the offense, that is, it fairly informs the accused of what he is to defend; and (2) if the allegations will enable the accused to plead an acquittal or conviction to bar a future prosecution for the same offense." *United States v. Rendelman*, 641 F.3d 36, 44 (4th Cir. 2011), *cert. denied*, 565 U.S. 1246 (2012).  In other words, the indictment must enable the defendant to plead double jeopardy in the event of a subsequent prosecution for a similar offense.  *Russell*, 369 U.S. at 764; *Williams*, 152 F.3d at 299.

Of relevance here, a defendant may "move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."  Fed. R. Crim. P. 7(f).  "The purpose of a bill of particulars is to enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 935 (4th Cir. 1973).

A bill of particulars does not amend or alter the indictment, however.  Instead, it "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citing *United States v. Howard*, 590 F.2d 564, 567 (4th Cir. 1979)).  Thus, "[i]f the indictment does not contain every essential element of the offense, it is invalid; and, a bill of particulars cannot cure the defect." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). Moreover, "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Medical Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *see United States v. Xiaojie Shun*, 1:16-CR-00075 RJA (MJR), 2019 WL 4396237, at *12 (W.D.N.Y. 2019) ("[T]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise

manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."); *United States v. Hsuan Bin Chen*, No. CR 09-110 SI, 2011 WL 332713, at \*7 (N.D. Cal. Jan. 29, 2011) (denying motion for bill of particulars where "defendants seek extremely detailed evidence to which they are not entitled through a bill of particulars"); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying motion for bill of particulars that sought the "'wheres, whens and with whoms' that Courts have held to be beyond the scope of a bill of particulars").

The Fourth Circuit summarized the standards for the sufficiency of an indictment in *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002).  It said, *id.* at 310 (internal citations omitted):

> "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Usually "an indictment is sufficient if it alleges an offense in the words of the statute," as long as the words used in the indictment "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence." However, simply parroting the language of the statute in the indictment is insufficient. When the words of a statute are used to describe the offense generally, they "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Thus, the indictment must also contain a "statement of the essential facts constituting the offense charged."

*See also United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999); *United States v. Darby*, 37 F. 3d 1059, 1063 (4th Cir. 1994); *United States v. Cobb*, 905 F. 2d 784, 790 (4th Cir. 1990), *cert. denied*, 498 U.S. 1049 (1991).

Of pertinence here, where an indictment is legally sufficient, detailed discovery may obviate the need for a bill of particulars. Therefore, when considering whether to grant a defendant's motion for a bill of particulars, it is appropriate for the court to inquire about the information that has already been provided by the government during discovery. *United States v.*

*Society of Independent Gasoline Marketers of America*, 624 F.2d 461, 466 (4th Cir. 1980); *see, e.g.*, *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (stating that a bill of particulars is unnecessary if the information relevant to preparation of defense—"elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated"—"is available through some other satisfactory form, such as discovery") (citation and internal quotation marks omitted); *United States v. Godfrey*, No. 11-10279-RWZ, 2013 WL 1414887, at *3 (D. Mass. Apr. 5, 2013) (denying bill of particulars where indictment is specific enough and discovery has been provided in searchable format); *United States v. Kemp*, No. CRIM.A.04-370, 2004 WL 2757867, at *8 (E.D. Pa. Dec. 2, 2004) ("Courts are especially reluctant to direct the filing of a bill of particulars when the government has provided the defendant with extensive pre-trial discovery.").

Nevertheless, the government's production of discovery is not determinative.  In other words, the production of discovery does not necessarily obviate the need for a bill of particulars. *See United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (stating that "district court made clear that it ordered a bill of particulars because so much discovery was produced to the defendants, not too little"); *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("A defendant is not fairly apprised of the necessary information merely because the government provided 'mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified' at trial."); *United States v. Aispuro*, Crim. No. 08-2936, 2010 WL 1404196, at *6 (D.N.M. Mar. 16, 2010) ("The Court also finds persuasive the Defendants' argument that, in a complex case with voluminous unorganized discovery, a bill of particulars is particularly necessary to avoid surprise at trial.").

