UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIM. NO. ELH-21-036 |
| JACKY LYNN McCOMBER, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

**MEMORANDOM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE INDICTMENT COUNTS 1-19
ON THE BASIS THAT THE ACTS ALLEGED ARE NOT CRIMES**

Introduction

On November 16, 2021, the United States of America notified McComber that the United States accepted all of the level-of-effort billed to the United States by InfoTeK and that the United States considered the Ironbridge contract complete. This should be dispositive of Counts 1-19. The Counts should be dismissed.

Specifically, the U.S. National Security Agency (NSA), Maryland Procurement Office, Contract Closeout Team – acting as agents of the Government on behalf of the Government – accepted McComber's level-of-effort from March 1, 2016 to September 30, 2017. As it pertains to the Indictment, McComber billed her level-of-effort hours on invoices over 19 months represented in Counts 1-19.[1] As this Memorandum explains, the United States accepted the level-of-effort hours prior to making payment on each of the invoices at a time prior to the Indictment. But now, after McComber's indictment and aware of McComber's indictment, NSA (the contract

---

[1] The email from the Contract Closeout Team is submitted as Motion Exhibit 1. McComber received the email on November 16, 2021. McComber advised defense counsel about the email on January 18, 2021. Counsel and a contract expert reviewed the email. The Motion to Dismiss, the Exhibits, and a supporting Memorandum of Law were prepared as timely as possible.

1

customer) has again reviewed McComber's level-of-effort. NSA has again accepted McComber's level-of-effort. NSA has again approved payment to McComber for the invoices relevant to Counts 1-19.

An *actus reus* cannot be at once lawful and criminal.

## Factual Background

This case is a 20-count federal indictment. Nineteen counts allege a violation of 18 USC § 287 (submission of false claims for hours billed on invoices presented each month to the Government for a 19-month period from April 4, 2016 to October 9, 2017). Count 20 alleges a violation of 18 USC § 1001(a)(2) (false statement).

The contract at issue in this Indictment began when the NSA issued a Request for Proposal (RFP) through its contracting organization, the Maryland Procurement Office (MPO), for the purpose of awarding a contract for services.[2] The RFP required a "Senior Program Manager" to supervise the work in support of the National Security Operations Center (NSOC). The Senior Program Manager's performance responsibilities were delineated in a Statement of Work (SOW) made part of the contract.

After accepting proposals from competitive bidders, the MPO awarded a type of government contract called firm-fixed-price. "A firm-fixed-price contract provides for a price that is not subject to any adjustment…." 48 CFR § 16.202-1. The contract number was H98230-11-C-1496; the contract title was "Ironbridge." The form of the government contract was a level-of-effort contract. "A firm-fixed-price, level-of-effort term contract is suitable for …research and development…" 48 CFR § 16.207-2. The law limits the use of such contracts. "This contract type [FFP-LOE] may be used only when - . . . (c) There is reasonable assurance that the intended result

---

[2] The parties have this document. The process is relevant; the document is irrelevant.

2

cannot be achieved by expending less than the stipulated effort…" 48 CFR § 16.207.3.

In a level-of-effort contract, the private contractor is *required* to deliver a specific level of best effort measured in hours per labor category. There is no requirement in the contract that a product be delivered.[3] "A firm-fixed-price, level-of-effort term contract requires – (a) The contractor to provide a specified level-of-effort, over a stated period of time, on work that can be stated only in general terms; and (b) The Government to pay the contractor a fixed dollar amount." 48 CFR § 16-207.1.

Ironbridge was awarded to InfoTeK, an Economically Disadvantaged Woman Owned Small Business (EDWOSB) on July 1, 2011.[4] For the time period relevant to Counts 1-19, McComber performed the required level-of-effort work on the Ironbridge contract as the Senior Program Manager pursuant to the terms and conditions of the contract.

The "deliverable" in a firm-fixed-price level-of-effort contract is the number of man-hours of effort required by § B of the contract. Put another way, as the Senior Program Manager on Ironbridge during the Indictment period, *if* McComber did not work the specific number of hours over the specified term for Senior Program Manager services, *then* McComber (or more correctly InfoTeK) would be in breach of the terms and conditions of the Government's Ironbridge contract.

As part of the Government's obligation under the Ironbridge contract, the Government was required to provide a desk for the Senior Program Manager.[5] Even if the work was not permitted

---

[3] This type of contract may be used to develop a unique product such as new software. Often, the parties are uncertain that the product can be engineered and manufactured.

