# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

UNITED STATES OF AMERICA )
                             )
        v.                   )     Crim. No. ELH-21-036
                             )
JACKY LYNN MCCOMBER,  )
  formerly known as         )
  Jacky Lynn Kimmel,     )
                             )
     *Defendant.*        )
_____ )

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT MCCOMBER'S MOTION FOR PRODUCTION OF PURPORTED *BRADY* MATERIAL

EREK L. BARRON
UNITED STATES ATTORNEY

Jefferson M. Gray
Joyce M. McDonald
Assistant U.S. Attorneys

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915

Peter L. Cooch
Special Assistant U.S. Attorney

U.S. Attorney's Office
6406 Ivy Lane Ste 800
Greenbelt, MD 20770
(301) 344-4236

*Counsel for the United States*

Date: July 5, 2022

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS:  THE ACTUAL COURSE OF THE PARTIES'
DEALINGS OVER DISCOVERY IN THIS CASE ......................................... 10

    A.    The Government's Discovery Productions ............................. 11

    B.    The Defense's Discovery Requests ....................................... 17

ARGUMENT ........................................................................................... 26

I.    THE ACTUAL SCOPE OF THE GOVERNMENT'S
    OBLIGATIONS UNDER FED. R. EVID. 16(a)(1)(E)
    AND *BRADY v. MARYLAND* AND ITS PROGENY........................... 26

    A.    The Government's Discovery Obligations Under
        Rule 16(a)(1)(E), and the Defense's Failure to Make
        the Required Showing That the Government Has
        Withheld Material Evidence ................................................... 27

    B.    The Government's Disclosure Obligations Under
        *Brady v. Maryland,* and the Defense's Failure to
        Demonstrate That the Government Has Withheld
        Exculpatory Evidence That Meets the Required
        Standard of Materiality .......................................................... 30

II.    SEVERAL OTHER MATTERS THAT DEFENSE COUNSEL
    RAISES IN ITS MOTION BY WAY OF COMPLAINING ABOUT
    THE DISCOVERY PROCESS ARE WHOLLY MERITLESS ............................ 46

CONCLUSION ......................................................................................... 58

The United States of America, by its undersigned counsel, submits this memorandum in opposition to defendant Jacky McComber's motion for production of purported *Brady*[1] material.

## **INTRODUCTION**

Defendant's May 31st motion for production of *Brady* material (ECF # 100) is the latest in an unfortunate series of misconceived and ill-considered filings by the defense that have chewed up enormous amounts of time, distracted both the parties and this Court, and have prevented all concerned from moving this case forward to trial and a final resolution.  That list consists of:

- the defense's motion for a bill of particulars (ECF # 20), which this Court denied in December after finding that "Defendant's concerns seem premised upon a misreading of the Indictment," *United States v, McComber*, 2021 WL 5760731, at *9 (D. Md. Dec. 3, 2021);

- the defense's motion to dismiss the indictment's False Claims Act counts (#s 1-19) (ECF #s 35/37 ), which – after the Court advised him back in early May that "I just don't think you have a very good argument there, Mr. Ahlers.  Good luck with that one"– defense counsel just yesterday informed the Court he has decided to withdraw (ECF # 116);

- the defense's designation in early February of T.J. Crews as either a lay or expert witness concerning the Unanet timekeeping software used by defendant's company InfoTeK (ITK), which defense counsel subsequently abandoned after the government filed a motion (ECF # 70), demonstrating that Crews himself had disavowed any knowledge or expertise with regard to the Unanet system in a civil deposition only three months earlier;

- the defense's accusation that the government had committed a *Brady* violation by failing to disclose the purported Cherril Guinter letter of October 2012 in discovery (ECF # 60), which – as this Court subsequently pointed out – overlooked the fact that "this document is in your client's possession and always should have been if it was legitimate.  So the defense had just as much access to

---

[1]   *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

this document as the government." (5/9/22 Status Conference Trans, at 9);

- and finally the defense's opposition to the government's request to be allowed to inspect and make a record of where in the ITK corporate files the purported Guinther letter had belatedly been discovered, which the Court initially accepted, but then reconsidered six weeks later after learning that defense counsel had substantially misrepresented the nature of the government's requests. ECF # 85. (Defense counsel did previously decide to make the ITK copy of the purported Guinther letter available to the government for inspection and tests.)

The defendant's current motion is characterized by many of the same flaws that its predecessors displayed, and it lacks merit for the following four reasons. First, it seriously misrepresents the course of the parties' dealings in pre-trial discovery, both with respect to what the government has done and produced, and with respect to *what* the defense has requested and *when* they requested it. See discussion at pages 11-25 below.

Second, as we previously saw in connection with the discovery of the purported Guinther letter, defense counsel's *Brady* demand reflects an inadequate understanding of the *Brady* doctrine, both in terms of what is considered "exculpatory" and with regard to the nature and extent of the government's duty to search for *Brady* material. Although defense counsel tries to pretend otherwise, the central core of *Brady* is preventing the suppression by prosecutors of favorable evidence that is known to them or to their law enforcement partners, but not to the defendant and his or her counsel. Here, in contrast, the defendant is thoroughly familiar with the government contracting world in which this case arises. She understands the documents, the paper flow, the terms of the contract, the mechanics of billing, the institutional setting, and not only the identities of the key witnesses, but furthermore enjoyed longstanding personal

2

relationships with many of them.  Beyond that:  no one knows better than the defendant herself what she was doing during the 2,342.5 hours that she billed to the Ironbridge contract when she was not on the NSA campus.  She knows where she was, who she was with, and what written or electronic or financial or digital records would reflect her presence and activities.  Under circumstances like these, the opportunity for the prosecution to suppress material exculpatory information that is wholly unknown to the defendant is more limited than it is in many other contexts.

Third, most of the records defense counsel has demanded that the government produce in his letters of April 6th, April 27th, May 5th, and June 12th of this year (see Exhibits 2, 3, and 4 attached to defendant's Motion to Compel, ECF 100-3, 100-4, and 100-5, as well as **Exhibit 14**) do not in fact seek evidence that is either "material" under FED. R. CRIM. P. 16(a)(1)(E) or exculpatory under *Brady*.  The reason for this is that defense counsel's recent flurry of discovery demands are grounded upon the undoubtedly sincere but misguided advice and opinions of his expert Mr. Charles Stein. Mr. Stein's influence, views, and opinions first became apparent in the arguments defense counsel presented to the Court at the motions hearing on the bill of particulars on December 1, 2021 (ECF # 30).  The defense's subsequent motion to dismiss Counts 1-19 (ECF #s 35/37, filed January 25th) was entirely based on the legal views of Mr. Stein – who, aside from not being a judge, is not even a lawyer – which were set forth in an affidavit of his that defense counsel attached in support of that motion (ECF # 35-1). Indeed, defense counsel's confidence in and reliance upon Mr. Stein's guidance in connection with that motion was so great that he made little apparent effort to look for relevant case law supporting his motion's contentions.

3

The defense's current motion to compel production of supposed *Brady* material (ECF # 100) is likewise thoroughly permeated with Mr. Stein's distinctive and at times simply erroneous take on important aspects of federal contracting law and procedure, as well as his complete ignorance of federal criminal law and his inability to adjust his perspective from the civil and administrative contexts in which he spent his entire career. Mr. Stein appears to be approaching this case as an apparently long-desired opportunity to audit the NSA's contracting practices over the nearly seven-year history of the Ironbridge contract and then to point out in his testimony all of the respects in which he believes those departed from what is required under the Federal Acquisitions Regulations (FAR). But the focus of a federal criminal fraud case is centered like a laser on the defendant's knowledge and intent, not on questions of whether the victim might have escaped being cheated if they had been more wary and alert.

Finally, as his own memorandum in support of his motion to compel makes clear – along with his other recent filings, including the letter he sent the Court today (ECF # 136) – defense counsel has become increasingly consumed with an intense and bitter animus towards the prosecutors (and the government's lead counsel in particular) and towards Lori Hazenstab, the original lead investigator from the National Security Agency's Office of the Inspector General (NSA-OIG), who retired in August 2021 after 37 years of law enforcement service. We believe this animus is the result of defense counsel's growing frustration and disappointment when first the November 2021 Garrett Bosshardt email and then purported Cherril Guinther letter of October 2012 did not prove to be game-changers that resulted in either the prosecutors dropping the case or the Court dismissing it. As he clearly demonstrated in the astonishingly intemperate and unprofessional email defense counsel sent to the government's lead counsel on

March 16th **(Exhibit 2(c))**, defense counsel has apparently convinced himself that only gross incompetence or malign intent towards his client could account for the refusal of the prosecutors (who, between Mr. Gray and Ms. McDonald, have nearly 70 combined years of prosecutorial experience) to abandon this prosecution.  In addition, the entirely reasonable requests that government counsel made to defense counsel in an email and two letters between March 4th and March 18th **(Exhibit 2(a) – 2(d))** asking that he make the purported Guinther letter available to investigators and to allow them to see the file or files in which it was found were instead treated by Mr. Ahlers as an attack on his personal integrity and as a threat to destroy his reputation and livelihood.

The Court has since found that the government's actual requests – as opposed to Mr. Ahlers' misrepresentations of their character in a filing on March 24th (ECF # 68) – in fact were entirely reasonable, and that the prosecutors had never impugned Mr. Ahlers's integrity.  5/9/22 Status Conference Transcript ["Trans."]. **(Exhibit 3)** at 9 (saying of the government's request that the defense be required to "produce the adjacent or other documents from the same time period, that seems perfectly reasonable and appropriate"), 31 ("the fact of the matter is you [Mr. Ahlers] need to produce the documents, at least as far as I understand, so that, in the context in which it was found. That seems reasonable.") and further that "the government I didn't think impugned your integrity" (*Id.* at 23).  Despite this, Mr. Ahlers's filings have become exceptionally vituperative and spiteful, demonstrating that his emotions have overwhelmed any measured professional judgment.  In addition, he has increasingly focused on trying to pin the government with the scarlet letter of a *Brady* violation – conduct that is clearly also motivated (at least in part) by a desire to recover ground he believes he lost with the Court when his disclosures and filings that in late February forced the postponement of

the then-scheduled April 4th trial date. *See, e.g.*, Defense Counsel's Email to Government Counsel dated March 16, 2022 **(Exhibit 2(c))**.

Defense counsel first contended that the government had violated *Brady* by not producing the purported Guinther letter in a filing on February 28th, although he then attributed this to the government's lead investigator rather than the prosecutors.  ECF # 60 at 4.  In the course of this filing, however, defense counsel – based upon the assumption that the purported Guinther letter was genuine[2] – accused the NSA's lead investigator of providing false information to a witness; accused Contracting Officer Guinther herself of "false statements" and of having "obviously inaccurate and faulty memories," and three other NSA witnesses for likewise having "faulty memory";[3] stated that the Guinther letter "makes a farce of Government witnesses' testimony to the Inspector General's investigator"; and contended that it "virtually guarantees that the Grand Jury was misled and indicted McComber under a misunderstanding of the facts

---

[2]    Given that Ms. Cherril Guinther, the supposed author of the document, has identified it as a fake; that the letter's purported recipient, ITK Chief Contracts Officer Craig Plunkett, has emphatically stated that he ever received or saw the letter and has further advised the Government that he found no such document in a search of ITK's Ironbridge contract files back in September 2017 when this investigation first commenced; and that the belatedly produced Guinther letter has many anomalies when compared with other NSA correspondence, see ECF # 72 at 6-10, the authenticity of that document is now under a substantial cloud of doubt, at the very least.

