**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(*Northern Division*)**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     Crim. No. ELH-21-036 |
| | ) |
| JACKY LYNN McCOMBER, | ) |
|    formerly known as | ) |
|    Jacky Lynn Kimmel, | ) |
| | ) |
|       *Defendant.* | ) |

**THE GOVERNMENT'S POST-HEARING BRIEF IN SUPPORT OF ITS
MOTION TO EXCLUDE MUCH OF THE PROFFERED TESTIMONY OF
<u>DEFENSE EXPERT CHARLES STEIN</u>**

**<u>Introduction</u>**

The United States of America, by its undersigned counsel, submits this further

memorandum in support of its cross-motion (ECF # 54, filed on February 22, 2022 in

conjunction with its opposition to the defendant's motion to dismiss Counts 1-19) to

exclude many of the proffered opinions of the defendant's designated expert witness

Charles Stein.[1] The government's reply brief on its cross-motion to exclude Mr. Stein's

---

[1]     The cross-motion to exclude Stein's opinions was filed in conjunction with the
Government's opposition to the defendant's motion to dismiss (ECF #s 35 & 38)
because that motion was grounded *entirely* on Mr. Stein's supporting affidavit and his
theories about what the Federal Acquisition Regulations (FAR) required. ECF # 38-1.
Defendant's original filing, ECF # 38, did not cite a single case that was pertinent to its
argument to dismiss these counts, instead making reference to only a single case in
passing (ECF # 38-1 at 11) that related to the government's obligations under *Brady v.
Maryland*, 373 U.S. 83 (1963). The defendant's subsequent supplemental filing (ECF #
42) did not cite any case at all. Eventually, in its reply brief (ECF # 60 at 7), the defense
cited a single inapposite case arising under the Civil False Claims Act. The time-
consuming litigation surrounding the defendant's motion to dismiss the 19 False Claims
Act counts was therefore wholly driven by Mr. Stein's flawed opinions from the very
beginning. See ECF # 54 at 4 ("the defendant relies entirely on an affidavit submitted by
its proffered expert Charles Stein").

opinions was ECF # 60, filed on April 15, 2022.  In addition, on June 16th, at the Court's
further request, the government filed a statement (ECF # 105) of its positions or
objections to the 62 opinions of Mr. Stein that the defense had designated (also at the
Court's request) on May 14th in ECF # 87.

In its original filing relating to Mr. Stein's opinions back in late February, the
Government contended that Mr. Stein's opinions as they had been identified at that
point failed to meet the basic requirements of Federal Rule of Evidence 702 and the
Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-
90 (1993).  ECF # 54 at 18-25.  The government's reply brief in mid-April further
addressed  these issues, emphasizing that (1) his opinions were factually unsupported,
given that he had no involvement with the contract until after the time period covered
by the indictment and the defendant's removal as Program Manager (PM), and that he
completely disregarded or discounted as unhelpful the contrary testimony of numerous
witnesses who actually did work on the contract about the defendant's limited level of
involvement; (2) his opinions were based on speculation and surmise, or untested
theories; (3) his opinions improperly purported to instruct the jury on numerous
matters of law, such as whether the contract was constructively amended by the
government's continuing to pay for the full amount of the defendant's claimed hours
even though she spent relatively little time on the NSA campus, or whether the
government's continued payment of ITK's invoices with her time (along with that of the
other 15-16 Ironbridge contract workers) and the subsequent sending in November 2021
of the Garrett Bosshardt email constituted a binding "acceptance" of her time as billed;
and (4) that he intended to offer an opinion on the actual verdict the jury should reach:

i.e., that she worked at least 90% of the hours for which ITK billed her services and that the government was therefore not defrauded.  ECF # 78 at 6-21.

Over the six months since then, the defense has successively expanded upon, added to, and in some cases modified Mr. Stein's opinions, but as we demonstrate below, their flawed factual underpinnings and fundamental legal incompatibility with the rules and law of evidence have only become more apparent.  This is particularly true in light of many of Mr. Stein's statements during his two-and-a-half days of testimony during the motions hearing in this case on July 14th, 20th, and 25th.

But looking at the problems with Mr. Stein's proposed testimony as an expert witness based simply on his deeply problematic opinions standing alone actually understates the significant problems and the potential danger of misleading and confusing the jury that his much of his proffered testimony would present.  For Mr. Stein is not some objective outside witness who comes to this case with no prior acquaintance or personal ties to either of the parties.  By his prior admission in his initial affidavit (ECF # 38-1 at 1-2) and his testimony at the motions hearing (Tr. 7/20/22 at 146-48, **Exhibit 5**), Mr. Stein's personal acquaintance with the defendant dates back perhaps as much as a decade.  Moreover, in the winter of 2018, prior to his departure from the NSA in December of that year, Mr. Stein became directly and by his own admission, substantially involved in a dispute between InfoTeK (ITK), the defendant, and the NSA arising directly out of the commencement of this criminal investigation in the late summer of 2017.  Tr. 7/25/22 at 15-24 **(Exhibit 6).**

After an anonymous whistleblower alleged that the defendant had been billing full eight-hour days on the Ironbridge contract when she was actually doing other things since at least the previous spring, representatives of the NSA's Office of the Inspector

General (OIG) interviewed the defendant on October 3, 2017.  Based on the responses she gave during that interview, as well as her subsequent inability to produce records supporting her claim to have worked these hours (and, indeed, the admission of her then-counsel in correspondence to the agency in early November 2017 that Ms. McComber had not in fact worked all the hours ITK billed for her services as PM), the NSA's Maryland Procurement Office (MPO) declined to pay ITK for roughly 78 hours of Ms. McComber's supposed work as Program Manager (PM) in September and October 2017.  These billings would have been worth just under $12,000 to ITK.

In early January 2018, the defendant then reached out to Mr. Stein, who was then still (at least on occasion) acting as an ombudsman on behalf of vendors who had a disagreement with the NSA.  **Exhibit 1** (Kimmel-Stein email dated January 2, 2018). She set up a meeting with him, which she subsequently attended with ITK's Vice President for Contracts, Craig Plunkett.  Based upon the defendant's representations at that meeting, by February 1, 2018 Mr. Stein had – according to the then-Ironbridge contracting specialist Allison Zombolas in a June 15, 2018 email "directed" the MPO to pay ITK for the 78 hours of the defendant's time.  **Exhibit 2.**

A few weeks later, in mid-February 208, Mr. Stein injected himself into the criminal investigation at the defendant's request.  The lead NSA-OIG had made a routine request to Jonathan Nace, who was then acting as the MPO's contract manager on the Ironbridge contract (which was then in the process of being wound up), for information about the defendant's billings as PM during a four-month period in the spring and summer of 2016.  The defendant apparently learned about the request and complained to Mr. Stein, asserting that this inquiry was "confusing the vendor" and causing challenges for ITK in wrapping up the Ironbridge contract.  Mr. Stein sent an

email to the NSA-OIG's investigator instructing her that she should not directly approach any of the NSA personnel contract personnel responsible for the Ironbridge contract, but instead should submit her requests through the Office of Contracting. **Exhibit 3**. Mr. Aubrey Bobb-Semple, the current NSA-OIG Assistant Director for Investigations, has advised us that there is no basis for this asserted limitation on the OIG's ability to request information pertinent to its investigations, given its status as an independent watchdog within the NSA. **Exhibit 4**.

