IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>　　　　　　　　　　　　　　　　)<br>　　v.　　　　　　　　　　　　　　)　　CRIM. NO. ELH-21-036<br>　　　　　　　　　　　　　　　　)<br>JACKY LYNN MCCOMBER,　　　)<br>　formerly known as　　　　　　)<br>　Jacky Lynn Kimmel,　　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　*Defendant.*　　　　　　)<br>_____) | |

**THE GOVERNMENT'S REPLY TO
THE DEFENDANT'S POST-HEARING BRIEF
CONCERNING THE ADMISSIBILITY OF CHARLES STEIN'S OPINIONS**

The United States of America, by its undersigned counsel, submits this further memorandum in support of its cross-motion (ECF # 54) to exclude many of the opinions of the defense's proffered expert witness, Mr. Charles Stein.

**ARGUMENT**

**LEAVING ASIDE THE FEW EXCEPTIONS NOTED BELOW (OPINIONS 1, 7, 11-13, & 17), THE REMAINING OPINIONS OF THE DEFENSE'S PROFFERED EXPERT CHARLES STEIN SHOULD BE EXCLUDED FROM COMING INTO EVIDENCE AT THE TRIAL OF THIS CASE**

In defense counsel's initial post-hearing brief (ECF # 149), he withdrew 36 of the original 62 opinions he had proffered in ECF # 87, leaving 26 opinions that he continues to pursue.[1] Of the remaining 26 opinions, they fall into the following categories:

---

[1]　Although defense counsel's filing does not expressly list the now-abandoned or set aside opinions, based upon the table he attached as ECF # 149-1, these appear to be Opinions 2-6, 8-10, 14-16, 19-21, 23, 26, 28-29, 31-32, 35, 37-39, 42, 46-49, 52-53, 55-56, and 58-60.

1

- **Opinions 1, 7, 11-13, 17-18, 22, 24-25, 27, 30 (12 opinions):** These opinions generally fall into the category of broad statements about the authority of Contracting Officers (Opinions 1, 7, 13); the significance of the Federal Acquisition Regulations (FAR) (Opinions 11-13); descriptions of firm-fixed-price and firm-fixed-price level-of-effort contracts (Opinions 17-18); how the government evaluates a contractor's performance (Opinion 22); what non-conforming services are, and whether a contract can be constructively amended if the government accepts non-conforming services (Opinions 24-25); what the significance of man-hours of effort in different labor categories are (Opinion 27); and what "deliverables" are (Opinion 30).

- **Opinions 33-34, 36, 40-41, 43-45, 54, 57, 62 (11 opinions):** These opinions relate to Mr. Stein's claim that he has the ability to "reverse engineer" a calculation of the exact number of hours that the defendant worked as program manager (PM) on the Ironbridge contract to a reasonable degree of professional certainty, based on the description of the PM's duties in the contract and the projected level-of-effort in hours for the PM labor category. They also encompass Mr. Stein's claims that "InfoTeK delivered all required services and every work product without exception," that "NSA accepted all required services and every work product without exception" (Opinion 54), and accordingly that no fraud occurred in this case (Opinion 62).

- **Opinion 36 (1 opinion):** This opinion states that Mr. Stein believes the disputed Guinther letter of October 10, 2012 to be authentic, and that it constituted a directive to the defendant to conduct her work as PM from an off-site location (while providing that she would be paid at the lower on-site rate).

- **Opinions 50-51 (2 opinions):** These opinions state that if the government starts the contract close-out process, that constitutes an affirmative finding that (1) the government has accepted all non-conforming services (Opinion 50) and that "this means that the contractor has performed all of the services and the Government has accepted those services" (Opinion 51). [Mr. Stein's Opinions 24 and 25 relating to "nonconforming services" are also somewhat similar to these two.]

