**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. NO. ELH-21-036 |
| | ) | |
| JACKY LYNN MCCOMBER, | ) | |
| formerly known as | ) | |
| Jacky Lynn Kimmel, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**THE GOVERNMENT'S MOTION *IN LIMINE* AND
SUPPLEMENTAL ADDITIONAL BRIEF CONCERNING
THE DEFENDANT'S "ACCEPTANCE" THEORY**

**Introduction**

The United States of America, by its undersigned counsel, hereby files this

Motion *in Limine* and supplemental additional brief seeking rulings from this Court that

two factual and legal theories advanced by the defense in various filings since last

January, and as part of the proffered opinions of its expert Charles Stein, are factually

unsupported and legally invalid and therefore should not be presented or argued to the

jury in this case.[1]

---

[1]    We are in an unusual position here because the defense's theories about
"acceptance" were originally put forward in support of a motion to dismiss (ECF # 35)
that they subsequently withdrew in early July, long after extensive briefing had occurred
on it and was complete.  In his letter of July 5, 2022 (ECF # 116) to the Court
withdrawing that motion, however, defense counsel stated that "I do intend to push the
factual bases of the Motion to Dismiss as evidence of Ms. McComber's factual and legal
innocence in the forthcoming trial."  Curiously, however, he then went on to say that "To
this end, the various memoranda relied upon by the defense will remain *tangentially*
relevant" (emphasis added), which, according to WEBSTER'S II NEW COLLEGE DICTIONARY
(1995), means either "Merely touching or slightly connected" (Definition 2) or
"Superficially relevant" (Definition 3).  The government will assume that this was simply
a poor choice of words by defense counsel, and thus we will treat the arguments
advanced in defendant's previous filings as remaining valid and binding statements of

The first of these is the defense's assertion, based almost entirely on the opinions of its non-lawyer expert Charles Stein or on its interpretation of various provisions of the Federal Acquisition Regulations (FAR), that the government's routine payment of regularly submitted monthly invoices from InfoTeK (ITK) that appeared valid on their face and that were certified by an ITK company officer as true and correct constituted an "acceptance."  In the defense's view (at least as we understand it), an "acceptance" constitutes the equivalent of an affirmation, finding or representation by the relevant government official (typically either the Contracting Officer's Representative [COR] or the Contract Manager [CM]) that he or she had thoroughly reviewed all of the underlying work produced by InfoTeK (ITK) on the Ironbridge contract within that billing period and was satisfied that the services had been provided as invoiced.  *See, e.g.*, ECF # 87 (Stein Opinions 22, 23, 41, 44, 51).[2]

The second factually and legally invalid "defense" is the defense's claim that the sending of an email by a low-level government contractor named Garrett Bosshardt to the defendant asking whether there was any impediment to closing out the Ironbridge contract on November 16, 2021 – which was more than four years after the last criminal offense charged in this indictment was committed; ten months after the defendant was indicted; and nine months after the NSA suspended ITK from seeking additional or expanded contracts with any Department of Defense (DOD) component – likewise

---

its legal positions and the reasoning supporting them.  We also ask that our previous briefings on these matters be treated as incorporated here by reference to the extent that they remain relevant so we can avoid burdening the court with duplicative briefing.

[2]    While defense counsel excluded Opinion # 23 from its "Reassessment" of the opinions of Mr. Stein that it now intends to present at trial (ECF # 149-1), its essence still appears to be encompassed within the remaining opinions.

constituted a "finding" by the government that the defendant had actually worked all of the hours that ITK billed to the government for her services as Program Manager on the Ironbridge contract between April 2016 and October 2017.  The defendant therefore asserts that the NSA was fully satisfied with ITK's performance of the Ironbridge contract, notwithstanding whatever contrary stance might have been taken by the federal grand jury that indicted the defendant; the Department of Justice; or, presumably, the NSA's own Office of the Inspector General (OIG).  Again, the only support the defense has previously offered in support of its position on this issue are various provisions of the FAR, as well as a number of opinions of Mr. Stein, *see, e.g.,* ECF # 87, Opinions 50, 51, 52, 55, and 56.  In its "Reassessment," the defense has since disavowed any further intent to proceed with Opinions 52, 55, and 56, which were the ones that squarely focused on the Bosshardt email.  ECF # 149-1 at 12.[3]

   Those last three opinions specifically related to the Garrett Bosshardt email.  It appeared to the government that the defense's abandonment of these opinions in its "Reassessment" indicated that the defense had recognized, in light of the testimony

---

[3]   An apparent proofreading error or typographical error in defendant's ECF # 149 has introduced an element of confusion or uncertainty here with regard to the status of Opinion 55.  Opinion 55 was a lengthy discussion of the significance in Mr. Stein's mind of the Bosshardt email.  **Exhibit 1 (comparison of opinions originally presented in ECF # 87 and ECF # 149).**  Defendant's "Reassessment," on its second page, states in its very final sentence that "Likewise, in Opinion 55, unnecessary sentences were redlined."  *Id.*  However, Opinion 55 is wholly stricken from the list of Opinions that follow in ECF # 149-1.

