UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| | | CRIM. NO. ELH-21-036 |
| JACKY LYNN McCOMBER, | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S OPPOSITION MEMORANDUM TO THE GOVERNMENT'S MOTION IN LIMINE (ACCEPTANCE)

**Introduction**

In this case, the Indictment accuses the Defendant of making a false claim for working a portion of the hours the government customer determined would be necessary to complete the assigned work in a Firm-Fixed Price, Level of Effort contract. Recently, the prosecutors filed a Motion in Limine to prohibit introduction of true and accurate facts. The prosecutors vacillate between calling certain facts an "acceptance theory" (ECF # 171 at 17) or an "acceptance defense." (*Id.* at 24).

The two "aspects" of the facts the prosecutors seek to bar seem to be: (1) acceptance of an invoice constitutes a certification or affirmation that all services identified in the invoice were provided, and (2) Garrett Bosshardt's email constituted "acceptance" of correct billing. McComber has never made either claim.

Instead, since January 28, 2022, the prosecutors have comingled three terms of art: (1) acceptance (or accepted); (2) complete (or completed); and (3) closeout. The prosecutors allege that the foundation of McComber's argument is that NSOC **accepted invoices** (ECF # 171 at 17). The actual foundation of McComber's argument is that NSOC **accepted services**.

1

In this Opposition Memorandum, McComber first delineates the definition of "acceptance" in the context of the Federal Acquisition Regulations. Then, McComber places the word acceptance in the context of the legally relevant facts of this case. Because this Honorable Court has not finished the work on Stein as an expert, McComber truncates the prosecutor's Motion in Limine from Stein. This isn't a comment on Stein's expertise and expert opinions. This is simply to rebut the prosecutors' obsession with Stein. McComber will focus the Court on facts beyond dispute and the black letter law of acceptance in the context of federal acquisition.

**<u>Acceptance</u>**

The United States Federal Acquisition Regulation includes Part 46 – Quality Assurance. As it relates to the Ironbridge contract, quality assurance is the part of the FAR that prescribes policies and procedures to ensure that services acquired under Government contract conform to the contract's quality and quantity requirements. The FAR regulations concerning quality assurance include inspection of services, acceptance of services, and other measures associated with quality requirements. FAR § 46.000. Acceptance is defined in the Federal Acquisition Regulations at FAR § 46.101.

46.101 Definitions.

As used in this part-

*Acceptance* **means the act of an authorized representative of the Government by which the Government**, for itself or as agent of another, assumes ownership of existing identified supplies tendered or **approves specific services rendered as partial or complete performance of the contract.**
(Italics in original; emphasis added.)

"Acceptance" is first relevant to this criminal case because the word is an important concept of Federal Acquisition Regulations that precedes the Ironbridge contract and controls the

2

Ironbridge contract. "Acceptance" is also relevant in this case because the word is used in the Ironbridge contract at sections E.2. and E.3. (USA-025675).

> E.2.   352.232.9011 CONSTRUCTIVE **ACCEPTANCE** – SERVICES (OCT 1993)
>
> Due to the nature of services being performed, inspection requirements, **acceptance** terms, resources available for **acceptance**, or other factors relevant to this contract, **acceptance** of services required herein shall be deemed to have occurred constructively on the 7th calendar day after performance for the purpose of determining the payment due date and computing Government interest payments pursuant to the Prompt Payment clause at 52.232-25.
>
> (End of Clause)
>
> E.3. 352.246-9001. INSPECTION AND **ACCEPTANCE** AT DESTINATION (APR 1989)
>
> Inspection and **acceptance** will be performed at destination by the Contracting Officer or duly authorized Agency personnel.
>
> (End of Clause)

(Emphasis added.)

NSOC accepted InfoTeK's Program Management services in a variety of ways. First, NSOC constructively accepted the services by not notifying the Ironbridge Program Manager of non-conforming services within 7 days of the work. *See* Ironbridge contract, § E.2. Next, NSOC paid certain invoices. Payment implies that a legally relevant event – acceptance – has occurred. *Infra* at footnote 14. Next, on June 11, 2018, the Contracting Officer (who was cross designated as a Contracting Specialist) completed a Pre-Award Modification for the express purpose of "deobligat[ing] all unliquidated funds to close out the contract." USA-027922. Deobligation of funds is a step taken only after a contract is complete. *Infra* at 11-12. Completion of the contract is the predicate to close out. *Infra* at 11-12.

