IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JACKY LYNN McCOMBER,
  Formerly known as
  Jacky Lynn Kimmel,

    *Defendant*.

Criminal Action No. ELH-21-36

**MEMORANDUM OPINION**

Defendant Jacky Lynn McComber, formerly known as Jacky Kimmel, was indicted on February 25, 2021, and charged with multiple offenses in connection with a government contract between the National Security Agency ("NSA" or "Agency") and InfoTeK Corporation ("InfoTeK" or "ITK"), ECF 1 (the "Indictment"). McComber is the Chief Executive Officer, President, and the sole shareholder of InfoTeK. A Superseding Indictment was returned on May 26, 2022. ECF 97.

The case is rooted in defendant's billing practices as Senior Program Manager ("PM") with respect to a contract known as the "Ironbridge Contract" (the "Contract").[1] In particular, InfoTeK billed NSA for 2,603.5 hours of work allegedly performed by the defendant between March 14, 2016 and September 8, 2017. The government contends that defendant submitted inflated timesheets and fraudulent invoices to NSA for that period. NSA paid the invoices in full, in the amount of $388,878.78.

---

[1] InfoTeK is an Economically Disadvantaged Woman Owned Small Business ("EDWOSB"). ECF 38 at 3 (citing 15 U.S.C. § 637; 48 C.F.R. § 19.1500).

The Superseding Indictment contains twenty counts.[2]   Counts One through Nineteen charge "Submission of False Claim," in violation of 18 U.S.C. §§ 287 and 2(b).   Count Twenty charges defendant with "False Statements" made on October 3, 2017, in violation of 18 U.S.C. § 1001(a)(2). *Id.* at 8, 10

The case is extremely contentious, and the parties paint entirely different pictures about what transpired.   The government maintains that the case is a simple and conventional fraud case, in which the defendant unlawfully billed the government for more hours than she worked.   *See*, *e.g.*, ECF 144 at 34.   The defense characterizes the case as "a complex statutory and regulatory matter" involving the Federal Acquisition Regulations ("FAR"); the duties of a Contracting Officer ("CO")[3]; the duties of a Contracting Officer Representative ("COR"); Department of Defense handbooks; a complicated contract; and "technical legal issues" pertaining to principles of federal contracting.   ECF 112-1 at 26.

The parties have filed multiple motions and numerous exhibits.   The Court held motions hearings on December 1, 2021 (ECF 30); July 14, 2022 (ECF 129); July 20, 2022 (ECF 131); July 25, 2022 (ECF 139); August 29, 2022 (153); August 30, 2022 (ECF 154); and September 7, 2022 (E.CF 160), at which evidence and/or argument were presented.   Another motion hearing is scheduled for November 14, 2022.

---

[2] The revisions appear to pertain to paragraph 5, concerning the status of work on the Contract.  Paragraph 5 of the Superseding Indictment alleges that "some NSA personnel believed" that work under the contract could be handled by the PM offsite, if the work did not involve the use of classified information.  The Superseding Indictment alleges that neither McComber nor InfoTeK obtained such authorization from the NSA.

[3] According to the defense expert, Charles Stein, every contracting officer is also "a contracting specialist."  ECF 131 (Tr. of 7/20/22) at 109.

This Memorandum Opinion concerns the government's motion to exclude most of the opinion testimony of defense expert Charles Stein, a former NSA employee. ECF 54 at 13-25. Defendant's opposition is at ECF 69. The government's reply is at ECF 78. At the request of the Court (ECF 86), the defendant submitted a clarification as to the actual proposed opinions of Mr. Stein. *See* ECF 87. At that time, the defense submitted 62 proposed opinions of Mr. Stein. *Id.*; *see also* ECF 112-1. The government's response is at ECF 105. And, the defense replied at ECF 112. Both sides also submitted multiple exhibits.

Mr. Stein testified on July 14, 2022 (ECF 129); July 20, 2022 (ECF 131); and July 25, 2022 (ECF 139). His Affidavit is at ECF 38-1. Several other witnesses also testified.

After the presentation of evidence, the defendant reassessed Stein's proposed expert opinions and pared them to "26 discrete opinions." ECF 143; ECF 149.[4] The government's post hearing brief is docketed at ECF 144. McComber's response is docketed at ECF 156. The government replied. ECF 158. And, the government submitted correspondence docketed at ECF 161.[5]

## I.       Factual Summary[6]

NSA's functions include intelligence operations. ECF 97 at 1, ¶ 1. InfoTeK is "in the business of providing information technology, engineering, and security management services to government agencies and commercial" entities. *Id.* ¶ 2. At the relevant time, McComber served

---

[4] ECF 143 and ECF 149 are essentially duplicate submissions.

[5] Trial is scheduled to begin on January 23, 2023. ECF 168. The trial was previously set for two earlier dates but was postponed.

[6] Given the posture of the case, most of the facts in Section A are drawn from the Superseding Indictment. The Superseding Indictment includes duplicate numbering of paragraphs 1, 2, and 3. Therefore, for clarity, when referencing those paragraphs I sometimes also cite to page numbers.

as "the Chief Executive Officer, President, and first the controlling and then later . . . the sole shareholder of InfoTeK."  *Id.* at 2, ⁋ 3.

Between July 2011 and February 2018, NSA "had an ongoing contract" with InfoTeK, *i.e.*, Prime Contract #98230-11-C-1496, "known as the IRONBRIDGE contract."  ECF 97 at 2, ⁋ 2.[7] The Statement of Work ("SOW") for the Contract required ITK "to provide maintenance and enhancement support for the information technology and software for requirements of the NSA's National Security Operations Center (NSOC) and the Counter Terrorism Mission Management Center . . . ."  *Id.*  The Contract was primarily to be performed at NSA's "main facility," located on the grounds of Fort George G. Meade in Maryland.  *Id.* ¶¶ 1, 4.

The Contract "established fixed labor rates . . . for the various positions held by each InfoTeK employee or contractor who worked on IRONBRIDGE."  *Id.*  And, "InfoTeK billed the NSA on a monthly basis based upon the level of effort expended (hours worked) by its employees and contractors in each position."  *Id.*  The defense refers to the Contract as a firm-fixed-price, level-of-effort contract.  *See*, *e.g.*, ECF 36 at 2; *see also* 48 C.F.R. § 16.207-2.

Further, the SOW "required InfoTeK to identify a program manager (PM) who would be responsible for managing all aspects of the contract and the Technical Task Orders (TTOs) issued under it."  *Id.* at 2, ⁋ 3.  The program manager was responsible for "overseeing InfoTeK's performance of its contractual obligations and serving as InfoTeK's point of contact in dealing with government personnel on matters relating to its contract performance."  *Id.*

The Contract itself is not classified.  But, "[b]ecause the subject matter of the IRONBRIDGE contract involved classified information," Clause F.6 of the Contract provided that

---

[7] Despite the deluge of exhibits submitted by the parties, and repeated reference to the Contract, they did not provide a copy of the Contract to the Court until July 2022, in response to my request.

all work was required to be performed at "the Government site," unless advance written permission to do otherwise was provided by "the Contracting Officer." *Id.* ⁋ 4 (citation and internal quotation marks omitted). The Superseding Indictment alleges that the work site was NSA's Fort George G. Meade facility. *Id.* at 1, ¶ 1; *id.* at 3, ¶ 4. However, "there were some limited administrative functions . . . that some NSA personnel believed a [PM] could appropriately handle from outside the NSA's secured facility." *Id.* ¶ 5. Nevertheless, the Superseding Indictment states that neither InfoTeK nor McComber ever obtained "formal authorization" from NSA "authorizing [defendant] to carry out [her] functions . . . at any location other than the Government Site." *Id.*

When ITK personnel worked on the Contract, they "used a web-based timesheet software program provided by Unanet, Inc., to record their billable time . . . ." *Id.* ⁋ 6. At the beginning of each month, an InfoTeK official generated an invoice that reflected the billing information under the Contract for hours worked for the prior month by InfoTeK employees and contractors. *Id.* Each invoice "included a table" reflecting the "hourly billing rate" for InfoTeK's personnel, as well as "the hours they had worked" on the Contract "in the previous month; the amount InfoTeK was billing for their services for the previous month, and . . . their cumulative hours and the cumulative amount billed for their services for the year to date." *Id.* Each invoice also listed "the total hours worked and the total dollar amount" submitted for payment. *Id.* Moreover, all invoices submitted by InfoTeK between the fall of 2013 and the fall of 2017 included a certification of the accuracy of the hours and charges presented. *Id.* ⁋ 7.

Defendant intermittently served as InfoTeK's program manager during the first two years of the Contract. *Id.* at 2-3, ⁋ 3. In the summer of 2013, another InfoTeK official, referred to as Individual A in the Superseding Indictment, assumed the role of Senior Program Manager, which she held until mid March of 2016. *Id.* at 3, ¶ 3. At some point during Individual A's tenure as

Senior Program Manager, Individual A allegedly indicated to other InfoTeK officials that "there was actually not enough work for the Program Manager to do" to support a full-time position. *Id.* ⁋ 8. Nevertheless, InfoTeK billed an average of 130 hours a month to the NSA for Individual A while she held her position. *Id.*

Individual A was replaced by defendant in March 2016. *Id.* at 3, ¶ 3. At that time, McComber "assumed" the position of Senior Program Manager. *Id.* ⁋ 9. She held the position through September 2017, *id.* at 3, ¶ 3, when "NSA asked that she be removed . . . ." *Id.* ¶ 9. The Superseding Indictment provides that throughout this roughly eighteen-month period, defendant generally "billed time to the IRONBRIDGE contract" for "a full 8 hours" per day. *Id.* Thus, ITK "billed an average of 144 hours a month to the NSA for [defendant's] supposed work . . . ." *Id.*

From March 14, 2016 through October 31, 2016, defendant charged an hourly rate of $148.13. *Id.* ¶ 10. Her hourly rate increased to $150.35 for the period November 1, 2016 through September 30, 2017. *Id.* In total, from March 14, 2016 through September 8, 2017, InfoTeK billed NSA for 2,603.5 hours of work by McComber, in the total sum of $388,878.78, and NSA "paid these charges in full . . . ." *Id.* ⁋ 11.

An anonymous whistleblower sent a letter to NSA dated August 23, 2017, claiming billing fraud by defendant. ECF 54-1. Thereafter, NSA conducted a review of McComber's "access control (key card) information with the time InfoTeK billed for her work" and, according to the Superseding Indictment, NSA determined that defendant "was not actually present at her contractually assigned duty station at the NSOC" for approximately ninety percent of the total hours that "she had recorded on her timesheets and that InfoTeK subsequently billed to the NSA." ECF 97, ⁋ 12. The Superseding Indictment alleges that there were 326 days between March 15, 2016 and September 8, 2017, and on 322 of the days, defendant's "billings exceeded the amount

of time she was actually in access control at the NSOC . . . ."  *Id.*  Moreover, the Agency's review purportedly found that on 218 of the 326 days that McComber claimed to have worked, she "did not access her assigned work station at the NSOC at all."  *Id.*  But, ITK billed 8 hours for the defendant on 204 of those days.  *Id.*[8]

Further, the Superseding Indictment alleges: "In addition to not being physically present at the NSOC worksite for the vast majority of the hours [the defendant] billed to the IRONBRIDGE contract, McComber did not in fact work the number of hours on the IRONBRIDGE contract that she entered on her time records and that InfoTeK subsequently billed . . . between April 2016 and September 2017."  *Id.* ⁋ 13.  Specifically, the Superseding Indictment states that "[o]n various occasions when [defendant] billed a full eight-hour day," McComber went on vacations, attended charity events, and did work outside the scope of the Contract.  *Id.* ⁋ 14.  Thus, according to the Superseding Indictment, defendant caused InfoTeK to submit "materially false, fictitious, and fraudulent invoices" to NSA.  *Id.* ⁋ 15.

