**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | |
| | | **CRIM. NO. ELH-21-036** |
| **JACKY LYNN McCOMBER,** | * | |
| **Defendant** | * | |

        *      *      *      *      *      *      *      *      *      *      *

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT'S**
**MOTION FOR JUDGMENT OF ACQUITTAL**

**Introduction**

On February 3, 2023, during the prosecution's case-in-chief, defense counsel made a Motion for Judgment of Acquittal pursuant to Fed. R. Crim. P. Rule 29. At the close of the prosecution's case, defense counsel – with permission of the Court – asserted the Rule 29 motion and adopted what was previously argued. The Court reserved judgment.

On May 3, 2023, this Honorable Court asked counsel to address the previously argued motion for judgment of acquittal in a written submission. ECF #308. This submission responds to the Court's request.

**Standard of Review**

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A "judgment for acquittal . . . is an important safeguard to the defendant. It tests the sufficiency of the evidence against the defendant, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt." Charles A. Wright, Fed. Prac. & Proc. Crim. § 461 (4th ed. 2013). In evaluating a Rule 29 motion, the trial judge should focus "on both the elements of

the offense charged and on the factual sufficiency of the evidence." *United States v. Alerre*, 430 F.3d 681, 693 n. 13 (4th Cir. 2005). Although the evidence is to be "viewed in the light most favorable to the prosecution," *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005), a conviction can only be sustained where the evidence is "substantial." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Bran*, 776 F.3d 276, 279 (4th Cir. 2015). The issue is "a matter of law." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003). Unless the government presented evidence to support a conviction based on reasonable inferences, the Rule 29 Motion should be granted because "the fact finder is not entitled to make 'leaps of logic.'" *United States v. Crounsset*, 403 F. Supp. 2d 475, 479 (E.D. Va. 2005) (quoting *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994)).

**Argument**

I.    The rule of lenity requires that 18 U.S.C. § 287 not be applied to a firm-fixed-price, level-of-effort[1] (FFP-LOE) contract. A FFP-LOE contract puts the contractor on notice that the work can only be described in general terms and cannot be clearly defined. It is unconstitutional to impose criminal sanctions for billing the stipulated level-of-effort.

This case begins with the National Security Agency (NSA) solicitation and award of an FFP-LOE contract. NSA selected the type and form of the contract. NSA named the contract "Ironbridge."

The Federal Acquisition Regulations (FAR) defines firm-fixed-price, level-of-effort contracts at FAR 16.207. The entire regulation is set forth below, with the most relevant portions for this case highlighted.

---

[1] The Federal Acquisition Regulations use a hyphen between most of the words ("firm-fixed-price, level-of-effort"). The conventions of other authorities vary.

16.207-1 Description.

**A firm-fixed-price, level-of-effort term contract requires**-

(a) **The contractor to provide a specified level-of-effort, over a stated period of time, on work that can be stated only in general terms**; and

(b) The Government to pay the contractor a fixed dollar amount.

16-207-2 Application.

A firm-fixed-price, level-of-effort term contract is suitable for investigation or study in a specific research and development area. The product of the contract is usually a report showing the results achieved through application of the required level-of-effort. However, payment is based on the effort expended rather than on the results achieved.

16-207-3 Limitations.

**This contract type may be used only when**-

(a) **The work required cannot otherwise be clearly defined;**

(b) **The required level-of-effort is identified and agreed upon in advance;**

(c) **There is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort; and**

(d) The contract price is the simplified acquisition threshold or less, unless approved by the chief of the contracting office.[2]

Before going further, please compare the FFP-LOE contract, Ironbridge, which stipulates

a level-of-effort, with another type of government contract: Task-Order Contract. *See* FAR 16.502.

"*Task-order contract* means a contract for services that does not procure or specify a firm quantity

of services (other than a minimum or maximum quantity) and that provides for the issuance of

---

[2] The simplified acquisition threshold in 2015 was $150,000. FR Doc. 2015-16206 Filed 7-1-15. This means that Ironbridge required the approval of the chief of the contracting office at NSA.

orders for the performance of tasks during the period of the contract." FAR 16.501-1. Unlike a stipulated level-of-effort contract, in a Task-Order contract, the level-of-effort is estimated.

> For the information of offerors and contractors, the contracting officer shall state a *realistic estimated total quantity* in the solicitation and resulting contract. This *estimate* is not a representation to an offeror or contractor that *the estimated quantity* will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may *obtain the estimate* from records of previous requirements and consumption, or by other means, and should *base the estimate* on the most current information available.
> FAR 16-503(a)(1) (Emphasis added).

