**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **JACKY LYNN MCCOMBER** | Case No. 1:21-cr-0036-ELH |
| Defendant. | |

<u>**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT
OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND ........................................................................................ 3

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ......................................................................................................................... 5

    I.      There Was Insufficient Evidence for the Jury to Find Ms. McComber
          Guilty on Nineteen Counts of Violating the False Claims Act
          (Counts 1 through 19) ........................................................................................... 5

          A.      The Government Did Not Carry Its Burden of Proving that Any of
                   the 19 Invoices Were Materially False Because Ms. McComber's
                   Hours Were Materially Inflated ................................................................ 5

                 1.      The jury was not entitled to infer falsity from evidence that
                         Ms. McComber was off-site for a substantial number of the
                         hours billed during the indictment period. ....................................... 6

                 2.      The government did not prove that there was insufficient
                         program manager work. .................................................................. 7

                 3.      The government could not prove falsity based on the lack of
                         physical work product. ................................................................. 11

                 4.      The government's count-specific evidence is flawed,
                         incomplete, and insufficient to prove falsity on any of the 19
                         invoices, much less all of them. .................................................... 12

           B.      The Government Did Not Carry Its Burden of Proving that
                     Ms. McComber Submitted Any Materially False Invoices with
                     Knowledge of their Falsity ...................................................................... 25

    II.     There Was Insufficient Evidence for the Jury to Find Ms. McComber
          Guilty of Knowingly and Willfully Making a False Statement to the
          Government (Count 20) ...................................................................................... 28

CONCLUSION ................................................................................................................... 30

Pursuant to the Court's order dated June 15, 2023 (ECF No. 338), Defendant Jacky Lynn McComber, by and through her undersigned counsel, hereby submits this supplemental memorandum in support of her Rule 29 motion for a judgment of acquittal or a new trial.

The evidence is insufficient to sustain Ms. McComber's convictions on each count of the superseding indictment.  Because no reasonable jury could have found that, on this record, the elements of Ms. McComber's convictions for submission of false claims or making false statements were satisfied beyond a reasonable doubt, the Court should grant Ms. McComber's motion for judgment of acquittal.

## **INTRODUCTION**

No reasonable jury could conclude beyond a reasonable doubt that Jacky McComber—a mother of four and teacher-turned-government contractor who worked extremely hard to build a successful company that provided critical information technology services to the federal government—knowingly and materially falsified her hours in 19 separate invoices submitted to the government over a 19-month period, and then knowingly and willfully made materially false statements to a government investigator.

To convict Ms. McComber of submitting false claims, the government was required to prove beyond a reasonable doubt that 19 different invoices submitted to and paid by the government each month were materially false, and that Ms. McComber knew that each and every invoice was materially false when it was submitted.  But the categories of evidence produced by the government to prove these core elements of knowledge and falsity failed:

- ***Evidence of Off-Site Work:***  Despite conceding that it was not unlawful for Ms. McComber to work off-site as program manager, the government repeatedly asked the jury to infer that if Ms. McComber was off-site, she was not working, and elicited contradictory and confusing testimony from witnesses about whether or not off-site work was permitted.

1

- ***Testimony about Ms. McComber's Role and Work:***  The government produced a series of witnesses who testified that there was not enough program manager work to support the hours Ms. McComber was billing.  Yet, it was uncontroverted that the plain language of the governing contract obligated Ms. McComber to provide full-time hours to the government during the indictment period.

- ***Lack of Physical Work Product:***  In its closing argument, the government emphasized that if Ms. McComber was really working, there would be "traces."  Day 14 Trial Tr. 104:21–22 (government closing).  But it was undisputed that Ironbridge was a specific type of government contract that does not result in tangible work product aside from monthly status reports, and government witnesses uniformly testified that they were satisfied with Ms. McComber's performance as program manager.

- ***Snippets of Daily Life:***  The government pulled together a hodgepodge of other evidence like calendar entries, chat messages, emails, and credit card charges from some of the days in the indictment period, even though the record reveals significant inaccuracies in the government's tabulation and portrayal of this evidence, government witnesses admitted that the government's evidence was incomplete, and there is ample evidence that none of these items are reliable indicators of how Ms. McComber was spending her time.

Despite the government's long list of witnesses and tall stack of trial exhibits, closer examination reveals that the government's evidence of falsity and knowledge is insufficient.  Its core theories about on-site vs. off-site time, the amount of work needed for the program manager position, and the work product generated by the position were either not supported or contradicted by the trial evidence and are insufficient bases to prove material falsity for any of the invoices.  And as the exhibits to this motion will show, even drawing all inferences in favor of the

2

government, the government failed to introduce substantial evidence from which a reasonable jury could conclude that Ms. McComber's hours were materially inflated in every invoice at issue.

The evidence on the remaining count—knowingly and willfully making a materially false statement to the government—is insufficient for similar reasons.  The two statements the government challenges could be materially false only if the invoices were materially false, too, so the government's failure to prove material falsity on the false claims counts likewise defeats the false statement count.  And the government separately failed to prove that Ms. McComber made any materially false statement knowingly and willfully—that is, with intent to violate the law. Nothing in the record suggests that was her intent.  To the contrary, after the government initiated its investigation, Ms. McComber and her attorney at the time reviewed some of her time entries and identified a handful for which Ms. McComber believed there were discrepancies between the hours billed and the hours she recalled working.  That evidence contradicts any claim that Ms. McComber intended to mislead investigators and violate the law.  Because the evidence is insufficient to support any of Ms. McComber's convictions, Ms. McComber is entitled to a judgment of acquittal on each of the 19 false claims counts as well as the false statement count.

## **PROCEDURAL BACKGROUND**

The Superseding Indictment (ECF No. 97) charged Ms. McComber with two offenses: submission of false claims, in violation of 18 U.S.C. § 287 (Counts 1–19), and false statements, in violation of 18 U.S.C. § 1001 (Count 20).  On February 15, 2023, the jury returned a verdict convicting Ms. McComber on each count.  ECF No. 279.

At the close of the government's case in chief, Ms. McComber's prior counsel, Clark Ahlers, moved for judgment of acquittal under Rule 29, and the Court reserved ruling on that motion.  Day 10 Trial Tr. 50:11–12, 51:3–4.  At the close of all evidence, Mr. Ahlers renewed the

Rule 29 motion, and the Court again reserved decision.  Day 13 Trial Tr. 147:14–19.

