```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION

UNITED STATES OF AMERICA,)
                         )
          vs.            )   CRIMINAL CASE NO. ELH-21-036
                         )
JACKY LYNN MCCOMBER,     )
          Defendant.     )
_____)




                      Tuesday, January 10, 2023
                            Courtroom 5B
                         Baltimore, Maryland

                        PRETRIAL CONFERENCE

     BEFORE:  THE HONORABLE ELLEN L. HOLLANDER, Senior Judge


On Behalf of the United States:

     Jefferson Gray, Esquire
     Peter Cooch, Esquire
     Assistant United States Attorneys
     6 South Charles Street
     Baltimore, MD 21201

On Behalf of the Defendant:

     Clarke F. Ahlers, Esquire
     10450 Shaker Dr, #111
     Columbia, MD 21046











          (Computer-aided transcription of stenotype notes)
```

*Kassandra L. McPherson, RPR - Federal Official Court Reporter*
*101 W.  Lombard Street, 4th Floor*
*Baltimore, MD 21201*

(410) 962-4544

```
1                        P R O C E E D I N G
                            10:06 a.m.
2
            (Court called to order.)
3

4           MR. GRAY:  Your Honor, we're here this morning in the

5   matter of United States versus Jacky Lynn McComber.  That is

6   criminal case number ELH-21-036.  The matter has been set in

7   this morning for proceedings on a motion in limine concerning

8   Unanet records filed by the defense back on December the 12th,

9   and potentially other matters as well.

10          I'm Jefferson Gray, Assistant United States Attorney,

11  here on behalf of the United States.  And with me at counsel

12  table is trial attorney Peter Cooch of the Department of

13  Justice's Fraud Section.

14          MR. COOCH:  Good morning.

15          THE COURT:  All right.  Thank you.  Good morning.

16      Counsel.

17          MR. AHLERS:  Good morning, Your Honor.  My name is

18  Clarke Ahlers, and I'm here along with the accused, Jacky

19  McComber.

20          THE COURT:  All right.  Good morning to you as well.

21          And let me just review, as I usually do, so we have a

22  record of what today's proceeding is about.

23          And counsel, if you're speaking and would like to

24  remove your mask, by all means, feel free to do so.  Of course

25  you're not required to, but I do ask you to keep your voice up.
```

1    And because I'm speaking, I will remove mine.

2            So as has been said, I believe it was December 11 of

3    2022, the Defendant filed a motion in limine re:  Unanet

4    records, that's at ECF 203, that is primarily the subject of

5    today's hearing.

6            It's a rather short motion, and in that motion the

7    Defendant seeks to bar the Government from introducing at trial

8    the Unanet timekeeping records of Infotek, or ITK, or any

9    summary of the records under Rule 1006 of the Federal Rules of

10   Evidence in the absence of the expert testimony and subject to a

11   Daubert hearing.  In effect, that was an effort to bar any

12   introduction of those records because the Government has not

13   named an expert and, therefore, the defense argues such records

14   would be inadmissible at trial, any summary of them as well, and

15   the defense attached several exhibits to the motion.

16           The Government's opposition was filed on December 31st

17   of 2022, docketed at ECF 214, also supported by exhibits.  Two

18   corrections were made to ECF 214 when a submission was presented

19   with ECF 230.

20           The Defendant filed what she called a rebuttal brief,

21   really a reply, on January 3rd of 2023, so arguably the motion

22   became ripe on that date.  That's at ECF 217, and one more

23   exhibit was filed with leave of Court at ECF 232, the Government

24   filed a surreply yesterday, January 9th, docketed at ECF 229

25   with a number of exhibits.

 1           Looking to the Defendant's reply, which I said was ECF
 2   217, frankly is far more extensive than the motion itself.  And
 3   I don't know that it's simply just in response to arguments in
 4   the opposition.  It speaks for itself so I'm just going to
 5   mention a couple points.
 6           The defense focuses, among other things, under claim
 7   of corruption of ITK's Unanet records by a former ITK employee
 8   Dwayne Preston.  He happens to also be a defendant in a civil
 9   case filed by ITK in this court pending before Judge Blake, and
10   that is case CCB-18-1386.
11           Defense counsel, on behalf of the defendant, asserts
12   that Preston vandalized the Unanet records of ITK.  And there
13   may be some disagreement on the number of occasions when that
14   occurred because the Government is quite clear it occurred once.
15   In any event, Mr. Preston was interviewed on March 26 of 2018,
16   by OIG Investigator Hazenstab, and also, he was deposed in the
17   Judge Blake case for the first time on November 12 of 2018.  And
18   so in both instances he was under oath and he lied as the
19   defense points out.
20           Therefore, the defense contends that the ITK records
21   are not admissible under FRE 803(6)(E) because they are not
22   trustworthy.  And defense counsel states at page 10 of ECF 217,
23   quote, It takes an unusual amount of gall to urge the Court to
24   rely upon the word of a perjurious vandal to prove the absence
25   of vandalism where it pleases the government.  The records ought

1    not be deemed trustworthy, close quote.

2          I pause to note that Mr. Preston has entered into a

3    non-prosecution agreement with the Government in connection with

4    his unauthorized entry into ITK's computer system on or about

5    July 19 of 2017, and with respect to his false statements to

6    investigators from NSA's Office of the Inspector General.  I

7    think it was March 16 of 2018.  And I may have said March 26 of

8    2018.  I may have the date wrong, but it's March of 2018, and

9    also during that deposition in November of 2018 in the Judge

10   Blake case.

11         The non-prosecution agreement itself is at ECF 229-6.

12   I point out also that Mr. Ahlers attended a second deposition of

13   Mr. Preston in that civil case which was held on December 17 of

14   2021.  So that's a full year before the motion in limine was

15   filed.  And much of that deposition focused on the lies that

16   Mr. Preston was accused of having made at the first deposition.

17         The defense makes what I call a good for the goose,

18   good for the gander argument in stating, quote, If -- and if is

19   italicized -- If the Court permits the introduction of part of

20   the bi-weekly time sheets by the government then -- and then is

21   also Italicized -- the Court ought to permit the introduction of

22   the remainder of the bi-weekly time sheets by defense.  That's

23   at ECF 217 at 11.

24         And the defense objects to what it calls the, quote,

25   People time detail records, id at 11, and Defendant challenges

 1   any introduction by the Government of a summary chart of these

 2   records under FRE 1006.

 3           Defense counsel also argues that he ought to be able

 4   to use the remainder of the Unanet logs in two ways.  And this

 5   is at page 13 of ECF 217.  He states, quote, First, Preston

 6   should be subject to cross-examination about the logs that

 7   demonstrate Preston's breach of the Unanet system and change of

 8   records on other dates.

 9           Secondly, a Rule 701 witness should be permitted to

10   testify about the log records if Preston denies other breaches

11   by him, close quote.  That's at page 13 of ECF 217.  The

12   discussion continues on pages 14 and 15.

13           So when I first looked at ECF 203 I thought the debate

14   was going to be about whether or not an expert was needed by the

15   Government, and if so, for what purpose.  And essentially that

16   if the Government didn't need an expert then the defense

17   shouldn't be in need of an expert.  But, of course -- I say of

18   course it became clear that the topic of whether an expert was

19   needed did not necessarily apply to the same universe of

20   records, and that is what I thought was the issue.

21           So I -- that brings me to my final comment before we

22   get started.  And that is, frankly, that this motion is quite

23   belated, for no reason of which I'm aware.  Jury selection is

24   set for January 19, today is January 10.  Trial is scheduled to

25   begin on January 23 and this issue is not new.  That is to say,

1    it's -- Mr. Ahlers' was present at the deposition of Mr. Preston

2    more than -- or about a year ago.

3          In a phone conference the Court held last week, which

4    was -- for which there was a court reporter but for which I do

5    not have a transcript, Mr. Ahlers thought and characterized his

6    motion, and I'm paraphrasing, as essentially simple.  And he

7    thought it was filed in plenty of time, but it only became fully

8    brief, not counting the surreply, last week, January 3rd.  So I

9    don't think it's a lot of time and I don't think it's simple.

10   And I think it's morphed into more than I even expected when I

11   read it the first time.  But it is fully briefed now and I'm

12   ready to go.

13         I point out, as the Government has indicated, I call

14   it the Government's to-do list.  On September 22nd of 2022, the

15   Government filed ECF 169 addressing what it thought were

16   outstanding matters that needed resolution prior to trial and

17   for which it anticipated, I thought, perhaps, somebody was going

18   to tee these up; at least that's what I thought if I was being

19   asked to decide anything.

20         I'm focusing on page 2, paragraph 4 which continues

21   onto paragraph -- pages 3 and 4, and these are all single

22   spaced, as almost all the correspondence I get from counsel on

23   both sides is single spaced and often quite lengthy and

24   certainly fulsome, including the letter I got last night -- I

25   still happened to be at the office actually -- that the

```
 1   Government filed about -- I guess it's the spoliation topic is
 2   the way I would look at it.
 3           So what I had for today in the morning fell out so I'm
 4   available to you.  I'll do the best I can to resolve whatever
 5   issues we can get to today.  The Government had moved for a
 6   postponement of the trial.  I'm as anxious as anybody to get
 7   this case in the rearview mirror one way or the other given the
 8   age of the case, but the defense objected to the postponement
 9   and therefore I didn't grant it so here we are.
10           It's your motion, Mr. Ahlers.
11           MR. AHLERS:  Thank you, Your Honor.
12           Your Honor, do you wish me to address the court from
13   this table or --
14           THE COURT:  Whatever makes you comfortable.
15           MR. AHLERS:  Thank you, Your Honor.
16           Your Honor, I would first like to begin with defining
17   certain terms.  The word Unanet is found twice in the
18   indictment.  In the superseding indictment, ECF No. 97, at page
19   3, averment 6 the indictment reads --
20           THE COURT:  I didn't bring out the indictment.  The
21   records in this case are so voluminous I just carried out what I
22   thought I needed for the motion hearing so...
23           MR. AHLERS:  Well, I don't think you really need a
24   copy of the indictment in front of you.  I was going to read the
25   two references, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. AHLERS:  Does Your Honor wish me to continue?

 3              THE COURT:  Sure.

 4              MR. AHLERS:  The first reference, Your Honor, is found

 5   at page 3 of the superseding indictment.  Infotek personnel,

 6   including McComber, used a web-based time sheet software program

 7   provided by Unanet, Inc., to record their billable time on the

 8   matters on which they worked.

 9              And then at page 4, From then until NSA asked that she

10   be removed from the program manager position in the fall of

11   2017, McComber recorded the time she purportedly spent working

12   as Infotek's program manager on the Ironbridge contract on the

13   Unanet time sheet software.

14              THE COURT:  Can you read that one one more time?  The

15   second one.

16              MR. AHLERS:  Yes, Your Honor.

17              From then until NSA asked that she be removed from the

18   program manager position in the fall of 2017, McComber recorded

19   the time she purportedly spent working as Infotek's program

20   manager on the Ironbridge contract on the Unanet time sheet

21   software.

22              THE COURT:  Okay.

23              MR. AHLERS:  Now, Your Honor, I've submitted some

24   exhibits, and I'd like to first start with Defendant's Exhibit

25   1.  And Your Honor has a courtesy copy.  Defendant's Exhibit 1,
```

 1   Your Honor, is the -- a copy of the Unanet dashboard to show the

 2   Court the variety of reports that could be made.

 3            And jumping a little bit ahead, Exhibit 3 is going to

 4   be the bi-weekly time sheets.  The bi-weekly time cards or time

 5   sheets, our Exhibit 3, are not one of the myriad reports that

 6   the Unanet system offers.

 7            Now, Defense Exhibit 2, Your Honor, is what a system

 8   administrator -- and Dwayne Preston was a system administrator.

 9   It defines -- it delineates what a Unanet system administrator

10   can do.  And further --

11            THE COURT:  Where do you see that?

12            MR. AHLERS:  First place I see it --

13            THE COURT:  I'm looking at number 2.

14            MR. AHLERS:  I'm sorry, Your Honor, I didn't hear you.

15            THE COURT:  I was looking at number 2 you said?

16            MR. AHLERS:  Yes, Your Honor.  Under my reports --

17            THE COURT:  Okay.

18            MR. AHLERS:  -- at the end of the first line it says,

19   once you save a report or create an ad hoc report.

20            THE COURT:  Okay.

21            MR. AHLERS:  And then under shared reports it says in

22   the middle of the sentence, administrators can define saved

23   reports.

24            THE COURT:  Okay.  And what makes him an

25   administrator?  He was CFO, wasn't he?

```
 1              MR. AHLERS:  He was CFO and he testified he was a
 2   system administrator --
 3              THE COURT:  Okay.
 4              MR. AHLERS:  -- for Unanet.
 5              Your Honor, Defense Exhibit 3 are the bi-weekly time
 6   sheets for all Infotek program managers from the inception of
 7   the contract to the completion of the contract.
 8              Now, I believe that the Government seeks to introduce
 9   the Unanet bi-weekly time keeping records for program manager
10   McComber from March 13th, 2016, to 10/7/2017.
11              Now, the Government's first reference to these
12   records, Your Honor, is found in ECF No. 70 at footnote 3.  And
13   on March 25th, 2022, the Government stated that, quote, The
14   individual bi-weekly time sheets are, of course, classic
15   business records compiled in the regular and ordinary course of
16   business, and, therefore, admissible pursuant to Federal Rule of
17   Evidence 803(6).
18              In ECF 70, in March of 2022 and to -- until today, the
19   Government has ignored that when these records were given to the
20   Government -- I gave them to the Government on September 2nd,
21   2020.  I cautioned the Government, in writing --
22              THE COURT:  Hang on one second.  So you said what
23   date?
24              MR. AHLERS:  September 2nd, 2020.
25              THE COURT:  Okay.
```

 1              MR. AHLERS:  I hand-delivered the records, Your Honor.

 2              And I cautioned the Government that Preston

 3    manipulated the records, which we'll prove to the Court today,

 4    I'm sure, in this hearing.

 5              THE COURT:  Now, just to be clear, I didn't mention

 6    this --

 7              MR. AHLERS:  Yes.

 8              THE COURT:  -- and it will be reflected in the phone

 9    conference which we held, but in that conference you said that

10    he never changed the total number of hours, and your belief was

11    that he manipulated certain days; the hours for certain days.

12    Am I right about that?

13              MR. AHLERS:  If I could articulate it in parts, Your

14    Honor, so that you follow my reasoning.

15              There were invoices sent at or near the first of each

16    month from Infotek to NSA for payment of the Ironbridge

17    contract.  Preston never changed those invoice hours after the

18    date those records were sent.  That invoice was sent to NSA.

19    Preston undoubtedly changed the time sheet records.  In fact,

20    we're going to show, Your Honor, that -- and it bears saying,

21    Your Honor, that this case is a case essentially of overbilling,

22    that's the claim.  And Your Honor will see, we've taken a finite

23    set of records to show the Court, to demonstrate our point that

24    Preston is not trustworthy when he tells the Government that the

25    remaining records, meaning Jacky McComber's time sheets, are

1    uncorrupted because he didn't corrupt them.

2           And we'll show the Court, in April of 2017, that the

3    time sheets add up to 152 hours of time that Jacky McComber

4    allegedly spent on the Ironbridge contract.  The invoice was 120

5    hours and the payment was for 120 hours, and that's Count 14 of

6    the indictment.  And we'll show you very easily how Mr. Preston

7    entered the timekeeping records and changed the timekeeping

8    records between the time -- he did so both before and after he

9    left Infotek, but these records were likely changed after he

10   left Infotek.  And I notified the Government of that when I

11   delivered the time sheets.  In other words, I didn't deliver

12   them and say these are perfect business records, I did the

13   opposite.  This is what we we're stuck with because Preston

14   corrupted the records.

15          Now, it's worth noting for a moment how the time --

16   bi-weekly time sheets came into being.  After leaving a meeting

17   with the U.S. Attorney's Office --

18          THE COURT:  Maybe I'm far afield, so forgive me

19   because I need to understand what points we're trying to make

20   because -- is your point -- how are you proving that he

21   corrupted the records in April of 2017?

22          MR. AHLERS:  May I approach with an additional

23   exhibit, Your Honor?

24          THE COURT:  Right.  But in other words, it would seem

25   to me -- this is what I thought the issue was originally.  What

```
 1   do the records show, and if they've been altered, how is that
 2   getting proven?
 3              MR. AHLERS:  Yes, Your Honor.
 4              THE COURT:  And you, I thought initially, wanted
 5   Mr. Crews and then didn't object to the Government's motion to
 6   bar him.  I ruled, as you know, finally, because I thought it
 7   was moot when you never opposed it.
 8              MR. AHLERS:  It was moot, Your Honor.
 9              THE COURT:  But -- water under the bridge now.  But it
10   would seem to me, to focus on this point, there's two ways to
11   prove that the records were corrupted.  Either Mr. Preston is
12   asked and says what he did, or an expert comes in, akin to the
13   report, the professional company that your client hired that has
14   been discussed, I forget the name of the company but it's in the
15   materials that I was provided, and they made an analysis and
16   determined where there was corruption, and that would be an
17   expert.
18              So that -- that's what I thought my task was.  Do you
19   need -- if you want to prove that he corrupted the records, you
20   either -- because I don't need to get into the weeds today.  I
21   think I just need this -- to decide -- I thought the issue was
22   do you need an expert or don't you.  Does the Government need an
23   expert or doesn't it.  What am I missing?  Because I'm not
24   trying to cut you off, it's fascinating, but I don't know if I
25   need it for today, all this detail.
```

 1          MR. AHLERS:  Your Honor, I don't believe you're

 2    cutting me off.  I think what the Government needs is an expert

 3    if the Government seeks to introduce the timekeeping records,

 4    because I will demonstrate to the Court, they're not

 5    trustworthy.  They're not trustworthy under 803(6)(E) for the

 6    following reasons.

 7          They've undoubtedly been corrupted.  Start with that

 8    premise.  That Preston admits that he corrupted the records.

 9    What he does is he says, I corrupted Infotek records, their

10    Unanet timekeeping system for the purpose of creating havoc for

11    Ms. McComber, but I did not change her timekeeping records.

12          THE COURT:  And then you get to cross-examine him.

13          MR. AHLERS:  Well, I'd like -- yes, Your Honor,

14    presumably.  And I'd like to show, if Your Honor lets in some of

15    the records -- first of all, we want to show the very records

16    the Government wants to introduce against Ms. McComber aren't

17    trustworthy, which we'll show that right now, if I may.

18          May I submit, Your Honor?

19          THE COURT:  Yeah.  I'm just looking at the rule again.

20    And nobody's really given me a case that I think covers anything

21    remotely like this situation.

22          MR. AHLERS:  Your Honor, I do think I sent -- I

23    thought I put a case in my --

24          THE COURT:  Which one are you referencing that I could

25    have missed that covers this kind of fact pattern?  Forgive me

 1    if I missed it.

 2              MR. AHLERS:  Your Honor, I've got to find my reply --

 3              THE COURT:  Well, that's okay, don't worry.  I'll go

 4    back to your memo, but I don't remember -- I have your memo

 5    here.  Everything about the memo.  Would it be the memo or the

 6    reply rebuttal brief?

 7              MR. AHLERS:  If Your Honor would take a look at what

 8    is marked for Your Honor as Defendant's Exhibit 7B and

 9    Defendant's Exhibit 13.

10              THE COURT:  Okay.  13 you said?

11              MR. AHLERS:  Yes, Your Honor.  It's not on the list, I

12    added it this morning.  I just handed it up.

13              THE COURT:  Is it in this little package?

14              MR. AHLERS:  Excuse me, Your Honor?

15              THE COURT:  Is -- what you just handed up.

16              MR. AHLERS:  Very small package I just handed up.

17              THE COURT:  Okay.

18              MR. AHLERS:  13 is an invoice, Your Honor, and it

19    shows that Jacky Kimmel, who we now know as Jacky McComber,

20    billed 120 hours for her April work on the Ironbridge contract.

21              THE COURT:  Okay.

22              MR. AHLERS:  Now, I'd like you to compare that to 7B,

23    Your Honor.  7B are three pages of the bi-weekly -- bi-weekly

24    time records because that's just the way they fall on the

25    calendar, the bi-weekly overlapping the month.

```
 1            THE COURT:  Okay.
 2            MR. AHLERS:  And I've shown Your Honor all of the
 3   hours that are on the bi-weekly; it's 32 on page 1, 80 on page
 4   2.
 5            THE COURT:  Wait.  Wait.  Let me -- I'm not as fast as
 6   you.  So I see on page 1 of 7B 32 hours, right?
 7            MR. AHLERS:  Correct.
 8            THE COURT:  Okay.  Keep going, page 2.
 9            MR. AHLERS:  80 hours.
10            THE COURT:  Okay.
11            MR. AHLERS:  And page 3, 40 hours.
12            THE COURT:  Right.
13            MR. AHLERS:  For a total of 152 hours.
14            THE COURT:  And part of this is March though, right?
15            MR. AHLERS:  No, Your Honor, it's --
16            THE COURT:  Isn't this --
17            MR. AHLERS:  These are -- the highlighted ones are all
18   April.
19            THE COURT:  Oh, I see.  Okay.  Okay.  I got you so
20   far.
21            MR. AHLERS:  So it is a little bit illogical to
22   believe that McComber, who's indicted in Count 14 for
23   overbilling the government, her timekeeping records show she
24   worked 152 hours but the invoice shows 120 hours.  And part of
25   the answer is found -- part of the answer -- I'll get into more
```

1  detail -- is found at 7A.  7A points out -- and this is the
2  pattern of Mr. Preston's that's easily provable in a way that a
3  non-expert, a lay person sitting on the jury, would understand
4  it, Your Honor.

5          Now, what Mr. Preston did -- well, he lied to the
6  Government a lot; even in their proffer session, even before the
7  grand jury.  But what Mr. Preston claimed is when he left Unanet
8  -- I'm sorry, Infotek, he no longer had access to Unanet through
9  his own credentials.  Not true, because in Exhibit 6, I'll show
10  you in a moment, he logged in after he left under his name.

11          But what he would frequently do is login as Jacky
12  McComber.  And one of the easiest ways to prove this, Your
13  Honor, is his modus operandi; there's a pattern to what he does.
14  After he breaks in as Jacky Kimmel and does things like edits
15  records, he then suddenly logs out as Jacky Kimmel then goes
16  back in as Jamie Preston, his wife.  And the reason that what
17  he's doing is obvious, is one, the IP addresses are often the
18  same.  But more importantly, Your Honor, the timing happens so
19  often it would virtually be impossible for any reasonable person
20  to believe that Dwayne Preston entered a computer system as
21  Jacky McComber, or alternatively that Jacky McComber entered
22  under her Jacky Kimmel, her name then.  And every time that
23  Kimmel leaves the system, within four seconds Jamie Preston,
24  doesn't matter night or day, middle of the night, Jamie Preston
25  automatically logs on.

```
 1           A much more logical explanation, which he makes a
 2    reference to in his grand jury testimony, is that he knew his
 3    wife had credentials and he was using her credentials while she
 4    still worked there.  And that only after she left -- remember,
 5    she was there until basically July 1st, 2017.  There was a gap
 6    when he had left.
 7           March 31st, 2017, Preston left the employment of
 8    Infotek.  And for April, May, and June his wife still worked
 9    there and he did a lot of corruption of the time sheet data.
10    Now, if I could move on for a moment to Exhibit 3, Your Honor.
11           THE COURT:  But so -- let me try to focus you, because
12    I'm not sure I understand what you're arguing --
13           MR. AHLERS:  Okay.
14           THE COURT:  -- and I need to get it right.
15           MR. AHLERS:  Sure.
16           THE COURT:  Because I feel like a lot of what you're
17    arguing is about your defense.
18           MR. AHLERS:  Is what, Your Honor?  I'm sorry.
19           THE COURT:  Is about your defense.
20           So my question is, what is your claim?  Your claim is
21    that because he did what it is he did, and exactly what he did
22    is disputed --
23           MR. AHLERS:  Right.
24           THE COURT:  -- that the entire universe of records
25    that the Government seeks to introduce cannot be introduced
```

  1   because this renders all of them untrustworthy.  Is that your

  2   argument?

  3                MR. AHLERS:  That's the first part of my argument,

  4   yes, Your Honor.  And the reason it renders it untrustworthy is

  5   because of the stop limits that he -- that Preston puts on his

  6   own conduct.  In other words, he takes -- he goes before the

  7   grand jury, he gives statements to Mr. Gray and investigators

  8   before going to the grand jury.  He goes to the grand jury and

  9   what he says is, I only corrupted records on a single occasion;

 10   July 19th, 2017.

 11                First of all, that's not true.  An example, Your

 12   Honor, I just showed you, was 7 -- the bi-weekly records that

 13   are in -- that are before Your Honor for 7B.

 14                THE COURT:  Well, the problem I have with that is,

 15   there is a discrepancy from what you've shown me, but I don't

 16   know who can --

 17                MR. AHLERS:  Well, that -- I understand.

 18                THE COURT:  -- I can't say that the discrepancy is the

 19   result of Mr. Preston.

 20                MR. AHLERS:  No, not yet you can't.  But when we look

 21   at Exhibit 6, Your Honor, which are the logs, and we -- the logs

 22   are 19,000 pages of logs.  And what the Government did in

 23   previous pleadings was challenge me to tell the Government each

 24   place in the logs that are inconsistent with Mr. Preston's

 25   testimony before the -- or I didn't have his grand jury at that

 1  time, are inconsistent with the report written by investigators
 2  about a proffer session with Dwayne Preston.
 3          And I declined to do all of their work for them.
 4  We've been through the 19,000 pages, but what I did was share
 5  some of the work with the Government.  The Government's not
 6  satisfied, but I'd like to share some of the work with you to
 7  show you why you shouldn't, A.  Believe these records are
 8  trustworthy based upon what Preston says.  I think that'd be
 9  helpful, Your Honor.
10          THE COURT:  What exhibit number is that?
11          MR. AHLERS:  Exhibit 6, Your Honor.
12          Your Honor, I invite your attention -- there's page
13  numbers at the bottom.
14          THE COURT:  I'm looking for 6.  So some of these I'm
15  not sure have a number.
16          MR. AHLERS:  Exhibit 6, Your Honor, the page numbers
17  are written in like --
18          THE COURT:  Well, I don't see a 5, for example.
19          MR. AHLERS:  You don't see a what, Your Honor?
20          THE COURT:  Exhibit 5.  I go from 4 --
21          MR. AHLERS:  4 has the exhibit sticker photocopied
22  right with it, and 5 is a timeline --
23          THE COURT:  I see 5.  Sorry.  Okay, I have 5.  And
24  then there's something that -- I'm going to hold it up.  It
25  doesn't have a sticker on it, it just says 6 right there.

```
 1                   MR. AHLERS:  Right, Your Honor.  We did this in my
 2    office and I --
 3                   THE COURT:  Is that what you mean by 6?
 4                   MR. AHLERS:  Yes.  The internet went down in my office
 5    so I couldn't print one of those government tabs --
 6                   THE COURT:  So this is your Number 6.
 7                   MR. AHLERS:  Yes, Your Honor.
 8                   THE COURT:  And where do you want me to look?
 9                   MR. AHLERS:  At the bottom of number 6 there's page
10    numbers.  I'd like you to look at 137.
11                   THE COURT:  Okay.
12                   MR. AHLERS:  As Your Honor can see, the third line
13    down starts 217 -- 2017, 4/9, 22, 25, 23.  Login Jacky Kimmel.
14                   THE COURT:  Okay.
15                   MR. AHLERS:  Now, assuming I'm allowed to
16    cross-examine Mr. Preston on this, I would have him ask if he
17    logged in on that occasion.  We know that it wasn't Ms. Kimmel,
18    she was on a flight to Texas at the time without access.  I'm
19    sorry.  I'm sorry, Your Honor in Texas.  Not on a flight to
20    Texas, in Texas.
21                   THE COURT:  So then that doesn't establish what you're
22    saying.
23                   MR. AHLERS:  Well, it does.  It does, Your Honor,
24    because the IP address and because Jamie Preston's internet
25    account was used with the same IP address.
```

```
 1              THE COURT:  And I'm going to stop right there.
 2              MR. AHLERS:  Yes, Your Honor.
 3              THE COURT:  And to me, when I looked at this and when
 4   it first came in, not this particular exhibit but this general
 5   type of record that was presented, I will concede you all know
 6   much more than I do and are way smarter than I am, so I'm like
 7   maybe a lay person on a jury.  And the fact that you say it's
 8   this, it's that, it shows this, it shows that, there is no way a
 9   person looking at this would be able to conclude it says what
10   you say it says.
11              To me this spells out that an expert would be needed.
12   If this is what the Government is planning to introduce with --
13   then I agree with you, they need an expert.  And if you're
14   trying to introduce this then you need an expert because this
15   does not speak for itself.
16              MR. AHLERS:  Very well, Your Honor.
17              THE COURT:  I think it's like completely -- it may as
18   well be Greek.
19              MR. AHLERS:  Very well, Your Honor.  May I perfect my
20   argument then on this --
21              THE COURT:  Sure.
22              MR. AHLERS:  -- and then move on?
23              THE COURT:  And you are free to make your argument to
24   me, but I'm just giving you my reaction.  Because a picture is
25   worth a thousand words, as the saying goes, and many people,
```

1  perhaps, in today's world would understand this, but I don't

2  think you can make that assumption.

3        You just told me this -- you can determine that it

4  wasn't Jacky Kimmel in Texas because the IP address would reveal

5  it couldn't be her.  Those are not your exact words, but I think

6  that's what you were trying to tell me.  And I don't know how

7  anyone would know that unless they have some expertise.  I don't

8  know that.

9        MR. AHLERS:  Very well, Your Honor.

10        Could I make the following argument?

11        THE COURT:  Sure.  And if I'm wrong, tell me.

12        MR. AHLERS:  I don't think -- I think your opinion is

13  well grounded, but I believe and I advocate that this is classic

14  701.

15        THE COURT:  That's my point.  701 is like not an

16  expert.

17        MR. AHLERS:  I know, but that's the point I want to

18  make.  An administrator, any administrator of the Unanet system,

19  including Dwayne Preston because Dwayne Preston used logs,

20  Government Exhibit 4, which when the Government gets to their

21  presentation is more difficult, and Preston knew what the log

22  was and knew what it says.

23        And if I could invite your attention to page 139, Your

24  Honor.

25        THE COURT:  Okay.

```
 1              MR. AHLERS:  Your Honor, about six lines down you'll
 2    see four -- well, 2017-04-09, 22, 31, 08.
 3              MR. GRAY:  I'm sorry, what page and what line are we
 4    on?
 5              THE COURT:  139.  I didn't -- I don't mean to
 6    interrupt, and I apologize, but I think the whole Rule 701 topic
 7    is important because -- and I've written on it in -- I didn't
 8    necessarily write on it in this case, but I've written on that
 9    before.  And I'm happy to entertain your argument as to why you
10    think this could be the subject of a Rule 701 witness.
11              MR. AHLERS:  Yes, Your Honor.  I think -- well, first
12    of all, Your Honor, an easy way to kind of appreciate that an
13    administrator can look at these logs and testify is the
14    Government produced Unanet logs, that's what these are, a
15    different -- he just did it in a different format.  Presented
16    Unanet logs through the witness Dwayne Preston to the grand jury
17    seeking an indictment.
18              THE COURT:  I don't think the fact that those
19    questions were asked at the grand jury governs what my ruling --
20              MR. AHLERS:  It does not.  I'm just saying -- but I'm
21    saying it might persuade you that lay people can understand it.
22    Because the grand jury -- Mr. Preston had no difficulty in
23    understanding it, the grand jury had no difficulty understanding
24    it.
25              THE COURT:  I think the questions that I read in the
```

1    grand jury testimony had to do with what his own conduct was,

2    that's what they were questioning him about.  But I just want to

3    look at Rule 701 because it says, If a witness is not testifying

4    as an expert testimony in the form of an opinion is limited to

5    one that is -- and then there's the criteria.  And C says, not

6    based on scientific, technical, or other specialized knowledge

7    within the scope of Rule 702.

8              And I didn't research this, perhaps, as carefully as I

9    should have, but from prior cases that I've looked at in regard

10   to this matter, I think the cases are careful that the court

11   can't conflate what the expert is supposed to do versus what a

12   Rule 701 person can do.  And the minute the 701 testimony would

13   cross the line into specialized knowledge you can't pretend

14   they're not an expert.

15             MR. AHLERS:  Your Honor, could I advocate differently?

16             THE COURT:  Sure.

17             MR. AHLERS:  Your Honor, 702 is Daubert.

18             THE COURT:  Right.

19             MR. AHLERS:  We're not going to find a Unanet

20   administrator that has subjected his Unanet administrator work

21   to peer review or received academic -- high academic honors or

22   published information about it.  This is, to me, classic 701

23   because it's just saying you're used -- it's no different, in my

24   mind, than somebody that uses Microsoft Word.  And you can -- as

25   Your Honor may know, there are all sorts of different versions

1    of Microsoft Word, in terms of you can print with edits, without

2    edits, and so forth.  Any competent user of Microsoft Word,

3    looking at a Microsoft Word document, would say, well, this is

4    with visible edits.

5              THE COURT:  This is what?  I'm sorry, I missed the

6    last part.

7              MR. AHLERS:  Visible edits.  In other words, this is

8    with visible edits.  We can go up here in Microsoft Word, hit

9    this button and all these edits disappear, the final is all

10   that's left.  And I don't think it's particularly -- I don't

11   think that would be a 702.  If I had a Microsoft Word issue I

12   don't think I would have a 702 expert witness.  I think I'd have

13   a competent user of Microsoft Word say, this is how it goes.

14   Just like I'd have an administrator, a Unanet administrator.

15             In fact, if you could go to 139 I'll show you exactly

16   what I mean, Your Honor.

17             THE COURT:  Okay.

18             MR. AHLERS:  Page 139 in Exhibit 6.

19             THE COURT:  I just -- I don't know if this case will

20   ever go to the Fourth Circuit because I don't know what the

21   outcome will be.  But if it ever goes to the Fourth Circuit, I

22   think if anybody looked at page 139, as you're telling me to do,

23   they would reach or have the same reaction I have, which is, I

24   mean, you say it's simple.  I don't think your analogy to

25   Microsoft Word holds up because I don't know what stop ITK

```
 1  action 4MSB, login B12MSB stop, ITK, action login, validate
 2  41MSB, finder, finder, finder.  What all these things mean, I
 3  have not one single clue.  Not to mention what is the
 4  significance of the IP address that you say this is an IP
 5  address.  I don't even know that.
 6          MR. AHLERS:  Your Honor, if I --
 7          THE COURT:  Those numbers.
 8          MR. AHLERS:  Your Honor, if I could invite your
 9  attention to page 139.
10          THE COURT:  I'm on 139.
11          MR. AHLERS:  The person logged in as Jacky Kimmel logs
12  out at 10:31 and 08 seconds.  10:31 p.m. and 08 seconds on April
13  9, 2017.
14          THE COURT:  Which line is that?
15          MR. AHLERS:  Eighth and ninth lines down counting from
16  the top.
17          THE COURT:  Okay.  I mean, if you say so.
18          MR. AHLERS:  Okay.  Now, Your Honor --
19          THE COURT:  I didn't even do justice to what this
20  record looks like in my description.
21          MR. AHLERS:  Well, that's why I admitted it as an
22  exhibit, Your Honor.
23          THE COURT:  I know, but --
24          MR. AHLERS:  So if the appellate court does have to
25  look at it, they'll see it.
```

```
 1              THE COURT:  But for motions hearings these exhibits
 2    usually aren't maintained by the court.
 3              MR. AHLERS:  I'm sorry, Your Honor.
 4              THE COURT:  So I'm a little worried about making sure
 5    the record captures this.  Go ahead.
 6              MR. AHLERS:  Your Honor, if you'll go down, if you're
 7    on the right-hand side you see the name Jamie Preston?
 8              THE COURT:  Yes.
 9              MR. AHLERS:  Okay.  Well, Jamie Preston's login fails,
10    and then Jamie Preston logs in at the bottom of the page.  The
11    Jamie Preston login is two seconds --
12              THE COURT:  How do you know it failed?
13              MR. AHLERS:  Because it says login failed right before
14    her name, Jamie Preston.
15              THE COURT:  It says -- so I'm looking at -- I see the
16    bracket of Jamie Preston.
17              MR. AHLERS:  Actually, you're looking too far down if
18    you see the bracket, Your Honor.
19              THE COURT:  Oh.
20              MR. AHLERS:  About five lines above that you'll see
21    Jamie Preston without the brackets.
22              THE COURT:  Oh, I see that.  Login failed, okay.
23              MR. AHLERS:  Now, the critical issue for Mr. Preston,
24    to impeach him because he's been dishonest to the Government and
25    to the grand jury, is that it shows Jacky Kimmel logging out at
```

1   10:31 and 08 seconds.  And it shows Jamie Preston --

2              THE COURT:  Wait.  Wait.  Now you're going too fast

3   again.

4              MR. AHLERS:  I'm sorry.

5              THE COURT:  So where does it show Jacky Kimmel logged

6   out when?

7              MR. AHLERS:  Okay.

8              THE COURT:  You have the logout highlighted.

9              MR. AHLERS:  Eight lines down you have the date and

10  time, Your Honor; 2017 April 9th, 22:31:08.

11             THE COURT:  Okay.  I have that.

12             MR. AHLERS:  And then the line below that, each time

13  the date and time are first, and it tells what the event is

14  second.  So the event is Jacky Kimmel logs out.

15             THE COURT:  Okay.

16             MR. AHLERS:  Now, Your Honor, go down to where it says

17  login failed, Jamie Preston.  Do you see that Your Honor?

18             THE COURT:  Yes.

19             MR. AHLERS:  The time for that event.

20             THE COURT:  Is two seconds later?

21             MR. AHLERS:  Yes, Your Honor.

22             Now, without getting a finite number, because I've

23  never added them up, but if you look at the 19,000 pages of logs

24  from January -- or December 2016 -- December 25th, 2016, to

25  October 17th, 2017, 19,000 pages, that pattern repeats itself

 1  again and again and again.

 2          What Dwayne Preston would do is he used Jacky Kimmel's

 3  credentials to break in.  Now the Government could say,

 4  hypothetically, no, it was Jacky Kimmel in each of these

 5  occasions, which it would be ironic.  First, it would show she's

 6  working very late at night, which would buttress her defense,

 7  but also it would be ironic that every single time Ms. Kimmel

 8  leaves the program, within two seconds Dwayne Preston's wife is

 9  joining the program.

10          THE COURT:  Over what period of time is that?

11          MR. AHLERS:  Well, Your Honor, from December 25th

12  until --

13          THE COURT:  December 25th of what year?

14          MR. AHLERS:  2016.  Let me break times down several

15  ways.  First, the records exist from December 25th, 2016, to

16  October 17th, 2017.  They don't exist earlier than that because

17  Unanet has an end of life system where they destroy old records.

18  But all of those records were provided to the Government.  And

19  what those -- to me, the Government has to be -- and I'm not

20  accusing them of anything, but if they looked at the records

21  they would want to ask follow-up questions of Mr. Preston,

22  because Mr. Preston's version is certainly inconsistent with the

23  log files.

24          Now, Jamie Preston leaves the employment of Infotek on

25  or about July 1st, 2017.  Dwayne Preston spins a tale to the

1    Government that his one and only breach where he edited records
2    was on July 19th, 2017, and he didn't -- he did not edit any of
3    the records of Ms. Kimmel.
4              If Your Honor would take a look at page 143.  Again,
5    these are only examples because there are 19,000 pages of these.
6    On page 143, Your Honor, about three-fifths of the way down the
7    page, and the date is 2017/4/11, the time is five minutes and 33
8    seconds after midnight.
9              THE COURT:  Where do you see the time?
10             MR. AHLERS:  Immediately to the right of the date.
11             MR. GRAY:  I'm sorry, what page is this?
12             THE COURT:  Right.  Again, not self-evident.
13             MR. GRAY:  I'm sorry, Your Honor, what page are we on
14   now?
15             THE COURT:  143.
16             MR. GRAY:  Okay.
17             THE COURT:  You said just after midnight on 4/11.
18             MR. AHLERS:  Well, because --
19             THE COURT:  And I'm not -- wouldn't that be -- what's
20   the first digit?
21             MR. AHLERS:  I'm sorry, when I say after midnight,
22   Your Honor, those words aren't there.  I mean the time is just
23   after midnight.  It's 00, meaning midnight, 05 meaning five
24   minutes after midnight, and 33 seconds.
25             THE COURT:  Okay.  So which one are you looking at?

```
1              MR. AHLERS:  00:05:33.

2              THE COURT:  Okay.

3              MR. AHLERS:  And you will see that the person logged

4    in as Jacky Kimmel edits --

5              THE COURT:  I don't actually see where it says -- oh,

6    I see Jacky Kimmel.  What's finer mean?

7              If Ms. McComber has to tell you it's not self-evident.

8              MR. AHLERS:  It literally just means focus.  In other

9    words, the computer's focusing on -- the computer is focusing on

10   what's going on.

11             THE COURT:  Okay.  So --

12             MR. AHLERS:  So on that date you see there was an

13   edit.

14             THE COURT:  Where do you see that?

15             MR. AHLERS:  Same date and time, second line.  ITK

16   action projects edit 1.

17             THE COURT:  Okay.  This is so not self-evident.

18             MR. AHLERS:  Well, I agree, but I think it's -- I

19   agree it's not something that if I was walking down the street

20   with no familiarity with Unanet I would understand it.  I do

21   think it's a thing a Unanet administrator would understand, Your

22   Honor, without being an expert, without having any 702

23   credentials, without publishing anything or submitting anything

24   to peer review.

25             But additionally, Your Honor, at the end of exhibit --
```

```
 1              THE COURT:  So your point though for this is that on
 2    April 11 of 2017, which is just after Mr. Preston's departure
 3    from ITK, somebody, not Ms. Kimmel, was editing her record?
 4              MR. AHLERS:  Correct, Your Honor.  And that's
 5    completely consistent with the bi-weekly timecard which doesn't
 6    match the invoice.
 7              THE COURT:  And if it wasn't -- well -- and so your
 8    other point is, either that or she's working at midnight and
 9    really working contrary to what the Government says.
10              MR. AHLERS:  Well, the Government wants it to be not
11    either of those.  They don't -- they don't -- even though the
12    Government are constantly seeing filings at four o'clock in the
13    morning and 6 a.m. and so forth from the Government, the
14    Government would suggest that Ms. Kimmel never worked long hours
15    or late into the night.
16              But additionally, Your Honor, it's clear that
17    Mr. Preston is not trustworthy.  He's not telling the truth to
18    the Government.  Because these records, Your Honor -- in fact,
19    we attach at the end of Exhibit 6, we attach phone logs, and
20    they're somewhat important.  I know Your Honor doesn't want to
21    get into the IP address, but the Government sought the phone
22    records of Ms. Kimmel through the phone company in a subpoenaed
23    from the Government.  And the phone records were delivered to us
24    as part of the discovery.  And the phone records have maps on
25    them for where she is.
```

1    It's a pretty nice system that AT&T does when they
2    give you the record.  It gives you the longitude and latitude
3    and then says what city it's in.  For example, San Antonio,
4    Texas; Austin, Texas; Halethorpe, Maryland.  So we can prove
5    through a -- we think, a 701 witness that two things are
6    important here.  There's a pattern where somebody enters as
7    Jacky Kimmel repeatedly for months.

8    And ironically, when that person -- it could be Jacky
9    Kimmel theoretically, but whenever that person leaves Jamie
10   Preston logs in.  Now, that seems a little bit convenient for
11   the Government to suggest that the person logging in as Jacky
12   Kimmel isn't Dwayne Preston.

13   THE COURT:  I thought the Government's claim was not
14   that he -- and I may mistake this so I'm sure both sides will
15   correct me.  Going from the deluge of material you all have
16   given me, and very short notice to read it all, that the
17   Government wasn't saying he never entered any other time, they
18   were saying that he only altered the records on one occasion.

19   MR. AHLERS:  That is what the Government is saying,
20   Your Honor.  I don't speak for the Government but that's my
21   understanding as well.  July 19th.

22   THE COURT:  Right.

23   MR. AHLERS:  But --

24   THE COURT:  In other words, the fact that there may be
25   other times he entered --

1          MR. AHLERS:  Well, there ought to be a couple things

2  which to me, since there's really a preponderance standard here,

3  that Your Honor has to decide whether or not they're

4  trustworthy, it seems to me a number of things suggest these

5  records aren't trustworthy.  One, there are other intrusions

6  with the word edit.  And the bi-weekly time sheets, which the

7  Government says are ordinary business records, don't match the

8  invoice for this month.

9          Now, we have other evidence, Your Honor, obviously I'd

10 like to keep some of it for cross-examination at trial, but I'm

11 giving you an example of what we'll be able to prove at trial to

12 prove Mr. Preston is not credible.

13         Now, I don't think we should have to prove that the

14 records are not credible.  I don't think they should come in in

15 the first place, absent the Government showing trustworthiness,

16 because I think I'm demonstrating untrustworthiness.  Including

17 the fact that the witness -- the sole witness who says these

18 records are trustworthy is the serial perjurer in this case

19 regarding the exact same issue, the records.

20         THE COURT:  So just to look at the rule, Rule 803(6).

21         MR. AHLERS:  Yes, Your Honor.

22         THE COURT:  Can we agree that (A), (B), (C), hopefully

23 (D) are all satisfied, and the only issue is 803(6)(E)?

24         MR. AHLERS:  That's the only issue I'm contesting.  I

25 think is (D) the timing of the record, Your Honor?

1      THE COURT:  No.  (D) is all conditions are shown by

2  the testimony of the custodian or another qualified witness or

3  by certification.

4      MR. AHLERS:  Well, Your Honor, I said to the

5  Government when I first gave them these records, and to Your

6  Honor in my rebuttal which should have been called a reply

7  brief, that we are contesting the authenticity.  In other words,

8  the screenshot that was recorded by Mr. Shawn McComber was not

9  altered in any way.  He took -- he pressed a button to create a

10  screenshot of what the records showed.

11      But since the very first time I produced these

12  records, and it might help if Your Honor thinks about why I did

13  produce these records.  I wanted to compare Raynett Colston's

14  hours over 19 months to Jacky McComber's hours over 19 months.

15  Because the Government said Raynett Colston worked part-time and

16  did great work and Jacky McComber worked full-time and did lousy

17  work.  So I wanted to find out if those two things are true.

18      MR. GRAY:  I'm sorry?

19      MR. AHLERS:  And what we found out is Raynett Colston

20  worked 2,525.5 hours for a 19-month period, which butts up to

21  when Jacky McComber takes over for her 19-count indictment

22  period.  And Jacky McComber during that same period of time

23  billed 2,603.5 hours.  A 78-hour difference over 19 months.  And

24  the difference in the confirmed log, because Your Honor hears

25  all these representations, and you've heard them since this case

1   began in oral argument from the Government.  Raynett Colston was
2   always onsite, Jacky McComber was never onsite.  The difference
3   in the confirm record between the two people over the 19-month
4   period is one hour and 12 minutes in favor of -- it might be
5   three minutes; one hour and three minutes, I believe, in favor
6   of Raynett Colston.  She was there an hour more than McComber
7   was during the 19 months that each was a program manager.

8           So it's nonsense to suggest to the Court that there's
9   some gross deviation.  But when we began the arduous task of
10  looking at each two-week time record and logging all the records
11  for the program managers, we noticed what appeared to be fraud.
12  So when I gave those records to the Government -- obviously I
13  wanted them for the point, this is the point in my reply brief,
14  I wanted the records to compare Raynett to McComber, but I also
15  had to be candid to the prosecution that the records had been
16  corrupted by Preston.

17          And once the Government brought an indictment, and we
18  spent, frankly, far more time with these records since the
19  indictment than before the indictment.  But when we do, we see
20  this pattern that we think any 701 witness, meaning if they're a
21  Unanet administrator, they ought to be able to come in and say
22  this is what that means.  And we don't think we can find a 702
23  witness, Your Honor.

24          THE COURT:  A Unanet administrator or --

25          MR. AHLERS:  Yes.

```
 1              THE COURT:  -- you mean --

 2              MR. AHLERS:  No, a Unanet --

 3              THE COURT:  -- an ITK administrator?

 4              MR. AHLERS:  No, a Unanet administrator.  This is a

 5    timed program from the internet.  It happened to be used by

 6    Infotek but it's used by many other companies.  And Unanet has

 7    people they call administrators.

 8              THE COURT:  And who is that person?

 9              MR. AHLERS:  Your Honor, I -- my client alerts me to

10    the fact that maybe implied in your question was the suggestion

11    that these are -- these work for Unanet.

12              THE COURT:  Right, that's what I thought you meant.

13              MR. AHLERS:  No.  I apologize.  I'm misleading the

14    Court if that's what your understanding is.

15              THE COURT:  She's right, that's exactly what I

16    thought.

17              MR. AHLERS:  Okay.  Well, I apologize.

18              Unanet has each company assigned administrators and

19    trains the person in that company.

20              THE COURT:  So it's an ITK person familiar --

21              MR. AHLERS:  Correct.

22              THE COURT:  -- with doing Unanet administration.

23              MR. AHLERS:  Correct.

24              And those Unanet administrators, Your Honor, exist in

25    all sorts of Department of Defense contractors around the
```

1    region.  Because it's a popular program.  The Unanet timekeeping

2    system, it's a popular program.

3              THE COURT:  So to answer my question though, what's --

4    of the various elements under 803(6) --

5              MR. AHLERS:  Just (E).

6              THE COURT:  Just (E) as in --

7              MR. AHLERS:  Yep, that's all I'm arguing, Your Honor,

8    (E).

9              THE COURT:  So only (E) is in dispute.

10             MR. AHLERS:  Correct.  And I did make that clear -- at

11   least I sought to make it clear by saying, as an officer of the

12   court, I think it meets the test of admissibility but for

13   trustworthiness.

14             And if, Your Honor -- and I make this point in the

15   brief.  It seems to me the Government could have done any number

16   of things.  If they want to say these records are trustworthy,

17   they could -- in fact, there's a reference that Mr. Preston

18   makes before the grand jury about speaking to the forensics

19   people.  And I don't know whether he's talking about somebody he

20   met with the government or something like that.

21             But the Government could have done an audit, like

22   we've done.  The Government could have compared the timekeeping

23   records to the invoices, all sorts of things, and then gone back

24   to Mr. Preston and said, how do you explain these things if

25   you're telling us the truth?  None of that was done.

 1    So I think they are in trouble with the idea of

 2  trustworthiness.  Meaning, that I think a fair assessment of

 3  these 803(6) records of regularly conducted business meet the

 4  test of (A) through (D) but do not meet the test of (E) which

 5  the Government's known since the day I delivered those records

 6  to them.

 7    THE COURT:  Then I say so have you, so why did I get

 8  this at the 11th hour and 59 minutes before the trial?

 9    MR. AHLERS:  Because, Your Honor, it is my opinion --

10  I thought the Government was going to -- I don't know how they

11  were going to prove their case, but ultimately they wrote

12  something saying the defense needs an expert.

13    And if you recall, Your Honor, I think you

14  characterized my motion as what's good for the goose is good for

15  the gander when we spoke on the phone conference call shortly

16  after I filed it.  But yes, that's my point.  If the defense

17  needs a 702 expert to enter these records such as the

18  timekeeping records, the people time detail records which were

19  created by Dwayne Preston and don't have audit trails on them,

20  which ought to raise an eyebrow, but if this person -- if the

21  Government says these records come in without an expert, I don't

22  think they can turn and say, but Mr. Ahlers you need an expert.

23  The rules are different for the defense on the evidence.

24    Now, the Government is -- and Your Honor has

25  distinguished between the logs and the reports.

```
 1              THE COURT:  And let's be clear because I'm not sure
 2    we're all defining these terms in the same way.
 3              MR. AHLERS:  Okay.
 4              THE COURT:  What do you mean by log and what do you
 5    mean by report?  Are we talking time cards or are we talking
 6    these -- I call them runs, I don't know what else --
 7              MR. AHLERS:  You call them what, Your Honor?
 8              THE COURT:  Page after page after page after page --
 9              MR. AHLERS:  I just didn't hear Your Honor.  There was
10    noise.
11              THE COURT:  I'm Sorry.  It looks like ticker tape to
12    me.  I mean, I don't know what else to describe it as.  What do
13    you mean?  Or I'll just tell you what I think.
14              Exhibit 6, I would say looks like just --
15              MR. AHLERS:  It's called a log.
16              THE COURT:  This is a log?
17              MR. AHLERS:  Yes, Your Honor.
18              THE COURT:  I have a concept of a log as being
19    something that would be -- something that would be in English
20    and you could read.
21              MR. GRAY:  Your Honor, if I may, the Government has
22    referred to these as run logs.  That's how we referred to them.
23              THE COURT:  Okay.  So run and logs, so we've got a
24    combination of names.  Okay.
25              So I don't know what the official name is, but for ECF
```

 1   -- excuse me, for Defendant's Exhibit 6, the Government calls
 2   them run logs and you call them what?
 3             MR. AHLERS:  Logs.  I just don't have the modifier run
 4   in front of it.
 5             THE COURT:  I was calling them runs.
 6             MR. AHLERS:  Yes, Your Honor.
 7             THE COURT:  But --
 8             MR. AHLERS:  Now, the reports --
 9             THE COURT:  -- I don't take ownership of that.
10             MR. AHLERS:  -- I'm referring to are Exhibit 3 and
11   Exhibit 4; 3 are the bi-weekly time sheets and 4 is the people
12   time detail report.
13             THE COURT:  And give me one second because I'm writing
14   it down --
15             MR. AHLERS:  Yes, Your Honor.
16             THE COURT:  -- but then I also want to pull it up.
17   Exhibit 4 is what?
18             MR. AHLERS:  They're called people time detail
19   reports.
20             THE COURT:  So let me find them in your package here.
21             So 3, I have a very big stack, certainly don't know
22   how many pages it is but it's a big, thick clip.  And you're
23   saying that's the bi-weekly time sheets.
24             MR. AHLERS:  My number 3, Your Honor, it's a big pile.
25             THE COURT:  Right, that's what I just said.

```
 1              MR. AHLERS:  Yes, Your Honor.

 2              THE COURT:  And then you said 4 is --

 3              MR. AHLERS:  If you look on page -- or Exhibit 4,

 4   first page.  Do you see on the left-hand side under Unanet it

 5   says people time details?

 6              THE COURT:  I see it.

 7              MR. AHLERS:  That's what I've been calling it.  And

 8   it's an ad hoc report, it says it right above.  It's an ad hoc

 9   report.  And if you look at the very last line on the last page,

10   page 6 of 6, it was created by Dwayne Preston.

11              MR. GRAY:  I'm sorry, what exhibit are we talking

12   about now?

13              MR. AHLERS:  4.

14              THE COURT:  4.  It's ECF 209-1.

15              MR. AHLERS:  Right.  I have it as a motion's exhibit,

16   Your Honor.

17              THE COURT:  Yes.  Okay.

18              MR. AHLERS:  Now, if I could just tell the Court, one

19   irony of this case is the following, Your Honor.  The records

20   which I think everybody would agree, Number 3, are kind of the

21   most user friendly record; the bi-weekly time sheets.  Those are

22   undoubtedly untrustworthy.

23              Number 6 --

24              THE COURT:  What period are Exhibit 3 covering?

25              MR. AHLERS:  The entire period of the Ironbridge
```

```
 1   contract, Your Honor.  So it starts with 7/10/2011 and it ends
 2   with -- Court's indulgence.  1/13/2018.
 3              THE COURT:  Okay.
 4              MR. AHLERS:  Now, the other irony is this, Your Honor.
 5   The thing that I think is a 701 witness, what you're calling the
 6   run logs now, they are undoubtedly the most trustworthy.
 7              THE COURT:  And what's the exhibit number of those
 8   again?
 9              MR. AHLERS:  6, Your Honor.
10              THE COURT:  Thank you.  And you're saying they're the
11   most trustworthy because they show when there was an entry?
12              MR. AHLERS:  Well, they're, to my knowledge and to
13   Unanet's -- I think their experienced knowledge, I don't know of
14   anybody that knows how to corrupt a run log.
15              THE COURT:  Well, what makes Exhibit 3 untrustworthy?
16              MR. AHLERS:  What makes it what, Your Honor?
17              THE COURT:  Untrustworthy.
18              MR. AHLERS:  They were -- first of all, they're
19   clearly not accurate because Mr. Preston changed times.  And
20   although Your Honor --
21              THE COURT:  And when did he start working at --
22              MR. AHLERS:  Do what?
23              THE COURT:  When did he begin to work at ITK?
24              MR. AHLERS:  Long before the indictment period, Your
25   Honor.  2008.  Unanet came in in 2009.  Preston left on March
```

1   31st, 2017.

2        THE COURT:  Well, was there something in 3 that --

3   Exhibit 3 that you wanted to show me to support your claim that

4   these are -- the entire --

5        MR. AHLERS:  Well --

6        THE COURT:  -- document is untrustworthy?

7        MR. AHLERS:  Well, Your Honor, what I did was take a

8   piece of 3 and call it 7B.

9        THE COURT:  Okay.  So Exhibit 7B comes from 3?

10        MR. AHLERS:  That's correct, Your Honor.  The relevant

11   bi-weekly time sheets for the bill which went to NSA for 120

12   hours.

13        THE COURT:  What is the best case you have for two

14   points.

15        1.  That under Rule 701 a witness can testify to

16   whatever information is contained in Exhibit 7B or Exhibit 3 or

17   any of these other exhibits.

18        MR. AHLERS:  Well --

19        THE COURT:  And 2.  What would be the best case you

20   have to show me that would say that under circumstances and

21   facts analysis to what we have here with -- I will call a vast

22   array of timekeeping records and a witness who admits to

23   altering some, renders the court unable to admit the records

24   with that caveat as untrustworthy in their entirety.

25        MR. AHLERS:  I'm not sure, Your Honor, how you asked

 1    the first part of the question, but the proponent of the record

 2    is the Government.

 3              THE COURT:  I understand that.  But still I'm asking,

 4    do you have a case that I can look at?  What cases do you point

 5    me to that say under these facts and circumstances that first of

 6    all, these are appropriate for a Rule 701 witness, that's my

 7    first question.

 8              And my second question is, are there any cases that

 9    discuss a fact pattern similar to what we have here, where

10    records clearly are business records, but because there was an

11    unauthorized edit, if you will, to some entries, that that means

12    with that information made known to the jury, the whole record,

13    nonetheless, would not be admissible.

14              MR. AHLERS:  Well, first, Your Honor --

15              THE COURT:  I think they clearly qualify as business

16    records and the only issue is trustworthiness.

17              MR. AHLERS:  Right.

18              THE COURT:  And does -- in other words, one rotten

19    apple will spoil the entire barrel.

20              MR. AHLERS:  Well, can I first address that and then

21    tell you the authority that I've cited?

22              THE COURT:  Sure.

23              MR. AHLERS:  Your Honor, the issue really isn't does

24    one bad apple spoil the entire barrel, because I think Your

25    Honor could reasonably say -- any judge, I think, could

```
 1   reasonably say these records, which are suspected corruption and
 2   which are proved trustworthy, come in.
 3            That step has been skipped by the Government.  The
 4   Government says in place of that step, in place of figuring out
 5   which bad apples exist we're gonna skip that and we're going to
 6   ask the corruptor did you corrupt these other records and he
 7   says no, I didn't.  How convenient.  It's not matched by the
 8   logs.  It's not matched -- he's impeachable 15 different ways.
 9            He admits in his first deposition it was 17 perjuries,
10   Your Honor, the errata sheet.  And he tells the grand jury that
11   his goal was not only to create havoc, but he is a person --
12   when they say well, you know, how did you come to this change
13   of -- he says, well, I just got there in a civil deposition and
14   told them what I thought they wanted to hear.
15            That's really a character issue.  He's admitting -- he
16   is a person who, under oath, will tell the listener what he
17   thinks the listener wants to hear as long as it's to his
18   advantage.  And it sure was, Your Honor.
19            My client has Count 20, lying to OIG.  She denies she
20   did it, he admits he did it and he gets a pass.  And he's a
21   certified public accountant and still has his license to
22   practice as a CPA in Maryland.  And the Government knew he was
23   lying for 579 days without requiring him to correct the record
24   before this court in the civil case.
25            Nobody ought to believe this guy, but the Government
```

 1   does.  All I'm saying is, there's plenty of ways you could say
 2   something is trustworthy, these records.  You could audit them.
 3   You could say, we've gone through the logs and we've eliminated
 4   those where there is a question and this is what's left.
 5   There's plenty of things you could do.
 6            Instead, what the Government said is we don't have to
 7   do any of those things because Mr. Preston told us, after he got
 8   a non-prosecution agreement, he didn't corrupt those records.
 9   Perfect.  Convenient, because after all she's the target.
10            And if he did say he corrected -- or corrupted the
11   records, as he obviously did, April being a perfect example.  I
12   mean, even their theory is that she overbilled the government.
13   Why would her records show 152 hours of work and a bill for 120
14   hours?  I'll tell you why.  Because he added eight hours, for
15   example, when he knew she was in Texas.  So that when he made --
16   he made the specific -- now he claims, well, I don't know, Your
17   Honor, who the whistleblower is.  None of them are really
18   whistleblower's because they're not employees of Infotek, but
19   we're all using that phrase kind of loosely.  But whoever it is
20   that contacted the Office of Inspector General about Ms.
21   McComber was very fact specific.  On this day she played golf
22   and on this day she billed.  On this day she went here and on
23   this day she billed.
24            It's possible she's a criminal and did those things.
25   It's also possible that somebody entered the Unanet timekeeping

```
 1    system and changed the records to reflect the hypothesis that
 2    she billed when she was clearly doing something different than
 3    working on Ironbridge.  And there's overwhelming evidence of it.
 4    In other words, that's what the logs show; 19,000 pages of his
 5    going in, he cuts -- he leaves, and within two seconds his wife
 6    is coming in.
 7              Now, the only way that could be Jacky McComber is if
 8    over 20 times she logged out two seconds before an employee
 9    named Jamie Preston logged in in the middle of the night.  And
10    it's not logical.  The far more logical explanation is the guy
11    who sought to seek havoc for her accomplished what he was trying
12    to do; he created havoc.  And he's not trustworthy, not just in
13    general, he's not trustworthy in this case.  Because in this
14    case he lied to OIG, he lied under penalty of perjury on the
15    deposition, he then hired a former assistant United States
16    attorney, cuts a deal with the Government for a proffer session.
17    Goes in, makes a grand jury statement which is absolutely
18    impeachable, if we get to that this morning, Your Honor, line
19    after line where we can impeach that.  He makes a grand jury
20    statement which is impeachable.  And then he's given a
21    non-prosecution agreement in exchange for his truthful testimony
22    against McComber.  And the Government says to Your Honor, we
23    don't have to meet the test of 803(6)(E) because he says they're
24    trustworthy.  And my basic point is, of all the reasons to say
25    records are trustworthy, the laughable reason is that Dwayne
```

1  Preston says they're trustworthy.  He's not worthy of that.

2        Now, Your Honor, Exhibit 7 are e-mails where my client

3  provided her prior counsel, who you heard mentioned, the name

4  Jan Miller in our phone conversation this week, or it might be

5  last week, Your Honor, the days are running together, I

6  apologize.  But our last conference call the Government talked

7  about Jan Miller.  She was previously represented by Jan Miller,

8  the former United States attorney here, and United States

9  attorney in Illinois.  And she provided records to him to

10 provide to the Government.  The critical point is, that at no

11 time did anybody from Infotek, from the beginning of this

12 investigation to present, ever represent to the Government that

13 the timekeeping records were trustworthy.  In fact, the exact

14 opposite.

15       Your Honor, in the -- in Mr. Preston's OIG interview,

16 I don't know if you want me to go through it chapter and

17 verse -- I'm sorry, in his grand jury testimony, I don't know

18 whether you want me to go through it chapter and verse --

19       THE COURT:  What point are we arguing here?  Just give

20 me a --

21       MR. AHLERS:  This is it.

22       THE COURT:  No, I mean what point.

23       MR. AHLERS:  Yeah, 803(6)(E).

24       THE COURT:  Okay.

25       MR. AHLERS:  The Government says we can rely on

 1   Preston.  And I say Your Honor shouldn't rely on Preston because
 2   he lied even before the grand jury.  In other words, this guy's
 3   just not going to tell the truth.  Which I get it, he's a liar,
 4   he's scheming, he wants a deal with the Government.  He's got
 5   the deal.  He's got a good non-prosecution agreement.  It
 6   requires him to tell the truth, and they all say that, Your
 7   Honor.  I've never seen a non-prosecution agreement that said
 8   get up and tell whatever story you want to tell; it all says you
 9   have to tell the truth.
10           The truth happens to be consistent with the
11   Government's theory of the case, which is that McComber is a
12   criminal and that Preston did these crimes; he broke in to
13   create havoc and he changed records but he didn't change the
14   only records which matter for our prosecution of McComber.
15           Even though the logs, which the Government basically
16   says, no, no, can't show the jury the logs.  Even through a
17   witness, a 701 witness who can tell the jury what the logs mean,
18   because to do so is unfair because we need a 702 witness.  And
19   Your Honor, there are not going to be any 702 witnesses just
20   like there wouldn't be a 702 witness on Microsoft Word.  There
21   are going to be 701 witnesses.
22           We use this program, this is what happens when we do
23   this, this is how the log reads.  When I change a record, the
24   log comes out and says I edited something.  We could probably
25   have them demonstrate it for the jury.

```
 1                  THE COURT:  Why don't you have an expert though, that
 2    would have made it a lot easier.
 3                  MR. AHLERS:  Several.  Practical reasons, Your Honor.
 4    I'd rather --
 5                  THE COURT:  Mr. Stein's --
 6                  MR. AHLERS:  I'd rather --
 7                  THE COURT:  Mr. Stein's testimony covers all sorts of
 8    things that seem to me you didn't need an expert for.  But why
 9    would you not have had an expert?
10                  MR. AHLERS:  Well, Your Honor --
11                  THE COURT:  Then this issue wouldn't exist.
12                  MR. AHLERS:  Do what Your Honor?
13                  THE COURT:  The issue -- we wouldn't even have this
14    discussion.  You had -- ITK hired a company to evaluate whether
15    there had been any tampering, vandalism to use your word --
16                  MR. AHLERS:  I know.
17                  THE COURT:  -- of the records and came to the
18    conclusion that on the date that the Government says there was,
19    why don't you have them?
20                  MR. AHLERS:  Here's why, Your Honor.  The Government
21    concedes there was vandalism on that date.  It's the other
22    dates.  And for each date they require between 50 and a hundred
23    thousand dollars.  So Ms. McComber's out of money, that's the
24    candid answer, Your Honor.  We're out of money.  And every time
25    this case gets postponed it creates more stress, because my
```

1   client can't make a living in the months between trial dates.

2   So she was debarred, or temporarily debarred from working for

3   the government.  Unlike what you've heard, she had substantial

4   contracts including what was just released -- just given to us

5   in discovery, turns out she won the re-compete for the

6   Ironbridge.  She won it and it was taken away from her because

7   of this investigation, which is precisely what Preston wanted to

8   accomplish.  He wanted to create havoc for her and he created

9   havoc for her.  But we're out of money.  I mean, that's the sort

10  answer, Your Honor.

11          But I also don't think there is a 702 witness.  In

12  other words, I thought about it carefully.  There's not going to

13  be anybody that's going to meet the Daubert test.  Look at what

14  I went through with Mr. Stein.  You think I can just call the

15  Government up and say I'm going to bring in the guy from Unanet

16  and they're going to say no problem?

17          So the answer is, the administrator, the person who

18  works with this day in, day out at the company and say yeah, I

19  look at these logs, I look at this, I get these reports, this is

20  what it means.  And they don't have to be an expert on

21  computers, they don't have to be an expert on computer language,

22  they don't have to be an expert on any of those things, anymore

23  than I'm an expert on computers and I use Microsoft Word

24  proficiently.

25          Your Honor, I think it's important to recognize

 1   Preston admitted he was the corruptor and perjurer before I ever
 2   gave the Government these time sheets, but I didn't know he'd
 3   admitted that.  In other words, this isn't -- I am either
 4   omniscient or I'm accurate.  I'm not omniscient.  I had no idea
 5   that he was cooperating with the Government and that he made an
 6   admission that he broke in and corrupted the records.  No idea.
 7             MR. GRAY:  Your Honor, I mean, I've sat here for 90
 8   minutes now.  I think this is the longest time I've ever heard
 9   someone speak uninterruptedly like in a motion argument.  The
10   problem is, quite frankly, Mr. Ahlers is all over the place.
11             THE COURT:  Mr. Ahlers what?
12             MR. GRAY:  Is all over the place.  And I'm trying to,
13   like, follow all of this with notes, but it's -- I mean, at this
14   point, for example, I would really like to respond to what he
15   just said because it has a fairly quick answer and it's
16   significant.
17             THE COURT:  Well, you'll certainly get your turn.  I
18   thought we were maybe near the point of taking a break but I
19   wanted to let Mr. Ahlers wind up.
20             MR. AHLERS:  Thank you, Your Honor.  The wind up is
21   this.  The Government has overwhelming evidence that the Unanet
22   records have been corrupted, and they rely on a single human
23   being, Preston, his word.  And not his first word and not his
24   word -- his third or fourth version is that he didn't corrupt
25   the records they want to use to prosecute Ms. McComber, and that

1    Mr. Ahlers shouldn't be allowed to use the logs which everybody

2    admits are not corrupted.

3              Thank you, Your Honor.

4              THE COURT:  So we're going to take our mid-morning

5    recess.  Maybe during this recess, Mr. Ahlers, you can take a

6    look at what you have cited or --

7              MR. AHLERS:  I'm sorry, page 10 of ECF 217, Your

8    Honor.  Page 10 is where I have the authorities.

9              THE COURT:  Okay.  I'll take a look at that.  What

10   authority is that for though?  Which of the two questions that I

11   was asked.

12             MR. AHLERS:  Which are what?

13             THE COURT:  I had two questions.

14             MR. AHLERS:  I'm sorry, I didn't hear the question,

15   Your Honor.

16             THE COURT:  Yes.  I had two questions.  One was, what

17   case should I look at that would say under Rule 701 this kind of

18   information would be properly the subject of a nonexpert.

19             And then my other question had to do with FRE

20   803(6)(E), at least I think that's what my question was, what

21   case, if any, would you be able to point me to that shows under

22   circumstances like we have here, that the entire gamut of

23   records doesn't come in.

24             MR. AHLERS:  The 803(6)(E) is United States v.

25   Hathaway, 798 F.2d 902 --

```
1              THE COURT:  I have that.  I mean, what you cited for
2    is that the showing of untrustworthiness is specific and
3    credible.
4              MR. AHLERS:  Correct.  And I think it is.
5              THE COURT:  A Sixth Circuit 1986 case, so I didn't
6    really think that was helpful.
7              MR. AHLERS:  Okay.
8              THE COURT:  But -- okay.
9              MR. AHLERS:  And then, Your Honor, I don't have a case
10   that says Unanet timekeeping records or similar timekeeping
11   records should be a 701 witness as opposed to a 702.  I arrived
12   at that by the logic of it's not truly a 702 because the Daubert
13   test would be inapplicable.
14             THE COURT:  Okay.  We'll take our mid-morning --
15             MR. GRAY:  Your Honor.
16             THE COURT:  -- recess --
17             MR. GRAY:  Your Honor.
18             THE COURT:  -- and when everyone is ready, please let
19   me know.
20             MR. GRAY:  Your Honor.
21             THE COURT:  Thank you.
22             THE CLERK:  All rise.  This Court stands in recess.
23        (Recess taken from 11:36 am to 11:54 a.m.)
24             THE COURT:  Okay.  Mr. Gray, your turn.
25             MR. GRAY:  Your Honor, the way I'm going to try and
```

1   organize my responses to what Mr. Ahlers said, is I'm going to

2   start off by dealing with the argument he's presented about when

3   Preston's lies became known.

4            And he seems to -- he --Mr. Ahlers is always taking

5   potshots at the Government's side of this case for one thing or

6   another, and that his latest one is that there's this 579-day

7   period when supposedly the Government hid from Mr. Ahlers the

8   fact that we knew that Preston had perjured himself on several

9   occasions.  And so that's fairly easy to deal with.

10           It was a lot of the reason -- his making that

11   allegation was a lot of the reason I felt the need to ask for

12   the surreply.  Because the table that he presented in his

13   rebuttal brief, as I think I've probably demonstrated in our

14   surreply, and the contrasting table I provided takes up about

15   half of our surreply.  And it's unfortunate we don't have the

16   projector system on today.

17           THE COURT:  We don't have what?

18           MR. GRAY:  That we don't have the projector system on

19   today because it would be --

20           THE COURT:  Would you like it?

21           MR. GRAY:  Yes, that would be grand.  I'm sorry, I

22   hadn't anticipated we were going to come in here and have a

23   stack of defense exhibits like this beyond what had already been

24   presented in the briefs.

25           But let me -- from very early -- very early on, this

1    issue about whether Preston altered any of Ms. McComber's -- and

2    I'm going to say time, billings as program manager on the

3    Infotek -- on the Ironbridge contract, it's very important to

4    use those precise words.  Because Mr. Ahlers in his briefs

5    recently, as part of this motion, sometimes very sloppily says,

6    or maybe from his perspective precisely says that he did admit

7    to altering time records.

8              Okay.  The time records that Preston admitted to

9    altering on July the 19th, he never --

10             THE COURT:  We should use years because this case

11   spans so many.

12             MR. GRAY:  July the 19th, 2017.  Those time records

13   were the paid time off accruals of a number of Infotek

14   employees.  And what he did was he increased their paid time

15   off.

16             THE COURT:  Mr. Ahlers' point is that that's a lie,

17   that he did much more than that.  That's his argument.

18             MR. GRAY:  Right.  But they did bring in the Atlantic

19   Data Forensic team to do a comprehensive analysis of exactly

20   what Mr. Preston did during the 42 minutes that he was in there

21   on July the 19th.  And we've attached -- it's getting hard to

22   remember sort of which exhibits that we've attached that in, but

23   I'm pretty sure this was in the exhibits to the surreply.  Let

24   me just find that list.

25             Surreply.  Yeah, we attached the summary of the report

```
 1    from ADF.
 2              THE COURT:  Next time -- I hope there isn't a next
 3    time, but just -- I know you were in a hurry and I appreciate
 4    the courtesy copy, but if you'd tab the exhibits going forward
 5    it will be a big help.
 6              MR. GRAY:  Your Honor, I'm sorry, I've actually given
 7    standard instructions to my paralegal to do that.
 8              THE COURT:  I know, I was just --
 9              MR. GRAY:  I would have done it myself if I had known
10    he hadn't.
11              THE COURT:  I wanted to be able to pull these up
12    easily, but it's Exhibit 3.
13              MR. GRAY:  That's right, Your Honor.
14              THE COURT:  So it's 229-3.  I just have to find it in
15    the pile.  Okay, I have it.
16              MR. GRAY:  Yeah.  And it begins with this --
17              THE COURT:  It's called Atlantic Data Forensics.
18              MR. GRAY:  Atlanta Data Forensics.
19              And so as you can see there right at the top, this is
20    on the very first page, you can see the company's header up
21    there.  This report was issued by a company that was retained by
22    the Defendant in her capacity as CEO of Infotek, and a sole
23    owner of Infotek, to look into Mr. Preston's 42-minute intrusion
24    on the evening of July the 19th, 2017.
25              So this is a report that they produced which says that
```

1  his -- they've determined that his cell phone was used to gain

2  unauthorized access and that he did various things.  And they

3  say, for example, down here, paragraph 5 over that -- they say

4  40-minute period, that they were able to determine that he

5  accessed the records of nine different employees and then they

6  list who those were.  Various individuals, one of the nine was

7  Jacky Kimmel.

8          THE COURT:  Can I ask you, just to clarify though.

9  What I'm not clear about is something that Mr. Ahlers indicated

10 when the Court was asking him about why he didn't have an

11 expert, was this date, if you know, a date provided by ITK?  I

12 didn't have the impression that Atlantic Data Forensics, Inc.,

13 did a global search.  So my understanding is they did a search

14 for this date and this is what they found, but that doesn't rule

15 out that there were other days that there could have been

16 entries by Mr. Preston.

17          MR. GRAY:  Sure, Your Honor.

18          THE COURT:  I don't know the answer to the question I

19 just asked, I was wondering if you know.

20          MR. GRAY:  Your Honor, I can assure you after having

21 been involved in this case since roughly February of 2018, I

22 know all of this pretty well.

23          When Mr. Preston made that intrusion, as you've seen,

24 it was made from about 10:02 to 10:42 p.m. on the night of July

25 the 19th.  Within a day or two some of these employees, whose

1   names you see on this page in front of you right now, began

2   coming to Ms. McComber and saying, I don't know what's going on

3   here but I just discovered that, like, my paid time off has been

4   increased.  And you've got to say God, what a great bunch of

5   employees, that they would see something like that happening and

6   the first thing they do is go to the boss and say hey, somebody

7   seems to be giving me more time than I should have; more time

8   off than I should have.

9           And so the intrusion was discovered practically

10  immediately.  Like on July the 20th, or certainly July the 21st,

11  and it was determined to investigate it almost immediately.

12          And if you look at my -- let me now get my chart.  As

13  you see, what I did here, Your Honor, was --

14          THE COURT:  Could you give me an ECF site, please?  Is

15  that -- this is in ECF 229?

16          MR. GRAY:  That's the one that was filed yesterday.

17          THE COURT:  Okay.

18          MR. GRAY:  Yeah.  It's a little harder to tell maybe

19  on the projector, but I think you can still see it.

20  What I did was I took Mr. Ahlers' chart from his rebuttal

21  memorandum.  His text is always in black.  My corrections and

22  additions and amendments are in red.  And so I note there,

23  that's the first -- that's -- he gave sort of a broad range and

24  suggested there were multiple intrusions in which things were

25  altered, although he really doesn't have evidence of that as to

 1   her actual time sheets.

 2          And so -- if you see there at the top, in this main

 3   paragraph here, that central one, that's what he acknowledged.

 4   That -- and for one thing, Mr. Ahlers suggests that Mr. Preston

 5   was so angry and determined to raise havoc and all of this, and

 6   that's why we know that he must have been doing this for months,

 7   but, in fact, there was a very concrete triggering event for

 8   that intrusion, which was the fact that after Mr. Preston

 9   resigned from Infotek voluntarily in March, although he had a

10   lot of misgivings about things going on there, with good reason.

11   His wife continued to work for Infotek for another three months

12   until Ms. McComber abruptly fired her at the very end of June

13   2017.  That was just a couple of days before the Preston family

14   was going to be departing on their summer vacation for Myrtle

15   Beach.

16          So for one thing, it's kind of disturbing for someone

17   to learn that they've been fired right on the eve of their

18   vacation.  Also, apparently originally, the firing was handled

19   in a way that meant that the Preston family no longer had any

20   health insurance as they were about to depart on vacation.

21   Fortunately somebody else on the Infotek staff apparently

22   corrected that.

23          THE COURT:  The bottom line though is, am I

24   understanding that correctly, that Preston made entries on other

25   dates, but the only date to the Government's knowledge that he

1    altered anything was July 19 of 2017?

2         MR. GRAY:  That's correct, with one sort of limited

3    caveat to that, which was that he also testified that Ms.

4    Kimmel's ex-husband Robert, who was continuing to work for

5    Infotek as a subcontractor, had difficulty entering his time as

6    a subcontractor on the other Silent Roar contract.  And so

7    Mr. Kimmel gave him his entry information so that he could go

8    in, I believe -- yeah, that was it -- go in and make -- if there

9    needed to be corrections or anything changed on Mr. Kimmel's

10   time on the Silent Roar, he would do that.

11        THE COURT:  Is that while Mr. Preston was still

12   employee or afterwards?

13        MR. GRAY:  I believe it was both.  I believe -- it was

14   something he continued to do as a favor for Mr. Kimmel after he

15   left the company in March.  But those should be reflected as

16   entries that were made using Mr. Kimmel's credentials, I

17   believe.  So they can really be put to one side.

18        So in the central paragraph there you have exactly

19   what Preston has acknowledged that he did.  He said he did some

20   stupid things; I gave people paid time off and transposed rates

21   on a few contracts to be a nuisance.  He says, I viewed time

22   cards, I didn't printout data.

23        And as I indicate there in the next paragraph, based

24   on the ADF report, and Preston's own admissions, the only

25   currently confirmed date on which Preston intruded into the

1    Unanet system and made changes --

2            THE COURT:  Can you be sure to use the microphone, Mr.

3    Gray?  Sometimes I have trouble hearing you.

4            MR. GRAY:  I'll move it over closer.

5            The only confirmed date, based on Preston's admissions

6    of the ADF report that he changed anything was July the 19th,

7    2017.

8            And, of course, because of the exhaustive report that

9    ADF did on that occasion, we know what he changed.  We know what

10   he did, and none of it was her time.  At least not that's

11   reflected in the ADF report.  And on top of that, of course, by

12   that stage of the game there were only a couple of billings

13   still to come.  And so even if he had changed something for her

14   time for June, you know, they could have looked into that,

15   corrected it before the -- well, not before June, but before --

16   if he had done anything for July they could have changed it

17   before the July bill went out.  And, of course, after that they

18   were alert to it, for the next couple of bills there shouldn't

19   have been an issue either.

20           Moreover, of course, as the program manager it was

21   always her responsibility to review everyone's time, including

22   her own, on the bill before it went out.  And so we've got

23   Mr. Ahlers here essentially saying that she never picked up that

24   her time was being changed for, lord knows how long, although

25   we're going to come to that in a moment and see that actually

```
 1  Mr. Ahlers has been strikingly inconsistent on that score.

 2          So yeah, so let me just see if I can quickly move

 3  through this because this really should be fairly --

 4          THE COURT:  But ADF was only asked to look at one day;

 5  is that true?

 6          MR. GRAY:  Yes, that appears to be true.

 7          And I guess what Mr. Ahlers was indicating at the

 8  closing moments of his argument a little while ago, was that

 9  they charge like 50 to a hundred thousand dollars even to do the

10  review of a single day, and so it was just not feasible for them

11  to have them check other days as well.

12          But, of course, if what Mr. Ahlers is saying about the

13  run logs, if he believes, for example, that there's evidence

14  that Mr. -- just from looking at the run logs, any lay person

15  could do it, that Mr. Preston went in on the evening of April

16  the 10th, that seems like a fairly discrete and specific thing

17  that you might ask Mr. -- you might ask ADF to do.  Is look at

18  this stuff for like a couple hours on the evening of April the

19  10th and tell us what happened here, tell us where this came

20  from, tell us who did this.  And I'm going to come back to some

21  of the implausibilities of that argument in a moment.

22          So at any rate, they knew as of July the 19th -- July

23  20th or 21st of 2017 that there had been this intrusion.  They

24  set to work investigating it almost immediately, one could see

25  why they would.  They determined that it had come from a
```

1  particular cell phone, but without getting information from

2  Verizon they couldn't determine whose cell phone it was.

3         So they filed a John Doe civil litigation in Anne

4  Arundel County Circuit Court in the fall of 2017 to compel

5  Verizon to disclose who was the owner and holder, the assigned

6  person for the phone number that had been used in the intrusion.

7  And based on that they determined that it was Mr. -- that it was

8  Mr. Preston.  And so in -- and I actually forgot and left this

9  off the chart, you see I put it in by hand there.

10        May of 2018, they filed a lawsuit against Preston.

11 And it was about two months before that that Preston made -- he

12 was interviewed as part of the NSA's investigation, and he lied

13 under oath and --

14        THE COURT:  When was the suit you said against Verizon

15 to disclose --

16        MR. GRAY:  It wasn't a suit against Verizon, it was a

17 John Doe complaint which gave them the opening to use discovery

18 so they could serve a discovery demand on Verizon and find out

19 from Verizon whose cell phone it was.

20        THE COURT:  Okay.  Filed a John Doe complaint to

21 compel Verizon to disclose the identity of the cell phone?

22        MR. GRAY:  The cell phone owner.

23        THE COURT:  Cell phone owner.

24        MR. GRAY:  Right.  And after that it was never --

25 Verizon was not being charged with any wrongdoing --

```
 1              THE COURT:  No, I understand, but --

 2              MR. GRAY:  -- it was just means to get discovery of

 3    the device.

 4              THE COURT:  When was that done?

 5              MR. GRAY:  That was done in the fall; perhaps as early

 6    as August or September, I believe certainly no later than

 7    October of 2017.  So that is when they -- I'm pretty darn sure

 8    that is when they did that.  Certainly it was in the fall of

 9    2017.  I see Mr. Ahlers is shaking his head, but we'll see about

10    that.

11              Because it was seven or eight months before they filed

12    a civil complaint in this court, in May of 2018, which accused

13    Preston of having part of a conspiracy to, like, steal

14    confidential business information from Infotek and also had

15    mentioned that he did these alterations.

16              THE COURT:  And when -- with respect to the John Doe

17    complaint, we know that that's how they learned --

18              MR. GRAY:  Yes.

19              THE COURT:  -- who the --

20              MR. GRAY:  That's how they learned it was Preston's

21    cell phone, and they knew that pretty early on.  And that's what

22    became the basis for filing the civil complaint in this court in

23    May of 2018.  As I say, I forgot to include it in my chart but I

24    have certainly noted it there.

25              Interestingly enough, when he gave false answers to
```

1  the Government in March of 2018, among the other false answers

2  that Mr. Preston gave in an attempt to avoid getting involved,

3  was he told the Government that he didn't have -- he didn't have

4  anything more than vague suspicion of anything untoward that Ms.

5  McComber had done at Infotek.  When, in fact, his knowledge went

6  considerably further than that of her activities.

7          So in about six months after they started the civil

8  action, and it was originally being handled by the Offit Kurman

9  firm up here, but at some point they brought Jan Miller in, I

10  think maybe initially to be criminal counsel for Ms. McComber,

11  but he effectively wound up acting in the civil case as well.

12  And one of the principal ways he did that, was in November of

13  2018 -- I mean, by that time they had the -- the report from ADF

14  is dated about three days later, but it's clear that they knew

15  the information, they had the report.  The whole purpose of

16  taking Mr. Preston's deposition in November of 2018 was to first

17  have him deny that he was the person responsible for the

18  intrusion back in July of 2017, and then to confront him with

19  the ADF information demonstrating that he had done it and

20  hopefully extract a confession.  So that's what was done by

21  Mr. Miller who was then acting jointly as her criminal and also,

22  at least partly, as her civil counsel in November of 2018.

23          And Mr. Preston, when confronted with the ADF report,

24  continued to deny that he was responsible for it.  And then

25  within a very short time after that, and I note that, he denied

1  that he was the one accessing the records.  In spite of the fact

2  that -- I mean, Mr. Miller brought the ADF document out towards

3  the end of the deposition and said -- give Mr. Miller credit for

4  being really fair, but also, he was trying to get a confession.

5  Look at this, this is what it shows, it shows you were the one.

6  So the defense knew all about that back in November of 2018.

7          I think I had a phone call from Mr. Miller about that

8  in early December of 2018, he then asked for a meeting.  And

9  when he came in for the meeting, he came in not only himself but

10  he actually brought Ryan Dijkstra who is the head and the author

11  of ADF report in with us and brought in these run logs so that

12  we could go over them and ask questions about them.

13          And by the way, Your Honor, I realized sort of -- I

14  was trying really hard to find a somewhat more legible version

15  of red logs from the ADF report.  When I filed the surreply

16  brief, I did ultimately find a more legible one, and that's what

17  I've handed up as Government Exhibit 1 for the purpose of this

18  hearing.  If you look at that it's much more readable than what

19  I previously was able to attach to either of the current

20  filings.

21          THE COURT:  Is this -- are you saying your Exhibit 1

22  is the same as what I was looking at earlier from Mr. Ahlers,

23  because they don't look the same?

24          MR. GRAY:  Yeah.  Well, what you're looking at from

25  him was a lot of stuff that goes back to April of 20 -- it's

 1    from April of 2017.  This all relates to the July 19th, 2017,

 2    intrusion.  Government's Exhibit --

 3            THE COURT:  Okay.

 4            MR. GRAY:  -- for the purposes of this hearing 1.  And

 5    as you can see there -- I mean, you can see it, it sort of -- it

 6    marks when it all started at 10:02.  And that was actually one

 7    of the main things that we asked, one of the reasons why we used

 8    this exhibit in the grand jury to show to Mr. Preston two years

 9    later, was to establish how long did the intrusion last?  And

10    then we relied on ADF's own report to establish what the

11    intrusion involved, whose records were changed, what was the

12    nature of the changes.

13            And I might as well address this right now.  I need

14    the surreply exhibits.  I'm sorry, Your Honor.  Court's

15    indulgence for just a moment.  I need to find exhibits.

16            Well, at any rate, Your Honor, I'm having difficulty

17    finding it right now.  Maybe Mr. Cooch will be able to find it,

18    and Your Honor may be able to find it first because it was

19    attached as an exhibit to the surreply.  And it is the grand

20    jury excerpts from Mr. Preston's testimony.

21            And what he says there, and this is also quoted in our

22    surreply brief, he's shown these run logs and he says -- he's

23    asked if he can recognize what those are.  And this is what

24    Mr. Preston, the Unanet administrator, whose knowledge of Unanet

25    run logs has been so touted here today.

1        But Mr. Ahlers says, he says?  That looks more like a

2   computer printout of some type of logins or talking with

3   forensics -- I'm sure he talked with some forensics people by

4   then because it had been an issue in his civil case for more

5   than a year at that point.  And so here he's relying on what

6   he's been told by forensic, consultants, I guess, in connection

7   with this defense.

8        It looks like every time you move around in software,

9   if you go to a labor category, like I talked about earlier, or

10  if you go to a person or you go anywhere it will record that

11  click of the mouse.

12       And as a matter of fact, as my footnote number one

13  down there notes, I expressly noted at the beginning of that

14  interchange, when I first showed him those records that, you

15  know, this is a document that was provided to us by counsel for

16  Infotek and quote, It's not something that you know about.  And

17  he didn't dispute that, and his subsequent answers make it

18  pretty clear that that was exactly correct.

19       So, just trying to move through this.  So these are

20  the run logs themselves for the date of the intrusion.  They

21  show the date of the intrusion.  But as you can tell, I mean,

22  even looking at this stuff, a nonexpert cannot tell what is

23  going on at any particular time there.  You know, and something

24  else is, the appearance of these logs, as Your Honor's question

25  earlier reflects, is somewhat different from the opinion of --

1    from the appearance of the April 2017 run logs that Mr. Ahlers
2    was showing you later on.  Maybe because some of it's -- this is
3    generated by ADF, the stuff that you see here.  The other stuff
4    was maybe generated straight from Infotek's own computer system.
5    But at any rate, run logs can look different, they don't
6    necessarily always appear in the same format.

7            So Mr. Miller came in and made the pitch to us in
8    January of 2019 that we've been able to demonstrate that Preston
9    intruded into the system in July of 2019.  So, it's possible
10   that he intruded on other occasions.  And, you know, and
11   basically sort of the theory that's been presented is,
12   originally -- it keeps changing -- was that he had gone in and
13   he had jacked up her hours and then he sent in the whistleblower
14   letter, you know, alerting the NSA to this.  And he did all that
15   to cause her problems with the NSA, to cause her to lose -- I
16   think Mr. Ahlers repeated that allegation today, or at least he
17   suggested that it had that effect, that it would cause her to
18   lose the renewal or the re-compete -- the re-compete, the new
19   Ironbridge II contract that was being looked -- bid upon in the
20   late -- in the summer of 2017.

21           So in light of the information that Mr. Miller, her
22   attorney, had himself developed in November of 2018, we have
23   always taken it for granted from that time to this, that this
24   issue about Preston's intrusion in July of 2017 was gonna be an
25   issue, that claims would be advanced as part of her defense.

 1    And who knows, he may have intruded on other occasions; perhaps

 2    he altered her record in other times in other ways.

 3            So the idea that we were, like, hiding this from Mr.

 4    Ahlers is, just frankly -- that's a word I use much more in this

 5    case than in most of my cases, absurd.  It's nonsense.

 6            And we actually, as my schedule here reflects, we

 7    pretty much decided the Preston thing, we're gonna have to sort

 8    of put him to one side and --

 9            THE COURT:  You're going to have to what?

10            MR. GRAY:  We're going to have to put his issues to

11    one side, do what else we need to do in this investigation, and

12    then figure out what we're going to do about what Preston did.

13    And so that's what led to the meetings with him in the fall of

14    2019.  Actually, very late fall of 2019, and to his testimony in

15    the grand jury in December where he admitted that he had done

16    the limited -- these limited things in terms of increasing paid

17    time off balance.  But as you see in his grand jury testimony

18    there --

19            THE COURT:  Counsel, I'm just going to take a minute

20    to go get a drink.

21            MR. GRAY:  Okay, sure.

22            THE COURT:  Give me one second.

23            THE CLERK:  All rise.

24        (Recess 12:21 p.m.)

25            THE CLERK:  All rise.

```
 1              THE COURT:  Sorry for that.  Okay.

 2              MR. GRAY:  Your Honor, I must apologize that you roped

 3    me in, and when I saw you depart to get thing of water, because

 4    I've had some recent throat surgery, I've got a throat lozenge

 5    in my mouth, so you may hear that occasionally.

 6              THE COURT:  I think what caused the coughing attack

 7    was that I was sucking on a lozenge, and that made it worse.

 8              MR. GRAY:  All right.  So just Court's indulgence on

 9    that point.

10              At any rate, so the defense -- I mean, it was

11    essential to the defense in the criminal case, and also it was

12    sort of a part of their action in the civil case in the very

13    beginning to focus on this whole thing about Preston's

14    intrusions.

15              Interestingly, the civil complaint doesn't actually

16    appear to -- well, whatever.  To serve expressly out this theory

17    that Preston was the whistleblower.  That first he set it all up

18    by like altering these records, and then he was the

19    whistleblower who exposed it and -- in order to get her in

20    trouble with the NSA.  And he's denied that he was the

21    whistleblower.  We believe that he was not the whistleblower.

22    And, you know, that is something I'm sure is going to be coming

23    out in the case when it goes to trial.

24              What else here in terms of the schedule.

25              I mean, Mr. Ahlers, I read at his -- him seeming to
```

1   say that we have not disclosed Preston's perjury prior to the

2   production of the -- of his grand jury testimony on December the

3   23rd.  And it seems really, perhaps what he was trying to say,

4   was that we had not compelled him in a sufficiently timely way

5   to file his errata sheet in the civil case.  But if you actually

6   look at our -- at the grand jury testimony, that was the

7   agreement that was outlined.  You know, we've agreed we're not

8   going to prosecute you, but you're going to admit to your

9   criminal conduct, you're going to file admissions of that in the

10  criminal case.  You're not only going to have a non-prosecution

11  agreement, you are going to enter into a statement of facts in

12  which you lay out all of the various crimes that you've

13  committed, because were not happy when somebody comes in and

14  lies to the Government like he did in March of 2018, even

15  though, for the most part, he exculpated Ms. McComber rather

16  than inculpated her.  And we were aware of the further perjury

17  in the civil case in November of 2018.  So he was required to

18  correct all that.

19          This all, again, taking place amidst the course of the

20  pandemic when things were significantly disordered; grand juries

21  were not even sitting in this district at times.  So that

22  certainly slowed things down, but there's never been any

23  question that he was going to have to set that right in the

24  civil case in front of Judge Blake, and that was fundamental to

25  the agreement we made and it was reflected in the documents that

```
 1    we've attached to the surreply which are very express, very

 2    lengthy.

 3              Mr. Ahlers, you know, likes to point out, it

 4    identifies 17 different times in that civil November 2018

 5    deposition that he lied.  Yep, it does.  And defense counsel,

 6    maybe not Mr. Ahlers but his predecessor, as criminal counsel

 7    and as civil counsel Mr. Miller, had been aware of that since

 8    November of 2018.  And I cannot believe that Ms. McComber hasn't

 9    been aware of that since November of 2018.

10              Mr. Ahlers then -- well, I'm going to get to that in a

11    moment, the Unanet time cards.  Let me make sure there's nothing

12    else here that I need to go into about that.

13              So that's the bottom line on that part of what we've

14    been discussing, which is far and away from the most significant

15    thing to discuss here.

16              Ah, I had them.  I had the grand jury testimony.

17    Yeah, Exhibit 6 to our surreply is the non-prosecution

18    agreement, the statement of facts, the errata sheet submitted by

19    him in connection with his false testimony in the civil --

20              THE COURT:  That's 229-6; is that right, ECF?

21              MR. GRAY:  I believe so, yes.

22              And I determined from Mr. Preston's counsel, criminal

23    counsel, that the errata sheet was filed like on July the 30th

24    of 2021.  So that was last summer.  And obviously one of the

25    things we contemplated as part of the resolution with
```

1   Mr. Preston was that he was going to have to be deposed again.

2   And he made himself -- he was summoned to a deposition and

3   appeared and testified.  And they went at him for 300 pages,

4   with Mr. Ahlers present sitting there actually with Ms. McComber

5   too, back in December 17th, I think, of 2021.  So more than a

6   year ago.

7             Okay.  Let's try and get to some of the stuff that's

8   more directly pertinent to the motion that the defense has

9   actually filed.

10            Let's start off with, as Your Honor noted, there's

11  several different types of documents here.  And Exhibit 2 was

12  what we've referred to as the ITK time sheets or time cards for

13  program managers on the Ironbridge contract produced by defense

14  counsel to the Government on September the 1st, 2020, during the

15  investigation.  And this goes back to what we were talking about

16  a moment ago.

17            THE COURT:  Sorry to be difficult, Mr. Gray, but

18  there's so many exhibits now.  You've given me one exhibit for

19  today that says Government's Exhibit.  Are you talking about an

20  attachment to one of your earlier submissions?

21            MR. GRAY:  Yes, exactly.

22            THE COURT:  And we have a lot of those, too.  So if

23  you could tell me an ECF number.

24            MR. GRAY:  I think that this is the -- this is for the

25  original Government's opposition filed on December the 31st.

```
1    And I believe that is --
2              THE COURT:  Okay.  That's ECF 214.
3              MR. GRAY:  Okay.  Good.  214.  Yeah.
4              So these are these -- these are these time sheets.
5    And originally -- originally, when I attached these to a letter
6    I sent to the Court, after we got the original filing here
7    saying these look nothing like the run logs which are what the
8    Crews testimony was supposed to be about.  These are completely
9    different.  These are something that any lay person can look at
10   these and determine immediately what they mean, what they say.
11   What information is being recorded here?
12             And Mr. Ahlers then chose, almost immediately, to send
13   a letter in which he fenced about that and said, well, these
14   were actually drawn -- these were taken from the system by my
15   investigative team and they are our work product and the
16   Government's certainly not going to be able to rely on these as
17   business records at trial.  And that position, that lasted about
18   a week.
19             And then when he filed his rebuttal brief, well then,
20   he told us like -- and I suspected already, it's pretty clear
21   when you look at these, the real story of how these records were
22   produced.  They were taken straight off Infotek's Unanet time
23   system.  They consist of screenshots of -- as Mr. Ahlers'
24   admitted here today -- they were taken by the defendant's now
25   husband, Shawn McComber who's also a Unanet administrator.  And
```

1    then were, you know, put together for these different periods.

2          And I indicated that I didn't expect the defense was

3    likely to be coming in and telling us that there were any

4    records, any numbers, or anything else that they had altered in

5    this records, and Mr. Ahlers again confirmed today that the

6    answer to that is no, he's not saying that.  He's saying that

7    these are photographs that were then transmitted to Microsoft

8    Word, then into PDFs in order to be produced.

9          I see he's shaking his head.  If there is -- you know,

10   if there is something that they've changed that we need to know

11   about to sort of reflect, then by all means let's hear it, but I

12   thought he reaffirmed that again earlier today.

13         You'll note these records have something called an

14   approval history.

15              THE COURT:  Something called what?

16              MR. GRAY:  An approval history.

17              THE COURT:  Uh-huh.

18              MR. GRAY:  It reflects who went in and who made

19   changes at particular times.  Gosh, that could be interesting.

20         This is an early one for an earlier program manager,

21   but if you look down towards the bottom there --

22              THE COURT:  Well, can you tell me what page?

23              MR. GRAY:  It's actually part of one of Mr. Ahlers'

24   exhibits.  It's part of one of the -- it's his exhibit for the

25   time sheets that he's given us today.

1    The key thing is the date to be able to identify it.

2  It's a time sheet for Al Peterman back in 2011.  And as you'll

3  see here, it gives you an audit trail, time changes.  And

4  actually, Mr. Ahlers has referenced this in some of his records.

5  He says that this shows that Preston knew how to make time

6  changes inside the records.  Of course.  Of course he did,

7  because if someone came to him and said I screwed up my time

8  entry, it needs to be changed, you can make changes like this,

9  and it leaves an audit trail if you make changes like this.

10    So one question that might be asked is if it leaves an

11  audit trail right on the screen, and if you think Mr. Preston

12  has changed a bunch of other dates, then maybe you should just

13  page through these things, which after all, you created and

14  produced, and identify any times when it looks like after

15  Preston left someone entered and altered her time.

16    If that's not easy to do, then perhaps an expert could

17  explain why that's not easy to do, but that would seem like

18  something you could do with these documents as long as you admit

19  that they're authentic and we all agree they should be

20  considered by the jury.

21    The -- you may have to help me with this, Peter,

22  because I'm getting a little -- I have a lot of documents around

23  me here.

24    The example from April that Mr. Ahlers showed you, and

25  this must be stressed, the original defense theory was evil

 1    Dwayne Preston came in and inflated her time wildly in order to

 2    get her in trouble with the NSA.  And by the way, she was the

 3    program manager on the contract and was approving all of the

 4    time entries, and never occurred to her that her time was being

 5    inflated, that maybe it should be adjusted before Preston had

 6    sent the bills off to the NSA.

 7              So, the example of alterations that he talked about,

 8    was he noted that the April 2017 invoice only listed 120 hours

 9    for her, but her -- this time we have --

10              Actually, can I turn the podium over to Mr. Cooch for

11    just a moment --

12              THE COURT:  Sure.

13              MR. GRAY:  -- and he can run through this part with

14    you?

15              MR. COOCH:  Thank you, Your Honor.  This is Peter

16    Cooch for the United States.

17              As you see on this example of the invoice, Your Honor,

18    there are 120 hours listed on the invoices associated with Jacky

19    Kimmel.  Early on in the investigation, Your Honor, Lori

20    Hazenstab at the Office of the Inspector General, requested from

21    Craig Plunkett, who was the VP of contracts at ITK, Ms. Kimmel's

22    time records.  At that time, back in 2017, Mr. Plunkett provided

23    Unanet people time details records.

24              Your Honor, and you'll see this example on the screen

25    which I will say does not include the April 2017 data.  This

 1   example is at ECF 209-1.  You can see here that the hours billed

 2   to a particular labor category, in this instance you can see the

 3   example, Debbie Fisher, billable to Ironbridge, the hours billed

 4   are associated with particular dates.

 5           And if you look at the Unanet people time detail

 6   sheets that Craig Plunkett provided to the Government back in

 7   2017, and if you'd look at the records for April of 2017

 8   associated with the Defendant, you will see that those entries

 9   that tie particular hours to particular dates, sum up to 120

10   hours.  So the records that Mr. Plunkett provided to the

11   Government back in 2017 sum up to the same number of hours that

12   appeared on the invoice.

13           THE COURT:  Meaning what?

14           MR. COOCH:  Meaning that the amount of time -- the

15   amount of hours that Infotek provided to the IG's office was

16   consistent with what the invoiced amount was.

17           Now, these particular -- the bi-weekly time sheets,

18   Your Honor, for April of 2017, if you add up the hours for April

19   of 2017 it's greater than 120 hours; it's something like

20   approximately 150 hours.

21           THE COURT:  And that came from what again?

22           MR. COOCH:  This came from the Defendant's husband,

23   Shawn McComber.  As Mr. Ahlers explained, he later in time took

24   screenshots of the Unanet system of these particular reports

25   that he generated.

```
 1              THE COURT:  And I guess what I was asking is, is that
 2    -- just to keep the labels straight.
 3              MR. COOCH:  Yes.
 4              THE COURT:  Is that the --
 5              MR. COOCH:  These are the bi-weekly time sheets.
 6              THE COURT:  That's what it's called, screenshots of
 7    the bi-weekly time sheets?
 8              MR. COOCH:  Yes, Your Honor.
 9              THE COURT:  That's different than the people detail?
10              MR. COOCH:  The people time details charts are a
11    different extract from Unanet.
12              THE COURT:  Okay.  So this is different --
13              MR. COOCH:  It's different type of time.
14              THE COURT:  -- screenshots of the biweekly time
15    records.
16              MR. COOCH:  Correct, Your Honor.  The people time
17    details is a chart of data extracted from Unanet that shows by
18    date, by labor category the number of hours billed.  Just a
19    different way to extract the data from the database.
20              MR. GRAY:  Well, Your Honor, let me clarify that if I
21    can.  The time details are focused expressly on the Ironbridge
22    contract.  So they show -- an individual time detail will show
23    the time for, say, April 2017, April 2017 for every one of the
24    15 or 16 Infotek employees and contractors who worked on the
25    contract.  Whereas the bi-weekly time sheets are just for a
```

 1  particular individual, such as Ms. McComber, that's what those
 2  are.  And I think actually --
 3              THE COURT:  Okay.  Thank you.
 4              MR. COOCH:  So Your Honor, if you look at the
 5  bi-weekly time sheets and you sum up the hours for April of
 6  2017, you get to a number that's greater than 120 which suggests
 7  that at the time --
 8              MR. GRAY:  Let's just take it through there.  So
 9  you've got the -- so the first sheet there shows that she --
10  that her time records reflect 32 hours there in the first week
11  of April 2017.  Her next bi-weekly time sheet reflects that she
12  worked full-time both of those middle weeks in April of 2017, so
13  that would be 32 hours plus 40 and plus 40, including eight
14  hours on April the 10th.  And then the final record shows that
15  in the last part of April she billed another 40 hours.  So that
16  comes out to 152 hours.  So the bill that was submitted,
17  however, on April the 17th puts her hours at 120.
18              So the defense has been claiming -- or they were
19  claiming for a long time that Mr. Preston went in and doctored
20  her hours to inflate them.  You see here that there's a
21  discrepancy, but the hours actually billed to the NSA were less
22  than what you might have expected from her own time records.
23  And that's inconsistent with the theory that he was inflating
24  the records to make her look bad.  And that may be why they're
25  now sort of coming around to this new theory that, well, he

 1   would go in and actually there was no overall change in the

 2   number of hours that were reported to the NSA, he just shifted

 3   stuff onto different days when she wasn't there to make her look

 4   bad for supposedly having billed on different days when she

 5   wasn't there.

 6            Well, but if there's no overall change to the hours

 7   that were billed to the NSA, then presumably he must have been

 8   deducting time from those other days to make it all match.  And

 9   then next --

10            THE COURT:  Well, what's the explanation for why the

11   time -- bi-weekly time records show 152 hours but she billed

12   120?

13            MR. GRAY:  We think it's because she was actually on

14   vacation for part of that time and maybe somebody at Infotek

15   caught that and discovered that she billed while she was on

16   vacation and decided to delete that time before the bill went

17   in.  That's our theory at least at this point.  We're working on

18   that, but that's what we think probably happened.

19            And you'll also notice that there's no record of

20   changes in here in her time.  And indeed, these were not

21   changed.  So one would think, hey, if Mr. Preston was in there,

22   whatever guise, whether he was in there as the Defendant

23   herself, whether he was in there as Jamie Preston, you would

24   think that there would be an audit log, an audit trail of the

25   changes.

1          Here's the one that covers April the 10th, there's no
2    audit trail there.  Nothing like that.  Nothing like that here
3    either.  Takes us through the end of April.  So there's actually
4    nothing in these, at any rate, to back up the defense's claim
5    that --
6          THE COURT:  There were discrepancies.
7          MR. GRAY:  There is -- there is one discrepancy, but
8    the discrepancy is between the hours shown on her time sheets
9    and what was ultimately billed at the end of the month to the
10   NSA.  And so far, at least, that's the only one of these that
11   we've been able to identify.  Which makes it interesting but
12   that's the only one we're able to identify.
13          And Ms. Preston -- I mean Ms. McComber has always
14   claimed that she -- and she claimed this in her original NSA
15   investigation questioning, that she entered her time daily.
16   Always entered it daily.  And that's what the employee manual
17   for Infotek requires people to do is to enter their time daily.
18          The -- so, bottom line is, the bi-weekly time sheet
19   records, I believe this is going to change, unless he's going to
20   say something different in a moment or two, it seems those were
21   drawn, according to what Mr. Ahlers has now given us, they were
22   drawn straight out of the system.  They were transferred from
23   screenshots to Microsoft Word to PDFs.  They were presented by
24   the defense to us in September of 2020, as something that could
25   be used to compare her hours with the hours of other program

1    managers before her.

2            Mr. Ahlers' claim is that he delivered those in hand,

3    in-person and warned me orally that they may be -- they may have

4    these inaccuracies in them.

5            MR. AHLERS:  No.

6            MR. GRAY:  Maybe he did.  His billing records might

7    reflect it, we don't keep billing records the same way.  I --

8    from what I've seen, it looks to me like it came to me by mail

9    and I was not able to look at it the for sometime.  I found some

10   emails back and forth between him and me about that.  But, you

11   know, we didn't -- we were -- by that point, let's see, that was

12   September of 2020.  So that was a year and a half after her

13   prior counsel, Mr. Miller, came to me and said, we've been able

14   to prove that Preston changed some things, not her time records

15   but some other things on July the 19th, 2017.  So we think it's

16   possible that he did it at other times as well.

17           So, okay, I've been aware of that for a year and a

18   half at that point.  So I didn't really need Mr. Ahlers to,

19   like, give me some great revolution -- revelation in September

20   of 2020 that the defense was going to make an issue about time

21   records.

22           THE COURT:  But I guess my question is, so from your

23   perspective what do you acknowledge was tampered with?

24           MR. GRAY:  The specific items that were identified by

25   the ADF report and that had been admitted by Mr. Preston with

 1    regard to July 19, 2017.

 2             THE COURT:  So that's it.  Whatever the ADF report

 3    says.

 4             MR. GRAY:  That's -- that's the only thing that we

 5    think has been definitively shown.  I mean, if he's got

 6    cross-examination, if he's got documents.  If he had wanted to

 7    bring in additional expert witnesses or get ADF to look at some

 8    other things, like this April 10th, 2017 date, he's had a couple

 9    years to do that by this point.

10             And bear in mind, it was because we knew all that,

11    that that's why I began pressing in the summer of 2021, you've

12    certainly given me every reason to believe you're going to have

13    expert witnesses in this case.  You know, we don't think there's

14    anything here that calls for experts, but if you've got some

15    then we may have to get our own in response so we need your

16    expert witness designations.  And, of course, it only took

17    another seven months to get those, and then Your Honor knows the

18    chaos that we've been dealing with ever since.

19             And so here we are, and we're a couple weeks before

20    trial, and we absolutely -- we stand by the idea that you cannot

21    bring in those run logs.

22             These things, the other things he showed you from

23    earlier today, you can't -- you can't interpret that without the

24    use of an expert witness.  And --

25             THE COURT:  So let's go to the basic question.  With

1    the tampering that took place, albeit from your perspective on

2    one day, how does that impact the analysis of trustworthiness?

3           MR. GRAY:  Well, the short answer, Your Honor, let's

4    get to one of the cases the defense actually cited, which

5    touches on that, and then we'll look at how we discussed it in

6    our brief.

7           One of the cases they cited was Third Circuit Court of

8    Appeals, 124 F.3d 449, *Securities and Exchange Commission vs.*

9    *Hughes Capital Corp.*

10          In that case the defendants had tried to introduce

11   some records and they wanted to -- they wanted to introduce some

12   check stubs that they claimed would establish that distribution

13   of the proceeds from the alleged security's fraud, and the

14   district court denied it.  And here, as the Third Circuit points

15   out, the defendant admitted the check stubs were altered before

16   photocopying.  Okay, so we got the defendant's own admission

17   that they're altered.  Then defendants nevertheless assert that

18   these alterations don't matter, that there's some way to check

19   it.  However, the defendant himself testified he cannot remember

20   what the information was that was on the stubs that was changed

21   prior to photocopying.

22          Well, the defendant says the canceled checks

23   themselves will bear out the accuracy of these stubs.  The

24   canceled checks, however, could not be -- could not be located

25   in response to requests for them in discovery.  And thus, the

```
 1    defendants cannot rely on missing evidence to support the

 2    authenticity of photocopies of admittedly altered check stubs.

 3              So this is specific admissions that someone altered

 4    exactly the evidence that is at issue here, but isn't able to

 5    conclusively say -- wasn't able to conclusively say how they

 6    altered them or, you know, what the amounts -- what the amounts

 7    were.

 8              There is no similar evidence here.  What we have

 9    instead cited in our brief, there's some cases -- yeah, this was

10    in the original brief.  This begins to appear at page 32 of -- I

11    think Your Honor said it would be ECF 214.  It's our original

12    opposition brief.  So we start the case citations, as you can

13    see, there.

14              The benefit of establishing the authenticity of a

15    particular document is a like one.  And contrary to Mr. Ahlers'

16    claim that a preponderance of the evidence standard applies to

17    determinations of reliability, it's, in fact, only a prima facie

18    showing.  There simply must be a prima facie evidence that the

19    documents are what the proponent claims they are.  All that is

20    required is sufficient evidence that a jury could reasonably

21    have concluded that a document is authentic.

22              And in this context, authentic means these are the

23    records as they came out of the Unanet computer system in its

24    current state.  And if you want to argue that there may have

25    been some changes or what have you, well, the answer to that is
```

1   shown there by the case of Matador Drilling Company versus Post,
2   662 F.2d 1190.
3           Defendant's general complaint that the records are
4   incomplete and inaccurate goes to weight of the evidence and not
5   to admissibility.
6           THE COURT:  Which case is that?
7           MR. GRAY:  Matador Drilling Company.
8           THE COURT:  Okay.
9           MR. GRAY:  There's the Hathaway case right above it.
10  Yeah, Hathaway actually winds up saying that the fact that
11  records were even missing or unavailable did not support,
12  necessarily, a finding that they were not trustworthy.
13          Once again, instead, it is an argument which best goes
14  to the weight to be given the exit -- I mean the evidence.  And
15  that's a case that Mr. Ahlers cited himself earlier in the
16  argument today.
17          Next, we have the whole issue of -- and I cited this
18  in my brief.  Mr. Ahlers is now trying to tell you that although
19  he really hasn't -- he's kind of pointed at something on April
20  the 10th, but even that, like, makes no sense at all.  Because
21  he tells you, look here, you see that Jacky Kimmel's credentials
22  were used to enter the system when she was actually in Texas?
23  Okay, last time I checked it was usually possible with a cell
24  phone to access things from Texas.
25          But then immediately once Preston supposedly is in

 1   there, he then comes out and looks like Jamie Preston's trying

 2   to enter.  Well, if Preston was already in the system as Jacky

 3   Kimmel, why would he feel the need to come out and try to

 4   re-enter it again just a couple seconds later as Jamie Preston?

 5   I mean, that's just -- I mean, just facially it doesn't make any

 6   sense.  It's amazing.

 7           Next, we have the slight problem here that Mr. Ahlers'

 8   position on this has changed since February of this past year;

 9   ECF 60.  What follows is McComber's consistent position before

10   and since indictment.  McComber worked every one of the 2,603.5

11   hours billed on the Ironbridge contract except for those few

12   hours where McComber's Unanet timekeeping records were sabotaged

13   by someone.  Dwayne Preston is probably the person who sabotaged

14   the records.  So that's what he said back then.  Just a few

15   hours, that's all that's at issue here.

16           THE COURT:  Where is that from?

17           MR. GRAY:  That's from his ECF -- it originally

18   appears in his ECF 60, which was his rebuttal brief to our

19   opposition to the motion to dismiss the false statement counts.

20   It then appears at page 29 of our reply brief to this motion,

21   which I think was -- I think you said it was 214.

22           So that's it.  I mean, defense counsel himself says,

23   ah, this -- at that point he was saying these -- even assuming

24   that Preston ever did actually do something that affected her

25   timekeeping records, which ADF's work doesn't show.  Nothing at

 1   ADF's analysis of July 19th shows that he did it then, and the

 2   defense has never, like, tried to do like a little drill down on

 3   sort of any other dates, you know, at a lesser cost to see if it

 4   happened then.

 5           But then we get to Mr. Stein's take on her hours.

 6   This is four months ago.  Once again, from our reply brief, this

 7   is at page 30.  I said, didn't Mr. Ahlers suggest in one of his

 8   questions earlier today that it is your opinion that you can

 9   state to a reasonable degree of professional certainty that

10   Ms. McComber actually worked within five percent of those 2,603

11   hours?  That would be within about 130 hours over the course of

12   18 or 19 months.

13           THE COURT:  But I didn't let him -- I said he couldn't

14   testify to that.

15           MR. GRAY:  Well, indeed.  But that's what Mr. Stein

16   would say.  And so he says no, I dismissed that.  I dismissed

17   the five percent.  He says, I am confident, to a reasonable

18   degree of professional certainty, that she worked the full

19   amount, all 2,603 hours.

20           Why should we hear from Mr. Stein about anything at

21   this point?  If he could say that, and then Mr. Ahlers is now

22   claiming a few months later that those records are at some level

23   or another fraudulent or contain fraud.  I mean, it seems sort

24   of what happened here is Your Honor ruled, as Your Honor says

25   you ruled on, I think it was November the 10th, that they

1   couldn't try to do that.  They couldn't try to use Mr. Stein and

2   make this case that all 2,603 hours had been worked.  So as long

3   as he thought he could make that case, the Preston thing seemed

4   to pretty much fall out of the case.  He didn't bother to file a

5   response to our motion in limine to get Mr. Crews.

6            And then when you make that ruling, about a month

7   later a motion rolls in where they're now trying to say oh, yes,

8   we do intend to try and show that Preston altered hours, but all

9   he did was, like, shift some hours around from days when she

10  wasn't available to other days.  As he said on the phone call

11  the other day; it didn't affect the overall number of hours

12  billed.

13           As I said on the phone call the other day, this whole

14  thing is an incredible morass.  Why in the world would we want

15  to go into this morass, which could take days, when the answer

16  at the end of it is it didn't affect the overall hours.  Your

17  Honor picked up on that very quickly.  That is a question you

18  asked on the record in the call just the other day.

19           Your Honor, if -- I've spoken for nearly an hour.  If

20  you will just give me a moment to kind of look back through my

21  notes and see if there is anything else I really feel like I

22  need to cover.

23           THE COURT:  Sure.

24           MR. GRAY:  I mean, I would also note this about the

25  business records rule.  The idea of the business records rule is

 1   you show there was a process through which stuff was recorded.
 2   That's not necessarily -- I mean, you can get to levels of
 3   probably egregious and accuracy where you wouldn't accept it,
 4   that's why the final part of the rule is there.  But, you know
 5   the idea is that, in general, if something is recorded on a
 6   regular basis, pursuant to regular procedures, it will be
 7   accurately recorded even if you can't bring in the person who
 8   actually recorded it because they died, they've disappeared off
 9   to some other job, what have you.
10             There's certainly such regular procedures here.  Ms.
11   McComber herself was -- said she entered her time on a daily
12   basis.  She was responsible as the program manager for checking
13   her hours and everybody else's before each monthly bill was
14   submitted, and she never raised questions about any of this back
15   then.
16             THE COURT:  She's shaking her head no.
17             MR. GRAY:  Well --
18             THE COURT:  She's shaking her head no; she didn't say
19   that.
20             MR. GRAY:  I believe that is exactly what -- I think
21   she, in fact, did say that in her deposition with the NSA, and
22   it's consistent with what the employee manual for Infotek itself
23   indicates.  But if she didn't, well, then I guess she wasn't
24   working as hard on this contract when she was away from the NSA
25   side as it's been suggested she has.  And moreover, when

1    Mr. Ahlers says look here, it shows she was doing something at

2    midnight on April the 10th, that shows she was working on this.

3            She's the CEO of a company, a company that had like at

4    least four other contracts, one of which was about five times

5    the size of this one.  Of course she's got stuff to do at other

6    times, but that's part of our case.  That she took advantage of

7    the fact that she wasn't needed on this contract to go ahead and

8    do work on other things, to do work as CEO, to do work on other

9    contracts, and then just to keep billing the full time pretty

10   much and bringing in 20 or $22,000 every month that she wasn't

11   working.  That comes to, you know, about $150 an hour billing

12   rate that's every single minute she bills is like $2.50.

13           Let's see here.  So just a key thing.  Mr. Ahlers

14   frequently says these records have undoubtedly been corrupted.

15   The only records that have been undoubtedly corrupted are the

16   few that are addressed by the ADF audit for July 19th, 2017, and

17   for Mr. Preston's own admissions.  If -- we're not saying the

18   defendant can't cross-examine, they can't bring in whatever else

19   they want, although, you know, they should have disclosed it in

20   discovery.  But if they have, then, you know, they can ask

21   questions, but you're not going to keep those documents out

22   because of that.  You simply get to try and say that there's

23   some questions that should be given to their weight.

24           And moreover, as I've pointed out, we don't maintain

25   that any of these Unanet records, as they relate to the

1   defendant, are completely accurate and reliable.  That's the
2   whole point of this case, is to demonstrate that they weren't.
3   That is the res gestae, the thing itself.
4        I mean, this would be a very weird world if every time
5   the government introduced a record of a business to show that
6   someone had made false representations, to which I will, but the
7   government says these representation are false so that document
8   doesn't come in, you know, We move to dismiss.
9        THE COURT:  So, actually, what -- just to restate what
10  you're telling me.  Your point is that if they could -- not
11  necessarily this case, any case.  That if, for example, the
12  proof of the fraud is in the business record, that the company
13  maintains the records in the regular course of its business, but
14  what it did in the -- is inflate the hours.
15       MR. GRAY:  Right.
16       THE COURT:  Not related to this case.  That the
17  trustworthiness aspect in that light would not defeat the
18  admission of the records.
19       MR. GRAY:  Exactly right.  I think what it really goes
20  to is, are the records authentic in terms of that they were,
21  what was kept in the company's records, they were what the
22  company used to bill then they come in.  But you can't say --
23  you can't let the fraud itself defeat the admissibility of the
24  document that demonstrates the fraud, or is one of the documents
25  that demonstrates the fraud.

```
 1                 THE COURT:  Then is it a different exception that
 2    applies?
 3                 MR. GRAY:  I think it's the fact that it is --
 4                 THE COURT:  Is it a statement of a party opponent?
 5                 MR. GRAY:  Well, yeah, there's that too.  And I cited
 6    those -- I cited those in the rebuttal brief, Your Honor.
 7    Government surreply.  Yeah, that second part of that, page 2,
 8    this is one that was filed the other day.  Count 2, hearsay,
 9    party must offer a statement.  To be hearsay a party must offer
10    a statement in evidence to prove the truth of the matter
11    asserted.  We're not offering her billing records to prove that
12    they're true, we're offering --
13                 THE COURT:  Well, you're offering it to prove -- yes,
14    you are, because you're offering to prove that that's what she
15    billed.
16                 MR. AHLERS:  Correct.
17                 MR. GRAY:  Yeah.  We're offering them to prove that's
18    what she billed.
19                 THE COURT:  What you're not doing is saying she should
20    have billed that.  But you are saying this is what she billed
21    so, therefore, you're trying to use it to prove the truth of the
22    billing.
23                 MR. GRAY:  Well, we're trying to -- yeah, there's no
24    dispute about that.  There's no dispute that this is for the
25    most part --
```

```
 1            THE COURT:  You're not offering it to prove the
 2    accuracy.
 3            MR. GRAY:  Right.  Right.  We're -- we are saying
 4    these are authentic records that were used to defraud the NSA.
 5    And moreover, they are being offered as res gestae, the thing
 6    itself, to prove that she caused ITK to make fraudulent
 7    representations about her work hours and therefore violated
 8    civil/criminal False Claims Act.
 9            As for the records relating to her earlier tenure as
10    program manager between October 12th and July the 2013th [sic],
11    which we tend to assume probably are relatively accurate, these
12    are admissible as opposing party statements either in the
13    defendant's own individual capacity where she manifested that
14    she believed them to be true by submitting bills based upon
15    them.  So --
16            And Your Honor, with all of the other stuff in this
17    case, it may not have sort of picked up on that.  I mean,
18    Mr. Ahlers, when he originally brought us these records, he
19    brought us records that covered all of the prior people who had
20    stints as the program manager on the contract going back to
21    2011.  So five years before she began her second stint.  And she
22    had earlier served a briefer stint as the program manager on the
23    contract from October of 2012 through July of 2013, which is
24    when Raynett Colston came aboard and handled it through March of
25    2016 when she left and the defendant took it over.  And she
```

 1   billed far lower hours as program manager in that period, in
 2   2012-2013.  She was also billing substantial amounts of time on
 3   other contracts and on her executive duties as CEO, as one would
 4   expect.  Whereas when you get into April of 2017, what you find
 5   is -- well, what you find is that it shows virtually no time as
 6   chief executive officer time, very little time, if any, to other
 7   contracts.  It's all pretty much just program manager on
 8   Ironbridge.
 9          So, I mean, Mr. Ahlers' references to how there's,
10   like, 19,000 pages of records here and they're all like replete
11   with evidence of fraud by Mr. Preston, well then why did he say
12   only a few months ago that it was a few hours, and why did
13   Mr. Stein say it was no hours at all that were fraudulent.
14          Here he said today, the screenshot -- this is as to
15   the bi-weekly time sheets quote.  The screenshot by Shawn
16   McComber was not altered in any way.  I think we have an
17   admission here.
18          THE COURT:  Where was that?
19          MR. GRAY:  That was in his argument today.  That --
20   yeah, the screenshot by Shawn McComber was not altered in any
21   way.  It's also backed up by what he said in his rebuttal
22   memorandum where he acknowledged the whole process, how the
23   records were generated.  These are admissible, it's not a
24   problem, you don't need an expert to do those.
25          Oh, boy.  At some point Mr. Ahlers said something

1    about how the Government said that Ms. McComber worked full-time

2    but did lousy work.  We never said that.  We said she didn't

3    work full-time.  That's the reason we have this case, that's why

4    we're here.  We say she claimed to work full-time but didn't.

5         Let's see here.  Yeah, this whole claim that he needed

6    to advise me that these records might not be reliable when

7    that's -- that's the -- I had long since had the meetings with

8    Mr. Miller a year and a half before that.  And on top of that,

9    we believe that her records were fraudulent.

10        And we've had -- Mr. Ahlers came into this case in

11   December of 2019.  The indictment was not returned until

12   February of 2021, so there were 14 months during which we had a

13   couple meetings and he presented lots of arguments.  Presented

14   arguments that we examined and weighed very carefully.  That's

15   one of the reasons why, in addition to the pandemic, that it

16   took -- we gave it as much time as we did before we brought

17   these charges, but he hasn't shown us really anything that goes

18   beyond what Jan Miller showed me in January of 2019, that this

19   suggests that Preston did anything substantial, did anything

20   really with regard to her Ironbridge billings.

21        Yeah, he said there were 19,000 pages of records where

22   Mr. Preston does this.  What have we seen?  We haven't seen

23   that.  Give us a few more examples if you've got them.  You're

24   arguing this evidence should be admitted, that seems like a

25   reasonable request.

```
 1              I'm done unless Your Honor has questions.
 2              THE COURT:  So why don't we take a luncheon recess.
 3    And then, Mr. Ahlers, I'll give you a few minutes for rebuttal
 4    when we come back, and then I'll decide if I'm able to rule.
 5    But we'll take up the other -- some of the other issues on the
 6    Government's list.
 7              MR. GRAY:  Very good.
 8              THE COURT:  Okay.  We'll stand in recess.
 9              MR. AHLERS:  What time are we due back, Your Honor?
10              THE COURT:  I'm sorry.  Oh, yeah, good point.  How
11    about 2:15?
12              MR. GRAY:  That's good.
13              MR. AHLERS:  Thank you, Your Honor.
14              THE CLERK:  All rise.  Court stands in recess.
15         (Lunch recess from 1:11-2:20 p.m.)
16              THE COURT:  Please be seated.  Just some housekeeping
17    matters.
18              Counsel, I have a matter at four which I've reset.  I
19    still have a matter at 4:30 and I can't reset that.  So it'll
20    probably go a half hour.  Obviously, I'll still be here
21    afterwards, but I don't think it's fair to ask other people who
22    are in front of me to stay, so we need to wrap up and get as far
23    as we can.  We can pick another day and come back if there's
24    more to address.
25              MR. GRAY:  Your Honor, as I think I was saying at the
```

 1  very end, unless Your Honor has more questions for me I think

 2  I've sort of adequately handled what I needed to handle.

 3          There was an issue that came up right as we were

 4  breaking.  I had made reference to that I recall the defendant

 5  having testified in her sworn statement with the NSA that she

 6  filled out her time cards every day, and apparently there was

 7  some negative reaction to that over on the defense side.  So we

 8  checked the records, and this is from page 25 of her NSA

 9  transcript from, I believe it was October the 3rd of 2017.

10          And you see there the question:  How then do you fill

11  out a time sheet for this contract?  How do you say that many

12  hours for that day, that many hours for that day, that many

13  hours for that day?

14          Answer:  Well, because I have to fill it out every

15  day.

16          Okay.

17          And I do my billable hours.  The other hours are sort

18  of extraneous.  It doesn't really matter for this contract.

19  It's an FFP LOE so -- so it's the billable hours that are the

20  important hours, that I have them accurate and I have them right

21  on there.

22          A little further down she said:  And I mark my

23  timecard.

24          And again on page 29, question:  So as far as you

25  know, you said you fill out a time sheet every day?

```
 1              Answer:  Yes.
 2              Question:  Okay.  At any time did you ever falsely
 3  fill out that time sheet?
 4              Answer:  No.
 5              Put any false information on it?
 6              No.
 7              That's actually the passage that's the subject of
 8  Count 20 of the indictment, the false statements count.
 9              So I meant -- that's, at any rate, what I was relying
10  on when I made that statement.  I don't know if defense may have
11  been reacting to something else, but that's what I was talking
12  about.
13              THE COURT:  Okay.  And with that are you finished?
14              MR. GRAY:  I am finished, Your Honor.  As I say, I'm
15  always at your disposal, of course.
16              THE COURT:  I understand.  Well, I said I would give
17  Mr. Ahlers some opportunity for rebuttal, so that's why I was
18  asking if you were done.  Okay.
19              MR. AHLERS:  Your Honor, first, with respect to what
20  is the precise 803(6)(E) issue, the issue is, under 803(6)(E)
21  the trustworthiness is who encoded the time into the Unanet
22  timekeeping system and when.  Was that person McComber?  Was
23  that person Preston or somebody else?
24              With respect to the --
25              THE COURT:  So instead of sort of talking about the
```

 1   records generically, because they encompass so many parts, can
 2   you be more specific?  Which part are you challenging?
 3           MR. AHLERS:  We challenge not every day, some days
 4   McComber put her time in and it's still accurate to this day.
 5   Other times Preston put her time in.
 6           THE COURT:  But, I mean, is it -- what I meant was,
 7   what's the name of the record?  Because there's --
 8           MR. AHLERS:  I apologize, Your Honor.
 9           THE COURT:  -- these runs.
10           MR. AHLERS:  I apologize, Your Honor.  Well, the
11   record that you have in front of you -- what I'm really
12   referring to is a computer data entry.  Meaning there isn't a
13   physical record, it's done in the cyberspace.  But the physical
14   records Your Honor has in front of you is called the bi-weekly
15   time sheet.
16           THE COURT:  That's what I was seeking.  So what you're
17   focusing on is the bi-weekly time sheet.
18           MR. AHLERS:  Yes, Your Honor.
19           Now, Mr. Cooch drew your attention to the people time
20   detail sheets.  I just want to note, the people time detail
21   sheet he used was for 2016 not for 2017.  That's why the number,
22   I think 156 hours, was different than the 120 hours actually
23   billed.
24           MR. COOCH:  Your Honor, I'd like an opportunity to
25   address that because that is not the case.  I made clear when I

1   was speaking that the example I was showing you was from April
2   of 2016 -- excuse me, April of 2016.  But if we have the April
3   2017 people time details report, and I'm happy to file it with
4   you after this hearing, you will see that the number that it
5   totals to is 120 hours, which matches what appeared on the
6   invoice at the time it was submitted.
7           It's the bi-weekly time sheets that are inflated by
8   about 32 hours, Your Honor.  And they haven't explained why they
9   were deflated apparently by the time the hours were then billed
10  to the government.
11          THE COURT:  So you're saying at the end of the day you
12  were talking about what he was talking about.  You're talking
13  about the same records he was talking about.
14          MR. COOCH:  He is correct that I was addressing the
15  people time detail records before.
16          THE COURT:  Right.
17          MR. COOCH:  He tried to suggest that I made an
18  incorrect comparison between records based on the wrong date.
19  That claim that he made, that I was looking at the wrong date,
20  is incorrect.
21          THE COURT:  That's what I'm asking.
22          Okay, Mr. Ahlers.
23          MR. AHLERS:  Your Honor, the Government actually did
24  -- did this court a service during their argument because they
25  pointed out why a Rule 701 witness will be necessary by the

1    Government to introduce the bi-weekly time sheets.

2           The Government talked about the approval history.

3    There's no data entry, they don't say what a change looks like.

4    Mr. Gray told you that all the changes are on the audit trail.

5    Not true.  Nobody has told the Court what a delete looks like.

6    And I'd like to show the Court something from one of the

7    records.

8           What I'm showing the Court is the people -- the

9    bi-weekly time sheet from November 6th, 2016, to November 19th,

10   2016.

11          THE COURT:  Is this marked so --

12          MR. AHLERS:  It's part of -- it's in sequence in

13   Exhibit 3, Your Honor.

14          THE COURT:  Okay.

15          MR. AHLERS:  And what this shows is contrary to the

16   idea that when Dwayne Preston did things under the name Jacky

17   McComber it would just say Jacky McComber.  No.  As the

18   administrator, when Dwayne Preston went in legitimately and

19   worked as the administrator, legitimately doing something in the

20   name of Jacky McComber, there's a parenthetical with the name of

21   the person whose record he's creating or using.

22          It then shows, Your Honor, that McComber submitted the

23   record, Preston approved the record, Preston approved fringe

24   vacation, Preston approved fringe holiday leave.  And this shows

25   you why these records are not trustworthy.  McComber would have

1    to have gone in at the exact date and time that everything else
2    takes place, Your Honor.  In other words, she submits it, and
3    within the same minute Preston approves it, Preston does the
4    fringe vacation, and Preston does the annual leave, fringe
5    holiday leave.  Somebody is going to have to explain that record
6    to the jury.  I think it's a 701 witness.
7           The Government is the proponent of these records and I
8    think they're going to need a 701 witness, or certainly I'll be
9    objecting if Mr. Gray were to tell the jury what he told this
10   Court; that the changes are on an audit trail.  Simply not true.
11          Next, Your Honor, the Government talks about
12   Mr. Ahlers made a concession at some point in the past that
13   there were only a few hours difference between the 2,603.5
14   billed and the actual hours of work.  I've been trying to make
15   this point from the beginning, obviously unsuccessfully, with
16   respect to the Government.  For the 19 months that Raynett
17   Colston was the program manager, and who worked apparently to
18   the complete satisfaction of the government, and who the
19   government has repeatedly characterized as working part-time,
20   she worked 2,525.5 hours.  McComber for 19 months, she worked
21   2603.5 hours.  The difference over the 19 months was 78 hours.
22   That is -- why that's critical is the Government keeps taking
23   these isolated incidents; a golf outing, a vacation, a praxis
24   event and saying Ms. McComber billed for those hours but she
25   didn't work those hours.

1           And we have no doubt, and we've said from the

2    beginning that she worked 2,603.5 hours.  And I've attested to

3    this to the Court, meaning I've proffered this to the Court

4    certainly.  The reason I can say that with complete confidence

5    is because the Government, for example, quotes a witness named

6    Shiloh Ware.  And when Shiloh Ware is interviewed, Shiloh Ware

7    says that McComber went to Las Vegas on a vacation with Shiloh

8    Ware and McComber billed the vacation to the Ironbridge

9    contract.

10          And when I asked Ms. McComber, let's get together your

11   emails, let's get together billing and so forth, the following

12   is true.  Undoubtedly McComber did substantial work on the

13   Ironbridge contract in Las Vegas.  She didn't bill a minute.  So

14   there is time I will be able to prove to the jury, unbilled time

15   on the Ironbridge contract, that would more than make up the 20

16   -- the difference.  In other words, if the Government wants to

17   say wait a minute, on this date she was playing golf, even

18   though we believe that her records were changed, I can more than

19   show she did work on these other days and didn't bill it.

20          With respect to what's important about -- and this is

21   partly Exhibit 6 and the internet logs.  Ms. McComber traveled

22   to Texas on April 7, 2017, returned to Maryland on April 11,

23   2017.  Attached, Your Honor, to Exhibit 6 are email's sent from

24   Ms. McComber to co-workers at Infotek.  And what she says is she

25   cannot access the Unanet system from Texas.

1          Additionally, there are phone records that show Ms.

2    McComber was in Texas.  In other words, there can't be any

3    question her phone was in Texas.  She claimed to be in Texas.

4    We also put forth the flight she was on that took her to Texas.

5    I think it's beyond reasonable dispute she was in Texas.

6          And then Your Honor asked about the dates of the info

7    -- I'm sorry, the ADF, Atlantic Data Forensics Report.  And

8    Exhibit 7A, Your Honor talks about, at the bottom of Exhibit 7A,

9    page 1, it talks about the fact that McComber's account was

10   accessed from Infotek, or elsewhere in Maryland while Jacky was

11   physically in Texas.  And important to that is that the IP

12   address that was used by the person who breached the Unanet

13   records was the same Unanet address -- I'm sorry, the same --

14          THE COURT:  IP.

15          MR. AHLERS:  -- IP address as Jamie Preston.  So the

16   point being, it's almost undoubtedly Dwayne Preston.

17          Additionally, Your Honor, those different dates, you

18   asked if the -- you thought, and I forget the question, but --

19   and I apologize if Your Honor didn't mean to imply this, but I

20   took from one of your questions to the Government, the kind of

21   commonsense thing that, well, did Infotek look at other dates?

22          Did they -- and Infotek, first of all, Your Honor,

23   paid -- and we looked it up on the break.  For the report on

24   July 29th -- I'm sorry, July 19th, I apologize Your Honor, July

25   19th, 2017, for that report Infotek paid $114,527.50 to ADF to

1    do this evaluation.  So it's very, very difficult for anybody,

2    unless you're a multimillionaire, to be able to afford to do

3    this level of work on every one of these intrusions.

4           Now, a simple thing the Government could do is call in

5    Dwayne Preston and query him about these things.  And that

6    brings me to really my next point, Your Honor.

7           In the ADF report that the court showed you -- I'm

8    sorry, that the Government showed you, what they showed you was

9    the draft report.  I don't know why, but that's what they showed

10   you as an exhibit.  In the ADF actual report the ADF finds that,

11   undoubtedly, Dwayne Preston attempted to make changes to

12   McComber's time sheets.  Now, the reason that's important is

13   when he testifies to the grand jury and when he gives his

14   deposition, he simply says as a fact, no, I didn't change her

15   time sheets.

16          First of all, he's sworn to tell the truth, the whole

17   truth, and nothing but the truth.  The whole truth would include

18   I tried to change her time sheets.  And, undoubtedly, the whole

19   truth includes that I changed her time sheets on other

20   occasions; April of 2017 being an example.

21          Now, the Government --

22          THE COURT:  Let's stop there for a minute.  First of

23   all, I don't know if I agree with what you just said.  But

24   beyond that, Mr. Gray, did you realize you didn't have the final

25   report?

1          MR. GRAY:  Your Honor, the report I had was the one

2    that was given to me by Jan Miller with Mr. Dijkstra of ADF when

3    they visited our office in early January of 2019.  If they

4    revised the report at some subsequent time, no one ever

5    delivered us a different version of it.

6          THE COURT:  And under Rule 16 wouldn't you be entitled

7    to that?

8          MR. GRAY:  I think we certainly would be if they plan

9    on relying on it, Your Honor.  Yeah, absolutely.  I mean, that

10   was one of the main reasons why I began pushing the issue of the

11   expert witnesses back in the summer of 2021, because I wanted to

12   find out is ADF going to be appearing in this case?  What's

13   going to be happening here?

14         THE COURT:  So --

15         MR. AHLERS:  Your Honor, respectfully it was delivered

16   in discovery.  I'll get the -- I'll get the Bate stamp number.

17   I don't have it at my hand, but I will get that and deliver it

18   to the Government later today.

19         THE COURT:  So he says he gave it to you, Mr. Gray.

20         MR. GRAY:  Well, Your Honor, the file -- the file that

21   I took this out of was a file I created the day that Mr. Miller

22   and Mr. Dijkstra were in my office and gave me the documents.

23   If an updated version of it came in in some later discovery

24   production, I may not have noticed if there was an updated

25   version, but we'll take a look and see if we have it.

```
 1                MR. AHLERS:  But don't accuse me of cheating.

 2                MR. GRAY:  I didn't accuse you of cheating.  I just

 3    said --

 4                THE COURT:  Quiet.  Nope, we're not going there.

 5                MR. AHLERS:  Your Honor, with respect --

 6                THE COURT:  The important part is, I'd like to know,

 7    looking at the report, that I had the right report.

 8                MR. AHLERS:  You did not, Your Honor.

 9                THE COURT:  So I guess, and I'll just be the difficult

10    one.  I guess it would be better if I had learned that before

11    almost 20 to three.

12                MR. AHLERS:  Well, my first chance to --

13                THE COURT:  Not really.

14                MR. AHLERS:  -- rebut --

15                THE COURT:  You've been filing material in this matter

16    since mid-December.  So, I mean, I'm just saying it --

17                MR. AHLERS:  I meant in this hearing, Your Honor.  I

18    didn't mean --

19                THE COURT:  Right --

20                MR. AHLERS:  I apologize to the Court if I've upset

21    the Court with when I filed the motion in limine.

22                THE COURT:  You did.  I can't be -- I can't hide it,

23    because I was just sitting here calculating; we're not done, we

24    started at 10.  I did take about a 15-minute break during the

25    morning session.  We broke at one o'clock, we started at 2:15.
```

1   And I'm thinking to the phone conference when you thought I

2   could just decide on the papers and I didn't think I could and I

3   thought it was more complicated than that.  Now I feel like I

4   really was right.  And I don't feel, frankly, like this is the

5   way to do business because it's very serious.  And I have a

6   trial that we're backing up here and I feel very pressured to

7   get something out to you, and it's not going to be my best work,

8   how could it be?  I spent lunch trying to find more cases than

9   what you guys gave me to be honest, that might be more on point.

10          And it's not -- it's easy to just cite a rule, but the

11  application of the rule is what's tricky.  And I don't really

12  know what I have here.  I don't know if I have the Government

13  saying basically that -- it's not, so I approve the falsity of

14  the record, but yet it is a business record, but one aspect of

15  it is undoubtedly not true, but beyond that, does the rest of it

16  just go to weight?  And that you get to cross-examine and how

17  much --

18          Are we going to have a mini trial on what Mr. Preston

19  did?  I mean, is it a mini trial because it goes to the heart of

20  the case, whether these records were altered, but then you also

21  said all along, and your expert said that she worked the hours

22  that are there so there's no change in the ultimate number of

23  hours regardless of what happened?  I mean, it's like a morass

24  in my mind I'm trying to sort through.  And I apologize, but I

25  think it's really important, and that's why I'm upset because it

1    is important and I don't want to make the wrong ruling.

2        MR. AHLERS:  I know you don't, Your Honor.  And I

3    apologize to the Court and to the Government for my part in the

4    belated filing.  I will -- I will tell the Court that there are

5    representations made which are somewhat baffling to me.  An

6    example is, Mr. Gray told the Court that he doesn't recall me

7    making some mention of these records when I delivered them on

8    September 2nd.  Your Honor, I sent him a letter with the records

9    and he appended one of the relevant pages of my letter to his

10   first pleading.  I think it was 214.  So he knows that I told

11   him at that time that these records are corrupted.

12       THE COURT:  Oh, that's been known, I gather, from --

13       MR. AHLERS:  Well, he just said that I might not have

14   mentioned it, his notes don't reflect it and so forth.

15       THE COURT:  No.  I think he was responding to your

16   claim that 500 plus days went by between the correction -- I

17   don't want to speak for anybody, but that was the way you

18   started, Mr. Gray, about correcting any misimpression I might be

19   having regarding the alleged inaction by the Government to cure

20   the misstatements, the perjury, whatever they might be, of

21   Mr. Preston at the original deposition in the Blake case.

22       MR. GRAY:  Yeah.  I mean, my only point, Your Honor,

23   was Mr. Ahlers had presented it as if he was telling me

24   something that I wouldn't have already known, which was that the

25   defense was prepared to contest whether Preston had altered some

1   of these records.  I've known that for a year and a half at that

2   point.

3           MR. AHLERS:  Actually, Your Honor, let me just please

4   correct.  At the time I gave -- in September of 2020 when I gave

5   these records to the Government, we didn't know that Mr. Preston

6   had changed his tune.  My client hadn't been indicted, I had no

7   discovery, we didn't have any police reports.  We didn't have

8   any reports of interviews.  All I was trying to say is that the

9   Government knew from the moment I delivered these reports.  For

10  them to say these are business records kept in the ordinary

11  course is really not entirely accurate.  Yes, they're 803(6)

12  records, but I told you in September of 2020 there's an (E)

13  problem.  I told you that when I delivered them.

14          The later issue is this.  Yes, my client gets

15  indicted, I get some discovery including notes from a proffer

16  session where Dwayne Preston admits he previously committed

17  perjury.  The Government tells you this today.  They say we

18  entered into an agreement with him and required him to do an

19  errata sheet.  579 days went by between them entering into an

20  agreement and him doing the errata sheet.

21          And I'm saying I think that's a problem.  Because

22  meantime Infotek can't pursue what it ought to be able to pursue

23  which is damages.  If we had a check from Mr. Preston for the

24  hundred thousand dollars he cost the company for the ADF, we

25  could have applied that to ADF to go back and find more dates.

1    And so the Government --

2         THE COURT:  Well, I don't want to even begin to go

3    there, as the saying goes, because you're referencing Judge

4    Blake's case, and I don't think you needed the errata sheet to

5    be able to -- I don't know if that's the reason you didn't have

6    damages.

7         MR. AHLERS:  First, I'm not the lawyer in the civil

8    case.

9         THE COURT:  Right.

10        MR. AHLERS:  And Mr. Gray says I was present for the

11   deposition, the second deposition.  It was a Zoom deposition.

12   My client attended from my office and we notified all parties

13   that I was also present in my office.  That's the extent of my

14   participation in the second deposition.

15        THE COURT:  No.  The point being, what I took from

16   that, is that you were aware of what was said.

17        MR. GRAY:  He was observing it.  He was there, he was

18   observing it, it's reflected in the first page, the cover sheet

19   of the deposition, and it's referred to by Mr. Preston's counsel

20   at one point.

21        THE COURT:  The point being, whatever was stated, you

22   were aware of it because you were there.

23        MR. AHLERS:  Yes, Your Honor.  That was after the

24   errata sheet.  In other words, it doesn't have anything to do

25   with the over 500 days of the gentleman not coming clean, so to

1    speak, with the court.  In other words, yes, once he came clean
2    with the errata sheet I was a participant in the sense that I
3    sat in a room and looked at a computer monitor and didn't open
4    my mouth and watched a deposition.  Mostly because it was in my
5    office, that's all.
6           THE COURT:  Well, I guess my point would be -- I might
7    be missing something, but the length of time and whether the
8    Government had any particular need or obligation to get the
9    errata sheet filed by a certain date seems a little bit like a
10   red herring to me.
11          MR. AHLERS:  Very well, Your Honor.  I'll --
12          THE COURT:  I'm not quite sure why it matters in this
13   case what time frame it is that he filed that errata sheet.
14          MR. AHLERS:  I'm really just replying back to the
15   Government.  I don't think I even brought it up in the -- my
16   first remarks.
17          THE COURT:  Well, you did.  You said 500 some odd days
18   --
19          MR. AHLERS:  Okay.
20          THE COURT:  -- had gone by and that's why it came up.
21          MR. AHLERS:  All right, Your Honor.
22          In any event, Mr. Gray says the intrusion of July 19th
23   was found right away.  It was found on July 26th, 2017.  That's
24   when Infotek learned of the intrusion that happened the week
25   before.

 1              The one hour the Government took arguing to Your Honor
 2    they didn't ask really the most critical question for the Court
 3    on 803(6)(E).  Why should the Court find Preston trustworthy?
 4    He is the person who corrupted the records.  He's the person who
 5    said he had a motive for corrupting the records.  He's the
 6    person who lied about corrupting the records twice under oath.
 7    Why do we suddenly say now he's telling the truth, besides the
 8    fact that it falls where we want it to fall?

 9              THE COURT:  Well, this is how I was looking at it,
10    Mr. Ahlers, maybe I'm wrong.  On the threshold question, it's
11    undisputed that, at a minimum, Mr. Preston -- let's -- we're
12    probably not able to settle on a choice word.  You said
13    vandalized, altered, tampered with, interfered with, edited,
14    there have been various usages, but he entered into the system
15    without authorization and altered records of ITK.  What exactly
16    he altered, you take one view, the Government has another view.

17              The Government's relying on the one report that was
18    done by ADF to -- and consistent with the defendant's
19    testimony and -- just hear me out -- and evidence that people at
20    ITK were alerting Ms. McComber of an intrusion to their paid
21    time off.  So they focused on the fact that there may have been
22    other intrusions, but there was only one edit or alteration.
23    And you claim there's more but -- and you've tried to show me,
24    but at this point, beyond the fact that I know there's some
25    alteration, the question then is, is that his credibility for me

1    or for the jury?

2              MR. AHLERS:  Can I answer that, Your Honor?

3              THE COURT:  Yes.

4              MR. AHLERS:  What I think the law is, is you're the

5    gatekeeper --

6              THE COURT:  Right.

7              MR. AHLERS:  -- of the evidence.  Meaning, I don't --

8    and I think what you have to do is say, Mr. Ahlers raises an

9    803(6)(E) objection to trustworthiness.  First of all, the

10   premise that Gray [sic] only altered non-timekeeping records of

11   -- Preston.

12             MR. GRAY:  I'm sorry, Gray?

13             MR. AHLERS:  I apologize, Your Honor.  Mr. --

14             MR. GRAY:  Preston.

15             THE COURT:  Preston.

16             MR. AHLERS:  I understand.  I was saying a prayer,

17   Your Honor.

18        The idea that Mr. Preston altered records only of

19   certain other people is borne out by two things.

20        1.  The ADF report, but the Government didn't go as

21   far as the ADF report.  It said he tried to change the time

22   records of McComber.  That's what the final report says.  And so

23   that ought to cause concern.

24        The way around that concern is to look at the program

25   run logs, the Unanet run logs, which certainly are highly

 1   suspicious, and impeach this witness, Mr. Preston.  And so Your

 2   Honor could say, Government, I'm satisfied that you can be, in a

 3   sense, willfully blind to whether or not this man changed 19

 4   months worth of records.  Because a man who's a perjurer and who

 5   broke in and committed a felony breaking into the records and

 6   modified some records has a deal with you, where if he says the

 7   following, which you claim to be true, you won't prosecute him.

 8          That would motivate many people to say it the way it

 9   helps the Government.  Particularly a man like Preston, who

10   testifies in the grand jury that the reason he lied in his first

11   deposition is basically it was civil and he just wanted to say

12   what they wanted to hear.  He was a person who was willing to

13   take an oath and just tell the audience what they want to hear.

14          So it would seem, Your Honor, that as the gatekeeper

15   you have to say the following.  We know that a man -- by the

16   way, the word I used, vandalism, is the word that Mr. Gray uses

17   before the grand jury.  He characterizes Preston as a vandal and

18   has Preston accept that characterization.  So, when I say he's a

19   vandal, I'm not trying to be rude to Preston, I'm just saying

20   that's what the Government called.

21          THE COURT:  I actually thought it was a good word.

22          MR. AHLERS:  Okay.  But in any event, Your Honor, you

23   have to decide whether a man who vandalized, which is a felony,

24   and lied about it, which is a felony on multiple occasions, 17

25   times on one occasion, suddenly has a moral awakening and

1    decides he's now going to tell the truth, and the truth is

2    completely self-serving to him and fits hand-in-glove with the

3    Government's theory of the case.  Even though there's

4    substantial evidence, first with the ADF report, which is the

5    Exhibit 7A which talks about all the other times that the ADF

6    sees highly suspicious activity.

7              MR. GRAY:  This is not the ADF report, this is merely

8    an email from ADF in 2018 at the very beginning of this process.

9              MR. AHLERS:  Your Honor, I apologize for using the

10   word report.  7A, I think it speaks for itself, it's obvious

11   it's an email from ADF, and it outlines other dates of concern.

12             MR. GRAY:  Under completely different phone numbers.

13             MR. AHLERS:  May I make an argument, Your Honor?

14             THE COURT:  Yes.  Go ahead.

15             MR. AHLERS:  Thank you.

16             So to me, what the Court -- the narrow issue the Court

17   has to decide is where the Government relies upon the vandal to

18   say yes, I vandalized the records but I didn't vandalize this

19   portion of the records that you want to blame McComber for, even

20   though Ahlers and McComber have shown the Court something's

21   wrong with these records, the time sheets don't even match the

22   invoice.

23             So what the Government says is, there's nothing else

24   for us to do, we just need you, Your Honor, to accept it; to

25   accept that Dwayne Preston's word -- and that's all it is -- his

1   word that he didn't corrupt these other records is sufficient

2   for the admission of these records.

3          And the obvious to me -- obvious thing the Government

4   could do, is to have a 701 witness familiar with all of these

5   records or --

6          THE COURT:  How do you know they're not?

7          MR. AHLERS:  Do what, Your Honor?

8          THE COURT:  How do you know they don't plan that?

9          MR. AHLERS:  Because they've said they're coming under

10  803(6), they don't even need a 701 witness, that's why.  And

11  they also say we can put him in a Rule 1006 summary chart for

12  the jury.  If they obviously need a 701 witness -- a 701 witness

13  by the Government solves most of the problem for the Court,

14  because it means that the Exhibit 3 records in their entirety --

15         THE COURT:  But you said early on that Mr. Preston was

16  an administrator of the system, so how do you know he's not

17  wearing more than one hat when he testifies?

18         MR. AHLERS:  For a couple of reasons, Your Honor.  The

19  first is very practical -- and I shouldn't say I know because I

20  don't know.  I suspect, as a lawyer who has done thousands of

21  criminal defenses, that the last person the Government wants me

22  to cross-examine on the integrity of these records is Dwayne

23  Preston.  I could be wrong.

24         THE COURT:  Well, that wouldn't make him -- I mean,

25  that's a different issue from whether he's able, under Rule 701,

1    to explain the records.

2            MR. AHLERS:  Right.  But if he's able to explain them

3    I'm able to cross-examine him on them.  And to say, given your

4    explanation, isn't there compelling evidence that you did this

5    on this day, and you did this on this day, and you did this on

6    this day --

7            THE COURT:  You still get to do that, don't you, even

8    if I -- I mean, we didn't cross that bridge, but if I rule that

9    the Government's able to introduce these records under the

10   exception, where did I ever say you wouldn't get to

11   cross-examine --

12           MR. AHLERS:  Well, Your Honor, I think that the --

13           THE COURT:  -- Mr. Preston?

14           MR. AHLERS:  Well, I think the practical -- there are

15   two issues.  First, I think I should be allowed to cross-examine

16   with all the records.  And also, I made the point without

17   waiving our objection, that if any of the bi-weekly time sheets

18   come in, I think they all come in.  Meaning that I get to use

19   the ones favorable to the defense in the way the Government

20   wants to use the ones they claim to be unfavorable to the

21   defense.

22           MR. GRAY:  Your Honor, just to clear that up right

23   now.  The Government actually intends to introduce all of the

24   time sheets, the bi-weekly time sheets for all of the project

25   managers that were produced to us by defense counsel himself on

 1    September the 2nd, or whatever it was, 2020.  We do plan to

 2    introduce all of those.

 3              THE COURT:  So then --

 4              MR. AHLERS:  I'll move past it, Your Honor.

 5              With respect to cross-examining Mr. Preston, the

 6    practical problem is Mr. Preston says, I don't know the answer

 7    to that, I've forgotten it, it's been years since I worked

 8    there, I'm under stress.  And that's why I should be allowed to

 9    call a 701 administrator from -- a Unanet administrator to offer

10    evidence of what these things mean.

11              For example, changes don't result in an automatic

12    audit trail.  And it is very obvious that the same person who is

13    doing the -- claims to be Jacky McComber is the person

14    submitting the record and approving it, who in fact is Dwayne

15    Preston.

16              THE COURT:  Well, just to be clear, the only issue I

17    thought I was being asked to decide, and this is part of what I

18    found a little confusing and tried to set that out when I began

19    this morning.  Is that I thought your issue of Rule 701 versus

20    702 applied to what we've now called the run log.

21              MR. AHLERS:  So did I when we came in this morning.

22              THE COURT:  So --

23              MR. AHLERS:  So did I.

24              THE COURT:  I never was being asked, to my knowledge,

25    to address whether you could call someone else from the company

01/10/2023 McComber Pretrial Conference

1   to explain something on those time sheets, and I don't know why

2   you couldn't.

3           MR. AHLERS:  Because Mr. Gray says I need a 702

4   expert.

5           THE COURT:  No.  Only for the -- I thought that was

6   for the logs.

7           MR. GRAY:  For the run logs.

8           THE COURT:  For the run logs.  That was all that I

9   understood to be an issue.

10          MR. GRAY:  If he wants to call various other witnesses

11  from Infotek to testify about the bi-weekly time cards, we have

12  no problem with that.  We'll be having some people from Infotek

13  ourselves, I'm sure, to testify about those.

14          THE COURT:  My focus was limited, in this respect on

15  Rule 701 versus 702, to the computer run logs.

16          MR. AHLERS:  Okay.  Very well, Your Honor.

17          With respect to the run logs, I think what the Court

18  then has to decide, given the incredible expense that it was for

19  this company to find even the July 29th -- I'm sorry, July 19th

20  intrusion and to document that carefully, I think what the

21  Government has to decide is can the Government simply accept the

22  word of an acknowledged perjurer, inside this case, and an

23  acknowledge vandal of the very records it seeks to introduce

24  inside this case, and do no further investigation or audit and

25  simply say, Judge, let them in under 803(6).

```
 1              And what I -- where I think the scale gets tipped is
 2   no, under 803(6)(E), there is a suggestion of trust --
 3   untrustworthiness, coupled with a specific -- in other words,
 4   not just some -- you know, I've shown you very specific reasons.
 5   And under the case law then, that the Government would be
 6   expected to introduce these records through a 701 witness, or
 7   between now and the trial date, do some sort of audit to
 8   convince the Court that they're operating in good faith.  But I
 9   don't think it's --
10              I think it's the gatekeeper's role to say whether the
11   jury credits Preston or doesn't credit Preston, I'm not
12   crediting his statement made pursuant to a non-prosecution
13   agreement that I can trust these records.  That's a bridge too
14   far.  That's my argument, Your Honor.
15              THE COURT:  Okay.  Thank you.
16              MR. AHLERS:  Thank you.
17              THE COURT:  So it's three o'clock.  We were going to
18   take up a few other things.  I didn't want to try to rule from
19   the bench but I think it would be best if I let you address
20   other issues, maybe I'll be able to do them all at the same
21   time.
22              MR. GRAY:  Your Honor, could I just speak very quickly
23   just to a couple things that -- I don't plan going to on for any
24   great length, but just to address a couple things here.
25              THE COURT:  Okay.
```

01/10/2023 McComber Pretrial Conference

1          MR. GRAY:  First, Mr. Ahlers at one point made

2    reference to what he said was Defense Exhibit 7A which he

3    described as, quote/unquote, the ADF report, which I initially

4    took to mean that he was referring to the formal, final ADF

5    report which he then corrected.  Let me just put it up there,

6    you should see what it is.

7          MR. AHLERS:  Your Honor, I object.  I'm a little

8    worried about time.  It's -- I gave you this exhibit.  So we --

9    there's really no need in rebuttal to my rebuttal to go through

10   line by line by line because we're going to run out of time.

11         THE COURT:  We're all going to run out of time anyway,

12   so why don't you take five minutes.

13         MR. GRAY:  Sure, Your Honor.

14         And actually, I don't know if it was in the defense

15   discovery, but I don't believe I -- I mean, I don't have a

16   recollection of having previously seen this one.  It certainly

17   was not attached to any of his filings.  I mean, we attach lots

18   of documents to our filings, he doesn't usually attach very

19   much.  So today was the first time --

20         THE COURT:  You mean you didn't see it before this

21   hearing?

22         MR. GRAY:  Yeah, that's right.  So as far as I know,

23   maybe it was somewhere in the discovery but I hadn't -- I had no

24   recollection of it and it had not been attached as an exhibit to

25   any filings.

01/10/2023 McComber Pretrial Conference

```
 1              So what this is, is an email from ADF in February of
 2    2018, that's fairly early in the process when they were getting
 3    involved to conduct this analysis.  And so what they've done
 4    there, and Mr. Ahlers has referred to this and the transcript
 5    will reflect this.  And he says this shows that there were lots
 6    of intrusions on another dates.  But what he didn't mention is
 7    -- this is the one that matters.  That's Preston's cell phone.
 8    And the only date that they're noting that they've got an
 9    intrusion by it is 19th July, 2017.
10              Then we have all of these other numbers which they've
11    conducted searches and they've determined that they think there
12    may be things that are suspect about these other cell phone
13    numbers.  There's a total of -- they continue on to the next
14    page.  There's four more of them on the next page.  So four on
15    that page, one, two, three, four, five other ones on this first
16    page, none of which -- I mean, none of which appear necessarily
17    to be linked to Preston.  This is the one that's linked to
18    Preston, the one they only have the July 19th date for.  These
19    are just speculation --
20              MR. AHLERS:  Respectfully, Your Honor --
21              MR. GRAY:  I'm sorry, sir, you do not allow me --
22              THE COURT:  Whoa, whoa, whoa.  One at a time.
23              MR. AHLERS:  You said to clarify if there's just a
24    mistake we're going down the wrong -- those are IP addresses
25    they're not phone numbers, Your Honor.  And you can tell by the
```

```
1    number --
2            THE COURT:  I thought you said they were IP addresses.
3            MR. GRAY:  They are.
4            MR. AHLERS:  I did.  No, Mr. Gray said they're phone
5    numbers.
6            MR. GRAY:  I said they are not tied in to Preston's
7    cell phone.
8            THE COURT:  I understood it to be --
9            MR. GRAY:  Tied to his cell phone.
10            THE COURT:  -- you didn't know who those IP addresses
11    belonged to.
12            MR. GRAY:  Right.  I mean, what this is, pretty
13    clearly, is it's something where ADF, which would like to get as
14    much business for itself as possible, that's what companies who
15    provide services do, look through and anything that it could
16    find that it thought might perhaps be worthy of some further
17    investigation, flagged it.  It wasn't saying these were all
18    evidence of intrusions by Mr. Preston, which is certainly how I
19    understood Mr. Ahlers' comments.
20            Mr. -- well, Mr. Ahlers was saying how can the
21    Government just take the word of this perjurer?  These are --
22    the time sheet records are records Mr. Ahlers himself produced,
23    which he says were generated by the defendant's husband, Shawn
24    McComber, from the system and involved no alteration, no
25    changes, no nothing.
```

1          So if you'd like us to call -- serve a subpoena on

2    Mr. Shawn McComber, we're certainly glad to do so and put him

3    up, start our case and get those records authenticated.

4          THE COURT:  And who is that?

5          MR. GRAY:  It's her husband.  And we can march on from

6    there.  Or we can have various people of our own testify about

7    it.  And that's -- those are just the couple points I want to

8    address and I'll -- but yes, I'm sure we will have people like

9    Plunkett, Preston, and some others, too, testify about these

10   records in our case.  I was kind of hoping that we could have an

11   agreement to a stipulation since he's admitted that the time

12   sheet records are authentic and haven't been altered in terms of

13   anything that he and Mr. McComber did.  That we could get those

14   in on like minute one as a stipulation and move into the case.

15   That's what we're looking forward to doing, and bring the

16   witnesses in in their normal order to discuss them.  That's what

17   we're thinking of doing.

18         THE COURT:  Okay.  Are we ready to move to a new

19   topic?  And what would that next topic be?  There's a long list

20   in your ECF filing of September 22nd, 2022 at 169.

21         MR. GRAY:  Well, some of them, you know, can be

22   potentially addressed today.  Let me see, where am I.  Here we

23   go.

24         THE COURT:  The first is the spoliation instruction,

25   but tomorrow is the last day of the discovery production.  I

1    don't know where we are on this claim.

2          MR. GRAY:  Do you want to address the terms of the

3    progress of the discovery production?

4          MR. COOCH:  In terms of status of discovery, Your

5    Honor, I think before the holiday, on December 23rd, we filed a

6    letter indicating that with respect to the defendant's discovery

7    request NSA had about 2,000 pages of documents that were in the

8    queue to be redacted.  And that was an ongoing process, as well

9    as some additional data that was being pulled and reviewed on an

10   ongoing basis.

11         Just last night -- or yesterday afternoon, excuse me,

12   NSA released to the Government 1,000 -- approximately 1,000 of

13   those 2,000 pages, and so those records are being prepared for

14   production.  They haven't completed the review of all the

15   custodial data, that's sort of within the possible scope of what

16   needed to be reviewed.  They did make substantial progress and

17   there is light at the end of the tunnel there, I think.  And the

18   status update that I'll provide to the court tomorrow, I will

19   include more detail about how far along that is and what

20   remains.  But in terms of that group of 2,000 pages, which we

21   think would be the bulk of what would be coming out, we're going

22   to release about half of them hopefully by tomorrow.

23         And then the NSA's estimate, as we have previously

24   indicated, is that a thousand pages takes about 30 days to

25   redact.  So they don't -- they are not in a position to finish

01/10/2023 McComber Pretrial Conference

1   the review by the start of trial.

2            THE COURT:  But they're going to keep going on a

3   rolling basis?

4            MR. COOCH:  Your Honor, my understanding from our

5   prior conversation was that they would produce what they could

6   by tomorrow and then we're done.

7            THE COURT:  Well, I did say that, but I might be

8   revisiting that.  If they -- we have got 2,000 in the sort of

9   queue, to use your words, and if I understood you correctly.

10           MR. COOCH:  It was 2,000 before the holiday, Your

11  Honor.  About a thousand of those have been released to the

12  Government --

13           THE COURT:  Right, so they've only got another

14  thousand.

15           MR. COOCH:  There's another thousand remaining.  Plus

16  there's some data that's being looked at so there may be some

17  additional pages added to that thousand number, but we just

18  don't -- while we think it's going to be a small subset

19  comparative to what's previously been produced, we don't really

20  have a clear picture as to how much that could end up being.

21           THE COURT:  But I guess my point was, that if they got

22  the other thousand, can they keep going?

23           MR. GRAY:  Sure.

24           Well, Your Honor, Mr. Ahlers at some point, in the

25  last month or so, of course, indicated a willingness to just say

1    they can go through January 11th and then stop.  That was one of

2    the things that troubled us extremely because we thought -- and

3    I said this in a follow-up letter to the Court -- that I thought

4    that would raise potential appellate issues, potential 2255

5    issues, and I just didn't see how that could be made to work.

6    But yeah, they can certainly keep going.

7            THE COURT:  I mean, I'm not holding up the trial, that

8    was his choice.  And if my memory serves me, if he wanted all of

9    them, we couldn't go forward on the 23rd.

10           MR. GRAY:  Correct.

11           THE COURT:  If he was willing to go forward with what

12   he had, then that's why I said what I said.

13           MR. GRAY:  Right.  But then what we were saying in

14   response to that is, we think that would raise such potentially

15   serious appellate and 2255 complications the Government would

16   strongly oppose that.

17           THE COURT:  Well, and his answer was we already had

18   those issues because of all the things you had said in your

19   filings about him, so you already made the case for a 2255 for

20   him.

21           MR. GRAY:  Your Honor, my --

22           THE COURT:  That's just what he said.

23           MR. GRAY:  I know that's what he said, but there is no

24   question whatsoever, and I'm sure Your Honor would back me up on

25   this, about Mr. Ahlers' zel in representing his client.  And

1    he's put an awful lot of time into it, and that is not the kind

2    of cases that typically wind up getting thrown out based on

3    ineffective assistance of counsel.

4          The hardest cases of all in which to establish

5    ineffective assistance of counsel are where someone makes a

6    judgment call, and then down the road someone wants to question

7    the validity of that judgement call.  Those are very difficult

8    cases to get relief on 2255s and --

9          THE COURT:  I just want to say, frankly, it's

10   incredible the effort that I've seen from Mr. Ahlers in this

11   case.  It's remarkable, frankly, for one person to have done all

12   that he has done.  Relentless and effective in my view.  I have

13   to give high praise where it's due.  Whether or not he's

14   successful on any individual one item is not the test.  I've

15   been amazed at what he as managed to turn around by himself,

16   unless there was ghost writers there with him, I don't know.

17          So -- but I do want it to be clear, I think it was

18   clear in the phone conference, the choice was his to make, in

19   consultation with his client, and I even gave him a few days to

20   get back to me, let me know what they preferred because I'm very

21   -- also very convinced that the Government has gone to great

22   lengths to produce what it has produced.  I don't think of it as

23   Brady at all, from what I've understood it to be, and I took the

24   blame for probably granting the request in the first place that

25   opened up this Pandora's Box requiring the Government to produce

 1    what it has produced to date.

 2            So the choice was the Defendant's.  And I guess all I

 3    was trying to say was, if he can get more and you can have your

 4    client make it available as -- on a rolling basis, then let's do

 5    it.

 6            MR. GRAY:  Your Honor, if you're talking about having

 7    to continue to come in on a rolling basis leading up to trial --

 8            THE COURT:  I guess it's not fair to you because you

 9    need to do other things to get ready for trial.

10            MR. GRAY:  Your Honor, that's always been my main

11    objection to what Mr. Ahlers has done in this case, is that he's

12    waisted copious amounts of our time with stuff like the TJ Crews

13    thing, the original motion to dismiss, the opinions that half of

14    them later on get withdrawn.  I mean, that's been my issue with

15    Mr. Ahlers; not his zel, not his energy, not his commitment to

16    his client.

17            But no, we can't -- we are already -- I mean, getting

18    something like this motion relating to the Unanet records

19    dropped on us in December when I'm thinking we need to be

20    briefing the spoliation issue.  We need to be preparing the

21    motion that deals with the admission of her testimony and can he

22    bring in other parts of it other than the ones that are

23    incriminating of her.

24            That's why I referred to it as like this grenade that

25    the got dropped into our preparation like barely a month before

1  trial, because of the shear amount of time we spent on the

2  motion to compel, production of Brady which was ultimately

3  largely denied.  The --

4            THE COURT:  The expert.

5            MR. GRAY:  -- the Stein opinions, the experts.  I mean

6  we -- hundreds of hours have gone just between -- not even

7  between the two of us, but then what's going on at NSA is more

8  hundreds of hours.  And, you know, we're doing our best to get

9  ready for a trial.  But, I mean, I lay out a bunch of issues

10 four months in advance of trial so that they can be focused on

11 and addressed, and I hoped it could happen while he was worrying

12 about the acceptance theory motion, and it didn't happen.

13           And then we find that on November the 4th, a full

14 month ago, Mr. Ahlers -- let's see where I've got it here.  He

15 drops a 27-page letter on the National Archives and Records

16 Administration outlining his theories of what all the NSA has

17 done wrong here in terms of its record retention, which was

18 exactly what we had asked him for back on September the 22nd.

19 And by the way, if you look at that footnote one down there --

20           THE COURT:  Yes, I saw that footnote.

21           MR. GRAY:  Yeah.  I mean, he seems at that point to

22 think that well, if we get a continuance and I get some kind of

23 a finding out of NARA that NSA did bad things, well, perhaps

24 that could be beneficial at trial.  Maybe that's what's going on

25 here.

1              THE COURT:  I saw the footnote, but the choice was the

2     defendant's and I'm going to honor her claim that the most

3     important thing to her is that this trial go forward.

4              MR. GRAY:  Right.  Well, what we are in is a situation

5     -- well, as I note, this submission goes on for --

6              THE COURT:  I didn't finish reading that, I have to

7     admit, this is what came last night.

8              MR. GRAY:  Right.  27 single spaced pages.

9              MR. AHLERS:  I should let you know there's a second

10    letter.  I don't know why Mr. Gray has one and not the second,

11    but there's two letters.  And I'm not sure which -- I haven't

12    seen the filing last night yet, but I mean, I knew there was one

13    but I'm not even sure whether that's the first or the second

14    NARA letter.  There are two NARA letters.

15             MR. GRAY:  Okay.  November the 4th NARA letter, which

16    is substantially ago.  And it would have been useful rather than

17    -- I mean, he didn't even have to choose, he could have done

18    this and still done the motion in limine relating to spoliation

19    issue, so we wouldn't be dealing with that on a crash basis

20    right before trial, or maybe even in the middle of trial.

21             THE COURT:  Well, I don't know what to say about all

22    that, but I thought maybe we could go down this list and find

23    out what is being pressed, and if so, how and when.  Because

24    some of these do not look like matters I can decide on the fly.

25             MR. GRAY:  Sure.

1          THE COURT:  And so we've had allusions to a spoliation

2    claim, but Mr. Ahlers said that he was going to wait until the

3    final production of discovery in order to determine whether he

4    wished to pursue that, and what's what I understood.  I honestly

5    have no concept of what's been produced.  I know what it was in

6    the order I signed, the kinds of things that I was authorizing

7    him to get.

8          The main argument all along has been that there should

9    be some discrete file for the contracting officer and the

10   contracting officer representative and then the contract, and

11   that those have yet to be produced.  And that was disputed in

12   the phone call.  So I don't know where to start on this one.

13         Mr. Ahlers, what are you thinking at least, tell me

14   this much, because if I have too many issues to decide by

15   January 19 when I'm supposed to pick a jury, I'm not picking a

16   jury.

17         MR. AHLERS:  Your Honor, I think spoliation can come

18   up during the trial if the Government's witnesses admit

19   something inconsistent with what the Government's previously

20   told you.

21         I believe, and I sent it out in a letter to NARA and

22   elsewhere, and I sent it out to this court.  I believe that the

23   Federal Acquisition Regulations require a discrete file.  When I

24   say that, the Government describes my understanding as fanciful.

25         THE COURT:  What the -- what I've not understood, and

 1    I apologize, I sincerely do, but I don't understand what

 2    difference that makes here.

 3              MR. AHLERS:  We don't have a file.

 4              THE COURT:  What would the file show?  The issue in

 5    the case is whether she billed for work she did or didn't bill

 6    for.

 7              MR. AHLERS:  I could give you a whole list of things,

 8    Your Honor.  First it would show approval of the spend plan.

 9              THE COURT:  It would show what?

10              MR. AHLERS:  Spend plan.  In other words, she tells

11    the government, I'm going to work 160 hours next month.  So they

12    approve that.  So, in other words, it's, in my mind, a little

13    bit absurd to then later say, when she works it, well, you

14    didn't really work it because you didn't need to work it.  In

15    other words, they approve the spend plan.

16              Secondly, Your Honor, they do a monthly review of the

17    work as it's done.  That's required under the FAR, it's required

18    under the Contracting Officer Representative's Handbook.

19              Additionally, Your Honor, there's a letter, which

20    we've now received as part of this late discovery, there's a

21    letter that each contracting officer representative has to sign

22    where it sets out what you will do to make certain that the

23    contractor does all the work she is supposed to do, or he is

24    supposed to do.

25              So the Government says those files don't even exist,

 1    Mr. Ahlers, and maybe they're right.  The Government runs the
 2    following risk.  They're going to call a number of CORS, or
 3    we're going to call a number of CORS, and I'm going to ask them,
 4    here's what you're told to do, here's the regulation, here's the
 5    handbook, did you follow this?  Did you have a COR file?  And if
 6    one of them says yes, I'm going to take the transcript where the
 7    Government said there's no such thing and say, Judge, what's
 8    going on here, and then I may ask for spoliation.
 9              Right now I don't have the major premise that I need
10    to get to spoliation which is that the records existed at one
11    time.  The Government says they never existed.  So, fair enough,
12    Judge, I can't make a spoliation argument now.  It would be, in
13    any mind, any competent judge would shoot it down in 30 seconds
14    because I can't get spoliation by saying, the record never
15    existed, it should have existed but it never existed, therefore
16    I want spoliation.  That's not spoliation.  So that's their
17    position, and they know it, and so I can't make that argument.
18              They run the risk, Your Honor, that at trial various
19    witnesses are going to say, absolutely we had this file.  It was
20    a paper file because that's the way it's done at NSA.  I put
21    everything in that file and I passed it on to the contracting
22    officer.  And if you don't -- excuse me.
23              And if they don't have it, I have no idea.
24              My client reminds me, and I understood this.  One
25    contracting officer representative turns it over to the next

 1   contracting officer representative, in serial, until ultimately

 2   it's made part of the permanent contract file.  And that's what

 3   the law requires be done.  That's why I filed an NARA complaint,

 4   because these prosecutors are saying that's not right, you're

 5   wrong, Mr. Ahlers.  Maybe I am, but I don't think I'm wrong and

 6   I've done interviews with -- besides Mr. Stein, with subject

 7   matter experts including currently employed contract officer

 8   representatives for the United States government, and they've

 9   said you're right.  I show them the transcript and they say, I

10   don't know why that's being said, your version, Ahlers, is

11   correct.  This is what the FAR requires, this is what my

12   handbook requires.

13           So spoliation is not ripe yet which is what I said,

14   because the Government doesn't concede that the records once

15   existed.  Soon as a witness says they once existed and I passed

16   them on to somebody else, obviously, Your Honor, at a bench

17   conference or outside the presence of the jury I'm going to be

18   asking the Court for some ruling.

19           THE COURT:  Okay.

20           MR. GRAY:  There's a further problem with regard to

21   spoliation, Your Honor, which as I understand the Spoliation

22   Doctrine, the records have to be lost or destroyed at a time

23   when that party has notice that litigation is either

24   contemplated or has been filed.  And taking all the stuff back

25   to 2011 to 2012, you know, even in 2016 to 2017, the first time

 1    that the government can be said to perhaps have some idea that

 2    litigation could be arising here is I think the whistleblower

 3    letter comes in on August the 23rd, 2017, which is, like, within

 4    six weeks of the end of the indictment period.  And the

 5    investigation is beginning to, like, get underway in

 6    mid-September.

 7            So that's what I've always seen as the big problem on

 8    spoliation argument.  Is that that turns on a party that has

 9    notice of litigation or is in fact in litigation, should be

10    aware that there are records it has that are relevant and should

11    be taking actions to preserve them and doesn't do it.

12            THE COURT:  So my -- I haven't researched this because

13    I have nothing -- no motion in front of me.  On the break I did

14    try to find something on spoliation real quickly.  I came upon a

15    Sixth Circuit case en banc -- no, excuse me, it's not en banc,

16    that was denied.  It was called U.S. versus Copeland, it's not

17    on point exactly, 321 F.3d 582 in 2003.  But it did give me a

18    definition of spoliation, and it is defined as -- and this is at

19    page of the opinion, lets see, 597.

20            Spoliation is defined as the intentional destruction

21    of evidence that is presumed to be unfavorable to the party

22    responsible for its destruction.  And that definition actually

23    came from Black's Law Dictionary.

24            And so the question in that case is about whether a

25    threat was spoliation.  So it has to be intentional and -- for

 1   one thing.  And it didn't say it quite like you said it,

 2   Mr. Gray, but this was hardly an exhaustive analysis.  And my

 3   concern is that I can't delay a trial while we duke it out.

 4           So I think if you are concerned that this is a matter

 5   you're going to be pursuing, Mr. Ahlers, we need to be ready.

 6   And I need both sides of you to give me something in advance so

 7   I can do my research.

 8           MR. GRAY:  Your Honor, that's exactly how I saw it,

 9   and that's what I would have spent the past month working on if

10   it hadn't been for the motion that was filed on December the

11   11th.

12           THE COURT:  Okay.  So my understanding would be

13   consistent with what you said, Mr. Gray.  If you didn't even

14   know you were going to be in a lawsuit, how could you possibly

15   have committed spoliation?  So that would mean that at least the

16   period of time before, it would seem to me, I'm not making a

17   ruling, that any period before the whistleblower letter couldn't

18   possibly fall in the -- sort of the time period for which there

19   could be any spoliation because nobody even had reason to think

20   that there was any wrongdoing.  So if there's no notice --

21           MR. AHLERS:  Your Honor, I agree with your analysis, I

22   just want to point something out.  We don't know -- because we

23   don't know when the records, if they even existed, we don't know

24   when they were destroyed.  In other words, part of what I'm

25   dealing with is a government that tells me we don't follow the

1    federal acquisition regulations.

2         MR. GRAY:  Your Honor, just for the record, I always

3    said this many times before, I think we briefed it, we do not

4    remotely accept Mr. Stein's interpretation of what the FAR

5    requires in terms of maintenance of these records.

6         THE COURT:  Well, Mr. Ahlers submitted the language of

7    what they say.  It seems to support his argument that they're

8    supposed to be keeping certain things.

9         MR. GRAY:  Actually, Your Honor, we think his

10   interpretation of the regs and the language goes substantially

11   beyond what they, in fact, say.  And the -- the concept -- I

12   mean, at various times he's alleged all work product has to be

13   included in the contract file.  That's not the case from a

14   practical standpoint.  Obviously, especially in like a seven

15   year IT services software development contract, that's just

16   nuts.  What you want in the contract files is the stuff you need

17   to be able to do -- to determine what the obligations and duties

18   and rights of the parties are under the contract.  You don't

19   need to clutter it up with all of the work done on the contract

20   over a seven-year period.

21        THE COURT:  So basically, if this issue materializes

22   there's two things that I'm going to need to do.  One is figure

23   out what the law requires in terms of keeping the records, which

24   is not something that you all agree on, and then get to the

25   issue of what spoliation is and whether it occurred.

1        MR. GRAY:  Right.  And how much time should we be

2   spending on this issue of whether the NSA's practices have

3   violated some concept of what the law requires when the issue

4   here is did she do the work or not.  And if she did do the work,

5   was there anyone in particular from the government that she went

6   to and said, this is what I've done, or here, take this, in a

7   box, this is the work I've done for the last month and then

8   somebody from the government signed off on that and said, okay,

9   very good.  That isn't what happened here.

10       I mean, her -- when she herself talks about -- do we

11  have the couple pages of the transcript from her grand jury

12  testimony?  I forgot.

13       THE COURT:  So --

14       MR. GRAY:  When she herself talks about what she does,

15  she talks in terms of I hold my employees' hands, I try to

16  maintain morale, stuff like that.  No government person is

17  reviewing and signing off on things like that, even if they

18  happened, which a lot of the witnesses don't frankly support.

19       Oh, yeah, here it is.  That's what she says about her

20  deliverables right there in her testimony on August the 3rd of

21  2017.

22       She was asked:  Well, what do you do?

23       And she says:  Strategic planning.  Oh, let's see,

24  doesn't matter what they are.  There's a small pool of them so

25  it's constantly refining the strategy of the company to keep the

1    people happy and engaged and, you know, affording things and

2    stuff.

3                THE COURT:  Okay.  I'm going to skip the blame the

4    victim concern and estoppel defense.

5                MR. GRAY:  Well, now, these are -- well, the blame the

6    victim, it really sort of ties into the spoliation to some

7    degree, but...

8                THE COURT:  Well, because I think I've written on

9    this.

10               MR. GRAY:  Did you ultimately write on that on

11   November 10th?

12               THE COURT:  Well --

13               MR. GRAY:  It's been briefed in the Stein stuff.

14               THE COURT:  I mean, I was trying to pick and choose,

15   in the time that we have left, we can come back to that one.

16               MR. GRAY:  Sure.  That's fine.

17               THE COURT:  But I thought we've had discussions on

18   that already.  But we have not touched on the next one, they're

19   not numbered, unfortunately, but it's the number -- would be

20   Number 3.  The Government's intention to introduce the

21   defendant's statements against interest.  During her sworn

22   testimony to the NSA OIG examiners that has been showing us on

23   October 3rd of 2017, and the impermissibility of the defense

24   introducing exculpatory statements from that same transcript.

25               MR. GRAY:  Correct.

 1            THE COURT:  So this is definitely an important issue.

 2            MR. GRAY:  It is an important issue and that's why I

 3    brought it to the Court's attention on September the 22nd.  And

 4    part of the reason I did that was because I realized I was going

 5    to now have to brief the issue of the acceptance theory again,

 6    with a reply brief following after that, and that was going to

 7    keep me from addressing things like this.

 8            THE COURT:  Well, I think this one is really important

 9    because we haven't had any briefing on it.  And I'm sure the

10    defense would be arguing like typical rule of completeness, and

11    your argument -- I need to know, basically, what authority each

12    of you cite --

13            MR. GRAY:  Sure.

14            THE COURT:  -- in your respective positions.

15            MR. GRAY:  And, Your Honor, that is, at this point,

16    about the next thing on my briefing list, it would have happened

17    a month ago but for the filing of this motion.  But we're within

18    two weeks of trial, I've got witness prep to be doing.

19            THE COURT:  I understand.

20            MR. GRAY:  I have exhibits to be -- exhibit lists to

21    be completing.  I mean, I can't keep -- after all the delays

22    that we've had that have been induced by the defense in this

23    case, I can't keep working on briefs up until the moment you

24    bring the jury in and say opening statement time.

25            THE COURT:  I appreciate your position, but I'm just

01/10/2023 McComber Pretrial Conference

```
 1  saying whether it was done sooner, later, nobody stopped
 2  working, so whether time went by since this or not, at some
 3  point you still would have had to take that same chunk of time.
 4  It sounds like you're very familiar with the issues so you must
 5  have some --
 6            MR. GRAY:  Sure.
 7            THE COURT:  -- cases that you can cite for your
 8  position, and I need some.
 9            MR. GRAY:  I'll put some together as soon as I can,
10  Your Honor.  And if that means -- I might be able to get it done
11  tomorrow.  Maybe like -- if we can have a generous
12  interpretation of what close of business is.  As you know, my
13  definition of close of business may be different from yours
14  but --
15            THE COURT:  Mine is pretty late.
16            MR. GRAY:  Yours is pretty late too.
17            THE COURT:  Mine is late, but the people who monitor
18  sometimes what's filed leave a little earlier than I do.  All I
19  monitor myself too.
20            Anything in the next few days would be helpful.
21            MR. GRAY:  Very good.  We'll get that done.
22            THE COURT:  And you can file simultaneous things.  I
23  don't need to wait.  I think you should be doing the same
24  homework.  We can set a date when we're done and we can have
25  something that covers all the topics.
```

 1          The fulsomeness of your submissions will be like the

 2     fulsomeness of my rulings.  There's only so much time.

 3          MR. GRAY:  We are well matched, Your Honor.

 4          THE COURT:  I know.  I mean, I'm just saying, I can't

 5     give you -- I can't manufacture hours in the day for you.

 6          So this next one, the Government's intention to

 7     introduce statements in an email sent by Infotek's counsel

 8     Andrew Halliwell, so former counsel, to NSA's OIG special

 9     investigator on November 10, 2017, in which he acknowledged that

10     Ms. McComber had not billed the full number of hours -- had not

11     billed or do you mean had not worked?

12          MR. GRAY:  Had not -- I'm sorry, had not worked.

13          THE COURT:  Because it says had not billed.

14          MR. GRAY:  Yeah.

15          THE COURT:  The full number of hours she charged as

16     program manager, because they would agree with what you said,

17     that she didn't bill the full number of hours.

18          MR. GRAY:  Right.  This was her corporate counsel at

19     the time.

20          THE COURT:  No, I think what I'm picking on is the

21     world billed.

22          MR. GRAY:  Yeah.  No, like I mentioned, I think I did

23     that letter about 9:30 at night at the end of a very long and

24     tiring day.  But no, it's the -- what he acknowledged, there's a

25     two- to three-page sheet that responds directly to the items in

1  the whistleblower complaint.  And I think as to about half of

2  them, it agrees that she didn't work those hours that day at

3  all.  On some of the others it's like a partial, she worked some

4  of these hours but not other of the hours.

5          THE COURT:  So I don't know even know if there would

6  be an objection to this because Mr. Ahlers has had that same

7  time I've had it, we didn't hear anything, but I have no idea.

8  Is this something you're going to be objecting to?  Because if

9  not we can move on.

10          MR. GRAY:  I would just mention, Your Honor --

11          THE COURT:  I'm sorry, I was asking Mr. Ahlers, are

12  you planning to object to that?

13          MR. AHLERS:  I haven't made up my mind, Your Honor,

14  because I just would need the Government to say precisely -- in

15  other words, send me the exhibit and tell me what you -- how it

16  intends to come into evidence.  Do you intend to just enter it

17  by stipulation or are you going to call Mr. Halliwell as a

18  witness as well.

19          THE COURT:  Well, it says calling Halliwell would be a

20  fallback basically.

21          MR. AHLERS:  Well, I would just like to know that,

22  Your Honor.  In other words --

23          THE COURT:  Well, it says it.  It says otherwise,

24  Mr. Halliwell may have to be called as a witness to testify.

25          MR. AHLERS:  Then we will object, Your Honor.

```
 1              THE COURT:  You do object?

 2              MR. AHLERS:  Yes, Your Honor.

 3              THE COURT:  So do you want Mr. Halliwell?

 4              MR. AHLERS:  Well, the Government -- it's the

 5   Government's case, Your Honor, and I'm just --

 6              THE COURT:  I know, but do you want them to call

 7   Mr. Halliwell, is that what you're saying?

 8              MR. AHLERS:  Yes, Your Honor.

 9              THE COURT:  You would rather they call Mr. Halliwell.

10   When Mr. Halliwell is called are you planning to object?  It's

11   the same question I had when I started.  I'm trying to get us

12   streamlined --

13              MR. AHLERS:  To the email, no, Your Honor.

14              THE COURT:  -- so we can go to trial and get the case

15   tried and have these issues decided, to the extent feasible,

16   things change in a trial, I realize that, these are fluid

17   rulings and they're not binding, but they're at least tentative

18   to give guideposts.  And if I'm going to have a complicated

19   legal question, then I need you guys to do your homework and

20   tell me what your authority is for your respective positions.

21              MR. AHLERS:  Your Honor, I do not object to the

22   Government calling Mr. Halliwell.  And when they call him, I

23   will not object to an email he had sent coming into evidence.

24              THE COURT:  Okay.  So that's the email that we're

25   talking about from Mr. Halliwell to Hazenstab on November 10,
```

```
 1   2017.
 2          MR. GRAY:  Yeah.  I think -- I mean, if -- I mean,
 3   what I really hope is that we could just agree to a stipulation
 4   that, you know, the attached email is something that was sent by
 5   Mr. Halliwell based on information provided to him by the
 6   defendant.  It doesn't have to be very long.  My preference is
 7   not to have to call Mr. Halliwell because it's awkward for any
 8   attorney to have to testify against a former client.  I mean,
 9   that's just not a nice thing to do to an attorney.
10          THE COURT:  Let me say this, and I certainly do not
11   mean to trample on anybody's right, and certainly not the right
12   of confrontation, but I heartily hope that both sides here will
13   confer and present by stipulation that which you can agree to.
14   Because I don't know how we're going to finish the trial in the
15   time allotted.  Calling a witness to introduce an email that
16   there's otherwise no objection to would seem like we could just
17   have a stipulation about the email.
18          MR. AHLERS:  Your Honor, there are additional facts
19   that I would like to bring out through the witness.
20          THE COURT:  Well, maybe you can discuss them and then
21   they'll be in the stipulation.
22          MR. GRAY:  Sure.
23          THE COURT:  If you don't talk to each other I know
24   nothing is going to happen.  But I don't know what you have in
25   mind but --
```

1        MR. AHLERS:  Yes, Your Honor.  I'll send an email to

2    the Government with what I would like them to stipulate to for

3    Mr. Halliwell.

4        THE COURT:  Okay.  So this is the part where counsel

5    need to work with each other and figure out where you can come

6    to an agreement.  It's undisputed what the email says.  The

7    legal question for me is whether this is a topic the government

8    can introduce.  The sensitive part being, as I see it, that

9    Mr. Halliwell had been the lawyer for the defendant, but we know

10   this isn't privileged because it wasn't confidential, and we

11   know that a lawyer can, as an agent of a client, make a

12   statement.  So I'm just laying it out there.  I'm not ruling.

13   This is why I'm asking you all what is it that I need to decide.

14   And if I can decide it in advance so we can move the ball along

15   at the trial, I'll be very grateful.

16        Okay.  So that one looks like there's a chance you

17   might work it out.  I'm making a note.  Possible stipulation.

18        The next one, the defense's stated intention to

19   introduce evidence that the NSA agreed to pay an additional one

20   million dollars to Infotek in connection with the wholly

21   separate Silent Roar contract in 2021, in response to a claim by

22   Infotek that it had mistakenly billed for less than what it was

23   entitled to on that contract.

24        So this is in your camp, Mr. Ahlers.  If you're not

25   planning to do it, we can move to the next topic.

1          MR. AHLERS:  Your Honor, Mr. Preston intentionally

2    under billed another contract.  It goes to impeach Mr. Preston

3    to show his venal efforts against Ms. McComber.

4          THE COURT:  So, no, no, no.  Let me stop you, and I

5    beg your forgiveness, but I'm mindful of the clock.

6          I want to stop you because, you, in my opinion, at

7    least from what I know right now, could illicit from Mr. Preston

8    that he tampered with the contract in this case.  And I might

9    well let you also introduce or try to impeach him with questions

10   that he tampered with the Silent Roar contract, and then that's

11   that.

12         MR. AHLERS:  Yes, Your Honor.

13         THE COURT:  Why does that have to do with the fact

14   that the Government was going to pay her a million dollars?  I

15   mean, that's like not even a part of this case.

16         MR. AHLERS:  Your Honor, just so you know, many times

17   what I think I can put into evidence is mischaracterized by

18   Mr. Gray.

19         THE COURT:  Okay.

20         MR. AHLERS:  So I haven't -- you haven't seen me file

21   something saying --

22         THE COURT:  No, no, I'm simply asking.  I'm trying to

23   go through this list.

24         MR. AHLERS:  Yes, Your Honor.

25         THE COURT:  My whole point is, please tell me if none

 1   of this is applicable then I'm moving to the next bullet item.

 2          MR. AHLERS:  Before we get off of this bullet item,

 3   the Government sends me witnesses of interviews -- or I mean

 4   witness interviews.  These witness interviews frequently say

 5   things about Ms. McComber and her management which are provably

 6   false.  For example, she was not able to win any new contracts

 7   for Infotek during the period of the indictment.  Blatantly

 8   false.  Not true.

 9          And I don't know if the witnesses are going to say

10   that, if the Government's going to try to illicit that to show

11   she was a terrible business person and needed to cheat on the

12   Infotek Unanet -- I mean, the Infotek Ironbridge contract to try

13   to make money, then I think it becomes relevant.  If it doesn't

14   come in on direct it's not going to come in on cross.

15          THE COURT:  Okay.  So what's the conclusion?  Am I to

16   worry about any effort to introduce that the NSA agreed to pay a

17   million dollars to ITK for the Silent Roar contract?

18          MR. GRAY:  Your Honor, just so you know, the basis for

19   my putting that in there was that in his first Toohey letter in

20   August Mr. Ahlers had dropped a footnote in which he said he

21   intended -- one of the reasons, a witness named Melissa Conley

22   from NSA was on the list because she was the contract officer

23   who signed off on that settlement.  And that he wanted to bring

24   her in, in part, he said, to testify about that settlement.

25          And as far as we're concerned, we believe that her --

1   anything that happened on Silent Roar, I believe, pretty much, I

2   mean, maybe if she billed some time to it herself but I don't

3   think she did, but really pretty much anything related to Silent

4   Roar, anything related to any other contract she had or didn't

5   have with the NSA should be out of bounds in this case.

6          We don't intend to go into it.  We're not going to

7   make any arguments based on it.  My sense was that the defense

8   actually had suggested -- and actually, that's how the issue of

9   contracts came up, the other contracts that did come up through

10  anything that was in a witness interview.

11         At some point he indicated, I believe, it may have

12  just been rhetorical, that it almost went toward acceptance.

13  That if the Government really thought she was so bad why did she

14  get other contracts during the time this was pending.

15         And I checked with the then NSA agent who was on the

16  case who no longer is, and said, did they get other contracts in

17  this period of time?  And she said not that I can find.  And so

18  I reported back, I'm hearing that they didn't have other

19  contracts at this time.

20         But no, we're not interested in bringing something out

21  about other contracts.  I think actually there were some issues

22  on some of the other contracts.  We don't want to get into

23  trying matters related to two or three other contracts

24  completely outside of Ironbridge.

25         THE COURT:  So my view would be, subject always to

```
 1   being revised if there's some reason to review it, that I don't
 2   think Silent Roar has anything to do with this case.
 3            MR. AHLERS:  Your Honor, I think the Government will
 4   likely open the door.  And the reason I say that is, they --
 5   almost every witness is asked this question by Hazenstab, were
 6   there other -- Agent Hazenstab, were there other contracts and
 7   so forth.
 8            What the Government just told you, that they can't
 9   find any others, they must not be looking, Judge, because they
10   have a number, they have a contract, it was awarded.  In other
11   words, it's just not true that there weren't other contracts.
12            MR. GRAY:  Your Honor --
13            MR. AHLERS:  So if that door's open, I'm going to try
14   to drive a truck through it.
15            THE COURT:  Well, even if they -- even if it comes up,
16   I'm not sure why that means that you would get to introduce
17   evidence that they paid her a million dollars --
18            MR. AHLERS:  No, no, I didn't -- I'm not saying that,
19   Your Honor.  I'm saying if there's a suggestion that --
20            MR. GRAY:  We don't need to talk about this at all.
21   There will not be.  This is back in the day when Mr. Ahlers and
22   I actually got along and had a very constructive, collegial,
23   fruitful relationship.  He mentioned something to me, I said
24   that sounds interesting, I'll check it with the NSA.  Someone
25   told me erroneously, apparently, that there weren't other
```

1    contracts, I reported that back to him.  You know, I've since

2    learned apparently that was erroneous and there were a couple

3    other contracts but we have no interest in getting in any of

4    these.

5            What I was cautioned about by Mr. Cooch, is that when

6    Ms. Kimmel would be in access control, the mere fact that she

7    was in access control for say an hour and a half, didn't

8    necessarily mean she was doing work on the Ironbridge because

9    Silent Roar was also there, and she could also go to the Silent

10   Roar area and be checking in with people there and doing that.

11           So the jury might need to be told that, by the way,

12   she also had another contract that she may have been working on

13   even during some of the time when she was in access control.

14   But as far as I can tell that's the only reason it should be

15   necessary to bring in Silent Roar.

16           MR. AHLERS:  I don't think the Government can have it

17   both ways.  If they're going to bring in Silent Roar then I

18   think we can talk about her work on Silent Roar.

19           Dwayne Preston, for whatever reason, Your Honor, I

20   don't know whether it was incompetence or whether it was because

21   he was -- hated Ms. McComber, he under billed it so much that

22   the government settled with her for more than $900,000.  In

23   other words, she proved to the government that it was under

24   billed.

25           One of the things that I suggested to Mr. Gray early

1  in the case, was it seems to me somewhat silly to believe that

2  this woman's within tens of hours of somebody else who had the

3  same job she had, and you claim she stole all this money while

4  she's -- because that would show bad character and she's a

5  thief, while simultaneously she's leaving a million dollars on

6  the table over here.

7          Now, I guess it cuts both ways.  You could say well,

8  that was her motivation, she didn't have that other money coming

9  in.  But she had a very productive, well-run, financially

10 solvent company.  And Mr. Preston, who I'm not trying to say

11 he's the world's most evil man, but he did some things which are

12 clearly unprofessional and likely intentional.

13          THE COURT:  Well, and illegal.

14          MR. AHLERS:  Well, not -- not -- billing is not

15 illegal.

16          THE COURT:  Oh, that part.

17          MR. AHLERS:  No, I don't mean that.  I mean, he's done

18 lots of illegal things, but I meant the -- not billing.  I

19 literally don't know if it's incompetence or intentional, I

20 can't tell.

21          THE COURT:  Okay.

22          MR. GRAY:  Right.  And as we know, settlements can be

23 done for all sorts of reasons; to avoid litigation because the

24 circumstances are unclear, just to get the matter away and

25 resolved and done.  Settlements prove nothing.  And what he's --

1   my concern about this is, it's like arguing because my client

2   didn't commit a crime on some other occasions, jury, you can

3   find that that means she's not likely to have committed a crime

4   on this one.  And there is ample case law that says that is not

5   legitimate evidence to bring in to try to exculpate someone.

6   That would be like saying because someone --

7         THE COURT:  I'm sticking with -- not to cut you off.

8   I'm sticking with what I said initially, which is that at least

9   as I understand the case right now there wouldn't be any reason

10  to get into the weeds of Silent Roar.  And I consider payment by

11  the government to settle an under billing to be the weeds.  So

12  that's not necessary.

13        Whether the name comes up or not, we'll wait and see,

14  but this is detail that really has no relevance to this case

15  from what I know right now.

16        So the next bullet item is the possibility that the

17  defense may try to introduce evidence that Infotek received two

18  additional contracts from the NSA between the fall of 2017 and

19  the return of the indictment and the issuance of the suspension

20  notice in late February/March 2017.  That's not all of it but

21  that's a good portion.

22        I still have laryngitis so prefer not to keep reading.

23        So do you want to speak to --

24        MR. GRAY:  Your Honor, that's the matter we were

25  talking about just a moment ago.  And because I had this back

1    and forth with Mr. Ahlers, and eventually we had established

2    there were apparently a couple of other contracts that -- I

3    mean, I took the same view of that.  We don't need to get into

4    -- for one thing, the investigation was ongoing and it was not

5    resolved.  And, generally, an investigative outfit like the NSA

6    OIG is not running around to every contracting office at the NSA

7    and say, oh, by the way, you should realize we have an

8    investigation going on this person.  She may or may not have

9    committed crimes, we're looking into it.  We don't know yet for

10   sure, it'll probably take awhile.

11         I mean, she can still seek other contracts under those

12   circumstances.  And the people who are making those decisions do

13   not necessarily -- know virtually nothing, if anything, about

14   what's going on in this criminal investigation, so those should

15   not come in.

16         MR. AHLERS:  Your Honor, I think if the Government

17   suggests to the jury that my client was somehow not performing

18   work under Ironbridge we should be allowed to prove the person

19   whose job it was to assess the quality of her work renewed the

20   Ironbridge contract, they called it Ironbridge II.

21         And additionally -- and the numbers are staggering,

22   Your Honor, but she was awarded a contract potentially worth

23   hundreds of millions of dollars during this time period.  So

24   it's kind of absurd.  I mean, I keep hearing Mr. Gray say things

25   about me and about my client in kind of a -- using euphemisms.

 1           And I think he said in the phone call, or recently in

 2    a pleading that he doesn't believe my client did a lot of work.

 3    Well, I disagree, as does NSA.  That's the point I'd like to

 4    make.  They thought she did plenty of work because they approved

 5    her.  They gave her evaluations which were very fine.  They --

 6    and they gave her these new contracts.  All of that is evidence

 7    to me that they were not only accepting her work but they were

 8    pleased with her work.

 9           THE COURT:  So as I said previously, not today but in

10    other conversations that we have had, including, I think, last

11    week in the phone conference, it's been my understanding that

12    the issue has not been the quality of the defendant's work.

13           MR. GRAY:  Right.

14           MR. AHLERS:  Well, may I just be heard?

15           MR. GRAY:  The defendant's company's, Infotek's work,

16    not the defendant.

17           THE COURT:  No.  No, Infotek.  I should have said

18    Infotek.

19           MR. AHLERS:  Mr. Gray says the quality of Infotek's

20    work was okay but she did no work.  And I'm saying she did a ton

21    of work and it was of high quality.

22           THE COURT:  I understand that.  But what I'm saying

23    is, it's been my understanding of the case that the issue is not

24    about the quality of Infotek's work, in which case -- rather,

25    the question is whether the defendant did the work she claimed.

01/10/2023 McComber Pretrial Conference

```
 1              MR. AHLERS:  Your Honor, the quality of Ms. McComber's
 2    work is something that was evaluated, and further evidence of
 3    that is she's CEO of Infotek, and Infotek is getting new
 4    contracts.  So I think there's ample evidence, not only that she
 5    did the work -- what Mr. Gray does is say there's -- the quality
 6    of Infotek's work was okay.  What he really means is all of the
 7    information technology people working in the inside.  He's never
 8    said the quality of Ms. McComber's work was high.  If he did,
 9    yes, I'll get off it, but he's not going to say that, Your
10    Honor.
11              THE COURT:  Okay.  Again, my understanding is that the
12    issue is not the quality of ITK's work.  And I don't see the
13    relevance.  And I'll just say, I think I have been incredibly
14    generous in my view that the defense gets to introduce evidence
15    generally about things, like performance reviews of Ms.
16    McComber, to support her claim that she did good work, i.e., she
17    did the work.  That has never been something that the Government
18    has agreed with me about, but I have -- I stand by those
19    rulings.
20              I think your point is that you are attempting to prove
21    that she didn't inflate the hours, that she did the work.  And
22    the proof that she did the work is the proof of the quality of
23    the work.  That people --
24              MR. AHLERS:  Yes, Your Honor.
25              THE COURT:  I mean, I'm just saying it very inartfully
```

```
 1    right now.

 2                MR. AHLERS:  Yes.

 3                THE COURT:  But I don't think that has anything to do

 4    with whether ITK got new contracts in the fall of 2017 or

 5    between the period of the indictment and the suspension notice.

 6                MR. AHLERS:  It may not, but --

 7                THE COURT:  It just doesn't.  We can't have any

 8    sideshows.  This case is already too dense.

 9                MR. AHLERS:  I agree with that, Your Honor, but please

10    accept that some of my proffers to the Government were made at a

11    time they were claiming evidence of the opposite.

12                THE COURT:  Okay.  Okay.  So then no -- not being

13    difficult, but all you need to say is Your Honor, we understand

14    the issue of whether ITK got new contracts is not an issue

15    anymore.  We're not pursuing that.  I mean, who cares if ITK got

16    new contracts?  The issue is about Ms. McComber.

17                MR. AHLERS:  Well, I would object then to any evidence

18    the Government tries to put on that Infotek won no new

19    contracts.

20                THE COURT:  That Infotek what?

21                MR. AHLERS:  Did not win new contracts.

22                THE COURT:  Well, if they say that, that's not true.

23                MR. AHLERS:  That's what I was referring to, Your

24    Honor.  That's what they said to me and I offered evidence of

25    the opposite.
```

 1          THE COURT:  Okay.  Well, I didn't hear that now.  I

 2   think what they're saying is, to the extent ITK got new

 3   contracts between the period of the indictment and the

 4   suspension notice, that's not relevant, and I agree.  But I've

 5   -- I think I've been given wide berth to allow to you pursue the

 6   introduction of evidence that shows all the glowing things about

 7   her work, because from that a jury could infer that she did the

 8   work which is what the case is about.  And that's why I think

 9   that does come in contrary to what the Government has said.

10          So this bullet point though, I agree with the

11   Government.  Other than I'll keep an open mind about -- I don't

12   know when the Ironbridge contract was renewed, I'm sure you told

13   me but I've already forgotten.

14          MR. GRAY:  Your Honor, it was up for re-bid in the

15   summer of 2017.  And, ultimately, they did not get that

16   contract.  As a matter of fact, we've been talking to witnesses

17   about that and circumstances about that earlier this week.  And

18   they told us of the decision not to give them the renewal award

19   in Ironbridge II was not related to anything having to do with

20   whistleblower or the investigation or anything.

21          So what the jury should simply be told, probably, is

22   that there was, that at a certain point in time the contract

23   came up for re-bid, it was given to another bidder.

24          THE COURT:  I don't really know why the jury needs to

25   know any of it.

```
 1              MR. GRAY:  Yeah.  I mean, certain of the witnesses
 2    will be indicating that, you know, I left ITK's employment at
 3    that time because I then signed on with the new contractor.  I
 4    mean, stuff like that.
 5              THE COURT:  Okay.  I mean, I don't think it really has
 6    to come in at all.
 7              So the next one the Government will be entitled at
 8    trial to bring out information relating to the records produced
 9    by ITK in response to the grand jury's subpoena in early 2020.
10    This may be addressed either by a stipulation or by the
11    designation of a document's custodian other than the defendant.
12              So where do we stand on that?
13              MR. GRAY:  Well, that goes to things like the time
14    cards.  That's probably what I was thinking about in terms of
15    time cards stuff that we agree is authentic.
16              Let's just get some stipulations done and, you know,
17    we're close.  We're within a few days, hopefully, of having most
18    of our exhibits put together and, you know, we'll say this is
19    what we plan to offer, which of these do you have any objections
20    to?  And there's so many things that there should be no
21    objections to.  I would anticipate, if all goes well, works
22    smoothly, we can get --
23              THE COURT:  This is what you were talking about.
24              MR. GRAY:  -- get a lot of the exhibits admitted first
25    day.
```

```
 1                THE COURT:  So this is the Unanet stuff.

 2                MR. GRAY:  Unanet stuff and other things too.

 3                MR. AHLERS:  Respectfully, Your Honor.

 4                MR. GRAY:  Like the emails that the defense produced

 5    to us.  Like emails from her and emails that show her doing

 6    other things on various days, that kind of stuff.

 7                MR. AHLERS:  Exhibit 3, the time sheets, were never

 8    subject to grand jury subpoena.  That's not how the Government

 9    got them.  You heard that ad nauseam today.  So when the

10    Government says -- in any event, certain -- I'm not sure what

11    records they want, and I'm sure they'll send me an exhibit list.

12    Thank you.

13                MR. COOCH:  Your Honor, the people time details

14    records were produced in response to the grand jury subpoena,

15    and those certainly are relevant to the Unanet records that the

16    government intends to introduce.  So that would be another

17    example.

18                THE COURT:  Okay.  So here I'm going to count on the

19    cooperation of counsel, and hopefully other than what I have to

20    decide today, obviously, that's a different issue.  If there's

21    anything else though, I hope that you'll talk to each other and

22    perhaps come to a stipulation.

23                Okay.  Now, the next one is thorny.  And I like the,

24    sort of -- I call it scolding.  Although, many defense attorneys

25    and occasionally even some judges aren't smart enough to
```

1   understand -- that's not really what is says -- the distinction.

2   The Government's going to file a short motion in limine, and

3   that hasn't happened.  I'm not criticizing, I'm just pointing it

4   out.  This has to do with what Mr. Gray is discussing, and

5   Mr. Cooch, is that while we all know the defendant has no burden

6   of proof and no obligation to testify or to produce evidence,

7   it's, according to the Government, also well-established that

8   this doesn't preclude the Government from noting the defense's

9   ability to present evidence and making reference to it's failure

10  to do so, so long as the evidence is available from some source

11  other than the Defendant.

12          And it's a very slippery slope and so I'll be looking

13  carefully at that motion in limine.

14          MR. GRAY:  Yeah.  And Your Honor, and I think it's

15  going to be especially critical in this case because we're going

16  to have the defense claiming -- well, they have claimed, I think

17  I cited it in the proposed order for the motion to compel.  We

18  don't have any records.  We don't have any documents.  And, I

19  mean, actually, there are -- there's, as I recall, there's an

20  obligation under the contract for them to retain records.  And

21  there are obligations in the CFR regs for contractors to retain

22  records.

23          And Mr. Ahlers has raised the fact that when the

24  contract is closed down at the end of summer of 2018, that at

25  that point there's some standard language in the agreement that

1   says something like, you know, you can't retain any classified
2   records or documents or something like that unless you ask us
3   for permission to do so, which he hasn't said his client did.
4   And at that point she had known she was under investigation for
5   eight or nine months.  So if the defense -- and he's never
6   affirmatively represented, actually, that they did throw away
7   any records in the summer of 2018.  He's just sort of said well,
8   we could have and you wouldn't be able to complain about it.
9        So the fact that we issue a subpoena and we ask them
10  for, you know, records of your work, and they give us documents
11  back and there's no records of like substantial work by her in
12  there, I think we're entitled to point out the fact that we
13  issued a subpoena, which is a legitimate thing to do, we got the
14  records back, those records did not include anything that was
15  responsive to this item on the subpoena.
16       THE COURT:  Well, that's different than what this is
17  about, I think.
18       MR. GRAY:  Well, it's a part of it.  I mean, it's how
19  -- I could see this coming up in this case with Mr. Ahlers
20  wanting to say that the Government can't say anything about the
21  fact that when it's tried to get records from the defense it
22  couldn't get them.
23       MR. AHLERS:  Your Honor, in December you said, I
24  think, or November you said they dropped a bomb on us.  The bomb
25  was they had 3,500 emails.  Up until that point the Government

1  told you, going all the way back to my motion for a Bill of
2  Particulars, that proof -- among the proof that this woman did
3  no work is there's no emails.  And if she had emails, she could
4  certainly -- she would be free to bring them forward.  But she
5  can't, they're high side emails.  Now there's 3,500 and they say
6  they can't get us the last thousand before trial.  We didn't
7  even ask for all 3,500, they can't get us the amount we've asked
8  for before trial.

9          I think the Government has to be careful not to open
10 the door.  If the Government shifts the burden on my client to
11 prove she's innocent, which I think is an unconstitutional
12 burden shifting and I'll object, but I think if they do it and
13 they open the door to the efforts I've made, which you described
14 the Government's efforts as Herculean to get me the records, I
15 think I've made Herculean efforts --

16         THE COURT:  Oh, that went without saying.  You've been
17 relentless.  I've said that.

18         MR. AHLERS:  Well, the point is then, if they don't
19 give them -- in other words, I think the Government saying
20 anything about this woman not having records runs the risk that
21 if it's said a certain way to the jury, Your Honor is going to
22 be asked by me to instruct the jury, Mr. Ahlers asked for all
23 this and they said it was difficult for NSA to comply with this,
24 it was just too much work.  And --

25         THE COURT:  Well, it was a bit of a fishing

```
 1   expedition.  I mean, it wasn't like we could pinpoint anything
 2   specific that you really wanted or needed or knew about.  So, I
 3   mean, I do feel -- I have to say, I'm sure there's plenty to
 4   criticize about me, and one thing is that I sent the Government
 5   on a wild goose chase here.  I mean, that was one heck of a very
 6   broad order that I signed requiring them to produce what they
 7   did.
 8            MR. AHLERS:  And they've produced Brady.  Pure Brady,
 9   Your Honor.  For example, evaluations which say my client worked
10   properly.
11            MR. GRAY:  No.  No.
12            THE COURT:  I just don't think that I can agree that
13   that's Brady.
14            MR. AHLERS:  Well, then I'll give you another example,
15   Your Honor.  They produced Giglio material, things that
16   absolutely impeach what witnesses -- never mind.  Mr. Gray wants
17   to laugh, I'll just sit down.
18            THE COURT:  I didn't think he was laughing.
19            MR. GRAY:  I think I might have to acknowledge I
20   chuckled a bit because this was in reference to this document he
21   filed the other day in which he claimed showed that the
22   defendant's company had saved the government $24 million on the
23   Ironbridge contract.  And if the government's original cost
24   estimates for the Ironbridge contract were a lot higher than
25   what Infotek and the other bidders on the contract put in for
```

 1   back in 2011, and so the government accepts a bid at a certain

 2   level, at that point it doesn't matter if maybe the government's

 3   original estimates were higher.  What matters is what you

 4   committed yourself in a contract to do it for, and then whether

 5   you actually did the work that you subsequently billed the

 6   government for.  Something like that is not Giglio, as he

 7   suggested it was.  I mean --

 8           THE COURT:  Is it Brady?

 9           MR. GRAY:  It's not Brady.  It's not even relevant.

10   It is in no way exculpatory.  Something could happen back, you

11   know, before the contract amount is actually set.  That's not --

12   it's not even admissible.

13           MR. AHLERS:  Your Honor, of course it's Brady in this

14   sense.  The government knows that it was willing to spend, and

15   we have the document, $40 million to accomplish what Infotek

16   accomplished for $15 million with two one-year extensions.  In

17   other words, it would have been much less than 15 million but

18   for the extensions.

19           What this means is, it's harder, and Your Honor can

20   certainly -- and a jury could understand this, it is harder to

21   accomplish big scale projects on the cheap than it is to have 40

22   million to hire everybody you want to hire with a snap of the

23   fingers.  And that -- the contract required that all key

24   personnel be replaced within two weeks if they resigned.

25           And Mr. Stein explained to Your Honor the problem, if

1   you're a guy that can make 190 an hour as an information

2   technology programmer, and you're working on a government

3   contract called Ironbridge, and you see that that contract

4   expires in September of 2017, in March of 2017 you're looking

5   for a new job.

6           And each of those people, 13 of them, each of those

7   people that left the contract, Ms. McComber's responsible not

8   only to replace them, the person replacing them has to have a

9   pass or a badge to get onto NSA, and has to have a TS SCI

10  security clearance.  So the pool of people that are information

11  technology geniuses that can step in to do the windshield, for

12  example, for the NSOC on secret development of software, it's a

13  small, small pool and it is harder to accomplish that task at a

14  low price.

15          And so, yes, I think it's perfectly -- I think it is

16  Brady material that the government knows it was willing to spend

17  $40 million.  It requested a request for proposal.  The low bid

18  proposal that was technically adequate that fit the requirements

19  of the NSA was the bid by Infotek.  And the government said, we

20  want a program manager to work this many hundreds of hours over

21  this period of time to make sure we accomplish this task.

22  That's what the contract -- that's what a firm, fixed price

23  level of effort contract is.

24          Now, everything was completed on time, under budget,

25  to the complete satisfaction of the government.  And now the

 1   government comes in and says, the program manager stole from us

 2   after she told us how many hours she was going to work, of

 3   course she told us that.  That was part of contract.  We

 4   required her to work those hours.  She told us she was going to

 5   work those hours; she worked those hours.  We evaluated her

 6   work, we approved of her work, we approved of the work another

 7   way, we paid for the work.

 8          And then they come back after the fact and say, three

 9   or four people who don't like her, including Dwayne Preston say,

10   she was never at work; she was golfing, she was drinking, she

11   was running around.  I never knew where she was.  That's their

12   case.

13          THE COURT:  What were we up to?

14          So this question for me was nothing complicated.  When

15   does the Government cross the line?  What can the Government say

16   if you try to argue that they -- and I'm not sure I really

17   understand what you're envisioning, Mr. Gray, that he's going to

18   say that he didn't --

19          MR. GRAY:  I mean, Mr. Ahlers -- and I was going to

20   try to find some examples of this to include in the pleading

21   when I had time to write it.  He's frequently accusing us of

22   trying to turn the tables and shift the burden of proof and put

23   the burden of proof on her.

24          We are entitled to note, for example, that -- I mean,

25   if there are obvious witnesses that a defendant could call to

 1  support an argument they present at trial and -- and they don't

 2  do so --

 3          THE COURT:  Five more minutes.

 4          MR. GRAY:  -- we're entitled to know that, you know,

 5  the defense has the subpoena power just like we do.

 6          THE COURT:  Well, I think there's a boiler plate

 7  instruction that says like, you don't get a missing witness

 8  instruction if both sides have access to that person and could

 9  call that person.

10          MR. GRAY:  Right.  No, but this is a little different.

11  This is if -- we have the right -- if they present a particular

12  theory, and so and so would be an obvious witness to present to

13  substantiate that theory, we have the ability to at the very

14  least say, they have the power of subpoena just like we do.

15          THE COURT:  But I think that's analogous to my missing

16  witness instruction.

17          MR. GRAY:  It is.  The missing witness thing, I'm

18  seeing sort of different, but you're right.

19          THE COURT:  But it's the same concept.  That you can't

20  -- that means the defense does not able to argue the Government

21  failed to call someone when they could have called the same

22  person.

23          MR. GRAY:  Well, and conversely, that the Government

24  cannot note that they could have called this person.  That's

25  what I'm talking about.  That we have the ability to say, they

01/10/2023 McComber Pretrial Conference

 1   don't have to, it's up to them, the burden's on us, but you

 2   should know that it's not like they can't call that person.

 3   They have the same ability to compel testimony as we do.  That's

 4   the kind of thing we typically say.

 5            THE COURT:  Well, if there's a defense case, and I'm

 6   assuming there will be, it will be obvious that they have the

 7   ability to call people.  But you want to be able to get up there

 8   and argue to the jury, where was -- and I'm making up a name --

 9   where was John Smith?  Did you hear from John Smith?  The

10   defense says John Smith did X, Y, and Z and they didn't call

11   John Smith.

12            MR. GRAY:  Right.  And the standard Government

13   response to that is:  They presented this argument, they don't

14   have to -- you're not compelled to bring in a witness, but you

15   should note they have the ability to do so if they wish.

16            THE COURT:  Or they have the right to.

17            MR. GRAY:  Right.

18            MR. AHLERS:  Well, some.  Remember, most of our

19   witnesses are subject to Toohey, Your Honor.  I just point that

20   out, because it's not as simple as I can just issue a subpoena.

21   Many of our witnesses are subject to approval by the Government.

22            THE COURT:  Okay.  I think this is one that we should

23   revisit when we know what the evidence is and whether this is

24   even an issue, because right now I really don't know.  It's too

25   theoretical.

```
 1              So the next one is about Mr. Crews, which I think is
 2   moot.
 3              The redaction issue I think you could all work out,
 4   which means I think we pretty much got through the list except
 5   for the blame the victim issue, which I think might be better
 6   characterized as the estoppel defense which --
 7              MR. GRAY:  Right.
 8              THE COURT:  Or the acceptance issue.
 9              Counsel, what I'm thinking is -- oh, a couple of other
10   matters.
11              I have for you a draft of my preliminary instructions
12   which would be what I give out to the jury.  What I read to the
13   jury rather when the jury is chosen after they're in the box or
14   we're ready to get started of, you know, before opening.
15              And then I have the proposed voir dire, so I want you
16   to look this over.  And I'm not going to docket it because these
17   are just drafts.  I just want to point out that for the proposed
18   voir dire I phrase every question so that if there's an issue
19   the answer is yes.  I don't have any questions about vaccination
20   anymore.
21              But to my knowledge, the jury will be in here, but
22   we're going to use an answer sheet and then I'm only going to
23   voir dire, individually, people who have answered yes to
24   questions and follow-up on those questions if follow-up is
25   required.  And the way we'll know is because they've answered
```

 1   yes, and yes will indicate further questioning is in order.

 2          Exactly how I'm doing that is not clear to me, because

 3   when we used the answer sheet during the height of COVID the

 4   jurors were gathered in the Jury Assembly Room and were brought

 5   down in small groups, and one at a time they came into the

 6   courtroom and stood there masked and nobody had to approach the

 7   bench.  But now I'm told they are going to be here, assembled.

 8          I'm planning on four alternates incidentally.

 9          So I have to sort of do some homework to find out

10   exactly what the process will be.

11          But let me ask the Clerk to give each side a package.

12   We're supposed to have a pretrial on Friday, and perhaps on

13   Friday we could meet and I could rule orally on the motion for

14   today.

15          MR. GRAY:  Just to let Your Honor know, we also have a

16   Lafler hearing schedule for Friday.

17          THE COURT:  What time?

18          MR. GRAY:  That's at 2 p.m., I believe.  Is the

19   pretrial at four?  Was the pretrial at four?

20          THE COURT:  Yes, but perhaps we should see if we can

21   have -- I have a class action fairness hearing Friday morning so

22   that will consume my Friday morning.  But perhaps after your

23   Lafler hearing we could have a hearing and then do whatever we

24   need to do for the pretrial.

25          MR. GRAY:  Right.

01/10/2023 McComber Pretrial Conference

```
 1              THE COURT:  So we'll get something on the calendar
 2    for, let's say, 2:30.
 3              MR. GRAY:  I think so.
 4              THE COURT:  Okay.  And I'll try to be ready to rule on
 5    today's motion.
 6              Okay.  So I do have that matter at 4:30, so we'll
 7    stand in recess for now and I'll see you at 2:30 on Friday.
 8              We were going to have a telephone call.  I don't think
 9    I need that call anymore, right?  Didn't we have a call set?
10              MR. COOCH:  The purpose of the call on Thursday was to
11    discuss the status of discovery.
12              THE COURT:  Can't I just do that --
13              MR. COOCH:  I think that makes sense for Friday, Your
14    Honor.
15              THE COURT:  We can do that Friday so we'll cancel the
16    call.  And that's important because I have a court reporter
17    lined up.  So we'll cancel the call for Thursday and I'll see
18    you at 2:30, hopefully, on Friday.
19              MR. GRAY:  Very good.
20              THE COURT:  Or whenever you're done.
21              MR. AHLERS:  Thank you, Your Honor.
22              (The proceedings concluded at 4:16 p.m.)
23
24
25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kassandra L. McPherson, Registered Professional

4    Reporter, in and for the United States District Court for the

5    District of Maryland, do hereby certify, pursuant to 28 U.S.C. §

6    753, that the foregoing is a true and correct transcript of the

7    stenographically-reported proceedings held in the above-entitled

8    matter and that the transcript page format is in conformance

9    with the regulations of the Judicial Conference of the United

10   States.

11

12                          Dated this 11th day of December 2023.

13                             -S-

14                          _____
                            KASSANDRA L. MCPHERSON, RPR
                            FEDERAL OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

1

## #

**#111** [1] - 1:18

## $

**$114,527.50** [1] - 111:25
**$15** [1] - 174:16
**$150** [1] - 97:11
**$2.50** [1] - 97:12
**$22,000** [1] - 97:10
**$24** [1] - 173:22
**$40** [2] - 174:15, 175:17
**$900,000** [1] - 160:22

## 0

**00** [1] - 32:23
**00:05:33** [1] - 33:1
**05** [1] - 32:23
**08** [4] - 25:2, 28:12, 30:1

## 1

**1** [11] - 9:25, 17:3, 17:6, 33:16, 46:15, 70:17, 70:21, 71:4, 111:9, 121:20
**1,000** [2] - 133:12
**1/13/2018** [1] - 45:2
**10** [8] - 1:8, 4:22, 6:24, 56:7, 56:8, 114:24, 151:9, 153:25
**10/7/2017** [1] - 11:10
**1006** [3] - 3:9, 6:2, 124:11
**10450** [1] - 1:18
**10:02** [2] - 61:24, 71:6
**10:06** [1] - 2:1
**10:31** [3] - 28:12, 30:1
**10:42** [1] - 61:24
**10th** [9] - 66:16, 66:19, 85:14, 87:1, 89:8, 92:20, 94:25, 97:2, 148:11
**11** [5] - 3:2, 5:23, 5:25, 34:2, 110:22

**1190** [1] - 92:2
**11:36** [1] - 57:23
**11:54** [1] - 57:23
**11th** [4] - 41:8, 135:1, 145:11, 182:12
**12** [2] - 4:17, 38:4
**120** [15] - 13:4, 13:5, 16:20, 17:24, 46:11, 49:13, 82:8, 82:18, 83:9, 83:19, 85:6, 85:17, 86:12, 106:22, 107:5
**124** [1] - 90:8
**12:21** [1] - 74:24
**12th** [2] - 2:8, 100:10
**13** [6] - 6:5, 6:11, 16:9, 16:10, 16:18, 175:6
**130** [1] - 94:11
**137** [1] - 22:10
**139** [7] - 24:23, 25:5, 27:15, 27:18, 27:22, 28:9, 28:10
**13th** [1] - 11:10
**14** [4] - 6:12, 13:5, 17:22, 102:12
**143** [3] - 32:4, 32:6, 32:15
**15** [4] - 6:12, 48:8, 84:24, 174:17
**15-minute** [1] - 114:24
**150** [1] - 83:20
**152** [6] - 13:3, 17:13, 17:24, 49:13, 85:16, 86:11
**156** [1] - 106:22
**16** [3] - 5:7, 84:24, 113:6
**160** [1] - 141:11
**169** [2] - 7:15, 132:20
**17** [4] - 5:13, 48:9, 77:4, 122:24
**17th** [4] - 30:25, 31:16, 78:5, 85:17
**18** [1] - 94:12
**19** [14] - 5:5, 6:24, 37:14, 37:23, 38:7, 64:1, 89:1, 94:12, 109:16, 109:20, 109:21, 122:3, 140:15

**19,000** [8] - 20:22, 21:4, 30:23, 30:25, 32:5, 50:4, 101:10, 102:21
**19-count** [1] - 37:21
**19-month** [2] - 37:20, 38:3
**190** [1] - 175:1
**1986** [1] - 57:23
**19th** [21] - 20:10, 32:2, 35:21, 59:9, 59:12, 59:21, 60:24, 61:25, 65:6, 66:22, 71:1, 88:15, 94:1, 97:16, 108:9, 111:24, 111:25, 119:22, 127:19, 130:9, 130:18
**1:11-2:20** [1] - 103:15
**1st** [3] - 19:5, 31:25, 78:14

## 2

**2** [11] - 7:20, 10:7, 10:13, 10:15, 17:4, 17:8, 46:19, 78:11, 99:7, 99:8, 180:18
**2,000** [5] - 133:7, 133:13, 133:20, 134:8, 134:10
**2,525.5** [2] - 37:20, 109:20
**2,603** [3] - 94:10, 94:19, 95:2
**2,603.5** [4] - 37:23, 93:10, 109:13, 110:2
**20** [7] - 48:19, 50:8, 70:25, 97:10, 105:8, 110:15, 114:11
**2003** [1] - 144:17
**2008** [1] - 45:25
**2009** [1] - 45:25
**2011** [4] - 81:2, 100:21, 143:25, 174:1
**2012** [2] - 100:23, 143:25
**2012-2013** [1] - 101:2
**2013** [1] - 100:23

**2013th** [1] - 100:10
**2016** [12] - 11:10, 30:24, 31:14, 31:15, 100:25, 106:21, 107:2, 108:9, 108:10, 143:25
**2017** [71] - 5:5, 9:11, 9:18, 13:2, 13:21, 19:5, 19:7, 20:10, 22:13, 28:13, 30:10, 30:25, 31:16, 31:25, 32:2, 34:2, 46:1, 59:12, 60:24, 63:13, 64:1, 65:7, 66:23, 67:4, 68:7, 68:9, 69:18, 71:1, 73:1, 73:20, 73:24, 82:8, 82:22, 82:25, 83:7, 83:11, 83:18, 83:19, 84:23, 85:6, 85:11, 85:12, 88:15, 89:1, 89:8, 97:16, 101:4, 104:9, 106:21, 107:3, 110:22, 110:23, 111:25, 112:20, 119:23, 130:9, 143:25, 144:3, 147:21, 148:23, 151:9, 154:1, 162:18, 162:20, 166:4, 167:15, 175:4
**2017-04-09** [1] - 25:2
**2017/4/11** [1] - 32:7
**2018** [26] - 4:15, 4:17, 5:7, 5:8, 5:9, 61:21, 67:10, 68:12, 68:23, 69:1, 69:13, 69:16, 69:22, 70:6, 70:8, 73:22, 76:14, 76:17, 77:4, 77:8, 77:9, 123:8, 130:2, 170:24, 171:7
**2019** [7] - 73:8, 73:9, 74:14, 102:11, 102:18,

113:3
**2020** [10] - 11:21, 11:24, 78:14, 87:24, 88:12, 88:20, 117:4, 117:12, 126:1, 168:9
**2021** [7] - 5:14, 77:24, 78:5, 89:11, 102:12, 113:11, 155:21
**2022** [6] - 3:3, 3:17, 7:14, 11:13, 11:18, 132:20
**2023** [3] - 1:8, 3:21, 182:12
**203** [2] - 3:4, 6:13
**209-1** [2] - 44:14, 83:1
**20th** [2] - 62:10, 66:23
**21046** [1] - 1:18
**21201** [1] - 1:15
**214** [7] - 3:17, 3:18, 79:2, 79:3, 91:11, 93:21, 116:10
**217** [8] - 3:22, 4:2, 4:22, 5:23, 6:5, 6:11, 22:13, 56:7
**21st** [2] - 62:10, 66:23
**22** [2] - 22:13, 25:2
**2255** [3] - 135:4, 135:15, 135:19
**2255s** [1] - 136:8
**229** [2] - 3:24, 62:15
**229-3** [1] - 60:14
**229-6** [2] - 5:11, 77:20
**22:31:08** [1] - 30:10
**22nd** [4] - 7:14, 132:20, 138:18, 149:3
**23** [2] - 6:25, 22:13
**230** [1] - 3:19
**232** [1] - 3:23
**23rd** [4] - 76:3, 135:5, 135:9, 144:3
**25** [2] - 22:13, 104:8
**25th** [5] - 11:13, 30:24, 31:11,

31:13, 31:15
**26** [2] - 4:15, 5:7
**2603.5** [1] - 109:21
**26th** [2] - 119:23
**27** [1] - 139:8
**27-page** [1] - 138:15
**28** [1] - 182:5
**29** [2] - 93:20, 104:24
**29th** [2] - 111:24, 127:19
**2:15** [2] - 103:11, 114:25
**2:30** [3] - 181:2, 181:7, 181:18
**2nd** [4] - 11:20, 11:24, 116:8, 126:1

## 3

**3** [26] - 7:21, 8:19, 9:5, 10:3, 10:5, 11:5, 11:12, 17:11, 19:10, 43:10, 43:11, 43:21, 43:24, 44:20, 44:24, 45:15, 46:2, 46:3, 46:8, 46:9, 46:16, 60:12, 108:13, 124:14, 148:20, 169:7
**3,500** [3] - 171:25, 172:5, 172:7
**30** [3] - 94:7, 133:24, 142:13
**300** [1] - 78:3
**30th** [1] - 77:23
**31** [1] - 25:2
**31st** [4] - 3:16, 19:7, 46:1, 78:25
**32** [6] - 17:3, 17:6, 85:10, 85:13, 91:10, 107:8
**321** [1] - 144:17
**33** [2] - 32:7, 32:24
**3rd** [5] - 3:21, 7:8, 104:9, 147:20, 148:23

## 4

**4** [13] - 7:20, 7:21, 9:9, 21:20, 21:21, 24:20,

43:11, 43:17,
44:2, 44:3,
44:13, 44:14
**4/11** [1] - 32:17
**4/9** [1] - 22:13
**40** [5] - 17:11,
85:13, 85:15,
174:21
**40-minute** [1] -
61:4
**41MSB** [1] - 28:2
**42** [1] - 59:20
**42-minute** [1] -
60:23
**449** [1] - 90:8
**4:16** [1] - 181:22
**4:30** [2] - 103:19,
181:6
**4MSB** [1] - 28:1
**4th** [2] - 138:13,
139:15

---

## 5

**5** [6] - 21:18,
21:20, 21:22,
21:23, 61:3
**50** [2] - 53:22,
66:9
**500** [3] - 116:16,
118:25, 119:17
**579** [2] - 48:23,
117:19
**579-day** [1] - 58:6
**582** [1] - 144:17
**59** [1] - 41:8
**597** [1] - 144:19
**5B** [1] - 1:8

---

## 6

**6** [23] - 1:15, 8:19,
18:9, 20:21,
21:11, 21:14,
21:16, 21:25,
22:3, 22:6, 22:9,
27:18, 34:13,
34:19, 42:14,
43:1, 44:10,
44:23, 45:9,
77:17, 110:21,
110:23
**60** [2] - 93:9,
93:18
**662** [1] - 92:2
**6th** [1] - 108:9

---

## 7

**7** [3] - 20:12, 51:2,

110:22
**7/10/2011** [1] -
45:1
**70** [2] - 11:12,
11:18
**701** [30] - 6:9,
24:14, 24:15,
25:6, 25:10,
26:3, 26:12,
26:22, 35:5,
38:20, 45:5,
46:15, 47:6,
52:17, 52:21,
56:17, 57:11,
107:25, 109:6,
109:8, 124:4,
124:10, 124:12,
124:25, 126:9,
126:19, 127:15,
128:6
**702** [16] - 26:7,
26:17, 27:11,
27:12, 33:22,
38:22, 41:17,
52:18, 52:19,
52:20, 54:11,
57:11, 57:12,
126:20, 127:3,
127:15
**753** [1] - 182:6
**78** [1] - 109:21
**78-hour** [1] -
37:23
**798** [1] - 56:25
**7A** [7] - 18:1,
111:8, 123:5,
123:10, 129:2
**7B** [8] - 16:8,
16:22, 16:23,
17:6, 20:13,
46:8, 46:9,
46:16

---

## 8

**80** [2] - 17:3, 17:9
**803(6** [4] - 40:4,
41:3, 117:11,
124:10
**803(6)** [3] - 11:17,
36:20, 127:25
**803(6)(E** [10] -
4:21, 15:5,
36:23, 50:23,
56:20, 56:24,
105:20, 121:9,
128:2
**803(6)(E)** [2] -
51:23, 120:3

---

## 9

**9** [1] - 28:13
**90** [1] - 55:7
**902** [1] - 56:25
**97** [1] - 8:18
**9:30** [1] - 151:23
**9th** [2] - 3:24,
30:10

---

## A

**a.m.** [3] - 2:1,
34:13, 57:23
**ability** [6] - 170:9,
177:13, 177:25,
178:3, 178:7,
178:15
**able** [36] - 6:3,
23:9, 36:11,
38:21, 56:21,
60:11, 61:4,
70:19, 71:17,
71:18, 73:8,
79:16, 81:1,
87:11, 87:12,
88:9, 88:13,
91:4, 91:5,
103:4, 110:14,
112:2, 117:22,
118:5, 120:12,
124:25, 125:2,
125:3, 125:9,
128:20, 146:17,
150:10, 157:6,
171:8, 177:20,
178:7
**aboard** [1] -
100:24
**above-entitled** [1]
- 182:7
**abruptly** [1] -
63:12
**absence** [2] -
3:10, 4:24
**absent** [1] - 36:15
**absolutely** [5] -
50:17, 89:20,
113:9, 142:19,
173:16
**absurd** [3] - 74:5,
141:13, 163:24
**academic** [2] -
26:21
**accept** [7] - 96:3,
122:18, 123:24,
123:25, 127:21,
146:4, 166:10
**acceptance** [4] -
138:12, 149:5,

158:12, 179:8
**accepting** [1] -
164:7
**accepts** [1] -
174:1
**access** [9] - 18:8,
22:18, 61:2,
92:24, 110:25,
160:6, 160:7,
160:13, 177:8
**accessed** [2] -
61:5, 111:10
**accessing** [1] -
70:1
**accomplish** [5] -
54:8, 174:15,
174:21, 175:13,
175:21
**accomplished** [2]
- 50:11, 174:16
**according** [2] -
87:21, 170:7
**account** [2] -
22:25, 111:9
**accountant** [1] -
48:21
**accruals** [1] -
59:13
**accuracy** [3] -
90:23, 96:3,
100:2
**accurate** [7] -
45:19, 55:4,
98:1, 100:11,
104:20, 106:4,
117:11
**accurately** [1] -
96:7
**accuse** [2] -
114:1, 114:2
**accused** [3] -
2:18, 5:16,
68:12
**accusing** [2] -
31:20, 176:21
**acknowledge** [3]
- 88:23, 127:23,
173:19
**acknowledged**
[6] - 63:3, 64:19,
101:22, 127:22,
151:9, 151:24
**Acquisition** [1] -
140:23
**acquisition** [1] -
146:1
**Act** [1] - 100:8
**acting** [2] - 69:11,
69:21
**action** [6] - 28:1,

33:16, 69:8,
75:12, 180:21
**actions** [1] -
144:11
**activities** [1] -
69:6
**activity** [1] - 123:6
**actual** [3] - 63:1,
109:14, 112:10
**ad** [4] - 10:19,
44:8, 169:9
**add** [2] - 13:3,
83:18
**added** [4] - 16:12,
30:23, 49:14,
134:17
**addition** [1] -
102:15
**additional** [7] -
13:22, 89:7,
133:9, 134:17,
154:18, 155:19,
162:18
**additionally** [6] -
33:25, 34:16,
111:1, 111:17,
141:19, 163:21
**additions** [1] -
62:22
**address** [19] -
8:12, 22:24,
22:25, 24:4,
28:4, 28:5,
34:21, 47:20,
71:13, 103:24,
106:25, 111:12,
111:13, 111:15,
126:25, 128:19,
128:24, 132:8,
133:2
**addressed** [4] -
97:16, 132:22,
138:11, 168:10
**addresses** [4] -
18:17, 130:24,
131:2, 131:10
**addressing** [3] -
7:15, 107:14,
149:7
**adequate** [1] -
175:18
**adequately** [1] -
104:2
**ADF** [39] - 60:1,
64:24, 65:6,
65:9, 65:11,
66:4, 66:17,
69:13, 69:19,
69:23, 70:2,
70:11, 70:15,

73:3, 88:25,
89:2, 89:7,
97:16, 111:7,
111:25, 112:7,
112:10, 113:2,
113:12, 117:24,
117:25, 120:18,
121:20, 121:21,
123:4, 123:5,
123:7, 123:8,
123:11, 129:3,
129:4, 130:1,
131:13
**ADF's** [3] - 71:10,
93:25, 94:1
**adjusted** [1] -
82:5
**Administration**
[1] - 138:16
**administration**
[1] - 39:22
**administrator** [25]
- 10:8, 10:9,
10:25, 11:2,
24:18, 25:13,
26:20, 27:14,
33:21, 38:21,
38:24, 39:3,
39:4, 54:17,
71:24, 79:25,
108:18, 108:19,
124:16, 126:9
**administrators**
[4] - 10:22, 39:7,
39:18, 39:24
**admissibility** [3] -
40:12, 92:5,
98:23
**admissible** [6] -
4:21, 11:16,
47:13, 100:12,
101:23, 174:12
**admission** [6] -
55:6, 90:16,
98:18, 101:17,
124:2, 137:21
**admissions** [5] -
64:24, 65:5,
76:9, 91:3,
97:17
**admit** [6] - 46:23,
59:6, 76:8,
81:18, 139:7,
140:18
**admits** [6] - 15:8,
46:22, 48:9,
48:20, 56:2,
117:16
**admitted** [11] -
28:21, 55:1,

55:3, 59:8,
74:15, 79:24,
88:25, 90:15,
102:24, 132:11,
168:24
admittedly [1] -
91:2
admitting [1] -
48:15
advance [3] -
138:10, 145:6,
155:14
advanced [1] -
73:25
advantage [2] -
48:18, 97:6
advise [1] - 102:6
advocate [2] -
24:13, 26:15
affect [2] - 95:11,
95:16
affected [1] -
93:24
affirmatively [1] -
171:6
afford [1] - 112:2
affording [1] -
148:1
afield [1] - 13:18
afternoon [1] -
133:11
afterwards [2] -
64:12, 103:21
age [1] - 8:8
Agent [1] - 159:6
agent [2] -
155:11, 158:15
ago [10] - 7:2,
66:8, 78:6,
78:16, 94:6,
101:12, 138:14,
139:16, 149:17,
162:25
agree [17] - 23:13,
33:18, 33:19,
36:22, 44:20,
81:19, 112:23,
145:21, 146:24,
151:16, 154:3,
154:13, 166:9,
167:4, 167:10,
168:15, 173:12
agreed [4] - 76:7,
155:19, 157:16,
165:18
agreement [16] -
5:3, 5:11, 49:8,
50:21, 52:5,
52:7, 76:7,
76:11, 76:25,

77:18, 117:18,
117:20, 128:13,
132:11, 155:6,
170:25
agrees [1] - 152:2
ahead [4] - 10:3,
29:5, 97:7,
123:14
ahlers [7] -
105:17, 131:22,
137:15, 138:14,
140:2, 140:13,
146:6
Ahlers [75] - 1:17,
2:18, 5:12, 7:5,
8:10, 41:22,
55:10, 55:11,
55:19, 56:1,
56:5, 58:1, 58:4,
58:7, 59:4, 61:9,
63:4, 65:23,
66:1, 66:7,
66:12, 68:9,
70:22, 72:1,
73:1, 73:16,
74:4, 75:25,
77:3, 77:6,
77:10, 78:4,
79:12, 80:5,
81:4, 81:24,
83:23, 87:21,
88:18, 92:15,
92:18, 94:7,
94:21, 97:1,
97:13, 100:18,
101:25, 102:10,
103:3, 107:22,
109:12, 116:23,
120:10, 121:8,
123:20, 129:1,
130:4, 131:20,
134:24, 136:10,
137:11, 142:1,
143:5, 143:10,
145:5, 152:6,
152:11, 155:24,
157:20, 159:21,
163:1, 170:23,
171:19, 172:22,
176:19
AHLERS [282] -
2:17, 8:11, 8:15,
8:23, 9:2, 9:4,
9:16, 9:23,
10:12, 10:14,
10:16, 10:18,
10:21, 11:1,
11:4, 11:24,
12:1, 12:7,
12:13, 13:22,

14:3, 14:8, 15:1,
15:13, 15:22,
16:2, 16:7,
16:11, 16:14,
16:16, 16:18,
16:22, 17:2,
17:7, 17:9,
17:11, 17:13,
17:15, 17:17,
17:21, 19:13,
19:15, 19:18,
19:23, 20:3,
20:17, 20:20,
21:11, 21:16,
21:19, 21:21,
22:1, 22:4, 22:7,
22:9, 22:12,
22:15, 22:23,
23:2, 23:16,
23:19, 23:22,
24:9, 24:12,
24:17, 25:1,
25:11, 25:20,
26:15, 26:17,
26:19, 27:7,
27:18, 28:6,
28:8, 28:11,
28:15, 28:18,
28:21, 28:24,
29:3, 29:6, 29:9,
29:13, 29:17,
29:20, 29:23,
30:4, 30:7, 30:9,
30:12, 30:16,
30:19, 30:21,
31:11, 31:14,
32:10, 32:18,
32:21, 33:1,
33:3, 33:8,
33:12, 33:15,
33:18, 34:4,
34:10, 35:19,
35:23, 36:1,
36:21, 36:24,
37:4, 37:19,
38:25, 39:2,
39:4, 39:9,
39:13, 39:17,
39:21, 39:23,
40:5, 40:7,
40:10, 41:9,
42:3, 42:7, 42:9,
42:15, 42:17,
43:3, 43:6, 43:8,
43:10, 43:15,
43:18, 43:24,
44:1, 44:3, 44:7,
44:13, 44:15,
44:18, 44:25,
45:4, 45:9,
45:12, 45:16,

45:18, 45:22,
45:24, 46:5,
46:7, 46:10,
46:18, 46:25,
47:14, 47:17,
47:20, 47:23,
51:21, 51:23,
51:25, 53:3,
53:6, 53:10,
53:12, 53:16,
53:20, 55:20,
56:7, 56:12,
56:14, 56:24,
57:4, 57:7, 57:9,
88:5, 99:16,
103:9, 103:13,
105:19, 106:3,
106:8, 106:10,
106:18, 107:23,
108:12, 108:15,
111:15, 113:15,
114:1, 114:5,
114:8, 114:12,
114:14, 114:17,
114:20, 116:2,
116:13, 117:3,
118:7, 118:10,
118:23, 119:11,
119:14, 119:19,
119:21, 121:2,
121:4, 121:7,
121:13, 121:16,
122:22, 123:9,
123:13, 123:15,
124:7, 124:9,
124:18, 125:2,
125:12, 125:14,
126:4, 126:21,
126:23, 127:3,
127:16, 128:16,
129:7, 130:20,
130:23, 131:4,
139:9, 140:17,
141:3, 141:7,
141:10, 145:21,
152:13, 152:21,
152:25, 153:2,
153:4, 153:8,
153:13, 153:21,
154:18, 155:1,
156:1, 156:12,
156:16, 156:20,
156:24, 157:2,
159:3, 159:13,
159:18, 160:16,
161:14, 161:17,
163:16, 164:14,
164:19, 165:1,
165:24, 166:2,
166:6, 166:9,
166:17, 166:21,

166:23, 169:3,
169:7, 171:23,
172:18, 173:8,
173:14, 174:13,
178:18, 181:21
Ahlers' [11] - 7:1,
59:16, 62:20,
79:23, 80:23,
88:2, 91:15,
93:7, 101:9,
131:19, 135:25
aided [1] - 1:25
akin [1] - 14:12
AI [1] - 81:2
albeit [1] - 90:1
alert [1] - 65:18
alerting [2] -
73:14, 120:20
alerts [1] - 39:9
allegation [2] -
58:11, 73:16
alleged [3] -
90:13, 116:19,
146:12
allegedly [1] -
13:4
allotted [1] -
154:15
allow [2] - 130:21,
167:5
allowed [5] -
22:15, 56:1,
125:15, 126:8,
163:18
allusions [1] -
140:1
almost [8] - 7:22,
62:11, 66:24,
79:12, 111:16,
114:11, 158:12,
159:5
alteration [3] -
120:22, 120:25,
131:24
alterations [3] -
68:15, 82:7,
90:18
altered [25] - 14:1,
35:18, 37:9,
59:1, 62:25,
64:1, 74:2, 80:4,
81:15, 90:15,
90:17, 91:2,
91:3, 91:6, 95:8,
101:16, 101:20,
115:20, 116:25,
120:13, 120:15,
120:16, 121:10,
121:18, 132:12
altering [4] -

46:23, 59:7,
59:9, 75:18
alternates [1] -
180:8
alternatively [1] -
18:21
amazed [1] -
136:15
amazing [1] - 93:6
amendments [1] -
62:22
AMERICA [1] -
1:3
amidst [1] - 76:19
amount [8] - 4:23,
83:14, 83:15,
83:16, 94:19,
138:1, 172:7,
174:11
amounts [4] -
91:6, 101:2,
137:12
ample [2] - 162:4,
165:4
analogous [1] -
177:15
analogy [1] -
27:24
analysis [8] -
14:15, 46:21,
59:19, 90:2,
94:1, 130:3,
145:2, 145:21
Andrew [1] -
151:8
angry [1] - 63:5
Anne [1] - 67:3
annual [1] - 109:4
answer [21] -
17:25, 40:3,
53:24, 54:10,
54:17, 55:15,
61:18, 80:6,
90:3, 91:25,
95:15, 104:14,
105:1, 105:4,
121:2, 126:6,
135:17, 179:19,
179:22, 180:3
answered [2] -
179:23, 179:25
answers [3] -
68:25, 69:1,
72:17
anticipate [1] -
168:21
anticipated [2] -
7:17, 58:22
Antonio [1] - 35:3
anxious [1] - 8:6

anyway [1] - 129:11
apologize [15] - 25:6, 39:13, 39:17, 51:6, 75:2, 106:8, 106:10, 111:19, 111:24, 114:20, 115:24, 116:3, 121:13, 123:9, 141:1
Appeals [1] - 90:8
appear [4] - 73:6, 75:16, 91:10, 130:16
appearance [2] - 72:24, 73:1
appeared [4] - 38:11, 78:3, 83:12, 107:5
appearing [1] - 113:12
appellate [3] - 28:24, 135:4, 135:15
appended [1] - 116:9
apple [2] - 47:19, 47:24
apples [1] - 48:5
applicable [1] - 157:1
application [1] - 115:11
applied [2] - 117:25, 126:20
applies [2] - 91:16, 99:2
apply [1] - 6:19
appreciate [3] - 25:12, 60:3, 149:25
approach [2] - 13:22, 180:6
appropriate [1] - 47:6
approval [5] - 80:14, 80:16, 108:2, 141:8, 178:21
approve [3] - 115:13, 141:12, 141:15
approved [6] - 108:23, 108:24, 164:4, 176:6
approves [1] - 109:3
approving [2] - 82:3, 126:14

April [40] - 13:2, 13:21, 16:20, 17:18, 19:8, 28:12, 30:10, 34:2, 49:11, 66:15, 66:18, 70:25, 71:1, 73:1, 81:24, 82:8, 82:25, 83:7, 83:18, 84:23, 85:5, 85:11, 85:12, 85:14, 85:15, 85:17, 87:1, 87:3, 89:8, 92:19, 97:2, 101:4, 107:1, 107:2, 110:22, 112:20
Archives [1] - 138:15
arduous [1] - 38:9
area [1] - 160:10
arguably [1] - 3:21
argue [4] - 91:24, 176:16, 177:20, 178:8
argues [2] - 3:13, 6:3
arguing [8] - 19:12, 19:17, 40:7, 51:19, 102:24, 120:1, 149:10, 162:1
argument [27] - 5:18, 20:2, 20:3, 23:20, 23:23, 24:10, 25:9, 38:1, 55:9, 58:2, 59:17, 66:8, 66:21, 92:13, 92:16, 101:19, 107:24, 123:13, 128:14, 140:8, 142:12, 142:17, 144:8, 146:7, 149:11, 177:1, 178:13
arguments [4] - 4:3, 102:13, 102:14, 158:7
arising [1] - 144:2
array [1] - 46:22
arrived [1] - 57:11
articulate [1] - 12:13
Arundel [1] - 67:4
aspect [2] - 98:17, 115:14

assembled [1] - 180:7
Assembly [1] - 180:4
assert [1] - 90:17
asserted [1] - 99:11
asserts [1] - 4:11
assess [1] - 163:19
assessment [1] - 41:2
assigned [2] - 39:18, 67:5
assistance [2] - 136:3, 136:5
assistant [1] - 50:15
Assistant [2] - 1:14, 2:10
associated [3] - 82:18, 83:4, 83:8
assume [1] - 100:11
assuming [3] - 22:15, 93:23, 178:6
assumption [1] - 24:2
assure [1] - 61:20
AT&T [1] - 35:1
Atlanta [1] - 60:18
Atlantic [4] - 59:18, 60:17, 61:12, 111:7
attach [5] - 34:19, 70:19, 129:17, 129:18
attached [11] - 3:15, 59:21, 59:22, 59:25, 71:19, 77:1, 79:5, 110:23, 129:17, 129:24, 154:4
attachment [1] - 78:20
attack [1] - 75:6
attempt [1] - 69:2
attempted [1] - 112:11
attempting [1] - 165:20
attended [2] - 5:12, 118:12
attention [5] - 21:12, 24:23, 28:9, 106:19, 149:3

attested [1] - 110:2
Attorney [1] - 2:10
attorney [7] - 2:12, 50:16, 51:8, 51:9, 73:22, 154:8, 154:9
Attorney's [1] - 13:17
attorneys [1] - 169:24
Attorneys [1] - 1:14
audience [1] - 122:13
audit [15] - 40:21, 41:19, 49:2, 81:3, 81:9, 81:11, 86:24, 87:2, 97:16, 108:4, 109:10, 126:12, 127:24, 128:7
August [4] - 68:6, 144:3, 147:20, 157:20
Austin [1] - 35:4
authentic [7] - 81:19, 91:21, 91:22, 98:20, 100:4, 132:12, 168:15
authenticated [1] - 132:3
authenticity [3] - 37:7, 91:2, 91:14
author [1] - 70:10
authorities [1] - 56:8
authority [4] - 47:21, 56:10, 149:11, 153:20
authorization [1] - 120:15
authorizing [1] - 140:6
automatic [1] - 126:11
automatically [1] - 18:25
available [4] - 8:4, 95:10, 137:4, 170:10
averment [1] - 8:19
avoid [2] - 69:2, 161:23

awakening [1] - 122:25
award [1] - 167:18
awarded [2] - 159:10, 163:22
aware [8] - 6:23, 76:16, 77:7, 77:9, 88:17, 118:16, 118:22, 144:10
awful [1] - 136:1
awhile [1] - 163:10
awkward [1] - 154:7

## B

B12MSB [1] - 28:1
backed [1] - 101:21
backing [1] - 115:6
bad [7] - 47:24, 48:5, 85:24, 86:4, 138:23, 158:13, 161:4
badge [1] - 175:9
baffling [1] - 116:5
balance [1] - 74:17
ball [1] - 155:14
Baltimore [2] - 1:9, 1:15
banc [2] - 144:15
bar [3] - 3:7, 3:11, 14:6
barely [1] - 137:25
barrel [2] - 47:19, 47:24
based [2] - 9:6, 21:8, 26:6, 64:23, 65:5, 67:7, 100:14, 107:18, 136:2, 154:5, 158:7
basic [2] - 50:24, 89:25
basis [9] - 68:22, 96:6, 96:12, 133:10, 134:3, 137:4, 137:7, 139:19, 157:18
Bate [1] - 113:16
Beach [1] - 63:15
bear [2] - 89:10, 90:23
bears [1] - 12:20

became [5] - 3:22, 6:18, 7:7, 58:3, 68:22
becomes [1] - 157:13
BEFORE [1] - 1:11
beg [1] - 156:5
began [7] - 38:1, 38:9, 62:1, 89:11, 100:21, 113:10, 126:18
begin [4] - 6:25, 8:16, 45:23, 118:2
beginning [7] - 51:11, 72:13, 75:13, 109:15, 110:2, 123:8, 144:5
begins [2] - 60:16, 91:10
behalf [2] - 2:11, 4:11
Behalf [2] - 1:12, 1:16
belated [2] - 6:23, 116:4
belief [1] - 12:10
believes [1] - 66:13
belonged [1] - 131:11
below [1] - 30:12
bench [3] - 128:19, 143:16, 180:7
beneficial [1] - 138:24
benefit [1] - 91:14
berth [1] - 167:5
best [7] - 8:4, 46:13, 46:19, 92:13, 115:7, 128:19, 138:8
better [2] - 114:10, 179:5
between [18] - 13:8, 38:3, 41:25, 53:22, 54:1, 87:8, 88:10, 100:10, 107:18, 109:13, 116:16, 117:19, 128:7, 138:6, 138:7, 162:18, 166:5, 167:3
beyond [7] - 58:23, 102:18, 111:5, 112:24,

115:15, 120:24, 146:11

**bi** [36] - 5:20, 5:22, 10:4, 11:5, 11:9, 11:14, 13:16, 16:23, 16:25, 17:3, 20:12, 34:5, 36:6, 43:11, 43:23, 44:21, 46:11, 83:17, 84:5, 84:7, 84:25, 85:5, 85:11, 86:11, 87:18, 101:15, 106:14, 106:17, 107:7, 108:1, 108:9, 125:17, 125:24, 127:11

**bi-weekly** [36] - 5:20, 5:22, 10:4, 11:5, 11:9, 11:14, 13:16, 16:23, 16:25, 17:3, 20:12, 34:5, 36:6, 43:11, 43:23, 44:21, 46:11, 83:17, 84:5, 84:7, 84:25, 85:5, 85:11, 86:11, 87:18, 101:15, 106:14, 106:17, 107:7, 108:1, 108:9, 125:17, 125:24, 127:11

**bid** [6] - 73:19, 167:14, 167:23, 174:1, 175:17, 175:19

**bidder** [1] - 167:23

**bidders** [1] - 173:25

**big** [6] - 43:21, 43:22, 43:24, 60:5, 144:7, 174:21

**Bill** [1] - 172:1

**bill** [12] - 46:11, 49:13, 65:17, 65:22, 85:16, 86:16, 96:13, 98:22, 110:13, 110:19, 141:5, 151:17

**billable** [4] - 9:7, 83:3, 104:17, 104:19

**billed** [38] - 16:20, 37:23, 49:22, 49:23, 50:2, 83:1, 83:3, 84:18, 85:15, 85:21, 86:4, 86:7, 86:11, 86:15, 87:9, 93:11, 95:12, 99:15, 99:18, 99:20, 101:1, 106:23, 107:9, 109:14, 109:24, 110:8, 141:5, 151:10, 151:11, 151:13, 151:21, 155:22, 156:2, 158:2, 160:21, 160:24, 174:5

**billing** [11] - 88:6, 88:7, 97:9, 97:11, 99:11, 99:22, 101:2, 110:11, 161:14, 161:18, 162:11

**billings** [3] - 59:2, 65:12, 102:20

**bills** [4] - 65:18, 82:6, 97:12, 100:14

**binding** [1] - 153:17

**bit** [7] - 10:3, 17:21, 35:10, 119:9, 141:13, 172:25, 173:20

**biweekly** [1] - 84:14

**black** [1] - 62:21

**Black's** [1] - 144:23

**Blake** [5] - 4:9, 4:17, 5:10, 76:24, 116:21

**Blake's** [1] - 118:4

**blame** [5] - 123:19, 136:24, 148:3, 148:5, 179:5

**blatantly** [1] - 157:7

**blind** [1] - 122:3

**boiler** [1] - 177:6

**bomb** [2] - 171:24

**borne** [1] - 121:19

**boss** [1] - 62:6

**bother** [1] - 95:4

**bottom** [8] - 21:13, 22:9, 29:10, 63:23,

77:13, 80:21, 87:18, 111:8

**bounds** [1] - 158:5

**Box** [1] - 136:25

**box** [2] - 147:7, 179:13

**boy** [1] - 101:25

**bracket** [2] - 29:16, 29:18

**brackets** [1] - 29:21

**Brady** [9] - 136:23, 138:2, 173:8, 173:13, 174:8, 174:9, 174:13, 175:16

**breach** [2] - 6:7, 32:1

**breached** [1] - 111:12

**breaches** [1] - 6:10

**break** [6] - 31:3, 31:14, 55:18, 111:23, 114:24, 144:13

**breaking** [2] - 104:4, 122:5

**breaks** [1] - 18:14

**bridge** [3] - 14:9, 125:8, 128:13

**brief** [21] - 3:20, 7:8, 16:6, 37:7, 38:13, 40:15, 58:13, 70:16, 71:22, 79:19, 90:6, 91:9, 91:10, 91:12, 92:18, 93:18, 93:20, 94:6, 99:6, 149:5, 149:6

**briefed** [3] - 7:11, 146:3, 148:13

**briefer** [1] - 100:22

**briefing** [3] - 137:20, 149:9, 149:16

**briefs** [3] - 58:24, 59:4, 149:23

**bring** [18] - 8:20, 54:15, 59:18, 89:7, 89:21, 96:7, 97:18, 132:15, 137:22, 149:24, 154:19, 157:23, 160:15, 160:17, 162:5,

168:8, 172:4, 178:14

**bringing** [2] - 97:10, 158:20

**brings** [2] - 6:21, 112:6

**broad** [2] - 62:23, 173:6

**broke** [4] - 52:12, 55:6, 114:25, 122:5

**brought** [11] - 38:17, 69:9, 70:2, 70:10, 70:11, 100:18, 100:19, 102:16, 119:15, 149:3, 180:4

**budget** [1] - 175:24

**bulk** [1] - 133:21

**bullet** [4] - 157:1, 157:2, 162:16, 167:10

**bunch** [3] - 62:4, 81:12, 138:9

**burden** [5] - 170:5, 172:10, 172:12, 176:22, 176:23

**burden's** [1] - 178:1

**business** [21] - 11:15, 11:16, 13:12, 36:7, 41:3, 47:10, 47:15, 68:14, 79:17, 95:25, 98:5, 98:12, 98:13, 115:5, 115:14, 117:10, 131:14, 150:12, 150:13, 157:11

**button** [2] - 27:9, 37:9

**buttress** [1] - 31:6

**butts** [1] - 37:20

**C**

**calculating** [1] - 114:23

**calendar** [2] - 16:25, 181:1

**camp** [1] - 155:24

**cancel** [2] - 181:15, 181:17

**canceled** [2] - 90:22, 90:24

**candid** [2] -

38:15, 53:24

**cannot** [8] - 19:25, 72:22, 77:8, 89:20, 90:19, 91:1, 110:25, 177:24

**capacity** [2] - 60:22, 100:13

**Capital** [1] - 90:9

**captures** [1] - 29:5

**cards** [9] - 10:4, 42:5, 64:22, 77:11, 78:12, 104:6, 127:11, 148:14, 168:15

**careful** [2] - 26:10, 172:9

**carefully** [5] - 26:8, 54:12, 102:14, 127:20, 170:13

**cares** [1] - 166:15

**carried** [1] - 8:21

**CASE** [1] - 1:4

**case** [103] - 2:6, 4:9, 4:10, 4:17, 5:10, 5:13, 8:7, 8:8, 8:21, 12:21, 15:20, 15:23, 25:8, 27:19, 36:18, 37:25, 41:11, 44:19, 46:13, 46:19, 47:4, 48:24, 50:13, 50:14, 52:11, 53:25, 56:17, 56:21, 57:5, 57:9, 58:5, 59:10, 61:21, 69:11, 72:4, 74:5, 75:11, 75:12, 75:23, 76:5, 76:10, 76:17, 76:24, 89:13, 90:10, 91:12, 92:1, 92:6, 92:9, 92:15, 95:2, 95:3, 95:4, 97:6, 98:2, 98:11, 98:16, 100:17, 102:3, 102:10, 106:25, 113:12, 115:20, 116:21, 118:4, 118:8, 119:13, 123:3, 127:22, 127:24, 128:5, 132:3, 132:10, 132:14,

135:19, 136:11, 137:11, 141:5, 144:15, 144:24, 146:13, 149:23, 153:5, 153:14, 156:8, 156:15, 158:5, 158:16, 159:2, 161:1, 162:4, 162:9, 162:14, 164:23, 164:24, 166:8, 167:8, 170:15, 171:19, 176:12, 178:5

**cases** [13] - 26:9, 26:10, 47:4, 47:8, 74:5, 90:4, 90:7, 91:9, 115:8, 136:2, 136:4, 136:8, 150:7

**category** [3] - 72:9, 83:2, 84:18

**caught** [1] - 86:15

**caused** [2] - 75:6, 100:6

**cautioned** [3] - 11:21, 12:2, 160:5

**caveat** [2] - 46:24, 64:3

**CCB-18-1386** [1] - 4:10

**cell** [13] - 61:1, 67:1, 67:2, 67:19, 67:21, 67:22, 67:23, 68:21, 92:23, 130:7, 130:12, 131:7, 131:9

**central** [2] - 63:3, 64:18

**CEO** [5] - 60:22, 97:3, 97:8, 101:3, 165:3

**certain** [12] - 8:17, 12:11, 119:9, 121:19, 141:22, 146:8, 167:22, 168:1, 169:10, 172:21, 174:1

**certainly** [25] - 7:24, 31:22, 43:21, 55:17, 62:10, 68:6, 68:8, 68:24, 76:22, 79:16, 89:12, 96:10, 109:8, 110:4,

113:8, 121:25,
129:16, 131:18,
132:2, 135:6,
154:10, 154:11,
169:15, 172:4,
174:20
**certainty** [2] -
94:9, 94:18
**CERTIFICATE** [1]
- 182:1
**certification** [1] -
37:3
**certified** [1] -
48:21
**certify** [1] - 182:5
**CFO** [2] - 10:25,
11:1
**CFR** [1] - 170:21
**challenge** [2] -
20:23, 106:3
**challenges** [1] -
5:25
**challenging** [1] -
106:2
**chance** [2] -
114:12, 155:16
**change** [14] - 6:7,
15:11, 48:12,
52:13, 52:23,
86:1, 86:6,
87:19, 108:3,
112:14, 112:18,
115:22, 121:21,
153:16
**changed** [26] -
12:10, 12:17,
12:19, 13:7,
13:9, 45:19,
50:1, 52:13,
64:9, 65:6, 65:9,
65:13, 65:16,
65:24, 71:11,
80:10, 81:8,
81:12, 86:21,
88:14, 90:20,
93:8, 110:18,
112:19, 117:6,
122:3
**changes** [15] -
65:1, 71:12,
80:19, 81:3,
81:6, 81:8, 81:9,
86:20, 86:25,
91:25, 108:4,
109:10, 112:11,
126:11, 131:25
**changing** [1] -
73:12
**chaos** [1] - 89:18
**chapter** [2] -

51:16, 51:18
**character** [2] -
48:15, 161:4
**characterization**
[1] - 122:18
**characterized** [4]
- 7:5, 41:14,
109:19, 179:6
**characterizes** [1]
- 122:17
**charge** [1] - 66:9
**charged** [2] -
67:25, 151:15
**charges** [1] -
102:17
**Charles** [1] - 1:15
**chart** [7] - 6:1,
62:12, 62:20,
67:9, 68:23,
84:17, 124:11
**charts** [1] - 84:10
**chase** [1] - 173:5
**cheap** [1] - 174:21
**cheat** [1] - 157:11
**cheating** [2] -
114:1, 114:2
**check** [7] - 66:11,
90:12, 90:15,
90:18, 91:2,
117:23, 159:24
**checked** [3] -
92:23, 104:8,
158:15
**checking** [2] -
96:12, 160:10
**checks** [2] -
90:22, 90:24
**chief** [1] - 101:6
**choice** [5] -
120:12, 135:8,
136:18, 137:2,
139:1
**choose** [2] -
139:17, 148:14
**chose** [1] - 79:12
**chosen** [1] -
179:13
**chuckled** [1] -
173:20
**chunk** [1] - 150:3
**Circuit** [7] - 27:20,
27:21, 57:5,
67:4, 90:7,
90:14, 144:15
**circumstances**
[6] - 46:20, 47:5,
56:22, 161:24,
163:12, 167:17
**citations** [1] -
91:12

**cite** [3] - 115:10,
149:12, 150:7
**cited** [11] - 47:21,
56:6, 57:1, 90:4,
90:7, 91:9,
92:15, 92:17,
99:5, 99:6,
170:17
**city** [1] - 35:3
**civil** [21] - 4:8,
5:13, 48:13,
48:24, 67:3,
68:12, 68:22,
69:7, 69:11,
69:22, 72:4,
75:12, 75:15,
76:5, 76:17,
76:24, 77:4,
77:7, 77:19,
118:7, 122:11
**civil/criminal** [1] -
100:8
**claim** [21] - 4:6,
12:22, 19:20,
35:13, 46:3,
87:4, 88:2,
91:16, 102:5,
107:19, 116:16,
120:23, 122:7,
125:20, 133:1,
139:2, 140:2,
155:21, 161:3,
165:16
**claimed** [9] - 18:7,
87:14, 90:12,
102:4, 111:3,
164:25, 170:16,
173:21
**claiming** [5] -
85:18, 85:19,
94:22, 166:11,
170:16
**claims** [4] - 49:16,
73:25, 91:19,
126:13
**Claims** [1] - 100:8
**clarify** [3] - 61:8,
84:20, 130:23
**Clarke** [2] - 1:17,
2:18
**class** [1] - 180:21
**classic** [3] -
11:14, 24:13,
26:22
**classified** [1] -
171:1
**clean** [2] - 118:25,
119:1
**clear** [18] - 4:14,
6:18, 12:5,

34:16, 40:10,
40:11, 42:1,
61:9, 69:14,
72:18, 79:20,
106:25, 125:22,
126:16, 134:20,
136:17, 136:18,
180:2
**clearance** [1] -
175:10
**clearly** [6] - 45:19,
47:10, 47:15,
50:2, 131:13,
161:12
**CLERK** [4] -
57:22, 74:23,
74:25, 103:14
**Clerk** [1] - 180:11
**click** [1] - 72:11
**client** [22] - 14:13,
39:9, 48:19,
51:2, 54:1,
117:6, 117:14,
118:12, 135:25,
136:19, 137:4,
137:16, 142:24,
154:8, 155:11,
162:1, 163:17,
163:25, 164:2,
171:3, 172:10,
173:9
**clip** [1] - 43:22
**clock** [1] - 156:5
**close** [5] - 5:1,
6:11, 150:12,
150:13, 168:17
**closed** [1] -
170:24
**closer** [1] - 65:4
**closing** [1] - 66:8
**clue** [1] - 28:3
**clutter** [1] -
146:19
**co** [1] - 110:24
**co-workers** [1] -
110:24
**collegial** [1] -
159:22
**Colston** [6] -
37:15, 37:19,
38:1, 38:6,
100:24, 109:17
**Colston's** [1] -
37:13
**Columbia** [1] -
1:18
**combination** [1] -
42:24
**comfortable** [1] -
8:14

**coming** [11] -
50:6, 62:2,
75:22, 80:3,
85:25, 118:25,
124:9, 133:21,
153:23, 161:8,
171:19
**comment** [1] -
6:21
**comments** [1] -
131:19
**Commission** [1] -
90:8
**commit** [1] -
162:2
**commitment** [1] -
137:15
**committed** [7] -
76:13, 117:16,
122:5, 145:15,
162:3, 163:9,
174:4
**commonsense**
[1] - 111:21
**companies** [2] -
39:6, 131:14
**Company** [2] -
92:1, 92:7
**company** [19] -
14:13, 14:14,
34:22, 39:18,
39:19, 53:14,
54:18, 60:21,
64:15, 97:3,
98:12, 98:22,
117:24, 126:25,
127:19, 147:25,
161:10, 173:22
**company's** [3] -
60:20, 98:21,
164:15
**comparative** [1] -
134:19
**compare** [4] -
16:22, 37:13,
38:14, 87:25
**compared** [1] -
40:22
**comparison** [1] -
107:18
**compel** [5] - 67:4,
67:21, 138:2,
170:17, 178:3
**compelled** [2] -
76:4, 178:14
**compelling** [1] -
125:4
**compete** [3] -
54:5, 73:18
**competent** [3] -

27:2, 27:13,
142:13
**compiled** [1] -
11:15
**complain** [1] -
171:8
**complaint** [9] -
67:17, 67:20,
68:12, 68:17,
68:22, 75:15,
92:3, 143:3,
152:1
**complete** [3] -
109:18, 110:4,
175:25
**completed** [2] -
133:14, 175:24
**completely** [7] -
23:17, 34:5,
79:8, 98:1,
123:2, 123:12,
158:24
**completeness** [1]
- 149:10
**completing** [1] -
149:21
**completion** [1] -
11:7
**complicated** [3] -
115:3, 153:18,
176:14
**complications** [1]
- 135:15
**comply** [1] -
172:23
**comprehensive**
[1] - 59:19
**Computer** [1] -
1:25
**computer** [10] -
5:4, 18:20, 33:9,
54:21, 72:2,
73:4, 91:23,
106:12, 119:3,
127:15
**computer's** [1] -
33:9
**Computer-aided**
[1] - 1:25
**computers** [2] -
54:21, 54:23
**concede** [2] -
23:5, 143:14
**concedes** [1] -
53:21
**concept** [5] -
42:18, 140:5,
146:11, 147:3,
177:19
**concern** [6] -

121:23, 121:24, 123:11, 145:3, 148:4, 162:1
**concerned** [2] - 145:4, 157:25
**concerning** [1] - 2:7
**concession** [1] - 109:12
**conclude** [1] - 23:9
**concluded** [2] - 91:21, 181:22
**conclusion** [2] - 53:18, 157:15
**conclusively** [2] - 91:5
**concrete** [1] - 63:7
**conditions** [1] - 37:1
**conduct** [4] - 20:6, 26:1, 76:9, 130:3
**conducted** [2] - 41:3, 130:11
**confer** [1] - 154:13
**CONFERENCE** [1] - 1:10
**Conference** [1] - 182:9
**conference** [9] - 7:3, 12:9, 41:15, 51:6, 115:1, 136:18, 143:17, 164:11
**confession** [2] - 69:20, 70:4
**confidence** [1] - 110:4
**confident** [1] - 94:17
**confidential** [2] - 68:14, 155:10
**confirm** [1] - 38:3
**confirmed** [4] - 37:24, 64:25, 65:5, 80:5
**conflate** [1] - 26:11
**conformance** [1] - 182:8
**confront** [1] - 69:18
**confrontation** [1] - 154:12
**confronted** [1] - 69:23
**confusing** [1] -

126:18
**Conley** [1] - 157:21
**connection** [4] - 5:3, 72:6, 77:19, 155:20
**consider** [1] - 162:10
**considerably** [1] - 69:6
**considered** [1] - 81:20
**consist** [1] - 79:23
**consistent** [7] - 34:5, 52:10, 83:16, 93:9, 96:22, 120:18, 145:13
**conspiracy** [1] - 68:13
**constantly** [2] - 34:12, 147:25
**constructive** [1] - 159:22
**consultants** [1] - 72:6
**consultation** [1] - 136:19
**consume** [1] - 180:22
**contacted** [1] - 49:20
**contain** [1] - 94:23
**contained** [1] - 46:16
**contemplated** [1] - 77:25, 143:24
**contends** [1] - 4:20
**contest** [1] - 116:25
**contesting** [2] - 36:24, 37:7
**context** [1] - 91:22
**continuance** [1] - 138:22
**continue** [3] - 9:2, 130:13, 137:7
**continued** [3] - 63:11, 64:14, 69:24
**continues** [2] - 6:12, 7:20
**continuing** [1] - 64:4
**contract** [63] - 9:12, 9:20, 11:7,

12:17, 13:4, 16:20, 45:1, 59:3, 64:6, 73:19, 78:13, 82:3, 84:22, 84:25, 93:11, 96:24, 97:7, 100:20, 100:23, 104:11, 104:18, 110:9, 110:13, 110:15, 140:10, 143:2, 143:7, 146:13, 146:15, 146:16, 146:18, 146:19, 155:21, 155:23, 156:2, 156:8, 156:10, 157:12, 157:17, 157:22, 158:4, 159:10, 160:12, 163:20, 163:22, 167:12, 167:16, 167:22, 170:20, 170:24, 173:23, 173:24, 173:25, 174:4, 174:11, 174:23, 175:3, 175:7, 175:22, 175:23, 176:3
**contracting** [7] - 140:9, 140:10, 141:21, 142:21, 142:25, 143:1, 163:6
**Contracting** [1] - 141:18
**contractor** [2] - 141:23, 168:3
**contractors** [3] - 39:25, 84:24, 170:21
**contracts** [31] - 54:4, 64:21, 82:21, 97:4, 97:9, 101:3, 101:7, 157:6, 158:9, 158:14, 158:16, 158:19, 158:21, 158:22, 158:23, 159:6, 159:11, 160:1, 160:3, 162:18, 163:2, 163:11, 164:6, 165:4, 166:4, 166:14, 166:16, 166:19, 166:21, 167:3
**contrary** [4] - 34:9, 91:15, 108:15, 167:9

**contrasting** [1] - 58:14
**control** [3] - 160:6, 160:7, 160:13
**convenient** [3] - 35:10, 48:7, 49:9
**conversation** [2] - 51:4, 134:5
**conversations** [1] - 164:10
**conversely** [1] - 177:23
**convince** [1] - 128:8
**convinced** [1] - 136:21
**Cooch** [8] - 1:14, 2:12, 71:17, 82:10, 82:16, 106:19, 160:5, 170:5
**COOCH** [21] - 2:14, 82:15, 83:14, 83:22, 84:3, 84:5, 84:8, 84:10, 84:13, 84:16, 85:4, 106:24, 107:14, 107:17, 133:4, 134:4, 134:10, 134:15, 169:13, 181:10, 181:13
**cooperating** [1] - 55:5
**cooperation** [1] - 169:19
**Copeland** [1] - 144:16
**copious** [1] - 137:12
**copy** [4] - 8:24, 9:25, 10:1, 60:4
**COR** [1] - 142:5
**Corp** [1] - 90:9
**corporate** [1] - 151:18
**correct** [18] - 17:7, 34:4, 35:15, 39:23, 40:10, 46:10, 48:23, 57:4, 64:2, 72:18, 76:18, 99:16, 107:14, 117:4, 135:10, 143:11, 148:25, 182:6
**Correct** [2] - 39:21, 84:16

**corrected** [4] - 49:10, 63:22, 65:15, 129:5
**correcting** [1] - 116:18
**correction** [1] - 116:16
**corrections** [3] - 3:18, 62:21, 64:9
**correctly** [2] - 63:24, 134:9
**correspondence** [1] - 7:22
**corrupt** [6] - 13:1, 45:14, 48:6, 49:8, 55:24, 124:1
**corrupted** [17] - 13:14, 13:21, 14:11, 14:19, 15:7, 15:8, 15:9, 20:9, 38:16, 49:10, 55:6, 55:22, 56:2, 97:14, 97:15, 116:11, 120:4
**corrupting** [2] - 120:5, 120:6
**corruption** [4] - 4:7, 14:16, 19:9, 48:1
**corruptor** [2] - 48:6, 55:1
**CORS** [2] - 142:2, 142:3
**cost** [3] - 94:3, 117:24, 173:23
**coughing** [1] - 75:6
**counsel** [30] - 2:11, 2:16, 2:23, 4:11, 4:22, 6:3, 7:22, 51:3, 69:10, 69:22, 72:15, 74:19, 77:5, 77:6, 77:7, 77:22, 77:23, 78:14, 88:13, 93:22, 118:19, 125:25, 136:3, 136:5, 151:7, 151:8, 151:18, 155:4, 169:19, 179:9
**Counsel** [1] - 103:18
**Count** [4] - 13:5, 17:22, 48:19, 105:8

**count** [3] - 99:8, 105:8, 169:18
**counting** [2] - 7:8, 28:15
**counts** [1] - 93:19
**County** [1] - 67:4
**couple** [18] - 4:5, 36:1, 63:13, 65:12, 65:18, 66:18, 89:8, 89:19, 93:4, 102:13, 124:18, 128:23, 128:24, 132:7, 147:11, 160:2, 163:2, 179:9
**coupled** [1] - 128:3
**course** [22] - 2:24, 6:17, 6:18, 11:14, 11:15, 65:8, 65:11, 65:17, 65:20, 66:12, 76:19, 81:6, 89:16, 94:11, 97:5, 98:13, 105:15, 117:11, 134:25, 174:13, 176:3
**court** [19] - 4:9, 7:4, 8:12, 26:10, 28:24, 29:2, 40:12, 46:23, 48:24, 68:12, 68:22, 90:14, 103:14, 107:24, 112:7, 119:1, 133:18, 140:22, 181:16
**Court** [41] - 2:2, 3:23, 4:23, 5:19, 5:21, 7:3, 10:2, 12:3, 12:23, 13:2, 15:4, 38:8, 39:14, 44:18, 57:22, 61:10, 67:4, 79:6, 90:7, 108:5, 108:6, 108:8, 109:10, 110:3, 114:20, 114:21, 116:3, 116:4, 116:6, 120:2, 120:3, 123:16, 123:20, 124:13, 127:17, 128:8, 135:3, 143:18, 182:4
**COURT** [430] - 1:1, 2:15, 2:20, 8:14, 8:20, 9:1,

9:3, 9:14, 9:22,
10:11, 10:13,
10:15, 10:17,
10:20, 10:24,
11:3, 11:22,
11:25, 12:5,
12:8, 13:18,
13:24, 14:4,
14:9, 15:12,
15:19, 15:24,
16:3, 16:10,
16:13, 16:15,
16:17, 16:21,
17:1, 17:5, 17:8,
17:10, 17:12,
17:14, 17:16,
17:19, 19:11,
19:14, 19:16,
19:19, 19:24,
20:14, 20:18,
21:10, 21:14,
21:18, 21:20,
21:23, 22:3,
22:6, 22:8,
22:11, 22:14,
22:21, 23:1,
23:3, 23:17,
23:21, 23:23,
24:11, 24:15,
24:25, 25:5,
25:18, 25:25,
26:16, 26:18,
27:5, 27:17,
27:19, 28:7,
28:10, 28:14,
28:17, 28:19,
28:23, 29:1,
29:4, 29:8,
29:12, 29:15,
29:19, 29:22,
30:2, 30:5, 30:8,
30:11, 30:15,
30:18, 30:20,
31:10, 31:13,
32:9, 32:12,
32:15, 32:17,
32:19, 32:25,
33:2, 33:5,
33:11, 33:14,
33:17, 34:1,
34:7, 35:13,
35:22, 35:24,
36:20, 36:22,
37:1, 38:24,
39:1, 39:3, 39:8,
39:12, 39:15,
39:20, 39:22,
40:3, 40:6, 40:9,
41:7, 42:1, 42:4,
42:8, 42:11,
42:16, 42:18,

42:23, 43:5,
43:7, 43:9,
43:13, 43:16,
43:20, 43:25,
44:2, 44:6,
44:14, 44:17,
44:24, 45:3,
45:7, 45:10,
45:15, 45:17,
45:21, 45:23,
46:2, 46:6, 46:9,
46:13, 46:19,
47:3, 47:15,
47:18, 47:22,
51:19, 51:22,
51:24, 53:1,
53:5, 53:7,
53:11, 53:13,
53:17, 55:11,
55:17, 56:4,
56:9, 56:13,
56:16, 57:1,
57:5, 57:8,
57:14, 57:16,
57:18, 57:21,
57:24, 58:17,
58:20, 59:10,
59:16, 60:2,
60:8, 60:11,
60:14, 60:17,
61:8, 61:18,
62:14, 62:17,
63:23, 64:11,
65:2, 66:4,
67:14, 67:20,
67:23, 68:1,
68:4, 68:16,
68:19, 70:21,
71:3, 74:9,
74:19, 74:22,
75:1, 75:6,
77:20, 78:17,
78:22, 79:2,
80:15, 80:17,
80:22, 82:12,
83:13, 83:21,
84:1, 84:4, 84:6,
84:9, 84:12,
84:14, 85:3,
86:10, 87:6,
88:22, 89:2,
89:25, 92:6,
92:8, 93:16,
94:13, 95:23,
96:16, 96:18,
98:9, 98:16,
99:1, 99:4,
99:13, 99:19,
100:1, 101:18,
103:2, 103:8,
103:10, 103:16,

105:13, 105:16,
105:25, 106:6,
106:9, 106:16,
107:11, 107:16,
107:21, 108:11,
108:14, 111:14,
112:22, 113:6,
113:14, 113:19,
114:4, 114:6,
114:9, 114:13,
114:15, 114:19,
114:22, 116:12,
116:15, 118:2,
118:9, 118:15,
118:21, 119:6,
119:12, 119:17,
119:20, 120:9,
121:3, 121:6,
121:15, 122:21,
123:14, 124:6,
124:8, 124:15,
124:24, 125:7,
125:13, 126:3,
126:16, 126:22,
126:24, 127:5,
127:8, 127:14,
128:15, 128:17,
128:25, 129:11,
129:20, 130:22,
131:2, 131:8,
131:10, 132:4,
132:18, 132:24,
134:2, 134:7,
134:13, 134:21,
135:7, 135:11,
135:17, 135:22,
136:9, 137:8,
138:4, 138:20,
139:1, 139:6,
139:21, 140:1,
140:25, 141:4,
141:9, 143:19,
144:12, 145:12,
146:6, 146:21,
147:13, 148:3,
148:8, 148:12,
148:14, 148:17,
149:1, 149:8,
149:14, 149:19,
149:25, 150:7,
150:15, 150:17,
150:22, 151:4,
151:13, 151:15,
151:20, 152:5,
152:11, 152:19,
152:23, 153:1,
153:3, 153:6,
153:9, 153:14,
153:24, 154:10,
154:20, 154:23,
155:4, 156:4,

156:13, 156:19,
156:22, 156:25,
157:15, 158:25,
159:15, 161:13,
161:16, 161:21,
162:7, 164:9,
164:17, 164:22,
165:11, 165:25,
166:3, 166:7,
166:12, 166:20,
166:22, 167:1,
167:24, 168:5,
168:23, 169:1,
169:18, 171:16,
172:16, 172:25,
173:12, 173:18,
174:8, 176:13,
176:17, 177:6,
177:15, 177:19,
178:5, 178:16,
178:22, 179:8,
180:17, 180:20,
181:1, 181:4,
181:12, 181:15,
181:20, 182:14
**Court's** [4] - 45:2,
71:14, 75:8,
149:3
**courtesy** [2] -
9:25, 60:4
**courtroom** [1] -
180:6
**Courtroom** [1] -
1:8
**cover** [2] - 95:22,
118:18
**covered** [1] -
100:19
**covering** [1] -
44:24
**covers** [5] - 15:20,
15:25, 53:7,
87:1, 150:25
**COVID** [1] - 180:3
**CPA** [1] - 48:22
**Craig** [2] - 82:21,
83:6
**crash** [1] - 139:19
**create** [5] - 10:19,
37:9, 48:11,
52:13, 54:8
**created** [6] -
41:19, 44:10,
50:12, 54:8,
81:13, 113:21
**creates** [1] - 53:25
**creating** [2] -
15:10, 108:21
**credentials** [7] -
18:9, 19:3, 31:3,

33:23, 64:16,
92:21
**credibility** [1] -
120:25
**credible** [3] -
36:12, 36:14,
57:3
**credit** [2] - 70:3,
128:11
**crediting** [1] -
128:12
**credits** [1] -
128:11
**crime** [2] - 162:2,
162:3
**crimes** [3] -
52:12, 76:12,
163:9
**criminal** [12] - 2:6,
49:24, 52:12,
69:10, 69:21,
75:11, 76:9,
76:10, 77:6,
77:22, 124:21,
163:14
**CRIMINAL** [1] -
1:4
**criteria** [1] - 26:5
**critical** [5] -
29:23, 51:10,
109:22, 120:2,
170:15
**criticize** [1] -
173:4
**criticizing** [1] -
170:3
**cross** [16] - 6:6,
15:12, 22:16,
26:13, 36:10,
89:6, 97:18,
115:16, 124:22,
125:3, 125:8,
125:11, 125:15,
126:5, 157:14,
176:15
**cross-
examination** [3]
- 6:6, 36:10,
89:6
**cross-examine**
[8] - 15:12,
22:16, 97:18,
115:16, 124:22,
125:3, 125:11,
125:15
**cross-
examining** [1] -
126:5
**Crews** [5] - 14:5,
79:8, 95:5,

137:12, 179:1
**cure** [1] - 116:19
**current** [2] -
70:19, 91:24
**custodial** [1] -
133:15
**custodian** [2] -
37:2, 168:11
**cut** [2] - 14:24,
162:7
**cuts** [3] - 50:5,
50:16, 161:7
**cutting** [1] - 15:2
**cyberspace** [1] -
106:13

## D

**daily** [4] - 87:15,
87:16, 87:17,
96:11
**damages** [2] -
117:23, 118:6
**darn** [1] - 68:7
**dashboard** [1] -
10:1
**Data** [5] - 59:19,
60:17, 60:18,
61:12, 111:7
**data** [10] - 19:9,
64:22, 82:25,
84:17, 84:19,
106:12, 108:3,
133:9, 133:15,
134:16
**database** [1] -
84:19
**date** [34] - 3:22,
5:8, 11:23,
12:18, 30:9,
30:13, 32:7,
32:10, 33:12,
33:15, 53:18,
53:21, 53:22,
61:11, 61:14,
63:25, 64:25,
65:5, 72:20,
72:21, 81:1,
84:18, 89:8,
107:18, 107:19,
109:1, 110:17,
119:9, 128:7,
130:8, 130:18,
137:1, 150:24
**dated** [1] - 69:14
**Dated** [1] - 182:12
**dates** [14] - 6:8,
53:22, 54:1,
63:25, 81:12,
83:4, 83:9, 94:3,

111:6, 111:17,
111:21, 117:25,
123:11, 130:6
**Daubert** [4] -
3:11, 26:17,
54:13, 57:12
**days** [25] - 12:11,
48:23, 51:5,
61:15, 63:13,
66:11, 69:14,
86:3, 86:4, 86:8,
95:9, 95:10,
95:15, 106:3,
110:19, 116:16,
117:19, 118:25,
119:17, 133:24,
136:19, 150:20,
168:17, 169:6
**deal** [5] - 50:16,
52:4, 52:5, 58:9,
122:6
**dealing** [4] - 58:2,
89:18, 139:19,
145:25
**deals** [1] - 137:21
**debarred** [2] -
54:2
**debate** [1] - 6:13
**Debbie** [1] - 83:3
**December** [21] -
2:8, 3:2, 3:16,
5:13, 30:24,
31:11, 31:13,
31:15, 70:8,
74:15, 76:2,
78:5, 78:25,
102:11, 114:16,
133:5, 137:19,
145:10, 171:23,
182:12
**decide** [15] - 7:19,
14:21, 36:3,
103:4, 115:2,
122:23, 123:17,
126:17, 127:18,
127:21, 139:24,
140:14, 155:13,
155:14, 169:20
**decided** [3] -
74:7, 86:16,
153:15
**decides** [1] -
123:1
**decision** [1] -
167:18
**decisions** [1] -
163:12
**declined** [1] -
21:3
**deducting** [1] -

86:8
**deemed** [1] - 5:1
**defeat** [2] - 98:17,
98:23
**defendant** [16] -
4:8, 4:11, 90:15,
90:19, 90:22,
97:18, 98:1,
100:25, 104:4,
154:6, 155:9,
164:16, 164:25,
168:11, 170:5,
176:25
**Defendant** [10] -
1:5, 1:16, 3:3,
3:7, 3:20, 5:25,
60:22, 83:8,
86:22, 170:11
**defendant's** [13] -
9:25, 79:24,
90:16, 92:3,
100:13, 120:18,
131:23, 133:6,
139:2, 148:21,
164:12, 164:15,
173:22
**Defendant's** [7] -
4:1, 9:24, 16:8,
16:9, 43:1,
83:22, 137:2
**defendants** [3] -
90:10, 90:17,
91:1
**defense** [61] - 2:8,
3:13, 3:15, 4:6,
4:11, 4:19, 4:20,
4:22, 5:17, 5:22,
5:24, 6:3, 6:16,
8:8, 19:17,
19:19, 31:6,
41:12, 41:16,
41:23, 58:23,
70:6, 72:7,
73:25, 75:10,
75:11, 77:5,
78:8, 78:13,
80:2, 81:25,
85:18, 87:24,
88:20, 90:4,
93:22, 94:2,
104:7, 105:10,
116:25, 125:19,
125:21, 125:25,
129:14, 148:4,
148:23, 149:10,
149:22, 158:7,
162:17, 165:14,
169:4, 169:24,
170:16, 171:5,
171:21, 177:5,

177:20, 178:5,
178:10, 179:6
**Defense** [4] -
10:7, 11:5,
39:25, 129:2
**defense's** [3] -
87:4, 155:18,
170:8
**defenses** [1] -
124:21
**define** [1] - 10:22
**defined** [2] -
144:18, 144:20
**defines** [1] - 10:9
**defining** [2] -
8:16, 42:2
**definitely** [1] -
149:1
**definition** [3] -
144:18, 144:22,
150:13
**definitively** [1] -
89:5
**deflated** [1] -
107:9
**defraud** [1] -
100:4
**degree** [3] - 94:9,
94:18, 148:7
**delay** [1] - 145:3
**delays** [1] -
149:21
**delete** [2] - 86:16,
108:5
**delineates** [1] -
10:9
**deliver** [2] -
13:11, 113:17
**deliverables** [1] -
147:20
**delivered** [10] -
12:1, 13:11,
34:23, 41:5,
88:2, 113:5,
113:15, 116:7,
117:9, 117:13
**deluge** [1] - 35:15
**demand** [1] -
67:18
**demonstrate** [6] -
6:7, 12:23, 15:4,
52:25, 73:8,
98:2
**demonstrated** [1]
- 58:13
**demonstrates** [2]
- 98:24, 98:25
**demonstrating**
[2] - 36:16,
69:19

**denied** [5] -
69:25, 75:20,
90:14, 138:3,
144:16
**denies** [2] - 6:10,
48:19
**dense** [1] - 166:8
**deny** [2] - 69:17,
69:24
**depart** [2] - 63:20,
75:3
**departing** [1] -
63:14
**Department** [2] -
2:12, 39:25
**departure** [1] -
34:2
**deposed** [2] -
4:16, 78:1
**deposition** [22] -
5:9, 5:12, 5:15,
5:16, 7:1, 48:9,
48:13, 50:15,
69:16, 70:3,
77:5, 78:2,
96:21, 112:14,
116:21, 118:11,
118:14, 118:19,
119:4, 122:11
**describe** [1] -
42:12
**described** [2] -
129:3, 172:13
**describes** [1] -
140:24
**description** [1] -
28:20
**designation** [1] -
168:11
**designations** [1] -
89:16
**destroy** [1] -
31:17
**destroyed** [2] -
143:22, 145:24
**destruction** [2] -
144:20, 144:22
**detail** [4] - 5:25,
14:25, 18:1,
41:18, 43:12,
43:18, 83:5,
84:9, 84:22,
106:20, 107:15,
133:19, 162:14
**details** [7] - 44:5,
82:23, 84:10,
84:17, 84:21,
107:3, 169:13
**determinations**
[1] - 91:17

**determine** [6] -
24:3, 61:4, 67:2,
79:10, 140:3,
146:17
**determined** [8] -
14:16, 61:1,
62:11, 63:5,
66:25, 67:7,
77:22, 130:11
**developed** [1] -
73:22
**development** [2] -
146:15, 175:12
**deviation** [1] -
38:9
**device** [1] - 68:3
**Dictionary** [1] -
144:23
**died** [1] - 96:8
**difference** [7] -
37:23, 37:24,
38:2, 109:13,
109:21, 110:16,
141:2
**different** [33] -
25:15, 26:23,
26:25, 41:23,
48:8, 50:2, 61:5,
72:25, 73:5,
77:4, 78:11,
79:9, 80:1, 84:9,
84:11, 84:12,
84:13, 84:19,
86:3, 86:4,
87:20, 99:1,
106:22, 111:17,
113:5, 123:12,
124:25, 150:13,
169:20, 171:16,
177:10, 177:18
**differently** [1] -
26:15
**difficult** [7] -
24:21, 78:17,
112:1, 114:9,
136:7, 166:13,
172:23
**difficulty** [4] -
25:22, 25:23,
64:5, 71:16
**digit** [1] - 32:20
**Dijkstra** [3] -
70:10, 113:2,
113:22
**dire** [3] - 179:15,
179:18, 179:23
**direct** [1] - 157:14
**directly** [2] - 78:8,
151:25
**disagree** [1] -

164:3
**disagreement** [1]
- 4:13
**disappear** [1] -
27:9
**disappeared** [1] -
96:8
**disclose** [3] -
67:5, 67:15,
67:21
**disclosed** [2] -
76:1, 97:19
**discovered** [3] -
62:3, 62:9,
86:15
**discovery** [20] -
34:24, 54:5,
67:17, 67:18,
68:2, 90:25,
97:20, 113:16,
113:23, 117:7,
117:15, 129:15,
129:23, 132:25,
133:3, 133:4,
133:6, 140:3,
141:20, 181:11
**discrepancies** [1]
- 87:6
**discrepancy** [5] -
20:15, 20:18,
85:21, 87:7,
87:8
**discrete** [3] -
66:16, 140:9,
140:23
**discuss** [5] - 47:9,
77:15, 132:16,
154:20, 181:11
**discussed** [2] -
14:14, 90:5
**discussing** [2] -
77:14, 170:4
**discussion** [2] -
6:12, 53:14
**discussions** [1] -
148:17
**dishonest** [1] -
29:24
**dismiss** [3] -
93:19, 98:8,
137:13
**dismissed** [2] -
94:16
**disordered** [1] -
76:20
**disposal** [1] -
105:15
**dispute** [5] - 40:9,
72:17, 99:24,
111:5

disputed [2] - 19:22, 140:11

distinction [1] - 170:1

distinguished [1] - 41:25

distribution [1] - 90:12

DISTRICT [2] - 1:1, 1:1

district [2] - 76:21, 90:14

District [2] - 182:4, 182:5

disturbing [1] - 63:16

DIVISION [1] - 1:2

docket [2] - 179:16

docketed [2] - 3:17, 3:24

doctored [1] - 85:19

Doctrine [1] - 143:22

document [11] - 27:3, 46:6, 70:2, 72:15, 91:15, 91:21, 98:7, 98:24, 127:20, 173:20, 174:15

document's [1] - 168:11

documents [14] - 76:25, 78:11, 81:18, 81:22, 89:6, 91:19, 97:21, 98:24, 113:22, 129:18, 133:7, 170:18, 171:2, 171:10

Doe [4] - 67:3, 67:17, 67:20, 68:16

dollars [9] - 53:23, 66:9, 117:24, 155:20, 156:14, 157:17, 159:17, 161:5, 163:23

done [42] - 40:15, 40:21, 40:22, 40:25, 60:9, 65:16, 68:4, 68:5, 69:5, 69:19, 69:20, 74:15, 103:1, 105:18, 106:13, 114:23, 120:18, 124:20, 130:3,

134:6, 136:11, 136:12, 137:11, 138:17, 139:17, 139:18, 141:17, 142:20, 143:3, 143:6, 146:19, 147:6, 147:7, 150:1, 150:10, 150:21, 150:24, 161:17, 161:23, 161:25, 168:16, 181:20

door [3] - 159:4, 172:10, 172:13

door's [1] - 159:13

doubt [1] - 110:1

down [26] - 22:4, 22:13, 25:1, 28:15, 29:6, 29:17, 30:9, 30:16, 31:14, 32:6, 33:19, 43:14, 61:3, 72:13, 76:22, 80:21, 94:2, 104:22, 130:24, 136:6, 138:19, 139:22, 142:13, 170:24, 173:17, 180:5

Dr [1] - 1:18

draft [2] - 112:9, 179:11

drafts [1] - 179:17

drawn [3] - 79:14, 87:21, 87:22

drew [1] - 106:19

drill [1] - 94:2

Drilling [2] - 92:1, 92:7

drink [1] - 74:20

drinking [1] - 176:10

drive [1] - 159:14

dropped [4] - 137:19, 137:25, 157:20, 171:24

drops [1] - 138:15

due [2] - 103:9, 136:13

duke [1] - 145:3

during [16] - 5:9, 37:22, 38:7, 56:5, 59:20, 78:14, 102:12, 107:24, 114:24, 140:18, 148:21, 157:7, 158:14, 160:13, 163:23,

180:3

duties [2] - 101:3, 146:17

Dwayne [27] - 4:8, 10:8, 18:20, 21:2, 24:19, 25:16, 31:2, 31:8, 31:25, 35:12, 41:19, 44:10, 50:25, 82:1, 93:13, 108:16, 108:18, 111:16, 112:5, 112:11, 117:16, 123:25, 124:22, 126:14, 160:19, 176:9

## E

E) [2] - 40:5, 40:8

e-mails [1] - 51:2

early [12] - 58:25, 68:5, 68:21, 70:8, 80:20, 82:19, 113:3, 124:15, 130:2, 160:25, 168:9

easier [1] - 53:2

easiest [1] - 18:12

easily [3] - 13:6, 18:2, 60:12

easy [5] - 25:12, 58:9, 81:16, 81:17, 115:10

ECF [32] - 3:4, 3:17, 3:18, 3:19, 3:22, 3:23, 3:24, 4:1, 4:22, 5:11, 5:23, 6:5, 6:11, 6:13, 7:15, 8:18, 11:12, 11:18, 42:25, 44:14, 56:7, 62:14, 62:15, 77:20, 78:23, 79:2, 83:1, 91:11, 93:9, 93:17, 93:18, 132:20

edit [2] - 32:2, 33:13, 33:16, 36:6, 47:11, 120:22

edited [3] - 32:1, 52:24, 120:13

editing [1] - 34:3

edits [8] - 18:14, 27:1, 27:2, 27:4, 27:7, 27:8, 27:9, 33:4

effect [3] - 3:11, 73:17

effective [1] - 136:12

effectively [1] - 69:11

effort [4] - 3:11, 136:10, 157:16, 175:23

efforts [4] - 156:3, 172:13, 172:14, 172:15

egregious [1] - 96:3

eight [5] - 30:9, 49:14, 68:11, 85:13, 171:5

eighth [1] - 28:15

either [11] - 14:11, 14:20, 34:8, 34:11, 55:3, 65:19, 70:19, 87:3, 100:12, 143:23, 168:10

elements [1] - 40:4

ELH-21-036 [2] - 1:4, 2:6

eliminated [1] - 49:3

ELLEN [1] - 1:11

elsewhere [2] - 111:10, 140:22

email [12] - 123:8, 123:11, 130:1, 151:7, 153:13, 153:23, 153:24, 154:4, 154:15, 154:17, 155:1, 155:6

email's [1] - 110:23

emails [9] - 88:10, 110:11, 169:4, 169:5, 171:25, 172:3, 172:5

employed [1] - 143:7

employee [5] - 4:7, 50:8, 64:12, 87:16, 96:22

employees [6] - 49:18, 59:14, 61:5, 61:25, 62:5, 84:24

employees' [1] - 147:15

employment [3] - 19:7, 31:24, 168:2

en [2] - 144:15

encoded [1] - 105:21

encompass [1] - 106:1

end [16] - 10:18, 31:17, 33:25, 34:19, 63:12, 70:3, 87:3, 87:9, 95:16, 104:1, 107:11, 133:17, 134:20, 144:4, 151:23, 170:24

ends [1] - 45:1

energy [1] - 137:15

engaged [1] - 148:1

English [1] - 42:19

enter [7] - 41:17, 76:11, 87:17, 92:22, 93:2, 93:4, 152:16

entered [13] - 5:2, 13:7, 18:20, 18:21, 35:17, 35:25, 49:25, 81:15, 87:15, 87:16, 96:11, 117:18, 120:14

entering [2] - 64:5, 117:19

enters [1] - 35:6

entertain [1] - 25:9

entire [6] - 19:24, 44:25, 46:4, 47:19, 47:24, 56:22

entirely [1] - 117:11

entirety [2] - 46:24, 124:14

entitled [7] - 113:6, 155:23, 168:7, 171:12, 176:24, 177:4, 182:7

entries [6] - 47:11, 61:16, 63:24, 64:16, 82:4, 83:8

entry [6] - 5:4, 45:11, 64:7, 81:8, 106:12, 108:3

envisioning [1] - 176:17

errata [11] - 48:10,

76:5, 77:18, 77:23, 117:19, 117:20, 118:4, 118:24, 119:2, 119:9, 119:13

erroneous [1] - 160:2

erroneously [1] - 159:25

especially [2] - 146:14, 170:15

Esquire [1] - 1:13, 1:14, 1:17

essential [1] - 75:11

essentially [4] - 6:15, 7:6, 12:21, 65:23

establish [5] - 22:21, 71:9, 71:10, 90:12, 136:4

established [2] - 163:1, 170:7

establishing [1] - 91:14

estimate [1] - 133:23

estimates [2] - 173:24, 174:3

estoppel [2] - 148:4, 179:6

euphemisms [1] - 163:25

evaluate [1] - 53:14

evaluated [2] - 165:2, 176:5

evaluation [1] - 112:1

evaluations [2] - 164:5, 173:9

eve [1] - 63:17

evening [3] - 60:24, 66:15, 66:18

event [9] - 4:15, 30:13, 30:14, 30:19, 63:7, 109:24, 119:22, 122:22, 169:10

eventually [1] - 163:1

evidence [43] - 36:9, 41:23, 50:3, 55:21, 62:25, 66:13, 91:1, 91:4, 91:8, 91:16, 91:18, 91:20, 92:4,

92:14, 99:10,
101:11, 102:24,
120:19, 121:7,
123:4, 125:4,
126:10, 131:18,
144:21, 152:16,
153:23, 155:19,
156:17, 159:17,
162:5, 162:17,
164:6, 165:2,
165:4, 165:14,
166:11, 166:17,
166:24, 167:6,
170:6, 170:9,
170:10, 178:23
**Evidence** [2] -
3:10, 11:17
**evident** [3] -
32:12, 33:7,
33:17
**evil** [2] - 81:25,
161:11
**ex** [1] - 64:4
**ex-husband** [1] -
64:4
**exact** [4] - 24:5,
36:19, 51:13,
109:1
**exactly** [16] -
19:21, 27:15,
39:15, 59:19,
64:18, 72:18,
78:21, 91:4,
96:20, 98:19,
120:15, 138:18,
144:17, 145:8,
180:2, 180:10
**examination** [3] -
6:6, 36:10, 89:6
**examine** [8] -
15:12, 22:16,
97:18, 115:16,
124:22, 125:3,
125:11, 125:15
**examined** [1] -
102:14
**examiners** [1] -
148:22
**examining** [1] -
126:5
**example** [27] -
20:11, 21:18,
35:3, 36:11,
49:11, 49:15,
55:14, 61:3,
66:13, 81:24,
82:7, 82:17,
82:24, 83:1,
83:3, 98:11,
107:1, 110:5,

112:20, 116:6,
126:11, 157:6,
169:17, 173:9,
173:14, 175:12,
176:24
**examples** [3] -
32:5, 102:23,
176:20
**except** [2] - 93:11,
179:4
**exception** [2] -
99:1, 125:10
**excerpts** [1] -
71:20
**exchange** [1] -
50:21
**Exchange** [1] -
90:8
**exculpate** [1] -
162:5
**exculpated** [1] -
76:15
**exculpatory** [2] -
148:24, 174:10
**excuse** [6] -
16:14, 43:1,
107:2, 133:11,
142:22, 144:15
**executive** [2] -
101:3, 101:6
**exhaustive** [2] -
65:8, 145:2
**Exhibit** [42] -
9:24, 9:25, 10:3,
10:5, 10:7, 11:5,
16:8, 16:9, 18:9,
19:10, 20:21,
21:20, 24:20,
27:18, 34:19,
43:1, 43:10,
43:11, 44:3,
44:24, 45:15,
46:3, 46:9,
46:16, 51:2,
60:12, 70:17,
70:21, 71:2,
77:17, 78:11,
78:19, 108:13,
110:21, 110:23,
111:8, 123:5,
124:14, 129:2,
169:7
**exhibit** [24] - 3:23,
13:23, 21:10,
21:11, 21:16,
21:21, 23:4,
28:22, 33:25,
42:14, 43:17,
44:11, 44:15,
45:7, 71:8,

71:19, 78:18,
80:24, 112:10,
129:8, 129:24,
149:20, 152:15,
169:11
**exhibits** [17] -
3:15, 3:17, 3:25,
9:24, 29:1,
46:17, 58:23,
59:22, 59:23,
60:4, 71:14,
71:15, 78:18,
80:24, 149:20,
168:18, 168:24
**exist** [6] - 31:15,
31:16, 39:24,
48:5, 53:11,
141:25
**existed** [8] -
142:10, 142:11,
142:15, 143:15,
145:23
**exit** [1] - 92:14
**expect** [2] - 80:2,
101:4
**expected** [3] -
7:10, 85:22,
128:6
**expedition** [1] -
173:1
**expense** [1] -
127:18
**experienced** [1] -
45:13
**expert** [43] - 3:10,
3:13, 6:14, 6:16,
6:17, 6:18,
14:12, 14:17,
14:22, 14:23,
15:2, 18:3,
23:11, 23:13,
23:14, 24:16,
26:4, 26:11,
26:14, 27:12,
33:22, 41:12,
41:17, 41:21,
41:22, 53:1,
53:8, 53:9,
54:20, 54:21,
54:22, 54:23,
61:11, 81:16,
89:7, 89:13,
89:16, 89:24,
101:24, 113:11,
115:21, 127:4,
138:4
**expertise** [1] -
24:7
**experts** [3] -
89:14, 138:5,

143:7
**expires** [1] -
175:4
**explain** [6] -
40:24, 81:17,
109:5, 125:1,
125:2, 127:1
**explained** [3] -
83:23, 107:8,
174:25
**explanation** [4] -
19:1, 50:10,
86:10, 125:4
**exposed** [1] -
75:19
**express** [1] - 77:1
**expressly** [3] -
72:13, 75:16,
84:21
**extensions** [2] -
174:16, 174:18
**extensive** [1] - 4:2
**extent** [3] -
118:13, 153:15,
167:2
**extract** [3] -
69:20, 84:11,
84:19
**extracted** [1] -
84:17
**extraneous** [1] -
104:18
**extremely** [1] -
135:2
**eyebrow** [1] -
41:20

# F

**F.2d** [2] - 56:25,
92:2
**F.3d** [2] - 90:8,
144:17
**facially** [1] - 93:5
**facie** [2] - 91:17,
91:18
**fact** [40] - 12:19,
15:25, 23:7,
25:18, 27:15,
34:18, 35:24,
36:17, 39:10,
40:17, 47:9,
49:21, 51:13,
58:8, 63:7, 63:8,
69:5, 70:1,
72:12, 91:17,
92:10, 96:21,
97:7, 99:3,
111:9, 112:14,
120:8, 120:21,

120:24, 126:14,
144:9, 146:11,
156:13, 160:6,
167:16, 170:23,
171:9, 171:12,
171:21, 176:8
**facts** [5] - 46:21,
47:5, 76:11,
77:18, 154:18
**failed** [5] - 29:12,
29:13, 29:22,
30:17, 177:21
**fails** [1] - 29:9
**failure** [1] - 170:9
**fair** [5] - 41:2,
70:4, 103:21,
137:8, 142:11
**fairly** [5] - 55:15,
58:9, 66:3,
66:16, 130:2
**fairness** [1] -
180:21
**faith** [1] - 128:8
**fall** [13] - 9:10,
9:18, 16:24,
67:4, 68:5, 68:8,
74:13, 74:14,
95:4, 120:8,
145:18, 162:18,
166:4
**fallback** [1] -
152:20
**falls** [1] - 120:8
**False** [1] - 100:8
**false** [11] - 5:5,
68:25, 69:1,
77:19, 93:19,
98:6, 98:7,
105:5, 105:8,
157:6, 157:8
**falsely** [1] - 105:2
**falsity** [1] - 115:13
**familiar** [3] -
39:20, 124:4,
150:4
**familiarity** [1] -
33:20
**family** [2] - 63:13,
63:19
**fanciful** [1] -
140:24
**far** [17] - 4:2,
13:18, 17:20,
29:17, 38:18,
50:10, 77:14,
87:10, 101:1,
103:22, 104:24,
121:21, 128:14,
129:22, 133:19,
157:25, 160:14

**FAR** [3] - 141:17,
143:11, 146:4
**fascinating** [1] -
14:24
**fast** [2] - 17:5,
30:2
**favor** [3] - 38:4,
38:5, 64:14
**favorable** [1] -
125:19
**feasible** [2] -
66:10, 153:15
**February** [4] -
61:21, 93:8,
102:12, 130:1
**February/March**
[1] - 162:20
**federal** [1] - 146:1
**FEDERAL** [1] -
182:14
**Federal** [3] - 3:9,
11:16, 140:23
**fell** [1] - 8:3
**felony** [3] - 122:5,
122:23, 122:24
**felt** [1] - 58:11
**fenced** [1] - 79:13
**few** [4] - 64:21,
93:11, 93:14,
94:22, 97:16,
101:12, 102:23,
103:3, 109:13,
128:18, 136:19,
150:20, 168:17
**FFP** [1] - 104:19
**fifths** [1] - 32:6
**figure** [3] - 74:12,
146:22, 155:5
**figuring** [1] - 48:4
**file** [20] - 76:5,
76:9, 95:4,
107:3, 113:20,
113:21, 140:9,
140:23, 141:3,
141:4, 142:5,
142:19, 142:20,
142:21, 143:2,
146:13, 150:22,
156:20, 170:2
**filed** [32] - 2:8,
3:3, 3:16, 3:20,
3:23, 3:24, 4:9,
5:15, 7:7, 7:15,
8:1, 41:16,
62:16, 67:3,
67:10, 67:20,
68:11, 70:15,
77:23, 78:9,
78:25, 79:19,
99:8, 114:21,

119:9, 119:13, 133:5, 143:3, 143:24, 145:10, 150:18, 173:21
**files** [3] - 31:23, 141:25, 146:16
**filing** [7] - 68:22, 79:6, 114:15, 116:4, 132:20, 139:12, 149:17
**filings** [6] - 34:12, 70:20, 129:17, 129:18, 129:25, 135:19
**fill** [4] - 104:10, 104:14, 104:25, 105:3
**filled** [1] - 104:6
**final** [8] - 6:21, 27:9, 85:14, 96:4, 112:24, 121:22, 129:4, 140:3
**finally** [1] - 14:6
**financially** [1] - 161:9
**finder** [3] - 28:2
**fine** [2] - 148:16, 164:5
**finer** [1] - 33:6
**fingers** [1] - 174:23
**finish** [3] - 133:25, 139:6, 154:14
**finished** [2] - 105:13, 105:14
**finite** [2] - 12:22, 30:22
**fired** [2] - 63:12, 63:17
**firing** [1] - 63:18
**firm** [2] - 69:9, 175:22
**first** [64] - 4:17, 5:16, 6:13, 7:11, 8:16, 9:4, 9:24, 10:12, 10:18, 11:11, 12:15, 15:15, 20:3, 20:11, 23:4, 25:11, 30:13, 31:5, 31:15, 32:20, 36:15, 37:5, 37:11, 44:4, 45:18, 47:1, 47:5, 47:7, 47:14, 47:20, 48:9, 55:23, 60:20, 62:6,

62:23, 69:16, 71:18, 72:14, 75:17, 85:9, 85:10, 105:19, 111:22, 112:16, 112:22, 114:12, 116:10, 118:7, 118:18, 119:16, 121:9, 122:10, 123:4, 124:19, 125:15, 129:19, 130:15, 132:24, 136:24, 139:13, 141:8, 143:25, 157:19, 168:24
**First** [2] - 6:5, 129:1
**Fisher** [1] - 83:3
**fishing** [1] - 172:25
**fit** [1] - 175:18
**fits** [1] - 123:2
**five** [10] - 29:20, 32:7, 32:23, 94:10, 94:17, 97:4, 100:21, 129:12, 130:15, 177:3
**fixed** [1] - 175:22
**flagged** [1] - 131:17
**flight** [3] - 22:18, 22:19, 111:4
**fluid** [1] - 153:16
**fly** [1] - 139:24
**focus** [5] - 14:10, 19:11, 33:8, 75:13, 127:14
**focused** [4] - 5:15, 84:21, 120:21, 138:10
**focuses** [1] - 4:6
**focusing** [4] - 7:20, 33:9, 106:17
**follow** [8] - 12:14, 31:21, 55:13, 135:3, 142:5, 145:25, 179:24
**follow-up** [4] - 31:21, 135:3, 179:24
**following** [8] - 15:6, 24:10, 44:19, 110:11, 122:7, 122:15, 142:2, 149:6
**follows** [1] - 93:9
**footnote** [6] - 11:12, 72:12,

138:19, 138:20, 139:1, 157:20
**FOR** [1] - 1:1
**foregoing** [1] - 182:6
**forensic** [1] - 72:6
**Forensic** [1] - 59:19
**forensics** [3] - 40:18, 72:3
**Forensics** [4] - 60:17, 60:18, 61:12, 111:7
**forget** [2] - 14:14, 111:18
**forgive** [2] - 13:18, 15:25
**forgiveness** [1] - 156:5
**forgot** [3] - 67:8, 68:23, 147:12
**forgotten** [2] - 126:7, 167:13
**form** [1] - 26:4
**formal** [1] - 129:4
**format** [3] - 25:15, 73:6, 182:8
**former** [5] - 4:7, 50:15, 51:8, 151:8, 154:8
**forth** [8] - 27:2, 34:13, 88:10, 110:11, 111:4, 116:14, 159:7, 163:1
**fortunately** [1] - 63:21
**forward** [6] - 60:4, 132:15, 135:9, 135:11, 139:3, 172:4
**four** [14] - 18:23, 25:2, 34:12, 94:6, 97:4, 103:18, 130:14, 130:15, 138:10, 176:9, 180:8, 180:19
**fourth** [1] - 55:24
**Fourth** [2] - 27:20, 27:21
**frame** [1] - 119:13
**frankly** [9] - 4:2, 6:22, 38:18, 55:10, 74:4, 115:4, 136:9, 136:11, 147:18
**Fraud** [1] - 2:13
**fraud** [8] - 38:11, 90:13, 94:23,

98:12, 98:23, 98:24, 98:25, 101:11
**fraudulent** [4] - 94:23, 100:6, 101:13, 102:9
**FRE** [3] - 4:21, 6:2, 56:19
**free** [5] - 2:24, 23:23, 172:4
**frequently** [4] - 18:11, 97:14, 157:4, 176:21
**Friday** [9] - 180:12, 180:13, 180:16, 180:21, 180:22, 181:7, 181:13, 181:15, 181:18
**friendly** [1] - 44:21
**fringe** [4] - 108:23, 108:24, 109:4
**front** [8] - 8:24, 43:4, 62:1, 76:24, 103:22, 106:11, 106:14, 144:13
**fruitful** [1] - 159:23
**full** [12] - 5:14, 37:16, 85:12, 94:18, 97:9, 102:1, 102:3, 102:4, 138:13, 151:10, 151:15, 151:17
**full-time** [5] - 37:16, 85:12, 102:1, 102:3, 102:4
**fully** [2] - 7:7, 7:11
**fulsome** [1] - 7:24
**fulsomeness** [2] - 151:1, 151:2
**fundamental** [1] - 76:24

## G

**gain** [1] - 61:1
**gall** [1] - 4:23
**game** [1] - 65:12
**gamut** [1] - 56:22
**gander** [2] - 5:18, 41:15
**gap** [1] - 19:5
**gatekeeper** [2] - 121:5, 122:14

**gatekeeper's** [1] - 128:10
**gather** [1] - 116:12
**gathered** [1] - 180:4
**general** [4] - 23:4, 50:13, 92:3, 96:5
**General** [3] - 5:6, 49:20, 82:20
**generally** [2] - 163:5, 165:15
**generated** [5] - 73:3, 73:4, 83:25, 101:23, 131:23
**generically** [1] - 106:1
**generous** [2] - 150:11, 165:14
**geniuses** [1] - 175:11
**gentleman** [1] - 118:25
**gestae** [2] - 98:3, 100:5
**ghost** [1] - 136:16
**Giglio** [2] - 173:15, 174:6
**given** [18] - 8:7, 11:19, 15:20, 35:16, 50:20, 54:4, 60:6, 78:18, 80:25, 87:21, 89:12, 92:14, 97:23, 113:2, 125:3, 127:18, 167:5, 167:23
**glad** [1] - 132:2
**global** [1] - 61:13
**glove** [1] - 123:2
**glowing** [1] - 167:6
**goal** [1] - 48:11
**God** [1] - 62:4
**golf** [3] - 49:21, 109:23, 110:17
**golfing** [1] - 176:10
**gonna** [3] - 48:5, 73:24, 74:7
**goose** [5] - 5:17, 41:14, 173:5
**gosh** [1] - 80:19
**Government** [179] - 3:7, 3:12, 3:23, 4:14, 5:3, 6:1, 6:15, 6:16,

7:13, 7:15, 8:1, 8:5, 11:8, 11:13, 11:19, 11:20, 11:21, 12:2, 12:24, 13:10, 14:22, 15:2, 15:3, 15:16, 18:6, 19:25, 20:22, 20:23, 21:5, 23:12, 24:20, 25:14, 29:24, 31:3, 31:18, 31:19, 32:1, 34:9, 34:10, 34:12, 34:13, 34:14, 34:18, 34:21, 34:23, 35:11, 35:17, 35:19, 35:20, 36:7, 36:15, 37:5, 37:15, 38:1, 38:12, 38:17, 40:15, 40:21, 40:22, 41:10, 41:21, 41:24, 42:21, 43:1, 47:2, 48:3, 48:4, 48:22, 48:25, 49:6, 50:16, 50:22, 51:6, 51:10, 51:12, 51:25, 52:4, 52:15, 53:18, 53:20, 54:15, 55:2, 55:5, 55:21, 58:7, 69:1, 69:3, 70:17, 76:14, 78:14, 83:6, 83:11, 102:1, 107:23, 108:1, 108:2, 109:7, 109:11, 109:16, 109:22, 110:5, 110:16, 111:20, 112:4, 112:8, 112:21, 113:18, 115:12, 116:3, 116:19, 117:5, 117:9, 117:17, 118:1, 119:8, 119:15, 120:1, 120:16, 121:20, 122:2, 122:9, 122:20, 123:17, 123:23, 124:3, 124:13, 124:21, 125:19, 125:23, 127:21, 128:5, 131:21, 133:12,

134:12, 135:15, 136:21, 136:25, 140:24, 141:25, 142:1, 142:7, 142:11, 143:14, 152:14, 153:4, 153:22, 155:2, 156:14, 157:3, 158:13, 159:3, 159:8, 160:16, 163:16, 165:17, 166:10, 166:18, 167:9, 167:11, 168:7, 169:8, 169:10, 170:7, 170:8, 171:20, 171:25, 172:9, 172:10, 172:19, 173:4, 176:15, 177:20, 177:23, 178:12, 178:21

**government** [34] - 4:25, 5:20, 17:23, 22:5, 40:20, 49:12, 54:3, 98:5, 98:7, 99:7, 107:10, 109:18, 109:19, 141:11, 143:8, 144:1, 145:25, 147:5, 147:8, 147:16, 155:7, 160:22, 160:23, 162:11, 169:16, 173:22, 174:1, 174:6, 174:14, 175:2, 175:16, 175:19, 175:25, 176:1

**government's** [3] - 71:2, 173:23, 174:2

**Government's** [25] - 3:16, 7:14, 11:11, 14:5, 21:5, 35:13, 41:5, 52:11, 58:5, 63:25, 78:19, 78:25, 79:16, 103:6, 120:17, 123:3, 125:9, 140:18, 140:19, 148:20, 151:6, 153:5, 157:10, 170:2, 172:14

**governs** [1] - 25:19

**grand** [34] - 18:7, 19:2, 20:7, 20:8,

20:25, 25:16, 25:19, 25:22, 25:23, 26:1, 29:25, 40:18, 48:10, 50:17, 50:19, 51:17, 52:2, 58:21, 71:8, 71:19, 74:15, 74:17, 76:2, 76:6, 76:20, 77:16, 112:13, 122:10, 122:17, 147:11, 168:9, 169:8, 169:14

**grant** [1] - 8:9

**granted** [1] - 73:23

**granting** [1] - 136:24

**grateful** [1] - 155:15

**GRAY** [175] - 2:4, 25:3, 32:11, 32:13, 32:16, 37:18, 42:21, 44:11, 55:7, 55:12, 57:15, 57:17, 57:20, 57:25, 58:18, 58:21, 59:12, 59:18, 60:6, 60:9, 60:13, 60:16, 60:18, 61:17, 61:20, 62:16, 62:18, 64:2, 64:13, 65:4, 66:6, 67:16, 67:22, 67:24, 68:2, 68:5, 68:18, 68:20, 70:24, 71:4, 74:10, 74:21, 75:2, 75:8, 77:21, 78:21, 78:24, 79:3, 80:16, 80:18, 80:23, 82:13, 84:20, 85:8, 86:13, 87:7, 88:6, 88:24, 89:4, 90:3, 92:7, 92:9, 93:17, 94:15, 95:24, 96:17, 96:20, 98:15, 98:19, 99:3, 99:5, 99:17, 99:23, 100:3, 101:19, 103:7,

103:12, 103:25, 105:14, 113:1, 113:8, 113:20, 114:2, 116:22, 118:17, 121:12, 121:14, 123:7, 123:12, 125:22, 127:7, 127:10, 128:22, 129:1, 129:13, 129:22, 130:21, 131:3, 131:6, 131:9, 131:12, 132:5, 132:21, 133:2, 134:23, 135:10, 135:13, 135:21, 135:23, 137:6, 137:10, 138:5, 138:21, 139:4, 139:8, 139:15, 139:25, 143:20, 145:8, 146:2, 146:9, 147:1, 147:14, 148:5, 148:10, 148:13, 148:16, 148:25, 149:2, 149:13, 149:15, 149:20, 150:6, 150:9, 150:16, 150:21, 151:3, 151:12, 151:14, 151:18, 151:22, 152:10, 154:2, 154:22, 157:18, 159:12, 159:20, 161:22, 162:24, 164:13, 164:15, 167:14, 168:1, 168:13, 168:24, 169:2, 169:4, 170:14, 171:18, 173:11, 173:19, 174:9, 176:19, 177:4, 177:10, 177:17, 177:23, 178:12, 178:17, 179:7, 180:15, 180:18, 180:25, 181:3, 181:19

**Gray** [6] - 1:13, 2:10, 121:10, 121:12, 131:4, 164:19

**gray** [24] - 20:7, 57:24, 65:3, 78:17, 108:4, 109:9, 112:24, 113:19, 116:6, 116:18, 118:10, 119:22, 122:16,

127:3, 139:10, 145:2, 145:13, 156:18, 160:25, 163:24, 165:5, 170:4, 173:16, 176:17

**great** [5] - 37:16, 62:4, 88:19, 128:24, 136:21

**greater** [2] - 83:19, 85:6

**Greek** [1] - 23:18

**grenade** [1] - 137:24

**gross** [1] - 38:9

**grounded** [1] - 24:13

**group** [1] - 133:20

**groups** [1] - 180:5

**guess** [13] - 8:1, 66:7, 72:6, 84:1, 88:22, 96:23, 114:9, 114:10, 119:6, 134:21, 137:2, 137:8, 161:7

**guideposts** [1] - 153:18

**guise** [1] - 86:22

**guy** [4] - 48:25, 50:10, 54:15, 175:1

**guys** [2] - 115:9, 153:19

## H

**Halethorpe** [1] - 35:4

**half** [10] - 58:15, 88:12, 88:18, 102:8, 103:20, 117:1, 133:22, 137:13, 152:1, 160:7

**Halliwell** [14] - 151:8, 152:17, 152:19, 152:24, 153:3, 153:7, 153:9, 153:10, 153:22, 153:25, 154:5, 154:7, 155:3, 155:9

**hand** [7] - 12:1, 29:7, 44:4, 67:9, 88:2, 113:17, 123:2

**hand-delivered** [1] - 12:1

**hand-in-glove** [1]

- 123:2

**Handbook** [1] - 141:18

**handbook** [2] - 142:5, 143:12

**handed** [4] - 16:12, 16:15, 16:16, 70:17

**handle** [1] - 104:2

**handled** [4] - 63:18, 69:8, 100:24, 104:2

**hands** [1] - 147:15

**hang** [1] - 11:22

**happy** [4] - 25:9, 76:13, 107:3, 148:1

**hard** [3] - 59:21, 70:14, 96:24

**harder** [4] - 62:18, 174:19, 174:20, 175:13

**hardest** [1] - 136:4

**hardly** [1] - 145:2

**hat** [1] - 124:17

**hated** [1] - 160:21

**Hathaway** [3] - 56:25, 92:9, 92:10

**havoc** [8] - 15:10, 48:11, 50:11, 50:12, 52:13, 54:8, 54:9, 63:5

**Hazenstab** [5] - 4:16, 82:20, 153:25, 159:5, 159:6

**head** [5] - 68:9, 70:10, 80:9, 96:16, 96:18

**header** [1] - 60:20

**health** [1] - 63:20

**hear** [14] - 10:14, 42:9, 48:14, 48:17, 56:14, 75:5, 80:11, 94:20, 120:19, 122:12, 122:13, 152:7, 167:1, 178:9

**heard** [6] - 37:25, 51:3, 54:3, 55:8, 164:14, 169:9

**hearing** [16] - 3:5, 3:11, 8:22, 12:4, 65:3, 70:18, 71:4, 107:4, 114:17, 129:21,

158:18, 163:24, 180:16, 180:21, 180:23

**hearings** [1] - 29:1

**hears** [1] - 37:24

**hearsay** [2] - 99:8, 99:9

**heart** [1] - 115:19

**heartily** [1] - 154:12

**heck** [1] - 173:5

**height** [1] - 180:3

**held** [4] - 5:13, 7:3, 12:9, 182:7

**help** [3] - 37:12, 60:5, 81:21

**helpful** [3] - 21:9, 57:6, 150:20

**helps** [1] - 122:9

**Herculean** [2] - 172:14, 172:15

**hereby** [1] - 182:5

**herring** [1] - 119:10

**herself** [5] - 86:23, 96:11, 147:10, 147:14, 158:2

**hid** [1] - 58:7

**hide** [1] - 114:22

**hiding** [1] - 74:3

**high** [5] - 26:21, 136:13, 164:21, 165:8, 172:5

**higher** [2] - 173:24, 174:3

**highlighted** [2] - 17:17, 30:8

**highly** [2] - 121:25, 123:6

**himself** [10] - 58:8, 70:9, 73:22, 78:2, 90:19, 92:15, 93:22, 125:25, 131:22, 136:15

**hire** [2] - 174:22

**hired** [3] - 14:13, 50:15, 53:14

**history** [3] - 80:14, 80:16, 108:2

**hit** [1] - 27:8

**hoc** [3] - 10:19, 44:8

**hold** [2] - 21:24, 147:15

**holder** [1] - 67:5

**holding** [1] -

135:7
**holds** [1] - 27:25
**holiday** [4] -
108:24, 109:5,
133:5, 134:10
**HOLLANDER** [1]
- 1:11
**homework** [3] -
150:24, 153:19,
180:9
**honest** [1] - 115:9
**honestly** [1] -
140:4
**Honor** [317] - 2:4,
2:17, 8:11, 8:12,
8:15, 8:16, 8:25,
9:2, 9:4, 9:16,
9:23, 9:25, 10:1,
10:7, 10:14,
10:16, 11:5,
11:12, 12:1,
12:14, 12:20,
12:21, 12:22,
13:23, 14:3,
14:8, 15:1,
15:13, 15:14,
15:18, 15:22,
16:2, 16:7, 16:8,
16:11, 16:14,
16:18, 16:23,
17:2, 17:15,
18:4, 18:13,
18:18, 19:10,
19:18, 20:4,
20:12, 20:13,
20:21, 21:9,
21:11, 21:12,
21:16, 21:19,
22:1, 22:7,
22:12, 22:19,
22:23, 23:2,
23:16, 23:19,
24:9, 24:24,
25:1, 25:11,
25:12, 26:15,
26:17, 26:25,
27:16, 28:6,
28:8, 28:18,
28:22, 29:3,
29:6, 29:18,
30:10, 30:16,
30:17, 30:21,
31:11, 32:4,
32:6, 32:13,
32:22, 33:22,
33:25, 34:4,
34:16, 34:18,
34:20, 35:20,
36:3, 36:9,
36:21, 36:25,

37:4, 37:6,
37:12, 37:24,
38:23, 39:9,
39:24, 40:7,
40:14, 41:9,
41:13, 41:24,
42:7, 42:9,
42:17, 42:21,
43:6, 43:15,
43:24, 44:1,
44:16, 44:19,
45:1, 45:4, 45:9,
45:16, 45:20,
45:25, 46:7,
46:10, 46:25,
47:14, 47:23,
47:25, 48:10,
48:18, 49:17,
50:18, 50:22,
51:2, 51:5,
51:15, 52:1,
52:7, 52:19,
53:3, 53:10,
53:12, 53:20,
53:24, 54:10,
54:25, 55:7,
55:20, 56:3,
56:8, 56:15,
57:9, 57:15,
57:17, 57:20,
57:25, 60:6,
60:13, 61:17,
61:20, 62:13,
70:13, 71:14,
71:16, 71:18,
75:2, 78:10,
82:15, 82:17,
82:19, 82:24,
83:18, 84:8,
84:16, 84:20,
85:4, 89:17,
90:3, 91:11,
94:24, 95:17,
95:19, 99:6,
100:16, 103:1,
103:9, 103:13,
103:25, 104:1,
105:14, 105:19,
106:8, 106:10,
106:14, 106:18,
106:24, 107:8,
107:23, 108:13,
108:22, 109:2,
109:11, 110:23,
111:6, 111:8,
111:17, 111:19,
111:22, 111:24,
112:6, 113:1,
113:9, 113:15,
113:20, 114:5,
114:8, 114:17,

116:2, 116:8,
116:22, 117:3,
118:23, 119:11,
119:21, 120:1,
121:2, 121:13,
121:17, 122:2,
122:14, 122:22,
123:9, 123:13,
123:24, 124:7,
124:18, 125:12,
125:22, 126:4,
127:16, 128:14,
128:22, 129:7,
129:13, 130:20,
130:25, 133:5,
134:4, 134:11,
134:24, 135:21,
135:24, 137:6,
137:10, 140:17,
141:8, 141:16,
141:19, 142:18,
143:16, 143:21,
145:8, 145:21,
146:2, 146:9,
149:15, 150:10,
151:3, 152:10,
152:13, 152:22,
152:25, 153:2,
153:5, 153:8,
153:13, 153:21,
154:18, 155:1,
156:1, 156:12,
156:16, 156:24,
157:18, 159:3,
159:12, 159:19,
160:19, 162:24,
163:16, 163:22,
165:1, 165:10,
165:24, 166:9,
166:13, 166:24,
167:14, 169:3,
169:13, 170:14,
171:23, 172:21,
173:9, 173:15,
174:13, 174:19,
174:25, 178:19,
180:15, 181:14,
181:21
**honor** [1] - 139:2
**Honor's** [1] -
72:24
**HONORABLE** [1]
- 1:11
**honors** [1] - 26:21
**hope** [4] - 60:2,
154:3, 154:12,
169:21
**hoped** [1] -
138:11
**hopefully** [1] -

36:22, 69:20,
133:22, 168:17,
169:19, 181:18
**hoping** [1] -
132:10
**hour** [10] - 38:4,
38:5, 38:6, 41:8,
95:19, 97:11,
103:20, 120:1,
160:7, 175:1
**hours** [109] -
12:10, 12:11,
12:17, 13:3,
13:5, 16:20,
17:3, 17:6, 17:9,
17:11, 17:13,
17:24, 34:14,
37:14, 37:20,
37:23, 46:12,
49:13, 49:14,
66:18, 73:13,
82:8, 82:18,
83:1, 83:3, 83:9,
83:10, 83:11,
83:15, 83:18,
83:19, 83:20,
84:18, 85:5,
85:10, 85:13,
85:14, 85:15,
85:16, 85:17,
85:20, 85:21,
86:2, 86:6,
86:11, 87:8,
87:25, 93:11,
93:12, 93:15,
94:5, 94:11,
94:19, 95:2,
95:8, 95:9,
95:11, 95:16,
96:13, 98:14,
100:7, 101:1,
101:12, 101:13,
104:12, 104:13,
104:17, 104:19,
104:20, 106:22,
107:5, 107:8,
107:9, 109:13,
109:14, 109:20,
109:21, 109:24,
109:25, 110:2,
115:21, 115:23,
138:6, 138:8,
141:11, 151:5,
151:10, 151:15,
151:17, 152:2,
152:4, 161:2,
165:21, 175:20,
176:2, 176:4,
176:5
**housekeeping** [1]
- 103:16

**Hughes** [1] - 90:9
**human** [1] - 55:22
**hundred** [3] -
53:22, 66:9,
117:24
**hundreds** [4] -
138:6, 138:8,
163:23, 175:20
**hurry** [1] - 60:3
**husband** [5] -
64:4, 79:25,
83:22, 131:23,
132:5
**hypothesis** [1] -
50:1
**hypothetically** [1]
- 31:4

## I

**i.e.** [1] - 165:16
**id** [1] - 5:25
**idea** [12] - 41:1,
55:4, 55:6, 74:3,
89:20, 95:25,
96:5, 108:16,
121:18, 142:23,
144:1, 152:7
**identified** [1] -
88:24
**identifies** [1] -
77:4
**identify** [4] - 81:1,
81:14, 87:11,
87:12
**identity** [1] -
67:21
**IG's** [1] - 83:15
**ignored** [1] -
11:19
**II** [3] - 73:19,
163:20, 167:19
**illegal** [3] -
161:13, 161:15,
161:18
**illicit** [2] - 156:7,
157:10
**Illinois** [1] - 51:9
**illogical** [1] -
17:21
**immediately** [7] -
32:10, 62:10,
62:11, 66:24,
79:10, 79:12,
92:25
**impact** [1] - 90:2
**impeach** [6] -
29:24, 50:19,
122:1, 156:2,
156:9, 173:16

**impeachable** [3] -
48:8, 50:18,
50:20
**impermissibility**
[1] - 148:23
**implausibilities**
[1] - 66:21
**implied** [1] -
39:10
**imply** [1] - 111:19
**important** [17] -
25:7, 34:20,
35:6, 54:25,
59:3, 104:20,
110:20, 111:11,
112:12, 114:6,
115:25, 116:1,
139:3, 149:1,
149:2, 149:8,
181:16
**importantly** [1] -
18:18
**impossible** [1] -
18:19
**impression** [1] -
61:12
**IN** [1] - 1:1
**in-person** [1] -
88:3
**inaccuracies** [1] -
88:4
**inaccurate** [1] -
92:4
**inaction** [1] -
116:19
**inadmissible** [1] -
3:14
**inapplicable** [1] -
57:13
**inartfully** [1] -
165:25
**Inc** [2] - 9:7, 61:12
**inception** [1] -
11:6
**incidentally** [1] -
180:8
**incidents** [1] -
109:23
**include** [6] -
68:23, 82:25,
112:17, 133:19,
171:14, 176:20
**included** [1] -
146:13
**includes** [1] -
112:19
**including** [11] -
7:24, 9:6, 24:19,
36:16, 54:4,
65:21, 85:13,

117:15, 143:7,
164:10, 176:9
**incompetence** [2]
- 160:20, 161:19
**incomplete** [1] -
92:4
**inconsistent** [6] -
20:24, 21:1,
31:22, 66:1,
85:23, 140:19
**incorrect** [2] -
107:18, 107:20
**increased** [2] -
59:14, 62:4
**increasing** [1] -
74:16
**incredible** [3] -
95:14, 127:18,
136:10
**incredibly** [1] -
165:13
**incriminating** [1]
- 137:23
**inculpated** [1] -
76:16
**indeed** [2] -
86:20, 94:15
**indicate** [2] -
64:23, 180:1
**indicated** [6] -
7:13, 61:9, 80:2,
133:24, 134:25,
158:11
**indicates** [1] -
96:23
**indicating** [3] -
66:7, 133:6,
168:2
**indicted** [3] -
17:22, 117:6,
117:15
**indictment** [21] -
8:18, 8:19, 8:20,
8:24, 9:5, 13:6,
25:17, 37:21,
38:17, 38:19,
45:24, 93:10,
102:11, 105:8,
144:4, 157:7,
162:19, 166:5,
167:3
**individual** [5] -
11:14, 84:22,
85:1, 100:13,
136:14
**individually** [1] -
179:23
**individuals** [1] -
61:6
**induced** [1] -

149:22
**indulgence** [3] -
45:2, 71:15,
75:8
**ineffective** [2] -
136:3, 136:5
**infer** [1] - 167:7
**inflate** [3] - 85:20,
98:14, 165:21
**inflated** [3] - 82:1,
82:5, 107:7
**inflating** [1] -
85:23
**info** [1] - 111:6
**information** [18] -
26:22, 46:16,
47:12, 56:18,
64:7, 67:1,
68:14, 69:15,
69:19, 73:21,
79:11, 90:20,
105:5, 154:5,
165:7, 168:8,
175:1, 175:10
Infotek [53] - 3:8,
9:5, 11:6, 12:16,
13:9, 13:10,
15:9, 18:8, 19:8,
31:24, 39:6,
49:18, 51:11,
59:3, 59:13,
60:22, 60:23,
63:9, 63:11,
63:21, 64:5,
68:14, 69:5,
72:16, 83:15,
84:24, 86:14,
87:17, 96:22,
110:24, 111:10,
111:21, 111:22,
111:25, 117:22,
119:24, 127:11,
127:12, 155:20,
155:22, 157:7,
157:12, 162:17,
164:17, 164:18,
165:3, 166:18,
166:20, 173:25,
174:15, 175:19
Infotek's [9] -
9:12, 9:19, 73:4,
79:22, 151:7,
164:15, 164:19,
164:24, 165:6
**innocent** [1] -
172:11
**inside** [4] - 81:6,
127:22, 127:24,
165:7
Inspector [3] -

5:6, 49:20,
82:20
**instance** [1] -
83:2
**instances** [1] -
4:18
**instead** [4] - 49:6,
91:9, 92:13,
105:25
**instruct** [1] -
172:22
**instruction** [4] -
132:24, 177:7,
177:8, 177:16
**instructions** [2] -
60:7, 179:11
**insurance** [1] -
63:20
**integrity** [1] -
124:22
**intend** [3] - 95:8,
152:16, 158:6
**intended** [1] -
157:21
**intends** [3] -
125:23, 152:16,
169:16
**intention** [3] -
148:20, 151:6,
155:18
**intentional** [4] -
144:20, 144:25,
161:12, 161:19
**intentionally** [1] -
156:1
**interchange** [1] -
72:14
**interest** [2] -
148:21, 160:3
**interested** [1] -
158:20
**interesting** [3] -
80:19, 87:11,
159:24
**interestingly** [2] -
68:25, 75:15
**interfered** [1] -
120:13
**internet** [4] - 22:4,
22:24, 39:5,
110:21
**interpret** [1] -
89:23
**interpretation** [3]
- 146:4, 146:10,
150:12
**interrupt** [1] -
25:6
**interview** [2] -
51:15, 158:10

**interviewed** [3] -
4:15, 67:12,
110:6
**interviews** [5] -
117:8, 143:6,
157:3, 157:4
**introduce** [25] -
11:8, 15:3,
15:16, 19:25,
23:12, 23:14,
90:10, 90:11,
108:1, 125:9,
125:23, 126:2,
127:23, 128:6,
148:20, 151:7,
154:15, 155:8,
155:19, 156:9,
157:16, 159:16,
162:17, 165:14,
169:16
**introduced** [2] -
19:25, 98:5
**introducing** [2] -
3:7, 148:24
**introduction** [5] -
3:12, 5:19, 5:21,
6:1, 167:6
**intruded** [4] -
64:25, 73:9,
73:10, 74:1
**intrusion** [18] -
60:23, 61:23,
62:9, 63:8,
66:23, 67:6,
69:18, 71:2,
71:9, 71:11,
72:20, 72:21,
73:24, 119:22,
119:24, 120:20,
127:20, 130:9
**intrusions** [7] -
36:5, 62:24,
75:14, 112:3,
120:22, 130:6,
131:18
**investigate** [1] -
62:11
**investigating** [1] -
66:24
**investigation** [15]
- 51:12, 54:7,
67:12, 74:11,
78:15, 82:19,
87:15, 127:24,
131:17, 144:5,
163:4, 163:8,
163:14, 167:20,
171:4
**investigative** [2] -
79:15, 163:5

**investigator** [1] -
151:9
**Investigator** [1] -
4:16
**investigators** [3] -
5:6, 20:7, 21:1
**invite** [3] - 21:12,
24:23, 28:8
**invoice** [12] -
12:17, 12:18,
13:4, 16:18,
17:24, 34:6,
36:8, 82:8,
82:17, 83:12,
107:6, 123:22
**invoiced** [1] -
83:16
**invoices** [2] -
12:15, 40:23,
82:18
**involved** [5] -
61:21, 69:2,
71:11, 130:3,
131:24
IP [13] - 18:17,
22:24, 22:25,
24:4, 28:4,
34:21, 111:11,
111:14, 111:15,
130:24, 131:2,
131:10
Ironbridge [30] -
9:12, 9:20,
12:16, 13:4,
16:20, 44:25,
50:3, 54:6, 59:3,
73:19, 78:13,
83:3, 84:21,
93:11, 101:8,
102:20, 110:8,
110:13, 110:15,
157:12, 158:24,
160:8, 163:18,
163:20, 167:12,
167:19, 173:23,
173:24, 175:3
IT [1] - 146:15
it'll [2] - 103:19,
163:10
**italicized** [1] -
5:19
**Italicized** [1] -
5:21
**item** [5] - 136:14,
157:1, 157:2,
162:16, 171:15
**items** [2] - 88:24,
151:25
ITK [25] - 3:8, 4:7,
4:9, 4:12, 4:20,
27:25, 28:1,
33:15, 34:3,
39:3, 39:20,
45:23, 53:14,
61:11, 78:12,
82:21, 100:6,
120:15, 120:20,
157:17, 166:4,
166:14, 166:15,
167:2, 168:9
ITK's [4] - 4:7,
5:4, 165:12,

36:23, 36:24,
47:16, 47:23,
48:15, 53:11,
53:13, 59:1,
65:19, 72:4,
73:24, 73:25,
88:20, 91:4,
92:17, 93:15,
104:3, 105:20,
113:10, 117:14,
123:16, 124:25,
126:16, 126:19,
127:9, 137:14,
137:20, 139:19,
141:4, 146:21,
146:25, 147:2,
147:3, 149:1,
149:2, 149:5,
158:8, 164:12,
164:23, 165:12,
166:14, 166:16,
169:20, 171:9,
178:20, 178:24,
179:3, 179:5,
179:8, 179:18
**issued** [2] - 60:21,
171:13
**issues** [13] - 8:5,
74:10, 103:5,
125:15, 128:20,
135:4, 135:5,
135:18, 138:9,
140:14, 150:4,
153:15, 158:21
**IT'll** [1] - 146:15
**it'll** [2] - 103:19,
163:10
**ironic** [2] - 31:5,
31:7
**ironically** [1] -
35:8
**irony** [2] - 44:19,
45:4
**isolated** [1] -
109:23
**issuance** [1] -
162:19
**issue** [59] - 6:20,
6:25, 13:25,
14:21, 27:11,
29:23, 36:19,

168:2
**itself** [11] - 4:2, 4:4, 5:11, 23:15, 30:25, 96:22, 98:3, 98:23, 100:6, 123:10, 131:14

## J

**jacked** [1] - 73:13
**Jacky** [40] - 2:5, 2:18, 12:25, 13:3, 16:19, 18:11, 18:14, 18:15, 18:21, 18:22, 22:13, 24:4, 28:11, 29:25, 30:5, 30:14, 31:2, 31:4, 33:4, 33:6, 35:7, 35:8, 35:11, 37:14, 37:16, 37:21, 37:22, 38:2, 50:7, 61:7, 82:18, 92:21, 93:2, 108:16, 108:17, 108:20, 111:10, 126:13
**JACKY** [1] - 1:5
**Jamie** [20] - 18:16, 18:23, 18:24, 22:24, 29:7, 29:9, 29:10, 29:11, 29:14, 29:16, 29:21, 30:1, 30:17, 31:24, 35:9, 50:9, 86:23, 93:1, 93:4, 111:15
**Jan** [6] - 51:4, 51:7, 69:9, 102:18, 113:2
**January** [13] - 1:8, 3:21, 3:24, 6:24, 6:25, 7:8, 30:24, 73:8, 102:18, 113:3, 135:1, 140:15
**Jefferson** [2] - 1:13, 2:10
**job** [4] - 96:9, 161:3, 163:19, 175:5
**John** [8] - 67:3, 67:17, 67:20, 68:16, 178:9, 178:10, 178:11

**joining** [1] - 31:9
**jointly** [1] - 69:21
**judge** [2] - 47:25, 142:13
**Judge** [10] - 1:11, 4:9, 4:17, 5:9, 76:24, 118:3, 127:25, 142:7, 142:12, 159:9
**judgement** [1] - 136:7
**judges** [1] - 169:25
**judgment** [1] - 136:6
**Judicial** [1] - 182:9
**July** [39] - 5:5, 19:5, 20:10, 31:25, 32:2, 35:21, 59:9, 59:12, 59:21, 60:24, 61:24, 62:10, 64:1, 65:6, 65:16, 65:17, 66:22, 69:18, 71:1, 73:9, 73:24, 77:23, 88:15, 89:1, 94:1, 97:16, 100:10, 100:23, 111:24, 119:22, 119:23, 127:19, 130:9, 130:18
**jumping** [1] - 10:3
**June** [4] - 19:8, 63:12, 65:14, 65:15
**juries** [1] - 76:20
**jurors** [1] - 180:4
**jury** [64] - 6:23, 18:3, 18:7, 19:2, 20:7, 20:8, 20:25, 23:7, 25:16, 25:19, 25:22, 25:23, 26:1, 29:25, 40:18, 47:12, 48:10, 50:17, 50:19, 51:17, 52:2, 52:16, 52:17, 52:25, 71:8, 71:20, 74:15, 74:17, 76:2, 76:6, 77:16, 81:20, 91:20, 109:6, 109:9, 110:14, 112:13, 121:1,

122:10, 122:17, 124:12, 128:11, 140:15, 140:16, 143:17, 147:11, 149:24, 160:11, 162:2, 163:17, 167:7, 167:21, 167:24, 169:8, 169:14, 172:21, 172:22, 174:20, 178:8, 179:12, 179:13, 179:21
**Jury** [1] - 180:4
**jury's** [1] - 168:9
**justice** [1] - 28:19
**Justice's** [1] - 2:13

## K

**Kassandra** [1] - 182:3
**KASSANDRA** [1] - 182:14
**keep** [17] - 2:25, 17:8, 36:10, 84:2, 88:7, 97:9, 97:21, 134:2, 134:22, 135:6, 147:25, 149:7, 149:21, 149:23, 162:22, 163:24, 167:11
**keeping** [3] - 11:9, 146:8, 146:23
**keeps** [2] - 73:12, 109:22
**kept** [2] - 98:21, 117:10
**key** [3] - 81:1, 97:13, 174:23
**Kimmel** [29] - 16:19, 18:14, 18:15, 18:22, 18:23, 22:13, 22:17, 24:4, 28:11, 29:25, 30:5, 30:14, 31:4, 31:7, 32:3, 33:4, 33:6, 34:3, 34:14, 34:22, 35:7, 35:9, 35:12, 61:7, 64:7, 64:14, 82:19, 93:3, 160:6
**Kimmel's** [6] - 31:2, 64:4, 64:9, 64:16, 82:21,

92:21
**kind** [16] - 15:25, 25:12, 44:20, 49:19, 56:17, 63:16, 92:19, 95:20, 111:20, 132:10, 136:1, 138:22, 163:24, 163:25, 169:6, 178:4
**kinds** [1] - 140:6
**knowledge** [9] - 26:7, 26:13, 45:12, 45:13, 63:25, 69:5, 71:24, 126:24, 179:21
**known** [8] - 41:5, 47:12, 58:3, 60:9, 116:12, 116:24, 117:1, 171:4
**knows** [7] - 45:14, 65:24, 74:1, 89:17, 116:10, 174:14, 175:16
**Kurman** [1] - 69:8

## L

**labels** [1] - 84:2
**labor** [3] - 72:9, 83:2, 84:18
**Lafler** [2] - 180:16, 180:23
**language** [4] - 54:21, 146:6, 146:10, 170:25
**largely** [1] - 138:3
**laryngitis** [1] - 162:22
**Las** [2] - 110:7, 110:13
**last** [21] - 7:3, 7:8, 7:24, 27:6, 44:9, 51:5, 51:6, 71:9, 77:24, 85:15, 92:23, 124:21, 132:25, 133:11, 134:25, 139:7, 139:12, 147:7, 164:10, 172:6
**lasted** [1] - 79:17
**late** [9] - 31:6, 34:15, 73:20, 74:14, 141:20, 150:15, 150:16, 150:17, 162:20
**latest** [1] - 58:6
**latitude** [1] - 35:2

**laugh** [1] - 173:17
**laughable** [1] - 50:25
**laughing** [1] - 173:18
**Law** [1] - 144:23
**law** [6] - 121:4, 128:5, 143:3, 146:23, 147:3, 162:4
**lawsuit** [1] - 67:10, 145:14
**lawyer** [4] - 118:7, 124:20, 155:9, 155:11
**lay** [7] - 18:3, 23:7, 25:21, 66:14, 76:12, 79:9, 138:9
**laying** [1] - 155:12
**leading** [1] - 137:7
**learn** [1] - 63:17
**learned** [5] - 68:17, 68:20, 114:10, 119:24, 160:2
**least** [15] - 7:18, 40:11, 56:20, 65:10, 69:22, 73:16, 86:17, 87:10, 97:4, 140:13, 145:15, 153:17, 156:7, 162:8, 177:14
**leave** [5] - 3:23, 108:24, 109:4, 109:5, 150:18
**leaves** [7] - 18:23, 31:8, 31:24, 35:9, 50:5, 81:9, 81:10
**leaving** [2] - 13:16, 161:5
**led** [1] - 74:13
**left** [18] - 13:9, 13:10, 18:7, 18:10, 19:4, 19:6, 19:7, 27:10, 44:4, 45:25, 49:4, 64:15, 67:8, 81:15, 100:25, 148:15, 168:2, 175:7
**left-hand** [1] - 44:4
**legal** [2] - 153:19, 155:7
**legible** [2] - 70:14,

70:16
**legitimate** [2] - 162:5, 171:13
**legitimately** [2] - 108:18, 108:19
**length** [2] - 119:7, 128:24
**lengths** [1] - 136:22
**lengthy** [2] - 7:23, 77:2
**less** [3] - 85:21, 155:22, 174:17
**lesser** [1] - 94:3
**letter** [19] - 7:24, 73:14, 79:5, 79:13, 116:8, 116:9, 133:6, 135:3, 138:15, 139:10, 139:14, 139:15, 140:21, 141:19, 141:21, 144:3, 145:17, 151:23, 157:19
**letters** [2] - 139:11, 139:14
**level** [4] - 94:22, 112:3, 174:2, 175:23
**levels** [1] - 96:2
**liar** [1] - 52:3
**license** [1] - 48:21
**lie** [1] - 59:16
**lied** [10] - 4:18, 18:5, 50:14, 52:2, 67:12, 77:5, 120:6, 122:10, 122:24
**lies** [3] - 5:15, 58:3, 76:14
**life** [1] - 31:17
**light** [3] - 73:21, 98:17, 133:17
**likely** [5] - 13:9, 80:3, 159:4, 161:12, 162:3
**limine** [8] - 2:7, 3:3, 5:14, 95:5, 114:21, 139:18, 170:2, 170:13
**limited** [3] - 26:5, 64:2, 74:16, 127:14
**limits** [1] - 20:5
**line** [17] - 10:18, 22:12, 25:3, 26:13, 28:14, 30:12, 33:15, 44:9, 50:18, 50:19, 63:23,

77:13, 87:18, 129:10, 176:15
**lined** [1] - 181:17
**lines** [4] - 25:1, 28:15, 29:20, 30:9
**linked** [2] - 130:17
**list** [13] - 7:14, 16:11, 59:24, 61:6, 103:6, 132:19, 139:22, 141:7, 149:16, 156:23, 157:22, 169:11, 179:4
**listed** [2] - 82:8, 82:18
**listener** [2] - 48:16, 48:17
**lists** [1] - 149:20
**literally** [2] - 33:8, 161:19
**litigation** [6] - 67:3, 143:23, 144:2, 144:9, 161:23
**living** [1] - 54:1
**located** [1] - 90:24
**LOE** [1] - 104:19
**log** [13] - 6:10, 24:21, 31:23, 37:24, 42:4, 42:15, 42:16, 42:18, 45:14, 52:23, 52:24, 86:24, 126:20
**logged** [7] - 18:10, 22:17, 28:11, 30:5, 33:3, 50:8, 50:9
**logging** [3] - 29:25, 35:11, 38:10
**logic** [1] - 57:12
**logical** [3] - 19:1, 50:10
**login** [9] - 18:11, 22:13, 28:1, 29:9, 29:11, 29:13, 29:22, 30:17
**logins** [1] - 72:2
**logout** [1] - 30:8
**logs** [52] - 6:4, 6:6, 18:15, 18:25, 20:21, 20:22, 20:24, 24:19, 25:13, 25:14, 25:16, 28:11, 29:10,

30:14, 30:23, 34:19, 35:10, 41:25, 42:22, 42:23, 43:2, 43:3, 45:6, 48:8, 49:3, 50:4, 52:15, 52:16, 52:17, 54:19, 56:1, 66:13, 66:14, 70:11, 70:15, 71:22, 71:25, 72:20, 72:24, 73:1, 73:5, 79:7, 89:21, 110:21, 121:25, 127:6, 127:7, 127:8, 127:15, 127:17
**longest** [1] - 55:8
**longitude** [1] - 35:2
**look** [51] - 8:2, 16:7, 20:20, 22:8, 22:10, 25:13, 26:3, 28:25, 30:23, 32:4, 36:20, 44:3, 44:9, 47:4, 54:13, 54:19, 56:6, 56:9, 56:17, 60:23, 62:12, 66:4, 66:17, 70:5, 70:18, 70:23, 73:5, 76:6, 79:7, 79:9, 79:21, 80:21, 83:5, 83:7, 85:4, 85:24, 86:3, 88:9, 89:7, 90:5, 92:21, 95:20, 97:1, 111:21, 113:25, 121:24, 131:15, 138:19, 139:24, 179:16
**looked** [10] - 6:13, 23:3, 26:9, 27:22, 31:20, 65:14, 73:19, 111:23, 119:3, 134:16
**looking** [23] - 4:1, 10:13, 10:15, 15:19, 21:14, 23:9, 27:3, 29:15, 29:17, 32:25, 38:10, 66:14, 70:22, 70:24, 72:22, 107:19, 114:7,

120:9, 132:15, 159:9, 163:9, 170:12, 175:4
**looks** [11] - 28:20, 42:11, 42:14, 72:1, 72:8, 81:14, 88:8, 93:1, 108:3, 108:5, 155:16
**loosely** [1] - 49:19
**lord** [1] - 65:24
**Lori** [1] - 82:19
**lose** [2] - 73:15, 73:18
**lost** [1] - 143:22
**lousy** [2] - 37:16, 102:2
**low** [2] - 175:14, 175:17
**lower** [1] - 101:1
**lozenge** [2] - 75:4, 75:7
**lunch** [1] - 115:8
**Lunch** [1] - 103:15
**luncheon** [1] - 103:2
**lying** [2] - 48:19, 48:23
**Lynn** [1] - 2:5
**LYNN** [1] - 1:5

## M

**mail** [1] - 88:8
**mails** [1] - 51:2
**main** [5] - 63:2, 71:7, 113:10, 137:10, 140:8
**maintain** [2] - 97:24, 147:16
**maintained** [1] - 29:2
**maintains** [1] - 98:13
**maintenance** [1] - 146:5
**major** [1] - 142:9
**man** [6] - 122:3, 122:4, 122:9, 122:15, 122:23, 161:11
**managed** [1] - 136:15
**management** [1] - 157:5
**manager** [20] - 9:10, 9:12, 9:18, 9:20, 11:9, 38:7, 59:2, 65:20,

80:20, 82:3, 96:12, 100:10, 100:20, 100:22, 101:1, 101:7, 109:17, 151:16, 175:20, 176:1
**managers** [5] - 11:6, 38:11, 78:13, 88:1, 125:25
**manifested** [1] - 100:13
**manipulated** [2] - 12:3, 12:11
**manual** [2] - 87:16, 96:22
**manufacture** [1] - 151:5
**maps** [1] - 34:24
**march** [1] - 132:5
**March** [16] - 4:15, 5:7, 5:8, 11:10, 11:13, 11:18, 17:14, 19:7, 45:25, 63:9, 64:15, 69:1, 76:14, 100:24, 175:4
**mark** [1] - 104:22
**marked** [2] - 16:8, 108:11
**marks** [1] - 71:6
**MARYLAND** [1] - 1:1
**Maryland** [6] - 1:9, 35:4, 48:22, 110:22, 111:10, 182:5
**mask** [1] - 2:24
**masked** [1] - 180:6
**Matador** [2] - 92:1, 92:7
**match** [4] - 34:6, 36:7, 86:8, 123:21
**matched** [3] - 48:7, 48:8, 151:3
**matches** [1] - 107:5
**material** [4] - 35:15, 114:15, 173:15, 175:16
**materializes** [1] - 146:21
**materials** [1] - 14:15
**matter** [21] - 2:5, 2:6, 18:24, 175:7

26:10, 52:14, 72:12, 90:18, 99:10, 103:18, 103:19, 104:18, 114:15, 143:7, 145:4, 147:24, 161:24, 162:24, 167:16, 174:2, 181:6, 182:8
**matters** [10] - 2:9, 7:16, 9:8, 103:17, 119:12, 130:7, 139:24, 158:23, 174:3, 179:10
**MCCOMBER** [1] - 1:5
**McComber** [75] - 2:5, 2:19, 9:6, 9:11, 9:18, 11:10, 13:3, 15:11, 15:16, 16:19, 17:22, 18:12, 18:21, 33:7, 37:8, 37:16, 37:21, 37:22, 38:2, 38:6, 38:14, 49:21, 50:7, 50:22, 52:11, 52:14, 55:25, 62:2, 63:12, 69:5, 69:10, 76:15, 77:8, 78:4, 79:25, 83:23, 85:1, 87:13, 93:10, 94:10, 96:11, 101:16, 101:20, 102:1, 105:22, 106:4, 108:17, 108:20, 108:22, 108:25, 109:20, 109:24, 110:7, 110:8, 110:10, 110:12, 110:21, 110:24, 111:2, 120:20, 121:22, 123:19, 123:20, 126:13, 131:24, 132:2, 132:13, 151:10, 156:3, 157:5, 160:21, 165:16, 166:16
**McComber's** [11] - 12:25, 37:14, 53:23, 59:1, 93:9, 93:12, 111:9, 112:12, 165:1, 165:8, 175:7

**McPherson** [1] - 182:3
**MCPHERSON** [1] - 182:14
**MD** [2] - 1:15, 1:18
**mean** [98] - 22:3, 25:5, 27:16, 27:24, 28:2, 28:17, 32:22, 33:6, 39:1, 42:4, 42:5, 42:12, 42:13, 49:12, 51:22, 52:17, 54:9, 55:7, 55:13, 57:1, 69:13, 70:2, 71:5, 72:21, 75:10, 75:25, 79:10, 87:13, 89:5, 92:14, 93:5, 93:22, 94:23, 95:24, 96:2, 98:4, 100:17, 101:9, 106:6, 111:19, 113:9, 114:16, 114:18, 115:19, 115:23, 116:22, 124:24, 125:8, 126:10, 129:4, 129:15, 129:17, 129:20, 130:16, 131:12, 135:7, 137:14, 137:17, 138:5, 138:9, 138:21, 139:12, 139:17, 145:15, 146:12, 147:10, 148:14, 149:21, 151:4, 151:11, 154:2, 154:8, 154:11, 156:15, 157:3, 157:12, 158:2, 160:8, 161:17, 163:3, 163:11, 163:24, 165:25, 166:15, 168:1, 168:4, 168:5, 170:19, 171:18, 173:1, 173:3, 173:5, 174:7, 176:19, 176:24
**meaning** [11] - 12:25, 32:23, 38:20, 41:2, 83:13, 83:14, 106:12, 110:3, 121:7, 125:18

means [16] - 2:24,
33:8, 38:22,
47:11, 54:20,
68:2, 80:11,
91:22, 124:14,
150:10, 159:16,
162:3, 165:6,
174:19, 177:20,
179:4
meant [6] - 39:12,
63:19, 105:9,
106:6, 114:17,
161:18
meantime [1] -
117:22
meet [5] - 41:3,
41:4, 50:23,
54:13, 180:13
meeting [3] -
13:16, 70:8,
70:9
meetings [3] -
74:13, 102:7,
102:13
meets [1] - 40:12
Melissa [1] -
157:21
memo [4] - 16:4,
16:5
memorandum [2]
- 62:21, 101:22
memory [1] -
135:8
mention [6] - 4:5,
12:5, 28:3,
116:7, 130:6,
152:10
mentioned [5] -
51:3, 68:15,
116:14, 151:22,
159:23
mere [1] - 160:6
merely [1] - 123:7
met [1] - 40:20
microphone [1] -
65:2
Microsoft [12] -
26:24, 27:1,
27:2, 27:3, 27:8,
27:11, 27:13,
27:25, 52:20,
54:23, 80:7,
87:23
mid [4] - 56:4,
57:14, 114:16,
144:6
mid-December
[1] - 114:16
mid-morning [2] -
56:4, 57:14

mid-September
[1] - 144:6
middle [5] -
10:22, 18:24,
50:9, 85:12,
139:20
midnight [8] -
32:8, 32:17,
32:21, 32:23,
32:24, 34:8,
97:2
might [24] - 25:21,
37:12, 38:4,
51:4, 66:17,
71:13, 81:10,
85:22, 88:6,
102:6, 115:9,
116:13, 116:18,
116:20, 119:6,
131:16, 134:7,
150:10, 155:17,
156:8, 160:11,
173:19, 179:5
Miller [16] - 51:4,
51:7, 69:9,
69:21, 70:2,
70:3, 70:7, 73:7,
73:21, 77:7,
88:13, 102:8,
102:18, 113:2,
113:21
million [11] -
155:20, 156:14,
157:17, 159:17,
161:5, 173:22,
174:15, 174:16,
174:17, 174:22,
175:17
millions [1] -
163:23
mind [9] - 26:24,
89:10, 115:24,
141:12, 142:13,
152:13, 154:25,
167:11, 173:16
mindful [1] -
156:5
mine [3] - 3:1,
150:15, 150:17
mini [2] - 115:18,
115:19
minimum [1] -
120:11
minute [8] -
26:12, 74:19,
97:12, 109:3,
110:13, 110:17,
112:22, 132:14
minutes [11] -
32:7, 32:24,

38:4, 38:5, 41:8,
55:8, 59:20,
103:3, 129:12,
177:3
mirror [1] - 8:7
mischaracterize
d [1] - 156:17
misgivings [1] -
63:10
misimpression
[1] - 116:18
misleading [1] -
39:13
missed [3] -
15:25, 16:1,
27:5
missing [7] -
14:23, 91:1,
92:11, 119:7,
177:7, 177:15,
177:17
misstatements
[1] - 116:20
mistake [2] -
35:14, 130:24
mistakenly [1] -
155:22
modified [1] -
122:6
modifier [1] - 43:3
modus [1] - 18:13
moment [14] -
13:15, 18:10,
19:10, 65:25,
66:21, 71:15,
77:11, 78:16,
82:11, 87:20,
95:20, 117:9,
149:23, 162:25
moments [1] -
66:8
money [6] -
53:23, 53:24,
54:9, 157:13,
161:3, 161:8
monitor [3] -
119:3, 150:17,
150:19
month [13] -
12:16, 16:25,
36:8, 87:9, 95:6,
97:10, 134:25,
137:25, 138:14,
141:11, 145:9,
147:7, 149:17
monthly [2] -
96:13, 141:16
months [23] -
35:7, 37:14,
37:23, 38:7,

54:1, 63:6,
63:11, 67:11,
68:11, 69:7,
89:17, 94:6,
94:12, 94:22,
101:12, 102:12,
109:16, 109:20,
109:21, 122:4,
138:10, 171:5
moot [3] - 14:7,
14:8, 179:2
moral [1] - 122:25
morale [1] -
147:16
morass [3] -
95:14, 95:15,
115:23
moreover [4] -
65:20, 96:25,
97:24, 100:5
morning [17] -
2:4, 2:7, 2:14,
2:15, 2:17, 2:20,
8:3, 16:12,
34:13, 50:18,
56:4, 57:14,
114:25, 126:19,
126:21, 180:21,
180:22
morphed [1] -
7:10
most [13] - 44:21,
45:6, 45:11,
74:5, 76:15,
77:14, 99:25,
120:2, 124:13,
139:2, 161:11,
167:8, 178:18
mostly [1] - 119:4
motion [37] - 2:7,
3:3, 3:6, 3:15,
3:21, 4:2, 5:14,
6:22, 7:6, 8:10,
8:22, 14:5,
41:14, 55:9,
59:5, 78:8,
93:19, 93:20,
95:5, 95:7,
114:21, 137:13,
137:18, 137:21,
138:2, 138:12,
139:18, 144:13,
145:10, 149:17,
170:2, 170:13,
170:17, 172:1,
180:13, 181:5
motion's [1] -
44:15
motions [1] - 29:1
motivate [1] -

122:8
motivation [1] -
161:8
motive [1] - 120:5
mouse [1] - 72:11
mouth [2] - 75:5,
119:4
move [13] - 19:10,
23:22, 65:4,
66:2, 72:8,
72:19, 98:8,
126:4, 132:14,
132:18, 152:9,
155:14, 155:25
moved [1] - 8:5
moving [1] -
157:1
multimillionaire
[1] - 112:2
multiple [2] -
62:24, 122:24
must [9] - 63:6,
75:2, 81:25,
86:7, 91:18,
99:9, 150:4,
155:9
myriad [1] - 10:5
Myrtle [1] - 63:14

# N

name [14] - 2:17,
14:14, 18:10,
18:22, 29:7,
29:14, 42:25,
51:3, 106:7,
108:16, 108:20,
162:13, 178:8
named [4] - 3:13,
50:9, 110:5,
157:21
names [2] - 42:24,
62:1
NARA [6] -
138:23, 139:14,
139:15, 140:21,
143:3
narrow [1] -
123:16
National [1] -
138:15
nature [1] - 71:12
nauseam [1] -
169:9
near [2] - 12:15,
55:18
nearly [1] - 95:19
necessarily [9] -
6:19, 25:8, 73:6,
92:12, 96:2,

98:11, 130:16,
160:8, 163:13
necessary [3] -
107:25, 160:15,
162:12
need [58] - 6:16,
6:17, 8:23,
13:19, 14:19,
14:20, 14:21,
14:22, 14:25,
19:14, 23:13,
23:14, 41:22,
52:18, 53:8,
58:11, 71:13,
71:15, 74:11,
77:12, 80:10,
88:18, 89:15,
93:3, 95:22,
101:24, 103:22,
109:8, 119:8,
123:24, 124:10,
124:12, 127:3,
129:9, 137:9,
137:19, 137:20,
141:14, 142:9,
145:5, 145:6,
146:16, 146:19,
146:22, 149:11,
150:8, 150:23,
152:14, 153:19,
155:5, 155:13,
159:20, 160:11,
163:3, 166:13,
180:24, 181:9
needed [13] -
6:14, 6:19, 7:16,
8:22, 23:11,
64:9, 97:7,
102:5, 104:2,
118:4, 133:16,
157:11, 173:2
needs [5] - 15:2,
41:12, 41:17,
81:8, 167:24
negative [1] -
104:7
never [27] - 12:10,
12:17, 14:7,
30:23, 34:14,
35:17, 38:2,
52:7, 59:9,
65:23, 67:24,
76:22, 82:4,
94:2, 96:14,
102:2, 126:24,
142:11, 142:14,
142:15, 165:7,
165:17, 169:7,
171:5, 173:16,
176:10, 176:11

**nevertheless** [1] - 90:17
**new** [15] - 6:25, 73:18, 85:25, 132:18, 157:6, 164:6, 165:3, 166:4, 166:14, 166:16, 166:18, 166:21, 167:2, 168:3, 175:5
**next** [26] - 60:2, 64:23, 65:18, 85:11, 86:9, 92:17, 93:7, 109:11, 112:6, 130:13, 130:14, 132:19, 141:11, 142:25, 148:18, 149:16, 150:20, 151:6, 155:18, 155:25, 157:1, 162:16, 168:7, 169:23, 179:1
**nice** [2] - 35:1, 154:9
**night** [11] - 7:24, 18:24, 31:6, 34:15, 50:9, 61:24, 133:11, 139:7, 139:12, 151:23
**nine** [3] - 61:5, 61:6, 171:5
**ninth** [1] - 28:15
**NO** [1] - 1:4
**nobody** [5] - 48:25, 108:5, 145:19, 150:1, 180:6
**nobody's** [1] - 15:20
**noise** [1] - 42:10
**non** [11] - 5:3, 5:11, 18:3, 49:8, 50:21, 52:5, 52:7, 76:10, 77:17, 121:10, 128:12
**non-expert** [1] - 18:3
**non-prosecution** [9] - 5:3, 5:11, 49:8, 50:21, 52:5, 52:7, 76:10, 77:17, 128:12
**non-timekeeping** [1] - 121:10

**none** [6] - 40:25, 49:17, 65:10, 130:16, 156:25
**nonetheless** [1] - 47:13
**nonexpert** [2] - 56:18, 72:22
**nonsense** [2] - 38:8, 74:5
**normal** [1] - 132:16
**NORTHERN** [1] - 1:2
**note** [11] - 5:2, 62:22, 69:25, 80:13, 95:24, 106:20, 139:5, 155:17, 176:24, 177:24, 178:15
**noted** [4] - 68:24, 72:13, 78:10, 82:8
**notes** [6] - 1:25, 55:13, 72:13, 95:21, 116:14, 117:15
**nothing** [14] - 77:11, 79:7, 87:2, 87:4, 93:25, 112:17, 123:23, 131:25, 144:13, 154:24, 161:25, 163:13, 176:14
**notice** [8] - 35:16, 86:19, 143:23, 144:9, 145:20, 162:20, 166:5, 167:4
**noticed** [2] - 38:11, 113:24
**notified** [2] - 13:10, 118:12
**noting** [3] - 13:15, 130:8, 170:8
**November** [20] - 4:17, 5:9, 69:12, 69:16, 69:22, 70:6, 73:22, 76:17, 77:4, 77:8, 77:9, 94:25, 108:9, 138:13, 139:15, 148:11, 151:9, 153:25, 171:24
**NSA** [40] - 9:9, 9:17, 12:16, 12:18, 46:11, 73:14, 73:15, 75:20, 82:2,

82:6, 85:21, 86:2, 86:7, 87:10, 87:14, 96:21, 96:24, 100:4, 104:5, 104:8, 133:7, 133:12, 138:7, 138:16, 138:23, 142:20, 148:22, 155:19, 157:16, 157:22, 158:5, 158:15, 159:24, 162:18, 163:5, 163:6, 164:3, 172:23, 175:9, 175:19
**NSA's** [5] - 5:6, 67:12, 133:23, 147:2, 151:8
**NSOC** [1] - 175:12
**nuisance** [1] - 64:21
**Number** [2] - 22:6, 44:20, 148:20
**number** [37] - 2:6, 3:25, 4:13, 10:13, 10:15, 12:10, 21:10, 21:15, 22:9, 30:22, 36:4, 40:15, 43:24, 44:23, 45:7, 59:13, 67:6, 72:12, 78:23, 83:11, 84:18, 85:6, 86:2, 95:11, 106:21, 107:4, 113:16, 115:22, 131:1, 134:17, 142:2, 142:3, 148:19, 151:10, 151:15, 151:17, 159:10
**numbered** [1] - 148:19
**numbers** [11] - 21:13, 21:16, 22:10, 28:7, 80:4, 123:12, 130:10, 130:13, 130:25, 131:5, 163:21
**nuts** [1] - 146:16

---

# O

**o'clock** [3] - 34:12, 114:25, 128:17

**oath** [5] - 4:18, 48:16, 67:13, 120:6, 122:13
**object** [10] - 14:5, 129:7, 152:12, 152:25, 153:1, 153:10, 153:21, 153:23, 166:17, 172:12
**objected** [1] - 8:8
**objecting** [2] - 109:9, 152:8
**objection** [5] - 121:9, 125:17, 137:11, 152:6, 154:16
**objections** [2] - 168:19, 168:21
**objects** [1] - 5:24
**obligation** [3] - 119:8, 170:6, 170:20
**obligations** [2] - 146:17, 170:21
**observing** [2] - 118:17, 118:18
**obvious** [8] - 18:17, 123:10, 124:3, 126:12, 176:25, 177:12, 178:6
**obviously** [10] - 36:9, 38:12, 49:11, 77:24, 103:20, 109:15, 124:12, 143:16, 146:14, 169:20
**occasion** [5] - 20:9, 22:17, 35:18, 65:9, 122:25
**occasionally** [2] - 75:5, 169:25
**occasions** [8] - 4:13, 31:5, 58:9, 73:10, 74:1, 112:20, 122:24, 162:2
**occurred** [4] - 4:14, 82:4, 146:25
**October** [7] - 30:25, 31:16, 68:7, 100:10, 100:23, 104:9, 148:23
**odd** [1] - 119:17
**OF** [3] - 1:1, 1:3, 182:1
**offer** [4] - 99:9,

126:9, 168:19
**offered** [2] - 100:5, 166:24
**offering** [6] - 99:11, 99:12, 99:13, 99:14, 99:17, 100:1
**offers** [1] - 10:6
**Office** [4] - 5:6, 13:17, 49:20, 82:20
**office** [10] - 7:25, 22:2, 22:4, 83:15, 113:3, 113:22, 118:12, 118:13, 119:5, 163:6
**officer** [10] - 40:11, 101:6, 140:9, 140:10, 141:21, 142:22, 142:25, 143:1, 143:7, 157:22
**Officer** [1] - 141:18
**official** [1] - 42:25
**OFFICIAL** [2] - 182:1, 182:14
**Offit** [1] - 69:8
**often** [3] - 7:23, 18:17, 18:19
**OIG** [7] - 4:16, 48:19, 50:14, 51:15, 148:22, 151:8, 163:6
**old** [1] - 31:17
**omniscient** [2] - 55:4
**once** [9] - 4:14, 10:19, 38:17, 92:13, 92:25, 94:6, 119:1, 143:14, 143:15
**one** [126] - 3:22, 8:7, 9:14, 9:15, 10:5, 11:22, 15:24, 18:12, 18:17, 22:5, 26:5, 28:3, 32:1, 32:25, 35:18, 36:5, 38:4, 38:5, 43:13, 44:18, 47:18, 47:24, 56:16, 58:5, 58:6, 61:6, 62:16, 63:3, 63:4, 63:16, 64:2, 64:17, 66:4, 66:24, 69:12, 70:1,

70:5, 70:16, 71:6, 71:7, 72:12, 74:8, 74:11, 74:22, 77:24, 78:18, 78:20, 80:20, 80:23, 80:24, 81:10, 84:23, 86:21, 87:1, 87:7, 87:10, 87:12, 90:2, 90:4, 90:7, 91:15, 93:10, 94:7, 97:4, 97:5, 98:24, 99:8, 101:3, 102:15, 108:6, 111:20, 112:3, 113:1, 113:4, 113:10, 114:10, 114:25, 115:14, 116:9, 118:20, 120:1, 120:16, 120:17, 120:22, 122:25, 124:17, 129:1, 129:16, 130:7, 130:15, 130:17, 130:18, 130:22, 132:14, 135:1, 136:11, 136:14, 138:19, 139:10, 139:12, 140:12, 142:6, 142:10, 142:24, 145:1, 146:22, 148:15, 148:18, 149:8, 156:5, 155:16, 155:18, 155:19, 157:21, 160:25, 162:4, 163:4, 168:7, 169:23, 173:4, 173:5, 174:16, 178:22, 179:1, 180:5
**one-year** [1] - 174:16
**ones** [5] - 17:17, 125:19, 125:20, 130:15, 137:22
**ongoing** [3] - 133:8, 133:10, 163:4
**onsite** [2] - 38:2
**open** [6] - 119:3, 159:4, 159:13, 167:11, 172:9, 172:13
**opened** [1] - 136:25
**opening** [3] -

67:17, 149:24,
179:14
**operandi** [1] -
18:13
**operating** [1] -
128:8
**opinion** [7] -
24:12, 26:4,
41:9, 72:25,
94:8, 144:19,
156:6
**opinions** [2] -
137:13, 138:5
**opponent** [1] -
99:4
**opportunity** [2] -
105:17, 106:24
**oppose** [1] -
135:16
**opposed** [2] -
14:7, 57:11
**opposing** [1] -
100:12
**opposite** [4] -
13:13, 51:14,
166:11, 166:25
**opposition** [5] -
3:16, 4:4, 78:25,
91:12, 93:19
**oral** [1] - 38:1
**orally** [2] - 88:3,
180:13
**order** [10] - 2:2,
75:19, 80:8,
82:1, 132:16,
140:3, 140:6,
170:17, 173:6,
180:1
**ordinary** [3] -
11:15, 36:7,
117:10
**organize** [1] -
58:1
**original** [10] -
78:25, 79:6,
81:25, 87:14,
91:10, 91:11,
116:21, 137:13,
173:23, 174:3
**originally** [8] -
13:25, 63:18,
69:8, 73:12,
79:5, 93:17,
100:18
**otherwise** [2] -
152:23, 154:16
**ought** [9] - 4:25,
5:21, 6:3, 36:1,
38:21, 41:20,
48:25, 117:22,

121:23
**ourselves** [1] -
127:13
**outcome** [1] -
27:21
**outfit** [1] - 163:5
**outing** [1] -
109:23
**outlined** [1] - 76:7
**outlines** [1] -
123:11
**outlining** [1] -
138:16
**outside** [2] -
143:17, 158:24
**outstanding** [1] -
7:16
**overall** [4] - 86:1,
86:6, 95:11,
95:16
**overbilled** [1] -
49:12
**overbilling** [2] -
12:21, 17:23
**overlapping** [1] -
16:25
**overwhelming** [2]
- 50:3, 55:21
**own** [13] - 18:9,
20:6, 26:1,
64:24, 65:22,
71:10, 73:4,
85:22, 89:15,
90:16, 97:17,
100:13, 132:6
**owner** [4] - 60:23,
67:5, 67:22,
67:23
**ownership** [1] -
43:9

---

**P**

---

**p.m.** [6] - 28:12,
61:24, 74:24,
103:15, 180:18,
181:22
**package** [4] -
16:13, 16:16,
43:20, 180:11
**page** [55] - 4:22,
6:5, 6:11, 7:20,
8:18, 9:5, 9:9,
17:3, 17:6, 17:8,
17:11, 21:12,
21:16, 22:9,
24:23, 25:3,
27:18, 27:22,
28:9, 29:10,
32:4, 32:6, 32:7,

32:11, 32:13,
42:8, 44:3, 44:4,
44:9, 44:10,
56:7, 56:8,
60:20, 62:1,
80:22, 81:13,
91:10, 93:20,
94:7, 99:7,
104:8, 104:24,
111:9, 118:18,
130:14, 130:15,
130:16, 144:19,
151:25, 182:8
**pages** [21] - 6:12,
7:21, 16:23,
20:22, 21:4,
30:23, 30:25,
32:5, 43:22,
50:4, 78:3,
101:10, 102:21,
116:9, 133:7,
133:13, 133:20,
133:24, 134:17,
139:8, 147:11
**paid** [10] - 59:13,
59:14, 62:3,
64:20, 74:16,
111:23, 111:25,
120:20, 159:17,
176:7
**pandemic** [2] -
76:20, 102:15
**Pandora's** [1] -
136:25
**paper** [1] - 142:20
**papers** [1] - 115:2
**paragraph** [6] -
7:20, 7:21, 61:3,
63:3, 64:18,
64:23
**paralegal** [1] -
60:7
**paraphrasing** [1]
- 7:6
**parenthetical** [1] -
108:20
**part** [43] - 5:19,
17:14, 17:24,
17:25, 20:3,
27:6, 34:24,
37:15, 47:1,
59:5, 67:12,
68:13, 73:25,
75:12, 76:15,
77:13, 77:25,
80:23, 80:24,
82:13, 85:15,
86:14, 96:4,
97:6, 99:7,
99:25, 106:2,

108:12, 109:19,
114:6, 116:3,
126:17, 141:20,
143:2, 145:24,
149:4, 155:4,
155:8, 156:15,
157:24, 161:16,
171:18, 176:3
**part-time** [2] -
37:15, 109:19
**partial** [1] - 152:3
**participant** [1] -
119:2
**participation** [1] -
118:14
**particular** [15] -
23:4, 67:1,
72:23, 80:19,
83:2, 83:4, 83:9,
83:17, 83:24,
85:1, 91:15,
119:8, 147:5,
177:11
**particularly** [2] -
27:10, 122:9
**Particulars** [1] -
172:2
**parties** [2] -
118:12, 146:18
**partly** [2] - 69:22,
110:21
**parts** [3] - 12:13,
106:1, 137:22
**party** [7] - 99:4,
99:9, 100:12,
143:23, 144:8,
144:21
**pass** [2] - 48:20,
175:9
**passage** [1] -
105:7
**passed** [2] -
142:21, 143:15
**past** [4] - 93:8,
109:12, 126:4,
145:9
**pattern** [7] -
15:25, 18:2,
18:13, 30:25,
35:6, 38:20,
47:9
**pause** [1] - 5:2
**pay** [3] - 155:19,
156:14, 157:16
**payment** [3] -
12:16, 13:5,
162:10
**PDFs** [2] - 80:8,
87:23
**peer** [2] - 26:21,

33:24
**penalty** [1] -
50:14
**pending** [2] - 4:9,
158:14
**People** [1] - 5:25
**people** [43] -
23:25, 25:21,
38:3, 39:7,
40:19, 41:18,
43:11, 43:18,
44:5, 64:20,
72:3, 82:23,
83:5, 84:9,
84:10, 84:16,
87:17, 100:19,
103:21, 106:19,
106:20, 107:3,
107:15, 108:8,
120:19, 121:19,
122:8, 127:12,
132:6, 132:8,
148:1, 150:17,
160:10, 163:12,
165:7, 165:23,
169:13, 175:6,
175:7, 175:10,
176:9, 178:7,
179:23
**percent** [2] -
94:10, 94:17
**perfect** [4] -
13:12, 23:19,
49:9, 49:11
**perfectly** [1] -
175:15
**performance** [1] -
165:15
**performing** [1] -
163:17
**perhaps** [14] -
7:17, 24:1, 26:8,
68:5, 74:1, 76:3,
81:16, 131:16,
138:23, 144:1,
169:22, 180:12,
180:20, 180:22
**period** [22] -
31:10, 37:20,
37:22, 38:4,
44:24, 44:25,
45:24, 58:7,
61:4, 101:1,
144:4, 145:16,
145:17, 145:18,
146:20, 157:7,
158:17, 163:23,
166:5, 167:3,
175:21
**periods** [1] - 80:1

**perjured** [1] - 58:8
**perjurer** [5] -
36:18, 55:1,
122:4, 127:22,
131:21
**perjuries** [1] -
48:9
**perjurious** [1] -
4:24
**perjury** [5] -
50:14, 76:1,
76:16, 116:20,
117:17
**permanent** [1] -
143:2
**permission** [1] -
171:3
**permit** [1] - 5:21
**permits** [1] - 5:19
**permitted** [1] - 6:9
**person** [47] - 18:3,
18:19, 23:7,
23:9, 26:12,
28:11, 33:3,
35:8, 35:9,
35:11, 39:8,
39:19, 39:20,
41:20, 48:11,
48:16, 54:17,
66:14, 67:6,
69:17, 72:10,
79:9, 88:3,
93:13, 96:7,
105:22, 105:23,
108:21, 111:12,
120:4, 120:6,
122:12, 124:21,
126:12, 126:13,
136:11, 147:16,
157:11, 163:8,
163:18, 175:8,
177:8, 177:9,
177:22, 177:24,
178:2
**personnel** [2] -
9:5, 174:24
**perspective** [3] -
59:6, 88:23,
90:1
**persuade** [1] -
25:21
**pertinent** [1] -
78:8
**Peter** [4] - 1:14,
2:12, 81:21,
82:15
**Peterman** [1] -
81:2
**phone** [36] - 7:3,
12:8, 34:19,

34:21, 34:22, 34:23, 34:24, 41:15, 51:4, 61:1, 67:1, 67:2, 67:6, 67:19, 67:21, 67:22, 67:23, 68:21, 70:7, 92:24, 95:10, 95:13, 111:1, 111:3, 115:1, 123:12, 130:7, 130:12, 130:25, 131:4, 131:7, 131:9, 136:18, 140:12, 164:1, 164:11
**photocopied** [1] - 21:21
**photocopies** [1] - 91:2
**photocopying** [2] - 90:16, 90:21
**photographs** [1] - 80:7
**phrase** [2] - 49:19, 179:18
**physical** [2] - 106:13
**physically** [1] - 111:11
**pick** [3] - 103:23, 140:15, 148:14
**picked** [3] - 65:23, 95:17, 100:17
**picking** [2] - 140:15, 151:20
**picture** [2] - 23:24, 134:20
**piece** [1] - 46:8
**pile** [2] - 43:24, 60:15
**pinpoint** [1] - 173:1
**pitch** [1] - 73:7
**place** [11] - 10:12, 20:24, 36:15, 48:4, 55:10, 55:12, 76:19, 90:1, 109:2, 136:24
**plan** [8] - 113:8, 124:8, 126:1, 128:23, 141:8, 141:10, 141:15, 168:19
**planning** [6] - 23:12, 147:23, 152:12, 153:10, 155:25, 180:8
**plate** [1] - 177:6

**played** [1] - 49:21
**playing** [1] - 110:17
**pleading** [3] - 116:10, 164:2, 176:20
**pleadings** [1] - 20:23
**pleased** [1] - 164:8
**pleases** [1] - 4:25
**plenty** [5] - 7:7, 49:1, 49:5, 164:4, 173:3
**Plunkett** [5] - 82:21, 82:22, 83:6, 83:10, 132:9
**plus** [4] - 85:13, 116:16, 134:15
**podium** [1] - 82:10
**point** [71] - 5:12, 7:13, 12:23, 13:20, 14:10, 24:15, 24:17, 34:1, 34:8, 38:13, 40:14, 41:16, 47:4, 50:24, 51:10, 51:19, 51:22, 55:14, 55:18, 56:21, 59:16, 69:9, 72:5, 75:9, 77:3, 86:17, 88:11, 88:18, 89:9, 93:23, 94:21, 98:2, 98:10, 101:25, 103:10, 109:12, 109:15, 111:16, 112:6, 115:9, 116:22, 117:2, 118:15, 118:20, 118:21, 119:6, 120:24, 125:16, 129:1, 134:21, 134:24, 138:21, 144:17, 145:22, 149:15, 150:3, 156:25, 158:11, 164:3, 165:20, 167:10, 167:22, 170:25, 171:4, 171:12, 171:25, 172:18, 174:2, 178:19, 179:17
**pointed** [3] - 92:19, 97:24, 107:25

**pointing** [1] - 170:3
**points** [7] - 4:5, 4:19, 13:19, 18:1, 46:14, 90:14, 132:7
**police** [1] - 117:7
**pool** [3] - 147:24, 175:10, 175:13
**popular** [2] - 40:1, 40:2
**portion** [2] - 123:19, 162:21
**position** [9] - 9:10, 9:18, 79:17, 93:8, 93:9, 133:25, 142:17, 149:25, 150:8
**positions** [2] - 149:14, 153:20
**possibility** [1] - 162:16
**possible** [8] - 49:24, 49:25, 73:9, 88:16, 92:23, 131:14, 133:15, 155:17
**possibly** [2] - 145:14, 145:18
**Post** [1] - 92:1
**postponed** [1] - 53:25
**postponement** [2] - 8:6, 8:8
**potential** [2] - 135:4
**potentially** [4] - 2:9, 132:22, 135:14, 163:22
**potshots** [1] - 58:5
**power** [2] - 177:5, 177:14
**practical** [5] - 53:3, 124:19, 125:14, 126:6, 146:14
**practically** [1] - 62:9
**practice** [1] - 48:22
**practices** [1] - 147:2
**praise** [1] - 136:13
**praxis** [1] - 109:23
**prayer** [1] - 121:16

**precise** [2] - 59:4, 105:20
**precisely** [3] - 54:7, 59:6, 152:14
**preclude** [1] - 170:8
**predecessor** [1] - 77:6
**prefer** [1] - 162:22
**preference** [1] - 154:6
**preferred** [1] - 136:20
**preliminary** [1] - 179:11
**premise** [3] - 15:8, 121:10, 142:9
**prep** [1] - 149:18
**preparation** [1] - 137:25
**prepared** [2] - 116:25, 133:13
**preparing** [1] - 137:20
**preponderance** [2] - 36:2, 91:16
**presence** [1] - 143:17
**present** [10] - 7:1, 51:12, 78:4, 118:10, 118:13, 154:13, 170:9, 177:1, 177:11, 177:12
**presentation** [1] - 24:21
**presented** [12] - 3:18, 23:5, 25:15, 58:2, 58:12, 58:24, 73:11, 87:23, 102:13, 116:23, 178:13
**preserve** [1] - 144:11
**pressed** [2] - 37:9, 139:23
**pressing** [1] - 89:11
**pressured** [1] - 115:6
**Preston** [166] - 4:8, 4:12, 4:15, 5:2, 5:13, 5:16, 6:5, 6:10, 7:1, 10:8, 12:2, 12:17, 12:19, 12:24, 13:6,

13:13, 14:11, 15:8, 18:5, 18:7, 18:16, 18:20, 18:23, 18:24, 19:7, 20:5, 20:19, 21:2, 21:8, 22:16, 24:19, 24:21, 25:16, 25:22, 29:7, 29:10, 29:11, 29:14, 29:16, 29:21, 29:23, 30:1, 30:17, 31:2, 31:21, 31:24, 31:25, 34:17, 35:10, 35:12, 36:12, 38:16, 40:17, 40:24, 41:19, 44:10, 45:19, 45:25, 49:7, 50:9, 51:1, 52:1, 52:12, 54:7, 55:1, 55:23, 58:8, 59:1, 59:8, 59:20, 61:16, 61:23, 63:4, 63:8, 63:13, 63:19, 63:24, 64:11, 64:19, 64:25, 66:15, 67:8, 67:10, 67:11, 68:13, 69:2, 69:23, 71:8, 71:24, 73:8, 74:7, 74:12, 75:17, 78:1, 81:5, 81:11, 81:15, 82:1, 82:5, 85:19, 86:21, 86:23, 87:13, 88:14, 88:25, 92:25, 93:2, 93:4, 93:13, 93:24, 95:3, 95:8, 101:11, 102:19, 102:22, 105:23, 106:5, 108:16, 108:18, 108:23, 108:24, 109:3, 109:4, 111:15, 111:16, 112:5, 112:11, 115:18, 116:21, 116:25, 117:5, 117:16, 117:23, 120:3, 120:11, 121:11, 121:14, 121:15, 121:18,

122:1, 122:9, 122:17, 122:18, 122:19, 124:15, 124:23, 125:13, 126:5, 126:6, 126:15, 128:11, 130:17, 130:18, 131:18, 132:9, 156:1, 156:2, 156:7, 160:19, 161:10, 176:9
**Preston's** [26] - 6:7, 18:2, 20:24, 22:24, 29:9, 31:8, 31:22, 34:2, 51:15, 58:3, 60:23, 64:24, 65:5, 68:20, 69:16, 71:20, 73:24, 75:13, 76:1, 77:22, 93:1, 97:17, 118:19, 123:25, 130:7, 131:6
**presumably** [2] - 15:14, 86:7
**presumed** [1] - 144:21
**pretend** [1] - 26:13
**PRETRIAL** [1] - 1:10
**pretrial** [4] - 180:12, 180:19, 180:24
**pretty** [17] - 35:1, 59:23, 61:22, 68:7, 68:21, 72:18, 74:7, 79:20, 95:4, 97:9, 101:7, 131:12, 150:15, 150:16, 158:1, 158:3, 179:4
**previous** [1] - 20:23
**previously** [8] - 51:7, 70:19, 117:16, 129:16, 133:23, 134:19, 140:19, 164:9
**price** [2] - 175:14, 175:22
**prima** [2] - 91:17, 91:18
**primarily** [1] - 3:4
**principal** [1] - 69:12
**print** [2] - 22:5,

27:1
**printout** [2] -
64:22, 72:2
**privileged** [1] -
155:10
**problem** [13] -
20:14, 54:16,
55:10, 93:7,
101:24, 117:13,
117:21, 124:13,
126:6, 127:12,
143:20, 144:7,
174:25
**problems** [1] -
73:15
**procedures** [2] -
96:6, 96:10
**proceeding** [1] -
2:22
**proceedings** [3] -
2:7, 181:22,
182:7
**proceeds** [1] -
90:13
**process** [6] -
96:1, 101:22,
123:8, 130:2,
133:8, 180:10
**produce** [6] -
37:13, 134:5,
136:22, 136:25,
170:6, 173:6
**produced** [19] -
25:14, 37:11,
60:25, 78:13,
79:22, 80:8,
81:14, 125:25,
131:22, 134:19,
136:22, 137:1,
140:5, 140:11,
168:8, 169:4,
169:14, 173:8,
173:15
**product** [2] -
79:15, 146:12
**production** [7] -
76:2, 113:24,
132:25, 133:3,
133:14, 138:2,
140:3
**productive** [1] -
161:9
**professional** [3] -
14:13, 94:9,
94:18
**Professional** [1] -
182:3
**proffer** [4] - 18:6,
21:2, 50:16,
117:15

**proffered** [1] -
110:3
**proffers** [1] -
166:10
**proficiently** [1] -
54:24
**program** [32] -
9:6, 9:10, 9:12,
9:18, 9:19, 11:6,
11:9, 31:8, 31:9,
38:7, 38:11,
39:5, 40:1, 40:2,
52:22, 59:2,
65:20, 78:13,
80:20, 82:3,
87:25, 96:12,
100:10, 100:20,
100:22, 101:1,
101:7, 109:17,
121:24, 151:16,
175:20, 176:1
**programmer** [1] -
175:2
**progress** [2] -
133:3, 133:16
**project** [1] -
125:24
**projector** [3] -
58:16, 58:18,
62:19
**projects** [2] -
33:16, 174:21
**proof** [8] - 98:12,
165:22, 170:6,
172:2, 176:22,
176:23
**properly** [2] -
56:18, 173:10
**proponent** [3] -
47:1, 91:19,
109:7
**proposal** [2] -
175:17, 175:18
**proposed** [3] -
170:17, 179:15,
179:17
**prosecute** [3] -
55:25, 76:8,
122:7
**prosecution** [11] -
5:3, 5:11, 38:15,
49:8, 50:21,
52:5, 52:7,
52:14, 76:10,
77:17, 128:12
**prosecutors** [1] -
143:4
**provable** [1] -
18:2
**provably** [1] -

157:5
**prove** [24] - 4:24,
12:3, 14:11,
14:19, 18:12,
35:4, 36:11,
36:12, 36:13,
41:11, 88:14,
99:10, 99:11,
99:13, 99:14,
99:17, 99:21,
100:1, 100:6,
110:14, 161:25,
163:18, 165:20,
172:11
**proved** [2] - 48:2,
160:23
**proven** [1] - 14:2
**provide** [3] -
51:10, 131:15,
133:18
**provided** [13] -
9:7, 14:15,
31:18, 51:3,
51:9, 58:14,
61:11, 72:15,
82:22, 83:6,
83:10, 83:15,
154:5
**proving** [1] -
13:20
**public** [1] - 48:21
**published** [1] -
26:22
**publishing** [1] -
33:23
**pull** [2] - 43:16,
60:11
**pulled** [1] - 133:9
**pure** [1] - 173:8
**purportedly** [2] -
9:11, 9:19
**purpose** [5] -
6:15, 15:10,
69:15, 70:17,
181:10
**purposes** [1] -
71:4
**pursuant** [4] -
11:16, 96:6,
128:12, 182:5
**pursue** [4] -
117:22, 140:4,
167:5
**pursuing** [2] -
145:5, 166:15
**pushing** [1] -
113:10
**put** [20] - 15:23,
64:17, 67:9,
74:8, 74:10,

80:1, 106:4,
106:5, 111:4,
124:11, 129:5,
132:2, 136:1,
142:20, 150:9,
156:17, 166:18,
168:18, 173:25,
176:22
**Put** [1] - 105:5
**puts** [2] - 20:5,
85:17
**putting** [1] -
157:19

**Q**

**qualified** [1] -
37:2
**qualify** [1] - 47:15
**quality** [10] -
163:19, 164:12,
164:19, 164:21,
164:24, 165:1,
165:5, 165:8,
165:12, 165:22
**query** [1] - 112:5
**questioning** [3] -
26:2, 87:15,
180:1
**questions** [18] -
25:19, 25:25,
31:21, 56:10,
56:13, 56:16,
70:12, 94:8,
96:14, 97:21,
97:23, 103:1,
104:1, 111:20,
156:9, 179:19,
179:24
**queue** [2] - 133:8,
134:9
**quick** [1] - 55:15
**quickly** [4] - 66:2,
95:17, 128:22,
144:14
**Quiet** [1] - 114:4
**quite** [6] - 4:14,
6:22, 7:23,
55:10, 119:12,
145:1
**quote** [9] - 4:23,
5:1, 5:18, 5:24,
6:5, 6:11, 11:13,
72:16, 101:15
**quote/unquote**
[1] - 129:3
**quoted** [1] - 71:21
**quotes** [1] - 110:5

**R**

**raise** [4] - 41:20,
63:5, 135:4,
135:14
**raised** [2] - 96:14,
170:23
**raises** [1] - 121:8
**range** [1] - 62:23
**rate** [7] - 66:22,
71:16, 73:5,
75:10, 87:4,
97:12, 105:9
**rates** [1] - 64:20
**rather** [8] - 3:6,
53:4, 53:6,
76:15, 139:16,
153:9, 164:24,
179:13
**Raynett** [8] -
37:13, 37:15,
37:19, 38:1,
38:6, 38:14,
100:24, 109:16
**re** [7] - 3:3, 54:5,
73:18, 93:4,
167:14, 167:23
**re-bid** [2] -
167:14, 167:23
**re-compete** [3] -
54:5, 73:18
**re-enter** [1] - 93:4
**reach** [1] - 27:23
**reacting** [1] -
105:11
**reaction** [3] -
23:24, 27:23,
104:7
**read** [8] - 7:11,
8:24, 9:14,
25:25, 35:16,
42:20, 75:25,
179:12
**readable** [1] -
70:18
**reading** [2] -
139:6, 162:22
**reads** [2] - 8:19,
52:23
**ready** [8] - 7:12,
57:18, 132:18,
137:9, 138:9,
145:5, 179:14,
181:4
**reaffirmed** [1] -
80:12
**real** [2] - 79:21,
144:14
**realize** [3] -
112:24, 153:16,

163:7
**realized** [2] -
70:13, 149:4
**really** [48] - 3:21,
8:23, 15:20,
34:9, 36:2,
47:23, 48:15,
49:17, 55:14,
57:6, 62:25,
64:17, 66:3,
70:4, 70:14,
76:3, 88:18,
92:19, 95:21,
98:19, 102:17,
102:20, 104:18,
106:11, 112:6,
114:13, 115:4,
115:11, 115:25,
117:11, 119:14,
120:2, 129:9,
134:19, 141:14,
148:6, 149:8,
154:3, 158:3,
158:13, 162:14,
165:6, 167:24,
168:5, 170:1,
173:2, 176:16,
178:24
**rearview** [1] - 8:7
**reason** [20] - 6:23,
18:16, 20:4,
50:25, 58:10,
58:11, 63:10,
89:12, 102:3,
110:4, 112:12,
118:5, 122:10,
145:19, 149:4,
159:1, 159:4,
160:14, 160:19,
162:9
**reasonable** [5] -
18:19, 94:9,
94:17, 102:25,
111:5
**reasonably** [3] -
47:25, 48:1,
91:20
**reasoning** [1] -
12:14
**reasons** [10] -
15:6, 50:24,
53:3, 71:7,
102:15, 113:10,
124:18, 128:4,
157:21, 161:23
**rebut** [1] - 114:14
**rebuttal** [13] -
3:20, 16:6, 37:6,
58:13, 62:20,
79:19, 93:18,

99:6, 101:21,
103:3, 105:17,
129:9
**received** [3] -
26:21, 141:20,
162:17
**recent** [1] - 75:4
**recently** [2] -
59:5, 164:1
**Recess** [1] -
74:24
**recess** [10] - 56:5,
57:16, 57:22,
57:23, 103:2,
103:8, 103:14,
103:15, 181:7
**recognize** [2] -
54:25, 71:23
**recollection** [2] -
129:16, 129:24
**record** [35] - 2:22,
9:7, 23:5, 28:20,
29:5, 34:3, 35:2,
36:25, 38:3,
38:10, 44:21,
47:1, 47:12,
48:23, 52:23,
72:10, 74:2,
85:14, 86:19,
95:18, 98:5,
98:12, 106:7,
106:11, 106:13,
108:21, 108:23,
109:5, 115:14,
126:14, 138:17,
142:14, 146:2
**recorded** [8] -
9:11, 9:18, 37:8,
79:11, 96:1,
96:5, 96:7, 96:8
**Records** [1] -
138:15
**records** [236] -
2:8, 3:4, 3:8,
3:9, 3:12, 3:13,
4:7, 4:12, 4:20,
4:25, 5:25, 6:2,
6:8, 6:10, 6:20,
8:21, 11:9,
11:12, 11:15,
11:19, 12:1,
12:3, 12:18,
12:19, 12:23,
12:25, 13:7,
13:8, 13:9,
13:12, 13:14,
13:21, 14:1,
14:11, 14:19,
15:3, 15:8, 15:9,
15:11, 15:15,

16:24, 17:23,
18:15, 19:24,
20:9, 20:12,
21:7, 31:15,
31:17, 31:18,
31:20, 32:1,
32:3, 34:18,
34:22, 34:23,
34:24, 35:18,
36:5, 36:7,
36:14, 36:18,
36:19, 37:5,
37:10, 37:12,
37:13, 38:10,
38:12, 38:14,
38:15, 38:18,
40:16, 40:23,
41:3, 41:5,
41:17, 41:18,
41:21, 44:19,
46:22, 46:23,
47:10, 47:16,
48:1, 48:6, 49:2,
49:8, 49:11,
49:13, 50:1,
50:25, 51:9,
51:13, 52:13,
52:14, 53:17,
55:6, 55:22,
55:25, 56:23,
57:10, 57:11,
59:7, 59:8,
59:12, 61:5,
70:1, 71:11,
72:14, 75:18,
79:17, 79:21,
80:4, 80:5,
80:13, 81:4,
81:6, 82:22,
82:23, 83:7,
83:10, 84:15,
85:10, 85:22,
85:24, 86:11,
87:19, 88:6,
88:7, 88:14,
88:21, 90:11,
91:23, 92:3,
92:11, 93:12,
93:14, 93:25,
94:22, 95:25,
97:14, 97:15,
97:25, 98:13,
98:18, 98:20,
98:21, 99:11,
100:4, 100:9,
100:18, 100:19,
101:10, 101:23,
102:6, 102:9,
102:21, 104:8,
106:1, 106:14,
107:13, 107:15,

107:18, 108:7,
108:25, 109:7,
110:18, 111:1,
111:13, 115:20,
116:7, 116:8,
116:11, 117:1,
117:5, 117:10,
117:12, 120:4,
120:5, 120:6,
120:15, 121:10,
121:18, 121:22,
122:4, 122:5,
122:6, 123:18,
123:19, 123:21,
124:1, 124:2,
124:5, 124:14,
124:22, 125:1,
125:9, 125:16,
127:23, 128:6,
128:13, 131:22,
132:3, 132:10,
132:12, 133:13,
137:18, 142:10,
143:14, 143:22,
144:10, 145:23,
146:5, 146:23,
168:8, 169:11,
169:14, 169:15,
170:18, 170:20,
170:22, 171:2,
171:7, 171:10,
171:11, 171:14,
171:21, 172:14,
172:20
**red** [3] - 62:22,
70:15, 119:10
**redact** [1] -
133:25
**redacted** [1] -
133:8
**redaction** [1] -
179:3
**reference** [8] -
9:4, 11:11, 19:2,
40:17, 104:4,
129:2, 170:9,
173:20
**referenced** [1] -
81:4
**references** [2] -
8:25, 101:9
**referencing** [2] -
15:24, 118:3
**referred** [6] -
42:22, 78:12,
118:19, 130:4,
137:24
**referring** [4] -
43:10, 106:12,
129:4, 166:23

**refining** [1] -
147:25
**reflect** [6] - 50:1,
80:11, 85:10,
88:7, 116:14,
130:5
**reflected** [5] -
12:8, 64:15,
65:11, 76:25,
118:18
**reflects** [4] -
72:25, 74:6,
80:18, 85:11
**regard** [4] - 26:9,
89:1, 102:20,
143:20
**regarding** [2] -
36:19, 116:19
**regardless** [1] -
115:23
**region** [1] - 40:1
**Registered** [1] -
182:3
**regs** [2] - 146:10,
170:21
**regular** [5] -
11:15, 96:6,
96:10, 98:13
**regularly** [1] -
41:3
**regulation** [1] -
142:4
**regulations** [2] -
146:1, 182:9
**Regulations** [1] -
140:23
**relate** [1] - 97:25
**related** [5] -
98:16, 158:3,
158:4, 158:23,
167:19
**relates** [1] - 71:1
**relating** [4] -
100:9, 137:18,
139:18, 168:8
**relationship** [1] -
159:23
**relatively** [1] -
100:11
**release** [1] -
133:22
**released** [3] -
54:4, 133:12,
134:11
**relentless** [2] -
136:12, 172:17
**relevance** [2] -
162:14, 165:13
**relevant** [7] -
46:10, 116:9,
**reply** [9] - 3:21,

144:10, 157:13,
167:4, 169:15,
174:9
**reliability** [1] -
91:17
**reliable** [2] - 98:1,
102:6
**relied** [1] - 71:10
**relief** [1] - 136:8
**relies** [1] - 123:17
**rely** [6] - 4:24,
51:25, 52:1,
55:22, 79:16,
91:1
**relying** [4] - 72:5,
105:9, 113:9,
120:17
**remainder** [2] -
5:22, 6:4
**remaining** [2] -
12:25, 134:15
**remains** [1] -
133:20
**remarkable** [1] -
136:11
**remarks** [1] -
119:16
**remember** [5] -
16:4, 19:4,
59:22, 90:19,
178:18
**reminds** [1] -
142:24
**remotely** [2] -
15:21, 146:4
**remove** [2] - 2:24,
3:1
**removed** [2] -
9:10, 9:17
**renders** [3] - 20:1,
20:4, 46:23
**renewal** [2] -
73:18, 167:18
**renewed** [2] -
163:19, 167:12
**repeated** [1] -
73:14
**repeatedly** [2] -
35:7, 109:19
**repeats** [1] -
30:25
**replace** [1] -
175:8
**replaced** [1] -
174:24
**replacing** [1] -
175:8
**replete** [1] -
101:10

4:1, 16:2, 16:6,
37:6, 38:13,
93:20, 94:6,
149:6
**replying** [1] -
119:14
**Report** [1] - 111:7
**report** [43] -
10:19, 14:13,
21:1, 42:5,
43:12, 44:8,
44:9, 59:25,
60:21, 60:25,
64:24, 65:6,
65:8, 65:11,
69:13, 69:15,
69:23, 70:11,
70:15, 71:10,
88:25, 89:2,
107:3, 111:23,
111:25, 112:7,
112:9, 112:10,
112:25, 113:1,
113:4, 114:7,
120:17, 121:20,
121:21, 121:22,
123:4, 123:7,
123:10, 129:3,
129:5
**reported** [4] -
86:2, 158:18,
160:1, 182:7
**reporter** [2] - 7:4,
181:16
**REPORTER** [2] -
182:1, 182:14
**Reporter** [1] -
182:4
**reports** [13] -
10:2, 10:5,
10:16, 10:21,
10:23, 41:25,
43:8, 43:19,
54:19, 83:24,
117:7, 117:8,
117:9
**represent** [1] -
51:12
**representation**
[1] - 98:7
**representations**
[4] - 37:25, 98:6,
100:7, 116:5
**representative** [4]
- 140:10,
141:21, 142:25,
143:1
**Representative'
s** [1] - 141:18
**representatives**

[1] - 143:8
**represented** [2] -
51:7, 171:6
**representing** [1] -
135:25
**request** [4] -
102:25, 133:7,
136:24, 175:17
**requested** [2] -
82:20, 175:17
**requests** [1] -
90:25
**require** [2] -
53:22, 140:23
**required** [9] -
2:25, 76:17,
91:20, 117:18,
141:17, 174:23,
176:4, 179:25
**requirements** [1]
- 175:18
**requires** [8] -
52:6, 87:17,
143:3, 143:11,
143:12, 146:5,
146:23, 147:3
**requiring** [3] -
48:23, 136:25,
173:6
**res** [2] - 98:3,
100:5
**research** [2] -
26:8, 145:7
**researched** [1] -
144:12
**reset** [2] - 103:18,
103:19
**resigned** [2] -
63:9, 174:24
**resolution** [2] -
7:16, 77:25
**resolve** [1] - 8:4
**resolved** [2] -
161:25, 163:5
**respect** [11] - 5:5,
68:16, 105:19,
105:24, 109:16,
110:20, 114:5,
126:5, 127:14,
127:17, 133:6
**respectfully** [3] -
113:15, 130:20,
169:3
**respective** [2] -
149:14, 153:20
**respond** [1] -
55:14
**responding** [1] -
116:15
**responds** [1] -

151:25
**response** [9] -
4:3, 89:15,
90:25, 95:5,
135:14, 155:21,
168:9, 169:14,
178:13
**responses** [1] -
58:1
**responsibility** [1]
- 65:21
**responsible** [5] -
69:17, 69:24,
96:12, 144:22,
175:7
**responsive** [1] -
171:15
**rest** [1] - 115:15
**restate** [1] - 98:9
**result** [2] - 20:19,
126:11
**retain** [3] -
170:20, 170:21,
171:1
**retained** [1] -
60:21
**retention** [1] -
138:17
**return** [1] - 162:19
**returned** [2] -
102:11, 110:22
**reveal** [1] - 24:4
**revelation** [1] -
88:19
**review** [9] - 2:21,
26:21, 33:24,
65:21, 66:10,
133:14, 134:1,
141:16, 159:1
**reviewed** [2] -
133:9, 133:16
**reviewing** [1] -
147:17
**reviews** [1] -
165:15
**revised** [2] -
113:4, 159:1
**revisit** [1] - 178:23
**revisiting** [1] -
134:8
**revolution** [1] -
88:19
**rhetorical** [1] -
158:12
**right-hand** [1] -
29:7
**rights** [1] - 146:18
**ripe** [2] - 3:22,
143:13
**rise** [4] - 57:22,

74:23, 74:25,
103:14
**risk** [3] - 142:2,
142:18, 172:20
**road** [1] - 136:6
**Roar** [14] - 64:6,
64:10, 155:21,
156:10, 157:17,
158:1, 158:4,
159:2, 160:9,
160:10, 160:15,
160:17, 160:18,
162:10
**Robert** [1] - 64:4
**role** [1] - 128:10
**rolling** [3] - 134:3,
137:4, 137:7
**rolls** [1] - 95:7
**room** [1] - 119:3
**Room** [1] - 180:4
**roped** [1] - 75:2
**rotten** [1] - 47:18
**roughly** [1] -
61:21
**RPR** [1] - 182:14
**rude** [1] - 122:19
**rule** [14] - 15:19,
36:20, 61:14,
95:25, 96:4,
103:4, 115:10,
115:11, 125:8,
128:18, 149:10,
180:13, 181:4
**Rule** [18] - 3:9,
6:9, 11:16, 25:6,
25:10, 26:3,
26:7, 26:12,
36:20, 46:15,
47:6, 56:17,
107:25, 113:6,
124:11, 124:25,
126:19, 127:15
**ruled** [3] - 14:6,
94:24, 94:25
**rules** [1] - 41:23
**Rules** [1] - 3:9
**ruling** [6] - 25:19,
95:6, 116:1,
143:18, 145:17,
155:12
**rulings** [3] -
151:2, 153:17,
165:19
**run** [28] - 42:22,
42:23, 43:2,
43:3, 45:6,
45:14, 66:13,
66:14, 70:11,
71:22, 71:25,
72:20, 73:1,

73:5, 79:7,
82:13, 89:21,
121:25, 126:20,
127:7, 127:8,
127:15, 127:17,
129:10, 129:11,
142:18, 161:9
**running** [3] - 51:5,
163:6, 176:11
**runs** [5] - 42:6,
43:5, 106:9,
142:1, 172:20
**Ryan** [1] - 70:10

## S

**sabotaged** [2] -
93:12, 93:13
**San** [1] - 35:3
**sat** [2] - 55:7,
119:3
**satisfaction** [2] -
109:18, 175:25
**satisfied** [3] -
21:6, 36:23,
122:2
**save** [1] - 10:19
**saved** [2] - 10:22,
173:22
**saw** [4] - 75:3,
138:20, 139:1,
145:8
**scale** [2] - 128:1,
174:21
**schedule** [3] -
74:6, 75:24,
180:16
**scheduled** [1] -
6:24
**scheming** [1] -
52:4
**SCI** [1] - 175:9
**scientific** [1] -
26:6
**scolding** [1] -
169:24
**scope** [2] - 26:7,
133:15
**score** [1] - 66:1
**screen** [2] -
81:11, 82:24
**screenshot** [5] -
37:8, 37:10,
101:14, 101:15,
101:20
**screenshots** [5] -
79:23, 83:24,
84:6, 84:14,
87:23
**screwed** [1] - 81:7

**search** [2] - 61:13
**searches** [1] -
130:11
**seated** [1] -
103:16
**second** [15] -
5:12, 9:15,
11:22, 30:14,
33:15, 43:13,
47:8, 74:22,
99:7, 100:21,
118:11, 118:14,
139:9, 139:10,
139:13
**secondly** [2] -
6:9, 141:16
**seconds** [13] -
18:23, 28:12,
29:11, 30:1,
30:20, 31:8,
32:8, 32:24,
50:5, 50:8, 93:4,
142:13
**secret** [1] - 175:12
**Section** [1] - 2:13
**Securities** [1] -
90:8
**security** [1] -
175:10
**security's** [1] -
90:13
**see** [76] - 10:11,
10:12, 12:22,
17:6, 17:19,
21:18, 21:19,
21:23, 22:12,
25:2, 28:25,
29:7, 29:15,
29:18, 29:20,
29:22, 30:17,
32:9, 33:3, 33:5,
33:6, 33:12,
33:14, 38:19,
44:4, 44:6,
60:19, 60:20,
62:1, 62:5,
62:13, 62:19,
63:2, 65:25,
66:2, 66:24,
67:9, 68:9, 71:5,
73:3, 74:17,
80:9, 81:3,
82:17, 82:24,
83:1, 83:2, 83:8,
85:20, 88:11,
91:13, 92:21,
94:3, 95:21,
97:13, 102:5,
104:10, 107:4,
113:25, 129:6,

129:20, 132:22,
135:5, 138:14,
144:19, 147:23,
155:8, 162:13,
165:12, 171:19,
175:3, 180:20,
181:7, 181:17
**seeing** [2] - 34:12,
177:18
**seek** [2] - 50:11,
163:11
**seeking** [2] -
25:17, 106:16
**seeks** [5] - 3:7,
11:8, 15:3,
19:25, 127:23
**seem** [7] - 13:24,
14:10, 53:8,
81:17, 122:14,
145:16, 154:16
**seeming** [1] -
75:25
**sees** [1] - 123:6
**selection** [1] -
6:23
**self** [4] - 32:12,
33:7, 33:17,
123:2
**self-evident** [1] -
32:12, 33:7,
33:17
**self-serving** [1] -
123:2
**send** [4] - 79:12,
152:15, 155:1,
169:11
**sends** [1] - 157:3
**Senior** [1] - 1:11
**sense** [7] - 92:20,
93:6, 119:2,
122:3, 158:7,
174:14, 181:13
**sensitive** [1] -
155:8
**sent** [15] - 12:15,
12:18, 15:22,
73:13, 79:6,
82:6, 110:23,
116:8, 140:21,
140:22, 151:7,
153:23, 154:4,
173:4
**sentence** [1] -
10:22
**separate** [1] -
155:21
**September** [17] -
7:14, 11:20,
11:24, 68:6,
78:14, 87:24,

88:12, 88:19, 116:8, 117:4, 117:12, 126:1, 132:20, 138:18, 144:6, 149:3, 175:4
**sequence** [1] - 108:12
**serial** [2] - 36:18, 143:1
**serious** [2] - 115:5, 135:15
**serve** [3] - 67:18, 75:16, 132:1
**served** [1] - 100:22
**serves** [1] - 135:8
**service** [1] - 107:24
**services** [2] - 131:15, 146:15
**serving** [1] - 123:2
**session** [5] - 18:6, 21:2, 50:16, 114:25, 117:16
**set** [10] - 2:6, 6:24, 12:23, 66:24, 75:17, 76:23, 126:18, 150:24, 174:11, 181:9
**sets** [1] - 141:22
**settle** [2] - 120:12, 162:11
**settled** [1] - 160:22
**settlement** [2] - 157:23, 157:24
**settlements** [2] - 161:22, 161:25
**seven** [4] - 68:11, 89:17, 146:14, 146:20
**seven-year** [1] - 146:20
**several** [5] - 3:15, 31:14, 53:3, 58:8, 78:11
**Shaker** [1] - 1:18
**shaking** [4] - 68:9, 80:9, 96:16, 96:18
**share** [2] - 21:4, 21:6
**shared** [1] - 10:21
**Shawn** [7] - 37:8, 79:25, 83:23, 101:15, 101:20, 131:23, 132:2

**shear** [1] - 138:1
**sheet** [33] - 9:6, 9:13, 9:20, 12:19, 19:9, 48:10, 76:5, 77:18, 77:23, 81:2, 85:9, 85:11, 87:18, 104:11, 104:25, 105:3, 106:15, 106:17, 106:21, 108:9, 117:19, 117:20, 118:4, 118:18, 118:24, 119:2, 119:9, 119:13, 131:22, 132:12, 151:25, 179:22, 180:3
**sheets** [41] - 5:20, 5:22, 10:4, 10:5, 11:6, 11:14, 12:25, 13:3, 13:11, 13:16, 36:6, 43:11, 43:23, 44:21, 46:11, 55:2, 63:1, 78:12, 79:4, 80:25, 83:6, 83:17, 84:5, 84:7, 84:25, 85:5, 87:8, 101:15, 106:20, 107:7, 108:1, 112:12, 112:15, 112:18, 112:19, 123:21, 125:17, 125:24, 127:1, 169:7
**shift** [2] - 95:9, 176:22
**shifted** [1] - 86:2
**shifting** [1] - 172:12
**shifts** [1] - 172:10
**Shiloh** [4] - 110:6, 110:7
**shoot** [1] - 142:13
**short** [5] - 3:6, 35:16, 69:25, 90:3, 170:2
**shortly** [1] - 41:15
**show** [42] - 10:1, 12:20, 12:23, 13:2, 13:6, 14:1, 15:14, 15:15, 15:17, 17:23, 18:9, 21:7, 27:15, 30:5, 31:5, 45:11, 46:3, 46:20,

49:13, 50:4, 52:16, 71:8, 72:21, 84:22, 86:11, 93:25, 95:8, 96:1, 98:5, 108:6, 110:19, 111:1, 120:23, 141:4, 141:8, 141:9, 143:9, 156:3, 157:10, 161:4, 169:5
**showed** [11] - 20:12, 37:10, 72:14, 81:24, 89:22, 102:18, 112:7, 112:8, 112:9, 173:21
**showing** [7] - 36:15, 57:2, 73:2, 91:18, 107:1, 108:8, 148:22
**shown** [10] - 17:2, 20:15, 37:1, 71:22, 87:8, 89:5, 92:1, 102:17, 123:20, 128:4
**shows** [22] - 16:19, 17:24, 23:8, 29:25, 30:1, 56:21, 70:5, 81:5, 84:17, 85:9, 85:14, 94:1, 97:1, 97:2, 101:5, 108:15, 108:22, 108:24, 130:5, 167:6
**sic** [2] - 100:10, 121:10
**side** [10] - 29:7, 44:4, 58:5, 64:17, 74:8, 74:11, 96:25, 104:7, 172:5, 180:11
**sides** [5] - 7:23, 35:14, 145:6, 154:12, 177:8
**sideshows** [1] - 166:8
**sign** [1] - 141:21
**signed** [5] - 140:6, 147:8, 157:23, 168:3, 173:6
**significance** [1] - 28:4
**significant** [2] -

55:16, 77:14
**significantly** [1] - 76:20
**signing** [1] - 147:17
**Silent** [14] - 64:6, 64:10, 155:21, 156:10, 157:17, 158:1, 158:3, 159:2, 160:9, 160:15, 160:17, 160:18, 162:10
**silly** [1] - 161:1
**similar** [3] - 47:9, 57:10, 91:8
**simple** [5] - 7:6, 7:9, 27:24, 112:4, 178:20
**simply** [9] - 4:3, 91:18, 97:22, 109:10, 112:14, 127:21, 127:25, 156:22, 167:21
**simultaneous** [1] - 150:22
**simultaneously** [1] - 161:5
**sincerely** [1] - 141:1
**single** [9] - 7:21, 7:23, 20:9, 28:3, 31:7, 55:22, 66:10, 97:12, 139:8
**sit** [1] - 173:17
**site** [1] - 62:14
**sitting** [4] - 18:3, 76:21, 78:4, 114:23
**situation** [2] - 15:21, 139:4
**six** [3] - 25:1, 69:7, 144:4
**Sixth** [2] - 57:5, 144:15
**size** [1] - 97:5
**skip** [2] - 48:5, 148:3
**skipped** [1] - 48:3
**slight** [1] - 93:7
**slippery** [1] - 170:12
**slope** [1] - 170:12
**sloppily** [1] - 59:5
**slowed** [1] - 76:22
**small** [6] - 16:16, 134:18, 147:24, 175:13, 180:5
**smart** [1] - 169:25
**smarter** [1] - 23:6

**Smith** [4] - 178:9, 178:10, 178:11
**smoothly** [1] - 168:22
**snap** [1] - 174:22
**software** [6] - 9:6, 9:13, 9:21, 72:8, 146:15, 175:12
**sole** [2] - 36:17, 60:22
**solvent** [1] - 161:10
**solves** [1] - 124:13
**someone** [14] - 55:9, 63:16, 81:7, 81:15, 91:3, 93:13, 98:6, 126:25, 136:5, 136:6, 159:24, 162:5, 162:6, 177:21
**something's** [1] - 123:20
**sometime** [1] - 88:9
**Sometimes** [1] - 65:3
**sometimes** [2] - 59:5, 150:18
**somewhat** [5] - 34:20, 70:14, 72:25, 116:5, 161:1
**somewhere** [1] - 129:23
**soon** [2] - 143:15, 150:9
**sooner** [1] - 150:1
**sorry** [33] - 10:14, 18:8, 19:18, 21:23, 22:19, 25:3, 27:5, 29:3, 30:4, 32:11, 32:13, 32:21, 37:18, 44:11, 51:17, 56:7, 56:14, 58:21, 60:6, 71:14, 75:1, 78:17, 103:10, 111:7, 111:13, 111:24, 112:8, 121:12, 127:19, 130:21, 151:12, 152:11
**Sorry** [1] - 42:11
**sort** [27] - 54:9, 59:22, 62:23, 64:2, 70:13, 71:5, 73:11,

74:7, 75:12, 80:11, 85:25, 94:3, 94:23, 100:17, 104:2, 104:17, 105:25, 115:24, 128:7, 133:15, 134:8, 145:18, 148:6, 169:24, 171:7, 177:18, 180:9
**sorts** [5] - 26:25, 39:25, 40:23, 53:7, 161:23
**sought** [3] - 34:21, 40:11, 50:11
**sounds** [2] - 150:4, 159:24
**source** [1] - 170:10
**South** [1] - 1:15
**spaced** [3] - 7:22, 7:23, 139:8
**spans** [1] - 59:11
**speaking** [4] - 2:23, 3:1, 40:18, 107:1
**speaks** [2] - 4:4, 123:10
**special** [1] - 151:8
**specialized** [2] - 26:6, 26:13
**specific** [10] - 49:16, 49:21, 57:2, 66:16, 88:24, 91:3, 106:2, 128:3, 128:4, 173:2
**speculation** [1] - 130:19
**spells** [1] - 23:11
**spend** [5] - 141:8, 141:10, 141:15, 174:14, 175:16
**spending** [1] - 147:2
**spent** [7] - 9:11, 9:19, 13:4, 38:18, 115:8, 138:1, 145:9
**spins** [1] - 31:25
**spite** [1] - 70:1
**spoil** [2] - 47:19, 47:24
**spoken** [1] - 95:19
**spoliation** [23] - 8:1, 132:24, 137:20, 139:18, 140:1, 140:17,

142:8, 142:10, 142:12, 142:14, 142:16, 143:13, 143:21, 144:8, 144:14, 144:18, 144:20, 144:25, 145:15, 145:19, 146:25, 148:6
**Spoliation** [1] - 143:21
**stack** [2] - 43:21, 58:23
**staff** [1] - 63:21
**stage** [1] - 65:12
**staggering** [1] - 163:21
**stamp** [1] - 113:16
**stand** [5] - 89:20, 103:8, 165:18, 168:12, 181:7
**standard** [5] - 36:2, 60:7, 91:16, 170:25, 178:12
**standpoint** [1] - 146:14
**stands** [2] - 57:22, 103:14
**start** [9] - 9:24, 15:7, 45:21, 58:2, 78:10, 91:12, 132:3, 134:1, 140:12
**started** [8] - 6:22, 69:7, 71:6, 114:24, 114:25, 116:18, 153:11, 179:14
**starts** [2] - 22:13, 45:1
**state** [2] - 91:24, 94:9
**statement** [13] - 50:17, 50:20, 76:11, 77:18, 93:19, 99:4, 99:9, 99:10, 104:5, 105:10, 128:12, 149:24, 155:12
**statements** [7] - 5:5, 20:7, 100:12, 105:8, 148:21, 148:24, 151:7
**states** [2] - 4:22, 6:5
**STATES** [2] - 1:1, 1:3

**States** [13] - 1:12, 1:14, 2:5, 2:10, 2:11, 50:15, 51:8, 56:24, 82:16, 143:8, 182:4, 182:10
**stating** [1] - 5:18
**status** [3] - 133:4, 133:18, 181:11
**stay** [1] - 103:22
**steal** [1] - 68:13
**Stein** [9] - 54:14, 94:15, 94:20, 95:1, 101:13, 138:5, 143:6, 148:13, 174:25
**Stein's** [4] - 53:5, 53:7, 94:5, 146:4
**stenographicall
y** [1] - 182:7
**stenographicall
y-reported** [1] - 182:7
**stenotype** [1] - 1:25
**step** [3] - 48:3, 48:4, 175:11
**sticker** [2] - 21:21, 21:25
**sticking** [2] - 162:7, 162:8
**still** [16] - 7:25, 19:4, 19:8, 47:3, 48:21, 62:19, 64:11, 65:13, 103:19, 103:20, 106:4, 125:7, 139:18, 150:3, 162:22, 163:11
**stint** [2] - 100:21, 100:22
**stints** [1] - 100:20
**stipulate** [1] - 155:2
**stipulation** [10] - 132:11, 132:14, 152:17, 154:3, 154:13, 154:17, 154:21, 155:17, 168:10, 169:22
**stipulations** [1] - 168:16
**stole** [2] - 161:3, 176:1
**stood** [1] - 180:6
**stop** [8] - 20:5, 23:1, 27:25, 28:1, 112:22, 135:1, 156:4,

156:6
**stopped** [1] - 150:1
**story** [2] - 52:8, 79:21
**straight** [4] - 73:4, 79:22, 84:2, 87:22
**strategic** [1] - 147:23
**strategy** [1] - 147:25
**streamlined** [1] - 153:12
**street** [1] - 33:19
**Street** [1] - 1:15
**stress** [2] - 53:25, 126:8
**stressed** [1] - 81:25
**strikingly** [1] - 66:1
**strongly** [1] - 135:16
**stubs** [5] - 90:12, 90:15, 90:20, 90:23, 91:2
**stuck** [1] - 13:13
**stuff** [21] - 66:18, 70:25, 72:22, 73:3, 78:7, 86:3, 96:1, 97:5, 100:16, 137:12, 143:24, 146:16, 147:16, 148:2, 148:13, 168:4, 168:15, 169:1, 169:2, 169:6
**stupid** [1] - 64:20
**subcontractor** [2] - 64:5, 64:6
**subject** [11] - 3:4, 3:10, 6:6, 25:10, 56:18, 105:7, 143:6, 158:25, 169:8, 178:19, 178:21
**subjected** [1] - 26:20
**submission** [2] - 3:18, 139:5
**submissions** [2] - 78:20, 151:1
**submit** [1] - 15:18
**submits** [1] - 109:2
**submitted** [7] - 9:23, 77:18, 85:16, 96:14, 107:6, 108:22,

146:6
**submitting** [3] - 33:23, 100:14, 126:14
**subpoena** [10] - 132:1, 168:9, 169:8, 169:14, 171:9, 171:13, 171:15, 177:5, 177:14, 178:20
**subpoenaed** [1] - 34:22
**subsequent** [2] - 72:17, 113:4
**subsequently** [1] - 174:5
**subset** [1] - 134:18
**substantial** [7] - 54:3, 101:2, 102:19, 110:12, 123:4, 133:16, 171:11
**substantially** [2] - 139:16, 146:10
**substantiate** [1] - 177:13
**successful** [1] - 136:14
**sucking** [1] - 75:7
**suddenly** [3] - 18:15, 120:7, 122:25
**sufficient** [2] - 91:20, 124:1
**sufficiently** [1] - 76:4
**suggest** [6] - 34:14, 35:11, 36:4, 38:8, 94:7, 107:17
**suggested** [6] - 62:24, 73:17, 96:25, 158:8, 160:25, 174:7
**suggestion** [3] - 39:10, 128:2, 159:19
**suggests** [4] - 63:4, 85:6, 102:19, 163:17
**suit** [2] - 67:14, 67:16
**sum** [1] - 83:9, 83:11, 85:5
**summary** [5] - 3:9, 3:14, 6:1, 59:25, 124:11
**summer** [1] - 63:14, 73:20,

77:24, 89:11, 113:11, 167:15, 170:24, 171:7
**summoned** [1] - 78:2
**superseding** [2] - 8:18, 9:5
**support** [7] - 46:3, 91:1, 92:11, 146:7, 147:18, 165:16, 177:1
**supported** [1] - 3:17
**supposed** [7] - 26:11, 79:8, 140:15, 141:23, 141:24, 146:8, 180:12
**supposedly** [3] - 58:7, 86:4, 92:25
**surgery** [1] - 75:4
**surreply** [14] - 3:24, 7:8, 58:12, 58:14, 58:15, 59:23, 59:25, 70:15, 71:14, 71:19, 71:22, 77:1, 77:17, 99:7
**suspect** [2] - 124:20, 130:12
**suspected** [2] - 48:1, 79:20
**suspension** [3] - 162:19, 166:5, 167:4
**suspicion** [1] - 69:4
**suspicious** [2] - 122:1, 123:6
**sworn** [3] - 104:5, 112:16, 148:21
**system** [32] - 5:4, 6:7, 10:6, 10:7, 10:8, 10:9, 11:2, 15:10, 18:20, 18:23, 24:18, 31:17, 35:1, 40:2, 50:1, 58:16, 58:18, 65:1, 73:4, 73:9, 79:14, 79:23, 83:24, 87:22, 91:23, 92:22, 93:2, 105:22, 110:25, 120:14, 124:16, 131:24

# T

**tab** [1] - 60:4
**table** [5] - 2:12, 8:13, 58:12, 58:14, 161:6
**tables** [1] - 176:22
**tabs** [1] - 22:5
**tale** [1] - 31:25
**talks** [7] - 109:11, 111:8, 111:9, 123:5, 147:10, 147:14, 147:15
**tampered** [4] - 88:23, 120:13, 156:8, 156:10
**tampering** [2] - 53:15, 90:1
**tape** [1] - 42:11
**target** [1] - 49:9
**task** [4] - 14:18, 38:9, 175:13, 175:21
**team** [2] - 59:19, 79:15
**technical** [1] - 26:6
**technically** [1] - 175:18
**technology** [3] - 165:7, 175:2, 175:11
**tee** [1] - 7:18
**telephone** [1] - 181:8
**temporarily** [1] - 54:2
**tend** [1] - 100:11
**tens** [1] - 161:2
**tentative** [1] - 153:17
**tenure** [1] - 100:9
**terms** [15] - 8:17, 27:1, 42:2, 74:16, 75:24, 98:20, 132:12, 133:2, 133:4, 133:20, 138:17, 146:5, 146:23, 147:15, 168:14
**terrible** [1] - 157:11
**test** [7] - 40:12, 41:4, 50:23, 54:13, 57:13, 136:14
**testified** [5] - 11:1, 64:3, 78:3, 90:19, 104:5
**testifies** [3] -

112:13, 122:10,
124:17
**testify** [12] - 6:10,
25:13, 46:15,
94:14, 127:11,
127:13, 132:6,
132:9, 152:24,
154:8, 157:24,
170:6
**testifying** [1] -
26:4
**testimony** [24] -
3:10, 19:2,
20:25, 26:1,
26:4, 26:12,
37:2, 50:21,
51:17, 53:7,
71:20, 74:14,
74:17, 76:2,
76:6, 77:16,
77:19, 79:8,
120:19, 137:21,
147:12, 147:20,
148:22, 178:3
**Texas** [18] -
22:18, 22:19,
22:20, 24:4,
35:4, 49:15,
92:22, 92:24,
110:22, 110:25,
111:2, 111:3,
111:4, 111:5,
111:11
**text** [1] - 62:21
**that'd** [1] - 21:8
**THE** [435] - 1:1,
1:1, 1:11, 2:15,
2:20, 8:14, 8:20,
9:1, 9:3, 9:14,
9:22, 10:11,
10:13, 10:15,
10:17, 10:20,
10:24, 11:3,
11:22, 11:25,
12:5, 12:8,
13:18, 13:24,
14:4, 14:9,
15:12, 15:19,
15:24, 16:3,
16:10, 16:13,
16:15, 16:17,
16:21, 17:1,
17:5, 17:8,
17:10, 17:12,
17:14, 17:16,
17:19, 19:11,
19:14, 19:16,
19:19, 19:24,
20:14, 20:18,
21:10, 21:14,

21:18, 21:20,
21:23, 22:3,
22:6, 22:8,
22:11, 22:14,
22:21, 23:1,
23:3, 23:17,
23:21, 23:23,
24:11, 24:15,
24:25, 25:5,
25:18, 25:25,
26:16, 26:18,
27:5, 27:17,
27:19, 28:7,
28:10, 28:14,
28:17, 28:19,
28:23, 29:1,
29:4, 29:8,
29:12, 29:15,
29:19, 29:22,
30:2, 30:5, 30:8,
30:11, 30:15,
30:18, 30:20,
31:10, 31:13,
32:9, 32:12,
32:15, 32:17,
32:19, 32:25,
33:2, 33:5,
33:11, 33:14,
33:17, 34:1,
34:7, 35:13,
35:22, 35:24,
36:20, 36:22,
37:1, 38:24,
39:1, 39:3, 39:8,
39:12, 39:15,
39:20, 39:22,
40:3, 40:6, 40:9,
41:7, 42:1, 42:4,
42:8, 42:11,
42:16, 42:18,
42:23, 43:5,
43:7, 43:9,
43:13, 43:16,
43:20, 43:25,
44:2, 44:6,
44:14, 44:17,
44:24, 45:3,
45:7, 45:10,
45:15, 45:17,
45:21, 45:23,
46:2, 46:6, 46:9,
46:13, 46:19,
47:3, 47:15,
47:18, 47:22,
51:19, 51:22,
51:24, 53:1,
53:5, 53:7,
53:11, 53:13,
53:17, 55:11,
55:17, 56:4,
56:9, 56:13,

56:16, 57:1,
57:5, 57:8,
57:14, 57:16,
57:18, 57:21,
57:22, 57:24,
58:17, 58:20,
59:10, 59:16,
60:2, 60:8,
60:11, 60:14,
60:17, 61:8,
61:18, 62:14,
62:17, 63:23,
64:11, 65:2,
66:4, 67:14,
67:20, 67:23,
68:1, 68:4,
68:16, 68:19,
70:21, 71:3,
74:9, 74:19,
74:22, 74:23,
74:25, 75:1,
75:6, 77:20,
78:17, 78:22,
79:2, 80:15,
80:17, 80:22,
82:12, 83:13,
83:21, 84:1,
84:4, 84:6, 84:9,
84:12, 84:14,
85:3, 86:10,
87:6, 88:22,
89:2, 89:25,
92:6, 92:8,
93:16, 94:13,
95:23, 96:16,
96:18, 98:9,
98:16, 99:1,
99:4, 99:13,
99:19, 100:1,
101:18, 103:2,
103:8, 103:10,
103:14, 103:16,
105:13, 105:16,
105:25, 106:6,
106:9, 106:16,
107:11, 107:16,
107:21, 108:11,
108:14, 111:14,
112:22, 113:6,
113:14, 113:19,
114:4, 114:6,
114:9, 114:13,
114:15, 114:19,
114:22, 116:12,
116:15, 118:2,
118:9, 118:15,
118:21, 119:6,
119:12, 119:17,
119:20, 120:9,
121:3, 121:6,
121:15, 122:21,

123:14, 124:6,
124:8, 124:15,
124:24, 125:7,
125:13, 126:3,
126:16, 126:22,
126:24, 127:5,
127:8, 127:14,
128:15, 128:17,
128:25, 129:11,
129:20, 130:22,
131:2, 131:8,
131:10, 132:4,
132:18, 132:24,
134:2, 134:7,
134:13, 134:21,
135:7, 135:11,
135:17, 135:22,
136:9, 137:8,
138:4, 138:20,
139:1, 139:6,
139:21, 140:1,
140:25, 141:4,
141:9, 143:19,
144:12, 145:12,
146:6, 146:21,
147:13, 148:3,
148:8, 148:12,
148:14, 148:17,
149:1, 149:8,
149:14, 149:19,
149:25, 150:7,
150:15, 150:17,
150:22, 151:4,
151:13, 151:15,
151:20, 152:5,
152:11, 152:19,
152:23, 153:1,
153:3, 153:6,
153:9, 153:14,
153:24, 154:10,
154:20, 154:23,
155:4, 156:4,
156:13, 156:19,
156:22, 156:25,
157:15, 158:25,
159:15, 161:13,
161:16, 161:21,
162:7, 164:9,
164:17, 164:22,
165:11, 165:25,
166:3, 166:7,
166:12, 166:20,
166:22, 167:1,
167:24, 168:5,
168:23, 169:1,
169:18, 171:16,
172:16, 172:25,
173:12, 173:18,
174:8, 176:13,
177:3, 177:6,
177:15, 177:19,

178:5, 178:16,
178:22, 179:8,
180:17, 180:20,
181:1, 181:4,
181:12, 181:15,
181:20
**themselves** [2] -
72:20, 90:23
**theoretical** [1] -
178:25
**theoretically** [1] -
35:9
**theories** [1] -
138:16
**theory** [13] -
49:12, 52:11,
73:11, 75:16,
81:25, 85:23,
85:25, 86:17,
123:3, 138:12,
149:5, 177:12,
177:13
**therefore** [7] -
3:13, 4:20, 8:9,
11:16, 99:21,
100:7, 142:15
**they've** [15] -
14:1, 15:7, 61:1,
63:17, 80:10,
96:8, 124:9,
130:3, 130:8,
130:10, 130:11,
134:13, 143:8,
173:8, 179:25
**thick** [1] - 43:22
**thief** [1] - 161:5
**thinking** [6] -
115:1, 132:17,
137:19, 140:13,
168:14, 179:9
**thinks** [2] - 37:12,
48:17
**Third** [2] - 90:7,
90:14
**third** [2] - 22:12,
55:24
**thorny** [1] -
169:23
**thousand** [11] -
23:25, 53:23,
66:9, 117:24,
133:24, 134:11,
134:14, 134:15,
134:17, 134:22,
172:6
**thousands** [1] -
124:20
**threat** [1] - 144:25
**three** [12] - 16:23,
32:6, 38:5,

63:11, 69:14,
114:11, 128:17,
130:15, 151:25,
158:23, 176:8
**three-fifths** [1] -
32:6
**three-page** [1] -
151:25
**threshold** [1] -
120:10
**throat** [2] - 75:4
**throw** [1] - 171:6
**thrown** [1] - 136:2
**Thursday** [2] -
181:10, 181:17
**ticker** [1] - 42:11
**tie** [1] - 83:9
**tied** [1] - 131:6
**Tied** [1] - 131:9
**ties** [1] - 148:6
**timecard** [2] -
34:5, 104:23
**timed** [1] - 39:5
**timekeeping** [19] -
3:8, 13:7, 15:3,
15:10, 15:11,
17:23, 40:1,
40:22, 41:18,
46:22, 49:25,
51:13, 57:10,
93:12, 93:25,
105:22, 121:10
**timeline** [1] -
21:22
**timely** [1] - 76:4
**timing** [2] - 18:18,
36:25
**tipped** [1] - 128:1
**tiring** [1] - 151:24
**TJ** [1] - 137:12
**to-do** [1] - 7:14
**today** [29] - 6:24,
8:3, 8:5, 11:18,
12:3, 14:20,
14:25, 58:16,
58:19, 71:25,
73:16, 78:19,
79:24, 80:5,
80:12, 80:25,
89:23, 92:16,
94:8, 101:14,
101:19, 113:18,
117:17, 129:19,
132:22, 164:9,
169:9, 169:20,
180:14
**today's** [4] - 2:22,
3:5, 24:1, 181:5
**together** [6] -
51:5, 80:1,

110:10, 110:11,
150:9, 168:18
**tomorrow** [5] -
132:25, 133:18,
133:22, 134:6,
150:11
**ton** [1] - 164:20
**Toohey** [2] -
157:19, 178:19
**took** [16] - 37:9,
62:20, 83:23,
89:16, 90:1,
97:6, 100:25,
102:16, 111:4,
111:20, 113:21,
118:15, 120:1,
129:4, 136:23,
163:3
**top** [5] - 28:16,
60:19, 63:2,
65:11, 102:8
**topic** [7] - 6:18,
8:1, 25:6,
132:19, 155:7,
155:25
**topics** [1] -
150:25
**total** [3] - 12:10,
17:13, 130:13
**totals** [1] - 107:5
**touched** [1] -
148:18
**touches** [1] - 90:5
**touted** [1] - 71:25
**toward** [1] -
158:12
**towards** [2] -
70:2, 80:21
**trail** [8] - 81:3,
81:9, 81:11,
86:24, 87:2,
108:4, 109:10,
126:12
**trails** [1] - 41:19
**trains** [1] - 39:19
**trample** [1] -
154:11
**transcript** [9] -
7:5, 104:9,
130:4, 142:6,
143:9, 147:11,
148:24, 182:6,
182:8
**transcription** [1] -
1:25
**transferred** [1] -
87:22
**transmitted** [1] -
80:7
**transposed** [1] -

64:20
**traveled** [1] -
110:21
**trial** [40] - 2:12,
3:7, 3:14, 6:24,
7:16, 8:6, 36:10,
36:11, 41:8,
54:1, 75:23,
79:17, 89:20,
115:6, 115:18,
115:19, 128:7,
134:1, 135:7,
137:7, 137:9,
138:1, 138:9,
138:10, 138:24,
139:3, 139:20,
140:18, 142:18,
145:3, 149:18,
153:14, 153:16,
154:14, 155:15,
168:8, 172:6,
172:8, 177:1
**tricky** [1] - 115:11
**tried** [9] - 90:10,
94:2, 107:17,
112:18, 120:23,
121:21, 126:18,
153:15, 171:21
**tries** [1] - 166:18
**triggering** [1] -
63:7
**trouble** [4] - 41:1,
65:3, 75:20,
82:2
**troubled** [1] -
135:2
**truck** [1] - 159:14
**true** [16] - 18:9,
20:11, 37:17,
66:5, 66:6,
99:12, 100:14,
108:5, 109:10,
110:12, 115:15,
122:7, 157:8,
159:11, 166:22,
182:6
**truly** [1] - 57:12
**trust** [2] - 128:2,
128:13
**trustworthiness**
[8] - 36:15,
40:13, 41:2,
47:16, 90:2,
98:17, 105:21,
121:9
**trustworthy** [25] -
4:22, 5:1, 12:24,
15:5, 15:17,
21:8, 34:17,
36:4, 36:5,

36:18, 40:16,
45:6, 45:11,
48:2, 49:2,
50:12, 50:13,
50:24, 50:25,
51:1, 51:13,
92:12, 108:25,
120:3
**truth** [16] - 34:17,
40:25, 52:3,
52:6, 52:9,
52:10, 99:10,
99:21, 112:16,
112:17, 112:19,
120:7, 123:1
**truthful** [1] -
50:21
**try** [20] - 19:11,
57:25, 78:7,
93:3, 95:1, 95:8,
97:22, 128:18,
144:14, 147:15,
156:9, 157:10,
157:12, 159:13,
162:5, 162:17,
176:16, 176:20,
181:4
**trying** [27] - 13:19,
14:24, 23:14,
24:6, 50:11,
55:12, 70:4,
70:14, 72:19,
76:3, 92:18,
93:1, 95:7,
99:21, 99:23,
109:14, 115:8,
115:24, 117:8,
122:19, 137:3,
148:14, 153:11,
156:22, 158:23,
161:10, 176:22
**TS** [1] - 175:9
**Tuesday** [1] - 1:8
**tune** [1] - 117:6
**tunnel** [1] -
133:17
**turn** [6] - 41:22,
55:17, 57:24,
82:10, 136:15,
176:22
**turns** [3] - 54:5,
142:25, 144:8
**twice** [2] - 8:17,
120:6
**two** [34] - 3:17,
6:4, 8:25, 14:10,
29:11, 30:20,
31:8, 35:5,
37:17, 38:3,
38:10, 46:13,

50:5, 50:8,
56:10, 56:13,
56:16, 61:25,
67:11, 71:8,
87:20, 121:19,
125:15, 130:15,
138:7, 139:11,
139:14, 146:22,
149:18, 151:25,
158:23, 162:17,
174:16, 174:24
**two-week** [1] -
38:10
**type** [3] - 23:5,
72:2, 84:13
**types** [1] - 78:11
**typical** [1] -
149:10
**typically** [2] -
136:2, 178:4

---

## U

**U.S** [2] - 13:17,
144:16
**U.S.C** [1] - 182:5
**ultimate** [1] -
115:22
**ultimately** [7] -
41:11, 70:16,
87:9, 138:2,
143:1, 148:10,
167:15
**unable** [1] - 46:23
**Unanet** [69] - 2:8,
3:3, 3:8, 4:7,
4:12, 6:4, 6:7,
8:17, 9:7, 9:13,
9:20, 10:1, 10:6,
10:9, 11:4, 11:9,
15:10, 18:7,
18:8, 24:18,
25:14, 25:16,
26:19, 26:20,
27:14, 31:17,
33:20, 33:21,
38:21, 38:24,
39:2, 39:4, 39:6,
39:11, 39:18,
39:22, 39:24,
40:1, 44:4,
45:25, 49:25,
54:15, 55:21,
57:10, 65:1,
71:24, 77:11,
79:22, 79:25,
82:23, 83:5,
83:24, 84:11,
84:17, 91:23,
93:12, 97:25,

105:21, 110:25,
111:12, 111:13,
121:25, 126:9,
137:18, 157:12,
169:1, 169:2,
169:15
**Unanet's** [1] -
45:13
**unauthorized** [3]
- 5:4, 47:11,
61:2
**unavailable** [1] -
92:11
**unbilled** [1] -
110:14
**unclear** [1] -
161:24
**unconstitutional**
[1] - 172:11
**uncorrupted** [1] -
13:1
**under** [45] - 3:9,
4:6, 4:18, 4:21,
6:2, 10:16,
10:21, 14:9,
15:5, 18:10,
18:22, 40:4,
44:4, 46:15,
46:20, 47:5,
48:16, 50:14,
56:17, 56:21,
67:13, 105:20,
108:16, 113:6,
120:6, 123:12,
124:9, 124:25,
125:9, 126:8,
127:25, 128:2,
128:5, 141:17,
141:18, 146:18,
156:2, 160:21,
160:23, 162:11,
163:11, 163:18,
170:20, 171:4,
175:24
**understood** [8] -
127:9, 131:8,
131:19, 134:9,
136:23, 140:4,
140:25, 142:24
**underway** [1] -
144:5
**undisputed** [2] -
120:11, 155:6
**undoubtedly** [11]
- 12:19, 15:7,
44:22, 45:6,
97:14, 97:15,
110:12, 111:16,
112:11, 112:18,
115:15

**unfair** [1] - 52:18
**unfavorable** [2] -
125:20, 144:21
**unfortunate** [1] -
58:15
**unfortunately** [1]
- 148:19
**uninterruptedly**
[1] - 55:9
**UNITED** [2] - 1:1,
1:3
**United** [13] - 1:12,
1:14, 2:5, 2:10,
2:11, 50:15,
51:8, 56:24,
82:16, 143:8,
182:4, 182:9
**universe** [2] -
6:19, 19:24
**unless** [7] - 24:7,
87:19, 103:1,
104:1, 112:2,
136:16, 171:2
**unlike** [1] - 54:3
**unprofessional**
[1] - 161:12
**unsuccessfully**
[1] - 109:15
**untoward** [1] -
69:4
**untrustworthine**
**ss** [3] - 36:16,
57:2, 128:3
**untrustworthy** [7]
- 20:1, 20:4,
44:22, 45:15,
45:17, 46:6,
46:24
**unusual** [1] - 4:23
**up** [74] - 2:25,
7:18, 13:3,
16:12, 16:15,
16:16, 21:24,
27:8, 27:25,
30:23, 31:21,
37:20, 43:16,
52:8, 54:15,
55:19, 55:20,
58:14, 60:11,
60:20, 65:23,
69:9, 69:11,
70:17, 73:13,
75:17, 81:7,
83:9, 83:11,
83:18, 85:5,
87:4, 92:10,
95:17, 100:17,
101:21, 103:5,
103:22, 104:3,
110:15, 111:23,

115:6, 119:15,
119:20, 125:22,
128:18, 129:5,
132:3, 134:20,
135:3, 135:7,
135:24, 136:2,
136:25, 137:7,
140:18, 146:19,
149:23, 152:13,
158:9, 159:15,
162:13, 167:14,
167:23, 171:19,
171:25, 176:13,
178:1, 178:7,
178:8, 179:24,
181:17
**update** [1] -
133:18
**updated** [2] -
113:23, 113:24
**upset** [2] -
114:20, 115:25
**urge** [1] - 4:23
**usages** [1] -
120:14
**useful** [1] -
139:16
**user** [3] - 27:2,
27:13, 44:21
**uses** [2] - 26:24,
122:16

## V

**vacation** [10] -
63:14, 63:18,
63:20, 86:14,
86:16, 108:24,
109:4, 109:23,
110:7, 110:8
**vaccination** [1] -
179:19
**vague** [1] - 69:4
**validate** [1] - 28:1
**validity** [1] - 136:7
**vandal** [5] - 4:24,
122:17, 122:19,
123:17, 127:23
**vandalism** [4] -
4:25, 53:15,
53:21, 122:16
**vandalize** [1] -
123:18
**vandalized** [4] -
4:12, 120:13,
122:23, 123:18
**variety** [1] - 10:2
**various** [10] -
40:4, 61:2, 61:6,
76:12, 120:14,

127:10, 132:6,
142:18, 146:12,
169:6
**vast** [1] - 46:21
**Vegas** [2] - 110:7,
110:13
**venal** [1] - 156:3
**Verizon** [8] - 67:2,
67:5, 67:14,
67:16, 67:18,
67:19, 67:21,
67:25
**verse** [2] - 51:17,
51:18
**version** [7] -
31:22, 55:24,
70:14, 113:5,
113:23, 113:25,
143:10
**versions** [1] -
26:25
**versus** [6] - 2:5,
26:11, 92:1,
126:19, 127:15,
144:16
**victim** [3] - 148:4,
148:6, 179:5
**view** [6] - 120:16,
136:12, 158:25,
163:3, 165:14
**viewed** [1] - 64:21
**violated** [2] -
100:7, 147:3
**virtually** [3] -
18:19, 101:5,
163:13
**visible** [3] - 27:4,
27:7, 27:8
**visited** [1] - 113:3
**voice** [1] - 2:25
**voir** [3] - 179:15,
179:18, 179:23
**voluminous** [1] -
8:21
**voluntarily** [1] -
63:9
**VP** [1] - 82:21
**vs** [2] - 1:4, 90:8

## W

**waisted** [1] -
137:12
**wait** [8] - 17:5,
30:2, 110:17,
140:2, 150:23,
162:13
**waiving** [1] -
125:17
**walking** [1] -

33:19
**wants** [10] -
15:16, 34:10,
48:17, 52:4,
110:16, 124:21,
125:20, 127:10,
136:6, 173:16
**Ware** [4] - 110:6,
110:8
**warned** [1] - 88:3
**watched** [1] -
119:4
**water** [2] - 14:9,
75:3
**ways** [10] - 6:4,
14:10, 18:12,
31:15, 48:8,
49:1, 69:12,
74:2, 160:17,
161:7
**wearing** [1] -
124:17
**web** [1] - 9:6
**web-based** [1] -
9:6
**weeds** [3] - 14:20,
162:10, 162:11
**week** [10] - 7:3,
7:8, 38:10, 51:4,
51:5, 79:18,
85:10, 119:24,
164:11, 167:17
**weekly** [36] - 5:20,
5:22, 10:4, 11:5,
11:9, 11:14,
13:16, 16:23,
16:25, 17:3,
20:12, 34:5,
36:6, 43:11,
43:23, 44:21,
46:11, 83:17,
84:5, 84:7,
84:25, 85:5,
85:11, 86:11,
87:18, 101:15,
106:14, 106:17,
107:7, 108:1,
108:9, 125:17,
125:24, 127:11
**weeks** [5] - 85:12,
89:19, 144:4,
149:18, 174:24
**weighed** [1] -
102:14
**weight** [4] - 92:4,
92:14, 97:23,
115:16
**weird** [1] - 98:4
**well-established**
[1] - 170:7

**well-run** [1] -
161:9
**whatsoever** [1] -
135:24
**whereas** [2] -
84:25, 101:4
**whistleblower**
[10] - 49:17,
73:13, 75:17,
75:19, 75:21,
144:2, 145:17,
152:1, 167:20
**whistleblower's**
[1] - 49:18
**whoa** [3] - 130:22
**whole** [14] - 25:6,
47:12, 69:15,
75:13, 92:17,
95:13, 98:2,
101:22, 102:5,
112:16, 112:17,
112:18, 141:7,
156:25
**wholly** [1] -
155:20
**wide** [1] - 167:5
**wife** [6] - 18:16,
19:3, 19:8, 31:8,
50:5, 63:11
**wild** [1] - 173:5
**wildly** [1] - 82:1
**willfully** [1] -
122:3
**willing** [4] -
122:12, 135:11,
174:14, 175:16
**willingness** [1] -
134:25
**win** [2] - 157:6,
166:21
**wind** [1] - 55:19,
55:20, 136:2
**winds** [1] - 92:10
**windshield** [1] -
175:11
**wish** [3] - 8:12,
9:2, 178:15
**wished** [1] - 140:4
**withdrawn** [1] -
137:14
**witness** [49] - 6:9,
25:10, 25:16,
26:3, 27:12,
35:5, 36:17,
37:2, 38:20,
38:23, 45:5,
46:15, 46:22,
47:6, 52:17,
52:18, 52:20,
54:11, 57:11,

89:16, 89:24,
107:25, 109:6,
109:8, 110:5,
122:1, 124:4,
124:10, 124:12,
128:6, 143:15,
149:18, 152:18,
152:24, 154:15,
154:19, 157:4,
157:21, 158:10,
159:5, 177:7,
177:12, 177:16,
177:17, 178:14
**witnesses** [18] -
52:19, 52:21,
89:7, 89:13,
113:11, 127:10,
132:16, 140:18,
142:19, 147:18,
157:3, 157:9,
167:16, 168:1,
173:16, 176:25,
178:19, 178:21
**woman** [2] -
172:2, 172:20
**woman's** [1] -
161:2
**won** [3] - 54:5,
54:6, 166:18
**wondering** [1] -
61:19
**word** [17] - 4:24,
8:17, 36:6,
53:15, 55:23,
55:24, 74:4,
120:12, 122:16,
122:21, 123:10,
123:25, 124:1,
127:22, 131:21
**Word** [12] - 26:24,
27:1, 27:2, 27:3,
27:8, 27:11,
27:13, 27:25,
52:20, 54:23,
80:8, 87:23
**words** [33] -
13:11, 13:24,
20:6, 23:25,
24:5, 27:7,
32:22, 33:9,
35:24, 37:7,
47:18, 50:4,
52:2, 54:12,
55:3, 59:4,
109:2, 110:16,
111:2, 118:24,
119:1, 128:3,
134:9, 141:10,
141:12, 141:15,
145:24, 152:15,

152:22, 159:11,
160:23, 172:19,
174:17
**workers** [1] -
110:24
**works** [3] - 54:18,
141:13, 168:21
**world** [4] - 24:1,
95:14, 98:4,
151:21
**world's** [1] -
161:11
**worried** [2] - 29:4,
129:8
**worry** [2] - 16:3,
157:16
**worrying** [1] -
138:11
**worse** [1] - 75:7
**worth** [4] - 13:15,
23:25, 122:4,
163:22
**worthy** [2] - 51:1,
131:16
**wound** [1] - 69:11
**wrap** [1] - 103:22
**write** [3] - 25:8,
148:10, 176:21
**writers** [1] -
136:16
**writing** [2] -
11:21, 43:13
**written** [5] - 21:1,
21:17, 25:7,
25:8, 148:8
**wrongdoing** [2] -
67:25, 145:20
**wrote** [1] - 41:11

## Y

**year** [13] - 5:14,
7:2, 31:13, 72:5,
78:6, 88:12,
88:17, 93:8,
102:8, 117:1,
146:15, 146:20,
174:16
**years** [5] - 59:10,
71:8, 89:9,
100:21, 126:7
**yesterday** [3] -
3:24, 62:16,
133:11
**yourself** [1] -
174:4

## Z

**zel** [2] - 135:25,



137:15
**Zoom** [1] - 118:11

**§**

**§** [1] - 182:5