## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. ELH-21-036 |
| | ) | |
| JACKY LYNN McCOMBER, | ) | |
| formerly known as | ) | |
| Jacky Lynn Kimmel, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## THE GOVERNMENT'S OPPOSITION TO THE SUPPLEMENTAL MOTION FILED BY NEW DEFENSE COUNSEL PURSUANT TO FED. R. CRIM. P. 29(c) SEEKING A JUDGMENT OF ACQUITTAL ON ALL COUNTS

EREK L. BARRON
UNITED STATES ATTORNEY

Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov

*Counsel for the United States*

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

    A.   The 20 Criminal Charges of Which the Defendant was Convicted
        and Their Elements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

    B.   The Evidence Presented at Trial by the Government to Establish the
        Defendant's Guilt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

THE APPLICABLE LEGAL STANDARDS GOVERNING MOTIONS FOR
A JUDGMENT OF ACQUITTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   The Standards Governing Pre-Verdict Motions for Judgment
        of Acquittal under Fed. R. Crim. P. 29(a). . . . . . . . . . . . . . . . . . . .   9

    B.   Reserving Decision on a Pre-Verdict Motions for Judgment
        of Acquittal under Fed. R. Crim. P. 29(b). . . . . . . . . . . . . . . . . . . .   9

    C.   The Standards Governing a Motion for Judgment of Acquittal
        Pursuant to Fed. R. Crim. P.  29(c). . . . . . . . . . . . . . . . . . . . . . . .   9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    THE EVIDENCE WAS MORE THAN SUFFICIENT TO SUPPORT THE
      JURY'S VERDICTS FINDING DEFENDANT MCCOMBER GUILTY ON
      ALL 19 OF THE FALSE CLAIMS ACT COUNTS . . . . . . . . . . . . . . . . . . . . 11

    A.   The Government Never Contended that the Jury Could Infer
        that the Defendant's Billings Were False Simply from the Fact
        that She Spent 90% of Her Billed Time Outside of NSA Access
        Control.  Moreover, the Court Strongly Emphasized This Point
        in Its Final Instructions Using an Instruction Submitted by the
        Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   The Government at Trial Presented Not Merely Substantial,
        but Overwhelming, Evidence that the Amount of Program
        Management Work Needed on the Ironbridge Contract by
        2016-17 was Minimal; that Little Program Management Work
        Could be Done from Off-Site; and that Such PM Work as Was
        Needed Was Largely Handled by Jason Doyle, the Contract's
        Technical Lead, Who was On-Site at NSOC Every Day. . . . . . . . . . . . . .22

II.   THE EVIDENCE PRESENTED AT TRIAL WAS LIKEWISE MORE
      THAN SUFFICIENT TO SUPPORT THE DEFENDANT'S CONVICTION
      FOR MAKING FALSE STATEMENTS UNDER OATH IN COUNT 20 . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

The United States of America, by its undersigned counsel, hereby states the following in opposition to the Supplemental Rule 29 motion (ECF # 359) filed by new defense counsel.[1] For the reasons set forth below, the contentions raised in this supplemental filing are wholly without merit, and the defendant's motion should be denied as to all twenty of the counts of which the defendant was convicted at the trial in this case.

## INTRODUCTION

### A.    The 20 Criminal Charges of Which the Defendant was Convicted and Their Elements.

On February 15th of this year, following a sixteen-day trial and approximately a day-and-a-half of deliberations, the jury in this case returned unanimous verdicts finding defendant Jacky McComber guilty of 19 counts of violating the Federal Criminal False Claims Act, 18 U.S.C. § 287 by causing her company InfoTeK (ITK) to submit fraudulent monthly invoices to the National Security Agency (NSA) on a contract known as Ironbridge that falsely billed for many hours of her time that she had not in fact worked.  The jury further found that defendant McComber violated the Federal False Statements statute, 18 U.S.C. § 1001, by making two false statements under oath during an October 2017 interview by agents of the NSA's Office of the Inspector General (NSA-OIG).

The elements of these two offenses are well-established.  To prove the crime of making a false claim upon the United States under § 287 as charged in Counts 1 through

---

[1]    New defense counsel advised the government on October 20, 2023 that they were withdrawing the previous written Rule 29 motion submitted by defendant's prior counsel Mr. Ahlers on May 8, 2023 "in full."  ECF # 371-1.

19 of the indictment, the government was required to establish each of the following three elements beyond a reasonable doubt:

> First, that on or about the date charged in a particular count, the defendant knowingly made or presented a claim to the NSA, a department or agency of the United States.

> Second, that the claim which was made or presented was a claim against the United States or a department or agency of the United States.

> Third, that the defendant presented the claim knowing that it was false, fictitious or fraudulent as to a material fact.

L. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS: CRIMINAL, Instruction 18-3; *see also* Trial Transcript ("Tr.") (1/23/23) at 15-16 (ECF # 292); Tr. (2/13/23), at 144-50 (ECF # 305).   At trial, there was no disputed issue as to the first two elements; only the third was contested.

As for Count 20, the crime of making a false statement to government investigators under § 1001, the government was required to prove the following five elements beyond a reasonable doubt:

> First, on or about the date specified, the defendant made a statement or representation;

> Second, that this statement or representation was material;

> Third, the statement or representation was false, fictitious or fraudulent;

> Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

> Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States, or that federal funds were involved.

L. SAND, ET AL., FEDERAL JURY INSTRUCTIONS: CRIMINAL, Instruction 36-9; *see also* Tr. (1/23/23) at 16-17 (ECF # 292); Tr. (2/13/23), at 156-61 (ECF # 305). Only the third and fourth elements were contested at trial.

As the next section demonstrates, the evidence presented by the government at trial was easily sufficient to establish the elements of each charged offense to the jury's satisfaction beyond a reasonable doubt.

**B.      The Evidence Presented at Trial by the Government to Establish the Defendant's Guilt.**

The twenty guilty verdicts here came at the end of a trial that lasted for sixteen days; that involved testimony by 25 witnesses, including the defendant herself and an expert witness (Charles Stein) called by the defense, resulting in roughly 3,000 pages of transcripts; and during which the government introduced approximately 215 exhibits. Among other key points, the testimonial and documentary evidence presented at trial was easily sufficient to establish each of the points listed below.

- Although the defendant caused ITK to bill 2,603.5 hours of her time to the NSA for her supposed services as the program manager on the Ironbridge contract between mid-March 2016 and the end of September 2017 (totaling $388,878.78), the defendant was not present within access control at the NSA for roughly 90%, or 2,333 of those hours, involving billings totaling approximately $350,000. GXs 1(a) – 19(a) (monthly invoices submitted to the NSA by ITK); GX 21(a) (government's combined investigative spreadsheet covering all 19 months).

- Moreover, the NSA's access control records demonstrated that the number and duration of defendant McComber's actual visits to the Ironbridge contract work site at the NSA's National Security Operations Center (NSOC) declined steadily after September 2016, until they became almost non-existent by the late spring and summer of 2017. GX 21(a) **(Exhibit 1)**.

3

- Evidence derived from the defendant's NSA high-side email account and her Lync instant messages demonstrated that the defendant sometimes did not check or respond to messages she received on these accounts for extended periods. GXs 22(i); 22(j); 22(k) (compilations of high-side emails and Lync conversations [Instant Messenger-type communications] sent or received by the defendant).

- The ITK employees and contractors who worked on the Ironbridge contract, along with the NSA employees and contracting officers (COs) and contracting officer's representatives (CORs) who were responsible for overseeing ITK's work on the contract, testified – consistently with the access control records – that defendant McComber spent little time on-site at the Ironbridge contract's work site in the National Security Operations Center (NSOC), further and that by 2016-17, there was little need for a Program Manager's services. See discussion and trial testimony cited and quotes at pages 22-49, *infra*.

- ITK employees, contractors, and NSA personnel testified at trial that ITK's technical lead on the Ironbridge contract, Jason Doyle, was the person responsible for keeping things running smoothly on the contract on a day-today basis, and not the defendant. Similarly, ITK Contracts Vice-President Craig Plunkett handled financial and administrative matters relating to the Ironbridge contract. See discussion and trial testimony cited and quotes at pages 23-31, 45-49, *infra*.

- Evidence introduced at trial demonstrated by late 2016, the NSA personnel working on the Ironbridge contract had decided that the contract was running sufficiently smoothly that there was no longer a need for regular reports or updates to monitor the contract's progress. On those infrequent occasions within the last year of the contract when reports were requested, defendant McComber delegated the task of preparing the updates to Jason Doyle, and/or the reports that were provided offered little in the way of specific detail. GXs 24(c) (email showing defendant relying on Jason Doyle to collect employees' vacation plans); GXs 24(e)(1) – 24(e)(3) (emails showing defendant taking over a month to respond to an NA request for a short status report, and ultimately delegating the task to Jason Doyle); GX 24(h) (July 2017 Second Quarter Program Review Slides, reflecting minimal PM activities over the course of that three-month period, in which the defendant billed 460 hours as the Ironbridge PM) (included in **Exhibit 2**).

4

- After a whistleblower – who was established at trial to have been ITK's Chief own Operations Officer (COO), Shilo Weir – sent an anonymous whistleblower letter to the NSA-OIG's reporting her suspicions that defendant McComber was billing the government for hours she had not worked, GX 23(a), ITK's company counsel, Andrew Hallowell, after consulting with the defendant, acknowledged that her time had in fact been improperly billed to the NSA on 9 of the 12 dates cited in the whistleblower's letter.  GX 23(b) (Hallowell Letter to NSAO-OIG Agent Hazenstab of 11/10/17).

- Aside from a limited amount of administrative work (almost all of which was in any case handled by ITK's Chief Financial Officer (CFO) Dwayne Preston and its Vice-President for Contracts Craig Plunkett, and was factored into ITK's requested hourly rates on the Ironbridge contract), there was little work that could be done as Program Manager on the Ironbridge contract from an off-site location.  See transcript excerpts quoted at pages 26-27, 30-40, 42-44 *infra*.

- Moreover, witnesses like ITK Chief Operations Officer Shilo Weir and CFO Dwayne Preston, who worked in close physical proximity to defendant McComber in ITK's offices – sometimes sharing the same physical office or contiguous office space – testified that defendant McComber also spent relatively little time in ITK's own offices, and that they usually had little idea of where she was or what she was doing with her time.  See transcript excerpts cited at pages 23-24 *infra*.

