**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **JACKY LYNN MCCOMBER,** | Case No. 1:21-cr-0036-ELH |
| Defendant. | |

## DEFENDANT'S REPLY IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 4

    I.      There Was Insufficient Evidence for the Jury to Find Ms. McComber
           Guilty on Nineteen Counts of Violating the False Claims Act (Counts 1
           through 19) ...................................................................................................... 4

           A.     The Government Did Not Carry Its Burden of Proving that Ms.
                   McComber Submitted Any Materially False Invoices with
                   Knowledge of their Falsity .................................................................. 4

           B.     The Government Did Not Carry Its Burden of Proving that Any of
                   the 19 Invoices Were Materially False Because Ms. McComber's
                   Hours Were Materially Inflated ........................................................... 6

                1.     The government did not prove that there was insufficient
                        program manager work for Ms. McComber to do off-site. ............ 6

                2.     The witness testimony the government relies on does not
                        support the verdict ........................................................................ 9

                  3.     The government does not defend the flaws and inaccuracies
                        in its unreliable spreadsheet. ...................................................... 15

    II.     There Was Insufficient Evidence for the Jury to Find Ms. McComber
           Guilty of Knowingly and Willfully Making a False Statement to the
           Government (Count 20) .................................................................................. 17

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Winship*,
   397 U.S. 358 (1970) ..................................................................................................4

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ..................................................................................................3

*United States ex rel. Schutte v. SuperValu, Inc.*,
   143 S. Ct. 1391 (2023) ...........................................................................................1, 5

*United States. v. Bolden*,
   325 F.3d 471 (4th Cir. 2003) ..................................................................................5, 6

*United States v. Elfenbein*,
   Criminal No. JKB-22-0146, 2023 WL 8829261 (D. Md. Dec. 21, 2023) ........................3, 4, 8

*United States v. Harra*,
   985 F.3d 196 (3d Cir. 2021)......................................................................................8

*United States v. Peterson*,
   223 F. 3d 756 (8th Cir. 2000) ..................................................................................6

## **INTRODUCTION**

The government's case at trial was plagued by significant flaws and gaps in the evidence. No rational juror could infer from the trial evidence that Ms. McComber knew that any of the 19 invoices at issue were false, that any invoice was in fact materially false, or that Ms. McComber knowingly and willfully made false statements to government investigators. The government's opposition does not (and cannot) explain away these deficiencies. Instead, the government's lengthy opposition largely consists of recitations of the legal standards and multi-paragraph excerpts of witness testimony (and even government counsel's opening statement). But none of this cures the core evidentiary insufficiencies that Ms. McComber has identified.

First, on the critical element of knowledge, the government is all but silent. It summarily contends that no trial witnesses "considered it reasonable … to believe that the defendant actually worked anything approaching the number of hours she billed." ECF No. 390 ("Opp.") at 49–50. But that is no answer at all. As the Supreme Court recently reaffirmed in *United States ex rel. Schutte v. SuperValu, Inc.*, 143 S. Ct. 1391 (2023), knowledge of falsity is a ***subjective*** standard that focuses on the defendant's own subjective knowledge and beliefs. *See* ECF No. 359 ("Mot.") at 26–27.

Here, there was ***no*** evidence that Ms. McComber subjectively believed she was billing her time falsely. And even if Ms. McComber was mistaken about the way she was supposed to record her time and/or which of her activities were billable to Ironbridge, that would not be sufficient to prove knowledge under *Schutte*. As described below, the government's evidence was not sufficient to prove that Ms. McComber failed to work the hours billed. And, despite eliciting testimony from non-expert witnesses about what work they thought ***could*** be performed off-site by a program manager, the government failed to establish what work Ms. McComber ***believed*** was permissible to perform off-site. The only rational inference from the evidence was that Ms.

McComber believed she was billing her time properly, just like her predecessor Raynett Colston—who, like Ms. McComber, openly worked off-site, billed nearly equivalent hours for that work, and offered unrebutted testimony that she did not pad her hours.  *See* Day 7 Trial Tr. 116:9–13 (R. Colston).   The government's refusal to respond to or engage with the lack of evidence of knowledge says it all, and this failure of proof alone warrants a judgment of acquittal.

