```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3     UNITED STATES OF AMERICA,)
            Plaintiff ,        )
 4                             )
            vs.                )   CASE NUMBER: ELH 21-cr-036
 5                             )
       JACKY LYNN McCOMBER,     )
 6          Defendant.         )
       _____)
 7

           TRANSCRIPT OF PROCEEDINGS - DISCOVERY CONFERENCE
 8        BEFORE THE HONORABLE ELLEN L. HOLLANDER, SENIOR JUDGE
                    Tuesday, January 30, 2024
 9                      Baltimore, Maryland

10                    A P P E A R A N C E S

11     FOR THE PLAINTIFF:
            BY: JEFFERSON M. GRAY, ESQUIRE
12              OFFICE OF THE UNITED STATES ATTORNEY
                36 S. Charles Street, 4th Floor
13              Baltimore, Maryland  21201

14     FOR THE DEFENDANT:
            BY: CRYSTAL L. WEEKS, ESQUIRE
15              Weil Gotshal & Manges LLP
                2001 M Street NW, Suite 600
16              Washington, DC  20036

17
            BY: PATRICIA RICHMAN, ESQUIRE
18              Office of the Federal Public Defender
                100 S. Charles Street, Tower II, Suite 900
19              Baltimore, Maryland  21201

20          BY: ALLI G. KATZEN, ESQUIRE (Present via telephone)
                Weil Gotshal & Manges LLP
21              2020 N. Bayshore Drive, 701
                Miami, Florida 33137
22
       Also Present:
23     Agent Nathaniel Brown, DCIS
       Jim Pyne, Esquire, NSA OGC
24     Holly Peacy, Investigative Agent, NSA OIG
       _____
25          ***Proceedings Recorded by Mechanical Stenography***
             Transcript Produced by Computer-Aided Transcription
```

```
1                        P R O C E E D I N G S
2      (10:04 a.m.)
3              THE COURT:  We are here this morning in the matter
4      of United States of America v. Jacky Lynn McComber. That is
5      Criminal Case Number 21-036, obviously ELH. The matter has
6      been set in this morning for discussion of a proposed order
7      relating to further discovery demands by the defense on the
8      National Security Agency in this case.
9              THE COURT:  Request, you could characterize it that
10     way.
11             MR. GRAY:  I don't really interpret them as
12     requests, but if Your Honor wants to put it in those terms I
13     think that would be the way to view it, actually.
14         My name is Jefferson M. Gray, Assistant United States
15     Attorney here on behalf of the United States. With me at
16     Government counsel table is DCIS Investigating Agent Nathaniel
17     Brown.
18         Also with us in the courtroom this morning are left to
19     right, Andrew Snowden who is senior counsel to the Inspector
20     General of the National Security Agency; Holly Peacy who Your
21     Honor has previously encountered on the telephone who is an
22     investigative agent with the National Security Agency Office
23     of the Inspector General; Julie Davis who is also an agent
24     with the National Security Agency Office of Inspector General
25     who has been working on dealing with these requests more
```

1    recently and then finally, Jim Keefe who is the chief of the

2    information security and classification section of the

3    National Security Agency.  And then finally, of course, James

4    Pyne who is an attorney with the National Security Agency

5    Office of General Counsel.

6         **THE COURT:**  Thank you very much. Thank you all for

7    coming.  And I'll just say before I call on the defense to

8    introduce themselves for the record, this speaks to the effort

9    I have said all along that I thought NSA has made. This is

10   unrelated to just recent requests, but the ones even before

11   the trial got underway.

12        But now I've made these requests and I'll say demands for

13   some help if you will from NSA where it can be accomplished so

14   that a) I can understand what the issues are and b) if there

15   are any rulings that are required on the part -- requiring NSA

16   to produce information, that we can make sure we understand

17   how it can be accomplished as expeditiously as possible and

18   that we all work together towards that goal because this case

19   has to come to an end.

20        Counsel.

21        **MS. WEEKS:**  Good morning, Your Honor.  Crystal Weeks

22   of Weil Gotshal on behalf of defendant, Jacky McComber, who is

23   present in the courtroom. Also at counsel table is Patricia

24   Richman of the Federal Public Defender's Office and we are

25   joined on the phone by Alli Katzen of Weil Gotshal as well,

1    Your Honor.

2         **THE COURT:**  All right, thank you all.  You may have

3    a seat.

4         We had scheduled this continuation of a status conference

5    or discovery conference when we were in session on this matter

6    on the MJOA argument last week and we turned to discovery

7    issues.  And I thought it would be fruitful if we convened in

8    open court rather than by telephone and could be joined by

9    representatives of NSA because there are some very pressing

10   issues, some of which pertain to exactly what has already been

11   produced, what was possibly ready to be produced, but

12   ultimately for whatever reason not necessarily produced, if

13   that is the case, because the trial got underway approximately

14   one year ago and ongoing issues and requests of the defense.

15        I thought I would begin by just reviewing at least

16   preliminarily what frames or what will frame today's

17   discussion.  I'm going to start with ECF 401 which was a

18   letter from Ms. Richman dated January 4th of 2024 outlining

19   categories of requests on the part of the defense. And it's

20   been my understanding all along that the reason these document

21   requests have been made is that the defense argues they are

22   pertinent to the issue of the amount of loss and, of course,

23   the amount of loss is central to the Government's claims, it's

24   pertinent to calculating guidelines.  And so the defense has

25   argued all along that if this material has not yet been

```
 1     produced, it's entitled to it and needs it. The burden is on

 2     the Government to prove loss, but they believe -- and I gather

 3     this is from communications between the parties, there were

 4     some earlier filings when sentencing was set for May of 2023,

 5     that's what at least I've understood as being the catalyst if

 6     you will, that the Government was making claims regarding loss

 7     and the defense disputed it claiming that Ms. McComber did

 8     more work off-site than the Government was giving her credit

 9     for.  And this is very much as I've understood it, an effort

10     on the part of the defense, the burden -- this isn't burden

11     shifting, but the defense has the right to challenge the

12     Government's contention and in its effort to do so seeks to

13     establish -- this is my understanding -- that she worked more

14     off-site than the Government has given her credit for in its

15     loss calculation. This is crucial because loss is a very large

16     part of the calculation of the advisory sentencing guideline

17     range.

18          So that's how this began, at least as I've understood it.

19     And ECF 401 speaks to categories of materials that the defense

20     believes would be relevant to its contention that, in fact,

21     Ms. McComber did do more work off-site than the Government has

22     given her credit for.

23          Then in preparation for today, first of all I had some

24     discussions at the conference last week about documenting by

25     formal order exactly what I was asking the Government to do.
```

1    There are transcripts. We've had a lot of status conferences,

2    but these submissions I'll just mention by ECF number, the

3    defense filed ECF 414 on January 26, that was Friday, I

4    believe, in anticipation of the conference noting that at our

5    hearing on January 23, 2024 I said we would address these

6    matters. The defense submitted a proposed order which it asks

7    the Court to enter to govern the search and production of

8    documents by NSA.  And the draft order was submitted with ECF

9    414. The Government responded yesterday at ECF 416 with its

10   disputes concerning the proposed order.

11       So those two documents I think are important for today as

12   well. And there are a number of transcripts that are also

13   worth noting because they include discussions of some of these

14   topics.

15       I'm going to go by ECF number. The interesting thing is

16   that the dates don't correspond, so they're not sequential

17   exactly. But they'll be sequential in ECF number. ECF 406 is

18   actually January 9, 2024's telephone conference. ECF 410 which

19   is after 406 obviously, concerns a conference on January 5, so

20   that preceded by date, but not by ECF number. And then ECF 415

21   is the hearing, as well as discussions on discovery addressed

22   on January 23, 2024. So I have those transcripts here if they

23   should become important.

24       Before we get too far, though, I did want to just remind

25   everybody about what the topic is for which these documents

1    have been requested. And that, again, concerns the amount of

2    loss.

3         Under §2B1.1(b) of the guidelines, it's the obligation of

4    the sentencing court to calculate the offense level for a

5    defendant convicted of a crime involving fraud or deceit on

6    the basis of the amount of loss resulting from the conduct.

7    That's not a quote, but that's a paraphrase. That's what the

8    guidelines say.  And as an example, I'll cite *U.S. v. Savage*,

9    885 F.3d 212 at 226 and that's a Fourth Circuit decision of

10   2018.  Cert was denied by the Supreme Court. There are

11   several, many cases actually that stand for that proposition.

12        Loss amount is the greater of actual loss or intended

13   loss. The amount of loss is a factual determination, but the

14   key -- and I think this is very important for what's at issue

15   -- several cases say the same thing.

16        A sentencing court need only make a reasonable estimate

17   of loss given the available information as supported by a

18   preponderance of the evidence, not proof beyond a reasonable

19   doubt.  But again, it's a fact-specific determination, but it

20   need only make a reasonable estimate. The *Savage* case says

21   that, the case of *United States v. Miller* says that, *Miller* at

22   316 F.3d at 503, also a Fourth Circuit decision.

23        And I think these are important principles because -- and

24   I commend and applaud the zeal with which the defense has

25   pursued these requests, but I'm worried that we have lost

1    sight of what's really at issue here. This is not the trial,

2    this is the sentencing phase. And the notion of the demands on

3    the Government to leave no stone unturned do not seem to me to

4    be necessarily within the framework that I just outlined.

5    Maybe I'm wrong, but that's what I discern from reading some

6    of these cases.

7         So I think we have to keep in mind as we go through this

8    today, what it is that is at issue because in this effort for

9    the defense to obtain these, the breadth and scope of the

10   documents it seems to want, I'm not 100 percent sure that this

11   is contemplated by what I've just outlined.

12        So we've already discussed the emails. There are issues

13   in the submissions about a notion that supposedly came,

14   according to the defense, from Ms. Peacy who disputes that she

15   said what the defense claims about what existed beforehand if

16   I got that right. It's one of the points you make, Mr. Gray.

17   There are a number of fact concerns about exactly what has

18   already been produced. And I've made clear this isn't a

19   do-over in terms of whatever it is Mr. Ahlers decided he

20   needed.  Now we have all these new search terms and new

21   people. And I'm just not sure how that fits with where we are

22   at this stage of the case.

23        So I'm going to give everybody their chance to be heard,

24   most especially we've imposed on NSA to bring all these people

25   here because if I decide that there is entitlement and I did

1    already certainly address some of the points, but perhaps not

2    with the proper foundation of knowledge. I need to hear from

3    NSA about what's reasonable, feasible, et cetera.

4        So there were as I said, a number of fact disputes from

5    your two letters. Who would like to go first?

6            **MS. WEEKS:**   Your Honor, the defense can go first.

7            **THE COURT:**   Okay.

8            **MS. WEEKS:**   Your Honor, just to start in terms of

9    the legal framework, we have been operating under that

10   foundation of knowledge on what's required and have been

11   operating from the premise that what the Government's original

12   sentencing submission stated in terms of loss was that Ms.

13   McComber was entitled to approximately 15 percent of the hours

14   she worked off-site which equates to 18 hours a month. So our

15   requests have been designed to determine whether NSA is still

16   in possession of documents that we, the defense, does not

17   have, that could rebut that reasonable assessment.  Whether

18   it's reasonable or not, that's the question that we are trying

19   to answer.  And we're operating from the understanding that

20   there were documents that were not turned over to the defense

21   before trial for the various reasons we've discussed at each

22   conference.

23       Your Honor ruled on January 9th that based on our ECF

24   401, the letter we proposed -- the request we proposed, that

25   we could narrow that down to 2C which was status reports

1   relating to the duties and responsibilities of the program

2   manager on the Ironbridge contract; 3, which was documents

3   relating to hiring and staffing for the Ironbridge contract.

4   We discussed that that can be very broad. And so Your Honor

5   asked us to work with the Government to come up with search

6   terms to really target that to documents that wouldn't have

7   been turned up by the prior searches that took place.

8        So Your Honor, I know Mr. Gray attached the spreadsheet

9   to his latest filing.  I think this was ECF -- one moment --

10  ECF 411-2 includes a spreadsheet with search terms and it's in

11  black and white so it's hard to tell. But if I could plug in

12  here and show Your Honor if you're able to see, all we've done

13  -- so this spreadsheet, Your Honor, is what Mr. Gray sent to

14  us after the January 9th hearing of the search terms that were

15  previously ran by NSA for the documents that Mr. Ahlers and

16  the Government had agreed to search for prior to trial. We

17  don't have any information on how these search terms came

18  about. Mr. Gray said he would reach out to Mr. Cooch to try to

19  get more information. We never heard back. We asked Mr. Gray

20  several times, you know, what the capabilities of the NSA's

21  search abilities were so we could narrow these down even more.

22  We didn't hear back so we sent him our proposed search terms

23  which are only those in red, Your Honor. There's only seven

24  additional terms. And our understanding and I'm grateful the

25  NSA is here today to answer questions. My understanding is

```
 1      that these documents that were previously collected are all
 2      sitting in a repository and that it's relatively easy to just
 3      run these search terms across those. We're only asking for
 4      those in red, Your Honor. So "interview" -- and there's a
 5      wildcard there, that's an explanation point.  But "interview"
 6      wasn't included before when they searched, "hir" and the
 7      wildcard is intended to get at "hire, hiring, hired, brief,
 8      badge, ECPRL" which relates to onboarding new candidates;
 9      "PMR" and then this specific --
10              THE COURT:  What, PMR?
11              MS. WEEKS:  "PMR" is for the program manager review
12      and then this DI number is a specific form for the status
13      report we've been discussing. It's separate from the status
14      report, the technical status report that Mr. Gray often points
15      to with Jason Doyle. This is a contract data requirement list
16      requirement for a weekly status report. Those are all.
17          And so you will see down here there are -- it's the same
18      one for each custodian and these are the same custodians, Your
19      Honor, that were previously agreed upon. We did add the same
20      search terms below for Megan Collins, Sherrill Guinther, and
21      Rob Bryant because for some reason those weren't previously
22      ran, those same search terms weren't previously ran for those
23      custodians.  And so we've asked that the same search terms
24      just be applied to those custodians.
25          But I think, Your Honor, we've tried to narrow this down
```

This is page 12 of 159.

1    to get exactly at what you've ordered without it being too

2    burdensome. And, you know, Mr. Gray, we've asked him several

3    times if we can discuss these search terms. The first

4    objection we heard was in his filing yesterday, Your Honor. He

5    never responded to the email with search terms trying to ask

6    us how we can narrow it down even further. We are trying to

7    work with him but, I mean, we can only do so much.

8         And then finally, Your Honor, on the fourth request in

9    ECF 401 that you ordered be searched for was internal

10   communications related to the program management review that

11   was held in July, 2017 and any other PMRs held during that

12   relevant time period.

13            THE COURT:  And any other what?

14            MS. WEEKS:  Any other PMRs that may have been held.

15   There is some indication in some of the documents there might

16   have been more than one of those program management reviews,

17   so we're asking them conduct a search --

18            THE COURT:  So here's what I want to ask you and I

19   should have said this perhaps earlier. Madam Clerk, can you

20   print 411?

21            THE CLERK: Sure.

22            THE COURT:  So in preparation for the hearing I

23   spent a fair amount of time trying to be sure that I

24   understood what the law requires and I'm just going to mention

25   for the record some of the cases I looked at so everybody is

1    on the same page.

2        One is U.S. -- let me pull these out. And I ask -- I want

3    to mention these because I think some of the discussions are

4    important. *U.S. v. Trevino*, 89 F.3d 187 Fourth Circuit 1996 --

5    and these are not in any special order. *U.S. v. Caro*, 597 F.3d

6    608 which is a 2010 decision of the Fourth Circuit; *U.S. v.*

7    *Anderson* 481 F.2d 685, a 1973 decision of the Fourth Circuit;

8    *U.S. v. Fernandez* 913 F.2d 148 which is 1990 decision of the

9    Fourth Circuit; a First Circuit decision from 2017, *U.S. v.*

10   *Goris*, G-o-r-i-s, 876 F.3d 40; *U.S. v. Mandel*, a Ninth Circuit

11   decision in 1990 at 914 F.2d 1215; an Eastern District of

12   California decision from 2009, *United States v. Jack* at 257

13   F.R.D. 221; *U.S. v. George* at 786 F.Supp 56, a Royce Lamberth

14   decision from 1992; *U.S. v. Indivior,* I-n-d-i-v-i-o-r Inc., at

15   2020 WL 616167, a 2020 decision from the Western District of

16   Virginia; and the standard *U.S. v. Nixon*, 418 U.S. 683 (1974);

17   and U.S. v. Maranzino, M-a-r-a-n-z-i-n-o 860 F.2d 981 from the

18   Tenth Circuit in 1988. This wasn't all I looked at, but these

19   are the ones I printed and brought out with me.

20       So the reason I wanted to pause and talk about these is

21   in reading through some of these cases, some in different

22   context, obviously a Rule 17 subpoena context is not entirely

23   pertinent, but it reminded me, Ms. Weeks, I wanted to ask are

24   we under Rule 16?  Are we under *Brady*?  What exactly is the

25   basis for the request legally?  And it matters because when

1    you just said words to the effect like we don't really know

2    what there is, that reminds me of starting with the *Nixon*

3    case, the fishing expedition is not what I'm supposed to

4    permit. So it needs to be focused. And now you have -- I'm not

5    saying that it's not focused, but really it's speculation on

6    your part as to what there is which is why it reminds me of a

7    pretrial phase instead of a sentencing phase.

8        So I guess I need you to explain to me what's the legal

9    authority for where we are?  I understand that we're talking

10   about loss. I understand that. And I've tried to set that

11   stage, but now when you start talking about a search to find

12   what might be there and might not be there, and maybe there

13   are more -- we're not starting -- this will be important for

14   Mr. Gray to speak to, but it's not a blank slate. There has

15   already been discovery. I don't want to lose sight of that. So

16   now you want to go back and refine the search. And without any

17   knowledge of if some of these things exist or alternatively --

18   and some of the cases suggest this, some of these things if

19   they're not on the high side would be things that your client

20   could have. So it's sort of -- there's just a lot out there it

21   seems to me as I try to help guide where we're going and what

22   you really are entitled to.

23           **MS. WEEKS:**  Understood, Your Honor. And if I stated

24   that we weren't sure of what exists I might have misspoken. We

25   have reason to believe based on the contract requirements that

1    there were status reports that were required and there was

2    trial testimony by Jon Smith that he never asked the defendant

3    not to do those and that they always received them.  So we

4    don't have any of those.

5              **THE COURT:**  What is "those" that you're talking

6    about?

7              **MS. WEEKS:**  It's the -- I can show you the actual

8    status report that's required under the contract, Your Honor,

9    if I can get back in here.

10             **THE COURT:**  And are those high side or low side?

11             **MS. WEEKS:**  I don't know how to delete that.

12             **THE CLERK:** Ms. Weeks, at the bottom left of your

13   monitor you can tap that and it should clear that red mark. At

14   the bottom left.

15             **MS. WEEKS:**  Of this actual monitor or this one?

16             **THE CLERK:** That one, yup.

17             **MS. WEEKS:**  I can't for some reason, I can't clear

18   it here. I can't get it, but I don't think it's obscuring

19   anything important.

20        Your Honor, this is a requirement within the contract

21   data requirement list for the Ironbridge contract. And it's

22   got -- down here at the bottom I'll show you that it's a

23   document that was produced by the Government. It's marked USA

24   025736 and it was also produced -- yeah, that was produced by

25   the Government.

| | |
|---|---|
| 1 | **THE COURT:** And it's dated in 2010, right? |
| 2 | **MS. WEEKS:** Right. So this is from the solicitation |
| 3 | of the Ironbridge contract and it's part of the contract data |
| 4 | requirement list that lists the requirements. And it states -- |
| 5 | sorry, I just realized I'm showing the wrong requirement. |
| 6 | There were several requirements. Let me unplug for a second |
| 7 | and search, Your Honor. Apologies, Your Honor.  The actual |
| 8 | Bates number is USA 027536. That's the one I just said. And |
| 9 | this is for -- you'll see here "status report." It's actually |
| 10 | this requirement, A013 status report and it says "frequency |
| 11 | weekly." |
| 12 | **THE COURT:** Show me where. |
| 13 | **MR. GRAY:** My screen is not on. |
| 14 | **MS. WEEKS:** Okay. |
| 15 | **MR. GRAY:** Ms. Herndon? |
| 16 | **MS. WEEKS:** Sorry that I don't have a hardcopy of |
| 17 | this with me. |
| 18 | **THE COURT:** It says blocks 11, 12, 13 and 14, |
| 19 | um-hum. |
| 20 | **MS. WEEKS:** Would it be possible for me to use the |
| 21 | Elmo? |
| 22 | **THE CLERK:** Yeah. |
| 23 | **THE COURT:** And they're under item 2 which is status |
| 24 | report. |
| 25 | **MS. WEEKS:** Yes, Your Honor. |

```
 1              THE COURT:  Weekly.

 2              MS. WEEKS:  Yes.

 3              MR. GRAY:  I'm sorry, I can't see the date.  It's

 4      cut off at the bottom.

 5              MS. WEEKS:  The date of what?

 6              MR. GRAY:  This is a year before the contract

 7      started.

 8              MS. WEEKS:  This is from the proposal for the

 9      Ironbridge -- the request for proposal for the Ironbridge

10      contract, the requirements.

11              THE COURT:  Now just to be clear, this is the

12      proposal, but isn't it the contract that matters?

13              MS. WEEKS:  My understanding, Your Honor, is this

14      contract data requirement list is part of the contract.  This

15      is part of a bigger document.  I mean, we're happy to provide a

16      submission on it, but this is just -- I'm just using this to

17      show that we're not pulling this out of thin air and that

18      there was testimony that nobody asked Ms. McComber not to do

19      this weekly requirement, this status report.

20              THE COURT:  Well, there was testimony that six

21      months went by without a request for a status report and then

22      Jason Doyle was asked by the defendant to complete it and

23      that, in fact -- this is the testimony and I'm obviously not

24      quoting it, that the defendant turned to Mr. Doyle to complete

25      the technical aspects of this status report because -- and she
```

```
 1   noted that no one had asked for months.
 2              MS. WEEKS:  Yes, Your Honor. There are different
 3   types of status reports. If I learned anything from working
 4   for the Government it's that they love status reports.  And
 5   that one in particular was a technical status report that Mr.
 6   Doyle helped put together as the technical lead. This is a
 7   separate status report.
 8              THE COURT:  Well, are these classified?
 9              MS. WEEKS:  No, Your Honor.
10              THE COURT:  Then why is it that the Government has
11   to produce them?  Why wouldn't she have them herself?
12              MS. WEEKS:  She doesn't have them, Your Honor.
13              THE COURT:  Okay, but what's the answer to that?  I
14   mean, in other words she's just -- do these cases suggest that
15   if it's equally accessible to both sides that the Government
16   then has to undertake this search?  I mean, in other words,
17   this becomes complicated when they are classified, but it
18   seems like with all due respect and I don't understand the
19   operations of the agency, once it goes into the hands of the
20   agency it's treated either as for official use only or it is
21   classified.  And retrieving it is not a simple matter. And
22   maybe the answer is if she doesn't have it but they do, that's
23   enough. Because I think Rule 16 says -- if you're under Rule
24   16 -- you didn't answer that yet, but I think Rule 16 says the
25   item is within -- this would be (f) -- well, that's reports of
```

1    examination and test. But no, let me look at (e), documents

2    and objects. The item was obtained from or belongs to the

3    defendant. So I suppose you could be under iii, Romanette

4    three, 16 -- this would be (a)(e) Romanette Three.  If it's

5    *Brady* I don't know because I don't know that it would be

6    *Brady*.  But if you thought it was *Brady* then I think the

7    Government doesn't necessarily have an obligation to produce

8    what she would already know about. Rule 16 seems broader.

9         **MS. WEEKS:**  Yes, Your Honor. And we acknowledge that

10   there's mixed case law on this. I believe there's -- I can't

11   remember the case name, but a Judge Rakoff decision out of the

12   Southern District of New York where he found that Rule 16 does

13   extend to sentencing and requests after trial. We would submit

14   that it does. I don't think Rule 16 narrows it to the case in

15   chief at trial. It's anything that's material to the defense.

16        And just as we're arguing that *Brady* applies here too to

17   the sentencing phase, these requests that are designed to

18   attain documents that are relevant to the amount of loss as

19   Your Honor mentioned, it's significant here. They're asking --

20   the Government is seeking a 12-level enhancement for loss and

21   they've suggested that she should only be given credit for 18

22   hours a month off-site.

23        There are documents within the possession of NSA that I

24   saw myself last week when I reviewed them that show that she

25   was doing work off-site. And to the extent that they have not

1    been able to represent to us so far that they've turned over

2    everything they had related to that issue, we're just asking

3    for them to conduct a search, produce the documents, or

4    certify that they have none.  That's all we've requested all

5    along.

6         And if Your Honor disagrees we just need a ruling. And

7    you've ordered now twice that the Government conduct these

8    searches and Mr. Gray is now objecting to those orders that

9    you've already made. And like I stated, we're trying to narrow

10   this down as much as possible and we're happy to work

11   together. Everybody here wants swift resolution of this.

12            **THE COURT:**  So my concern though is we may not have

13   had the same understanding of exactly what was contemplated by

14   status reports. So that's one of the -- for example, when we

15   had the discussion I think January 9th, I was very clear that

16   my understanding of what would be relevant was different. Not

17   that you didn't accept the Court's ruling in this respect if

18   it was a ruling at all, but I wanted to draw a distinction

19   between work that was done that you were in my view attempting

20   to attribute to the defendant as captain of the ship versus

21   what she really personally did.  And I'm only allowing, if I

22   was allowing anything, anything that would pertain to what she

23   personally did.  And that's all I think that you would be

24   entitled to in the first place.

25         So my concern now though is that there isn't any actual

1    -- it's supposition or speculation, conjecture on your part

2    that there might be more, that you think there might be more

3    because they were supposed to do status reports. And my

4    concern was making sure I'm not asking the Government to redo

5    what it did already because some of this I would have thought

6    was captured in earlier productions. And the fact that you

7    don't have what you want doesn't mean there's more to produce.

8            MS. WEEKS:  Right.

9            THE COURT:  I mean, in other words, there's also

10   evidence that this many years into the contract, that date you

11   just showed me was 2010. The relevant time period is years

12   later, 2016 and 2017 almost towards the end of the contract

13   that the rules were not necessarily strictly applied. In fact,

14   that's what the testimony would support that at least whatever

15   kind of status report that was that the defendant asked Jason

16   Doyle to prepare, what kind of status report was that?

17           MS. WEEKS:  That was a technical status report, Your

18   Honor.

19           THE COURT:  And what kind of status reports are

20   these?

21           MS. WEEKS:  That's a program management status

22   report.

23           THE COURT:  Have you ever seen any program

24   management status reports?

25           MS. WEEKS:  Have I seen them?

```
 1              THE COURT:  I mean, yes. In other words --
 2              MS. WEEKS:  They've not been produced, Your Honor.
 3    And they were required under law in the contract to maintain
 4    those in the COR file. We don't have them. So that's why our
 5    search terms were narrowly tailored to include this specific
 6    form number to do one last effort to search for those
 7    documents that would talk about Ms. McComber's performance on
 8    the contract and what's she's done. Those are comprehensive
 9    reports about how the contract is performing, the hours
10    expended, the status of the work. And we suggested terms that
11    would not have been captured by the previous searches to try
12    to avoid the NSA who has been doing a lot of work in this case
13    and has done, we don't dispute that, to make it easier on
14    them. And Mr. Pyne suggested last hearing that it was
15    relatively easy to run the search terms.
16              THE COURT:  So let me ask you about under 2,
17    technical status reports for the Ironbridge contract. Why
18    would that have anything to do with the defendant?
19              MS. WEEKS:  Your Honor, you ordered only C, 2C.
20    You've already --
21              THE COURT:  Okay.
22              MS. WEEKS:  You've already denied our request for
23    those documents. We're focused on any other weekly or monthly
24    status report relating to the duties and responsibilities of
25    the program manager.
```

1    **THE COURT:**  Let's go over 401 then because that's

2    still when I say "all," all that you're seeking is what's in

3    this 401, right?

4    **MS. WEEKS:**  Yes, 401 2C is what we're talking about,

5    Your Honor.

6    **THE COURT:**  So are you satisfied with the email

7    production?

8    **MS. WEEKS:**  The email production is a separate

9    issue. The documents that Ms. Katzen and I identified we have

10   not yet received those. We're hoping to hear from NSA today on

11   the status of that production.

12   **THE COURT:**  Okay. And then performance evaluations,

13   number one. I just want to make sure everybody here hears the

14   same thing about what it is you're seeking.

15   **MS. WEEKS:**  Your Honor, on 401 our understanding

16   based on your ruling on January 9th is that the only searches

17   that you've ordered be performed are for 2C 3 and 4. I think

18   you had already said that we weren't entitled to number one.

19   Happy to revisit that if you changed your mind, but --

20   **THE COURT:**  No, because it was too broad. It was for

21   the Ironbridge contract.

22   **MS. WEEKS:**  Yes.  We've narrowed it down to 2C 3 and

23   4.

24   **THE COURT:**  Okay. So you made a claim -- let me pull

25   out 414. You made a claim in this proposed order that looking

1    at ECF 414-1, paragraph (b), that NSA is in possession of

2    documents that have been collected, reviewed, and redacted

3    before trial. You call this the previously redacted materials

4    but which were never produced to the defense. And then you

5    want me to order NSA to expeditiously produce them, separate

6    and apart from other materials. I'm not sure where you're

7    going with that. But that was what you said.

8         And that will be a topic I want Mr. Gray to address

9    because in his submission at 416 he, I think, was disputing

10   that the comment was ever made in the first place, if I have

11   the right one. I think that's the one.

12        Before I call on Mr. Gray, was there anything else you

13   want to tell me?

14             **MS. WEEKS:**  Yes, Your Honor.  With respect to that

15   issue in particular, as 414-1 states at sub-paragraph (b) that

16   you are reading from, "Defense counsel" -- would be me --

17   "relayed to you that during our visit to NSA we were informed

18   that NSA is in possession of a set of documents that had been

19   collected, reviewed, and redacted."

20        I never stated that those had been turned over to Mr.

21   Gray and not produced to us. It was simply our impression from

22   my conversation with Ms. Peacy that there may have been

23   documents in their possession that had been reviewed and

24   redacted and never produced. She said that in the context of

25   being able to determine whether any of the emails that Ms.

1    Katzen and I had identified on January 22nd might have been in
2    those documents and thus, easily produceable. That's simply
3    all that was stated on that and I look forward to hearing from
4    Ms. Peacy on the clarification of that and at what point Mr.
5    Gray learned of the existence of those documents if they
6    exist.
7         And in terms of keeping them segregated from other
8    documents, we do -- we would like to know what documents, if
9    any, were in the possession of the Government before trial
10   that were not produced to the defendant.
11        **THE COURT:**  And the reason you want to know that?
12        **MS. WEEKS:**  For protection of our client's
13   constitutional right to due process.
14        **THE COURT:**  Okay, thank you. Anything else?
15        **MS. WEEKS:**  No, Your Honor.
16        **THE COURT:**  Thank you, Ms. Weeks.
17        Mr. Gray.
18        **MR. GRAY:**  Yes, Your Honor.
19        **THE COURT:**  So just before you get started, just to
20   keep in mind I do want to know about the emails and where we
21   stand on that, among other things.
22        **MR. GRAY:**  Yes, Your Honor.  So we don't forget, let
23   me address that right offhand. To begin with, I just want to
24   briefly state the whole history of this issue.
25        **THE COURT:**  The what?  I'm sorry.

1          **MR. GRAY:**  The history of this issue.  As the Court

2     knows, we initially turned over what we thought was the

3     complete set of emails in August of 2021. That was about three

4     months after the arraignment. In the argument on the motion

5     for Bill of Particulars on December the 1st of 2021 I stated

6     here in this very court in the presence of Mr. Ahlers, that a

7     lot of the questions he was raising could be addressed by

8     looking at that email production. There's no evidence that Mr.

9     -- apparently, that Mr. Ahlers and his client like took the

10    emails at all seriously until we discovered during the motion

11    hearings in the summer of 2022 that there was a problem with

12    the production and that the production was not fully complete

13    because of a technical problem. Up until that point --

14         **THE COURT:**  Could you just elaborate?  Wasn't

15    complete because of a technical problem meaning the flash

16    drive, for example, was defective or because you didn't give

17    them everything you really had?

18         **MR. GRAY:**  The production as it was generated seemed

19    to involve as I understand it, I was not involved in the email

20    side of things, I had more than enough to do as the Court

21    knows with dealing with Mr. Ahlers' various motions and briefs

22    and I think it was six days of motion hearings in the summer

23    of 2022 during which this came up. But as I understand it, it

24    was something that caused the production to include only the

25    first several days of each month and the last several days of

each month.

But what that means is if the defense had looked at them, they would have identified the issue very quickly and gotten back to us.  And they never actually identified the issue. It was we who in the course of looking at that production again during the motion hearings discovered the problem and raised it with the Court.

So then in the late fall of 2022, as part of trying to deal with that issue before trial, we said -- we said to Mr. Ahlers and to his client, "Why don't you come out, review all the emails yourselves on our computers and then we'll get those produced before the trial date. We'll certainly try to get them produced before the trial date."

Well, the first thing that happened is Mr. Ahlers declined to accompany his client to go out there. As Mr. Pyne explained to me at the time, part of the reason why they had made special arrangements to try to have Mr. Ahlers come out there with Ms. McComber is because they thought he might exercise a restraining influence on her and that she would not just make a blanket demand for the emails which the NSA would be incapable of dealing with. But Mr. Ahlers decided he didn't want to go out there and look at the emails.

The defense keeps talking about "We have reason to believe." Well, I think in light of the fact that Mr. Ahlers didn't think it was worth his time to go out there and look at

1    those emails for a couple of days, we have reason to believe

2    that he already suspected it would be a waste of his time.

3         So on December the 7th and December the 9, 2022 we did

4    allow Ms. McComber to go out there and review the emails. And

5    Your Honor I think knows what resulted from that, exactly in

6    connection and -- exactly consistent with what Mr. Pyne had

7    feared, she requested production of 1,315 emails.  And I still

8    need to get to you, to the Court and also to defense counsel

9    since they -- I'm not sure if they saw it when they were out

10   there or not, I would think they did, her list of what she

11   wanted.  Because when you go down to it, especially for the

12   final months that she was program manager, almost none of it

13   is emails that were specifically directed to her. Many of them

14   were NSA all emails or National Security Operation Center all

15   emails. That means going out to everyone in the NSA or

16   everybody in NSOC, not anything that was specifically focused

17   on her.

18             **THE COURT:**  When are you going to get that to them?

19             **MR. GRAY:**  Huh?

20             **THE COURT:**  When are you getting that list to them?

21             **MR. GRAY:** I can get that -- well, for one thing I'm

22   pretty sure actually that Ms. Derrow saw it when she was out

23   there in December. And I'm not sure, I think I got it some

24   time in January. And I'll be glad to get that over to them.

25   It's not small. It's like 60 or 70 pages because it lists

1    1,315 emails. It goes on for pages, many, many pages.

2         So after Ms. McComber was out there and demanded these

3    1,315 emails, what happened a month later?  She decided to

4    waive production of those, any further production beyond what

5    the Government already had in progress. And Mr. Ahlers signed

6    off on that.

7         And a huge problem in this case, Your Honor has accepted,

8    I'm sorry to say I think far too readily, the defense's claim

9    that oh, well this is now, this is now sentencing so we can

10   renew and advance different discovery demands and we can

11   completely ignore our client's and her then counsel's knowing,

12   counseled, fully aware, very solemn waiver of further

13   discovery productions that took place prior to the trial.

14        And as I was sitting here over the weekend just

15   contemplating where we stand in this case, I mean, it struck

16   me that that is one of the most troubling things about how we

17   happened to be here. Because the defense just blithely says,

18   "We're not bound by that prior waiver. Our client is not bound

19   by her own knowledgeable, counseled, prior waiver."

20        And so I ran a search.  I turned up one case from the

21   Northern District of Georgia called *United States v. Lawrence*,

22   2019 Westlaw 3006620.

23             **THE COURT:**  What's that, 29 Westlaw what?

24             **MR. GRAY:**  2019 Westlaw 3006620. And it says the

25   following: This case had dealt with the legality of a search

1  and it says, "The defendant has abandoned" -- it says, "It is

2  evident from the filings, defendant's counsel" this is just

3  the counsel, the defense lawyer -- "considered challenging the

4  legality of the stop but ultimately elected not to do so. In

5  his reply brief filed after the evidentiary hearing, defendant

6  did not challenge either 1) the Government's contention that

7  the defendant had abandoned any challenge to the search; or

8  2), the Government's argued that based on the evidence

9  presented at the hearing the search was constitutionally

10 valid. The defendant has abandoned his right to challenge the

11 legality of the search. See *New York v. Hill* 528 U.S. 110, 114

12 to 115, holding that the defendant is bound by the acts and

13 decisions of his counsel except those relating to certain

14 fundamental rights. Followed by *Hill versus Jones* an Eleventh

15 Circuit decision --

16         **THE COURT:**  You don't have to go on because I don't

17 think you're telling me anything anyone here doesn't already

18 know. That's not a novel proposition. There's cases that say

19 things like that.  I disagree with you to this extent, I don't

20 think the waiver, if any, the abandonment, if any, extended

21 beyond issues pertinent to the trial and what defense counsel

22 contends. And I think this is -- this part I agree with them

23 about. We're in a new ball game. This is the sentencing. An

24 issue at sentencing, a central issue is the amount of the

25 loss.  And what they're claiming, now I don't know that I

```
 1   agree with them on their entitlement to everything they're
 2   claiming, but the foundation of their claim is this:  To the
 3   extent there even was a waiver, it did not extend to a new
 4   issue at the sentencing phase concerning the amount of the
 5   loss. So I just don't think that -- there was nothing before
 6   me that said if the decision was made to go to trial with what
 7   they had and I believe that decision was made, that that
 8   foreclosed a later right to seek information pertinent to new
 9   issues that evolved concerning a totally separate phase of the
10   trial; sentencing, where I have to calculate the amount of the
11   loss.  And the parties disagree and it's a fact-intensive
12   determination.  I don't have to be 100 percent certain, but I
13   have to be in the ballpark. It has to be -- I have to have a
14   ground for whatever loss I determine.
15       And their claim is they disagree that she only worked 18
16   hours a month which is what you wanted to give her credit for
17   off-site and that there are records that will show it.
18   Whatever happened before the trial does not foreclose their
19   right to make that argument.  And to do so they're seeking
20   documents. Now what documents and whether their request is
21   reasonable and appropriate is a different issue.
22             MR. GRAY:  Your Honor, I think what Your Honor is
23   missing with regard to that is for one thing, there was
24   serious detrimental reliance by the Government on that waiver
25   because we stopped the production at that point in time.
```

1          And Your Honor, I was reviewing that January the 10th

2     transcript the other night. You and I have had some back and

3     forth discussions about this.  And what I had told you in the

4     past --

5               THE COURT:  January 10?

6               MR. GRAY:  January 10 of 2023.

7               THE COURT:  Oh, okay. I thought we were in 2024.

8     That's why I wasn't -- yeah, definitely make sure. This case

9     is so old that you better make sure you say the year.

10              MR. GRAY:  Right.  We also had very significant

11    events in this case in January of 2022.  So it's now been the

12    second anniversary now of Mr. Ahlers' learning about the

13    famous Garrett Bosshardt email that he viewed as being so

14    critical. But let's finish this up.

15         I moved for a continuance of the trial apparently in

16    early January. And what I said in the hearing on January the

17    10th --

18              THE COURT:  January 10th of 2023.

19              MR. GRAY:  We said if we proceeded to trial with the

20    various demands of the defendant not having been fully met,

21    that I was concerned -- and I expressly cited "appellate risks

22    and 2255 risks" that would arise out of that. I felt that we

23    were opening ourselves up for that.  And the status of

24    things --

25              THE COURT:  Well, that's clearly on the minds of

1    defense counsel I'm pretty confident.

2         **MR. GRAY:**  Oh, this defense counsel?  Yes, Your

3    Honor. Quite frankly, I think an awful lot of what we're

4    seeing here has relatively little to do with any realistic

5    expectation of finding material evidence that would reduce the

6    amount of the loss and a desire to make a *Brady* issue that

7    will give them an issue on appeal that they certainly don't

8    have now. And that's exactly the reason why the defense was

9    asking for that passage that you thought was kind of strange.

10        Why are you saying you want to know exactly when the

11   Government got this information and how long they had it?  And

12   Ms. Weeks gave you a very general and ambiguous answer about

13   "We're just trying to protect our client's constitutional

14   rights."

15        **THE COURT:**  Well, it wasn't lost on me.  That's why

16   I asked the question.

17        **MR. GRAY:**  Right, exactly. What this is totally all

18   about is if they can find something that suggests that we had

19   something before January the 10th that we didn't turn over,

20   then they've got an issue that they can use to attack the

21   trial itself. They can claim there was a *Brady* violation in

22   advance of the trial.  And that won't just go to sentencing,

23   that won't just go to the amount of loss.

24        **THE COURT:**  Well, Mr. Ahlers always argued that all

25   of this that he sought, whatever it was that he sought, his

1   argument always was that it was *Brady*. I kept disagreeing with

2   him because I don't see how this fit any definition of *Brady*

3   that I understood. But that -- that is what he argued.

4          **MR. GRAY:**  Sure. Because what he was trying to --

5   for one thing, *Brady* these days for defense counsel is just

6   like catnip. They all want to try and find some *Brady*

7   violation that they can hang around the neck of the Government

8   for all sorts of reasons, including their professional

9   standing and in the defense community and various other

10  things. So yes, they always say that.

11         But, I mean, *Brady* is actually a pretty limited doctrine.

12  I mean, one of the most fundamental aspects of it -- and Ms.

13  Richman I'm afraid we've discussed this before, just does not

14  seem to process this -- is that what it involves is

15  suppression of exculpatory evidence by the Government that

16  would tend to show that the defendant is not guilty.

17         I mean, the original *Brady* v. Maryland case if I recall

18  correctly involved a situation where I think it was a bank

19  robbery where the defendant knew that a witness had identified

20  somebody else as the culprit and didn't divulge that. Of

21  course that is, you know, it would be a serious constitutional

22  violation.

23         What we are talking about here, what is passing under the

24  supposed rubric of *Brady* here, first from Mr. Ahlers and now

25  from the defense here, the new defense counsel, is that if we

1  can find some email that we can say indicates that she sent a

2  two-line email from off-site -- which by the way they

3  certainly should have access to themselves, then that would be

4  exculpatory. Of what?  I mean, it might indicate that she did

5  what, two minutes of work?  Okay, two minutes of work. That

6  would take about five dollars off the amount of the loss here.

7  I mean, it's beyond immaterial.

8         And so I want to get to this. I mean, Ms. Weeks focuses

9  in her argument this morning on the off-site time.  The

10  Government only gave her credit for 18 hours a month of

11  off-site time. As I indicated, I think that 18 hours, I think

12  that's a gift.

13         It is so ironic that when we put together our loss and

14  restitution statement back in late April of last year, we

15  tried to make every reasonable allowance. I mean, the overall

16  amount of the time that was billed is something like 380,000

17  hours and we said we would give her credit for two-thirds of

18  her time in Access Control and I think 15 percent or so of her

19  time out of Access Control. So the total that we gave her

20  credit for was in the range of 30 hours a month. That would be

21  like roughly four full days of work a month as program

22  manager. We've heard nothing that suggests that she did

23  anything like that.

24         The defense, as I said, keeps saying, "We have reason to

25  believe." But even aside from the waiver issue which, I

1    mean -- and I need to finish on this because when they made

2    that waiver on January the 10th, we were nine days away, eight

3    days away from jury selection. Barely two weeks away from the

4    beginning of trial.  For months our efforts had been diverted

5    into chasing these will of the wisps of supposed exculpatory

6    evidence.  We had been in six days of hearings in this case

7    before we even got to trial, maybe longer when you factor in

8    the various motion hearings. And so we were really -- then as

9    you know, the defendant filed a Motion in Limine on the Unanet

10   matters, Unanet documents that's discussed in the January 10th

11   transcript, like, shortly before Christmas. So crazily, time

12   over Christmas that I should have been able to spend getting

13   ready for trial, I was spending getting ready for a motion in

14   limine argument on that that was right after the new year.

15       So we could not -- when this came down, we had to turn

16   our attention immediately to getting the case ready for trial.

17   We couldn't say all right, we want to document exactly where

18   we are, we want to find out exactly which of these folks are

19   still in -- which of the custodians are still in process. And

20   that is part of the reason why the record is so confused now.

21       And it's extremely revealing that what I began suggesting

22   about a month ago that clearly this case cannot finish in the

23   District Court without our assembling a file that lays out

24   clearly, easily, and directly so the Court of Appeals can

25   understand it, exactly what had been produced to the point

1    where the defense pulled the plug and what still remained.

2         And when I raised that, the first thing Ms. Richman says

3    is "Oh, that's unnecessary because we had a hearing on

4    December the 21st, so that's what I think that was about." The

5    hearing on December the 21st was not remotely comparable to

6    anything --

7              **THE COURT:**  December 21st of 2023.

8              **MR. GRAY:**  2023, right. I think there is -- I think

9    it's perfectly clear that that's a lot of what is driving this

10   is the desire to create some kind of *Brady* or Rule 16 issue

11   for purposes of the appeal.

12        Let me see -- let me continue, yes.  There's so many

13   things I want to get to.  It's going to take a while this

14   morning, Your Honor.  This is so significant because it shows

15   how lost and mindless, futile minutia we have gotten in terms

16   of the discovery issues.  And this goes directly to the

17   emails.

18        And by the way, I guess I didn't say this, we have

19   received the emails as I understand from Mr. Pyne.  The

20   members of Mr. Keefe's section worked through the weekend, the

21   weekend before last to get these reviewed and produced to us.

22             **THE COURT:**  So these are the 400 or the --

23             **MR. GRAY:**  They ultimately asked for about -- I've

24   heard different figures, 75, 85 --

25             **THE COURT:**   The revised list.

```
 1            MR. GRAY:  To call them individual emails as Mr.
 2     Pyne would correct me is --
 3            THE COURT:  Mr. Pyne told us they really --
 4            MR. GRAY:  They're chains.
 5            THE COURT:  --were chains.  So it's not just a
 6     discrete 60 emails. Some of them are lengthy.
 7            MR. GRAY:  Right.
 8            THE COURT:  Because they're chains.
 9            MR. GRAY:  Right. So even aside from the fact that
10     the defendant and her counsel chose to go to trial originally
11     without having gotten the supposed -- well, actually received
12     a number of emails because there were searches going on using
13     the keywords and any emails of any of the identified
14     custodians relating to those were produced on a rolling basis
15     over the fall of --
16            THE COURT:  Right.  I mean, I don't want it to
17     appear as far as I'm concerned that NSA wasn't producing
18     documents until the 11th hour and 59 minutes.  They were.
19            MR. GRAY:  Right.
20            THE COURT:  In response to the Court's August 2023
21     order.
22            MR. GRAY:  And not only that, but they were
23     producing emails and a substantial number of emails were
24     introduced as I think three different -- parts of three
25     different exhibits at trial.
```

1          But with regard to the -- and Ms. Weeks --

2          **THE COURT:** So--

3          **MR. GRAY:**  May I finish Your Honor?

4          **THE COURT:**  No.  I want to ask you this:  Of the 60

5     or so emails that are ready, were any of those -- are these

6     all brand new, none of them were ever produced before, do we

7     know?

8          **MR. GRAY:**  We'd have to do a comparison and I

9     haven't even finished looking through them myself.  I was

10    trying to do that over the weekend. But a number of them

11    looked very familiar to me.

12         **THE COURT:**  A number of them what?

13         **MR. GRAY:**  A number of them looked very familiar to

14    me.  And I can tell you the ones that I've gotten through so

15    far, some of them are things like, "Dear Ms. McComber we need

16    you to do such and such to get access to the computer system."

17    Stuff like that.

18         **THE COURT:**  Okay. So -- but I was just curious

19    because I think it's arguably important, are these brand new

20    or are these a duplicate of what was already produced in whole

21    or in part?

22         **MR. GRAY:**  I suspect, Your Honor, that some of these

23    have previously been produced. It may be that some of them

24    have not. You know, when you see the list of the emails that

25    were requested by the 1,315 emails that were requested by the

1      defendant when she was out at the NSA in December of 2021, you

2      will see red notations from I believe -- maybe not Ms. Peacy,

3      maybe Maxine Meade, from Maxine Meade that reflected that she

4      was beginning to try and track down where these emails were so

5      that those could be produced and then the plug got pulled and

6      she stopped. That was like -- I think maybe she was about 40

7      or so emails into that process at the time.

8          But they're going to have these emails within a couple

9      days that they requested. And in the end they boiled it down

10     to about 85 chains of emails which we think would be helpful

11     and it will be important for us to look at those and see how

12     material those actually are.

13         This gets into the well, what is the issue of materiality

14     with regard to these emails?  At the hearing last week when I

15     tried to make the point that all of these emails that we're

16     looking at out there are high side emails, Ms. Weeks objected

17     to that.  She said, "No, no, no, no, no, many of these are

18     unclassified. These are unclassified emails. They're different

19     from the high side emails." That's not right. The high side

20     emails fall into two categories. The high side emails first

21     and foremost are anything that are sent to or from the secure

22     computers at the NSA. They can be either emails that carry a--

23     documents that carry a classification rating or they can be

24     emails that are UF//OUO, Unclassified For Official Use Only.

25     In other words, things that haven't been through

 1        classification review yet, but have to go through

 2        classification review before they can be released outside of

 3        the NSA.

 4            So we as part of our -- and Your Honor may want to go

 5        back and take a look at it because it was last April, our loss

 6        and restitution filing we said okay, there's about 270

 7        some-odd hours of time that she spent in Access Control at the

 8        NSA. In Access Control, not necessarily in NSOC. And some of

 9        that time we could identify as having spent at a different

10        part of the facility on the other Silent Roar contract that

11        InfoTeK held. I think we identified about 15 or so hours that

12        we could definitely say was related to Silent Roar.

13            And then we noted that it's a fairly long hike from where

14        you make your entrance to the NSA to where NSOC is. I think

15        typically based on the records it looked like it took her

16        about 20-plus minutes to do that. So we take that time out,

17        that slices off about another 60 hours. We didn't take off

18        time for anything else.

19            And actually and as I pointed out just recently in the

20        trial itself under her cross-examination by Mr. Cooch, after

21        we had introduced evidence showing, for example, that she

22        would engage in lengthy back and forth instant messages with a

23        man she was then dating who also worked inside NSA, the

24        defendant admitted that you could not properly bill for all of

25        the time she spent in Access Control.

1    And on top of that, we had testimony from Mr. Bryant, the

2    head of the K3 section in NSOC that most of his conversations

3    to Ms. -- with Ms. McComber just related to like discussing

4    sports. So the idea that we have spent as much time as --

5    　　　　THE COURT:  I don't want to really focus on the time

6    at NSA because I don't really think that's the issue. It's the

7    time off-site that we're talking about.

8    　　　　MR. GRAY:  Oh, Your Honor, the time at the NSA

9    though, it goes to the claim that we have reason to believe

10   the 70 or so hours that we took out of her time on-site at the

11   NSA which is the only thing the high side emails could relate

12   to, I think if my math is right that would amount to about

13   $7,500 worth of billings or something like that. I mean, it's

14   clearly -- against the total amount that's at issue here, it's

15   extremely small.  And given the parameters of the law relating

16   to determining the amount of the loss it's immaterial.

17   　　　　And this has -- I mean, I had to go out to the NSA to

18   look through these, to identify what was there. I've sent two

19   detailed letters as the Court knows to the defense back in

20   early December trying to facilitate their review of these

21   documents. We produced an Excel spreadsheet to them in advance

22   of Ms. Derrow going out there to show -- that showed the

23   number of emails and number of instant messages that she sent

24   on any day she was in Access Control. So you can zero right in

25   on those. And that document is damming in and of itself

1     because of how relatively few emails there are that are on it.

2          So let me get to some other things. I want to sort of go

3     back to the -- I got to go back to the beginning of Ms. Weeks'

4     remarks and then I have yet what I intended to be my own

5     remarks.

6          The two cases that Ms. Richman cited with regard to oh,

7     discovery applies at the sentencing context as well, one of

8     them I recall as being totally clear that there was a guilty

9     plea in that case. And of course with guilty pleas, and if the

10    guilty plea happens early enough, discovery is not required

11    and may not have been turned over. So first that decision was

12    just to indicate that okay, the guilty plea has been taken

13    now, but that now means she's got to cough up the discovery.

14         There is no distinction between what is involved in

15    trying to show whether she spent material time working on this

16    contract during each month that was covered by a charge in the

17    indictment and what is going to be demonstrated at sentencing.

18    That's not -- that is not the distinction. We would never and

19    certainly we did not here, we would never hold back anything

20    from our initial production to defense because we say "Oh,

21    that's not a guilt/innocent issue, that's a sentencing issue

22    if we get that far." We would never do that. And not only

23    here, as I've said before, they're opposite faces of the same

24    coin. Anything that is relevant to show that she did a

25    material amount of work on the contract for purposes of

1    showing that she didn't submit a false claim is material for

2    the exact same reasons with regard to determining the amount

3    of the loss. Indistinguishable. Absolutely indistinguishable.

4    And she and her counsel were willing to waive further

5    production of those last January.

6        Another thing that makes this case absolutely --

7        **THE COURT:**  I don't know if I agree with that

8    because the focus at this stage is establishing -- you didn't

9    need to prove your case, get into the particulars of how much

10   if you establish that her bills were materially false.

11       **MR. GRAY:**  Right. But the defense in order to show

12   that she had -- that her bills were not materially false was

13   entitled to any evidence that we had that we knew of that

14   showed she worked. So it's not a function of what we had to

15   prove, it's a function of what the defense was entitled to.

16   And so that's why we did not withhold anything to our

17   knowledge that showed her doing work prior to the trial.

18       **THE COURT:**  I guess my point would be I understand

19   that you didn't withhold, but what they're saying is you also

20   didn't conduct the kind of search that they think is more

21   focused, at least that's the allegation. That all of these

22   kinds of categories of material were not explored.

23       **MR. GRAY:**  Your Honor, I think -- actually, they may

24   be trying to suggest that because defense lawyers love to

25   suggest that the Government is incompetent and it's negligent,

1    its people are not thorough. I mean, the fact that whoever

2    drafted the defense's order put that footnote number one on

3    there trying to get the Court to sign off on something that

4    made it sound like the NSA wasn't treating this seriously and

5    had just been casual about it and that -- I mean, I am beside

6    myself what the NSA has been put through in this matter and

7    how -- and one thing that we're going to need to do, Your

8    Honor, is to file a number of the examples of these redacted

9    documents with the Court so you can see exactly how time

10   consuming the redaction and review process is. This is not a

11   joke. This is not a matter of anyone being sloppy, or

12   negligent.  These are people who work for an incredibly

13   important and sensitive government agency applying the same

14   kind of due diligence that Ms. McComber -- Ms. Richman

15   repeatedly feels that she feels obliged that she feels to

16   display in the course of her work. These are people who are

17   being every bit as diligent on that.

18        So then let's get to what I was going to say a moment

19   ago.  A huge distinction in this case that will stand out in

20   anything that is in the federal reports is the sheer amount of

21   testimony that is already available to the Court, the

22   Government, and the defense to assess how much work was done

23   by the defendant.

24             **THE COURT:**  I said that all along.

25             **MR. GRAY:**  I'm sorry?

1      **THE COURT:**  I've said that all along.

2      **MR. GRAY:**  But Your Honor, it is such a weighty

3  factor in the equation in determining whether these requests

4  are -- they have to be reasonable. They still have to be

5  reasonable, Your Honor.

6      Your Honor suggested last week that "Well, it's clear

7  that these requests are probably not proportional to the cost

8  of what's going to be involved in coming up with it."

9      **THE COURT:**  Well, on page 42 of ECF 406 I said, "If

10  you come back to me and say their requests are either

11  unreasonable or frivolous I'll have to hear you out, but if

12  their requests are reasonable then somebody is going to have

13  to work extra and get this done."

14      **MR. GRAY:**  Right. And that's why I made it very

15  clear in my comments in response to the defense's draft order

16  that we strongly submit that defense counsel's requests are

17  not only duplicative of past productions, but are frivolous,

18  abusive, irresponsible, and unreasonable given the substantial

19  burden they impose on the NSA and the minimal or wholly

20  nonexistent probative value these requests have with regard to

21  the loss determination issue in this case. When I looked at it

22  afterwards I thought I should have also thrown in or added

23  "futile" and "frivolous."

24      We have 2,000 pages of NSA investigative transcripts of

25  people talking about what Ms. McComber did and didn't do

1    before we even got to the trial. That included information

2    from 41 different witnesses.

3            **THE COURT:**  I know you've said that before and that

4    certainly is a part of the investigation, but I don't see that

5    as a substitute for documents, if there are any. I mean, I

6    think you should focus on the documents, if they exist or they

7    don't exist.  And what was done -- I don't want the NSA to

8    repeat anything it's already done. I couldn't have been more

9    clear about that. I've said that. If this has been produced or

10   this search has been conducted, that's the end of it.  I was

11   trying to find out what was done, have these searches been

12   undertaken. I know you have those interviews, that was all

13   part of what I heard before, during, and after the trial. But

14   that's not -- that's apples and oranges to me.

15           **MR. GRAY:**  It's not apples and oranges.

16           **THE COURT:**  It is. You don't get to choose. If you

17   have witnesses who say X, but a document would show Y, the

18   fact that you have a witness who says X does not obviate the

19   need for the document if it exists or if it's reasonable to

20   procure it.

21           **MR. GRAY:**  Right. This goes to whether there is any

22   reason to believe such documents exist.  And when you have

23   somebody like Tiffany Starr-Smith who testifies at trial that

24   the administrative burdens that involve this contract period,

25   much less anything that could be done off-site would be

1    minimal, that is huge. That goes directly towards the issue of

2    do these documents even exist.

3         And so let's turn to the issue that -- and for one thing,

4    maybe we should just pause for a moment here. Ms. Peacy, do

5    you want to perhaps come up to the microphone and address the

6    issue of what you believe you said?

7         **THE COURT:**  And please state and spell your name for

8    the record.

9         **MS. PEACY:**  Ms. Holly Peacy.  H-o-l-l-y P-e-a-c-y.

10         **THE COURT:**  Ms. Peacy, what do you recall that you

11   stated to Ms. Weeks when she was out there a week ago

12   yesterday on the 22nd of January with regard to the status of

13   the productions at the point where the defense said they

14   wanted to go to trial?

15         **MS. PEACY:**  The comment I made was that I did not

16   know what had been produced to the defense because the OIG

17   produces it to the AUSA's office.  After that we're out of

18   that process, but that I had copies of everything that had

19   been produced to the AUSA's office and NSA maintained those

20   copies.

21         **THE COURT:**  Wait, you lost me.  I'm sorry, Ms.

22   Peacy.  You said OIG produces to the AUSA?

23         **MS. PEACY:**  Yes. The AUSA documents were produced by

24   the Office of the Inspector General at my office, to the AUSA.

25   After that we are out of that process.  So we're not involved

1     in any of the AUSA's process for what gets turned over or

2     doesn't get turned over.  I have no knowledge of that process.

3             **THE COURT:**  Okay.

4             **MS. PEACY:**  So what I said was I did not know what

5     was produced to the defense, but we have copies and maintain

6     copies of all of those and I can look through all of those

7     that we had that had already been redacted against the list of

8     emails that they were requesting to see if any of those had

9     already been redacted in an effort to save us some time.

10             **MR. GRAY:**  So that goes to your question. But that

11     was a week ago and in the end the decision was made regardless

12     of whether there was duplication, just to go ahead and produce

13     everything they wanted.  Right?  Is that what happened?

14             **MS. PEACY:**  For the 85 emails?

15             **MR. GRAY:**  Right.

16             **MS. PEACY:**  Yes, we produced them all.

17             **MR. GRAY:**  Without regard to whether they were

18     duplicates.

19             **THE COURT:**  But you have a record of what you gave

20     to the AUSA. Is that what I understood?  You don't know what

21     the AUSA does with them, but you have a record of what you

22     would have turned over to the AUSA?

23             **MS. PEACY:**  Yes.

24             **MR. GRAY:**  Are you talking about the AUSA or are you

25     talking about the paralegal?

1          **THE COURT:**  I couldn't hear you, Mr. Gray.

2          **MS. PEACY:**  So we upload them to USAfx and send a

3      note to -- I think between yourself, Mr. Cooch, and then

4      there's been a couple of paralegals, so I don't know what

5      agent.

6          **MR. GRAY:**  So what you're saying is for all the

7      stuff that was searched for and produced before the plug was

8      pulled by the defense, you still have copies and records of

9      all of them?

10         **MS. PEACY:**  Yes, yes.  We have the redacted copies of

11     all of those.

12         **MR. GRAY:**  And do you recall the last date that you

13     sent over a production?

14         **MS. PEACY:**  I believe it was the 18th or 19th of

15     January was the last item we sent over before trial started.

16         **MR. GRAY:**  Are you sure of that?

17         **MS. PEACY:**  I couldn't tell you whether it was the

18     18th or 19th, without looking at my notes.

19         **MR. GRAY:**  But you believe it was one or the other?

20         **MS. PEACY:**  Yes, it was one or the other.

21         **MR. GRAY:**  Well, I can tell you that our last

22     production we made to defense was January the 12th. And what I

23     recall being said on the record at the hearing on January the

24     10th or maybe this was in Mr. Cooch's last letter, was that

25     there were about another thousand pages of documents that were

1    ready to be produced.  And in addition, there were another

2    thousand pages of documents that were still in the redaction

3    queue. And on January the 12th we produced -- and this is

4    Government-produced production letter number 12, this was two

5    days after the defense said they didn't want anything else,

6    they were ready to go to trial.  And that was literally the

7    words Mr. Ahlers said. "We are ready for trial."  That

8    included 600 pages of documents relating to Mr. Jonathan

9    Smith, it included 415 pages of records from Ms. Kimmel's own

10   high side emails.  It included 52 pages of records from

11   Tiffany Starr-Smith.

12           **THE COURT:**  What happened to the documents that were

13   sent over on the 18th or 19th?

14           **MR. GRAY:**  I'll have to check about that, Your

15   Honor. I mean, we'll have to determine what was in that. I

16   mean, the discussion that Mr. Cooch and I had was that we

17   would continue producing whatever we received in spite of what

18   the defense had said. But I'm not -- I don't -- I'm not going

19   to say anything when I haven't had a chance to look at it,

20   Your Honor, because I don't want the defense to be able to say

21   that I misrepresented something down the road.  But we

22   certainly will look into that to determine if there was

23   anything else that came. I mean, and the issue that

24   fair-minded people have to apply to this was that anything

25   arriving on the 18th or the 19th, I mean --

            **THE COURT:**  We had already picked a jury on the

15th.

            **MR. GRAY:**  The 19th.

            **THE COURT:**  The 19th, excuse me.

            **MR. GRAY:**  I think it was Thursday, the 19th.  I

said this repeatedly in the hearing on the 10th. If we're

going to go forward to trial on the 23rd, this has to stop. We

cannot continue having our attention distracted by handling

these discovery productions, many of which there is no reason,

let's emphasize this, there is no reason to believe that there

is anything of material significance in these. This is what

the defense asked for, but now the defense has withdrawn that

request.

     So to say that right up to the last minute we should be

processing those, I mean, Mr. Davis I can tell you, our

paralegal, was wild with frustration at trying to get the time

to just do the Government's exhibits and get them ready for

trial within that short period of time.

            **THE COURT:**  Well, maybe the story is in the fact

that I don't think any of these documents ever came in at

trial.

            **MR. GRAY:**  There you go. I think one or two of them

did. One or two. There were like drafts of the -- the drafts

of a couple of evaluations and he got to produce those at

trial. They were never finalized -- I think one of them, I

 1    think one was finalized, one was not. But yes. I think we'd

 2    have to check, but I'm sure it was probably 15,000 some-odd

 3    pages of documents that got produced. That's a very rough

 4    estimate.

 5        **THE COURT:**  I was going to actually ask Ms. Peacy

 6    that question if she had any ability to quantify for me how

 7    many documents you, meaning not you personally, but NSA

 8    produced to the Government as a result of my order. There were

 9    some already produced actually, of course in discovery by the

10    Government in the first place, but then I issued that order in

11    August.

12        **MR. GRAY:**  And Your Honor, if I can clarify this,

13    Ms. Peacy I think did not even come into this until November

14    of 2022.

15        **MS. PEACY:**  Yeah, it was late September, early

16    October so I don't have knowledge prior to that.

17        **MR. GRAY:**  What we got was reflected by the

18    successive transmission letters.  The one I just mentioned was

19    transmission letter number 12.  Those went back to right after

20    the arraignment the previous year. But everything that we

21    received from the NSA and produced is reflected in those

22    transmittal letters.  And as I say, the very last one reflects

23    a transmission of Tiffany Starr-Smith's records, records from

24    the defendant's emails, records from Mr. Smith. So, I mean, is

25    there anything else we need Ms. Peacy for?

1          **MS. WEEKS:**  I'd like to ask her a few questions if I

2     can.

3          **THE COURT:**  Sure.

4          **MS. WEEKS:**  So just so I'm clear, sorry, I'm a

5     little slow this morning. You're saying here today that there

6     were no documents that had been redacted and reviewed that had

7     not been turned over to either the AUSA or to the defense?

8          **THE COURT:**  Or to who, the AUSA or?

9          **MS. WEEKS:**  Or to the defense.

10         **MS. PEACY:**  Again, we don't turn over to the

11     defense.  That's not our process.  But everything that we had

12     that had been reviewed and redacted had been turned over to

13     the AUSA.

14         **MS. WEEKS:**  And the last production to the AUSA was

15     on the 18th?

16         **MS. PEACY:**  I believe it was on the 18th or 19th.  I

17     believe if I remember correctly it was one Excel file document

18     that they had trouble redacting.  It took an extensive amount

19     of time for that one file.

20         **THE COURT:**  So this is the 18th or 19th of January

21     of 2023?

22         **MS. PEACY:**   Correct.

23         **THE COURT:**  So you're saying if you remember, Ms.

24     Peacy, was that the only part of the production, the Excel

25     spreadsheet?

1    **MS. PEACY:**  I think that was the only item sent on

2    the 18th or 19th. There were multiple items exactly as Mr.

3    Gray said, there were multiple items for multiple different

4    custodians that were sent somewhere between the time frame of

5    the 10th and that 18th date.  But I think the last item sent

6    over was a singular Excel file that they had trouble

7    redacting. Those are a little harder to redact than say a Word

8    file or PDF document.

9    **MS. WEEKS:**  And does NSA maintain a log of the

10   documents that are sent over?

11   **THE COURT:**  I'm sorry, Ms. Weeks, because you're

12   facing --

13   **MS. WEEKS:**  I'm sorry, Your Honor.

14   **THE COURT:**  --facing Ms. Peacy, somehow I'm not

15   hearing you.

16   **MS. WEEKS:**  I was just asking if NSA maintains a log

17   of the amount of documents they produce to the AUSA and the

18   dates and the size of the document production.

19   **MS. PEACY:**  So we maintained a folder of everything

20   that was transferred over. It's dated.  If we opened it up it

21   would tell us the size of those documents. Offhand I couldn't

22   give you a page number, exact page number off the top of my

23   head, but if we went back and looked I could give you a page

24   number in totality.

25   **MS. WEEKS:**  Okay, that would be helpful. And then in

```
1     terms of applying search terms, when Mr. Pyne was here last
2     week I think he said Tiffany Starr-Smith's high side emails
3     had been searched but not her low side emails; is that
4     correct?
5             MS. PEACY:   Correct. We did not receive -- so the
6     process for them to get all of those emails from archives to
7     reproduce them from that time was still being worked. We did
8     not get those -- I believe it was the 18th of January was when
9     we got the unclassified from our low side system. There might
10    have been Unclassified For Official Use Only in the classified
11    system, those we did search.
12            MS. WEEKS:   Okay. So NSA now has Tiffany
13    Starr-Smith's low side emails, but they have not applied the
14    search terms to those emails?
15            MS. PEACY:   Correct.
16            MS. WEEKS:   And were the documents that were
17    searched both emails and shared drives?
18            MS. PEACY:   Yeah, they were shared files and emails.
19            MR. GRAY:   Point of clarification.  What time
20    period?
21            MS. WEEKS:   We're only asking for the 19 months of
22    the indictment period.
23            MR. GRAY:   What time period in terms of the search
24    being done?
25            MS. WEEKS:   What do you mean?  Like when was the
```

1   search done?  They were saying the search has not been done on

2   Tiffany Starr-Smith's emails at all.

3          MS. PEACY:  Low side.

4          MR. GRAY:  Clarification, low side emails. So that

5   was something that was -- there was production of emails from

6   her that was sent over on January the 12, 2023, that

7   presumably was the high side emails --

8          MS. PEACY: And her high side files.

9          MR. GRAY: And her high side files. The low side

10  files would be the only thing still left. When you say "low

11  side files," those are low side files that contained any of a

12  rather lengthy list of -- and these are not necessarily --

13  these are really I think into the not so much as like -- this

14  is what Ms. Meade told me -- not so much as like literal

15  search terms, but it's topics that would be used to generate

16  ideas.  Okay, if you can any of anything else, throw that in

17  too in terms of what you're searching for. That's what she

18  told me.

19         MS. PEACY:  So we had search terms after August of

20  2022. So the custodians that were listed in that August 2022,

21  we searched those using search terms. Prior to that I believe

22  what you're saying is accurate, they searched topics. I was

23  not involved in those searches because it was before I came on

24  board.

25         MR. GRAY:  Okay, thanks for that clarification.

```
 1              MS. WEEKS:  And is there a record of the searches
 2      that were run?
 3              MS. PEACY:  Which terms were used against who?
 4              MS. WEEKS:  Yes.
 5              MS. PEACY: Yes.
 6              MS. WEEKS:  The ones that you're saying were kind of
 7      modified by the person conducting the search, those exist,
 8      like a record for what was searched for exists?
 9              MR. GRAY:  Let's be clear about this --
10              THE COURT:  Let her finish and then --
11              MS. PEACY:  They weren't modified. We were given set
12      search terms after August of 2022 with specific time periods
13      to search against specific custodians.  And that's what we
14      used when we did those searches any time after August of 2022.
15              MS. WEEKS:  And I believe that's the spreadsheet
16      that Mr. Gray has shared with us.
17              MR. GRAY:  Spreadsheet?
18              MS. WEEKS:  The spreadsheet attached to your letter.
19      It's right there in front of you, the red.
20              MS. PEACY:  The one you placed on the screen before.
21              MR. GRAY:  Yes, those.  Right.  Okay, anything
22      further?
23              MS. WEEKS:  So we requested approximately seven
24      additional terms. What is the process like for searching those
25      terms in the database of documents that are collected?
```

```
 1            MS. PEACY:  So we would have to -- for each
 2    custodian we would upload one month at a time because that's
 3    how they're pulled off and then we would search those terms,
 4    put the search term in and search the search term against it.
 5    If the search terms are fairly narrow or included something
 6    like a term "and InfoTeK" "and Ironbridge," that narrows it
 7    down a little bit. If there's a broad search term like
 8    "badge," that could bring back a lot of things that are
 9    unrelated that then we'll have to go through and figure out
10    what's really related to this case and what is -- for example,
11    if someone used the word "badge," say a security person wrote
12    "badge" and what pulls in from that. So depending on how
13    specific the search terms are is the length of time it could
14    take.

15         But we have -- for the custodians listed we have all of
16    their emails and files already, so there won't be any
17    additional time to have those files uploaded.  If we add any
18    new folks in, that would be additional time to have those
19    emails reproduced.  There are a few folks that when we were
20    given the search terms we were only searching July of 2017 for
21    their search terms.  For those folks we only have July of
22    2017.  So if we were asked to search outside of that scope we
23    would also have to have those emails recreated for us.

24            MS. WEEKS:  Do you know who those custodians are?
25            MS. PEACY:  If I could grab my notes I could tell
```

```
 1        you for sure.
 2              THE COURT:  Sure. What would be the relevance of
 3        searching for the word "badge"?
 4              MS. WEEKS:  Your Honor, our client was responsible
 5        for onboarding new hires to the Ironbridge contract and part
 6        of that was getting their badges set up.  And there was
 7        communications about that process, paperwork that had to be --
 8              THE COURT:  What about searching for, I mean,
 9        "badge" is so generic.
10              MS. WEEKS:  Your Honor, I think there's --
11              THE COURT:  Especially when you have to badge in or
12        the access card system.  I mean, that just seems like a wild
13        goose chase.
14              MS. WEEKS:  I think we can certainly work together
15        to put in some limiting terms to make sure that this is only
16        coming up with either contractors who were onboarding
17        Ironbridge and/or Jacky and, you know, Ironbridge to try to
18        just narrow it so we're not getting all badge-related
19        correspondence for the whole NSOC.
20              THE COURT:  Ms. Peacy if you know, I know you
21        weren't involved throughout, but to the extent you know, who
22        chose the search terms that were used in the first place?
23              MS. PEACY:  So while I wasn't involved in that, my
24        understanding was there was some discussion between the
25        prosecution's office and the defense and they came up with
```

1      those search terms based on that.

2                THE COURT:  Okay, thank you.

3                MS. PEACY:  So there are several people that we were

4      given smaller time frames to search. Some of them are also in

5      the time frames that have larger, so we did have larger time

6      frames for some of them. Jennifer Blake and -- Jennifer Blake

7      we had July of 2017 only. Katherine Cruder we only had July of

8      2017 for her as well. Those are the two.

9                MR. GRAY:  And if I may, what was the significance

10     of July 2017?  Do you know why that time period was asked to

11     be searched for?

12               MS. PEACY:  It was specific to the 2017 management

13     review meeting notes and any emails related to that.  The

14     search term was 2017 management review and InfoTeK. It was

15     specifically looking for those PMRs.

16               MR. GRAY:  Which I think was item four in defense

17     counsel's January the 4th, 2024 letter.

18               THE COURT:  Did you have --

19               MS. WEEKS:  Correct.  I mean, that is the relevance

20     of July 2017.

21               THE COURT:  Was Jennifer Blake, am I remembering

22     correctly, one of the people Mr. Ahlers had talked about

23     calling as a witness and then he didn't?

24               MR. GRAY:  You're impressive, Your Honor. Yeah, that

25     was another little wrangle because she was --

1          **THE COURT:**  Overseas or something.

2          **MR. GRAY:**  She was now in Germany and we had

3    indicated that we weren't going to call her, but that if he

4    wanted her we would make the arrangements to bring her over

5    and in the end, he decided not to bring her in.

6          **THE COURT:**  So that's why her name doesn't really

7    come up much at the trial.

8          **MR. GRAY:**  No.

9          **THE COURT:**  It came up in that way, I remember that.

10         **MS. WEEKS:**  Your Honor, Jennifer Blake was the C O R

11   T, the technical T and our client did have a lot of

12   correspondence with her.

13         **THE COURT:**  Right.  Mr. Ahlers had contemplated

14   calling her, but then he didn't. I mean --

15         **MS. WEEKS:**  Yes.  Excuse me, technical director. It

16   is disturbing that only July 2017 of her emails were searched

17   if she was one of the primary points of contact for our

18   client. Just to clarify, you're saying that only July 2017

19   were the only emails and files that were searched for Jennifer

20   Blake?

21         **MS. PEACY:**  Correct.

22         **MR. GRAY:**  Just to clarify, are you talking

23   originally or recently?

24         **MS. PEACY:**  Originally.  That was the only thing.

25   So she only appeared one place in the search terms we were

1    given.  Her name only appeared as a custodian under those two

2    requests for search term related to the 2017 management

3    reviews. Her name did not appear under any of the other search

4    terms we were given. So only 2017, July 2017 was pulled and

5    recreated for her emails and files.

6         **MR. GRAY:**  And once again, just what time period was

7    that pulled during?

8         **MS. PEACY:**  That would have been prior to my start

9    through -- some of the files -- some of the folks never even

10   got pulled before trial started.  So I would say sometime

11   before August when they decided who the custodians were

12   through when the trial started. There were a couple folks that

13   were minor people that only had one or two search terms, like

14   folks that were also in that same search term category as

15   Jennifer Blake, that their files were still in the process of

16   being uploaded and recreated and were never recreated prior to

17   trial.

18        **MR. GRAY:**  Right. And so just so we're clear, this

19   document which I think I attached as an exhibit to I think

20   it's maybe like ECF number 410, a letter about sort of the

21   defense's additional requests. So as to people like the

22   defendant, Kristin Mair, Jonathan Smith, Jason Doyle, Regina

23   Shirley, Tiffany Starr-Smith and Donald Pugh, those are all

24   people that previously were searched for; is that right?

25        **MS. PEACY:**  Yes.  And we have at least two years, at

1    least 2016 and '17 dated for all of them. Some of them we have

2    even further back, as far back as 2015 for some of those folks

3    that were searched previously.

4         **MR. GRAY:**  And as to these folks, new defense

5    counsel is now asking for different search terms than were

6    used in the previous search.

7         **MS. WEEKS:**  As discussed at the January 9th

8    conference and as ordered by the Court, yes.

9         **THE COURT:**  Well, I'm not sure I really ordered

10   necessarily all the terms you contemplated, but if I did I'm

11   going to revise my order.

12        That said, I need to understand. If you have -- what I

13   thought I heard you say, Ms. Peacy, is if you have these

14   emails already, using new search terms or additional search

15   terms is not going to be necessarily difficult; is that

16   accurate?  Did I say that right?

17        **MS. PEACY:**  Yes.  It's not as labor intensive as

18   having to rebuild those emails and also have those uploaded.

19   So it's just the time and we have to do one month at a time.

20   So depending on the amount of time we are searching will kind

21   of tell us the amount of time it would take us, right?  If

22   we're searching one or two months versus 24 months, it would

23   be quicker.

24        **THE COURT:**  Okay, so let's take a person -- I just

25   want to be sure I understand what you're saying, that I have

1    this right. If you have Jennifer Blake -- first of all, my

2    question is did you only search July of 2017 because there was

3    -- in the effort to determine if she was someone for whom

4    records should be searched, her name with the terms you used

5    her name only came up in July of '17?

6         **MS. PEACY:**   Correct.  She was only listed as a

7    custodian against that search term for the 2017 PMR. She was

8    not listed for a ton of the other search terms we were given.

9         **THE COURT:**   Okay, so I want to be clear about this.

10   You, NSA, the Government, did not randomly limit Jennifer

11   Blake's search to one month. One month was searched because

12   when you were doing a broader effort, her name appeared only

13   in one month. Did I say that right?  Did you understand what I

14   said?

15        **MS. PEACY:**   Yes, I understand what you're saying. So

16   when we were given search terms we were given the search term,

17   a time frame, and then we were given which custodians to

18   search within that search term. That was a list that I'm not

19   sure how it was created, but my understanding is it was a

20   conversation between prosecution and defense. So that list of

21   defense search terms is what we used.

22        So in Jennifer Blake's case, her name only appeared as a

23   custodian for that 2017 management review search term. Her

24   name did not appear listed as a custodian for any of the other

25   search terms we were given.

1             **THE COURT:**  Okay.  So what I'm trying to establish

2   so that the record is clear is the Government, whether it's

3   NSA or the U.S. Attorney's Office, did not unilaterally if you

4   will, decide "We're only going to look at one month for

5   Jennifer Blake." You looked at one month for Jennifer Blake

6   because using the terms that you used, which as I've always

7   understood it was a result of Mr. Ahlers' request, that was

8   how I understood it with input from the Government, her name

9   showed up only for that period. Is that accurate?

10             **MS. PEACY:**  That's correct, Your Honor.

11             **THE COURT:**  You didn't decide we're not looking at

12   Jennifer Blake, this very important person, for all the other

13   months because you didn't want to look for the rest of the

14   months. You only looked using the terms you had?

15             **MR. GRAY:**  Right.

16             **THE COURT:**  And her name pops up for that one month.

17             **MS. PEACY:**  Yes, ma'am.

18             **THE COURT:**  Okay, well that's really important.

19             **MR. GRAY:**  Yes.

20             **THE COURT:**  To me.

21             **MR. GRAY:**  And Your Honor, if I may, if I may add

22   something else about that.  Ms. Blake and Ms. McComber were

23   very close personal friends and I've seen lots of emails

24   between the two of them that were just purely friendly emails,

25   friendly discussions. So if the defendant is telling her

1    counsel that Ms. Blake was one of her principal contacts, a

2    lot of that was social. And that's why the point that was just

3    made using the search terms the only time she comes up is in

4    July of '17 in association with the PMR, that's very

5    significant.

6                **THE COURT:**  And Ms. Peacy, did I understand you

7    correctly that to broaden the search now is not problematic if

8    it's for the same periods of time?  What would be difficult

9    even though -- I'm only just -- I'm sorry if I'm muddling too

10   many things in one sentence. If a person's period of time was

11   multiple months, it would be labor intensive for NSA because

12   you have to do it one month at a time. But it wouldn't be the

13   same intensity as if you have to go find new months

14   altogether. Did I understand that correctly?

15               **MS. PEACY:**  Yes, ma'am.  That's accurate.

16               **THE COURT:**  So if I said to you, "I want you to go

17   back and search Jennifer Blake beginning in March of 2016,"

18   that would be a big ask because you don't have those uploaded

19   anywhere; is that right?

20               **MS. PEACY:**  Correct.  Capabilities would have to get

21   those from archives and re-upload which would take some amount

22   of time on their part before we could even begin searching.

23               **THE COURT:**  And the uploading process, just to find

24   them I think we should be clear what exactly is involved in

25   that.

1          **MS. PEACY:**  So I unfortunately cannot speak to that.

2     The capabilities folks at NSA do the uploading and recreation

3     of that email. What I can tell you is that when they were

4     producing for the custodians we were given previously and the

5     parameters we had, that started sometime before August and was

6     still being done even when trial started and we didn't have

7     all of them.

8          **THE COURT:**  And I'm not -- I know there's more

9     questions of you, but just when you're done, is there anyone

10    here with you from NSA who can answer my questions, or for the

11    record explain what the process entails to locate records,

12    emails if you will, whatever it might be, documents outside

13    the period where we already have the documents?

14         **MS. PEACY:**  No, ma'am.  We didn't bring anybody

15    today because we thought we were talking about the principals

16    listed in the proposal who we do have emails for.

17         **THE COURT:**  Okay, but the time periods are not

18    necessarily what defense has wanted, so that's why I was

19    asking that question.

20         For the people for whom there are multiple months,

21    conducting a search with new terms other than the time -- and

22    I don't mean to minimize it -- that it would take because you

23    have to go month by month, once that's done, do you have any

24    sense of how much time we're talking about?

25         **MS. PEACY:**  So Mr. Keefe could speak better to that

1    than I could because once we have all of them, we turn them

2    over to his office that does the redaction and they do the

3    redaction from there. That's their process.

4            THE COURT:   Okay. So this all would be basically the

5    first step in a multi-step process for the NSA. It hardly

6    tells the story to get them uploaded.  It's after that once

7    you identify them, then you have to go -- and I say "you,"

8    meaning NSA has an intensive redaction process. Is that right,

9    from your knowledge?

10           MS. PEACY:   Yes, ma'am.

11           MR. GRAY:   Classification review and redaction. So

12   the second step is a two-step process too.

13           THE COURT:   And did counsel say that correctly?

14           MS. PEACY:   Yes, that's correct.

15           THE COURT:   Okay. Adding new people altogether would

16   be similar to adding I gather time periods that weren't

17   previously searched; is that true?

18           MS. PEACY:   Yes.

19           THE COURT:   It would be the same idea. I mean,

20   basically you've got to find where -- their materials are --

21   if you can answer this, I mean, just so again the record is

22   clear, some of this has been covered in other hearings, but

23   how are they maintained such that NSA could go back in time

24   and find them in the first place?

25           MS. PEACY:   So I can only offer a very high level

1    because my understanding, I'm not technical in nature, that's

2    not my understanding, by they are archived off after a year.

3    So we're talking periods that have been archived for years.

4    And they pull those archives one month at a time.  So they

5    would have to pull the archive records each month and upload

6    those each month at a time to recreate those documents.

7          **THE COURT:**  Okay. Anybody want to ask anything in

8    light of my questions?

9          **MS. WEEKS:**  I just had one clarifying point, Your

10    Honor.  I heard a little bit of a distinction between how you

11    were describing the Jennifer Blake search parameters and how

12    Ms. Peacy was. My understanding is that the search was limited

13    to July of 2017 because of the agreed upon search parameters

14    by counsel, right?  Not because they conducted some search and

15    her name was only popping up in terms of having documents for

16    July 2017.

17          **MS. PEACY:**  Correct.  The parameters for Ms. Blake

18    we were given were only one month, July 2017.

19          **THE COURT:**  See now then I'm lost because I thought

20    that's not what you said. I thought a preliminary search was

21    conducted and her name only appeared for July of 2017.

22          **MS. PEACY:**  No. We were only given her name for a

23    one-month parameter under search term for July 2017 under that

24    2017 program review search term.

25          **THE COURT:**  So in other words, there was no effort

1    to search her files I'll call them, whether it's high side

2    emails, whatever it might be, none of that was done for any

3    month beyond July '17 -- first let me stop there; is that

4    correct?

5         **MS. PEACY:**  So my knowledge, once I came on board in

6    September or October of '22 that would be accurate.  I'm not

7    sure and I can't speak to what might have been done before

8    that.

9         **THE COURT:**  So do you know how it was determined to

10   only look for her for one month?

11        **MS. PEACY:**  I don't. I was not involved in that

12   process. That happened before I came on board.

13        **THE COURT:**  Okay, thank you. Anybody else have any

14   questions?

15        **MR. GRAY:**  I don't have any further ones for Ms.

16   Peacy, Your Honor. But there are other matters I still need to

17   address.

18        **THE COURT:**  Thank you, Ms. Peacy. See now I don't

19   really get it, Mr. Gray. Maybe you can help me out here.  Why

20   was Jennifer Blake only searched for one month, just out of

21   curiosity?  Not saying she should have been searched for more,

22   but why only one month?  Who made that decision?

23        **MR. GRAY:**  Your Honor, this explains why we have to

24   do the document that I began referencing about a month ago.

25   We need to do a complete explanation of the course of the

 1          searches, what decisions were made, who did it, who made those

 2          decisions and we have to have that to be ultimately part of

 3          the appellate record in this case. I mean, I think Your Honor

 4          has gotten a sense now as to why reopening all of this now and

 5          ignoring the defendant's waiver is such a problem.

 6              And I want to go back to this document from the defense.

 7          And I think this -- I'm sorry, can we get this up on the

 8          screen?

 9                  **THE CLERK:** You have to change it to document cam on

10          the little box over there.  It's a little screen on the side.

11                  **MR. GRAY:**  Okay, document cam. Yes.

12                  **THE CLERK:** There you go.

13                  **MR. GRAY:**  So this is what I received from Ms. Peacy

14          and there's two things I want to point out about this.

15                  **THE COURT:**  Is this already -- is this part of your

16          ECF 411?

17                  **MR. GRAY:**  I'm thinking that it was attached as an

18          exhibit, like Exhibit 1 or 2 to ECF 410, but my memory of that

19          may be off, but it was --

20                  **THE COURT:**  I just wanted to make sure we have a

21          good record.

22                  **MR. GRAY:**  You'll see at the bottom there are three

23          people who were labeled who I think Ms. Weeks was under the

24          perception were not previously searched for at all. I mean, I

25          can't believe Mr. Bryant was not searched for. I'm quite

confident that searches were run on Mr. Bryant's documents. We can confirm that, but the idea that we wouldn't have searched that given that he was one of our most important witnesses and the defense would not have requested Mr. Bryant just it makes no sense to me.

Now the next two names above that, Megan Collins and Sherrill Guinther, quite bluntly the idea that we're being asked to conduct searches of their records using all of these terms is mind boggling because Ms. Guinther was out of supervising the Ironbridge contract in I believe February of 2013, so more than three years before the period that's covered from the defendant being a program manager. She had a role at trial as Your Honor will recall because of the dealings she had during that early period in 2011 through the very end of 2012, beginning of 2013.

Megan Collins was a contract specialist under Ms. Guinther, I believe in the time period just of 2012. She had not worked for the NSA for years after that. But she also had some involvement in connection with -- I think she was the one who actually transmitted the facts -- well, whose name was put on the facts that supposedly transmitted the Guinther letter. That's how she got dragged into the case.

THE COURT: But you're saying based on the time period they couldn't be relevant to the lawsuit.

MR. GRAY: Correct.

```
 1              THE COURT:  And Ms. Richman is shaking her head in
 2    the affirmative.  Does that mean you agree?
 3              MS. RICHMAN:  Yes, Your Honor.  And this is
 4    illustrating to me how useful it would have been to get on the
 5    phone and talk this through with Mr. Gray after we sent the
 6    search terms to him.
 7              THE COURT:  Okay, but how about Rob Bryant?
 8              MR. GRAY:  As I say, Your Honor, we can check on
 9    that, but--
10              MS. PEACY:  I think there was a second page to that.
11              MR. GRAY:  Am I missing a second page?  There it is,
12    right. It's just carried over onto the second page where it
13    reflects what was previously searched for him. And then Erica
14    Heinze where they're adding a whole number of things in
15    connection with Erica Heinze that came in the last period and
16    then Jennifer Blake.
17              MS. WEEKS:  Just to clarify, Rob Bryant only had the
18    2017 management review, project manager or PM and removed her
19    bill for hours. What you showed on page 2 was the search for
20    Jason Clark.  And all we're asking is that Rob Bryant had the
21    same search terms already searched for the other custodians
22    related to the request.
23              MR. GRAY:  I see.  It's a little confusing, Your
24    Honor, because the name of the person in question appears like
25    on the very last line of the paragraph that supposedly
```

1    indicates everything that was searched for.  So it's a little

2    baffling.  And then I guess as to Jennifer Blake it's just

3    those few items. They themselves appears only are asking for a

4    few items related to the program manager review.

5           **THE COURT:**  But I can't tell.  Are you saying Rob

6    Bryant there was a search or there wasn't a search?

7           **MR. GRAY:**  Your Honor, what I'm saying is -- and

8    remember, once again I had to deal with everything else that

9    Mr. Ahlers was generating, plus be lead counsel on the trial

10   in terms of preparing the case for trial.  So Mr. Cooch was

11   the one who took on the lead role.  And quite frankly, for

12   most of the time period from the end of September, October,

13   November, December of 2022, most of his time was spent on

14   dealing with these document production issues rather than

15   preparing for trial per se.

16          **THE COURT:**  Well, it's a simple question. Can

17   someone from NSA answer my question?

18          **MR. GRAY:**  Of course.

19          **THE COURT:**  Was Rob Bryant someone who was searched?

20          **MR. GRAY:**  Absolutely. That was assumed by my prior

21   statements, Your Honor.

22          **THE COURT:**  Well, whatever you just showed me which

23   isn't going to be clear on the record because we don't have a

24   reference point for it, doesn't make it clear what the search

25   was for him.

1          **MR. GRAY:**  Yes, Your Honor. This document was an

2    attachment to one of my letters under ECF 410 or ECF 411.

3          **THE COURT:**  It's one of your letters --

4          **MR. GRAY:**  And there was one other thing that I

5    wanted to cover here. This is more sort of correcting the

6    record from something that happened back during the sentencing

7    hearings in November. During the sentencing hearings in

8    November, as part of the discussion of the Guinther letter, I

9    produced Access Control -- it may have been just in an email

10   confirming that Ms. Guinther was in Access Control on both

11   December the 19th of 2021 which was the date of the letter

12   from which Ms. Guinther's signature was cut and pasted on the

13   later fraudulent Guinther document from October the 10th of

14   2012. So I produced documents showing that she was in Access

15   Control on both of those dates so there could not be a

16   suggestion that "Oh, well she was out of the office so perhaps

17   she had someone else do it for her."

18        Ms. Weeks objected strenuously that that document had

19   never been received in discovery previously and as this

20   reflects, they got those Access Control records on December

21   the 20, 2022 in advance of the original trial. So I think we

22   just need to correct that in terms of the record of the

23   sentencing proceedings back in November.

24        Your Honor, let me see what else I may have. And Your

25   Honor, just one other thing I want to make a cautionary note

about is the idea that sentencing determinations are

completely different from guilt/innocence determinations,

especially in regard to cases involving the submission of

false claims where the amount of the loss is at issue.  As

I've said, I don't believe there's a basis for that. It's not

a distinction that we apply in terms of our discovery

productions in this case.  It's not the kind of distinction

that's applied in the U.S. Attorney's Office in discovery

productions in any case.  But accepting that at face value

would mean that in virtually any criminal case in this

district, the defense can then come back after the trial phase

and say, "Okay, now we want all of these additional discovery

requests in connection with the sentencing phase because the

sentencing phase presents completely different issues."

        **THE COURT:**  The sentencing phase what?

        **MR. GRAY:**  Presents different issues. That would be

a very ominous and unfortunate precedent to set. And there was

an example of something that I thought legitimately fell into

that category which was when they raised the question that

they thought there was positive information about her

character in the security file, that was something that had

not been part of our guilt/innocence case at trial. Would not

have been relevant because we would have been getting into

issues of her character which would not have been appropriate

at trial. But when they raised that once we figured out what

 1      they were actually talking about that it was not the personnel

 2      file, I went out to the NSA as early as September the 30th to

 3      review those records and to start those in the process of

 4      being reviewed.

 5            So occasionally there will be things where there may be

 6      some issues that goes to a defendant's character that would

 7      not be properly within the scope of guilt/innocence

 8      determinations.  But to say that any case where the defense

 9      can just say "Oh, well, the amount of the loss is not quite --

10      is not the same as what is material for the purpose of the

11      elements of the Section 287 violation so we're entitled to go

12      back to the races on discovery and start something entirely

13      new there absent some really substantial reason for believing

14      that something significant was not turned over originally and

15      should be produced now."

16            And in this case we have the -- and I'm sure this is

17      unprecedented in the federal reports, where a defendant has

18      and her counsel, knowingly waived further production of items

19      that they have demanded, probably because they knew they were

20      not very useful since of the thousands of pages previously

21      produced they only used one or two of them. Would they have

22      waived that?  And the Government has shut down its processes,

23      when a thousand pages were apparently still in the security

24      and classification department's queue at that time and

25      presumably were getting close to being produced.  When we were

1    being told that the remaining thousand pages could probably be

2    produced and reviewed and redacted and reduced within at most,

3    four to six weeks.  We shut all that down, the request of the

4    defendant and her counsel and have been substantially

5    prejudiced as a result of having done so.

6        I mean, Ms. Richman was raising issues about the

7    defendant having been prejudiced by the continuing ongoing

8    character of these proceedings which is wholly a function of

9    the defendant's own demands.

10        And Your Honor, I want to emphasize the Government has

11    been severely prejudiced by the continuation of all of this,

12    from this engineered change of counsel back in May of last

13    year to the present. The NSA has been severely prejudiced by

14    the continuation of this and was prejudiced by the frivolous,

15    groundless, unproductive request that they were forced to deal

16    with for months in advance of the original trial. The

17    Department of Justice has been prejudiced by this insofar as I

18    have other matters that I have not been able to address. I

19    have at least one case that I had to decline because of the

20    extraordinary demands that this case and the discovery and

21    everything else put on us.

22        And then finally, obviously the Court by the additional

23    time it's had to take and then finally, perceptions of the

24    justice system as a whole suffer and are damaged when a

25    defendant gets convicted of serious crimes like this on

1    February the 15, 2023 and has not yet been sentenced almost a

2    year later. There is a lot of prejudice going around in this

3    case as a result of the continuing actions of the defense and

4    their belief that this is what they need to do in order to

5    feel comfortable that they've done their due diligence.

6         **THE COURT:** Well, last hearing they didn't want to

7    postpone the sentencing of March 7 and you did. It's still the

8    sentencing date.

9         So now I appreciate your impassioned remarks, Mr. Gray,

10   and the record won't reflect the passion with which you

11   delivered them so I'm announcing that. I had nothing to do

12   with the change of counsel and I can't help that. That ship

13   sailed, so here we are.

14       **MR. GRAY:** Actually, Your Honor, it hasn't entirely

15   sailed because we intend to bring it up in the sentencing

16   memo. We believe the defendant engineered that.

17       **THE COURT:** Well, the decision to allow the change

18   of counsel is not something that I was involved in.

19       **MR. GRAY:** Exactly, yeah.  And as a matter of fact,

20   I think we're probably going to be requesting that the

21   attorney inquiry hearing be transcribed because I would not be

22   at all -- we have some reason to believe as the defense would

23   say, that it's reasonably likely that false representations

24   were made at the attorney inquiry hearing.

25       **MS. RICHMAN:** Your Honor, to the extent that hearing

1   was ex parte, I think an inquiry will need to be made about

2   whether the Government is entitled to that. If they're

3   pursuing a new investigation of facts with connection to --

4          **THE COURT:**  Well, I don't want to spend a lot of

5   time on it because this would be --

6          **MS. RICHMAN:**  I don't either, Your Honor, but I

7   would object to an ex parte--

8          **THE COURT:**  Talk about a frolic and a detour.  I

9   don't think that would be a productive use of our time.

10         **MR. GRAY:**  I think Your Honor would have a very

11  different view when you see what the defendant was actually up

12  to at the time of that transfer.

13         **MS. RICHMAN:**  I understand that Mr. Gray is

14  referring to communications my client and her counsel made to

15  policymakers noting their disagreement with interpretation of

16  the law.  I spent a year on the Health Hill working for

17  Senator Durbin. It was fairly routine for me to see people who

18  were not happy with the positions courts had taken come in and

19  request changes to the law or changes in policy as a result of

20  that.

21      I'm interested in why Mr. Gray thinks that this is an

22  engineered -- I don't -- I think it probably is a sideshow to

23  the issue of sentencing, but if there is discussion of ex

24  parte transcript of an attorney inquiry hearing being made

25  available to the Government, we will want to brief that and

1    understand the basis for that request. That is all I'd like to

2    say.

3              **MR. GRAY:**  Of course.  That was totally assumed --

4              **THE COURT:**  I'm moving off that topic because we've

5    already been at this two hours and I'm not really going to

6    spend the rest of the time that we have on that issue.

7        What I do still feel uncertain about is some of the

8    requests of the defense it would seem to me were already

9    provided in connection with what you say, Mr. Gray, if I've

10   understood your remarks correctly, essentially that as part of

11   your discovery disclosure obligation, some of this material

12   would have -- you weren't sort of parsing out the issue of

13   amount of loss from other issues. So this would have been --

14   some of this it seems to me would have been captured in

15   earlier discovery productions.

16             **MR. GRAY:**  From my perspective, Your Honor, prior to

17   trial those were completely indistinguishable.  Because

18   anything that showed she spent any time at all --

19             **THE COURT:**  But what I searched for an answer for

20   and I don't know that I feel I have one is, for example, are

21   you able to -- I know you weren't involved personally, Mr.

22   Cooch handled this, or Ms. McDonald before.  It was sort of

23   never your particular assignment.  Ms. McDonald, Joyce

24   McDonald is the AUSA to whom I'm referring who is no longer in

25   the office.  But my question would be this claim, for example,

1  that the contract required weekly status reports.  So where

2  are they?  I mean, did they exist or don't they exist?

3           **MR. GRAY:**  I'm sorry, Your Honor.  There really were

4  -- I got a little off-track and there really were a number of

5  other points that I had intended to address.  We have been

6  going on for a while, so --

7           **THE COURT:**  And let me just ask because I never need

8  a break. Does anybody in front of me need a break?  You're

9  good?  Okay.  You'll let me know?  Okay, thank you.

10          **MR. GRAY:** As regards to those status reports, and

11 once again, this is -- I mean, it's a substantial record. I've

12 certainly seen far more substantial records and have worked

13 with some fairly recently. But there are times when there

14 appear to be some gaps in defense counsel's knowledge which is

15 understandable under the circumstances perhaps.

16     With regard to the status reports, yes. The ultimate

17 contract includes a number of different items that are set

18 forth as contract data sequels, contract data required

19 documents. I'm confident, I'm pretty sure it may have been

20 testified to by Mr. Bryant, perhaps by Mr. Smith that at trial

21 it was specifically discussed -- I think we went down a list

22 of those reports and I think it was identified that there was

23 maybe only one item that as a practical matter was being

24 insisted upon by the Government in connection with the

25 Ironbridge contract.

1    I mean, obviously these form contracts are used in all

2    sorts of circumstances used widely across the board and so

3    those are standard requirements that are set forth, but that

4    doesn't mean that as a practical matter they actually happen.

5    And it was interesting that the defense said well, Mr.

6    Smith said if you never formally said that he wanted -- he

7    didn't want the status reports anymore.  Well, what he

8    actually said was he didn't recall that he ever specifically

9    said no more status reports, he just said, "I remember getting

10   them but I never looked at them. They were of no relevance to

11   me."

12   And quite frankly, Your Honor, as I have sort of viewed a

13   lot of this, I've begun to wonder whether what Mr. Smith

14   called a "status report" was, in fact, the FMHER which

15   basically indicated like how many hours had been expended for

16   every labor category on the Ironbridge contract. And that was

17   important because you had to keep track of that stuff on an

18   ongoing basis to determine whether there was likely to be some

19   kind of a shortage of funds before the end of the fiscal year.

20   That was Mr. Pugh's primary responsibility, it was not Mr.

21   Smith's.

22   All of the FMHERs for the relevant months were introduced

23   in evidence at trial already.  So if that was what Mr. Smith

24   was actually talking about, those are already in evidence at

25   trial.

1    I have identified I think in my recent filing that there
2    was testimony by Ms. Colston at trial that she remembered
3    doing her reports, but she was blithe in dismissing how little
4    time they took. And it may well be that at some point after
5    that it just was decided that there really is no need to do
6    these status reports, where all except Ms. McComber who is
7    rarely there, are all in this very small office at NSOC seeing
8    each other on a daily basis basically able to reach out and
9    touch some of her colleagues at the adjoining desk or work
10   station.
11       And so the mere fact that something is in a contract in
12   practical terms doesn't mean that it was done. And the idea
13   that if these were being done during her tenure as the program
14   manager the second time around -- I mean, the most significant
15   statement on this issue is a contemporaneous statement by the
16   defendant herself in that email to Jason Doyle in early April
17   saying Jon Smith told us we don't have to do these anymore.
18   So maybe Mr. Smith doesn't recall having said that and maybe
19   he was just so indifferent to them that at some point people
20   stopped doing them and he never objected.  But it is the
21   defendant herself who says that "Jon Smith told us we don't
22   have to do those anymore and so we stopped" and, you know, "I
23   hate having to do these again."
24       And moreover, as I pointed out in my most recent filing,
25   Jon Smith had been gone by that point for like six months. So

1    it's not just that nothing had been done for the previous six

2    months, it's apparently for some time before that during his

3    tenure, prior to his departure in roughly October or November

4    of 2016 they weren't being done either. And that takes us back

5    very close to the time where the defendant became the program

6    manager. So that would suggest that at most, maybe they were

7    being done for a few months in 2016 after she first came

8    aboard before that practice just fell into desuetude as one

9    might say.

10        Let me see if there was anything else. There was some

11   point you had raised which was about --

12        **THE COURT:**  I was just wondering if apart from what

13   happened after the Court's order of August 2022, did NSA also

14   have a record of what it produced to the Government prior to

15   that period?  Because what lingers in my mind is I haven't

16   felt that I can conclude that a search for these -- I know

17   your point that they were not produced, but who is going to

18   verify that they were -- there weren't any others?

19        **MR. GRAY:**  I'm sorry, any other what?

20        **THE COURT:**  Status reports or whatever they're

21   consisting of.  The fact is that I realize and I understand

22   that you're saying these are form contracts, standard

23   requirements are not enforced and so on. But as a practical

24   matter, nobody really was asking for those particular reports

25   at that point in time.  But can someone tell me that search

1    was undertaken?  Because you want to distinguish -- well, I'll

2    just add this: I appreciate your point, Mr. Gray. I understand

3    your argument about waiver and/or abandonment, but I don't

4    think it extends to the sentencing. I don't know that this is

5    an everyday occurrence, but there are certainly cases where

6    the courts hold hearings in connection with issues that are

7    solely related to issues pertaining to sentencing. And there's

8    often discovery exchanged in connection with whatever those

9    issues are. So I don't think it's as sort of cut and dry as

10   you want me to conclude. I don't think that whatever

11   transpired before necessarily precludes the defense from

12   seeking to obtain information pertinent to issues that are

13   solely related. I know you're saying they're not solely, but I

14   think this is a much more refined, if you will, aspect of the

15   case regarding issues that are pertinent to sentencing. What

16   is the precise amount of the loss.  And it doesn't have to be

17   precise in the sense of what I reviewed when we began, but

18   some kind of -- precise in the sense that we have a range, a

19   reasonable estimation that the Court can base it on.

20           **MR. GRAY:**  Your Honor, you have said repeatedly and

21   I cited some of those references in my filing of early

22   yesterday morning that we're not going to do a do-over here.

23           **THE COURT:**  And I couldn't be more --

24           **MR. GRAY:**  All of these names --

25           **THE COURT:**  --positive about that view.

1        **MR. GRAY:**  --up there, that is exactly what the

2   defense is asking for.

3        **THE COURT:**  Well, for example, right now I'm feeling

4   -- I was trying to go through the transcript of January 9

5   which is ECF 406, and I know with respect to Rob Bryant, it

6   does seem surprising that -- I'm not sure I can say a search

7   was ever done for Rob Bryant. How would that be?

8        **MR. GRAY:**  I wouldn't necessarily expect you -- Your

9   Honor, you should not be expected to be able to off the top of

10  your head to say that a search was done for Rob Bryant.  I

11  will make this statement:  I would be flabbergasted if no

12  search was done for Rob Bryant.

13       **THE COURT:**  Could Ms. Peacy tell us?

14       **MR. GRAY:**  He was considered an important --

15       **THE COURT:**  Right, I agree with you.

16       **MR. GRAY:**  He probably would have been one of the

17  very first ones that was done before Ms. Peacy even came into

18  the process in the fall of 2022.

19       **THE COURT:**  So on Page 53 of ECF 406, Ms. Peacy

20  says, "Rob Bryant, the only email we found was already sent

21  under Kristin Mair. They were both on the same email so that

22  was sent in the January 2023 time frame." What I think you're

23  telling me is before August of 2023, that information would

24  have been procured regarding Rob Bryant, but I'm not sure that

25  anyone has ever verified that.  And is that something you can

1  verify?

2          **MR. GRAY:**  Your Honor, you said -- just for the

3  record, you said August of 2023.  I think you meant August of

4  2022.

5          **THE COURT:**  I'm sorry.

6          **MR. GRAY:**  Right.  And absolutely, yes, we can

7  verify that.  We can, and we will and I hope --

8          **THE COURT:**  I did mean my August 2022 order, sorry.

9          **MR. GRAY:** Right, but the fact as to all of these

10 people they're going back and saying "Hey, we now think there

11 are actually other terms that should have been requested for

12 these folks."  So even though --

13         **THE COURT:**  Well, the terms don't -- maybe this is

14 incorrect, but the terms aren't my worry as much as who and

15 what periods of time. The question for me is whether I'm

16 expanding the number of people and the time period.  Because

17 what I think I've heard today and last time is that for

18 someone for whom there's already been an upload, adding a few

19 additional search terms is not going to be as difficult as

20 completely locating and going back to wherever these are

21 stored and finding the people and finding the time periods and

22 uploading those and conducting some -- the process that's

23 involved to do all of it. So I'm not as worried about adding

24 the few search terms as I am what period of time and for whom.

25         **MR. GRAY:**  And then beyond that, how long is it

1        going to take those to go through classification review and

2        then the redaction of the names?  There is a queue and Your

3        Honor has suggested at times you think that matters in this

4        case should be elevated to importance beyond anything else

5        that is pending with classification review.  And at the same

6        time, Your Honor, you yourself have used the word "tangential"

7        to characterize what you believe to be the likely relevance of

8        all of the new stuff that they're asking for. So to ask the

9        NSA to elevate to the top of its priority for classification

10       review the marginal, tangential --

11               **THE COURT:**  Well, that's because I don't want to

12       postpone the sentencing, so time is of the essence.

13               **MR. GRAY:**  Well, Your Honor, I don't think the NSA

14       should be asked to do that when this is a function of two

15       defense counsel who are hardworking and very zealous and very

16       diligent and who have been trained in the ways of large law

17       firms where the idea is leave no stone unturned, but we're

18       past conviction now. Tons of evidence has been presented. Tons

19       of testimony has been taken and we -- there's a very wise

20       American folk saying to the extent of "When you find that

21       you've dug yourself into a hole, stop digging."  I think that

22       time has long since arrived in this case at this point. I

23       think we should be enforcing the waiver that the defendant did

24       back in January of 2010 and getting this thing to sentencing

25       and getting it done.  Thank you.

1          **THE COURT:**  So let me see if I can wrap this up. The

2     emails, am I correct, that issue, have they actually been

3     turned over or about to be turned over?

4          **MR. GRAY:**  They had been turned over to us, Your

5     Honor, and we'll have to number those.  I think I also asked

6     my paralegal if she could get them in chronological order

7     because they're not in chronological order, but I anticipate

8     we'll be able to get that done this week.

9          **THE COURT:**  So the emails which were a part of the

10    topic are going to be provided, the reduced number this week?

11         **MR. GRAY:**  Right.

12         **THE COURT:**  For status reports. I had wanted NSA to

13    -- my concern is some of this may have already been done. This

14    is one of the lingering issues I've raised repeatedly that the

15    request was for status reports that related to the duties and

16    responsibilities of the program manager on the Ironbridge

17    contract. And I had contemplated permitting that if it hadn't

18    already been provided.

19         **MR. GRAY:**  Your Honor, the contract itself shows

20    what was originally back in 2011 as a matter of standard

21    Government practice set forth as the required reports. We've

22    had testimony at trial from all sorts of witnesses who were in

23    a position to discuss this about what actually was required

24    during Ms. Colston's time and what was not required it appears

25    during most, if not all, of Ms. McComber's time as the program

1      manager.

2          Of course this is something that the idea that the status

3      reports which as we've seen were the subject of -- I mean,

4      those were sent, the last one, the one that we know was done

5      in April of 2017 was sent on the low side from InfoTeK --

6      through InfoTeK's own emails to the Government. The defendant

7      knew she was under investigation, knew what the issues were in

8      this case in October of 2017 like right at -- I mean, that

9      terminated her conduct, the discovery of her fraud as a result

10     of the whistleblower letter that was sent in by the number 2

11     person in her company, the Chief Operations Officer, Shilo

12     Weir.

13         So the idea that the defendant who had counsel then, who

14     had secured counsel in a matter of months in the person of Jan

15     Miller, formally the section chief for our offices' Southern

16     Division and later the U.S. Attorney in the Central District

17     of Illinois that he wouldn't have, like, instructed her to

18     preserve this stuff, that this stuff couldn't have been

19     preserved?  That the idea that she -- a) she can't produce it

20     herself. Beyond that I'll have to check the testimony exactly,

21     but I'm not sure she was even asked by her own counsel at

22     trial whether she produced status reports. I'll have to check

23     the record on that, but it wouldn't surprise me if the answer

24     is she wasn't even asked that.

25             **THE COURT:**  But here's my question --

1      **MR. GRAY:**  She always said -- remember this, Your

2   Honor.  She always said, "My main function is the care and the

3   feeding of the personnel on the contract."

4      **THE COURT:**  I don't think she said that was her main

5   function, but she said it was something she did.

6      **MR. GRAY:**  Oh, if you look at the testimony I think

7   you will find she frequently --

8      **THE COURT:**  She certainly said "care and feeding,"

9   but she didn't necessarily say it was her main function.

10      **MR. GRAY:**  We will pin that down, Your Honor, but I

11   think in her original NSA transcript she did.

12      **THE COURT:**  I read that transcript.

13      **MR. GRAY:**  Right.

14      **THE COURT:**  Just the other day.

15      **MR. GRAY:**  Yeah. I think -- well, we'll check. We'll

16   confirm.  But no, I don't recall her ever saying "my principal

17   function was writing reports. That's most of what my time was

18   spent on." Do you recall that, Your Honor?

19      **THE COURT:**  No, I do not. But I don't know if it's

20   clear one way or the other if Rule 16 does apply.  It does

21   include items obtained from or belonging to the defendant.  So

22   the answer that she might have kept them or had them isn't

23   really necessarily dispositive.

24      What I don't want to have happen is that we redo what the

25   Government has done.  And nobody has ever been able to tell me

1    what has been looked for in terms of these status reports.

2    Maybe Mr. Pyne can enlighten me.

3            **MR. PYNE:**  Ms. Peacy does have a list of exactly the

4    terms and who she's run them against if it would be helpful.

5            **THE COURT:**  Okay. Does it include status reports?

6            **MR. PYNE:**  Status reports was run against at least

7    six or seven different names.

8            **THE COURT:**  Okay, let's find out who then.

9            **MR. PYNE:**  And she has all the other terms that were

10   run as well.

11           **THE COURT:**  Okay.

12           **MS. PEACY:** For the period of 2016 and 2017 the word

13   "status report," initials "MSR" standing for monthly status

14   report and "InfoTeK" and/or "Ironbridge" associated with those

15   was run against Jason Clark --

16           **THE COURT:**  Hang on, I'm writing this down so just a

17   little slower.

18           **MS. PEACY:**  Jacky McComber, the defendant; Kristin

19   Mair, Donn Pugh, Regina Shirley, and Jonathan Smith.

20           **THE COURT:**  And not Rob Bryant?

21           **MS. PEACY:**  He was not listed in the custodians we

22   were given during the search.

23           **MR. GRAY:**  But during the search when you were

24   there, right?

25           **MS. PEACY:** Correct. This is from August 2022.  I

```
 1    couldn't speak to anything that was done on Rob Bryant prior
 2    to me.
 3            MR. GRAY:  Right.  Because that would have been done
 4    by Maxine Meade, right?
 5            MS. PEACY:  Maxine or potentially someone prior to
 6    Maxine, yes.
 7            MR. GRAY:  Right.
 8            THE COURT:  But we don't know because you don't have
 9    that information.
10            MS. PEACY:  I don't have knowledge standing here
11    offhand, but it's something we can go back and find out and
12    talk to some of the other folks that were involved.
13            MR. GRAY:  And Your Honor, bear in mind that we have
14    testimony from Rob Bryant both in his NSA transcript and at
15    trial that he had no idea what the defendant did as the
16    program manager on the Ironbridge contract.
17            THE COURT:  Okay. Well let me turn to the defense
18    and ask of the search -- well, the search was done for the
19    words "status report," "InfoTeK," "MSR" -- "MSR" and
20    "Ironbridge." Monthly status report with "InfoTeK" and
21    "Ironbridge" and "status report" for multiple people.  So why
22    would I have ordered any more?
23            MS. WEEKS:  Your Honor, the people listed do not
24    include Roy Bryant as we just discussed. We're not sure what
25    search terms and when were applied to him.  But also there's a
```

1    possibility that the name "status report" would not turn up

2    what we were looking for in that specific form I discussed

3    earlier.  That's why we provided one additional search term

4    designed to look for that document that was required by the

5    contract and was not --

6              **THE COURT:**  And what's that term?

7              **MS. WEEKS:**  That's the DI -- I had it up on the

8    screen earlier.

9              **THE COURT:**  I remember, but I don't remember what it

10   was.

11             **MS. WEEKS:**  DI_MGMT-803688. That specific form is a

12   requirement under the CDRL.  Mr. Stein testified that if the

13   Government was not receiving that for any reason, there should

14   be a noted deficiency in the file and there wasn't. I believe

15   Kelly Sulewski testified that there were monthly status

16   reports required to be done.  And again, I would just note for

17   the record that this is distinct from the technical status

18   report that Jason Doyle testified about that Mr. Gray

19   continues to point out.

20             **MR. GRAY:**  Let me clarify if we can.  You said this

21   is different from the technical status report.  And I'm sorry,

22   this is the DI -- that's a DI_ management, MGMT-80368 A?

23             **MS. WEEKS:**  Yeah, it's AO13 in the CDRL of the

24   contract, if you need further clarification.

25             **THE COURT:**  And what exactly do you think that

```
 1     report includes?  What's your understanding?
 2          MS. WEEKS:  I looked it up on the internet earlier
 3     because again, I've never seen one since it wasn't produced.
 4     And I have a list of what it would include if it would be
 5     helpful for me to show the Court.
 6          MR. GRAY:  Sure.
 7          THE COURT:  Yes.
 8          MS. WEEKS:  If I can find it. Again, this is the
 9     document we're talking about. Status report. The status report
10     documents the status of contractor effort towards achieving
11     contract objectives. It identifies accomplishments to date and
12     difficulties encountered and compares the status achieved to
13     planned goals and the resources expended. It is used by the
14     Government to monitor and evaluate contractor performance.
15          THE COURT:  And is this a classified or
16     unclassified, from your perspective?
17          MS. WEEKS:  Your Honor, I believe it's unclass--
18     you're talking to me?
19          THE COURT:  Yes.
20          MS. WEEKS:  I believe it's unclassified, but it
21     might have been kept on the high side and it might also have
22     classified aspects of it to the extent it's getting into the
23     technical contract requirements.
24          THE COURT:  So is your client saying that she
25     actually prepared reports like this?
```

 1              **MS. WEEKS:**  Yes, Your Honor.

 2              **THE COURT:**  But she doesn't have them?

 3              **MS. WEEKS:**  Correct.

 4          **MR. GRAY:** I'm sorry, are we sure she's actually

 5      saying that?

 6              **MS. WEEKS:**  Yes, Your Honor.

 7          **MR. GRAY:**  She's actually saying she prepared these

 8      reports on what, a weekly basis or a monthly basis?

 9              **MS. RICHMAN:**  Excuse me, Your Honor, we have good

10      reason to believe and proffer to the Court that our client

11      created these reports.  We're not putting her on the stand to

12      testify right now or putting statements by her into the

13      record.

14              **THE COURT:**  No, I was trying to understand, though,

15      I wasn't -- because I don't think it's fair to ask the

16      Government to go on a wild goose chase, so I was trying to

17      find out if this is theoretical or we know she's claiming she

18      really did make these submissions.

19              **MS. RICHMAN:**  I'm a little bit of a problem solver,

20      Your Honor, and one thing that occurs to me is that if it is,

21      in fact, relatively easy to run this term over the documents

22      that have been collected so far, it might be possible to know

23      whether there's actually any hits pretty quickly.

24              **THE COURT:**  Well, I understand that, but I'm not

25      interested in broadening it to people who weren't already

1      searched.

2              **MS. RICHMAN:**  And I don't think we're asking that.

3              **THE COURT:**  Okay, well I only got the names that

4      just were read.

5              **MS. RICHMAN:**  You mean you don't want to broaden it

6      for people who were searched for "status report" or

7      searched --

8              **THE COURT:**  I don't want to broaden the search for

9      people for whom a search for some reason wasn't conducted in

10     the time period you're talking about.

11             **MS. RICHMAN:**  Okay, that's fine.  I think the only

12     person's name that was added by Ms. Weeks was Jennifer Blake.

13     So I think everybody else on our list, we used that list

14     because our understanding was they had been collected and

15     searched already.

16             **THE COURT:**  So -- okay.

17             **MS. RICHMAN:**  So then I wonder whether Ms. Weeks can

18     continue to establish the relevance of this document. I know

19     it seems like there's two sides of the Government's concern in

20     terms of burden. One is the search itself, the second is the

21     redaction and production process. We don't know whether there

22     will be a burdensome redaction and production process if this

23     turns up zero hits. And I wonder whether we could just get

24     some -- I was kind of hoping we'd come here today and get some

25     baseline information about how large this universe for the

1    seven terms that the defense added to people already searched

2    so that we can make these decisions in a nonspeculative

3    manner.

4        I'll let Ms. Weeks continue, but I did want to put forth

5    that suggestion.  If we could even quickly get like how many

6    hits are there for the terms that Your Honor believes are

7    relevant to the issues of loss, and then we can make informed

8    decisions about how burdensome redaction and production of

9    these documents would be.

10        **MR. GRAY:**  Your Honor, I just have a quick question.

11   I want to make sure this is clear on the record. Is the

12   defendant saying these release status reports were produced on

13   a weekly basis or monthly basis? And over what period of time

14   is she saying she produced the reports?

15        **MS. WEEKS:**  And I would just refer the Court back to

16   the contract requirements which state that this was a weekly

17   requirement and that it was to be delivered no later than

18   Thursday weekly. That's what the contract states.

19        **MR. GRAY:**  And the one thing I would ask -- that I

20   would say, Your Honor, further on this point is having looked

21   at that text as to what these reports are supposed to say, it

22   explains where Jonathan Smith was coming from when he

23   testified at trial "Why would I have cared about reports like

24   this when we're all in the small room" -- except for Ms.

25   McComber, of course -- "day in and day out working directly

1    with each other. Why would I have needed anything like that?"

2         **THE COURT:**   Okay, he did essentially say -- those

3    may not have been his exact words, the gist of it. That said,

4    it doesn't mean that there weren't reports. Maybe there were,

5    maybe there weren't. Obviously I have no idea. I highly doubt,

6    frankly, that there were weekly reports based on the way the

7    contract was managed at this stage late in the life of the

8    contract. It doesn't seem -- there wasn't any testimony, for

9    example, of the defendant when she testified that she was

10   producing these reports, if my memory is correct.

11        **MR. GRAY:**   Also, Your Honor, let's bear in mind that

12   since we've had Mr. Stein invoked here, someone who I think it

13   became clear over the course of these proceedings was quite

14   frankly a crank, that he was asked on direct examination at

15   trial by me:  "Have you ever seen any of Ms. McComber's work

16   product?"  His answer was "No." I then asked him:  "Have you

17   ever even requested to see any of Ms. McComber's work

18   product?"  His answer, was again, "No."

19        **MS. WEEKS:**   I believe he was accepted as an expert

20   on contract process and procedures, DOD. I don't think he was

21   a fact witness as to the work product that Ms. McComber was

22   producing.

23        **THE COURT:**   So my question is to the people at

24   NSA -- and if I understood you correctly, Ms. Richman, you

25   were suggesting not all of the search terms you originally

1    sought are you pressing now.

2             **MS. RICHMAN:**  We have added seven suggested

3    additional search terms. I think we've talked about "badge"

4    and we've talked about this particular form.

5             **THE COURT:**  But why "badge"?

6             **MS. WEEKS:**  But we also talked about, Your Honor,

7    the fact that we'd be happy to meet and confer with the

8    Government.

9             **THE COURT:**  But that drags everything else, so I'd

10   rather -- the purpose of the "badge" was because it's somehow

11   relevant to onboarding. Is "onboarding" a word?

12            **MS. RICHMAN:**  Yes, Your Honor.  And I will note that

13   I think that was a word that was misspelled in the previous

14   search terms that were run of these custodians, at least in

15   Excel that was provided to us. I don't know that that's

16   reflective of what was typed into the search engine. So

17   there's these seven terms.  And my suggestion would be to the

18   extent that the Court agrees with us that they're narrowly

19   tailored and I understand there's more discussion to be had

20   about at least one of these, that we just get a list of hits,

21   determine if this is a universe that is significant and then

22   can make informed decisions about whether this would be unduly

23   burdensome to NSA to produce.

24            **THE COURT:**  Right. And so what I'm hearing -- and I

25   want to hear from NSA on this -- is that at least initially

1    the request is to conduct a search of people for whom a search

2    has already been conducted that just expands the use of a

3    handful of search terms, such as "onboarding" spelled

4    correctly or "on board" with the additional formulations of

5    that word; "DI_mgmt" et cetera.

6         **MR. PYNE:**  Your Honor, I know Ms. Peacy can probably

7    respond to this better, but I know for you put it on Rob

8    Bryant, for instance, they only have one month of his emails.

9    And so that would have to go through the process of

10   recreating--

11        **THE COURT:**  No, I was going to limit it to periods

12   where we already have done the search, not asking NSA to

13   expand the months that were searched. That I can't justify.

14        **MR. PYNE:**  So it would be limited to individuals

15   where we have emails from 2016 and 2017?

16        **THE COURT:**  No, it would be limited to anyone for

17   whom you have emails that were searched before for whatever

18   period you searched them. So if Jennifer Blake was only one

19   month, then you're only going to look for one month.

20        **MR. PYNE:**  Very good.

21        **THE COURT:**  The thing about Rob Bryant that remains

22   unclear is whether he wasn't part of this because he was

23   previously already searched.  As Mr. Gray was suggesting,

24   given his importance at the trial, they, meaning the

25   Government, may have already conducted a search and turned

1    information over unrelated to my August 22 order.  And that's

2    why he wasn't captured again.

3            **MR. PYNE:**  And some individuals did a search

4    themselves, so those would not be in that universe.

5            **THE COURT:**  Okay, and do we know who they are?

6            **MR. PYNE:**  I'm sure we could determine that. Michael

7    Miller.

8            **MR. GRAY:**  Michael Miller's were part of that final

9    production of 1,100 pages of documents on January the 12, 2023

10   that's shown on Government production letter 12.

11           **THE COURT:**  But running the search term, Mr. Pyne,

12   is that -- let's say you had somebody for the whole 19 months

13   whose records are part of this. Is running the search term for

14   the 19-month period difficult, additional search terms?

15           **MR. PYNE:**  It's going to involve running it against

16   19 different data sets.

17           **THE COURT:**  Because each one is a separate -- each

18   month is a separate data?

19           **MR. PYNE:**  Exactly.

20           **THE COURT:**  Is that long though?  Is that time

21   consuming?  Is that laborious?  Not talking about the

22   redaction now, we're just talking about if there's even a hit.

23           **MR. GRAY:**  I think that's a Ms. Peacy question.

24           **MS. PEACY:**  A couple days per person.

25           **THE COURT:**  I didn't hear the answer.

```
 1              MR. PYNE:  Her answer was it would take a couple
 2     days per person.
 3              THE COURT:  So let's focus on the people who really
 4     matter. I mean, you know who they are.  I don't know who they
 5     are, Ms. Richman.  From your client's perspective, she knows
 6     who she wants searched. We can't do everybody. I don't think
 7     it's justified anyway, but let's just say I'm willing to allow
 8     this search.  Obviously just my guesses would be Jason Clark,
 9     Jacky McComber, Kristin Mair, Donn Pugh, Regina Shirley,
10     Jonathan Smith and for the month that there's Rob Bryant that
11     we know of.
12              MS. RICHMAN:  Give me a moment to confer?
13              THE COURT:  I'm sorry?
14              MS. RICHMAN:  If I could have a moment to confer,
15     Your Honor?
16              (Discussion held off the record.)
17              MS. WEEKS:  Your Honor, so the custodians to search
18     for this particular status report would be Jacky McComber,
19     Jason Clark, Jon Smith, Donald Pugh, Tiffany Starr-Smith.
20              MR. GRAY:  I'm sorry, could you go a little slower?
21     Who else?
22              MS. WEEKS:  Jon Smith, Donn Pugh, Tiffany
23     Starr-Smith, Erica Heinze, Regina Shirley.  And then for
24     whatever documents of these custodians that have been
25     collected, Rob Bryant and Jennifer Blake.
```

```
1              MR. GRAY:  So I'm sorry, how many names is that all
2     told?
3              MS. WEEKS:  Nine with the caveat on the two that
4     it's for the documents that were already collected.
5              MR. GRAY:  So potentially two days each, we're
6     talking roughly three weeks of work.
7              THE COURT:  Can you go through the names one more
8     time?  Jason Clark.
9              MS. WEEKS:  Jacky McComber.
10             THE COURT:  Jacky McComber.
11             MS. WEEKS:  Jon Smith, Donn Pugh, Tiffany
12    Starr-Smith, Erica Heinze, Regina Shirley, Rob Bryant,
13    Jennifer Blake.
14             THE COURT:  Not Kristin Mair?
15             MS. WEEKS:  No, Your Honor.
16             THE COURT:  Now with respect to your request for
17    hiring and staffing material and communications related to the
18    PMR in July 2017, is it the same process or are you asking for
19    some other effort on the part of NSA?
20             MS. WEEKS:  Your Honor, we had suggested four search
21    terms related to hiring.
22             THE COURT:  Is that part of your overall numbers
23    that you were giving me before or is this something else?
24             MS. WEEKS:  Yes, that's part of that number.
25             THE COURT:  So this is all one search is what I'm
```

1    trying to get at.

2            **MS. WEEKS:**  Yes, if it takes one -- if it takes two

3    days per person, they could run this three or four additional

4    search terms for that person and then move onto the next

5    person is my understanding. I don't want to put words in their

6    mouth.

7            **THE COURT:**  So tell me what search terms you have in

8    mind.

9            **MS. WEEKS:**  Well Your Honor, again, we had proposed

10   "interview, hire, brief" which is designed to get at the --

11           **THE COURT:**  What's the word?

12           **MS. WEEKS:**  "Brief," but it was for like when new

13   hires are brought on, they are like debriefed or onboarded,

14   they get security briefs to get their security clearance.  So

15   that's what that word is designed to capture. Again, we are

16   happy to limit this to "interview" and "Ironbridge" or

17   "Jacky," or ways to narrow these down to specific -- to narrow

18   it for relevance.  But again, we haven't had that discussion

19   with the Government yet.  We were just trying to capture all

20   the terms. "Onboarding" was misspelled. So it's "interview,"

21   "hire," "brief" and then maybe "badge" and "sponsor."

22           **THE COURT:**  What's the last one?

23           **MS. WEEKS:**  "Badge," "sponsor."

24           **THE COURT:**  Sponsor?

25           **MS. WEEKS:**  Yes. And then the other hiring term,

1    Your Honor, that we've added as an acronym it's "ECPRL" and

2    that is a database in which new contract hires have to be

3    enrolled.  And Ms. McComber had a large role in facilitating

4    that process with people like Donn Pugh. But we would expect

5    that acronym to return documents related to the new hires on

6    the Ironbridge contract.

7         **THE COURT:**  So let me turn back to either Mr. Pyne

8    or Ms. Peacy. When the search terms are entered, it's all done

9    by computer, right?  So whether you have five terms or ten

10   terms, is that significant?

11        **MS. PEACY:**  We have to search one term at a time. We

12   can search "hire and InfoTeK," but we have to search each term

13   separate.  But outside of that, no.

14        **THE COURT:**  That's important to know. But it is a

15   separate search by word. It's not like let's put in all the

16   words and it's going to search everything at the same time.

17   And you're shaking your head yes.

18        **MS. PEACY:**  That's correct. You're correct in what

19   you're saying.

20        **THE COURT:**  So fewer words saves time.

21        **MS. PEACY:**  Yes, ma'am.

22        **THE COURT:**  So -- well, what I've heard, what I

23   think is that to the extent there have already been identified

24   these searches that were previously conducted for certain

25   people, then it seems reasonable to me to expand the search

1    for those terms if we can sort of focus a little bit more

2    selectively on terms so it doesn't take as long. I'm not going

3    to introduce new people. I think that's beyond the pale and

4    you've already mentioned people for whom these searches were

5    already done as far as I'm aware, for whatever period it was

6    done.

7         I'm not asking NSA to go find new records beyond the

8    periods that they already searched for. I'm unclear on Rob

9    Bryant. I know there was at least one month or one email

10   rather. The suspicion is that he was already reviewed and I

11   would say NSA should verify that or the Government should find

12   out one way or the other because if he was, then he should be

13   included. But this is not going to be quick.

14        **MR. GRAY:**  Your Honor, if I may add one other thing

15   on that. For -- well, to a decreasing extent over time I have

16   been trying to copy Mr. Cooch on emails about significant

17   things going on in this case just because I thought he might

18   have some interest. I can't remember the last time I got an

19   email response from him on any of those. And finally a couple

20   of nights ago he actually called me at home at about 9 in the

21   evening to apologize for not having gotten back to me.  And

22   explained that he had been spending most of his time on a

23   series of matters down in Columbia, and that is in Columbia as

24   in Bogota, not Columbia as in Howard County.  And that he

25   expected that he would be spending substantial time in

1    Columbia over the course of the weeks to come too.

2         **THE COURT:**  So I know the defense copies him on

3    everything, but he's just not part of this case anymore, I'll

4    say unfortunately because he had a big role in terms of his

5    involvement in the case. And certainly I understood him to be

6    the lead person without a doubt once the discovery issues

7    really expanded.  And after my order of August of 2022 he took

8    the lead on that, not Mr. Gray as far as I was aware. And

9    certainly the record would reflect that Mr. Gray complained

10   bitterly about the distraction of the whole discovery process

11   right down to the last minute when all of this was happening

12   and the decision was made to go to trial while the Government

13   was still trying to accommodate all of these requests.

14        I've always been unclear on what took place before that

15   order of October of 2022, but I certainly don't think it was

16   ground zero in October of 2022. It had already been, I

17   understood, voluminous production.

18        So that's the one thing that I think is a little murky to

19   me. This didn't start with my order. There had been an ongoing

20   extensive production by the Government, some of which may well

21   have encapsulated a lot of what is now happening, what is

22   being asked for.

23        **MR. GRAY:**  Your Honor, if I understand what I think

24   you're talking about, obviously we've had extensive hearings

25   about the so-called *Brady* motion back in July -- actually,

1     those may have been the 28th and 29th of August or 29th and

2     30th of August 2022 that we had those discussions. And at the

3     end of the second day in late August, you sort of let us know

4     what you wanted us to do and then tasked us with putting

5     together a draft order. We tendered that to Mr. Ahlers

6     sometime in September.

7          If I remember rightly, your final order formally adopting

8     that wasn't until November the 16th of 2022.  But all of the

9     effort to produce the stuff that was called for had been

10    underway for months.

11         **THE COURT:**   Thank you. But my point, the larger

12    point was discovery didn't begin with that order. Discovery

13    had been made by the Government as to what the Government

14    thought it was obligated to produce well before my order.

15         **MR. GRAY:**   Right, Your Honor. It was -- that had

16    been done by us before Mr. Ahlers filed his first -- his

17    so-called motion to compel which I think was like July the 6th

18    of 2022.

19         **THE COURT:**   Right.  And all I was trying to

20    establish is discovery didn't begin with my order. The hearing

21    was August and maybe I'm misstating the date. But the bottom

22    line is I made an oral determination in August of 2022. And by

23    then it had always been my understanding that the Government

24    had certainly made an ample production. The question was Mr.

25    Ahlers' theme had been, for example, "the Government approved

1     the invoices. It wouldn't approve invoices unless it thought

2     the work was done. The Government accepted the work and

3     therefore the work must have been done." And there was a lot

4     of time spent on federal acquisition regulations and matters

5     of that type. And some of what I basically approved from his

6     perspective in August of 2022, regardless of the actual date I

7     signed an order, was consistent with what he was trying to

8     present as his defense, that the Government wouldn't have paid

9     if the work hadn't have been done.  So the work must have been

10    done because the Government paid. I mean, there was a big

11    theme if my memory is correct along those lines.

12         Is that your memory, Mr. Gray?  Or different?

13         **MR. GRAY:**  No, that was certainly one of his themes

14    and he argued that simply by paying the invoices that

15    constituted an acceptance and then this would tie into various

16    of Mr. Stein's opinions about the Government has to, like,

17    verify everything, presumably verify the exact hours for all

18    15 or 16 people who worked on the "small contract" as the

19    Government people called it every month before it pays, even

20    though there's prompt payment rule that applies to the

21    Government because if they don't pay promptly, then the

22    contractor can't pay its subcontractors and it has cascading

23    effects.

24         **THE COURT:**  Well, and also we reviewed at some point

25    provisions that discuss that if your -- and the argument that

1    if you're defrauded, you wouldn't know that it wasn't done and

2    so once you find out if that's what the claim is, then you're

3    not bound by having paid when you didn't have all the

4    information.

5            **MR. GRAY:**  Exactly.

6            **THE COURT:**  My question now is this: I'd like to

7    find out from the defense, we have a sentencing date of March

8    7th. What I've heard from NSA today is that the more months

9    involved, the longer it takes. The more search terms there

10   are, the longer it takes. I don't know if it's accurate, but

11   roughly two days a person, we have nine people, that's 18

12   days.  And that's not necessarily starting this minute.

13       So what do you want to do about the sentencing?  And that

14   doesn't begin to cover the redactions, if there are any.

15           **MS. WEEKS:**  Would it be possible for us to take a

16   five-minute break?  We've be going for three hours.

17           **THE COURT:**  Yes. And I'll just say this, Mr. Gray,

18   I'm positive that every lawyer here has been involved in cases

19   where for whatever reason, the sentencing doesn't follow from

20   the conviction as quickly as we would like for a variety of

21   reasons. Just this week I had one that for which due to health

22   reasons, there was an incredibly long delay regarding the

23   sentencing of the defendant. It's not ideal, I will agree with

24   you on that, but I can't -- I want this to come to an end and

25   I've said that, but I cannot make my decision on the basis of

1    that. If I think that there's a reasonable period that we can

2    accomplish this and I can make sure every i has been dotted

3    and every t has been crossed, then I'd like to do that.

4            **MR. GRAY:**  I understand that, Your Honor. I mean, no

5    one could fail to be impressed by your commitment to fairness

6    and your -- I didn't like it when you said the other day that

7    you thought you were a plodder. The word I would use --

8            **THE COURT:** I thought I was what?

9            **MR. GRAY:** A plodder, p-l-o-d-d-e-r. I think you're

10   very deliberative and deliberate and those are fine things.

11       There are certainly other cases in which there are

12   lengthy delays for whatever reason between trial and

13   sentencing, but in none of those cases does the case that's

14   been tried continue to chew up the sheer amount of Government

15   personnel time that this case has continued to chew up in a

16   way that prevents us from moving on to work on other matters.

17           **THE COURT:**  And I thought about that a lot in my

18   spare time like from 2 a.m. to 4 a.m. and I thought about your

19   comments. I think about everybody's comments.  And all I could

20   say to myself was everybody has worked really, really hard and

21   that's our job.  That's what we have to do.  So I, for

22   example, said goodbye to everyone my office while I stayed

23   last night to prepare for today. So that's just what we have

24   to do. So sometimes it goes quickly and sometimes it doesn't.

25   Sometimes it goes smoothly, many times it doesn't.

1        We'll take that five-minute recess.

2            **(Recess was taken from 12:58 to 1:08 p.m.)**

3            **THE COURT:**  A question for NSA. Let's say that one

4    of the searches that we were just contemplating shows a

5    reference to one of the search terms and let's say it's this

6    DI_ mgmt, et cetera. Then what?  These are -- we're searching

7    people, but how do you get the document?

8            **MR. PYNE:**  Any document would be the attachment.

9            **THE CLERK:** Sir, you have to come up to a mic,

10   please.

11           **THE COURT:**  Okay.

12           **MR. PYNE:**  I was just saying that the only way

13   documents would be involved would be an attachment.  But in

14   terms of if you're asking -- the email itself would be made

15   into a PDF, if that's what you're asking.

16           **THE COURT:**  No, I was asking if there's a reference

17   to a document, how do you get the document because we're

18   searching people.

19           **MR. PYNE:**  It would be an attachment and then that

20   would have to go through redaction as well.

21           **THE COURT:**  I want to ask you this, Mr. Gray, and

22   then maybe come back to Mr. Pyne who was just speaking. But

23   let me ask you this, Mr. Gray:  My memory is one of Mr.

24   Ahlers' big themes was about the adequacy of the contract file

25   and he talked a lot about -- there were all these discussions

1    about the file and then some of it is the shared drive and

2    some of it seemed like it would be a hardcopy.  And he pointed

3    to regulations if my memory is correct that the Government was

4    supposed to maintain the file. So didn't -- didn't the

5    Government produce to the defense what it considered to be the

6    contract file?  In other words, I'm trying to understand

7    whether this effort for something like these status reports,

8    wasn't this already -- I'm coming back to something I alluded

9    to.  I'm not overruling myself, but I am trying to make sure

10   I've got it right. Didn't the Government produce what it

11   considered to be the contract file?

12        **MR. GRAY:**  Absolutely, Your Honor. Just to be clear

13   on this for the purposes of the appellate record, originally I

14   think I naively believed that given that InfoTeK had its own

15   contract file which by the way, remains in existence and was

16   actually used as a trial exhibit and which was meticulously

17   maintained by Craig Plunkett who was a very meticulous,

18   deliberate -- kind of like Your Honor -- individual. And Mr.

19   -- my thought had been that he could come over and review the

20   contract file and ask for anything that he thought InfoTeK

21   didn't have. He never took me up on that offer.

22        Eventually when he began, like, just as a result of the

23   servicing of the Guinther letter, the Bosshardt email, the

24   arrival of Mr. Stein on the scene who convinced him based on

25   his reading of the FAR that all sorts of things are absolutely

1    mandated, required to be done, that are not necessarily done
2    on a day-in day-out basis, you know, at the NSA.  That there
3    was all this other stuff and thus he insisted that he get the
4    entire Government contract file produced which we did in the
5    spring of 2022.
6         The kind of concepts that you're talking about that
7    absolutely everything has to be in the contract file -- and I
8    think Mr. Ahlers believed this for a while, he believed that
9    like all of the defendant's work product should be in the
10   Government's contract file, although apparently none of it was
11   supposed to be in the meticulously maintained InfoTeK version
12   of the contract file that Mr. Plunkett took care of.  So the
13   idea that the contract file for a classified contract would
14   be, quite frankly, cluttered up by including not just stuff
15   that was relevant to the rights and responsibilities of the
16   parties under the contract, but all of the work that was
17   required under the contract was quite frankly nonsensical.
18   That was the kind of position that Mr. Stein was capable of
19   advocating, but that's not how -- it doesn't make sense, it's
20   not how it worked, and it's not anything that's required.
21        I think Mr. Stein also had some idea, it gets a little
22   hazy in retrospect.  I think he -- yes, I believe he was of
23   the view that every separate contracting officer should be
24   maintaining their own contract file that they put stuff in.
25             **THE COURT:**  He did make that argument or contention.

1          **MR. GRAY:**  Right. Whereas --

2          **THE COURT:**  And that's how I came to learn about the

3    shared drive, because that's where they made their entries.

4          **MR. GRAY:**  And the response which makes sense was

5    that there was a single shared drive that was used for these

6    purposes because, I mean, there are on any contract like the

7    Ironbridge contract, you had the contracting officer

8    administrative, Mr. Pugh. You had the contracting officer

9    technical for much of the time, Mr. Smith.  Later I think Mr.

10   Clark. You had the contracting -- you had various contracting

11   specialists.  And so you would have -- the idea that each of

12   these people should have been maintaining a separate file

13   which then would have to go off to storage Lord knows where

14   where they turned over which they frequently did over the

15   course of a six or seven-year contract just did not make

16   sense.

17        But yes, the actual physical copy of the contract file

18   which existed in the contract office, that was produced to the

19   defense.  And anything that was turned up by any of the search

20   terms and any files maintained by any of the listed custodians

21   up until the point where the defense pulled the plug, those

22   would have been produced as well.

23        Also, Ms. Peacy came up to me during the break and made

24   what I think was an important point which is that you'll see

25   here --

1      **THE COURT:**  And let's say what the record is that

2  you're showing me.

3      **MR. GRAY:**  Yeah, this is this list that I received

4  from the defense in which I believe is attached to ECF 410 or

5  411 of --

6      **THE COURT:**  So it was 411?

7      **MR. GRAY:**  410 or 411, I'm really not sure which, of

8  the new terms that they wanted for each of these custodians.

9  And you'll see -- yeah, there it is. The DI_mgmt, various

10  numbers, 80368A, that is the CPEA. So they already searched

11  using not just the document number, but the abbreviation for

12  the name of the document.  It's like contractor performance

13  evaluation something.  So just the Court should just be aware

14  and it should be clear on the record that --

15      **MS. WEEKS:**  What does CPEA stand for?  I'm not sure

16  what that is or how it is the same thing. It's not referenced

17  on this sheet. I find this --

18      **MR. GRAY:**  Do you want to come up here and address

19  this, Ms. Peacy?

20      **MS. RICHMAN:**  And Your Honor, after Ms. Peacy comes

21  up I did want to correct the record on some of the discussion

22  just then about the production and collection of documents, I

23  didn't get a chance to -- before we move onto the next topic.

24      **THE COURT:**  Sure. CPEA stands for what, Ms. Peacy?

25      **MS. PEACY:**  Contractor Performance Evaluation

1    Assessment.  I think that's what you described when you put up

2    the memo that described that document.

3            **MS. WEEKS:**  No, I don't think so. I mean, this is a

4    weekly status report talking about -- I mean, this document is

5    longer than I showed on the screen earlier, but it has all the

6    milestones and tasks associated with the contract and it's the

7    contractor performing explaining the status of that.  And it's

8    not an evaluation.

9            **MR. GRAY:**  Actually, that CPEA sounds like it may be

10   something that goes more towards the evaluation.

11           **MS. RICHMAN:**  The annual performance evaluation,

12   that's correct.

13           **MR. GRAY:**  So we clarified that.

14           **THE COURT:**  Okay, thank you.

15           **MS. RICHMAN:**  Just briefly, Your Honor, I'm still

16   recreating this record from what I read, but my understanding

17   was that the reason for the Court's ruling was triggered in

18   part by --

19           **THE COURT:**  Which ruling?  There's been many.

20           **MS. RICHMAN:**  The ruling I think it was the November

21   16, 2022 which reduced to writing the August 2022 direction

22   that the Court gave was predicated in part on testimony from

23   Ms. Kelly Sulewski.  And she testified at that hearing -- I do

24   not have the transcript in front of me -- that the shared

25   drive had not been searched for individuals who were involved

1    with the Ironbridge contract. She testified that when she

2    looked into the file that she had reviewed she saw

3    discrepancies that she could only explain by the fact that

4    people were not putting what they should have been putting in

5    there.  And so because of that, there was rather surprising

6    testimony that the OIG had never asked her to look into the

7    shared drives of any of these people, there was a decision

8    made to continue to look for these documents or to make sure

9    that these areas had been searched outside of the contract

10   file.

11        To the extent -- I guess just getting to the point of

12   Your Honor's question, I think if there were these weekly

13   reports, wouldn't they have been part of the file that's

14   already been produced to the defense?  I think that the fact

15   of her testimony along with things like when various

16   custodians, the records were looked into, that's when they

17   first finally began to find performance evaluations that had

18   been requested for a long time and I think those were drafts.

19   But that's how those were located. So that is the reason why

20   this set of documents remains a database to be searched.

21             **THE COURT:**  Well, I could be wrong. I don't recall

22   it entirely that way, but that may have been a factor. Mr.

23   Ahlers from the beginning with his motion for Bill of

24   Particulars had been demanding all kinds of information that

25   he said he was entitled to and needed and didn't get, et

1    cetera. But I just wanted to verify for myself that there was

2    some hardcopy of a hard file and that it had been produced.

3    What was in it, I couldn't tell you. But I do recall and with

4    a handful of exceptions, most all of whatever was produced in

5    response to my order of both the oral one, the written one of

6    August and November of 2022 didn't produce anything that

7    really -- there was a defense case, so I'm just saying, I

8    didn't see much of anything that came in from that effort.

9         **MS. RICHMAN:**  Yeah, no.  We've taken a look and I do

10   think there were a handful of exhibits that were produced.

11        **THE COURT:**  Handful is what I'm saying.  It was like

12   a massive undertaking and a handful.

13        **MS. RICHMAN:**  And Your Honor, were I to redo this

14   case and had been the defense attorney, that might have been

15   different and that's not what I'm trying to do here.  I'm

16   trying to steward us to sentencing.

17        You asked me a question before we went to break about

18   what we'd like to do.

19        **THE COURT:** Yes.

20        **MS. RICHMAN:**  I'm struggling with the question a bit

21   because I do not want to indefinitely delay sentencing. I also

22   want to -- I feel that we're a bit stuck in this discussion

23   and I want to move forward.

24        One suggestion, I mean, with regard to moving sentencing,

25   I just looked at the dates.  Mr. Gray I don't think would be

1    ready to file his sentencing memo tomorrow. I think if we were

2    to keep the March 7th date that would be required in order for

3    us to have a two-week period after the filing and then for

4    there to be an additional two-week period for the response.

5    And I think even then that would come right on the 7th. So I

6    don't think that's within the realm of possibility unless Mr.

7    Gray wishes to just stand on his prior sentencing submissions.

8         I spoke to Ms. Weeks and my client. We think that the

9    list of people to be searched could be further reduced to four

10   people.

11             THE COURT:  Okay, that's excellent. Who?

12             MS. RICHMAN:  Donn Pugh --

13             THE COURT:  Let me just make note. Donn Pugh.

14             MS. RICHMAN:  Jon Smith, Jason Clark and Regina

15   Shirley.

16             THE COURT:  That's very helpful.

17             MS. RICHMAN:  Thank you, I hope so.

18             THE COURT:  And how about terms, any narrowing

19   there?

20             MS. RICHMAN:  We will work to restrict the terms on

21   "badge" and also propose to -- and we are happy to communicate

22   directly with Ms. Peacy to the extent it expedites because we

23   really are in solutions mode. We want to get on the phone and

24   figure this out. So if there are limitations we can put "and"

25   connectors with these searches to make sure they're targeted.

1   We are very, very happy to do so because what we hope to see

2   is a narrow universe of hits that are easy.

3           **THE COURT:**  Right.  So what we didn't contemplate

4   yet, I mean, it's out there, is what happens when -- if and

5   when there are hits?  Because that process I need some

6   understanding. I know we covered this before of exactly how

7   long that takes. I guess it's hard to know when you don't know

8   what turns up.

9           **MS. RICHMAN:**  I'm really struggling with it, Your

10  Honor. I'm struggling with a solution to propose because I'm

11  not in a position where I want to waive my client's -- any of

12  her discovery rights and I do not want anything that I'm

13  proposing to be construed as such a waiver. I don't think the

14  Court would construe it that way, so I'm trying to balance

15  those two things.

16      We also want to get to sentencing, Your Honor. I too have

17  a lot of other cases and also this has just been -- it's been

18  significant for Ms. McComber as well. I understand everybody

19  has had a hard time with this case, Your Honor. I'm not trying

20  to elevate one person's situation above the rest, but I agree

21  it's time to get this to closure and I want to do that.

22      One thing that we could do, so these are four people. We

23  were quoted two days per person. That's about eight days.

24  We're not going to work on weekends, right, so that's about

25  two work weeks where we would have an idea of the universe of

1    hits that we have. We could set a sentencing date today

2    predicated on the understanding that there will be some

3    universe of hits. One thing that we could do is if there are

4    hits I don't know whether it's going to be possible to get the

5    one time read-in again where we could just go out and look at

6    the documents and narrow it down.

7              **THE COURT:**  Is that possible?

8              **MR. PYNE:**  That's possible. I actually brought that

9    up myself, but we don't know the classification. We can get a

10   one-time read usually up to Secret without too heavy a lift.

11   But if these are Top Secret classified, I don't know that we

12   could get present counsel cleared. There is other cleared

13   counsel in their office that came out previously, I don't know

14   if that would be an option.

15             **MS. RICHMAN:**  I think we found it was really

16   difficult, but I have to anticipate that the universe in that

17   higher level of classification given what we're seeking might

18   be pretty small.  And so my hope would be we could all work

19   together.  Once there's hits, we could segregate out the most

20   sensitive documents, keep them back. We can get out there,

21   Your Honor, at the drop of a dime and reduce and narrow if

22   there's a need there. This isn't answering the question of

23   what's the date.

24             **THE COURT:**  No, but it's helpful. So I think that's

25   the most efficient way to go, Mr. Pyne, is once the searches

1    are completed, the defense counsel comes out at least if they

2    can to review whether there's anything they even want you to

3    bother redacting.

4         **MR. PYNE:**  Well, would it make sense, Your Honor, to

5    once we get the results, to inform both parties of the number

6    and classification of the results and --

7         **THE COURT:**  I mean, I've always said -- I think I

8    said, I thought I said, I certainly meant to say why can't we

9    all work together here and we have a common goal.

10        **MR. PYNE:**  Sure.

11        **THE COURT:**  So justice always being the number one

12   priority. So if you and Mr. Gray and the defense team can

13   communicate, that's the first step.  And then just my comment

14   that is in that submission by the defense and which Ms. Peacy

15   and you were on the line when I said it, I know that you

16   understood that all I was trying to say was we have to make

17   this happen. I wasn't trying to ask NSA to become -- to put

18   this case ahead of pressing needs, but I needed people to

19   understand it had to be prioritized because we have to come to

20   a conclusion. And so I needed your help to make that happen.

21   I was trying to implore you all to understand that you have

22   your ways, we have our ways. The wheels they say sometimes

23   grind slowly, the wheels of justice, but now we've got to move

24   them along and I needed your help.  So that was what I was

25   trying to convey.

1      So if you all could possibly communicate that would go a

2  long way and then get them out there. But I'm here, so all you

3  have to do is let me know there's a problem and I think I've

4  -- the only day I couldn't make myself available at the drop

5  of a dime was May 5th when the Government wanted an extension

6  of -- May 5th now of 2023 -- of the Rule 29 memo because you

7  were working on your opposition or Mr. Ahlers' objections to

8  the sentencing and it waited until Monday. You filed it at I

9  don't know, in the afternoon sometime on May 5th.  It happened

10  to be my Portrait Ceremony, I was a little busy. So otherwise

11  I think the record reflects I dropped everything the minute

12  any of you have a complaint, a concern, or anything and I

13  haven't changed my ways.  So I'm here. You can call me if

14  there's an issue. I'll do whatever I can to find a time to

15  talk to you.

16      **MS. RICHMAN:**  We really appreciate that and it's

17  been very helpful.  And I would suggest that we're all in a

18  room right now.  I don't know if we need Your Honor for this,

19  but there's these seven terms, we can sit down right now.

20      **THE COURT:**  I would really -- I know people may be

21  hungry or maybe this made you lose your appetite, I don't know

22  which, but whatever it is, if you could spend a little bit of

23  time going over the search terms it would save a lot of time

24  down the road. I'm happy to stay and be a participant, but I

25  don't think you need me and I'm not sure it's appropriate.

```
1          So we have the four people, that's huge. But tell me what
2    you want to do with sentencing.
3               MS. RICHMAN:  I think there's two things we could
4    do. We could put -- so we have two weeks there, right?  If
5    there's hits, that's the wildcard right?  It's taken them --
6    how long ago did you go out to NSA?
7               MS. WEEKS:  The 22nd.
8               MS. RICHMAN:  So it took about two weeks to produce
9    that narrow set of documents, but they were changed.  So if we
10   assumed three weeks and so that's five weeks total and found a
11   sentencing date that would allow us to incorporate any new
12   materials into our submission and work backward from there,
13   with the strong hope that we get there.
14              THE COURT:  And your point is well taken. What's the
15   point of any of this if you all don't get a chance to address
16   whatever it is that's found?
17              MS. RICHMAN:  Right.
18              THE COURT:  If there's anything found, if it's at all
19   relevant, obviously you're going to want to address it, both
20   sides.
21              MS. RICHMAN:  Right.  So five weeks from now puts us
22   I think in the first week of April.
23              MR. GRAY:  I'm sorry, five weeks from now?
24              MS. RICHMAN:  The first week of April, if I'm doing
25   this right but my third grader is admittedly better at --
```

1          **MR. GRAY:**  Five weeks from now would be March.

2          **MS. RICHMAN:**  March 5th. Oh, I was going from

3     February.  Mr. Gray is on vacation and so we need to factor

4     that in as well. Mr. Gray you leave on March --

5          **MR. GRAY:**  I leave on February 16th and I'm back on

6     the 29th.

7          **THE COURT:**  The point you were making is you're

8     going to incorporate it in your submissions so you need time

9     to do your submissions.  I mean, you can start, nobody has to

10    wait until they get this, this would just be an insert

11    somewhere. But it's already basically the 1st of February.

12         **MS. RICHMAN:**  Yes.

13         **THE COURT:**  And so --

14         **MS. RICHMAN:**  I would suggest to look towards the

15    last week of March or the first week of April.

16         **MR. GRAY:**  I'm sorry, for what?  For completion of

17    the further reviews or --

18         **THE COURT:**  I'm in trial the week of April 8th, just

19    so everybody--

20         **MS. RICHMAN:**  Maybe we should sit down for a minute

21    and try to handle --

22         **THE COURT:**  And then I'm in trial the week of April

23    15th. Do you want to take a minute?

24         **(Discussion held off the record.)**

25         **THE COURT:**  I don't want to interrupt, Ms. Richman,

1    but just realistically five weeks until you have everything,

2    but then you have to give me your memos.

3         **MS. RICHMAN:**  Right. And Mr. Gray still also has to

4    submit his memo.

5         **THE COURT:**  And then your memo and then I need a

6    little time to digest it, so I don't see how you do this

7    before May.

8         **MS. RICHMAN:**  Your Honor, you've been doing

9    scheduling like this a lot longer than I have, so I will defer

10   to the Court.  And I hope that we won't -- because we defined

11   sort of the parameters of what remains to be done, that this

12   will not be as burdensome to the parties as prior periods and

13   delays have been.

14        **THE COURT:** I'm sorry, were you still trying -- were

15   you waiting for me or am I waiting for you?

16        **MS. RICHMAN:**  Oh, I thought I was waiting for you,

17   Your Honor, that we were looking at May.

18        **THE COURT:**  I didn't understand what you said.  What

19   do you want me to look for?

20        **MS. RICHMAN:**  I'll defer to you. I think we have

21   from other counsel on this case a blackout day on May 1st and

22   May 30th and I have a commitment May 22nd to May 24th, but we

23   are otherwise available.

24        **THE COURT:**  I'm in trial the week of May 6th also.

25        **MR. GRAY:**  Your Honor, my family and I typically go

1    away for a week in May down to the Georgia coast. I don't know

2    if my wife has set that in stone yet, but that's typically

3    when we do it.  But if we're just talking about briefing dates

4    we can work around that.

5         THE COURT:  No, I thought we were talking about the

6    sentencing and then we were going to work backwards for the

7    briefing.

8         MR. GRAY:  Well, I'll have to check with my wife

9    about what week that would be.  It's always in May. It's only

10   a week.

11        MS. RICHMAN:  It's a later week in May for your

12   vacation?

13        THE COURT:  I was going to say May 17, does that

14   work?

15        MS. RICHMAN:  That works for defense.

16        MR. GRAY:  Let me double check with my wife and our

17   schedules, but May 17th tentatively sounds okay.

18        THE COURT:  I'm counting the number of trial days in

19   my case. It's always risky because I'll be in trial.  I want

20   to make sure I read everything, of course. But how about if we

21   say May 17 at 10 a.m. And so that means I would need -- now

22   just to be clear, getting the Government's sentencing memo,

23   the defense sentencing memo, am I getting a reply; is that

24   contemplated?

25        MR. GRAY:  Yes.

1          **THE COURT:**  So I'm just saying, don't hold me to

2     these, I'm going to play with them. But if I have a sentencing

3     on May 17, I would want the reply on May 3rd. And that means

4     the response or opposition would be April 19, I think.  I

5     think that's right.  And then that means the memo April 5th.

6          **MR. GRAY:**  Okay. I'm sorry, Your Honor.

7          **THE COURT:**  Does that sound right to everybody?

8          **MR. GRAY:**  Yes. Could I get the blackout dates for

9     first Your Honor's trial and on the defense side for the month

10    of May?  Because I am going to have to check with my wife.

11         **THE COURT:**  Yes. And I just want to point out that

12    that's not that long. I mean, that just -- I don't want to be

13    -- I don't want to have to revisit it. Is it too ambitious?

14    The first memo is due April 5th and realistically -- we don't

15    know what we're going to find, but I think we're looking at

16    roughly a five-week process.

17         **MR. GRAY:**  Your Honor, I think this is doable.  I

18    had begun thinking as we got into the first couple of weeks of

19    this year like it was looking to me that this was ultimately

20    going to have to be done in May. And I think Your Honor has

21    already addressed this, but I just do have a strong concern

22    that we have enough time in the schedule so that things aren't

23    having to be done on a crash basis that excludes my ability to

24    take time off when I need to or to work on other matters.

25         **THE COURT:**  Okay, well you asked for my trial

1    schedule. I'm only going to bother with April and May.

2         **MR. GRAY:**  Yeah, May is really the month I'm

3    concerned about because of our standard family vacation plans.

4         **THE COURT:**  I thought you wanted my schedule.

5         **MR. GRAY:**  I do.  I want to know what weeks you're

6    out of pocket in May in case my wife tells me she wants to be

7    away the week of the 17th.

8         **THE COURT:**  Well, I have trials throughout April and

9    then again on May 6th.

10         **MR. GRAY:**  For how long?

11         **THE COURT:**  So -- okay.

12         **MS. RICHMAN:**  Mr. Gray was--

13         **THE COURT:**  Now the one final request would be if

14    you want to prepare something to memorialize what transpired

15    today.

16         **MS. RICHMAN:**  I can try, Your Honor.

17         **THE COURT:**  Okay.

18         **MS. RICHMAN:**  The other issue I want to circle back

19    on, Your Honor, and I want people to get to lunch is that we

20    would like to have more information about the Government has

21    now made several allusion to potentially having received a

22    group of materials for production that did not make it out for

23    production for whatever reason, the paralegal was busy or the

24    trial. We'd like a firm answer on that as soon as possible,

25    Your Honor. And if those materials were not produced we would

1    like them produced to us. We are just learning of this.  This

2    is new information. We are learning. We were not aware of it

3    in our representation of Ms. McComber to date and now we want

4    to investigate it and make sure we understand exactly what

5    happened with that production and what it contained, if it was

6    held back.

7         **MR. GRAY:**  My suspicion is that most of it is the

8    production that went out on January the 12th.  That's the

9    1,100 pages, but I'll check that with Ms. Peacy. One of the

10   problems is that the file sharing system that the Government

11   now uses for production of discovery, USAfx, material only

12   stays in there for 60 days and then it, like, evaporates.  So

13   determining exactly what hit our USAfx system in early January

14   of 2023 may not even be possible.

15        **THE COURT:**  But NSA has a record.  What I don't know

16   though from that is that doesn't necessarily mean the

17   Government didn't produce it.

18        **MS. RICHMAN:**  Right.  We have the complete volume of

19   production cover letters.  And so if NSA wanted to produce

20   that log to us we could compare it against the materials that

21   have been produced to find a quick answer to this question.

22        **THE COURT:**  Any problem with that, Mr. Gray?

23        **MR. GRAY:**  Not that I'm aware of, Your Honor.

24        **THE COURT:**  Okay. So you can include that in your

25   proposed order.

1          **MS. RICHMAN:**  Great.  And I might suggest a date.

2          **THE COURT:**  I think just -- these are just proposed

3     orders, I realize that, but I don't know that it needs

4     editorializing.

5          **MS. RICHMAN:**  Keep it simple?

6          **THE COURT:**  What I said in a hearing, live

7     commentary like I need NSA to do this, that, or the other.

8          **MS. RICHMAN:**  Understood, Your Honor.

9          **THE COURT:**  Let's just keep it neat and simple.

10         **MS. RICHMAN:**  Yes, Your Honor. Would you like me to

11    submit a proposed scheduling order as well or do we want to

12    wait until Mr. Gray has confirmed his schedule?

13         **THE COURT:**  I suppose we may as well wait.

14         **MR. GRAY:**  I'll try and do that today, Your Honor.

15         **THE COURT:**  Okay. So I'm going to enter though just

16    because I don't want to forget, the sentencing on my calendar,

17    the court calendar for May 17th and if I have to change it,

18    that's fine.

19         **MR. GRAY:**  Right, that's fine.

20         **THE COURT:**  But we'll get it up there.

21       So what didn't I address that we need to address other

22    than a deadline for a proposed order?

23         **MR. GRAY:**  I think that covers it, Your Honor.

24         **THE COURT:**  Obviously it has to go to you first, Mr.

25    Gray, and if you object to any of it then you get to submit

 1    whatever version you think I should sign.  But again, the same

 2    commentary, I don't need editorializing, I just need the

 3    facts.

 4        So can you do that relatively quickly, by certainly the

 5    end of the week?

 6            **MS. RICHMAN:**  Absolutely, Your Honor.  And my hope

 7    is we'll be able to confer with NSA now on search terms which

 8    we'll include in the order.

 9            **THE COURT:**  Well, let me publicly acknowledge and

10    express my gratitude to the people from NSA who did take time

11    from their very demanding work schedules, I'm sure, important

12    work to come here. It was actually extremely helpful and I

13    don't know what questions, I couldn't tell you were going to

14    arise, but the fact that some of you were able to answer

15    substantively what either has taken place or what the process

16    would be going forward was enormously beneficial and helped us

17    resolve the disputes for today.  So I do want to thank you all

18    very, very much.

19        If there's nothing else, we'll stand in recess.

20            **MR. GRAY:**  Very good.

21            **(Proceeding concluded at 1:42 p.m.)**

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, Nadine M. Bachmann, Certified Realtime Reporter

 6     and Registered Merit Reporter, in and for the United States

 7     District Court for the District of Maryland, do hereby

 8     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9     true and correct transcript of the stenographically-reported

10     proceedings held in the above-entitled matter and that the

11     transcript page format is in conformance with the regulations

12     of the Judicial Conference of the United States.

13

14                          Dated this 2nd day of February, 2024.

15

16                          -S-

17                          _____

18                          NADINE M. BACHMANN, CRR, RMR
                            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

## $

**$7,500** [1] - 42:13

## '

**'17** [4] - 64:1, 65:5, 67:4, 71:3
**'22** [1] - 71:6

## 0

**025736** [1] - 15:24
**027536** [1] - 16:8

## 1

**1** [2] - 30:6, 72:18
**1,100** [2] - 104:9, 134:9
**1,315** [4] - 28:7, 29:1, 29:3, 39:25
**10** [3] - 32:5, 32:6, 131:21
**100** [3] - 1:18, 8:10, 31:12
**10:04** [1] - 2:2
**10th** [10] - 32:1, 32:17, 32:18, 33:19, 36:2, 36:10, 50:24, 52:6, 55:5, 76:13
**11** [1] - 16:18
**110** [1] - 30:11
**114** [1] - 30:11
**115** [1] - 30:12
**11th** [1] - 38:18
**12** [6] - 16:18, 51:4, 53:19, 57:6, 104:9, 104:10
**12-level** [1] - 19:20
**1215** [1] - 13:11
**12:58** [1] - 115:2
**12th** [3] - 50:22, 51:3, 134:8
**13** [1] - 16:18
**14** [1] - 16:18
**148** [1] - 13:8
**15** [5] - 9:13, 35:18, 41:11, 80:1, 112:18
**15,000** [1] - 53:2
**15th** [2] - 52:2, 129:23
**16** [12] - 13:24, 18:23, 18:24, 19:4, 19:8, 19:12, 19:14, 37:10, 93:20, 112:18, 120:21
**16th** [2] - 111:8, 129:5
**17** [4] - 13:22, 131:13, 131:21, 132:3
**17th** [3] - 131:17,

133:7, 135:17
**18** [6] - 9:14, 19:21, 31:15, 35:10, 35:11, 113:11
**187** [1] - 13:4
**18th** [10] - 50:14, 50:18, 51:13, 51:25, 54:15, 54:16, 54:20, 55:2, 55:5, 56:8
**19** [4] - 56:21, 104:12, 104:16, 132:4
**19-month** [1] - 104:14
**1973** [1] - 13:7
**1974** [1] - 13:16
**1988** [1] - 13:18
**1990** [2] - 13:8, 13:11
**1992** [1] - 13:14
**1996** [1] - 13:4
**19th** [11] - 50:14, 50:18, 51:13, 51:25, 52:3, 52:4, 52:5, 54:16, 54:20, 55:2, 76:11
**1:08** [1] - 115:2
**1:42** [1] - 136:21
**1st** [3] - 26:5, 129:11, 130:21

## 2

**2** [7] - 16:23, 22:16, 30:8, 72:18, 74:19, 92:10, 114:18
**2,000** [1] - 46:24
**20** [1] - 76:21
**20-plus** [1] - 41:16
**2001** [1] - 1:15
**20036** [1] - 1:16
**2009** [1] - 13:12
**2010** [4] - 13:6, 16:1, 21:11, 90:24
**2011** [2] - 73:14, 91:20
**2012** [3] - 73:15, 73:17, 76:14
**2013** [2] - 73:11, 73:15
**2015** [1] - 64:2
**2016** [7] - 21:12, 64:1, 67:17, 86:4, 86:7, 94:12, 103:15
**2017** [31] - 12:11, 13:9, 21:12, 59:20, 59:22, 61:7, 61:8, 61:10, 61:12, 61:14, 61:20, 62:16, 62:18, 63:2, 63:4, 65:2, 65:7, 65:23, 70:13, 70:16, 70:18, 70:21, 70:23, 70:24, 74:18, 92:5, 92:8, 94:12, 103:15, 106:18

**2018** [1] - 7:10
**2019** [2] - 29:22, 29:24
**2020** [3] - 1:21, 13:15
**2021** [4] - 26:3, 26:5, 40:1, 76:11
**2022** [29] - 26:11, 26:23, 27:8, 28:3, 32:11, 53:14, 57:20, 58:12, 58:14, 75:13, 76:21, 86:13, 88:18, 89:4, 89:8, 94:25, 110:7, 110:15, 110:16, 111:2, 111:8, 111:18, 111:22, 112:6, 117:5, 120:21, 122:6
**2023** [15] - 5:4, 32:6, 32:18, 37:7, 37:8, 38:20, 54:21, 57:6, 80:1, 88:22, 88:23, 89:3, 104:9, 127:6, 134:14
**2024** [7] - 1:8, 4:18, 6:5, 6:22, 32:7, 61:17, 137:14
**2024's** [1] - 6:18
**21-036** [1] - 2:5
**21-cr-036** [1] - 1:4
**212** [1] - 7:9
**21201** [2] - 1:13, 1:19
**21st** [3] - 37:4, 37:5, 37:7
**22** [1] - 104:1
**221** [1] - 13:13
**2255** [1] - 32:22
**226** [1] - 7:9
**22nd** [4] - 25:1, 48:12, 128:7, 130:22
**23** [2] - 6:5, 6:22
**23rd** [1] - 52:7
**24** [1] - 64:22
**24th** [1] - 130:22
**257** [1] - 13:12
**26** [1] - 6:3
**270** [1] - 41:6
**28** [1] - 137:8
**287** [1] - 78:11
**28th** [1] - 111:1
**29** [2] - 29:23, 127:6
**29th** [3] - 111:1, 129:6
**2C** [5] - 9:25, 22:19, 23:4, 23:17, 23:22
**2nd** [1] - 137:14

## 3

**3** [3] - 10:2, 23:17, 23:22
**30** [2] - 1:8, 35:20
**3006620** [2] - 29:22,

29:24
**30th** [3] - 78:2, 111:2, 130:22
**316** [1] - 7:22
**33137** [1] - 1:21
**36** [1] - 1:12
**380,000** [1] - 35:16
**3rd** [1] - 132:3

## 4

**4** [3] - 23:17, 23:23, 114:18
**40** [2] - 13:10, 40:6
**400** [1] - 37:22
**401** [8] - 4:17, 5:19, 9:24, 12:9, 23:1, 23:3, 23:4, 23:15
**406** [5] - 6:17, 6:19, 46:9, 88:5, 88:19
**41** [1] - 47:2
**410** [6] - 6:18, 63:20, 72:18, 76:2, 119:4, 119:7
**411** [6] - 12:20, 72:16, 76:2, 119:5, 119:6, 119:7
**411-2** [1] - 10:10
**414** [3] - 6:3, 6:9, 23:25
**414-1** [2] - 24:1, 24:15
**415** [2] - 6:20, 51:9
**416** [2] - 6:9, 24:9
**418** [1] - 13:16
**42** [1] - 46:9
**481** [1] - 13:7
**4th** [3] - 1:12, 4:18, 61:17

## 5

**5** [1] - 6:19
**503** [1] - 7:22
**52** [1] - 51:10
**528** [1] - 30:11
**53** [1] - 88:19
**56** [1] - 13:13
**59** [1] - 38:18
**597** [1] - 13:5
**5th** [6] - 127:5, 127:6, 127:9, 129:2, 132:5, 132:14

## 6

**60** [5] - 28:25, 38:6, 39:4, 41:17, 134:12
**600** [2] - 1:15, 51:8
**608** [1] - 13:6
**616167** [2] - 13:15

**683** [1] - 13:16
**685** [1] - 13:7
**6th** [3] - 111:17, 130:24, 133:9

## 7

**7** [1] - 80:7
**70** [2] - 28:25, 42:10
**701** [1] - 1:21
**75** [1] - 37:24
**753** [1] - 137:8
**786** [1] - 13:13
**7th** [4] - 28:3, 113:8, 123:2, 123:5

## 8

**80368A** [1] - 119:10
**85** [3] - 37:24, 40:10, 49:14
**860** [1] - 13:17
**876** [1] - 13:10
**885** [1] - 7:9
**89** [1] - 13:4
**8th** [1] - 129:18

## 9

**9** [4] - 6:18, 28:3, 88:4, 109:20
**900** [1] - 1:18
**913** [1] - 13:8
**914** [1] - 13:11
**981** [1] - 13:17
**9th** [5] - 9:23, 10:14, 20:15, 23:16, 64:7

## A

**a)(e** [1] - 19:4
**a.m** [4] - 2:2, 114:18, 131:21
**A013** [1] - 16:10
**abandoned** [3] - 30:1, 30:7, 30:10
**abandonment** [2] - 30:20, 87:3
**abbreviation** [1] - 119:11
**abilities** [1] - 10:21
**ability** [2] - 53:6, 132:23
**able** [13] - 10:12, 20:1, 24:25, 36:12, 51:20, 79:18, 82:21, 85:8, 88:9, 91:8, 93:25, 136:7, 136:14
**aboard** [1] - 86:8
**above-entitled** [1] -

137:10
**absent** [1] - 78:13
**absolutely** [8] - 44:3, 44:6, 75:20, 89:6, 116:12, 116:25, 117:7, 136:6
**abusive** [1] - 46:18
**accept** [1] - 20:17
**acceptance** [1] - 112:15
**accepted** [3] - 29:7, 101:19, 112:2
**accepting** [1] - 77:9
**access** [3] - 35:3, 39:16, 60:12
**Access** [10] - 35:18, 35:19, 41:7, 41:8, 41:25, 42:24, 76:9, 76:10, 76:14, 76:20
**accessible** [1] - 18:15
**accommodate** [1] - 110:13
**accompany** [1] - 27:15
**accomplish** [1] - 114:2
**accomplished** [2] - 3:13, 3:17
**accomplishments** [1] - 97:11
**according** [1] - 8:14
**accurate** [6] - 57:22, 64:16, 66:9, 67:15, 71:6, 113:10
**achieved** [1] - 97:12
**achieving** [1] - 97:10
**acknowledge** [2] - 19:9, 136:9
**acquisition** [1] - 112:4
**acronym** [2] - 108:1, 108:5
**actions** [1] - 80:3
**acts** [1] - 30:12
**actual** [7] - 7:12, 15:7, 15:15, 16:7, 20:25, 112:6, 118:17
**add** [5] - 11:19, 59:17, 66:21, 87:2, 109:14
**added** [5] - 46:22, 99:12, 100:1, 102:2, 108:1
**adding** [5] - 69:15, 69:16, 74:14, 89:18, 89:23
**addition** [1] - 51:1
**additional** [15] - 10:24, 58:24, 59:17, 59:18, 63:21, 64:14, 77:12, 79:22, 89:19, 96:3, 102:3, 103:4,

104:14, 107:3, 123:4
**address** [13] - 6:5, 9:1, 24:8, 25:23, 48:5, 71:17, 79:18, 83:5, 119:18, 128:15, 128:19, 135:21
**addressed** [3] - 6:21, 26:7, 132:21
**adequacy** [1] - 115:24
**adjoining** [1] - 85:9
**administrative** [2] - 47:24, 118:8
**admitted** [1] - 41:24
**admittedly** [1] - 128:25
**adopting** [1] - 111:7
**advance** [5] - 29:10, 33:22, 42:21, 76:21, 79:16
**advisory** [1] - 5:16
**advocating** [1] - 117:19
**afraid** [1] - 34:13
**afternoon** [1] - 127:9
**afterwards** [1] - 46:22
**agency** [3] - 18:19, 18:20, 45:13
**Agency** [6] - 2:8, 2:20, 2:22, 2:24, 3:3, 3:4
**Agent** [3] - 1:23, 1:24, 2:16
**agent** [3] - 2:22, 2:23, 50:5
**ago** [8] - 4:14, 36:22, 45:19, 48:11, 49:11, 71:24, 109:20, 128:6
**agree** [7] - 30:22, 31:1, 44:7, 74:2, 88:15, 113:23, 124:20
**agreed** [3] - 10:16, 11:19, 70:13
**agrees** [1] - 102:18
**ahead** [2] - 49:12, 126:18
**Ahlers** [20] - 8:19, 10:15, 26:6, 26:9, 27:10, 27:14, 27:17, 27:21, 27:24, 29:5, 33:24, 34:24, 51:7, 61:22, 62:13, 75:9, 111:5, 111:16, 117:8, 121:23
**Ahlers'** [6] - 26:21, 32:12, 66:7, 111:25, 115:24, 127:7
**Aided** [1] - 1:25
**air** [1] - 17:17
**allegation** [1] - 44:21
**Alli** [1] - 3:25

**ALLI** [1] - 1:20
**allow** [4] - 28:4, 80:17, 105:7, 128:11
**allowance** [1] - 35:15
**allowing** [2] - 20:21, 20:22
**alluded** [1] - 116:8
**allusion** [1] - 133:21
**almost** [3] - 21:12, 28:12, 80:1
**alternatively** [1] - 14:17
**altogether** [2] - 67:14, 69:15
**ambiguous** [1] - 33:12
**ambitious** [1] - 132:13
**America** [1] - 2:4
**AMERICA** [1] - 1:3
**American** [1] - 90:20
**amount** [31] - 4:22, 4:23, 7:1, 7:6, 7:12, 7:13, 12:23, 19:18, 30:24, 31:4, 31:10, 33:6, 33:23, 35:6, 35:16, 42:12, 42:14, 42:16, 43:25, 44:2, 45:20, 54:18, 55:17, 64:20, 64:21, 67:21, 77:4, 78:9, 82:13, 87:16, 114:14
**ample** [1] - 111:24
**Anderson** [1] - 13:7
**Andrew** [1] - 2:19
**anniversary** [1] - 32:12
**announcing** [1] - 80:11
**annual** [1] - 120:11
**answer** [19] - 9:19, 10:25, 18:13, 18:22, 18:24, 33:12, 68:10, 69:21, 75:17, 82:19, 92:23, 93:22, 101:16, 101:18, 104:25, 105:1, 133:24, 134:21, 136:14
**answering** [1] - 125:22
**anticipate** [2] - 91:7, 125:16
**anticipation** [1] - 6:4
**anyway** [1] - 105:7
**AO13** [1] - 96:23
**apart** [2] - 24:6, 86:12
**apologies** [1] - 16:7
**apologize** [1] - 109:21
**appeal** [2] - 33:7, 37:11
**Appeals** [1] - 36:24

**appear** [4] - 38:17, 63:3, 65:24, 83:14
**appeared** [5] - 62:25, 63:1, 65:12, 65:22, 70:21
**appellate** [3] - 32:21, 72:3, 116:13
**appetite** [1] - 127:21
**applaud** [1] - 7:24
**apples** [2] - 47:14, 47:15
**applied** [5] - 11:24, 21:13, 56:13, 77:8, 95:25
**applies** [3] - 19:16, 43:7, 112:20
**apply** [5] - 51:24, 77:6, 93:20
**applying** [2] - 45:13, 56:1
**appreciate** [3] - 80:9, 87:2, 127:16
**appropriate** [3] - 31:21, 77:24, 127:25
**approve** [1] - 112:1
**approved** [2] - 111:25, 112:5
**April** [14] - 35:14, 41:5, 85:16, 92:5, 128:22, 128:24, 129:15, 129:18, 129:22, 132:4, 132:5, 132:14, 133:1, 133:8
**archive** [1] - 70:5
**archived** [2] - 70:2, 70:3
**archives** [3] - 56:6, 67:21, 70:4
**areas** [1] - 121:9
**arguably** [1] - 39:19
**argued** [5] - 4:25, 30:8, 33:24, 34:3, 112:14
**argues** [1] - 4:21
**arguing** [1] - 19:16
**argument** [9] - 4:6, 26:4, 31:19, 34:1, 35:9, 36:14, 87:3, 112:25, 117:25
**arise** [2] - 32:22, 136:14
**arraignment** [2] - 26:4, 53:20
**arrangements** [2] - 27:17, 62:4
**arrival** [1] - 116:24
**arrived** [1] - 90:22
**arriving** [1] - 51:25
**aside** [2] - 35:25, 38:9

**aspect** [1] - 87:14
**aspects** [3] - 17:25, 34:12, 97:22
**assembling** [1] - 36:23
**assess** [1] - 45:22
**assessment** [1] - 9:17
**Assessment** [1] - 120:1
**assignment** [1] - 82:23
**Assistant** [1] - 2:14
**associated** [2] - 94:14, 120:6
**association** [1] - 67:4
**assumed** [3] - 75:20, 82:3, 128:10
**attached** [5] - 10:8, 58:18, 63:19, 72:17, 119:4
**attachment** [4] - 76:2, 115:8, 115:13, 115:19
**attack** [1] - 33:20
**attain** [1] - 19:18
**attempting** [1] - 20:19
**attention** [2] - 36:16, 52:8
**Attorney** [2] - 2:15, 92:16
**ATTORNEY** [1] - 1:12
**attorney** [5] - 3:4, 80:21, 80:24, 81:24, 122:14
**Attorney's** [2] - 66:3, 77:8
**attribute** [1] - 20:20
**August** [25] - 26:3, 38:20, 53:11, 57:19, 57:20, 58:12, 58:14, 63:11, 68:5, 86:13, 88:23, 89:3, 89:8, 94:25, 104:1, 110:7, 111:1, 111:2, 111:3, 111:21, 111:22, 112:6, 120:21, 122:6
**AUSA** [13] - 48:22, 48:23, 48:24, 49:20, 49:21, 49:22, 49:24, 54:7, 54:8, 54:13, 54:14, 55:17, 82:24
**AUSA's** [3] - 48:17, 48:19, 49:1
**authority** [1] - 14:9
**available** [5] - 7:17, 45:21, 81:25, 127:4, 130:23
**avoid** [1] - 22:12
**aware** [6] - 29:12, 109:5, 110:8,

119:13, 134:2, 134:23
**awful** [1] - 33:3

# B

**Bachmann** [1] - 137:5
**BACHMANN** [1] - 137:18
**backward** [1] - 128:12
**backwards** [1] - 131:6
**badge** [14] - 11:8, 59:8, 59:11, 59:12, 60:3, 60:9, 60:11, 60:18, 102:3, 102:5, 102:10, 107:21, 107:23, 123:21
**badge-related** [1] - 60:18
**badges** [1] - 60:6
**baffling** [1] - 75:2
**balance** [1] - 124:14
**ball** [1] - 30:23
**ballpark** [1] - 31:13
**Baltimore** [3] - 1:9, 1:13, 1:19
**bank** [1] - 34:18
**barely** [1] - 36:3
**base** [1] - 87:19
**based** [9] - 9:23, 14:25, 23:16, 30:8, 41:15, 61:1, 73:23, 101:6, 116:24
**baseline** [1] - 99:25
**basis** [14] - 7:6, 13:25, 38:14, 77:5, 82:1, 84:18, 85:8, 98:8, 100:13, 113:25, 117:2, 132:23
**Bates** [1] - 16:8
**Bayshore** [1] - 1:21
**bear** [2] - 95:13, 101:11
**became** [2] - 86:5, 101:13
**become** [2] - 6:23, 126:17
**becomes** [1] - 18:17
**BEFORE** [1] - 1:8
**beforehand** [1] - 8:15
**began** [6] - 5:18, 36:21, 71:24, 87:17, 116:22, 121:17
**begin** [6] - 4:15, 25:23, 67:22, 111:12, 111:20, 113:14

**begun** [2] - 84:13, 132:18
**behalf** [2] - 2:15, 3:22
**belief** [1] - 80:4
**believes** [2] - 5:20, 100:6
**belonging** [1] - 93:21
**belongs** [1] - 19:2
**below** [1] - 11:20
**beneficial** [1] - 136:16
**beside** [1] - 45:5
**better** [4] - 32:9, 68:25, 103:7, 128:25
**between** [10] - 5:3, 20:19, 43:14, 50:3, 55:4, 60:24, 65:20, 66:24, 70:10, 114:12
**beyond** [10] - 7:18, 29:4, 30:21, 35:7, 71:3, 89:25, 90:4, 92:20, 109:3, 109:7
**big** [4] - 67:18, 110:4, 112:10, 115:24
**bigger** [1] - 17:15
**bill** [2] - 41:24, 74:19
**Bill** [2] - 26:5, 121:23
**billed** [1] - 35:16
**billings** [1] - 42:13
**bills** [2] - 44:10, 44:12
**bit** [8] - 45:17, 59:7, 70:10, 98:19, 109:1, 122:20, 122:22, 127:22
**bitterly** [1] - 110:10
**black** [1] - 10:11
**blackout** [2] - 130:21, 132:8
**Blake** [22] - 61:6, 61:21, 62:10, 62:20, 63:15, 65:1, 66:5, 66:12, 66:22, 67:1, 67:17, 70:11, 70:17, 71:20, 74:16, 75:2, 99:12, 103:18, 105:25, 106:13
**Blake's** [2] - 65:11, 65:22
**blank** [1] - 14:14
**blanket** [1] - 27:20
**blithe** [1] - 85:3
**blithely** [1] - 29:17
**blocks** [1] - 16:18
**bluntly** [1] - 73:7
**board** [5] - 57:24, 71:5, 71:12, 84:2, 103:4
**boggling** [1] - 73:9
**Bogota** [1] - 109:24
**boiled** [1] - 40:9
**Bosshardt** [2] - 32:13,

116:23
**bother** [2] - 126:3, 133:1
**bottom** [6] - 15:12, 15:14, 15:22, 17:4, 72:22, 111:21
**bound** [4] - 29:18, 30:12, 113:3
**box** [1] - 72:10
**Brady** [16] - 13:24, 19:5, 19:6, 19:16, 33:6, 33:21, 34:1, 34:2, 34:5, 34:6, 34:11, 34:17, 34:24, 37:10, 110:25
**brand** [2] - 39:6, 39:19
**breadth** [1] - 8:9
**break** [5] - 83:8, 113:16, 118:23, 122:17
**brief** [6] - 11:7, 30:5, 81:25, 107:10, 107:12, 107:21
**briefing** [2] - 131:3, 131:7
**briefly** [2] - 25:24, 120:15
**briefs** [2] - 26:21, 107:14
**bring** [6] - 8:24, 59:8, 62:4, 62:5, 68:14, 80:15
**broad** [3] - 10:4, 23:20, 59:7
**broaden** [3] - 67:7, 99:5, 99:8
**broadening** [1] - 98:25
**broader** [2] - 19:8, 65:12
**brought** [3] - 13:19, 107:13, 125:8
**Brown** [2] - 1:23, 2:17
**Bryant** [26] - 11:21, 42:1, 72:25, 73:4, 74:7, 74:17, 74:20, 75:6, 75:19, 83:20, 88:5, 88:7, 88:10, 88:12, 88:20, 88:24, 94:20, 95:1, 95:14, 95:24, 103:8, 103:21, 105:10, 105:25, 106:12, 109:9
**Bryant's** [1] - 73:1
**burden** [5] - 5:1, 5:10, 46:19, 99:20
**burdens** [1] - 47:24
**burdensome** [5] - 12:2, 99:22, 100:8,

102:23, 130:12
**busy** [2] - 127:10, 133:23
**BY** [4] - 1:11, 1:14, 1:17, 1:20

# C

**calculate** [2] - 7:4, 31:10
**calculating** [1] - 4:24
**calculation** [2] - 5:15, 5:16
**calendar** [2] - 135:16, 135:17
**California** [1] - 13:12
**cam** [2] - 72:9, 72:11
**candidates** [1] - 11:8
**cannot** [4] - 36:22, 52:8, 68:1, 113:25
**capabilities** [3] - 10:20, 67:20, 68:2
**capable** [1] - 117:18
**captain** [1] - 20:20
**capture** [2] - 107:15, 107:19
**captured** [4] - 21:6, 22:11, 82:14, 104:2
**card** [1] - 60:12
**care** [3] - 93:2, 93:8, 117:12
**cared** [1] - 100:23
**Caro** [1] - 13:5
**carried** [1] - 74:12
**carry** [2] - 40:22, 40:23
**cascading** [1] - 112:22
**Case** [1] - 2:5
**case** [56] - 2:8, 3:18, 4:13, 7:20, 7:21, 8:22, 14:3, 19:10, 19:11, 19:14, 22:12, 29:7, 29:15, 29:20, 29:25, 32:8, 32:11, 34:17, 36:6, 36:16, 36:22, 43:9, 44:6, 44:9, 45:19, 46:21, 59:10, 65:22, 72:3, 73:22, 75:10, 77:7, 77:9, 77:10, 77:22, 78:8, 78:16, 79:19, 79:20, 80:3, 87:15, 90:4, 90:22, 92:8, 109:17, 110:3, 110:5, 114:13, 114:15, 122:7, 122:14, 124:19, 126:18, 130:21, 131:19, 133:6

**CASE** [1] - 1:4
**cases** [15] - 7:11, 7:15, 8:6, 12:25, 13:21, 14:18, 18:14, 30:18, 43:6, 77:3, 87:5, 113:18, 114:11, 114:13, 124:17
**casual** [1] - 45:5
**catalyst** [1] - 5:5
**categories** [4] - 4:19, 5:19, 40:20, 44:22
**category** [2] - 63:14, 77:19, 84:16
**catnip** [1] - 34:6
**caused** [1] - 26:24
**cautionary** [1] - 76:25
**caveat** [1] - 106:3
**CDRL** [2] - 96:12, 96:23
**Center** [1] - 28:14
**Central** [1] - 92:16
**central** [2] - 4:23, 30:24
**Ceremony** [1] - 127:10
**cert** [1] - 7:10
**certain** [3] - 30:13, 31:12, 108:24
**certainly** [9] - 9:1, 27:12, 33:7, 35:3, 43:19, 47:4, 51:22, 60:14, 83:12, 87:5, 93:8, 110:5, 110:9, 110:15, 111:24, 112:13, 114:11, 126:8, 136:4
**CERTIFICATE** [1] - 137:1
**Certified** [1] - 137:5
**certify** [2] - 20:4, 137:8
**cetera** [4] - 9:3, 103:5, 115:6, 122:1
**chains** [5] - 38:4, 38:5, 38:8, 40:10
**challenge** [4] - 5:11, 30:6, 30:7, 30:10
**challenging** [1] - 30:3
**chance** [4] - 8:23, 51:19, 119:23, 128:15
**change** [5] - 72:9, 79:12, 80:12, 80:17, 135:17
**changed** [3] - 23:19, 127:13, 128:9
**changes** [2] - 81:19
**character** [4] - 77:21, 77:24, 78:6, 79:8
**characterize** [2] - 2:9, 90:7

charge [1] - 43:16
Charles [2] - 1:12, 1:18
chase [2] - 60:13, 98:16
chasing [1] - 36:5
check [10] - 51:14, 53:2, 74:8, 92:20, 92:22, 93:15, 131:8, 131:16, 132:10, 134:9
chew [2] - 114:14, 114:15
chief [3] - 3:1, 19:15, 92:15
Chief [1] - 92:11
choose [1] - 47:16
chose [2] - 38:10, 60:22
Christmas [2] - 36:11, 36:12
chronological [2] - 91:6, 91:7
circle [1] - 133:18
Circuit [10] - 7:9, 7:22, 13:4, 13:6, 13:7, 13:9, 13:10, 13:18, 30:15
circumstances [2] - 83:15, 84:2
cite [1] - 7:8
cited [3] - 32:21, 43:6, 87:21
claim [10] - 23:24, 23:25, 29:8, 31:2, 31:15, 33:21, 42:9, 44:1, 82:25, 113:2
claiming [4] - 5:7, 30:25, 31:2, 98:17
claims [4] - 4:23, 5:6, 8:15, 77:4
clarification [5] - 25:4, 56:19, 57:4, 57:25, 96:24
clarified [1] - 120:13
clarify [5] - 53:12, 62:18, 62:22, 74:17, 96:20
clarifying [1] - 70:9
Clark [7] - 74:20, 94:15, 105:8, 105:19, 106:8, 118:10, 123:14
classification [12] - 3:2, 40:23, 41:1, 41:2, 69:11, 78:24, 90:1, 90:5, 90:9, 125:9, 125:17, 126:6
classified [8] - 18:8, 18:17, 18:21, 56:10,

97:15, 97:22, 117:13, 125:11
clear [25] - 8:18, 15:13, 15:17, 17:11, 20:15, 37:9, 43:8, 46:6, 46:15, 47:9, 54:4, 58:9, 63:18, 65:9, 66:2, 67:24, 69:22, 75:23, 75:24, 93:20, 100:11, 101:13, 116:12, 119:14, 131:22
clearance [1] - 107:14
cleared [2] - 125:12
clearly [4] - 32:25, 36:22, 36:24, 42:14
Clerk [1] - 12:19
CLERK [7] - 12:21, 15:12, 15:16, 16:22, 72:9, 72:12, 115:9
client [12] - 14:19, 26:9, 27:10, 27:15, 29:18, 60:4, 62:11, 62:18, 81:14, 97:24, 98:10, 123:8
client's [5] - 25:12, 29:11, 33:13, 105:5, 124:11
close [3] - 66:23, 78:25, 86:5
closure [1] - 124:21
cluttered [1] - 117:14
coast [1] - 131:1
coin [1] - 43:24
colleagues [1] - 85:9
collected [8] - 11:1, 24:2, 24:19, 58:25, 98:22, 99:14, 105:25, 106:4
collection [1] - 119:22
Collins [3] - 11:20, 73:6, 73:16
Colston [1] - 85:2
Colston's [1] - 91:24
Columbia [4] - 109:23, 109:24, 110:1
comfortable [1] - 80:5
coming [5] - 3:7, 46:8, 60:16, 100:22, 116:8
commend [1] - 7:24
comment [3] - 24:10, 48:15, 126:13
commentary [2] - 135:7, 136:2
comments [3] - 46:15, 114:19
commitment [2] - 114:5, 130:22
common [1] - 126:9
communicate [3] -

123:21, 126:13, 127:1
communications [5] - 5:3, 12:10, 60:7, 81:14, 106:17
community [1] - 34:9
company [1] - 92:11
comparable [1] - 37:5
compare [1] - 134:20
compares [1] - 97:12
comparison [1] - 39:8
compel [1] - 111:17
complained [1] - 110:9
complaint [1] - 127:12
complete [7] - 17:22, 17:24, 26:3, 26:12, 26:15, 71:25, 134:18
completed [1] - 126:1
completely [5] - 29:11, 77:2, 77:14, 82:17, 89:20
completion [1] - 129:16
complicated [1] - 18:17
comprehensive [1] - 22:8
computer [2] - 39:16, 108:9
Computer [1] - 1:25
Computer-Aided [1] - 1:25
computers [2] - 27:11, 40:22
concepts [1] - 117:6
concern [7] - 20:12, 20:25, 21:4, 91:13, 99:19, 127:12, 132:21
concerned [3] - 32:21, 38:17, 133:3
concerning [3] - 6:10, 31:4, 31:9
concerns [3] - 6:19, 7:1, 8:17
conclude [2] - 86:16, 87:10
concluded [1] - 136:21
conclusion [1] - 126:20
conduct [8] - 7:6, 12:17, 20:3, 20:7, 44:20, 73:8, 92:9, 103:1
conducted [7] - 47:10, 70:14, 70:21, 99:9, 103:2, 103:25, 108:24

conducting [3] - 58:7, 68:21, 89:22
confer [4] - 102:7, 105:12, 105:14, 136:7
conference [8] - 4:4, 4:5, 5:24, 6:4, 6:18, 6:19, 9:22, 64:8
Conference [1] - 137:12
CONFERENCE [1] - 1:7
conferences [1] - 6:1
confident [3] - 33:1, 73:1, 83:19
confirm [2] - 73:2, 93:16
confirmed [1] - 135:12
confirming [1] - 76:10
conformance [1] - 137:11
confused [1] - 36:20
confusing [1] - 74:23
conjecture [1] - 21:1
connection [9] - 28:6, 73:19, 74:15, 77:13, 81:3, 82:9, 83:24, 87:6, 87:8
connectors [1] - 123:25
considered [4] - 30:3, 88:14, 116:5, 116:11
consistent [2] - 28:6, 112:7
consisting [1] - 86:21
constituted [1] - 112:15
constitutional [3] - 25:13, 33:13, 34:21
constitutionally [1] - 30:9
construe [1] - 124:14
construed [1] - 124:13
consuming [2] - 45:10, 104:21
contact [1] - 62:17
contacts [1] - 67:1
contained [2] - 57:11, 134:5
contemplate [1] - 124:3
contemplated [6] - 8:11, 20:13, 62:13, 64:10, 91:17, 131:24
contemplating [2] - 29:15, 115:4
contemporaneous [1] - 85:15
contends [1] - 30:22
contention [4] - 5:12,

5:20, 30:6, 117:25
context [4] - 13:22, 24:24, 43:7
continuance [1] - 32:15
continuation [3] - 4:4, 79:11, 79:14
continue [7] - 37:12, 51:17, 52:8, 99:18, 100:4, 114:14, 121:8
continued [1] - 114:15
continues [1] - 96:19
continuing [2] - 79:7, 80:3
contract [73] - 10:2, 10:3, 11:15, 14:25, 15:8, 15:20, 15:21, 16:3, 17:6, 17:10, 17:12, 17:14, 21:10, 21:12, 22:3, 22:8, 22:9, 22:17, 23:21, 41:10, 43:16, 43:25, 47:24, 60:5, 73:10, 73:16, 83:1, 83:17, 83:18, 83:25, 84:16, 85:11, 91:17, 91:19, 93:3, 95:16, 96:5, 96:24, 97:11, 97:23, 100:16, 100:18, 101:7, 101:8, 101:20, 108:2, 108:6, 112:18, 115:24, 116:6, 116:11, 116:15, 116:20, 117:4, 117:7, 117:10, 117:12, 117:13, 117:16, 117:17, 117:24, 118:6, 118:7, 118:15, 118:17, 118:18, 120:6, 121:1, 121:9
contracting [5] - 117:23, 118:7, 118:8, 118:10
contractor [6] - 97:10, 97:14, 112:22, 119:12, 119:25, 120:7
contractors [1] - 60:16
contracts [2] - 84:1, 86:22
Control [10] - 35:18, 35:19, 41:7, 41:8, 41:25, 42:24, 76:9, 76:10, 76:15, 76:20
convened [1] - 4:7
conversation [2] - 24:22, 65:20

**conversations** [1] - 42:2
**convey** [1] - 126:25
**convicted** [2] - 7:5, 79:25
**conviction** [2] - 90:18, 113:20
**convinced** [1] - 116:24
**Cooch** [7] - 10:18, 41:20, 50:3, 51:16, 75:10, 82:22, 109:16
**Cooch's** [1] - 50:24
**copies** [7] - 48:18, 48:20, 49:5, 49:6, 50:8, 50:10, 110:2
**copy** [2] - 109:16, 118:17
**COR** [1] - 22:4
**correct** [26] - 38:2, 54:22, 56:4, 56:5, 56:15, 61:19, 62:21, 65:6, 66:10, 67:20, 69:14, 70:17, 71:4, 73:25, 76:22, 91:2, 94:25, 98:3, 101:10, 108:18, 112:11, 116:3, 119:21, 120:12, 137:9
**correcting** [1] - 76:5
**correctly** [9] - 34:18, 54:17, 61:22, 67:7, 67:14, 69:13, 82:10, 101:24, 103:4
**correspond** [1] - 6:16
**correspondence** [1] - 60:19, 62:12
**cost** [1] - 46:7
**cough** [1] - 43:13
**counsel** [35] - 2:16, 2:19, 3:20, 3:23, 24:16, 28:8, 30:2, 30:3, 30:13, 30:21, 33:1, 33:2, 34:5, 34:25, 38:10, 44:4, 64:5, 67:1, 69:13, 70:14, 75:9, 78:18, 79:4, 79:12, 80:12, 80:18, 81:14, 90:15, 92:13, 92:14, 92:21, 125:12, 125:13, 126:1, 130:21
**Counsel** [1] - 3:5
**counsel's** [4] - 29:11, 46:16, 61:17, 83:14
**counseled** [2] - 29:12, 29:19
**counting** [1] - 131:18
**County** [1] - 109:24
**couple** [9] - 28:1,

40:8, 50:4, 52:24, 63:12, 104:24, 105:1, 109:19, 132:18
**course** [16] - 3:3, 4:22, 27:5, 34:21, 43:9, 45:16, 53:9, 71:25, 75:18, 82:3, 92:2, 100:25, 101:13, 110:1, 118:15, 131:20
**court** [5] - 4:8, 7:4, 7:16, 26:6, 135:17
**COURT** [277] - 1:1, 2:3, 2:9, 3:6, 4:2, 9:7, 11:10, 12:13, 12:18, 12:22, 15:5, 15:10, 16:1, 16:12, 16:18, 16:23, 17:1, 17:11, 17:20, 18:8, 18:10, 18:13, 20:12, 21:9, 21:19, 21:23, 22:1, 22:16, 22:21, 23:1, 23:6, 23:12, 23:20, 23:24, 25:11, 25:14, 25:16, 25:19, 25:25, 26:14, 28:18, 28:20, 29:23, 30:16, 32:5, 32:7, 32:18, 32:25, 33:15, 33:24, 37:7, 37:22, 37:25, 38:3, 38:5, 38:8, 38:16, 38:20, 39:2, 39:4, 39:12, 39:18, 42:5, 44:7, 44:18, 45:24, 46:1, 46:9, 47:3, 47:16, 48:7, 48:10, 48:21, 49:3, 49:19, 50:1, 51:12, 52:1, 52:4, 52:19, 53:5, 54:3, 54:8, 54:20, 54:23, 55:11, 55:14, 58:10, 60:2, 60:8, 60:11, 60:20, 61:2, 61:18, 61:21, 62:1, 62:6, 62:9, 62:13, 64:9, 64:24, 65:9, 66:1, 66:11, 66:16, 66:18, 66:20, 67:6, 67:16, 67:23, 68:8, 68:17, 69:4, 69:13, 69:15, 69:19, 70:7, 70:19, 70:25, 71:9, 71:13, 71:18, 72:15, 72:20, 73:23, 74:1, 74:7, 75:5, 75:16, 75:19, 75:22, 76:3, 77:15, 80:6, 80:17, 81:4, 81:8, 82:4, 82:19, 83:7, 86:12, 86:20, 87:23,

87:25, 88:3, 88:13, 88:15, 88:19, 89:5, 89:8, 89:13, 90:11, 91:1, 91:9, 91:12, 92:25, 93:4, 93:8, 93:12, 93:14, 93:19, 94:5, 94:8, 94:11, 94:16, 94:20, 95:8, 95:17, 96:6, 96:9, 96:25, 97:7, 97:15, 97:19, 97:24, 98:2, 98:14, 98:24, 99:3, 99:8, 99:16, 101:2, 101:23, 102:5, 102:9, 102:24, 103:11, 103:16, 103:21, 104:5, 104:11, 104:17, 104:20, 104:25, 105:3, 105:13, 106:7, 106:10, 106:14, 106:16, 106:22, 106:25, 107:7, 107:11, 107:22, 107:24, 108:7, 108:14, 108:20, 108:22, 110:2, 111:11, 111:19, 112:24, 113:6, 113:17, 114:8, 114:17, 115:3, 115:11, 115:16, 115:21, 117:25, 118:2, 119:1, 119:6, 119:24, 120:14, 120:19, 121:21, 122:11, 122:19, 123:11, 123:13, 123:16, 123:18, 124:3, 125:7, 125:24, 126:7, 126:11, 127:20, 128:14, 128:18, 129:7, 129:13, 129:18, 129:22, 129:25, 130:5, 130:14, 130:18, 130:24, 131:5, 131:13, 131:18, 132:1, 132:7, 132:11, 132:25, 133:4, 133:8, 133:11, 133:13, 133:17, 134:15, 134:22, 134:24, 135:2, 135:6, 135:9, 135:13, 135:15, 135:20, 135:24, 136:9, 137:18
**Court** [24] - 6:7, 7:10,

26:1, 26:20, 27:7, 28:8, 36:23, 36:24, 42:19, 45:3, 45:9, 45:21, 64:8, 79:22, 87:19, 97:5, 98:10, 100:15, 102:18, 119:13, 120:22, 124:14, 130:10, 137:7
**Court's** [4] - 20:17, 38:20, 86:13, 120:17
**courtroom** [2] - 2:18, 3:23
**courts** [2] - 81:18, 87:6
**cover** [3] - 76:5, 113:14, 134:19
**covered** [4] - 43:16, 69:22, 73:12, 124:6
**covers** [1] - 135:23
**CPEA** [4] - 119:10, 119:15, 119:24, 120:9
**Craig** [1] - 116:17
**crank** [1] - 101:14
**crash** [1] - 132:23
**crazily** [1] - 36:11
**create** [1] - 37:10
**created** [2] - 65:19, 98:11
**credit** [8] - 5:8, 5:14, 5:22, 19:21, 31:16, 35:10, 35:17, 35:20
**crime** [1] - 7:5
**crimes** [1] - 79:25
**Criminal** [1] - 2:5
**criminal** [1] - 77:10
**critical** [1] - 32:14
**cross** [1] - 41:20
**cross-examination** [1] - 41:20
**crossed** [1] - 114:3
**CRR** [1] - 137:18
**crucial** [1] - 5:15
**Cruder** [1] - 61:7
**CRYSTAL** [1] - 1:14
**Crystal** [1] - 3:21
**culprit** [1] - 34:20
**curiosity** [1] - 71:21
**curious** [1] - 39:18
**custodian** [6] - 11:18, 59:2, 63:1, 65:7, 65:23, 65:24
**custodians** [21] - 11:18, 11:23, 11:24, 36:19, 38:14, 55:4, 57:20, 58:13, 59:15, 59:24, 63:11, 65:17, 68:4, 74:21, 94:21, 102:14, 105:17,

105:24, 118:20, 119:8, 121:16
**cut** [3] - 17:4, 76:12, 87:9

# D

**daily** [1] - 85:8
**damaged** [1] - 79:24
**damming** [1] - 42:25
**data** [8] - 11:15, 15:21, 16:3, 17:14, 83:18, 104:16, 104:18
**database** [3] - 58:25, 108:2, 121:20
**date** [20] - 6:20, 17:3, 17:5, 21:10, 27:12, 27:13, 50:12, 55:5, 76:11, 80:8, 97:11, 111:21, 112:6, 113:7, 123:2, 125:1, 125:23, 128:11, 134:3, 135:1
**Dated** [1] - 137:14
**dated** [4] - 4:18, 16:1, 55:20, 64:1
**dates** [6] - 6:16, 55:18, 76:15, 122:25, 131:3, 132:8
**dating** [1] - 41:23
**Davis** [2] - 2:23, 52:15
**day-in** [1] - 117:2
**day-out** [1] - 117:2
**days** [21] - 26:22, 26:25, 28:1, 34:5, 35:21, 36:2, 36:3, 36:6, 40:9, 51:5, 104:24, 105:2, 106:5, 107:3, 113:11, 113:12, 124:23, 131:18, 134:12
**DC** [1] - 1:16
**DCIS** [2] - 1:23, 2:16
**deadline** [1] - 135:22
**deal** [3] - 27:9, 75:8, 79:15
**dealing** [4] - 2:25, 26:21, 27:21, 75:14
**dealings** [1] - 73:14
**dealt** [1] - 29:25
**Dear** [1] - 39:15
**debriefed** [1] - 107:13
**deceit** [1] - 7:5
**December** [12] - 26:5, 28:3, 28:23, 37:4, 37:5, 37:7, 40:1, 42:20, 75:13, 76:11, 76:20
**decide** [3] - 8:25, 66:4,

66:11
**decided** [6] - 8:19, 27:21, 29:3, 62:5, 63:11, 85:5
**decision** [21] - 7:9, 7:22, 13:6, 13:7, 13:8, 13:9, 13:11, 13:12, 13:14, 13:15, 19:11, 30:15, 31:6, 31:7, 43:11, 49:11, 71:22, 80:17, 110:12, 113:25, 121:7
**decisions** [6] - 30:13, 72:1, 72:2, 100:2, 100:8, 102:22
**decline** [1] - 79:19
**declined** [1] - 27:15
**decreasing** [1] - 109:15
**defective** [1] - 26:16
**defendant** [44] - 3:22, 7:5, 15:2, 17:22, 17:24, 19:3, 20:20, 21:15, 22:18, 25:10, 30:1, 30:5, 30:7, 30:10, 30:12, 32:20, 34:16, 34:19, 36:9, 38:10, 40:1, 41:24, 45:23, 63:22, 66:25, 73:12, 78:17, 79:4, 79:7, 79:25, 80:16, 81:11, 85:16, 85:21, 86:5, 90:23, 92:6, 92:13, 93:21, 94:18, 95:15, 100:12, 101:9, 113:23
**Defendant** [1] - 1:6
**DEFENDANT** [1] - 1:14
**defendant's** [6] - 30:2, 53:24, 72:5, 78:6, 79:9, 117:9
**Defender** [1] - 1:18
**Defender's** [1] - 3:24
**Defense** [1] - 24:16
**defense** [92] - 2:7, 3:7, 4:14, 4:19, 4:21, 4:24, 5:7, 5:10, 5:11, 5:19, 6:3, 6:6, 7:24, 8:9, 8:14, 8:15, 9:6, 9:16, 9:20, 19:15, 24:4, 27:2, 27:23, 28:8, 29:17, 30:3, 30:21, 33:1, 33:2, 33:8, 34:5, 34:9, 34:25, 35:24, 37:1, 42:19, 43:20, 44:11, 44:15, 44:24, 45:22, 46:16, 48:13, 48:16,

49:5, 50:8, 50:22, 51:5, 51:18, 51:20, 52:12, 54:7, 54:9, 54:11, 60:25, 61:16, 64:4, 65:20, 65:21, 68:18, 72:6, 73:4, 77:11, 78:8, 80:3, 80:22, 82:8, 83:14, 84:5, 87:11, 88:2, 90:15, 95:17, 100:1, 110:2, 112:8, 113:7, 116:5, 118:19, 118:21, 119:4, 121:14, 122:7, 122:14, 126:1, 126:12, 126:14, 131:15, 131:23, 132:9
**defense's** [4] - 29:8, 45:2, 46:15, 63:21
**defer** [2] - 130:9, 130:20
**deficiency** [1] - 96:14
**defined** [1] - 130:10
**definitely** [2] - 32:8, 41:12
**definition** [1] - 34:2
**defrauded** [1] - 113:1
**delay** [2] - 113:22, 122:21
**delays** [2] - 114:12, 130:13
**delete** [1] - 15:11
**deliberate** [2] - 114:10, 116:18
**deliberative** [1] - 114:10
**delivered** [2] - 80:11, 100:17
**demand** [1] - 27:20
**demanded** [2] - 29:2, 78:19
**demanding** [2] - 121:24, 136:11
**demands** [7] - 2:7, 3:12, 8:2, 29:10, 32:20, 79:9, 79:20
**demonstrated** [1] - 43:17
**denied** [2] - 7:10, 22:22
**Department** [1] - 79:17
**department's** [1] - 78:24
**departure** [1] - 86:3
**Derrow** [2] - 28:22, 42:22
**described** [2] - 120:1, 120:2

**describing** [1] - 70:11
**designed** [5] - 9:15, 19:17, 96:4, 107:10, 107:15
**desire** [2] - 33:6, 37:10
**desk** [1] - 85:9
**desuetude** [1] - 86:8
**detailed** [1] - 42:19
**determination** [5] - 7:13, 7:19, 31:12, 46:21, 111:22
**determinations** [3] - 77:1, 77:2, 78:8
**determine** [9] - 9:15, 24:25, 31:14, 51:15, 51:22, 65:3, 84:18, 102:21, 104:6
**determined** [1] - 71:9
**determining** [4] - 42:16, 44:2, 46:3, 134:13
**detour** [1] - 81:8
**detrimental** [1] - 31:24
**DI** [5] - 11:12, 96:7, 96:22, 115:6
**DI_mgmt** [2] - 103:5, 119:9
**DI_MGMT-803688** [1] - 96:11
**different** [23] - 13:21, 18:2, 20:16, 29:10, 31:21, 37:24, 38:24, 38:25, 40:18, 41:9, 47:2, 55:3, 64:5, 77:2, 77:14, 77:16, 81:11, 83:17, 94:7, 96:21, 104:16, 112:12, 122:15
**difficult** [5] - 64:15, 67:8, 89:19, 104:14, 125:16
**difficulties** [1] - 97:12
**digest** [1] - 130:6
**digging** [1] - 90:21
**diligence** [2] - 45:14, 80:5
**diligent** [2] - 45:17, 90:16
**dime** [2] - 125:21, 127:5
**direct** [1] - 101:14
**directed** [1] - 28:13
**direction** [1] - 120:21
**directly** [5] - 36:24, 37:16, 48:1, 100:25, 123:22
**director** [1] - 62:15
**disagree** [3] - 30:19, 31:11, 31:15

**disagreeing** [1] - 34:1
**disagreement** [1] - 81:15
**disagrees** [1] - 20:6
**discern** [1] - 8:5
**disclosure** [1] - 82:11
**discovered** [2] - 26:10, 27:6
**DISCOVERY** [1] - 1:7
**discovery** [30] - 2:7, 4:5, 4:6, 6:21, 14:15, 29:10, 29:13, 37:16, 43:7, 43:10, 43:13, 52:9, 53:9, 76:19, 77:6, 77:8, 77:12, 78:12, 79:20, 82:11, 82:15, 87:8, 92:9, 110:6, 110:10, 111:12, 111:20, 124:12, 134:11
**discrepancies** [1] - 121:3
**discrete** [1] - 38:6
**discuss** [3] - 12:3, 91:23, 112:25
**discussed** [9] - 8:12, 9:21, 10:4, 34:13, 36:10, 64:7, 83:21, 95:24, 96:2
**discussing** [2] - 11:13, 42:3
**discussion** [11] - 2:6, 4:17, 20:15, 51:16, 60:24, 76:8, 81:23, 102:19, 107:18, 119:21, 122:22
**Discussion** [2] - 105:16, 129:24
**discussions** [8] - 5:24, 6:13, 6:21, 13:3, 32:3, 66:25, 111:2, 115:25
**dismissing** [1] - 85:3
**display** [1] - 45:16
**dispositive** [1] - 93:23
**dispute** [1] - 22:13
**disputed** [1] - 5:7
**disputes** [4] - 6:10, 8:14, 9:4, 136:17
**disputing** [1] - 24:9
**distinct** [1] - 96:17
**distinction** [7] - 20:18, 43:14, 43:18, 45:19, 70:10, 77:6, 77:7
**distinguish** [1] - 87:1
**distracted** [1] - 52:8
**distraction** [1] - 110:10
**district** [1] - 77:11
**District** [8] - 13:11,

13:15, 19:12, 29:21, 36:23, 92:16, 137:7
**DISTRICT** [2] - 1:1, 1:1
**disturbing** [1] - 62:16
**diverted** [1] - 36:4
**Division** [1] - 92:16
**DIVISION** [1] - 1:2
**divulge** [1] - 34:20
**do-over** [2] - 8:19, 87:22
**doable** [1] - 132:17
**doctrine** [1] - 34:11
**document** [30] - 4:20, 15:23, 17:15, 36:17, 42:25, 47:17, 47:19, 54:17, 55:8, 55:18, 63:19, 71:24, 72:6, 72:9, 72:11, 75:14, 76:1, 76:13, 76:18, 96:4, 97:9, 99:18, 115:7, 115:8, 115:17, 119:11, 119:12, 120:2, 120:4
**documenting** [1] - 5:24
**documents** [71] - 6:8, 6:11, 6:25, 8:10, 9:16, 9:20, 10:2, 10:6, 10:15, 11:1, 12:15, 19:1, 19:18, 19:23, 20:3, 22:7, 22:23, 23:9, 24:2, 24:18, 24:23, 25:2, 25:5, 25:8, 31:20, 36:10, 38:18, 40:23, 42:21, 45:9, 47:5, 47:6, 47:22, 48:2, 48:23, 50:25, 51:2, 51:8, 51:12, 52:20, 53:3, 53:7, 54:6, 55:10, 55:17, 55:21, 56:16, 58:25, 68:12, 68:13, 70:6, 70:15, 73:1, 76:14, 83:19, 97:10, 98:21, 100:9, 104:9, 105:24, 106:4, 108:5, 115:13, 119:22, 121:8, 121:20, 125:6, 125:20, 128:9
**DOD** [1] - 101:20
**dollars** [1] - 35:6
**Donald** [2] - 63:23, 105:19
**done** [53] - 10:12, 20:19, 22:8, 22:13, 45:22, 46:13, 47:7, 47:8, 47:11, 47:25, 56:24, 57:1, 68:6, 68:9, 68:23, 71:2,

7

71:7, 79:5, 80:5, 85:12, 85:13, 86:1, 86:4, 86:7, 88:7, 88:10, 88:12, 88:17, 90:25, 91:8, 91:13, 92:4, 93:25, 95:1, 95:3, 95:18, 96:16, 103:12, 108:8, 109:5, 109:6, 111:16, 112:2, 112:3, 112:9, 112:10, 113:1, 117:1, 130:11, 132:20, 132:23
**Donn** [7] - 94:19, 105:9, 105:22, 106:11, 108:4, 123:12, 123:13
**dotted** [1] - 114:2
**double** [1] - 131:16
**doubt** [3] - 7:19, 101:5, 110:6
**down** [27] - 9:25, 10:21, 11:17, 11:25, 12:6, 15:22, 20:10, 23:22, 28:11, 36:15, 40:4, 40:9, 51:21, 59:7, 78:22, 79:3, 83:21, 93:10, 94:16, 107:17, 109:23, 110:11, 125:6, 127:19, 127:24, 129:20, 131:1
**Doyle** [8] - 11:15, 17:22, 17:24, 18:6, 21:16, 63:22, 85:16, 96:18
**draft** [3] - 6:8, 46:15, 111:5
**drafted** [1] - 45:2
**drafts** [2] - 52:23, 121:18
**dragged** [1] - 73:22
**drags** [1] - 102:9
**draw** [1] - 20:18
**drive** [5] - 26:16, 116:1, 118:3, 118:5, 120:25
**Drive** [1] - 1:21
**drives** [2] - 56:17, 121:7
**driving** [1] - 37:9
**drop** [2] - 125:21, 127:4
**dropped** [1] - 127:11
**dry** [1] - 87:9
**due** [6] - 18:18, 25:13, 45:14, 80:5, 113:21, 132:14
**dug** [1] - 90:21

**duplicate** [1] - 39:20
**duplicates** [1] - 49:18
**duplication** [1] - 49:12
**duplicative** [1] - 46:17
**Durbin** [1] - 81:17
**during** [18] - 12:11, 24:17, 26:10, 26:23, 27:6, 43:16, 47:13, 63:7, 73:14, 76:6, 76:7, 85:13, 86:2, 91:24, 91:25, 94:22, 94:23, 118:23
**duties** [3] - 10:1, 22:24, 91:15

# E

**early** [9] - 32:16, 42:20, 43:10, 53:15, 73:14, 78:2, 85:16, 87:21, 134:13
**easier** [1] - 22:13
**easily** [2] - 25:2, 36:24
**Eastern** [1] - 13:11
**easy** [4] - 11:2, 22:15, 90:21, 124:2
**ECF** [26] - 4:17, 5:19, 6:2, 6:3, 6:8, 6:9, 6:15, 6:17, 6:18, 6:20, 9:23, 10:9, 10:10, 12:9, 24:1, 46:9, 63:20, 72:16, 72:18, 76:2, 88:5, 88:19, 119:4
**ECPRL** [2] - 11:8, 108:1
**editorializing** [2] - 135:4, 136:2
**effect** [1] - 14:1
**effects** [1] - 112:23
**efficient** [1] - 125:25
**effort** [14] - 3:8, 5:9, 5:12, 8:8, 22:6, 49:9, 65:3, 65:12, 70:25, 97:10, 106:19, 111:9, 116:7, 122:8
**efforts** [1] - 36:4
**eight** [2] - 36:2, 124:23
**either** [10] - 18:20, 30:6, 40:22, 46:10, 54:7, 60:16, 81:6, 86:4, 108:7, 136:15
**elaborate** [1] - 26:14
**elected** [1] - 30:4
**elements** [1] - 78:11
**elevate** [2] - 90:9, 124:20
**elevated** [1] - 90:4
**Eleventh** [1] - 30:14

**ELH** [2] - 1:4, 2:5
**ELLEN** [1] - 1:8
**Elmo** [1] - 16:21
**email** [17] - 12:5, 23:6, 23:8, 26:8, 26:19, 32:13, 35:1, 35:2, 68:3, 76:9, 85:16, 88:20, 88:21, 109:9, 109:19, 115:14, 116:23
**emails** [79] - 8:12, 24:25, 25:20, 26:3, 26:10, 27:11, 27:20, 27:22, 28:1, 28:4, 28:7, 28:13, 28:14, 28:15, 29:1, 29:3, 37:17, 37:19, 38:1, 38:6, 38:12, 38:13, 38:23, 39:5, 39:24, 39:25, 40:4, 40:7, 40:8, 40:10, 40:14, 40:15, 40:16, 40:18, 40:19, 40:20, 40:22, 40:24, 42:11, 42:23, 43:1, 49:8, 49:14, 51:10, 53:24, 56:2, 56:3, 56:6, 56:13, 56:14, 56:17, 56:18, 57:2, 57:4, 57:5, 57:7, 59:16, 59:19, 59:23, 61:13, 62:16, 62:19, 63:5, 64:14, 64:18, 66:23, 66:24, 68:12, 68:16, 71:2, 91:2, 91:9, 92:6, 103:8, 103:15, 103:17, 109:16
**emphasize** [2] - 52:10, 79:10
**encapsulated** [1] - 110:21
**encountered** [2] - 2:21, 97:12
**end** [12] - 3:19, 21:12, 40:9, 47:10, 49:11, 62:5, 73:15, 75:12, 84:19, 111:3, 113:24, 136:5
**enforced** [1] - 86:23
**enforcing** [1] - 90:23
**engage** [1] - 41:22
**engine** [1] - 102:16
**engineered** [3] - 79:12, 80:16, 81:22
**enhancement** [1] - 19:20
**enlighten** [1] - 94:2
**enormously** [1] - 136:16
**enrolled** [1] - 108:3

**entails** [1] - 68:11
**enter** [2] - 6:7, 135:15
**entered** [1] - 108:8
**entire** [1] - 117:4
**entirely** [4] - 13:22, 78:12, 80:14, 121:22
**entitled** [1] - 5:1, 9:13, 14:22, 20:24, 23:18, 44:13, 44:15, 78:11, 81:2, 121:25, 137:10
**entitlement** [2] - 8:25, 31:1
**entrance** [1] - 41:14
**entries** [1] - 118:3
**equally** [1] - 18:15
**equates** [1] - 9:14
**equation** [1] - 46:3
**Erica** [4] - 74:13, 74:15, 105:23, 106:12
**especially** [4] - 8:24, 28:11, 60:11, 77:3
**Esquire** [1] - 1:23
**ESQUIRE** [4] - 1:11, 1:14, 1:17, 1:20
**essence** [1] - 90:12
**essentially** [2] - 82:10, 101:2
**establish** [5] - 5:13, 44:10, 66:1, 99:18, 111:20
**establishing** [1] - 44:8
**estimate** [3] - 7:16, 7:20, 53:4
**estimation** [1] - 87:19
**et** [4] - 9:3, 103:5, 115:6, 121:25
**evaluate** [1] - 97:14
**evaluation** [4] - 119:13, 120:8, 120:10, 120:11
**Evaluation** [1] - 119:25
**evaluations** [3] - 23:12, 52:24, 121:17
**evaporates** [1] - 134:12
**evening** [1] - 109:21
**events** [1] - 32:11
**eventually** [1] - 116:22
**everyday** [1] - 87:5
**evidence** [12] - 7:18, 21:10, 26:8, 30:8, 33:5, 34:15, 36:6, 41:21, 44:13, 84:23, 84:24, 90:18
**evident** [1] - 30:2
**evidentiary** [1] - 30:5
**evolved** [1] - 31:9

**ex** [3] - 81:1, 81:7, 81:23
**exact** [4] - 44:2, 55:22, 101:3, 112:17
**exactly** [28] - 4:10, 5:25, 6:17, 8:17, 12:1, 13:24, 20:13, 28:5, 28:6, 33:8, 33:10, 33:17, 36:17, 36:18, 36:25, 45:9, 55:2, 67:24, 80:19, 88:1, 92:20, 94:3, 96:25, 104:19, 113:5, 124:6, 134:4, 134:13
**examination** [3] - 19:1, 41:20, 101:14
**example** [12] - 7:8, 20:14, 26:16, 41:21, 59:10, 77:18, 82:20, 82:25, 88:3, 101:9, 111:25, 114:22
**examples** [1] - 45:8
**Excel** [5] - 42:21, 54:17, 54:24, 55:6, 102:15
**excellent** [1] - 123:11
**except** [3] - 30:13, 85:6, 100:24
**exceptions** [1] - 122:4
**exchanged** [1] - 87:8
**excludes** [1] - 132:23
**exculpatory** [3] - 34:15, 35:4, 36:5
**Excuse** [1] - 98:9
**excuse** [2] - 52:4, 62:15
**exercise** [1] - 27:19
**exhibit** [3] - 63:19, 72:18, 116:16
**Exhibit** [1] - 72:18
**exhibits** [3] - 38:25, 52:17, 122:10
**exist** [9] - 14:17, 25:6, 47:6, 47:7, 47:22, 48:2, 58:7, 83:2
**existed** [2] - 8:15, 118:18
**existence** [2] - 25:5, 116:15
**exists** [3] - 14:24, 47:19, 58:8
**expand** [2] - 103:13, 108:25
**expanded** [1] - 110:7
**expanding** [1] - 89:16
**expands** [1] - 103:2
**expect** [2] - 88:8, 108:4
**expectation** [1] - 33:5

8

**expected** [2] - 88:9, 109:25
**expedites** [1] - 123:22
**expedition** [1] - 14:3
**expeditiously** [2] - 3:17, 24:5
**expended** [3] - 22:10, 84:15, 97:13
**expert** [1] - 101:19
**explain** [3] - 14:8, 68:11, 121:3
**explained** [2] - 27:16, 109:22
**explaining** [1] - 120:7
**explains** [2] - 71:23, 100:22
**explanation** [2] - 11:5, 71:25
**explored** [1] - 44:22
**express** [1] - 136:10
**expressly** [1] - 32:21
**extend** [2] - 19:13, 31:3
**extended** [1] - 30:20
**extends** [1] - 87:4
**extension** [1] - 127:5
**extensive** [3] - 54:18, 110:20, 110:24
**extent** [12] - 19:25, 30:19, 31:3, 60:21, 80:25, 90:20, 97:22, 102:18, 108:23, 109:15, 121:11, 123:22
**extra** [1] - 46:13
**extraordinary** [1] - 79:20
**extremely** [3] - 36:21, 42:15, 136:12

## F

**F.2d** [4] - 13:7, 13:8, 13:11, 13:17
**F.3d** [5] - 7:9, 7:22, 13:4, 13:5, 13:10
**F.R.D** [1] - 13:13
**F.Supp** [1] - 13:13
**face** [1] - 77:9
**faces** [1] - 43:23
**facilitate** [1] - 42:20
**facilitating** [1] - 108:3
**facility** [1] - 41:10
**facing** [2] - 55:12, 55:14
**fact** [24] - 5:20, 7:19, 8:17, 9:4, 17:23, 21:6, 21:13, 27:24, 31:11, 38:9, 45:1, 47:18, 52:19, 80:19,

84:14, 85:11, 86:21, 89:9, 98:21, 101:21, 102:7, 121:3, 121:14, 136:14
**fact-intensive** [1] - 31:11
**fact-specific** [1] - 7:19
**factor** [4] - 36:7, 46:3, 121:22, 129:3
**facts** [4] - 73:20, 73:21, 81:3, 136:3
**factual** [1] - 7:13
**fail** [1] - 114:5
**fair** [3] - 12:23, 51:24, 98:15
**fair-minded** [1] - 51:24
**fairly** [4] - 41:13, 59:5, 81:17, 83:13
**fairness** [1] - 114:5
**fall** [4] - 27:8, 38:15, 40:20, 88:18
**false** [5] - 44:1, 44:10, 44:12, 77:4, 80:23
**familiar** [2] - 39:11, 39:13
**family** [2] - 130:25, 133:3
**famous** [1] - 32:13
**far** [11] - 6:24, 20:1, 29:8, 38:17, 39:15, 43:22, 64:2, 83:12, 98:22, 109:5, 110:8
**FAR** [1] - 116:25
**feared** [1] - 28:7
**feasible** [1] - 9:3
**February** [6] - 73:10, 80:1, 129:3, 129:5, 129:11, 137:14
**federal** [3] - 45:20, 78:17, 112:4
**FEDERAL** [1] - 137:18
**Federal** [2] - 1:18, 3:24
**feeding** [2] - 93:3, 93:8
**fell** [2] - 77:18, 86:8
**felt** [2] - 32:22, 86:16
**Fernandez** [1] - 13:8
**few** [8] - 43:1, 54:1, 59:19, 75:3, 75:4, 86:7, 89:18, 89:24
**fewer** [1] - 108:20
**figure** [2] - 59:9, 123:24
**figured** [1] - 77:25
**figures** [1] - 37:24
**file** [31] - 22:4, 36:23, 45:8, 54:17, 54:19, 55:6, 55:8, 77:21,

78:2, 96:14, 115:24, 116:1, 116:4, 116:6, 116:11, 116:15, 116:20, 117:4, 117:7, 117:10, 117:12, 117:13, 117:24, 118:12, 118:17, 121:2, 121:10, 121:13, 122:2, 123:1, 134:10
**filed** [5] - 6:3, 30:5, 36:9, 111:16, 127:8
**files** [14] - 56:18, 57:8, 57:9, 57:10, 57:11, 59:16, 59:17, 62:19, 63:5, 63:9, 63:15, 71:1, 118:20
**filing** [7] - 10:9, 12:4, 41:6, 85:1, 85:24, 87:21, 123:3
**filings** [2] - 5:4, 30:2
**final** [4] - 28:12, 104:8, 111:7, 133:13
**finalized** [2] - 52:25, 53:1
**finally** [7] - 3:1, 3:3, 12:8, 79:22, 79:23, 109:19, 121:17
**fine** [4] - 99:11, 114:10, 135:18, 135:19
**finish** [5] - 32:14, 36:1, 36:22, 39:3, 58:10
**finished** [1] - 39:9
**firm** [1] - 133:24
**firms** [1] - 90:17
**First** [1] - 13:9
**first** [30] - 5:23, 9:5, 9:6, 12:3, 20:24, 24:10, 26:25, 27:14, 34:24, 37:2, 40:20, 43:11, 53:10, 60:22, 65:1, 69:5, 69:24, 71:3, 86:7, 88:17, 111:16, 121:17, 126:13, 128:22, 128:24, 129:15, 132:9, 132:14, 132:18, 135:24
**fiscal** [1] - 84:19
**fishing** [1] - 14:3
**fit** [1] - 34:2
**fits** [1] - 8:21
**five** [10] - 35:6, 108:9, 113:16, 115:1, 128:10, 128:21, 128:23, 129:1, 130:1, 132:16
**five-minute** [2] -

113:16, 115:1
**five-week** [1] - 132:16
**flabbergasted** [1] - 88:11
**flash** [1] - 26:15
**Floor** [1] - 1:12
**Florida** [1] - 1:21
**FMHER** [1] - 84:14
**FMHERs** [1] - 84:22
**focus** [5] - 42:5, 44:8, 47:6, 105:3, 109:1
**focused** [5] - 14:4, 14:5, 22:23, 28:16, 44:21
**focuses** [1] - 35:8
**folder** [1] - 55:19
**folk** [1] - 90:20
**folks** [12] - 36:18, 59:18, 59:19, 59:21, 63:9, 63:12, 63:14, 64:2, 64:4, 68:2, 89:12, 95:12
**follow** [1] - 113:19
**followed** [1] - 30:14
**following** [1] - 29:25
**footnote** [1] - 45:2
**FOR** [3] - 1:1, 1:11, 1:14
**forced** [1] - 79:15
**foreclose** [1] - 31:18
**foreclosed** [1] - 31:8
**foregoing** [1] - 137:8
**foremost** [1] - 40:21
**forget** [2] - 25:22, 135:16
**form** [7] - 11:12, 22:6, 84:1, 86:22, 96:2, 96:11, 102:4
**formal** [1] - 5:25
**formally** [3] - 84:6, 92:15, 111:7
**format** [1] - 137:11
**formulations** [1] - 103:4
**forth** [6] - 32:3, 41:22, 83:18, 84:3, 91:21, 100:4
**forward** [4] - 25:3, 52:7, 122:23, 136:16
**foundation** [3] - 9:2, 9:10, 31:2
**four** [8] - 35:21, 61:16, 79:3, 106:20, 107:3, 123:9, 124:22, 128:1
**Fourth** [6] - 7:9, 7:22, 13:4, 13:6, 13:7, 13:9
**fourth** [1] - 12:3
**frame** [4] - 4:16, 55:4, 65:17, 88:22

**frames** [4] - 4:16, 61:4, 61:5, 61:6
**framework** [2] - 8:4, 9:9
**frankly** [7] - 33:3, 75:11, 84:12, 101:6, 101:14, 117:14, 117:17
**fraud** [2] - 7:5, 92:9
**fraudulent** [1] - 76:13
**frequency** [1] - 16:10
**frequently** [2] - 93:7, 118:14
**Friday** [1] - 6:3
**friendly** [2] - 66:24, 66:25
**friends** [1] - 66:23
**frivolous** [4] - 46:11, 46:17, 46:23, 79:14
**frolic** [1] - 81:8
**front** [2] - 58:19, 83:8, 120:24
**fruitful** [1] - 4:7
**frustration** [1] - 52:16
**full** [1] - 35:21
**fully** [3] - 26:12, 29:12, 32:20
**function** [8] - 44:14, 44:15, 79:8, 90:14, 93:2, 93:5, 93:9, 93:17
**fundamental** [2] - 30:14, 34:12
**funds** [1] - 84:19
**futile** [2] - 37:15, 46:23

## G

**game** [1] - 30:23
**gaps** [1] - 83:14
**Garrett** [1] - 32:13
**gather** [2] - 5:2, 69:16
**General** [5] - 2:20, 2:23, 2:24, 3:5, 48:24
**general** [1] - 33:12
**generate** [1] - 57:15
**generated** [1] - 26:18
**generating** [1] - 75:9
**generic** [1] - 60:9
**George** [1] - 13:13
**Georgia** [2] - 29:21, 131:1
**Germany** [1] - 62:2
**gift** [1] - 35:12
**gist** [1] - 101:3
**given** [31] - 5:14, 5:22, 7:17, 19:21, 42:15, 46:18, 58:11, 59:20,

61:4, 63:1, 63:4, 65:8, 65:16, 65:17, 65:25, 68:4, 70:18, 70:22, 73:3, 94:22, 103:24, 116:14, 125:17
**glad** [1] - 28:24
**goal** [2] - 3:18, 126:9
**goals** [1] - 97:13
**goodbye** [1] - 114:22
**goose** [2] - 60:13, 98:16
**Goris** [1] - 13:10
**GORIS** [1] - 13:10
**Gotshal** [4] - 1:15, 1:20, 3:22, 3:25
**govern** [1] - 6:7
**government** [1] - 45:13
**Government** [73] - 2:16, 5:2, 5:6, 5:8, 5:14, 5:21, 5:25, 6:9, 8:3, 10:5, 10:16, 15:23, 15:25, 18:4, 18:10, 18:15, 19:7, 19:20, 20:7, 21:4, 25:9, 29:5, 31:24, 33:11, 34:7, 34:15, 35:10, 44:25, 45:22, 51:4, 53:8, 53:10, 65:10, 66:2, 66:8, 78:22, 79:10, 81:2, 81:25, 83:24, 86:14, 91:21, 92:6, 93:25, 96:13, 97:14, 98:16, 102:8, 103:25, 104:10, 107:19, 109:11, 110:12, 110:20, 111:13, 111:23, 111:25, 112:2, 112:8, 112:10, 112:16, 112:19, 112:21, 114:14, 116:3, 116:5, 116:10, 117:4, 127:5, 133:20, 134:10, 134:17
**Government's** [9] - 4:23, 5:12, 9:11, 30:6, 30:8, 52:17, 99:19, 117:10, 131:22
**Government-produced** [1] - 51:4
**grab** [1] - 59:25
**grader** [1] - 128:25
**grateful** [1] - 44:7
**gratitude** [1] - 136:10
**gray** [42] - 8:16, 10:8,

10:13, 10:18, 10:19, 11:14, 12:2, 14:14, 20:8, 24:8, 24:12, 24:21, 25:5, 25:17, 49:15, 50:1, 55:3, 58:16, 71:19, 74:5, 80:9, 81:13, 81:21, 82:9, 87:2, 96:18, 103:23, 110:8, 110:9, 112:12, 113:17, 115:21, 115:23, 122:25, 126:12, 129:3, 129:4, 130:3, 133:12, 134:22, 135:12, 135:25
**GRAY** [169] - 1:11, 2:11, 16:13, 16:15, 17:3, 17:6, 25:18, 25:22, 26:1, 26:18, 28:19, 28:21, 29:24, 31:22, 32:6, 32:10, 32:19, 33:2, 33:17, 34:4, 37:8, 37:23, 38:1, 38:4, 38:7, 38:9, 38:19, 38:22, 39:3, 39:8, 39:13, 39:22, 42:8, 44:11, 44:23, 45:25, 46:2, 46:14, 47:15, 47:21, 49:10, 49:17, 49:24, 50:6, 50:12, 50:16, 50:19, 50:21, 51:14, 52:3, 52:5, 52:22, 53:12, 53:17, 56:19, 56:23, 57:4, 57:9, 57:25, 58:9, 58:17, 58:21, 61:9, 61:16, 61:24, 62:2, 62:8, 62:22, 63:6, 63:18, 64:4, 66:15, 66:19, 66:21, 69:11, 71:15, 71:23, 72:11, 72:13, 72:17, 72:22, 73:25, 74:8, 74:11, 74:23, 75:7, 75:18, 75:20, 76:1, 76:4, 77:16, 80:14, 80:19, 81:10, 82:3, 82:16, 83:3, 83:10, 86:19, 87:20, 87:24, 88:1, 88:8, 88:14, 88:16, 89:2, 89:6, 89:9, 89:25, 90:13, 91:4, 91:11, 91:19, 93:1, 93:6, 93:10, 93:13, 93:15, 94:23, 95:3, 95:7, 95:13, 96:20, 97:6, 98:4, 98:7, 100:10, 100:19, 101:11, 104:8, 104:23,

105:20, 106:1, 106:5, 109:14, 110:23, 111:15, 112:13, 113:5, 114:4, 114:9, 116:12, 118:1, 118:4, 119:3, 119:7, 119:18, 120:9, 120:13, 128:23, 129:1, 129:5, 129:16, 130:25, 131:8, 131:16, 131:25, 132:6, 132:8, 132:17, 133:2, 133:5, 133:10, 134:7, 134:23, 135:14, 135:19, 135:23, 136:20
**Gray** [2] - 2:14, 123:7
**great** [1] - 135:1
**greater** [1] - 7:12
**grind** [1] - 126:23
**ground** [2] - 31:14, 110:16
**groundless** [1] - 79:15
**group** [1] - 133:22
**guess** [6] - 14:8, 37:18, 44:18, 75:2, 121:11, 124:7
**guesses** [1] - 105:8
**guide** [1] - 14:21
**guideline** [1] - 5:16
**guidelines** [3] - 4:24, 7:3, 7:8
**guilt/innocence** [3] - 77:2, 77:22, 78:7
**guilt/innocent** [1] - 43:21
**guilty** [5] - 34:16, 43:8, 43:9, 43:10, 43:12
**Guinther** [9] - 11:20, 73:7, 73:9, 73:17, 73:21, 76:8, 76:10, 76:13, 116:23
**Guinther's** [1] - 76:12

## H

**handful** [5] - 103:3, 122:4, 122:10, 122:11, 122:12
**handle** [1] - 129:21
**handled** [1] - 82:22
**handling** [1] - 52:8
**hands** [1] - 18:19
**hang** [2] - 34:7, 94:16
**happy** [9] - 17:15, 20:10, 23:19, 81:18,

102:7, 107:16, 123:21, 124:1, 127:24
**hard** [5] - 10:11, 114:20, 122:2, 124:7, 124:19
**hardcopy** [3] - 16:16, 116:2, 122:2
**harder** [1] - 55:7
**hardly** [1] - 69:5
**hardworking** [1] - 90:15
**hate** [1] - 85:23
**hazy** [1] - 117:22
**head** [5] - 42:2, 55:23, 74:1, 88:10, 108:17
**Health** [1] - 81:16
**health** [1] - 113:21
**hear** [7] - 9:2, 10:22, 23:10, 46:11, 50:1, 102:25, 104:25
**heard** [11] - 8:23, 10:19, 12:4, 35:22, 37:24, 47:13, 64:13, 70:10, 89:17, 108:22, 113:8
**hearing** [24] - 6:5, 6:21, 10:14, 12:22, 22:14, 25:3, 30:5, 30:9, 32:16, 37:3, 37:5, 40:14, 50:23, 52:6, 55:15, 80:6, 80:21, 80:24, 80:25, 81:24, 102:24, 111:20, 120:23, 135:6
**hearings** [10] - 26:11, 26:22, 27:6, 36:6, 36:8, 69:22, 76:7, 87:6, 110:24
**hears** [1] - 23:13
**heavy** [1] - 125:10
**Heinze** [4] - 74:14, 74:15, 105:23, 106:12
**held** [8] - 12:11, 12:14, 41:11, 105:16, 129:24, 134:6, 137:10
**help** [6] - 3:13, 14:21, 71:19, 80:12, 126:20, 126:24
**helped** [2] - 18:6, 136:16
**helpful** [8] - 40:10, 55:25, 94:4, 97:5, 123:16, 125:24, 127:17, 136:12
**hereby** [1] - 137:7
**Herndon** [1] - 16:15

**herself** [4] - 18:11, 85:16, 85:21, 92:20
**high** [15] - 14:19, 15:10, 40:16, 40:19, 40:20, 42:11, 51:10, 56:2, 57:7, 57:8, 57:9, 69:25, 71:1, 97:21
**higher** [1] - 125:17
**highly** [1] - 101:5
**hike** [1] - 41:13
**hill** [1] - 30:11
**Hill** [2] - 30:14, 81:16
**hir** [1] - 11:6
**hire** [4] - 11:7, 107:10, 107:21, 108:12
**hired** [1] - 11:7
**hires** [4] - 60:5, 107:13, 108:2, 108:5
**hiring** [5] - 10:3, 11:7, 106:17, 106:21, 107:25
**history** [2] - 25:24, 26:1
**hit** [2] - 104:22, 134:13
**hits** [11] - 98:23, 99:23, 100:6, 102:20, 124:2, 124:5, 125:1, 125:3, 125:4, 125:19, 128:5
**hold** [3] - 43:19, 87:6, 132:1
**holding** [1] - 30:12
**hole** [1] - 90:21
**HOLLANDER** [1] - 1:8
**Holly** [3] - 1:24, 2:20, 48:9
**HOLLY** [1] - 48:9
**home** [1] - 109:20
**Honor** [147] - 2:12, 2:21, 3:21, 4:1, 9:6, 9:8, 9:23, 10:4, 10:8, 10:12, 10:13, 10:23, 11:4, 11:19, 11:25, 12:4, 12:8, 14:23, 15:8, 15:20, 16:7, 16:25, 17:13, 18:2, 18:9, 18:12, 19:9, 19:19, 20:6, 21:18, 22:2, 22:19, 23:5, 23:15, 24:14, 25:15, 25:18, 25:22, 28:5, 29:7, 31:22, 32:1, 33:3, 37:14, 39:3, 39:22, 41:4, 42:8, 44:23, 45:8, 46:2, 46:5, 46:6, 51:15, 51:20, 53:12, 55:13, 60:4, 60:10, 61:24, 62:10, 66:10, 66:21,

70:10, 71:16, 71:23, 72:3, 73:13, 74:3, 74:8, 74:24, 75:7, 75:21, 76:1, 76:24, 76:25, 79:10, 80:14, 80:25, 81:6, 81:10, 82:16, 83:3, 84:12, 87:20, 88:9, 89:2, 90:3, 90:6, 90:13, 91:5, 91:19, 93:2, 93:10, 93:18, 95:13, 95:23, 97:17, 98:1, 98:6, 98:9, 98:20, 100:6, 100:10, 100:20, 101:11, 102:6, 102:12, 103:6, 105:15, 105:17, 106:15, 106:20, 107:9, 108:1, 109:14, 110:23, 111:15, 114:4, 116:12, 116:18, 119:20, 120:15, 122:13, 124:10, 124:16, 124:19, 125:21, 126:4, 127:18, 130:8, 130:17, 130:25, 132:6, 132:17, 132:20, 133:16, 133:19, 133:25, 134:23, 135:8, 135:10, 135:14, 135:23, 136:6

**Honor's** [2] - 121:12, 132:9

**HONORABLE** [1] - 1:8

**hope** [7] - 89:7, 123:17, 124:1, 125:18, 128:13, 130:10, 136:6

**hoping** [2] - 23:10, 99:24

**hour** [1] - 38:18

**hours** [18] - 9:13, 9:14, 19:22, 22:9, 31:16, 35:10, 35:11, 35:17, 35:20, 41:7, 41:11, 41:17, 42:10, 74:19, 82:5, 84:15, 112:17, 113:16

**Howard** [1] - 109:24

**huge** [4] - 29:7, 45:19, 48:1, 128:1

**hum** [1] - 16:19

**hungry** [1] - 127:21

## I

**idea** [16] - 42:4, 69:19, 73:2, 73:7, 77:1, 85:12, 90:17, 92:2, 92:13, 92:19, 95:15, 101:5, 117:13, 117:21, 118:11, 124:25

**ideal** [1] - 113:23

**ideas** [1] - 57:16

**identified** [10] - 23:9, 25:1, 27:3, 27:4, 34:19, 38:13, 41:11, 83:22, 85:1, 108:23

**identifies** [1] - 97:11

**identify** [3] - 41:9, 42:18, 69:7

**ignore** [1] - 29:11

**ignoring** [1] - 72:5

**II** [1] - 1:18

**iii** [1] - 19:3

**Illinois** [1] - 92:17

**illustrating** [1] - 74:4

**immaterial** [2] - 35:7, 42:16

**immediately** [1] - 36:16

**impassioned** [1] - 80:9

**implore** [1] - 126:21

**importance** [2] - 90:4, 103:24

**important** [18] - 6:11, 6:23, 7:14, 7:23, 13:4, 14:13, 15:19, 39:19, 40:11, 45:13, 66:12, 66:18, 73:3, 84:17, 88:14, 108:14, 118:24, 136:11

**impose** [1] - 46:19

**imposed** [1] - 8:24

**impressed** [1] - 114:5

**impression** [1] - 24:21

**impressive** [1] - 61:24

**IN** [1] - 1:1

**Inc** [1] - 13:14

**incapable** [1] - 27:21

**include** [9] - 6:13, 22:5, 26:24, 93:21, 94:5, 95:24, 97:4, 134:24, 136:8

**included** [7] - 11:6, 47:1, 51:8, 51:9, 51:10, 52:9, 105:13

**includes** [3] - 10:10, 83:17, 97:1

**including** [2] - 34:8, 117:14

**incompetent** [1] - 44:25

**incorporate** [2] - 128:11, 129:8

**incorrect** [1] - 89:14

**incredibly** [2] - 45:12, 113:22

**indefinitely** [1] - 122:21

**indicate** [2] - 35:4, 43:12

**indicated** [1] - 35:11, 62:3, 84:15

**indicates** [1] - 35:1, 75:1

**indication** [1] - 12:15

**indictment** [2] - 43:17, 56:22

**indifferent** [1] - 85:19

**indistinguishable** [3] - 44:3, 82:17

**individual** [2] - 38:1, 116:18

**individuals** [3] - 103:14, 104:3, 120:25

**Indivior** [1] - 13:14

**INDIVIOR** [1] - 13:14

**influence** [1] - 27:19

**inform** [1] - 126:5

**information** [18] - 3:2, 3:16, 7:17, 10:17, 10:19, 31:8, 33:11, 47:1, 77:20, 87:12, 88:23, 95:9, 99:25, 104:1, 113:4, 121:24, 133:20, 134:2

**informed** [3] - 24:17, 100:7, 102:22

**InfoTeK** [11] - 41:11, 59:6, 61:14, 92:5, 94:14, 95:19, 95:20, 108:12, 116:14, 116:20, 117:11

**InfoTeK's** [1] - 92:6

**initial** [1] - 43:20

**initials** [1] - 94:13

**input** [1] - 66:8

**inquiry** [4] - 80:21, 80:24, 81:1, 81:24

**insert** [1] - 129:10

**inside** [1] - 41:23

**insisted** [2] - 83:24, 117:3

**insofar** [1] - 79:17

**Inspector** [2] - 2:19, 2:23, 2:24, 87:12

**instance** [1] - 103:8

**instant** [2] - 41:22, 42:23

**instead** [1] - 14:7

**instructed** [1] - 92:17

**intend** [1] - 80:15

**intended** [4] - 7:12, 11:7, 43:4, 83:5

**intensity** [1] - 67:13

**intensive** [4] - 31:11, 64:17, 67:11, 69:8

**interest** [1] - 109:18

**interested** [2] - 81:21, 98:25

**interesting** [2] - 6:15, 84:5

**internal** [1] - 12:9

**internet** [1] - 97:2

**interpret** [1] - 2:11

**interpretation** [1] - 81:15

**interrupt** [1] - 129:25

**interview** [5] - 11:4, 11:5, 107:10, 107:16, 107:20

**interviews** [1] - 47:12

**introduce** [2] - 3:8, 109:3

**introduced** [3] - 38:24, 41:21, 84:22

**investigate** [1] - 134:4

**Investigating** [1] - 2:16

**investigation** [3] - 47:4, 81:3, 92:7

**investigative** [2] - 2:22, 46:24

**Investigative** [1] - 1:24

**invoices** [3] - 112:1, 112:14

**invoked** [1] - 101:12

**involve** [3] - 26:19, 47:24, 104:15

**involved** [18] - 26:19, 34:18, 43:14, 46:8, 48:25, 57:23, 60:21, 60:23, 67:24, 71:11, 80:18, 82:21, 89:23, 95:12, 113:9, 113:18, 115:13, 120:25

**involvement** [2] - 73:19, 110:5

**involves** [1] - 34:14

**involving** [2] - 7:5, 77:3

**Ironbridge** [24] - 10:2, 10:3, 15:21, 16:3, 17:9, 22:17, 23:21, 59:6, 60:5, 60:17, 73:10, 83:25, 84:16,

91:16, 94:14, 95:16, 95:20, 95:21, 107:16, 108:6, 118:7, 121:1

**ironic** [1] - 35:13

**irresponsible** [1] - 46:18

**issue** [39] - 4:22, 7:14, 8:1, 8:8, 20:2, 23:9, 24:15, 25:24, 26:1, 27:3, 27:4, 27:9, 30:24, 31:4, 31:21, 33:6, 33:7, 33:20, 35:25, 37:10, 40:13, 42:6, 42:14, 43:21, 46:21, 48:1, 48:3, 48:6, 51:23, 77:4, 81:23, 82:6, 82:12, 85:15, 91:2, 127:14, 133:18

**issued** [1] - 53:10

**issues** [24] - 3:14, 4:7, 4:10, 4:14, 8:12, 30:21, 31:9, 37:16, 75:14, 77:14, 77:16, 77:24, 78:6, 79:6, 82:13, 87:6, 87:7, 87:9, 87:12, 87:15, 91:14, 92:7, 100:7, 110:6

**item** [8] - 16:23, 18:25, 19:2, 50:15, 55:1, 55:5, 61:16, 83:23

**items** [7] - 55:2, 55:3, 75:3, 75:4, 78:18, 83:17, 93:21

**itself** [6] - 33:21, 41:20, 42:25, 91:19, 99:20, 115:14

## J

**Jack** [1] - 13:12

**Jacky** [9] - 2:4, 3:22, 60:17, 94:18, 105:9, 105:18, 106:9, 106:10, 107:17

**JACKY** [1] - 1:5

**James** [1] - 3:3

**Jan** [1] - 92:14

**January** [40] - 1:8, 4:18, 6:3, 6:5, 6:18, 6:19, 6:22, 9:23, 10:14, 20:15, 23:16, 25:1, 28:24, 32:1, 32:5, 32:6, 32:11, 32:16, 32:18, 33:19, 36:2, 36:10, 44:5, 48:12, 50:15, 50:22, 50:23, 51:3, 54:20,

56:8, 57:6, 61:17, 64:7, 88:4, 88:22, 90:24, 104:9, 134:8, 134:13
**Jason** [12] - 11:15, 17:22, 21:15, 63:22, 74:20, 85:16, 94:15, 96:18, 105:8, 105:19, 106:8, 123:14
**JEFFERSON** [1] - 1:11
**Jefferson** [1] - 2:14
**Jennifer** [21] - 61:6, 61:21, 62:10, 62:19, 63:15, 65:1, 65:10, 65:22, 66:5, 66:12, 67:17, 70:11, 71:20, 74:16, 75:2, 99:12, 103:18, 105:25, 106:13
**Jim** [2] - 1:23, 3:1
**job** [1] - 114:21
**joined** [2] - 3:25, 4:8
**joke** [1] - 45:11
**Jon** [8] - 15:2, 85:17, 85:21, 85:25, 105:19, 105:22, 106:11, 123:14
**Jonathan** [5] - 51:8, 63:22, 94:19, 100:22, 105:10
**Jones** [1] - 30:14
**Joyce** [1] - 82:23
**Judge** [1] - 19:11
**JUDGE** [1] - 1:8
**Judicial** [1] - 137:12
**Julie** [1] - 2:23
**July** [22] - 12:11, 59:20, 59:21, 61:7, 61:10, 61:20, 62:16, 62:18, 63:4, 65:2, 65:5, 67:4, 70:13, 70:16, 70:18, 70:21, 70:23, 71:3, 106:18, 110:25, 111:17
**jury** [2] - 36:3, 52:1
**Justice** [1] - 79:17
**justice** [3] - 79:24, 126:11, 126:23
**justified** [1] - 105:7
**justify** [1] - 103:13

## K

**K3** [1] - 42:2
**Katherine** [1] - 61:7
**Katzen** [3] - 3:25, 23:9, 25:1
**KATZEN** [1] - 1:20

**Keefe** [2] - 3:1, 68:25
**Keefe's** [1] - 37:20
**keep** [7] - 8:7, 25:20, 84:17, 123:2, 125:20, 135:5, 135:9
**keeping** [1] - 25:7
**keeps** [2] - 27:23, 35:24
**Kelly** [2] - 96:15, 120:23
**kept** [3] - 34:1, 93:22, 97:21
**key** [1] - 71:14
**keywords** [1] - 38:13
**Kimmel's** [1] - 51:9
**kind** [16] - 21:15, 21:16, 21:19, 33:9, 37:10, 44:20, 45:14, 58:6, 64:20, 77:7, 84:19, 87:18, 99:24, 116:18, 117:6, 117:18
**kinds** [2] - 44:22, 121:24
**knowing** [1] - 29:11
**knowingly** [1] - 78:18
**knowledge** [10] - 9:2, 9:10, 14:17, 44:17, 49:2, 53:16, 69:9, 71:5, 83:14, 95:10
**knowledgeable** [1] - 29:19
**knows** [6] - 26:2, 26:21, 28:5, 42:19, 105:5, 118:13
**Kristin** [5] - 63:22, 88:21, 94:18, 105:9, 106:14

## L

**labeled** [1] - 72:23
**labor** [3] - 64:17, 67:11, 84:16
**laborious** [1] - 104:21
**Lamberth** [1] - 13:13
**large** [4] - 5:15, 90:16, 99:25, 108:3
**larger** [3] - 61:5, 111:11
**last** [32] - 4:6, 5:24, 19:24, 22:6, 22:14, 26:25, 35:14, 37:21, 40:14, 41:5, 44:5, 46:6, 50:12, 50:15, 50:21, 50:24, 52:14, 53:22, 54:14, 55:5, 56:1, 74:15, 74:25, 79:12, 80:6, 89:17, 92:4, 107:22,

109:18, 110:11, 114:23, 129:15
**late** [5] - 27:8, 35:14, 53:15, 101:7, 111:3
**latest** [1] - 10:9
**law** [7] - 12:24, 19:10, 22:3, 42:15, 81:16, 81:19, 90:16
**Lawrence** [1] - 29:21
**lawsuit** [1] - 73:24
**lawyer** [2] - 30:3, 113:18
**lawyers** [1] - 44:24
**lays** [1] - 36:23
**lead** [5] - 18:6, 75:9, 75:11, 110:6, 110:8
**learn** [1] - 118:2
**learned** [2] - 18:3, 25:5
**learning** [3] - 32:12, 134:1, 134:2
**least** [14] - 4:15, 5:5, 5:18, 21:14, 44:21, 63:25, 64:1, 79:19, 94:6, 102:14, 102:20, 102:25, 109:9, 126:1
**leave** [4] - 8:3, 90:17, 129:4, 129:5
**left** [4] - 2:18, 15:12, 15:14, 57:10
**legal** [2] - 9:9, 14:8
**legality** [3] - 29:25, 30:4, 30:11
**legally** [1] - 13:25
**legitimately** [1] - 77:18
**length** [1] - 59:13
**lengthy** [4] - 38:6, 41:22, 57:12, 114:12
**less** [1] - 47:25
**letter** [14] - 4:18, 9:24, 50:24, 51:4, 53:19, 58:18, 61:17, 63:20, 73:21, 76:8, 76:11, 92:10, 104:10, 116:23
**letters** [7] - 9:5, 42:19, 53:18, 53:22, 76:2, 76:3, 134:19
**level** [3] - 7:4, 69:25, 125:17
**life** [1] - 101:7
**lift** [1] - 125:10
**light** [2] - 27:24, 70:8
**likely** [3] - 80:23, 84:18, 90:7
**Limine** [1] - 36:14
**limine** [1] - 36:14
**limit** [3] - 65:10,

103:11, 107:16
**limitations** [1] - 123:24
**limited** [4] - 34:11, 70:12, 103:14, 103:16
**limiting** [1] - 60:15
**line** [4] - 35:2, 74:25, 111:22, 126:15
**lines** [1] - 112:11
**lingering** [1] - 91:14
**lingers** [1] - 86:15
**list** [20] - 11:15, 15:21, 16:4, 17:14, 28:10, 28:20, 37:25, 39:24, 49:7, 57:12, 65:18, 65:20, 83:21, 94:3, 97:4, 99:13, 102:20, 119:3, 123:9
**listed** [9] - 57:20, 59:15, 65:6, 65:8, 65:24, 68:16, 94:21, 95:23, 118:20
**lists** [2] - 16:4, 28:25
**literal** [1] - 57:14
**literally** [1] - 51:6
**live** [1] - 135:6
**LLP** [2] - 1:15, 1:20
**locate** [1] - 68:11
**located** [1] - 121:19
**locating** [1] - 89:20
**log** [2] - 55:9, 55:16, 134:20
**look** [22] - 19:1, 25:3, 27:22, 27:25, 40:11, 41:5, 42:18, 49:6, 51:19, 51:22, 66:4, 66:13, 71:10, 93:6, 96:4, 103:19, 121:6, 121:8, 122:9, 125:5, 129:14, 130:19
**looked** [17] - 12:25, 13:18, 27:2, 39:11, 39:13, 41:15, 46:21, 55:23, 66:5, 66:14, 84:10, 94:1, 97:2, 100:20, 121:2, 121:16, 122:25
**looking** [12] - 23:25, 26:8, 27:5, 39:9, 40:16, 50:18, 61:15, 66:11, 96:2, 130:17, 132:15, 132:19
**Lord** [1] - 118:13
**lose** [2] - 14:15, 127:21
**loss** [34] - 4:22, 4:23, 5:2, 5:6, 5:15, 7:2, 7:6, 7:12, 7:13, 7:17, 9:12, 14:10, 19:18,

19:20, 30:25, 31:5, 31:11, 31:14, 33:6, 33:23, 35:6, 35:13, 41:5, 42:16, 44:3, 46:21, 77:4, 78:9, 82:13, 87:16, 100:7
**lost** [5] - 7:25, 33:15, 37:15, 48:21, 70:19
**love** [2] - 18:4, 44:24
**low** [10] - 15:10, 56:3, 56:9, 56:13, 57:3, 57:4, 57:9, 57:10, 57:11, 92:5
**lunch** [1] - 133:19
**Lynn** [1] - 2:4
**LYNN** [1] - 1:5

## M

**ma'am** [5] - 66:17, 67:15, 68:14, 69:10, 108:21
**Madam** [1] - 12:19
**main** [3] - 93:2, 93:4, 93:9
**maintain** [4] - 22:3, 49:5, 55:9, 116:4
**maintained** [6] - 48:19, 55:19, 69:23, 116:17, 117:11, 118:20
**maintaining** [2] - 117:24, 118:12
**maintains** [1] - 55:16
**Mair** [5] - 63:22, 88:21, 94:19, 105:9, 106:14
**man** [1] - 41:23
**managed** [1] - 101:7
**management** [12] - 12:10, 12:16, 21:21, 21:24, 61:12, 61:14, 63:2, 65:23, 74:18, 96:22
**manager** [13] - 10:2, 11:11, 22:25, 28:12, 35:22, 73:12, 74:18, 75:4, 85:14, 86:6, 91:16, 92:1, 95:16
**mandated** [1] - 117:1
**Mandel** [1] - 13:10
**Manges** [2] - 1:15, 1:20
**manner** [1] - 100:3
**Maranzino** [1] - 13:17
**MARANZINO** [1] - 13:17
**March** [8] - 67:17, 80:7, 113:7, 123:2, 129:1, 129:2, 129:4, 129:15

**marginal** [1] - 90:10
**mark** [1] - 15:13
**marked** [1] - 15:23
**MARYLAND** [1] - 1:1
**Maryland** [5] - 1:9, 1:13, 1:19, 34:17, 137:7
**massive** [1] - 122:12
**material** [13] - 4:25, 19:15, 33:5, 40:12, 43:15, 43:25, 44:1, 44:22, 52:11, 78:10, 82:11, 106:17, 134:11
**materiality** [1] - 40:13
**materially** [2] - 44:10, 44:12
**materials** [8] - 5:19, 24:3, 24:6, 69:20, 128:12, 133:22, 133:25, 134:20
**math** [1] - 42:12
**matter** [14] - 2:3, 2:5, 4:5, 18:21, 45:6, 45:11, 80:19, 83:23, 84:4, 86:24, 91:20, 92:14, 105:4, 137:10
**matters** [11] - 6:6, 13:25, 17:12, 36:10, 71:16, 79:18, 90:3, 109:23, 112:4, 114:16, 132:24
**Maxine** [5] - 40:3, 95:4, 95:5, 95:6
**McComber** [26] - 1:5, 2:4, 3:22, 5:7, 5:21, 9:13, 17:18, 27:18, 28:4, 29:2, 39:15, 42:3, 45:14, 46:25, 66:22, 85:6, 94:18, 100:25, 101:21, 105:9, 105:18, 106:9, 106:10, 108:3, 124:18, 134:3
**McComber's** [4] - 22:7, 91:25, 101:15, 101:17
**McDonald** [3] - 82:22, 82:23, 82:24
**Meade** [4] - 40:3, 57:14, 95:4
**mean** [64] - 12:7, 17:15, 18:14, 18:16, 21:7, 21:9, 22:1, 29:15, 34:11, 34:12, 34:17, 35:4, 35:7, 35:8, 35:15, 36:1, 38:16, 42:13, 42:17, 45:1, 45:5, 47:5, 51:15, 51:16, 51:23,

51:25, 52:15, 53:24, 56:25, 60:8, 60:12, 61:19, 62:14, 68:22, 69:19, 69:21, 72:3, 72:24, 74:2, 77:10, 79:6, 83:2, 83:11, 84:1, 84:4, 85:12, 85:14, 89:8, 92:3, 92:8, 99:5, 101:4, 105:4, 112:10, 114:4, 118:6, 120:3, 120:4, 122:24, 124:4, 126:7, 129:9, 132:12, 134:16
**meaning** [4] - 26:15, 53:7, 69:8, 103:24
**means** [6] - 27:2, 28:15, 43:13, 131:21, 132:3, 132:5
**meant** [2] - 89:3, 126:8
**Mechanical** [1] - 1:25
**meet** [1] - 102:7
**meeting** [1] - 61:13
**Megan** [3] - 11:20, 73:6, 73:16
**members** [1] - 37:20
**memo** [10] - 80:16, 120:2, 123:1, 127:6, 130:4, 130:5, 131:22, 131:23, 132:5, 132:14
**memorialize** [1] - 133:14
**memory** [6] - 72:18, 101:10, 112:11, 112:12, 115:23, 116:3
**memos** [1] - 130:2
**mention** [3] - 6:2, 12:24, 13:3
**mentioned** [3] - 19:19, 53:18, 109:4
**mere** [1] - 85:11
**Merit** [1] - 137:6
**messages** [2] - 41:22, 42:23
**met** [1] - 32:20
**meticulous** [1] - 116:17
**meticulously** [2] - 116:16, 117:11
**mgmt** [1] - 115:6
**MGMT-80368** [1] - 96:22
**Miami** [1] - 1:21
**mic** [1] - 115:9
**Michael** [2] - 104:6, 104:8
**microphone** [1] - 48:5

**might** [22] - 12:15, 14:12, 14:24, 21:2, 25:1, 27:18, 35:4, 56:9, 68:12, 71:2, 71:7, 86:9, 93:22, 97:21, 98:22, 109:17, 122:14, 125:17, 135:1
**milestones** [1] - 120:6
**Miller** [4] - 7:21, 92:15, 104:7
**Miller's** [1] - 104:8
**mind** [8] - 8:7, 23:19, 25:20, 73:9, 86:15, 95:13, 101:11, 107:8
**minded** [1] - 51:24
**mindless** [1] - 37:15
**minds** [1] - 32:25
**minimal** [2] - 46:19, 48:1
**minimize** [1] - 68:22
**minor** [1] - 63:13
**minute** [8] - 52:14, 110:11, 113:12, 113:16, 115:1, 127:11, 129:20, 129:23
**minutes** [4] - 35:5, 38:18, 41:16
**minutia** [1] - 37:15
**misrepresented** [1] - 51:21
**missing** [2] - 31:23, 74:11
**misspelled** [2] - 102:13, 107:20
**misspoken** [1] - 14:24
**misstating** [1] - 111:21
**mixed** [1] - 19:10
**MJOA** [1] - 4:6
**mode** [1] - 123:23
**modified** [2] - 58:7, 58:11
**moment** [5] - 10:9, 45:18, 48:4, 105:12, 105:14
**Monday** [1] - 127:8
**monitor** [3] - 15:13, 15:15, 97:14
**month** [41] - 9:14, 19:22, 26:25, 27:1, 29:3, 31:16, 35:10, 35:20, 35:21, 36:22, 43:16, 59:2, 64:19, 65:11, 65:13, 66:4, 66:5, 66:16, 67:12, 68:23, 70:4, 70:5, 70:6, 70:18, 70:23, 71:3, 71:10, 71:20,

71:22, 71:24, 103:8, 103:19, 104:18, 105:10, 109:9, 112:19, 132:9, 133:2
**monthly** [6] - 22:23, 94:13, 95:20, 96:15, 98:8, 100:13
**months** [23] - 17:21, 18:1, 26:4, 28:12, 36:4, 56:21, 64:22, 66:13, 66:14, 67:11, 67:13, 68:20, 79:16, 84:22, 85:25, 86:2, 86:7, 92:14, 103:13, 104:12, 111:10, 113:8
**moreover** [1] - 85:24
**morning** [8] - 2:3, 2:6, 2:18, 3:21, 35:9, 37:14, 54:5, 87:22
**most** [18] - 8:24, 29:16, 34:12, 42:2, 73:3, 75:12, 75:13, 79:2, 85:14, 85:24, 86:6, 91:25, 93:17, 109:22, 122:4, 125:19, 125:25, 134:7
**Motion** [1] - 36:9
**motion** [9] - 26:4, 26:10, 26:22, 27:6, 36:8, 36:13, 110:25, 111:17, 121:23
**motions** [1] - 26:21
**mouth** [1] - 107:6
**move** [4] - 107:4, 119:23, 122:23, 126:23
**moved** [1] - 32:15
**moving** [3] - 82:4, 114:16, 122:24
**MR** [186] - 2:11, 16:13, 16:15, 17:3, 17:6, 25:18, 25:22, 26:1, 26:18, 28:19, 28:21, 29:24, 31:22, 32:6, 32:10, 32:19, 33:2, 33:17, 34:4, 37:8, 37:23, 38:1, 38:4, 38:7, 38:9, 38:19, 38:22, 39:3, 39:8, 39:13, 39:22, 42:8, 44:11, 44:23, 45:25, 46:2, 46:14, 47:15, 47:21, 49:10, 49:15, 49:17, 49:24, 50:6, 50:12, 50:16, 50:19, 50:21, 51:14, 52:3, 52:5, 52:22, 53:12, 53:17, 56:19, 56:23,

57:4, 57:9, 57:25, 58:9, 58:17, 58:21, 61:9, 61:16, 61:24, 62:2, 62:8, 62:22, 63:6, 63:18, 64:4, 66:15, 66:19, 66:21, 69:11, 71:15, 71:23, 72:11, 72:13, 72:17, 72:22, 73:25, 74:8, 74:11, 74:23, 75:7, 75:18, 75:20, 76:1, 76:4, 77:16, 80:14, 80:19, 81:10, 82:3, 82:16, 83:3, 83:10, 86:19, 87:20, 87:24, 88:1, 88:8, 88:14, 88:16, 89:2, 89:6, 89:9, 89:25, 90:13, 91:4, 91:11, 91:19, 93:1, 93:6, 93:10, 93:13, 93:15, 94:3, 94:6, 94:9, 94:23, 95:3, 95:7, 95:13, 96:20, 97:6, 98:4, 98:7, 100:10, 100:19, 101:11, 103:6, 103:14, 103:20, 104:3, 104:6, 104:8, 104:15, 104:19, 104:23, 105:1, 105:20, 106:1, 106:5, 109:14, 110:23, 111:15, 112:13, 113:5, 114:4, 114:9, 115:8, 115:12, 115:19, 116:12, 118:1, 118:4, 119:3, 119:7, 119:18, 120:9, 120:13, 125:8, 126:4, 126:10, 128:23, 129:1, 129:5, 129:16, 130:25, 131:8, 131:16, 131:25, 132:6, 132:8, 132:17, 133:2, 133:5, 133:10, 134:7, 134:23, 135:14, 135:19, 135:23, 136:20
**MS** [215] - 3:21, 9:6, 9:8, 11:11, 12:14, 14:23, 15:7, 15:11, 15:15, 15:17, 16:2, 16:14, 16:16, 16:20, 16:25, 17:2, 17:5, 17:8, 17:13, 18:2, 18:9, 18:12, 19:9, 21:8, 21:17, 21:21,

21:25, 22:2, 22:19, 22:22, 23:4, 23:8, 23:15, 23:22, 24:14, 25:12, 25:15, 48:9, 48:15, 48:23, 49:4, 49:14, 49:16, 49:23, 50:2, 50:10, 50:14, 50:17, 50:20, 53:15, 54:1, 54:4, 54:9, 54:10, 54:14, 54:16, 54:22, 55:1, 55:9, 55:13, 55:16, 55:19, 55:25, 56:5, 56:12, 56:15, 56:16, 56:18, 56:21, 56:25, 57:3, 57:8, 57:19, 58:1, 58:3, 58:4, 58:5, 58:6, 58:11, 58:15, 58:18, 58:20, 58:23, 59:1, 59:24, 59:25, 60:4, 60:10, 60:14, 60:23, 61:3, 61:12, 61:19, 62:10, 62:15, 62:21, 62:24, 63:8, 63:25, 64:7, 64:17, 65:6, 65:15, 66:10, 66:17, 67:15, 67:20, 68:1, 68:14, 68:25, 69:10, 69:14, 69:18, 69:25, 70:9, 70:17, 70:22, 71:5, 71:11, 74:3, 74:10, 74:17, 80:25, 81:6, 81:13, 94:12, 94:18, 94:21, 94:25, 95:5, 95:10, 95:23, 96:7, 96:11, 96:23, 97:2, 97:8, 97:17, 97:20, 98:1, 98:3, 98:6, 98:9, 98:19, 99:2, 99:5, 99:11, 99:17, 100:15, 101:19, 102:2, 102:6, 102:12, 104:24, 105:12, 105:14, 105:17, 105:22, 106:3, 106:9, 106:11, 106:15, 106:20, 106:24, 107:2, 107:9, 107:12, 107:23, 107:25, 108:11, 108:18, 108:21, 113:15, 119:15, 119:20, 119:25, 120:3, 120:11, 120:15, 120:20, 122:9, 122:13, 122:20, 123:12, 123:14, 123:17, 123:20, 124:9,

125:15, 127:16, 128:3, 128:7, 128:8, 128:17, 128:21, 128:24, 129:2, 129:12, 129:14, 129:20, 130:3, 130:8, 130:16, 130:20, 131:11, 131:15, 133:12, 133:16, 133:18, 134:18, 135:1, 135:5, 135:8, 135:10, 136:14
**MSR** [3] - 94:13, 95:19
**muddling** [1] - 67:9
**multi** [1] - 69:5
**multi-step** [1] - 69:5
**multiple** [6] - 55:2, 55:3, 67:11, 68:20, 95:21
**murky** [1] - 110:18
**must** [2] - 112:3, 112:9

## N

**Nadine** [1] - 137:5
**NADINE** [1] - 137:18
**naively** [1] - 116:14
**name** [21] - 2:14, 19:11, 48:7, 62:6, 63:1, 63:3, 65:4, 65:5, 65:12, 65:22, 65:24, 66:8, 66:16, 70:15, 70:21, 70:22, 73:20, 74:24, 96:1, 99:12, 119:12
**names** [7] - 73:6, 87:24, 90:2, 94:7, 99:3, 106:1, 106:7
**narrow** [9] - 9:25, 10:21, 11:25, 12:6, 20:9, 59:5, 60:18, 107:17, 124:2, 125:6, 125:21, 128:9
**narrowed** [1] - 23:22
**narrowing** [1] - 123:18
**narrowly** [2] - 22:5, 102:18
**narrows** [2] - 19:14, 59:6
**Nathaniel** [2] - 1:23, 2:16
**National** [7] - 2:8, 2:20, 2:22, 2:24, 3:3, 3:4, 28:14
**nature** [1] - 70:1
**neat** [1] - 135:9
**necessarily** [16] - 4:12, 8:4, 19:7,

21:13, 41:8, 57:12, 64:10, 64:15, 68:18, 87:11, 88:8, 93:9, 93:23, 113:12, 117:1, 134:16
**neck** [1] - 34:7
**need** [35] - 7:16, 7:20, 9:2, 14:8, 20:6, 28:8, 36:1, 39:15, 44:9, 45:7, 47:19, 53:25, 64:12, 71:16, 71:25, 76:22, 80:4, 81:1, 83:7, 83:8, 85:5, 96:24, 124:5, 125:22, 127:18, 127:25, 129:3, 129:8, 130:5, 131:21, 132:24, 135:7, 135:21, 136:2
**needed** [6] - 8:20, 101:1, 121:25, 126:18, 126:20, 126:24
**needs** [4] - 5:1, 14:4, 126:18, 135:3
**negligent** [2] - 44:25, 45:12
**never** [22] - 10:19, 12:5, 15:2, 24:4, 24:20, 24:24, 27:4, 43:18, 43:19, 43:22, 52:25, 63:9, 63:16, 76:19, 82:23, 83:7, 84:6, 84:10, 85:20, 97:3, 116:21, 121:6
**New** [2] - 19:12, 30:11
**new** [28] - 8:20, 11:8, 30:23, 31:3, 31:8, 34:25, 36:14, 39:6, 39:19, 59:18, 60:5, 64:4, 64:14, 67:13, 68:21, 69:15, 78:13, 81:3, 90:8, 107:12, 108:2, 108:5, 109:3, 109:7, 119:8, 128:11, 134:2
**next** [3] - 73:6, 107:4, 119:23
**night** [2] - 32:2, 114:23
**nights** [1] - 109:20
**nine** [3] - 36:2, 106:3, 113:11
**Ninth** [1] - 13:10
**Nixon** [2] - 13:16, 14:2
**nobody** [4] - 17:18, 86:24, 93:25, 129:9
**none** [6] - 20:4, 28:12, 39:6, 71:2, 114:13, 117:10

**nonexistent** [1] - 46:20
**nonsensical** [1] - 117:17
**nonspeculative** [1] - 100:2
**Northern** [1] - 29:21
**NORTHERN** [1] - 1:2
**notations** [1] - 40:2
**note** [5] - 50:3, 76:25, 96:16, 102:12, 123:13
**noted** [3] - 18:1, 41:13, 96:14
**notes** [3] - 50:18, 59:25, 61:13
**nothing** [5] - 31:5, 35:22, 80:11, 86:1, 136:19
**noting** [3] - 6:4, 6:13, 81:15
**notion** [2] - 8:2, 8:13
**novel** [1] - 30:18
**November** [9] - 53:13, 75:13, 76:7, 76:8, 76:23, 86:3, 111:8, 120:20, 122:6
**NSA** [79] - 1:23, 1:24, 3:9, 3:13, 3:15, 4:9, 6:8, 8:24, 9:3, 9:15, 10:15, 10:25, 19:23, 22:12, 23:10, 24:1, 24:5, 24:17, 24:18, 27:20, 28:14, 28:15, 38:17, 40:1, 40:22, 41:3, 41:8, 41:14, 41:23, 42:6, 42:8, 42:11, 42:17, 45:4, 45:6, 46:19, 46:24, 47:7, 48:19, 53:7, 53:21, 55:9, 55:16, 56:12, 65:10, 66:3, 67:11, 68:2, 68:10, 69:5, 69:8, 69:23, 73:18, 75:17, 78:2, 79:13, 86:13, 90:9, 90:13, 91:12, 93:11, 95:14, 101:24, 102:23, 102:25, 103:12, 106:19, 109:7, 109:11, 113:8, 115:3, 117:2, 126:17, 128:6, 134:15, 134:19, 135:7, 136:7, 136:10
**NSA's** [1] - 10:20
**NSOC** [6] - 28:16, 41:8, 41:14, 42:2, 60:19, 85:7
**number** [39] - 6:2,

6:12, 6:15, 6:17, 6:20, 8:17, 9:4, 11:12, 16:8, 22:6, 23:13, 23:18, 38:12, 38:23, 39:10, 39:12, 39:13, 42:23, 45:2, 45:8, 51:4, 53:19, 55:22, 55:24, 63:20, 74:14, 83:4, 83:17, 89:16, 91:5, 91:10, 92:10, 106:24, 119:11, 126:5, 126:11, 131:18
**Number** [1] - 2:5
**NUMBER** [1] - 1:4
**numbers** [2] - 106:22, 119:10
**NW** [1] - 1:15

## O

**object** [2] - 81:7, 135:25
**objected** [3] - 40:16, 76:18, 85:20
**objecting** [1] - 20:8
**objection** [1] - 12:4
**objections** [1] - 127:7
**objectives** [1] - 97:11
**objects** [1] - 19:2
**obligated** [1] - 111:14
**obligation** [3] - 7:3, 19:7, 82:11
**obliged** [1] - 45:15
**obscuring** [1] - 15:18
**obtain** [2] - 8:9, 87:12
**obtained** [2] - 19:2, 93:21
**obviate** [1] - 47:18
**obviously** [10] - 2:5, 6:19, 13:22, 17:23, 79:22, 84:1, 101:5, 110:24, 128:19, 135:24
**Obviously** [1] - 105:8
**occasionally** [1] - 78:5
**occurrence** [1] - 87:5
**occurs** [1] - 98:20
**October** [8] - 53:16, 71:6, 75:12, 76:13, 86:3, 92:8, 110:15, 110:16
**odd** [2] - 41:7, 53:2
**OF** [5] - 1:1, 1:3, 1:7, 1:12, 137:1
**off-site** [12] - 5:8, 5:14, 5:21, 9:14, 19:22, 19:25, 31:17, 35:2, 35:9, 35:11, 42:7, 47:25

**off-track** [1] - 83:4
**offense** [1] - 7:4
**offer** [2] - 69:25, 116:21
**offhand** [3] - 25:23, 55:21, 95:11
**office** [11] - 48:17, 48:19, 48:24, 60:25, 69:2, 76:16, 82:25, 85:7, 114:22, 118:18, 125:13
**OFFICE** [1] - 1:12
**Office** [8] - 1:18, 2:22, 2:24, 3:5, 3:24, 48:24, 66:3, 77:8
**Officer** [1] - 92:11
**officer** [3] - 117:23, 118:7, 118:8
**offices'** [1] - 92:15
**Official** [2] - 40:24, 56:10
**OFFICIAL** [2] - 137:1, 137:18
**official** [1] - 18:20
**often** [2] - 11:14, 87:8
**OGC** [1] - 1:23
**OIG** [4] - 1:24, 48:16, 48:22, 121:6
**old** [1] - 32:9
**ominous** [1] - 77:17
**on-site** [1] - 42:10
**onboarded** [1] - 107:13
**onboarding** [7] - 11:8, 60:5, 60:16, 102:11, 103:3, 107:20
**once** [14] - 18:19, 63:6, 68:23, 69:1, 69:6, 71:5, 75:8, 77:25, 83:11, 110:6, 113:2, 125:19, 125:25, 126:5
**one** [116] - 4:14, 8:16, 10:9, 11:18, 12:16, 13:2, 15:15, 15:16, 16:8, 18:1, 18:5, 20:14, 22:6, 23:13, 23:18, 24:11, 28:21, 29:16, 29:20, 31:23, 34:5, 34:12, 43:7, 45:2, 45:7, 48:3, 50:19, 50:20, 52:22, 52:23, 52:25, 53:1, 53:18, 53:22, 54:17, 54:19, 58:20, 59:2, 61:22, 62:17, 62:25, 63:13, 64:19, 64:22, 65:11, 65:13, 66:4, 66:5, 66:16, 67:1, 67:10, 67:12, 70:4,

70:9, 70:18, 70:23, 71:10, 71:20, 71:22, 73:3, 73:19, 75:11, 76:2, 76:3, 76:4, 76:25, 78:21, 79:19, 82:20, 83:23, 86:8, 88:16, 91:14, 92:4, 93:20, 96:3, 97:3, 98:20, 99:20, 100:19, 102:20, 103:8, 103:18, 103:19, 104:17, 106:7, 106:25, 107:2, 107:22, 108:11, 109:9, 109:12, 109:14, 110:18, 112:13, 113:21, 114:5, 115:3, 115:5, 115:23, 122:5, 122:24, 124:20, 124:22, 125:3, 125:5, 125:10, 126:11, 133:13, 134:9
**one-month** [1] - 70:23
**one-time** [1] - 125:10
**ones** [6] - 3:10, 13:19, 39:14, 58:6, 71:15, 88:17
**ongoing** [4] - 4:14, 79:7, 84:18, 110:19
**open** [1] - 4:8
**opened** [1] - 55:20
**opening** [1] - 32:23
**operating** [3] - 9:9, 9:11, 9:19
**Operation** [1] - 28:14
**Operations** [1] - 92:11
**operations** [1] - 18:19
**opinions** [1] - 112:16
**opposite** [1] - 43:23
**opposition** [2] - 127:7, 132:4
**option** [1] - 125:14
**oral** [2] - 111:22, 122:5
**oranges** [2] - 47:14, 47:15
**order** [36] - 2:6, 5:25, 6:6, 6:8, 6:10, 13:5, 23:25, 24:5, 38:21, 44:11, 45:2, 46:15, 53:8, 53:10, 64:11, 80:4, 86:13, 89:8, 91:6, 91:7, 104:1, 110:7, 110:15, 110:19, 111:5, 111:7, 111:12, 111:14, 111:20,

112:7, 122:5, 123:2, 134:25, 135:11, 135:22, 136:8
**ordered** [8] - 12:1, 12:9, 20:7, 22:19, 23:17, 64:8, 64:9, 95:22
**orders** [2] - 20:8, 135:3
**original** [5] - 9:11, 34:17, 76:21, 79:16, 93:11
**originally** [7] - 38:10, 62:23, 62:24, 78:14, 91:20, 101:25, 116:13
**otherwise** [2] - 127:10, 130:23
**ourselves** [1] - 32:23
**outlined** [2] - 8:4, 8:11
**outlining** [1] - 4:18
**outside** [5] - 41:2, 59:22, 68:12, 108:13, 121:9
**overall** [2] - 35:15, 106:22
**overruling** [1] - 116:9
**overseas** [1] - 62:1
**own** [8] - 29:19, 43:4, 51:9, 79:9, 92:6, 92:21, 116:14, 117:24

**P**

**P-e-a-c-y** [1] - 48:9
**p-l-o-d-d-e-r** [1] - 114:9
**p.m** [2] - 115:2, 136:21
**page** [10] - 13:1, 46:9, 55:22, 55:23, 74:10, 74:11, 74:12, 74:19, 137:11
**Page** [1] - 88:19
**pages** [15] - 28:25, 29:1, 46:24, 50:25, 51:2, 51:8, 51:9, 51:10, 53:3, 78:20, 78:23, 79:1, 104:9, 134:9
**paid** [3] - 112:8, 112:10, 113:3
**pale** [1] - 109:3
**paperwork** [1] - 60:7
**paragraph** [2] - 24:1, 24:15, 74:25
**paralegal** [4] - 49:25, 52:16, 91:6, 133:23
**paralegals** [1] - 50:4
**parameter** [1] - 70:23

**parameters** [6] - 42:15, 68:5, 70:11, 70:13, 70:17, 130:11
**paraphrase** [1] - 7:7
**parsing** [1] - 82:12
**part** [37] - 3:15, 4:19, 5:10, 5:16, 14:6, 16:3, 17:14, 17:15, 21:1, 27:8, 27:16, 30:22, 36:20, 39:21, 41:4, 41:10, 47:4, 47:13, 54:24, 60:5, 67:22, 72:2, 72:15, 76:8, 77:22, 82:10, 91:9, 103:22, 104:8, 104:13, 106:19, 106:22, 106:24, 110:3, 120:18, 120:22, 121:13
**parte** [3] - 81:1, 81:7, 81:24
**participant** [1] - 127:24
**particular** [6] - 18:5, 24:15, 82:23, 86:24, 102:4, 105:18
**Particulars** [2] - 26:5, 121:24
**particulars** [1] - 44:9
**parties** [5] - 5:3, 31:11, 117:16, 126:5, 130:12
**parts** [1] - 38:24
**passage** [1] - 33:9
**passing** [1] - 34:23
**passion** [1] - 80:10
**past** [3] - 32:4, 46:17, 90:18
**pasted** [1] - 76:12
**Patricia** [1] - 3:23
**PATRICIA** [1] - 1:17
**pause** [2] - 13:20, 48:4
**pay** [2] - 112:21, 112:22
**paying** [1] - 112:14
**payment** [1] - 112:20
**pays** [1] - 112:19
**PDF** [2] - 55:8, 115:15
**PEACY** [67] - 48:9, 48:15, 48:23, 49:4, 49:14, 49:16, 49:23, 50:2, 50:10, 50:14, 50:17, 50:20, 53:15, 54:10, 54:16, 54:22, 55:1, 55:19, 56:5, 56:15, 56:18, 57:3, 57:8, 57:19, 58:3, 58:5, 58:11, 58:20, 59:1, 59:25, 60:23, 61:3, 61:12, 62:21,

62:24, 63:8, 63:25, 64:17, 65:6, 65:15, 66:10, 66:17, 67:15, 67:20, 68:1, 68:14, 68:25, 69:10, 69:14, 69:18, 69:25, 70:17, 70:22, 71:5, 71:11, 74:10, 94:12, 94:18, 94:21, 94:25, 95:5, 95:10, 104:24, 108:11, 108:18, 108:21, 119:25
**Peacy** [36] - 1:24, 2:20, 8:14, 24:22, 25:4, 40:2, 48:4, 48:9, 48:10, 48:22, 53:5, 53:13, 53:25, 54:24, 55:14, 60:20, 64:13, 67:6, 70:12, 71:16, 71:18, 72:13, 88:13, 88:17, 88:19, 94:3, 103:6, 104:23, 108:8, 118:23, 119:19, 119:20, 119:24, 123:22, 126:14, 134:9
**pending** [1] - 90:5
**people** [49] - 8:21, 8:24, 45:1, 45:12, 45:16, 46:25, 51:24, 61:3, 61:22, 63:13, 63:21, 63:24, 68:20, 69:15, 72:23, 81:17, 85:19, 89:10, 89:16, 89:21, 95:21, 95:23, 98:25, 99:6, 99:9, 100:1, 101:23, 103:1, 105:3, 108:4, 108:25, 109:3, 109:4, 112:18, 112:19, 113:11, 115:7, 115:18, 118:12, 121:4, 121:7, 123:9, 123:10, 124:22, 126:18, 127:20, 128:1, 133:19, 136:10
**per** [5] - 75:15, 104:24, 105:2, 107:3, 124:23
**percent** [4] - 8:10, 9:13, 31:12, 35:18
**perception** [1] - 72:24
**perceptions** [1] - 79:23
**perfectly** [1] - 37:9
**Performance** [1] - 119:25
**performance** [6] -

22:7, 23:12, 97:14, 119:12, 120:11, 121:17
**performed** [1] - 23:17
**performing** [2] - 22:9, 120:7
**perhaps** [6] - 9:1, 12:19, 48:5, 76:16, 83:15, 83:20
**period** [30] - 12:12, 21:11, 47:24, 52:18, 56:20, 56:22, 56:23, 61:10, 63:6, 66:9, 67:10, 68:13, 73:11, 73:14, 73:17, 73:24, 74:15, 75:12, 86:15, 89:16, 89:24, 94:12, 99:10, 100:13, 103:18, 104:14, 109:5, 114:1, 123:3, 123:4
**periods** [10] - 58:12, 67:8, 68:17, 69:16, 70:3, 89:15, 89:21, 103:11, 109:8, 130:12
**permit** [1] - 14:4
**permitting** [1] - 91:17
**person** [15] - 58:7, 59:11, 64:24, 66:12, 74:24, 92:11, 92:14, 104:24, 105:2, 107:3, 107:4, 107:5, 110:6, 113:11, 124:23
**person's** [3] - 67:10, 99:12, 124:20
**personal** [1] - 66:23
**personally** [4] - 20:21, 20:23, 53:7, 82:21
**personnel** [3] - 78:1, 93:3, 114:15
**perspective** [4] - 82:16, 97:16, 105:5, 112:6
**pertain** [2] - 4:10, 20:22
**pertaining** [1] - 87:7
**pertinent** [7] - 4:22, 4:24, 13:23, 30:21, 31:8, 87:12, 87:15
**phase** [10] - 8:2, 14:7, 19:17, 31:4, 31:9, 77:11, 77:13, 77:14, 77:15
**phone** [3] - 3:25, 74:5, 123:23
**physical** [1] - 118:17
**picked** [1] - 52:1
**pin** [1] - 93:10

**place** [10] - 10:7, 20:24, 24:10, 29:13, 53:10, 60:22, 62:25, 69:24, 110:14, 136:15
**placed** [1] - 58:20
**Plaintiff** [1] - 1:3
**PLAINTIFF** [1] - 1:11
**planned** [1] - 97:13
**plans** [1] - 133:3
**play** [1] - 132:2
**plea** [3] - 43:9, 43:10, 43:12
**pleas** [1] - 43:9
**plodder** [2] - 114:7, 114:9
**plug** [5] - 10:11, 37:1, 40:5, 50:7, 118:21
**Plunkett** [2] - 116:17, 117:12
**plus** [1] - 75:9
**PM** [1] - 74:18
**PMR** [6] - 11:9, 11:10, 11:11, 65:7, 67:4, 106:18
**PMRs** [3] - 12:11, 12:14, 61:15
**pocket** [1] - 133:6
**point** [33] - 11:5, 25:4, 26:13, 31:25, 36:25, 40:15, 44:18, 48:13, 56:19, 67:2, 70:9, 72:14, 75:24, 85:4, 85:19, 85:25, 86:11, 86:17, 86:25, 87:2, 90:22, 96:19, 100:20, 111:11, 111:12, 112:24, 118:21, 118:24, 121:11, 128:14, 128:15, 129:7, 132:11
**pointed** [3] - 41:19, 85:24, 116:2
**points** [5] - 8:16, 9:1, 11:14, 62:17, 83:5
**policy** [1] - 81:19
**policymakers** [1] - 81:15
**popping** [1] - 70:15
**pops** [1] - 66:16
**Portrait** [1] - 127:10
**position** [3] - 91:23, 117:18, 124:11
**positions** [1] - 81:18
**positive** [3] - 77:20, 87:25, 113:18
**possession** [6] - 9:16, 19:23, 24:1, 24:18, 24:23, 25:9

**possibility** [2] - 96:1, 123:6
**possible** [10] - 3:17, 16:20, 20:10, 98:22, 113:15, 125:4, 125:7, 125:8, 133:24, 134:14
**possibly** [2] - 4:11, 127:1
**postpone** [2] - 80:7, 90:12
**potentially** [3] - 95:5, 106:5, 133:21
**practical** [4] - 83:23, 84:4, 85:12, 86:23
**practice** [2] - 86:8, 91:21
**preceded** [1] - 6:20
**precedent** [1] - 77:17
**precise** [3] - 87:16, 87:17, 87:18
**precludes** [1] - 87:11
**predicated** [2] - 120:22, 125:2
**prejudice** [1] - 80:2
**prejudiced** [6] - 79:5, 79:7, 79:11, 79:13, 79:14, 79:17
**preliminarily** [1] - 4:16
**preliminary** [1] - 70:20
**premise** [1] - 9:11
**preparation** [2] - 5:23, 12:22
**prepare** [3] - 21:16, 114:23, 133:14
**prepared** [2] - 97:25, 98:7
**preparing** [2] - 75:10, 75:15
**preponderance** [1] - 7:18
**presence** [1] - 26:6
**present** [4] - 3:23, 79:13, 112:8, 125:12
**Present** [2] - 1:20, 1:22
**presented** [2] - 30:9, 90:18
**presents** [2] - 77:14, 77:16
**preserve** [1] - 92:18
**preserved** [1] - 92:19
**pressing** [3] - 4:9, 102:1, 126:18
**presumably** [3] - 57:7, 78:25, 112:17
**pretrial** [1] - 14:7
**pretty** [6] - 28:22, 33:1, 34:11, 83:19, 98:23, 125:18

**prevents** [1] - 114:16
**previous** [5] - 22:11, 53:20, 64:6, 86:1, 102:13
**previously** [19] - 2:21, 10:15, 11:1, 11:19, 11:21, 11:22, 24:3, 39:23, 63:24, 64:3, 68:4, 69:17, 72:24, 74:13, 76:19, 78:20, 103:23, 108:24, 125:13
**primary** [2] - 62:17, 84:20
**principal** [2] - 67:1, 93:16
**principals** [1] - 68:15
**principles** [1] - 7:23
**print** [1] - 12:20
**printed** [1] - 13:19
**prioritized** [1] - 126:19
**priority** [2] - 90:9, 126:12
**probative** [1] - 46:20
**problem** [9] - 26:11, 26:13, 26:15, 27:6, 29:7, 72:5, 98:19, 127:3, 134:22
**problematic** [1] - 67:7
**problems** [1] - 134:10
**procedures** [1] - 101:20
**proceeded** [1] - 32:19
**Proceeding** [1] - 136:21
**PROCEEDINGS** [1] - 1:7
**Proceedings** [1] - 1:25
**proceedings** [4] - 76:23, 79:8, 101:13, 137:10
**process** [34] - 25:13, 34:14, 36:19, 40:7, 45:10, 48:18, 48:25, 49:1, 49:2, 54:11, 56:6, 58:24, 60:7, 63:15, 67:23, 68:11, 69:3, 69:5, 69:8, 69:12, 71:12, 78:3, 88:18, 89:22, 99:21, 99:22, 101:20, 103:9, 106:18, 108:4, 110:10, 124:5, 132:16, 136:15
**processes** [1] - 78:22
**processing** [1] - 52:15
**procure** [1] - 47:20
**procured** [1] - 88:24

**produce** [19] - 3:16, 18:11, 19:7, 20:3, 21:7, 24:5, 49:12, 52:24, 55:17, 92:19, 102:23, 111:9, 111:14, 116:5, 116:10, 122:6, 128:8, 134:17, 134:19
**produceable** [1] - 25:2
**Produced** [1] - 1:25
**produced** [59] - 4:11, 4:12, 5:1, 8:18, 15:23, 15:24, 22:2, 24:4, 24:21, 24:24, 25:10, 27:12, 27:13, 36:25, 37:21, 38:14, 39:6, 39:20, 39:23, 40:5, 42:21, 47:9, 48:16, 48:19, 48:23, 49:5, 49:16, 50:7, 51:1, 51:3, 51:4, 53:3, 53:8, 53:9, 53:21, 76:9, 76:14, 78:15, 78:21, 78:25, 79:2, 86:14, 86:17, 92:22, 97:3, 100:12, 100:14, 117:4, 118:18, 118:22, 121:14, 122:2, 122:4, 122:10, 133:25, 134:1, 134:21
**produces** [2] - 48:17, 48:22
**producing** [6] - 38:17, 38:23, 51:17, 68:4, 101:10, 101:22
**product** [4] - 101:16, 101:18, 101:21, 117:9
**production** [40] - 6:7, 23:7, 23:8, 23:11, 26:8, 26:12, 26:18, 26:24, 27:5, 28:7, 29:4, 31:25, 43:20, 44:5, 50:13, 50:22, 51:4, 54:14, 54:24, 55:18, 57:5, 75:14, 78:18, 99:21, 99:22, 100:8, 104:9, 104:10, 110:17, 110:20, 111:24, 119:22, 133:22, 133:23, 134:5, 134:8, 134:11, 134:19
**productions** [8] - 21:6, 29:13, 46:17, 48:13, 52:9, 77:7,

77:9, 82:15
**productive** [1] - 81:9
**professional** [1] - 34:8
**proffer** [1] - 98:10
**program** [17] - 10:1, 11:11, 12:10, 12:16, 21:21, 21:23, 22:25, 28:12, 35:21, 70:24, 73:12, 75:4, 85:13, 86:5, 91:16, 91:25, 95:16
**progress** [1] - 29:5
**project** [1] - 74:18
**prompt** [1] - 112:20
**promptly** [1] - 112:21
**proof** [1] - 7:18
**proper** [1] - 9:2
**properly** [2] - 41:24, 78:7
**proportional** [1] - 46:7
**proposal** [4] - 17:8, 17:9, 17:12, 68:16
**propose** [2] - 123:21, 124:10
**proposed** [12] - 2:6, 6:6, 6:10, 9:24, 10:22, 23:25, 107:9, 134:25, 135:2, 135:11, 135:22
**proposing** [1] - 124:13
**proposition** [2] - 7:11, 30:18
**prosecution** [1] - 65:20
**prosecution's** [1] - 60:25
**protect** [1] - 33:13
**protection** [1] - 25:12
**prove** [3] - 5:2, 44:9, 44:15
**provide** [1] - 17:15
**provided** [5] - 82:9, 91:10, 91:18, 96:3, 102:15
**provisions** [1] - 112:25
**Public** [2] - 1:18, 3:24
**publicly** [1] - 136:9
**Pugh** [10] - 63:23, 94:19, 105:9, 105:19, 105:22, 106:11, 108:4, 118:8, 123:12, 123:13
**Pugh's** [1] - 84:20
**pull** [4] - 13:2, 23:24, 70:4, 70:5
**pulled** [8] - 37:1, 40:5, 50:8, 59:3, 63:4,

63:7, 63:10, 118:21
**pulling** [1] - 17:17
**pulls** [1] - 59:12
**purely** [1] - 66:24
**purpose** [2] - 78:10, 102:10
**purposes** [4] - 37:11, 43:25, 116:13, 118:6
**pursuant** [1] - 19:11
**pursued** [1] - 7:25
**pursuing** [1] - 81:3
**put** [18] - 2:12, 18:6, 35:13, 45:2, 45:6, 59:4, 60:15, 73:20, 79:21, 100:4, 103:7, 107:5, 108:15, 117:24, 120:1, 123:24, 126:17, 128:4
**puts** [1] - 128:21
**putting** [5] - 98:11, 98:12, 111:4, 121:4
**Pyne** [14] - 1:23, 3:4, 22:14, 27:15, 28:6, 37:19, 38:2, 38:3, 56:1, 94:2, 104:11, 108:7, 115:22, 125:25
**PYNE** [17] - 94:3, 94:6, 94:9, 103:6, 103:14, 103:20, 104:3, 104:6, 104:15, 104:19, 105:1, 115:8, 115:12, 115:19, 125:8, 126:4, 126:10

## Q

**quantify** [1] - 53:6
**questions** [8] - 10:25, 26:7, 54:1, 68:9, 68:10, 70:8, 71:14, 136:13
**queue** [3] - 51:3, 78:24, 90:2
**quick** [3] - 100:10, 109:13, 134:21
**quicker** [1] - 64:23
**quickly** [6] - 27:3, 98:23, 100:5, 113:20, 114:24, 136:4
**quite** [9] - 33:3, 72:25, 73:7, 75:11, 78:9, 84:12, 101:13, 117:14, 117:17
**quote** [1] - 7:7
**quoted** [1] - 124:23
**quoting** [1] - 17:24

## R

**races** [1] - 78:12
**raised** [6] - 27:6, 37:2, 77:19, 77:25, 86:11, 91:14
**raising** [2] - 26:7, 79:6
**Rakoff** [1] - 19:11
**ran** [4] - 10:15, 11:22, 29:20
**randomly** [1] - 65:10
**range** [3] - 5:17, 35:20, 87:18
**rarely** [1] - 85:7
**rather** [6] - 4:8, 57:12, 75:14, 102:10, 109:10, 121:5
**rating** [1] - 40:23
**re** [1] - 67:21
**re-upload** [1] - 67:21
**reach** [2] - 10:18, 85:8
**read** [6] - 93:12, 99:4, 120:16, 125:5, 125:10, 131:20
**read-in** [1] - 125:5
**readily** [1] - 29:8
**reading** [4] - 8:5, 13:21, 24:16, 116:25
**ready** [10] - 4:11, 36:13, 36:16, 39:5, 51:1, 51:6, 51:7, 52:17, 123:1
**realistic** [1] - 33:4
**realistically** [2] - 130:1, 132:14
**realize** [2] - 86:21, 135:3
**realized** [1] - 16:5
**really** [38] - 2:11, 8:1, 10:6, 14:1, 14:5, 14:22, 20:21, 26:17, 36:8, 38:3, 42:5, 42:6, 57:13, 59:10, 62:6, 64:9, 66:18, 71:19, 78:13, 82:5, 83:3, 83:4, 85:5, 86:24, 93:23, 98:18, 105:3, 110:7, 114:20, 119:7, 122:7, 123:23, 124:9, 125:15, 127:16, 127:20, 133:2
**realm** [1] - 123:6
**Realtime** [1] - 137:5
**reason** [27] - 4:12, 4:20, 11:21, 13:20, 14:25, 15:17, 25:11, 27:16, 27:23, 28:1, 33:8, 35:24, 36:20,

42:9, 47:22, 52:9, 52:10, 78:13, 80:22, 96:13, 98:10, 99:9, 113:19, 114:12, 120:17, 121:19, 133:23
**reasonable** [15] - 7:16, 7:18, 7:20, 9:3, 9:17, 9:18, 31:21, 35:15, 46:4, 46:5, 46:12, 47:19, 87:19, 108:25, 114:1
**reasonably** [1] - 80:23
**reasons** [5] - 9:21, 34:8, 44:2, 113:21, 113:22
**rebuild** [1] - 64:18
**rebut** [1] - 9:17
**receive** [1] - 56:5
**received** [10] - 15:3, 23:10, 37:19, 38:11, 51:17, 53:21, 72:13, 76:19, 119:3, 133:21
**receiving** [1] - 96:13
**recent** [3] - 3:10, 85:1, 85:24
**recently** [4] - 3:1, 41:19, 62:23, 83:13
**recess** [2] - 115:1, 136:19
**Recess** [1] - 115:2
**record** [35] - 3:8, 12:25, 36:20, 48:8, 49:19, 49:21, 50:23, 58:1, 58:8, 66:2, 68:11, 69:21, 72:3, 72:21, 75:23, 76:6, 76:22, 80:10, 83:11, 86:14, 89:3, 92:23, 96:17, 98:13, 100:11, 105:16, 110:9, 116:13, 119:1, 119:14, 119:21, 120:16, 127:11, 129:24, 134:15
**Recorded** [1] - 1:25
**records** [18] - 31:17, 41:15, 50:8, 51:9, 51:10, 53:23, 53:24, 65:4, 68:11, 70:5, 73:8, 76:20, 78:3, 83:12, 104:13, 109:7, 121:16
**recreate** [1] - 70:6
**recreated** [4] - 59:23, 63:5, 63:16
**recreating** [2] - 103:10, 120:16
**recreation** [1] - 68:2

**red** [5] - 10:23, 11:4, 15:13, 40:2, 58:19
**redact** [1] - 55:7
**redacted** [11] - 24:2, 24:3, 24:19, 24:24, 45:8, 49:7, 49:9, 50:10, 54:6, 54:12, 79:2
**redacting** [3] - 54:18, 55:7, 126:3
**redaction** [12] - 45:10, 51:2, 69:2, 69:3, 69:8, 69:11, 90:2, 99:21, 99:22, 100:8, 104:22, 115:20
**redactions** [1] - 113:14
**redo** [3] - 21:4, 93:24, 122:13
**reduce** [2] - 33:5, 125:21
**reduced** [4] - 79:2, 91:10, 120:21, 123:9
**refer** [1] - 100:15
**reference** [3] - 75:24, 115:5, 115:16
**referenced** [1] - 119:16
**references** [1] - 87:21
**referencing** [1] - 71:24
**referring** [2] - 81:14, 82:24
**refine** [1] - 14:16
**refined** [1] - 87:14
**reflect** [2] - 80:10, 110:9
**reflected** [3] - 40:3, 53:17, 53:21
**reflective** [1] - 102:16
**reflects** [4] - 53:22, 74:13, 76:20, 127:11
**regard** [11] - 31:23, 39:1, 40:14, 43:6, 44:2, 46:20, 48:12, 49:17, 77:3, 83:16, 122:24
**regarding** [4] - 5:6, 87:15, 88:24, 113:22
**regardless** [2] - 49:11, 112:6
**regards** [1] - 83:10
**Regina** [2] - 63:22, 94:19, 105:9, 105:23, 106:12, 123:14
**Registered** [1] - 137:6
**regulations** [3] - 112:4, 116:3, 137:11
**relate** [1] - 42:11
**related** [16] - 12:10,

20:2, 41:12, 42:3,
59:10, 60:18, 61:13,
63:2, 74:22, 75:4,
87:7, 87:13, 91:15,
106:17, 106:21,
108:5
**relates** [1] - 11:8
**relating** [8] - 2:7, 10:1,
10:3, 22:24, 30:13,
38:14, 42:15, 51:8
**relatively** [6] - 11:2,
22:15, 33:4, 43:1,
98:21, 136:4
**relayed** [1] - 24:17
**release** [1] - 100:12
**released** [1] - 41:2
**relevance** [6] - 60:2,
61:19, 84:10, 90:7,
99:18, 107:18
**relevant** [13] - 5:20,
12:12, 19:18, 20:16,
21:11, 43:24, 73:24,
77:23, 84:22, 100:7,
102:11, 117:15,
128:19
**reliance** [1] - 31:24
**remained** [1] - 37:1
**remaining** [1] - 79:1
**remains** [4] - 103:21,
116:15, 121:20,
130:11
**remarks** [4] - 43:4,
43:5, 80:9, 82:10
**remember** [11] -
19:11, 54:17, 54:23,
62:9, 75:8, 84:9,
93:1, 96:9, 109:18,
111:7
**remembered** [1] - 85:2
**remembering** [1] -
61:21
**remind** [1] - 6:24
**reminded** [1] - 13:23
**reminds** [2] - 14:2,
14:6
**remotely** [1] - 37:5
**removed** [1] - 74:18
**renew** [1] - 29:10
**reopening** [1] - 72:4
**repeat** [1] - 47:8
**repeatedly** [4] - 45:15,
52:6, 87:20, 91:14
**reply** [3] - 30:5,
131:23, 132:3
**report** [33] - 11:13,
11:14, 11:16, 15:8,
16:9, 16:10, 16:24,
17:19, 17:21, 17:25,
18:5, 18:7, 21:15,
21:16, 21:17, 21:22,

22:24, 84:14, 94:13,
94:14, 95:19, 95:20,
95:21, 96:1, 96:18,
96:21, 97:1, 97:9,
99:6, 105:18, 120:4
**reported** [1] - 137:9
**REPORTER** [2] -
137:1, 137:18
**Reporter** [2] - 137:5,
137:6
**reports** [45] - 9:25,
15:1, 18:3, 18:4,
18:25, 20:14, 21:3,
21:19, 21:24, 22:9,
22:17, 45:20, 78:17,
83:1, 83:10, 83:16,
83:22, 84:7, 84:9,
85:3, 85:6, 86:20,
86:24, 91:12, 91:15,
91:21, 92:3, 92:22,
93:17, 94:1, 94:5,
94:6, 96:16, 97:25,
98:8, 98:11, 100:12,
100:14, 100:21,
100:23, 101:4,
101:6, 101:10,
116:7, 121:13
**repository** [1] - 11:2
**represent** [1] - 20:1
**representation** [1] -
134:3
**representations** [1] -
80:23
**representatives** [1] -
4:9
**reproduce** [1] - 56:7
**reproduced** [1] -
59:19
**request** [19] - 2:9,
9:24, 12:8, 13:25,
17:9, 17:21, 22:22,
31:20, 52:13, 66:7,
74:22, 79:3, 79:15,
81:19, 82:1, 91:15,
103:1, 106:16,
133:13
**requested** [11] - 7:1,
20:4, 28:7, 39:25,
40:9, 58:23, 73:4,
89:11, 101:17,
121:18
**requesting** [2] - 49:8,
80:20
**requests** [22] - 2:12,
2:25, 3:10, 3:12,
4:14, 4:19, 4:21,
7:25, 9:15, 19:13,
19:17, 46:3, 46:7,
46:10, 46:12, 46:16,
46:20, 63:2, 63:21,

77:13, 82:8, 110:13
**required** [17] - 3:15,
9:10, 15:1, 15:8,
22:3, 43:10, 83:1,
83:18, 91:21, 91:23,
91:24, 96:4, 96:16,
117:1, 117:17,
117:20, 123:2
**requirement** [11] -
11:15, 11:16, 15:20,
15:21, 16:4, 16:5,
16:10, 17:14, 17:19,
96:12, 100:17
**requirements** [8] -
14:25, 16:4, 16:6,
17:10, 84:3, 86:23,
97:23, 100:16
**requires** [1] - 12:24
**requiring** [1] - 3:15
**resolution** [1] - 20:11
**resolve** [1] - 136:17
**resources** [1] - 97:13
**respect** [5] - 18:18,
20:17, 24:14, 88:5,
106:16
**respond** [1] - 103:7
**responded** [2] - 6:9,
12:5
**response** [7] - 38:20,
46:15, 109:19,
118:4, 122:5, 123:4,
132:4
**responsibilities** [4] -
10:1, 22:24, 91:16,
117:15
**responsibility** [1] -
84:20
**responsible** [1] - 60:4
**rest** [3] - 66:13, 82:6,
124:20
**restitution** [2] - 35:14,
41:6
**restraining** [1] - 27:19
**restrict** [1] - 123:20
**result** [7] - 53:8, 66:7,
79:5, 80:3, 81:19,
92:9, 116:22
**resulted** [1] - 28:5
**resulting** [1] - 7:6
**results** [2] - 126:5,
126:6
**retrieving** [1] - 18:21
**retrospect** [1] - 117:22
**return** [1] - 108:5
**revealing** [1] - 36:21
**review** [21] - 11:11,
12:10, 27:10, 28:4,
41:1, 41:2, 42:20,
45:10, 61:13, 61:14,
65:23, 69:11, 70:24,

74:18, 75:4, 78:3,
90:1, 90:5, 90:10,
116:19, 126:2
**reviewed** [13] - 19:24,
24:2, 24:19, 24:23,
37:21, 54:6, 54:12,
78:4, 79:2, 87:17,
109:10, 112:24,
121:2
**reviewing** [2] - 4:15,
32:1
**reviews** [3] - 12:16,
63:3, 129:17
**revise** [1] - 64:11
**revised** [1] - 37:25
**revisit** [2] - 23:19,
132:13
**RICHMAN** [53] - 1:17,
74:3, 80:25, 81:6,
81:13, 98:9, 98:19,
99:2, 99:5, 99:11,
99:17, 102:2,
102:12, 105:12,
105:14, 119:20,
120:11, 120:15,
120:20, 122:9,
122:13, 122:20,
123:12, 123:14,
123:17, 123:20,
124:9, 125:15,
127:16, 128:3,
128:8, 128:17,
128:21, 128:24,
129:2, 129:12,
129:14, 129:20,
130:3, 130:8,
130:16, 130:20,
131:11, 131:15,
133:12, 133:16,
133:18, 134:18,
135:1, 135:5, 135:8,
135:10, 136:6
**Richman** [11] - 3:24,
4:18, 34:13, 37:2,
43:6, 45:14, 74:1,
79:6, 101:24, 105:5,
129:25
**rightly** [1] - 111:7
**rights** [4] - 30:14,
33:14, 117:15,
124:12
**risks** [2] - 32:21, 32:22
**risky** [1] - 131:19
**RMR** [1] - 137:18
**road** [2] - 51:21,
127:24
**Roar** [2] - 41:10, 41:12
**Rob** [21] - 11:21, 74:7,
74:17, 74:20, 75:5,
75:19, 88:5, 88:7,

88:10, 88:12, 88:20,
88:24, 94:20, 95:1,
95:14, 103:7,
103:21, 105:10,
105:25, 106:12,
109:8
**robbery** [1] - 34:19
**role** [4] - 73:13, 75:11,
108:3, 110:4
**rolling** [1] - 38:14
**Romanette** [2] - 19:3,
19:4
**room** [2] - 100:24,
127:18
**rough** [1] - 53:3
**roughly** [5] - 35:21,
86:3, 106:6, 113:11,
132:16
**routine** [1] - 81:17
**Roy** [1] - 95:24
**Royce** [1] - 13:13
**rubric** [1] - 34:24
**rule** [1] - 112:20
**Rule** [11] - 13:22,
13:24, 18:23, 18:24,
19:8, 19:12, 19:14,
37:10, 93:20, 127:6
**ruled** [1] - 9:23
**rules** [1] - 21:13
**ruling** [7] - 20:6,
20:17, 20:18, 23:16,
120:17, 120:19,
120:20
**rulings** [1] - 3:15
**run** [11] - 11:3, 22:15,
58:2, 73:1, 94:4,
94:6, 94:10, 94:15,
98:21, 102:14, 107:3
**running** [3] - 104:11,
104:13, 104:15

## S

**sailed** [2] - 80:13,
80:15
**satisfied** [1] - 23:6
**Savage** [2] - 7:8, 7:20
**save** [2] - 49:9, 127:23
**saves** [1] - 108:20
**saw** [4] - 19:24, 28:9,
28:22, 121:2
**scene** [1] - 116:24
**schedule** [2] - 132:22,
133:1, 133:4, 135:12
**scheduled** [1] - 4:4
**schedules** [2] -
131:17, 136:11
**scheduling** [2] -
130:9, 135:11
**scope** [3] - 8:9, 59:22,

78:7
**screen** [6] - 16:13, 58:20, 72:8, 72:10, 96:8, 120:5
**se** [1] - 75:15
**search** [142] - 6:7, 8:20, 10:5, 10:10, 10:14, 10:16, 10:17, 10:21, 10:22, 11:3, 11:20, 11:22, 11:23, 12:3, 12:5, 12:17, 14:11, 14:16, 16:7, 18:16, 20:3, 22:5, 22:6, 22:15, 29:20, 29:25, 30:7, 30:9, 30:11, 44:20, 47:10, 56:1, 56:11, 56:14, 56:23, 57:1, 57:15, 57:19, 57:21, 58:7, 58:12, 58:13, 59:3, 59:4, 59:5, 59:7, 59:13, 59:20, 59:21, 59:22, 60:22, 61:1, 61:4, 61:14, 62:25, 63:2, 63:3, 63:13, 63:14, 64:5, 64:6, 64:14, 65:2, 65:7, 65:8, 65:11, 65:16, 65:18, 65:21, 65:23, 65:25, 67:3, 67:7, 67:17, 68:21, 70:11, 70:12, 70:13, 70:14, 70:20, 70:23, 70:24, 71:1, 74:6, 74:19, 74:21, 75:6, 75:24, 86:16, 86:25, 88:6, 88:10, 88:12, 89:19, 89:24, 94:22, 94:23, 95:18, 95:25, 96:3, 99:8, 99:9, 99:20, 101:25, 102:3, 102:14, 102:16, 103:1, 103:3, 103:12, 103:25, 104:3, 104:11, 104:13, 104:14, 105:8, 105:17, 106:20, 106:25, 107:4, 107:7, 108:8, 108:11, 108:12, 108:15, 108:16, 108:25, 113:9, 115:5, 118:19, 127:23, 136:7
**searched** [42] - 11:6, 12:9, 50:7, 56:3, 56:17, 57:21, 57:22, 58:8, 61:11, 62:16, 62:19, 63:24, 64:3, 65:4, 65:11, 69:17, 71:20, 71:21, 72:24,

72:25, 73:2, 74:13, 74:21, 75:1, 75:19, 82:19, 99:1, 99:6, 99:7, 99:15, 100:1, 103:13, 103:17, 103:18, 103:23, 105:6, 109:8, 119:10, 120:25, 121:9, 121:20, 123:9
**searches** [17] - 10:7, 20:8, 22:11, 23:16, 38:12, 47:11, 57:23, 58:1, 58:14, 72:1, 73:1, 73:8, 108:24, 109:4, 115:4, 123:25, 125:25
**searching** [10] - 57:17, 58:24, 59:20, 60:3, 60:8, 64:20, 64:22, 67:22, 115:6, 115:18
**seat** [1] - 4:3
**second** [9] - 16:6, 32:12, 69:12, 74:10, 74:11, 74:12, 85:14, 99:20, 111:3
**Secret** [2] - 125:10, 125:11
**Section** [1] - 78:11
**section** [4] - 3:2, 37:20, 42:2, 92:15
**secure** [1] - 40:21
**secured** [1] - 92:14
**Security** [7] - 2:8, 2:20, 2:22, 2:24, 3:3, 3:4, 28:14
**security** [6] - 3:2, 59:11, 77:21, 78:23, 107:14
**see** [28] - 10:12, 11:17, 16:9, 17:3, 30:11, 34:2, 37:12, 39:24, 40:2, 40:11, 45:9, 47:4, 49:8, 70:19, 71:18, 72:22, 74:23, 76:24, 81:11, 81:17, 86:10, 91:1, 101:17, 118:24, 119:9, 122:8, 124:1, 130:6
**seeing** [2] - 33:4, 85:7
**seek** [1] - 31:8
**seeking** [6] - 19:20, 23:2, 23:14, 31:19, 87:12, 125:17
**seeks** [1] - 5:12
**seem** [5] - 8:3, 34:14, 82:8, 88:6, 101:8
**segregate** [1] - 125:19
**segregated** [1] - 25:7
**selection** [1] - 36:3
**selectively** [1] - 109:2

**Senator** [1] - 81:17
**send** [1] - 50:2
**senior** [1] - 2:19
**SENIOR** [1] - 1:8
**sense** [9] - 68:24, 72:4, 73:5, 87:17, 87:18, 117:19, 118:4, 118:16, 126:4
**sensitive** [2] - 45:13, 125:20
**sent** [20] - 10:13, 10:22, 35:1, 40:21, 42:18, 42:23, 50:13, 50:15, 51:13, 55:1, 55:4, 55:5, 55:10, 57:6, 74:5, 88:20, 88:22, 92:4, 92:5, 92:10
**sentence** [1] - 67:10
**sentenced** [1] - 80:1
**sentencing** [54] - 5:4, 5:16, 7:4, 7:16, 8:2, 9:12, 14:7, 19:13, 19:17, 29:9, 30:23, 30:24, 31:4, 31:10, 33:22, 43:7, 43:17, 43:21, 76:6, 76:7, 76:23, 77:1, 77:13, 77:14, 77:15, 80:7, 80:8, 80:15, 81:23, 87:4, 87:7, 87:15, 90:12, 90:24, 113:7, 113:13, 113:19, 113:23, 114:13, 122:16, 122:21, 122:24, 123:1, 123:7, 124:16, 125:1, 127:8, 128:2, 128:11, 131:6, 131:22, 131:23, 132:2, 135:16
**separate** [11] - 11:13, 18:7, 23:8, 24:5, 31:9, 104:17, 104:18, 108:13, 108:15, 117:23, 118:12
**September** [5] - 53:15, 71:6, 75:12, 78:2, 111:6
**sequels** [1] - 83:18
**sequential** [2] - 6:16, 6:17
**series** [1] - 109:23
**serious** [3] - 31:24, 34:21, 79:25
**seriously** [2] - 26:10, 45:4
**servicing** [1] - 116:23
**session** [1] - 4:5

**set** [15] - 2:6, 5:4, 14:10, 24:18, 26:3, 58:11, 60:6, 77:17, 83:17, 84:3, 91:21, 121:20, 125:1, 128:9, 131:2
**sets** [1] - 104:16
**seven** [8] - 10:23, 58:23, 94:7, 100:1, 102:2, 102:17, 118:15, 127:19
**seven-year** [1] - 118:15
**several** [9] - 7:11, 7:15, 10:20, 12:2, 16:6, 26:25, 61:3, 133:21
**severely** [2] - 79:11, 79:13
**shaking** [2] - 74:1, 108:17
**shared** [8] - 56:17, 56:18, 58:16, 116:1, 118:3, 118:5, 120:24, 121:7
**sharing** [1] - 134:10
**sheer** [2] - 45:20, 114:14
**sheet** [1] - 119:17
**Sherrill** [2] - 11:20, 73:7
**shifting** [1] - 5:11
**Shilo** [1] - 92:11
**ship** [2] - 20:20, 80:12
**Shirley** [6] - 63:23, 94:19, 105:9, 105:23, 106:12, 123:15
**short** [1] - 52:18
**shortage** [1] - 84:19
**shortly** [1] - 36:11
**show** [14] - 10:12, 15:7, 15:22, 16:12, 17:17, 19:24, 31:17, 34:16, 42:22, 43:15, 43:24, 44:11, 47:17, 97:5
**showed** [9] - 21:11, 42:22, 44:14, 44:17, 66:9, 74:19, 75:22, 82:18, 120:5
**showing** [5] - 16:5, 41:21, 44:1, 76:14, 119:2
**shown** [1] - 104:10
**shows** [3] - 37:14, 91:19, 115:4
**shut** [2] - 78:22, 79:3
**side** [27] - 14:19, 15:10, 26:20, 40:16,

40:19, 40:20, 42:11, 51:10, 56:2, 56:3, 56:9, 56:13, 57:3, 57:4, 57:7, 57:8, 57:9, 57:11, 71:1, 72:10, 92:5, 97:21, 132:9
**sides** [3] - 18:15, 99:19, 128:20
**sideshow** [1] - 81:22
**sight** [2] - 8:1, 14:15
**sign** [2] - 45:3, 136:1
**signature** [1] - 76:12
**signed** [2] - 29:5, 112:7
**significance** [2] - 52:11, 61:9
**significant** [10] - 19:19, 32:10, 37:14, 67:5, 78:14, 85:14, 102:21, 108:10, 109:16, 124:18
**Silent** [2] - 41:10, 41:12
**similar** [1] - 69:16
**simple** [4] - 18:21, 75:16, 135:5, 135:9
**simply** [3] - 24:21, 25:2, 112:14
**single** [1] - 118:5
**singular** [1] - 55:6
**sit** [2] - 127:19, 129:20
**site** [13] - 5:8, 5:14, 5:21, 9:14, 19:22, 19:25, 31:17, 35:2, 35:9, 35:11, 42:7, 42:10, 47:25
**sitting** [2] - 11:2, 29:14
**situation** [2] - 34:18, 124:20
**six** [8] - 17:20, 26:22, 36:6, 79:3, 85:25, 86:1, 94:7, 118:15
**size** [2] - 55:18, 55:21
**slate** [1] - 14:14
**slices** [1] - 41:17
**sloppy** [1] - 45:11
**slow** [1] - 54:5
**slower** [2] - 94:17, 105:20
**slowly** [1] - 126:23
**small** [6] - 28:25, 42:15, 85:7, 100:24, 112:18, 125:18
**smaller** [1] - 61:4
**Smith** [26] - 15:2, 47:23, 51:9, 51:11, 53:24, 63:22, 63:23, 83:20, 84:6, 84:13,

84:23, 85:17, 85:18, 85:21, 85:25, 94:19, 100:22, 105:10, 105:19, 105:22, 105:23, 106:11, 106:12, 118:9, 123:14
**Smith's** [5] - 53:23, 56:2, 56:13, 57:2, 84:21
**smoothly** [1] - 114:25
**Snowden** [1] - 2:19
**so-called** [2] - 110:25, 111:17
**social** [1] - 67:2
**solely** [3] - 87:7, 87:13
**solemn** [1] - 29:12
**solicitation** [1] - 16:2
**solution** [1] - 124:10
**solutions** [1] - 123:23
**solver** [1] - 98:19
**some-odd** [2] - 41:7, 53:2
**someone** [9] - 59:11, 65:3, 75:17, 75:19, 76:17, 86:25, 89:18, 95:5, 101:12
**sometime** [4] - 63:10, 68:5, 111:6, 127:9
**sometimes** [4] - 114:24, 114:25, 126:22
**somewhere** [2] - 55:4, 129:11
**soon** [1] - 133:24
**sorry** [25] - 16:5, 16:16, 17:3, 25:25, 29:8, 45:25, 48:21, 54:4, 55:11, 55:13, 67:9, 72:7, 83:3, 86:19, 89:5, 89:8, 96:21, 98:4, 105:13, 105:20, 106:1, 128:23, 129:16, 130:14, 132:6
**sort** [11] - 14:20, 43:2, 63:20, 76:5, 82:12, 82:22, 84:12, 87:9, 109:1, 111:3, 130:11
**sorts** [4] - 34:8, 84:2, 91:22, 116:25
**sought** [3] - 33:25, 102:1
**sound** [2] - 45:4, 132:7
**sounds** [2] - 120:9, 131:17
**Southern** [2] - 19:12, 92:15
**spare** [1] - 114:18

**speaking** [1] - 115:22
**speaks** [2] - 3:8, 5:19
**special** [2] - 13:5, 27:17
**specialist** [1] - 73:16
**specialists** [1] - 118:11
**specific** [11] - 7:19, 11:9, 11:12, 22:5, 58:12, 58:13, 59:13, 61:12, 96:2, 96:11, 107:17
**specifically** [5] - 28:13, 28:16, 61:15, 83:21, 84:8
**speculation** [2] - 14:5, 21:1
**spell** [1] - 48:7
**spelled** [1] - 103:3
**spend** [4] - 36:12, 81:4, 82:6, 127:22
**spending** [3] - 36:13, 109:22, 109:25
**spent** [11] - 12:23, 41:7, 41:9, 41:25, 42:4, 43:15, 75:13, 81:16, 82:18, 93:18, 112:4
**spite** [1] - 51:17
**sponsor** [3] - 107:21, 107:23, 107:24
**sports** [1] - 42:4
**spreadsheet** [8] - 10:8, 10:10, 10:13, 42:21, 54:25, 58:15, 58:17, 58:18
**spring** [1] - 117:5
**staffing** [2] - 10:3, 106:17
**stage** [4] - 8:22, 14:11, 44:8, 101:7
**stand** [8] - 7:11, 25:21, 29:15, 45:19, 98:11, 119:15, 123:7, 136:19
**standard** [5] - 13:16, 84:3, 86:22, 91:20, 133:3
**standing** [3] - 34:9, 94:13, 95:10
**stands** [1] - 119:24
**Starr** [10] - 47:23, 51:11, 53:23, 56:2, 56:13, 57:2, 63:23, 105:19, 105:23, 106:12
**Starr-Smith** [6] - 47:23, 51:11, 63:23, 105:19, 105:23, 106:12

**Starr-Smith's** [4] - 53:23, 56:2, 56:13, 57:2
**start** [8] - 4:17, 9:8, 14:11, 63:8, 78:3, 78:12, 110:19, 129:9
**started** [7] - 17:7, 25:19, 50:15, 63:10, 63:12, 68:5, 68:6
**starting** [3] - 14:2, 14:13, 113:12
**state** [3] - 25:24, 48:7, 100:16
**statement** [4] - 35:14, 85:15, 88:11
**statements** [2] - 75:21, 98:12
**States** [8] - 2:4, 2:14, 2:15, 7:21, 13:12, 29:21, 137:6, 137:12
**STATES** [3] - 1:1, 1:3, 1:12
**states** [3] - 16:4, 24:15, 100:18
**station** [1] - 85:10
**status** [67] - 4:4, 6:1, 9:25, 11:12, 11:13, 11:14, 11:16, 15:1, 15:8, 16:9, 16:10, 16:23, 17:19, 17:21, 17:25, 18:3, 18:4, 18:5, 18:7, 20:14, 21:3, 21:15, 21:16, 21:17, 21:19, 21:21, 21:24, 22:10, 22:17, 22:24, 23:11, 32:23, 48:12, 83:1, 83:10, 83:16, 84:7, 84:9, 84:14, 85:6, 86:20, 91:12, 91:15, 92:2, 92:22, 94:1, 94:5, 94:6, 94:13, 95:19, 95:20, 95:21, 96:1, 96:15, 96:17, 96:21, 97:9, 97:10, 97:12, 99:6, 100:12, 105:18, 116:7, 120:4, 120:7
**stay** [1] - 127:24
**stayed** [1] - 114:22
**stays** [1] - 134:12
**Stein** [5] - 96:12, 101:12, 116:24, 117:18, 117:21
**Stein's** [1] - 112:16
**stenographically** [1] - 137:9
**stenographically-reported** [1] - 137:9
**Stenography** [1] -

1:25
**step** [5] - 69:5, 69:12, 126:13
**steward** [1] - 122:16
**still** [21] - 9:15, 23:2, 28:7, 36:19, 37:1, 46:4, 50:8, 51:2, 56:7, 57:10, 63:15, 68:6, 71:16, 78:23, 80:7, 82:7, 110:13, 120:15, 130:3, 130:14
**stone** [2] - 8:3, 90:17, 131:2
**stop** [4] - 30:4, 52:7, 71:3, 90:21
**stopped** [4] - 31:25, 40:6, 85:20, 85:22
**storage** [1] - 118:13
**stored** [1] - 89:21
**story** [2] - 52:19, 69:6
**strange** [1] - 33:9
**Street** [3] - 1:12, 1:15, 1:18
**strenuously** [1] - 76:18
**strictly** [1] - 21:13
**strong** [2] - 128:13, 132:21
**strongly** [1] - 46:16
**struck** [1] - 29:15
**struggling** [3] - 122:20, 124:9, 124:10
**stuck** [1] - 122:22
**stuff** [10] - 39:17, 50:7, 84:17, 90:8, 92:18, 111:9, 117:3, 117:14, 117:24
**sub** [1] - 24:15
**sub-paragraph** [1] - 24:15
**subcontractors** [1] - 112:22
**subject** [1] - 92:3
**submission** [6] - 9:12, 17:16, 24:9, 77:3, 126:14, 128:12
**submissions** [6] - 6:2, 8:13, 98:18, 123:7, 129:8, 129:9
**submit** [6] - 19:13, 44:1, 46:16, 130:4, 135:11, 135:25
**submitted** [2] - 6:6, 6:8
**subpoena** [1] - 13:22
**substantial** [6] - 38:23, 46:18, 78:13, 83:11, 83:12, 109:25

**substantially** [1] - 79:4
**substantively** [1] - 136:15
**substitute** [1] - 47:5
**successive** [1] - 53:18
**suffer** [1] - 79:24
**suggest** [8] - 14:18, 18:14, 44:24, 44:25, 86:6, 127:17, 129:14, 135:1
**suggested** [7] - 19:21, 22:10, 22:14, 46:6, 90:3, 102:2, 106:20
**suggesting** [3] - 36:21, 101:25, 103:23
**suggestion** [4] - 76:16, 100:5, 102:17, 122:24
**suggests** [2] - 33:18, 35:22
**Suite** [2] - 1:15, 1:18
**Sulewski** [2] - 96:15, 120:23
**summer** [2] - 26:11, 26:22
**supervising** [1] - 73:10
**support** [1] - 21:14
**supported** [1] - 7:17
**suppose** [2] - 19:3, 135:13
**supposed** [8] - 14:3, 21:3, 34:24, 36:5, 38:11, 100:21, 116:4, 117:11
**supposedly** [3] - 8:13, 73:21, 74:25
**supposition** [1] - 21:1
**suppression** [1] - 34:15
**Supreme** [1] - 7:10
**surprise** [1] - 92:23
**surprising** [2] - 88:6, 121:5
**suspect** [1] - 39:22
**suspected** [1] - 28:2
**suspicion** [2] - 109:10, 134:7
**swift** [1] - 20:11
**system** [7] - 39:16, 56:9, 56:11, 60:12, 79:24, 134:10, 134:13

**T**

**table** [2] - 2:16, 3:23
**tailored** [2] - 22:5,

102:19
**tangential** [2] - 90:6, 90:10
**tap** [1] - 15:13
**target** [1] - 10:6
**targeted** [1] - 123:25
**tasked** [1] - 111:4
**tasks** [1] - 120:6
**team** [1] - 126:12
**technical** [15] - 11:14, 17:25, 18:5, 18:6, 21:17, 22:17, 26:13, 26:15, 62:11, 62:15, 70:1, 96:17, 96:21, 97:23, 118:9
**telephone** [4] - 1:20, 2:21, 4:8, 6:18
**ten** [1] - 108:9
**tend** [1] - 34:16
**tendered** [1] - 111:5
**tentatively** [1] - 131:17
**Tenth** [1] - 13:18
**tenure** [2] - 85:13, 86:3
**term** [21] - 59:4, 59:6, 59:7, 61:14, 63:2, 63:14, 65:7, 65:16, 65:18, 65:23, 70:23, 70:24, 96:3, 96:6, 98:21, 104:11, 104:13, 107:25, 108:11, 108:12
**terminated** [1] - 92:9
**terms** [104] - 2:12, 8:19, 8:20, 9:8, 9:12, 10:6, 10:10, 10:14, 10:17, 10:22, 10:24, 11:3, 11:20, 11:22, 11:23, 12:3, 12:5, 22:5, 22:10, 22:15, 25:7, 37:15, 56:1, 56:14, 56:23, 57:15, 57:17, 57:19, 57:21, 58:3, 58:12, 58:24, 58:25, 59:3, 59:5, 59:13, 59:20, 59:21, 60:15, 60:22, 61:1, 62:25, 63:4, 63:13, 64:5, 64:10, 64:14, 64:15, 65:4, 65:8, 65:16, 65:21, 65:25, 66:6, 66:14, 67:3, 68:21, 70:15, 73:9, 74:6, 74:21, 75:10, 76:22, 77:6, 85:12, 89:11, 89:13, 89:14, 89:19, 89:24, 94:1, 94:4, 94:9, 95:25, 99:20, 100:1, 100:6,

101:25, 102:3, 102:14, 102:17, 103:3, 104:14, 106:21, 107:4, 107:7, 107:20, 108:8, 108:9, 108:10, 109:1, 109:2, 110:4, 113:9, 115:5, 115:14, 118:20, 119:8, 123:18, 123:20, 127:19, 127:23, 136:7
**test** [1] - 19:1
**testified** [8] - 83:20, 96:12, 96:15, 96:18, 100:23, 101:9, 120:23, 121:1
**testifies** [1] - 47:23
**testify** [1] - 98:12
**testimony** [17] - 15:2, 17:18, 17:20, 17:23, 21:14, 42:1, 45:21, 85:2, 90:19, 91:22, 92:20, 93:6, 95:14, 101:8, 120:22, 121:6, 121:15
**text** [1] - 100:21
**THE** [288] - 1:1, 1:1, 1:8, 1:11, 1:12, 1:14, 2:3, 2:9, 3:6, 4:2, 9:7, 11:10, 12:13, 12:18, 12:21, 15:22, 15:5, 15:10, 15:12, 15:16, 16:1, 16:12, 16:18, 16:22, 16:23, 17:1, 17:11, 17:20, 18:8, 18:10, 18:13, 20:12, 21:9, 21:19, 21:23, 22:1, 22:16, 22:21, 23:1, 23:6, 23:12, 23:20, 23:24, 25:11, 25:14, 25:16, 25:19, 25:25, 26:14, 28:18, 28:20, 29:23, 30:16, 32:5, 32:7, 32:18, 32:25, 33:15, 33:24, 37:7, 37:22, 37:25, 38:3, 38:5, 38:8, 38:16, 38:20, 39:2, 39:4, 39:12, 39:18, 42:5, 44:7, 44:18, 45:24, 46:1, 46:9, 47:3, 47:16, 48:7, 48:10, 48:21, 49:3, 49:19, 50:1, 51:12, 52:1, 52:4, 52:19, 53:5, 54:3, 54:8, 54:20, 54:23, 55:11, 55:14, 58:10,

60:2, 60:8, 60:11, 60:20, 61:2, 61:18, 61:21, 62:1, 62:6, 62:9, 62:13, 64:9, 64:24, 65:9, 66:1, 66:11, 66:16, 66:18, 66:20, 67:6, 67:16, 67:23, 68:8, 68:17, 69:4, 69:13, 69:15, 69:19, 70:7, 70:19, 70:25, 71:9, 71:13, 71:18, 72:9, 72:12, 72:15, 72:20, 73:23, 74:1, 74:7, 75:5, 75:16, 75:19, 75:22, 76:3, 77:15, 80:6, 80:17, 81:4, 81:8, 82:4, 82:19, 83:7, 86:12, 86:20, 87:23, 87:25, 88:3, 88:13, 88:15, 88:19, 89:5, 89:8, 89:13, 90:11, 91:1, 91:9, 91:12, 92:25, 93:4, 93:8, 93:12, 93:14, 93:19, 94:5, 94:8, 94:11, 94:16, 94:20, 95:8, 95:17, 96:6, 96:9, 96:25, 97:7, 97:15, 97:19, 97:24, 98:2, 98:14, 98:24, 99:3, 99:8, 99:16, 101:2, 101:23, 102:5, 102:9, 102:24, 103:11, 103:16, 103:21, 104:5, 104:11, 104:17, 104:20, 104:25, 105:3, 105:13, 106:7, 106:10, 106:14, 106:16, 106:22, 106:25, 107:7, 107:11, 107:22, 107:24, 108:7, 108:14, 108:20, 108:22, 110:2, 111:11, 111:19, 112:24, 113:6, 113:17, 114:8, 114:17, 115:3, 115:9, 115:11, 115:16, 115:21, 117:25, 118:2, 119:1, 119:6, 119:24, 120:14, 120:19, 121:21, 122:11, 122:19, 123:11, 123:13, 123:16, 123:18, 124:3, 125:7, 125:24, 126:7,

126:11, 127:20, 128:14, 128:18, 129:7, 129:13, 129:18, 129:22, 129:25, 130:5, 130:14, 130:18, 130:24, 131:5, 131:13, 131:18, 132:1, 132:7, 132:11, 132:25, 133:4, 133:8, 133:11, 133:13, 133:17, 134:15, 134:22, 134:24, 135:2, 135:6, 135:9, 135:13, 135:15, 135:20, 135:24, 136:9
**theme** [2] - 111:25, 112:11
**themes** [2] - 112:13, 115:24
**themselves** [4] - 3:8, 35:3, 75:3, 104:4
**theoretical** [1] - 98:17
**therefore** [1] - 112:3
**they've** [5] - 19:21, 20:1, 22:2, 33:20, 80:5
**thin** [1] - 17:17
**thinking** [2] - 72:17, 132:18
**thinks** [1] - 81:21
**third** [1] - 128:25
**thirds** [1] - 35:17
**thorough** [1] - 45:1
**thousand** [4] - 50:25, 51:2, 78:23, 79:1
**thousands** [1] - 78:20
**three** [10] - 19:4, 26:3, 38:24, 72:22, 73:11, 106:6, 107:3, 113:16, 128:10
**Three** [1] - 19:4
**throughout** [2] - 60:21, 133:8
**throw** [1] - 57:16
**thrown** [1] - 46:22
**Thursday** [2] - 52:5, 100:18
**tie** [1] - 112:15
**Tiffany** [10] - 47:23, 51:11, 53:23, 56:2, 56:12, 57:2, 63:23, 105:19, 105:22, 106:11
**today** [15] - 5:23, 6:11, 8:8, 10:25, 23:10, 54:5, 68:15, 89:17, 99:24, 113:8,

114:23, 125:1, 133:15, 135:14, 136:17
**today's** [1] - 4:16
**together** [8] - 3:18, 18:6, 20:11, 35:13, 60:14, 111:5, 125:19, 126:9
**tomorrow** [1] - 123:1
**ton** [1] - 65:8
**tons** [2] - 90:18
**took** [13] - 10:7, 26:9, 29:13, 41:15, 42:10, 54:18, 75:11, 85:4, 110:7, 110:14, 116:21, 117:12, 128:8
**Top** [1] - 125:11
**top** [4] - 42:1, 55:22, 88:9, 90:9
**topic** [5] - 6:25, 24:8, 82:4, 91:10, 119:23
**topics** [3] - 6:14, 57:15, 57:22
**total** [3] - 35:19, 42:14, 128:10
**totality** [1] - 55:24
**totally** [4] - 31:9, 33:17, 43:8, 82:3
**touch** [1] - 85:9
**towards** [6] - 3:18, 21:12, 48:1, 97:10, 120:10, 129:14
**Tower** [1] - 1:18
**track** [3] - 40:4, 83:4, 84:17
**trained** [1] - 90:16
**transcribed** [1] - 80:21
**transcript** [10] - 32:2, 36:11, 81:24, 88:4, 93:11, 93:12, 95:14, 120:24, 137:9, 137:11
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:7
**Transcription** [1] - 1:25
**transcripts** [4] - 6:1, 6:12, 6:22, 46:24
**transfer** [1] - 81:12
**transferred** [1] - 55:20
**transmission** [3] - 53:18, 53:19, 53:23
**transmittal** [1] - 53:22
**transmitted** [2] - 73:20, 73:21
**transpired** [2] - 87:11, 133:14
**treated** [1] - 18:20
**treating** [1] - 45:4

**Trevino** [1] - 13:4
**trial** [77] - 3:11, 4:13, 8:1, 9:21, 10:16, 15:2, 19:13, 19:15, 24:3, 25:9, 27:9, 27:12, 27:13, 29:13, 30:21, 31:6, 31:10, 31:18, 32:15, 32:19, 33:21, 33:22, 36:4, 36:7, 36:13, 36:16, 38:10, 38:25, 41:20, 44:17, 47:1, 47:13, 47:23, 48:14, 50:15, 51:6, 51:7, 52:7, 52:18, 52:21, 52:25, 62:7, 63:10, 63:12, 63:17, 68:6, 73:13, 75:9, 75:10, 75:15, 76:21, 77:11, 77:22, 77:25, 79:16, 82:17, 83:20, 84:23, 84:25, 85:2, 91:22, 92:22, 95:15, 100:23, 101:15, 103:24, 110:12, 114:12, 116:16, 129:18, 129:22, 130:24, 131:18, 131:19, 132:9, 132:25, 133:24
**trials** [1] - 133:8
**tried** [5] - 11:25, 14:10, 35:15, 40:15, 114:14
**triggered** [1] - 120:17
**trouble** [2] - 54:18, 55:6
**troubling** [1] - 29:16
**true** [2] - 69:17, 137:9
**try** [11] - 10:18, 14:21, 22:11, 27:12, 27:17, 34:6, 40:4, 60:17, 129:21, 133:16, 135:14
**trying** [36] - 9:18, 12:5, 12:6, 12:23, 20:9, 27:8, 33:13, 34:4, 39:10, 42:20, 43:15, 44:24, 45:3, 47:11, 52:16, 66:1, 88:4, 98:14, 98:16, 107:1, 107:19, 109:16, 110:13, 111:19, 112:7, 116:6, 116:9, 122:15, 122:16, 124:14, 124:19, 126:16, 126:17, 126:21, 126:25, 130:14
**Tuesday** [1] - 1:8

**turn** [8] - 33:19, 36:15, 48:3, 54:10, 69:1, 95:17, 96:1, 108:7
**turned** [21] - 4:6, 9:20, 10:7, 17:24, 20:1, 24:20, 26:2, 29:20, 43:11, 49:1, 49:2, 49:22, 54:7, 54:12, 78:14, 91:3, 91:4, 103:25, 118:14, 118:19
**turns** [2] - 99:23, 124:8
**twice** [1] - 20:7
**two** [38] - 6:11, 9:5, 35:2, 35:5, 35:17, 36:3, 40:20, 42:18, 43:6, 51:4, 52:22, 52:23, 61:8, 63:1, 63:13, 63:25, 64:22, 66:24, 69:12, 72:14, 73:6, 78:21, 82:5, 90:14, 99:19, 106:3, 106:5, 107:2, 113:11, 123:3, 123:4, 124:15, 124:23, 124:25, 128:3, 128:4, 128:8
**two-line** [1] - 35:2
**two-step** [1] - 69:12
**two-thirds** [1] - 35:17
**two-week** [2] - 123:3, 123:4
**type** [1] - 112:5
**typed** [1] - 102:16
**types** [1] - 18:3
**typically** [3] - 41:15, 130:25, 131:2

## U

**U.S** [17] - 7:8, 13:2, 13:4, 13:5, 13:6, 13:8, 13:9, 13:10, 13:13, 13:14, 13:16, 13:17, 30:11, 66:3, 77:8, 92:16
**U.S.C** [1] - 137:8
**UF//OUO** [1] - 40:24
**ultimate** [1] - 83:16
**ultimately** [5] - 4:12, 30:4, 37:23, 72:2, 132:19
**um-hum** [1] - 16:19
**Unanet** [2] - 36:9, 36:10
**uncertain** [1] - 82:7
**unclass** [1] - 97:17
**unclassified** [5] - 40:18, 56:9, 97:16,

97:20
**Unclassified** [2] - 40:24, 56:10
**unclear** [3] - 103:22, 109:8, 110:14
**under** [25] - 7:3, 9:9, 13:24, 15:8, 16:23, 18:23, 19:3, 22:3, 22:16, 34:23, 41:20, 63:1, 63:3, 70:23, 72:23, 73:16, 76:2, 83:15, 88:21, 92:7, 96:12, 117:16, 117:17
**understandable** [1] - 83:15
**understood** [15] - 5:5, 5:9, 5:18, 12:24, 14:23, 34:3, 49:20, 66:7, 66:8, 82:10, 101:24, 110:5, 110:17, 126:16, 135:8
**undertake** [1] - 18:16
**undertaken** [2] - 47:12, 87:1
**undertaking** [1] - 122:12
**underway** [3] - 3:11, 4:13, 111:10
**unduly** [1] - 102:22
**unfortunate** [1] - 77:17
**unfortunately** [2] - 68:1, 110:4
**unilaterally** [1] - 66:3
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [8] - 2:4, 2:14, 2:15, 7:21, 13:12, 29:21, 137:6, 137:12
**universe** [7] - 99:25, 102:21, 104:4, 124:2, 124:25, 125:3, 125:16
**unless** [2] - 112:1, 123:6
**unnecessary** [1] - 37:3
**unplug** [1] - 16:6
**unprecedented** [1] - 78:17
**unproductive** [1] - 79:15
**unreasonable** [2] - 46:11, 46:18
**unrelated** [3] - 3:10, 59:9, 104:1
**unturned** [2] - 8:3, 90:17

**up** [46] - 10:5, 10:7, 26:13, 26:23, 29:20, 32:14, 32:23, 43:13, 46:8, 48:5, 52:14, 55:20, 60:6, 60:16, 60:25, 62:7, 62:9, 65:5, 66:9, 66:16, 67:3, 70:15, 72:7, 80:15, 81:11, 88:1, 91:1, 96:1, 96:7, 97:2, 99:23, 114:14, 114:15, 115:9, 116:21, 117:14, 118:19, 118:21, 118:23, 119:18, 119:21, 120:1, 124:8, 125:9, 125:10, 135:20
**upload** [5] - 50:2, 59:2, 67:21, 70:5, 89:18
**uploaded** [5] - 59:17, 63:16, 64:18, 67:18, 69:6
**uploading** [3] - 67:23, 68:2, 89:22
**USA** [2] - 15:23, 16:8
**USAfx** [3] - 50:2, 134:11, 134:13
**useful** [2] - 74:4, 78:20
**uses** [1] - 134:11

## V

**vacation** [3] - 129:3, 131:12, 133:3
**valid** [1] - 30:10
**value** [2] - 46:20, 77:9
**variety** [1] - 113:20
**various** [9] - 9:21, 26:21, 32:20, 34:9, 36:8, 112:15, 118:10, 119:9, 121:15
**verified** [1] - 88:25
**verify** [7] - 86:18, 89:1, 89:7, 109:11, 112:17, 122:1
**version** [2] - 117:11, 136:1
**versus** [3] - 20:20, 30:14, 64:22
**via** [1] - 1:20
**view** [5] - 2:13, 20:19, 81:11, 87:25, 117:23
**viewed** [2] - 32:13, 84:12
**violation** [4] - 33:21, 34:7, 34:22, 78:11

**Virginia** [1] - 13:16
**virtually** [1] - 77:10
**visit** [1] - 24:17
**volume** [1] - 134:18
**voluminous** [1] - 110:17
**vs** [1] - 1:4

## W

**wait** [4] - 48:21, 129:10, 135:12, 135:13
**waited** [1] - 127:8
**waiting** [3] - 130:15, 130:16
**waive** [3] - 29:4, 44:4, 124:11
**waived** [2] - 78:18, 78:22
**waiver** [12] - 29:12, 29:18, 29:19, 30:20, 31:3, 31:24, 35:25, 36:2, 72:5, 87:3, 90:23, 124:13
**wants** [4] - 2:12, 20:11, 105:6, 133:6
**Washington** [1] - 1:16
**waste** [1] - 28:2
**ways** [5] - 90:16, 107:17, 126:22, 127:13
**week** [27] - 4:6, 5:24, 19:24, 40:14, 46:6, 48:11, 49:11, 56:2, 91:8, 91:10, 113:21, 123:3, 123:4, 128:22, 128:24, 129:15, 129:18, 129:22, 130:24, 131:1, 131:9, 131:10, 131:11, 132:16, 133:7, 136:5
**weekend** [4] - 29:14, 37:20, 37:21, 39:10
**weekends** [1] - 124:24
**weekly** [13] - 11:16, 16:11, 17:1, 17:19, 22:23, 83:1, 98:8, 100:13, 100:16, 100:18, 101:6, 120:4, 121:12
**WEEKS** [97] - 1:14, 3:21, 9:6, 9:8, 11:11, 12:14, 14:23, 15:7, 15:11, 15:15, 15:17, 16:2, 16:14, 16:16, 16:20, 16:25, 17:2, 17:5, 17:8, 17:13, 18:2, 18:9, 18:12,

19:9, 21:8, 21:17,
21:21, 21:25, 22:2,
22:19, 22:22, 23:4,
23:8, 23:15, 23:22,
24:14, 25:12, 25:15,
54:1, 54:4, 54:9,
54:14, 55:9, 55:13,
55:16, 55:25, 56:12,
56:16, 56:21, 56:25,
58:1, 58:4, 58:6,
58:15, 58:18, 58:23,
59:24, 60:4, 60:10,
60:14, 61:19, 62:10,
62:15, 64:7, 70:9,
74:17, 95:23, 96:7,
96:11, 96:23, 97:2,
97:8, 97:17, 97:20,
98:1, 98:3, 98:6,
100:15, 101:19,
102:6, 105:17,
105:22, 106:3,
106:9, 106:11,
106:15, 106:20,
106:24, 107:2,
107:9, 107:12,
107:23, 107:25,
113:15, 119:15,
120:3, 128:7
**weeks** [29] - 13:23,
25:16, 33:12, 35:8,
36:3, 39:1, 40:16,
48:11, 55:11, 72:23,
76:18, 79:3, 99:12,
99:17, 100:4, 106:6,
110:1, 123:8,
124:25, 128:4,
128:8, 128:10,
128:21, 128:23,
129:1, 130:1,
132:18, 133:5
**Weeks** [2] - 3:21,
15:12
**weeks'** [1] - 43:3
**weighty** [1] - 46:2
**Weil** [4] - 1:15, 1:20,
3:22, 3:25
**Weir** [1] - 92:12
**Western** [1] - 13:15
**Westlaw** [3] - 29:22,
29:23, 29:24
**wheels** [2] - 126:22,
126:23
**whereas** [1] - 118:1
**whistleblower** [1] -
92:10
**white** [1] - 10:11
**whole** [7] - 25:24,
39:20, 60:19, 74:14,
79:24, 104:12,
110:10

**wholly** [2] - 46:19,
79:8
**widely** [1] - 84:2
**wife** [5] - 131:2, 131:8,
131:16, 132:10,
133:6
**wild** [3] - 52:16, 60:12,
98:16
**wildcard** [3] - 11:5,
11:7, 128:5
**willing** [2] - 44:4,
105:7
**wise** [1] - 90:19
**wishes** [1] - 123:7
**wisps** [1] - 36:5
**withdrawn** [1] - 52:12
**withhold** [2] - 44:16,
44:19
**witness** [4] - 34:19,
47:18, 61:23, 101:21
**witnesses** [4] - 47:2,
47:17, 73:3, 91:22
**WL** [1] - 13:15
**wonder** [3] - 84:13,
99:17, 99:23
**wondering** [1] - 86:12
**Word** [1] - 55:7
**word** [11] - 59:11,
60:3, 90:6, 94:12,
102:11, 102:13,
103:5, 107:11,
107:15, 108:15,
114:7
**words** [14] - 14:1,
18:14, 18:16, 21:9,
22:1, 40:25, 51:7,
70:25, 95:19, 101:3,
107:5, 108:16,
108:20, 116:6
**works** [1] - 131:15
**worried** [2] - 7:25,
89:23
**worry** [1] - 89:14
**worth** [3] - 6:13,
27:25, 42:13
**wrangle** [1] - 61:25
**wrap** [1] - 91:1
**writing** [3] - 93:17,
94:16, 120:21
**written** [1] - 122:5
**wrote** [1] - 59:11

## Y

**year** [13] - 4:14, 17:6,
32:9, 35:14, 36:14,
53:20, 70:2, 79:13,
80:2, 81:16, 84:19,
118:15, 132:19
**years** [6] - 21:10,

21:11, 63:25, 70:3,
73:11, 73:18
**yesterday** [4] - 6:9,
12:4, 48:12, 87:22
**York** [2] - 19:12, 30:11
**yourself** [3] - 50:3,
90:6, 90:21
**yourselves** [1] - 27:11
**yup** [1] - 15:16

## Z

**zeal** [1] - 7:24
**zealous** [1] - 90:15
**zero** [3] - 42:24, 99:23,
110:16

## §

**§** [1] - 137:8
**§2B1.1(b** [1] - 7:3