IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JACKY LYNN McCOMBER,
   Formerly known as
   Jacky Lynn Kimmel,

    *Defendant*.

Criminal Action No. ELH-21-036

**MEMORANDUM OPINION**

This Memorandum Opinion resolves the motion for judgment of acquittal submitted pursuant to Fed. R. Crim. P. 29 by defendant Jacky Lynn McComber, formerly known as Jacky Lynn Kimmel.

Defendant was indicted on February 25, 2021 (ECF 1), and charged with multiple offenses in connection with a government contract between the National Security Agency ("NSA" or "Agency") and InfoTeK Corporation ("InfoTeK" or "ITK").[1]  McComber is the Chief Executive Officer, President, and sole shareholder of InfoTeK.[2]

The contract, which was awarded in 2011, is known as the "Ironbridge Contract" (the "Contract," the "Ironbridge Contract," or "Ironbridge").  *See* Gov't. Exhibit ("GX") 28(a). Ironbridge was a multi-year contract involving highly technical software and application development services.  *See*, *e.g.*, ECF 297 (Tr. 1/30/23, testimony of Cherrill Guinther), at 13; *see*

---

[1] The spelling of "Info Tek" appears in the Indictment (ECF 1) and the Superseding Indictment (ECF 97).  However, the record also reflects the spelling as "InfoTek."  *See*, *e.g.*, Gov't. Exhibit 27(b); ECF 408 at 5.

[2] Defendant's former husband, Robert Kimmel, previously was a co-owner of ITK.

*id.* at 24, 25.[3]  The case concerns defendant's work as Senior Program Manager ("PM") with respect to the Contract during the period from March 2016 through September 2017.

The grand jury issued a Superseding Indictment on May 26, 2022 (ECF 97), which is the operative charging instrument.  It contains twenty counts.

Counts One through Nineteen charge "Submission of False Claims" by defendant, in violation of 18 U.S.C. §§ 287 and 2(b).  These counts pertain to ITK's monthly billing to NSA for work allegedly performed by defendant during the period March 2016 through September 2017. In particular, the Superseding Indictment alleges that defendant caused the submission of false and fraudulent claims to the government "for services that were not in fact performed by [defendant] in connection with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices . . . ."  ECF 97, ¶ 16.

Count Twenty charges defendant with two "False Statements" made by her during an investigative interview in October 2017, while under oath, to two agents of NSA's Office of the Inspector General ("OIG"), in violation of 18 U.S.C. § 1001(a)(2).  Specifically, paragraph 6 of Count Twenty referenced an interview transcript and identifies the following:

- p. 30: After **MCCOMBER** stated that she filled out a timesheet every day, she answered "No" in response to both of the questions, "At any time, did you ever falsely fill out that timesheet?" and "Put any false information on it?"

- p. 32: When one of the investigators noted that **MCCOMBER** had billed a full 8 hours on almost all of the days she had billed time to the IRONBRIDGE contract and asked "So, that's accurate?", **MCCOMBER** responded:

  "Yes, that is accurate, because I – I monitor my time throughout the day on

---

[3] Throughout this Memorandum Opinion, I cite to the electronic pagination.  It does not always correspond to the page number imprinted on a particular submission.

When citing to the trial transcripts, I include at least once the trial date of the testimony and the witness's first and last names.  But, I do not include the date and full name every time that I cite to a transcript.

what I'm doing for Ironbridge and what's against Ironbridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it."

In sum, InfoTeK billed NSA for 2,603.5 hours of work allegedly performed by the defendant while she served as PM between March 14, 2016 and September 8, 2017. *See* GX 1(a) to GX 19(a). According to the government, defendant caused ITK to submit inflated timesheets and fraudulent invoices to NSA with respect to the period in issue.

The technical work for the Contract is classified and therefore ITK's employees had to perform that work at NSA's facility at Fort George G. Meade in Maryland. The quality of ITK's technical work is not in issue. Indeed, there is no question that ITK did a "fine job." ECF 298 (Tr. 1/31/23, testimony of Jonathan Smith), at 30; *see also*, *e.g.*, ECF 299 (Tr. 2/1/23, testimony of Kristin Mair), at 83, 84 (stating that "mission customers were very pleased with the [ITK] technical contractors," *i.e.* "the software engineers"). But, NSA's access control records reflect that defendant was only on-site at NSA for about 10% of the hours that she billed. Put another way, defendant was not at NSA for about 90% of the time for which ITK billed the Agency, *i.e.*, defendant billed for 2,603.5 hours and was off-site for 2,333 of those hours. *See* GX 1(c) to GX 19(c); GX 21(a). NSA paid the ITK invoices, in the amount of $388,878.78. *See*, *e.g.*, GX 1(a) to GX 19(a); ECF 295 (Tr. 1/26/23, testimony of Keith Benderoth), at 181.

The government agrees that the PM could perform some administrative functions for the Contract off-site, *i.e.*, not at the NSA complex. *See* ECF 390 at 14 n.2; ECF 97, ¶ 5. Indeed, Paragraph 5 of the Superseding Indictment (ECF 97) added that "some NSA personnel believed" that work under the Contract could be handled by the PM "outside the NSA's secured facility" if

the work "did not involve the use of classified information."[4]  But, the parties vigorously disagree as to the extent of the work that defendant could perform and that she actually performed while off-site.

The case proceeded to a jury trial that began in January 2023.  *See* ECF 247.  At trial, the Court reserved ruling on defendant's motion under Fed. R. Crim. P. 29.  On February 15, 2023, the jury returned a verdict finding defendant guilty on all twenty counts.  ECF 279.  After trial, defendant obtained a team of new counsel who submitted a supplemental motion under Rule 29.[5] I shall refer to the Rule 29 motions made at trial and the supplemental motion collectively as the "Motion" or the "Rule 29 Motion."  The Court heard argument on the Motion on January 23, 2024. ECF 412; ECF 415 (Tr. 1/23/24).

Defense counsel have left no stone unturned in their vigorous and zealous attempt to challenge the jury's verdict.  Despite their laudable efforts, the defense has generated the proverbial smoke, but no fire.  In effect, they have sliced the onion too thin, asking the Court to consider each ring in isolation.  *Cf. United States ex rel. JDJ & Associates LLP v. Natixis*, PKC-15-5427, 2017 WL 4357797, at *9 (S.D.N.Y. Sept. 29, 2017).  They focus on the occasional wrinkle in the evidence to argue that the evidence is insufficient.  But, in doing so, the defense ignores the totality of the evidence.  And, "the whole is often greater than the sum of its parts . . . ."  *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018); *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019).

---

[4] The Superseding Indictment also alleges that neither McComber nor InfoTeK obtained authorization from NSA to work off-site.  ECF 97, ¶ 5.

[5] Defendant's trial attorney was privately retained.  After trial, he sought leave to withdraw, discussed *infra*.  Defendant was then provided with court-appointed counsel from the Office of the Federal Public Defender ("FPD").  And, the FPD has been joined by several pro bono lawyers.

For the reasons that follow, I shall deny the Motion.  Sentencing shall proceed on May 17, 2024.  *See* ECF 417.

## I.       Procedural Background

The pretrial phase of the case was extremely contentious, with the parties painting very different pictures about the case.  The government has consistently maintained that the case is a conventional fraud case, in which the defendant knowingly billed the government for more hours than she worked.  In contrast, the defense characterized the case as a complex statutory and regulatory matter involving complicated federal contract law, including the Federal Acquisition Regulations ("FAR"), as well as the duties of federal Contracting Officers ("CO"); Contract Specialists; Contracting Officer Representatives ("COR"); Contracting Officer Representatives — Technical ("COR-T"); Contracting Officers Representatives – Administrative ("COR-A"); and Contract Managers.  *See*, *e.g.*, ECF 112-1 at 26; *see also*, *e.g.*, ECF 292 (Tr. 1/23/23, testimony of Kelly Sulewski), at 98-108 (explaining duties of various federal contracting positions); ECF 296 (Tr. 1/27/23, testimony of Regina Shirley), at 71-74 (same); ECF 298 (Tr. 1/31/23, testimony of Jonathan Nace), at 161-64 (same); ECF 299 (Tr. 2/1/23, testimony of Kristin Mair), at 84-85 (same).

The parties filed numerous pretrial motions, which resulted in multiple motions hearings.  In particular, pretrial motions hearings were held on December 1, 2021 (ECF 30); July 14, 2022 (ECF 129); July 20, 2022 (ECF 131); July 25, 2022 (ECF 139); August 29, 2022 (ECF 153); August 30, 2022 (ECF 154); September 7, 2022 (ECF 160); November 14, 2022 (ECF 197); January 10, 2023 (ECF 234); and January 13, 2023 (ECF 244).  In addition, as reflected on the Docket, the Court conducted many telephone status conferences, usually joined by the defendant, and often with a court reporter.

Jury selection took place on January 19, 2023.  ECF 247.  The presentation of testimony began on January 23, 2023.  ECF 249.[6]  Approximately twenty-five witnesses testified at the trial, including the defendant.  More than 200 exhibits were introduced into evidence.  As noted, on February 15, 2023, the jury returned a verdict of guilty on all counts.  ECF 279.

Of relevance here, at the close of the government's case-in-chief, Ms. McComber's former trial attorney, Clarke Ahlers, moved for judgment of acquittal ("MJOA"), pursuant to Fed. R. Crim. P. 29.  *See* ECF 262-1; ECF 300 (Tr. 2/3/23), at 4-67; ECF 301 (Tr. 2/6/23), at 50-51.[7]  The Court reserved ruling.  ECF 264; ECF 300 (Tr. 2/3/23), at 4-67; ECF 301 (Tr. 2/6/23), at 51.  Then, at the close of all the evidence, Mr. Ahlers renewed his MJOA.  ECF 268; ECF 304 (Tr. 2/9/23), at 147.  Again, the Court reserved its decision.  ECF 268; ECF 304 (Tr. 2/9/23), at 147-48.

As mentioned, the jury returned its verdict on February 15, 2023.  ECF 279.  Sentencing was initially set for May 12, 2023.  ECF 282 at 3.  By letter of March 1, 2023 (ECF 284), Mr. Ahlers informed the Court that he did not intend to file any post-trial motions.

The first Presentence Report ("PSR") was docketed on April 24, 2023.  ECF 285.  An updated PSR was docketed on November 8, 2023.  *See* ECF 376.

---

[6] The docket and the transcripts refer to January 23, 2023, as "Day 1" of the trial.  *See*, *e.g.*, ECF 249, ECF 292 (Tr. 1/23/23), at 1.  In actuality, the day of jury selection (January 19, 2023) constituted the first day of trial.

[7] To avoid imposing on the jury's time during the trial, and in the interest of avoiding delay, the Court heard arguments on the MJOA on Friday, February 3, 2023 – a day when the jury was not sitting.  At that point, the government had not yet formally rested, but it planned to rest on the next business day.  *See* ECF 300 (Tr. 2/3/23), at 2-4.  After the government actually rested on Monday, February 6, 2023 (ECF 301, Tr. 2/6/23, at 50), the Court invited defense counsel to supplement his argument, but counsel declined to do so.  *Id.* at 50-51.  Defense counsel renewed his MJOA, but he adopted the arguments he had previously made.  *Id.* at 50.

The government filed its first sentencing memorandum on April 28, 2023.  ECF 286.  It also filed a memorandum in support of its request for restitution.  ECF 288.  On the same date, the defense filed objections to the PSR.  ECF 290.

In anticipation of the then impending sentencing on May 12, 2023, and because about three months had passed since the verdict, I issued an Order on Wednesday, May 3, 2023 (ECF 308), asking counsel to provide a written submission addressing the pending MJOA, due by noon on Monday, May 8, 2023.  *Id.*  At approximately noon on Friday, May 5, 2023, the government requested a two-day extension, until May 10, 2023.  ECF 309.  It explained that it was completing its response to the defendants' sentencing submission (*see* ECF 290) and was also preparing witnesses for the upcoming sentencing proceeding on May 12, 2023.  ECF 309.  At about 2:30 p.m. on May 5, 2023, the defense filed an objection to the government's extension request.  ECF 310.[8]

On Saturday, May 6, 2023, the government did, indeed, file a sentencing reply brief in response to defendant's objections to the PSR.  ECF 311.  It was twenty-eight pages in length and exhibits were also appended.[9]  And, on Monday, May 8, 2023, Mr. Ahlers timely filed the Rule 29 memorandum (ECF 313) that I had requested on May 3, 2023 (ECF 308).

Also on May 8, 2023, I held a telephone conference with counsel to discuss, *inter alia*, the government's extension request of May 5, 2023.  ECF 314; ECF 315; ECF 316; *see also* ECF 320

---

[8] Although it was my practice in this case to promptly hold telephone conferences with counsel to address such disputes, I was unavailable to do so at that time.  This is because the District Court was holding a portrait ceremony for the undersigned that afternoon.  However, I discerned no reason to deny such a request.

[9] As noted, the government's need to complete this particular submission was one of the grounds for which it sought the two-day extension for the submission of its MJOA memorandum.

(Tr. 5/8/23).  The Court held another telephone conference call on May 9, 2023.  *See* Docket, 5/9/23; ECF 321 (Tr. 5/9/23).

On May 9, 2023, to the surprise of the Court, Mr. Ahlers moved to withdraw from the case.  ECF 317.  Therefore, I referred the matter to a magistrate judge for an attorney inquiry hearing.  ECF 318, ECF 319.[10]  Magistrate Judge A. David Copperthite held an attorney inquiry hearing on May 22, 2023.  ECF 326.  And, he granted Mr. Ahlers's request to withdraw.  ECF 327.

The Office of the Federal Public Defender ("FPD") subsequently entered the case as counsel for the defendant.  ECF 328; *see also* ECF 336 (Order appointing FPD).  Thereafter, the FPD was joined by a team of pro bono lawyers from the law firm of Weil, Gotshal & Manges LLP.  *See* ECF 341, ECF 342, ECF 343, ECF 368.  Obviously, the change in defense counsel necessitated a delay in sentencing, so that the new team of defense lawyers could familiarize themselves with the voluminous record.[11]

New defense counsel subsequently withdrew "in full" the Rule 29 memorandum that Mr. Ahlers had submitted on May 8, 2023 (ECF 313).  *See* ECF 372-1.  In lieu of Mr. Ahlers's submission, defense counsel filed "Defendant's Supplemental Memorandum of Law in Support of Rule 29 Motion for Judgment of Acquittal."  ECF 359 (the "Supplement").[12]  The Rule 29 Motion is supported by nineteen exhibits.  ECF 359-2 to ECF 359-20.  The government's opposition is

---

[10] Under the circumstances, I obviously could not proceed with the defendant's sentencing on May 12, 2023.

[11] The post-trial schedule has been the topic of many communications with counsel, and the schedule has been revised numerous times, for various reasons.  *See, e.g.*, ECF 338, ECF 344; ECF 346; ECF 354; ECF 356, ECF 357 (Tr. 8/21/23); ECF 358, ECF 371, ECF 385, ECF 386, ECF 387, ECF 392, ECF 393, ECF 399, ECF 400 (Tr. 12/21/23); ECF 404, ECF 411, ECF 417; ECF 418; ECF 425.

[12] As noted, I refer to the MJOA motions made at trial and the Supplement collectively as the "Motion" or the "Rule 29 Motion."

docketed at ECF 390.  It is also supported by multiple exhibits.  ECF 390-1 to ECF 390-4.
Defendant has replied.  ECF 408.