## C.

In her first request, the defendant asks the government to specify the number of hours that the government agrees the defendant worked, and for which NSA properly paid.  The government posits that "nothing about the criminal offenses charged" in Counts One through Nineteen "requires the government to prove the specific number of hours that Ms. McComber actually worked over her roughly 18 months as the PM on the IRONBRIDGE contract . . . ."  ECF 21 at 11.  Rather, the government argues that, to convict the defendant under this statute, the government must establish that "defendant presented or caused a claim to be presented to a federal agency or department; that the claim was a claim against that agency or department . . . and then finally, 'that the defendant presented the claim knowing that it was false, fictitious or fraudulent as to a material fact.'"  *Id.* at 12 (quoting Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS, CRIMINAL INSTRUCTION 18-3 (emphasis omitted)).

A "'material fact'" is defined as "'one which has a natural tendency to influence or is capable of affecting or influencing a government function.  That is, it must relate to an important fact as distinguished from some unimportant or trivial detail.'"  ECF 21 at 12 (quoting Sand, *et al.*, *supra*, INSTRUCTION 18-7).  And, according to the government, the material falsehood at issue in this case is "the correct number of hours actually worked by Ms. McComber on behalf of the IRONBRIDGE contract in a given month . . . ."  ECF 21 at 12. Therefore, in the government's view, the Indictment is sufficient because it alleges that defendant knowingly caused InfoTeK to submit nineteen fraudulent claims to the NSA.

In any event, it appears that the government has provided the requested information.  ECF 21-4 is an excerpt of the government's work product, as described earlier.  It contains a column titled "Discrepant Hours."  The information in the document indicates the hours in each billing

14

that the government disputes. In other words, the government describes the hours billed and the hours in that billing for which it contends work was not performed.

As to defendant's remaining seven requests, the government asserts that its answers to these questions may "be gleaned from the discovery that the United States submitted to the defense . . . ." *Id.* In particular, the government points defendant to the transcripts of the "interviews its investigators conducted" of twelve witnesses, and those transcripts have been made available to the defense. *Id.*

In the Reply, defendant seems to agree that she has been provided with extensive discovery. ECF 22 at 2 ("The Government . . . produced thousands of pages of additional discovery . . . ."). But, McComber avers that the availability of these materials does not cure the Indictment's fundamental flaw: charging McComber with "submitting false claims for every hour" she "invoiced," *id.* at 1, without explaining how, or to what extent, defendant failed to perform according to the terms of the Contract. *Id.* at 2-3.

Much of defendant's argument at the hearing was in the nature of a defense to the charges. According to the defendant, the materials she has received in discovery tend to show the weakness of the government's case against her. *See* ECF 22 at 3 n.1 ("The discovery is replete with acknowledgements by the Contracting Officers and Contracting Officers' Representatives that the Government was aware that McComber was *working* off-site.") (emphasis in original). But, defendant expresses concern that if she tries to highlight this discrepancy by, for example, showing that "she did work on the contract, she runs the risk that her efforts will result in the logical expectation that McComber account for all of her time." ECF 22 at 3-4. And, such a challenge would likely prove insurmountable, in defendant's view. This is because the relevant time frame occurred some three to four years ago. *Id.* at 4. And, defendant points out that there was no

requirement in the Contract that defendant "keep track of what she was doing as she worked on Ironbridge." *Id.* at 4. At oral argument, she reiterated that she was not required to keep a log of her work. For this reason, defendant asserts that the Indictment effectively "shifts the burden of production and persuasion onto the Defendant." *Id.* at 3.

I am not so convinced. As an initial matter, to secure a conviction under 18 U.S.C. § 287, the government must show: "[T]he defendant knowingly made or presented a claim to any federal agency and . . . the defendant knew that such claim was false, fictitious, or fraudulent." *United States v. Whyte*, 918 F.3d 339, 350 n.12 (4th Cir. 2019) (citing *United States v. Ewing*, 957 F.2d 115, 119 (4th Cir. 1992)). The Fourth Circuit has read this statute to require that the claim must have been false as to a material fact. *See United States v. Snider*, 502 F.2d 645, 652 n.12 (4th Cir. 1974); *see also United States v. Chance*, AW-10-0760, 2011 WL 5548966, at *1 n.2 (D. Md. Nov. 10, 2011). And, in my view, the Indictment plainly alleges each of these elements in sufficient detail to put defendant on notice of the charges against her.