[4] The Small Business Act, 15 U.S.C. § 637, created the Women-Owned Small Business (WOSB) Program. An economically disadvantaged women-owned small business (EDWOSB) concern is a sub-category of WOSB. 48 CFR § 19.1500.

[5] Whether the Government actually provided workspace/desk for the Senior Program Manager is a subject of disagreement between the parties. However, that issue is only tangentially related to the topic of this Motion and Memorandum of Law.

3

offsite, the Government constructively accepted the work pursuant to the express terms of the contract. Specifically, as stated in § E2 of the contract, "constructive acceptance" of all of the work is deemed to have occurred on the seventh calendar day after performance absent objection by the Government.

> Due to the nature of services being performed, inspection requirements, acceptance terms, resources available for acceptance, or other factors relevant to this contract, acceptance of services required herein shall be deemed to have occurred constructively on the 7th calendar day after performance for the purpose of determining the payment due date and computing Government interest payments pursuant to the Prompt Payment clause at 52.232-25.

Ironbridge, § E.2.

The contract did not require the Senior Program Manager to keep a log of the specific best level-of-effort tasks as the work was performed. The contract did require that Invoices for the hours expended by each labor category be submitted. Ironbridge, § G.8.

Multiple, interwoven, reviews of McComber occurred during the contract period. The first level of review is a review of the contractor's performance in real time.

It is the policy of the United States that Agencies[6] ensure that contracts include inspection and other quality requirements, that the Government contract quality assurance is conducted before acceptance and that nonconforming services be rejected. 48 CFR § 46.102 The contract administration office is required to perform all actions necessary to verify that the contractor's services conform to quality control requirements. 48 CFR § 46.104. The Government is required to reject any non-conforming services; the Government accepted all services. Therefore, no services were non-conforming.

The work of assuring quality control falls to persons known as a Contracting Officer (CO)

---

[6] "Agency of the United States" is defined at 41 U.S.C. § 6501.

and a Contracting Officer Representative (COR). The Department of Defense COR Handbook,[7] "addresses key aspects of contract quality surveillance and the roles and responsibilities of the Contracting Officer, the COR and the requiring activity/COR management." *Id.*, Foreword. "The Contracting Officer is responsible for monitoring invoice payments according to the terms and conditions of the contract and local policy/guidance." *Id.*, at 66. "CORs must monitor contractor performance through review of monthly reports, onsite visits, and surveillance reviews." *Id.*, at 66.

Basically the COR must affirmatively conduct adequate surveillance of the contractor's level-of-effort to satisfy the COR that the contractor has performed the level-of-effort labor hours being billed in the invoice. "Approval of a voucher or invoice implies that, to the best of the COR's knowledge, the nature, type, and quality of effort or materials being expended are in accord with the progress of work under the contract." *Id.*, at 67.

A second level of review occurs upon invoice. During the period of the Ironbridge contract, the Government changed the approval process for invoices. At all times relevant to the Indictment period (April 4, 2016 to October 9, 2017), InfoTeK uploaded the invoice to the MPO. The MPO sent the InfoTeK invoice it received to the Defense Contract Audit Agency (DCAA), which operates under the authority and control of the Undersecretary of Defense. After completing its audit, the DCAA sends an approval to the MPO. MPO then sends a copy of the invoice to the COR and CO for review and approval. After completion of the COR and CO review and approval, the MPO sends the invoice to the NSA Accounts Payable (AP) for review, approval, and payment.

> The Contracting Officer's Representative (COR) is required to review and approve invoices as part of the payment process. When invoicing electronically, the COR will automatically receive notification of a pending invoice.
>
> Ironbridge, § G.8.g.

---

[7] Director, Defense Procurement and Acquisition Policy OUSD (AT&L).

As you would expect, the Government's Ironbridge contract required the contractor to submit invoices. While the contract did not require the contractor to invoice on a monthly basis, the standard in the industry is monthly billing and InfoTeK invoiced on a monthly basis. *See* Ironbridge § G.8.