[3]    Defense counsel's attack on the memory of the NSA witnesses is rather rich given that the defendant *herself* denied in her sworn interview with the NSA investigators in October 2017 that she or ITK ever received written authorization to work off-site.  See 10/3/17 J. Kimmel Testimony at 17:15–21 (Kimmel: "Like, we talked about having a desk for the PM, and the answer was, "Well, we don't have one," so "you just gotta Hotdesk, and then work from your corporate, and just come in and out.  I mean that was just the answer given. *We weren't given a waiver . . .*") (emphasis added) **(Exhibit 4)**. ITK's chief Contracts Officer Craig Plunkett likewise agreed in his testimony that no written authorization for ITK's program manager to work off-site was ever given by the NSA.  3/8/18 C. Plunkett Testimony at 19-20 **(Exhibit 4)**.

and law." ECF # 60 at page 4, 12, 13. Yet as this Court subsequently noted during the parties' conference call on May 9th, "I understand the government's offense at the *Brady* claim because this document is in your client's possession and always should have been if it was legitimate. So the defense had just as much access to this document as the government." The court further pointed out that "the government . . . cannot locate such a document and has serious concerns as to its authenticity." 5/9/2022 Hearing Trans. at 11 **(Exhibit 3)**.

After the government filed its surreply to the defendant's motion to dismiss Counts 1-19 (ECF # 72), which contained our first substantial response to the purported Guinther letter and outlined the issues we had identified with it by that point, defense counsel filed a "Rebuttal" on April 15th (ECF # 79). There, he asserted that the prosecutors "feigned surprise," engaged in "misdirection," "know this is inaccurate" (these examples all come from page 3); "changed their tactic" and "implied misconduct" (4); "This isn't a mystery, and at least Gray – Ahlers' prior *interrogator*[4] – knows it" (4; emphasis added); "took Ahlers' answers, put them in a different and confusing context, and feigned suspicion to the Court in multiple pleadings" (4); "And, the false representations continue" (11); "The prosecutors are – if nothing else – shameless" (13);

---

[4]    In light of defense counsel's subsequent vociferous complaints in his March 24th filing (ECF # 68) that the government was attempting to "interrogate" him at that time, the Court may be surprised to learn that counsel in fact had a straightforward and businesslike conversation three weeks earlier on March 1st – which we believe was actually initiated by defense counsel, who thought we had gotten some things wrong in a letter (ECF # 61) we sent the Court the day before – about the circumstances under which the purported Guinther letter belatedly came to his attention. Government counsel's notes based on that call are attached as **Exhibit 5**; defense counsel has also subsequently addressed the circumstances of the purported Guinther letter's discovery in his Rebuttal Memorandum supporting his motion to dismiss (ECF # 60) at 2 and during the conference call with the Court on May 9th (**Exhibit 3**, pages 22-23).

"the prosecutors showed themselves to be more interested in advocacy than forensic accuracy or logic" (14); "if the FBI's analyst was tainted with the misinformation in the Surreply . . . it is the prosecutors – not McComber and not her lawyer – who are perpetuating a fraud or obstruction of justice" (15); "like many average poker players, the prosecutors' forensic assessment of the October 10, 2012 letter ignores their 'tell'"[5] (15); "It is impossible that the prosecutors – *who spent pages describing imaginary 'flagpoles'* – missed this."[6] (16; emphasis added); "this is a back-door effort to separate defense counsel from the accused" (18); "The prosecutors begin the argument about discovery by *again* misleading the Court," (18; emphasis in the original); "the prosecutors make a habit of attacking the integrity of defense counsel" (26); there are repeated references to "the prosecutors' wordplay" (26, 27); "At some point, the intentional obfuscation of the simplest matters is not in line with the requirements of practice before the United States District Court in the District of Maryland" (28);[7] "The

---

[5]    The juvenile character of this jab speaks volumes about defense counsel's state of mind and personal animus by this point in mid-April.

[6]    This statement demonstrates defense counsel's increasing penchant as this matter has proceeded for gross exaggeration and wild accusations that reflect an utter lack of concern with being soberly factual.  The government's surreply (ECF # 72) actually includes only two mild sentences and a fragment of another (totaling, in all 54 words) that noted the strange appearance of the Department of Defense seal on the purported Guinther letter's fax cover sheet:  "In addition, the seal at the top of the questioned fax cover sheet oddly appears to have what looks like a flagpole attached to its left side.  It appears this seal may likewise have been cut-and-pasted from another document." *Id.* at 9; see also *id.* at 10 (noting that Ms. Guinther "stated that the double line alongside the Department of Defense seal did not look right . . . .").

[7]    It is ironic that defense counsel presumes to lecture the government about "the requirements of practice before the United States District Court in the District of Maryland," since he appears to be unaware of Local Rule 606, "Civility." That rule provides:  "The Court expects all of its judges and all of its counsel to conduct themselves in a professional and courteous manner in connection with all matters pending before the Court."

prosecutors are relentless in their pursuit of McComber" (31); "it is difficult to imagine how McComber is forced to defend herself against the incessant, strident accusations of criminality when the prosecutors only look at the most relevant evidence in the case *after* indictment, fail to deliver *Brady* material until after the deadline for motions, and then ignore overwhelming evidence of innocence" (32).

The off-the-charts animus towards the prosecution team that defense counsel expressed so clearly in his April 15th filing now appears to have given rise to a consuming desire on his part to find some way of tainting the reputation of the government team's members with a judicial finding that they violated the *Brady* doctrine. We believe this motion is the latest expression of that desire.

In the telephonic status conference held on May 9th, the Court expressed its astonishment about the level of contentiousness that had developed in this case over the previous several months. 5/9/22 Status Conf. Trans. at 2 (**Exhibit 3**). But there is no great mystery about why this case has run so badly off the rails during the past five months.[8] Fundamentally, the train wreck we have witnessed here is the result of defense counsel's too-ready acceptance of the often misguided or improper opinions and conclusions advanced by his expert Mr. Stein, as was first evidenced by his filing the motion to dismiss the False Claims Act charges in late January – a motion he has now

---

[8]    We submit that this mystery can be readily resolved by reading, in its proper chronological sequence, the government's initial March 4th email to Mr. Ahlers about the purported Guinther letter; the government's March 16th follow-up letter; defense counsel's responding email to government counsel on the evening of March 16th; the government's response to that email on March 18th; and then finally, defense counsel's filing with the Court on March 24th. These documents are attached as **Exhibits 2(a), 2(b), 2(c), 2(d),** and **2(e).**

decided to withdraw.  Next, there was defense counsel's evident surprise and

increasingly angry frustration when developments he expected to be dramatic game-

changers – such as the motion to dismiss  based upon the November 2021 Garrett

Bosshardt email or the purported Guinther letter – instead produced reactions that were

the opposite of what he anticipated.  Finally, there was defense counsel's wild over-

reaction to the government's entirely reasonable requests (as this Court ultimately

found) for more specific information about the circumstances under which the

purported Guinther letter so belatedly came to light.  These three circumstances have

combined into a poisonous witches' brew that has produced defense counsel's

increasingly intemperate and baseless denunciations of the members of the government

team, of which the defense's current motion to compel production of *Brady* material is

simply the latest expression.

### STATEMENT OF FACTS:
### THE ACTUAL COURSE OF THE PARTIES' DEALINGS
### OVER DISCOVERY IN THIS CASE

This is a case about a government contractor whom the government contends

billed the NSA for many, many hours of work that she never actually performed.  The

issue for the jury at trial is straightforward:  did the defendant in fact actually work a

number of hours that approached the 2,603.5 hours that ITK billed for her services as

program manager on the Ironbridge contract in 2016-17 or not?

If the defendant worked those hours, she presumably should be able to readily

establish this through the testimony of witnesses who worked on the contract; through

her email communications; through her personal calendar records; through meeting

notes; and through examples of her own personal work product or supervisory or review

or editing efforts that she can expressly identify, whether those remained in ITK's possession in its corporate files were sent to the NSA.[9]  Obviously, much of this evidence should have been readily available to the defendant from ITK's and her own personal records, or it could have been specifically requested from the government.  In addition, the defense had available ITK's own Ironbridge contract file that was carefully organized and maintained by ITK's Chief Contracts Officer Craig Plunkett, in which he sought to include every document that was material to ITK's obligations and rights under the Ironbridge contract.  **Exhibit 12 (photos of the ITK Ironbridge contract files).**

### A.    The Government's Discovery Productions.

Following the defendant's arraignment and the filing  of the executed discovery agreement with the Court on March 16th (ECF # 10), the government began making available to the defendant the evidence that it considered potentially "material" under FED. R. CRIM. P. 16(a)(1)(E) or the *Brady* doctrine.

To enable the defense to begin identifying any witnesses who potentially had favorable testimony to present, the government's first production of discovery on April 12, 2021 included a total of 39 witness interview reports prepared by the Defense Criminal Investigative Service (DCIS) (USA-014211-014212, USA-014225-014243) or the NSA-OIG (USA-014250-USA014322).  All but a handful of these interview reports were summaries of sworn testimony by these witnesses that was taken under oath by the

---

[9]    The defendant learned of this investigation in late September 2017 at the very end of the time period that has since given rise to the charges in the indictment.  She reasonably could be expected to have taken steps at that time to preserve useful evidence in her company's possession and to identify for the government investigators specific work projects in which she was deeply involved.

NSA-OIG, sometimes in tandem with DCIS representatives. **Exhibit 6 (4/12/2021 First Discovery Letter)**.

Not satisfied with the summaries of these 39 witness interviews, defense counsel soon began pressing to receive the actual recordings and transcripts of the interviews, although under the discovery agreement, Jenks Act material would normally only have been produced a month prior to the then-scheduled trial date, in late February or early March 2022.  In early June 2021, however, government counsel advised the Court in a status conference that given the sheer number and length of these interviews, he was amenable to turning over the full transcripts of all of the witnesses other than the government's case agent at an earlier time.  That time came in mid-August 2021, when the government as part of its second discovery production turned over 35 complete transcripts of investigative witness interviews that were conducted under oath (USA-016572-USA-018289) – a total of **1,717** pages – along with three additional interview reports (USA-016565-USA-016571), thereby bringing the total of witness interview reports and transcripts disclosed by the government up to 43.  **Exhibit 7 (8/19/2021 Second Discovery Letter).**

These 43 interview reports and transcripts reflected information received from ITK employees and contractors (both ones who worked at the Ironbridge site at the National Security Operations Center and at ITK's offices) and from government employees who interacted or worked with the defendant and the other ITK workers on the Ironbridge contract.  The investigators had questioned all of these witnesses concerning what information they had with regard to the hours the defendant had worked or the contributions she had made on the Ironbridge contract.  This discovery –

produced more than half a year in advance of when it was required to be[10] – should have

enabled the defense to identify any witnesses who could attest that the defendant was an

active, visible participant who made substantial contributions to the Ironbridge contract

and who might reasonably have typically worked around 150 hours a month – while still

also taking care of her substantial responsibilities as the Chief Executive Officer and

owner of ITK.  Yet in the motion argument concerning the bill of particulars on

December 1st, defense counsel dismissed the significance of this evidence from

witnesses who had actually observed what the defendant did and did not do in

connection with the work of the Ironbridge contract:

> To say that Mr. Ahlers can read the transcripts – I've read transcripts.
> People say, all I can call it is imprecise things, Your Honor.
>
> For example, she always seemed to be planning something that had
> nothing to do with work.  It was an after-hours party or something.  Okay.
> A witness makes that statement.  That doesn't tell me anything at all
> whether the hours she billed is valid or not except in some amorphous
> way.

12/1/21 Motions Hearing Trans. (**Exhibit 9**) at 28-29.[11]

The witness interview transcripts Mr. Ahlers was so quick to brush aside at the

motions hearing in fact provided little basis for believing the defendant had produced

significant mission-related work product that related to the classified aspects of the

Ironbridge contract.  Consider these selections from the testimony of several of the most

---

[10]    This example of the Government going far beyond its obligations under the
executed Discovery Agreement at defense counsel's request to assist him in his
preparation for trial of course receives no acknowledgement in defense counsel's filing.