Mr. Stein therefore twice became involved at the defendant's request in matters relating ITK's billings for her time as the Ironbridge PM during the early stages of this investigation. Clearly, nothing that has happened since then has shaken his absolute confidence in her integrity. But Mr. Stein's peremptory dismissal of *any* of the substantial evidence supporting the charges against the defendant in this case – including the acknowledgement of her then-counsel Andrew Hallowell in November 2017 based upon the defendant's admissions that she did not work all the claimed hours on the many of the dates cited by the whistleblower, and the testimony of numerous Ironbridge contract workers that she made little apparent contribution to its continued successful performance in 2016-17 – indicates that he is a committed partisan whose proffered opinion testimony fails to meet Fed. R. Evid. 702's fundamental requirements of reliability and helpfulness. His testimony would therefore likely confuse or mislead the jury, rather than assisting it.

## ARGUMENT

### I.    THE BULK OF MR. STEIN'S PROFFERED TESTIMONY FAILS TO MEET THE FOUR REQUIREMENTS FOR ADMISSIBILITY OF EXPERT OPINIONS UNDER RULE 702

#### A.    Because of the Substantial Gaps in Mr. Stein's Knowledge and the Extraordinarily Dated Character of his Relevant Experience, Most of his Opinions Would Not Be Helpful to the Jurors as Required by Rule 702(a), and Instead Would Likely Confuse or Mislead Them.

The government noted the following in its original cross-motion to exclude Mr. Stein's testimony:

> While his long service to the federal government merits respect and he is doubtless sincere in his desire to assist the defendant in this case, with whom he has been acquainted for many years, he is simply a fish out of water here.  He has no legal training; no apparent experience as an expert witness or familiarity with the legal standards and boundaries that govern expert testimony; and his personal confidence in the defendant's integrity has led him to engage in rank speculation about what she did with her time as CEO of ITK, while at the same time disregarding substantial witness testimony that her contributions to the Ironbridge contract during her second stint as Program Manager were relatively minimal.

ECF # 54 at 19.[2]  All of those statements have been fully borne out by everything that has since transpired and developed with regard to this issue, particularly Mr. Stein's

---

[2]    These statements are a far cry from defense counsel's subsequent claim in his intemperate March 16th email to government counsel that "You have attacked Mr. Stein who is not a friend of Ms. McComber's and has an unimpeachable reputation and who has offered valid expert assessments and diminished him as though he is somehow a testimonial prostitute."  ECF 84-4.  The two prosecutors assigned to this case at that time had respectively 41 and 28 years of experience as federal government employees.  It is evident from Mr. Stein's c.v., as well as from his recent testimony at the motion hearing, that much of his own time in government has been spent in highly responsible and demanding positions.  Accordingly, we each have the highest respect for his decades of public service.  It happens, however, that the nature of the positions he has held and the actual work experience he has had – coupled with his apparent strong personal bias in the defendant's favor – means that he fails to meet the requirements for giving expert testimony in a case like this one involving straightforward claims of fraudulent billing by a government contractor for work that was not actually performed.

testimony from the witness stand at the motions hearing.  See discussion and examples cited below.

Beyond that, however, the defense's expanded statements of Mr. Stein's proffered opinions, along with his motions hearing testimony, have confirmed something that the government already suspected when it moved to exclude his opinions last February: that he is simply out of his element in trying to assist the defendant by appearing as an expert witness here.  While he spent 34 years as an employee of the NSA, it emerged during the motions hearing that his actual time directly working on or overseeing individual government contracts was limited to his first eight years with the agency from 1984-1992.  Tr. 7/20/22 at 109, 119, 126 **(Exhibit 5)**.  After he gained his contracting officer's warrant in May 1989, he only used it for roughly three-and-a-half years before he departed for an assignment on Capitol Hill at the end of 1992.  *Id.* at 118.  While his warrant was restored to him almost two decades later when he assumed the position of Senior Contracts Advisor in or about 2014, he testified that he did not have the authority or responsibility to sign off on government contracts in that position, *id.* at 142, and his warrant was again rescinded when he moved to his final position as Senior Strategist for the Business and Management Acquisition Organization.  *Id.*  Indeed, he conceded in his testimony at the motions hearing that the last time he put his signature to an NSA contract as a Contracting Officer was in 1992, fully 30 years ago (although he stated that he was "Really not good with  numbers") in the final year of President George H.W. Bush's presidency.  *Id.* at 126-27.  Beyond that, Mr. Stein conceded during his testimony that he had not reviewed or approved invoices on an NSA contract since 1992, *id.* at 138-39; had not supervised directly supervised other contracting officers since 1992, *id.* at

126; and could not remember the last time he looked at a complete contract file. *Id.* at
191-92 (although he thought it might have been a decade or longer ago).

Thus, it is tempting to say that Mr. Stein is sort of like a Rip Van Winkle of day-
to-day contract administration experience. This lack of recent hands-on experience
(combined with his evident desire to say anything he can that will be of assistance to the
defendant) sometimes led him egregiously astray in ways that would have seriously
misled and confused the jury had he been permitted to present this proffered testimony
at trial.

This was most clearly demonstrated by his assertion – repeated in the defense's
original summary of his expected testimony (ECF # 38-1); in multiple defense filings
(see, e.g., ECF # 38 at 5 & ECF # 79 at 30) and in at least two of his proffered opinions
(Nos. 34 and 49) that the Defense Contract Audit Agency (DCAA) *audits every single
invoice that a federal government contractor submits before it is authorized for
payment.* Tr. 7/25/22 at 8-15 **(Exhibit 6)**. From the moment the defense first
advanced this assertion, it struck government counsel as wholly inconceivable from a
practical standpoint, both with regard to the resources and time that would be required
for such individual audits; the practical impossibility of effectively auditing each invoice
submitted on all of the government's ongoing contracts; and the delays in routine
payments and the consequent disruptions that would entail, both for contractors and
subcontractors and the government, if this were indeed the practice. Yet Mr. Stein
staunchly stood by this facially inconceivable assertion until the motions hearing, where
he witnessed Ms. Jennifer Kolodny of the NSA and Ms. Twilla Taylor of the DCAA
briskly dismiss it. Tr. 7/14/22 at 65, 138. Subsequently, on cross-examination, Mr.
Stein had to concede that he had never had any first-hand personal knowledge (*see, e.g.*,

F<small>ED</small>. R. E<small>VID</small>. 602) of such routine audits being carried out by the DCAA, but had instead based it upon a document he was shown by defense counsel.  Tr. 7/25/22 at 15 **(Exhibit 6)**.