In our initial post-hearing brief (ECF # 144), the government advised the court that it believed the defense's proffered opinions 1-6, 12-13, 19-21, and 28-29 "could be appropriately admitted as statements of fact by a properly qualified and experienced

2

witness." ECF # 144 at 33. Of these opinions, the only ones that the defense is still pursuing (and that are referenced above) are Opinions 1, 12, and 13. In addition, while the government is not willing to stipulate to the exact wording used in defendant's Opinions 7, 11, and 17, we could agree that our differences with the defense about the accuracy of these opinions fall within a sufficiently limited range that these can be addressed by cross-examination, as opposed to requiring the outright exclusion of these opinions. (These six opinions all fall within the first group set forth above.)

That leaves 22 opinions of Mr. Stein's – Opinions 18, 22, 24-25, 27-30, 33-34, 36, 40-41, 43-45, 50-51, 54, 57, and 61-62 – that the Government considers to be either fundamentally flawed or wholly improper or inadmissible. These fall into several general groupings, which we will address sequentially.

The 11 opinions (33-34, 36, 40-41, 43-45, 54, 57, and 62) in the second group above should be excluded on two primary grounds, either of which is a sufficient basis for their exclusion. First, they are based on speculation, surmise, or mere personal belief (also known as an *ipse dixit*, Latin for "Because I say so"), while at the same time they simply ignore or dismiss compelling contradictory testimony from a large number of witnesses who – unlike Mr. Stein – actually have personal knowledge and experience of the inner workings and day-to-day operation of the Ironbridge contract. Accordingly, these opinions of Mr. Stein's are grounded on inadequate data and are unreliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993) (an expert's opinion must be based on something more than subjective belief or unsupported assumptions); *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476-77 (4th Cir. 2005); *Oglesby v. Gen'l Motors Corp.*, 190 F.3d 244, 249-51 (4th Cir. 1999); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's

opinion should be excluded when it is based on assumptions which are speculated and are not supported by facts."); *United States v. Blair*, 2021 WL 5040334, at *6 (D. Md. Oct. 29, 2021).

Examples of pertinent information provided by witnesses who were far better placed than Mr. Stein to assess the hours actually worked by the defendant as the PM on the Ironbridge contract but which he nevertheless chose to dismiss are that provided by Raynett Colston, the Ironbridge PM from July 2013 through March 2016, and the COR-T (Technical) on the contract, Jonathan Smith. *See, e.g.*, Tr. 7/14/22 at 180-82 and 7/20/22 at 183-84 **(Exhibit 2)**. But an even more powerful example of information that Mr. Stein either overlooked or chose to disregard is the experience of Ms. Colston's predecessor as the PM on the Ironbridge contract between October 2012 and July 2013 – which was none other than the defendant herself, who during that period served the first of her two stints as the Ironbridge contract PM.

Attached as **Exhibit 1** are copies of the defendant's timesheets showing the hours she billed as the Ironbridge PM between September 30, 2012 and July 20, 2013. In his now-abandoned (or set aside) Opinion # 46, Mr. Stein was scornfully dismissive of the longtime Ironbridge COR-T Mr. Smith's expressed view that the job of PM on the Ironbridge contract by 2016 was at most a quarter-time position, asserting that:

> The second problem with that testimony is that the work of the Program Manager could not be done in ten hours a week. *That is frankly absurd*. It is like saying that a multi-million dollar business can be run with one management personnel [*sic*] working less than ten hours a week. The manager is responsible for all aspects of human resources, compliance, customer relations, review and approval of work product, and preparation of many reports for the customer. I have never seen a complex federal technology contract run on ten hours a week of program management.

4

ECF # 87 at 8-9 (filed 5/14/22) (emphasis added).  Yet what Mr. Stein brusquely dismissed as "frankly absurd" is exactly what the defendant herself did as the PM on the Ironbridge contract during a nearly ten-month period between the fall of 2012 and the summer of 2013, just before Ms. Colston took over the PM position.  This is demonstrated by the chart below:

**DEFENDANT MCCOMBER'S BILLINGS
AS PROGRAM MANAGER ON THE IRONBRIDGE CONTRACT
AND AS INFOTEK CHIEF EXECUTIVE OFFICER (CEO),
9/30/2012 – 7/20/2013**[2]

| Biweekly Timesheet | Hours Billed as Ironbridge PM | Hours Billed to "G&A Management Labor" as ITK Chief Executive Officer |
|---|---|---|
| 9/30/12 – 10/13/12 | 7.0 | 63.0 |
| 10/14/12 – 10/27/12 | 12.5 | 58.0 |
| 10/28/12 – 11/10/12 | 15.0 | 22.0 |
| 11/11/12 – 11/24/12 | 14.0 | 31.0 |
| 11/25/12 – 12/8/12 | 11.0 | 59.0 |
| 12/9/12 – 12/22/12 | 12.5 | 49.50 |
| 12/23/12 – 1/5/13 | 11.5 | 34.5 |
| 1/6/13 – 1/19/13 | 11.5 | 50.5 |
| 1/20/13 – 2/2/13 | 17.0 | 21.0 |
| 2/3/13 – 2/16/13 | 21.5 | 48.5 |
| 2/17/13 – 3/2/13 | 21.5 | 33.0 |
| 3/3/13 – 3/16/13 | 15.0 | 47.0 |
| 3/7/13 – 3/30/13 | 11.0 | 59.0 |
| 3/31/13 – 4/13/13 | 10.0 | 25.0 |
| 4/14/13 – 4/27/13 | 14.0 | 56.0 |
| 4/28/13 – 5/11/13 | 9.5 | 60.5 |
| 5/12/13 – 5/25/13 | 11.0 | 35.0 |
| 5/26/13 – 6/8/13 | 11.0 | 51.0 |
| 6/9/13 – 6/22/13 | 17.5 | 39.5 |
| 6/23/13 – 7/6/13 | 11.0 | 29.0 |
| 7/7/13 – 7/20/13 | 7.0 | 47.0 |
| | | |
| **TOTALS:** | **272.0** | **919.0** |

---

[2]  The total hours for these two categories typically do not approximate 80 hours for a biweekly time period because the defendant also billed time to another infoTeK contract with MicroSoft, vacation, holiday leave, etc.

5

It should be kept in mind that when the Court asked Mr. Stein during his testimony at the motions hearing whether the responsibilities of the PM "change [over time] or is it static?", he responded, "No, your Honor, they don't. The responsibilities are static." Tr. 7/20/22 at 183-84 (**Exhibit 2**).

The second ground on which the 11 opinions included in the second group bullet-pointed above should be excluded is that they are not based upon "reliable principles and methods" as required by FED. R. EVID. 702(c) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), which stressed that a trial judge must function as a gatekeeper to ensure that any and all testimony admitted under Rule 702 "is not only relevant, but reliable." *Id.* at 589; *see also id.* at 592-93. We have addressed this deficiency at length in our previous filing, see ECF # 144 at 12-23, and will not repeat that analysis here.

Government's Exhibits 8-11, presented during last week's hearing on the defendant's motion to compel production of supposed *Brady* material, further demonstrate the unreliability of Mr. Stein's methodology and his conclusions. Among the "deliverables" that Mr. Stein assumed the defendant was responsible for producing, and that he believed she did produce, were monthly contract status reports. Thus, when defense counsel asked him to "tell the Court what the deliverable in a firm-fixed price level-of-effort contract is?", he replied, among other things, that

> the third deliverable would be whatever reports are required in the statement of work and in the contract data requirements list. Those are also deliverables. There are monthly deliverables on man-hours expenditure, on funds expenditure, on status reports.

Tr. 7/20/22 at 34. He then later again reiterated his belief that the defendant had prepared regular status reports:

6

>   She was required under the terms of the contract to generate a large number of deliverable artifacts, funds and man-hours expenditure reports, status reports, any reports of any meetings or discussions. There was a lot of work that she was required to do as the program manager, and I believe she did that work.
>
>   **Q.**     Now, as the basis of that opinion --
>
>   **THE COURT:**  I'm sorry, I was just going to ask what would be the basis of that opinion. So thank you, Counsel.
>
>   **THE WITNESS:**   Yeah. So the deliverable of those artifacts. So they -- *they didn't create themselves. Somebody had to [do] the work.* She was the program manager. *That would lead me to believe that she did the work,* she delivered those hours.  The artifacts exist.

Tr. 7/20/22 at 61 **(Exhibit 2)** (emphasis added).