   This suggests three possibilities to us:  (1) the reference to Opinion "55" on page 2 of ECF # 149 is a typo, and was actually intended to refer to some other Stein opinion in among those numbered in the 50's that was edited); (2) defense counsel originally intended only to edit Opinion 55, but then decided to strike it in its entirety before filing ECF # 149 and failed to eliminate the remaining vestigial reference to it on page 2; or (3) that defense counsel intended only to edit Opinion 55, but made a mistake and struck it in its entirety.  Clarification from defense counsel would be helpful here.

presented by Mr. Bosshardt and Ms. Jennifer Kolodny, Chief of the Contract Close-Out Division at the NSA, at the motions hearing on July 14th that the factual assumptions it had made about how the Bosshardt email came to be sent – and which formed the basis for these three opinions of Mr. Stein's – were completely unfounded.

However, in its subsequent Response to the Government's post-hearing brief (ECF # 156), defense counsel seemed to forget that the Bosshardt opinions had been stricken from his previous filing, as he asserted that "Bosshardt's email is critical because NSA through its agent Bosshardt states that the Ironbridge contract was 'hereby finalized,' 'was complete,' and 'no further supplies or services are due under the terms of the contract.'" *Id.* at 7.  We also noticed during the conference call last Thursday, September 22nd, that when the Court indicated that it believed the defense was still intending to present the Bosshardt email, defense counsel did not correct this statement or acknowledge that the defense had abandoned Mr. Stein's opinions related to the Bosshardt e-mail when it filed ECF # 149.

Conceivably, this could mean that the defense still intends to introduce the Bosshardt email, whether by calling him or the defendant as witnesses, but without having Mr. Stein offer opinions about its significance.  In any case, as a result of defense counsel's contradictory filings, we are now uncertain about the defense's posture.  We will therefore proceed to address the reasons why the Bosshardt email is not admissible under FED. R. EVID. 401 or 403 in this memorandum.

Accordingly, for the reasons set forth below in addition to those previously presented in the government's earlier filings on this issue (ECF #s 54, 78, 105, 144, and 158), the government's payment of invoices from a contractor, without more, does not constitute a representation or affirmation that the COR or CM investigated every line

item on every monthly invoice, and the defense should not be allowed to suggest at trial that it does.  Furthermore, the factual assumptions that underlay the defense's arguments and Mr. Stein's opinions about the significance of the Garrett Bosshardt email were all exposed as baseless at the motions hearing.  This "evidence" should therefore be excluded on the grounds that it is without relevance and, if admitted, could only potentially serve to confuse or mislead the jury.

### THE RELEVANT TESTIMONY TAKEN AT THE MOTIONS HEARINGS IN JULY AND AUGUST

In July and August, at motions hearings held over five days (July 14th, 20th, and 25th and August 29th and 30th), the United States presented testimony from three witnesses that is relevant to the issues raised by the defense's various filings and the proffered opinions of Mr. Charles Stein.  These were: NSA contractor Garrett Bosshardt; NSA Chief of the Contract Close-Out Division Jennifer Kolodny; and NSA Contracting Office Chief Kelly Sulewski, who was responsible for overseeing contracting for the Director of Operations, Engagement, and Policy and for the National Security Operations Center (NSOC).  The key particulars of their testimony for our current purposes were as follows.

### A.     The Testimony of Garrett Bosshardt and Jennifer Kolodny Concerning the Contract Close-Out Process.

As the Court will recall, Mr. Garrett Bosshardt was a low-level government contractor assigned to work at the NSA by his employer, a private company named T-Rosa Security, starting in 2018.  Bosshardt was initially assigned to work as an Access Control Specialist (ACS) (2018 – August 2021) who was responsible for checking identifications and searching persons entering and leaving the NSA's secured facility.

Transcript (Tr.) 7/14/22 at 3-4 (**Exhibit 2**).  His next assignment was as an
Acquisitions Professional (August 2021 – present), where he was assigned to work for
the Contract Close-Out Office.  In that position, he was assigned to work on "a huge
backlog" of old contracts that were stored in a particular office (B333) at the NSA and
"to start the process of trying to close these out" so that they could be moved and stored
in other facilities.  *Id.* at 4-8.

Mr. Bosshardt testified that when he and a colleague arrived at B333, they found
roughly 12 desks plus a number of cabinets that "were clear full of contracts," all of
which were completely uninventoried.  He and his co-worker began by tackling the task
of assembling an inventory of the contracts, which they found to number roughly 1,600.
They divided those equally and then began trying to "separate[] the contracts that were
still ongoing versus the ones that appeared to be closed."  *Id.* at 8-9.  Asked "how did you
determine if a particular contract appeared to be closed," Bosshardt responded that:

> We would go through the contract and the period of performance end date
> would be one of the key indicators we used to check to see if the contract had
> been closed. Other things we kind of looked at was how much the contract, the
> obligated amount the contract was awarded versus how much had been paid out
> and that was kind of another indicator.