3

The prosecutors have focused the Court on the Bosshardt email in a contract vacuum, as though nothing occurred before the Bosshardt email relevant to closeout. The prosecutors aver that Bosshardt was without authority to begin the close out process. But this isn't true. The prosecutors' "contract file" discovery provided to McComber in March of 2022 (including USA-027922) proves that the *close out of Ironbridge began* in June of 2018, or 41 months *before* the Bosshardt email. "The purpose of this modification [is to] deobligate all unliquidated funds to close out the contract." USA-027922. Moreover, the government followed up the Pre-Award Modification with a unilateral modification of the contract. PO053. USA-028169.

These acts and others are evidence that NSOC accepted the services, that the services were complete, and that NSOC began the Ironbridge "closeout" 41 months *before* the Bosshardt email. The Motion in Limine is an effort to re-write the facts of the case to fit the theory of criminal liability espoused by the prosecutors.

<u>Is There Evidence of Any Fact Other Than Acceptance?</u>

There is another way to consider the factual foundation and legal validity of this issue. The prosecutors assert:

> Thus, defense counsel has made it clear that he intends to tell the jury that because the government regularly paid ITK's monthly invoices as they were submitted, government representatives at the time must have determined that the defendant and the 15 or so Ironbridge contract workers worked all of the hours reported for them on each of those invoices.

> Of course, if defense counsel can get the relevant CORs to testify that they in fact did specifically investigate and affirmatively determine each month that the defendant had worked the number of hours shown for her on InfoTeK's invoices, the government would not stand in the way of him bringing out that testimony. But we doubt very much that this will be the case. Rather, we believe that what defense counsel wants is for this Court to allow his proffered expert witness Charles Stein to testify that if a contractor's invoice is paid by a federal agency, it must be presumed or assumed that the COR specifically verified each line item on the invoice before authorizing payment.

ECF # 171 at 17-18.

McComber has every right to tell the jury the facts. It is a fact that the government paid InfoTeK's invoices as submitted (with some exceptions that defense counsel will scrupulously advise the jury). It is a fact that the relevant CORs had an extensive surveillance plan (consistent with the requirements of the FAR), finally disclosed in discovery by the government in September of 2022. USA 028605-614. The government's dilemma is that their theory of the case (the PM work was done but for 19 consecutive months McComber overbilled her time for work she performed) requires the willful suspension of disbelief: every Contracting Officer and every Contracting Officer's Representative did none of the surveillance or review work they were required to do at any time during the Indictment period.

The prosecutors challenge McComber's counsel to "get the relevant CORs to testify that they in fact did specifically investigate and affirmatively determine each month that the defendant had worked the number of hours shown for her on InfoTeK's invoices." ECF # 171 at 18. But a criminal trial in a federal courtroom is a search for the truth, not an occasion to make empty dares to opposing counsel. The Ironbridge CORs were required to conduct surveillance. USA 028605-14. This is a fact, not McComber's speculation. It is a formal exposition of responsibility for NSA acquisition professionals. And at least to this point, defense counsel presumes that government professionals will testify truthfully.

In this case (Contract H98230-11-C-1496 aka Ironbridge), the Contracting Officer issued a "Memorandum of Appointment" for each person appointed as a Contracting Officer's Representative. USA 025770-804. For the Ironbridge contract, the Memorandum of Appointment specifically appointed CORs to be responsible for – among other things – oversight, cost control, general work certification, quality control, [to] **monitor contractor performance to ensure**