Paragraph 16 of the Superseding Indictment contains a list of nineteen counts.  For each, it specifies the invoice date; defendant's hours billed on that date; defendant's hourly rate; and the total amount charged to NSA and paid by NSA.  Further, it states that defendant submitted false and fraudulent claims "for services that were not in fact performed by [defendant] in connection

---

[8] Defendant contends that she was authorized to work off-site, either expressly or by tacit approval.  She relies, *inter alia,* on the purported approval contained in a letter from Cherril Guinther, Contracting Officer, dated October 10, 2012.  ECF 84-1 at 3.  Defense counsel found the letter a few months ago in ITK's files.  The government disputes the authenticity of the letter. In any event, during a telephone conference held on the record on September 22, 2022, defense counsel indicated that he no longer intends to rely on the Guinther letter.  *See* ECF 169, ¶ 2.

with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices set forth . . . ."[9]

Defendant submitted to an interview by NSA-OIG on October 3, 2017.  ECF 78-4 at 48-55.  Subsequently, defendant's prior attorney, Andrew Hallowell, sent an email to the investigators, acknowledging some errors in billing.  ECF 54-2.  But, he also claimed that someone "gained unauthorized access" to ITK's time-keeping system and "tampered" with defendant's hours.  *Id.* at 2.[10]  The government's contracting officer at the time, Kristin Mair, approved only partial payment of the invoice submitted by ITK for September 2017.  ECF 54 at 8.

The U.S. Attorney's Office was advised of the alleged billing improprieties in February 2018, and began a grand jury investigation.  *Id.* at 8-9.  As mentioned, defendant was indicted in February 2021.  ECF 1.  Then, on March 30, 2021, NSA issued a Notice of Suspension to ITK.  ECF 54-3.

In the late summer or early fall of 2021, an NSA contractor, Garrett Bosshardt, who worked for T-Rosa Security, was one of several people tasked" by the Maryland Procurement Office to review old NSA files to see whether contracts "could be closed out . . . ."  ECF 54 at 10.  If "there was no work outstanding and no unresolved issues," Bosshardt would prepare "the necessary paperwork and forward it to an NSA official on the Contract Close-out Team for review and possible final action.[]"  *Id.* at 11.

---

[9] The Superseding Indictment does not specify the number of hours billed to the NSA that the government believes McComber actually performed pursuant to the Contract.  Moreover, to my knowledge, the government has never indicated to the defense the number of hours that it believes the defendant actually worked.

[10] InfoTeK Corporation has sued its former employee and CFO, Dwayne Preston, in federal court, alleging, *inter alia*, unlawful access to InfoTeK's Unanet account.  The case is pending before Judge Catherine Blake.  *See* CCB-18-1386.

On November 16, 2021, some eight months after the ITK suspension, Bosshardt sent a letter to the defendant via email.  ECF 35-1 at 1; *see also* ECF 38 at 7; ECF 54-5 at 2.  He wrote that the Maryland Procurement Office "is in the process of expediting the closeout of many overage contracts."  ECF 35-1 at 1.  Bosshardt noted that the Contract was awarded to ITK for $15,987,658.96, and he expressly stated that it "is hereby finalized in the amount of $15,985,382.21." *Id.*  This sum pertained to the period of performance from July 1, 2011 through May 31, 2018. *Id.*  Further, Bosshardt stated, *id.*:  "Our records indicate that the subject contract is complete and no further supplies or services are due under the terms of the contract; therefore the Government considers it complete."

McComber promptly responded.  ECF 54-5 at 6.  She said:  "Your data is incorrect.  This contract is the subject of legal action and close out will not be possible until the legal actions are completedK. . . ." *Id.*  Bosshardt answered, *id.*:  "Thank you for the update!  Contract will remain ongoing."

Bosshardt testified at the motion hearing on July 14, 2022.  ECF 129.  He explained that, at the relevant time, he worked for an NSA contractor, *id.* at 5, as an "acquisitions professional." *Id.* at 4.  At the time, there was a "backlog of contracts" and he personally had "roughly 800" of them to review. *Id.* at 8.  He attempted to determine from various "key indicators," *id.* at 15, 25, whether a contract was "finished . . . ." *Id.* at 10.  These indicators included the period of performance and the obligated amount of the contract. *Id.* at 25.  After Bosshardt made a preliminary assessment of the Contract, he "assumed" that it was "complete." *Id.* at 30.  But, he said that "there could be many issues for why the contract would not be closed." *Id.* at 15.  And,

he said: "[W]e always reach out to the vendor to try to see what the status of the contract is." *Id.* at 11; *see also id.* at 15, 16, 27, 45.[11]

Jennifer Kolodny, Chief of the Contract Closeout Office at NSA, also testified at the motion hearing. ECF 129 at 51. In her 18-year career at NSA, she has held various contracting positions. *Id.* at 52-54.

Kolodny affirmed that NSA had a backlog of thousands of old contract files when Bosshardt sent the email to defendant. *Id.* at 60-61. She also explained the contract close out process, *id.* at 67-69, as well as Bosshardt's assignment. *Id.* at 70-72. According to Kolodny, Bosshardt was not an NSA contracting specialist or contracting officer, and he "did not have any authority to bind the government." *Id.* at 72. Rather, "[h]e was there to make recommendations" to proceed with a closeout. *Id.* Moreover, if a contract is in litigation, it cannot be closed out. *Id.* at 77. And, Bosshardt had no knowledge that defendant had been indicted in connection with the Contract. *Id.* at 78.

Twilla Taylor is a supervisory auditor with the Defense Contract Audit Agency ("DCCA"). ECF 129 at 130-31. She was on a team responsible for ITK contracts. *Id.* at 132. But, her office focuses on "cost type contracts," not "firm-fixed" contracts. *Id.* at 133. She claimed that, "as a matter of course," those kinds of contracts are not "routed" to DCAA for review. *Id.* Moreover, she said: "Invoices are not audited. They are reviewed." *Id.* at 134. She was unaware of any audit by DCAA that ever found "fraud or fault" with ITK. *Id.* at 136.[12]

---

[11] Arguably, Bosshardt's testimony is not entirely consistent with the assertions in his letter of November 16, 2021. *See* ECF 35-1 at 1.

[12] Defendant asserts that "the assigned DCAA Offices for the Info Tek corporation" are in New York and Virginia. ECF 156 at 7.

Kelly Sulewski testified on August 29, 2022, in connection with the defendant's motion under *Brady v. Maryland,* 373 U.S. 83 (1963).  *See* ECF 162 (Tr. of 8/29/22).  But, some of her testimony is pertinent here.

Sulewski has worked at NSA for 35 years and, since 2018, she is "a contracting office chief."  *Id.* at 68; *see id.* at 69.  Among other things, her office handles contracting for NSOC.  *Id.* at 69.  And, her office had responsibility for the Contract.  *Id.* at 70.

According to Sulewski, "the file of record [for a contract] is the hard copy contract file."  *Id.* at 73.  She stated that there are six files associated with the Contract, each of which is about two to three inches thick.  *Id.* at 75.  However, the most recent file had become separated.  *Id.* at 78.  Sulewski took possession of it in January 2022.  *Id.* at 79.

Additional facts are included, *infra*.

## II.      The Defense Expert

### A.

McComber relies on several "critical terms of art" that she claims are "fundamental" to government contracts in general and to the Contract, in particular.  ECF 42 at 1.  The terms include firm-fixed price, level of effort contract; contract deliverable(s); contract close-out; contract completion; and contract acceptance.  In addition, defendant indicates that an understanding of the duties and roles of contracting officers, contracting officer representatives, and the customer are all critical.  Further, defendant asserts that the Federal Acquisition Regulations ("FAR") are also pertinent.  They are found in 48 C.F.R.  Therefore, defendant urges the Court to permit Mr. Stein to explain these matters, as well as other matters, to the jury.

"A firm-fixed-price contract" is described in 48 C.F.R. § 16.202-1 as a contract that "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."

"A firm-fixed-price, level-of-effort term contract" is described in FAR as one that is "suitable for investigation or study in a specific research and development area."  48 C.F.R. § 16-207-2.  Moreover, "[t]he product of the contract is usually a report showing the results achieved through application of the required level of effort."  *Id.*  Notably, "payment is based on the effort expended rather than on the results achieved."  *Id.*

According to defendant, the "deliverable" in a firm-fixed-price, level-of-effort contract includes "the number of man-hours of effort required by" the contract.  ECF 36 at 3.  Such a contract does not necessarily require delivery of a product.  *Id.*; *see also* ECF 162 (Sulewski testimony) at 83-85.

Further, defendant explains that the term "complete" means "whole, entire, full, finished and/or ended."  ECF 42 at 2.  She asserts: "Contract completion does not occur until the Government has accepted all deliverable hours and all of the services provided."  *Id.* at 5.  In defendant's view, when a contract is deemed "complete," it "means that the customer . . . accepts that every level-of-effort hour of work required" under a contract "was delivered . . . ."  *Id.* at 2.

In 48 C.F.R. § 4.804-4, titled "Physically completed contracts," it states, in part:

[A] contract is considered physically completed when —

(1)(i)   The contractor has completed the required deliveries and the Government has inspected and accepted the supplies;
   (ii)  The contractor has performed all services and the Government has accepted these services[.]

As to a firm-fixed price, level-of-effort contract, defendant posits that acceptance means "that the customer has favorably approved of the contract deliverable:  the hours of work."  ECF

42 at 5. Moreover, defendant asserts: "Acceptance constitutes acknowledgement that the supplies *or services* conform with applicable contract quality and quantity requirements . . . ." ECF 42 at 2 (quoting 48 C.F.R. § 46.501) (emphasis in ECF 42). She adds, ECF 42 at 2: "Acceptance is favorable approval." And, defendant maintains that NSA accepted McComber's level-of-effort, and such acceptance is "binding on the Government." *Id.*

In 48 C.F.R. 46.501, it states, in part: "Acceptance constitutes acknowledge that the supplies or services conform with applicable contract quality and quantity requirements. . . . Supplies or services shall ordinarily not be accepted before completion of Government contract quality assurance actions. . . ."

According to defendant, "Contract Closeout" is the "administrative final action" taken on a Department of Defense ("DoD") contract to ensure that "the Government can settle" its financial obligations. ECF 42 at 2; *see* 48 C.F.R. § 4.804-1. She asserts, ECF 42 at 2: "Closeout is not initiated until the Government is satisfied of contract completion."

Here, the Contract was a firm-fixed-price, level-of-effort contract that exceeded $500,000. Therefore, Manual Contract Closeout was required. ECF 42 at 5. This requires physical completion of the Contract, defined in 48 C.F.R. § 4.804-4. But, § 4.804-1(c) expressly states, in part: "A contract file shall not be closed if — 1) The contract is in litigation or under appeal[.]"