InfoTeK delivered a Program Manager to work as the Program Manager on the Ironbridge contract. The role of the Program Manager is described by the Defense Acquisition University.

> Cost, schedule, performance, and risk define the basic dimensions of program management. We mean several things when we say this. First, PMs are evaluated primarily by their ability to remain within cost and schedule bounds while achieving performance objectives and managing risk. Acquisition program baselines track program compliance with established cost, schedule, and performance targets—and PMs are held accountable when they exceed cost or schedule or fall short of performance targets.
>
> William T. Cooley & Brian C. Ruhm, A Guide for DoD Program Managers 14-15 (Defense Acquisition University, Dec. 2014).

Though InfoTeK/Colston/McComber performed work as a Program Manager under a FFP-LOE contract with a stipulated level-of-effort, only McComber was indicted on a 20-count Indictment and tried on a superseding 20-count Indictment. ECF # 97. The first 19-counts charged McComber with violation of 18 U.S.C. § 287. The statute prohibits false claims against the United States.

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, **any claim** upon or against the United States, or any department or agency thereof, **knowing such claim to be false, fictitious, or fraudulent,** shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.
> 18 U.S.C. § 287 (Emphasis added).

In this case, the "claims" were InfoTeK invoices billing hours of program management.

4

In evaluating the applicability of the rule of lenity, this Honorable Court should note that *after* signing the Ironbridge contract but *before* billing a single hour of program management, InfoTeK filed a spend plan with NSA that encompassed the level-of-effort hours of work for the period of performance. NSA *never* challenged the spend plans; the spend plans reflected the obligated level-of-effort. Moreover, NSA *accepted* the invoices, which is evidence that the work performed was to the satisfaction of NSA and in compliance with the contract requirements.

The specific level-of-effort for the Program Manager during the Indictment period is not – and was never – an "estimate." This is fully explained *infra* at 12-13.

Of course, Ironbridge is a contract. The FAR defines a contract as "a mutually binding legal relationship obligating the seller to furnish the supplies or services and the buyer to pay for them." FAR 2.101. So, the upshot is this: on the government's part, the government contracted for 1880 hours of program management work per 12-month period and the contractor must deliver 1880 hours of program management work per 12-month period. "Shall denotes the imperative." FAR 2.101. (Must is defined as a synonym; *see* shall at FAR 2.101).

It is certain that InfoTeK was obligated to provide 1880 hours of program management per 12-month period. "The use of a word of command 'shall' compels the conclusion that the language is mandatory and not merely directory or precatory." *Lomas & Littleton Co. v. United States*, 1 Cl. Ct. 641 (1982). Unfortunately, the prosecutors purposefully and repeatedly blurred this legal requirement by falsely asserting that the specific language of the contract denoted an "estimate." (The word "estimate" was used 42 times during the trial.)

To prove McComber guilty of a crime, the government had to overcome the following obstacles to proof beyond a reasonable doubt regarding criminal *mens rea*: Ironbridge was a written contract requiring a stipulated level-of-effort; NSA had a history of approving invoices

for virtually identical level-of-effort for Raynett Colston; InfoTeK delivered a spend plan that encompassed the level-of-effort hours of work for the period of performance; NSA's surveillance and inspection put the contractor on notice that NSA could and would evaluate the level-of-effort contemporaneous with the level-of-effort; NSA's formal process of acceptance required Contracting Officer Representatives (CORs) to review each invoice for accuracy, contract compliance, and acceptable work; and NSA began the close out of the contract on two occasions, including one that specifically accepted all of the work delivered post-Indictment.

In *Wooden v. United States,* 595 U.S. ___, 143 S. Ct. 1063 (2022), Justice Gorsuch, in a concurring opinion, carefully summarized the rule of lenity.

> The "rule of lenity" is a new name for an old idea—the notion that "penal laws should be construed strictly." *The Adventure*, 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (Marshall, C. J.). The rule first appeared in English courts, justified in part on the assumption that when Parliament intended to inflict severe punishments it would do so clearly. 1 W. Blackstone, Commentaries on the Laws of England 88 (1765) (Blackstone); 2 M. Hale, The History of the Pleas of the Crown 335 (1736); see also L. Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749–751 (1935). In the hands of judges in this country, however, lenity came to serve distinctively American functions —a means for upholding the Constitution's commitments to due process and the separation of powers. Accordingly, lenity became a widely recognized rule of statutory construction in the Republic's early years.
>
> Consider lenity's relationship to due process. Under the Fifth and Fourteenth Amendments, neither the federal government nor the States may deprive individuals of "life, liberty, or property, without due process of law." U. S. Const., Amdts. 5, 14. Generally, that guarantee requires governments seeking to take a person's freedom or possessions to adhere to "those settled usages and modes of proceeding" found in the common law. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856); N. Chapman & M. McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1774–1775 (2012). And among those "settled usages" is the ancient rule that the law must afford ordinary people fair notice of its demands. See, *e.g.*, *Sessions* v. *Dimaya*, 584 U. S. ___ (2018) (GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 3–5). Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails

over ambiguous laws.