On May 3, 2023, the Court ordered the Parties to address Ms. McComber's motion for judgment of acquittal through written submissions (ECF No. 308), and on May 9, 2023, Ms. McComber's prior counsel did so.  ECF No. 313.  Shortly thereafter, Ms. McComber's prior counsel sought leave to withdraw from the case.  ECF No. 317.  That motion was granted on May 22, 2023 by Magistrate Judge A. David Copperthite, and on May 24, 2023, the Federal Public Defender was appointed to represent Ms. McComber.  In response to these events, and to a request by the government to modify its submission deadline for the Rule 29 motions, the Court issued a new scheduling order dated June 15, 2023 (ECF No. 338).

Consistent with the Court's instructions in the scheduling order, this memorandum provides additional detail on the arguments asserted in Ms. McComber's oral Rule 29 motion and discussed at oral argument on that motion during trial, as well as in Mr. Ahlers' subsequent written submission.  In particular, this motion elaborates on the arguments that the government did not introduce sufficient evidence to find Ms. McComber guilty of any of the 20 counts charged in the indictment because it did not prove that any of the invoices submitted to the government were materially false or that Ms. McComber knowingly presented any false claims or knowingly and willfully made a false statement.  *See* Day 9 Trial Tr. 4:11–67:11 (discussing whether there was sufficient evidence for a jury to convict on the counts charged); ECF No. 313 (arguing that the trial evidence was insufficient to sustain Ms. McComber's convictions).

## <u>LEGAL STANDARD</u>

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "In its assessment of a challenge to the sufficiency of evidence, a reviewing court views the evidence in the light most favorable to

the prosecution and decides whether substantial evidence—that is, evidence that a reasonable

finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt

beyond a reasonable doubt—supports the verdict." *United States v. Young*, 916 F.3d 368, 384 (4th

Cir. 2019) (citation and internal quotation marks omitted).

## **ARGUMENT**

### I.    **There Was Insufficient Evidence for the Jury to Find Ms. McComber Guilty on Nineteen Counts of Violating the False Claims Act (Counts 1 through 19)**

In order for the jury to find Ms. McComber guilty on any of the nineteen charged counts

of violating the False Claims Act, the government had to prove that Ms. McComber presented

each invoice "knowing that it was false, fictitious, or fraudulent as to a material fact."[1]   Day 14

Trial Tr. 145:8–9 (jury instructions); *see also United States v. Ewing*, 957 F.2d 115, 119 (4th Cir.

1992).   The government has not met this burden.   Even viewing the record in the light most

favorable to the prosecution, there was insufficient evidence at trial for the jury to find that ***any***—

much less all—of the nineteen invoices were materially false, or that Ms. McComber ***knew*** that

any of these invoices were false.   Either failure of proof is independently sufficient to acquit Ms.

McComber on Counts 1 to 19.

### A.   **The Government Did Not Carry Its Burden of Proving that Any of the 19 Invoices Were Materially False Because Ms. McComber's Hours Were Materially Inflated**

The government's core theory at trial was that Ms. McComber's hours were materially

false in each of the 19 invoices because (1) Ms. McComber was only on-site at NSA for 257.14

out of 2,605.3 hours billed; (2) some witnesses believed there was not enough work for a full-time

---

[1] A claim is "false if it was untrue when made and was then known to be untrue by the person making it or causing it to be made"; "fictitious if it was not real or if it does not correspond to what actually happened and the person making it or causing it to be made knew that it was not real at the time that it was made"; and "fraudulent if it was falsely made or caused to be made with the intent to defraud."   Day 14 Trial Tr. 147:2–9 (jury instructions).

program manager and/or did not personally observe Ms. McComber working on Ironbridge; and (3) there was a dearth of physical work product to corroborate that Ms. McComber actually worked the hours billed.  These three points were central to the government's overall effort to prove that each and every invoice was materially false.  But the government failed to introduce sufficient evidence at trial to support a reasonable inference of material falsity for any of these reasons.  And the government's remaining evidence does not correct these fundamental defects.  It consists of incomplete and unreliable evidence like calendar entries and ATM receipts that at most show that Ms. McComber—like every working professional—was balancing other obligations in addition to serving as program manager for the Ironbridge contract during the indictment period.  It was not Ms. McComber's burden to prove her innocence.  *See* Day 14 Trial Tr. 122:16–22 (jury instructions).  And a comprehensive review of the evidence the government introduced for each day of the indictment period demonstrates that the government did not carry its burden of proving that each and every invoice was materially false.

### 1.  The jury was not entitled to infer falsity from evidence that Ms. McComber was off-site for a substantial number of the hours billed during the indictment period.

The amount of time Ms. McComber spent on-site at NSA in comparison to the total number of hours she billed has been central to the government's theory of falsity since day one of this case—and it was central to the evidence at trial.  Although the jury was instructed that "[t]he Government does not contend that the Defendant violated the law if she worked off-site" (Day 14 Trial Tr. 149:23–24), the government nonetheless repeatedly asked the jury to infer that Ms. McComber was not working because she was off-site much of the time and "some of the work on the Ironbridge contract concerned classified matters that could not be done off-site."  *Id.* at 149:24–150:5 (jury instructions).  But it was not reasonable for the jury to infer falsity from such evidence because the government's key witnesses uniformly testified at trial that whether or not Ms.

McComber was on-site was not sufficient to assess whether or not she was working.  For example, OIG Inspector Lori Hazenstab testified that "it was not sufficient just to know that [Ms. McComber] was not [in] Access Control."  Day 3 Trial Tr. 170:15–17.  She also conceded that a key government exhibit presented to the jury—an 81-page spreadsheet showing the time Ms. McComber spent in access control at NSA (Gov't Ex. 21(b))—"[was]n't valid as proof of criminal activity or a representation of criminal activity if the program manager was allowed to work off-site" and did not account "for off-site [work]."  Day 3 Trial Tr. 93:4–7, 97:20.

For similar reasons, the jury was not entitled to infer falsity from the government's "investigative spreadsheet," which consisted largely of access control hours for the indictment period as well as a handful of other categories of information, including some of Ms. McComber's InfoTek chat messages and emails, calendar invites, and credit card or ATM charges.  Gov't Ex. 21(a).  The investigative spreadsheet is also incomplete and does not accurately or completely account for evidence that Ms. McComber was working on Ironbridge (from any location).  Agent Benderoth admitted at trial that "not all" of the evidence he had "that Ms. McComber was working on the Ironbridge contract, such as an email from Ms. McComber to NSA about the Ironbridge contract," is included.  Day 4 Trial Tr. 207:9–16.  The investigative spreadsheet is thus unreliable and incomplete, and it cannot support an inference of falsity on any of the 19 invoices.