- Defendant McComber's time records (GXs 22(c)(1) – 22(c)(13) & 25(c)) reflected that she did not make any conscientious attempt to track or record the time she billed to the Ironbridge contract.  Instead, she routinely billed an even 8.0 hours virtually every day, whereas the billings by most other ITK Ironbridge employees reflected a greater degree of variation.  Moreover, it was established at trial that defendant McComber's claim to the investigating NSA agents during her testimony in October 2017 and again at the trial itself that she was false.  In fact, Ms. McComber's own billing records (GX 25(c)) reflected that she often did not even open her billing records for the Ironbridge contract until well into each two-week pay period, and, indeed, that she sometimes opened her billing records and made her entries only after the entire two-week period was over.  That was further confirmed by the rebuttal

testimony of former ITK CFO Dwayne Preston.  Tr. 2/9/23, at 32-
65 (ECF # 304).

- On numerous days on which defendant McComber billed a full
  eight hours to the Ironbridge contract, other evidence introduced by
  the government established that she spent much of that day
  engaging in other activities such as attending charity golf
  tournaments; vacationing; attending a high school reunion;
  attending industry conferences that presented networking
  activities; or working on proposals for other contracts that ITK was
  seeking.  GX 21(a) and supporting documents in the GX 22 series.

In response to this avalanche of proof demonstrating that defendant McComber

did little work as the Program Manager on the Ironbridge contract over the nineteen

months between March 2016 and September 2017 and nevertheless reported, and

caused ITK to bill, for eight hours of her time on virtually every workday at a charge of

successively $148.13 or $150.35 an hour, the defendant's supplemental memorandum

supporting her Rule 29(c) motion lamely argues that because the government did not

specifically document exactly what Ms. McComber was doing between the hours of 7

a.m. and midnight each workday for which she billed the Ironbridge contract over this

19-month period, then it is conceivably possible that she might actually have worked the

hours she reported, or at least enough of them so that there was no material variance

between the number of hours for which she billed and the number of hours that she

actually worked.  But even aside from the other flaws in the defense's analysis – which

we will discuss in our forthcoming updated Sentencing Memorandum – the trial

testimony quoted at pages 22-49 *infra* overwhelmingly demonstrates that there is little

evidence indicating that the defendant performed *any* significant amount of work as the

Ironbridge PM from an off-site location at any hour of the day or night.

6

## THE APPLICABLE LEGAL STANDARDS GOVERNING MOTIONS FOR A JUDGMENT OF ACQUITTAL

### A.    The Standards Governing Pre-Verdict Motions for Judgment of Acquittal under Fed. R. Crim. P. 29(a).

FED. R. CRIM. P. 29(a) provides that either after the government closes its evidence, or after the close of all the evidence in a trial, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The Supreme Court in *United States v. Burks*, 437 U.S. 1, 16 (1978) stated that "the prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." *See also United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982) (the test "is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a finding that the defendant was guilty beyond a reasonable doubt."); *United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979). "Substantial evidence" means direct or circumstantial evidence "that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of the defendant's built beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 ((4th Cir. 1996). The standard on a pre-verdict motion for judgment of acquittal is no different from that which applies following a jury's verdict. *Burks*, 437 U.S. at 17 (noting that on appeal, "a federal court applies no higher standard" than that applied by the district court at the close of the government's case).

The Supreme Court in *Burks* further stressed that the trial court's role "in deciding whether a case should be considered by the jury is quite limited," emphasizing that even though the trial judge has heard the testimony of the witnesses, the trial

court's role "is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal." *Id.; see also United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) ("the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe."). Moreover, the evidence presented by the government should not be examined in a piecemeal fashion, but must instead be considered "in cumulative context": that is, the court "must not rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation." *Burgos*, 94 F.3d at 863; *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (the substantial evidence test must be applied to "the totality of the government's case and not to each element, as each fact may gain color from others").

Thus, a trial court's decision to not to submit particular counts or an entire case to the jury "will be confined to cases where the prosecution's failure is clear." *Burks*, 437 U.S. at 17. As the Second Circuit has stated, "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged *is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.*" *Guadagna*, 183 F.3d at 130 (emphasis added). This reflects what the Fourth Circuit has characterized as one of the "bedrock principles of Anglo-American jurisprudence": that "the jury determines [whether] the Government has satisfied this evidentiary burden" of proving the defendant's guilt beyond a reasonable doubt. *Burgos*, 94 F.3d at 853; *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982) (if the evidence is substantial, that is enough to support a jury's verdict of guilty, even if it is "by no means overwhelming").

8

### B.    Reserving Decision on a Pre-Verdict Motions for Judgment of Acquittal under Fed. R. Crim. P. 29(b).

FED. R. CRIM. P. 29(b) further affords the trial court the option of reserving its decision on a motion for judgment of acquittal filed at the end of the government's case, allowing it to submit the case to the jury and then decide the motion after the jury either returns its verdict or fails to reach a verdict. (In this case, however, the Court must still reach its decision based on the presentation of the evidence as it existed at the close of the government's case.). This option was added by the Advisory Committee on the Rules in 1994 in order to "remove the dilemma in those close cases in which the court would feel pressured into making an immediate, and perhaps erroneous, decision or violating the rules as presently written by reserving its ruling on the motion." Adv. Comm. Notes on the 1994 Amendments to Rule 29.

### C.    The Standards Governing a Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(c).

A jury's verdict commands the respect of the reviewing court, *United States v. Siegelman*, 640 F.3d 1159, 1164 (11th Cir. 2011) (characterizing it as a "sword and buckler," and noting that jurors are asked to sit through "long days" of testimony and "pore over countless documents to decide what happened"), and their judgment is entitled to great deference. *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004); *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) ("We apply a particularly deferential standard when determining if a jury verdict rests on sufficient evidence"). The task of a defendant who challenges the sufficiency of the evidence is thus an exceptionally daunting one. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003); *United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999) (a defendant making a

9

sufficiency of the evidence challenge bears a heavy burden and faces a nearly insurmountable hurdle"); *United States v. Zambrano*, 776 F.2d 1091, 1094 (2d Cir. 1985) (such challenges are "seldom successful").

The jury's verdict must be sustained if there is substantial evidence in the record to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Wilson*, 198 F.3d 467, 469 (4th Cir. 1999). In determining whether the evidence the record is substantial, the court must view the evidence in the light most favorable to the government, drawing all reasonable inferences from the evidence in its favor. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008); *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006); *Hicks*, 368 F.3d at 804; *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (the government is granted "the benefit of all reasonable inferences from the facts proven to those sought to be established"). A judgment of acquittal should be granted only if "there is *no* interpretation of the evidence that would allow a reasonable jury to find the defendant guilty . . . ." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999) (emphasis added); *Moye*, 454 F.3d at 394 (conviction can be reversed based upon insufficiency of the evidence only where the government's failure is clear); *United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984). If *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the jury's verdict must be sustained. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Tresvant*, 677 F.2d at 1021. Where the evidence supports differing reasonable interpretations, it is the jury's responsibility to determine which interpretation to accept. *Moye*, 454 F.3d at 394; *Wilson*, 118 F.3d at 234. And in particular, intent to defraud may be inferred from the totality of the circumstances, and need not be proven by direct evidence. *Harvey*, 532 F.3d at 334.

**ARGUMENT**

I.   **THE EVIDENCE WAS MORE THAN SUFFICIENT TO SUPPORT THE JURY'S VERDICTS FINDING DEFENDANT MCCOMBER GUILTY ON ALL 19 OF THE FALSE CLAIMS ACT COUNTS**

In response to the extensive testimonial and documentary evidence detailed above that was presented by the government to establish the defendant's guilt, new defense counsel advances a hodgepodge of groundless and misleading arguments in an unsuccessful attempt to undermine the "great deference" that attaches to a jury's verdict.  All lack merit.

      A.   **The Government Never Suggested that the Jury Could Infer that the Defendant's Billings Were False Simply from the Fact that She Spent 90% of Her Billed Time Outside of NSA Access Control.  Moreover, the Court Strongly Emphasized This Point in Its Final Instructions Using an Instruction Submitted by the Government.**

First, the defense contends that "the government [] *repeatedly* asked the jury to infer that Ms. McComber was not working because she was off-site much of the time," ECF # 359 at 6 (emphasis added).[2]  Even aside from the question of whether the government actually even did that – see discussion *infra* – defense counsel's implication

---

[2]   The defense's brief does not include a single citation to a statement by either of the government's trial counsel supporting this claim.  Instead, their brief (ECF # 359 at 6) cites only a fragment of a sentence from the *Court's* final instructions – "some of the work on the Ironbridge contract concerned classified matters that could not be done off-site" – which they extracted from the lengthy cautionary instruction that the Court gave at the government's request (see discussion at page 21 *infra*) expressly instructing the jury about the significance of the evidence that the defendant was not present at the NSA for 90% of the time she billed.  Tr. 2/13/23 at 150 (ECF # 305).  Significantly, the sentence in the Court's instruction immediately *preceding* the one from which defense counsel extracted this fragment – "The Government does not contend that the Defendant violated the law if she worked off-site," *id.* at 149 – utterly eviscerates the defense's claim.  But it goes both unquoted, and unnoted, by their brief.

that there is something improper about asking a jury in a criminal trial to draw
reasonable inferences from the evidence presented is simply nonsense.  To the contrary,
there is nothing wrong or improper about arguing to a jury that it can draw reasonable
inferences about events that may have occurred outside the direct observation of
witnesses based upon other facts that are known and proved by the evidence.  Indeed,
this bedrock principle is the subject of one of the best known jury instructions in the
federal canon: that dealing with the distinction between direct and indirect, or
circumstantial, evidence.  L. Sand, et *al.*, MODERN FEDERAL JURY INSTRUCTIONS:
CRIMINAL, Instruction No. 5-2.