Second, the government's evidence was insufficient as to material falsity.   The government's core argument is that Ms. McComber could not have worked anything close to the number of hours she billed during the 19 months at issue because there was little program manager work that could be done off-site.   But the government relied on witnesses who admitted they had little or no understanding of what the program manager did, and/or were responsible for ***technical*** intricacies of the Ironbridge contract that were outside of Ms. McComber's responsibilities, which included staffing, hiring, and financial and budget management.  *See* Gov. Ex. 30(a)(3) at 11.  The government also stubbornly ignores that NSA continued to ***require*** InfoTek to provide a full-time-equivalent program manager during the indictment period, despite years of the program manager working substantially off-site.   And, despite making its "investigative spreadsheet" (Opp. 20) the centerpiece of its case at trial, the government now relegates the spreadsheet to a few scattered references in its opposition and largely declines to respond to the significant flaws and inaccuracies that Ms. McComber's opening brief exposed.

Finally, the government falls short on Count 20, knowingly and willfully making a false statement to the government.  The government's opposition mostly stands on the evidence it cited in support of the False Claims Act counts, arguing that this evidence also showed "that the defendant knowing[ly] lied under oath when she claimed that she had never falsely filled out her timesheet."  Opp. 52–53.  Because the government failed to prove that the timesheets were

2

materially false, Count 20 thus fails for substantially the same reasons as Counts 1 through 19. The government's remaining theory—that Ms. McComber lied by saying that "she carefully tracked her time every day and recorded it promptly" (*id.* at 53)—misstates the record.  As Ms. McComber pointed out, and as the trial evidence unequivocally shows, Ms. McComber never claimed to ***enter*** her time every day; she simply said that she "monitor[ed] [her] time throughout the day" and kept track of which work was for Ironbridge and which was not.  *Id.* at 52.  Nothing in the record proves otherwise.  And even if the government had proved that Ms. McComber made any materially false statement, it certainly did not prove knowledge and willfulness.  The evidence showed that Ms. McComber cooperated with government investigators and even acknowledged that there were a handful of time entries with inaccuracies—certainly "not the actions of someone who willfully intended to violate the law."  Mot. 29–30.  The government does not respond.

Without substantial evidence supporting the verdict, the government urges the Court to nonetheless uphold Ms. McComber's convictions because they resulted from a 16-day trial with many witnesses and exhibits.  *See* Opp. 3.  But as Chief Judge Bredar recently recognized in granting a post-verdict Rule 29 motion, although the Court should "not take lightly the fact that a jury heard the evidence in this case and found [Ms. McComber] guilty," the Court's ability to "entertain a Rule 29 motion 'serves [ ] to highlight the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion.'"  *United States v. Elfenbein*, Criminal No. JKB-22-0146, 2023 WL 8829261, at *41 (D. Md. Dec. 21, 2023) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 n.10 (1979)).  This is one of those cases where the jury got it wrong.  Because the evidence is insufficient to support any of Ms. McComber's convictions, Ms. McComber is entitled to a judgment of acquittal on each of the False Claims Act counts as well as the false statement count.

## ARGUMENT

I. **There Was Insufficient Evidence for the Jury to Find Ms. McComber Guilty on Nineteen Counts of Violating the False Claims Act (Counts 1 through 19)**

The government's opposition confirms that there was insufficient evidence for the jury to find that Ms. McComber knew that any of the 19 invoices at issue were false, or that any of these invoices were in fact materially false.  The opposition relies on inapposite witness testimony, brushes over core categories of evidence—and gaps in the evidence—that Ms. McComber's opening brief discussed in detail, and all but ***ignores*** the critical element of knowledge, which the government was independently required to prove beyond a reasonable doubt.  The government's failure to carry its burden on either element—knowledge or material falsity—is sufficient to acquit Ms. McComber of the 19 False Claims Act counts.

### A. The Government Did Not Carry Its Burden of Proving that Ms. McComber Submitted Any Materially False Invoices with Knowledge of their Falsity

Ms. McComber's opening brief detailed why there was insufficient evidence for a reasonable jury to conclude that Ms. McComber ***knew*** any of the invoices were materially false.  This is an independent basis for acquittal, yet the government's opposition says next to nothing about the element of knowledge—it mostly just refers back to purported evidence of falsity.  *See* Opp. 49–50.  This argument repeats the same error the government made in *Elfenbein* because it "improperly collapses two of the … elements the Government was required to prove beyond a reasonable doubt"—knowledge and falsity.  2023 WL 8829261, at *26 (citing *In re Winship*, 397 U.S. 358, 364 (1970)).  "[T]he Government is required to prove beyond a reasonable doubt *each element* of the crime."  *Id.* (emphasis added).  The government has not done that here.