In November 2023, while the Rule 29 Motion was in the briefing phase, the Court held
three days of evidentiary hearings on issues related to sentencing.  *See* ECF 377, ECF 378, ECF
379; *see also* ECF 382 (Tr. 11/16/23); ECF 383 (Tr. 11/17/23); ECF 384 (Tr. 11/20/23).  The Court
has also held several discovery conferences with counsel and conducted discovery hearings on
December 21, 2023, and January 30, 2024, concerning discovery disputes with respect to issues
pertinent to sentencing.  *See*, *e.g.*, ECF 395; ECF 396; ECF 416; ECF 418.    And, as noted, the
Court heard argument on the Rule 29 Motion on January 23, 2024.  ECF 412; ECF 415 (Tr.
1/23/24).

## II.      Fed. R. Crim. P. 29

Under the Constitution, an accused is protected from conviction "except upon proof beyond
a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In
re Winship*, 397 U.S. 358, 364 (1970); *see also United States v. Gaudin*, 515 U.S. 506, 522 (1995).
Rule 29 of the Federal Rules of Criminal Procedure, which governs a motion for judgment of
acquittal, helps to ensure this protection.  It requires that "the court on the defendant's motion must
enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a
conviction."

"Sufficiency-of-the evidence review involves assessment by the courts of whether the
evidence adduced at trial could support any rational determination of guilty beyond a reasonable
doubt."  *United States v. Powell*, 469 U.S. 57, 67 (1984).  In other words, the "relevant question is
whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond
a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original); *see*

*United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). Notably, a finding of insufficiency must "be confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978); *accord United States v. Hoover*, 2024 WL 1057764, at *4 (4th Cir. March 12, 2024); *United States v. Davis*, 75 F. 4th 428, 437 (4th Cir. 2023); *United States v. Clarke*, 842 F.3d 288, 297 (4th Cir. 2016).

It follows that, "to reverse [a conviction], the record must demonstrate a lack of evidence from which a jury could find guilt beyond a reasonable doubt[.]" *United States v. Tillmon*, 954 F.3d 628, 637 (4th Cir. 2019) (quotations, citations, and alterations omitted); *accord United States v. Seigler*, 990 F.3d 331, 337-38 (4th Cir. 2021). As the Fourth Circuit recently explained in *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023), "a judgment of acquittal is appropriate when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" (Quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)). That is, if the evidence is so insufficient that *no* rational trier of fact could convict, the court should enter a judgment of acquittal." *Rafiekian*, 68 F.4th at 186 (emphasis in *Rafiekian*).

When, as here, the defense moved for judgment of acquittal at the close of the government's case, and the court reserved ruling, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).[13] Nevertheless, it is well established that "[a] defendant who brings a sufficiency challenge bears a heavy burden . . . ." *Clarke*, 842 F.3d at  297; *see United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024); *Davis*, 75 F.4th at 437; *United States v. Edlind*, 887 F.3d 166, 172 (4th Cir. 2018); *United States v. Savage*,

---

[13] In contrast, if a court denies a Rule 29 motion at the end of the government's case, "the mid-trial motion is deemed withdrawn and a reviewing court considers both sides' proof when faced with a post-trial sufficiency challenge." *United States v. Gallagher*, 90 F.4th 182, 189 (4th Cir. 2024); *see United States v. Heller*, 527 F.2d 1173, 1773 (4th Cir. 1975) (per curiam).

885 F.3d 212, 219 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 238 (2018); *United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015); *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

In determining whether to grant a judgment of acquittal, the court views the evidence and the inferences therefrom in the light most favorable to the prosecution. *See*, *e.g.*, *United States v. Wiley*, 93 F.4th 619, 632 (4th Cir. 2024); *Rafiekian*, 68 F.4th at 186; *United States v. Buzzard*, 1 F.4th 198, 205 (4th Cir. 2021); *United States v. Gillion*, 704 F.3d 284, 294 (4th Cir. 2012). Ultimately, the jury's verdict should not be disturbed if there is substantial evidence, viewed in the light most favorable to the government, to support it. *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018); *see United States v. Bailey*, 819 F.3d 92, 95 (4th Cir. 2016); *United States v. Bran*, 776 F.3d 276, 279 (4th Cir. 2015), *abrogated on other grounds by Lara v. United States*, 599 U.S. 453 (2023).

"Substantial evidence" is defined as evidence that "'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *Burfoot*, 899 F.3d at 334 (citation omitted); *see Hoover*, 2024 WL 1057764, at *4; *Gallagher*, 90 F.4th 182, 190; *Edlind*, 887 F.3d at 172; *Savage*, 885 F.3d at 219; *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006); *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). And, of relevance here, the evidence must be considered "in its totality . . . ." *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008); *see Savage*, 885 F.3d at 219. As mentioned, "the whole is often greater than the sum of its parts . . . ." *Wesby*, 583 U.S. at 61; *see Drummond*, 925 F.3d at 687.

Notably, it is the jury, not the court, that "'weighs the credibility of the evidence and resolves any conflicts in the evidence . . . .'" *Burgos*, 94 F.3d at 862 (citation omitted); *see Burks*,

437 U.S. at 16; *Wiley*, 93 F.4th at 632.  In other words, "determinations of credibility 'are within the sole province of the jury and are not susceptible to judicial review.'"  *Burgos*, 94 F.3d at 863 (citation omitted); *see United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014).  And, the court must "'assume that the jury resolved any conflicting evidence in the prosecution's favor.'"  *United States v. Taylor*, 659 F.3d 339, 343 (4th Cir. 2011) (citation omitted); *see Wiley*, 93 F.4th at 632.

It is also salient that evidence is not insufficient merely because it is "susceptible to alternative interpretations . . . ."  *Burgos*, 94 F.3d at 862.  Moreover, it is the jury that decides reasonable interpretations of the evidence.  *Id.* (citation omitted).  Therefore, "where the evidence supports differing and reasonable interpretations," it is for the jury to decide "which interpretation to accept."  *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc); *see Seigler*, 990 F.3d at 338.

To be sure, it may be difficult to prove a person's intent or knowledge of falsity with direct evidence.  But, the government is entitled to "'the benefit of all reasonable inferences from the facts . . . .'"  *Savage*, 885 F.3d at 219-20 (citations omitted).  A jury may also consider both circumstantial and direct evidence.  *United States v. Hicks*, 64 F. 4th 546, 550 (4th Cir. 2023); *Savage*, 885 F.3d at 219-20; *United States v. Corral*, 972 F.2d 342, at *2 (4th Cir. 1992) (per curiam, unpublished); *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982).  Indeed, "circumstantial evidence 'is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence.'"  *United States v. Rafiekian*, AJT-18-457, 2019 WL 4647254, at *9 (E.D. Va. Sept. 24, 2019) (quoting *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989)), *rev'd in part on other grounds*, 991 F.3d 529 (4th Cir. 2021).  Simply put, the government is not required

to exclude "'every reasonable hypothesis consistent with innocence.'" *Osborne*, 514 F.3d at 387 (citation omitted).

In sum, "'it is the jury's job to determine what the defendant actually did, knew, and intended' . . . ." *Edlind*, 887 F.3d at 172 (citation omitted). The evidence is sufficient to sustain a conviction "'as long as a rational jury, making permissible inferences, could find beyond a reasonable doubt that the elements of the counts were satisfied.'" *Id.* Conversely, to set aside a jury's verdict based on insufficient evidence, the court must conclude that "'the prosecution's failure is clear.'" *Clarke*, 842 F.3d at 297 (citations omitted). In other words, the Court must conclude that "no reasonable juror 'could have found the essential elements of the crime [charged] beyond a reasonable doubt.'" *United States v. Robertson*, 68 F.4th 855, 862 (4th Cir. 2023) (quoting *United States v. Dennis*, 19 F.4th 656, 666 (4th Cir. 2021) (citation omitted)) (alteration added).

### III.    Factual Summary[14]

NSA's functions include intelligence operations. Kelly Sulewski, who worked for NSA for more than 35 years as of the time of trial, primarily in contracting, explained NSA's "mission." ECF 292 (Tr. 1/23/23, testimony of Kelly Sulewski), at 83; *see id.* at 82. She said, *id.* at 83: "NSA is basically the government lead for signals analysis and cybersecurity operation services . . . ."

---

[14] The government's evidence in this fact-intensive case is voluminous. And, counsel did not provide the Court with courtesy copies of the trial transcripts. Given the volume of the evidence, this factual presentation is, indeed, merely a summary of the evidence adduced by the government in its case-in-chief. And, as discussed, the evidence is construed in the light most favorable to the government.

InfoTeK is "in the business of providing information technology, engineering, and security management services to government agencies and commercial" entities.  ECF 97, ¶ 2.[15]  At the relevant time, McComber served as "the Chief Executive Officer, President, and first the controlling and then later . . . the sole shareholder of InfoTeK."  *Id.* at 2, ¶ 3; *see also*, *e.g.*, ECF 296 (Tr. 1/27/23, testimony of Robert Bryant), at 36.

From July 2011 to about February 2018, NSA and ITK were parties to Prime Contract #98230-11-C-1496, known as the Ironbridge Contract.  GX 28(a).  ITK was the prime contractor.  ECF 292 (Tr. 1/23/23, Sulewski testimony), at 102, 111.  In general, the customer is an organization within NSA.  *Id.* at 95.  And, the "mission customer" develops the requirements for a given contract.  *Id.* at 174; *see id.* at 95-96.

The Contract concerned software and application development.  ECF 297 (Tr. 1/30/23, testimony of Cherrill Guinther), at 13, 24-25.  Ironbridge was described as "a service contract."  ECF 296 (Tr. 1/27/23, testimony of Regina Shirley), at 102.

The Contract includes a detailed Statement of Work ("SOW").  *See* GX 30(a)(1); GX 30(a)(2); GX 30(a)(3); GX 30(a)(4); GX 30(a)(5).  Sulewski explained that the Statement of Work in the Contract "basically describes the scope of work," including the "separate requirements," technical task orders or TTOs, and the "place of performance."  ECF 292 at 116.  The "Scope of Work" (GX 28(a), § B.2) "tells the contractor what materials or services they are to provide to the government in accordance with the statement of work . . . ."  ECF 292 at 116.

In general, the SOW required ITK to "implement state-of-the art information technology requirements and software requirements" and to "provide all necessary maintenance and

---

[15] For convenience, I occasionally rely on my trial notes or cite to the Superseding Indictment for a handful of uncontested background facts.

enhancement support" for certain information technology and software tools and applications, so as to enable NSA's National Security Operations Center ("NSOC") and its Counter Terrorism Mission Management Center ("CT MMC") "to gather, aggregate . . . and disseminate mission-critical information." *See*, *e.g.*, GX 30(a)(4) (SOW, 11/29/16), §§ 1.0, 2.0.

The CT MMC portion of the Contract was subsequently removed. This reduced the work under the Contract. *See* ECF 297 (Tr. 1/30/23, testimony of Jonathan Smith), at 190-97; ECF 297 (Tr. 1/30/23, testimony of Cherrill Guinther), at 39. Moreover, during the pendency of the Contract, the SOW was modified several times. *See* GX 32(a) to GX 32(n); ECF 292 (Sulewski testimony), at 142-43.

As indicated, the work of the Contract was for NSOC, which is the Agency's "24/7 Operations Center." *See*, *e.g.*, *id.* § 1. Among other things, NSOC "anticipates and reacts to world events and drives time-sensitive mission management of the NSA/CSS[16] worldwide cryptologic enterprise by maintaining maximum cognizance of global issues . . . ." *Id.*

As noted, as of the trial, Kelly Sulewski had worked at NSA for more than three decades. ECF 292 (Sulewski testimony), at 82. She described NSOC as NSA's "24/7 operation center that monitors world events." *Id.* at 92. According to Sulewski, NSOC handles "sensitive and highly classified intelligence information[.]" *Id.* at 93. And, the "K3" unit provides "support" to NSOC. *Id.*

Robert Bryant, an aerospace engineer, had been at NSA for more than 39 years as of the time of trial. ECF 296 (TR. 1/27/23, testimony of Robert Bryant), at 5. He served as "the chief of K3, which is innovative solutions" at NSOC. *Id.* at 6. He also had "IT and facilities"

---

[16] I was unable to locate a definition of "CSS" in the SOW.

responsibilities. *Id.* at 5.[17]  Regina Shirley also worked for NSOC for several years.  ECF 296 (Tr. 1/27/23, Shirley testimony), at 64.  Both Shirley (*id.* at 66) and Bryant (*id.* at 6) described NSOC as "the nerve center" of NSA.

According to Bryant, the work of NSOC includes "signals intelligence for the intelligence community."  ECF 296 (Bryant testimony), at 7.  He testified that NSOC "runs 24 hours a day, seven days a week . . . ."  *Id.* at 7-8.  Indeed, he claimed that NSOC "never sleeps."  *Id.* at 8. Shirley described NSOC as "a fast-paced organization" with "a lot of work to do."  ECF 296 (Shirley testimony), at 81.[18]  Cherrill Guinther, a former Contracting Officer at NSA, described NSOC as "the mission element."  ECF 297 (Tr. 1/30/23, Guinther testimony), at 14; *see also id.* at 11.

Jonathan Smith, who worked in IT at NSOC, described NSOC as follows:  "NSOC functions as kind of a central hub for events that occur outside of the United States."  ECF 297 (Tr. 1/30/23, testimony of Jonathan Smith), at 178.  He explained that NSOC "listens [to Signals Intelligence].  And then it has to analyze and interpret it . . . ."  *Id.*

Sulewski worked in the Office of Contracting for over 25 years.  ECF 292; *id.* at 83. Previously, Sulewski served as Chief of B33, where she "oversaw the contracts for the Director of Operations, Engagement and Policy, and NSOC."  *Id.* at 94.  She characterized the Contract as a "small" contract for NSA.  ECF 292 (Sulewski testimony), at 132.  The type of contract is what is known as a "Firm Fixed Price Level of Effort" contract ("FFP-LOE").  GX 28(a), § B.3; *see also*

---

[17] Bryant was asked at trial about his various responsibilities at NSA.  ECF 296 (Bryant testimony), at 5.  He said, *id.*: "Most of them I can't talk about."

[18] According to Shirley, "Everybody knows NSOC . . . . It is the place everyone wants to work . . . . It's a prestigious job if you can work there."  ECF 296 (Shirley testimony), at 66.  When she was offered a position at NSOC, she "couldn't turn that down.  That was just too good to be true."  *Id.* at 70.

48 C.F.R. § 16.207-2; ECF 292 (Sulewski testimony), at 119-20.  The substantive work required by the Contract was classified.  ECF 292 at 112.

Cherrill Guinther worked for the Agency from March 2005 until her retirement in March 2022.  ECF 297 (Guinther testimony), at 11, 12.[19]  From 2009 to 2011, she was the Contracting Officer at NSA who was involved in seeking a contract to provide software and application development services to NSOC.  *Id.* at 13-14.  As to FFP-LOE contracts, she explained, *id.* at 18-19:  "[W]here the NSA uses firm-fixed price level of efforts on these service contracts . . . we specify to the contractor the labor category, the description of the qualifications that labor category has to have, and the number of hours that we're projecting that we need."

Guinther indicated that the Agency "usually uses 1920 [hours] as a full-time equivalent." *Id.* at 19; *see id.* at 33; *see also* ECF 292 (Sulewski testimony), at 130.  In addition, a rate of pay is assigned for each labor category.  ECF 297 (Guinther testimony), at 19.  With respect to the hours allocated for each labor category, Guinther explained that the Agency "determine[s] that those hours are needed" and the contractor is then "obligated to provide those hours."  *Id.* at 22; *see also id.* at 20, 76-77.

In other words, for a FFP-LOE contract, the government "award[s] an estimated number of hours to accomplish the work in the statement of work for the contract."  ECF 292 (Sulewski testimony), at 120.  In using an FFP-LOE form of contract, the Agency is specifying that the work in the various labor categories "cannot be achieved by expending less than the stipulated effort . . . ."  *Id.* at 177; *see also id.* 177-78.  Nevertheless, Guinther explained that the number of hours allocated to a position is not a guarantee of work.  ECF 297 (Guinther testimony), at 19.  She

_____

[19] Guinther worked for other federal agencies before joining NSA.  ECF 297 (Guinther testimony), at 12.

said, *id.* at 20: "[W]e specifically say as we award the hours, then those are hours you work, and you get paid for each hours [sic] you work."