Specifically, the Indictment describes the relevant period of time in which defendant allegedly caused InfoTeK to submit fraudulent invoices to the Agency, ECF 1 ¶ 9; the mechanism by which defendant submitted allegedly false billings to InfoTeK and, through it, to the Agency, *id.* ¶¶ 6-7; the number of hours per month defendant billed to the Contract during this time frame, *id.*; the Contract's requirement that all work on the Contract must be completed at an NSA facility, unless written authorization is provided to do otherwise, *id.* ¶ 4; the defendant failed to obtain such authorization, *id.* ¶ 5; the number of days in which defendant did not access the Agency's facilities but billed time to the Contract, *id.* ¶ 12; and specific instances in which defendant billed time to the Contract on days that defendant was, allegedly, otherwise occupied, *id.* ¶ 14. In sum, the Indictment provides defendant with ample notice of its core allegation: defendant knowingly and

repeatedly recorded false billing information, thereby causing InfoTeK to submit nineteen fraudulent invoices to the Agency.

Defendant's concerns seem premised upon a misreading of the Indictment.  The government's position is not that every hour billed to the Agency was "theft," ECF 20-1 at 2, but that the monthly total of defendant's hours charged to the NSA, as provided in each InfoTeK invoice, was materially inaccurate. *See* ECF 1, ⁋ 16 (charging that defendant "did knowingly cause to be submitted materially false, fictitious and fraudulent claims upon and against the NSA . . . for services that were not in fact performed by McComber in connection with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices . . . ."); ECF 21 at 12 (explaining that the material facts at issue in each Count of the Indictment, for Counts One through Nineteen, is the "number of hours actually worked by Ms. McComber on behalf of the IRONBRIDGE contract in a given month").

The Indictment does not shift the burden of production or the burden of persuasion onto defendant, functionally or otherwise.  To the contrary, it specifically alleges identifiable issues with defendant's billing that caused the government to believe the billings McComber submitted to the Agency were inflated and thus fraudulent. *See* ECF 1, ⁋⁋ 12-14.

In any event, the government's discovery production provided the defendant with ample material to determine the specific dates of defendant's billing that the government believes are at issue.  ECF 21 at 9.  Beyond the summaries and transcripts of the government's witness interviews and investigative reports that have been made available to defendant, the government has also offered defendant "an extensive spreadsheet prepared by the government's principal investigator" that tracks "the defendant's day-to-day presence within access control at NSA, as well as other

17

known activities" that defendant undertook as the Contract's program manager, "unrelated to her work." *Id.*; *see generally* ECF 21-4.  Thus, I conclude that defendant's first request is unwarranted.

Likewise, there is no merit to defendant's seven remaining requests for particulars. Characterized broadly, they ask the government to state whether it believes that defendant failed to perform under the terms of the Contract and related task orders and, if so, to particularize the basis for the belief.  *See* ECF 20, ¶¶ 2-8.  These requests are not consistent with a request for a bill of particulars.

The Indictment alleges that defendant caused InfoTeK to submit artificially inflated invoices to the Agency, knowing that these invoices did not accurately reflect the number of hours that defendant worked on the Contract.  *See* ECF 1, ¶ 16.  Determining whether the defendant adequately performed would not disprove the allegation that she overcharged the federal government in the process of doing so.   And, even if these requests were on point, the government's answers to these questions are available in the discovery materials already provided to defendant.  *See* ECF 21 at 12.

Accordingly, I conclude the Motion lacks merit.  *See United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (holding that an indictment need not go further than setting forth the elements of the offense charged and need not allege "in detail the factual proof that will be relied upon to support the charges.") (citing *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir.1978), *cert. denied*, 439 U.S. 1069 (1979)); *United States v. Johnson*, 504 F.2d 622, 628 (7th Cir. 1974) ("A defendant is not entitled to recovery evidentiary matters by filing a motion for a bill of particulars."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which

it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories.").

### III.    Conclusion

For the reasons set forth above, I shall deny defendant's Motion.   An Order follows, consistent with this Memorandum Opinion.


Date: December 3, 2021                                      _____/s/_____
                                                                            Ellen L. Hollander
                                                                            United States District Judge