Besides the Statement of Work, the contractor is required to produce monthly status reports, among other deliverable documents, and each month a Senior Program Manager must prepare for a Program Management Review (PMR). This review may be accomplished by email or a telephone call between the Senior Program Manager and the COR. NSA conducted only one in-person PMR on the Ironbridge contract. This occurred on July 27, 2017. NSA concluded that InfoTeK met all contractual obligations in every category, including billing and program manager support.[8]

Only the Government could modify the Ironbridge contract. Over the period of the Ironbridge contract, the contract was modified 53 times. For each modification, the Government reaffirmed a specific level-of-effort it required the Senior Program Manager to deliver. In discussions with the Assistant United States Attorneys, the Government takes the position that there was insufficient work for the level-of-effort required under the Ironbridge contract for the Senior Program Manager. This completely misses the point for three reasons: (1) the level-of-effort was determined and required by the NSA; (2) the COR was required to assess performance in real time by myriad tools as the level-of-effort was expended; and (3) the NSA repeatedly re-assessed and re-required the level-of-effort as the Ironbridge contract was modified. In fact, over the life of the contract the level of effort required for the Senior Program Manager labor category

---

[8] InfoTeK was awarded new NSA contracts even after the NSA OIG began its investigation of McComber. This further implies complete satisfaction with the level-of-effort performed by the Senior Program Manager during the time period of the indictment.

6

increased substantially.

McComber was indicted on February 25, 2021. Presently, the Defendant and her counsel do not have access to the information presented to the Grand Jury. Presumably, the Government presented a witness to offer some "evidence" that McComber deceived the CO and COR while performing the level-of-effort, and then deceived the DCAA, COR, CO, and AP when invoicing the level-of-effort.

During the period of the indictment, every Government agent at NSA admitted that the work of the Senior Program Manager was completed to the complete satisfaction of the customer, NSA/NSOC. It remains to be seen whether the Grand Jury presentation was as nuanced as the Government theory of the case: (a) McComber did little or no level-of-effort over nineteen months; (b) While doing little or no level-of-effort, McComber avoided being detected doing nothing by the COR and the CO; (c) McComber accomplished all of the Statement of Work of the Senior Program Manager in spite of little or no level-of-effort; (d) McComber invoiced fictitious level-of-effort hours but the fiction was not discovered by audit of the DCAA, review by the COR, review by CO, and review by the NSA AP; (e) The Government repeatedly modified and extended the FFP-LOE contract; and (f) Before each modification, the MPO reviewed past performance and reaffirmed a level-of-effort for a Senior Program Manager. Next, the unthinkable happened.

On November 16, 2021, Mr. Garrett D. Bosshardt, a member of the MPO Contract Closeout Team sent an email to McComber. The email is appended as Motion Exhibit 1. The email proves that the United States has *again* accepted the work of InfoTeK under the terms of the contract. "Our records indicate that the subject contract is complete and no further supplies or services are due under the terms of the contract; therefore the Government considers it complete." *Id.* The email also proves that the United States is willing to close out the Ironbridge contract

having paid nearly the full amount of FFP-LOE 16M (million) dollar contract (less a negligible and unexplained $2,276.70.). If the contract is in dispute for any reason – such as overpayment of $388,878.69 – the contract does not go to close out. Since it has, there is no dispute.

Finding the contract complete means that the customer, the United States NSA, accepts every level-of-effort hour of work by McComber invoiced in Counts 1-19. The amount of money the United States expended for Ironbridge (less $2,276.70) is not in dispute. This includes every dollar the United States alleges McComber obtained by false claim.

Argument

The Indictment charges that McComber "did knowingly cause to be submitted materially false, fictitious and fraudulent claims upon and against the NSA, an agency of the United States, *for services that were not in fact performed by MCCOMBER* in connection with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices…" Indictment at p. 7 (emphasis added). The objective of Congress in enacting 18 U.S.C. § 287 was to ensure the integrity of claims and vouchers submitted to the government. To prove a violation of § 287, the Government must prove beyond a reasonable doubt that, *inter alia*, the claims (or invoices) were false, fictitious or fraudulent as to a material fact. The material fact at issue in the indictment is the level-of-effort expended by McComber.

While the Grand Jury and the Office of the United States Attorney for the District of Maryland are of the opinion that McComber did not expend the invoiced level-of-effort, all other agents of the United States disagree. The NSA, by its agents – COs, CORs, DCAA, AP and the MPO Contract Closeout Team – officially accept the level-of-effort was performed as required by the Ironbridge contract.