[11]    A few minutes later in the hearing, government counsel noted that "Mr. Ahlers even
complained sometimes about the sheer voluminousness of the transcripts and the
interview reports," the former of which the government had produced more than half a
year early *at his repeated request. Id.* at 36.  Sometimes no good deed goes unpunished.

important personnel (and witnesses) who were involved in day-to-day work on the

Ironbridge contract:

**Robert Bryant (NSA), Government Employee and the Chief of the K-3 Section at the National Security Operations Center (NSOC), which was the government customer on the Ironbridge contract:**

- Mr. Bryant stated that "I'm not sure exactly what the PM [Project Manager] is supposed to do," but suggested that "I would think that would probably take halftime at the most . . . because I can't imagine that much care and feeding for 13, 14 contractors [the number on Ironbridge], you know." 10/11/17 NSA Interview Transcript at 14 (**Exhibit 10).**

- "I don't know how much care and feeding Ironbridge takes, but I can't imagine its much, right." *Id.* at 17.

- When asked if McComber did any "mission work" on the Ironbridge contract, Mr. Bryant responded: "No, absolutely not. . . . Like I said, that position I don't think from my perspective was a mission position. It's like every contractor has to have a PM, okay.  And they usually get a certain amount of hours to do the PM work, but it's not a part of getting the mission done." *Id.* at 19-20."

**Jason Clark (NSA), Government employee and later Contracting Officer's Representative on the Ironbridge Contract from 2011-17:**

- Asked when the defendant "shifted all of the day-to-day work to her technical lead, Jason Doyle," he replied, "it was fairly early on in the contract; I'd say probably within, you know, about six months after the contract started as far as the day-to-day . . . if not earlier." J. Clark 6/20/19 NSA Interview Transcript at 21 (ECF # 72, Exhibit 4).

- Asked how he would characterize the defendant's degree of actual technical knowledge relating to the work on the Ironbridge contract, he responded, "*So as far as, you know, technical knowledge of the work that was being performed, I would say probably low,* which is, you know, the reason why, you know, I think that she handed all the day-to-day work to Jason [Doyle] . . ." *Id.* at 25 (emphasis added).

- Asked what contributions the defendant made during her second stint as PM starting in March 2016, he responded, "You know – you know, she was – was doing some degree of – of program management for the contractor side, but Jason [Doyle] was still providing all the technical leadership that was going on at that point, if I recall." *Id.* at 43.

14

- Asked whether "over the last year or so before you left in May 2017, based on your observations, was Jacky Kimmel working full-time on the Ironbridge contract?", he responded, "No." *Id.* at 44.

- Asked whether people on the contract team would have reached out to the defendant or to someone else with regard to "issues that arose in terms of their day-to-day work that they needed help with," he responded, "They would have reached out to Jason Doyle in most cases." *Id.* at 45.

**Jason Doyle (ITK),  Senior Web Developer on the Ironbridge contract (whom both he and other witnesses characterized as the *de facto* Project Manager or PM in defendant McComber's absence):**

- He stated that when defendant McComber took over as the PM in March 2016, "she wasn't there as much" [as her predecessor Raynett Colston had been], so he concluded (with regard to the PM's responsibilities) that "no one else is here to do it, so I'm going to have to be the one to do it[.]"  J. Doyle 4/16/19 NSA Interview Transcript at 16, 19 (ECF # 72, Exhibit 4).

- "I think the employees maybe said, you know, we noticed, you know, Jackie's not here.  There was always some rumblings of, you know, if she's the PM, why isn't she ever here?" *Id.* at 20.

- Asked by an NSA-OIG investigator, "Was the[re] work that you knew of on the high side [i.e., the classified side of the Ironbridge contract] for her [defendant McComber] to be doing?", he responded, "No, not really.  I mean, her -- her role as the PM, there was -- I wouldn't think there's any work, like development work or software or, you know, fixing things or --." *Id.* at 21.

- "I remember that always being the baseline for everyone's comments was, you know, she's supposed to be here 20 hours a week, so I saw her one hour this week, you know, I saw her one hour, you know, 10 in the last month, you know." *Id.* at 32.

- "That was always the – the joke, I guess, was, you know, she's – she can't even be here part time." *Id.*

When the defendant herself was asked in her own interview whether she was involved in

doing "the nuts and bolts" of the work on the Ironbridge contract, she replied, "Do I

program? I don't write code." 10/3/17 NSA Interview Transcript at 13 **(Exhibit 4)**.
And, indeed, Mr. Ahlers himself at the December motions argument brushed any
suggestion that his client had any substantial involvement in the classified work done on
the contract, stating that "The program manager work was not of the, was not of the
nature of classified intelligence information." 12/1/21 Motions Hearing at 30 (**Exhibit
9**).

Documentary records of course can also be a vital tool in trying to establish how
many hours someone had actually worked while serving as the program manager on a
contract like Ironbridge. As a starting point, it would certainly be important to know
how many hours she actually spent in access control at the NSA, where she would at
least potentially be available to meet and consult in person with government personnel
and ITK's own employees and contractors (although, since ITK had a second contract –
Silent Roar – at the NSA, it was also possible that the defendant spent part of her time
in access control working on matters relating to it). The government accordingly
produced the defendant's access control records for the NSA campus in its second
production in mid-August 2021, along with all of the evidence it had at that time
concerning non-Ironbridge activities the defendant had engaged in on particular dates,
such as non-Ironbridge related travel, golf tournaments, and attending happy hours and
other marketing and networking activities.

Classified emails from the defendant's work computer at the NSA likewise might
be potentially important to establishing how much work the defendant actually did on
the Ironbridge contract, so the government had those downloaded and reviewed and
cleared for release to defense counsel, which occurred as part of the second production
in mid-August 2021. However, the total number of pages of these emails (USA-016074-

USA-016246) amounted to only 172.  In the government's view, the relative paucity of such emails sheds significant light on how little work the defendant actually did on the Ironbridge contract, even when she was in access control at the NSA.

### B.    The Defense's Discovery Requests.

In contrast to the government's early and extensive efforts to identify and produce the discovery to which the defense was entitled, the defense's discovery demands during 2021 were usually general, unspecific, and made little attempt to comply either with the limits of Rule 16(a)(1)(E)(i) or to assist the government in identifying non-obvious potential *Brady* material.   On May 28, 2021, for example, the government's lead counsel sent Mr. Ahlers an email in reference to an upcoming conference call with the Court and the approaching deadline for filing pre-trial motions in which he asked, "is there anything else you feel you should have received, or otherwise have questions about?" **Exhibit 11**.

In response, on June 1st, defense counsel requested the "(1) contract and all modifications; (2) whistleblower letter; and (3) grand jury transcripts." *Id.*  Because the government's lead counsel was preoccupied with motions practice and other preparation for a three-to-four week trial then scheduled to begin on July 7th, he referred Mr. Ahlers' request for the contract documents to the NSA-OIG case agent, Lori Hazenstab, and asked her to look into starting to make arrangements to produce them or make them available to defense counsel for his review (which required a clearance from the NSA's Office of General Counsel, and a review with the Contract Office). Government counsel took time off from his trial preparations on the evening of Sunday, June 13th to provide defense counsel with the whistleblower letter, **Exhibit 11**; and he

ultimately arranged for the production of all of the NSA witness interview transcripts in mid-August, as previously noted.  **Exhibit 7 (second government discovery letter).**  At that time, the defense of course already had access to ITK's own set of the Ironbridge contract and its modifications.  **Exhibit 12** (photographs showing ITK's copy of the Ironbridge contract file and its modifications).  And several months later, towards the end of the year, defense counsel advised the government that he was only missing 11 of the 52 contract modifications based upon his access to ITK's own Ironbridge contract file.

Although government counsel's July trial was postponed to October in mid-June, he remained busy with trial preparation and motions practice throughout July, August, and September.  It appears that defense counsel was likewise otherwise engaged, because the government received no further emails (at least) inquiring about discovery from him until Friday, July 16, 2021, when defense counsel abruptly sent the government a letter demanding that the government produce "the 'Government Contract Files' and *all that the files contain* for Ironbridge I" (emphasis added), citing 48 CR 4.802 & 4.803 (**Exhibit 16**), within a period of five days (i.e., by the following Wednesday).  This letter – and the short time demand, after six weeks of what seems to have been complete silence – appears to have been prompted by the looming defense motions deadline of July 30th.  Defense counsel's letter also asserted that "This case is a glorified contract dispute" – an unfounded assertion, but one that defense counsel and Mr. Stein have stubbornly refused to abandon ever since.

The government's lead counsel responded with a letter on July 21st, and also spoke to defense counsel by telephone the same day.  Government counsel's letter pointed out that the defense's abrupt demand for "all that the files contain for

Ironbridge I" was a wholly new one that went far beyond its previous request on June 1st for the contract itself and its modifications.  Government counsel noted as a result of invoking the FAR provisions defense counsel's letter had cited – which, together, ran for some five-and-a-quarter pages of closely-set type **(Exhibit 17)** – the defense's new, far broader demand now extended to 41 separate categories of documents, and even encompassed materials dating back to the original bid solicitation process.  Government counsel further pointed out that the discovery demand in the defense's July 16th letter went far beyond what was authorized by FED. R. CRIM. P. 16(a)(1)(E)(i) – (iii).  He asked that the defense limit its request to documents covered by three sections of the cited provisions of the FAR that appeared to be "the ones that are most clearly material for purposes of this case."  These covered the original of the signed contract; all contract modifications; "[a]ny additional documents on which action was taken or that reflect actions taken by the contracting office pertinent to the contract"; and a "chronological list identifying the awarding and successive contracting officers, with inclusive dates of responsibility."  Government counsel further noted that:

> To the extent there are other specific other items listed in § 4.803(a), (b), or (c) that you consider material, please identify those for us, and we will assess whether it is appropriate for us to make those available to you as well.  Alternatively, we would be willing to look into making arrangements for you to come out to the MPO [Maryland Procurement Office] to examine the materials available there in person, or potentially to have these materials copied by a contractor that you select.

**Exhibit 11.**  Government counsel further clarified that "Agent Hazenstab has advised me that the full contract file is not available electronically.  There are substantial portions of it that exist only in hard copy."

The following day, July 22, 2021, government counsel again wrote to defense counsel to point out that he had thus far not produced a single page of reciprocal

discovery and requested that he proceed without further delay to identify any expert witnesses he intended to use, noting that "your letter of July 16th, as well as your previous presentations to us, suggest that you are in fact contemplating the use of expert witnesses at trial as part of Ms. McComber's defense." **Exhibit 11.**

The government apparently received no further communications from defense counsel for nearly three weeks. Then, on August 11th, Mr. Ahlers sent a further letter asking for the "Contracting office contract file," the "contract administration office contract file," and the "paying office contract file." These were drawn from standard references in the FAR, and likely reflected advice from Mr. Stein; however, the NSA did not in fact maintain a distinct "contract administration office" file. Moreover, since there was no dispute about the invoices that had been submitted by ITK and paid by the NSA, the materiality of further duplicative payment records was not evident (and, indeed, it was subsequently not pursued). Defense counsel also noted at the end of his August 11th letter – perhaps by way of explaining his own failure to make any progress on producing his reciprocal discovery or disclosing his expert witnesses – that "my schedule has been complicated by the Court's re-opening post-Covid which caused an unusual number of state cases to be scheduled at roughly the same time. I think the rush is abating and I look forward to complying with my responsibilities in the McComber case." **Exhibit 11**.

When defense counsel's August 11th letter was received, the government's lead counsel was preparing to produce the Government's second discovery production. That went out on August 23rd and included the 1,717 pages of the NSA investigation witness transcripts, as well as some 500 pages of contract-related documents and 175 pages of emails from the defendant's classified NSA computer. **Exhibit 7.** Government counsel

had further suggested in mid-July that defense counsel might want to come out to the NSA and review the contract materials in person, thinking that this would permit him to determine what if anything he was missing from ITK's own files.  Defense counsel responded that he wanted to have his client with him if he did, but as government counsel explained, the NSA's rules precluded a person whose security clearance had been suspended (which was true of the defendant) from coming onto the premises.  That created at least a short-term impasse.  It appears that soon all three counsel became preoccupied with other matters – the *Liberto* trial that took most of October for the government's lead counsel, followed by a January 11th trial date for the five-to-six week trial of *United States v. FitzGerald*; the final resolution of the investigation of Governor Hogan's former chief of staff Roy McGrath for AUSA McDonald, which resulted in his indictment in late October; and the demands of a busy one-man practice dealing with many long-postponed matters in defense counsel's case.  In addition, Agent Hazenstab had retired in August and a new NSA-OIG agent was not assigned until November.