In and of itself, the embarrassment of Mr. Stein's wholly incorrect but repeated and emphatic insistence that the DCAA audited every invoice submitted to the NSA by a contractor should be sufficient to demonstrate that he is a poor candidate to meaningfully assist the jury as an expert witness in this case.  But there is more.

Although Mr. Stein has opined (Opinions 41, 45, & 54 and Tr. 7/20/22 at 190, **Exhibit 5**) that "My  opinions were formed based on the belief that the Government was not defrauded, that the Government received all of the services and man-hours of effort for which it entered into the contract, and my belief that the Government did not suffer any loss or harm," he then made the following stunning concession during the motions hearing:

> **Q.**   How many of the deliverables that you've spoken about that you believe were prepared and filed by Ms. McComber have you actually seen?
>
> **A.**   I have not seen them.
>
> **Q.**   You haven't seen a single one?
>
> **THE COURT:** Is there a question?
>
> **BY MR. GRAY:**
> **Q.**   The question was you haven't seen a single one?
>
> **A.**   So I -- I may have seen some that were provided to me by defense counsel.

Tr. 7/20/22 at 190 **(Exhibit 5)**.  Mr. Stein also admitted that when he provided the affidavit supporting the defendant's Motion to Dismiss (ECF #s 35 and 38) on all of the False Claims Act charges based on the Garrett Bosshardt email (which had merely

inquired of the defendant whether the contract could be closed out), he was not then aware that the Federal Acquisition Regulations or FAR (48 C.F.R. §4.804-1(c)) expressly state that "A contract shall not be closed out if (1) the contract is in litigation":

> **Q.**    And at that time, is it correct, is it not, that I asked you whether the fact that the FAR says that a contract can't be closed out if it's in litigation, you said you didn't know?
>
> **A.**    I had not familiarized myself with the finer details of the closeout procedure.
>
> **Q.**    But the closeout procedures are set forth in the contract closeout manual, which has been used as an exhibit by the defense in your testimony, correct?
>
> **A.**    I read that subsequent to our conversation.
>
> **Q.**    All right. And doesn't that expressly say that a contract can't be closed out if it's in litigation?
>
> **A.**    It does.

Tr. 7/20/22 at 192 **(Exhibit 5)**.

Mr. Stein then proceeded to indicate that he was uncertain about whether the Department of Defense's procurement manual stated that decisions accepting a contractor's work were not final in the event of fraud:

> **Q.**    Doesn't the DoD's contract -- procurement – contract procurement manual also indicate that acceptance decisions are not final in the event of fraud?
>
> **THE COURT:** Even what?
>
> **MR. GRAY:** Are not final in the event of fraud.
>
> **THE WITNESS:** I don't recall that citation.

Tr. 7/20/22 at 192-93 **(Exhibit 5)**.

**B.** **Many of Mr. Stein's Proffered Opinions Are Not Based on Sufficient Facts or Data, as Required by Rule 702(b).**

As the examples already cited above and in the next section demonstrate, Mr. Stein's opinions are also often not based on sufficient facts and data.  AS we have previously pointed out, ECF # 54 at 21*ff.*, many of Mr. Stein's proffered opinions are inadmissible because they are based on speculation, surmise, or mere personal belief, while at the same time he simultaneously disregards compelling testimony from a large number of witnesses.  Accordingly, they are grounded on inadequate data and are unreliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993) (an expert's opinion must be based on something more than subjective belief or unsupported assumptions); *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476-77 (4th Cir. 2005) (expert's opinion as to source of the fire that killed the plaintiff's decedent was inadmissible where the expert "did not exclude all or even most of the other possible sources of the fire"); *Oglesby v. Gen'l Motors Corp.*, 190 F.3d 244, 249-51 (4th Cir. 1999); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculated and are not supported by facts."); *United States v. Blair*, 2021 WL 5040334, at *6 (D. Md. Oct. 29, 2021).

No single passage better illustrates the factual infirmities that pervade Mr. Stein's proffered opinions than this one, from page 3 of a letter summarizing his opinions sent by defense counsel on February 10, 2022 (ECF # 54-9 at 4):  "InfoTek would be entitled to be paid for Jacky McComber's Senior Program Manager Services or level of effort *because it is apparent* that she delivered and NSA accepted Ms. McComber's deliverables and the contract was evidently well-run."  (Emphasis added.)  But this is

11

merely an *ipse dixit* ("Because I say so"), based on nothing more than the expert's naked assertion of his own personal belief, which the Fourth Circuit has described as the "hallmark of an unreliable opinion." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 296 (4th Cir. 2021); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"). And that is not a sufficient basis for admissibility to satisfy Rule 702(b).

C.   **Mr. Stein's Assertions that He Can "Reverse Engineer" a Determination of Exactly How Many PM Hours the Defendant Worked in 2016-17 (his Opinions 33, 41, and 45) Are Not the Product of Reliable Principles and Methods that Have Stood the Test of Review and Scrutiny by Others, as Required by Rule 702(c) and *Daubert* and *Kumho Tire*.**

It appears that the set of opinions that defense counsel most wishes to rely on Mr. Stein for are those in which he purports to be able to "reverse engineer" a determination of exactly how many hours the defendant actually worked as the Ironbridge contract's PM in 2016-17. But amidst a sea of defective and improper opinions, these are the most clearly defective and improper of all.

As with the defense's proffered opinions of Mr. Stein overall, the ones relating to his ability to "reverse engineer" a determination of the hours that the defendant put in as PM between five and six years ago have been a work-in-progress that have undergone an evolution, apparently as the defense's perception of its litigation needs at trial has evolved. First, the defense asserted in its initial letter of February 10, 2022 summarizing Mr. Stein's opinions that the evidence was "consistent with the required level of effort in man hours performed by the Senior Program Manager to within a small

margin of error (roughly 10%)." ECF # 54-9 at 5. By the time of the motions hearing, defense counsel was suggesting at the end of his direct examination that Mr. Stein could pinpoint the number of hours actually worked by the defendant with reasonable professional certainty to within a margin of 5%. Tr. 7/20/22 at 89 **(Exhibit 5).** But on cross-examination, Mr. Stein serenely insisted that defense counsel's 5% figure was still selling his skills too short. He instead affirmed that he could testify to a reasonable degree of professional certainty that the defendant had worked *every last one* of the 2,603.5 hours that ITK had billed for her between early April 2016 and early October 2017:

> **Q.**   . . . And so then -- yes, your opinion number 41 is, "My opinion, to a reasonable degree of professional certainty, is that Ms. McComber did work the total number of hours for which the Government was billed. The work product delivered by InfoTek, so-called deliverables, and accepted by NSA accords with her working 2,603.5 hours during this period of the indictment."
>
>   That's another one of your opinions, right?
>
> **A.**   Yes.
>
> **Q.**   And let's see. Let's go to your opinion number 45. Ms. McComber most likely performed -- most likely performed, repeat it again, the hours of work she billed. And then you cite a lengthy list of your reasons for believing that to be the case, correct?
>
> **A.**   Correct.
>
> **Q.**   And I think -- didn't Mr. Ahlers suggest in one of his questions earlier today that it is your opinion that you can state to a reasonable degree of professional certainty that Ms. McComber actually worked to within 5 percent of those 2,603 hours that she -- that InfoTek billed for her services as program manager?
>
> **A.**   I believe she actually worked the hours that she billed for.
>
> **Q.**   Okay. You believe she worked the full amount, all 2,603 hours?