This passage is a classic example of a proffered expert relying on untested and unsupported assumptions and speculation, rather than on solid information derived either from his own knowledge; from the testimony of other witnesses with first-hand personal knowledge; or from the review of specific (and available) documents and records.  For as was demonstrated by the emails that were introduced as Government's Exhibits (GXs) 8, 9, 10, and 11 at last week's *Brady* motion hearing, status reports, at least, were not in fact done during much of first year of the defendant's second tenure as the Ironbridge PM starting in March 2016.

Thus, as GX 8 demonstrated, on April 4, 2017 – just over a year into her second stint as the Ironbridge PM – the defendant was asked by the assigned Ironbridge contract specialist at the time to actually produce a status report.  Clearly irked at this request – and either unwilling or unable to handle it herself, as a result of her own lack of knowledge about the actual work of the Ironbridge contract – defendant McComber

7

wrote to Jason Doyle, the technical lead on the contract (whom the government has identified as the person who took up most of the slack resulting from the defendant's abdication of her responsibilities), and told him to draft the report:

> ```
> Jason,
> A friendly reminder I need you to mock up some quick
> points over the past six months on the program and
> send them to me. Jon[athan Smith] had us stop doing
> these and now the COS [Contracting Specialist] is
> demanding them.
> Ugh!
> ```

GX 8 (attached as **Exhibit 3)**.

Doyle responded promptly with a bullet-pointed list summarizing the last six months of activity on the Ironbridge contract and also asked, "`Let me know if this is what you are looking for.  Is this something that should be done weekly?  Monthly?`", to which the defendant replied, "`monthly`". GX 9 **(Exhibit 3).** Doyle's final question suggests (consistent with his sworn testimony to the NSA about the defendant's general lack of involvement with the Ironbridge contract) that he suspected that the obligation to prepare these monthly status reports would continue to rest with him going forward.  Less than twenty minutes later, after having apparently made no changes to what Doyle had sent her, other than adding a heading with her name at the top and inserting a six-character prefix at the start of each bullet point that is redacted in the NSA's production copy, the defendant dispatched this slightly-more-than-one-page status report that was deemed sufficient to cover half a year's activity on the Ironbridge contract to the contracting specialist who had requested it.  GXs 10 & 11 **(Exhibit 3)**.  So while it is true that "Somebody had to [do] the work," it

was not the program manager, as Mr. Stein simply assumed.  Moreover, the work required was far more minimal (and irregularly requested) than he surmised it to be.

This group of emails, along with other matters that came to light at the motion hearing – such as Mr. Stein's forced withdrawal of his heretofore confident assertion that the Defense Contract Audit Agency (DCAA) audited every contractor invoice submitted to the NSA's Maryland Procurement Office (MPO) – demonstrates the serious dangers that can arise from permitting testimony by a proffered expert who is (for whatever reason) blindly committed to the defendant and determined to help her, while also being decades out-of-date with daily contracting practices at the NSA and who furthermore is only too willing to assume or speculate his way out of the gaps in his personal knowledge.  Whether out of a desire to assist the defendant or simply because he was unwilling to admit the limits of his knowledge, Mr. Stein appeared unable to stop himself from repeatedly engaging in speculation on the witness stand.  For example, asked whether he was capable of bringing anything to his testimony "`that is based on firsthand experience with the Ironbridge contract?`", Mr. Stein replied as follows:

> **THE WITNESS:** *I don't recall* any substantive contemporaneous involvement with the Ironbridge contract beyond the issue of the invoicing [in early 2018]. *There may have been* some relatively informal meetings and conversations. *I think there may have been one* regarding space -- available space in NSOC and whether they had enough desks.
>
> **BY MR. GRAY:**
>
> Q. That's speculation on your part, isn't it?
>
> A. *There may have been.* I don't recall.

Tr. 7/20/22 at 180-81 (**Exhibit 2**) (emphasis added).