*Id.* at 9.[4]

Once he and his colleague had identified a contract that seemed like it was
"maybe ready to be closed out," they would take "a standard template" that had been
given to them to use that "we would send to all of the vendors kind of just stating that,
hey, this contract looks like it's possibly closed" and asking the vendor whether they

---

[4]    On cross-examination by defense counsel, Mr. Bosshardt reiterated that the key
indicators he focused on before sending out a standard email like the one he sent out to
the defendant were simply "period of performance" and "the obligated amount of the
contract versus where it was status-wise," adding that "then reaching out to the vendors
also is a key indicator." *Id.* at 25.

were aware of any circumstances that would preclude the contract from being closed.  If they were advised of any such circumstances – as happened here with the defendant's response that the Ironbridge contract could not yet be closed out because it was in litigation – then "the contract would stay ongoing . . . ."  Mr. Bosshardt further stressed that "We hadn't made any, like, final determinations until we received communication with the vendor."  *Id.*  at 10-11, 17.

Mr. Bosshardt testified that there was nothing special about the Ironbridge contract in terms of how it came to his attention.  Rather, he had just "started on one side of the office closing out contracts desk by desk" and he ran across it ("it was just a regular contract like any of the other ones I've worked") in the course of that process. He seems to have done so some time into this project, since he began working in B333 in August and sent out the email to the defendant concerning the Ironbridge contract in mid-November; he testified that "I know it wasn't one of the first ones or the last one, but it was somewhere in the middle probably."  *Id.* at 41.  He further explained that he would reach out to the vendor once he had made a preliminary assessment of the contract's status because "we only have so many key indicators of things to look for in a contract. The vendor's gonna have further knowledge on their side of what's going on, what the specifics of the contract, where they are."  *Id.* at 12, 15, 44.

Moreover, when he was asked by government counsel "Did you review every page in the Ironbridge contract file that you had at B333?", Mr. Bosshardt responded, "No." *Id.* at 44.  This exchange then followed:

> **Q.**    Mr. Bosshardt, when you examined the Ironbridge contract file, did you examine all of the work that InfoTek Corporation had done in connection with or pursuant to the Ironbridge  contract?

**A.**    No.

**Q.**    Do you know one way or the other whether or not they did all the work
          that they were contractually obligated to do?

**A.**    That's one of the reasons why we reach out to the vendor in the first
          place to see -- to see where they are with the contract itself. That they
          had completed their part of things and then on the government side,
          after I'm done looking at it, it goes through other eyes.

*Id.* at 48.

In addition, Mr. Bosshardt testified that, contrary to defense counsel's claims in
his memorandum supporting his motion to dismiss (ECF # 38, at 1-2), at the time he
came across a part of the Ironbridge file in B333 and sent out his email of inquiry to the
defendant, he had no knowledge whatsoever about the criminal investigation relating to
her actions; her subsequent indictment; or the suspension of her and her company from
the list of eligible contractors for the Department of Defense:

**Q.**    And at the time that you reached out to Ms. McComber, were you aware
          of the -- that the NSA Office of Inspector General had conducted an
          investigation of Ms. McComber's billing practices as the program
          manager on the Ironbridge contract starting in the late summer of 2017?

**A.**    No, I was not aware.

**Q.**    Okay. Were you at the time aware of the pending criminal case against
          Ms. McComber?

**A.**    No.

**Q.**    Were you aware, in late March of 2021, the NSA had suspended Ms.
          McComber and InfoTek for continuing to provide services as a contractor
          to the United States Government?

**A.**    No.

*Id.* at 18.

Once he was advised by Ms. McComber that the contract could not be closed out because it was in litigation, Bosshardt testified that he simply responded by "saying thanks for the information and this will -- this contract will stay ongoing."  Then he recorded this information in his Excel database sheet and returned the file to the cabinet flipper where he had originally found it.  *Id.* at 19-20.  Mr. Bosshardt further stated that when he reached out to the defendant, he had not made an official determination that the Ironbridge contract file should be closed out ("No. That's why we reach out to the vendor.") and, moreover, that he did not have authority as a contractor at NSA to even make that decision.  *Id.* at 45.

Mr. Bosshardt's testimony was followed by that of Ms. Jennifer Kolodny, the Chief of the Contract Close-Out Division at the NSA, who is an 18-year veteran of the agency.  *Id.* at 51-52, 56.  Ms. Kolodny explained that she had started out at the agency as a contract specialist, assisting contract officers in the performance of their duties, and that she then moved up to being a contracting officer herself, receiving an unlimited Warrant back in 2009.  *Id.* at 51-52, 54-56.

Ms. Kolodny confirmed and elaborated upon the testimony given by Mr. Bosshardt.  She explained that the review process in which he was engaged in the late summer and fall of 2021 involved "thousands of files" that had accumulated in the B333 office to the point that "It was actually a hazard to have any more files in the office."  *Id.* at 60-61.