**services are delivered in accordance with the contract**, and **verify that all deliverables have been received and were accepted**, review all invoices for accuracy, and **check the accuracy of the number of hours of services received by the government**. (Emphasis added.) USA 025772-73; 025775; and 025782. Every Contracting Officer Representative called to testify will have a Hobson's choice during direct or cross-examination: admit that the COR did do his/her work as directed *or* admit that the COR did *not* do his/her work as directed. If the COR worked as directed, the obvious implication is that McComber did the work she billed as confirmed by the surveillance plan and checked by the COR for accuracy upon invoice. If the COR did not do work as directed, other rules apply. The Code of Federal Regulations requires that a federal employee put forth honest effort in the performance of their duties. 5 CFR § 2635.101(b)(5). Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities. *Id.* at (b)(11). If a Contracting Officer's Representative admits that he did not work as directed, the COR is subject to administrative liability. 5 CFR § 2635.106. But that is a difficulty for the prosecutors. It is not a legal reason to prevent the jury from hearing the facts.

Facts Beyond Dispute

The following facts are beyond dispute. (1) Government contracting is highly regulated through application of the FAR and DFAR.[1] (2) During a pre-award process, the government

---

1.  **FAR § 1.102 Statement of guiding principles for the Federal Acquisition System.**

    (a) The vision for the Federal Acquisition System is to deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives. Participants in the acquisition process should work together as a team and should be empowered to make decisions within their area of responsibility.

    (b) The Federal Acquisition System will-

(1) Satisfy the customer in terms of cost, quality, and timeliness of the delivered product or service by, for example-

(i) Maximizing the use of commercial products and commercial services;

(ii) Using contractors who have a track record of successful past performance or who demonstrate a current superior ability to perform; and

(iii) Promoting competition;

(2) Minimize administrative operating costs;

(3) Conduct business with integrity, fairness, and openness; and

(4) Fulfill public policy objectives.

(c) The Acquisition Team consists of all participants in Government acquisition including not only representatives of the technical, supply, and procurement communities but also the customers they serve, and the contractors who provide the products and services.

(d) The role of each member of the Acquisition Team is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs. In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR, nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

## DFAR § 201.101 Purpose.

(1) The defense acquisition system, as defined in 10 U.S.C 2545, exists to manage the investments of the United States in technologies, programs, and product support necessary to achieve the national security strategy prescribed by the President pursuant to section 108 of the National Security Act of 1947 (50 U.S.C. 3043) and to support the United States Armed Forces.

(2) The investment strategy of DoD shall be postured to support not only the current United States armed forces, but also future armed forces of the United States.

(3) The primary objective of DoD acquisition is to acquire quality supplies and services that satisfy user needs with measurable improvements to mission capability and operational support at a fair and reasonable price.

determined the hours needed to perform the Ironbridge contract prior to issuing a request for

proposal.[2] (3) The Ironbridge contract required that InfoTeK provide a program manager to work

---

2.  FAR Subpart 1.7 requires a "Determination and Findings" (D&F). FAR § 1.701 Definition.

*Determination and Findings* means a special form of written approval by an authorized official that is required by statute or regulation as a prerequisite to taking certain contract actions. The "determination" is a conclusion or decision supported by the "findings." The findings are statements of fact or rationale essential to support the determination and must cover each requirement of the statute or regulation.

FAR § 16.207-1 Description.

A firm-fixed-price, level-of-effort term contract requires-

(a) The contractor to provide a specified level of effort, over a stated period of time, on work that can be stated only in general terms; and

(b) The Government to pay the contractor a fixed dollar amount.

16.207-2 Application.

A firm-fixed-price, level-of-effort term contract is suitable for investigation or study in a specific research and development area. The product of the contract is usually a report showing the results achieved through application of the required level of effort. However, payment is based on the effort expended rather than on the results achieved.

16.207-3 Limitations.

This contract type may be used **only** when-

(a) The work required cannot otherwise be clearly defined;

(b) The required level of effort is identified and agreed upon in advance;

(c) **There is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort;** (emphasis added) and

(d) The contract price is the simplified acquisition threshold or less, unless approved by the chief of the contracting office.