The defense submitted portions of the DoD "Contract Closeout Guidebook" ("Guidebook") as of October 25, 2019. *See* ECF 42-1. The government submitted portions of the DOD's "COR Handbook," pertaining to "Defense Procurement and Acquisition Policy," dated March 22, 2012. ECF 171-4.

As of October 25, 2019, the Preface to the Guidebook stated, in part, ECF 42-1 at 3:

Contract Closeout is the final action taken on each DoD acquisition and establishes that each party has fully satisfied its obligation to the other. The contractor must

13

have delivered everything the contract required (material, services, data, certifications, etc.) and the Government must have paid the contractor in full. . . . [A]ll necessary documentation must have been included in the contract file . . . Notably, the preface all states that Contract Closeout "is often given a low priority . . . and often the subject of audit investigations . . . ."

Section 3.1 of the Guidebook states, in part, *id.* at 4: "The office administering the contract is responsible for initiating administrative closeout after receiving evidence of physical completion." Physical completion is defined in FAR § 4.804-4 to include, in part, ECF 42-1 at 4: "The contractor has performed all services and the Government has accepted these services . . . ."

In addition, § 3.1 of the Guidebook provides that a contract "may not be closed even if it is physically complete" when, *inter alia*, "there is an outstanding claim by or against the contractor . . . ." *Id.* at 5. Further, § 3.1 states, *id.*: "A contract should NOT be closed if: The contract is in litigation . . . [or] The contract is under investigation . . . ." This admonition is highlighted in large letters. Moreover, § 3.2.2 of the Guidebook states, *id.* at 9: "Complex, long running contracts with many deliveries, payments, and modifications may require a reconciliation audit. . . ."[13]

According to defendant, the Contract Closeout Team, as agents of the government, "accepted McComber's level-of-effort from March 1, 2016 to September 30, 2017." ECF 38 at 1. Therefore, defendant maintains that because the government "accepted all services," it follows that "no services were non-conforming." *Id.* at 4. And, this acceptance is binding on the government, according to defendant. *Id.* at 10 (citing 48 C.F.R. § 46.501). Indeed, defendant asserts that, in

---

[13] Defendant does not address § 3.2.2 of the Guidebook, which clearly contemplates an audit in a long running contract. In other words, payments under such a contract are subject to review, which seems to foreclose the claim that acceptance is binding.

various ways, and throughout the life of the Contract, NSA determined that ITK's work "was completed to the complete satisfaction of the customer, NSA/NSOC." ECF 38 at 7.

The COR [Contracting Officer's Representative] Handbook states, in part, ECF 171-4 at 3: "Acceptance is the responsibility of the Contracting Officer but his responsibility may be delegated to the COR . . . . However, supplies or services ordinarily should not be accepted before completion of Government contract quality assurance actions . . . ." Moreover, "the COR must ensure that the work performed under the Contract is measured against the contract terms and quality requirements." *Id.* at 4.

Among other things, defendant claims that Bosshardt's letter constitutes "additional evidence that duly authorized agents of the Government accepted *all* of the deliverables (level-of-effort man-hours) and services called for in the Ironbridge contract." ECF 42 at 4 (emphasis in original); *see also* ECF 38 at 8. Defendant argues: "It defies logic that any or all of the hours billed were fraudulent. For nineteen months in a row, multiple agents of the Government, acting within their authority, agreed and certified that the hours *were* delivered and the services *were* provided." ECF 42 at 5 (emphasis in original). For this reason, argues defendant, the government communicated its willingness to close out the Contract. *Id.* at 3. And, defendant contends that close out would only happen if the government is satisfied that the work was performed.

**B.**

To elucidate the terms and concepts mentioned above, as well as other matters, the defendant has named Charles Stein as her expert witness.[14] Stein is a former NSA employee who

---

[14] The government has not named an expert witness. According to the government, "there is nothing complicated" about the case, and there is no need for "specialized or technical knowledge. . . ." ECF 144 at 34.

enjoyed a distinguished career at NSA, spanning some 34 years.  Over the years, Stein held numerous positions with the Agency.  *Id.*; *see* ECF 38-1, ¶ 3.

The defense provided Stein's proposed opinions in a letter of February 10, 2022.  *See* ECF 54-9; ECF 78-2.  Thereafter, the government moved to exclude many of the proffered opinions. ECF 54 at 13-25.  McComber filed an opposition.  ECF 69.  The government replied.  ECF 78.  It argued, *inter alia*, that the expert's proposed opinions "fail the test of admissibility under Fed. R. Evid. 702 on virtually every conceivable ground."  *Id.* at 3.  In addition, the government claimed that, in the defense filing of March 24, 2022 (ECF 69), the defendant "disclosed a number of wholly new opinions for the first time . . . ."  ECF 78 at 5.  As to the "more recently disclosed opinions," the government argued that many, but not all, are improper.  *Id.*

The initial defense submission of February 10, 2022, was difficult for the Court to consider, because of the manner of presentation.  *See* ECF 54-9; ECF 78-2.  Therefore, by Order of May 13, 2022 (ECF 86), I directed the defense to file a revised submission specifying each discrete opinion, separately and by number, so that each could be analyzed and addressed.  The defense presented a revised submission on May 14, 2022, containing 62 separate opinions.  ECF 87.  Thereafter, the government responded.  ECF 105.  The defendant replied.  ECF 112.  And, both sides submitted multiple exhibits.

Concerning Stein's qualifications, the government suggests his knowledge is quite dated. It points out that Stein's "actual time directly working on or overseeing individual government contracts was limited to" the period from 1984 to 1992.  ECF 144 at 7; *see* ECF 131 (Tr. of 7/20/22) at 109, 119, 126-27, 138-39, 191-92.  He last served as a contracting officer in 1992.  *Id.* at 126. Moreover, Stein conceded that he is "not an expert on fraud."  ECF 139 at 6.  Indeed, in the course of his long career with NSA, he has "personally never dealt with any aspect of fraud . . . ."  *Id.* at

8.  Thus, the government describes Stein as "a fish out of water . . . ."  (ECF 54 at 19) with a "lack of recent hands-on experience."  ECF 144 at 8.

In addition, Stein has known the defendant since at least 2014.  ECF 38-1, ¶ 5; ECF 131 (Tr. of 7/20/22), at 146-48.  During the relevant time, he became involved in attempting to resolve at least two matters involving ITK and NSA, serving in an "ombudsman role."  ECF 139 (Tr. of 7/25/22) at 22; *see id.* at 15-23.  He also recalled that he went to ITK's offices, although he claimed this was "not uncommon."  *Id.* at 23.

Given Stein's personal relationship with the defendant, the government characterizes Stein as "a committed partisan . . . ." whose testimony is not reliable.  ECF 144 at 5.  Moreover, the government maintains that Stein's bias, as well as his lack of recent experience, have "led [Stein] egregiously astray . . . ."  *Id.* at 144 Indeed, the government describes Stein's opinions as "deeply problematic."  *Id.* at 3.

At the motion hearing on July 14, 2022, defense counsel conducted a detailed and exhaustive review of Mr. Stein's work experience at NSA and his knowledge of federal contracting at NSA, acquired during his lengthy government career.  ECF 129 at 143-163.  Stein's work experience at NSA included service as a contracting officer, program executive officer for information assurance, and for Information Technology Portfolio.  ECF 129 at 145-46.  He was also a senior contracts advisor in the Office of Contracting, and then senior strategist for the business management organization.  *Id.* at 146, 149.  And, as senior contracts advisor, he held "the number three position" in the "NSA contracting hierarchy."  *Id.* at 149.  Stein was granted an unlimited warrant as a contracting officer in 1989.  *Id.* at 145.  But, his warrant was rescinded when he left the Office of Contracting.  ECF 131 at 127.  Stein also took training courses in government contracting.  ECF 129 at 148-49.

17

Stein retired from NSA in 2018. *Id.* at 146. And, he has not served as a CO in decades. ECF 131 at 126. Thus, much of his experience appears quite dated. But, the government did not point to any significant changes in the contracting process over the years. Indeed, it agreed "in general terms" with the proposed designation of Stein as an expert on NSA contracting procedures. *Id.* at 168. However, it reserved the right at trial to challenge Stein's qualifications to render particular opinions, as well as the opinions themselves. *Id.* at 169.

Therefore, for the purpose of this Memorandum Opinion, I need not rule on Stein's qualifications to serve as an expert regarding NSA contracting procedures. Similarly, Stein's relationship with defendant constitutes fertile ground for cross-examination. But, it is not a basis to disqualify Stein as an expert.

### III.  Legal Standard

As indicated, following the hearings, plaintiff revised her proposed expert opinions, reducing them to 26 discrete opinions, rather than the 62 that were initially submitted. *See* ECF 143, ECF 149. Nonetheless, the government claims that because of "substantial gaps" in Stein's knowledge, and the "extraordinary dated character of his relevant experience," many of the remaining opinions would confuse or mislead the jury. ECF 144 at 6; *id.* at n.2.

Under Rule 104(a) of the Federal Rules of Evidence ("F.R.E."), the court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence." This includes the admissibility of expert testimony.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established that expert scientific testimony is admissible in evidence if "it rests on a reliable foundation and is relevant," and if it will assist the trier of fact to understand or determine a fact in issue. *Id.* at 597. Thereafter, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999),

the Supreme Court extended the *Daubert* principles to all expert testimony requiring technical or

specialized knowledge.

F.R.E. 702 essentially codifies those decisions.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will
help the trier of fact to understand the evidence or to determine a fact in
issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of
the case.

Rule 702 "was intended to liberalize the introduction of relevant expert evidence."

*Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 261 (4th Cir. 1999).  Pursuant to F.R.E. 702, a

properly qualified expert witness may testify regarding technical, scientific, or other specialized

knowledge in a given field if the testimony would assist the trier of fact in understanding the

evidence or to determine a fact in issue, and the testimony is both reliable and relevant.  *See Sardis*

*v. Overhead Door Corp.*, 10 F. 4th 268, 281 (4th Cir. 2021); *United States v. Smith*, 919 F.3d 825,

835 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019).

To be sure, "'[e]xpert evidence can be both powerful and quite misleading. . . .'"  *Daubert*,

509 U.S. at 595 (citation omitted).  Therefore, the trial court serves a critical "gatekeeping role"

by making pretrial determinations that ensure that the expert is qualified and that the expert's

testimony "rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see Sardis*,

10 F. 4th at 282; *Smith*, 919 F.3d at 835; *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567,

577 (4th Cir. 2017).  In addition, the trial court must make "a preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also* F.R.E. 104(a).

The "importance of [the] gatekeeping function cannot be overstated." *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018) (citation and internal quotation marks omitted). Indeed, the Fourth Circuit has described the district court's "Rule 702 gatekeeping function" as "indispensable." *Sardis*, 10 F. 4th at 284. However, the gatekeeper role is not meant to "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596); *see United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (recognizing that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). Thus, "the rejection of expert testimony is the exception rather then the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II),* 892 F.3d 624, 631 (4th Cir. 2018) ("*In re Lipitor*") (citation and quotation marks omitted).

The party seeking to present expert testimony has the burden to establish the admissibility of the evidence, by a preponderance of the evidence. *See Bourjailu v. United States*, 483 U.S. 171, 175-76 (1987); *Cady v. Ride-Away Handicap Equipment Corp.*, 702 Fed. App'x 120, 124 (4th Cir. 2017); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011); *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011). When "the admissibility of expert testimony is specifically questioned, Rule 702 and *Daubert* require that the district court make

explicit findings, whether by written opinion or orally on the record, as to the challenged preconditions to admissibility." *Sardis,* 10 F.4th at 283.