Early cases confirm the message. In *United States* v. *Wiltberger*, a sailor had killed an individual on a river in China. 5 Wheat. 76, 77 (1820). But the federal statute under which he was charged criminalized manslaughter only on the "'high seas.'" *Id.*, at 93 (quoting Act of Apr. 30, 1790, § 12, 1 Stat. 115). Chief Justice Marshall acknowledged that other parts of the law might have suggested Congress intended to capture the sailor's conduct. 5 Wheat., at 105. But he insisted that "penal laws are to be construed strictly" because of "the tenderness of the law for the rights of individuals"—and, more specifically, the right of every person to suffer only those punishments dictated by "the plain meaning of words." *Id.*, at 95–96. Where the text of a law mandates punishment for the defendant's conduct in terms an ordinary person can understand, a court's job is to apply it as written. *Id.*, at 95. But where uncertainty exists, the law gives way to liberty.

*United States* v. *Mann* tells a similar story. 26 F. Cas. 1153 (No. 15, 718) (CC NH 1812). There, Justice Story faced the question whether a federal statute authorized punishment against a shipowner. After concluding the statutory text did not supply a "definite" answer, Justice Story explained that "[i]t is a principle grown hoary in age and wisdom, that penal statutes are to be construed strictly." *Id.*, at 1157. And that principle more or less resolved the case. "I will not be the first judge," Justice Story wrote, "to strain a proviso against [a] citizen, beyond the fair import of its expressions." *Ibid.* Here again, the connection between lenity and fair notice was clear: If the law inflicting punishment does not speak "plainly" to the defendant's conduct, liberty must prevail. *Ibid.*

Of course, most ordinary people today don't spend their leisure time reading statutes—and they probably didn't in Justice Marshall's and Justice Story's time either. But lenity's emphasis on fair notice isn't about indulging a fantasy. It is about protecting an indispensable part of the rule of law—the promise that, whether or not individuals happen to read the law, they can suffer penalties only for violating standing rules announced in advance. As the framers understood, "subjecting . . . men to punishment for things which, when they were done, were breaches of no law . . . ha[s] been, in all ages, the favorite and most formidable instrumen[t] of tyranny." The Federalist No. 84, pp. 511–512 (C. Rossiter ed. 1961) (A. Hamilton); see also *McBoyle* v. *United States*, 283 U.S. 25, 27 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law . . . fair warning should be given to the world in language that the common world will understand").

The Constitution prohibits statutes that are "void for vagueness." In *Jordan v. De George*, 341 U.S. 223, 230 (1951), the Supreme Court stated:

> The essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct. *Williams v. United States,* 341 U.S. 97, decided April 23, 1951; *Screws v. United States,* 325 U.S. 91, 103-04 (1945). This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law. *Lanzetta v. New Jersey,* 306 U.S. 451 (1939); *United States v. L. Cohen Grocery Co.,* 255 U.S. 81 (1921).

The Constitution requires "adequate notice of what is illegal." *See, e.g., Dunn v. United States*, 442 U.S. 100, 112 (1979) (stating that lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate . . . whether his conduct is prohibited"); *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *see also* Lisa K. Sachs, *Construction of the Rule of Lenity in the Interpretation of Environmental Crimes*, 5 N.Y.U. ENVTL. L.J. 600, 636 (1996) ("The rule of lenity serves to promote fair notice to those subject to the criminal laws" and "minimize the risk of selective or arbitrary enforcement").

McComber was not on fair notice that her invoices constituted a federal crime. To the contrary, NSA put McComber on notice that NSA could not even define the work she was required to do, except in general terms *and* the work required could not be clearly defined. Then NSA repeatedly paid InfoTeK for Colston's and McComber's level-of-effort, which can only occur *after* a formal acceptance of the level-of-effort.

To prosecute McComber for billing for her level-of-effort working off-site – which was the heart of the investigation and prosecution – the government grafted a contract for vague, undefined work onto a criminal statute in the case of McComber, and then charged McComber with committing many crimes.