### 2.  *The Government did not prove that there was insufficient program manager work.*

The government also elicited testimony from various witnesses that the hours billed must have been false because there simply was not enough work for the program manager to do to fill those hours, and/or because some witnesses claimed they did not personally observe Ms. McComber working very often.  For example, Shilo Weir claimed that Ms. McComber was spending "[t]wenty-five percent or less" of her time in InfoTek's office.  Day 2 Trial Tr. 25:18–21.  But the government agreed that Ms. McComber was permitted to work off-site and did not

argue or introduce evidence that her off-site work was limited to InfoTek's offices.  Ultimately, the fact that Ms. Weir and Ms. McComber were not around each other that often only underscores that Ms. Weir did not know what Ms. McComber was doing with her time.  Ms. Weir also admitted that during the relevant period, she "didn't have an understanding of what [Ms. McComber's] responsibilities would have been."  *Id.* at 15:24–16:11.  And it was not reasonable for the jury to infer falsity from any witness's speculation about what they thought was an appropriate workload for the program manager or how often they personally observed Ms. McComber working when the plain language of the contract—along with unrebutted testimony from government witnesses that all of the work on the contract was completed to the government's satisfaction during the indictment period—directly contradicts any inference that Ms. McComber did not have enough work to do.  Indeed, during the indictment period, the government repeatedly signed off on contract modifications that continued or increased the number of hours required to be delivered by the program manager.  *See* Day 6 Trial Tr. 78:11–81:4 (C. Guinther).

Ms. McComber's specific responsibilities as program manager were spelled out in writing in the statements of work for the Ironbridge contract and included:

- "managing all aspects of the contract and [Technical Task Orders] issued under IRONBRIDGE";

- serving as "the official Point of Contact" with the government;

- "plan[ning], organiz[ing], staff[ing], control[ling], and lead[ing] the combined efforts for managing the IRONBRIDGE contract and associated TTOs"; and

- assisting with "[u]pdating program plans and documentation," "[c]reating and maintaining program schedules," "[t]racking program status," "[m]anaging, analyzing and reporting program risks and mitigation plans," and "Quality Assurance."

*See* Gov't Exs. 30(a)(1) at 7, 30(a)(2) at 7, 30(a)(3) at 7, 30(a)(4) at 7, 30(a)(5) at 7 (statements of work for Ironbridge contract). In other words, as government witnesses Rob Bryant and Raynett Colston explained, a substantial part of the program manager role was "the care and feeding" of the contractors (Day 5 Trial Tr. 29:9–11 (R. Bryant); Day 7 Trial Tr. 65:17–66:2 (R. Colston)), and the program manager also played a key role in "identifying and hiring new individuals" (Day 7 Trial Tr. 66:24–67:3 (R. Colston)).

No amount of uninformed witness speculation that Ms. McComber did not have enough work to do can change the fact that the black-letter contract undisputedly ***required*** InfoTek to provide a ***full-time-equivalent*** program manager to perform all of these tasks for the Ironbridge contract throughout the indictment period. *See* Gov't Exs. 31(a) through 31(n) (technical task orders requiring full-time program manager for the period January 2016 through November 2017); *see also, e.g.*, Day 4 Trial Tr. 190:2–11. And the government's determination, reflected in the contract and the TTOs, that the program manager was a full-time position is particularly relevant here, where Ironbridge was a firm-fixed-price level-of-effort contract—meaning that "there is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort." Day 1 Trial Tr. 177:18–21. In the words of government witness Cherrill Guinther, "When we issued the TTO for those hours, they [the contractor] ***are obligated to fulfill them***, and if they don't, it could be a breach of contract. … [W]e don't give the[] [contractor] the work and let them propose the hours. We determine that those hours are needed. So there's really no question." Day 6 Trial Tr. 22:7–17 (emphasis added); *see also id.* at 76:4–77:17; Gov't Ex. 28(a) at 6 (stating the total amount "obligated"). And there was no evidence presented at trial that NSA ever notified InfoTek during the indictment period that it believed there was insufficient work for the program manager to remain a full-time-equivalent position during that period.

9

In light of the plain language of the contract and the accompanying statements of work and TTOs requiring a full-time program manager, it was not reasonable for the jury to infer that Ms. McComber could not have worked all of the hours billed because there was not enough work for her to do. Moreover, the jury also heard evidence about Raynett Colston that undermines any speculation that Ms. McComber did not have enough work to be a full-time program manager. Ms. Colston was the program manager for the Ironbridge contract during the three years before Ms. McComber served in that role. As government witness Jonathan Smith testified, Ms. Colston did "exactly the same job that Jacky did." Day 7 Trial Tr. 28:18. Jason Doyle—InfoTek's technical lead on the Ironbridge contract and another key witness for the government—likewise testified that the nature of the program manager work did not change from Ms. Colston to Ms. McComber. Day 6 Trial Tr. 112:20–113:2.

The jury also heard testimony that just like Ms. McComber, Ms. Colston worked off-site openly and often during her tenure as program manager. Day 7 Trial Tr. 116:3–8 (R. Colston); *see also* Day 3 Trial Tr. 98:13–99:11 (L. Hazenstab). Mr. Smith, who worked on Ironbridge on the government side, testified that Ms. McComber and Ms. Colston "didn't do anything different in terms of coming and going. It was random. They were there sporadically. They always interfaced with me. They always wanted to know the projects. They would discuss them with me. They would bring up ideas. If there were staffing issues, they would bring up new candidates." Day 7 Trial Tr. 12:25–13:5. And, similar to the 257.14 on-site hours out of 2,603.5 total hours that Ms. McComber billed, Ms. Colston billed 2,525.5 hours during a 19-month period, only 258.16 of which were on-site at NSA. *See* Def. Ex. 45.1; Day 7 Trial Tr. 123:21–124:16 (R. Colston). Ms. Colston testified that she never padded her hours and that no one at InfoTek was padding her hours either. *Id.* at 116:9–13. And government witnesses praised Ms. Colston for her

10

"excellent" service, despite the substantial amount of time that Ms. Colston spent off-site.  Day 5 Trial Tr. 29:12–13 (R. Bryant).  In light of this evidence, it simply was not credible for the government to claim—or for a reasonable jury to find—that Ms. McComber's hours were materially inflated because there was not enough work for her to do as program manager.