That standard, time-honored, fundamental instruction was given by the Court
here both during its more abbreviated introductory instructions and then again at the
close of the evidence.  During its opening instructions, the Court advised the members
of the jury that:

> I want to explain, also, ladies and gentlemen, that there are two types of
> evidence:  Direct and circumstantial.  And both are admissible, and both can be
> considered by you.  *Many people think circumstantial evidence not as reliable
> as direct evidence, but that is not necessarily so.  You may rely on it just as
> much as you rely on direct evidence.*
>
> Direct evidence is evidence where a witness tells you that he or she
> directly observed something with his or her senses; in other words, the witness
> has personal, first hand knowledge of the matter about which he or she is
> testifying.  For example, the witness may testify that he saw that it was raining
> last night.  That is direct evidence that it was, in fact, raining last night.
>
> Circumstantial evidence is sometimes called indirect evidence.  *It flows
> from a logical inference from a known, observed fact.*  For example, the witness
> may say that he did not look outside last night, but he saw someone who had just
> been outside, that person had an umbrella, and the person and the umbrella were
> wet. This is circumstantial evidence that it was raining outside.  *You are free to
> make logical inferences in your determination of the facts in the case. That is all
> there is to circumstantial evidence.  You infer on the basis of reason and
> experience, from an established fact, the existence or nonexistence of some other
> fact. Circumstantial evidence is of no less value than direct evidence.  And as a*

*general rule, the law makes no distinction between direct and circumstantial evidence.*

Tr. 1/23/23 at 19-20 (ECF # 292) (emphasis added). The court then reiterated these instructions at the close of the case, just prior to the jury's retiring to deliberate on its verdicts, but also expounded further on the meaning of the term "inference":

> So we just used the word "inference."  I'm going to give you a little more detail about it.  *In their [counsel's closing] arguments, and as I just was using the term, you may have been asked to infer on the basis of your recent experience and common sense from one or more established facts the existence of some other fact.*  Again, an inference is not a suspicion or a guess.  It's a reason, logical decision, to conclude that a disputed fact exists on the basis of another fact which you know exists.
>
> *There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence the Government asked you to draw one set of inferences, while the defense asked you to draw another. It's up to you, and you alone, to decide what inferences you will draw.*
>
> The process of drawing inferences from facts in evidence is not a matter of speculation.  *An inference is a deduction or conclusion that you, the jury, are permitted to draw but not required to draw from the facts which have been established either by direct or circumstantial evidence.  In drawing inferences, you should exercise your common sense.*
>
> So while you are considering the evidence presented to you, *you are permitted to draw from the facts you find to be proven such reasonable inferences as would be justified in light of your own experience.*
>
> Here again, let me remind you that whether based upon direct or circumstantial evidence and the logical reasonable inferences from such evidence, you must be satisfied of the guilt of the Defendant beyond a reasonable doubt before you may convict the Defendant.

Tr. 2/14/23 at 127-28 (ECF # 306) (emphasis added).

Thus, as the Court emphasized in its final instructions, it is not only entirely proper, but is to be expected that counsel will likely urge the jury to reach certain inferences on the basis of evidence that in the nature of things (at least, in the absence of universal 24-hour video and audio surveillance of everyone and everything) will always

be partial and to some degree incomplete.  And there was nothing improper about the government's arguing, on the basis of not simply the defendant's mere absence from access control at the NSA during 90% of the hours she billed for, but from substantial other evidence as well, that it was reasonable to infer and ultimately to conclude that the defendant was not working on the Ironbridge contract during a materially significant number of those hours (which was all the government was required to prove at trial).

Even in the face of repeated assurances by government counsel that this was not the case, the defendant's prior counsel, Clarke Ahlers, Esq., continued to assert that it was the government's position that any work she did on the Ironbridge contract from some off-site location could not be taken into account in determining whether her billings were fraudulent.  This was false.  The government's position instead was that, given the classified nature of the subject matter of the IRONBRIDGE contract, almost all of the work on it could only be done at the NSOC worksite at NSA, but that there were some administrative functions amounting at most to a limited number of hours that certain government employees believed could be done off-site.  Government counsel emphasized this in pre-indictment conversations with Mr. Ahlers; during the December 1, 2021 argument on the defendant's motion for a bill of particulars (ECF # 30); and to make sure it was clear, returned a superseding indictment in May 2022 with substantial language emphasizing this point:

> 5.     No formal authorization was ever obtained by InfoTeK or **MCCOMBER** from the NSA authorizing her or Individual A to carry out their functions as program manager on the IRONBRIDGE contract at any location other than the Government site.  *However, there were some limited administrative functions concerning the management of the IRONBRIDGE contract that did not involve the use of classified information that some NSA personnel believed a program manager could appropriately handle from outside the NSA's secured facility.*

14

13.     In addition to not being physically present at the NSOC worksite for the vast majority of the hours she billed to the IRONBRIDGE contract, **MCCOMBER** *did not in fact work the number of hours on the IRONBRIDGE contract that she entered on her time records and that InfoTeK subsequently billed for her services* on the invoices it submitted to the NSA each month between April 2016 and September 2017.

14.     On various occasions when **MCCOMBER** billed a full eight-hour day to the IRONBRIDGE contract, **MCCOMBER** played in charity golf tournaments; participated in a charity event sponsored by a former Washington Redskins player in northern Virginia; attended her high school reunion in Virginia Beach, Virginia; vacationed in Texas and in Ocean City; and traveled to and was present in Augusta, Georgia as part of business development efforts for InfoTeK that were unrelated to the IRONBRIDGE contract.  On other occasions when she billed an eight-hour day to the IRONBRIDGE contract, **MCCOMBER** was drafting proposals to obtain other business for InfoTeK or was doing work related to other government contracts or administrative work for the company in her capacity as its CEO.[3]

ECF # 97 (emphasis added); *see also* ECF # 99 (redlined version of superseding indictment).

Throughout the trial itself, government counsel (and the government's witnesses) carefully emphasized this distinction: that while the defendant's absenteeism from the NSA for fully 90% of the time she billed as IRONBRIDGE Program Manager (PM) in 2016-17 was strong evidence that she had not worked anything close to the time she reported, there was limited scope for her to bill time as PM on the IRONBRIDGE contract where she *actually did so* some work off-site.  But any evidence that she in fact did perform significant work off-site was thin to non-existent at trial.  See transcript excerpts cited at pages 22-49 *infra*.  Therefore, even if she was given credit for a some assumed minimal amount of work done by her off-site, it would not have been remotely

---

[3]     Notably, McComber's then-counsel Andrew Hallowell advised the government in November 2017 that she admitted that her billings on 9 of the 12 occasions that served as the basis for ¶ 14 were all inaccurate, either in whole or in part.  GX 23(b).

sufficient to undercut the government's proof that the time billed for her on each of the

19 monthly invoices in question were all materially false, fictious, or fraudulent.  Tr.

2/13/23 at 144-48 (ECF # 305) (Court's final jury instructions on the False Claims Act

counts).

In opening statement, for example, government counsel addressed these matters

as follows.  First, government counsel explained that because all of the material ITK's

software developers were working with was classified,

> that imposes certain constraints on the contract.
>
> Among other things, you can't just email back and forth from the NSA to
> InfoTeK's headquarter's offices in Columbia, Maryland, about stuff that may
> disclose classified information. You can't do that.
>
> So the NSA has what's called it's high-side email system.  That system
> allows you to send emails within the NSA itself, and it allows you to send emails
> from the NSA to a facility known as a -- it's called a SCIF, Secured
> Compartmented Information Facility, which is something that is set up to have a
> specific type of electronic connection to the NSA that will enable it to remain
> confidential and to safeguard the information.  Once it arrives at a SCIF, SCIFs
> have to be locked, secured and all sorts of requirements that go with operating a
> SCIF.
>
> Did InfoTeK have a SCIF? No, it didn't.
>
> So that would seriously limit the amount -- I mean, it would basically
> make it impossible to do anything that involved potentially classified information
> from any location other than the NSA offices themselves. And perhaps as a result
> of that, but not surprisingly, that's what the contract says, is that basically the
> work site is here at the NSA. It's supposed to be done here.

Tr. 1/23/23 at 39-40 (ECF # 292).

* * *

> Now, you'll see some of the government contracting officers, witnesses, testify
> that, Sure, we thought there were some administrative things she could do off-site,
> you know, a few things each month maybe. But on the whole, you're supposed to
> be there and be on-site to do the work.

*Id.* at 53.

* * *

There were roughly 326 days from the date March 15th of 2016 when Ms. McComber, previous name was Kimmel, became the program manager through September 7th, which was basically when the focus o[f] the indictment ends. On those 326 days, all totaled, Ms. McComber was actually in Access Control at the NSA for about 260 hours out of that 2,600 hours. So 90 percent of the time that's getting billed to the NSA for her services, she's not there.

It's a classified contract that involves work in a highly-secured office setting that adjoins the main situation room at the NSA at the rate of $150 an hour or $2.50 a minute. Where was she? That's the question we'll be answering for you in the course of this case. And you're going to see that -- interestingly enough, you're going to hear from witnesses who worked for InfoTeK, she wasn't at the InfoTeK offices all that much either.

And so you've got someone working on government contract that certainly involves software being used in a classified setting who isn't at the NSA and, as you're going to hear, isn't necessarily at the offices of InfoTeK either.

A clue is that she was both the program manager and the chief executive officer of InfoTeK. She's the head of the whole company. What do the heads of companies do? One of the main things they do is they try to develop new business. They try to go out and find new business. They go out and they market. They interface with people, they go to social gatherings, they go to business gatherings, they go to cocktail parties, they pitch their product to people.

Sometimes, as you'll hear, maybe you acquire some other small company that has a couple of contracts and you need to integrate the people from those contracts from the InfoTeK. She did things like that.

She'd drive down to Virginia to meet with those people for purposes like that, and you'll see some things like that in the investigative spreadsheets that our agents developed.

*Id.* at 44-45.

* * *

And you will learn that out of those 12 days that were identified as likely overbilled to the government contract by the whistleblower, Ms. Weir, that ultimately, based on information received from the Defendant, Mr. Hallowell was going to concede that overbilling had occurred on nine of those 12 days. And that's days where specific, discrete, highly-identifiable things, like attending golf tournaments or things of that character, were involved.

*Id.* at 53; *see also id.* at 37 (noting that the final column in the investigative spreadsheets that were introduced as Government Exhibits 1(c) – 21(c) and 22(a) showed "all of the information that we've been able to collect and develop about other things she was actually doing on those days, which will include things like playing in charity golf tournaments, taking vacations, going to a high school reunion, things of that character").

In its opening statement, the government furthermore emphasized that another important way of demonstrating the falsity of the defendant's billings was the remarkable uniformity of her time sheets:

> The Defendant's billing pattern is significant, too. As you can see from some of the other entries on the invoices, InfoTeK's accounting system, and it's called the Unanet accounting system, can take hours in increments in as little as a quarter of an hour, 15-minute increments. So let's take a look at sort of how Ms. McComber's billed hours ran.
>
> This is another stipulated document. It's going to be Government's Exhibit 22(d)1. And as you'll see, eight hours, eight hours, eight hours, eight hours, eight hours. Very occasionally, you'll get something less than eight hours. But otherwise, it's pretty much eight hours just about every day.

*Id.* at 53.

Following the opening statements and the Court's introductory instructions, the first witness the government called was Shilo Weir, the former Chief Operating Officer (COO) of InfoTeK from September 2016 through October 2017. She testified that from early 2017 through the time she left the company in the fall of that year, she and the defendant actually shared an office in ITK's office suite in Hanover, Maryland, so that "If she was present, I was aware." She added that each of them was able to hear the other's ends of telephone conversations. Ms. Weir summarized the matters she observed the defendant spending time on as follows:

> She was the chief executive officer. She did a number of things from meeting with potential partners and clients, to directing the work of the recruiters, to

18

visiting and, you know, trying to find the new office locations, managing the renovation of the new location. She was in charge of the entire company. She did a little bit of everything.