The government's sole argument on knowledge is that "[t]here is nothing complex or technical or particularly challenging about carefully tracking the number of hours actually worked on a matter and then entering those hours accurately," and it claims there was a lack of testimony

from witnesses "that they considered it reasonable, based upon their observations of, or contacts and communications with her, to believe that the defendant actually worked anything approaching the number of hours she billed." Opp. 49–50. This is not the standard for knowledge under the False Claims Act. As the Supreme Court has clarified, scienter focuses on the defendant's "knowledge and *subjective beliefs*—not to what an objectively reasonable person may have known or believed." *Schutte*, 143 S. Ct. at 1399 (emphasis added). The government does not dispute this (or even mention *Schutte*).

Nor does the government's opposition cure the fact that there was insufficient evidence from which a reasonable jury could conclude that Ms. McComber believed she was not billing her time properly. For example, the trial evidence showed "that Ms. McComber openly worked off-site a substantial portion of the time, that she never sought to conceal what she was doing or where she was, and that no one at InfoTek or the government gave her any reason to believe that her off-site time was not billable or that she had to be on-site most or all of the time to perform her role as program manager." Mot. 25–26. Further, the evidence showed that "month after month, the government paid invoices for full-time program manager work that was conducted substantially off-site, first by Ms. Colston and then by Ms. McComber," for a position that the government *required* to be full-time equivalent. *Id.* at 26. Even if Ms. McComber was mistaken about the way she was supposed to record her time and/or which of her activities were billable to Ironbridge, that would be insufficient to establish knowledge under *Schutte*. The government has no response.

In a similar vein, the government conspicuously neglects to respond to counter-examples provided by the defense where, unlike here, there *was* sufficient evidence of knowledge to convict the defendant for violating the False Claims Act. *See* Mot. 25–26. In *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003), the Fourth Circuit found sufficient evidence of knowledge where the

defendant instructed an employee "to go ahead and bill Medicaid" for patients who were no longer being treated at the defendant's nursing facility "because it was necessary 'to get money into the facility.'"  *Id.* at 494–95.  And in *United States v. Peterson*, 223 F. 3d 756 (8th Cir. 2000), the Eighth Circuit found sufficient evidence of knowledge where the defendants instructed their employees to overbill for X-rays even after some of the employees "questioned the propriety of this practice."  *Id.* at 760.  There is no evidence at all like that here, and it is telling that the government does not even acknowledge these cases, much less respond to them.  The government's failure to prove knowledge with respect to any of the 19 False Claims Act counts is an independent basis to acquit Ms. McComber on these counts.

**B.  The Government Did Not Carry Its Burden of Proving that Any of the 19 Invoices Were Materially False Because Ms. McComber's Hours Were Materially Inflated**

Separate and apart from knowledge, the government also failed to prove the threshold element of material falsity.  The government's opposition does not remedy this defect.

**1.  The government did not prove that there was insufficient program manager work for Ms. McComber to do off-site.**

The government insists that its case was not predicated on the amount of time Ms. McComber spent on-site versus off-site.  Instead, the government argues that "given the classified nature of the subject matter of the IRONBRIDGE contract, almost all of the work on it could only be done at the NSOC worksite at NSA, but that there were some administrative functions amounting at most to a limited number of hours that certain government employees believed could be done off-site."  Opp. 14.  Not so.  First, the witness testimony the government relies on does not support that assertion, as discussed below.  *See infra* at pp. 9–15.  And, even more fundamentally, the government does not explain how there was not enough off-site work to do when the evidence showed that Ms. McComber—and her predecessor—openly worked off-site

6

over the life of the Ironbridge contract, and that the government continued to **require** a full-time program manager throughout the indictment period.