Guinther also noted that the hours set forth in the FFP-LOE contract are "mutually agreed on [and] all parties sign off on it." *Id.* at 83. She observed that when a contractor is "signing up," the contractor is representing that "they have those personnel available to work" the hours specified in the contract, *i.e.*, the capacity to perform. *Id.* at 21.

According to Sulewski, "[t]he mission customer would determine the number of hours" for a FFP-LOE contract, but the determination of hours is not "an exact science." ECF 292 (Sulewski testimony), at 121. As noted, for a full-time equivalent, NSA allocates 1,920 hours per year. *Id.* at 130; ECF 297 (Guinther testimony), at 19. And, Sulewski agreed that 1,920 hours is "a fairly common number of hours to assign a labor category," with multiples of that number if more than one person is required for a particular position. ECF 292 (Sulewski testimony), at 130. In other words, most full-time labor categories are designated for 1,920 hours. *See id.* at 129.

Regardless of the hours awarded to a labor category in a FFP-LOE contract, an allocation of hours by the government to a labor category is not a license to bill the government for the allocated hours. ECF 297 (Guinther testimony), at 83. On cross-examination, Guinther stated, *id.*: "But they [*i.e.*, the contractor] can only bill for the hours expended."[20]

Similarly, Sulewski testified that a contractor cannot bill for hours that are not worked, because "when they issue an invoice to the government, they are certifying that those hours were worked." ECF 292 (Sulewski testimony), at 121; *see id.* at 119, 122 (stating that a contractor cannot bill for work that is not performed); *see also* ECF 298 (Tr. 1/31/23, testimony of Jonathan

---

[20] The defendant has never claimed that she thought she had a right to bill for whatever hours were allocated to the PM pursuant to the Contract.

Nace), at 172 (stating that, even in a FFP–LOE contract, a contractor "can only bill for the hours . . . worked against the contract"); *see also id.* at 231 (stating that a contractor "can only invoice . . . the government, for hours that were worked against the contract"); ECF 297 (Jonathan Smith testimony), at 218 (stating that individuals can only bill for what they work).

In effect, the specified hours are an estimate of the hours that will be needed to do the work. ECF 295 (Tr. 1/26/23, testimony of Keith Benderoth), at 190.  And, Guinther acknowledged that hours and labor categories "sometimes" get adjusted or shifted among labor categories.  ECF 297 (Guinther testimony), at 22; *see id.* at 23.  She said, *id.* at 22-23:  "Because our mission is fluid . . . they might transfer some of the hours . . . [s]o they can be adjusted.  But when that's done, it's done by modification . . . ."  *See also* ECF 296 (Shirley testimony), at 80, 81.

A Contracting Officer "is the only person that has the authority to obligate the government" with regard to an NSA contract. ECF 292 (Sulewski testimony), at 96.  Sulewski had an unlimited "warrant," meaning that she had the authority "to obligate the government for an unlimited amount of funds."  *Id.* at 83.  Guinther, too, had the "authority" to "obligate the Government's bonds."  ECF 297 (Guinther testimony), at 14.  And, she also had an "unlimited" warrant.  *Id.* at 13; *see also* ECF 296 (Shirley testimony), at 71.

According to Sulewski, a Contracting Officer "basically takes the requirements from the mission or the customer," and then "they develop the acquisition package" and "issue a request for proposal to contractors."  ECF 292 (Sulewski testimony), at 98.  They also evaluate the proposals, culminating in the award of a contract.  *Id.*  Thereafter, the Contracting Officer is responsible for "administrating the contract," which includes "changes that arise throughout the life of the contract," such as "place of performance" and "modifications."  *Id.* at 100.  They are assisted by Contract Specialists.  *Id.* at 100-03.

In addition, a Contracting Officer works with a Contracting Officer's Representative to oversee the administration of a contract. *Id.* at 104. They are referred to as CORs. *Id.* In particular, there are both administrative and technical CORs. *Id.* at 105-08. A Contracting Officer is also assisted by a "Contract Specialist." ECF 297 (Guinther testimony), at 14, 15.

Guinther testified that she worked "hand-in-hand" with NSOC, the mission customer for the Contract, to help NSOC draft the Statement of Work, the request for proposal, and in "guiding the team in evaluating" proposals, and "then ultimately awarding the contract." *Id.* at 14; *see also* ECF 296 (Shirley testimony), at 71. Guinther recalled that she is the one who "signed off" on the Contract for NSA. ECF 297 (Guinther testimony), at 17, 18. As indicated, she explained that the Contract is a FFP-LOE contract. *Id.* at 18.

According to Sulewski, any change to a contract must be made by way of a contract modification, and generally it must be signed by both parties to the contract. ECF 292 (Sulewski testimony), at 143. Similarly, Guinther testified that only a Contracting Officer is permitted to make any changes or modifications to the terms of a government contract. ECF 297 (Guinther testimony), at 14. And, all changes must be in writing. *Id.* at 15.

During her testimony, Sulewski reviewed various modifications to the Contract. *See* GX 32(a)-32(n); ECF 292 (Sulewski testimony), at 144-61. The evidence showed that Craig Plunkett was the individual from ITK who usually signed the Contract modifications. ECF 292 (Sulewski testimony), at 144-61.

The Contract specified: "Effort performed in fulfilling the total level of effort specified [in the Contract] shall only include effort in direct support of the contract . . . ." GX 28(a), § B.4(c). The Contract does not permit billing for travel, lunch, or work performed at an "employee's residence or other non-work locations, or other effort which does not have a specific and direct

contribution to [the] tasks described . . . ." *Id.* According to Sulewski, this section of the Contract is "basically saying if the contractor was not working at [NSA], they cannot bill for that time." ECF 292 (Sulewski testimony), at 122. She added that "work that was done but is not in direct correlation to the statement of work of the contract" is "not billable." *Id.* at 122-23.

A contract is funded by way of a Technical Task Order ("TTO"). ECF 297 (Guinther testimony), at 25; *see* GX 28(a), § H.13. A TTO "specifies what hours and labor categories the government is authorizing to the contractor." ECF 297 (Guinther testimony), at 25. It "describes in more detail the work that a contractor should do in accordance with the statement of work for the contract." ECF 292 (Sulewski testimony), at 127; *see id.* at 132. They are regularly updated. *Id.* at 127; *see* GX 31(a) through GX 31(n).

The Contract includes "deliverables" that the contractor must provide. ECF 292 (Sulewski testimony), at 118-19. This refers to items such as monthly status reports. *Id.* at 119. Status reports indicate the work that the contractor has "accomplished in a given month . . . ." *Id.* at 140. The Contract also includes "CDRL Deliverables," which refer to the "contract data requirements list[.]" *Id.*

As noted, defendant served as PM for the Contract from March 2016 through September 2017.[21] Each Statement of Work provided that the Program Manager was "responsible for managing all aspects of the contract and TTOs issued under [the Contract]." *See* Section 4 of GX 30(a)(1), 30(a)(2), 30(a)(3), 30(a)(4), 30(a)(5). Moreover, the PM was to "function as the official Point of Contact (POC) with the Government" on matters relating to Contract performance. *Id.*

---

[21] Defendant also served as InfoTeK's PM during 2012 and 2013. The earlier period is not in issue, although it was referenced at trial. *See, e.g.*, ECF 295 (Benderoth testimony), at 167-69; ECF 297 (Smith testimony), at 210; ECF 298 (Smith testimony), at 41.

In addition, the responsibilities of the Senior Program Manager are described in an appendix to each SOW. *See*, *e.g.* GX 30(a)(4) at 11. The appendix states that the PM is responsible "for overseeing the planning, execution and performance of all activities associated with the contract." *Id.* Further, the PM is "[r]esponsible for hiring and staffing personnel for the program to ensure mission requirements are met." *Id.* The PM also resolves "work discrepancies" and "ensures compliance with contract requirements." *Id.* Moreover, the PM serves as the "primary representative with the Government regarding the status of the program, program deliverables and any contractual matters." *Id.* The PM also has "[p]rimary responsibility for financial/budget management." *Id.* And, the PM "[s]erves as the primary interface to other subcontracting companies" with regard to the tasks. *Id.*

As mentioned, the substantive work required by the Contract was technical and it was classified. ECF 292 (Sulewski testimony), at 112. Therefore, the technical work had to be done at NSA, located on the grounds of Fort Meade. In particular, the work of the Contract was performed for NSOC, which is located in the "OPS1" building at NSA. ECF 292 (Sulewski testimony), at 92, 107. The OPS1 building is one of the "Big Four" buildings at NSA. *Id.* at 84-85.

Section F.6 of the Contract (GX 28(a)) concerned the place of performance of the Contract, and it provided that all work was required to be performed at "the government site" unless "written approval" was obtained in "advance" from "the contracting officer." *See* ECF 292 (Sulewski testimony), at 124. Moreover, there were no modifications to the Contract that changed the place of performance. *Id.* at 125.

According to Sulewski, if NSA were going to permit a contractor to work off-site, the Contract would include a place of performance clause that "indicated work at another location."

22

*Id.* at 124.  Guinther testified that if a particular labor category position is to be performed on-site at NSA, the contractor cannot unilaterally decide to work off-site.  ECF 297 (Guinther testimony), at 41-42.  Although InfoTeK never obtained formal authorization from NSA to work at any location other than NSA, the government concedes that "there were some limited administrative functions . . . that some NSA personnel believed a [PM] could appropriately handle from outside the NSA's secured facility."  ECF 97, ¶ 5; *see, e.g.*, ECF 300 at 119-23; ECF 305 (Tr. 2/13/23), at 148-49.[22]

NSA is a secure facility and any person entering a building at NSA must "scan" a "badge" to enter.  ECF 292 (Sulewski testimony), at 86.  The system is referred to as "Access Control" or "Confirm."  *Id.* at 86, 87; *see also* ECF 293 (Hazenstab testimony), at 119, 123.  Through this system, NSA keeps "track" of people going in and out of its various buildings.  ECF 292 (Sulewski testimony), at 87.

Communications with NSA are generally sensitive, and therefore most must occur by what is referred to as the "high-side."  *Id.* at 88.  The "high-side" pertains to the classified, top secret network at NSA, and is in contrast to the "low-side," which is not classified.  *See, e.g.*, ECF 297 (Tr. 1/30/23, testimony of Jason Doyle), at 108; ECF 292 (Sulewski testimony), at 88.  A security clearance is required to access the high side.  ECF 292 at 88.  Lync messages are text messages on the high side network.  *See, e.g.*, ECF 295 (Benderoth testimony), at 10; ECF 292 (Sulewski

---

[22] The Court instructed the jury that defendant was permitted to work off site for some of her duties.  The Court stated, in part, ECF 305 at 149-50:  "The Government does not contend that the Defendant violated the law if she worked off-site.  However, the Government's position . . . is that evidence of whether and when the Defendant was present at NSA is relevant to the question of whether she was working as program manager because some of the work on the Ironbridge contract concerned classified matters that could not be done off-site."

testimony), at 92.  An individual "can't reach the high side from an unclassified network, like the internet."  ECF 297 (Doyle testimony), at 108-09; *see* ECF 292 (Sulewski testimony), at 88-89.

NSA contractors are not permitted to bring their own cell phones or laptop computers on-site.  ECF 292 (Sulewski testimony), at 87, 88.  Sulewski recalled that in 2016 and 2017, "when you [were] on the low-side . . . you could not send emails to the high-side, you could not communicate with people if you were on the low-side to those that were on the high-side."  *Id.* at 89.  While at NSA, you can call "the outside world" on a low-side phone, but you cannot use a low-side phone to call someone on the high-side.  *Id.* at 90.  And, a person who is not on-site at NSA can access the high-side only "[i]f they have an approved NSA accredited SCIF."  *Id.* at 88.  Sulewski explained that a "SCIF" is a secured and approved facility where classified information can be stored.  ECF 292 at 88-89.[23]

ITK did not have a SCIF.  ECF 293 (Tr. 1/24/23, testimony of Lori Hazenstab), at 139.  Jason Doyle, the technical lead on the Contract for ITK during the relevant time, testified that ITK could not access the high side from its corporate office.  ECF 297 (Tr. 1/30/23, Doyle testimony), at 109.

In accordance with the Contract, InfoTeK billed NSA on a monthly basis.  ECF 292 (Sulewski testimony), at 125.  The invoice is based upon the level of effort allegedly expended by each of its employees in each position, *i.e.*, the hours that the ITK employees worked.  *Id.* at 164.  The COR is "required to ensure that the hours that are on the invoice are in accordance with the contract and the technical task orders for each labor category."  *Id.* at 126.  The government has approximately seven days to pay an invoice.  *Id.* at 125.

---

[23] The acronym refers to "sensitive compartmented information facility."  *See* Fed. R. Evid. 201.

ITK personnel used a timesheet software program provided by Unanet, Inc. to record their billable time with respect to Ironbridge.  *See* GX 22(c)2 to GX 22(c)13; GX 25(a), GX 25(b), GX 25(c).  In general, ITK generated monthly invoices that reflected the billing information for hours worked for the prior month by ITK employees.  *See, e.g.*, ECF 293 (Tr. 1/24/23, testimony of Shilo Weir), at 31-35.  Each invoice reflected, *inter alia*, the hourly billing rate for InfoTeK's various personnel, as well as the hours they had worked on the Contract in the particular month and the amount ITK was billing for their services.  Each invoice also listed the total hours worked and the total dollar amount submitted for payment.  Moreover, the invoices included a certification from ITK as to the accuracy of the hours and charges presented.[24]

When the Contract was initially awarded, most positions were allocated at 800 hours, including the PM.  *See* GX 28(a), § B.4.  On July 28, 2012, Guinther sent an email to ITK's Craig Plunkett, with a copy to the defendant and others.  GX 27(e).  The email said, in part, *id.*: "Also, I wanted to address the PM, due to the relatively small size of the contract the Government does not believe it requires a full-time on-site PM.  However, we understand that off-site PM hours are needed to generate reports, process TTO, etc.  I will work with Karen [Blevins] on revising the SOW so that it is more reflective of an off-site PM and we will be requesting a proposal for the off-site PM hours."  *See also* ECF 297 (Guinther testimony), at 51, 52.  However, it does not

---

[24] Defendant testified at trial that Dwayne Preston, ITK's former Chief Financial Officer, tampered with and altered her time records.  *See, e.g.*, ECF 303 (Tr. 2/7/23, testimony of Jacky McComber), at 22-31.  Preston testified as a rebuttal witness.  ECF 304 (Tr. 2/9/23).  He denied that he changed defendant's time records.  *See, e.g., id.* at 95.  But, again, I only consider here the evidence presented by the government in its case-in-chief.

I note that InfoTeK has sued Preston in federal court in Maryland, alleging, *inter alia*, unlawful access to InfoTeK's Unanet system.  The case is pending before Judge Catherine Blake. *See* CCB-18-1386.

appear that the Contract was ever modified on this basis.[25]  And, for option years three and four, the PM was designated as a full-time position.  ECF 292 (Sulewski testimony), at 129-30.

In total, from March 14, 2016 through September 8, 2017, InfoTeK billed NSA for 2,603 hours of work allegedly performed by defendant.  Of that time, she was on-site at NSA for about 259 hours.  NSA paid ITK a total sum of $388,878.78 in connection with those invoices.  *See* GX 1(a) to 19(a); GX 1(b) to 19(b); GX 21(a); GX 22(c)(1) to GX 22(c)(13); GX 25(c).