We have long known that the United States accepted the level-of-effort before the NSA

OIG investigation and subsequent Indictment. Still the steps of acceptance are worth a brief review. Before the NSA OIG investigation and indictment, the Government accepted the level-of-effort by McComber under the terms of the contract by four independent agents of the United States. First, the COR *constructively* accepted the work under the express terms of the Ironbridge contract when the COR did not object within seven days of the work being performed. Then, the COR *actually* accepted the work under the express terms of the Ironbridge contract when the COR monitored the contractor performance through review of monthly reports, onsite visits, and surveillance reviews. Next, the Contracting Officer (CO) accepted the level-of-effort by McComber under the terms of the contract when the CO conducted the Program Management Reviews (as the CO deemed appropriate). At the time of invoice each month, the DCAA audited the invoice before accepting the level-of-effort by McComber under the terms of the contract for each of the invoices. Upon approval of the DCAA, the MPO then referred the invoice to the COR and CO for a review of the invoice against the real time surveillance of the Senior Program Manager, review of the Senior Program Manager's level-of-effort Statement of Work, and the CO's PMR. The final pre-payment review is then conducted by NSA's AP.

In theory, the post-indictment review and acceptance of the level-of-effort might have been because NSA contract personnel were unaware of McComber's indictment. No. NSA contract personnel *were aware* of the Indictment. Following the return of the Indictment, the Office of the United States Attorney for the District of Maryland issued an extensive press release. Then, on March 30, 2021, the Senior Acquisition Executive for NSA suspended McComber from future contracting with any "agency that is part of the executive branch of the United States Government." The Senior Acquisition Executive wrote that the decision was based upon the Indictment and the press release. Moreover, McComber's company, InfoTeK, was suspended from performing any

9

government contract and is facing debarment.

After the OIG investigation, and after the Indictment, and after the Senior Acquisition Executive received the Indictment and the U.S. Attorney's press release, the NSA MPO Contract Closeout Team began a final review of the Ironbridge contract, H98230-11-C-1496. The NSA MPO Contract Closeout Team wrote: "Our records indicate that the subject contract is complete and no further supplies or services are due under the terms of the contract; therefore the Government considers it complete." Motion Ex. 1.

This is important; the words are terms of art. "[A] contract is considered to be physically completed when … [t]he contractor has performed all services and the Government has accepted these services." 48 CFR § 4.804-4(a)(1)(ii). "Acceptance constitutes acknowledgment that the supplies or services conform with applicable contract quality and quantity requirements . . . . Supplies or services shall ordinarily not be accepted before completion of Government contract quality assurance actions…" 48 CFR § 46.501. That review, in pertinent part, established the award of the (original) contract (and modifications) and finalized payment from July 1, 2011 to March 31, 2018. Acceptance by the agency, NSA, is binding on the Government. 48 CFR § 46.501.

Motion Exhibit 2 is the affidavit of Mr. Charles Stein. Mr. Stein is a subject matter expert at government contracting, spent his career at NSA, and worked at NSA during the entire indictment period. Mr. Stein has reviewed this pleading, the relevant documents (such as the Ironbridge contract) referred to in this pleading and affirms that the level-of-effort was accepted by the Government before the Indictment and has been accepted by the Government since the Indictment. Quite obviously, McComber's level-of-effort surveilled, reviewed, and approved by all of the Government's NSA agents before and after an indictment cannot be the same level-of-effort that establishes the crime of false claim.

### The Requested Relief by the Court

McComber, by counsel, respectfully requests this Honorable Court to order the NSA MPO Contract Closeout Team to deliver a copy of the Contract File in H98230-11-C-1496 to the Office of the United States Attorney for review of the file by the prosecutors in this case for exculpatory evidence, including, any evidence of acceptance of level-of-effort or evidence that the Government regards the Ironbridge contract as complete as awarded. McComber, by counsel, respectfully requests that the assigned Assistant United States Attorneys, who have been completely professional in the prosecution of this matter, provide the relevant names of the persons involved in the Contract Closeout Team to defense counsel. *See, Monroe v. Angelone*, 323 F.2d 286, 300-01 (4th Cir.2003) (information regarding identity of witnesses with exculpatory information was *Brady* material).

Moreover, McComber also requests that the Court hold a hearing on the motion. McComber requests that at such hearing, and after the Court considers the arguments of the Defendant and the Government, that the Court dismiss Cts 1-19 for the reason that that charged behavior in this case was not criminal behavior.

Respectfully submitted,

/s/

Clarke F. Ahlers, Esq.
Bar ID No.: 08577
Clarke F. Ahlers, P.C.
Atholton Square
10450 Shaker Drive, Suite 111
Columbia, Maryland 21046
cahlers@aol.com
410-740-1444

Attorney for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 25, 2022 I caused a copy of this Motion to Dismiss to be electronically served upon the Office of the United States Attorney for the District of Maryland.

/s/
_____
Clarke F. Ahlers, Esq.