Lead government counsel's emails reflect no further contact from defense counsel about any discovery matters through the end of 2021, although a status conference occurred in mid-November and government counsel recalls discussions possibly in December where defense counsel again pressed for the production the grand jury transcripts, as well as copies of 11 contract modifications (Nos. 3-8, 10, 13-15, and 17) that were not in ITK's Ironbridge contract file.  NSA investigators tracked these down, put them through the NSA clearance process, and these modifications were produced as part of the government's third production in February.  **Exhibit 8 (production letter dated 2/17/22)**.

At the December 1st motions argument, defense counsel asserted that the government was required to state how many hours it believed the defendant had actually worked each month, and he further complained that "I have not gotten from the government any support that my client did one hour of work during the indictment period," 12/1/21 Motions Hearing Trans. at 7-8 **(Exhibit 9)** – but he raised no complaint whatsoever concerning obtaining a copy of the government's edition of the contract.

As for defense counsel's own reciprocal discovery obligations, he made no progress on producing his client's reciprocal discovery until January 11, 2022, almost seven months after government counsel had raised the matter in his July 22, 2021 letter.[12]  Government counsel further raised the issue of expert witness disclosure with defense counsel just before the motions argument in late November, but without receiving any assurance that the disclosures would be coming soon.  Accordingly, Government counsel expressed the growing urgency with which he viewed the need for expert witness disclosure by the defense in remarks to the Court during the motions hearing on December 1st:

> I asked them back then [i.e., in mid-July] about expert witnesses.  I had a conversation with Mr. Ahlers just the other day in which he indicated he was still trying to figure out who his experts were.  *But, you know, we've got a problem now.  We're only about four months away from trial.*  We still have a very unclear sense of exactly what the defense is going to be.  *From our conversation yesterday [November 30th] it appears clear to me there's going to be grist for some significant motions in limine from the government about the defense's expert witness testimony . . . .*

---

[12]     Defense counsel did explain the reasons for the last part of his delay in an email to government counsel on January 10th, to which he replied courteously and expressed his appreciation.  **Exhibit 11.**

> So we need to be getting stuff from the defense that we can tee up
> appropriate motions in limine for the Court a reasonable amount of time
> in advance of this trial date, which is now barely four months away.

*Id.* at 34-35 (emphasis added).[13]

This Court knows what the sequel was. When the defense finally disclosed its proposed expert witnesses as January turned into February, there did indeed prove to be "grist for some significant motions in limine from the government about the defense's expert witness testimony." That forced a postponement of the trial date and has resulted in briefing that has been substantial, and ongoing, and as to Mr. Stein's opinions, at least, the issue still remains unresolved.

As for the production of a copy of the NSA's own contract file, to the best of counsel's current recollection, this issue did not come up again until January 25, 2022, when the defense belatedly filed a motion to dismiss the Indictment based on its now-retained expert Charles Stein's opinion that a routine email from a low-level NSA contractor attempting to determine whether the contract was ready for closeout absolutely precluded any further federal prosecution for billing fraud. The defense's motion to dismiss also requested, among other things, that the Court order the "Contract Closeout Team to deliver a copy of the [Ironbridge] Contract File." The defense also for the first time began demanding that the government produce a "Contract Closeout File," claiming to the Court (again presumably based upon

---

[13]   Based upon statements Mr. Ahlers had made going back at least as far as the mid-summer of 2021, and in light of certain arguments he raised during the December 1st motions hearing, government counsel believes that Mr. Ahlers and Mr. Stein had clearly been consulting well before Mr. Stein was formally retained in December.

misunderstood or inaccurate information from Mr. Stein) that the NSA maintains such files.  See **Exhibit 2(a)** (March 4, 2022 C. Ahlers email).[14]

In light of these requests and as a result of additional conversations with defense counsel in late January and early February, the government instructed the NSA on February 14, 2022 to copy the Ironbridge contract file for production to the defense.  On Friday, February 25th, as Mr. Ahlers himself noted in an email a week later **(Exhibit 2(a),** page 2), "during our conversations with Jeff I was told that the government was having the Contract File scanned and that it would be made available."

The following Monday, February 28th, however, a conference call was held with the Court in which Judge Hollander ordered the trial to be postponed until the late summer as a result of Mr. Ahlers's delays in identifying his expert witnesses and his untimely filing of the motion to dismiss.  Apparently embarrassed by this setback, Mr. Ahlers then piped up and told the Court that he was still trying to get the government to produce the NSA contract file – without mentioning that government counsel had already informed him that this was in process just the previous Friday.  Government counsel thought this was uncalled for, but he recognized the unpleasant situation in which Mr. Ahlers found himself and therefore shrugged it off.  In his motion to compel, however, defense counsel first implies (ECF # 100-1, at 11) and then squarely states (ECF # 100-1, at 18) that the government finally produced the contract file *only* because it was pressured to do so by the Court during this conference call.  This is false, as

---

[14]    The defense subsequently abandoned that request once the government determined that no separate "Contract Closeout File" exists at the NSA; rather, the key documents relating to contract close-out are simply included at the end of the main contract file.

defense counsel's own email of March 4th discussing government counsel's assurances of the previous Friday demonstrates **(Exhibit 2(a))**.

On March 4, 2022, as part of the same email **(Exhibit 2(a))** in which it first raised the issue of access to the purported Guinther letter and the file in which it had been found, the government updated defense counsel regarding its progress on producing the contract file:

> 1.     **The Contract File.** -- Personnel in the Contracts Office at NSA pitched in to copy the roughly 12" of material that constitutes the contract file.  That was delivered to our offices here today.  Our plan is to identify a local contractor to scan it and then we will produce a disc to you when that is done, which I suspect might be Wednesday-Thursday of next week, although our offices services guy won't be speaking to the contractors until he's in the office next Monday.

The government further offered to permit Mr. Ahlers to inspect the copy of the contract file at the government's offices if he wished to see the files sooner.  He did not respond to this offer.

After a legal support services firm had scanned the original contracting office file and made a copy, the government produced it to the defense on March 18, 2022, which is now over three months ago.  The letter also invited the defense to review the hard copy of the original contract "as we [the USAO] received it from the NSA at our offices". **Exhibit 8(b).**

There comes a time in a case like this one when advocates need to put aside the posing and the pretense that all is black on one side and white on the other.  All three of the attorneys involved in the case in the latter half of 2021 were spread very thin with other demanding commitments, and were struggling to deal with the ongoing consequences and continued unpredictability of the pandemic.  The government also had no case agent from the NSA from roughly mid-August through mid-November.

In any case, the government produced a copy of the NSA's contract file as maintained by the Contracting Office at NSA more than three months ago. To the extent that this file contained anything that defense counsel had not previously seen that it considers to be *Brady*, it has now had that material since late March, more than five months in advance of the scheduled August 29th trial date, which is more than ample time to use it to prepare for trial. In a few other areas, the government is still working to identify other possible records that may be material and producible under Rule 16 or *Brady*. But as shown below, most of the additional material that the defense has demanded in its letters of April 6th, April 27th, May 5th, and then finally on June 12th is neither material, nor exculpatory, nor would it be admissible at trial.

## ARGUMENT

### I.   THE ACTUAL SCOPE OF THE GOVERNMENT'S OBLIGATIONS UNDER FED. R. EVID. 16(a)(1)(E) AND *BRADY v. MARYLAND* AND ITS PROGENY

The Supreme Court and the lower federal courts have repeatedly emphasized that "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *Pennsylvania v. Ritchie*, 480 U.S. at 39, 59 (1987). *See also United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("Unlike Rule 16 and the Jencks Act, however, *Brady* 'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation' and is not violated unless the government's nondisclosure infringes upon a defendant's right to a fair trial."), *rev'd in part on other grounds as stated in Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 289 (3d Cir. 2021). Discovery from the government in criminal cases is instead narrowly limited and, as to documents or records, is governed

by FED. R. CRIM. P. 16(a)(1)(E).  *United States v. Fischel*, 686 F.2d 1082, 1090 (5th Cir. 1982) (noting that many means of discovery available in civil cases do not apply to criminal proceedings); *United States v. Ware*, 2019 WL 2268959, at *1 (E.D. Tex. May 24, 2019).

Although the title of defense counsel's motion makes reference only to *Brady*, his motion itself also includes a *pro forma* reference to "Federal Rule of Criminal Procedure 16." After that, however, he never again references Rule 16 in the 19 pages of his memorandum, nor sets out its standards or discusses how or why his requests of the government were proper under Rule 16. In light of the defense's passing invocation of Rule 16 in his motion, however, we will first address that Rule's actual standards and what the defendant should have – but has not – established to meet her burden of demonstrating "materiality" in order to obtain discovery under that Rule.

### A. The Government's Discovery Obligations Under Rule 16(a)(1)(E), and the Defense's Failure to Make the Required Showing that the Government Has Withheld Material Evidence.

The government's discovery obligations with respect to documents and records under Rule 16 are limited to producing (1) items that are material to preparing the defense; (2) items that the prosecution intends to use in its case-in-chief at trial; or (3) items that were obtained from or that belonged to the defendant. FED. R. CRIM. P. 16(a)(1)(E)(i) – (iii). To obtain discovery under Rule 16, it is incumbent upon a defendant to first make a *prima facie* showing of materiality. *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978). Ordering production by the government without requiring a showing of materiality is inconsistent with Rule 16. *Mandel*, 914 F.2d at 1219. That showing

requires the defendant to demonstrate that the documents he or she seeks are material to the preparation of his defense. *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991). General descriptions of the information sought or conclusory allegations of materiality are insufficient; instead, a defendant must present specific facts tending to show that the government is in possession of information helpful to the defense. *Mandel*, 914 F.2d at 1219. And "[u]nless a defendant has made a plausible showing that the documents sought will produce material evidence, the government's decision on disclosure is final." *United States v. Liang*, 2021 WL5323570, at *3 (E.D. Tex. Nov. 16, 2021).

> As for what is "material" under Rule 16,
>
> [m]ateriality means more than that the evidence in questions bears some abstract logical relationship to the issues in the case. . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant *significantly to alter the quantum of proof in his favor.*

*United States v. Ross*, 511 F.2d 757, 762-63 (5th Cir. 1975) (emphasis added). The courts have recognized that evidence is "material" if it is "significantly helpful to an understanding of important inculpatory or exculpatory evidence," *United States v. Liquid Sugars, Inc.*, 154 F.R.D. 466, 471 (E.D. Cal. 1994), or if there is a strong indication that the evidence will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010); *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993); *United States v. Jackson*, 850 F. Supp. 1481, 1503 (D. Kan. 1994). But "the prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the

appropriate standard of materiality." *United States v. Little*, 753 F.2d 1420, 1440-41

(9th Cir. 1980). *See also United States v. Agurs*, 427 U.S. 97, 109-110 (1976) ("The mere

possibility that an item of undisclosed information might have helped the defense . . .

does not establish 'materiality' in the constitutional sense.").[15]  Finally, the Supreme

Court has further emphasized that

> [T]his Court has never held – even in the absence of a statute restricting
> disclosure – that a defendant alone may make the determination as to the
> materiality of the information.  Settled practice is to the contrary.  In the
> typical case where a defendant makes only a general request for
> exculpatory material under *Brady* [full citation omitted], it is the State
> that decides which information must be disclosed.  Unless defense counsel
> becomes aware that other exculpatory evidence was withheld and brings it
> to the Court's attention, the prosecutor's decision on disclosure is final.

*Ritchie*, 480 U.S. at 59.