**A.**     That's what she billed for.

**Q.**     Okay. So the fact that she billed for those hours is enough, in your view, to indicate to you that she actually worked all of those hours?

**A.**     That, coupled with all of the other elements that lead up to my opinion on that. So element one being that the Government asked for a certain number of hours to get a certain amount of work done. The contracting officer certified that the work couldn't get done for less than that total level of effort. That those number of hours were reasonably consistent with other monthly expenditures of hours for similar work.

That there were a significant number of artifacts that were produced, delivered, and accepted by the Government as being wholly in conformance with the contract.

**Q.**     Right. So I think the -- the short answer to my question is you do -- you believe that you can determine in retrospect, based on your general knowledge of contracting practices and what you know of this contract, that she did bill the full 2,000 -- that she did work the full 2,603 hours for which InfoTek billed for her services as program manager?

**A.**     My answer is that I believe that she did work them.

**Q.**     Okay.  And that's -- and you believe that to a reasonable degree of professional certainty based on the things that you've said, right?

**A.**     Yes.

Tr. 7/20/22 at 175-77 **(Exhibit 5)**.

For expert testimony to be admissible, Rule 702(c) requires that it must be "the product of reliable principles and methods . . . ."  Further explicating that principle, the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) stressed that a trial judge must function as a gatekeeper to ensure that any and all testimony admitted under Rule 702 "is not only relevant, but reliable," *id.* at 589; *see also id.* at 592-93, which the Court has subsequently described as the trial judge's "gatekeeper" function.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999).  The Supreme

14

Court further emphasized in *Daubert* that as used in Rule 702, "the word 'knowledge' connotes more than subjective belief or unsupported speculation. . . . Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based upon what is known." 509 U.S. at 590.   In both *Daubert* and in *Kumho Tire*, the Court held that among the factors that should be considered by a trial court when evaluating the reliability of proffered expert testimony are such things as (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) whether, in regard to a particular technique, there are standards controlling the technique's operation and whether it is has a high known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a given scientific, technical, or professional community. *Daubert*, 509 U.S. at 593-595; *Kumho Tire*, 526 U.S. at 149-50.

Merely to state these standards is sufficient to demonstrate that Mr. Stein's Opinions 33, 41, and 45 fail them abysmally.  It should furthermore be emphasized that Mr. Stein is not asserting here merely that he can derive an approximate, rough ballpark estimate of the PM hours that the defendant worked between five and six years ago. Instead, he is asserting that he can pin the number down precisely *to the half hour* – that is, the 2,603.5 that ITK billed for her supposed work as the Ironbridge PM over a 17-month period in 2016-17.  Tr. 7/20/22 at 175 **(Exhibit 5)**.

There is no obvious way to test the accuracy of Mr. Stein's "calculation of hours worked by reverse engineering" theory in practice, and, even beyond that, it is clear that neither he nor anyone else that the defense can identify appears to tried to do so.  Nor has his theory been subjected to publication or other forms of peer review; there is no known study or studies identifying its potential error rates; there are no known

standards or controls for calculating the hours that someone worked over a period of almost a year and a half; and the defense can point to nothing suggesting that this theory or technique enjoys general acceptance within the community of government contracting professionals.  All of these things were ultimately conceded by Mr. Stein on cross-examination at the motions hearing:

> **Q.** Okay. Now, let's turn to whether -- have you ever previously engaged in an exercise like this with regard to trying to reverse engineer and determine whether someone actually worked the hours for which they billed the Government on a Government contract?
>
> **A.** Not exactly like this specific instance.
>
> **Q.** All right. What does that mean, "not exactly like this specific instance"?
>
> **A.** It means that at any number of times throughout my career employees and other people would say that it was going to take a certain number of hours to get something done and then they would say that it took more or less than that.  And in my assessment of their professional skills and their abilities and their knowledge and the quality of the work product, I would agree that -- with a reasonable degree of certainty that if Bill said it took him 42 hours to get that done, the evidence indicates to me that it most likely did.
>
> **Q.** All right. And have you ever prepared any kind of a written statement of the methodology that you pursue[d] in making this kind of process of re- -- sorry, what did you say?
>
> **A.** Reverse engineer.
>
> **Q.** Reverse engineering to figure out whether the amount of hours is reasonable or not?
>
> **A.** I've never published anything or written anything down.  It's the way a lot of people work.
>
> **Q.** And I take it your theories about this -- your theories about this have never been like published in print anywhere before their submission and filings in this case, right?

**A.**      No.

**Q.**      And they've never been peer-reviewed by any professional journals or anything like that?

**A.**      No.

**Q.**      Or by administrative law, administrative sciences professors, or experts in the field, right?

**A.**      No.

**Q.**      Okay. So there's basically no peer review of your opinion about your ability to reverse engineer and figure out the number of hours Ms. McComber worked?

**A.**      That's correct.

Thus, the best Mr. Stein could come up with at the motions hearing in support of this theory so central to his proposed testimony is to note that people not infrequently will ballpark how much time a particular task is likely to take – and as any lawyer and certainly the Court would readily acknowledge, such estimates are not merely commonly wrong; they are often so by a wide margin.

Moreover, when Mr. Stein and defense counsel set out in his Opinion 45 the factors that he considered in drawing the conclusions that he previously advanced as his Opinions 31 and 43 ("My opinion to a reasonable degree of professional certainty is that McComber did work the total number of hours for which the government was billed . . . . 2603.5 hours during the period of the Indictment."), it is clear that the factors he purports to rely upon cannot begin to support the degree of precision and specificity that he and defense counsel wish to claim for their "calculation of hours worked by reverse engineering" theory:

Ms. McComber most likely performed the hours of work she billed.

First, the type of contract signifies to me that the customer did not believe the intended result could be achieved in less than the stipulated effort of program management hours.

Then, the Contracting Officer certified that the intended result cannot be achieved in less than the stipulated level of effort.

Then, the customer requested the specific number of hours to accomplish the intended result.

The number of hours worked corresponds to the MPO NSOC (customer) estimate and contract award.

The Program Manager delivered all reports.

The Program Manager completed all ITOs.