Of the remainder of Mr. Stein's surviving opinions that are identified in the third and fourth bullet points at pages 2-3 above, it should be clear that Mr. Stein's willingness to dash in with an opinion (# 36) on the purported Guinther letter's authenticity is wholly without any reasonable basis and would be of no assistance to the court or a jury in determining whether that document was real or a fake.  In her testimony at last week's motions hearing on the defendant's *Brady* motion, Ms. Kelly Sulewski, the NSA's current Contract Office Division Chief for Engagement, Policy, and the NSOC Mission, testified that when she first saw the purported Guinther letter after it was produced by the defense of February 28th, she immediately thought that "it didn't make sense" for a number of compelling reasons.[3]  Ms. Sulewski testified that purported letter's text didn't include any of the steps that would normally be involved in shifting a position off-site; it imposed on-site rates for an off-site position, whereas the latter are higher (reflecting the contractor's additional overhead); it sought justify this change by stating that there wasn't room for one Full Time Equivalent (FTE) in the NSOC suite, which also did not make sense; it lacked the "Reply To" directive that typically appears in the upper left-hand corner of the majority of NSA contracting correspondence; and it was never formalized in a Program Modification (although fully 53 of these were done over the life of the Ironbridge contract).  Moreover, as a result of her recent review of the Ironbridge contract file in connection with preparing it to be produced to the defense, Ms. Sulewski knew that the signature on the purported October 12, 2012 Guinther letter was not consistent with most of Cherril Guinther's signatures in the file.  There was one Cherril Guinther signature in the contract file, however – on a December 19, 2011 letter

---

[3]   Because the transcript of last Monday's hearing is not yet available, this summary is based upon counsel's notes.

sent to ITK – that was not merely consistent with that on the purported Guinther letter: it was identical to it. Ms. Sulewski testified that she was able to confirm this by using the Snip-It tool on her computer to copy the signature from the December 19th letter and then comparing it with that on the purported Guinther letter. Once she determined this, Ms. Sulewski called Contract Office Chief Robert Blaschak the very next day and advised him that she did not believe the NSA had created the letter.[4]

While the admissibility of the purported Guinther letter will need to be addressed at a future hearing, Mr. Stein's proffered Opinion 36, with its casual and smug assertion that "It looks like <u>thousands</u> of other Contracting Officer letters that I have seen over 34 years," demonstrates that he has no credible basis for offering any opinions on this matter whatsoever.

Finally, Mr. Stein's last remaining group of contested opinions (Opinions 50 and 51), which contend that the very short-lived initiation of procedures relating to closing out the Ironbridge contract constitutes either an estoppel or a conclusive finding that the government had "accepted" the defendant's performance and the accuracy of all the hours she billed as PM, are both factually and legally defective. We have previously addressed the reasons for this in our responses (ECF #s 54, 72, & 78) to the defendant's motion to dismiss and in our original post-hearing brief (ECF # 144) at 30-32, where we furthermore cited a number of cases demonstrating that the defendant's position is without any legal merit.

---

[4] The concerns raised by Ms. Sulewski, which were relayed to the government from the NSA's Office of General Counsel without identifying her as their source, prompted our further inquiries which soon established that (1) Ms. Guinther was confident that she had never written the letter and (2) that its purported addressee, ITK's Contracts Manager Craig Plunkett, was likewise confident that he had never received or seen it and that it was not in ITK's own Ironbridge contract file.

## **CONCLUSION**

For the reasons stated above and in our previous filings, Mr. Stein's remaining contested opinions should be excluded from coming into evidence at the trial of this matter.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
_____
Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov


Peter L. Cooch
Trial Attorney

Fraud Section
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Peter.Cooch2@usdoj.gov


*Counsel for the United States*

## **EXHIBITS**

| **Exhibit No.** | **Description** |
| --- | --- |
| 1 | Defendant McComber's ITK timesheets showing the hours she billed for her work as the Program Manager on the Ironbridge contract between late September 2012 and late July 2013 |
| 2 | Tr. 7/20/22 at 61 & 180-84 |
| 3 | Government Exhibits 8-11 from the hearing on the Motion to Compel Production of *Brady* material, consisting of emails between the defendant and the Ironbridge contract's Technical Lead Jason Doyle and an NSA Contracting Specialist on April 4, 2017, relating to the preparation of a status report covering the work done under the contract over the previous six months |