Asked to describe the process that her office went through in commencing the process of closing out a file, Ms. Kolodny explained that they would first go through and try and verify that they had all of the associated files; would check to see whether there

was any indication that the contractor might have classified material, or had been provided anything that would be subject to a patent; and then finally:

> We also look at very basic -- we pull up a financial report to see where we stand as far as obligation versus paid amounts. If there's no invoice activity when you look at the financial report, that's something you need to look at further too. But we kind of pull that financial just to get a basic idea of how they're doing billing-wise.

*Id.* at 66-67.  Once these steps were taken, they would then send out a notification to the contractor reporting that they were potentially ready to commence the administrative process of closing out the file, and asking whether there were any reasons from the contractor's perspective why this could not proceed.  *Id.* at 68.

Asked about the meaning of the term "physically complete," which appears at 48 C.F.R. § 4.804-4 of the Federal Acquisition Regulations (FAR) and which the defense interprets to mean that there are no questions about the propriety of the contractor's billings, Ms. Kolodny responded that "from where our office sits, 'physically complete' is based on the period of performance end date."  *Id.* at 69.  She further stated that finding that a contract file was "physically complete" did not mean that it could no longer be the subject of remedial or corrective action, noting that there was a six-year statute of limitations applicable to civil actions under the Contract Disputes Act, which begins to run "from the date that the incident occurred or the party became aware of the occurrence."  *Id.* at 69-70.  *See* 48 C.F.R. § 52.333-1(d)(1).

Explaining how Mr. Bosshardt came to work on the B333 file closing project, Ms. Kolodny stated that he was instructed that "there was a large cabinet [*sic*] of files that they needed to determine whether they were ready to move forward with the closeout process, and he would be working with them to make those determinations."  *Id.* at 71. Asked what authority, if any, Mr. Bosshardt had to bind the government, Ms. Kolodny

responded that "He did not have any authority to bind the government. He was there to make recommendations and a recommendation to proceed with a closeout of a file, but he didn't have the authority to bind the government." *Id.* at 72.

Finally, Ms. Kolodny testified that at the time Mr. Bosshardt sent his email, she herself was in possession of only general and vague knowledge about the suspension imposed upon ITK, and that Mr. Bosshardt had no knowledge relevant to the suspension or indictment at all:

> **Q.** Now, let me ask you this: As of November 16th of 2021, when Mr. Bosshardt sent his email, did you have some knowledge relating to the existence of criminal charges against Ms. McComber arising out of the Ironbridge contract?
>
> **A.** I did not know contract specifics. I knew that there was a suspension that had been processed. And, again, I didn't know any specific contract tied to it.
>
> **Q.** I see. But there was a suspension that had been processed as to Ms. McComber and/or InfoTek at an earlier time that you had awareness of?
>
> **A.** Yes.
>
> **Q.** Did Mr. Bosshardt have awareness of that suspension?
>
> **A.** He did not.
>
> **Q.** To your knowledge, did Mr. Bosshardt have any awareness that Ms. McComber was then the subject of a federal criminal indictment arising out of the Ironbridge contract?
>
> **A.** He did not.

*Id.* at 78.

After some initial perplexity over what defense counsel was talking about, Ms. Kolodny corrected defense counsel's mistaken belief that there had to be some written report with factual findings about the adequacy of the contractor's performance before a

file could proceed to be considered for close-out.  After Mr. Ahlers asked if there would

"be a communication from the obligating office to somebody saying that this file is ready

for closeout," she responded:

> **THE WITNESS:** Okay. So they would follow our standard operating procedures that say *the organization would run their reports, make a determination of which files are ready to review for closeout.* Then they would use those two letters from our Maryland Procurement Offices supplement to initiate contact with the CORs and the contractor. That would be based *on a recommendation from the CO that this is your list to work from.*

> **BY MR. AHLERS:**
>
> **Q.**   So assume, again, for the purposes of this question that the norm process was followed in the Ironbridge case. What would a lawyer seeking to see the recommendation of the CO or COR, what would the lawyer tell you in contract closeout he needs to see?
>
> **A.**   I'm not sure. I'm not really following.
>
> **Q.**   Well, we were talking about the standard practice to close a file.
>
> **A.**   Yes.
>
> **Q.**   I think it started -- the standard operating procedure started with a recommendation by somebody to close out the file?
>
> **A.**   It starts with a report.
>
> **Q.**   A report. Okay, a report. Who writes the report?
>
> **A.**   It's a report that gets run by that office through our contracting system *to give them a listing of all the files that have expired period of performances.*
>
> **Q.**   Does the -- is there any obligation on the part of a contracting officer as a period of performance is coming to a close on a contract to document whether the contract has been completed or not?
>
> **A.**   *There is no documentation. Usually it's just initiation of that contact to the COR and CO and contractor to say we've identified this file is ready for closeout.*