**Please note:** Defense counsel has requested, and still awaits, the D&F for the original Ironbridge award.

a fixed number of hours over a fixed period of time, subject to unilateral contract modification.[3]

(4) McComber advised the government that the government could remove hours from the labor category of program manager to other labor categories while Raynett Colston was the Ironbridge Program Manager; the government removed the hours.[4] (5) McComber advised the government that the government could remove hours from the labor category of program manager while McComber was the Ironbridge Program Manager; the government removed the hours.[5] (6) McComber completed "spend plans" for the period of performance and delivered them to the Contracting Officer Representative *before* she worked any hours of any month during the period

---

**3.** Ironbridge contract, B.4 (Level of Effort) (USA-025673) & F.4 (Period of Performance) (USA-025676), and contract modifications PO01 thru PO052. Contract modifications are in the form of a Purchase Order, commonly shortened to the letters P and O: "PO." The two letters are typically pronounced "Pooh," as in Winnie the Pooh, followed by the number.   So PO01 would be pronounced "Pooh One."

**4.** PO023. USA 026240-251. Raynett Colston reported to McComber that there was insufficient work to support the directed hours for Program Management. InfoTeK communicated with the COR. A re-alignment resulted in 650 fewer Program Management hours over a one-year period of performance. The realignment on March 23, 2015 resulted in the hours being applied by the NSA customer, NSOC, to other Labor Categories "LCATs."

**5.** PO038. USA 027496-507. InfoTeK reported to the COR that there were surplus hours remaining in the program manager LCAT. On 5/16/2017, a realignment by the Government took 125 hours of program management and realigned the hours in other LCATs. Also, please see PO040. USA 027455-467. McComber reported to the COR that surplus directed hours for program management in the Ironbridge contract were available to be realigned. On August 29, 2017, 35 hours were realigned.

of the Indictment. [6] (7) The government never questioned McComber's spend plans. [7] (8)

McComber's spend plan estimated the Program Management hours each month of the Indictment

---

**6.** InfoTeK "spend plans" were required by Technical Task Order 1. McComber's "spend plans" were not the subject of the Grand Jury subpoena which sought proof of the hours worked and invoice documents. **"Spend plans" precede the performance of the work.** The prosecutors are aware of the spend plans because they are listed as a requirement of the Technical Task Order, TTO 1. USA 026920. Moreover, they are required to be part of the NSA contract file.

Perhaps these have been reviewed by the prosecutors or someone acting on their behalf and not produced because they are not classic *Brady* material. Nevertheless, the spend plans prove that *another* check and balance existed as further evidence of McComber's innocence. Specifically, **InfoTeK sent a "spend plan" *before* any month wherein McComber did the Program Management work. The spend plan predicted the amount of time that McComber would spend on Program Management.**

All of this should be found in the contract file. Unfortunately, the prosecutors muddle the law of the "contract file." (A.) The FAR at § 4.801 speaks in mandatory language. "The head of each office performing contracting, contract administration, or paying functions *shall* establish files containing the records of *all* contractual actions." FAR § 4.801(a) (emphasis added). The documentation in the files *shall be sufficient* to constitute a *complete* history of the transaction for the purpose of – . . . (4) Furnishing essential facts in the event of litigation." FAR § 4.801(b) (emphasis added). (B.) The FAR at § 4.802 speaks in mandatory language. 4.802(c): "Files *must* be maintained at organizational levels that ensure-(1) Effective documentation of contract actions..." FAR § 4.802(c)(1) (emphasis added). (C) The FAR doesn't prohibit decentralization during the performance of the contract. *See* FAR § 4.802 (d). However, the FAR requires the ability to "locate promptly any contract files." *Id.*

Please see representative spend plans at Motion Exhibit 1. The first is a spend plan requested by the COR for January 1, 2016, to October 15, 2016. The second was for January 1, 2016 to October 31, 2016. CORs frequently requested spend plays for proposed periods of performance to assess allocation of funds for the future and possible extension of the period of performance.