Notably, to be admissible, "'the proffered expert opinion [must be] based on scientific, technical, or other specialized *knowledge* and not on belief or speculation . . . .'" *United States v. Landersman*, 886 F.3d 393, 412 (4th Cir. 2018) (citation omitted) (emphasis in *Landersman*); *see Daubert*, 509 U.S. at 589–90; *Sardis*, 10 F. 4th at 290; *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). "While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact . . . an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392–393 (D. Md. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

The word "knowledge" is not superfluous. "[T]he requirement of 'knowledge' guards against the admission of subjective or speculative opinions.[]" *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("*In re Rezulin*"). And, the term knowledge "'connotes more than subjective belief . . . .'[]" *Id.* at 543 (citation omitted). Expert testimony based on "belief or speculation" is not admissible. *Oglesby*, 190 F.3d at 250. Moreover, testimony that concerns matters within the common knowledge and experience of a lay juror does not pass muster. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995); *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). The foundation of "knowledge" helps to ensure that a witness does not testify about lay matters, for which an expert is not appropriate. *In re Rezulin*, 309 F. Supp. 2d at 541.

An expert opinion must be supported by the record. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Tyger Const. Co. v. Pensacola Const. Co.*, 29

F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340.  However, in general, "'questions regarding the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation omitted).

District courts necessarily have "broad latitude in ruling on the admissibility of evidence," and as to "evidentiary rulings with respect to relevance and reliability." *Bryte*, 429 F.3d at 475; *see United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).  But, "a district court abuses its discretion if it fails to ensure that a proffered expert opinion is 'sufficiently relevant and reliable . . . .'" *Sardis*, 10 F.4th at 282 (citation omitted).  This is because reliability and relevance are "'*precondition[s]* to admissibility'" of expert testimony. *Sardis*, 10 F. 4th at 282 (emphasis in *Sardis*) (citation omitted).

To be reliable, the testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions. *Daubert*, 509 U.S. at 589–90; *see Sardis*, 10 F. 4th at 290; *Belville*, 919 F.3d at 232; *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  An expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'" *Belville*, 919 F.3d at 232 (citation omitted).  And, as mentioned, the expert testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert* 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005).  In other words, helpfulness to the trier of fact is "the 'touchstone'" under Rule 702. *Kopf*, 993 F.2d at 377 (citation omitted).  And, "'[d]oubt regarding whether an expert's testimony will be useful

should generally be resolved in favor of admissibility.'" *Mack v. Amerisource Bergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (citation omitted).

*Daubert* articulated five non-exhaustive factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *see Sardis*, 10 F.4th at 295 (reiterating that the "hallmarks of reliability" are "testing, peer review, literature, rate of error or general acceptance . . . ."); *see also United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Belville*, 919 F.3d at 233; *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003).

As mentioned, the *Daubert* factors are "'not exhaustive.'" *Belville*, 919 F.3d at 233 (citation omitted). They are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Kumho Tire Co.*, 526 U.S. at 151; *see Nease*, 848 F.3d at 229. Indeed, the Supreme Court has said that the factors are not a "checklist." *Kumho Tire Co.*, 526 U.S. at 150. As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Thus, the evaluation "is always a flexible one . . . ." *Oglesby*, 190 F.3d at 250.

Expert testimony need not be "'irrefutable or certainly correct'" in order to be admissible. *Moreland*, 437 F. 3d at 431 (citation omitted); *see Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195; *Westberry*, 178 F.3d at 261. And, the "subject matter of Rule 702 testimony need not be arcane or especially difficult to comprehend." *Kopf*, 993 F.2d at 377. Moreover, the trial court

"should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004); *see Bresler*, 855 F.3d at 195.

However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixi*t of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "*ipse dixit*" is the "hallmark of an unreliable opinion." *Sardis*, 10 F.4th at 295, 296.

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide a sufficient foundation for expert testimony. *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). However, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, AW–07–3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999), *aff'd*, 11 F. App'x 335 (4th Cir. 2001))).

In contrast to principles of common law, F.R.E. 704(a) permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact." *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020), *cert. denied sub nom. Washington v. United States*, ___ U.S. ___, 141 S. Ct. 927 (2020); *see United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006); *Perkins*,

470 F.3d at 157; *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002).  The decision whether to permit such testimony turns on an analysis of Rule 702.  *Campbell*, 963 F.3d at 314.  "Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *Barile*, 286 F.3d at 760.   In any event, such testimony cannot "tell the jury what result to reach . . . ."  *Id.*

As the Court noted in *Perkins*, 470 F.3d at 158:  "To state the general rule, however, 'is not to decide the far more complicated and measured question of when there is a transgression of the rule.'"  (Citation omitted).  Indeed, "'[t]he line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern.'"  *Campbell*, 963 F.3d at 314.  (Citation omitted).  And, "drawing that line requires a case-specific inquiry of the charges, the testimony, and the context in which it was made."  *Id.*

Expert testimony about a legal standard in a given case is an important issue.  Ordinarily, expert testimony that states a legal conclusion is inadmissible. *See Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988); *see also United States v. Melvin*, 508 Fed. App'x 209, 211 (4th Cir. 2013) (stating that "an expert generally is not permitted to apply law to facts to reach a legal conclusion").  But, there is no absolute proscription concerning the admissibility of testimony concerning legal matters. *McIver*, 470 F.3d at 561-62; *see*, *e.g.*, *Adams v. New England Scaffolding, Inc.*, No. 13-12629-FDS, 2015 WL 9412518, *5 (D. Mass. Dec. 22, 2015) (recognizing that "admission of expert evidence concerning the law is not nearly as rare as the case law might suggest" and outlining recent federal cases involving legal experts).

Of relevance, "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.  Because of their specialized

knowledge, their testimony can be extremely valuable and probative." *United State v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *see United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (stating that "in complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts"), *cert. denied*, 502 U.S. 83 (1991).

In determining whether expert testimony constitutes an impermissible legal conclusion, courts look to "whether the question [posed to the expert] tracks the language of the legal principle at issue or of the applicable statute" and "whether the terms employed have specialized legal meaning" – in other words, "'a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *Barile*, 286 F.3d at 760 (citation omitted); *see Perkins*, 470 F.3d at 158; *JFJ Toys, Inc. v. Sears Holding Corp.*, 237 F. Supp. 3d 311, 324 (D. Md. 2017).  Courts also consider whether the proposed expert testimony would "take away from the jury its responsibility to determine the facts and ultimately, whether the defendants are liable." *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CCB-13-617, 2016 WL 524270, at *5 (D. Md. Feb. 10, 2016) (excluding portions of expert report that were unhelpful legal conclusions).

Nevertheless, "[i]n appropriate circumstances, an expert may offer an opinion that applies the facts to a legal standard." *Campbell*, 963 F.3d at 314; *see id.* at 315 (affirming district court's exercise of discretion in permitting doctor to testify that "heroin intoxication" was the cause of death and, "'but for the heroin,'" the victim "'would have lived'") (citation omitted); *see, e.g., In re Lipitor*, 892 F.3d at 646-47 (discussing the need for expert testimony to establish that a drug was the cause of death); *Wolf*, 860 F.3d at 193 (in a mortgage fraud case, allowing testimony of expert as to whether "categories of information would have been material to lenders"); *United States v. Chikvashvili*, 859 F.3d 285, 292-94 (4th Cir. 2017) (affirming the admission of a doctor's "expert opinion on causation" of death); *United States v. Alvarado*, 816 F.3d 242, 246 (4th Cir.

2016) (affirming the district court's admission of an expert witness's testimony that, "without the heroin, [the victim] doesn't die"); *McIver*, 470 F.3d at 562 (finding no error in the admission of testimony of a physician who opined that the defendant, also a physician, acted outside the course of legitimate medical practice in his pain medication prescriptions).  *But see*, *e.g.*, *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (ruling inadmissible expert testimony that defendant's conduct constituted "extortion"); *Miller v. Clark County*, 340 F.3d 959, 963 n.7 (9th Cir. 2003) (stating that expert testimony that a dog bite constituted "deadly force" amounts to a legal conclusion); *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (observing that testimony regarding the existence of "fiduciary duties" constitutes a legal conclusion).

In *Mallory*, 988 F.3d 730, a False Claims Act case under 31 U.S.C. § 3729, the government presented evidence that the defendants violated the statute in various ways, "including by paying physicians" for lab work, in violation of the Anti-Kickback State ("AKS"), 42 U.S.C. § 1320a-76(b).  *Id.* at 735.  Among the issues on appeal, the Fourth Circuit considered the district court's exclusion of various defense experts.  *Id.* at 741-742.

In particular, a health care attorney sought to testify as to whether the defendants "'would have reason to know what the legal obligations were.'"  *Id.* at 741.  The district court determined that the testimony constituted "a legal conclusion informing the jury about how it should apply the law, which is prohibited."  *Id.*  The district judge also excluded the testimony of a nurse, who sought to testify as to Medicare Code calculations, because she lacked personal knowledge of Medicare's "precise methodology."  And, the district judge barred a proposed expert on the process of handling fees with regard to blood tests, because it found unreliable the methodology for calculations of fair market value.  *Id.* at 742.  The Fourth Circuit upheld the rulings, concluding that the district court did not abuse its discretion.  *Id.*

27

*United States v. Offill*, 666 F.3d 168 (4th Cir. 2011), also provides guidance.  In that case, a lawyer was convicted of securities fraud, wire fraud, and conspiracy to commit securities registration violations.  On appeal, the defendant challenged, *inter alia*, the testimony of two government experts, claiming they improperly gave opinions on the scope and meaning of certain legal terms and standards, including the meaning of the term "underwriter," criteria for securities registration, criteria for when investors can sell shares, and related issues.  *Id.* at 174.

The Fourth Circuit cautioned that an expert witness may not testify as to his or her view of the verdict that the jury should reach.  Nor can the witness usurp the judge's role in determining the law and explaining it to the jury.  *Id.* at 175.  But, the Court recognized that expert testimony may be admitted to explain a "legal regime [that] is complex" if it would assist the jury.  *Id.*  The Court reasoned, *id.*:

> We conclude that the specialized nature of the legal regimes involved in this case and the complex concepts involving securities registration, registration exemptions, and specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury. The jury in this case needed to understand not only federal securities registration requirements but also the operation of several obscure Texas Code provisions and their relationship with the federal regime.  To be sure, the ultimate responsibility for instructing the jury on the law belonged to the district court, but we cannot conclude that in these circumstances the district court abused its discretion by concluding that the expert testimony presented in this case would assist the jury. Indeed, we find it difficult to imagine how the government could have presented its case against Offill without the assistance of expert testimony to explain the intricate regulatory landscape and how securities practitioners function within it.

In addition, the Court recognized that "experts may offer opinions based on hypothetical questions proposed by the attorneys . . . ."  *Id.* at 177.  And, "[s]uch testimony would be admissible even though the hypothetical question mirrored the defendant's conduct," so long as it did not encroach on the defendant's intent.  *Id.*

*Adams*, 2015 WL 9412518, a negligence case, is also instructive.  There, a worker was injured when he fell from scaffolding.  The plaintiff claimed that the defendant failed to comply with a lengthy and complicated regulation issued by the Occupational Safety and Health Administration ("OSHA"), 29 C.F.R. § 1926.451.  The defense moved to bar the testimony of plaintiff's expert as to any claim of non-compliance with OSHA provisions.