This case is the opposite of fair notice. It is a case where the contractor risks imprisonment for performing an obligated level-of-effort under the contract while being simultaneously evaluated as providing "satisfactory" and "very good" levels of effort. It is a

case where the government notified the contractor that it would inspect her work *before* paying for the work, and in all Colston's invoiced hours and in all 19 months of the Indictment accepted and paid for the services. Ironbridge, Section E. (Inspection and Acceptance). This is legally significant; the government is prohibited from paying for unacceptable services. COR Handbook, March 22, 2012, at pp. 33-34.

As this Honorable Court witnessed, the OIG investigator focused her entire inquiry on off-site work. In fact, she prepared witnesses by telling them that billing for off-site work was a crime that McComber had committed by inviting the witnesses' attention to her chart which outlined the difference between confirm hours and invoiced hours.

Off-site work was either permitted in writing or the conduct of both parties resulted in a constructive change to the contract for years *before* the Indictment period. So, the prosecutors developed a new theory (post-OIG) that there was *insufficient* work.

McComber denies that there was insufficient work for Colston or McComber. But, assuming *arguendo*, that there was insufficient work for the Program Manager, InfoTeK was nevertheless obligated to provide a person ready, willing, and able to do whatever work was necessary for the hours required in the Ironbridge contract. The Ironbridge contract controlled whether Colston or McComber was committing a crime – not the after the fact observation or theory of the prosecution that there was insufficient work for the Program Manager.

At trial, there was no evidence that NSOC ever determined there was insufficient work for the Program Manager, nor notified InfoTeK/Colston/McComber that there was insufficient work for the Program Manager. This is very important because *if* the customer (NSOC) had determined that there was insufficient work for the Program Manager, NSOC must notify the COR in writing of the contract issue. *See* COR Handbook, March 22, 2012, at p. 30. The COR

has no independent authority to modify a contract; the COR must forward the information to the Contracting Officer (CO). *Id.* at p. 33; FAR 1.602-1. The CO has authority to unilaterally change the contract. FAR 1.602-1. If the CO changes a contract for professional services, they are required to use a particular clause of the FAR. *See* 52.233-1, Alternate III. The FAR regulation with Alternate III (clause) states:

> a) The *Contracting Officer may* at any time, by written order, and without notice to the *sureties*, if any, make changes within the general scope of this contract in the services to be performed.
>
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the *Contracting Officer shall* make an equitable adjustment in the contract price,[3] the delivery schedule, or both, and *shall* modify the contract.
>
> (c) The Contractor *must* assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the *Contracting Officer* decides that the facts justify it, the *Contracting Officer may* receive and act upon a proposal submitted before final payment of the contract.
>
> (d) If the Contractor's proposal includes the cost of property made obsolete or excess by the change, the *Contracting Officer shall* have the right to prescribe the manner of the disposition of the property.
>
> (e) Failure to agree to any adjustment *shall* be a dispute under the Disputes clause. (Note: *see* Fn. 3) However, nothing in this clause *shall* excuse the Contractor from proceeding with the contract as changed.
>
> (f) No services for which an additional cost or fee will be charged by the Contractor *shall* be furnished without the prior written authorization of the *Contracting Officer*.

---

[3] If the Contracting Officer modified the Ironbridge contract to require fewer Program Manager hours, the Contracting Officer would also need to make an "equitable adjustment" to compensate InfoTeK for anticipated lost profits *or* InfoTeK would assert its right to an adjustment under the FAR. In effect, even if the prosecutors now claim there was insufficient work, the law requires them to subtract anticipated profit from the alleged loss.

The Contracting Officer for the period of the Indictment, Tiffany Starr Smith, testified that she did *not* change the stipulated level-of-effort in the Ironbridge contract. As a matter of law, for the entire Indictment period, InfoTeK was mandated to provide the level-of-effort for which McComber now stands indicted. Contrary to this Honorable Court's misimpression, this was *not* for the jury to decide. *See* Trans., Feb. 3, 2023, at 27, The Court. ("[Stipulated effort] is for the jury to decide.")

The jury convicted McComber for billing her level-of-effort *because* the prosecutors imposed a novation upon the contract that worked like this: "we, the prosecutors, ordain that the level-of-effort for program management was unnecessary and therefore any hours allegedly performed were a fraud upon the government. We buttress our opinion with the testimony of others who are not program managers to assert their belief that there was insufficient work. We simultaneously excuse that none of these persons expressed such a belief at any time during the life of the contract. And, in this way, we take the indefiniteness of the contract level-of-effort, re-define it to the government's advantage, and then invite the jury to convict McComber for billing time that we, the prosecutors, deem unnecessary *ex post facto*."

It is unconstitutional to convict a person without fair notice that their conduct is unlawful. In this case, McComber is convicted of conduct that was lawful when performed by Colston and later deemed "satisfactory" or "very good" by the United States at the time of McComber's conduct, and then *ex post facto* declared unnecessary and therefore, criminal. This Honorable Court should grant the motion for judgment of acquittal on the grounds of the rule of lenity alone.