### 3.   The Government could not prove falsity based on the lack of physical work product.

The government also emphasized the purported lack of physical work product as evidence that Ms. McComber did not perform under the contract, but this too was an insufficient basis for the jury to find that any of the invoices were materially false.  The jury heard unrefuted testimony from government witnesses that Ironbridge was a firm-fixed-price level-of-effort contract, a type of government contract that "may be used only when … the work required cannot otherwise be clearly defined," and "[t]here is no defined deliverable," other than the stipulated level of effort.[2] Day 1 Trial Tr. 173:25–174:1, 177:11–14 (K. Sulewski).  In fact, "the only deliverable" due to the government "was the monthly status report."[3]  Day 7 Trial Tr. 30:7–8 (J. Smith).  In light of this evidence, it is not at all surprising or unusual that there were not reams of paper evidencing Ms. McComber's work—nor was it her burden to prove her innocence through such evidence.

Nor was there any reasonable basis for the jury to find that Ms. McComber was not doing her job.  In addition to the testimony that Ms. McComber and Ms. Colston did the same type of work during their respective tenures as program manager, Mr. Doyle testified that he has **no**

---

[2] The Government Accountability Office recently affirmed this in sustaining a bid protest, where it noted that "[a] [firm] fixed-price level-of-effort contract is generally intended for use in contracts … where the work required cannot be clearly defined," and the final work product "is usually a report showing the results achieved through application of the required level of effort." *Matter of Gen. Dynamics Info. Tech.*, File No. B-421525, at 5 (May 26, 2023).

[3] The submitted monthly status reports are in the government's sole possession, custody, and control.  To date, Ms. McComber and her counsel have not received copies of any of these status reports from the government, despite requesting them repeatedly.

*evidence* that Ms. McComber "did not prepare program deliverables" during the indictment period (Day 6 Trial Tr. 148:17–19), and that he was always able to find Ms. McComber when he needed her (*id.* at 145:11–14).   Other government witnesses testified that Ms. McComber "did a good job … [f]or the work that she did as the program manager" (Day 7 Trial Tr. 32:12–14) (J. Smith); agreed that she would "bend over backwards for the mission" (Day 5 Trial Tr. 59:3–6) (R. Bryant); and testified that when she was offsite, they were easily able to communicate with her via her low-side email (Day 7 Trial Tr.117:4–11) (J. Smith).  Ms. Hazenstab's investigation corroborated this: She did not "find a ***single time*** that a government contracting officer's representative attempted to reach Ms. McComber and could not."  Day 3 Trial Tr. 155:10–13 (emphasis added).

Moreover, although the government suggested that Mr. Doyle was the one actually doing the work of the program manager instead of Ms. McComber, Mr. Doyle testified that he was "unaware what the requirements of the position were."  Day 6 Trial Tr. 119:1–3.  When asked about tasks that the program manager was responsible for, Mr. Doyle was unfamiliar with many of the tasks or who was performing them.  *See, e.g.*, *id.* at 137:4–139:21.  And it is undisputed— as multiple witnesses for the government testified—that all of the work on the Ironbridge contract was completed to the government's satisfaction during the indictment period.  *See, e.g.*, Day 1 Trial Tr. 188:7–8 (K. Sulewski); Day 7 Trial Tr. 29:17–30:4 (J. Smith).  Even Shilo Weir admitted she had never heard "that Ms. McComber had failed to do any of the work the government asked her to do."  Day 2 Trial Tr. 75:13–15.

On this record, the jury could not reasonably conclude that any of the 19 invoices were materially false based on the lack of physical work product.

### 4.   The Government's count-specific evidence is flawed, incomplete, and insufficient to prove falsity on any of the 19 invoices, much less all of them.

The government's remaining evidence is not sufficient to sustain a finding of material

falsity either.  The government presented a patchwork of count-specific evidence that purported to account for each month in the indictment period, memorialized in the government's "investigative spreadsheet."  *See* Gov't Ex. 21(a).  But there are significant gaps, flaws, and logical leaps in this spreadsheet that render it completely unreliable and insufficient.  And even if a reasonable jury could credit the evidence in the government's spreadsheet, it simply shows that Ms. McComber also traveled and had other commitments during the 19 months when she was working as the program manager for Ironbridge—normal activities that are not inconsistent with the hours billed.

*The investigative spreadsheet misrepresents the hours billed to the government.*  The government portrayed its investigative spreadsheet to the jury as an accurate reflection of the hours the "Company billed" to the government, but a comparison of Ms. McComber's timecards, monthly invoices, and the investigative spreadsheet shows that is not at all accurate.  April 2017 is a prime example.  Ms. McComber's bi-weekly timesheets show 8 hours billed on the dates April 10, 11, and 12, as well as April 25–29, with the total hours she billed for the month equaling 152. *See* Gov't Ex. 25(c) at 3–5.  But the "People Time Details" chart the government also introduced, which purported to show the time that was billed to the government, shows Ms. McComber billing 120 hours for April 2017, and no time billed for April 25–29.  *See* Gov't Ex. 22(c)(9) at 5; *see also* Gov't Ex. 14(a) (showing 120 hours billed).  Bizarrely, the government's investigative spreadsheet also shows that on April 26th, 2017, Ms. McComber was in access at NSA, but the government "adjusted [her time] to zero" on the spreadsheet.  *See* Ex. 21(a) at 43.  Further complicating things, Ms. McComber's former attorney, Mr. Hallowell, reported to NSA that the hours reflected on her timecard did not correspond with the hours Ms. McComber recalled working on April 10–12 while she was in Texas.  Although she worked on Ironbridge each day, she did not recall working for the full 8 hours reflected on her timesheet.  *See* Gov't Ex. 23(b) at 9.

The same thing happened in March 2016. The hours on Ms. McComber's timesheets totaled 80 hours billed for the month (*see* Gov't Ex. 25(c) at 2–3), but the invoice shows only 64 hours for the month (Ex. 1(a)). And without explanation, the government excluded March 22, 2016 from its investigative spreadsheet entirely (*see* Gov't Ex. 21(a) at 38–39), even though Ms. McComber's timecard shows time billed on that day (Gov't Ex. 25(c) at 2), and her calendar is chock full of work appointments, including "discussing staffing" at 7:00 a.m. (*see* Gov't Ex. 22(a) at 3). The government's spreadsheet is unreliable, and the underlying evidence is so inconsistent and contradictory that no reasonable juror could accept it as "adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Young*, 609 F.3d at 355.