Tr. 1/24/23 at 9, 11, 21-22 (ECF # 293). In contrast, when asked "how much time did you observe Ms. McComber spending for her work as the program manager on the Ironbridge contract, she responded succinctly, "Minimal to none." *Id*. at 23. She further elaborated upon that answer as follows:

> Until about June of 2017, I was under the assumption that Jacky Kimmel was holding that position [i.e., Program Manager on the IRONBRIDGE contract] kind of in name only as a representative of the company because it was necessary on the contract.

**Q.** And that was through June 2017?

**A.** Correct.

**Q.** Was there someone else that you thought was really doing most of the work as the program manager on the Ironbridge contract?

**A.** We had an employee named Jason Doyle who was the on-site lead, and I believe he managed the day-to-day work of what a project manager would have done and reported that out to Jacky.

**Q.** Okay. And what was your basis for believing that most of the actual work of the program manager on the Ironbridge contract was done by the technical lead, Jason Doyle?

**A.** My conversations with Jason Doyle.

**Q.** All right. And what was your sense or your understanding of Ms. McComber's understanding of the day-to-day activities that were occurring on the Ironbridge contract?

**A.** I believe she only knew what Jason Doyle told her.

Tr. 1/24/23 at 24-25 (ECF # 293). Later, Ms. Weir testified that Jason Doyle "would complain about her performance to me." *Id*. at 85.

Because the Court heard the full evidence at the trial, further elaboration on this point is superfluous. If the government had simply been relying on the defendant's 90%

19

absenteeism rate from the NSA as a factor sufficient in and of itself to establish her guilt on the 19 false claim counts, it would hardly have needed to put in the painstaking work involved in assembling the investigative spreadsheet;[4] would not have needed to introduce the various exhibits in the GX 22 series – including the defendant's personal calendars; her billing records (which consistently reflected 8 hours of daily work on Ironbridge, but little or nothing for her duties as ITK CEO); her expense reports; her credit card charge records; her bank records; many of her NSA high-side emails and Lynch conversation messages (GXs 22(i), (j), and (k)); her ITK emails (GX 22(l)); and records of her various golf outings (GX 22(m) & 22(n); or other exhibits reflecting her reliance on Jason Doyle to answer even the most basic questions about the work underway on the Ironbridge contract (GXs 24(e)(1) – (e)(3); 24(f); and 24(h). **Exhibit 3** (Government's Exhibit List) and **Exhibit 4** (Table of Particularly Important Government Exhibits).  Nor would the government have needed to call approximately 17 witnesses in the course of presenting its case-in-chief for the prosecution.  Moreover, in its opening closing argument, the government meticulously parsed through the accumulated evidence demonstrating that when she was not in access control at the NSA, there was substantial evidence showing that the defendant spent very little time

---

4   In an attempt to find something to support their contention that the government's evidence at trial was weak, the defense points to acknowledgements by the retired NSA-OIG Agent Lori Hazenstab and Defense Criminal Investigative Service Agent (DCIS) Keith Benderoth that (1) the access control records did not dispositively establish that Ms. McComber did not work when she was off-site and (2) that the investigative spreadsheet standing alone was not sufficient to establish how much work she did off-site.  ECF # 359 at 6.  But this testimony by these witnesses was fully consistent with the government's position at trial that the investigative spreadsheet, while extremely important evidence, would not be relied upon by the government as sufficient to establish the defendant's guilt in and of itself, but would be further supported by other equally significant documentary evidence and witness testimony.

doing anything that related to her ostensible responsibilities as Program Manager for the Ironbridge contract.  Tr. 2/13/23, at 27-44 (ECF # 305).

Finally, in order to ensure that the jury was left under no confusion as to this point, the government submitted a special instruction to the Court addressing this matter as the trial was approaching its end, which the Court not only gave, but repeated more than once:

> So this is very important.  All of these are important, ladies and gentlemen, and I remind you [that] you have to consider all of them as a whole, you cannot single out any one instruction.  You must consider all in light of the other.  But let me reiterate. I'm going to read this part over.
>
> *The Government does not contend that the Defendant violated the law if she worked off-site.  However, the Government's position, as set forth in the indictment and as advanced at trial, is that evidence of whether and when the Defendant was present at NSA is relevant to the question of whether she was working as program manager because some of the work on the Ironbridge contract concerned classified matters that could not be done off-site.*
>
> *To the extent that you find that in a given month the Defendant did work off-site in performance of the duties of program manager, you may take those hours into account in determining whether there was a material difference between the number of hours the Defendant actually worked as program manager in that month and the number of hours that InfoTeK billed NSA for Defendant's work that month,* as set forth in each of the individual counts of the indictment charging her with violations of the False Claims Act.
>
> That's a very long sentence and I'm going to read it one more time.  To the extent that you find that in a given month the Defendant did work off-site in performance of the duties of program manager, you may take those hours into account in determining whether there was a material difference between the number of hours the Defendant actually worked as program manager in that month and the number of hours that InfoTeK billed NSA for the Defendant's work that month, as set forth in each of the individual counts of the indictment charging her with a violation of the False Claims Act.

Tr. 2/13/13 at 148-50 (ECF # 305) (emphasis added).   The defense's first argument is therefore completely without merit.

**B.**    **The Government at Trial Presented Not Merely Substantial, but Overwhelming, Evidence that the Amount of Program Management Work Needed on the Ironbridge Contract by 2016-17 was Minimal; that Little PM Work Could be Done Off-Site; and that Such PM Work as was Needed Was Largely Handled by Jason Doyle, the Contract's Technical Lead, Who was On-Site at NSOC Every Day.**

The defense's second argument – that the evidence presented at trial was insufficient to establish not only that the defendant herself did little program manager work on the contract, but that there was, in any case, little program manager work by 2016-17 that needed to be done by *anyone* – fares no better.  The points offered by the defense are three:  (1) that Shilo Weir's personal observation that the defendant spent "Minimal to none" of her time working on the Ironbridge contract (Tr. 1/24/23 at 23) (ECF # 293) during the eight or nine months they shared an office at ITK between early 2017 and September 2017 is not entitled to any weight; (2) that the terms of the contract, which was finalized in the spring of 2011 before performance actually began on July 2011, assigned various duties to a Program Manager, so it can be inferred that the defendant must have in fact  performed them, particularly since there was no dispute that the contract was running well in 2016-17; and (3) that a few minor snippets of testimony from three witnesses can be offered to imply that the defendant was indeed working the 8 hours on virtually every workday that she billed for the PM's position, GXs 22(c)(1) – 22(c)(13) & GX 25(c), even though other testimony by those witnesses and extensive testimony by other witnesses that the defense fails to acknowledge wholly guts this claim.

First, Shilo Weir's testimony as a former close friend of the defendant's and her top ITK deputy in 2016-17 was extremely credible – which was a principal reason that

22

the government called her as its second witness at trial. She had a sterling past history as a twenty-year veteran of the United States Air Force (she had followed her father into the service). She finished with the rank of Major and an Honorable Discharge. Tr. 1/24/23 at 6-9. She became friends with the defendant while she was living in Maryland as she concluded her service with the Air Force. *Id.* at 9-10. The defendant herself recruited Ms. Weir to become the company's Chief Operations Officer (COO) – the No. 2 position in the company hierarchy. She testified that "I really loved that job. . . The people and the things we were accomplishing," as well as the fact that the company had "a very social culture." *Id.* at 12.

As time passed, however – especially after she began physically sharing an office with the defendant in early 2017, *id.* at 20-22 – she began to have growing concerns about the defendant's conduct and her professional ethics. First, she was surprised to eventually learn that the defendant held the PM position on the Ironbridge contract. *Id.* at 13, 15. As already quoted at page 18-19 *supra*, she observed that the defendant spent her time on matters related to her function as Chief Executive Officer (CEO), including marketing and directing the renovation of the company's new office suite. *Id.* at 22-23. But from her observations, the time she spent working as the PM on Ironbridge while in ITK's offices from early 2017 through September of that year was "Minimal to none." Tr. 1/24/23 at 23 (ECF # 293). As previously quoted, she believed that Jason Doyle, the contract's Technical Lead, "managed the day-to-day work of what the program manager would have done and reported that out to Jacky," whom she believed (based on her contemporaneous conversations with Doyle) "only knew what Jason Doyle told her." *Id.* at 24-25. And asked whether, when they physically shared an office, "was it common for you to hear her speaking or having exchanges with a contracting officer on one of the

23

government contracts that InfoTeK had?", her answer was crisp and emphatic: "No." *Id.* at 26-27. She further testified that she could not recall the defendant ever specifically telling her during the year-plus period that they worked closely together that she was working on the Ironbridge contract, or had an Ironbridge-related deadline to meet. *Id.* at 98-99.

The NSA's access records establish that the defendant was not present there for fully 90% of the hours she billed (GX 21(a), **Exhibit 1**); Ms. Weir's testimony established that she also spent relatively little time in ITK's own offices – giving an estimate of "Twenty-five percent or less." At first, Ms. Weir said she assumed that the defendant was spending most of that time at the NSA, because "she would tell us that she was there." Over time, however, she concluded that the defendant was lying, in part because she would send text messages saying she was held up in a meeting at the NSA when Ms. Weir knew that she would not have been allowed to have a cell phone inside the building. *Id.* at 27-28.

Those concerns grew after ITK's long-time CFO Dwayne Preston left in March 2017, and Ms. Weir was required to take over his responsibility of certifying the accuracy of the invoices (including the defendant's hours as PM) on the monthly invoices ITK submitted to the NSA. *Id.* at 30, 36 (she assumed this function in early April 2017). Initially, she assumed that the defendant was accurately reporting her time as PM, but that changed by June 2017, when she noted that the defendant had gone out of town on a personal vacation and still billed her time against Ironbridge. She then looked back to April and identified another anomaly. *Id.* at 37-41. At that point she decided to undertake a more detailed investigation covering a four to-five month period. The results of that investigation prompted her to prepare the anonymous whistleblower

24

letter that she sent to the NSA-OIG on August 23, 2017 (GX 23(a)).  She explained to the jury at trial that she acted because "I believed that [the defendant] was fraudulently billing the government" and that her conduct "lacked integrity.  And it's illegal. . . .  I'm a strong believer in integrity and service before self."  *Id.* at 41-47.  She also detailed the investigation she had conducted to support her conclusions about the 12 specific occasions of apparent fraudulent misbilling that she detailed in the letter.  *Id.* at 50-56, 99-103.  As noted above, when the NSA-OIG investigators presented her anonymous letter to the defendant and ITK's counsel Andrew Hallowell a few months later, he conferred with Ms. McComber and then reported in a letter to the government on November 10, 2017 that 9 of the 12 specifications of misbilling in Ms. Weir's whistleblower's letter were correct in whole or in part.  GX 23(b).