The government's trial evidence established that both the contract itself and the technical task orders in place during the indictment period required InfoTek to provide a full-time-equivalent program manager, and that InfoTek was obligated to provide those hours.  *See* Mot. 9.   The government's only response is that it is not logical to infer that Ms. McComber "must have been working roughly full-time in 2016-17 in order to carry" out "the functions defined for the PM position by the contract back in the spring of 2011." Opp. 25.  The government misses the point:  As the defense pointed out, the evidence showed that the government made the decision to **continue** requiring a full-time-equivalent program manager during the indictment period in 2016 and 2017, and it "repeatedly signed off on contract modifications that continued or increased the number of hours required to be delivered by the program manager."  Mot. 8 (citing Day 6 Trial Tr. 78:11–81:4 (C. Guinther)).

The government's determination that the program manager warranted full-time hours is particularly relevant for a firm-fixed-price level-of-effort ("FFP-LOE") contract like Ironbridge, where "there is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort" and the contractor is "obligated to fulfill" the stipulated level of effort. Mot. 9 (quoting Day 1 Trial Tr. 177:18–21 (K. Sulewski), Day 6 Trial Tr. 22:7–17 (C. Guinther)). Ms. McComber put forth an expert witness on this topic, Charles Stein, whom the Court received as an expert on NSA contracting processes and procedures.  *See* Day 10 Trial Tr. 69:23–24 (C. Stein).   Mr. Stein worked for NSA for 34 years and testified that, based on his experience and knowledge of the Federal Acquisition Regulation, he would infer from the fact that the Ironbridge contract was an FFP-LOE contract "that the work cannot be done for less than the specified level

of effort."  Day 10 Trial Tr. 156:1–6 (C. Stein).  Meaning, the program manager job could not be done in less time than the requested 1880 hours a year.  Mr. Stein also testified that "if the government thinks the work can be done for less than that specified level of effort, they should not use that type of contract or they should specify a lower level of effort."  *Id.* at 156:10–13.  This testimony was unrebutted, and the government did not even offer any expert testimony to support its case. *Cf. United States v. Harra*, 985 F.3d 196, 216 (3d Cir. 2021) (noting that proving material falsity in False Claims Act case may require expert testimony); *Elfenbein*, 2023 WL 8829261, at *32 (holding that government failed to prove falsity where it did not provide an expert to testify about medical coding matters outside the knowledge of lay jurors).  As a result, no rational juror could infer that there was not enough work for Ms. McComber to bill full-time hours.

The government's opposition does not meaningfully engage with any of this evidence about the contract and the number of hours the government required InfoTek to provide.  Instead, it points to inapposite evidence like the fact that Ms. McComber "sometimes did not check or respond to messages she received on [her 'high-side'] accounts for extended periods."  Opp. 4.  This is not surprising or probative of falsity:  Ms. McComber was permitted to work off-site, it is undisputed that Ms. McComber could not access the high-side when she was off-site, and the unrefuted trial evidence showed that everyone could reach Ms. McComber on the low-side when they needed her.  *See, e.g.*, Day 3 Trial Tr. 155:10–13 (OIG Investigator Lori Hazenstab testifying that her investigation did not "find a single time that a government contracting officer's representative attempted to reach Ms. McComber and could not").

The government's opposition is also noteworthy for what it does ***not*** say.  The government does not even acknowledge the defense's arguments about Ms. McComber's predecessor, Raynett Colston.  Ms. McComber's opening brief pointed out that any speculation that there was not

enough work for Ms. McComber to bill full-time hours was soundly refuted by the trial evidence about Ms. Colston.  Ms. Colston did "exactly the same job that Jacky did."  Day 7 Trial Tr. 28:18 (J. Smith).  Her work habits were substantially similar:  Whereas Ms. McComber billed 257.14 on-site hours out of 2,603.5 total hours during the 19-month indictment period, Ms. Colston billed 2,525.5 hours during a 19-month period, 258.16 of which were on-site at NSA.  *See* Mot. 10 (citing Def. Ex. 45.1; Day 7 Trial Tr. 123:21–124:16 (R. Colston)).  And Ms. Colston testified that neither she nor anyone at InfoTek padded her hours.  Day 7 Trial Tr. at 116:9–13.  The government does not respond—it completely ignores Ms. Colston aside from a passing mention that Ms. Colston elected to spend some of her on-site time doing technical work (Opp. 35)—something that was not typical of a program manager.  *See* Day 5 Trial Tr. 42:10–13 (R. Bryant) (characterizing Ms. Colston's decision to do some technical work as an "anomaly").  The government's refusal to even acknowledge the parallels between Ms. McComber and Ms. Colston is telling.  A rational jury presented with this evidence could not reasonably infer that Ms. McComber was inflating her hours while Ms. Colston was not.