Defendant succeeded Raynett Colston as PM.  Colston served as ITK's Senior Program Manager from mid-2013 until mid-March of 2016.  During a 19-month period of time, comparable in length to the period at issue in the Superseding Indictment, Colston billed for 2,525.5 hours.  And, during that 19-month period of comparison, Colston was only on-site at NSA for about 258 hours.  *See* Defense Ex. 45.1; ECF 298 (Tr. 1/31/23, testimony of Raynett Colston), at 123-24.[26]

By letter dated August 23, 2017, an anonymous whistleblower wrote to NSA, claiming billing fraud by defendant.  *See* GX 23(a).  In the letter, the whistleblower provided fourteen dates for which she believed that defendant improperly billed NSA.  *Id.*

The whistleblower, later identified as Shilo Weir, testified as a government witness at trial.  She served as Chief Operating Officer of ITK from September 2016 through October 2017.  ECF

---

[25] Defendant contends that she was authorized to work off-site, either expressly or by tacit approval.  Former defense counsel found a purported letter in ITK's files from Guinther, dated October 10, 2012, authorizing the PM to work off-site because "there is no longer a need for a full-time on site program manager."  The letter was not disclosed by the defense until February 25, 2022, shortly before what was then a trial date of April 4, 2022.  ECF 382 (Tr. 11/16/23), at 10; ECF 84-1.  The government disputed the authenticity of the letter, and the defense did not introduce it at trial.  In November 2023, the Court held evidentiary hearings concerning issues pertinent to sentencing, including the authenticity of the letter.  *See* ECF 377; ECF 378; ECF 379.

[26] In light of the comparability in positions between Colston and the defendant, McComber argues that it was not reasonable for a jury to find that defendant's hours were materially inflated.  ECF 359 at 13.

293 (Weir testimony), at 9, 13, 21.  Weir described herself as "the second in command" at ITK and "the number 2" person in the Company.  *Id.* at 11, 51.

According to Weir, beginning approximately November 2016, ITK relocated its office to an "interim" office while searching for "a better office space . . . ."  *Id.* at 18.  Defendant owned the building where the interim office was located, referred to as the Farmhouse, and ITK occupied it for about two months.  *Id.* at 18-19; *see* GX 42 (photo of the Farmhouse).  Weir described the Farmhouse as "very small" and said, ECF 293 at 19: "We all shared offices.  So the four primaries were in one room . . . ."  Even when ITK moved to a new office location, defendant and Weir "shared an office," beginning early 2017 and continuing until Weir left ITK in October 2017.  *Id.* at 20, 21.  Weir observed that privacy was "limited," and she was "aware" when defendant was "present" at the office.  *Id.* at 21.  She could also hear defendant's end of telephone conversations.  *Id.* at 22.

Weir recalled that ITK was the prime contractor on both Ironbridge and a contract with NSA called "Silent Roar."  *Id.* at 14, 15.  ITK also had "a handful of other subcontracts."  *Id.* at 14.  According to Weir, Jason Doyle, ITK's technical lead on the Ironbridge Contract, "managed the day-to-day work of what a project manager would have done . . . ."  *Id.* at 24.  Weir claimed that defendant "only knew what Jason Doyle told her."  *Id.* at 25.

The prosecution asked Weir about her observations as to how defendant spent her time from late summer of 2016 until Weir left ITK in October 2017.  *Id.* at 22.  Weir responded, *id.*: "She was the chief executive officer.  She did a number of things from meeting with potential partners and clients, to directing the work of the recruiters, to visiting and, you know, trying to find the new office locations, managing the renovation of the new location.  She was in charge of

the entire company.  She did a little bit of everything."  Weir also claimed that defendant spent considerable time on marketing activity for ITK.  *Id.* at 23.

In addition, Weir was asked how much time defendant worked on the Contract.  *Id.*  She responded, *id.* at 24:  "Minimal to none."  Moreover, Weir estimated that defendant spent only 25% of her time at ITK's office.  *Id.* at 25.[27]  And, even when defendant was at the office, Weir claimed that defendant spent her time "directing the work of recruiters," talking to ITK's Craig Plunkett, vice-president for contracting (*id.* at 12), and discussing "potential future work."  *Id.* at 25-26.  According to Weir, defendant was not talking to or working with government employees in regard to the Contract.  *Id.* at 27.  Nor did ITK employees who worked at NSA meet with defendant at ITK's office.  *Id.* at 38-39.

Dwayne Preston was ITK's Chief Financial Officer for a portion of the relevant time.  ECF 298 (Tr. 1/31/23, testimony of Paul Rooney, Jr.), at 140.  He left ITK in approximately March of 2017.  ECF 293 (Weir testimony) at 31.  At that time, Weir assumed responsibility for approval of defendant's time records.  *Id.* at 30-31, 36.  This included certifying the accuracy of them.  *Id.* at 30, 36.

Initially, Weir had "no reason" to question the hours that defendant reported as work in regard to the Contract.  *Id.* at 37, 40.  But, in June 2017 Weir realized that while defendant was on vacation, she reported time to the Contract.  *Id.* at 38, 40-41.  At that point, Weir believed that McComber "was billing the government for work she wasn't performing."  *Id.* at 40; *see also id.* at 47.

---

[27] Paul Rooney, Jr. was President of ITK from February 2014 to February 2015.  ECF 298 (Tr. 1/31/23, testimony of Paul Rooney, Jr.), at 140, 151.  He claimed that defendant focused "largely" on "business development" and was not at the ITK office "very often."  *Id.* at 146.  He also recalled that defendant was only present at ITK "a couple hours a week."  *Id.* at 146-47.

Weir's observation led her to compare some of defendant's earlier time records to publicly available information, which she used to ascertain defendant's whereabouts. *Id.* at 44. Eventually, despite Weir's efforts to verify the accuracy of defendant's time submissions, she concluded that she could not determine whether the hours that defendant reported were accurate. *Id.* at 43-44. So, Weir "decided to write a letter to authorities . . . ." *Id.* at 43; *see id.* at 49-50; GX 23(a). In the letter (GX 23(a)), addressed "To Whom It May Concern," Weir outlined twelve periods of "timecard/billing fraud" by defendant in connection with the Contract, with a total of fourteen dates. *See* GX 23(a); *see also* ECF 293 (Weir testimony), at 50-56, 99-103.

Lori Hazenstab had a career of some 38 years in law enforcement before she retired from government service in August 2021. ECF 293 (Tr. 1/24/23, testimony of Lori Hazenstab), at 109-14. In 2015, she transferred from the Department of Homeland Security to NSA's Office of the Inspector General (*id.* at 114), where she worked as a senior investigator. *Id.* at 109. While at OIG, Hazenstab's duties included investigation of labor overcharging by government contractors. *Id.* at 115. She was the case agent on this matter until her retirement, and her investigation concerned alleged "labor mischarging" by defendant. *Id.* at 114, 115, 120, 124.

In response to the whistleblower letter, Hazenstab requested defendant's "access control" information at NSA. *Id.* at 119; *see also* ECF 294 (Tr. 1/25/23, Hazenstab testimony), at 167-68. She also obtained records pertaining to the time that defendant billed NSA for her work in regard to the Contract. ECF 293 (Hazenstab testimony), at 126-27. In particular, Hazenstab obtained ITK's billing information from ITK's Craig Plunkett. *Id.* at 127.

Hazenstab explained the "Confirm Hours" or "Access Control" system used by NSA. As reviewed earlier, it is a swipe system by which a person badges in and out to enter and leave buildings at the NSA complex, which "goes into the computer system." *Id.* at 119; *see id.* at 123;

*see also* ECF 292 (Sulewski testimony), at 86-87.  Hazenstab added that "a unique code" is "assigned" to every individual.  ECF 293 at 119.  She also described the NSA complex, which consists of several buildings.  *Id.* at 121-22; *see also* ECF 292 (Sulewski testimony), at 84-85.

According to Hazenstab, if a PM is not within Access Control, it limits the work that can be done by the PM with respect to the Contract.  ECF 293 (Hazenstab testimony), at 137.  For example, the PM could not meet with government officials or talk to ITK employees who were on-site about the Contract; telephoning is possible but emailing is limited.  *Id.* at 138.  Hazenstab also explained that defendant could only check or send high-side emails if she were on site at NSA or had a "SCIF" for her use off-site, *i.e.*, a secure facility.  *Id.* at 139.  And, as noted, ITK did not have a SCIF.  *Id.*

Based on the investigation, NSA determined that defendant was not present at NSA for approximately ninety percent of the total hours that she had recorded on her timesheets and that InfoTeK billed to the NSA.  *Id.* at 119; GX 1(c) to GX 19(c); GX 21(a); GX 21(b).  In particular, ITK billed NSA for 326 days of defendant's time, and defendant was not in Access Control at NSA at all on 218 of those days.  ECF 293 (Hazenstab testimony), at 135; ECF 294 (Hazenstab testimony), at 170-71; GX 1(c) to GX 19(c); GX 21(b).  And, ITK billed NSA eight hours per day for the defendant on more than 200 of the dates for which she billed.  GX 21(a); GX 21(b); GX 22(b).

The prosecution reviewed with Hazenstab what NSA's access control records showed, as well as defendant's billing records.  For example, Hazenstab recounted that defendant had eighteen consecutive no-access days from January 25, 2017 to February 21, 2017.  ECF 293 (Hazenstab testimony), at 140.  On February 22, 2017, defendant was at NSA for just one hour and forty minutes.  *Id.* at 141.  Moreover, the government introduced evidence that showed that on many of

the dates when defendant billed eight hours to the Contract, she was either out-of-town, or attending a charity event, or tending to personal matters, or working on other ITK business, or engaging in business development. *See*, *e.g.*, GX 22(a); GX 22(i); 22(j); 22(k); 22(l); 22(m); 22(n).

Hazenstab recounted that, at the relevant time, ITK was a party to the "Silent Roar" contract with NSA. ECF 293 (Hazenstab testimony), at 134. The personnel for Silent Roar were located in the "R&E" building at NSA. *Id.* But, the R&E building is "not associated" with NSOC or Ironbridge. *Id.* at 133. As noted, NSOC is located in the OPS1 building. *See* ECF 292 (Sulewski testimony), at 92, 107. And, defendant did not hold a billable position on Silent Roar. ECF 293 (Hazenstab testimony), at 134.

On October 3, 2017, defendant submitted to a recorded interview conducted at NSA by NSA-OIG investigators Hazenstab and Ricky Phaison. *See* GX 20(b) (McComber Interview Transcript); ECF 293 (Hazenstab testimony), at 148-77; ECF 294 (Hazenstab testimony), at 5-10. At the time of the interview, defendant was under oath. GX 20(b) at 3. Prior to the interview, defendant was informed that the subject matter concerned the "allegation of labor mischarging", by which defendant allegedly "had submitted hours that she did not work." *Id.* at 2. She was also told her statements could be used against her in a criminal case, that the interview was voluntary, and that she was not required to answer any questions. ECF 293 (Hazenstab testimony), at 150. Defendant signed an Acknowledgement on the Warning Form. *See* GX 20(a).

The audiotape of the interview was played for the jury. ECF 293 (Hazenstab testimony), at 178. However, I shall refer to the transcript.

During the interview, defendant was asked: "[W]hat exactly do you do [as PM]? What are your duties?" GX 20(b) at 10. Defendant responded, *id.*: "I manage the staff, I take care of all the financials on the contract." She added, *id.* at 11: "I manage the staff. I manage any issues - -

on the program."  She also claimed that she made sure "we have funding . . . ."  *Id.*[28]  Further, she said that she makes "sure all the staff stay trained," that "clients are happy with what is being delivered," and she is "responsible for interviewing, vetting, [and] hiring" staff, and that she "mak[es] sure that all of those things stay up to date."  *Id.* at 12; *see also id.* at 19.

In addition, defendant noted that ITK had "a compliancy issue with agency-changed protocol on web pages" and so she "was negotiating with the vendors" for "assistance."  *Id.* at 14.  Among other things, she explained that "we worked" with vendors for testing computer management "tools."  *Id.* at 15.  However, she said, *id.* at 13:  "I'm not a tech person."  Nor does she "write code."  *Id.*

Defendant was asked where she does her work.  *Id.* at 16.  She answered, *id.*:  "I hotdesk, so I don't have a desk [at NSA], I have a space."[29]  She claimed that the "majority" of her work "is done outside" of NSA, and that she meets staff at her "corporate office."  *Id.*; *see also id.* at 23.  Defendant said, *id.* at 16:  "I don't have a desk, so I don't have anywhere for storage, I don't have anywhere for information, so I keep all that at my corporate office."  And, she said, *id.*:  "[T]he staff will come there and meet me at different times to do different things . . . especially, you know, the problems with the web pages, the TLS problem - - I do a lot of that work outside of her[e]."  Defendant added, *id.* at 17:  "I'm not stationed here [*i.e.*, NSA] full time."

Additionally, defendant said, *id.* at 27:  "[W]e have VPN access . . . so I can get to my information in working on the different things."  And, defendant claims that "it's always been" that she "can hotdesk" and could "work wherever, as the PM, everybody else has to physically be

---

[28] In regard to ITK's work in connection with the Contract, defendant sometimes said "We", in contrast to "I."

[29] The term "hot-desk" refers to the practice in an office of allocating available desks to workers, rather than assigning a specific desk.  *See* Fed. R. Evid. 201.

here [*i.e.* at NSA] . . . so I just do work." *Id.* at 27-28. And, she said, *id.* at 28: "Yeah, there's lots of times that [I] . . . do it from wherever." Moreover, defendant claimed that she was told to "work it that way," despite the Contract requirement that the work must be done at NSA. *Id.*

According to defendant, it was "sort of a waste of time" for her to go to NSA "to just walk around"; she could not "do any functional work" at NSA, because she did not have a desk. *Id.* at 30. McComber acknowledged that the "bulk" of her time was not spent at NSA. *Id.* at 23. And, she said: "[M]y badge swipes aren't going to match my work . . . I don't have a desk." *Id.* at 16; *see also id.* at 22. But, she noted, *id.* at 23-24: "[T]hat has never been a problem, because there's no desk, and in fact, I just got an e-mail yesterday – high side, again, about desks and space . . . [T]hey're going to Hotdesk, I mean, because they're out of space."

Hazenstab pointed out that the Contract provides for "work performance" at NSA. *Id.* at 17. Defendant responded that, "since the inception of the entire contract," she was told there was no desk for the PM at NSA, and "so you just gotta Hotdesk, and then work from your corporate, and just come in and out. I mean, that was just the answer given. We weren't given a waiver . . . ." *Id.* Defendant also said, *id.* at 28: "Yeah, there's lots of times that I'm, you know, [working] from wherever."

According to the defendant, "a lot of the PM hours" assigned on the Contract were "shifted" to other labor categories, as needed. *Id.* at 22. She explained, *id.* at 20: "[W]e always seem to have extra hours in the PM labor category." And, she added, *id.* "[W]e move hours around as we need them in different labor categories . . . ." *See also id.* at 21. When defendant was asked if hours are "more likely" to be "taken out of [her] category," she answered "Yes." *Id.* at 21.

In addition to addressing defendant's work on the Contract, defendant explained, *id.* at 24: "I run a company . . . I have a lot of work." According to defendant, her work includes proposals,

"staffing issues," and "strategic planning." *Id.* at 25.  And, "it's constantly refining the strategy of the company to keep people happy and engaged . . . ." *Id.*

Moreover, defendant claimed that she works "on Saturdays," and "in the wee hours of the morning" and "late into the night. . . ." *Id.*  She also works while on vacation. *Id.* at 26.  And, her staff and the customers "can pretty much call [her] 24-7," and she will respond. *Id.* at 27.