Because defense counsel included only a passing reference to Rule 16 in his

motion, it is perhaps unsurprising that his brief never cites, quotes, or addresses any of

the legal standards set forth above.  Accordingly, defense counsel does not appear to

realize that he has the burden of first making a *prima facie* showing of materiality as to

the specific items that he seeks.  Defense counsel instead seems to think it is sufficient

simply for him to say "We demand this," but as the authorities cited above demonstrate,

a mere demand is not enough.  Thus, in light of the defense's failure to meet its burden

of demonstrating materiality as required by Rule 16(a)(1)(E)(i) and the applicable case

---

[15]   A district court's discovery rulings are subject to review for abuse of discretion, and
relief on appeal in the form of a new trial will only be granted if there is "some indication
that the pretrial disclosure of the disputed evidence would have enabled the defendant
*significantly* to alter the quantum of proof in his favor."  *Id., quoting United States v.
Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (emphasis added).

law, the Court should find that the defense has failed to make the required showing that there is additional material evidence to which it is entitled under that Rule.

### B. The Government's Disclosure Obligations Under *Brady v. Maryland*, and the Defense's Failure to Demonstrate That the Government Has Withheld Exculpatory Evidence That Meets the Required Standard of Materiality.

In addition to the government's obligations under Rule 16, the Supreme Court established in *Brady v. Maryland*, 373 U.S. 83 (1963) that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. *Brady* itself arose out of a murder prosecution in which two individuals were jointly charged, but tried separately. Brady's counsel did not intend to contest his involvement in the crime, but only intended to argue that he had not committed the actual murder and therefore should be convicted of a non-capital offense. Prior to trial, Brady's counsel expressly asked the prosecutors to allow him to review the co-defendant's statements to law enforcement. The prosecutors showed him several of these statements, but (for reasons that the opinion leaves unclear) did not produce one in which the co-defendant admitted that he carried out the actual homicide. This other, nondisclosed statement by the co-defendant did not come to light until after Brady's trial, in which he was convicted of capital murder and sentenced to death. *Id.* at 84. The Supreme Court easily concluded that "suppression of this confession was a violation of the Fourteenth Amendment." *Id.* at 86.

Thus, in *Brady*, the central facts were that that the government was in possession of important evidence that was clearly exculpatory, with regard to both guilt and

punishment; the government was uniquely in the possession of that evidence, which could only become known to Brady's counsel if the government disclosed it (or, less, likely, if his co-defendant's counsel did so); and the defendant had expressly requested evidence of this character from the government, and for whatever reason, did not receive it. Because *Brady* is ultimately about ensuring that the defendant has access to evidence that might be of material assistance at his or her trial or sentencing, the Court held that whether the prosecution had acted in good or bad faith in not disclosing the evidence was irrelevant. *Id.* at 87.

There are three required elements that must be met to establish a *Brady* violation post-trial: (1) there was nondisclosed information that was favorable to the accused, either because it was exculpatory or impeaching; (2) *the information was suppressed by the prosecution*; and (3) the information was material to guilt or punishment, meaning that there was a "reasonable probability" that the evidence would have resulted in a different outcome had it been disclosed and presented, such that its suppression undermines confidence in the outcome of the proceeding. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *United States v. Bagley*, 473 U.S. 667, 678, 682, 684 (1985); *Horner v. Nines*, 995 F.2d 185, 204 (4th Cir. 2021); *United States v. Wolf*, 860 F.3d 175 (4th Cir. 2017).[16]

---

[16]   Because *Brady* did not establish an additional discovery mechanism for the defense, however (see cases cited at page 38 below), and because "The *Brady* analysis assumes the discovery, after trial, of favorable, material evidence known to the prosecution but unknown to the defense," *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984), cases interpreting *Brady* issues that arose in the post-trial context can be an awkward fit where, as here, the defense attempts to misapply *Brady* by using it as a pre-trial discovery device.

31

Exculpatory evidence consists of "material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness." *Starusko*, 729 F.2d 256; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983); *United States v. Avellino,* 138 F.3d 249, 255 (2d Cir. 1998) (*Brady* "includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment of a significant prosecution witness"). However,

> [i]f a statement does not contain any *expressly exculpatory* material, the Government need not produce that statement to the defense. To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning.

*United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1998) (emphasis added). Moreover, evidence is not "material" under *Brady* unless it either consists of, or would lead to, evidence admissible at trial for either substantive or impeachment purposes. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (there is no *Brady* violation if the nondisclosed evidence would not have been admissible at trial, and the defendant merely speculates that the withheld evidence would have led to admissible evidence); *Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996); *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991); *Buckley*, 586 F.2d at 506.

The prosecutor's obligation in a criminal proceeding to disclose information is generally limited to information known to the prosecution – and, of course, not known to the defense. *Kyles v. Whitley*, 514 U.S. 419, 431, 437 (1995); *Avellino,* 138 F.3d at 255; *United States v. Young*, 20 F.3d 758, 764 (7th Cir. 1994); *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975) ("*Brady* clearly does not impose an affirmative duty

upon the government to take action to discover information which it does not possess.");
*United States v. Makarita*, 576 Fed. Appx. 252, 262 (4th Cir. 2014) ("*Brady* does not
require the Government to investigate the defense's theory of the case or create evidence
that might be helpful to the defense.").

*Kyles* and other decisions have extended this principle to a limited degree,
holding that prosecutors cannot rest with simply disclosing exculpatory evidence of
which they are personally aware, but must take appropriate steps to uncover and
disclose exculpatory evidence that is in the files of other law enforcement agencies with
which they have worked together closely during the investigation or prosecution – in
other words, of persons or agencies that the Second Circuit has said can be considered to
have acted "as an arm of the prosecution" or the "prosecution team." *Kyles*, 514 U.S. at
437-38 ("the individual prosecutor has a duty to learn of any favorable evidence known
to others acting on the government's behalf in the case, including the police"); *Strickler*,
527 U.S. at 280-281 (the *Brady* disclosure obligation also encompasses evidence
"known only to police investigators"); *United States v. Stewart*, 433 F.3d 273, 298 (2d
Cir. 2006), *quoting Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982). This
includes potential impeaching evidence that is currently found in the personnel files of
government law enforcement witnesses. *United States v. Bagley*, 473 U.S. 667, 676
(1985); *see also Giglio v. United States*, 405 U.S. 150, 154 (1986).

But the courts have also recognized that there are substantial limits on the extent
to which knowledge possessed by others – even those having some connection to the
investigation or the trial of the prosecution's case – can be imputed to the prosecutor.
The Fourth Circuit stated in *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010)
that "the knowledge of *some of those who are part of the investigative team* is imputed

33

to prosecutors regardless of the prosecutors' actual awareness" (emphasis added), and it further noted that "Courts have routinely refused to extend *Brady*'s constructive knowledge doctrine where doing so would cut against the agency principles underlying imputed knowledge . . . ." *Id.* at 951-52. In *Robinson*, the Court held that the prosecution was not chargeable with knowledge of unrelated acts of professional misconduct committed by a number of state police officers who had worked on the federal investigation of the defendant that were not reflected in their personnel files. *Id.* at 946-48, 951-52; *see also Horner*, 995 F.3d at 193, 205 (prosecutors were not chargeable with knowledge that a key witness against the defendant, a former cellmate of his, had previously been a paid informant where the officer who paid him did not participate in the prosecution). And in *Stewart*, the Second Circuit held that a forensic documents examiner who testified as a government witness at trial was not a "fully functioning member of the prosecution team," as the defendants suggested, notwithstanding the fact that he was a government employee, because he "did not interview witnesses or gather facts" and was not "in any way involved with the investigation or presentation of the case to the grand jury." 433 F.3d at 298-299.[17]

An important corollary to the requirement that there must be a showing that the government has suppressed evidence to establish a *Brady* violation is that there can be no suppression by the government when evidence or information is in the defendant's

---

[17]    The Ninth Circuit appears to be unique in having further extended this doctrine to hold that information in the hands of other federal agencies must also be turned over if the prosecutor has knowledge of, and access to, the relevant documents. *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989). The Fourth Circuit, in contrast, stands solidly by the "prosecution team" concept subsequently put forward by the Supreme Court in *Kyles*, as it reaffirmed barely nine weeks ago in *Horner*, 995 F.3d at 205-06. *See also, e.g., Robinson*, 627 F.3d at 952; *United States v. Taylor*, 942 F.3d 205, 225-26 (4th Cir. 2019).

possession, or the defense has knowledge of and the ability to access or obtain the evidence in question. *See, e.g., United States v. Phillips*, 596 F.2d 414, 418-19 (7th Cir. 2010); *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) ("[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available from another source."). A series of Fourth Circuit cases have held that there can be no *Brady* violation where exculpatory evidence is available to the defendant and is in a place where a reasonable defendant would have looked. *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990); *Lovitt v. True*, 403 F.3d 171, 184 (4th Cir. 2005); *Hoke*, 92 F.3d at 1354-1356.

Moreover – and of particular relevance in addressing a pleading that is styled as a "Motion for Production of *Brady* Material" – the Supreme Court and the lower federal courts (including the Fourth Circuit) have repeatedly stressed that *Brady* does not create an additional discovery mechanism for the defense to use. "We have often noted that *Brady* requests cannot be used as discovery devices." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010); *United States v. Weld*, 2009 WL 901871, at *2 (N.D. Cal. April 1, 2009) ("[D]efendants cannot use *Brady* simply to search for *Brady* materials. *Brady* is not a pretrial discovery tool."). Yet the defense here has simply ignored that prohibition, and is trying to do that very thing by presenting a sweeping request for a large volume of materials of dubious or clearly non-existent relevance as a *Brady* request – largely, in our view, for the purpose of harassing the government and trying to malign the members of the prosecution team. The Fourth Circuit and other federal courts have drawn a clear line against such efforts to misuse *Brady* as a vehicle

35

for seeking material not otherwise available under the well-established and narrow limits that apply to discovery by the parties in criminal cases.

The Fourth Circuit's decision in *Caro*, in particular, is strikingly on point here. *Caro* was a capital murder prosecution brought in connection with a homicide that occurred within a federal prison facility. A key issue involved the government's efforts to prove the non-statutory aggravating factor of future dangerousness on the part of the defendant. In an effort to bolster the testimony of its own retained expert on dangerousness (much as the defendant here is trying to bolster the testimony of its expert witness, Charles Stein), the defense filed what it presented as a *Brady* request seeking to compel the government to produce numerous categories of records relating to the security arrangements for holding dangerous individuals at the maximum security federal prison facility in Florence, Colorado.

The district court denied the defendant's motion to compel production of these materials under *Brady*, and the Fourth Circuit readily affirmed. As the Court explained:

> We have often noted that *Brady* requests cannot be used as discovery devices. As the Supreme Court remarked, "There is no general constitutional right to discovery in a federal criminal case, and *Brady* did not create one."

*Caro*, 597 F.3d at 619, *quoting Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). The Fourth Circuit went on to note that the defendant had been unable to carry his burden of demonstrating that the requested records would be favorable to him, and therefore had failed to establish that they were material. *Id.*

Similarly, in *United States v. Ducore*, 309 F. Supp. 3d 436 (E.D. Va. Apr. 10, 2018), a criminal prosecution charging a defendant with assault upon an airline flight attendant, the defense filed a purported *Brady* motion that sought to compel the

government to disclose the names and telephone numbers of other passengers seated in first class, which it contended might produce exculpatory information or allow it to impeach the testimony of the government's flight attendant witnesses. The district court rejected this request, relying on the Supreme Court's decision in *Weatherford* and the Fourth Circuit's decision in *Caro*. *Id.* at 439-440 (noting that the defendant's "*Brady* request fails before it can even get off the ground").