The Program Manager worked as Official Point of Contact.

The Program Manager updated program plans and documentation. The Program Manager maintained the program schedule.

The Program Manager notified the COR of changes in personnel.

The Program Manager provided credentials for employees assigned to the lronbridge contract.

The Program Manager assured, directed, and managed, InfoTeK to complete two major projects during the time of the First 10 counts of the Indictment.

The Program Manager delivered a wide range of work products that demonstrated work. was being done and progress was being made.

As a federal contracting expert very familiar with the administration of service contracts for highly technical missions of the NSA NSOC, based on the totality of information l have reviewed, including what is set forth here, I can easily infer that InfoTeK delivered the hours billed under the contract.

Stein Opinion 45 (ECF #s 87 & 105). The first three of these purported supporting factors, however, employ circular reasoning: the government budgeted for a particular number of program manager hours, therefore the actual number of program manager

hours worked must have approximately matched that.[3]   Most of the rest are strikingly general and unspecific.  Mr. Stein does not state (and clearly has not made an effort to determine) exactly how many reports were delivered; how much time was involved in serving as the "Official Point of Contact" (particularly since the Ironbridge technical lead, Jason Doyle, was actually physically on site at the K-3 offices in NSOC on a daily basis); or whether it was the defendant who "delivered a wide range of work products," as opposed to the Ironbridge contract staff working under Jason Doyle's technical direction.

Beyond that, as we have noted, Mr. Stein (and defense counsel) essentially dismissed out of hand all of the sworn testimony from actual Ironbridge contract workers as to what the defendant did, and did not, do (and who else did it, such as Mr. Doyle).  Yet as he conceded on cross-examination, Mr. Stein's own involvement with the Ironbridge contract prior to the time that he became involved in the PM billing issue in early 2018 (by which time the contract was winding down towards its termination three months later) was minimal, if not non-existent:

> **Q.**   Did you have any previous direct involvement or experience with the Ironbridge contract [prior to the PM billing issue in early 2018]?
>
> **A.**   I may have done it.
>
> **Q.**   But you don't know?
>
> **A.**   I can't recall.

---

[3]   In fact, of course, given the unknown nature of future threats impacting on U.S. national security and the technological unknowns and imponderables that might be involved in addressing such threats, it is equally plausible to assume that such estimates would include a generous extra margin to account for potentially unexpected future developments.

**Q.**     You can't recall anything about having had previous experience with the Ironbridge contract?

**A.**     Not in any specific level of detail.

**Q.**     All right.  So then we can agree that if you can't recall if you've ever had any previous experience dealing with the Ironbridge contract that there is nothing that you bring to your testimony as an expert witness here that is based on firsthand experience with the Ironbridge contract?

[objection by defense counsel asserted and resolved]

**THE WITNESS:** I don't recall any substantive contemporaneous involvement with the Ironbridge contract beyond the issue of the invoicing. There may have been some relatively informal meetings and conversations. I think there may have been one regarding space -- available space in NSOC and whether they had enough desks.

**BY MR. GRAY:**
**Q.**     That's speculation on your part, isn't it?

**A.**     There may have been. I don't recall.

Tr. 7/20/22 at 179-81 **(Exhibit 5)**.

Eventually, Mr. Stein did eventually concede on cross-examination the altogether obvious point that the ITK employees and subcontractors who actually worked on the Ironbridge contract in 2016-17 were better qualified than he was to reach an evaluation of how much work Ms. McComber actually did:

**Q.**     Mr. Stein, is it fair to say that you have chosen to give no weight to all of the sworn, under oath testimony that was given by the witnesses that we've quoted in our filing number 78?

**A.**     I wouldn't say no weight.

**Q.**     What weight you have given it?

**A.**     Well, I don't know what anyone in that conversation about day-to-day work meant by "day-to-day work." I simply don't know what they would have meant by that. I really don't.

> **Q.**   Would you agree with me that all of these employees and contractors who actually worked on the contract are in a much better place than you are to reach an evaluation as to how much work Ms. McComber did?
>
> **A.**   They were certainly there to observe the work that was going on on-site, and in that respect, they were better qualified than I am.

Tr. 7/20/22 at 182-83 **(Exhibit 5)**.

A few moments later, Mr. Stein likewise appropriately conceded that Ms. Raynett Colston, who was the defendant's predecessor as the PM on the Ironbridge contract from mid-2013 through March 2017, and who said that she found that the PM position did not require all her time and who therefore reached out to Rob Bryan, the Chief of K-3, for other constructive work she could do, was better placed than he was to evaluate how much work the position required:

> **Q.**   All right. You reviewed, I take it -- I think you've said that you reviewed at least some of the transcripts. Did you review the transcript of Raynette Colston?
>
> **A.**   Yes.
>
> **Q.**   And who is Ms. Colston?
>
> **A.**   She was a program manager on Ironbridge. She may have been the initial program manager.
>
> **Q.**   You think she may have been the initial program manager?  Wasn't she, in fact, the program manager from July of 2013 through March of 2016? In other words, she was the previous incumbent in the program manager's position before Ms. McComber took it on the second time?
>
> **A.**   So by "initial," I meant she was just the first. Not that her work was not over a period of time. That's all I meant by the word "initial."
>
> **Q.**   All right. Do you recall that she, in fact, was Ms. McComber's immediate predecessor in the position of program manager?
>
> **A.**   I do.

**Q.**     All right. And do you recall that she indicated that she felt that she didn't have enough work to do?

**A.**     I recall that she indicated that.

**Q.**     And would you agree with me that the person who was the previous program manager on this contract is better placed than you are to reach a reasonable evaluation as to how much work the program manager's job required?

**A.**     Yes.

**Q.**     And how much weight did you give Ms. Colston's statement, based on her own experience in that position, that the position did not require all of her time and that she was bored and looked for other work to do?

**A.**     Some. It wasn't a mathematical assessment. I didn't disregard it out of hand.

**THE COURT:** I'm just curious, sir, was the work that Ms. Colston was performing between July 2013 and March 2016 identical to the work the Defendant was supposedly performing?

**THE WITNESS:** She was in the same position.

**THE COURT:** I know it's the same position.

**THE WITNESS:** She had the same responsibilities. I don't know they --

**THE COURT:** Did it change?

**THE WITNESS:** I'm sorry?

**THE COURT:** Do they change or is it static?

**THE WITNESS:** No, Your Honor, they don't. The responsibilities are static.

**THE COURT:** Pardon?

**THE WITNESS:** The responsibilities remain.

Tr. 7/20/22 at 183-84 **(Exhibit 5)**.