*Id.* at 118-119 (emphasis added).  Thus, contrary to defense counsel's mistaken belief (likely caused by Mr. Stein, based upon his interpretation of the FAR, rather than upon any familiarity with the NSA's current or recent practices), the "report" that started the close-out process rolling here was simply a lengthy computer-generated list "*of all the files that have expired period of performances.*"

Near the end of her testimony, Ms. Kolodny succinctly addressed the fundamental flaw in the defense's odd belief that if a contractor cheated the government by overbilling for the hours they had actually worked, the contracting officer's representative was required to detect that at the time and file a written report notifying the Contracting Office – or be blocked from challenging their bill subsequently:

> **Q.**   . . . Mr. Ahlers asked you some questions that if the services are not performed does someone have to put something in writing to reflect that services were not  performed. Do you recall those, that line of questions?
>
> **A.**   I do.
>
> **Q.**   Hypothetically, if someone overbilled for a number of hours that were expended on a project and submitted an invoice for payment that appeared to back up the amount that they were billing, would anyone know that services hadn't been performed to that full degree?
>
> **A.**   If supporting documentation was there, I don't know what would have alerted anybody to a problem like that.

*Id.* at 125-26.

### B.   Ms. Kelly Sulewski's Testimony Concerning Acceptance and Closing Out Contracts

Although Ms. Kelly Sulewski, the NSA's Contracting Office Chief, was called by the government to testify at the hearing on the defendant's *Brady* motion about the various categories of documents that defense counsel believed were still out there that

should be produced to him, during his cross-examination, defense counsel did take up his and Mr. Stein's theories about "acceptance" and contract completion with her during his cross-examination.  Again, however, as with Mr. Bosshardt and Ms. Kolodny, Ms. Sulewski often had difficulty understanding defense counsel's questions because their underlying premises were fundamentally erroneous.  In any case, her responses again undercut the defense's claims and the theories advanced by Mr. Stein.

Take, for example, this exchange from Mr. Ahlers's cross-examination:

**Q.**    Now, my next question involves acceptance. Do you know of any form or document that is used to prove the intentional acceptance of services? Meaning, not that I got an invoice and I'm relying in good faith on the contractor's invoice, but that I have in some way verified services and accepted them?

**A.**    **No.**   [emphasis added]

**Q.**    All right. Next, do you know of any records regarding how you complete a file, the process of completion?

**A.**    When you say "completion," are you referring to closeout?

**Q.**    Yes.

**A.**    I'm not sure what you're referring to.

**Q.**    I think completion occurs before closeout, but we'll move to closeout. Completion does occur before closeout, correct?

**A.**    The contract ends, yes.

**Q.**    And it's got to be complete, correct?

**A.**    Yes. The period [of] performance could have run out, yes.

**Q.**    Okay. Have you looked at the file with respect to the idea of completion, yes or no?

**A.**    I know that the last modification was to de-obligate unliquidated obligations from the contract, and that the review form associated with

that modification – so they were required for backup documentation to support why we're doing a certain action, and the review form indicated that the funds were being de-obligated to begin closeout of the contract.

**Q.**     And have you provided a copy of that review form to the Government?

**A.**     Yes.

**Q.**     And does that review form tell you, as a person familiar with NSA contracting, that the contract was complete?

**A.**     Yes.

**Q.**     And does it tell you it means that NSA accepted all services?

[objection asserted by the Government and ultimately sustained]

**THE COURT:**     Okay. So what is the purpose of the review form, to your knowledge, if you know?

**THE WITNESS:** With any modification, there is just a simple review form that simply states the purpose of this modification is, and a contracting officer signs it. And then depending on how extensive the action is, there may be other documentation that goes along on that particular side of the file. But it's simply just stating what the purpose of the modification is.

**THE COURT:** So it pertains to contract modifications?

**MR. AHLERS  [???  So in the transcript; probably was actually spoken by Ms. Sulewski]:**  It's internal, it's basically backup documentation that tells the story as to the particular action that was done.

**THE COURT:**     So it's not this part of the closeout process or acceptance process?

**THE WITNESS:** No.

**MR. AHLERS:**  If I may, Your Honor.

**BY MR. AHLERS:**

**Q.**     Is it true that the final modification on many contracts is a modification to de-obligate funds that are still being held in escrow, so to speak, so that

NSA can use them elsewhere because the contract, let's say Ironbridge is complete and will need no further funding?

**A.**     Yes. The purpose is to de-obligate unliquidated obligations, which means they haven't been billed for and expended.

*Id.* at 189-195 **(Exhibit 2)**.

The upshots of this extended colloquy were that the NSA's current Contracting Chief, who is herself a 35-year agency veteran (Tr. 8/29/22 at 68-70), testified to the following:

- She knew of no form or document at NSA that was "used to prove the intentional acceptance of services," which took the form of a certification that "I have in some way verified services and accepted them" (*id.* at 189-90);

- That a contract could be deemed complete because "the period [of] performance could have run out, yes" (*id.* at 190);

- That the document that would indicate completion of a contract would be "the last modification" that served "to de-obligate unliquidated obligations from the contract," along with a "review form associated with that modification" that provided "backup documentation to support why we're doing a certain action, and the review form indicated that the funds were being de-obligated to begin close-out of the contract (*id.* at 191); "With any modification, there is just a simple review form that simply states the purpose of this modification is, and a contracting officer signs it" (*id.* at 194).