**If the prosecutors' theory of the case is valid, the spend plans mean that McComber notified the government of her intention to bill unnecessary hours *before* not working the hours and *before* billing the hours she did not work, over 19 months while (by remarkable coincidence) all government COs and CORs failed to put forth honest efforts in the performance of their duties as required by law.**

**7.** There were no deficiency reports against InfoTeK or McComber in the official contract file. Testimony of Kelly Sulewski, a contracting office chief, before this Honorable Court on August 29, 2022. ECF # 162 at 68, 180.

period. *See* Motion Exhibit 2.[8]  (9) The government customer constructively **accepted** the services

that McComber worked under the express terms of the Ironbridge contract.[9] (10) All of the work

that the government contracted to be done was done by the program manager.[10]  (11) The entire

contract file does not include a single notice of deficiency.[11] (12) InfoTeK billed the hours of its

workers, including McComber as program manager, on a monthly basis during the Indictment

period.[12] (13) The Indictment alleges that the government paid the invoices in full.[13] (14) The

payment of an invoice constitutes an acceptance of the services invoiced as a matter of law.[14]

---

**8.** Recall that the Ironbridge firm-fixed price level-of-effort contract required PM hours over time. InfoTeK delivered 14 spend plans for the 19-month Indictment period. (Many spend plans cover multiple months. Each month of the Indictment period included a spend plan with PM hours *before* any of the PM work was completed during the month.)

**9.** There is no evidence of a deficiency report or any other evidence that InfoTeK or McComber was notified of non-conforming service hours within seven days of any work. *See* Ironbridge contract at Section E.2.  Section E.2. of the Ironbridge contract is consistent with the requirement of the Federal Acquisition Regulations, FAR § 32.904(b)(1)(ii)(B)(1).

**10.** In the interest of speeding things along, the prosecutors ought to stipulate that InfoTeK did the work required by the Ironbridge contract, the modifications during the Indictment Period and all TTO's in effect from the beginning of the contract to and thru the end of the Indictment period without exception.  The prosecutor could argue that Jason Doyle did the work; the defense could argue that Jacky McComber did the work.

**11.** Testimony of Kelly Sulewski, a contracting office chief, before this Honorable Court on August 29, 2022. ECF # 162 at 68, 180.

**12.** JLM [Def. discovery to government] 000050-000082

**13.** Refer to the Indictment. ECF # 97 at 5.

**14.** FAR § 46.102 provides that "Agencies shall ensure that – (c) *Government contract quality assurance is conducted before acceptance.* FAR § 46.103 provides that Contracting offices are responsible for – (e) Ensuring that nonconformances are identified … when considering the acceptability of … services which do not meet contract requirements. FAR § 46.501 provides that acceptance constitutes acknowledgment that the services conform with applicable contract quality and quantity requirements. FAR § 46.502 provides that acceptance of services is the responsibility of the contracting officer. **Please note** that **NSA has never revoked any acceptance of services**. Also note that FAR § 33.209 mandates that whenever "the contractor is unable to support any part

(15) Acceptance of the services as a matter of law does not bar the government from investigating alleged criminal conduct, such as false claims. (16) The law requires the government to evaluate contractors annually.[15] Two annual evaluations prior to the Indictment period prove that Raynett Colston was an "exceptional" program manager.[16] (17) The only evaluation found during the Indictment period proves that McComber was a "very good" program manager and that invoices were properly billed for 10 of the 19 months/counts in the Indictment.[17] (18) The government cannot begin the closeout process until the contract has been physically completed.[18] (19) A contract is not physically completed until the services due under the contract have been accepted.[19] (20) The Ironbridge contract was completed on or before June 11, 2018, and the government

---

of a claim and there is evidence that the inability is attributable to misrepresentation of fact or fraud on the part of the contractor, the CO *shall* refer the matter to the agency official responsible for investigating the fraud." **To date, no COR or CO has reported any fraud to anyone**. This case is the product of an anonymous report of alleged overbilling to the NSA OIG.

**15.** The COR appointment letters (some delivered to the defense as part of discovery in March of 2022 and some delivered to the defense as part of discovery in September of 2022) require the Contracting Officer Representative so appointed to complete an annual evaluation of the contractor. For a representative appointment letter, refer to USA 028615-634.

**16.** USA 028522-526, USA 028537-541.

**17.** USA 028527-31.

**18.** FAR § 4.804-5(a) The contract administration office is responsible for initiating (automated or manual) administrative closeout of the contract after receiving evidence of its physical completion. At the outset of this process, the contract administration office must review the contract funds status and notify the contracting office of any excess funds the contract administration office might deobligate.