The district court in Massachusetts observed that the "admission of expert evidence concerning the law is not nearly as rare as the case law might suggest."  *Id.* at *5.  The court said, *id*.: "Indeed, it would be unwise and unworkable to impose such a prohibition.  We live in a highly complex and often bureaucratic society with a multitude of legal and regulatory requirements . . . ."  Further, the court observed that often a party's conduct "can only be fully understood in the context of a particular regulatory environment [that] needs to be explained to lay persons . . . ."  But, the court cautioned that expert testimony must "accurately state the law."  *Id.* at *6.  The *Adams* Court added, *id.*:  "Put simply, any expert description of the law is admissible only if it is correct."  And, to the extent of a dispute as to the law, only the court can resolve it.  *Id.*

The *Adams* Court included various examples of cases in which experts have applied facts to law and then concluded that the law was violated.  *Id.*  The court pointed out, for example, that "it is routine for courts in tax evasion prosecutions to permit an IRS representative to testify that he or she performed a tax calculation, using various deductions, exemptions, and other provisions of the Internal Revenue Code . . . .  Such testimony is normally labeled 'summary' or 'accounting' testimony. . . .  Whatever the label, it is, in substance, expert testimony applying the facts (the defendant's income and expenses) to the law (the tax code) to reach a legal conclusion (that a tax was owed).  Again, such evidence is routinely admitted, because it is helpful to the jury and it is not unfair."  *Id.* (citations omitted).

The *Adams* Court summarized its discussion as follows, *id.* at *8:

1.      There is no general prohibition against an expert describing the law (including specific regulations or a regulatory framework).

2.      An expert can describe the law only if that description is accurate.  If there is a dispute as to the law, it is for the court to resolve.

3.      There is no general prohibition against an expert describing the application of facts to law, or stating a conclusion based on that application.  However, any such testimony must not be, in form or substance, an opinion as to a disputed issue of law.

4.      All expert testimony concerning the law must be helpful to the jury in accordance with Fed. R. Evid. 402.  Testimony by an expert concerning an ultimate legal conclusion is not likely to be helpful, and therefore should rarely be admitted.

5.      All expert testimony concerning the law is subject to the limitations of Fed. R. Evid. 403.

Given this framework, the district court concluded, *inter alia*, that the plaintiff's expert could describe the OSHA regulations and set forth his view as to why the scaffolding did not comply with OSHA.  *Id.* at *9.  In other words, assuming an adequate factual basis, the expert could testify that the defendant violated the regulation.  But, he could not opine as to the defendant's legal duty to plaintiff under OSHA, or the breach of that duty.  *Id.*

To be sure, case law can be found that supports or rejects such testimony, and it is clear that a case-by-case analysis is required.  But, on the whole, in cases involving a complex statutory or regulatory scheme, there are many cases that support the use of an expert to address matters pertaining to legal standards.  *See*, *e.g.*, *United States v. Turner*, 620 Fed. App'x 249, 252 (5th Cir. 2015) (permitting Medicare expert to testify that Medicare does not pay claims associated with kickbacks); *United States v. Onyenso*, 615 Fed. App'x 734, 738 (3rd Cir. 2015) (concluding that district court did not abuse its discretion in allowing government expert to testify regarding the purposes of the AKS and that Medicare does not allow payment of claims tainted by kickbacks);

*United States v. Strange*, 23 Fed. App'x 715, 717 (9th Cir. 2001) (noting that "expert testimony regarding Medicare regulations and reimbursement procedures" is "entirely appropriate for an expert"); *United States v. Van Dyke*, 14 F.3d 415, 422 (8th Cir. 1994) (concluding that trial court erred in refusing to allow defense expert to explain a banking regulation that was addressed by a government witness); *United States v. Mohney*, 949 F.2d 1397, 1406-07 (6th Cir. 1991) (concluding that IRS agent's expert testimony created framework for jury to understand the evidence), *cert. denied*, 504 U.S. 910 (1992); *United States v. Okoroji*, No. 3:15-cr-00559-0, 2018 WL 8756434 (N.D. Tex. June 12, 2018) (permitting defense expert to "explain how Medicare and its billing process work and whether a defendant who violated the AKS or Medicare regulations would receive reimbursements"); *United States v. Crinel*, No. 15-61, 2016 WL 6441249, at *8 (E.D. La. Nov. 1, 2016) (allowing expert to testify regarding Medicare's standards and practices because of the complexity of the regulations); *id.* at *10 (where defendant sought to offer expert testimony on the AKS and safe harbors, government's motion in limine was denied to the extent it sought to exclude testimony about practice and procedures "which [experts] believe do not violate the [AKS]" but precluding testimony as to experts' belief that certain conduct was lawful and barring opinion testimony as to "what the law is . . . ."); *United States v. Pacific Gas and Electric Co.*, 14-cr-00175-THE, 2016 WL 3268994 (N.D. Calif. June 15, 2016) (permitting defense expert to testify about complex regulatory framework "that underlies this criminal prosecution"; defendant claimed that alleged regulatory violations were not "knowing and willful" because regulations are vague, contradictory, or confusing, and expert testimony would help jury to "digest" the "complex regulatory framework"); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 4:08-cv-3396, 2015 WL 5178074, at *7 (S.D. Tex. Sept. 3, 2015) (in False Claims Act case, based on claim that defendant violated AKS, rejecting Relator's objection to expert testimony providing

background on the long term care industry, because it was not specific to the defendant; an expert can educate the factfinder, within reason, about general principles relevant to the case, particularly where the case "concerns a complex industry governed by a number of federal statutory and regulatory schemes").

There is also ample authority for the admission of expert testimony concerning the features of a fraud scheme. *See*, *e.g.*, *Wolf*, 860 F.3d at 193 (in a mortgage fraud case allowing testimony of expert as to whether certain information would have been material to lenders); *United States v. Toliver*, 451 Fed. App'x 97, 104 (3rd Cir. 2011) (upholding admission of testimony concerning "typical features" of a bank fraud scheme); *United States v. McCollum*, 802 F.2d 344, 346 (9th Cir. 1986) (permitting expert testimony regarding the nature of mail fraud schemes); *United States v. Carson*, 702 F.2d 351, 369 (2nd Cir. 1983) (allowing expert testimony on "the clandestine manner in which drugs are bought and sold"); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 514 (D. Md. 2014) (permitting expert testimony concerning common aspects of human trafficking cases); *United States v. Robinson*, No. 98 Cr. 167, 2000 WL 65239, at *3 (S.D.N.Y. Jan. 26, 2000) (concluding that expert testimony regarding the "hallmark" of prime bank fraud schemes would assist the jury).

In sum, in cases where "the legal regime is complex" and the regulatory landscape is "intricate," the testimony of a qualified expert could be helpful in providing background information to the jury with regard to the statutory and regulatory schemes. *Offill*, 666 F.3d at 175. But, the questions must be carefully posed. And, the testimony cannot trample on the responsibility of the court to ascertain the law and to advise the jury accordingly. Nor may such testimony undermine the jury's responsibility to decide the facts.

The framework set forth above guides my analysis. The admission of all expert testimony is, of course, subject to a proper foundation. And, the rulings that follow are subject to revision, based on the actual presentation of evidence. Moreover, upon request, the Court will consider a limiting instruction where appropriate, advising the jury that their decisions must be based on the law as set forth by the Court, not by a witness.

## IV.     Discussion

The defense initially submitted 62 proposed opinions of Mr. Stein. ECF 112-1. The defendant subsequently revised the submission, reducing the request to 26 proposed opinions. ECF 143, ECF 149. Specifically, as set forth in ECF 149-1, plaintiff seeks to admit the following proposed opinions: 1, 7, 11, 12, 13, 17, 18, 22, 24, 25, 27, 30, 33, 34, 36, 40, 41, 43, 44, 45, 50, 51, 54, 57,  61, and 62. *See* ECF 149-1 at 2-14.[15]

The government advised that "many of the 62 opinions set forth" in ECF 87 "could be appropriately admitted as statements of fact by a properly qualified and experienced witness." ECF 144 at 33; *see also* ECF 158 at 2-3. This acknowledgement appears to apply to opinions 1-6, 12-13, 19-21, and 28-29. ECF 144 at 33. And, the government adds "that as a practical matter, it is likely that these matters will already be a part of the record before the trial reaches the defense's case." *Id.* at 34.

With respect to opinions 7, 11, 17, and 18 (number 18 added at oral argument, ECF 174, Tr. of 9/7/22, at 20, 54), the government states that it "is not willing to stipulate" to defendant's "exact wording." ECF 158 at 3. But, it suggests that the government "could agree" to address its

---

[15] Thus, defendant has abandoned proposed opinions 2-6, 8-10, 14-16, 19-21, 23, 26, 28-29, 31-32, 35, 37-39, 42, 46-49, 52-53, 55-56, and 58-60. *See* ECF 158 at 1 n.1.

concerns through "cross-examination," rather than "outright exclusion of these opinions."  ECF 158 at 33.

Therefore, I conclude that I need not address Stein's proposed opinions 1-7, 11-13, 17-21, and 28-29, some of which defendant has abandoned.  This leaves twenty-two contested opinions: 22, 24, 25, 27, 30, 33, 34, 36, 40, 41, 43, 44, 45, 50, 51, 54, 57, 61, and 62.  *Id.*  According to the government, all of the contested opinions are "fundamentally flawed or wholly improper or inadmissible."  ECF 158 at 3.  In its view, the opinions are unreliable because the "entire methodology and approach is flawed."  ECF 174 at 21.

I turn to review the contested proposed opinions.

**Opinion 22**   (ECF 149-1 at 4)

The Government, through its Contracting Officers, evaluates services in multiple ways.

First, every service contract should have a surveillance plan that requires real time observation.   Next, the Contracting Officer and Contracting Officer's Representative (or specialist) views all deliverables and carefully critiques deliverables.  Contracting Officers are trained to ask themselves these questions. Were the deliverables on time?  Were the deliverables accurate?  Did the work conform to the terms of the contract?  Next the Contracting Officer discusses the deliverables with the customer to make certain that the customer is completely satisfied with the services manifested in the deliverables.  Monthly, the Contracting Officer reviews the performance of all services under the contract.  The Contracting Officer writes a performance review yearly.  An example of this is the evaluation of InfoTeK during the Indictment period.  USA-027907-027912.

The government does not object to the first sentence.  ECF 105 at 8.  The government also agrees that the opinion is "accurate in some respects . . . ."  *Id.*  But, it claims that the recitation is inaccurate in suggesting that a CO or COR personally reviews and critiques all deliverables.  *Id.*

The defense argues, *inter alia*, that the government failed to address Opinion 22 in ECF 144. *See* ECF 174 at 55-56. But, given the government's earlier response, this contention lacks merit.

The proposed opinion is largely consistent with Stein's testimony at the motion hearing. *See* ECF 129 at 183-86. However, in the portion of the transcript cited by the defendant (ECF 149-1 at 4, citing ECF 129 at 183-86), Stein did not testify that "contracting officers are trained to ask themselves [certain questions . . . .]. In any event, in large measure, the government has no quarrel with Opinion 22, except to suggest that, in reality, this is not necessarily how government contracts "actually operate . . . ." ECF 105 at 8.