II.   The proof offered during the McComber trial is insufficient as a matter of law. (A) No crime is committed where a contractor achieves the intended result of a FFP-LOE contract and bills less than the stipulated effort. (B) Inspection and Acceptance of Colston's invoiced hours and McComber's invoiced hours put McComber on notice

that she was acting lawfully. (C) The prosecutors repeatedly misstated the law and misled the jury about the Ironbridge FFP-LOE contract. (D) McComber's statement to the OIG Inspector is immaterial as a matter of law.

A.  No crime is committed where a contractor achieves the intended result of a Firm-Fixed-Price, Level-of-effort contract, and bills less than the stipulated level-of-effort.

If intended results cannot be achieved without a specific level-of-effort, and intended results are achieved, one can infer that the specific level-of-effort was expended. This is simple logic. If a specific level-of-effort is *the condition precedent* to the outcome, and the outcome occurs, *the condition precedent must have occurred*. If a baby is born, the fertilization of an egg must have occurred.

From the beginning of the case, defense counsel asserted that certain facts beyond dispute support the logical proposition – set forth above – that no crime was committed: (1) the level-of-effort was identified and agreed upon by the parties in advance of performance; (2) the government asserted that the intended result could not be achieved by expending fewer labor hours; and (3) the intended result was achieved to the complete satisfaction of the government. The prosecutors misled the jury on all three parts of defense counsel's logical argument.

It is beyond dispute: the level-of-effort was identified and agreed upon in advance. The total level-of-effort for the performance of the Ironbridge contract during the Indictment period is delineated in Section B(a) of the Ironbridge contract (Mod 38).

The contractor agrees to provide the total level-of-effort specified below in performance of the work described herein. The total level-of-effort for the performance of this contract shall be 134,684.19 hours of direct labor (including subcontractor direct labor hours) and 0 hours of uncompensated overtime.

The specific level-of-effort for Program Manager is delineated in two tables in Section B(b). Because of three time periods during the extension period of the contract, two tables in Ironbridge, Section B(b), and the vagaries of incremental funding over multiple modifications,

the specific level-of-effort is superficially complicated. However, by doing the math, the specific level-of-effort for the Program Manager during the Indictment period is full-time equivalent: 1880 hours per 12-month period. This is beyond debate!

The prosecutors changed a fact beyond debate – that the level-of-effort (1880 hours per 12-month period) was identified and agreed upon in advance – by treating the FAR as elastic. The level-of-effort became merely "an estimate." But it isn't! The FAR is not malleable or subject to manipulation. *See Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1551 (Fed. Cir. 1993). "The FAR and DFARS are issued under statutory authority and published in conformance with required statutory and regulatory procedures. FAR 1.301(b). Accordingly, those regulations have the force and effect of law." *Davies Precision Machining, Inc. v. United States*, 35 Fed. Cl. 651, 657 (1996).[4]

The word "estimate" is not found in these clauses of the Ironbridge contract. It was somehow grafted into these clauses of the contract by the prosecutors. But the FAR limits the government's use of an "estimate." A FFP-LOE contract has a stipulated effort, not an estimate. A different form of contract – "task-order contract" allows for level-of-effort estimates. But even if this had been a task-order contract where estimated level-of-effort hours are permitted, the prosecutor's "estimate" would be unlawful. This is because task-order contracts require the "estimate" to be rational and realistic. "For the information of offerors and contractors, the *contracting officer shall* state a *realistic estimated* total quantity in the solicitation and resulting contract." FAR 16.503(a)(1) (Emphasis added.)

---

[4] Regrettably, this Honorable Court did not accept this from the beginning of this case. This was a constant source of problems for McComber's defense. The Court remarked: "Not all FAR provisions are mandatory. Some are preparatory or illustrative." Transcript, Feb. 13, 2023, at pp. 5-6.

In the Ironbridge extension contract – which is at issue in the Indictment – the contracting officer testified that she relied upon the NSOC-created Hours Workbook which mandated full-time equivalent hours. The prosecutors' *ex post facto* estimate of "ten hours per week" is just 27% of the contractual obligation. That number isn't even an "estimate" under the clear requirements of the FAR. But the prosecutors repeated the word "estimate" dozens of times and had non-program managers give opinions completely at odds with the contract requirements.

It is important to recall that the government solicited and awarded the commitment of full-time equivalent program management hours to achieve the government's intended result. The intended result was for a hybrid, but largely off-site, Program Manager to provide and manage on-site technical workers and to provide excellent service to the government. It was NSA that reasoned – based on its prior experience – that projects like Ironbridge don't run themselves. It was NSA that determined the committed level-of-effort required by InfoTeK's Program Manager.