There are also numerous instances on the spreadsheet where the government depicts the record evidence on the wrong date, to Ms. McComber's detriment in the eyes of the jury. For example, on March 20, 2017, the investigative spreadsheet shows, "Amex: Golden Nugget Hotel – Departure date 3/20/2017" (Gov't. Ex. 21(a) at 38), making it seem like Ms. McComber was still in Las Vegas on March 20 (and checking out of her hotel). Agent Benderoth also testified to that information at trial. Day 4 Trial Tr. 121:12–14. But the AmEx statement (Gov't Ex. 22(f) at 127) shows that ***March 19*** was the departure date, corroborated by other charges in Maryland on March 20 (*see id.*). The same thing occurred on March 23, 2017. The government spreadsheet says "AmEx: Hilton Palacio Del Rio 3/23/2017 Check Out," but the actual AmEx statement shows check out from that hotel on March 22, 2017 (*see* Gov't Ex. 22(f) at 128). This is corroborated by Ms. McComber's calendar showing she flew back to Maryland at 11:25 a.m. on the 22nd. *See* Gov't Ex. 22(a) at 15. In each of these instances, the government's inaccurate portrayal of the record evidence on its investigative spreadsheet led the jury to believe that Ms. McComber was on travel outside of Maryland a day longer than the record evidence shows she actually was.

14

***The record shows that there was ample time for Ms. McComber to work the hours billed.***

Compounding the many flaws in the government's investigative spreadsheet, the government's evidence also does not even attempt to account for the number of hours available each day when Ms. McComber could have been working, compared to the hours that she billed each day. There are 24 hours in a day and, as Agent Benderoth testified at trial, the Ironbridge contract did not "require a set schedule of work" such as 9 a.m. to 5 p.m., meaning that any hours worked to Ironbridge outside of normal business hours (*e.g.*, "if [Ms. McComber] worked from 6:00 a.m. to 7:00 a.m.") would be billable. Day 4 Trial Tr. 187:25–189:25. Other witnesses called by the government corroborated this testimony. For example, Mr. Doyle testified that Ironbridge "was a 24/7 operation," with demands outside of normal business hours. Day 6 Trial Tr. 106:17–25. And former InfoTek employee Michael Kemp testified that he left Ironbridge because he was "tired about getting called in in the middle of the night. … I just felt it was time to go where I wasn't going to get called in at 3:00 in the morning." Day 5 Trial Tr. 172:23–173:3.

The record shows that there were ***many*** available hours in each day for Ms. McComber to perform work relating to the Ironbridge contract outside of a strictly 9-to-5 schedule. It was the government's burden to prove that Ms. McComber's hours were materially inflated—it was not Ms. McComber's burden to prove that she indeed worked every single hour billed. And a detailed, hour-by-hour review of the evidence in the trial record confirms that—even drawing every inference in favor of the government—it did not carry its burden with respect to ***any*** of the 19 charges, much less all of them. Ms. McComber's counsel has organized the evidence adduced at trial into a month-by-month analysis of the "workable hours" (*i.e.*, the hours during which Ms. McComber could have been working on Ironbridge) each day, compared to the number of hours that Ms. McComber billed to the contract each day. An hour-by-hour review of the evidence is

15

attached as Exhibits 1 through 19 to this brief, with each exhibit corresponding to one monthly invoice during the indictment period, starting with March 2016 and ending with September 2017.

In reviewing the record, Ms. McComber's counsel made a number of conservative assumptions to ensure the record is construed in the light most favorable to the government:

- Counsel tallied workable hours *only* on days when Ms. McComber billed time to Ironbridge, even where the evidence shows that she also worked on weekends, vacations, and personal days.

- Counsel assumed that Ms. McComber slept seven hours every night and only allocated workable hours between 7 a.m. and 11 p.m., unless there was direct evidence to the contrary.

- Counsel allocated two hours for each meal—breakfast, lunch, or dinner—reflected in the evidence, such as calendar entries, references to meals in communications, or credit card charges to restaurants.  Counsel only allotted less than two hours if there was evidence to the contrary or if the meal involved a fast food restaurant, in which case counsel allotted one hour.  Counsel relied on as much of the record evidence as possible to determine the time, place, and details of each event.  To the extent counsel was able to determine the time of each meal, it is detailed on the spreadsheet (e.g., receipts indicate time paid), but where the only evidence of a meal is a credit card statement, counsel assigned it a two-hour window around a standard meal time based on the other evidence for that day.

- Counsel allocated one hour for each meeting, unless there was evidence to the contrary.  Similarly, errands such as grocery shopping, pumping gas, and taking kids to dance class

are assigned 30-minute windows.[4]

- Yellow shading represents workable hours, including any hour for which the evidence affirmatively shows that Ms. McComber was working on Ironbridge or is insufficient to determine one way or another, and therefore, could have been used to work on Ironbridge.

- Orange shading represents calendar events that are not related to Ironbridge on their face and are solely supported by Ms. McComber's calendar and no other evidence.  Counsel subtracted these hours from the total workable hours despite the evident inaccuracies and contradictions even within Ms. McComber's own calendar and the possibility that they could have been related to Ironbridge.

- White shading represents activities that do not appear to be related to Ironbridge, and are supported by evidence other than Ms. McComber's calendar entries alone.  These hours are deducted from and not counted as part of the total workable hours.

The results of the hour-by-hour review, which are briefly discussed below and documented in more detail in each of the corresponding exhibits, confirm that there was not a single month in which the hours billed exceeded the workable hours, and thus there was insufficient evidence for the jury to find that any of the 19 invoices were materially false:

- ***Count 1: March 2016.***  The evidence shows that there were 9 days in March 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 103.5, compared to 64 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed by at least 3 hours—and often by much more.

---

[4] Ms. McComber testified at trial that she had a nanny for the duration of the indictment period who took her kids to "all routine appointments," and the appointments were listed on Ms. McComber's calendar only as a reminder to herself on those days.  Day 12 Trial Tr. at 45:14–22. Nevertheless, counsel deducted thirty minutes for those appointments to consider the evidence in the light most favorable to the government.

*See* Ex. 1.

- ***Count 2: April 2016.***  The evidence shows that there were 21 days in April 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 276, compared to 168 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—at times by as much as 8.5 hours a day.  *See* Ex. 2.

- ***Count 3: May 2016.***  The evidence shows that there were 18 days in May 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 198, compared to 142 hours billed.  And on all but one of the relevant days, the workable hours exceeded the hours billed, usually by a wide margin.  *See* Ex. 3.

- ***Count 4: June 2016.***  The evidence shows that there were 22 days in June 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 269.5, compared to 162 hours billed.  And on all but one relevant day, the workable hours exceeded the hours billed—often by a wide margin as high as 8 hours.  *See* Ex. 4.

- ***Count 5: July 2016.***  The evidence shows that there were 20 days in July 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 233.5, compared to 136 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—often by as many as 7 or even 8 hours a day.  *See* Ex. 5.