As for the defendant's second assertion – that the functions defined for the PM position by the contract back in the spring of 2011 meant that the defendant must have been working roughly full-time in 2016-17 in order to carry those out – that remarkably weak argument is already partly answered by Ms. Weir's discovery that it was in fact the technical lead, Jason Doyle, who was handling the PM functions in addition to his own demanding job.  As the testimony discussed below reflects, it was Doyle who was the primary person – along with the individual members of the IRONBRIDGE team and their government counterparts – who merited credit for the contract's smooth functioning and successful performance in 2016-17.  Numerous witnesses and documentary evidence confirmed the government's twin claims at trial that (1) the demands of the PM position by 2016-17 were relatively slight and (2) that it was Jason Doyle, not the defendant, who was the person responsible for meeting them.

25

Doyle joined ITK originally in 2009, Tr. 1/30/23 at 95 (ECF # 297); shifted to working on the Ironbridge contract in 2013, *id.* at 96; and took over from Michael Kemp as the Contract's Technical Lead in 2016. *Id.* at 102. He testified that at that point, "I was responsible for the tasking of everyone on the team," which consisted of between eight and ten people. *Id.* at 103. He was responsible for interacting with the lead government figures on the contract, Contracting Officer's Technical Representative (COTR) Jonathan Smith; K2 Section Chief (and the overall supervisor of the NSOC support unit) Rob Bryant; and the final Contracting Officer Jennifer Blake, who would "visit my desk or call me into their office and ask me the status on certain things and tickets – you know, who's assigned to what and how it's going." *Id.* at 105. Doyle further testified that a key management and work allocation tool was the typically twice-weekly stand-ups:

> A.  About twice a week you would stand up with your team. They called it a stand up because everyone kind of backed away from their computers for a minute and stand up and go around the room and tell everyone what you're working on and see if you need any help from any -- any of the other team members of what you're working on. And then the tech lead would know the status of everyone, how they're doing on their -- on their tasking.
>
> Q.  Okay. And so what was -- generally what was the purpose of doing these stand ups?
>
> A.  Just to know what everyone was worked on and to make sure that everyone was staying up to pace with what they were assigned to do, and then to let me know how their tickets were going.

*Id.* at 105. Two points readily emerge from this description: first, the stand-ups were a critical tool in managing the ongoing work on the Ironbridge contract and identifying potential problem areas and complications; and second, that the defendant was absent

from the K3 worksite at NSOC 90% of the time meant that she would rarely have been present for these highly informative and useful sessions.

Other important points that Doyle testified to were the following:

- The NSOC Watch Floor was a 24/7 operation. If there was a problem outside of normal business hours, NSOC K3 Section Chief Rob Bryant would call Doyle on his personal cell phone, sometime in the middle of the night, and would rely on him to address it. When these calls came in, Doyle had no need to reach out to the defendant before he took action because "it was already worked out ahead of time that we were allowed to come in after-hours if we were requested by the government to do so." Asked whether "these after-hours calls, that is just something you would handle yourself?", he replied, "Yeah." *Id.* at 106-09.

- Doyle further testified that he could not access the high-side at the NSA via the internet – "You have to be on-site" – and that "100 percent of my job" required him to be on-site: "I had no tasking on the – on any unclass[ified] system." *Id.* at 109.

- He further testified that he did not find it necessary to reach out to the defendant on a regular basis:

Q.   Did you find that you needed to reach out to [the defendant] throughout the day on a regular basis?

A.   No.

Q.   Why not?

A.   **I think things ran smooth enough or there was never an issue that needed her attention.**

Q.   What things were running smoothly?

A.   The tasking, the systems, the -- the program itself, the -- just the day-to-day operations of what we had to do. There weren't many issues.

Q.   And was it that ticketing system that was helping things run smoothly?

A.   Yeah, you could say that. Yeah, sure.

Q.   And so did you need daily feedback from the program manager on the Ironbridge contract to help you run the contract smoothly?

27

**A.**   Daily feedback, no.

**Q.**   Okay.  And so what were the nature of these one-off interactions that you would have with the program manager on the Ironbridge contract while you were the technical lead?

**A.**   If there was a question that came back to me that I couldn't answer myself -- I couldn't provide an answer to the government myself, then I would -- I would reach out to Jacky.

**Q.**   How often was that happening?

**A.**   **Not very often.  Maybe once a week, once every other week.**

**Q.**   What about the other folks who are working with you in support of the Ironbridge contract, those contractors and subcontractors who are reporting to you as the technical lead -- what percent their work needed to be done on-site at NSA headquarters?

**A.**   A hundred percent of their work.

*Id.* at 109-10.

Doyle further testified that during the two years when he was the Technical Lead – a period that largely overlapped with the defendant's appointment as Ironbridge PM – there was little turnover among the Ironbridge team's personnel:

**Q.**   And was there much turnover among the team while you were there?

**A.**   No.  There was a few people that came and went while I was there, but it -- it wasn't a lot of turnover.

**Q.**   Okay. And were you involved in hiring new individuals to replace those few and far between people who left the contract?

**A.**   Yeah. I would -- I would help interview them to make sure they were -- they could perform the task that we needed of them, yeah.

**Q.**   And who else was involved in the -- in those efforts to hire new individuals?

**A.**   Jacky.

**Q.**   Okay.

**A.**     And we had recruiters that worked as well -- they would find the candidates.

**Q.**     I'm sorry.  Could you speak up and say that again?

**A.**     They had -- we had recruiters that worked in the home office, and they would -- they were responsible for finding the candidates.

**Q.**     They were responsible for finding the candidates?

**A.**     Yeah. Well, I wouldn't say they were responsible, but they helped to find potential candidates.

**Q.**     Did they help InfoTeK Corporation narrow down the pool of people --

**A.**     Yeah.

**Q.**     -- to talk to?

**A.**     Yeah.

*Id.* at 111-12.

Doyle further testified that the defendant's extended non-appearances at the Ironbridge worksite had no substantial negative impact on the contract's operations:

**MR. COOCH:**  Now, in the month of January of 2017, the blue [color on the investigative spreadsheet] indicates no access to NSA facilities [by the defendant]. So that means there's no badge in and out of the building. So looking at this chart, there's -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 -- 16 days in that month in which she billed time on the Ironbridge contract but did not access NSA facilities.

Is this an instance -- or do these appear to be instances in which she was, as you mentioned before, gone for an extended period of time?

**A.**     Yes.

**Q.**     Okay. And is that something that stood out to you in your mind at the time?

**A.**     No, not at that time.

**Q.**     Okay.  And why not?

**A.**   I wasn't -- **I wasn't aware that there was any – any strict schedule that she was adhering to.**

**Q.**   Well, and when she's gone for an extended period of time, as far as you're aware, was she having a substantial impact on the operations of the Ironbridge contract?

**A.**   No, I wouldn't think so.

**Q.**   Okay.  **And did the fact that she was rarely there for some of these months really impact your day-to-day work on the contract?**

**A.**   **Not too much.**

**Q.**   Now, at the time did you understand the program manager position to be a full-time position?

**A.**   I was unaware what the requirements of the position were.

**Q.**   Did you know how the Defendant was spending her time off site?

**A.**   No.

**Q.**   Did you have any sense of whether or not she was doing program manager work in support of the Ironbridge contract while she was off site?

**A.**   No. I had no –

**THE COURT:**      No, she wasn't, or no, you didn't know?

**THE WITNESS:**   No, I didn't know what she was doing off-site.

**BY MR. COOCH:**

**Q.**   Were there at least some occasions where she would communicate with you from off-site about what was going on with Ironbridge?

**A.**   Yeah.

**Q.**   Okay. And did the -- did those communications take up a substantial portion of your time?

**A.**   No.

*Id.* at 118-19.

30

****

**Q.**    What did you understand the program manager was required to do in support of the Ironbridge contract?

**A.**    Program manager would -- would lay out the long-term goals of the project, would interface with the government on those goals, would manage the personnel on the contract.

**Q.**    And were there times where you felt like you were managing personnel on the contract?

**A.**    Yeah.[5]

**Q.**    Okay. And were there times where, when you were managing personnel on the contract, you thought it was something that the program manager should have been doing?

**A.**    Yeah.

*Id.* at 120.

Other witnesses who played critical roles in the performance of the Ironbridge contract during the defendant's term as the designated PM in 2016-17 further supported the government's contention that the defendant performed little actual work.

As the Section Chief of K3, Rob Bryant was responsible for ensuring that NSOC received the necessary support from an IT and facilities standpoint. Tr. 1/27/23 at 5-8 (ECF # 296). He testified that back in 2016-17, the K3 workspace was typically home to four to six government employees, as well as 10-12 contractors from ITK and its subs. *Id.* at 17-21. His own office was in the K3 space where these employees worked, and he

---

[5]    Doyle further answered "No" when asked "would she provide daily tasking on the Ironbridge contract," and said he had no idea whether she was providing regular status reports to the government employees. Tr. 1/30/23 at 120. Doyle's own subsequent testimony (Tr. 1/30/23 at 132-143), together with the government exhibits relating to the NSA's request for a status update in March-April 2017 and the subsequent Program Management Review in late July 2017, GXs 24(e)(1) – 24(e)(3) and 24(h) **(Exhibit 2)**, made it clear that she was not, because the government did not require status reports every month and "they did not ask for them for a period of time." *Id.* at 132.

testified that he usually worked an 8 to 10 hour day starting at 6:30 or 7:00 a.m.  *Id.* at

15, 25-26.

Bryant described the work of the ITK PM on the Ironbridge contract as "the

person who's just managing the contractors there, their health and well-being, and, you know,

making sure they're on task, I guess, and, you know, stuff like that." *Id.* at 24.  Asked

"approximately how many hours a week did you find that you needed of support from a program

manager on the contractor side" of the Ironbridge contract, he responded:

> from my perspective, right, the contract was always doing well. I didn't find, like,
> there needed to be a lot of program management from the contractor side.
> Definitely not from my side. My guys better be managing the group as a holistic,
> you know, approach.  But from the -- I don't know what a program manager
> exactly has to do. I'm sure they're worried -- from the contractor's side, I'm sure
> they're worried about hours and whether somebody is at work or that kind of
> thing. But I didn't require a lot of service from that except for, you know,
> are the people here and are they doing their job. That's really all I needed to know.