### 2.   The witness testimony the government relies on does not support the verdict.

The government's opposition largely depends on witness testimony that it claims shows there was not enough work for Ms. McComber to do and/or that she was not actually working.  But none of the testimony the government points to could rationally give rise to an inference of material falsity on any of the 19 counts.  Nor could the lengthy excerpts from the prosecution's opening statement that the government quotes in its brief.  Opp. 16–18.  Counsel's opening statement is, of course, "not evidence."  *See* Day 14 Trial Tr. 115:17–19 (jury instructions).

***Shilo Weir.***  The government leans heavily on testimony from InfoTek's former Chief Operations Officer, Shilo Weir, that Ms. Weir observed Ms. McComber spending little time on

Ironbridge program manager responsibilities when Ms. Weir shared an office with Ms. McComber in 2017, and that Ms. McComber spent less than a quarter of her time in InfoTek's offices.  *See* Opp. 19–24.  But Ms. Weir admitted that she "didn't have an understanding of what [Ms. McComber's] responsibilities would have been" as program manager.  Day 2 Trial Tr. 15:24– 16:11.  She thus had no basis of knowledge as to what Ms. McComber should or should not have been doing to support Ironbridge—indeed, she conceded that she never read the Ironbridge contract or statements of work.  *See id.* at 74:3–8, 75:2–12.  And Ms. Weir's assertion that Ms. McComber was not at InfoTek's offices a majority of the time further undermines the notion that Ms. Weir had any idea about how much of her time Ms. McComber was spending on Ironbridge.

The government also points to Ms. Weir's hearsay testimony that InfoTek's technical lead for Ironbridge, Jason Doyle, complained to her about Ms. McComber's performance.  *See* Opp. 19.  Mr. Doyle himself, however, never testified about any issues with Ms. McComber's performance—and even Ms. Weir admitted on the stand that she never heard "that Ms. McComber had failed to do any of the work the government asked her to do."  Day 2 Trial Tr. 75:13–15.  It is not rational to infer from this snippet of unsubstantiated hearsay about what Ms. Weir supposedly heard from Mr. Doyle that Ms. McComber was not performing adequately when the weight of the trial evidence shows the opposite.  *See, e.g.*, *id.*; Day 7 Trial Tr. 32:12–14 (Jonathan Smith testifying that Ms. McComber "did a good job"); Day 5 Trial Tr. 59:3–6 (Rob Bryant testifying that Ms. McComber would "bend over backwards for the mission").

***Jason Doyle.***  The government argues the jury was entitled to infer that Ms. McComber could not have worked the full extent of the hours billed because Mr. Doyle, the technical lead during the relevant period, testified that he was responsible for the daily tasking of the contractors on the team and for handling day-to-day interactions with the government.  *See* Opp. 26–31, 45–

48. Mr. Doyle testified that he did not regularly need to reach out to Ms. McComber with questions or concerns, and that the limited amount of time that Ms. McComber spent on-site did not negatively impact the contract's operations. *See id.* at 27–30. But none of this is surprising or at all inconsistent with the nature of Mr. Doyle's and Ms. McComber's respective roles as technical lead and program manager.