With regard to defendant's time records for the Contract, Hazenstab noted, "with all that - - all of that going on" (*id.* at 25), "I have to ask you . . . . How do you . . . fill out a time sheet . . . ." *Id.*  Defendant answered, *id.* at 26:  "Well, because I have to fill it out every day . . . . And I do my billable hours."  She added, *id.*:  ""The other hours are sort of extraneous, and it doesn't really matter for this contract.  It's a -- it's an FFP-LOE . . . [S]o it's the billable hours that are the important hours, that I have them accurate and I have them right on here . . .  And I mark my time card."

Defendant was again asked, *id.* at 29:  "So, as far as, you know - - you said you fill out a timesheet every day."  Defendant responded, "Yes."  *Id.*  Further, defendant was specifically asked:  "Did you ever falsely fill out that timesheet?"  *Id.*  She answered:  "No."  *Id.*  Then, she was asked:  "Put any false information on it?"  *Id.*  Again, she answered "No."  *Id.*

Hazenstab asked defendant if she was "part-time" with regard to the Contract.  *Id.* at 18; *see id.* at 31.  Defendant twice answered, "Mm-hmm."  *Id.* at 18; *see id.* at 31.  Defendant explained that there had been "resignations" (*id.* at 19), because it was the last year of the Contract.  *Id.* at 18.  So, she "was involved in the interviewing, staffing and working with the customer . . . ."  *Id.* at 19.  And, she said, *id.*:  "We had a number of POP-mods this year that -- working through those.  I mean, not full time, no, but . . . two thirds."  Then, she said, *id.* at 20:  "[I]t's about three quarters . . . ."

34

Hazenstab pointed to multiple instances when defendant claimed to have worked "8-hour days." *Id.* at 31.  Hazenstab then asked defendant if that "accurate." *Id.*  Defendant answered, *id.*: "Yes, that is accurate, because I - - I monitor my time throughout the day on what I'm doing for IronBridge and what's against IronBridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it."  She added, *id.*: "And I was working a lot of time . . . with the outside vendors" in connection with the Contract.

McComber acknowledged that she was in Texas from April 10 to 12.[30]  *Id.* at 32.  But, defendant asserted, *id.* at 34: "I did actually work when I was down there . . . ."  For example, she recalled conference calls with staff.  *Id.*

However, defendant conceded an error in billing the government for her trip to Georgia in June 2017.[31]  *Id.* at 35-37.  But, defendant attributed the error to an assistant.  *Id.* at 37.  She added, *id.* at 39: "But everybody does make a mistake."  Defendant also conceded an error with respect to an 8-hour billing to the Contract on a day when defendant participated in a golf outing in May 2017.  *Id.* at 43-44.[32]

After the interview of defendant, beginning on October 16, 2017, defendant's prior attorney, Andrew Hallowell, contacted Hazenstab.  ECF 294 (Hazenstab testimony), at 15-16.  In an email from Hallowell to Hazenstab on November 2, 2017 (GX 23(b)), Hallowell wrote, in part, *id.* at 3: "To follow-up on the issue of Ms. Kimmel's off-site work as Program Manager, she has been clear that this arrangement was approved by the Ironbridge contracting office."

---

[30] Hazenstab did not specify the year.  But, in context, it appears to have been in 2017.

[31] Again, the investigator did not provide the year.

[32] Once again, the year was not mentioned.

Hallowell also wrote, *id.* at 2: "As I have mentioned, ITK very strongly believes that certain individual(s) gained unauthorized access to its time-keeping system, and tampered with [defendant's] hours."  The intrusion into ITK's Unanet System occurred in mid-July of 2017.  GX 23(b) at 3; ECF 294 (Hazenstab testimony), at 17.  However, according to Hazenstab, by the time of the intrusion into ITK's Unanet timekeeping system in July 2017, NSA had already paid sixteen of the nineteen invoices in issue.  ECF 294 at 17-18.

Then, in a letter of November 10, 2017, sent via email, Hollowell addressed twelve of the fourteen dates of concern identified by Weir in her whistleblower letter.  ECF 294 at 21; *see* GX 23(b) at 9-11.[33]  Out of the twelve dates, Hallowell acknowledged errors in billing as to nine of them.  ECF 294 at 35.  Specifically, he acknowledged 60 hours of overbilling.  *Id.*  And, at a billing rate of $150 per hour, that time was valued at $9,000.  *Id.*; *see also* GX 23(b).  Only 36 hours were properly billed.  ECF 294 at 36.

The government reviewed with Hazenstab each date mentioned in the whistleblower letter that Hallowell had addressed, and what he related from the defendant.  ECF 294 at 22-38.  For example, NSA believed that defendant was in Texas from April 10, 2017 to April 12, 2017.  *Id.* at 22.  Defendant billed eight hours to the Contract for each day.  *Id.* at 23-25.  But, Hallowell indicated that defendant later recalled that, as to April 10, 2017, she only worked one hour on the Contract and three hours were actually devoted to overhead and "G and A" (*i.e.*, general and administrative).  *Id.* at 23, 29.  Moreover, four hours should have been used for vacation time.  GX 23(b) at 9.

---

[33] Hallowell did not address the dates of June 26 and June 27 of 2017, when defendant allegedly took time for the refinancing of her house.  ECF 294 at 21-22.

For April 11, 2017, Hallowell advised that defendant had only worked three hours on the Contract, rather than the eight hours that she billed. ECF 294 at 24. But, according to Hallowell, defendant claimed that she accurately billed the eight hours for April 12, 2017, because she had returned early from Texas on April 11, 2017, rather than April 12, 2017. *Id.* at 25.

As for May 12, 2017, defendant participated in a charity golf tournament for another company. *Id.* at 25-26. Defendant billed eight hours to the Contract. But, Hazenstab was told by Hallowell that "the eight hours were actually business development." *Id.* at 26; *see also* GX 23(b) at 9.

With respect to May 15, 2017, defendant participated in another charity golf outing. ECF 294 at 27. And, according to Hallowell, defendant recalled that 6.5 hours were for "Overhead and G&A." *See* GX 23(b) at 10. So, Hazenstab testified that defendant "had actually worked two hours toward the Ironbridge Contract instead of the eight that was reported." ECF 294 at 27. As to those two hours, defendant claimed she worked with Jason Doyle on "ongoing TLS compliance issues" and other substantive Contract matters. GX 23(b) at 10.[34]

Concerning June 5, 2017, defendant played in a charity golf event in Virginia. ECF 294 at 29. This was part of ITK's "Community Giveback effort . . . ." GX 23(b) at 10. Therefore, Hallowell indicated that the eight hours billed on the Contract for defendant were incorrect, and all eight hours should have been charged to "overhead and G&A." ECF 294 at 29-30.

On June 14, 2017, defendant traveled to Georgia in regard to a "potential contract." *Id.* at 30. Hallowell indicated that defendant recalled working two hours on Ironbridge, rather than the eight hours that were billed to NSA. *Id.* But, as to the two hours, defendant claimed that she was

---

[34] As discussed, *infra*, Doyle's testimony was generally inconsistent with that assertion.

"'intermittently supporting'" Contract issues for Jason Doyle and other ITK personnel.  *Id.*; *see* GX 23(b) at 10.

With respect to June 15, 2017, when defendant was in Georgia, Hallowell represented that defendant spent two hours of work on the Contract, rather than the eight hours that were charged. ECF 294 at 31.  But, he also claimed that defendant again provided Contract support to Doyle and others.  *Id.*; *see* GX 23(b) at 11.

As to June 16, 2017, the last day of defendant's trip to Georgia, Hallowell related that the eight hours billed by defendant to the Contract were incorrect.  ECF 294 at 31.  Rather, defendant worked only two hours, with the same explanation as provided above, *i.e.*, that she provided assistance to ITK employees who worked at NSA.  *Id.* at 31-32; *see* GX 23(b) at 11.

Regarding June 22, 2017, Hallowell wrote that defendant did, in fact, work eight hours on the Contract.  GX 23(b) at 11.  He claimed that, according to defendant, due to work obligations, she worked a full day on the Contract before heading to Virginia Beach to attend her high school reunion.  *Id.*

With respect to June 23, 2017, defendant billed eight hours to the Contract while she was at her high school reunion in Virginia.  ECF 294 at 33.  But, according to Hallowell, five hours should have been allocated to overhead and G&A and three hours to vacation.  *Id.*  Nevertheless, Hallowell also claimed that defendant "attended two business development meetings while in Virginia Beach . . . ."  GX 23(b) at 11.

From July 2011 to March 2016, Michael Kemp was ITK's technical lead on the Contract. ECF 296 (Tr. 1/27/23, testimony of Michael Kemp), at 164-65, 171.  Kemp stated that the PM was not involved in "daily tasking . . . ."  *Id.* at 169.  Even when Kemp transitioned the technical lead

duties to Jason Doyle, Kemp claimed that defendant was not involved in that process.  *Id.* at 172.
Nor did he have regular meetings with the defendant in regard to the Contract.  *Id.*

Kemp recalled that he decided to leave ITK because he "was a little tired about getting
called [by the government] in the middle of the night."  *Id.*  However, he did not recall contact
with the defendant to deal with problems concerning Ironbridge.  *Id.* at 173.

Jason Doyle joined ITK in 2009.  ECF 297 (Tr. 1/30/23, testimony of Jason Doyle), at 95.
He began working on the Contract in 2013.  *Id.* at 96.  And, in 2016, Doyle succeeded Kemp as
the technical lead on the Contract.  *Id.* at 102.  At the time, defendant was the PM for the Contract.
*Id.*

Doyle claimed that, as technical lead, he was responsible for the operations of the Contract.
*Id.* at 103. His duties and responsibilities included "the tasking of everyone on the team . . . ."  *Id.*
He also managed personnel.  *Id.* at 121.  Moreover, he stated that "100 percent of [his] job" was
performed at NSA.  *Id.* at 109.  However, he attended "company meetings . . . ." at ITK's office.
*Id.* at 111.  Nevertheless, Doyle made clear that all of the ITK people who were actually working
on the Contract had to do so only at NSA.  *Id.* at 110.

As part of his duties, Doyle interacted with the key government personnel, including
Jonathan Smith, the Contracting Officer's Technical Representative ("COR-T"); Rob Bryant, the
K3 Section Chief; and Jennifer Blake, a Contracting Officer.  *See id.* at 104.  Doyle said, *id.* at
124:  "On a daily basis, I would have been interacting with them."  According to Doyle, he had
infrequent contact with defendant.  *Id.* at 109-110.  Nor did Doyle have regular meetings with the
defendant.  *Id.* at 110.  He explained that "there was never an issue that needed [defendant's]
attention." *Id.* at 109.  On occasion, however, "[m]aybe once a week, once every other week," he

had a question from the government that he could not answer, and would reach out to the defendant. *Id.* at 110.

Notably, Doyle claimed that he did not require "daily feedback" from the defendant to help him with the Contract. *Id.* at 110. He also denied that defendant was "overseeing" or handling the execution and performance of "activities" associated with the Contract. *Id.* at 123. Doyle suggested that defendant could not do so if she were not at the NSA site. *Id.* He explained, *id.*: "Because you had to be there to see what's going on and see that - - the work that needs to be done is getting done." *Id.*

Moreover, Doyle claimed that, when an issue arose outside of normal business hours, Rob Bryant would call Doyle on Doyle's personal cell phone or house phone. *Id.* at 106, 107, 108. Sometimes, the calls occurred in the middle of the night. *Id.* at 107. On those occasions, Doyle did not involve defendant. *Id.* at 107-108.

With regard to the PM's role in planning with respect to the Contract when Doyle was the technical lead, he said that "most of the contract was already laid out and planned and we already knew what we were responsible for." *Id.* at 123. But, he did not know who provided deliverables due under the Contract. *Id.* at 124-25; *see also* ECF 292 (Sulewski testimony), at 118-19 (explaining that deliverables are contract requirements and include whatever the contractor is obligated to provide, such as status reports).

According to Doyle, there was little "turnover" in employees with regard to the Contract. ECF 297 at 111. In any event, ITK "had recruiters" to find applicants. *Id.* at 111-12. And, he helped the defendant with interviews and hiring "to make sure" that the persons who were hired "could perform the task that we needed of them[.]" *Id.* at 111; *see id.* at 125. However, Doyle claimed that hiring needs did not require a substantial amount of his time. *Id.* at 125.

Jonathan Smith, a long-time NSA employee, worked at NSOC from 2011 to 2016. ECF 297 (Tr. 1/30/23, testimony of Jonathan Smith), at 176, 179, 195. In general, he worked in the field of information technology, *id.* at 184, 187, and his duties included SharePoint Software Developer. *Id.* at 177-78, 180, 193. He was also the web services development manager in K3 at NSOC. ECF 298 (Tr. 1/31/23, testimony of Jonathan Smith), at 9. And, he "inherited" the position of "Windshield program manager" (ECF 297 at 193), and later became "the backup technical COR . . ." for the Contract. *Id.* In sum, his job was "to make sure that the information flows" to decision-makers. *Id.* at 187.

Smith was already working at NSOC at the outset of Ironbridge. *Id.* at 188-89. As to the Contract, he explained: "It was all for the technology – oriented tasks." *Id.* at 190. According to Smith, he and Jason Clark, the "overall technical COR" on the Contract, both reported to Rob Bryant. *Id.* at 194. Smith "was responsible for the technical management of the work" for the Contract "to make sure that the work got done" (*id.* at 195), and Clark "was responsible for all of the paperwork," such as invoices. *Id.*; *see also* ECF 292 (Sulewski testimony), at 136 (outlining Contract responsibilities, *inter alia*, of Donald Pugh, Jason Clark, and Jonathan Smith).

After Kemp left ITK, Smith primarily dealt with Jason Doyle. ECF 297 (Smith testimony), at 196. Smith spent between 80% and 100% of his time "overseeing" ITK personnel. ECF 298 (Smith testimony), at 11.

Smith related that "information at the agency is classified" but "not everyone has the same levels of classification authority . . . ." *Id.* at 9. Smith also testified that, under the Contract, the place of performance was at NSA. *Id.* at 19. And, when asked "how much off-site work" was "available" for defendant to do as PM, Smith responded: "Very little." *Id.* at 18. Moreover, he

41

claimed that once TTO 2 was "removed" from the Contract (*id.* at 18), involving CT MMC, Info Tek could only work at NSOC. *Id.* at 19; *see also* ECF 297 at 190-92; GX 22(c).

Smith recalled that defendant had also served as PM for the Contract for fiscal year 2013 (*i.e.*, 10/1/12 to 9/30/13). ECF 297 at 210. Her ITK time sheets at that time largely reflected billings consistent with a quarter-time position. *Id.* at 210-212. And in 2014, based on Smith's contacts with the defendant, Smith reported the PM position as "Quarter time." *Id.* at 208; GX 24(a). That equated to about ten hours of work per week. ECF 298 at 8. Smith stated, *id.*: "That was all I ever saw her." *Id.*

Then, between March 2016 and October 2016, Smith again worked with defendant as PM. He believed that the defendant worked the same amount of time on the Contract in 2016 as she had previously worked in 2013 – ten hours a week. *Id.* at 41.

In April 2017, after about a six-month hiatus, Smith asked defendant for a status report with respect to the Contract. *See* GX 24(e)(1). Yet, to submit the report, defendant turned to Doyle and asked him to "mock up some quick points over the past six months" so that she could submit the requested report. *Id.* Doyle's efforts are set forth in GX 24(e)(2), dated April 4, 2017. And, on the same date, soon after defendant received the information from Doyle, defendant provided the requested report to NSA. GX 24(e)(3). Defendant's submission is virtually identical to what she received from Doyle. Compare GX 24(e)(2) at 1-2 with GX 24(e)(3) at 2-3.