The defense cites a handful of Supreme Court decisions in its *Brady* discussion, but none of these citations are linked to any particular items requested in the defense's recent correspondence in April and May of this year. The defense's *Brady* discussion is most notable for its attempt to read out of the *Brady* standard or to gloss over the requirement that the prosecution must have suppressed the evidence in order for a violation to have occurred. Thus, the defense claims that in *Brady*, "the Supreme Court held that due process requires something more than not suppressing the evidence," citing *Brady*, 373 U.S. at 87 – thus suggesting that the government has an affirmative duty to seek out exculpatory evidence beyond that which is in its possession or that of its investigative partners. But the very page of the *Brady* opinion the defendant cites repeatedly stresses the requirement of suppression: "We hold that the *suppression* by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." (Emphasis added.)

The defense appears to feel somewhat self-conscious about its failure to make any express demands for particular categories of documents for more than a year after the indictment was returned until April and May of this year. The defense first relies on the basic provisions of the discovery agreement itself, and next upon the self-executing character of the government's *Brady* obligations. ECF 100-1 at 2. But what the defense

37

contends is *Brady* material here is nothing so straightforward as the co-defendant's

confession to actually having committed the charged homicide in *Brady*, or, indeed,

what constitutes *Brady* material in most cases.  And although the defense devotes

almost a third of its memorandum to a section (Section II, ECF # 100-1 at 2-8) that

purports to be a "Description of *Brady* Material in *U.S. v. McComber*," that section

continues to rely upon a fundamental misrepresentation or misunderstanding

concerning the nature of the crimes charged in the indictment.

At ECF # 100-1 at 3, defense counsel attempts to cast doubt on government

counsel's consistency, integrity, and good faith by asserting that "With the discovery and

production of the 'Guinther letter,' the prosecutors have adopted a different argument:

'The central issue in this case is thus whether there was a material difference between

the hours that the defendant billed the NSA for, and the hours she actually put in

working on the Ironbridge contract – not whether she did so at the NSA or anywhere

else.' Gov't Letter to Judge Hollander, ECF #81, pp. 5-6, n. 1."  In fact, the government

has never changed its position.

To the contrary:  From its first meeting with defense counsel to discuss this

matter back in August 2020, the government has always made it clear that the central

issue here is whether the defendant put in anything approaching the hours of work she

claimed as the Program Manager of the Ironbridge contract in 2016-17.  That the

defendant spent so little time on the NSA campus is important because it sharply

limited the amount of time she could have spent doing any work that involved handling

classified material – which was the primary task of those working on the Ironbridge

contract.   As for the defense's further assertion that it is the government's position that

the "Program Manager's work was easily accomplished with a minimum of effort" (ECF

100-1 at 2), that too is a significant distortion. As the indictment expressly states in ¶ 8, it became apparent during the tenure of the defendant's predecessor as Ironbridge program manager in 2013-2016 that "there was actually not enough work for the Program Manager to do to support" it being a full-time position. Moreover, as a number of witnesses told the government's investigators, other persons – particularly Jason Doyle, the ITK employee who was the technical lead on the contract – stepped in to assume many of the program manager's responsibilities because the defendant was rarely on-site and lacked the knowledge to respond to technical questions when she was.

Far from reflecting any significant change in the government's theory of prosecution, the same grand jury that had returned the original indictment on February 25, 2021 (ECF # 1) returned the Superseding Indictment on May 26, 2022, which added no new charges, counts, or defendants. ECF # 97.[18] Since February 2021, the Indictment and more recently the Superseding Indictment have charged the defendant for the same crimes, relying on the same theory: that the defendant knowingly inflated the time she billed to the Ironbridge contract as its Program Manager, thereby causing ITK's monthly invoices to NSA for the Ironbridge contract to misrepresent the hours she had worked and causing the government to overpay ITK by hundreds of thousands of dollars in 2016-17.[19]

---

[18]    Aside from some minor editorial and proofreading changes in ¶ 13 of Count One, the only changes in the superseding indictment were to the first sentence of ¶ 5 and the addition of a second sentence to that paragraph. In light of the possibility that defense counsel might present arguments at trial that explicitly or implicitly misstated the government's actual theory of prosecution, these changes were intended to emphasize that the key issue in the case is whether the defendant actually worked the hours she reported, not whether she did so on-site or off-site.

[19]    In keeping with its stubborn but unfounded determination to believe that the government has changed its theory of prosecution, the defense also wrongly asserts

There are ultimately only two specific categories of *Brady* information that the defense purports to identify in its motion. The first is "evidence of informal authorization" to accomplish some administrative functions off-site, ECF 100-1 at 5, and the second (also bold-faced in defendant's motion) is that "evidence of the work that McComber did is *Brady* material." ECF 100-1 at 7. But since the government's position is – and has always been – that what matters for the purpose of the charges in this case is whether the defendant actually *worked* the full number of hours she reported, not *where* she worked those hours, the fact that some NSA personnel felt that the defendant could appropriately address some administrative functions in an off-site location (as stated in the additional new sentence added to ¶ 5 of the superseding indictment) is clearly not "material that goes to the heart of the defendant's guilt or innocence . . . ." *Starusko*, 729 F.2d 256; *Higgs*, 713 F.2d at 42; *Avellino*, 138 F.3d at 255.[20]

-------

(ECF # 100-1 at 3) that the government changed its theory in the superseding indictment as a result of "the discovery and production of the 'Guinther letter.'" In fact, government counsel stated clearly at the argument on the defendant's motion for a bill of particulars back on December 1st – three full months before the purported Guinther letter finally surfaced – that "What the indictment says is that she did not work the full amount of hours that she billed." The Court then noted: "So you're relying on the full amount of the hours, meaning she worked some, but not all," to which government counsel responded, "Exactly. That's right. . . . [W]e would have to show that there was a material variance between what she billed for and what she actually did." 12/1/21 Motions Hearing Trans. at 11-12. Two pages later, in response to a question from the Court, government counsel stated that the defendant would not have been prosecuted if "she really did do the work, but not on-site." *Id.* at 14.

[20]   Not only is the fact that some NSA personnel believed that limited administrative functions could be performed off-site not *Brady* material, but the defense is already well aware of this evidence. The basis that government counsel relied upon for the slight change to the first sentence of ¶ 5 and the addition of the second sentence is (1) the statements of NSA NSOC back-up Contracting Officer's Representative Jonathan Smith that he believed this would be appropriate, as stated in his interview transcript (which government counsel drew to defense counsel's attention in a letter dated August 23, 2021, and (2) a letter from Contracting Officer Cherril Guinther in the summer of 2012 indicating that she was considering shifting the Program Manager's duty station to ITK's

Despite defense counsel's and Mr. Stein's strong desire to believe otherwise, this case is not a contract dispute between the NSA and ITK about whether the Ironbridge contract was "constructively changed" to permit the defendant to work offsite. The government's case is a criminal prosecution of Ms. McComber for fraudulently billing the government for many hours of work she did not in fact perform. Accordingly, what would be material under 18 U.S.C. § 287 for purposes of *Brady* at the trial in this case (as opposed to at sentencing) is evidence demonstrating that there in fact was no material variance between the hours the defendant worked and what was reported on ITK's monthly billings for the Ironbridge contract. And as the testimony and statements of numerous witnesses reflect, as well as all the evidence of the defendant's other activities, the government has no knowledge to suggest that was the case.

Finally, we come to the defense's insistence that the government must produce "the work product / deliverables that McComber produced as program manager." ECF # 100-1 at 8. As we have seen, however, the three exhibits attached to the defendant's memorandum in which these requests were purportedly first conveyed to the government (ECF #s 100-3, 100-4, and 100-5) are respectively dated April 6th, April 27th, and May 5th, 2022. The April 6th letter also seeks reams of contract-related documents such as routine correspondence and financial reports with no evident connection to the defendant's overbilling in 2016-17 that harken back to the defense's requests in the summer of 2021 for essentially every document in the NSA's possession relating to the Ironbridge contract. Even a casual review of this letter (which we suspect

---

offices. Defense counsel is also well aware of the latter document; indeed, he sent the government a copy of it as part of a submission he made during the investigation phase of the case on February 2020, and again made reference to it during the motion argument on December 1st. 12/1/21 Trans. at 27-28 **(Exhibit 9)**.

may have originated with a list drawn up by Mr. Stein) demonstrates that it does not seek evidence that is "material" under Rule 16 – since for many of the items requested, defense counsel did not make the slightest effort to explain why they would be relevant at trial.  Its real purpose appears to have been a desire to wrongly suggest to the Court that the government was seriously remiss in its discovery obligations and was violating *Brady* on a wholesale basis, and perhaps simply to harass the government and distract it in the run-up to trial as well.

Otherwise, the defense's April 6 letter (ECF # 100-3) asserted that it was seeking "discovery of the Ironbridge contract file," which the government had already produced with a total of over 2,800 pages three weeks earlier.  The letter further identified a series of documents the defense believes "existed at one time" or "likely existed at one time," including various contract modifications, pre-award modifications, performance evaluation, appointment letters, TTOs, Contract Deliverables, and correspondence concerning Ironbridge.  Clearly, the defense's April 6th letter could hardly be a clearer example of purporting to use *Brady* as a discovery device, which the federal courts at all levels have repeatedly rejected.

The government sent a letter to defense counsel on June 3, 2022 **(Exhibit 13)** that responded to each request in detail.  The government explained which requests sought information that was not discoverable, which documents it could not find, and it also agreed in limited instances to search for and produce responsive records, if any exist.

On June 12, 2022, in response to the government's June 3 letter, the defense sent a further fifteen (15) page, single-spaced letter that reiterated many of its prior requests, demanded some documents that were already in its possession, and raised a variety of

new issues. **Exhibit 14**. The government reached out to defense counsel on June 14, in an attempt to narrow down the issues, but defense counsel responded to one question and ignored the rest.

Although its motion to compel focuses on the production of the "deliverables [McComber] prepared," ECF # 100-1 at 14, the defense's letter of June 12, 2022, makes clear that the defense continues to demand all the requests set forth in its various letters, even those the government has already satisfied. To aid the court in evaluating the defense's requests and arguments, below are general responses to various issues raised by the defense. The government's responses to particular requests advanced by the defense are detailed in the table attached as **Exhibit 1**. Remarkably, as the Court will see, the defense has recently conceded that it in fact is already in possession of many of these documents, but asserts that it is pursuing these requests in order to force the government to concede that these records are authentic.

*Production of the "Contract File."* As noted above, the defense continues to demand the "complete official contract file"/the "entire official contract file". 6/12/22 C. Ahlers Letter at 4 and 5 **(Exhibit 14)**. Three months ago, the government produced a copy of the Ironbridge contract file, which exists in hard copy form in several 4" – 5" thick file folders in NSA's contracting office. The production included all documents contained in the file from the original contract itself through the last modification, including any correspondence, internal records, or other documents contained therein. As the government explained in its production cover letter **(Exhibit 8(b)**, the government withheld only the portion of the contract file containing the Ironbridge RFP and response, because InfoTeK has the RFP and its response, and that portion of the file contained proprietary competitor information. The defense obviously knows that the

43

government produced the Ironbridge contract file, but nonetheless continues to demand
its production in an apparent effort to suggest that there is some live, lingering issue
with respect to what the government has produced. This distortion of the truth is an
obvious attempt to mask the fact that the defense's successive discovery requests since
April 6th were in fact almost entirely new, and simply sought reams of Ironbridge
contract-related material without making anything more than the most threadbare
attempt at demonstrating how these documents would be relevant or admissible at trial.

 *Application of the FAR.* The defense's claim that the government has not
produced the Ironbridge contract file and its claim that many of the records it seeks are
required to be preserved in the Ironbridge contract file reflect a misreading of the
Federal Acquisition Regulations (FAR), and a surprising failure on Mr. Stein's part to
understand some of the basic contracting and record-keeping practices of the agency
with which he was associated for so many years. The defense essentially argues that the
FAR mandates that NSA keep all records related to the Ironbridge contract in the
contract file. *See, e.g.*, 6/12/22 C. Ahlers Letter at 6 **(Exhibit 14)**. Not only is the claim
entirely inconsistent with the practical aspects of managing complex federal contracts,
but the FAR does not even support the defense's claims. For example, 48 C.F.R. §
4.802(a) actually says only that "A contract file should *generally* consist of . . . ." various
enumerated items. 48 CFR § 4.803(a) states that "The following are examples of the
records *normally contained, if applicable*, in contract files" (emphasis added) **(Exhibit
16)**. Moreover, even if some documents have been misplaced that should be in the
contract file, that is known to happen in government service, especially at large, busy
agencies that are understaffed. It is nonsense to suggest that documents which likely

44

went missing long before there was any criminal investigation in this matter can give rise to a spoliation instruction.