Mr. Stein further conceded that he had arrived at his opinions about the number of hours that the defendant would have been required to put in as PM without knowing what the level of vacancies were on the Ironbridge contract that she would have been obliged to fill:

> **Q.** What actual knowledge do you have of the level of employee turnover on the Ironbridge contract?
>
> **A.** Only that there was some that took place. I don't recall whether it was out of the ordinary for other similar contracts.  I believe that towards the end of the contract the turnover was higher, as is fairly typical.  But just because it's typical for turnover to be higher at the end of the contract doesn't relieve the contractor of replacing those people with qualified staff.
>
> **Q.** But that's one of the points you relied on is that she had to spend time hiring new employees. And in fact if I'm understanding you correctly, you have no specific knowledge as to how often she had to hire new employees during the period between March of 2016 and September of 2017 when she was the program manager?
>
> **A.** I couldn't tell you how many people she interviewed, and I couldn't tell you for any given day or week or month how many vacancies there were against the requirement.

Tr. 7/20/22 at 186 **(Exhibit 5)**.

> **D.**   **Mr. Stein has Not Reliably Applied his Purported Principles and Methods to the Facts of this Case, as Required by Rule 702(d); Instead, He has Reflexively Dismissed or Discounted Information that is Not Helpful to the Defendant.**

Many of the examples cited in the previous section likewise suffice the demonstrate the inadmissibility of Mr. Stein's opinions under Rule 702(d).  Another revealing example of Mr. Stein's staunch determination to reach a conclusion that would benefit the defendant came during his discussion of non-conforming services, where his

testimony departed from the common understanding of the word "services" and, indeed, simple common sense.

In his Opinions 24, 25, and 50, Mr. Stein contended that if the government failed to reject a contractor's services as non-conforming, then that constituted a "constructive change to the contract, and accepting non-conforming services constitutes constructive acceptance," by which the government would thereafter be bound, as shown below:

**Opinion 24:**

There is something known as a "non-conforming service." An example of a non-conforming service would be if a contractor's employee had to work at the government site but did the work off-site.

**Opinion 25:**

Under the FAR 48 CFR § 46.104, the government must reject any non-conforming services. But if the government accepts non-conforming services over time, the fundamental principles of federal contracting treat the repeated acceptance of the non-conforming services as a constructive change to the contract, and accepting non-conforming services constitutes constructive acceptance.

**Opinion 50:**

The Contract Administrative Office is required by FAR to do certain things before closeout. This is found at 48 CFR §§ 46.102 & 104. The Contract Administrative Office must perform all actions necessary to verify Contractor's services conform to quality controls *before beginning* the closeout. The government must reject non-conforming services.

In an effort to make this case about non-conforming services as to which a constructive amendment of the contract had occurred – rather than services that were never in fact provided, which is what the indictment charges occurred here – Mr. Stein's treatment of the common meaning of the word "services" eventually verged on the Orwellian or Kafkaesque:

> **Q.**      . . . If someone overbills the Government and charges the Government for work they did not actually put in on a Government contract, is that a nonconforming service?
>
> **A.**      If they don't -- if they don't do the work, then the fact that they did not do the work means the service was nonconforming.

Tr. 7/20/22 at 195 **(Exhibit 5)**.

When the cross-examination continued on the third morning of the motion hearing, Mr. Stein continued to fence with government counsel at extraordinary length (and with irrelevant digressions) about whether a contractor's overbilling for work that was never performed was a non-conforming service. Eventually, however, he conceded the obvious point – that a contractor who billed for work he or she never actually performed should not be paid for that work – although it appeared that he still could not bring himself to say that a contractor's false invoice could ever be anything other than "erroneous":

> **Q.**      Mr. Stein, at the close of the hearing last Wednesday, I believe we had been talking about your interpretation of what nonconforming services are, do you recall that testimony?
>
> **A.**      I recall the conversation.
>
> **Q.**      Okay. And I believe you had indicated that your belief was that if a contractor was obligated to provide a certain number of hours of work and did not in fact work that number of hours, that would constitute nonconforming services; is that right?
>
> **A.**      It would.
>
> **Q.**      And so if a contractor overbills for the amount of work that they actually did, that in your view is a nonconforming service?
>
> **A.**      I don't know that that billing is necessarily part of the service under the contract.

Q.    Well, billing is essential in order to get paid, wouldn't you agree?

A.    It is.

Q.    Right. And so the only way a contractor could get paid for the work that they actually do, is if they billed for it; right?

A.    Correct.

Q.    All right. And so if a contractor fraudulently bills for more time than they actually put in, in your view, is that a nonconforming service?

A.    So I'm trying to put a fine point on what the services are under a contract. Under a government services contract, the services are all of those services that are included in the contract that are called for in the contract. In the section B, in a term type contract there's a level of effort and those are required under the contract. There's a statement of work that tells the contractor how to perform the services.  There's a DD form 1423, which lists all of the documentation that is required under the contract. And then there are any number of clauses that are in the contract that tell the contractor what they're supposed to do.

      If they don't -- if they work in a fashion that does not conform with the strict terms and conditions of the contract, if they perform services that are different from the services that are required under the contract, those services are nonconforming.

Q.    All right. Well, Mr. Stein, I take it, and you can correct me if I'm wrong, but I take it from your last answer that you in fact agree that if a contractor bills for more hours than they in fact have put in on the contract, and that bill is submitted to the NSA, the hours that they didn't work are not a non-conforming service, that's simply services that weren't provided; correct?

A.    **They've submitted an invoice that might be erroneous,** but the services that they provide are the services that they provide. That's -- and as long as all of those services are in strict conformance with the contract, then they have performed conforming services. If they're doing different work, or if they

> are not doing work, then their services are not in
> conformance.
>
> Q.   All right. So you have repeatedly said if they work,
>      if they perform services, then in the final answer you
>      just said if they don't perform work then that would
>      also be nonconforming. In your view, if a contractor
>      overbills for the amount of time that they actually
>      worked, on a firm-fixed-price level of effort
>      contract, are they entitled to be paid the amount that
>      they billed even though they didn't actually work it?
>
> THE COURT: Even though what?
>
> MR. GRAY: Even though they didn't actually work it.
>
> A.   **If the invoice is found to be erroneous for whatever
>      reason,** then they should not be paid the amount that
>      is in that invoice.

Tr. 7/25/22 at 3-6 (emphasis added) **(Exhibit 6)**.

A few minutes later, Mr. Stein – whose Opinions 41, 43, 45, 54, and 62 all, in one way or another, opined that the defendant had not defrauded the government – proceeded to make the remarkable admission that he had no more than a limited understanding of the meaning of the term "fraud." He further acknowledged that in his entire 34-year career as an employee of the NSA, he had never studied fraud and had never actually dealt with a fraud case:

> Q.   (BY MR. GRAY) All right. You say if the invoice is
>      found to be erroneous for whatever reason they should
>      not be paid.  What time period are you talking about,
>      are you talking about when the invoice first comes in
>      or are you talking about years down the road?
>
> A.   So generally speaking, it's when the invoice comes in.
>      However, the government does have the right to --
>      there's the -- the concept of latent defects,
>      something in a contract that after the performance of
>      the contract is found to be nonconforming, then the
>      government may pursue remedies.
>
> Q.   Mr. Stein, you just said there is the concept of
>      latent defects. Isn't there also a recognized concept

called fraud that is an exception to the government's obligation to pay and to its ability to seek to recoup overpayments years after the fact?