As we discuss further below, the defense's main "acceptance" theory is thus based on the assumption that a COR's or CM's decision to approve for payment any submitted invoice from a contractor requires verification of presumably every line item that makes up that invoice – in this case, verifying the exact number of hours submitted for the 14-16 ITK employees and contractors whose time on the Ironbridge contract was billed to the NSA each month – and that somewhere, there should be a document confirming or evidencing that verification.  Yet the testimony of Ms. Sulewski – whose current position and responsibilities and lengthy relevant past experience (25 years) within the

contracting office made her eminently qualified to address those claims – was that each of them was without foundation.

**ARGUMENT**

I.   **THE DEFENSE'S THEORY THAT THE GOVERNMENT'S ACCEPTANCE OF AN INVOICE FOR PAYMENT CONSTITUTES A CERTIFICATION OR AFFIRMATION THAT ALL SERVICES IDENTIFIED IN THAT INVOICE WERE PROVIDED AS BILLED IS LEGALLY INVALID AND SHOULD BE EXCLUDED FROM PRESENTATION OR ARGUMENT AT TRIAL UNDER FED. R. EVID. 401 AND 403**

The defense's main "acceptance" theory, as put forward originally in its motion to dismiss (ECF # 38, filed 1/26/2022), stated the following:

> On November 16, 2021, the United States of America notified McComber that the United States accepted all of the level of efforts billed to the United States by InfoTeK and that the United States considered the Ironbridge contract complete. . . .

> Specifically, the U.S. National Security Agency (NSA), Maryland Procurement Office, Contract Close-Out Team – acting as agents of the Government on behalf of the Government – accepted McComber's level-of-effort from March 1, 2016 to September 30, 2017.  As it pertains to the Indictment, McComber billed her level-of-effort hours on invoices over 19 months represented in Counts 1-19.  As this memorandum explains, *the United States accepted the level of effort hours prior to making payment on each of the invoices at a time prior to the Indictment.*  But now, *after McComber's indictment and aware of McComber's indictment, NSA (the contract customer) has again reviewed McComber's level-of-effort.  NSA has again accepted McComber's level-of-effort.  NSA has again approved payment to McComber for the invoices relevant to Counts 1-19.*

ECF # 38 at 1-2 (emphasis added; footnote omitted).  Although defense counsel notified the Court in his letter of July 5th (ECF # 116) that he was withdrawing his Motion to Dismiss (ECF # 116), he reiterated that he still intends to advance these contentions at trial.  Thus, defense counsel has made it clear that he intends to tell the jury that because the government regularly paid ITK's monthly invoices as they were submitted,

government representatives at the time must have determined that the defendant and the other 15 or so Ironbridge contract workers worked all of the hours reported for them on each of those invoices.

Of course, if defense counsel can get the relevant CORs to testify that they in fact did specifically investigate and affirmatively determine each month that the defendant had worked the number of hours shown for her on InfoTeK's invoices, the government certainly would not stand in the way of him bringing out that testimony. But we doubt very much that this will be the case. Rather, we believe that what defense counsel wants is for this Court to allow his proffered expert witness Charles Stein to testify that if a contractor's invoice is paid by a federal agency, it must be *presumed* or *assumed* that the COR specifically verified each line item on the invoice before authorizing payment.

That claim is not remotely plausible as a practical matter. What is even more problematic and ultimately dispositive, however, is that this claim turns on legal assumptions about what the FAR asks of a COR or CM in making the decision whether to pay an invoice that are both legally unsupported and far outside the proper purview of an expert witness. See ECF # 54, 78, 144, & 168 (briefs on Government's Motion to Exclude Stein Testimony).

In short, while defense counsel's July 5th letter states that he has belatedly come to the conclusion that his original motion "invade[d] the province of the jury," he now proposes to tell the jury by means of his expert witness that its decision on the criminal false claim charges brought in this case is dictated by the legal consequences of "acceptance" and "contract completion" under the FAR. What that actually does, of course, is invade the province of the Court. Any doubt that this supposed "defense" is utterly dependent on the dubious legal contentions advanced by Charles Stein can be

quickly extinguished by reviewing the defendant's proposed jury instruction # 72

("Reading Various Provisions of the Federal Acquisition Regulations"), which consists of

five single-spaced pages of excerpts from the FAR that defense counsel (and Charles

Stein) propose to have the Court instruct the members of the jury that they must parse

through and ultimately apply.  **Exhibit 3 (Defendant's Requested Instruction No.**

**72).**

The easiest basis for rejecting the defense's "acceptance" argument is a key

provision in a volume that the defense's expert Charles Stein has repeatedly cited for

other purposes:  the DEPARTMENT OF DEFENSE COR HANDBOOK (March 22, 2012 edition)

(relevant excerpts attached as **Exhibit 4**).  The COR HANDBOOK discusses "Acceptance"

at page 61, although in terms that are clearly intended to apply to the vast generality of

DoD contracts and that are often a poor fit for a contract that involved software coding

like Ironbridge.[5]  But the following single sentence in the COR HANDBOOK blows away

defense counsel's and Mr. Stein's arguments about the decisive importance of

acceptance in this case as easily as a child's breath disperses the puff ball of a dandelion

in the spring:

> Exceptions to final acceptance include:
>
> • Latent defects,
> • **fraud**, and
> • gross mistakes amounting to fraud.