**19.** FAR § 4.804-4(a)(1)(ii). …A contract is considered to be physically completed when – the contractor has performed all services and the government has accepted these services. FAR § 4.804-4(a)(2) The government has given the contractor a notice of complete contract termination.

notified InfoTeK of this fact.[20] (21) Following the pre-award modification and FMS1100, the government issued PO0053.   (22) On November 16, 2021, the government continued the closeout process with the Bosshardt email. (23). The Bosshardt email unequivocally states: (i) "The subject Firm Fixed Price type contract H98230-11-C-1496 … is hereby finalized…;" (ii) "Our records indicate that the subject contract is complete, and no further supplies or services are due under the terms of the contract; and (iii) "[T]he Government considers it [the Ironbridge contract] complete." (24) Completion of the contract implies acceptance of all services; a letter from the government stating that no further services are due under the terms of the contact implies that all services under the contract were provided, conforming, and accepted. *Supra* at 6-13.

These facts establish beyond dispute that NSA accepted the services of InfoTeK's Program Manager seven days after the services were performed, at the time of the invoice for the services was approved for payment, and at the time of the payment of the services for the period of the Indictment. These facts establish that NSA considered the Ironbridge contract complete no later than June 11, 2018. These facts establish that NSA began the contract closeout in May of 2018. Bosshardt was obviously assigned to clean up, buckle up, and store the contract as part of the closeout process in November of 2021.

---

**20.** In the Ironbridge scenario, on June 11, 2018, the government notified InfoTeK by email of complete contract termination. The process preceding this notification is extensive. The process started on May 30, 2018 and was completed on June 11, 2018. Specifically, the Contracting Officer – who on May 30, 2018, was Allison Zombolas – completed a Form FMS1100.   The Form FMS1100 is a document that makes a formal, permanent record of the deobligation of all remaining funds for a contract (in this case Ironbridge) and the return of the balance of unliquidated funds to the NSOC Program Manager. The form FMS1100 is reviewed and approved by virtually every acquisition professional in any way associated with the contract. For the Ironbridge I contract, the FMS1100 was signed by the Mission Customer (Lindsay Martin), the BF5 (Nicole Brown), Business Administration (Kristin Mair), BF2 Funds Certification (Laura Ensey), and the Contracting Officer (Allison Zombolas). USA 027930, 027934-940.

Finally, it is necessary to comment on the expert opinions of Charles Stein. McComber should be permitted by this Honorable Court to present Charles Stein to offer the opinions outlined in ECF # 149; *see* also ECF # 156.   But, for the purposes of proving the admissibility of McComber's defense, the facts beyond dispute in this Memorandum were not by referance to any opinion of Charles Stein.   The facts beyond dispute in this Memorandum are the product of information contained in the contract file, provided by the government in discovery, or a matter of the Federal Acquisition Regulations.

## The Prosecutors' Argument

The United States Attorney, or his office, persuaded a Grand Jury to return a 20-count indictment against McComber. Obviously, the law permits the United States Attorney, or his assistants, to present evidence that –- despite facts beyond dispute highly indicative of complete factual and legal innocence – McComber committed a crime or crimes.

So be it. But the 24-page Memorandum filed by the prosecutors does not cite to a single case, statute, rule of evidence, or federal regulation that supports the idea that upon motion by the government the Court may prohibit an accused from presenting a defense. Moreover, as shown in this Memorandum, these are facts beyond dispute. The inferences drawn from these facts beyond dispute are that NSA accepted the services of McComber *and* that NSA began the closeout process on the Ironbridge contract.

## McComber Has a Legal Right to Present a Defense

In 1909, the Supreme Court reversed the conviction of a man convicted of defrauding the federal government because of the exclusion of defense evidence. *Crawford v. United States*, 212 U.S. 183 (1909). "There is a presumption of harm arising from the existence of an error committed

by a trial court against the party complaining, in excluding material evidence on a trial, especially before a jury." *Id.* at 203.