Stein's opinions are primarily based on his work experience. He may testify, generally, as to the responsibilities of a CO and a COR, because such information would be helpful to the jury in understanding the contracting process at NSA and the evaluation of the evidence. *See United States v. Blair*, ELH-19-0410, 2021 WL 5040334 at *18 (D. Md. Oct. 29, 2021) (permitting physician to testify about prescription practices and FDA's approval process for medications); *id.* at * 20 (allowing government expert to introduce, through physician expert, certain background information because it would be helpful to the jury). This may include, for example, the duties of a CO and/or a COR to view the deliverables.

However, Stein cannot make the bald general assertion that a CO and/or a COR "carefully" reviews deliverables. Of course, the expectation is that an employee carefully does his or her work. But, wishing does not make it so. Whether a CO or a COR has "carefully" performed his or her duties undoubtedly varies with the CO/COR and the particular circumstance. Such a blanket assertion amounts to *ipse dixit*.

**Opinion 24**   (ECF 149-1 at 5)

There is something known as a "non-conforming service."  An example of a non-conforming service would be if a contractor's employee had to work at the government site but did the work off-site.

The government objects.  It contends that the "issue is whether the defendant worked the amount of hours that ITK billed for her supposed services as program manager, not whether she did the work off-site or on-site."  ECF 105 at 9.  Based on the government's representations, its theory of the case seemingly does not concern the location where the defendant performed her work.  But, the Superseding Indictment specifically alleges that McComber and ITK never obtained "formal authorization" from NSA to work off-site. ECF 97, ¶ 5.  The government has also claimed that, to the extent that the defendant's work was classified, it could not have been performed off site, thereby implying that she did not expend the time that she claimed.

The Court will defer ruling on Opinion 24 until the government presents its evidence at trial.  However, if the government presents evidence suggesting that defendant did not perform the hours of work because she could not have performed them off-site, then the proposed testimony would seem quite relevant.

**Opinion 25**   (ECF 149-1 at 5)

Under the FAR 48 CFR 46.104, the government must reject any non-conforming services.  But if the government accepts non-conforming services over time, the fundamental principles of federal contracting treat the repeated acceptance of the non-conforming services as a constructive change to the contract, and accepting non-conforming services constitutes constructive acceptance.

In his testimony, ECF 131 at 23, Stein asserted that, under the Code of Federal Regulations, the government is required to reject non-conforming services.  He also relied generically on the changes clause of every NSA contract.  ECF 131 at 24.  Therefore, Stein indicated that if the government accepts a non-conforming performance, "that becomes the new baseline to the

contract." *Id.* He also said that "the contracting officer should then modify the contract to reflect [the change] as the new baseline." *Id.*; *see also id.* at 26.

The government objects, claiming that the defendant is not charged with providing a non-conforming service. ECF 105 at 10. Rather, she is charged with billing NSA for hours that she did not work. *Id.* In any event, the Contract was never formally modified to reflect a change in defendant's place of performance.

In the present posture of the case, the proposed testimony is not relevant. The issue is not whether the defendant provided non-conforming services. Rather, the issue is whether the defendant inflated the hours she worked. Moreover, the matter of whether a contract is constructively modified by conduct is a mixed question of law and fact. Testimony that the contract was constructively modified appears to invade the province of the court.

In *United States v. Spencer's Safe & Lock Service, Inc.*, 99 F.3d 1132 (4th Cir. 1996) (per curiam), State Department employees learned that the defendants billed the government in excess of the work performed. *Id.* at *1. On appeal, the defendants complained that their expert should have been permitted to testify about a modification to the contract based on course of performance. *Id.* at *2. In particular, they claimed that "the contract was modified to authorize payment for services not rendered on State Department premises . . . ." *Id.* The Court disagreed. It said, *id.*: "Contract interpretation . . . is generally an issue for the court, which obviously requires no expert testimony. . . ."

Nevertheless, I will allow Stein to explain the contractual process at NSA for modification of a contract. But, he cannot opine that the government constructively modified the Contract as to the location of defendant's place of performance by accepting non-conforming services.

**Opinion 27**   (ECF 149-1 at 6)

Section B of federal service contracts is how the government tells the contractor how many man-hours of effort in each different labor category the contractor must deliver.  Many large, complicated service contracts require a certain number of program management man-hours.  In those cases, at the NSA, the Maryland Procurement Office awards a specific number of labor hours for the labor category "program manager."  An example might be 1880 hours for one year of program management.  A "year" in the Ironbridge contract referred to "fiscal year."  The fiscal year runs from October 1st to September 31st.

In his testimony, Mr. Stein stated that the government "estimates how much work is required under the contract . . . to satisfactorily perform all of the services under the contract." ECF 131 at 28.  The government objects.  It claims that the "relevant question is whether the defendant actually worked the number of hours that ITK billed for her supposed services."  ECF 105 at 10.

The defendant is entitled to introduce evidence that provides useful background information about the contracting process at NSA, because it will be helpful to the jury.  Therefore, Stein may explain the terms "man hours" and "level of effort," as well as the process involved in NSA's projection of labor hours per labor category.

However, Mr. Stein may not testify or suggest that a person may bill for hours not worked, merely because the government estimated a certain number of hours.  Nor may he opine that if the government projected or awarded a certain number of hours, it means those hours were necessary to complete the work required by the Contract.

**Opinion 30**   (ECF 149-1 at 6)

The word "deliverables" describes both the man hours of effort to be delivered and the services, reports or other work product generated during the man hours of service.  Contract deliverables generally appear in Section B of the contract.  The total man hours awarded are the primary deliverable.  The contract[or] agrees to deliver the hours specified in the contract by labor category.  For example, InfoTeK agrees to deliver 1880 hours of Program Management effort, over a one-year period.  That is the "level of effort".

Stein testified that "there are several deliverables."  ECF 131 at 34.  One of them is "the expenditure of man-hours of effort per labor category . . . ."  *Id.*  In addition, deliverables include items such as reports required by the Statement of Work.  *Id.* at 34-35.

The government objects.  It reiterates that "the critical issue . . . is simply whether the defendant actually worked the number of hours for which InfoTeK billed . . ." and for which ITK "was paid."  ECF 105 at 12.

The proposed testimony hardly seems controversial.  The defense is entitled to explain concepts that will assist the jurors in evaluating whether defendant worked the hours she claimed, and for which she billed the NSA.  This includes the term "deliverable," and the kinds of items that constitute deliverables.  *See* ECF 131 at 34.  However, as discussed above, Stein may not testify that the award of "man-hours" entitles a contractor to bill the NSA for those hours, unless those hours were actually expended in service of the Contract.

**Opinion 33**   (ECF 149-1 at 7)

The number of hours [for] Program Manager set forth in the Ironbridge contract were necessary to do the work.  The Contracting Officer made an affirmative determination that the work could not be done for fewer than the number of hours in Section B.  The Contracting Officer certified that determination in writing.  Over the life of the contract, that total number increased each year.

In his testimony, Stein explained that the "preferred contracting method" for the government is "firm-fixed price completion."  ECF 131 at 40.  That type of contract is generally used by the government when it makes a purchase of a commodity.  *Id.*  As to a firm-fixed price, level-of-effort contract, such as the Ironbridge Contract, the Contracting Officer must issue a Determination and Finding ("D&F"), explaining why he chose a form of contract "other than firm-fixed price completion."  *Id.*

If the government chooses a "firm-fixed price level-of-effort contract," then, according to Stein, "the contracting officer has to document that the work cannot be done for less than the stated level of effort." *Id.* at 41. Among other things, the CO must "examine[] the type of work" and other factors to conclude that the selected type of contract is "appropriate." *Id.* at 41. And, the CO must document the basis for his view that the "work can only be expressed in general terms and that the work could not reasonably [be] expected to be done for less than the [stated] level of effort." *Id.*

In other words, according to the CO's analysis, "[i]t will take at least the number of hours that are in the contract to get the work done." *Id.* To reach that conclusion, the CO must document that he or she has "looked at all the circumstances of the contract." *Id.* Therefore, Stein opined that "those hours are necessary because the contracting officer has said so." *Id.*

The government objects. ECF 105 at 13. It argues, *inter alia*, that the first sentence of the proposed opinion constitutes *ipse dixit*. *Id.*

Stein certainly may explain the process that is utilized by a CO to arrive at the type of contract utilized by the CO, as well as the process for determining the number of hours of work awarded in the Contract. This would include the assessment conducted by the Contracting Officer as to the number of hours he or she believed was needed to complete the work. However, Stein has no basis to opine that the number of hours in the Contract for the Program Manager were, in fact, actually "necessary to do the work."

In other words, the opinion that "[t]he number of hours [for] Program Manager set forth in the Ironbridge Contract were necessary to do the work," because the CO made that determination, is pure *ipse dixit*. Such an opinion does not pass muster.

**Opinion 34**   (ECF 149-1 at 7-8)

The program management hours required by the Ironbridge Contract were subject to repeated formal review.  Evidence of [this] for the Ironbridge Contract is found in the fact that it was modified by the Contacting Officer 53 times.  Each time the contract was modified the Program Manager hours were reaffirmed.  This means the Program Management level-of-effort hours were required by the NSA customer.  NSA repeatedly re-assessed and re-required the Program Manager hours.  Secondly a Contracting Officer Representative had to review the work in real time.  Then, the Contracting Office Representative actually accepted the hours after reviewing monthly reports, onsite visits, and surveillance.   Then the Contracting Officer conducted a monthly Program Management Review.

Stein said that the CO must show that "[i]t will take at least the number of hours that are in the contract to get the work done."  ECF 131 at 41.  He also claimed that, as an expert, he "would know that those hours are necessary because the contracting officer has said so."  *Id.*

Moreover, Stein explained that a D&F is a determination of reasonableness of price.  *Id.* at 42.  According to Stein, when a CO signs a contract modification, "[t]hey're stating that the contract reflects the requirements of the Government."  *Id.*  And, he added that when the government "exercised an option to extend the term of the contract, they added" more "man-hours" to the various labor categories.  *Id.* at 42-43.

The government objects.  ECF 105 at 13.  It contends that, regardless of the number of hours anticipated by a CO, a program manager cannot bill the government for hours that were not worked.  *Id.*  And, it characterizes as "seriously misleading" the assertion that a contract modification constitutes a reaffirmance of the projected hours needed to do the work.  *Id.*

Nothing in the contracting process permits a contractor to bill for hours of work that are not performed.  And, the Court will not permit testimony from Mr. Stein that suggests that merely because a CO makes an award of hours or a particular finding of a level of effort for the work or services in a contract, this means that the contractor necessarily worked the hours that were

41

projected.  As the government puts it, ECF 144 at 12, such an opinion is "based on nothing more than the expert's naked assertion of his own personal belief . . . ."  That is the "hallmark of an unreliable opinion."  *Sardis*, 10 F.4th at 296.

On the other hand, Stein may testify generally about the type of contract at issue in this case, including the process utilized by a CO to determine and award the number of hours or level of effort.  The government is misguided in its view that such testimony has no place in the case.

The defendant claims that she, in fact, worked the hours that she billed.  The defense notes that those hours largely coincided with the hours that defendant's predecessor worked (*see* ECF 156 at 9-10), and defendant's hours allegedly matched the hours that were allocated by the CO.  That trained government personnel believed it would take the amount of time that defendant claims to have expended is certainly relevant.