The prosecutors' assessment is irrelevant as a matter of law. So is the opinion of each witness who suggested that there was not enough work. Whether there was sufficient program management work during the life of the contract in the minds of the prosecutors and others (except the Contracting Officer), InfoTeK/Colston/McComber were required to commit to a level-of-effort.

The intended result was clearly achieved.  The prosecutor tacitly admitted it in a question to NSA's former contracting expert Charles Stein. "There is no dispute that InfoTeK's personnel, which numbered 15 or 16, that they delivered work product to the government, right?" Trans., J. Gray, Feb. 6, 2023, p. 154.

*If* as NSA asserted, consistent with FAR 16.207, that the condition precedent to the intended result was the stipulated level-of-effort of the Program Manager (fertilization of the egg), *and* the intended result (baby's birth) was achieved, *then* the Program Manager performed the level-of-effort (fertilization of the egg) beyond all reasonable doubt. In this case, the invoiced level-of-effort was the obligated effort. Accordingly, no crime of false claim was committed.

B. Inspection and Acceptance of Colston's invoice hours and McComber's invoice hours put McComber on notice that she was acting lawfully.

One of the atypical aspects of this prosecution has been the prosecutors' touting of Raynett Colston as an exemplary Program Manager. Simultaneously, they condemned McComber.

This makes no sense. Both Colston and McComber filed spend plans with NSA before working any level-of-effort. The spend plans were preparatory to either Program Manager doing any work. Department of Defense regulations mandated that the work of Colston and McComber be surveilled. Then, both Colston and McComber submitted their hours on InfoTeK invoices as required by the contract. Department of Defense regulations mandated that CORs inspect the InfoTeK invoices for the level-of-effort of both Program Managers to determine that the services provided are consistent with the amount billed and that the invoices were accurate. Although not done in complete adherence to the FAR, both Colston and McComber had their work annually evaluated. Overall, Colston was evaluated to be a very good to excellent Program Manager. McComber was evaluated to be a satisfactory to very good Program Manager. Ironically, in one of McComber's annual evaluations during the Indictment period, she was lauded for accurate invoices.

The verified facts prove Colston's level-of-effort and McComber's level-of-effort were practically identical. Colston provided 2,525 hours of program management over 19 months;

McComber provided 2,603 hours of program management over 19 months. Colston was on-site at NSA for 250.79 hours over 19 months. McComber was on-site at NSA for 263 hours over 19 months.

Contrary to the prosecutors' argument, there was no change in the requirements for Program Manager Colston for the comparable 19-month period. The TTOs were identical for Colston and McComber.

NSA approved Colston's level-of-effort, even though 90% of her billed time was offsite. NSA approved Colston's level-of-effort even though she billed 2,525 hours over nineteen months, or roughly 1,843 hours more than the prosecutors estimated it would take to complete the work of program management for McComber's 19 months.

For McComber's level-of-effort to be a crime, the prosecutors needed to disprove the probity of (1) Spend Plans by Colston and McComber; (2) Required Surveillance of Colston and McComber; (3) Acceptance of invoices for the level-of-effort expended by Colston and McComber; and (4) The evaluations of Colston and McComber. The prosecutors' theory of the case required NSA to be *not fleeced* by Colston *but fleeced* by McComber. And it required McComber, but not Colston, to be the beneficiary of government omission (no review of the invoices). And it required McComber, but not Colston, to be the beneficiary of government commission; the government's evaluation of Colston was accurate but the government's evaluation of McComber was inaccurate.

The prosecutors' theory of the case requires the willful suspension of disbelief to convict McComber. The jury (and this Honorable Court) must forgive the government for twice beginning to "close out" the Ironbridge contract and twice acknowledging acceptance of all services. *See* Modification POO53 and Bosshardt letter. Incredibly, the Bosshardt attempted

close out occurred post-Indictment. But wherever it suited the prosecutors' theory of the case, the prosecutors dismissed evidence consistent with innocence as *another* NSA mistake. The prosecutors denied – without legal justification – that any of the "mistakes" were non-compliant with the FAR by misinterpreting the FAR for the Court and the Jury.

Even for a cynic, it is inconceivable that NSA is run as poorly and unlawfully as the prosecutors depict in this case. Everything – literally everything – that NSA did to McComber during the entire Indictment period put McComber on notice that she was acting lawfully. One cannot reconcile NSA's conduct with McComber's guilt.