- ***Count 6: August 2016.***  The evidence shows that there were 18 days in August 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 203, compared to 144 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—and at times the daily delta between workable hours and hours billed was as high as 8 or 9 hours.  *See* Ex. 6.

- ***Count 7: September 2016.***  The evidence shows that there were 21 days in September 2016

when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 263, compared to 168 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—sometimes by 8 or even 9 hours.  *See* Ex. 7.

- *Count 8: October 2016.*  The evidence shows that there were 18 days in October 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 246, compared to 138 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—often by a wide margin that stretched as high as 13.5 hours.  *See* Ex. 8.

- *Count 9: November 2016.*  The evidence shows that there were 17 days in November 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 215.5, compared to 136 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—often by a very wide margin.  *See* Ex. 9.

- *Count 10: December 2016.*  The evidence shows that there were 16 days in December 2016 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 196.5, compared to 128 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—sometimes by as much as 8.  *See* Ex. 10.

- *Count 11: January 2017.*  The evidence shows that there were 19 days in January 2017 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 247, compared to 146 hours billed.  And on each of the relevant days, the workable hours exceeded the hours billed—sometimes by more than 7 hours.  *See* Ex. 11.

- *Count 12: February 2017.*  The evidence shows that there were 18 days in February 2017 when Ms. McComber billed time to Ironbridge.  The total number of workable hours for these days was 235.5, compared to 144 hours billed.  And on each of the relevant days, the

workable hours exceeded the hours billed by a substantial margin that often exceeded 4 or more hours, and reached as high as 9.5 hours. *See* Ex. 12.

- *Count 13: March 2017.* The evidence shows that there were 19 days in March 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 228.5, compared to 146.5 hours billed. And on each of the relevant days, the workable hours exceeded the hours billed, often by a wide margin. *See* Ex. 13.

- *Count 14: April 2017.* The evidence shows that there were 15 days in April 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 183, compared to 120 hours billed. And on all of the relevant days except April 10 through 12, the workable hours exceeded the hours billed, often by a lot. *See* Ex. 14. Those three days are the ones that Ms. McComber and her prior attorney, Mr. Hallowell, reported to the government did not correspond to the hours Ms. McComber recalled working. *See supra* at 13; *infra* at 27, 29.

- *Count 15: May 2017.* The evidence shows that there were 22 days in May 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 258.5, compared to 170 hours billed. And on all of the relevant days except two, the workable hours exceeded the hours billed—sometimes by more than 10 hours. *See* Ex. 15. And again, those two days—May 12 and May 15—are days that Ms. McComber reviewed with Mr. Hallowell and reported to the government that she did not recall working all of the hours billed. *See supra* at 13; *infra* at 27, 29.

- *Count 16: June 2017.* The evidence shows that there were 22 days in June 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 241.5, compared to 170 hours billed. And on all of the relevant days but five, the

workable hours exceeded the hours billed. *See* Ex. 15. The remaining five days—June 5, 14, 15, 15, and 23—are days that Ms. McComber and Mr. Hallowell reviewed and reported that she did not recall working all of those hours. *supra* at 13; *infra* at 27, 29.

- ***Count 17: July 2017.*** The evidence shows that there were 16 days in July 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 170, compared to 109 hours billed. And on each of the relevant days, the workable hours equaled or exceeded the hours billed—often by a wide margin. *See* Ex. 17.

- ***Count 18: August 2017.*** The evidence shows that there were 12 days in August 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 164.5, compared to 94 hours billed. And on each of the relevant days, the workable hours exceeded the hours billed by at least 2.5 hours. *See* Ex. 18.

- ***Count 19: September 2017.*** The evidence shows that there were 13 days in September 2017 when Ms. McComber billed time to Ironbridge. The total number of workable hours for these days was 161, compared to 78 hours billed. And on each of the relevant days, the workable hours exceeded the hours billed by at least 3 hours. *See* Ex. 19.

These numbers speak for themselves. Even construing the count-by-count evidence in the light most favorable to the government, the jury could not reasonably conclude that the government proved material falsity on all 19 counts. But the month-by-month evidence also reveals additional flaws and gaps that pervaded the government's evidence and further undermine the verdict:

- ***Ms. McComber's calendar entries did not accurately reflect her activities.*** The government relied heavily on Ms. McComber's calendar entries throughout the indictment period in an effort to prove that she materially falsified her timesheets. But there was no evidence presented to show that Ms. McComber actually attended most or all of these

21

appointments or that she did not make up any time missed outside of regular business hours.  For example, the government's investigative spreadsheet showed that, based on Ms. McComber's calendar (Gov't Ex. 22(a) at 17) and the Whistleblower letter (Gov't Ex. 23(a)), Ms. McComber "participated in a charity golf tournament hosted by JDRF in Pasadena, MD" on May 19, 2017.  *See* Gov't Ex. 21(a) at 45.  But as Ms. McComber's attorney Andrew Hallowell later reported, Ms. McComber was "unable to participate [in that golf charity event] due to Ironbridge project requirements."  (*See* Gov't Ex. 23(b) at 10).  And Ms. McComber's cell phone GPS records confirm that she was not near the location of that charity golf event, in Pasadena, Maryland, on May 19, 2017, and thus could not have attended that event.  *See* Def. Ex. 44.  When asked why, "if [he] had evidence such as [Ms. McComber's] phone records and the explanation from [her] attorney that [she] did not attend the JDRF golf event," it was "on the chart," Agent Benderoth's only explanation was that he "included every single instance where the whistleblower reported something," whether or not there was evidence calling into question the accuracy of the whistleblower report.  Day 4 Trial Tr. at 241:16–23.

- ***Ms. McComber's credit card charges did not accurately reflect her activities.***  The jury heard unrefuted testimony that others often used Ms. McComber's credit card to make purchases.  Day 12 Trial Tr. 64:7 (J. McComber).  The record evidence supports this.  For example, the statement for the Tower Federal Credit Union credit card that Agent Benderoth often relied on to populate the government's investigative spreadsheet (*see, e.g.*, Gov't Ex. 21(a) at 46), showed charges at establishments in Phoenix and Tempe, Arizona, on May 25 and 26, 2017 (*see* Gov't Ex. 22(h) at 24), although the government asserted that Ms. McComber was in Ocean City, Maryland on those days (*see* Gov't Ex. 21(a) at 46).

Ms. McComber could not be both places at once.  Accordingly, it was not reasonable for the jury to treat the credit card charges included on the government's investigative spreadsheet as an accurate reflection of Ms. McComber's activities.