*Id.* at 25.  He also testified that there was not a lot of personnel turnover on the contract:

> A.    The Ironbridge contract, I always thought, was -- did very well. I mean,
> **we didn't have a lot of turnover.**  We did have people leave, I mean, but
> no more than any other contract that I had.  Yeah, it was -- **I thought it
> was considered stable.**

*Id.* at 26 (emphasis added).  Bryant described his management style as personal and

informal.  When asked  "Did you find that you needed substantial numbers of

deliverables or reports from the contractors?",  Bryant testified:

> A.    **I personally did not.**  So I'm not exactly -- I'm ["not" may be missing
> here] kind of an ivory tower manager.  I know everybody that works for
> me.  I'm -- I like to get fairly close to the people that work for me so I
> know what they can do and be able to encourage them in the right way,
> that kind of thing.  **And so I know what they're doing.**
>
> I mean, we're a small organization.  My God, we're under, you know,
> 30 people, maybe even under 20 at that point. That's miniscule, right.
> So I don't need, you know, a ton of reports to tell me what people are
> doing that I'm talking to every day.

*Id.* at 27 (emphasis added).

Bryant further testified that all of the work being done by the contractors to support the Ironbridge contract had to be done on-site. He explained that:

> [I]t's a classified arena. I mean, we've just recently been able to do coding on the --  the outside unclassified net. But back then, everything was done in-house. Everything, yeah.
>
> **Q.**   Okay. And did you find that you needed to reach out to InfoTeK employees on the low side regularly in connection with the Ironbridge contract?
>
> **A.**   No. You mean like outside of work hours, or --
>
> **Q.**   During work hours or outside of work hours --
>
> **A.**   No.
>
> **Q.**   -- just reaching out to somebody who is off-site to assist you with the Ironbridge contract?
>
> **A.**   Oh no.  No. No, no, no. I see what you're saying. Yeah, we're all there just working.

*Id.* at 28 (ECF # 296).

With regard to his impressions of the defendant's work as the Ironbridge PM, Bryant testified that he would see Ms. McComber

> **a couple of times a month, maybe, come through**. . . . [I]f there's an empty desk I had available for an hour or two so she could check email or stuff like that, or come talk with me.  I mean, I knew her pretty well. We socialized about, you know, stuff, just in general.  Like sports or whatever. yeah, it wasn't – But I'd say, you know, a couple times a month to check on the folks.
>
> **Q.**   Okay. So at times when she is meeting with you at NSOC facilities, it sounds like you're having sort of just regular social discussions?
>
> **A.**   Yeah. And, I mean, she could say, you know, how are the folks doing, all that kind of stuff. You know, it's -- I don't want to say they're like drive-bys, but yeah, just come in and check on the folks.

> I mean, that's what most folks that are program managers are. Owners of the company, like now, they do -- they stop in every once in a while and see how the folks are doing.

> **Q.**    And some of the time she was on-site, did you understand her to be checking on other contracts or other work unrelated to the Ironbridge contract that InfoTeK Corporation had with NSA?

> **A.**    That was my assumption. I mean, if you're checking your email -- I mean, I believe the company had other contracts.  Yeah.

*Id.* at 38-39.  He further testified that he never recalled attending meetings relating to the Ironbridge contract at ITK's offices, and that while he had occasional encounters with her of a social nature outside of NSOC, none of these were billable to the Ironbridge contract. *Id.* at 37.  He also stated squarely that he never needed to contact the defendant after-hours.  Instead, what would happen in the event of an after-hours emergency was that "I'm sure the COR-T would call the tech lead [Jason Doyle] and -- you know, if somebody had to come in after-hours." *Id.* at 41.  Asked "About how much time did you expect the program manager to be spending in support of the [Ironbridge] contract," Bryant responded:

> **A.**    I wouldn't -- from my perspective, I wouldn't think a lot, because everything with the contract ran pretty smooth.  I mean, they're good people. They know what they're doing.  Yeah.

*Id.* at 42.

Finally, government counsel provided Bryant with copies of the defendant's actual billing records as the PM on the Ironbridge contract.  These exchanges followed:

> **Q.**    [D]id there come a time when you learned how much time Ms. McComber was billing to the Ironbridge contract as a program manager?

> **A.**    I did.  I was called up into the IG's offices and they showed me the number, yeah.

> **Q.**    Okay.  And do you recall what that number was, approximately?

34

**A.**     I believe it was somewhere between, like, 16 and 1,700 hours.

**Q.**     For how long, if you remember?

**A.**     That's where my -- I'm not sure if it was a year or two years. I forget what the lady [NSA-OIG investigator Lori Hazenstab] said the time frame was, right.

**Q.**     Okay.

**A.**     But I do remember the number-ish. Yeah.

**Q.**     And what was your reaction to that number?

**A.**     **I was surprised. Yeah.**

**Q.**     Why were you surprised?

**A.**     **Because I don't know what would constitute those kind of hours. I don't. I don't know how much -- or what would be -- you know, a program manager would be doing for those many hours if you're not doing K3 work [as the previous PM, Raynett Colston, did].** I just -- yeah, I was -- I was surprised.  Yeah.

**Q.**     Okay. And so Mr. Bryant, I'm showing you Government's Exhibit 25(c). These are biweekly time sheets for the Defendant. They've already been admitted into evidence.

        Have you ever seen these before?

**A.**     I have not.

**Q.**     Okay. And you can see on the left-hand side where it says "billable Ironbridge"?

**A.**     Okay.

**Q.**     All right. So this is the time the Defendant billed the  Ironbridge contract as the program manager?

**A.**     Okay.

**Q.**     This is for a two-week period from January 29th, 2017 through February 11th, 2017?

**A.**     Okay.

**Q.**     And you can see she billed eight[y] hours to the Ironbridge contract?

**A.**     Okay.

**Q.**     I mean, **in your experience, did you ever need 80 hours of program management support in the two-week period for the Ironbridge contract?**

**A.**     **No.**

**Q.**     And just another example, this is the following two weeks beginning February 12th, 2017, through February 5th, 2017. You can see the billable line item here to the program manager role, 64 hours. **Did you ever really need 64 hours of program management support in support of the Ironbridge contract?**

**A.**     **No.**

**Q.**     And then just -- just one more. I'm showing you Government's Exhibit 22(c)11. This is a project time details sheet covering the month of June of 2017.

And have you ever seen this document before, Mr. Bryant?

**A.**     No.

**Q.**     Okay.  Just give me one second.

Can you see in the middle of Page 2 of Exhibit 22(c)11 where it says Ironbridge senior program manager, Jacky Kimmel?

**A.**     Yes.

**Q.**     Okay. Can you see the billings by date and the number of hours billed on that date for the month of July 2017? June --

**A.**     I can, yes.

**Q.**     Excuse me, June of 2017.

And so can you see the totals here listed for the Defendant, Ms. McComber, then Jacky McComber, showing that 170 hours were billed as the program manager on the Ironbridge contract in June of 2017. Do you see that?

> **A.** I do.
>
> **Q.** **Did you ever need 170 hours of program management --**
>
> **A.** **No.**
>
> **Q.** -- support by Ms. McComber?
>
> **A.** **No.  None.**
>
> **Q.** For a given month?
>
> **A.** **No.**

Tr. 1/27/23 at 42-45 (emphasis added) (ECF # 296).

Following defense counsel's cross-examination of Bryant, in which he elicited certain positive statements that Bryant had made about the defendant's character in October 2017 during his initial interview with the NSA-OIG investigators (which occurred before they made him aware of just how many hours the defendant had been billing for her time as the Ironbridge PM), government counsel asked him about whether he had been aware of the magnitude of Ms. McComber's billings as the Ironbridge PM when he made those statements:

> **Q.** Mr. Bryant, Mr. Ahlers asked you some questions about the prior statements you made about Ms. McComber's character --
>
> **A.** Okay.
>
> **Q.** -- do you recall that?
>
> **A.** Yes.
>
> **Q.** When you were making those statements, had you been told what the number of hours that Ms. McComber had billed to the Ironbridge contract were? Do you recall?
>
> **A.** Oh no.  No.
>
> **Q.** Okay.  And so at the time you made those statements -- I'm showing you Government's Exhibit 45 -- did you have an understanding that she had

billed, for the period March of 2016 through September of 2017, 2,603 and a half hours to the Ironbridge contract?

**A.**   **No.**

**Q.**   Okay. And did you have -- **did you have an understanding that, you know, she regularly billed well over 100 hours a month to the Ironbridge contract in that period?**

**A.**   **No. No.**

**Q.**   Okay. And did you -- just looking at this chart, in April 2016, 168 hours; May 2016, 142 hours; June 2016, 172 hours; July 2016, 156 hours. **Did you ever have any understanding that the NSOC needed that many hours of program manager support for the Ironbridge contract?**

**A.**   **No.**

Tr. 1/27/23 at 60-61 (emphasis added) (ECF # 296).

Numerous other witnesses at trial likewise affirmed that because the Ironbridge contract was well-established by 2016-17, and was staffed with able, motivated performers who knew each other well and worked effectively together, there was no need for any significant amount of "hand-holding" or other similar PM services, which the defendant had asserted was her primary role.

**Regina Shirley, NSA Software Engineer:**

**Q.**   All right. So let me ask you this: Can you tell me whether or not, based your observations, the InfoTeK contractors, who worked on the Ironbridge contract, whether as a group that seemed to require a lot of handholding?

**A.**   No, I did not feel they did. They -- as I said, the way Rob ran the shop, they were all very professional. We hired them for a specific reason, and they did their job.

Tr. 1/27/23 at 96 (ECF # 296).

**Michael Kemp, Jason Doyle's Predecessor as Ironbridge Technical Lead (July 2011- March 2016):**

38

Q.    Okay. So did there ever come a time while you were at InfoTeK
      Corporation that you needed full-time support from a program manager on
      the Ironbridge contract?

A.    No. Full -- I was just going to say like -- whether there was, like, you
      know, full-time or, like, part-time, it didn't affect my day-to-day stuff.

Q.    Okay. Why didn't it affect your day-to-day stuff?

A.    We -- a lot of us had worked together for a long time. We -- you know,
      from the team -- the InfoTeK team as well as the government team. We
      had a pretty good routine going. So there was never any huge need for an
      extra, you know, person in the middle of, you know, tasks needing to be
      done and then being assigned. It was always just -- they [the government
      personnel] could walk back to the other end of the room and ask us to do
      so.

Q.    Was the program manager from InfoTeK Corporation ever giving you
      daily tasking or sort of running the day-to-day of what your team was
      doing?

A.    No.

Tr. 1/27/23 at 168-69 (ECF # 296).