Mr. Doyle testified that when he was a web developer on Ironbridge—before he became technical lead—the former technical lead, Michael Kemp, was responsible for tasking the contractors with work. *See* Day 6 Trial Tr. 99:25–100:4 (J. Doyle). Mr. Kemp recalled the same, testifying that the program manager was never "giving [him] daily tasking or … running the day-to-day of what [his] team was doing." Day 5 Trial Tr. 168:15–169:7 (M. Kemp). This was, of course, ***before*** Ms. McComber's tenure as program manager, when Ms. Colston was still serving in that role. Mr. Doyle testified that the work of the program manager did not change when Ms. McComber took on that role following Ms. Colston's departure. *See* Day 6 Trial Tr. 112:16–25 (J. Doyle). And the technical lead's responsibility for day-to-day matters makes perfect sense, given the role of the technical lead vis-à-vis the program manager as described in the applicable statements of work for Ironbridge. Gov. Ex. 30(a)(3) at 11. The Senior Technical Project Leader labor category was responsible for "oversee[ing] all technical activities of the project," while the Senior Program Manager was responsible for higher-level management such as "hiring and staffing personnel for the program to ensure mission requirements are met," "financial/budget management," and "overseeing the planning, execution and performance of all activities associated with the contract." *Id.* The distinctions between these roles were confirmed by government witnesses at trial. For example, Regina Shirley—a software engineer at NSA (and another witness whose testimony the government relies on in its opposition)—testified that "there's a difference

between the technical manager who is responsible for the day-to-day nitty-gritty operations of what's going on" and the program manager, who is responsible for the planning and execution of the contract "[a]t a high level," "[n]ot the day-to-day running of it."  Day 5 Trial Tr. 143:18–144:1, 145:25–146:5 (R. Shirley).

All of this explains why Mr. Doyle was the one doing day-to-day tasking and holding twice-weekly "stand-ups" to check in with the contractors and ensure they were on task.  *See* Opp. 26.  It is not evidence from which the jury could reasonably infer that Ms. McComber did not have enough work to do or was not doing her job as program manager, with its distinct responsibilities. Indeed, the distinctions between the responsibilities of the technical lead and the program manager were particularly evident from Mr. Doyle's trial testimony that he was "unaware what the requirements of the [program manager] position were," and his lack of familiarity with many of the actual program manager tasks or who was performing them.  *See* Day 6 Trial Tr. 119:1–3, 137:4–139:21 (J. Doyle).  Mr. Doyle also testified that he had no evidence that Ms. McComber "did not prepare program deliverables" during the relevant period.  *Id.* at 148:17–19.  The rational inference is that Ms. McComber was fulfilling her duties as program manager, which the evidence showed were different from the duties Mr. Doyle was performing as the contract's technical lead.

***Jonathan Smith.***  The government's reliance on testimony by the Contracting Officer's Technical Representative, Jonathan Smith, is misplaced for similar reasons.  The government points to Mr. Smith's testimony that he thought Ms. McComber's hours were inflated because she was "not physically present" for the full number of hours billed, that he heard from Ms. McComber by phone or low-side email only rarely, and that the only deliverable was the monthly status report and it was not particularly important to him.  *See* Opp. 39–42.  But whether the monthly status report was "important to him" says nothing about whether it was done.  As the COR-T, Mr. Smith

was responsible for "managing the *technical aspect* of" the work, not the administrative side—that was handled by a separate Contracting Officer's Administrative Representative.  It would have been Donn Pugh (and after he retired, Kristin Mair), who interfaced with the program manager on administrative matters such as invoices, FMHERs, and whether the mission was "happy."  Day 8 Trial Tr. 85:3–11 (K. Mair) (emphasis added).  Mr. Smith would have had no reason to interface extensively with Ms. McComber; he would have been working closely with the technical lead, Mr. Doyle, on the technical aspects of the contract.

*Kristin Mair and Donn Pugh.*    The government cites testimony from Ms. Mair and her predecessor, Donn Pugh, that the main person they interfaced with at InfoTek about FMHERs and invoices was Craig Plunkett, InfoTek's "finance guy."  Opp. 48–49.  The fact that Mr. Plunkett was a point of contact, however, says little to nothing about how much time Ms. McComber was also spending on invoices and FMHERs (much less her other responsibilities as program manager).  Mr. Pugh's testimony made clear that there was a limit to what Mr. Plunkett could do with the FMHERs; if there was any "issue" with them, Mr. Pugh said he "need[ed] to talk to the program manager."  Day 8 Trial Tr. at 38:2–4 (D. Pugh).  Nor is it surprising that Ms. McComber coordinated with Mr. Plunkett on financial matters—although she had "[p]rimary responsibility for financial/budget management," nothing in the contract or statements of work assigned her *sole* responsibility for these matters.  *See* Gov. Ex. 30(a)(3) at 11.