According to Smith, the government expected each individual to work the number of hours assigned to his or her position. ECF 297 at 217-18. But, he added that "if they did not work, they had to bill less." *Id.* at 218. And, either party can request a Contract modification. *Id.* at 220. Moreover, he explained that a contractor must certify the accuracy of the hours it bills (*id.*) and, if the contractor bills hours that are not accurate, it "is considered fraud." *Id.* at 221.

Smith disputed the accuracy of defendant's billings.  ECF 298 at 18, 21, 22.  For example,

for the month of August 2016, defendant billed 144 hours to the Contract.  *Id.* at 21.  Yet, he

indicated that defendant was not present at NSA "anywhere close to that number of hours."  *Id.*

Smith explained that because defendant was not present at NSA, "she could not have

communicated on the high-side."  *Id.*  He also indicated that defendant "Very rarely" called or sent

"low-side" emails.  *Id.*  Moreover, he never received complaints from defendant about the lack of

a desk for her to use.  *Id.* at 6; *see* ECF 297 at 221.  Indeed, he claimed a desk "was always

available" for the defendant.  ECF 297 at 223.

As noted, Rob Bryant was the K3 Chief at NSOC, and he had worked at NSA for more

than 39 years as of the time of trial.  ECF 296 (Tr. 1/27/23), at 5.  When Bryant was asked what

percentage of work on the Contract had to be done on-site at NSOC (*id.* at 28), he responded, *id*:

"Oh, all of it."  He explained, *id.*:  "Well, it's a classified arena."  At the relevant time, he said,

"everything was done in-house.  Everything[.]"  *Id.*; *see also id.* at 29 (stating that the PM is "there

for the care and feeding of the . . . contractors that are there").  Moreover, he denied that he ever

told the defendant that she could work off-site.  *Id.* at 39-40.

According to Bryant, the PM for Ironbridge on "the contractor side would be the person

who's just managing the contractors there, their health and well-being, and . . . making sure they're

on task . . . . They're not managing the work . . . ."  *Id.* at 24.  Moreover, Bryant had no need to

interact with ITK employees on the low side "regularly" in connection with the Contract.  *Id.* at

28.

Bryant claimed that he interacted with defendant "a couple of times a month . . . ."  *Id.* at

38.  He also saw her and other ITK employees outside of NSOC.  *Id.* at 37.  But, he did not consider

that time as billable to the Contract, because "everything we do is classified . . . ."  *Id.*  Moreover,

when the defendant came to NSOC, he usually just "socialized" with her. *Id.* at 38. He explained that program managers who are company owners usually just "stop in every once in a while and see how the folks are doing." *Id.* at 39. Nor did Bryant talk to defendant after normal business hours. *Id.* at 41.

In addition, Bryant indicated that there was not much employee turnover on the Contract. *Id.* at 26. In his view, the Contract was "stable." *Id.*; *see also* ECF 296 (Shirley testimony), at 86 (stating that personnel turnover was "very, very low"). Moreover, "the contract was always doing well" and there was no need for "a lot of program management from the contractor side" or the government side. ECF 296 (Bryant testimony), at 25.

Bryant acknowledged that he did not "know what a program manager exactly has to do." *Id.* Nevertheless, he did not expect a PM to spend much time in support of the Contract, "because everything with the contract ran pretty smooth." *Id.* at 42. Upon review of defendant's hours charged to the Contract, Bryant was "surprised," because he did not know what a PM "would be doing for those many hours" if the PM was not performing mission work. *Id.* at 43; *see id.* at 44-45.

The topic of Contract deliverables was addressed with both Smith and Bryant. According to Smith, "the only deliverable due [under the Contract] was the monthly status report." ECF 298 at 30. Although Smith did not recall telling ITK that the reports were not necessary, he did not regard them as "important" or "material" to the Contract. *Id.* Similarly, Bryant testified that he did not require a lot of deliverables or reports. ECF 296 at 27. He elaborated: "I mean, we're a small organization . . . So I don't need, you know, a ton of reports to tell me what people are doing that I'm talking [with] every day." *Id.*

Donald Pugh worked at NSA for about 23 years, in various positions.  ECF 299 (Tr. 2/1/23, Donald Pugh testimony) at 18-19.  From 2015 until his retirement in September 2017, Pugh was "the primary" Contracting Officer's Representative on Ironbridge.  *Id.* at 19; *see id.* at 21, *see also* ECF 296 (Shirley testimony), at 74 (describing Pugh as the COR-A on the Contract, with responsibility as to the contractor's timesheets); ECF 292 (Sulewski testimony), at 136.  Pugh also worked with several COR-Ts.  ECF 299 (Pugh testimony), at 19-20.  In addition, Pugh worked with ITK's Craig Plunkett on financial matters.  *Id.* at 20-21, 38.  Pugh recalled that he only met with the defendant a few times (*id.* at 38), although he sometimes spoke with her by telephone or communicated by email.  *Id.* at 39.

Pugh also was a Contract Manager.  *Id.* at 19.  As both a COR and a Contract Manager, Pugh was "responsible for making sure that the contractor was applying their time" properly (*id.* at 22), and charging the government "correctly."  *Id.* at 23.  He relied, *inter alia*, on invoices and on what he referred to as Federal Man Hours Employment Reports, or "FMHERS", submitted by ITK.  *Id.* at 27, 37; *see* GX 1(b) to GX 19(b).  Sulewski referred to the reports as the "Funds and Monthly Hourly Expenditure Report."  ECF 292 (Sulewski testimony), at 165, 166.

According to Pugh, ITK's submissions of the FMHERS amounted to representations of ITK as to the hours worked by ITK personnel and that "the people they said did the work" were paid.  ECF 299 (Pugh testimony), at 47.  The Certification from ITK as to the information included the number of hours that were worked.  *Id.*  Similarly, Sulewski stated that the hours of work set forth in the FMHERS are provided by the contractor.  ECF 292 (Sulewski testimony), at 167.

Jonathan Nace, a Contract Manager, explained that a COR will rely on the contractor/vendor and the COR-T as to the accuracy of hours in a FMHER.  ECF 298 (Tr. 1/31/23, testimony of Jonathan Nace), at 168, 172; *see* ECF 292 (Sulewski testimony), at 167.

Nevertheless, Nace claimed that it is "very difficult for anybody to be able to track multiple people for every hour and every minute." ECF 298 (Nace testimony), at 168. And, he claimed it is even more difficult when the work is performed off-site. *Id.*

Nace characterized the FMHERS as "critical" with regard to reporting accurate hours. *Id.* at 169. He explained that the Agency is "really trusting and relying on them," along with "our own checks," to verify accuracy. *Id.* But, he maintained that, "ultimately, that responsibility lies with the contractor," who must certify the accuracy of the hours. *Id.*

Kristin Mair was an NSA division chief for the contract managers. ECF 299 (Tr. 2/1/23, testimony of Kristin Mair), at 80. She supervised Pugh, who was a COR-A. *Id.* at 81, 84-85. And, when Pugh retired in 2017, she assumed responsibility for the administrative aspects of the Contract, and became a COR-A for the Contract. *Id.* at 83, 85.

Although Mair was aware that defendant was the PM for the Contract (*id.* at 84), Mair's interactions with ITK regarding the administration of the Contract were "normally" with Craig Plunkett, and not the defendant. *Id.* at 93. Mair stated, *id.* at 85: "So the main person that I did talk to when I had Ironbridge was Craig Plunkett." She obtained "financials" from Plunkett (*id.* at 93), as well as FMHERS. *Id.* at 85, 86. She also noted that the Contract did not provide for "off-site rates." *Id.* at 93. And, she said, *id.*: "[O]f course, when we approve contracts, they're to work on-site or off-site."

Mair was asked: "Based on your experience as a contract manager, how much work could there even have been off-site in support of the contract?" *Id.* at 93. She answered: "Not much work." *Id.* In addition, Mair indicated that the PM cannot bill the government for "care and

feeding of staff." *Id.* at 99; *see* GX 19(d)(3).  In any event, the staff was located at NSOC.  ECF 299 at 99-100.[35]

As mentioned earlier, defendant succeeded Raynett Colston as PM.  Colston worked for ITK from July 2013 to March 2016.  ECF 298 (Tr. 1/31/23), at 51-52.  She holds a bachelor's degree in computer science and she has an MBA degree.  *Id.* at 43-45.  When Colston was hired, she had expected to serve as PM on ITK's Silent Roar contract.  *Id.* at 53.  Instead, she was assigned to serve as PM for Ironbridge.  *Id.* at 53-54.

At NSOC, Colston primarily interacted with Jonathan Smith and Regina Shirley, who were both NSA employees as well as ITK's employees.  *Id.* at 60.  Colston indicated that she worked "closely" with Shirley on "technical items, system engineering, [and] gathering requirements."  *Id.* at 61.  But, she claimed it was not actually PM work.  *Id.*

Colston did not get involved in daily tasking with regard to the Contract.  *Id.* at 64.  According to Colston, her primary duties as PM required her "to manage the folks on the contract, to work with the government lead."  *Id.* at 65.  In addition, she was responsible for "the care and feeding of the employees" who were on-site, "making sure that they were on task . . ." and collecting and providing monthly reports, working with timecards, addressing company issues, and answering "any kind of program-management-type questions."  *Id.*  But, Colston observed that the employees were "pretty self-sufficient," so she did not "have a lot of those issues."  *Id.* at 66.  On occasion, Colston was also involved in hiring.  *Id.* at 67.  However, she noted that there was not much staff turnover for the Contract.  *Id.*

---

[35] Tiffany Starr-Smith, a contracting officer, was also involved in regard to the Contract. *See*, *e.g.*, ECF 299 (Tr. 2/1/23, Mair testimony), at 94.  However, she was called as a defense witness.  *See* ECF 301 (Tr. 2/6/23, testimony of Tiffany Starr-Smith), at 157-172.  Therefore, I have not referenced her testimony.

According to Colston, defendant and Dwayne Preston were involved in submitting the FMHERs to the government, which, as noted, is a report of hours of work expended on the Contract. *Id.* at 68. Colston submitted a weekly and a monthly report to the government, which was described as a "deliverable." *Id.* at 68-69. But, each one took her "no more than an hour . . ." to prepare. *Id.* at 69.

Colston recalled that when she "came on board" at ITK, she was told that Ironbridge was "a full-time position" and that was supposed to be her "focus." *Id.* at 85. Although Colston claimed that she was "used to multitasking," she "was the 100 per cent program manager for Ironbridge." *Id.* However, Colston "did not feel that [the PM position] was enough work for a full-time program manager . . . .", because there was not enough work for her to do. *Id.* at 84; *see id.* at 61. Indeed, Colston claimed that she was "bored" at work. *Id.* at 110. Sometimes, she took sick leave and left early, because she "had nothing to do . . . ." *Id.* at 104. And, she was "absolutely" searching for things to do on the Contract. *Id.* at 85; *see id.* at 84. Colston raised concerns with her "boss," Craig Plunkett, about her work. *Id.* at 67, 109, 110.

Moreover, Colston stated that at times she "felt some activities" that she "was doing" did not constitute PM work for Ironbridge. *Id.* at 85. On those occasions, she would "inquire" of the defendant, "and ask if [she] should be charging that time to the Ironbridge contract." *Id.* And, "in most cases," defendant told Colston to charge her time to the Contract. *Id.* at 86.

For example, even if there were no open positions for the Contract, Colston was told she could interview people because they might be used "in the future," and she should then bill her time to the Contract. *Id.* Colston also claimed that defendant told her to bill for staff meetings, even if they were not related to Ironbridge, because she was representing Ironbridge as the PM. *Id.* at 86-87. But, she said, *id.* at 110: "I didn't want to just charge the government for things that

48

I wasn't doing."  Indeed, she maintained that she was "uncomfortable" with her employment situation.  *Id.*

Colston testified that if she did not work eight hours for the Contract, she could not bill that amount of time.  *Id.* at 93-94.  And, if she worked on another contract, she could not bill the time to Ironbridge.  *Id.* at 97.  Nor could she bill for work she performed on other contract proposals. *Id.* at 101.  Moreover, she testified that an Industry Day cannot be billed to the Contract.  *Id.* at 99.

On cross-examination, Colston said she worked, "on average," 40 hours a week for ITK. *Id.* at 112.  The defense reviewed with Colston that from August 22, 2014 through March 18, 2016, she billed 2,525.5 hours to Ironbridge.  *Id.* at 123.  Yet, she was only on-site at NSA for 258 hours during that period of time.  *Id.* at 124.  Colston agreed that she never "padded" her hours.  *Id.* at 116.  Nor did she believe she was committing a fraud by working off-site with regard to the Contract.  *Id.*

On redirect, Colston was asked, *id.* at 125:  "If there are 1,920 hours allotted to the program manager on the Ironbridge contract, but there isn't 1,920 hours' worth of work for that year, can the program manager . . . bill the government [for] 1,920 hours?"  Colston responded:  "They should not."  *Id.*  She added that "if they're not working on the contract . . . then they should not be billing that."  *Id.*

Jonathan Smith testified that he considered defendant's job and Colston's job to be "[e]xactly the same."  ECF 298 (Smith testimony), at 12; *see id.* at 28.  Moreover, both Colston and defendant were at NSA only "sporadically."  *Id.* at 13.  Smith observed that Colston "did a fine job" as PM.  *Id.* at 12.

Rob Bryant, the K3 Chief, recalled that Colston was at NSOC "for the care and feeding of . . . the contractors."  ECF 296 at 29.  However, he claimed that, in addition, she "actually did

K3 work . . . mission work." *Id.*  He stated that "she actually sat in our spaces and did K3 work," in contrast to a program manager who is "just worried about . . . what's going on on the contract" and whether people are "happy." *Id.* at 30.  Indeed, Bryant described Colston as "a great help to the organization . . . ." *Id.* at 42.

Regina Shirley worked at NSOC from 2013 to 2019.  ECF 296 (Tr. 1/27/23, Shirley testimony), at 64.[36]  Shirley began at NSOC as a software engineer in K3, "the technical support group within NSOC." *Id.* at 70-71.  When she left NSOC, she was Chief of "K2 modernization of the operations floor." *Id.* at 64; *see id.* at 70-71.  At the time of trial, she held the position of "a cryptologic enforcement officer." *Id.* at 63.

In the interim, *i.e.*, before leaving NSOC, Shirley became a Contracting Officer's Representative for NSOC.  *Id.* at 71.  She served as a COR-T for the Contract while also serving as a COR-A on three other contracts.  *Id.* at 73.  Shirley replaced Jason Clark, *id.* at 91, 92, and Rob Bryant was her "manager." *Id.* at 82.

According to Shirley, Colston assisted her with her projects while also working as PM on the Contract.  *Id.* at 84, 87-89.  She explained that "there was a lot of hours available in the [PM] category" and ITK was "able to bill to that category for the time [Colston] was working with [Shirley]." *Id.* at 89.  It was Shirley's understanding that Smith assigned Colston to work with Shirley because Colston "needed something to do[.]" *Id.* at 95.

Keith Benderoth, a Special Agent with the Defense Criminal Investigative Service ("DCIS") for over a decade, is "charged with investigating fraud, waste and abuse" with regard to defense contracts.  ECF 295 (Tr. 1/26/23, Benderoth testimony), at 7.  He testified at length and in

---

[36] Like many of the NSA employees mentioned earlier, Shirley has impressive credentials that include military service and work in the private sector.  *See, e.g.*, ECF 296 at 63-70.

detail about the investigation of defendant's billings to NSA in connection with the Contract. Indeed, he testified about almost every work day during the period in issue when defendant served as PM, as well as the contested invoices.

Benderoth recounted that he and Hazenstab assembled a summary investigative chart (*see* GX 21(a)) based on about 1,800 documents containing defendant's emails and email chains and ITK emails, as well as thousands of other documents obtained by subpoena and discovery. These included defendant's calendars, Lync messages, bank records, credit card records, and ITK records, such as the Funds Expenditure Man Hour Reports or "FMHERS". ECF 295 at 9-14, 192, 193, 210, 211. These records were used to help determine where defendant was located at a particular time and what she was doing. *Id.* at 11, 191.