*Contract Deliverables.*  The defense has demanded all "Contract Deliverables" for the life of the contract, claiming that these records are evidence of work by Ms. McComber.  ECF 100-1 at 8 & ECF 100-3 at page 5 of 7.  We suspect this is an attempt to get around the fact that the defense appears to have a shortage of witnesses who will say that the defendant did substantial work by trying to pretend that the work product of the roughly fourteen other employees on the Ironbridge contract can be attributed to her oversight and supervision.  But that claim runs afoul of the testimony of numerous witnesses who, as set forth above, testified that it was Jason Doyle who was the person primarily responsible for the ongoing technical success of the Ironbridge contract.

While we believe that many of the defense's recent requests dating back to April 6th are being advanced for improper purposes and may well be primarily intended simply to be harassing and abusive, the government is eager to ensure that the defense has access to all evidence that meets the tests of relevancy and materiality.  Accordingly, the government is currently searching Ms. McComber's personal folders and her low-side emails at NSA for any of her work product related to the Ironbridge contract and will produce those records to the defense.

*Other Requests.*  Although the defense is clearly focused on obtaining the "Contract Deliverables," its recent requests also seek a smattering of other records, including (1) a small number of modifications and similar contract documents that were not in the contract file; (2) additional performance evaluations; (3) various categories of correspondence, most of which are entirely irrelevant or already in the possession of the defense; and (4) documents related to the new allegations in the Superseding

45

Indictment.  As detailed in the chart attached as **Exhibit 1**, the motion fails to establish

that these records are *Brady* material.  In several instances, the government has looked

for the records and has been unable to locate them.  And in limited circumstances, the

government has nonetheless agreed to search for and produce responsive records, if

any, now that the defense has asked for them.

## II.   SEVERAL OTHER MATTERS THAT THE DEFENSE COUNSEL RAISES IN ITS MOTION BY WAY OF COMPLAINING ABOUT THE DISCOVERY PROCESS ARE WHOLLY MERITLESS

Finally, if any further proof were needed of the degree to which defense counsel's

actions in this case have apparently come to be driven by a venomous personal animus

towards the NSA and the prosecution team,[21] that proof is provided by his devoting

almost 10% of the text of his memorandum supporting his motion to compel to

digressions into two extraneous matters.  One of these arises out of the Ironbridge

contract, but has no relationship to anything of relevance to the criminal case here,

while the second involves a completely different and wholly unrelated criminal

prosecution in this jurisdiction.  Mr. Ahlers has clearly raised these matters in an

attempt to blacken the images of the NSA and the government's lead counsel with the

Court.  But because he failed to investigate either matter adequately, Mr. Ahlers

ultimately embarrasses only himself, suggesting the extent to which his emotions have

overcome his better professional judgment.

---

[21]   In bringing up these extraneous matters and forcing this Court to waste its time delving them, Mr. Ahlers appears to be driven by a desire to strike back against the government for not unquestionably accepting the highly suspect purported Guinther letter as authentic, as well as for what he sees as the unjust maligning of his client's reputation as a result of this prosecution.

Ostensibly in an effort to back up the assertion in his memorandum that "Nothing about discovery in this case has been normal" (ECF 100-1 at 5 n.1),[22] defense counsel inflicts upon the Court a 20-line single-spaced footnote railing about "what defense counsel believed to be forged electronic signatures" on two documents included in the government's production of a copy of the NSA Contract Office's Ironbridge Contract file.  He also attaches his letter to government counsel of April 5, 2022 concerning this matter with the documents attached as Exhibit 1 to his motion to compel.  However, defense counsel does *not* include with his exhibit the calm and straightforward reply AUSA Joyce McDonald sent on May 3rd, 2022 showing him what he had overlooked about the electronic signatures and demonstrating that there was no ground for believing anything untoward had occurred here.  So we have attached our response as **Exhibit 15(a) (Letter from AUSA McDonald to Clarke Ahlers, Esq. dated May 3, 2022).**

This matter should have ended there.  Indeed, defense counsel's use of the language "*believed* to be forged electronic signatures" (emphasis added) in the past tense at the start of this footnote is significant, for it suggests that Mr. Ahlers now

---

[22]    To the contrary, as the discussion at pages 11-20 above demonstrates, discovery in this case proceeded in a relatively normal manner until, first, Mr. Stein brought his misguided perspective to the defense team's efforts, and second, government counsel responded to the defense's belated surfacing of the purported Cherril Guinther letter on February 28 by responding with reasonable requests in order to assess its authenticity – requests this Court has since found were reasonable.  Those requests were answered by defense counsel's unhinged email to the government on the evening of March 16th **(Exhibit 2(c))** and by the extraordinary misstatements he subsequently made to the Court in his filing on March 24th (ECF # 68, **Exhibit 2(e))** about the character of the government's requests.  Since that time, we fully agree that nothing about discovery in this case has been remotely close to normal – but the responsibility for that in our view rests with defense counsel and Mr. Stein.

understands that the electronic signatures in question were not forged. But in his current frame of mind, it appears that defense counsel cannot simply admit that he was mistaken, or jumped to unsupported conclusions. Instead, he still tries to salvage something from this episode, possibly in an effort to obscure the serious doubts about the authenticity of the purported Guinther letter.[23] And so we reluctantly believe that we must address this matter – because defense's counsel's footnote 1 (and, indeed, his motion's Exhibit 1) as they stand would otherwise be incomprehensible and confusing to the Court (particularly since he has attached only the signature pages of the documents in question), and because he is still suggesting that he intends to raise this matter at trial, depending on which witnesses the government calls.

In his April 5th letter (attached to his memorandum as Exhibit 1 and ECF # 100-2), defense counsel contended that two modifications to the Ironbridge contract dating to FY 18 (October 1, 2017 through September 30, 2018) that carried electronic signatures of an NSA Contracting Officer's Representative (COR)/Contract Manager (CM) named Earl Pugh (Government discovery production numbers USA-028402 & USA-028411) "likely contain a forged electronic signature." Defense counsel's (or perhaps Mr. Stein's) reasoning was that "Someone submitted documents for signature by the contractor and the Contracting Officer using Don Pugh's PKI [public key infrastructure] signature long after Don Pugh had retired from the NSA. The use of Pugh's PKI seem unusual and unlawful to me. My understanding is that Don Pugh

---

[23]   Defense counsel gives away his underlying motivation at the very end of this footnote when he complains that "The prosecutors' reaction seems completely inconsistent with the reaction displayed upon production of the Guinther letter and facsimile production sheet." ECF 100-2, at 5 n.1. Of course, no one should be surprised if prosecutors take particularly strong exception to anything that smacks of an attempt to obstruct justice in a federal criminal proceeding.

retired from NSA [on] or about August 2017." ECF # 100-2, at 3.  Defense counsel then went on to opine that

> Use of another person's PKI is a serious breach of national security. (Witness the Edward Snowden case where Snowden used the credentials of others.)  This is prohibited by Department of Defense instruction 8520.02.  Upon information and belief, it is also a federal crime.
>
> The PKI electronic signature of a retired COR causes me to question either the authenticity of the documents delivered to the Government by me or the integrity of the officials who knowingly submitted this authentic, but forged, document to you to give to me.  [Defense counsel then named four NSA employees whose names appeared on these documents in addition to Mr. Pugh's.]
>
> Obviously, *the conduct of these persons may be criminal and the investigation into the facts may take some time*.  However, please respond to this letter promptly with your decision about using any of these persons as witnesses in this case.

*Id.* (emphasis added).

Actually, investigating these facts took very little time.  As soon as government counsel examined the electronic signatures of Mr. Pugh on USA-028402 and USA-028411, we noticed that they carried a date of "2017.08.30" – August 30, 2017.  Next, as explained in our letter back to Mr. Ahlers of May 3rd:

> Mr. Pugh retired on September 27, 2017, which was also his last day at work as shown on the attached SF 50 (redacted to remove Mr. Pugh's personal information). Mr. Pugh's electronic signatures which you question were a month prior to his retirement and thus do not pose an issue.

**Exhibit 15(b) (additional pages from the contract modifications included in the defendant's ECF # 100-2).**  Moreover, the electronic signature of the NSA Contracting Officer's Technical Representative (COR-T) Regina Shirley that also appeared on these documents was likewise dated August 30th.

After these two documents were prepared at NSA and electronically signed by the two NSA officials, they were then sent to ITK Contracts Vice President W. Craig Plunkett for his signature, which he executed in wet ink on the same day – 12/15/17 – for both documents. Once he sent the documents back to the NSA, they were executed and thus confirmed by NSA Contracting Officer (CO) Stephanie Carter on the following day – 12/18/17.

It thus appears either that Mr. Ahlers (or Mr. Stein) simply failed to examine the Don Pugh electronic signatures closely enough to note their actual date (which is never referenced in defense counsel's letter); or that they did so, but assumed (without having, or seeking, any information to this effect) that Mr. Pugh had retired sometime in August 2017 prior to August 30th or that, based upon the lengthy time interval that elapsed before Mr. Plunkett of ITK added his signature, they concluded that Mr. Pugh's signature was added well after his departure and that the documents were only sent to ITK shortly before Mr. Plunkett signed them. But that would be nothing more than unsupported speculation. It might also be the case that the two documents sat on Mr. Plunkett's desk for some time while he was preoccupied with the start of the criminal investigation of the defendant until he signed them both on the dates indicated.

But even beyond that, these two contract modifications were remarkably minor in nature and completely uncontroversial. Nor do they have factual relevance whatsoever to the central issue in this criminal case – whether the defendant actually worked something approaching the 2,603.5 hours that ITK billed for her time as program manager for the months of March through September 2017. As USA-028392, a document not included in the Defendant's Exhibit 1 demonstrates (included in our **Exhibit 15(b)**), the contract modification for which USA-028402 is the signature page

(Technical Task Order [TTO] # 1, Modification 1) related to a period of performance (POP) November 8, 2017 – 19 December 2017.  The time period during which the defendant is alleged in the indictment to have overbilled her time ended on September 30, 2017 – five weeks before the period covered by this modification began.  Moreover, the actual subject matter of this modification, as shown by USA-028393 (another document not included in his Exhibit 1 by Mr. Ahlers), was a "No cost POP [period of performance] extension to 19 December 2017" – presumably because unallocated funds remained sufficient to finance the continuation of this phase of the Task Order beyond its originally scheduled ending date (which, as USA-0283893 shows, was previously December 15, 2017).  Thus, this document had the effect of extending the operative period of a single individual task order under the Ironbridge contract by all of *four days*, at no additional cost to the government – and it did so, moreover, with regard to a time period falling roughly ten weeks after the defendant's overbilling scheme was exposed and came to an end.

As for the contract modification for which USA-028411 (TTO] # 4, Modification 2) is the signature page, as USA-028403 shows, it relates to a period of performance (POP) from November 8, 2017 – January 31, 2018, thus making it even further removed from the time period in which the indictment alleges that the defendant's fraud occurred.  And it simply extended the POP for this task order from December 15th to January 31, 2018, although in this case that was done because additional funding had become available.  Thus, once again, these minor modifications to aspects of the work on the Ironbridge contract as it neared its end have no relevance here, and there is accordingly no reason whatsoever why these should be put into evidence at trial.

51

Yet rather than backing off from this unfounded allegation, Mr. Ahlers has instead doubled down on it by forcing it upon the Court's attention.  Moreover, he has attached his original letter – which alleges that one or more of four NSA employees have committed "a serious breach of national security" that is "prohibited by Department of Defense instruction 8520.02" and that he further suggests may be "a federal crime" that merits the commencement of a criminal investigation – to a filing that is part of this Court's public docket in this case.  He has thereby published a meritless accusation against public servants who lack a forum in which they may respond.