**A.**     **I'm familiar with the concept, I'm not an expert on fraud.**

**Q.**     You're not an expert on fraud, okay. Well, I mean you're -- you've been proffered here as an expert on National Security Administration contracting procedures, I believe, or words more or less to that extent. So do you mean to tell us, and to tell the Court here, that you can't say whether the fact that a contractor defrauded the government by knowingly overbilling for more work than they in fact did, you can't say whether that entitles the government not to pay that bill?

**A.**     **As far as I understand the concepts of fraud,** if fraud is found to have been committed, then the government may seek remedies.

**Q.**     All right. And the government can in fact seek those remedies after the bill was originally paid; correct?

**A.**     Yes.

**Q.**     All right. And so the fact that the -- if the government receives a bill that on its face calls for payment of a certain number of hours at a certain rate, and the government pays that bill, and then it turns out that in fact they were cheated or defrauded by the contractor, the government can pursue collecting that money; right?

**A.**     **As far as I understand the statute,** certainly.

**Q.**     Which statute are you talking about? Are you talking --

**A.**     The fraud statutes. **Again, I'm not an expert in fraud. I've never dealt with any instance of fraud in my career at the National Security Agency.**

**Q.**     Okay. Let's be clear on that. So in the course of your 34-year career with the National Security Agency, prior to this case, you have never previously dealt with any aspect of fraud against the agency. That's your testimony?

```
A.    I have personally never dealt with any aspect of fraud
      at -- in my career.

Q.    And you're not an expert on fraud?

A.    I'm not.

Q.    And you haven't studied fraud?

A.    I have not.

Q.    And you haven't read the federal False Claims Act
      statute -- criminal False Claims Act statute before
      our hearing last Wednesday?

A.    I haven't read it recently.⁴
```

Tr. 7/25/22 at 6-8 (emphasis added) **(Exhibit 6)**.  This remarkable exchange confirms the impression that the government was left with after reading each of the successive iterations of Mr. Stein's opinions:  that he simply finds it inconceivable that a government contractor could ever be subject to anything other than civil or administrative remedies for improperly billing the government for its services.  Indeed, the defense expressly stated that this was Mr. Stein's view in its original letter disclosing his opinions of February 10th (attached to the Government's Reply brief as ECF # 78-2) and in the defense's  response brief (ECF # 69 at 5, first bullet point) to the government's original cross-motion to exclude his opinions.

---

⁴     In his testimony the previous week, when he was asked whether he had ever read the Federal criminal False Claims Act (18 U.S.C. § 287), the basis for most of the charges in this case, Mr. Stein replied vaguely that "I may have read it a long time ago in my career as part of some training activity" and "I believe I've read these words before." Tr. 7/20/22 at 189-90 **(Exhibit 5).**

## II.   MR. STEIN IS NOT QUALIFIED TO BE AN EXPERT WITNESS AS TO MATTERS OF LAW, AND MANY OF HIS OPINIONS TRESPASS UPON THE COURT'S RESPONSIBILITY TO DETREMINE WHAT THE LAW IS AND WHAT LEGAL PRINCIPLES ARE RELEVANT IN THIS CASE

Beginning with its original challenge to Mr. Stein's opinions, the government has always maintained that many of them (notably Opinions 24, 25, 32, 44, 46, and 50) appeared to usurp or displace the Court's rule to say what the law is, and what legal principles are relevant to determining the defendant's guilt or innocence in this case. The Court has itself expressed similar concerns. The government submits that this tendency of Mr. Stein's is particularly troubling with regard to his repeated suggestions (e.g., in his Opinions 23 & 44) that if the government pays a contractor's submitted invoice, that constitutes an "acceptance" that either (1) constitutes an affirmative finding that the government has determined that the contractor's services were provided as billed or (2) effectively serves to estop the government from questioning that invoice or bringing criminal charges based upon it in the future.

As the Court has likewise previously observed, the law is to the contrary. *See United States v. Ebersole*, 411 F.3d 517, 522-23 (4th Cir. 2005) (affirming defendant's conviction under 18 U.S.C. § 287 even though fraudulent invoices were accepted and reviewed by the prime contractor and multiple State Department offices); *United States v. Ewing*, 1993 U.S. App. LEXIS 9899 (4th Cir. 1993) (same). Among other unpublished decisions, in *United States v. Agnew*, 147 Fed. Appx. 347 (4th Cir. 2005), the Fourth Circuit confronted the issue of whether an FDIC-insured financial institution's acceptance of fraudulent invoices meant that the Government had "implicitly acquiesced" to the conduct. *Id.* at 355. In a unanimous *per curiam* decision, the court affirmed the defendants' convictions for fraud, writing that "it is sufficient for

fraud to demonstrate a defendant's knowledge that the invoice does not qualify for payment." *Id.* This condition had been met. Equally damning, in the court's view, was that the defendants had failed to show any express authorization, either oral or written, for the modification they had made to the contract. *Id.* To the contrary: As the court put it, "they rel[ied] on the fact that their increasingly brazen series of misrepresentations passed without notice." *Id.* Rejecting the defendants' interpretation of the law, the Fourth Circuit panel declared that the defendants' success in submitting fraudulent invoices "does not absolve them from engaging in that practice in the first place." *Id.*

Another unpublished Fourth Circuit decision that reached this same conclusion is *United States v. Spencer*, 1996 U.S. App. LEXIS 27424 (4th Cir. 1996). In that case, the defendant was awarded a contract to supply the Department of State with locksmith services. In performing the contract, the defendant submitted fraudulent invoices and billed for hours not worked. *Id.* at 7-8. The Fourth Circuit panel again unanimously concluded that the invoices, even if they were accepted, were still fraudulent because they failed to properly reflect actual work done. *Id.* at 4. The court also rejected the defendant's argument that the contract had been modified by course of performance. Because Spencer failed to produce evidence that the State Department was clearly aware of his questionable behavior, the court found that it was "impossible to conclude that the Department ratified the alleged modification." *Id.* at 6.

Indeed, even civil cases have rejected the premises and assumptions underlying the opinions concerning "acceptance" proffered by the defense. In *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003), for example, the Second Circuit held that for a course of performance to demonstrate mutual assent to a contract

modification, the parties' mutual conduct must evidence an "indisputable mutual departure from the written agreement." *Id.* at 783.  And in *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999), the court further declared that a defendant's knowledge that an invoice did not qualify for payment was sufficient to prove fraud.  *Id.* at 238-41.  The reasoning of all of these decisions fails to support what at times seems to be the defendant's implicit theory that the government's contemporaneous failure to detect false or fraudulent billing by a contractor should preclude future criminal prosecution for those acts.