COR HANDBOOK at 62 (emphasis added) **(Exhibit 4)**.

---

[5]   For example, the COR HANDBOOK states that "Acceptance is evidenced by execution of an acceptance certificate on an inspection or receiving report form or on a commercial shipping document/packing list."  This provision probably lies behind defense counsel's obsessive (and unsuccessful) effort to get Ms. Sulewski to identify particular documents evidencing "acceptance" that he believed should be included in the Ironbridge contract file.

Thus, the DOD's COR Handbook therefore unequivocally establishes that there can be no "final acceptance" if there fraud has been committed by the contractor.  The existence of fraud (or latent defects, or gross mistakes amounting to fraud) renders irrelevant the principles of acceptance that would otherwise apply.  Moreover, this provision tacitly (and understandably) recognizes that defects in performance that are not obvious and apparent on the face of the services provided or goods delivered require an exception to the rules relating to acceptance.

In light of the clear importance of this provision and its devastating consequences for a number of his stated opinions, it is perhaps not surprising that Mr. Stein responded evasively when asked about it during the motions hearing:

> **Q.**   Doesn't the DoD's contract -- procurement – contract procurement manual also indicate that acceptance decisions are not final in the event of fraud?
>
> **THE COURT:**   Even what?
>
> **MR. GRAY:**   Are not final in the event of fraud.
>
> **THE WITNESS:** I don't recall that citation.

Tr. 7/20/22 at 192-93.[6]

Nothing better evidences why Mr. Stein should not be allowed to testify in support of the defendant's "acceptance" defense at trial than this single exchange.  If he

---

[6]   Mr. Stein's profession of ignorance about whether fraud was an exception to the COR Handbook's otherwise applicable provisions about "Acceptance" should also be considered in tandem with his repeated admissions during his cross-examination at the motions hearing that "I've never dealt with any instance of fraud in my career at the National Security Agency"; "I'm not an expert in fraud";  and that he had never studied fraud.  Tr. 7/25/22 at 6-8 ("As far as I understand the concepts of fraud . . . .")

really was ignorant that the "acceptance" provisions in the COR Handbook provided an exception for cases involving fraud, then his lack of knowledge and diligence was inexcusable – given that the treatment of "Acceptance" in the COR Handbook covers only a few pages – and he clearly lacks the knowledge and reliability to be an appropriate expert witness.  Conversely, if he was simply not prepared to concede this exception in front of the Court because he understood the potential impact of this concession on the opinions he had previously advanced, then he is equally unreliable and is an inappropriate candidate to testify as an expert about these matters on that ground.

II.     **THE DEFENSE'S CONTENTION THAT GARRETT BOSSHARDT'S NOVEMBER 2021 EMAIL CONSTITUTED AN "ACCEPTANCE" OR ACKNOWLEDGEMENT BY THE GOVERNMENT THAT ITK HAD CORRECTLY BILLED THE DEFENDANT'S HOURS AS PROGRAM MANAGER BACK IN 2016-17 IS FACTUALLY UNFOUNDED AND LEGALLY INVALID AND LIKEWISE SHOULD NOT BE PRESENTED TO THE JURY AT TRIAL**

In its original memorandum supporting his motion to dismiss, defense counsel contended that NSA contractor Garrett Bosshardt's November 16, 2021 email to the defendant – which in pertinent part, merely stated that "Our records indicate that the subject contract is complete and no further supplies or services are due under the terms of the contract" – demonstrated that the "NSA has again accepted McComber's level-of-effort" and had "again approved payment to McComber for the invoices relevant to Counts 1-19."  ECF #s 38, filed 1/26/22, at 1.