By no later than 1918, the Supreme Court adopted a preference for admissibility of evidence, leaving the trier of fact to determine its weight. *Rosen v. United States*, 245 U.S. 467 (1918).

> [T]ruth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent.
> *Id.* at 471.

The recognition that an accused has a constitutional right to present a defense was not recognized until *Cooke v. United States*, 267 U.S. 517 (1925). Chief Justice Taft's opinion stressed that the fifth amendment requires the opportunity to defend in federal courts. In *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court decided a case involving the partial exclusion of defense evidence. Chief Justice Warren extended the sixth amendment's right to compulsory process to include presenting exculpatory testimony of a coprincipal, prohibited to the defense under Texas law.

> The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use.
> 388 U.S. at 23.

Chief Justice Warren cited to *In re Oliver*, 333 U.S. 257 (1948), and stressed that the due process clause protected an accused's right to present a defense.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms **the right to present a defense, the right to present the defendant's version of the facts** as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

15

388 U.S. at 19.

In *Jenkins v. McKeithen*, 395 U.S. 411 (1969), the constitution's guarantees to the criminally accused were further delineated. *Jenkins* was a civil case, but it arose out of the work of the Louisiana's state Labor-Management Commission on Inquiry. The Commission served a quasi-criminal function, investigating criminal accusations to determine probable cause. Justice Marshall's opinion enumerated the sixth amendment guarantees of confrontation and cross-examination to include the right "to present evidence on [one's] own behalf." *Id.* at 429.

In three cases, decided in 1972 and 1973, the Supreme Court resolved that the accused's opportunity to present a defense is grounded upon the due process clause. The three cases – *Chambers v. Mississippi*, 410 U.S 284 (1973); *Webb v. Texas*, 409 U.S. 95 (1972); *Cool v. United States*, 409 U.S. 100 (1972) – set the stage for a right to defend analysis rooted in due process principles. In *Chambers v. Mississippi*, 410 U.S. 284 (1973), Justice Powell applied the right to defend for the first time to a case involving only partial exclusion of the defense testimony. *Compare Taylor v. Hayes*, 418 U.S. 488 (1974). Put simply, McComber has the right to put evidence that might influence the determination of guilt or innocence before her jury. *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).

In *United States v. Fernandez*, 913 F.2d 148 (1990), the Fourth Circuit affirmed the district court ruling that certain classified evidence the defendant sought to admit would be admissible.

> "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "[T]he Constitution guarantees criminal defendants a `meaningful opportunity to present a complete defense'," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Tromberra*, 467 U.S. 479, 495 (1984), and "the right to present a defense ... is a fundamental element of due process of law," *Washington v. Texas*, 388 U.S. 14, 19 (1967). Here, the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution.
> *Id.* at 154.

16

In *Richardson v. Kornegay*, 3 F.4th 687 (4th Cir. 2021), the Fourth Circuit evaluated the right to present a defense in the context of a *habeas* appeal from a state conviction wherein the trial judge excluded a defense expert witness. Recognizing that while even the right to present a defense has limits, exclusion of evidence may violate the Constitution if it "infringe[es] upon a weighty interest of the accused" and is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" *Id.* at 696 quoting *United States v. Scheffer*, 523 U.S. 303, 324 (1998).

Conclusion

In this case, McComber seeks to introduce evidence that was generated by the relevant government actors during and after the period of Indictment for the weighty interest of proving that the government accepted the services she performed *and* began the process of closeout of the contract. McComber's right to present this evidence is protected by the United States Constitution, *supra* at 14-17. The government has provided no valid reason or authority for the Court to exclude the evidence.

/s/
_____
Clarke F. Ahlers, Esq.
Bar ID No.: 08577
Clarke F. Ahlers, P.C.
Atholton Square
10450 Shaker Drive, Suite 111
Columbia, Maryland 21046
cahlers@aol.com
410-740-1444

Attorney for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 12, 2021, this DEFENDANT'S OPPOSITION MEMORANDUM TO THE  GOVERNMENT'S MOTION IN LIMINE (ACCEPTANCE) was served by ECF upon the Office of the United States Attorney for the District of Maryland.

/s/

_____

Clarke F. Ahlers, Esq.