To be sure, the allotment of hours is, ultimately, an estimate or a prediction.  But, the projected hours are supposedly the product of a reasoned process by the CO, in consultation with the customer.  Professionals at NSA and NSOC allegedly believed that, to perform the work of program manager, the program manager would have to work the number of hours that were awarded.  Defendant claims she provided the work product.  And, the estimate of hours it would take to do that work supports defendant's contention that she worked the hours that she claimed.  *See* ECF 156 at 12.

The government seemingly suggests that the NSA professionals got it wrong, and that the work of program manager did not require the hours that were awarded.  But, defendant is entitled to introduce evidence that explains the process used to determine the allocation of hours in the Contract.  If a trained CO at NSA, and the customer, believed the job would require a certain

number of hours, this is information defendant is entitled to present to the jury to support her position that she worked the hours that she billed.

**Opinion 36**   (ECF 149-1 at 8)

The Guinther letter of October 10, 2012

The Contracting Officer's letter of October 12, 2012, directs Info TeK to perform program manager work from facilities other than the government facility. It is typical of direction from a CO to a company under the Changes Clause of the contract. It looks like <u>thousands</u> of other Contracting Officer letters that I have seen over 34 years. The substance of the letter is wholly consistent with the Changes Clause.

In my professional opinion, InfoTeK was directed to perform all program management work offsite on the Ironbridge contract from October 2012 to the time when such approval was affirmatively revoked (roughly December 2017).

Defendant has indicated that she no longer intends to introduce the Guinther letter. *See*, *e.g.*, ECF 169; ECF 175. Therefore, it is not entirely clear whether a ruling remains necessary. But, as I see it, the content of the letter speaks for itself. Moreover, the typicality of such a letter is not relevant. Accordingly, Mr. Stein may not testify to Opinion 36.

**Opinion 40**   (ECF 149-1 at 8-9)

McComber could do things other than work on Ironbridge Monday thru Friday between 8 AM and 4PM. She could still bill 8 hours to Ironbridge if she worked from midnight to 8 AM, or from 4 PM to midnight, or 3 hours before 8, 2 hours during the 8-4 period, and 3 hours after 4 PM. That would be fine. The Ironbridge contract says nothing about when the work has to be done, except that it has to be done during the contract. The contractor may work 24 hours a day, seven days a week.

According to Stein, the defendant could work "any eight-hour period" on the Contract on a given day, and "that would be appropriate." ECF 131 at 60. In other words, the Contract did not specify particular hours that defendant was required to work; it was not necessarily a 9 to 5 job.

43

The government objects to Opinion 40.  ECF 105 at 17; ECF 158 at 3.  Among other things, it states, ECF 105 at 17:  "This is not an expert opinion.  It simply amounts to a jury argument based purely on speculation and not on personal observation or documentary evidence."  *See also* ECF 158 at 3.  Further, the government claims that the assertion reflects Stein's "deep personal commitment to the defendant . . . ."  *Id.*  And, the government argues that Opinion 40 is based on inadequate data and is unreliable.  ECF 158 at 3, 6.

In my view, the Contract speaks for itself.  In his testimony, however, Stein may refer to particular Contract terms and provisions, if relevant.  This may include that the Contract does not establish a particular or required work schedule.

I shall next address proposed opinions 41, 43, 45, and 54, and I shall do so collectively, because they are related and somewhat repetitive.

**Opinion 41**     (ECF 149-1 at 9)

The Indictment at page 6, paragraph 14, reads:  "McComber did not in fact work the number of hours on the Ironbridge contract that she recorded on her time records."

My opinion to a reasonable degree of professional certainty is that McComber did work the total number of hours for which the government was billed.  The work product delivered by InfoTeK (the so-called "deliverables" under the Ironbridge contract) and accepted by NSA accords with her working 2603.5 hours during the period of the Indictment.

**Opinion 43**     (ECF 149-1 at 10)

Counts 1-10 of the Indictment allege that McComber's invoices were materially false, fictitious, and fraudulent.  I see evidence in the Ironbridge contract file which rebuts these allegations.  [ECF #79-10] was a Contracting Officer's evaluation that stated the invoices were accurate during the time of Counts 1-10 of the Indictment.  This directly contradicts the Indictment.

**Opinion 45**     (ECF 149-1 at 11-12)

Ms. McComber most likely performed . . . the hours of work she billed.

First, the type of contract signifies to me that the customer did not believe the intended result could be achieved in less than the stipulated effort of program management hours.

Then, the Contracting Officer certified that the intended result cannot be achieved in less than the stipulated level of effort.

Then, the customer requested the specific number of hours to accomplish the intended result.

The number of hours worked corresponds to the MPO NSOC (customer) estimate and contract award.

The Program Manager delivered all reports.

The Program Manager completed all TTOs.

The Program Manager worked as Official Point of Contact.

The Program Manager updated program plans and documentation.  The Program Manager maintained the program schedule.

The Program Manager notified the COR of changes in personnel.

The Program Manager provided credentials for employees assigned to the Ironbridge contract.

The Program Manager assured, directed, and managed, InfoTeK to complete two major projects during the time of the First 10 counts of the Indictment.

The Program Manager delivered a wide range of work products that demonstrated work was being done and progress was being made.

As a federal contracting expert very familiar with the administration of service contracts for highly technical missions of the NSA NSOC, based on the totality of information I have reviewed, including what is set forth here, I can easily infer that InfoTeK delivered the hours billed under the contract.

**Opinion 54**    (ECF 149-1 at 13)

InfoTeK delivered all required services and every work product without exception. NSA accepted all required services and every work product without exception. During the first ten months of the Indictment period, Counts 1 – 10, I am convinced that InfoTeK performed well on all tasks, including program management and that their invoices were accurate.

At the hearing, Stein testified, ECF 131 at 173-74:  "So I believe that you can look at a body of work product, and with some knowledge of what a program manager, with some knowledge of the time and effort it takes to gather information, put it together, validate it, have it reviewed.  I think you can take a look at those things and to a rough order of magnitude, make a determination that that's how much time it would take."  Moreover, Stein agreed that the term "reverse engineering" was apt to describe the process of determining whether an individual spent the time working in a labor category, as claimed.  *Id.* at 174.  This is the framework for the parties' dispute.

Notably, as to Opinion 41, Stein opined that McComber worked the total number of  hours for which the government was billed.  ECF 131 at 61.  In particular, Stein expressly concluded that McComber worked the 2603.5 hours pertinent to the Indictment.  *Id.*  He largely founded his opinion on the following, *id.*:  "There was work product generated.  It was accepted by NSA, and it was consistent with the number of hours that would be required to do the work of program management during that period."  He added, *id.*:  "She was required under the terms of the contract to generate a large number of deliverable artifacts . . . man-hours expenditure reports, status reports . . . .  There was a lot of work that she was required to do as the program manager, and I believe she did that work."  Noting the work that was required under the Contract, Stein opined:  "I believe she did that work."  *Id.*

With regard to Opinion 43, Stein referred to a CO's "standard form" for a period performance evaluation, thereby indicating that the invoices were accurate.  ECF 131 at 86-87.  And, he addressed the responsibility of the CO with respect to quality control.  *Id.* at 88.  On this basis, he again opined that the work was performed by defendant, as she claimed, and the invoices submitted to the government were accurate.

Similarly, as to Opinion 45, Stein testified that defendant "delivered" the required hours of work and "she did the work," with an unexplained margin of error of 5%. *Id.* at 89. In reaching this conclusion, Stein relied on the view of both the CO and the customer (NSOC) that the work could not be done in less time. *Id.* In addition, he considered that the deliverables, such as reports, were satisfactorily completed. *Id.* at 90.

Opinion 54 is to the same effect. Stein also relied on the contemporaneous determination of NSA that the invoices submitted by defendant were accurate. *Id.* at 86-87.

The government vigorously objects, asserting several grounds. It argues, *inter alia*, that Stein did not consider the sworn statements provided by many witnesses who stated that defendant did not expend the time that she claimed. *See, e.g.*, ECF 105 at 18; ECF 144 at 11; ECF 158 at 3-4. This contention was addressed at length at the motion hearing (ECF 174 at 10, 21-28) and is not persuasive. For one thing, Stein testified that he did read the witness statements, noting that the witnesses did not have supervisory power over defendant. ECF 131 at 80. In any event, an expert does not have to credit the government's witnesses in order to render an admissible opinion.

Nevertheless, the opinions are flawed for other reasons.

The Court asked Stein to clarify the basis of his opinion that defendant worked the hours she claimed. ECF 131 at 61. Pointing to the "deliverable artifacts," Stein said, *id.*: "[T]hey didn't create themselves. Somebody had to [do] the work. She was the program manager. That would lead me to believe that she did the work, she delivered those hours. The artifacts exist."

Moreover, Stein relied on the Contracting Officer's evaluation during the contract period, evaluating the invoices as accurate. *Id.* at 86-87. Similarly, Stein testified that the defendant performed or "delivered" the hours of work that she claimed, because the government never

complained during that time that the work was not done; the schedule was maintained; and reports were completed.  *Id.* at 89-90; *see also id.* at 174-181 (cross examination).

On cross-examination, Stein reiterated, *id.* at 176:  "I believe [the defendant] actually worked the hours that she billed for," *i.e.*, 2,603 hours.  *Id.*; *see also id.* at 177 (same).  To reach that conclusion, Stein relied on the fact that the CO "asked for a certain number of hours to get a certain amount of work done."  *Id.* at 176.  He added, *id.*:  "The contracting officer certified that the work couldn't get done for less than that total level of effort . . . . That there were a significant number of artifacts that were produced, delivered, and accepted by the Government as being wholly in conformance with the contract."

In effect, Stein agreed that his process was one of reverse engineering to determine whether defendant performed the hours she claimed.  ECF 131 at 178.  He also opined that the government "was not defrauded" because it "received all of the services and man-hours of effort" for which it contracted.  *Id.* at 196.

The central theme of Stein's proposed opinions is his belief that defendant worked the hours she claimed and thus the invoices she submitted to the government were accurate.  In essence, the basis for Stein's opinion is that the CO and the customer believed it would take a certain number of hours to do the work; "artifacts" indicative of the work were created; and plaintiff necessarily would have had to spend the time allotted by the CO in order to do the work.  Thus, according to Stein, her invoices were accurate.

Stein agreed that his methodology in determining the number of hours that the defendant worked has never been peer-reviewed.  *Id.* at 178.  Indeed, he did not claim that he used a methodology that is a generally accepted practice among contracting professionals.  Nor was he directly involved in the Contract, such that he had personal knowledge of what transpired.  *Id.* at

48

179-180.  There is no simply basis for Stein to opine that whatever "artifacts" were created must have taken the time that the defendant claims.  Because Stein's opinions are not based on data or a tested methodology, and certainly are not within a margin of error of 5% or otherwise, his conclusions amount to sheer speculation and are thus unreliable.

Rule 702(c) requires expert testimony to be based on "reliable principles and methods . . . ."  I agree with the government that there is no way to test Stein's "calculation of hours" that defendant claims to have worked, based on a process of "reverse engineering."  ECF 144 at 15.  As I see it, Stein's conclusion is circular:  if the customer and the CO provided for a certain number of hours to do the work, then invoices consistent with those allotments prove that the hours were expended.  The allotment of hours by a CO, coupled with the production of so called artifacts, does not make it so.