C. The prosecutors misstated the law and misled the jury about the Ironbridge FFP-LOE contract.

The prosecutors misstated the law and misled the jury about the following terms or ideas associated with the Ironbridge contract: (1) The requirement that program management work had to be done on-site, particularly for reasons of national security;  (2) That Clause F.6 of the Ironbridge contract required an "official modification" before the Program Manager could work off-site; (3) That the "changes clause" in the Ironbridge contract required an "official modification" for the Program Manager to work off-site; (4) That the specified level-of-effort was an "estimate" and not an obligation of contractor performance; and (5) That NSA was not obligated to pay the level-of-effort for work program management performed off-site or for 73% of the level-of-effort that the contractor was required to provide.

McComber was *obviously* approved to work offsite. (It is hard to believe that 5 and ½ years after the OIG investigation, on-site v. off-site is still at issue.) First, InfoTeK received an email that is in evidence. The email was sufficient evidence of the intent of the contracting parties to put this matter to bed. Then, InfoTeK received the faxed Guinther letter, though it wasn't filed

appropriately by InfoTeK staff.[5]   Beginning with the Indictment *and continuing after the jury*

*verdict*, the Office of the United States Attorney publicly alleged that McComber billed for work

off-site when national security required the work to be done at the NSA. The prosecutors' browbeat

the jury with the idea that McComber was breaching the contract and committing a crime when

she worked offsite, when even a first-year law student would recognize constructive change in the

contract under the facts of this case, even if there was no writing. The prosecutors intentionally

---

[5] There is an obsessiveness to the prosecution effort in this case, particularly for an alleged property crime. This case does not involve a lot of money. It is the smallest property crime defense counsel has ever defended in federal court and smaller than some cases counsel has defended in state court. The alleged "victim" isn't a widow or orphan; it is the largest, richest, most powerful government in the history of the world. Given the prosecutions' unnatural and melodramatic sentencing efforts, please remember that no there is no dead body, sexually abused minor, or kilo of fentanyl in this controversy. Nowhere is the prosecutors' vehemence more patently absurd than in the prosecutors' delusion called "the Guinther letter." It is absurd because it requires the willful suspension of disbelief that NSA can find all their documents related to the Ironbridge file. NSA – the preeminent signals intelligence agency in the world – cannot be relied upon to find dung in a cow pasture in the McComber case. This was demonstrated repeatedly in this case. This Honorable Court will recall that 18 months after NSA had located "all" of McComber's emails (fewer than 100), NSA "found" over 3500 additional emails. Oops.  Recall that NSA didn't find *any* work product of McComber and didn't find any notice that work product wasn't received. Both are required to be maintained.  Recall that NSA never found a single COR files. The COR files are the most likely place that NSA stored the Guinther letter when it was written and sent by facsimile transmission to InfoTeK.  Recall that NSA did not complete the Court ordered review of discovery months and months *after* the deadline. That is odd because the FAR requires that a contract file be maintained in easily retrievable fashion. Recall that NSA lost one folder of the InfoTeK file in a cabinet drawer of some type. Meanwhile the Office of the United States Attorney hasn't been efficient in this case either. After the OIG and the AUSA allegedly reviewed the entire contract file, NSA discovered annual evaluations of the Program Manager during the Indictment period. These were clearly exculpatory. How could they be missed? Assuming good faith on the part of AUSA Joyce McDonald, she made a mistake or NSA had the evaluations in a place other than the Ironbridge file. Now recall the trial. The prosecutors' NSA witnesses routinely testified that they did not comply with the mandatory language of the FAR *or* the Contracting Officer's Representative's Letter of Appointment. The testimony proved wholesale negligence or recklessness on the part of the NSA beginning before Colston and continuing through the completion of the contract. In fact, this was the basis of a jury question. Given the incredible un-trustworthiness of NSA's record keeping in this case, it is irresponsible and irrational to accuse McComber of creating the Guinther letter. Ms. Guinther's account of the history of the letter was completely discredited by defense counsel in ECF #79 and exhibits appended thereto. For shame on the Department of Justice for inventing this absurdity *and* for seeking an enhanced penalty for alleged obstruction of justice.

confused the requirement for change – written permission of the contracting officer – with official modification and then repeatedly drummed the idea that there was no official modification to the contract *as required* by the contract. *See* Ironbridge F.6. Mr. Cooch argued that official modification was required by the changes clause for the Program Manager to work off-site. It is not. Only on the final day of the trial – with intervention by the Court – did the prosecutors reluctantly agree that the jury could not legally find McComber guilty of work she performed offsite.

> Because I think that the jury could be thinking, from what we've heard so far, that the Government is also going after Ms. McComber because she was not, you know, you have these charts when she was not there and definitely people have said, well, the contract was never modified so she shouldn't have been working off-site. Leaving the impression that if she was off-site she couldn't be working.