- ***Ms. McComber worked long hours to fit in all of her work commitments.***  The evidence shows that Ms. McComber was stretched thin and worked well into the nights to manage her workload.  For example, many of the chat messages and calendar invites in the investigative spreadsheet for the March-April 2016 timeframe involved a project called Road Rally, a separate contract proposal that Ms. McComber was working on.  In one message, Ms. McComber said she had been "up until 2 every night working road rally." Gov't Ex. 21(a) at 2.  In another message, Ms. McComber said she had not "slept since yesterday am b/c I had to pull an all nighter working that [Road Rally] proposal." *Id.* at 3. And in an email, Ms. McComber wrote to a colleague, "I can relate on short on time etc. I'm covering a vacated PM spot also." *Id.* at 2.  It would make no sense for Ms. McComber to be short on time because of the program manager position if she was not actually doing the work—the only reasonable inference from Ms. McComber's long hours is that the new demands on her time contributed to her staying up late to complete other work.

- ***Ms. McComber often worked during vacation and other personal time.***  The record is replete with evidence that Ms. McComber was often working even on days that her calendar indicated were vacation days or personal time.  For example, the evidence shows that Ms. McComber traveled to Las Vegas in March 2016, but that she continued to work while she was away.  *See* Gov't Ex. 22(j) at 5 (message from Ms. McComber stating that she would need to work on a bid proposal while she was away, but "d[idn't] mind" having to do that).  In light of this evidence, the jury could not reasonably infer that Ms. McComber

23

was not working whenever her calendar indicated vacation or personal time.

- ***When Ms. McComber actually took personal time off, she did not bill for it.***  The evidence also shows that when Ms. McComber ***actually*** took some time off—as opposed to just whatever her calendar said—she did not bill for it.  For example, Ms. McComber was in Las Vegas from March 16–21, 2016, and she did not bill a single hour to Ironbridge while she was away.  *See* Gov't Ex. 21(a) at 1.  Similarly, Ms. McComber was in New York on vacation the week of July 10, 2017.  On Monday, July 10, she billed 5 hours to Ironbridge and 2 hours to vacation leave, and then she billed 8 hours to vacation leave every other weekday that week.  *See id.* at 50–51.  It is not reasonable to infer that Ms. McComber could not have been working on Ironbridge whenever she was traveling or had vacation time marked on her calendar.  Instead, the evidence showed that Ms. McComber's time entries distinguished between vacation time actually taken versus time spent working during days that had been earmarked for vacation but ended up involving some work.

These are just a few representative examples of the significant gaps and insufficiencies in the government's evidence of material falsity; there are many, many more.

\*     \*     \*

In sum, the government's evidence of falsity is insufficient at every level.  Its core theories about on-site vs. off-site time, the amount of work needed for the program manager position, and the work product generated by the position were either not supported or contradicted by the trial evidence and are insufficient bases to prove material falsity for any of the invoices.  And at the month-by-month, hour-by-hour level, the government's proof does not hold up either.  Without sufficient evidence of falsity, Ms. McComber is entitled to a judgment of acquittal on each of the 19 False Claims Act counts.

**B. The Government Did Not Carry Its Burden of Proving that Ms. McComber Submitted Any Materially False Invoices with Knowledge of their Falsity**

Regardless of whether the government carried its burden of proving that any of the 19 invoices at issue were materially false, there also was insufficient evidence for the jury to conclude that Ms. McComber presented any of these claims with knowledge that they were false. To prove knowledge, the government had to establish beyond a reasonable doubt that Ms. McComber acted "voluntarily and purposefully and not by mistake, carelessness, or other innocent reason," and that she "knew [each] claim was false or fictitious." Day 14 Trial Tr. 147:14–19 (jury instructions). Even viewed in the light most favorable to the government, the evidence did not meet this standard.

Courts have rigorously applied the knowledge element in considering whether to sustain a False Claims Act conviction. In *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003), for example, the Fourth Circuit considered whether there was sufficient evidence of knowledge to sustain a conviction for violating the False Claims Act based on claims submitted for Medicaid reimbursement for patients who were no longer being treated at the defendant's nursing facility. The Fourth Circuit affirmed the denial of the defendant's Rule 29 motion, citing evidence that the defendant had been informed by an accounts receivable clerk that the "patient census was inaccurate, yet [the defendant] instructed her to go ahead and bill Medicaid because it was necessary 'to get money into the facility.'" *Id.* at 494–95.

Similarly, in *United States v. Peterson*, 223 F. 3d 756 (8th Cir. 2000), the Eighth Circuit rejected sufficiency challenges to defendants' convictions for submitting false claims to Medicare arising from overbilling for X-rays. The court relied on testimony from billing employees that the defendants instructed them to fill out Medicare forms to indicate that only one patient was serviced regardless of how many patients were actually cared for during a visit in order to manipulate the amounts that Medicare would reimburse—even after some billing employees "questioned the

propriety of this practice." *Id.* at 760.  There is no evidence remotely like this here.

Instead, the evidence shows that Ms. McComber openly worked off-site a substantial portion of the time, that she never sought to conceal what she was doing or where she was, and that no one at InfoTek or the government gave her any reason to believe that her off-site time was not billable or that she had to be on-site most or all of the time to perform her role as program manager.  To the contrary, month after month, the government paid invoices for full-time program manager work that was conducted substantially off-site, first by Ms. Colston and then by Ms. McComber.   The contract and TTOs required a full-time-equivalent program manager for Ironbridge throughout the indictment period, consistent with the full-time hours Ms. Colston had worked during the latter part of her tenure as program manager. *See supra* at 8–11.  The contract "**obligated**" InfoTek to provide a full-time-equivalent program manager to fulfill the full-time hours the government required InfoTek to supply.   Day 6 Trial Tr. 22:11–17 (C. Guinther) (emphasis added).   And the evidence shows that the government was satisfied with the performance it was receiving each month and never raised any concerns about Ms. McComber's performance, availability, or whereabouts. *See supra* at 8, 12; *see also* Day 1 Trial Tr. 188:7–8 (Kelly Sulewski testifying that over the life of the entire contract, she never "saw any indication of a poor performance").

In other words, Ms. McComber had ample reason to believe that she was properly billing her time throughout the indictment period.  Even if she was mistaken about that or was mistaken about which of her activities were and were not actually billable to Ironbridge, and even if the jury believed it was unreasonable for Ms. McComber to hold these beliefs, the Supreme Court has made clear that scienter under the False Claims Act focuses on the defendant's "knowledge and **subjective beliefs**—not to what an objectively reasonable person may have known or believed."