### Jonathan Smith, Government Sharepoint Software Developer and Contracting Officer's Technical Representative (COTR), 2011-late 2016

Q.    And then finally, I'm directing your attention to the portion of
      Government's Exhibit 22(c)-2, which shows Ms. Kimmel's billings for the
      month of August 2016. How many days in the month -- how many of the
      workdays in August 2016 did she bill a full eight hours to the Ironbridge
      contract?

A.    It appears every working day.

Q.    For a total of 144 hours?

A.    Yes, sir.

Q.    **And based upon your dealings with her as the program manager on
      the Ironbridge contract, do you believe that time is accurately billed?**

A.    **No, I do not.**

Q.    Why not?

39

**A.**  She was not physically present anywhere close to that number of hours.

**Q.**  Okay. Let's talk about other than physically present. Would you often hear -- can you tell us how often you would hear from Ms. McComber by telephone?

**A.**  **Very rarely.**

**Q.**  Can you tell us how often you would hear from Ms. McComber by low-side email?

**A.**  **Very rarely.**

**Q.**  And can you tell us whether you could hear from Ms. McComber by high-side email if she wasn't either on-site at the NSA or in a SCIF back at InfoTeK itself?

**A.**  No, she could not have communicated on the high-side.

**Q.**  All right. Now showing you what's been marked as Government's Exhibit 22(c)-3. That is the people, time, details for the Ironbridge contract from the Unanet timekeeping system for InfoTeK for the month of September of 2016.

I direct your attention to Ms. McComber's billings in the month of [September] 2016. **How many of the workdays did she bill eight hours for?**

**A.**  **It appears all of the workdays.**

**Q.**  **Based on your dealings with her as the program manager on the Ironbridge contract, do you believe this is accurately billed?**

**A.**  **No, I do not.**

**Q.**  For the same reasons you previously stated?

**A.**  Yes, sir.

**Q.**  And then finally, we'll look at one last one. This takes us through October of 2016, that is Government's Exhibit 22(c)-4.

**In October 2016, Ms. McComber billed a total of 138 hours to the Ironbridge contract and billed eight hours every working day for which she billed except for one. Based on your contacts and dealings**

40

> **with her as the program manager on the Ironbridge contract at that period of time, do you believe this is accurately billed?**
>
> A.   **No, I do not.**

*Id.* at 20-23 (ECF # 298).

Government counsel then asked Mr. Smith to state his opinions of the work performed by the various ITK employees and subcontractors he had worked with on the Ironbridge contract other than the defendant.  Again and again, he stated that the work performed by each of them was "excellent"; that "They worked very closely together"; and that the overall working atmosphere in Section K3 of NSOC was a "collegial" and "collaborative" environment.  *Id.* at 23-28.  He further praised ITK's technical performance on the Ironbridge contract during the time he was there. *Id.* at 29-30.  He concluded his testimony on direct by stating the following with regard to the actual importance of "deliverables" and monthly status reports to the effective performance of the Ironbridge contract:

> Q.   Did Ms. McComber ever deliver specific reports or documents known as deliverables to you?
>
> A.   No. There was -- the only deliverable due was the monthly status report.
>
> Q.   Right. Now, do you recall if you ever instructed anyone at InfoTeK that the monthly status reports were no longer necessary?
>
> A.   No, I did not.
>
> Q.   You don't recall doing that?
>
> A.   No, I do not.
>
> Q.   How essential did you consider the monthly status reports to be, to your understanding what was going on?
>
> A.   **They were not important to me.** They were a required component the contracts [office] levied on the contract.

Q.    Okay. But not something that was actually material to the work you were
doing?

A.    That is correct. We had a ticket system that I maintained very close
knowledge on, and so I knew the status of anything that was going on
from -- already from the tickets.

Tr. 1/31/23 at 30-31 (ECF # 298).

### Tiffany Starr-Smith, Contracting Specialist and Later Contracting Officer, Ironbridge Contract, 2016-17

Ms. Starr Smith was actually called as a defense witness at trial because she had

prepared ITK's performance evaluation on the Ironbridge contract for the year 2016

(Defense Exhibit 8). On cross-examination by government counsel, however, Ms. Smith

shredded the defense's claims that there was significant PM work to do on the

Ironbridge contract, much less than it could be done from an off-site location:

Q.    **Ms. Smith, do you recall what you told Agent Hazenstab about
whether or not there was a meaningful amount of program manager
work to be done on the Ironbridge contract off-site?**

A.    **It's minimal.**

Q.    **And why was it minimal?**

A.    **Because -- well, really, I think, at this point, like, thinking back, this
contract in particular was all government site rates so there should
not be any work, like, done on, like, at the contractor's facility because
it's all government site.**

Q.    Was the contract technical in nature?

A.    Yes.

Q.    Would that technical work generally need to be done on the high side?

A.    Yes, it had to be done on the watch floor.

Q.    So if the contractor had no SCIF, could that technical work be done at the
contractor's offices?

42

A.    No.  Everything would have had to be done at the government site because the place of performance says government site.

Q.    What about administrative work for the PM. Was there much administrative work for the PM to do on this contract?

A.    No, because there was only, like, I think this contract only had, like, three TTOs. Where one that had a lot of work would have been something, like, 80 TTOs. This one only had three.

Q.    So would you character it as a small contract?

A.    Yes, very.

Q.    So if the contractor was performing those administrative tasks off-site, would there be much administrative work to be  done on the contract?

A.    No.

Q.    Okay. Why not?

A.    Because it wasn't administratively burdensome. It was more of a technical contract done at the facility on the watch floor.

Q.    So when you describe the amount of work to be done off-site as minimal, did that include the administrative work that could have possibly been done off-site?

A.    Yes.

Q.    How long did you have responsibility for this contract?

A.    Pretty long because I was actually a contracting specialist on this before I became the CO. I don't have, you know, obviously my contract file, so I don't remember the exact dates where, like, I was a CS and then transitioned to CO. But it was under -- I was on it for a while.

* * *

Q.    Now, with respect to the statements that Mr. Ahlers showed you about the invoices being timely and accurate, did there come a time where you learned how many hours the Defendant was billing to the Ironbridge contract?

A.    Yes. During the interview with Lori.

Q.     And what was your reaction to learning about how many hours she
       had been billing?

A.     I was surprised at the number of hours based -- that was different
       from the Confirm because she [Agent Hazenstab] gave me a side-by-
       side of the Confirm versus the hours billed for those days.

Q.     And what was the nature of your surprise? Like, why were you
       surprised?

A.     Because they were different.

Q.     Okay. And you mentioned before that there would be minimal work
       to be done off-site by the program manager on the Ironbridge
       contract?

A.     Yes, because it was administratively not burdensome of a contract.

Q.     So when you saw those hours, was it difficult for you to imagine how
       the Defendant could have possibly worked that number of hours off-
       site?

A.     Yes.

Tr. 2/6/23 at 166-72 (ECF # 301) (emphasis added).

In the face of this consistent and highly persuasive testimony from witnesses who
worked in the K3 section of NSOC on a daily basis during the defendant's term as the
designated Ironbridge PM in 2016-17 about what they directly saw and experienced, the
defense has no substantial or remotely persuasive countervailing testimonial and
documentary evidence that it can point to.  Instead, the defense can only frantically
mischaracterize these witness's testimony based upon their direct personal experience
and observations as "uninformed witness speculation."  ECF # 359 at 9.

Left with nothing else to offer, the defense then contends that all of this
testimony and the accompanying documentary evidence should be disregarded because
"the black-letter contract undisputably *required* InfoTeK to provide a *full-time
equivalent* program manager to provide all these tasks for the Ironbridge contract" –

44

was utterly eviscerated during Doyle's direct examination.  There, government counsel took him through the very contract provisions on which the defense relies.  Doyle's testimony established that the defendant did virtually none of these things, and that some of them were not actually required on an ongoing basis in any case:

> **Q.**  So I'm showing you, Mr. Doyle, Government Exhibit Number 48.  And a portion of the Ironbridge contract includes a description of the program manager's responsibilities as the PM on the contract. And this is just an excerpt of -- of that description. Take a moment to read it. The bullets below the description are simply the description itself broken out into subparts.
>
> So when you're ready, I'll just direct your attention to the first bullet point.
>
> **A.**  Okay. I'm ready.
>
> **Q.**  So it says, "The PM is responsible for overseeing the planning, execution, and performance of all activities associated with the contract."
>
> In your time as the technical lead on the contract in 2016, 2017, **was Ms. McComber handling and overseeing the execution and performance of all activities associated with the contract?**
>
> **A.**  **No.**
>
> **Q.**  Okay. And why not?
>
> **A.**  There would have been some -- some day-to-day things that -- that we were working on that she didn't oversee or plan.
>
> **Q.**  And did the fact that she was often missing from NSA facilities for an extended period of time affect her ability to oversee the execution and performance of all activities associated with the contract?
>
> **A.**  **Yeah, I would think so.**
>
> **Q.**  And what -- why is that?
>
> **A.**  **Because you had to be there to see what's going on and see that -- the work that needs to be done is getting done.**
>
> **Q.**  And what about planning? **Was there some extensive planning that you're aware of related to the Ironbridge contract in 2016, 2017?**

45

A.     **No.** I think most of the contract was already laid out and planned and we already knew what we were responsible for.

Q.     In the second bullet, "He/she will serve as the primary representative with the government regarding the status of the program, program deliverables, and any contractual matters."

You mentioned earlier you're not sure about who was handling the contractual matters; is that right?

A.     Right.

Q.     Okay. And as -- what about the primary representative?

**Who was interacting directly with the government on a daily basis while you were the technical lead on the Ironbridge contract?**

A.     **On a daily basis, I would have been interacting with them.**

Q.     That would have been you.

And these stand ups that you mentioned before, was that the primary method of keeping the government employees aware of the status of the program?

A.     The stand up was -- was, most of the time, just the contract -- the contractors would do the stand up. **We had ticket meetings, and the government lead or government individuals would be in those meetings with us, and that's when they would get their information on the ticket statuses.**

Q.     And were those on-site meetings?

A.     **On-site, yeah.**

Q.     What about program deliverables? Were you providing program deliverables to the government?

A.     No. I think they were already set out in the -- in the contract, in the program, itself.

Q.     Okay. Do you know who was providing deliverables to the government?

A.     I don't know.

Q.   Now, responsible for hiring and staffing personnel for the program to ensure mission requirements are met. You mentioned before you were involved in some of that, is that right?

A.   Yeah. I would be involved in some of the interviewing.

Q.   And the Defendant was involved in some of that?

A.   Yeah.

Q.   But throughout that period, **was there ever a time when the hiring needs of the contract took up a substantial portion of your time?**

A.   **No.**

Q.   And then it says, "Serves as the primary interface to other subcontracting companies performing in the task."

     How many subcontractors were there in your time as the technical lead on the Ironbridge contract?