*Rob Bryant.*    The government identifies K3 Section Chief Rob Bryant as another witness whose testimony "supported the government's contention that the defendant performed little actual work."  Opp. 31.  The government cites testimony that Mr. Bryant did not need much program manager support from the InfoTek side, did not need the number of hours Ms. McComber was billing, did not need to contact Ms. McComber after hours, and that all the work the contractors

13

were doing to support Ironbridge had to be done on-site. *See id.* at 32–37.  Similar to Mr. Doyle, however, Mr. Bryant's role was not one that would be expected to require much, if any, program manager support.  Mr. Bryant testified that on the contractor side, the program manager was "not managing the work – the Government work of K3," and that he did not even "know what a program manager exactly has to do."  Day 5 Trial Tr. 24:12–17, 25:8–14 (R. Bryant).  He also testified that Ms. McComber would come to "check on folks," which was what "[he] expect[ed] a PM to do" and was consistent with "what most folks that are program managers are [doing]."  *Id.* at 39:6–12, 42:10–13.  And he testified that Ms. McComber would "bend over backwards for the mission."  *Id.* at 59:3–6.  It is not rational to infer from any of this evidence that Ms. McComber was not doing her job.

  ***Regina Shirley.***  In support of its argument that there was little need for the extent of the program manager hours billed, the government cites Ms. Shirley's testimony that the Ironbridge contractors did not "require a lot of handholding" during the relevant period.  Opp. 38.  As discussed above, however, Ms. Shirley testified about the important distinctions between the technical lead and program manager positions.  *See supra* at pp. 11-12.  She also testified that she was "not really involved … with [Ms. McComber's] specific duties" and thus could not answer whether Ms. McComber was carrying out her program manager responsibilities.  *See* Day 5 Trial Tr. 147:5–10 (R. Shirley).  And her testimony **supports** an inference that staffing and turnover on the contract would have occupied a substantial portion of Ms. McComber's time.  Ms. Shirley testified that there were "several modifications to the contract" during the 2017 timeframe and that there were "people leaving and people coming."  *Id.* at 139:12–24.  She further testified that "find[ing] and vet[ting]" new personnel like SharePoint developers was "not a government duty"

but rather "would be the responsibility of the contracting company"—*i.e.*, Ms. McComber. *Id.* at 144:19–23.

    ***Tiffany Starr-Smith.***   The government points to testimony from Contracting Officer Tiffany Starr-Smith that in her view, there was "minimal" program manager work that could be done off-site because the work was technical and needed to be done on-site, and the rates were "all government site rates so there should not be any work, like, done on, like, at the contractor's facility because it's all government site."  Opp. 42–43.  But the rates are not probative of material falsity, given that: (1) it was undisputed that Ms. McComber was doing ***some*** work off-site even though there was not an off-site rate; and (2) billing for off-site work at an on-site rate was ***less expensive*** for the government.  *See* Day 6 Trial Tr. 56:1-5 (C. Guinther) ("Off-site rates are higher because they [the contractor] are providing the electricity, the office space, and et cetera for the -- for the contractor to work.  When the government -- when we're on the government site, we're paying for all of that.  So it's built into their rate to cover those costs.").

    **3.  The government does not defend the flaws and inaccuracies in its unreliable spreadsheet.**

    The government concedes that the percentage of time Ms. McComber spent on-site versus off-site was not "sufficient in and of itself to establish her guilt on the 19 false claim counts," and contends that this is why the government "needed to put in the painstaking work involved in assembling the investigative spreadsheet," which includes the underlying materials like Ms. McComber's calendars, expense reports, banking records, and emails and other documents reflecting her off-site activities.  Opp. 20.  The investigative spreadsheet was the centerpiece of the government's case at trial (something the government has reiterated in subsequent filings, including its initial sentencing memorandum, ECF No. 286 at 6).  And the government's opposition continues to assert that the fact that Ms. McComber was also doing other things "such

as attending charity golf tournaments," "vacationing," and "attending a high school reunion"—all purported activities documented in the investigative spreadsheet—is evidence of material falsity. Opp. 6.  It is perplexing, then, that the government declines to respond to any of the significant flaws and inaccuracies in the spreadsheet and underlying evidence that Ms. McComber's opening brief identified, choosing instead to punt all of these issues to sentencing and the Court's determination of loss.  *See id.* at 50–51.