The investigative summary chart, GX 21(a), is color coded, annotated, and 55 pages in length. *See also* GX 1(c) to GX 19(c). Among other things, by date and day of the week, GX 21(a) shows whether defendant was at NSA; the time that she was at NSA; the building(s) she entered and the times of entry and exit; the hours she billed to the government for the date, if any; and notations that were derived from other records, relevant to defendant's location or activity. The summary chart also included information reported by the whistleblower, even if it was later unsubstantiated. *See* ECF 295 at 241-42. Benderoth was also questioned about GX 45, which is a summary of defendant's Access Control records at NSA for the period of March 2016 to September 2017. *See* ECF 295 at 170-71.

Benderoth's testimony was replete with instances when defendant billed the government for eight hours of work supposedly expended on the Contract, even though she was either not at NSA at all on the date or only briefly at NSA, or was working on another ITK contract , such as "Silent Roar," or an ITK contract proposal, such as "Road Rally" or "Bamboo Tiger," or playing

in a charity golf event, or engaged in personal matters, or out-of-town.  *Id.* at 30.  Given the length and detail of Benderoth's testimony, I shall discuss just a portion of his testimony and the summary chart.

In an ITK email on March 30, 2016, to an individual at Parsons Corporation, defendant wrote:  "I can relate on short on time etc.  I'm covering a vacated PM spot . . . ."  GX 21(a) at 2.

In March 2016 and afterwards, defendant spent time working on the "Road Rally" contract proposal.  *See*, *e.g.*, ECF 295 at 30, 31, 32, 37, 43, 44; *see* GX 21(a) at 1, 43.  She wrote in an ITK email dated March 31, 2016, that she had "been up until 2 every night working road rally."  GX 21(a) at 2; *see* ECF 295 at 30-31, 34.[37]

Defendant arrived in South Carolina on March 31, 2016, for an "Industry Day" event on April 1, 2016, which was not related to the Contract.  ECF 295 at 31; GX 21(a) at 2.  She billed eight hours to the Contract.  ECF 295 at 32-33.

Defendant spent less than three hours at NSA on April 8, 2016, billed the Contract for eight hours, and attended a music concert that evening.  *Id.* at 35.  She was at NSA for almost four hours on April 13, 2016, but not all in the NSOC building, and she billed eight hours to the Contract.  GX 21(a) at 4.   In a Lync message on April 13, 2016, defendant referenced her business development efforts and her "CEO duties" for ITK.  ECF 295 at 36.  She also referenced "a huge proposal" that she "was working . . . ."  *Id.*; *see also* GX 21(a) at 4.

Defendant billed eight hours to the Contract on May 4, 2016.  ECF 295 at 40.  Based on a Lync message, however, she was at an all-day meeting in Hunt Valley, Maryland.  *Id.*; *see* GX 21(a) at 7.

---

[37] On occasion, there are slight variations between Benderoth's testimony as to the text of a document reflected on GX 21(a) and the presentation of the text on GX 21(a).

On May 9, 2016, defendant was at NSA for one hour and sixteen minutes.  GX 21(a) at 8. She billed eight hours to the Contract.  *Id.*

Defendant spent about two and a half hours at NSA on May 11, 2016.  ECF 295 at 40-41. She said in a communication about ITK's Silent Roar contract that she was "cutting out early" because of her daughter's birthday.  *Id.* at 41.  She billed eight hours to the Contract.  GX 21(a) at 9.

With respect to May 13, 2016, defendant billed eight hours to Ironbridge.  ECF 295 at 43. On that date, she played in a golf tournament and planned to "end up at" a restaurant afterwards. *Id.*; *see also* GX 21(a) at 8 (referencing a Lync message to Lauren Starr-Wolfe, discussing plans for golf, Green Turtle, and McDoogles).

On June 1, 2016, defendant did not access NSA.  ECF 295 at 45.  Jason Doyle emailed her, asking if she would be "coming in."  *Id.*  She billed eight hours to the Contract.  *Id.*

Defendant was at NSA on June 2, 2016, for about two hours.  *Id.*  She billed the Contract for eight hours of work.  GX 21(a) at 10.  But, in a Lync message to John Barker on that date, she advised that she was "headed out" because she had "meetings on the outside the rest of the day and off to Reston [Virginia] for a proposal this evening."  *Id.*; *see* ECF 295 at 45-46.

Defendant did not access NSA on June 6, 2016, but billed for eight hours of work on the Contract.  ECF 295 at 46.  In an email, she wrote, in part:  "I am sitting ou[t]side in 82-degree weather in the hills of Virginia volunteering for a charity golf event."  GX 21(a) at 11.

McComber told Shawn Rye that she would be in Myrtle Beach, South Carolina for a country music festival from June 10 to June 12, 2016.  ECF 295 at 48.  Her calendar reflected a flight on June 10, 2016.  *Id.* at 50.  She also billed eight hours to the Contract on that date.  *Id.*

Then, on June 16, 2016, defendant again billed eight hours to the Contract, although she participated in another charity golf event. *Id.* at 51.

Defendant was in Ocean City, Maryland on July 5, 2016. *Id.* at 56-57. She billed eight hours to the Contract. *Id.* at 56.

On July 27, 2016, defendant drove her daughter to college in Alabama. *Id.* at 61. She also billed eight hours to the Contract. *Id.*

Defendant billed eight hours to the Contract on August 10, 2016. GX 21(a) at 19. She was at NSA for about three hours on August 11, 2016, and billed eight hours to the Contract. ECF 295 at 64; GX 21(a) at 19. In a Lync exchange with an NSA employee on August 11, 2016, she wrote about events of August 10, 2016, explaining that she needed a corporate line of credit in her own name and had issues with her former husband (ECF 295 at 64-65), and said: "Just wasted literally my entire day." *Id.* at 65. Yet, as noted, she had billed eight hours to the Contract on August 10, 2016. GX 21(a) at 19.

ITK acquired a company called Silver Rhino on or about September 1, 2016. ECF 295 at 70. Although defendant traveled to Virginia on that date to meet the employees (*id.* at 70-71), she also billed eight hours to the Contract. *Id.* at 71.

Defendant participated in a golf outing on September 12, 2016. *Id.* at 73-75. She also billed eight hours to Ironbridge on that date. *Id.* at 73.

Although defendant was not at NSA on September 14, 2016, she billed eight hours to the Contract. *Id.* at 75. Various records and receipts reflect that she was in Washington D.C. on that date. *Id.* at 75-76.

Defendant participated in another golf tournament on September 22, 2016, and then attended a happy hour event. *Id.* at 76-77. She also billed eight hours to the Contract. *Id.* at 77.

ITK's records indicated that defendant organized a strategic planning session for ITK on October 19 and October 20 of 2016. *Id.* at 88-90. The days appear to have been devoted to the sessions, and the session included a dinner on October 19, 2016. *Id.* at 88-90. Yet, for each day, defendant billed eight hours to the Contract. *Id.* at 88.

The defendant billed eight hours to the Contract on March 29, 2017. *Id.* at 123-24. A Lync message and defendant's calendar reflect medical and hair appointments on that date. *Id.* at 123-25.

On May 12, 2017 and May 15, 2017, defendant participated in golf outings. *Id.* at 133-34. And, she billed eight hours to the Contract on both days. *Id.* at 132.

GX 21(a) at 45 highlights in yellow that the whistleblower reported that defendant participated in a JDRF golf tournament on May 19, 2017. But, the annotation on GX 21(a) at 45 also states that "ITK Attorney represented the hours" that were billed were "correct," because defendant "was unable to participate [in Planet Works Charity Golf Event] due to IRONBRIDGE project requirements." *Id.* The investigative chart also shows that defendant was at NSA for one hour and 22 minutes on that date. *Id.*

Defendant was in Ocean City, Maryland over Memorial Day weekend in May 2017. ECF 295 at 136-38. She billed eight hours to the Contract on Friday, May 26, 2017. *Id.* at 138.

Records reflect that defendant was in Georgia from June 14 to June 16, 2017, on matters unrelated to Ironbridge. *Id.* at 145-46. And, she attended a high school reunion in Virginia Beach from June 22, 2017 to June 23, 2017. *Id.* at 146-47. On each of these dates, defendant billed eight hours to the Contract. *Id.* at 145.

On July 17, 2017,[38] defendant sent an email to Don Pugh and Regina Shirley, NSA employees, regarding a Program Manager Review scheduled for July 27, 2017.  *Id.* at 152.  She said, *id.*:  "I had virtually no contact for all of last week.  I am not prepared to hold a PMR."  Yet, for the period June 29, 2017 to July 6, 2017, defendant billed 38 hours to the Contract.  *See* GX 21(a) at 50.  For July 7, July 10, and July 13, she billed ten hours to the Contract.  *Id.* at 50-51.  And, from July 18, 2017, to July 26, 2017, defendant billed 55 hours.  *Id.* at 51-52.

As mentioned, the evidence also included references to defendant's work on matters unrelated to Ironbridge.  *See*, *e.g.*, ECF 295 at 30, 31, 44, 96-101, 103, 106, 109-110, 115, 117-18, 121-22, 129, 132, 135, 147, 153.  For example, ITK's Silent Roar contract was handled at the R&E Building at NSA.  *Id.* at 44.  On August 31, 2017, defendant arrived at NSA at 8:19 a.m.  GX 21(a) at 54.  By 8:49 a.m., she badged into the R&E Building.  ECF 295 at 159.  She left that building at 10:04 a.m.  GX 21(a) at 54.  She spent a total of one hour and 45 minutes at NSA, a good portion of which was in the R&E building.  *Id.*  And, she billed eight hours to the Contract.  *Id.*

For the month of September 2016, defendant was at NSA for a total of nine hours and 35 minutes.  ECF 295 at 83.  She billed 168 hours to the Contract.  *Id.*

In February 2017, defendant was at NSA for a total of one hour and 40 minutes.  *Id.* at 118-19.  Yet, she billed 144 hours to the Contract that month.  *Id.* at 119.  Defendant was at NSA for a total of twelve hours and sixteen minutes in May 2017.  *Id.* at 138.  She billed 170 hours to the Contract.  *Id.* at 139.  In June 2017, she was at NSA for three hours and twelve minutes, and she billed a total of 170 hours to the Contract.  *Id.* at 148-49.

---

[38] The transcript references the date of July 7, 2017, but this appears to be an error.  GX 21(a) at 51 makes clear that the correct date is July 17, 2017.  And, the inquiry followed a discussion about July 10, 2017, and preceded a discussion of July 19, 2017.  I do not know if the date was misstated by the prosecutor or transcribed incorrectly by the court reporter.

The government also compared defendant's billings for the contested period to her billings during her prior service as a PM in 2012 and 2013. *Id.* at 167. To illustrate, she billed eleven hours as PM from May 12, 2013 to May 25, 2013. *Id.* at 169.

In sum, Benderoth testified that, during the indictment period, defendant billed 2,603 hours to the Contract; she was at NSA for a total of 259 hours; and she had 229 days of no-access at NSA. *Id.* at 171; *see also* GX 45.

Benderoth also testified that in 2016, defendant separated from her then husband, Robert ("Bobby") Kimmel. ECF 295 at 175. On or about June 30, 2016, she and Mr. Kimmel entered into an agreement by which defendant agreed to purchase Mr. Kimmel's 49% ownership share of ITK for the sum of $3 million. *See* GX 38; ECF 295 at 175-76. Under the stock transfer agreement, defendant was obligated to pay Mr. Kimmel monthly installments of $16,666.66. ECF 295 at 176-77.

Defense counsel conducted a vigorous cross-examination of Benderoth, in which he sought, *inter alia*, to attack the accuracy and the adequacy of the government's investigative summary. *See* ECF 295 at 179 *et seq.* In addition, defense counsel established that the Contract did not require defendant to work a set schedule. *Id.* at 188. Therefore, defendant could work any hour of any day to arrive at a total of eight hours on a given day. *Id.*

Agent Benderoth reiterated that during the investigation, he tried "to figure out what [defendant] was doing" when she was not at NSA. *Id.* at 191. And, the government was provided with "tens of thousands of pages of documents" from defendant. *Id.* at 192.

Defendant's Exhibit 42(c) is an email of October 19, 2016, from defendant to Don Pugh. ECF 295 at 197. It was not included on the investigative summary. Defense Exhibit 42(h) is an email of March 27, 2017, from defendant to Jason Clark, about shifting 60 hours in labor

categories. *See* ECF 295 at 200.  Counsel pointed to Defendant's Exhibit 42(d) as evidence that defendant was working on the Contract while off-site.  *Id.* at 208.  In addition, the defense identified six emails sent by defendant on the low side to NSA employees at low side email addresses.  *Id.* at 209-10; *see* Defense Exhibit 42(d). These were among the examples of defendant's work on the Contract that were not included in the investigative summaries.  Defense counsel also reviewed that defendant actually did not participate in the JDRF golf event on May 19, 2017.  *Id.* at 241; *see also id.* at 194, 212-13.

Defense counsel asked Benderoth whether GX 1(c) through GX 19(c)[39] "exclude[d] every piece of evidence that [the agent] found . . . consistent with McComber working . . . ."  ECF 295 at 206-07.  Benderoth acknowledged that he did not include all emails that reflected that defendant was working on the Contract.  *Id.* at 207.  He explained that this was either because defendant wrote them while at NSOC, for which she was already credited in terms of time at NSA, or the emails were just "one line."  *Id.* at 207; *see also id.* at 211.

On redirect, the government showed that, for example, defendant's email, contained in Defendant's Exhibit 42(b), consisted of four words.  *See* ECF 295 at 236.  And, Defendant's Exhibit 42(g) was three lines in length.  *Id.* at 237.

### IV.  Discussion

### A.

Ms. McComber insists that the evidence at trial was insufficient to convict her of any of the twenty offenses for which she was charged.  To address sufficiency, it is helpful to begin with a review of the elements of the two categories of offenses, as they frame the analysis.

---

[39] GX 1(c) and GX 19(c) are incorporated in GX 21(a).

Counts One through Nineteen of the Superseding Indictment charged the defendant with making a false claim upon the United States, in violation of 18 U.S.C. § 287 and § 2(b).  To prove the offense, the government had to establish, beyond a reasonable doubt, each of the following three elements:

> First, that on or about the date charged in a particular count, the defendant knowingly made or presented a claim to the NSA, a department or agency of the United States, or caused the submission or presentation of a claim.

> Second, that the claim which was made or presented was a claim against the United States or a department or agency of the United States.

> Third, that the defendant presented the claim knowing that it was false, fictitious or fraudulent as to a material fact.

L. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS: CRIMINAL, Instruction 18-3; *see also* ECF 305 (Tr. 2/13/23, jury instructions), at 144-50.[40]  Only the third element was contested.

In Count Twenty, defendant was charged with making a false statement to government investigators, in violation of 18 U.S.C., § 1001.  The government was required to prove the following five elements, beyond a reasonable doubt:

> First, on or about the date specified, the defendant made a statement or representation;

> Second, that this statement or representation was material;

> Third, the statement or representation was false, fictitious or fraudulent;

> Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

> Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States, or that federal funds were involved.

---

[40] At trial, the jury was also instructed as to 18 U.S.C. § 2(b).  *See* ECF 305 (Tr. 2/13/23), at 146, 152-55.

L. Sand, *et al.*, FEDERAL JURY INSTRUCTIONS: CRIMINAL, Instruction 36-9; *see also* ECF 305 (Tr. 2/13/23, jury instructions), at 156-61.