But there is more.  In another of his misplaced "Aha!" moments, Mr. Ahlers spends most of what is supposed to be the section in which he outlines "The Requested Relief" he is seeking in this case to trying to smear the government's counsel by suggesting that he is a serial *Brady* offender.  Section IV, ECF # 100-1 at 17-18.

Once again, there is no reason why the Court should be obliged to go down this additional rabbit hole concerning an unrelated case.  But lest due diligence and conscientious investigation undercut the negative impression he is so eager to leave, Mr. Ahlers doesn't even try to present a fair account of what happened in this other case.  So, once again, we are obliged to do so.

Shortly before the trial of *United States v. Liberto*, Crim. No. RDB-19-0600, a case that involved procurement fraud against the Postal Service commenced before this Court in October of last year, the government's case agent realized that back near the beginning of the investigation, he had neglected to upload to his office's electronic filing system a short interview memo and a substantial number of documents that he had received from a postal employee at a local post office in Cumberland, Maryland.  As a result, those records were never turned over to government counsel and were not

produced in pre-trial discovery.  It was therefore undisputed that the two government counsel on the case were not in possession of these documents themselves, or of the interview memo that the agent had prepared concerning them, and had no knowledge of their existence until shortly before trial.  As soon as government counsel learned about the documents and the interview memo, they were immediately produced to defense counsel.

Defense counsel Martin S. Himeles, Esq. then moved not only to suppress the documents received from the Cumberland Post Office employee and to bar him from testifying, but went far beyond that to demand that the government should be compelled to determine whether any of the other hundreds of post offices located all over the mid-Atlantic region between North Carolina, Pennsylvania, and even Ohio had any similar documents in their possession.  Effectively, Mr. Himeles sought to persuade the Court to radically extend the *Kyles v. Whitley* doctrine beyond those "acting on the government's behalf in the case" to any records anywhere in the files of a government agency that had some role in the matter.  *United States v. Liberto*, ECF # 83.  Government counsel opposed that sweeping request by Mr. Himeles with a lengthy list of pertinent authorities from the Supreme Court, the Fourth Circuit, and other courts. *Liberto*, ECF # 85 (& ECF # 100-6 here).  With the misplaced smugness that has come to characterize many of his filings in this case, Mr. Ahlers suggests that "this has the appearance of a Gray 'play book," ECF # 100-1, at 17 – as if there were something untoward about conscientiously doing extensive legal research and then carefully presenting that to the Court.

But in his eagerness to whip out his poison pen, Mr. Ahlers missed two important things about to this incident in the *Liberto* case.  The first is that Judge Bennett did not

53

grant Mr. Himeles the sweeping relief he was seeking.  Instead, he accepted the

government's position and refused to order the massive search of records at other postal

offices all over the mid-Atlantic region sought by the defense, citing the Supreme Court's

decision in *Kyles* and the Fourth Circuit's decision in the *Robinson* case and only finding

that "As the cases cited above make clear, *the knowledge of an investigating agent

acting on behalf of the Government* can be imputed to the prosecution in the *Brady*

context." *United States v. Liberto*, 2021 WL 4459219 at *6, *8 (emphasis added).  Judge

Bennett accordingly imposed only the limited sanctions of ordering that the

Cumberland Post Office employee could not be called as a government witness at trial,

and that none of the documents he had given to the agent could be introduced in

evidence.  *United States v. Liberto*, Crim. No. RDB-19-0600, ECF # 91, at 2(a).

    Even more significantly, *Judge Bennett made it clear that it he did blame either

AUSA Gray or his co-counsel, AUSA Matthew Phelps, for the late production of the

documents*.  At the hearing on the matter, Judge Bennett expressly stated that "I don't

blame you for it, Mr. Gray, and I don't blame Mr. Phelps for it, but at some point in time

the case agent has to understand that we don't try cases here in the United States

District Court that way.  It's not rolling discovery." *United States v. Liberto*, ECF # 92,

at 70-71.  And in his written opinion in the case, Judge Bennett likewise went out of his

way to stress that "The Court notes that this violation is not the result of any

misconduct on the part of Government counsel.  It clearly relates to errors of

Government investigators." *Liberto*, 2021 WL 4459219, at *7 n.6.

    Two more minor points advanced by Mr. Ahlers in his memorandum require

comment.  First, Mr. Ahlers stated that "In the McComber case, Gray has intentionally

described the formal written authorization with nomenclature assuring that it will not

54

be found in the Government's file.  This isn't consistent with McComber's rights to due

process of law."  ECF # 100-1 at 17-18.  Earlier in his memorandum, defense counsel

purports to provide the back-up for this assertion:

> [T]he prosecutors wrote that Hazenstab instructed (unnamed) NSA contract
> office personnel to search the contract files for any documents showing
> McComber had received "written authorization to work off-site on a virtually
> full time basis." ECF # 72, The Government's Surreply, p. 15.  Of course, the
> federal "written authorization" would not refer to "McComber," or "Kimmel."
> It would refer to the title within the labor category: Program Manager.

*Id.* at 9.  Even by the overall standards of defendant's memorandum, this passage

reaches a particularly low point.  From reading defense counsel's description above, the

Court might well take away the understanding that government counsel, desirous of

*claiming* that he had directed a search for exculpatory material relating to whether the

defendant was authorized to work off-site while not *actually* doing so, had issued an

instruction to the government's case agent to "have a search conducted for any

documents stating that 'Kimmel is hereby authorized to work off-site.'"  The Court might

further be mistakenly led to believe that if he is making such an allegation, presumably

defense counsel has uncovered written evidence, such as an email, that reflected

government counsel's unethical and dishonest attempt to *pretend* to act in accordance

with his obligations under *Brady*, while in fact *intending* to do the exact opposite.

This is a vile accusation, of course, made all the worse by the lack of *any* evidence

whatsoever to support it (for defense counsel's flights of fancy and leaps of logic most

assuredly do not constitute "evidence").  Of course, if such an email did exist, defense

counsel would have quoted it directly and attached it to this memorandum; even beyond

that, he would presumably have brought it to the Court's attention as soon as he learned

of it.  No such thing has occurred.  Instead, defense counsel bases this extraordinarily

serious allegation of professional misconduct on two sentences in government counsel's

surreply brief, which had merely stated that:

> lead NSA-OIG investigator Agent Lori Hazenstab reviewed the main
> contract during the investigation and instructed NSA contract office
> personnel to search the contract files for any documents indicating that
> the defendant had received written authorization to work off-site on a
> virtually full-time basis.  Moreover, in the summer of 2021, when defense
> counsel asked the government to again review the contract file to
> determine if there was any evidence of formal written authorization being
> given by the NSA to Ms. Kimmel to work off-site, Agent Hazenstab
> followed up on her prior requests to the Contract Office staff and searched
> through the contract file herself, likewise finding no evidence of the formal
> written authorization the defendant was seeking.

ECF # 72 at 15.  Neither of these sentences purports to set forth the exact language in

which government counsel issued his instructions to Agent Hazenstab, much less

supports Mr. Ahlers's claim that government counsel knowingly crafted this request to

ensure that it would overlook the most likely pertinent documents.[24]  To the contrary,

the purpose of each of these searches, one occurring during the investigation and one in

connection with pre-trial discovery very shortly after the indictment was returned (in

March-April 2021), was to determine whether there was anything that in any way

supported Mr. Ahlers' repeated insistence that there *must* be some written or other

reflection of authorization for the Ironbridge program manager to work off-site

somewhere in the NSA's contract files, notwithstanding (1) the defendant's and ITK

Contract chief Craig Plunkett's sworn testimony to NSA investigators in the fall and

winter of 2017-18 that no such written authorization was ever issued; and (2) the

---

[24]     In advancing this assertion, Mr. Ahlers may have forgotten what government
counsel advised him of in the summer of 2021 **(Exhibit 11)**: that not all of the contract-
related documents on the Ironbridge contract were even searchable by digital means.
See ECF 100-1 at 15 (suggesting that "If NSA has documents digitized, first search the
digital universe for the Guinther letter").

testimony of numerous other witnesses who were involved with the Ironbridge contract that they had no knowledge of any such written authorization being issued; and (3) the representation made to the government by ITK's attorney Andrew Hallowell on November 2, 2017 – based upon information produced by Craig Plunkett and, presumably, the defendant herself – that there was no written authorization for off-site work by the program manager, but only an oral understanding.

Finally, there is no need here to appoint a special master to oversee the discovery process.  Instead, this Court should reject Mr. Stein's misguided opinions about "acceptance" and "constructive amendment" and intuiting out of thin air how many hours a person worked half a decade ago while cavalierly disregarding the first-hand, direct personal knowledge of people who were actually there at the time and on the scene.  Once that occurs, this case can then move forward to a resolution.

## CONCLUSION

For the reasons set forth above, the defense's motion to compel is without merit, and it should accordingly be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/

_____

Jefferson M. Gray
Joyce K. McDonald
Assistant U.S. Attorneys

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800

Jefferson.M.Gray@usdoj.gov
Joyce.McDonald@usdoj.gov

Peter L. Cooch
Special Assistant U.S. Attorney
U.S. Attorney's Office
6406 Ivy Lane Ste 800
Greenbelt, MD 20770
(301)344-4236
Peter.Cooch2@usdoj.gov

*Counsel for the United States*

## EXHIBITS

| **Exhibit Number** | **Description** |
|---|---|
| 1 | Table showing particular documents demanded by defense counsel in their letters of April 6th, April 27th, May 5th, and June 12th, along with the defense's justifications and the government's responses |
| 2(a) | Government Counsel's Email to Defense Counsel dated March 4, 2022 concerning the purported Guinther letter and other matters |
| 2(b) | Government Counsel's Letter to Defense Counsel dated March 16, 2022 |
| 2(c) | Defense Counsel's Email to Government Counsel dated March 16, 2022 |
| 2(d) | Government Counsel's Further Letter to Defense Counsel dated March 16, 2022 |
| 3 | Cited Transcript Pages from the Status Conference Held on May 9, 2022 |
| 4(a) | Cited Transcript Pages from the Sworn Testimony of Defendant Jacky McComber before NSA-OIG Investigators |
| 4(b) | Cited Transcript Pages from the Sworn Testimony of ITK Contracts Chief Craig Plunkett before NSA-OIG Investigators |
| 5 | Government Counsel's Notes from his Call with Defense Counsel on 3/1/2022 Concerning the Discovery of the Purported Guinther Letter |
| 6 | The Government's First Discovery Transmittal Letter dated April 12, 2021 |
| 7 | The Government's Second Discovery Transmittal Letter dated August 23, 2021 |
| 8(a) | The Government's Third Discovery Transmittal Letter dated February 17, 2022 |
| 8(b) | The Government's Fourth Discovery Transmittal Letter dated March 18, 2021 |

| 9 | Cited Transcript Pages from the December 1, 2021 Motions Hearing |
| --- | --- |
| 10 | Cited Transcript Pages from the Sworn Testimony of Robert Bryan Taken Before NSA-OIG Investigators |
| 11 | Documents Relating to the Parties' Dealings Concerning Discovery from May 2021 through January 2022 |
| 12 | Photographs Showing ITK's Own Set of the Ironbridge Contract and Its Modifications as Delivered to the Government in May 2022 |
| 13 | The Government's June 3, 2022 Letter to Defense Counsel Concerning NSA Documents Requested on April 6, 2022 |
| 14 | Defense Counsel's Letter to the Government Concerning Discovery and Other Matters Dated June 12, 2022 |
| 15(a) & 15(b) | The Government's Letter to Defense Counsel Concerning the Electronic Signatures on Certain Ironbridge Contract Modifications in the Latter Part of 2017 and 2018, Along with Additional Pages from These Modifications Not Included in Defendant's Exhibit |
| 16 | 48 C.F.R. § 4.8, "Government Contract Files," from the FAR |