With regard to the issue of improper legal opinions more generally, Mr. Stein's personal opinion as to the defendant's innocence, or his view that questions concerning the accuracy of a federal contractor's billings should only be resolved through administrative or civil proceedings, and not through a criminal prosecution, are utterly irrelevant under FED. R. EVID. 401.  "[A] witness cannot testify as to his or her view of the verdict that should be reached."  *Blair*, 2021 WL 5040334, at *10, *citing Offill*, 666 F.3d at 175 (4th Cir. 2011); *see also Blair*, 2021 WL 5040334, at *27 ("Nor may an expert, in effect, tell the jury what verdict to reach."), *citing United States v. Perkins*, 470 F.3d 150, 157-58 (4th Cir. 2006).  Mr. Stein's opinions that "it is almost inconceivable that the Government could assert that the contractor did not perform the level of effort hours" (ECF # 54-9 at 7) or that "If the Customer alleged that InfoTek billed for hours not worked, this would best be resolved under the Disputes Clause" (ECF # 69 at 5, first bullet point) both fall squarely within that well-established prohibition.

Likewise, the defense's view that the Court should permit Mr. Stein to instruct the jury that "the Government constructively changed the terms of the contract and

accepted the work as conforming" (ECF # 54-9 at 7) runs afoul of the fundamental principle that "Expert testimony that states a legal conclusion or concerns dispositive legal issues is generally inadmissible." *Blair*, 2021 WL 5040334, at *9, *citing Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988) and *United States v. Melvin*, 508 Fed. App'x 209, 211 (4th Cir. 2013) (stating that "an expert generally is not permitted to apply law to facts to reach a legal conclusion"); *see also Blair*, 2021 WL 5040334, at *10 ("Nor can the witness usurp the judge's role in determining the law and explaining it to the jury."). Accordingly, the defense's attempts to present as matters of expert opinion Mr. Stein's legal conclusions that the Ironbridge contract was "constructively amended" by the NSA's failure to detect the defendant's fraud at an earlier point, or that the November 2021 Bosshardt email constituted an "acceptance" that triggered an equitable estoppel against the government, thereby requiring dismissal of a grand jury indictment returned almost nine months earlier, as well as his further opinions about how this matter should have been addressed or what result the jury should reach, should be squarely rejected by this Court.

### III.   A LIMITED NUMBER OF MR. STEIN'S "OPINIONS" COULD BE PROPERLY PRESENTED AS STATEMENTS OF FACT BY A WITNESS WITH APPROPRIATE PERSONBAL KNOWLEDGE OR EXPERIENCE

As we acknowledged in our reply brief, ECF # 78 at 22, many of the 62 opinions set forth in the defendant's filing ECF # 87 (notably Opinions 1-6, 12-13, 19-21, and 28-29) could be appropriately admitted as statements of fact by a properly qualified and experienced witness.  It may also be that the parties could agree to appropriately phrased stipulations covering the information advanced in many of these.  While Mr.

Stein might well be qualified to offer factual testimony relating to these matters, we note that as a practical matter, it is likely that these matters will already be a part of the record before the trial reaches the defense's case.

IV.    **WHETHER THE DEFENDANT IN FACT WORKED A NUMBER OF HOURS THAT WAS NOT MATERIALLY DIFFERENT FROM WHAT ITK BILLED FOR HER IS A STRAIGHTFORWARD INQUIRY AND DOES NOT REQUIRE SPECIALIZED KNOWLEDGE, EXPERIENCE, OR TESTIMONY FROM AN EXPERT WITNESS FOR THE JURY TO UNDERSTAND**

Finally, in a number of the "rebuttal" points advanced in its filing (ECF # 112-1) in response to the government's statement of its objections to Mr. Stein's opinions (ECF # 105), notably those for Opinion 13, the defense has invoked the idea that expert opinion testimony is particularly appropriate in cases involving complex statutory or regulatory matters or issues.  But government contracting, of course, runs the gamut from very simple, straightforward matters to far more complicated ones.  And unlike fraud cases involving billing for health care services, which often turn on technical language involving the scope or applicability of procedure codes published by the Center for Medicare and Medicaid Services (CMS), there is nothing complicated about billing for an hour of work.  As we have noted before, see, e.g., ECF # 105 (responding to Mr. Stein's Opinions 26 & 27), there is nothing about the concept of a "man hour" in federal contracting that is different from the concept of an "hour" comprised of 60 minutes of 60 seconds each with which all jurors will be familiar.  All the jury will be asked to determine here is whether the defendant actually worked the number of hours – leaving aside any discrepancies judged to be immaterial – or whether she did not.  No specialized or technical knowledge is necessary to resolve that issue – only careful

attention to the evidence relating to what the defendant did and did not do as the Program Manager on the Ironbridge contract.

<u>**CONCLUSION**</u>

For the reasons set forth above, the opinions of Mr. Stein's that the government has challenged in its successive filings addressing these issues should be excluded and not presented to the jury at the trial of this case.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/

_____
Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800
Jefferson.M.Gray@usdoj.gov

Peter L. Cooch
Special Assistant U.S. Attorney

U.S. Attorney's Office
6406 Ivy Lane Ste 800
Greenbelt, MD 20770
(301) 344-4236
Peter.Cooch2@usdoj.gov

*Counsel for the United States*

## EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 1 | Email between Jacky (Kimmel) McComber and Charles Stein dated January 2, 2018 |
| 2 | Emails between NSA Contracting Specialist Allison Zombolas and ITK Vice President (Contracts) Craig Plunkett concerning the de-obligation of the remaining funds on the Ironbridge I contract (June 11-15, 2018) which include discussion of Charles Stein's role in the NSA's decision to pay ITK for 78 hours of Ironbridge Program Manager time in September-October 2017 that had previously been withheld based on inadequate documentation of the hours purportedly worked |
| 3 | Emails between Kimmel (McComber) lead investigator NSA-OIG Senior Investigator (S/I) Lori Hazenstab and Ironbridge Contract Manager Jonathan Nace commencing on February 12, 2018 regarding needed documentation for the Kimmel investigation, and an email dated February 13, 2018 from Charles Stein to S/I Hazenstab directing her (incorrectly) that she should only contact NSA contracting officials on the Ironbridge contract by going through the Office of Contracting's Front Office |
| 4 | Memorandum from NSA-OIG Assistant Inspector General Aubrey Bobb-Semple dated August 23, 2022 confirming that, contrary to Mr. Stein's instructions to S/I Hazenstab in Exhibit 3, "There is no requirement that IG investigators make requests for documents, interviews, or any other mat[t]er related to an investigation through the Office of Contracting or any other NSA Office" |
| 5 | Selected transcript pages from the motions hearing held in this case on July 20, 2022 |
| 6 | Selected transcript pages from the motions hearing held in this case on July 25, 2022 |