But the testimony of Mr. Bosshardt and Ms. Kolodny at the motions hearing on July 14th established that the purported factual underpinnings of the defense's assertion were completely non-existent.  To begin with, the fact that fraud is an exception to the

principles otherwise governing "acceptance" utterly eviscerates the underlying premises of this contention.  Next, the contention advanced by defendant's original motion to dismiss that Bosshardt's email demonstrated that the "NSA (the contract customer) has again reviewed McComber's level-of-effort" had no basis whatsoever.  Bosshardt's testimony made it quite clear that he in fact had reviewed *nothing* relating to the defendant's level of effort, but had instead looked only to the close-out date on the contract and how the amount paid under the contract compared to the amount obligated.  Tr. 7/14/22 at 9, 25 **(Exhibit 2).**  Bosshardt testified that he did not "examine all of the work that InfoTeK corporation had done in connection with or pursuant to the Ironbridge contract," and he further conceded that he knew nothing "one way or the other [about] whether or not they did all of the work that they were contractually obligated to do."  *Id.* at 48.  He further testified that he did not "review every page in the Ironbridge contract file that you had at B333."  *Id.* at 44.  Indeed, since Bosshardt had in his possession only had a single part of the multi-folder Ironbridge contract file, he could not have reviewed every page in the complete file even if there had been some reason why he would have needed to do so.  *Id.* at 19-20.[7]

Furthermore, Bosshardt was not specifically assigned to "review" the Ironbridge contract; it was instead one of approximately 800 old and presumably completed contracts he was assigned to review, and he only reached it after having apparently previously reviewed hundreds of others.  *Id.* at 8-9, 41.  Moreover, Ms. Kolodny testified that as a contractor, Mr. Bosshardt in any case "did not have any authority to bind the

---

[7]    That Bosshardt did not even have the whole Ironbridge file in B333 (apparently because the portion he found had been caught and left behind in a file drawer when the rest of it was removed, Tr. 7/14/22 at 19-20) casts an interesting light upon the defense's claim that his email reflects a finding that the file was "physically complete."

government," but was instead only there "to make recommendations and a recommendation to proceed with the close-out of a file . . . ."  *Id.* at 72.

The defense's claim that Bosshardt's email "accepted" the complete accuracy of the defendant's billed time as Program Manager in 2016-17 was further founded on the (unfounded) assumption that he was acting with the knowledge of McComber's indictment.  The defense's original motion to dismiss asserted:

> In theory, the post-indictment review and acceptance of the level-of-effort might have been because NSA contract personnel were unaware of McComber's indictment.  No.  NSA contract personnel *were aware* of the Indictment.

ECF # 38 at 9-10 (emphasis in the original).  But Garrett Bosshardt was the one who sent the email that supposedly reflected a "finding" that the defendant had done nothing wrong in connection with the Ironbridge contract, and Bosshardt testified that he was unaware either of McComber's indictment or of her and ITK's suspension from DoD contracting.  Tr. 7/14/22 at 18 **(Exhibit 2)**; see discussion at page 8 *supra*.  Indeed, even Ms. Kolodny, the head of the Contract Close-out Office, testified that she had only a vague degree of knowledge about the suspension.  *Id.* at 78 & discussion at page 11 *supra*.

Thus, the longer one focuses on the defense's arguments about the supposed significance of Bosshardt's email – which was, after all, based upon a template he was given that Ms. Kolodny thought was actually not the one he should have used – the clearer it becomes that they are based on nothing.  According to the defense, the significant statement in Bosshardt's email was that "Our records indicate that the subject contract is complete and no further supplies or services are due under the terms of the contract; therefore the Government considers it complete."  But a standard

dictionary definition of "complete" (from WEBSTER'S II NEW COLLEGE DICTIONARY again) is "Having come to an end," which the Ironbridge contract most definitely had done – back at the end of March 2018, nearly four years earlier.  Consistent with that, as we have seen (page 10 *supra*), Ms. Kolodny herself testified that "from where our office sits, 'physically complete' is based on the period of performance end date."  *Id*. at 69.

Thus, all of the factual assumptions advanced by the defendant to support the assignment of some significant weight or meaning to the Bosshardt email have now been proven to lack any factual basis whatsoever.  This "evidence" therefore clearly fails the test of relevance and hence admissibility, because it neither "has any tendency to make a fact more or less probable than it would be without the evidence," FED. R. EVID. 401(a), nor is it a "fact [that] is of consequence in determining the action."  FED. R. EVID. 401(b).  To the contrary: permitting the defense to introduce the Bosshardt email would simply waste the time of all concerned and doubtless leave the jury perplexed about why they are hearing about such an insignificant and meaningless event that occurred more than four years after the defendant allegedly committed her crimes.

## **CONCLUSION**

Because both aspects of the defendant's "acceptance" defense are factually unfounded and legally invalid, they should not be presented to the jury at trial, and the Court should issue an order *in limine* that so holds.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
_____

Jefferson M. Gray
Assistant U.S. Attorney

24

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov

Peter L. Cooch
Trial Attorney
Fraud Section
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
Peter.Cooch2@usdoj.gov

*Counsel for the United States*


## EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 1 | Excerpts from ECF #s 87 and 149, showing Striking of Charles Stein Opinions Relating to the Garrett Bosshardt Email |
| 2 | Transcript Pages Cited from 7/14/22 Motions Hearing |
| 3 | Requested Defense Jury Instructions Relating to Provisions of the Federal Acquisition Regulations (FAR) |
| 4 | Excerpts from the Department of Defense COR Handbook (March 22, 2012) |
| 5 | Transcript Pages Cited from 7/20/22 Motions Hearing |