But, as stated earlier, Stein is entitled to discuss the man hours designated by the CO and the customer.  He may also address the work product that was produced by defendant, to the extent he knows the work that the defendant performed, or can otherwise ascertain it.  But, he may not say that defendant worked a specified number of hours, because that opinion is pure *ipse dixit*.

From the testimony and the other evidence, the jury will determine whether defendant performed the hours of work that she claimed.  *See* ECF 158 at 6; ECF 144 at 12-23.

**Opinion 44**    (ECF 149-1 at 10)

It is the policy of the United States that Agencies ensure that contracts include inspection and other quality requirements, that the Government conduct quality assurance before acceptance and that nonconforming services be rejected.  48 CFR 46.102.  The work of assuring quality control falls to the Contracting Officer and Contracting Officer Representative.  The DoD COR Handbook addresses the key aspects of contract quality surveillance and the roles and responsibilities of the CO and the COR.  The CO is responsible for monitoring invoice payment according to the terms and conditions of the contract and local policy guidelines.  CORs must monitor contractor performance through review of monthly reports, onsite visits, and surveillance reviews.

> Approval of a voucher or invoice indicates that to the best of the COR's knowledge, the nature, type, and quality of effort begin [sic] expended agree with the progress of work under the contract.

Stein testified: "So the ultimate responsibility and accountability for quality control and quality acceptance is the contracting officer." ECF 131 at 88. However. some responsibility is also "delegated" to the COR. *Id.* And, Stein explained that a quality assurance plan is part of every contract, as a tool to measure performance. *Id.* However, he did not state: "It is the policy of the United States that Agencies ensure that contracts include inspection and other quality requirements . . . ."

The government asserts that the proposed opinion "usurp[s] or displace[s] the Court's rule [sic] to say what the law is, and what legal principles are relevant . . . ." ECF 144 at 30. It adds that the opinion is based on "mere personal belief . . . ." ECF 158 at 3. Moreover, the government contends that the opinion is not based on reliable principles and methods, as required by Rule 702(c). *Id.* at 6.

Defendant argues that review of invoices is subject to "intense scrutiny" by the government. ECF 149-1 at 10. In defendant's view, Stein's proposed testimony about the invoice process of NSA "is like the expert testifying to the reimbursement procedures under Medicare." *Id.* at 11.

Stein may testify about the "invoice process of NSA . . . ." However, defendant otherwise misses the mark.

A Medicare expert would not be permitted to opine that if the agency paid the invoice, it means the physician actually rendered the service. In the same way, Stein cannot opine that if

NSA paid the invoice, it means defendant worked the hours for which she billed.  Moreover, Stein is not qualified to speak about the "Policy" of the United States.

I address Opinion 50 and Opinion 51 together, because they are related.

**Opinion 50**    (ECF 149-1 at 12)

The Contract Administrative Office is required by FAR to do certain things before closeout.  This is found at 48 CFR 46.102 & 104.  The Contract Administrative [O]ffice must perform all actions necessary to verify Contractor's services conform to quality controls *before beginning* the closeout.  The government must reject nonconforming services.

**Opinion 51**    (ECF 149-1 at 13)

The contract closeout **process begins** after physical completion of a contract.  In a firm-fixed price, level-of-effort contract this means that the contractor has performed all of the services and the Government has accepted those services.  You can see this outlined at page 4 of the Contract Closeout Guidebook (ECF 42-1).

Stein testified that, as part of a contract closeout, the Contract Administrative Office is "supposed to determine that all of the work under the contract has been completed or that items have been delivered."  ECF 131 at 102.  He also said, *id.*:  "That's a process.  And the contract is not closed out until all of the steps in that process have taken place."  Further, Stein asserted, *id.*: "But the beginning of the contract closeout phase is an affirmative determination that all of the work has been completed or, if it's a contract for supplies, that all of the items have been delivered."

Stein also agreed that the closeout process begins after physical completion of a contract. *Id.* at 103.  However, he did not state that, in a firm-fixed price, level-of-effort contract, this means the contractor has performed all services and that the government accepted those services, as set forth in proposed Opinion 51.

The government objects.  *See*, *e.g.*, ECF 158 at 3, 11.  It takes issue with the factual and legal accuracy of the content of the proposed opinion.  *Id.* at 11.  In this regard, the government

points to the motion hearing testimony of Garrett Bosshardt, an NSA contractor; Jennifer Kolodny, NSA Chief of the Contract Closeout Division; and Kelly Sulewski, Chief, NSA Contracting Officer. *See* ECF 129 (testimony of Bosshardt and Kolodny on 7/14/22); ECF 171-5 (excerpt of Sulewski testimony on 8/29/22).

The Department of Defense COR Handbook (ECF 171-4) states, in part, *id.* at 3: "Before services or supplies furnished by the contractor can be accepted, the COR must determine acceptability by review or inspection." Further, it states, *id.* at 4: "[T]he COR must ensure that the work performed under the contract is measured against the contract terms and quality requirements." And, it also states, *id.*: "[I]t is incumbent upon the COR to identify deficiencies . . . ."

Such requirements come as no surprise. Indeed, it would be shocking if the government, like any sensible consumer, did not attempt to assure that it received the benefit of its bargain. Stein may testify, generally, as to the process in this regard.

However, the process of acceptance leaves a rather wide berth, which defendant consistently seems to overlook. The same Handbook sets forth "[e]xceptions to final acceptance" due to "latent defects, fraud, and gross mistakes amounting to fraud." *Id.* And, the claim of fraud is at the heart of this case. As Kolodny testified, if a contractor overstates the number of hours expended on a project, the reviewer would not necessarily be aware of the problem at the time of review. ECF 129 at 125-26. Indeed, such is the nature if fraud; it generally involves some intent to deceive, which would not necessarily be apparent in the first instance. A CO's failure to detect fraud when invoices are submitted does not foreclose the government from complaining at a later time about fraud. Thus, acceptance does not bar the government from establishing that the acceptance is of no legal effect because it was based on false information.

Defendant is entitled to introduce evidence to support her defense that she fully performed under the Contract, *i.e.*, that she worked the hours for which she billed. She is entitled to ask the jury to infer that, in order to do the required tasks, she must have worked the number of hours that she claimed. That the government reviewed, approved, and paid the invoices are facts that she can introduce.

On the other hand, such testimony does not establish that defendant performed as she claimed, or that the invoices are accurate. *See*, *e.g.*, *United States v. Agnew*, 147 Fed. App'x 347 (4th Cir. 2005) (per curiam) (defendant's company submitted invoices for work that had not been performed, and an audit revealed the fraud; bank fraud convictions were supported by the evidence); *United States v. Spencer's Safe & Lock Service, Inc.,* 99 F.3d 1132 (4th Cir. 1996) (per curiam) (defendant charged with inflated billings after the agency conducted an investigation that revealed improper charges).

### Opinion 57   (ECF 149-1 at 13)

I have reviewed the invoices during the Indictment period. McComber never billed more hours than InfoTeK was awarded, and therefore required to perform, for program management.

Stein was asked whether ITK, on behalf of the defendant, "ever bill[ed] more hours than InfoTeK was awarded for program management?" ECF 131 at 103. He answered, *id.*: "InfoTeK did not." In fact, he claimed 257 hours of program management had been awarded but were not billed. *Id.* at 104.

According to defendant, the opinion is based on speculation or surmise, or inadequate data. ECF 158 at 3. Further, the government suggests that it is not based on reliable principles and methods. *Id.* at 6.

The proposed opinion is narrow.  Stein simply addressed what ITK billed.  The proposed opinion is more in the nature of fact testimony.  The objection to this proposed testimony is without merit.

**Opinion 61**   (ECF 149-1 at 13)

In my professional opinion, the completeness of the Ironbridge contract file under Federal Acquisition Regulation standards as provided to the defense by the United States Attorney is woefully deficient.

Stein testified that the file for the Contract and the "working file" did not include what was "required to be maintained . . . ."  ECF 131 at 105-06.  He explained that both the CO and the COR would keep files, and that "[t]he totality of those files . . . constitute what's called the contract file."  *Id.* at 106.

The government objects, claiming that Stein misstates what the FAR requires.  ECF 105 at 31.  According to the government, 48 C.F.R. § 4.802(a) describes what a contract file "should generally consist of . . . ." and the FAR provides examples of records that are "normally contained, if applicable, in contract files . . . ."  48 C.F.R. § 4.803(a).

In my view, Stein may opine as to what "normally," in his experience, would be kept in a contract file.  The Court has the duty to inform the jury as to what the law requires.

**Opinion 62**   (ECF 149-1 at 13-14)[16]

Based on the fundamental principles of federal contracting, it is my opinion that the government was not defrauded.  The government received all of the services it contracted with InfoTeK to deliver.  The government determined throughout the contract term, including during the Indictment period, that the services were [sic] Based on the fundamental principles of federal contracting, it is my opinion that the government was not defrauded.  The government received all of the services it contracted with InfoTeK to deliver.  The government determined throughout the contract term, including during the Indictment period, that the services were wholly acceptable.  There services in toto were provided for less than the fixed contract amount.  None of the testimony from any of the witnesses or other [sic] who

---

[16] Opinion 62 contains several typographical errors, as will be evident upon reading it.

provided statements to OIG Inspector Hazenstab including during the Indictment period, that the services were wholly acceptable. The services in toto were provided for less than the fixed contract amount. None of the testimony from any of the witnesses or others who provided statements to OIG Investigator Hazenstab refute that position.

Stein testified that, in his opinion, the government "was not defrauded" in regard to the Contract. ECF 131 at 107. Further, he opines that the government received all the services from ITK for which it contracted. *Id.* Moreover, he opines that the government determined that the services were "wholly acceptable." *Id.*at 107-08. He added that if the services were "other than acceptable," the government must notify the contractor of the fact "and rectify it." *Id.* at 108.

According to defendant, F.R.E. 702 "permits expert testimony that 'embraces an ultimate issue to be decided by the trier of fact.'" ECF 149-1 at 14 (quoting *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020), *cert. denied sub nom. Washington v. United States*, ___ U.S. ___, 141 S. Ct. 927 (2020)). Thus, she contends the opinion is admissible.

The government objects, asserting that the opinion is based on speculation; based on "untested" assumptions; and "flatly and demonstrably false . . . ." ECF 105 at 32. Further, it contends that the opinion is unreliable because it is "grounded on inadequate data . . ." ECF 158 at 3.

In Stein's career with the government, he has not been involved in a fraud case, nor has he studied fraud. ECF 139 at 6-8. Indeed, Stein conceded that he is not an expert on fraud. *Id.* at 8. As I see it, he is not qualified to render the proposed opinion as to whether the government was defrauded.

Even assuming, *arguendo*, that Stein is qualified to opine on whether the government was defrauded, the opinion fails for lack of reliability and relevance. For one thing, the issue is not whether the services were provided, or the quality of them, or even whether they were provided

for less than the contract amount.  The question is whether defendant worked the hours that she claimed, or billed the government for hours that she did not work.  If, for example, the defendant delivered a perfect product, she still cannot charge the government for hours that she did not work.  And, the fact that the government "accepted" the work does not foreclose the government from determining at a later time that the invoices contained false information.

### V.      Conclusion

For the reasons set forth above, I shall grant the government's motion in part and deny it in part.

An Order follows.


Date:   November 7, 2022                 _____/s/_____
                                          Ellen L. Hollander
                                          United States District Judge