The damage was done. The prosecutors successfully tainted McComber as a scofflaw in every regard. To overcome the obvious problem that Colston worked offsite as much as McComber, the prosecutors called witnesses who offered provably false testimony exaggerating the amount of time that Colston was on-site at NSA. The prosecutors – who had charts for every piece of data known to man – had to know that they were offering blatantly erroneous information to persuade the jury that Colston was a good and lawful Program Manager while in stark contrast McComber was a felon.

This Honorable Court should grant the Defendant's Motion for Judgment of Acquittal on the grounds of insufficiency of the evidence alone. However, both grounds asserted in this Memorandum of Law compel the judgment of acquittal.

D. McComber's statement to the OIG Inspector is immaterial as a matter of law.

Count 20 charges a violation of 18 U.S.C. § 1001, False Statement. The gravamen of defense counsel's Rule 29 motion regarding Count 20 is that because the TTO's did not require the

stipulated level of effort to be worked (or invoiced) during a particular contract period of performance, *and* because the intended result was achieved, it is legally immaterial whether McComber's statement to OIG Investigator Hazenstab was accurate.

This Honorable Court frequently interrupted the Rule 29 argument. Defense counsel intended to further point out that McComber told Hazenstab that she kept track of her hours on a "timesheet." McComber never told Hazenstab that she filled out her Unanet internet timecard every day.

There are two reasons to grant an acquittal on Count 20 as well as Counts 1-19.

**Conclusion**

McComber was never on notice that her conduct was criminal. And, *if* the intended result of the Ironbridge contract was achieved, *then* McComber provided the requisite level-of-effort of Program Manager. *If* McComber stood on a golf course with a cell phone in her hand *and* managed to keep the Ironbridge contract within cost and schedule bounds while achieving performance objectives and managing risk all to the complete satisfaction of the government, *then* McComber performed the level-of-effort required for Program Manager.

> It is the obligation of the United States to do right. Every free government can be judged by the degree to which it respects the life, liberty and property of its citizens. The United States stands tall among the Nations because it is a just Nation. In the instant cases the United States has not acted in a manner worthy of the great just Nation it is.
>
> . . . .
>
> [O]ne is almost tempted to wonder if insanity is indeed a prerequisite for contracting with the government.
>
> *California Federal Bank v. United States*, 39 Fed. Cl. 753, 754, 767 (1997) (Opinion by Chief Judge Loren Smith, U.S. Court of Federal Claims).

This case was – at best – a contract dispute based upon an anonymous whistleblower's report to the NSA OIG. It has been exaggerated and morphed into 20 indicted federal felonies, thousands of pages of filings (including the 223-page objection to the U.S. Probation Pre-Sentencing Report), and days and days of pre-trial hearings and jury trial. Yet only the following is proven beyond all reasonable doubt:

1. NSA said it required 1880 hours per 12-month period of program management to achieve the intended result for the Ironbridge contract during the Indictment period.

2. NSA reported that InfoTeK provided "excellent" services to the complete satisfaction of the government. The intended result was achieved.

3. The government's OIG investigator focused her investigation on the issue of on-site vs. off-site, frequently telling witnesses that she had evidence of McComber's criminality before interviewing them.

4. Two prosecutors convinced a federal Grand Jury and a federal petit jury that McComber did not do work because there was little or no work to do.

5. Every aspect of McComber's level-of-effort mirrors that of Colston, who the government touted as an excellent Program Manager.

6. The Unanet system was deliberately breached by Dwayne Preston *before* the Hazenstab interview. The prosecutors rewarded Preston and tacitly approved of his intentional misrepresentations to the Maryland State government. The prosecutors are willfully blind to even the possibility of corruption of the Unanet records.

Something is very wrong with this case. Perhaps defense counsel has not been sufficiently talented to convince the Honorable Court of this, but it remains a fact. Something is very wrong with this case. McComber should not suffer penalty for violating the standard procedures of the

NSA applicable to Colston and McComber. The uncertainty that a crime occurred, or was proven, should give way to liberty. The Court should issue a Judgment of Acquittal.

Respectfully submitted,

/s/

_____
Clarke F. Ahlers, Esq.
Bar ID No.: 08577
Clarke F. Ahlers, P.C.
Atholton Square
10450 Shaker Drive, Suite 111
Columbia, Maryland 21046
cahlers@aol.com
410-740-1444
Attorney for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 8, 2023, this **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL** was served by ECF upon the Office of the United States Attorney for the District of Maryland.

/s/

_____
Clarke F. Ahlers, Esq.