*United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1399 (2023) (emphasis added). This rule is consistent with Ms. Hazenstab's testimony that the government would not view a "good faith … misunderstanding of the contract provision or something like that" as appropriate for criminal prosecution or liability.  Day 3 Trial Tr. 166:13–25.

The count-specific evidence discussed above also further supports that the only reasonable conclusion for the jury to draw was that Ms. McComber believed she was billing her time truthfully and accurately.  For example, while the government asked the jury to infer that Ms. McComber billed for time when she was actually taking personal vacations, her time entries show the opposite. In the January 2017 invoice (Count 11), for instance, she billed just two hours to the Ironbridge contract on January 19, 2017 and did not bill any time to the Ironbridge contract on January 20, 2017, corresponding to vacation time. *See* Day 4 Trial Tr. 108:14–25 (K. Benderoth); *see also* Ex. 11 at 8.  It is not reasonable to infer from this evidence that Ms. McComber was knowingly and purposefully falsifying her time entries to bill for time not worked because she was actually on vacation, when her time entries repeatedly distinguished between vacation time and billable work. The same is true of the evidence about time entries that Ms. McComber and her prior attorney, Mr. Hallowell, reviewed and corrected based on Ms. McComber's recollection of her activities on each day in question.  *See supra* at 13; *infra* at 29.  The reasonable inference from this evidence is that any erroneous time entries were the result of an innocent mistake, not knowing falsification by Ms. McComber.

The government's failure to prove knowledge with respect to any of the 19 False Claims Act counts is an additional, independent basis to enter a judgment of acquittal on these counts.

**II.     There Was Insufficient Evidence for the Jury to Find Ms. McComber Guilty of Knowingly and Willfully Making a False Statement to the Government (Count 20)**

In order for the jury to find Ms. McComber guilty of violating 18 U.S.C. § 1001(a)(2), the government was required to "establish beyond a reasonable doubt" that (1) Ms. McComber made a material statement or representation that was "false, fictitious, or fraudulent," and (2) "the false, fictitious or fraudulent statement was made knowingly and willfully."  Day 14 Trial Tr. 159:1–8; *see also* 18 U.S.C. § 1001(a)(2).  Even viewed in the light most favorable to the prosecution, the evidence at trial was plainly insufficient for the government to carry its burden of proof on either element, and Ms. McComber should be acquitted on Count 20 as well.

*The Government did not prove that Ms. McComber made a materially false statement.* Count 20 is based on two allegedly false statements that Ms. McComber made to OIG Inspector Lori Hazenstab during her interview in the fall of 2017:

- "After McComber stated that she filled out a time sheet every day she answered 'No' in response to both of the questions, quote, 'At any time, did you ever falsely fill out that time sheet?' closed quote; and quote, 'Put any false information on it?'"  Day 14 Trial Tr. 157:8–12.

- "When one of the investigators noted that McComber had billed a full eight hours on almost all of the days she had billed time to the Ironbridge contract and asked, 'So that's accurate?' That was the question. McComber responded, 'Yes, that's accurate because I -- I monitor my time throughout the day on what I'm doing for Ironbridge and what's against Ironbridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it.'"  *Id.* at 157:13–21.

But the evidence presented at trial was insufficient for the jury to find that either of these statements were materially false.  As discussed above, the government did not carry its burden of proving that

any of the invoices were materially false, so there was no reasonable basis for the jury to conclude that Ms. McComber ever falsely filled out her time sheets or that her hours were materially inflated. *See supra* at 5–25.  Nor was there any evidence that Ms. McComber was ***not*** monitoring her time each day.  To be sure, the government focused on evidence that Ms. McComber did not open and close her biweekly team cards each day.  *See* Day 14 Trial Tr. 45:11–15 (closing argument).  But Ms. McComber did not tell Ms. Hazenstab that she ***entered*** her time on her time card every day— just that she monitored it and that she filled out her time cards accurately.  And there was no evidence that Ms. McComber was not keeping track of her time or that her tracking methods were material to the government's investigation in any event.  Count 20 thus fails at the first step.

>    ***The Government did not prove knowledge and willfulness.***  This Court instructed the jury that for purposes of Count 20, "an act is done knowingly if it is done purposely and voluntarily as opposed to mistakenly or by accident," and "[a]n act is done willfully if it is done with the intention to do something the law forbids, that is with a bad purpose to disobey the law."  Day 14 Trial Tr. 160:7–12.  The government did not meet this standard at trial.  For the same reasons that there was insufficient evidence that Ms. McComber knowingly submitted any false claims to the government, the evidence does not support a finding that Ms. McComber told Ms. Hazenstab her time entries were accurate with knowledge that this was untrue or with the intent to violate the law.  *See supra* at 25–27.  And in fact, the evidence shows the opposite.  After Ms. McComber reviewed the relevant invoices with Mr. Hallowell, her lawyer at the time, he notified the government that there were a handful of days where the hours billed were inaccurate based on Ms. McComber's recollection of what she did on each of those days.  *See, e.g.*, Gov't Ex. 21(a) at 41, 44, 47–49; Gov't Ex. 23(b) at 9–11.  Ms. McComber affirmed at trial that she agreed with this assessment.  *See* Day 12 Trial Tr. 179:1–6.  These are not the actions of someone who willfully

29

intended to violate the law.  The government's failure to prove knowledge and willfulness is a second, independent basis to acquit Ms. McComber on Count 20.

<u>**CONCLUSION**</u>

For the foregoing reasons, Ms. McComber respectfully requests that the Court enter a judgement of acquittal on each of the 20 counts Ms. McComber was convicted of in this case.

Dated: September 22, 2023       Respectfully submitted,

JAMES WYDA
Federal Public Defender

<table>
<tr>
<td>

_/s/ Andrew S. Tulumello_
Andrew S. Tulumello (Bar No. 15494)
Claire L. Chapla (admitted _pro hac vice_)
Crystal L. Weeks (admitted _pro hac vice_)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Fax: (202) 857-0940
Drew.tulumello@weil.com
Claire.chapla@weil.com
Crystal.weeks@weil.com

</td>
<td>

_/s/ Patricia L. Richman_
Patricia L. Richman (Bar No. 803572)
(_signed by Andrew S. Tulumello with
permission of Patricia L. Richman_)
ASSISTANT FEDERAL PUBLIC DEFENDER
6411 Ivy Lane
Suite 710
Greenbelt, MD 20770
Phone: (301)-344-0600
Fax: (301) 344-0019
Email: patricia_richman@fd.org

</td>
</tr>
</table>