A.   There was -- there was one subcontract company and there were -- I'm sorry, there were two subcontract companies with three people.

Q.   And **were those three individuals coming to you for tasking?**

A.   **Yeah.**

Q.   **And would you interact with those subcontractors on a daily basis?**

A.   **Yeah.**

Q.   The second-to-last bullet point, "Resolves work discrepancies and ensures compliance with contract requirements."

     Again, you're not sure about this contract requirements side of things; is that right?

A.   Right.

Q.   Okay. What about resolving work discrepancies? Were there many discrepancies that needed to be resolved while you were on-site at NSA?

A.   I mean, **if there was a work discrepancy, the government would -- would come and talk to the team.**

47

Q.     **Okay.**

A.     **And we'd try to work out what the discrepancy was.**

Q.     **As far as you're aware, was Ms. McComber, you know, regularly or often resolving work discrepancies for the Ironbridge contract?**

A.     **Not regularly or often, no.**

Q.     And then, "Primary responsibility for financial, budget management." Were you involved in managing the budget or finances for the Ironbridge contract?

A.     No.

Q.     Do you know who at InfoTeK Corporation was handling that for the Ironbridge contract?

A.     Yeah, I'm not sure.

Tr. 1/30/23 at 122-26 (ECF # 297).  However, Donald Pugh, the NSA's Administrative COR or Contract Manager for the Ironbridge contract between roughly 2015-17 testified that Craig Plunkett was "the finance guy" for ITK and the person he would deal with if there were any questions about ITK's monthly Ironbridge invoices or the Federal Man Hours Employment Reports (FMHERS) it was required to submit as well.  Tr. 2/1/23 (ECF # 299) at 20-21, 37-39.  Similarly, Kristin Mair, who was Pugh's supervisor, and who later temporarily took over responsibility for the Ironbridge contract after he retired, testified that she, too, consistently dealt with Craig Plunkett on administrative matters relating to Ironbridge:

Q.     Okay. And so prior to taking responsibility as the COR on the contract, did you have an understanding of who the program manager was on the Ironbridge contract from InfoTeK Corporation?

A.     I knew who -- I knew **it was Jacky as the name, yes.**

Q.     Okay. Was there anybody else from InfoTeK Corporation that you had interacted with prior to taking responsibility for the contract?

48

**A.**      I mainly talked to -- if it's anyone from InfoTeK as a program manager type, it would be Craig Plunkett is one of the people that I really communicated with.

**Q.**      So you said as a program manager type you would communicate with Craig Plunkett. Can you just explain what you meant by that?

**A.**      Craig -- so basically, as a contract manager, there's a COR, contracting officer representative, and then there's the administrative portion, which I was and Don Pugh was, and then there was the technical portion.  So there's a COR-A and then the COR-T.

So the COR-T were basically in NSOC and managing the technical aspect of it. I don't have a technical knowledge or background, so I'm the administrative portion. So basically I helped -- the administrative portion, we really talk to the program managers just to make sure, hey, are the deliverables being met, is mission happy.  All that stuff.  The administrative, like, hey, can you give me your -- the FMHERs or the invoices or what's going on.  Administrative actions, basically.

So that was what I did. And when I mainly talked to Craig -- so as the administrative person, we mainly, talked to, like, the program manager. So even when I managed other contracts, I talked to other program managers of that contract.

So the main person that I did talk to when I had Ironbridge was Craig Plunkett.

**Q.**      Okay. And why did you take responsibility as the administrative COR in 2017?

**A.**      That time is when Don retired.

Tr. 2/1/23 (ECF # 299) at 84-85.

In light of all of the evidence detailed above, the defense's further contention (ECF # 359 at 25-27) that the evidence was insufficient to provide an adequate basis for the jury to find that the defendant knowingly recorded her time as the PM on IRONBRIDGE falsely is simply absurd.  There is nothing complex or technical or particularly challenging about carefully tracking the number of hours actually worked on a matter and then entering those hours accurately.  As discussed above, extensive

49

documentary evidence presented by the government at trial demonstrated that the defendant routinely billed exactly 8.0 hours to her PM duties on the Ironbridge contract virtually every day. And yet the defense has been unable to point to the testimony of a single witness who testified that they considered it reasonable, based upon their observations of, or contacts and communications with her, to believe that the defendant actually worked anything approaching the number of hours she billed. The trial record is instead completely to the contrary.

As for the defendant's attack (ECF # 359 at 12-24) upon the government's investigative spreadsheet, it is merely empty argument pretending to be meaningful analysis. The defense's claim that "The record shows that there was ample time for Ms. McComber to work the hours billed" (ECF # 359 at 15-21) is entirely frivolous. To begin with, as the Big Law associates who presumably drafted much of this brief certainly know, honestly billing a solid eight hours of work in the course of a day is demanding, and requires discipline and concentration. In any professional or business environment, work of that volume also typically generates substantial written work product in forms ranging from emails to far more substantial written memoranda or presentations. Yet the defense here blithely acknowledges (ECF # 359 at 11-12) that the defendant's supposed 2,333 hours of billed off-site time as PM on the Ironbridge contract generated no meaningful written or physical work product whatsoever.

Finally, the handful of flyspecking attacks the defense launches against the Government's investigative spreadsheet (ECF # 359 at 13-15) largely just reprise criticisms offered by prior defense counsel at trial, and that were heard, considered, and rejected by the jury. The Court by this point has had the benefit of listening to hours of direct testimony and cross-examinations of Agents Hazenstab and Benderoth at trial,

plus additional testimony at the sentencing hearing. The Court has also seen the voluminous additional supporting documentation that was used in assembling the spreadsheet introduced into evidence at trial as well. We submit that by this point, it is clear that there is no basis for discarding a single one, much less all, of the defendant's false claims convictions based on the scattered handful of complaints new defense counsel has mustered over three pages of their brief. To the extent that the defense's attacks might be deemed to be of some relevance to establishing the amount of the loss, we will be glad to address them in our forthcoming sentencing memoranda.

## II.   THE EVIDENCE PRESENTED AT TRIAL WAS LIKEWISE MORE THAN SUFFICIENT TO SUPPORT THE DEFENDANT'S CONVICTION FOR MAKING FALSE STATEMENTS UNDER OATH IN COUNT 20

Count 20 charged the defendant with making two false statements under oath during her recorded interview with Agent Hazenstab and another NSA-OIG agent early in the investigation on October 3, 2017. As detailed in the indictment, in the warning form that was introduced into evidence as GX 20(a) at trial, and in the testimony of Agent Hazenstab, Tr. 1/24/23 at 149-155 (ECF # 293), Ms. McComber was expressly warned that:

> This is a voluntary interview. Accordingly, you do not have to answer questions. NSA will not take action against you solely for refusing to answer the Office of the Inspector General's questions in this matter. If you do decide to answer questions or make a statement, you may stop answering at any time. Any statement you furnish may be used as evidence in any future criminal or administrative proceeding, or both.

Next, before proceeding with the interview, the defendant signed an "Acknowledgement" on the "Warning And Assurances" form, which stated that:

> I understand the warning and assurances stated above and I am willing to make a statement and answer questions. No promises or threats have

51

been made to me and no pressure or coercion of any kind has been used against me.

Furthermore, at the very start of the interview, the defendant was advised on the record that the interview related to an allegation that she had charged the government for hours that she did not actually work.  She was further advised that the interview was being recorded.  The defendant acknowledged on the record that she had read and understood the "Warning and Assurances" form, and then was placed under oath and swore to tell the truth before the questioning about the mischarging allegation began.  The interview was recorded, and at trial the jury heard both the audio recording (GX 20(c)) and was able to follow along with a transcript of the session (GX 20(b)).

Count 20 alleged that during this interview, the defendant made two false statements.  First, that after stating that she filled out her timesheet every day, she then responded "No" to each of two questions asking her "At any time, did you ever falsely fill out that timesheet?" and "Put any false information on it?"  Second, after one of the investigators pointed out that she had almost invariably recorded working eight hours as the PM on the Ironbridge contract on almost every day that she had billed time to the contract, she testified "Yes, that is accurate, because I – I monitor my time throughout the day on what I'm doing for Ironbridge and what's against Ironbridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it."

Based upon all of the documentary evidence that was introduced by the government at trial, as well as the testimony the Court heard from the 25 witnesses who testified, we submit that just as the jury's verdict on the 19 False Claims Act counts are all supported by substantial evidence, the same applies to jury's conclusion that the

52

defendant knowing lied under oath when she claimed that she had never falsely filled out her timesheet and that, in fact, she carefully tracked her time every day and recorded it promptly. In particular, Dwayne Preston's testimony as a rebuttal witness, Tr. 2/9/23 at 36-65 (ECF # 304), together with GX 25(c), established beyond any reasonable doubt that the defendant typically did not enter her time on a daily basis, and frequently had to be repeatedly reminded by Preston to do so – to the point that sometimes, her dilatoriness threatened the company's ability to get its payroll checks out to its employees on time. And strikingly, after this extensive testimony was presented to the jury, her counsel Mr. Ahlers did not ask a single question directly challenging or questioning any of the testimony Mr. Preston had just given. Tr. 2/9/23 at 66-68. The defendant's motion seeking to have this Count set aside under Rule 29 is therefore equally groundless, and likewise should be denied.

## CONCLUSION

In conclusion, the above summary of the testimonial and documentary proof presented at trial demonstrates that the case presented by the government at trial was extremely strong, and that the arguments advanced by the defense are not even close to being sufficient to overturn the jury's guilty verdicts on every single one of the 19 criminal False Claims Act counts, nor on her conviction for making false statements under oath in Count 20. This is clearly not one of those cases "where the prosecution's failure is clear," *Burks*, 437 U.S. at 17, or where "the evidence that the defendant committed the crime alleged *is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.*" *Guadagna*, 183 F.3d at 130 (emphasis added).

The defendant's motion should therefore be denied its entirety.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
_____

Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov

*Counsel for the United States*


## EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 1 | The Government's Summary Investigative Spreadsheet (GX 21(a) |
| 2 | GX 24(c), showing the defendant relying on Jason Doyle to determine Ironbridge employees' vacation plans; GXs 24(e)(1)-(3), showing the defendant belatedly asking Jason Doyle to write up a status report in response to a query from NSA, and GX 24(h), the July 2017 Second Quarter Program Review PowerPoint Slides, reflecting minimal Program Management Activities over a 3 month period in which the defendant billed 460 hours to the Ironbridge contract |
| 3 | The Government's Trial Exhibit List at Trial |
| 4 | Summary Table Listing Particularly Important Government Exhibits |