Liability and sentencing are distinct inquiries, and the issues Ms. McComber has identified are fundamental to whether the government introduced sufficient evidence of material falsity on each of the 19 counts.  For example, the spreadsheet did not accurately reflect the number of hours that InfoTek billed to the government.  There are multiple instances where the purported evidence of falsity is denoted on the wrong date.  The underlying evidence that the government relied on to construct the spreadsheet—such as Ms. McComber's calendar entries and banking records—did not accurately reflect her activities.  The spreadsheet did not reflect the ample record evidence that Ms. McComber often worked even when she was supposed to be on vacation or during other personal time.  And it certainly did not show that there was insufficient time for Ms. McComber to work the full extent of the hours billed in light of her purported other activities.  *See* Mot. 13–24.

Ms. McComber's opening brief described these evidentiary insufficiencies in detail, but the government refuses to respond, aside from asserting that "the Big Law associates who presumably drafted much of [Ms. McComber's] brief certainly know [that] honestly billing a solid eight hours of work in the course of a day is demanding, and requires discipline and concentration." Opp. 50.  That's true, and as any diligent lawyer knows, billing eight hours or more each day often requires working late into the night or early in the morning, balancing other non-work and non-

16

billable commitments that arise during working hours, and working during planned vacation and personal time off—all things that the evidence shows Ms. McComber did as well.

## II.    There Was Insufficient Evidence for the Jury to Find Ms. McComber Guilty of Knowingly and Willfully Making a False Statement to the Government (Count 20)

Similar to the False Claims Act counts, the government's opposition barely even **mentions** the scienter element of Count 20, which required the government to prove not only that Ms. McComber made false statements "purposely and voluntarily," but also that she made them "with the intention to do something the law forbids, that is with a bad purpose to disobey the law."  Mot. 29 (quoting Day 14 Trial Tr. 160:7–12 (jury instructions)).  The defense pointed out the lack of evidence of intent to violate the law, and the evidence showing the opposite.  *See id.*  The government does not respond.

The government's failure to prove knowledge and willfulness entitles Ms. McComber to a judgment of acquittal on Count 20 at the outset.  But there was also insufficient evidence that Ms. McComber made any materially false statement, and the government's opposition does not show otherwise.  The government agrees that the analysis largely turns on whether there was sufficient evidence on material falsity on the False Claims Act counts (*see* Opp. 52–53), so Count 20 fails in light of the lack of sufficient evidence for the jury to conclude that any invoices were materially false.  *See supra* at pp. 6–16.  The government's only remaining argument is that Ms. McComber's statement about tracking her time each day and accurately recording it was false because Mr. Preston testified that she "typically did not enter her time on a daily basis, and frequently had to be repeatedly reminded by Preston to do so."  Opp. 53.  This repeats the same error the defense pointed out in its opening brief:  At no point did Ms. McComber tell the OIG Investigator "that she **entered** her time on her time card every day—just that she monitored it and that she filled out her time cards accurately."  Mot. 29 (emphasis in original).  The government's opposition does

not address this important distinction; it doubles down on the inapposite (and undisputed) assertion that Ms. McComber did not open and close her time card every day.  The government's failure to prove that Ms. McComber made any materially false statement warrants a judgment of acquittal on Count 20.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Ms. McComber respectfully requests that the Court enter a judgement of acquittal on each of the 20 counts Ms. McComber was convicted of in this case.

Dated: January 11, 2024

Respectfully submitted,

JAMES WYDA
Federal Public Defender

/s/ Andrew S. Tulumello
Andrew S. Tulumello (Bar No. 15494)
Claire L. Chapla (admitted *pro hac vice*)
Crystal L. Weeks (admitted *pro hac vice*)
Alli G. Katzen (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Fax: (202) 857-0940
Drew.tulumello@weil.com
Claire.chapla@weil.com
Crystal.weeks@weil.com
Alli.Katzen@weil.com

/s/ Patricia L. Richman
Patricia L. Richman (Bar No. 803572)
(*signed by Andrew S. Tulumello with permission of Patricia L. Richman*)
ASSISTANT FEDERAL PUBLIC DEFENDER
6411 Ivy Lane
Suite 710
Greenbelt, MD 20770
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: patricia_richman@fd.org