A claim is "false if it was untrue when made and was then known to be untrue by the person making it or causing it to be made"; "fictitious if it was not real or if it does not correspond to what actually happened and the person making it or causing it to be made knew that it was not real at the time that it was made""; and "fraudulent if it was falsely made or caused to be made with the intent to defraud." ECF 305 at 147. A fact is material if it was capable of influencing the government's decision. *Id.* at 159.

As to Count Twenty, the first and fifth elements are not in issue. The government also contends that the second element is not in issue, because at trial the defense contested only the third and fourth elements. *See* ECF 390 at 6; ECF 419. However, in the Motion, defendant challenges materiality. *See*, *e.g.*, ECF 359 at 27-29; *see also* ECF 420. I shall assume that the issue as to materiality is preserved, and therefore the second, third, and fourth elements are at issue. The defense asserts, *inter alia*, that the evidence produced by the government did not establish knowledge or falsity as to any count. ECF 359 at 3, 7.

By way of background, I note that, based on the evidence, and at the defense request, the Court instructed the jury about certain provisions in the Federal Acquisition Regulations, including FFP-LOE contracts. *See* 48 C.F.R. § 16.207-3; ECF 305 at 151. This includes that an FFP-LOE contract is used when "there is reasonable assurance that the intended result . . . cannot be achieved by expending less than the stipulated effort." ECF 305 at 151.

Moreover, the jury was advised that, "[i]n considering whether the Defendant worked the amount of hours that were billed to NSA," it could consider the "total number of hours originally estimated by NSA for the senior program manager position . . . ." *Id.* at 151. And, the Court

instructed the jury that defendant was permitted to work off site for some of her duties.  *Id.* at 149-50.

## B.

Defendant maintains that "[t]his is one of those cases where the jury got it wrong."  ECF 408 at 6.  She advances a host of contentions to support her Motion.  These include the claim that "[t]he jury was not entitled to infer falsity from evidence that Ms. McComber was off-site [from NSA] for a substantial number of the hours [that she] billed" (ECF 359 at 8-9); the PM had specific and extensive duties under each SOW (*id.* at 10-11); the Contract required a full time PM (*id.* at 11); it was not reasonable for the government to contend or for the jury to infer that defendant could not have worked all the hours that she billed on the ground that "there was not enough work for her to do." (*id.* at 12); the Contract did not require a "tangible work product," apart from certain reports (*id.* at 4); the government could not prove falsity based on the lack of a physical work product because, given the nature of the Contract, the only "deliverable" is the "stipulated level of effort[]" (*id.* at 13); the nature of a FFP-LOE contract meant that the government itself believed the work of the PM could not be done in less than the hours that were allocated and billed (*id.* at 11); and the prior PM, Raynett Colston, spent comparable time off-site and at NSA, and billed similar hours, for a similar period, without complaint from the government.  *Id.* at 12-13.

McComber also argues that the government's investigative spreadsheet (GX 21(a)) misrepresents the hours billed by defendant (ECF 359 at 15) and is replete with errors and was thus "unreliable."  *Id.* at 16.  And, noting that there are 24 hours in a day, and that the Contract did not require work at a specific time, defendant asserts that "there was ample time [every day] for Ms. McComber to work the hours billed."  *Id.* at 17; *see also* ECF 359-1 to ECF 359-19.

Similarly, the defense insists that the government did not prove that defendant made any materially false statements. ECF 359 at 5, 30. According to defendant, Count Twenty "fails at the first step," *id.* at 31, because there was no basis to conclude that any of the invoices were materially false. *Id.*

In addition, the defendant contends that the government failed to prove that the defendant had the requisite knowledge of falsity. *Id.* at 27-29. She argues that "there was ___no___ evidence that Ms. McComber subjectively believed she was billing her time falsely." ECF 408 at 4 (emphasis in original). Indeed, defendant contends that, as to this element, "the government is all but silent." *Id.*

In support of defendant's claim that the evidence was legally insufficient as to proof of knowledge, she relies, *inter alia*, on *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 747 (2023). In my view, *Schutte* does not lead to the result urged by defendant.

*Schutte* is a civil case under the False Claims Act ("FCA"). There, the defendants argued that their personal understanding of the billing regulations at issue was not relevant, because the question of knowledge turned on an objectively reasonable construction of the ambiguous regulations in issue. In its unanimous decision, the Supreme Court disagreed. In short, the Court concluded that, even if the regulations were facially ambiguous, this would not preclude a finding that defendants themselves actually knew their billing claims were false.

As the Supreme Court explained, the FCA, which is "largely a fraud statute," *id.* at 750, "imposes liability on those who 'knowingly presen[t] . . . a false or fraudulent claim for payment.'" *Id.* at 747 (citing U.S.C. § 3729(a)(1)(A)) (alterations in *Schutte*). The Court also stated (*id.* at 749-50): "The FCA defines the term 'knowingly' as encompassing three mental states: First, that the person 'has actual knowledge of the information,' § 3729(b)(1)(A)(i). Second, that the person

'acts in deliberate ignorance of the truth or falsity of the information,' § 3729(b)(1)(A)(ii).  And, third, that the person 'acts in reckless disregard of the truth or falsity of the information,' § 3729(b)(1)(A)(iii)."  According to the Court, "either actual knowledge, deliberate ignorance, or recklessness will suffice.[]"  *Id.* at 749-50.[41]  Notably, the Court added, *id.* at 750:  "That three-part test largely tracks the traditional common law scienter requirement for claims of fraud."

Relying on *Schutte*, defendant argues a failure of proof by the government because "knowledge of falsity is a ***subjective*** standard that focuses on the defendant's own subjective knowledge and beliefs."  ECF 408 at 4 (emphasis in ECF 408).  As noted, the defense posits that "there was **no** evidence that Ms. McComber subjectively believed she was billing her time falsely." *Id.* (emphasis in ECF 408).  Moreover, she claims that the evidence did not prove that defendant "failed to work the hours billed."  *Id.*  Further, the defense claims that "the government failed to establish what work Ms. McComber ***believed*** was permissible to perform off-site."  *Id.*  In her view, the government "stubbornly ignores that NSA continued to ***require*** InfoTek to provide a full-time equivalent program manager . . . despite years of the program manager working substantially off-site."  *Id.* at 5.

As I see it, defendant misses the mark.  The *Schutte* Court explained, 598 U.S. at 752: "What typically matters at common law is whether the defendant made the false statement 'without belief in its truth or recklessly, careless of whether it is true or false.'"  (Citation omitted).  Like the common law, the statute's "standards focus primarily on what [a defendant] thought and believed."  *Id.* at 751.  But, a defendant who is "'aware of' information" has actual knowledge.  *Id.*

---

[41] At the Motion hearing, the Court asked defense counsel whether "all three mental State apply here[.]"  ECF 415 (Tr. 1/23/24), at 119.  Although the FCA captures "deliberate ignorance" and "reckless" conduct, defense counsel responded that only the first mental state – actual knowledge – applies.  *Id.*  But, the defense conceded that actual knowledge can be established "directly" and "indirectly."  *Id.*

The Supreme Court illustrated the concept, stating, *id.* at 742-43:  "If a law authorized payment of $100 for 'each' medical test, and a doctor knows that he did five tests but submits a claim for ten, then he has knowingly submitted a false claim."  In contrast, said the Court, if a law permits payment for only "customary" medical tests, then "some doctors might be confused when it came time for billing."  *Id.* at 743.  However, the Court noted that, as to those doctors who were told what is considered "customary," but who "submit claims that were inaccurate anyway," *id.*, their conduct is knowing, despite the facial ambiguity of the term.  As the Court put it, *id.*: "What matters for an FCA case is whether the defendant knew the [billing] claim was false."  The "focus," said the Court, is "on what the defendant thought when presenting the false claim" and not "on *post hoc* interpretations that might have rendered their claims accurate."  *Id.* at 752.

The Court provided another illustration, referencing a hypothetical motorist.  *Id.* at 753.  The Court discussed a driver who encounters a road sign that instructs one to drive at a reasonable speed.  According to the Court, the driver, "without any more information, might have no way of knowing what speeds are reasonable and what speeds are too fast."  *Id.*  But, if the driver learns from a police officer that speeds in excess of 50 mph are regarded as unreasonable, and the driver also notices others driving under 50 mph, that driver would know that a reasonable speed is one below 50 mph.  *Id.*  As the Court put it, the driver "would be hard pressed to argue that some other person might have understood the sign to allow driving" in excess of 50 mph.  *Id.*  An ambiguity for other persons would be of no moment to the particular driver, given that driver's actual knowledge of what is regarded as reasonable.

The government's case is premised on the claim that defendant did not work all of the hours for which she billed NSA.  To establish that defendant did not work the hours that she billed, the government showed that only limited tasks could have been performed by defendant off-site.

64

As a result of the restrictions on what work defendant could perform off-site, coupled with the infrequency of defendant's presence at NSA, her lack of interaction with Contract personnel, along with the evidence of defendant's other responsibilities as CEO, her marketing efforts, other business pursuits, personal commitments, and charitable outings, the jury could readily conclude that defendant did not work the hours for which she billed the government in connection with the Ironbridge Contract.

Even as to a firm fixed price level of effort contract, there is no ambiguity about an elementary and cardinal principle: one cannot charge the government for work that is not performed. In a fraud case, it is the defendant's knowledge that matters. But, a subjective standard does not entitle a defendant to rely on information that might be unclear to others, when a defendant knows what is required or expected. In other words, the confusion of others is beside the point. That is the teaching of *Schutte*. *Cf. United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024) (in a post-*Schutte* case involving false statements in connection with a conspiracy to fraudulently obtain U.S. citizenship, concluding, without citation to *Schutte*, that evidence was sufficient to support jury findings that defendants knowingly lied and lies were material; vacatur on other grounds).

The government introduced a blitzkrieg of evidence that showed defendant repeatedly and frequently billed a full eight hours to the Contract, and on many of the dates that she did so, she knew that she was not working on Ironbridge; she was either not at NSA at all, or she was there for a short time, or in a building unrelated to the Contract, or was out of town, or was working on other matters unrelated to the Contract, or was engaged in personal or charitable endeavors. The evidence in the government's case-in-chief was also sufficient to establish that defendant was well aware that she was not entitled to bill the government for work she did not perform, whether on-site or off-site.

In the Motion, as at trial, defendant makes much of the Agency's own view that the PM's performance of the assigned tasks would require the expenditure of the hours the Agency had awarded to the PM position. But, that assertion mischaracterizes the evidence. The testimony established that the number of hours assigned by the mission customer at NSA to a labor category is only an estimate. Despite the defendant's attempt to suggest that the PM hours were customized and tailored to that position, the evidence showed that the hours allocated to a full-time position are generally standard, and do not vary according to labor category. Regardless, it is clear that the assignment of hours is not a license to bill for those hours if the work was not performed. Moreover, any mistake by the government in awarding the hours is not a ground to bilk the government, charging the Agency time for work that was not done.

As indicated, the defense points out that the defendant was not obligated to work a set schedule, and she could have worked any portion of a 24-hour day. It is true, as defense counsel argues, that defendant had the right to work on the Contract at any point during a 24-hour period. And, some work is portable.[42] Moreover, the Court is well aware that many people have jobs for which they work far more than eight hours per day, and they work on weekends, during holidays, and on vacations. But, contrary to defense counsel's suggestion, the speculative possibility that defendant could have worked throughout the 24 hours of any day does not mean that the evidence was legally insufficient. In the face of the evidence presented, the jury was entitled to reject the contention that defendant was actually working on the Contract at all hours of the day and night.

---

[42] In the defense case, defendant testified that she generally worked seven days a week, 75 to 80 hours per week. ECF 303 at 46. She also claimed she did all the work for which she billed. *Id.* And, she agreed that NSA's swipe records are accurate, *id.* at 63, and that she was not at NSA on the days shown by the government. *Id.* at 64.

The Contract was for technical services, and that work could not have been performed off-site.  Moreover, several witnesses testified that defendant had no significant role in the technical work of the Contract.  For example, when Jonathan Smith requested a status report after a six-month hiatus, defendant turned to Jason Doyle, the technical lead on the Contract, to obtain the information needed for the report.

The evidence also suggests that the administrative work for the Contract was limited, both in scope and as to plaintiff's performance.  To the extent that the status report requested by Jonathan Smith is considered administrative in nature, rather than technical, the fact remains that defendant asked Doyle to provide her with the information for the report.  Similarly, on April 25, 2016, defendant asked Doyle to ascertain vacation days of employees.  GX 24(c).  And, on July 17, 2017, defendant contacted Don Pugh and Regina Shirley regarding a Program Manager Review set for July 27, 2017, because she was not "prepared" for the review.  ECF 295 at 152.[43]

To be sure, the SOW describes the role of the PM and the broad duties and functions of the PM.  But, on the basis of the evidence adduced at trial, the jury could conclude that the hours billed by defendant to the Contract were inflated.  In this regard, it is salient that, by the time the defendant became PM in 2016, the Contract had been under way for several years, and the testimony of ITK and NSA employees indicated that the Contract was running smoothly.  There was relatively little turnover in employees, and not much to do in terms of Contract administration.  Indeed, those involved in the Contract had very little interaction with defendant, on-site or off-site.  And, again, only a handful of tasks could be performed off-site, because of the classified nature of

---

[43] As noted, the transcript appears to contain an error as to the date; it refers to a date of July 7, 2017, but GX 21(a) at 50-51 makes clear that the correct date is July 17, 2017.

the technical work, and because ITK did not have a SCIF.  As a result, defendant was unable to contact anyone at NSA via the high side if she was not at NSA.

"Care and feeding" of ITK employees is not a compensable task under the Contract. For the most part, only administrative matters, such as personnel interviews, hiring, and billing, could be handled off-site.  But, even as to hiring, there were only nine people brought onto the Contract during defendant's tenure as PM.  And, ITK used recruiters to identify potential employees, and defendant was not the only one to conduct interviews.  The jury could infer that hiring of staff could not justify the hours that were charged.

The defense also points to the work and billing of Raynett Colston, who preceded the defendant in the role of PM.  ECF 359 at 12.  According to Jonathan Smith, who served as a COR-T (*i.e.*, Contracting Officer's Technical Representative), Ms. Colston did "exactly the same job that Jacky did."  ECF 298 (Tr. 1/31/23) at 28; *see also* ECF 297 (Tr. 1/30/23), at 112-113 (testimony of Jason Doyle, ITK's technical lead).  But, Colston testified that there was not enough work for her to do.  And, she claimed that she was sometimes told by defendant to bill to the Contract for time that she believed she should not have been billed.

The jury easily could have concluded that Colston's bills were inflated, but that two wrongs do not make a right.  Or, it could have concluded that Colston actually performed more work than defendant, consistent with the testimony of NSA employees, even though her on-site time was consistent with that of defendant.  Or, it could have decided that, unlike defendant, Colston was merely an employee of ITK, assigned to the position of PM for Ironbridge, and because she did, in fact, report to work, it was understandable that she billed her time.  Regardless, the billings for Colston do not justify the conclusion that the defendant performed as she claimed.

Defendant also argues that the Contract did not require much in the way of tangible work product. ECF 359 at 13.  It asserts that the only deliverable due under the Contract was the monthly status report.  *Id.*  But, this contention does not assist defendant.  The flip side is that defendant could not have been spending time working on deliverables, because the Contract did not require much in the way of deliverables.

To the extent that there were a handful of errors and omissions in the government's summary exhibits, the jury was made aware of them.  The jury was not required to throw out the baby with the bath water.

And, based on the evidence, the jury was also entitled to conclude that defendant violated 18 U.S.C. § 1001 when she maintained that she properly completed her time records as to the Contract.

From the evidence presented by the government in its case-in-chief, the evidence was more than sufficient to sustain the jury's guilty findings for all twenty counts.

An Order follows.


Date:  March 22, 2024                                     _____/s/_____
                                                                           Ellen L. Hollander
                                                                           United States District Judge