# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. ELH-21-036 |
| | ) | |
| JACKY LYNN McCOMBER, | ) | |
| formerly known as | ) | |
| Jacky Lynn Kimmel, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## THE GOVERNMENT'S SUPPLEMENTAL BRIEF
## ADDRESSING ISSUES RELATING TO
## THE DEFENDANT'S SENTENCING

EREK L. BARRON
UNITED STATES ATTORNEY

Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland  21201
(410) 209-4915

*Counsel for the United States*

Date:  April 6, 2024

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 1

I.    DEFENDANT MCCOMBER OBSTRUCTED JUSTICE BY CREATING
THE FAKE PURPORTED CHERRIL GUINTHER LETTER AND ITS
FACSIMILE COVER SHEET AND CAUSING HER THEN-COUNSEL TO
PRODUCE THESE TO THE GOVERNMENT AND THE COURT ON
FEBRUARY 28, 2022 ................................................................................ 1

II.    THE DEFENDANT FURTHER ATTEMPTED TO OBSTRUCT JUSTICE
BY REPEATEDLY LYING DURING HER TESTIMONY AT TRIAL ................. 28

III.    THE DEFENDANT'S RELENTLESS EFFORT TO SHIFT THE BLAME
FOR HER OVERBILLINGS TO DWAYNE PRESTON BY PURSUING
A CIVIL LAWSUIT AGAINST HIM WAS ANOTHER FORM OF
OBSTRUCTION OF JUSTICE ......................................................................... 32

IV.    THE DEFENDANT MADE ADDITIONAL FALSE STATEMENTS
TO THE PROBATION OFFICER DURING THESE SENTENCING
PROCEEDINGS ........................................................................................ 34

V.    THE GOVERNMENT'S ESTIMATE THAT THE DEFENDANT'S
CRIMINAL CONDUCT RESULTED IN FRAUDULENT OVERBILLINGS
TO THE NSA EXCEEDING $300,000 IS REASONABLE ................................ 35

The United States of America, by its undersigned counsel, provides the following supplemental sentencing memorandum in connection with the defendant's upcoming sentencing on Friday, May 17th.  This memorandum primarily addresses the information presented at the three-day evidentiary sentencing hearing on November 16th, 17th, and 20th, 2023 relating to (1) the evidence that the defendant committed an additional act of attempted obstruction of justice by faking the purported Cherril Guinther letter dated October 10, 2012 as well as (2) the amount of the government's loss in this case.

### ARGUMENT

### I.  DEFENDANT MCCOMBER OBSTRUCTED JUSTICE BY CREATING THE FAKE PURPORTED CHERRIL GUINTHER LETTER AND ITS FACSIMILE COVER SHEET AND CAUSING HER THEN-COUNSEL TO PRODUCE THESE TO THE GOVERNMENT AND THE COURT ON FEBRUARY 28, 2022

It has now been just over two years since the purported Guinther letter and its facsimile cover sheet (**Exhibit 1**) first surfaced on Monday, February 28, 2022, when then-defense counsel Clarke Ahlers attached it as an exhibit to his reply brief supporting his motion (ECF # 60) to dismiss all of the False Claims Act counts in the indictment (Counts 1-19).  After so much time has passed, it bears stressing that the defense not only sought to use this document to support its pending motion to dismiss the criminal False Claims Act counts,[1] but that when it was produced, this case was scheduled to go

---

[1]  As we have done previously, ECF # 67, the government wishes to emphasize that we do not believe that Mr. Ahlers knew that the purported October 10, 2012 letter from Cherril Guinther to Craig Plunkett, ITK's Vice-President for Contracts, was a fake when he produced it.  Rather, we believe that his strong commitment to his client caused him to fail to apply an appropriate level of critical scrutiny to what proved almost immediately to be an extremely questionable document.

to trial only five weeks later on April 4th.  The abrupt surfacing of the purported Guinther letter, along with the defense's belated disclosure of two expert witnesses in late January and early February, resulted in this Court issuing an order postponing the trial date on March 3rd (ECF # 63).  Defense counsel's belief that the government had negligently failed to locate and produce the purported Guinther letter likely fostered his accelerating series of demands for the Court to order the government to produce additional records over the spring and into the summer of 2022.  ECF #s 79 and 100. Those demands tied this case up in knots for months, resulting in further successive postponements of the trial date to January 23, 2023 – a delay of nearly ten months.

From the time the purported Guinther letter first surfaced just five weeks before the then-scheduled trial date, there were reasons to question its authenticity.  First, as far back as her initial interview with the NSA-OIG investigators on October 4, 2017, defendant McComber had given sworn testimony that there was never a formal written waiver of the contractual requirement that her work be performed on-site.  Kimmel NSA-OIG Interview Transcript (10/3/17) at 17-18.  Similarly, Craig Plunkett, ITK's Vice President for Contracts, had testified in his NSA-OIG interview that there was only an informal "gentleman's agreement" allowing the IRONBRIDGE Program Manager (PM) to work off-site, owing to a shortage of desks at the National Security Operations Center (NSOC).  Plunkett NSA-OIG Interview Transcript (5/8/18) at 12-14.

Second, the circumstances under which defense counsel ultimately encountered the purported Guinther letter on February 25, 2022, as he described them first to government counsel in a telephone call on March 1st and then in a conference call with the Court on May 7, 2022, were likewise very suspect.  Defense counsel told both government counsel and the Court that he recalled having previously reviewed the

documents amongst which the purported Guinther letter was found, but that he had never before seen it.  In addition, the purported Guinther documents were not located in ITK's IRONBRIDGE contract files that were so carefully maintained by Craig Plunkett, but rather were found inserted into a file of correspondence maintained by ITK's former Chief Financial Officer (CFO) (and the defendant's all-purpose scapegoat and *bete noir*), Dwayne Preston.  The purported Guinther letter and its accompanying fax had also been uniquely folded together into quarters, which distinguished them from the surrounding papers and caused them to stand out, making them more likely to be noticed as Mr. Ahlers was paging through the files of records the defendant had delivered to his office the previous Friday.  **Exhibit 2 (government counsel's notes and Ahlers's statements during the May 7, 2022 conference call about the circumstances under which he first ran across these documents).**

When government counsel provided the purported Guinther letter and its accompanying fax to officials at the NSA and asked for their assessment, the response came back quickly and strongly that these documents were fake.  Kelly Sulewski, the NSA's Contracting Office Chief for the Directorate of Operations, Engagement, Policy and the National Security Operations Center (NSOC) and a 35-year agency veteran, testified during the August 29, 2022 motions hearing that when she first received this letter from Andrew Cruikshank in the NSA's General Counsel's Office and was asked to examine it, she immediately recognized from her prior review of the NSA's IRONBRIDGE contract file that it had not been present there.  At Mr. Cruikshank's request, she reconfirmed that, and then checked the shared drive used by NSA personnel assigned to the IRONBRIDGE contract to see if it was included in there –

3

which it wasn't.  Ms. Sulewski testified as follows about her reaction to her initial review

of the letter:

**Q.**  I'm showing you what was filed on February 28, 2022, at ECF 60-1 [the purported October 10, 2012 Guinther letter and its associated facsimile sheet].  Ms. Sulewski, can you see the letter on the screen?

**A.**  I can see the top portion of it, yes.

**Q.**  Let me zoom out there. Is this a copy of the letter that you received from Mr. Cruikshank?

**A.**  Yes.

**Q.**  What was your reaction to the letter when you first received it?

**A.**  **When I first received it and I read the content of the letter, I thought the content of the letter didn't make sense to how we would do business as a contracting officer when it came to this type of action.**

**Q.**  And why didn't it make sense?

**A.**  Because it didn't have any of the steps involved in this type of action, which would normally be requesting a proposal, conducting negotiations, and doing a modification to incorporate off-site rates.

**Q.**  And doing a modification, what do you mean "doing a modification"?

**A.**  Typically for an action like this, if we were going to move contractors off-site, we issue a request for proposal for the labor categories that we would like to move off-site.  And we get a proposal for off-site rates.  We conduct negotiations on those rates.  **And then we do a contract modification to change the place of performance in Section F of the contract, as well as incorporating rates for those off-site rates into the contract.**

**Q.**  And why would the off-site rates be different?

**A.**  Because they're responsible for overhead for the employees working at their site.

**Q.**  **When you reviewed the Ironbridge contract file, did you find a modification related to the letter on the screen?**

4

**A.**     **No.**

**Q.**     And in your view, **a modification should have been done in order to effectuate any sort of agreement with respect to changing the location of the place of performance for a particular labor category?**

**A.**     **Yes.**

**Q.**     Now, you mentioned that when you looked at the letter, it didn't make sense to you.

* * *

**A.**     It didn't make sense to me, first of all, because to say that there wasn't room for one FTE ["full-time equivalent"] in the NSOC spaces did not make sense to me.  And then it didn't make sense to me that a contracting officer would direct a contractor to have that FTE, work off-site for the remaining portion of the contract. Under normal circumstances, in my experience, there would have been a request for proposal to incorporate off-site rates for the time period that we were in and any remaining option years of the contract.

**Q.**     Was there anything about the format of the letter that struck you as odd?

**A.**     Yes.  So having -- the unclassified for official use only would normally be on the bottom of the letter, as well.  And I can't see the bottom [on the screen], but I don't believe it is on there.  There is also, on, I would say, the majority of letters that go out from contracting officers at the top left near the emblem, there is normally a very small typed that says "Reply to the attention of."  And it would have the initials of the contracting specialist.

And then, because I had been through the contract file so much, I was surprised at how clear Ms. Guinther's signature was because normally her signature was not that legible. And so then when I looked through the file, I did -- there was one other letter in the file, and her signature was – looked almost identical to the signature on this file. [N.B. This was the December 19, 2011 letter.]  But no other signature in the file look likes [sic] remotely close to this signature.

**Q.**     Okay. And at the time you are reviewing this letter for the first time and realizing that it didn't make sense, had somebody suggested to you already that the letter didn't make sense?

5

**A.**     No. I -- I went down -- I called Bob Blaschak [NSA Senior Contracts Advisor], and I went down to talk to Bob Blaschak about the letter and the fact that I didn't believe that it made sense and I wasn't sure that it was a letter that we created.

And he told me to contact Andrew Cruikshank, which is what I did, and shared my thoughts with him.

**Q.**     And approximately how soon after receiving the letter did you raise those concerns?

**A.**     I raised -- I think it was the very next day.

**Q.**     I'm showing you what's been marked as Government's Exhibit Number 2.

\* \* \*

Ms. Sulewski, do you recognize this letter?

**A.**     Yes.

**Q.**     What is it?

**A.**     It's the letter that includes the signature that looks identical to the previous letter [i.e., the legitimate December 19, 2011 Cherril Guinther letter].

\* \* \*

**Q.**     Now, did you come across this letter while you were reviewing the contract file?

**A.**     Yes. I came across this letter when I was looking specifically for the previous letter to see if that was in the contract file.

**Q.**     Okay. And so at the time that you saw it, did you notice something about the signatures?

**A.**     They look identical.

**Q.**     And was Government's Exhibit 2, this letter dated December 19th, 2011 –

**A.**     Yes.

**Q.**     -- included in the files that you copied for production?

6

**A.**      Yes.

Motions Hearing Transcript ("Mot. Hrng. Tr."), 8/29/2022, at 91-97 (emphasis added) **(Exhibit 3)**.

When the government filed its previous sentencing reply brief on May 6, 2023 (ECF # 311), neither the NSA's Cherril Guinther nor ITK's Vice President for Contracts, Craig Plunkett, had yet testified under oath concerning the falsity of the purported Guinther letter, because defense counsel had advised the government in the fall of 2022 that he was no longer seeking to introduce it at trial.  ECF #s 166, 169.  As a result, when Guinther was called by the government at trial to discuss the early years of the IRONBRIDGE contract (ECF # 297 at 10-89), she was not asked to address the purported Guinther letter, while Craig Plunkett, ITK's Vice President for Contracts, was not called by either side to testify at trial.   Accordingly, in its sentencing reply brief last spring, the government relied on its notes of their interviews (which were attached as Exhibits 5 and 6) to present the information they had provided when the purported Guinther letter had surfaced the previous year.  ECF # 311 at pp. 11-12.  However, both of these witnesses were subsequently called by the government at the November 2023 sentencing hearing to testify about the purported Guinther letter.  In each case, their testimony strongly supported the conclusion that the letter was a late-created and clumsy fake.

For example, when Ms. Guinther was asked at the sentencing hearing "whether or not any directive was ever issued by the NSA to InfoTeK that the program manager should work essentially full time off site?", she responded as follows:

**A.**      No, there was not.

**Q.**      Or part-time offsite?

7

**A.**     No, there was not.

ECF # 382 (Evidentiary Sentencing Hearing Transcript [Evid. Sent. Hrng. Tr.] at 36-37 **(Exhibit 4)**.  Ms. Guinther then authenticated her December 19, 2011 letter with her actual signature as legitimate **(Exhibit 5)**.  *Id.* at 37-42.  After identifying a number of other authentic examples of her signature, the Government introduced the purported Guinther letter **(Exhibit 1)**.  When asked whether she had written that document, Ms. Guinther immediately responded, "I did not."  She further testified that no one else at NSA had drafted the letter for her.  Asked "How do you know that," she responded as follows:

> **A.**     Because if you just look at the document itself, we're very rigid, government, we have certain formats as we were talking about earlier. We always put our date over to the right of the page. The attention who we're sending it to is also after the address. We also reference the contract number, either separately as reference or in the subject. And there's no subject number.
>
> At the end of it -- I'll just go to the bottom. I always, always address the bottom as any questions direct to the undersigned -- I don't reference my own name because I'm the one that's signing the letter -- or the specialist.
>
> Our format for our numbers is the area code in parentheses, first three digits, then the dash, and the last four digits.
>
> We have the unclassified on top and bottom.

ECF # 382 (Evid. Sent. Hrng. Tr.) at 48 **(Exhibit 4)**.  Ms. Guinther then pointed out additional aspects of the letter in terms of both its style and formatting and its substance, that were not consistent with her practices.  *Id.* at 49-51.  She noted that the letter's supposed instruction to ITK to work off-site without an off-site rate "would have been an Antideficiency Act [violation] on my part."  *Id.*  She further compared her signature on the legitimate December 19, 2011 letter with that which appeared on the

purported Guinther letter of October 10, 2012 and stated, "From my eyes, it looks identical." *Id.*

Government counsel then asked Ms. Guinther about the first time she was shown the letter by the government's counsel and investigators in March 2022 out at the NSA. This colloquy ensued:

**Q.** . . . . Ms. Guinther, was there a time when myself and another government lawyer and some investigators asked to see you out at NSA in March of 2022?

**A.** Yes, that's correct.

**Q.** When you came to that meeting, did we show you the letter we were just looking at?

**A.** Yes, you did.

**Q.** Did we tell you anything about the letter?

**A.** No, except for that it was reported that I had provided that letter to InfoTek.

**Q.** Did anyone say anything to you that this letter is a fake or we think it's a fake or anything like that?

**A.** No.

**Q.** Did we ask what you recall or what you knew about the letter?

**A.** Yes, you asked me that.

**Q.** What was your immediate response?

**A.** Is [*sic*; "It was"?] **I didn't write this letter.** After I reviewed it.

**Q.** Right.  Did you put it in stronger terms than that?

**A.** I might have, but I can't . . .

**Q.** Did we take down notes based on all of the things about that letter that you said were not consistent with your, and the NSA's, normal approach to formatting such a letter?

**A.** Yes, you did.

**Q.** All of the various anomalies that you identified?

**A.** Yes, right.

**Q.** Now, I'm going to put up on the screen Government's Exhibit 5 **(Exhibit 6)**. Did we prepare that document based on the information that you gave us?

**A.** Yes.

**Q.** And did we provide that document to you at some point for you to check over it and see if you agreed with everything that was on it?

**A.** Yes, you did.

*Id.* at 51-52 (emphasis added). Ms. Guinther then went through Government Hearing Exhibit 5 (attached here as **Exhibit 6(a)**) and pointed out all the things that were inconsistent with standard NSA protocol and procedure as well as her own practices. *Id.* at 52-57. She also testified that similar inconsistencies characterized the purported accompanying facsimile cover sheet (**Exhibit 1(b)**) (the marked-up version flagging the inconsistencies is **Exhibit 6(b)** ). *Id.* at 57-60. Finally, Ms. Guinther was shown examples of Ms. McComber's own correspondence with the NSA, which displayed many of the same features in terms of formatting and punctuation as the purported Guinther letter and fax sheet. *Id.* at 60-64. Finally, Ms. Guinther confirmed Ms. Sulewski's previous testimony that an instruction directing the defendant to work off-site would have necessitated a Program Modification – which were often done for things as minor as slight adjustments in the term of the contract or the allocation of funds or hours

among labor categories – but that no such modification was done for this purported reassignment of the Program Manager's workplace. *Id.* at 64-66 **(Exhibit 4)**.

Following Ms. Guinther's testimony, the government called Craig Plunkett, ITK's long-time Vice President for Contracts, who was responsible for maintaining ITK's own copy of the IRONBRIDGE contract file: "we had two prime contracts and it was my job to make sure we had the records. I kept all the records for the prime contracts for all of the correspondence in and out, modifications to the contracts. Those kinds of things." *Id.* at 118-19 **(Exhibit 7)**. Plunkett, who worked for ITK from January 2011 through September 2018, testified that:

> Any document that I believed belonged in a file I would, once they were processed, reviewed, processed, and depending whether a modification had to be signed and sent back, those kinds of things, then it would go into the file right away so it didn't get lost. That was really the process. There was nothing else past that.

*Id.* at 120-21. Government counsel then showed Plunkett the purported Guinther letter **(Exhibit 1(a))**, and the following colloquy ensued:

> Q.   Right. Okay. I'm going to put up on the screen a document that's already been introduced as Exhibit 4(a). And can you tell me, if you recall, being shown that document by government investigators in the spring of 2022?
>
> A.   Yes.
>
> Q.   Okay. And what information were you given about this document when it was shown to you?
>
> A.   Originally it was -- I was given no information. I was just given the document and asked to review it and give my thoughts on the document.
>
> Q.   What were your thoughts on the document once you had an opportunity to review it?
>
> A.   **My original thought was I never seen the document before until I got it there.** Actually, my attorney gave it to me before we talked to you, but

after that that was the first time I've seen the document, I've seen it before. **Seen some inconsistencies with what I'll call a normal regular government letter that I pointed out to you and the group in the room at the time.**

Q.   Let's begin with one sort of preliminary question.  You said you had never seen the document before.  Given your responsibilities as the contracting officer at InfoTek, would you have seen a document like this if it had come in to you?

A.   **Yes, I would have seen it if it came in to me.**

Q.   As a matter of fact, you are the named addressee on the document, correct?

A.   Yes, sir.

Q.   And if a document like this came to you, and you had a chance to review the text of the document, **can you tell us whether or not this is a document you would have considered to be a very important document?**

A.   **Yes, it would have definitely gone into the file.**

Q.   Why would you consider this document to be very important?

A.   Because this document gave ITK the ability to work offsite.

[interjection omitted]

***

Q.   Is that something that would have been desirable from ITK's perspective?

A.   Yes, sir.

Q.   All right.  However, you mentioned that there were some, I believe you used the word "anomalies" or curious things about the document.  Can you just tell us what a number of those were that stuck out to you?

A.   Yes.  First, at the top of the page there is no marking for the government markings.  Usually it's an office number, like, B623.  Something like that.

Q.   (Indicating).

12

**A.**     Yes, sir.

**Q.**     That would be up there?

**A.**     Yes.

**Q.**     Okay.

**A.**     There's no classification on the bottom of the page --

**Q.**     Leaving aside this FBI documents --

**A.**     Yes, sir.

**Q.**     -- thing. But there's no classification text like the one that appears at the top of the page?

**A.**     Correct.

**Q.**     And normally does that appear at both the top and the bottom of the page?

**A.**     Yes, sir.

**Q.**     What other anomalies or unusual characteristics did you remark about this document?

**A.**     I know the phone numbers look different than what I would normally see from the CO and the contracting specialist.

**Q.**     What about the phone numbers looks different?

**THE COURT:**   What about what?

**Q.**     What about the phone numbers looks different?

**A.**     The phone numbers are in parentheses.  The first three numbers of the phone number in parentheses and the rest by itself.  So that was just a different thing that jumped out at me.

**Q.**     Directing your attention to the second paragraph of the document of the letter, purported letter, is there anything that sort of stands out to you there in terms of the substance of the text?

**A.**    No. This is definitely the -- I mean, if we wanted -- this is a letter that we as ITK, or ITK at the time, would have wanted to receive because it gave us exactly that we wanted which was full authorization to work offsite at the rate that we're currently bidding.  So it's the exact wording that we would want to see in a letter like this.

**Q.**    All right.  **That would have meant it would have been very important to you?**

**A.**    **Yes, sir.**

**Q.**    And would you have done certain acts by the way of follow up upon receiving a letter that gave you something you very much wanted?

**A.**    I don't understand the follow up?

**Q.**    Would you have done some follow up to make sure that the actions that are set forth are approved in that letter would actually come into effect?

**A.**    Yes, sir.

**Q.**    What would be the nature of the follow up that you would have done?

**A.**    **More likely than not either called or emailed to let Cherril know that I received the letter, and what are the next steps forward to -- we would have to have a modification of the contract to go forward so that would be the next steps.** So I basically would be, what are the next steps. Got the letter, thank you very much, what are the next steps to get this thing complete and finalized and in the contract.

**Q.**    All right. Did you take any such actions at that time?

**A.**    **There was no reason. I never received the letter.**

* * *

**Q.**    Okay.  Let me now show you Government's Exhibit 6 [the purported fax cover sheet].  Do you recognize that as a document that you were also shown in approximately April or May of 2022 by government investigators?

**A.**    Yes, sir.

**Q.**    What was your reaction to seeing this document?

14

**A.**    This document, looking over it real quick, it's the cover sheet to the -- to the letter that would have been sent over to us by fax.   Looking at it real quick, for the most part it looked pretty normal.  The only thing -- I can't see the bottom.  I'm not sure if the bottom has a classification or not.  But it also seemed like, if you look at the holes, the punch holes for the document, as well as the letter, they seem to be off.  Again, that could be not a big deal.  At the same time it's something to notice.

**Q.**    Mr. Plunkett, can you tell us, are you pretty meticulous in the way you maintained your contract files for InfoTek?

**A.**    Yes, sir.

**Q.**    All right.  Let's take a look at back again at Exhibit 3, Government's Exhibit 3. And so here we see the punch holes on the questioned document, that's Government's Exhibits 4(a) and 6(a).

I'm now going to show you a series of documents from the InfoTek contract files on the Ironbridge contract that are from roughly the same period of time 2011 and 2012.  As we look through these, can you tell me what you notice about the hole punches?

**A.**    They pretty much match up across the board looks like to me.

**Q.**    I want to ask you something else. Let's go back to 4 and, unfortunately, do I have -- actually, I can begin with 6(b).  Could you see if you could find a copy of 4(b) for me, Agent Brown.

* * *

**BY MR. GRAY:**

**Q.**    Let's look at 4(b) for a moment first. This is a photograph, 4(b), and it's in color. And do you notice anything about how the paper has been handled or stored?

**A.**    It looks like it's been folded.

**Q.**    Folded into quarters?

**A.**    Yes, sir.

**Q.**    And if we look at 6(b), can you tell me what your observations are of the appearance of 6(b) of how it appears it was stored?

**A.** It looks the same.

**Q.** In other words, what?

**A.** Folded in quarter.

**Q.** **Was it ever your practice to fold documents like this into quarters for any reason?**

**A.** **No, sir.**

**Q.** Now, Mr. Plunkett, did there come a time when you were asked to search the InfoTek contract files to see if you could find any document from the NSA that affirmatively authorized InfoTek to have the program manager work offsite?

**A.** Yes, sir.

**Q.** When was that?

**A.** That was in the -- I believe it was in the March 2018 time frame.  Actually, I was asked by Andrew Hallowell at the time, who was our attorney, to find any document that related to anything that related to offsite work.

**Q.** And Mr. Hallowell was the company's corporate attorney at the time?

**Q.** Can you recall whether or not that was right after the investigation into the alleged overbilling started?

**A.** Yes, sir, I'm pretty sure --

**Q.** As a result of that, would you tell the Court what you did to search the contract records on the Ironbridge contract and determine if any such authorization had ever been extended by the NSA?

**A.** Yes, sir. **I spent approximately eight hours of time looking through every one of the InfoTek documents at that time, probably would have been at least six, maybe seven documents [*sic*].  Going through every page trying to find anything and everything that had to do with offsite work. And also, after that, whatever emails I did not have on the folder I looked on my commuter to see if I had anything else on the computer that had to do with offsite correspondence back and forth to the government.**

16

**Q.**   I think you said maybe a moment ago that you looked through six or seven documents. Did you mean six or seven file folders?

**A.**   Yes, sir. I'm sorry, yes.

**Q.**   All right.  **Did you find any document that offered any such consent to the program manager working offsite at the Ironbridge contract?**

**A.**   **No, sir.**

**Q.**   **Did you find any document that referred to something like that ever having happened?**

**A.**   **No, sir.**

**Q.**   In other words, it appears that these two documents that we've seen, 4(a) and 6(a), were not in your contract files?

**A.**   Not to my knowledge; no, sir.

**Q.**   If they weren't in your contract files, can you tell us why they would have hole punches in the top?

**A.**   No, sir; I cannot.

**Q.**   So once you determined that you could not, after an eight-hour search, find copies of 4(a) or 6(a) in the file, what [*sic*; who?] did you tell about that?

**A.**   About this letter?

**Q.**   About your inability to find any such document?

**A.**   Well, basically I gave Mr. Hallowell all the documents that I could find in regards to working offsite.

**Q.**   Right.  Which did not include these two documents?

**A.**   No, sir.

**Q.**   Right.  Did you have any discussion with the Defendant about the fact that you had not been able to find any documents that supported the idea that there was an affirmative direction from the NSA to InfoTek that it could have a program manager work offsite?

> **A.**     No. [*sic*] **Ms. McComber was aware of all of the documents I gave to Mr. Hallowell and what was in them and what was not.**

*Id.* at 121-130 **(Exhibit 7).**   After defense counsel's cross-examination, the

following colloquy took place on government counsel's re-direct:

**BY MR. GRAY:**

> **Q.**     Mr. Plunkett, it was suggested by Ms. Chapla that it would be very understandable if you had overlooked or missed some document relating to permission from the government to work offsite in the course of your review in the fall of 2017 or early 2018, do you recall that statement by her?
>
> **A.**     Yes, sir.
>
> **Q.**     Do you agree with it?
>
> **A.**     **No, sir.**
>
> **Q.**     Why not?
>
> **A.**     **They were my files. I knew what was in them, I knew where to look. I would not have missed this document.**
>
> **Q.**     You have seen Exhibit 4(a) [the questioned Guinther letter], is there any doubt in your mind that you had never received or seen that document before it was shown to you in May of 2022 by the Government's representatives?
>
> A. No, sir.

*Id.* at 152 **(Exhibit 7)** (emphasis added).

The trial record in this case provides additional evidence – or, conversely, the

absence of it – that strongly supports Ms. Guinther's and Mr. Plunkett's testimony

concerning this matter.  Significantly, there was nothing in the exchanges between ITK

and the NSA over the several weeks following the October 10, 2012 date of the purported

Guinther letter in which any reference was made to it at all.  There are no emails

referencing any development such as that reflected by the purported letter, for example. Indeed, perhaps the most compelling affirmative evidence from the IRONBRIDGE contract records demonstrating that the purported Guinther letter was fake is GX 27(k).

As Ms. Sulewski, Ms. Guinther, and Mr. Plunkett all testified, if the IRONBRIDGE contract had been modified to allow the defendant to carry out most of the PM's work off-site, a contract modification should have been done to reflect that. And, in fact, a contract modification (P0008:  GX 27(k)) *was* done on the IRONBRIDGE contract on November 1, 2012 – only three weeks after the date of the purported Guinther letter.  That would have been the ideal time to have incorporated a development as significant as changing the Program Manager's work location.  But Modification P0008 made no reference to changing the defendant's work location. Instead, it simply extended the contract's period of performance for an additional thirty days to November 30, 2012, reflecting that there were still appropriated but unspent funds available from the previous fiscal year to continue funding the contract for that brief additional period.  See **Exhibit 8** (GX 27(k).  Nor was the "change" supposedly accomplished by the purported Guinther letter reflected in any of the 45 subsequent Program Modifications to the IRONBRIDGE contract.

After the sworn testimony of the NSA's Ms. Guinther and ITK's Mr. Plunkett respectively established that the person who ostensibly wrote the questioned October 10, 2012 letter denied writing it; that the person to whom it was addressed denied ever receiving it, and was confident that there was no copy of it in his files as of March 2018; and that both agreed the letter was a fake, further evidence relating to the letter's falsity was essentially superfluous.  However, the government also presented testimony at the evidentiary sentencing hearing from FBI Questioned Documents Examiner Linda

Eisenhart, an 11-year veteran of its laboratory at Quantico.  ECF # 382 (Evid. Sent. Hrng. Tr.) at 156-160 & Government Sentencing Hearing Exhibit (GSX) 11 **(Exhibit 9)**.[2]

Examiner Eisenhart was asked to determine two things with regard to the purported Guinther letter and its accompanying fax that were produced by defense counsel to the Court and the government on February 28, 2022.  The first was whether they actually had been faxed and the second was whether they had "been altered or manipulated in some way" so that they were other than what they appeared to be.  *Id.* at 168-69.[3]

To assist her in performing this analysis, the government provided Examiner Eisenhart with other roughly contemporaneous documents from ITK's IRONBRIDGE contract files so that she could determine "The type of printing that was on there as well as some of the formatting of the documents."  *Id.* at 169, 173-75.  She was also asked whether she could determine the age of the two purported documents, but reported that she was not able to do so due to the absence of a watermark and the nature of the printing technology that was used to produce them.  *Id.* at 170, 179.  Nor was she able to determine whether the purported Guinther documents had originally been faxed.

---

[2]     Examiner Eisenhart had received a number of awards in recognition of her work, including the FBI Director's Award for Outstanding Scientific Achievement in 2021; an innovation award from the American Society of Crime Lab Directors; and a Medal of Excellence from the FBI in 2018.  *Id.* at 160-163.

[3]     As Examiner Eisenhart explained, saying that a document has "an alteration" means "That a document was changed, generated, manipulated, any of those would fit into the alteration category."  *Id.* at 177.

However, Examiner Eisenhart was able to determine (and her report, GSX 14, reflected) that she detected alterations in the questioned Guinther documents. In particular, she reported that the non-original Cherril Guinther signature on the purported October 10, 2012 letter had originated with the authentic December 19, 2011 letter, and that this "signature was transferred onto the document digitally, mechanically, or by other means." *Id.* at 174-75 (the December 19, 2011 letter "was the source of the Cherril Guinther signature that was used on the October 10th, 2012 letter"). She stressed that this determination was further solidified because she had obtained the inked original of the December 19, 2011 letter. This established that the December 19th signature was not "a toner or inkjet produced signature," and thus "that it was not an electronic signature that was being reused and perhaps authorized, or a signature stamp which is another reason we might see two signatures overlaying. So knowing that I had the original inked signature on [the December 19, 2011 letter], I was able to conclude that this was, in fact, the source either directly or indirectly." *Id.* at 176, 178 (it was significant that there was "absolutely no variance" between the signatures).[4]

Beyond determining that the signature on the questioned Guinther letter had been transferred from an earlier authentic Guinther-signed letter, Examiner Eisenhart used examination techniques known collectively as "graphic arts" in an effort to determine whether the questioned Guinther documents first produced in late February

---

[4]   In addition, prior to trial, the government produced evidence in discovery to the defense establishing that the NSA's access control records reflected that Ms. Guinther had been physically present at the NSA on both December 19, 2011 (the date of the letter with her actual signature) and October 10, 2012 (the date of the letter with the transferred signature). **Exhibit 10.** Thus, there would have been no need for anyone at the NSA on October 10, 2012 to do a cut-and-paste of her signature from the earlier letter onto the subsequent one.

2022 had been printed by the same machines as other documents in ITK's

IRONBRIDGE contracts file dating back to 2011-2012.  Examiner Eisenhart explained to

the Court that while she could not offer a definitive opinion that the questioned

documents came from a different printer or source than the known authentic

comparison documents, there were a significant number of observable inconsistencies

between them which indicated that this might be the case:

> **Q.**   All right. Were you able to come to any conclusions,
> however, even if you weren't able to reach a definitive answer,
> as to whether questioned Items 1 and 2 were printed by the same
> office machines as say [comparison] Items 3, 4, 15, 16 and 18?
>
> **A.**   **Yes, with respect to those known items that you mentioned,
> my opinion is they're** [*sic;* there is?] **a support for different sources** and
> those were facsimile exemplars I compared the Items 1 and 2
> questioned documents to.
>
> **Q.**   And then you provided more information on that further
> down in your report?
>
> **A.**   Yes. To reiterate for the Court, that is not a definitive
> opinion. It's not an exclusion saying they do not come from
> the same source. There are some limitations to the testing
> that we can do, but **there was inconsistencies between them that
> I can demonstrate.**

*Id.* at 180-181.

As shown by the government's exhibits introduced during Examiner Eisenhart's

testimony, there were in fact numerous "inconsistencies" between the characteristics of

the known contemporaneous documents in ITK's IRONBRIDGE contract file from 2011-

2012 and the questioned Guinther documents first produced by the defense almost a full

decade later.  The first of these related to the characteristics of the **type** shown in the

questioned Guinther documents and that found in the known contemporaneous faxes.

When Examiner Eisenhart compared the letters "ques" taken from the type in the

questioned Guinther facsimile cover sheet against an example of the same four letters in type taken from a known contemporaneous actual fax (Item 18), she found that the latter were consistent in appearance with what would typically be expected in a faxed document, showing "stepped edges":

> so a good example of that might be if you look at the view on the right-hand side, the top right image, hopefully you can see in the center of that there are portions that appear to not be smooth. They're sort of boxed in nature. And around curved edges you tend to see what looks like a classic staircase with steps. Around curved edges, that happened with facsimiles because of the way they're transmitted. They're reduced in size going from digital to analogue back to digital. So there's usually some degradation of the quality of the image classically.

*Id.* at 184-87 & GSXs 14 & 15). But those features characteristic of documents that were known to have actually been faxed did *not* appear on the questioned Guinther document. Examiner Eisenhart concluded that "the difference in the print quality was significant to me. It's something that I evaluated, in part, with other characteristics in comparing those questioned and known items." *Id.*

Second, Examiner Eisenhart found that there were likewise inconsistencies between **the print processes and machine characteristics** of the questioned Guinther documents and the known contemporaneous ones used for comparison purposes. As she testified:

> A.  So the Item 1 and 2 documents [the questioned Guinther documents] and the process that was used to print those **is a different process than I observed** on Pages 1 and 2 of Item 4 -- or, excuse me, Pages 1, 2, and 4 of Item 4-1, Item 5, 6, 7, 8, Page 2 of Item 9 and 10 [the known contemporaneous documents]. **So those I can confidently say are different print processes and the same machine could not have been used to produce Item 1 and 2 compared to those** –
>
> Q.  Right.

23

> **A.**    -- the machine used to compare those items.

*Id.* at 187 (emphasis added).[5]

Third, Examiner Eisenhart compared the **toner** used on the questioned documents with that used on the known contemporaneous documents.  Again, she found more inconsistencies that provided further support for the view that the two groups of documents came from different sources:

> **Q.**    So let's go to the next box you have there, support for different sources, ink/toner exemplars, ink/toner exemplars, you're looking at the same thing.  But at this point you're saying here is support for different sources rather than elimination.  What does that difference mean?
>
> **A.**    Right.  So this is not a definite determination, this conclusion I have on these other known items, when I compared the questioned documents to them.  **But I did observe inconsistencies in the type of toner that was used to produce these documents.** In particular, **I did a test for magnetic toner and I found magnetic toner on the Item 1 and 2 questioned**

---

5   There were only two comparison items – numbers 11 and 12 – with regard to which Examiner Eisenhart could not definitively conclude that they were not printed on the same machine that was used to print the questioned Guinther documents.  Like the questioned Guinther documents, these both were printed with magnetic black toner.  However, as Examiner Eisenhart further explained, owing to the paucity of distinguishing printer characteristics, it was also impossible to determine conclusively whether these items had been printed on the same machine as the questioned documents:

> the theoretical bucket of the number of machines that could produce a document with those characteristics is quite large, and so with the absence of any characteristics on those documents that would allow me then to distinguish the  machine to only being -- the only machine being used, those were just absent.  I didn't have any characteristics I could use to further correlate the same machines, such as the trash mark we had talked about earlier. So all I could say was that they were consistent and with regard to if it was the same source I'm inconclusive.

*Id.* at 197-98.

> **documents but not on these other items where I gave a conclusion of support for different source.**

*Id.* at 187-88 (emphasis added).

Fourth and finally, Examiner Eisenhart conducted an examination comparing the **paper** of the questioned Guinther documents with that of the known contemporaneous documents that were used for purposes of comparison. She determined that many of the comparison documents were inconsistent in both paper class and optical characteristics with those of the questioned Guinther documents (Items 1 and 2):

**Q.**   Okay. Did you also conduct a paper examination and what did that show?

**A.**   **So I had a couple conclusions with regard to examining the paper.** There was a large set of the exemplars that are listed here: Item 4, 4-1, 6, 7, 8, 9, 10, 11, 15, 16 and 18. Those were all inconsistent.

**THE COURT:**   Not 10. I don't see 10 listed.

**THE WITNESS:**   I'm sorry. Let me reread that just for the record.

> Item 4, 4-1, 6, 7, 8, 9, 11, 12, 15, 16 and 18. **Those were all inconsistent in class characteristics, optical characteristics with Item 1 and 2.**

**BY MR. GRAY:**
**Q.**   Once again, what are Items 1 and 2?

**A.**   Those are the questioned items.

**Q.**   The questioned Guinther documents.

**A.**   So, again, this is a observation and a conclusion that I'm giving but it does have limitations. It's important to note that even though these items of paper, they're paper in particular, shows differences in their optical characteristics. From the times that we've had a chance to tour the papermaking facilities, we do know that sometimes the reams of paper can be put together from multiple rolls. So there can be times when there will be variation in optical characteristics in between individual sheets in a ream. However, I did want to at least offer that observation.

25

**Q.**     Because, in fact, **for a substantial number of the comparison documents they appear to have different characteristics of the two questioned Guinther documents?**

**A.**     That's right.

*Id.* at 188-89 **(Exhibit 9)** (emphasis added).

A review of the summary charts relating to Examiner Eisenhart's investigation that the government introduced as its Sentencing Hearing Exhibit 15 **(Exhibit 11)** clearly establishes that the suspect Guinther documents, when compared against the other known contemporaneous documents taken from ITK's IRONBRIDGE contract file, were outliers in virtually every respect.  Beyond that, it has been definitively determined that the signature appearing on the purported Guinther letter dated October 10, 2012 was copied from that appearing on the authentic December 19, 2011 letter. And the testimony of both Ms. Guinther and Mr. Plunkett, together with the account given by the defendant's own counsel about the suspicious circumstances in which he first belatedly encountered these suspect documents, demonstrates not merely by a preponderance of the evidence – which is the standard that applies to findings of fact in a sentencing proceeding – but beyond any reasonable doubt that the questioned Guinther documents were fakes prepared by defendant McComber, most likely shortly before they were first produced, in an effort to improve her chances in her then-approaching April 4, 2022 trial by fraudulent means.[6]

---

[6]     In addition, as we noted in our previous sentencing reply brief (ECF # 311 at 12 & Exhibit 11), largely at the behest of the defendant's previous defense counsel, we had FBI Fingerprints Examiner Nicole Cover test the originals of the two Guinther documents for fingerprints.  As her report (Exhibit 11) reflected, the only identifiable fingerprints recovered from it were associated with defendant McComber and the mail clerk in the U.S. Attorney's Office who had opened up the envelope containing the originals of the questioned Guinther documents after defense counsel finally sent them to us without providing any advance notice that they were coming and would require special handling.

As we noted in our previous sentencing reply brief, ECF # 311 at 13-14, falsifying a document in connection with a pending prosecution is squarely included in the conduct encompassed by the obstruction enhancement provided for by U.S.S.G. § 3C1.1. See Commentary Note 4(C) (covered conduct includes "producing or attempting to produce a false, altered, or counterfeit document of record during an official investigation or judicial proceeding").  The defendant's conduct in this instance was even more grave, in that she created the fake document long after she had been represented by counsel, and she then (in the Government's view) arranged matters so that Mr. Ahlers would run across it in a way that both unknowingly involved him in her obstructive criminal conduct,  and that caused him to make an unfounded accusation against the government of a *Brady* violation.  See ECF # 60.  Moreover, she did so barely a month before then then-scheduled trial date of April 4, 2022, clearly with the intention of putting the government at a disadvantage in uncovering and countering her fraud.  This is exceptionally serious criminal conduct of a kind that is fortunately relatively rare in federal white-collar criminal proceedings.  We submit that this obstructive conduct by defendant McComber, standing alone, would fully merit an additional upward departure of two offense levels – but as the next section demonstrates, this was not the end of the defendant's obstructive conduct in the pre-trial and trial phases of this case.

27

## II.   THE DEFENDANT FURTHER ATTEMPTED TO OBSTRUCT JUSTICE BY REPEATEDLY LYING DURING HER TESTIMONY AT TRIAL

In ECF # 311, our previous sentencing reply brief, we set forth at pages 14-17 first the legal basis for imposing a further obstruction enhancement upon the defendant based upon her perjured testimony at the trial itself.  Based on a review of the final trial transcripts, we have identified a number of areas in her trial testimony where the defendant testified falsely:

- The defendant testified that "monthly status reports, which were one of the required deliverables by the program manager . . . were sent to multiple CORs every month," ECF # 303 at 47-48, even though she herself had claimed in an email to Jason Doyle (GX 24(e)(1)) on April 4, 2017) that "I need you to mock up some quick points over the past six months on the program and send them to me.  Jon had us stop doing these and now the COS is demanding them";

- The defendant further told the jury that her expert Mr. Charles Stein had been unable to review her work product, and she had been unable to produce it for the jury to see, because her NSA OneDrive account had expired and NSA was unable to reinstate it.  "So all of my data was gone. . . I don't have the work product.  It was done and stored on the OneDrive.  It was sent to those NSA personnels [*sic*] on a monthly basis."  In fact, when the defendant was again ordered to produce a status report in the spring of 2017 (and she had to ask Jason Doyle to do it for her), she sent it back to the NSA's Erica Heinze by regular email, while also asserting that "I was given guidance by our former government PM [Jonathan Smith] that he no longer wanted to have us submit these." *Id.* at 47-48 & GX 24(e)(3);

- The defendant claimed that "I don't recall putting eights [hours] in every single day" on her timecards for her work on the Ironbridge contract, ECF # 303 at 150, *but see* GX 22(c)(1) – 22(c)(13) [the Unanet Time Detail Sheets reflecting the defendant's daily hourly billings]; claimed that "I was answering truthfully [to Agent Hazenstab] because I knew I didn't falsify my time card.  I was unaware that anyone else would ever do such things, invade our Unanet system" (*id.*);[7] claimed that "I didn't have a habit" of billing

---

[7]   In fact, by the time of her interview with Agent Hazenstab on October 4, 2017, the defendant had known since late July that there had been an invasion of ITK's Unanet

"eight hours basically everyday," and answered "Yes" when asked, "So is your testimony that you would bill something other than eight hours?" (*id.* at 151);

- The defendant claimed that "**I never billed an hour on the Ironbridge contract that I did not work. . . .** The amount of time is accurate, yes. . . . [T]he hours are accurate.  They are a culmination[,] in an FFP-LOE it doesn't matter when you worked the hours you have to keep an accordance [*sic*] of the hours and bill the hours that are performed in direct support of the contract." [*id.* at 154-155];

- **"My billing habits were to put in the hours that I actually worked and never anything more than that.  I do not and cannot testify to the fact that these are the hours that I put in or that these hours are accurate or that I did it at all."** [66]

- She claimed that she was tracking "My tasks and the amount of time" on "scratch sheets" that were later destroyed (*id.* at 172-173), notwithstanding the records (e.g., GX 22(c)(1) – (13)) that showed her routinely recording a flat 8 hours every single day for long stretches of time;

- She repeatedly suggested that Dwayne Preston had altered her time records (*id.* at 20-21, 22-23 ("I can't answer that honestly because I don't know what was changed in the system by Mr. Preston"), 24 ("Dwayne as the administrator for some unknown reason, decided to created my time card on my behalf"), 26-27 ("Dwayne Preston as the administrator is going in and creating my time card on my behalf on [*sic*] three-quarters of the sway through the time period"), 191, even though she knew that the computer forensic experts ITK had hired to examine the records had been unable to identify any evidence that he did so during his acknowledged intrusion into the Unanet system on July 19, 2017, see GX 34 (Atlantic Data Forensics Report);

- She testified that "I did not bill that time" on the nine dates in the spring and summer of 2017 that her corporate counsel, Andrew Hallowell, had conceded in a letter to the government on November 10, 2017 (GX 23(b)) were not accurately billed (*id.* at 179);

- She agreed that she was claiming that she was "tracking my time" and "entering it not daily, but regularly" (*id.*), even though the Unanet time

---

system that has resulted in, *inter alia*, increasing certain employees' paid time off (PTO) hours.

records demonstrated that she frequently entered her time many days after the dates in question – and sometimes even after the two-week time periods had ended – and frequently did so only after she had been strongly pressed by ITK's CFO Dwayne Preston to act, in some instances because her failure to do so was threatening to hold up the company's payroll, ECF # 304 at 28-65 (Rebuttal Testimony by Dwayne Preston); and

- She testified that when she went into her time records to enter a new day or days, "I would never look at them [the previous entries] with any interest," and thus never became aware that Dwayne Preston had (supposedly) been routinely altering her reported time on the IRONBRIDGE contract (*id.* at 190-91).

**Exhibit 12** (cited pages from defendant's testimony).

In our previous sentencing reply brief (ECF # 311 at 14-16), we have already discussed the applicable case law (including the Supreme Court's decision in *United States v. Dunnigan*, 507 U.S. 87 (1993) that addresses when an obstruction of justice enhancement is appropriate based upon a finding that a defendant committed perjury while testifying at trial, and have also set forth the required elements of the perjury offense.  We will therefore not repeat that discussion here.

The next step in the obstruction analysis is determining how defendant McComber's multiple acts of obstruction – (1) making false statements during her October 2017 interview by investigating NSA-OIG agents; (2) producing a fraudulent document supporting her defense barely five weeks before this case was then scheduled for trial; and then (3) providing extensive false testimony under oath during her trial testimony in her own defense – should be addressed for the purposes of sentencing. Fortunately for the reliability of the justice system, serial obstructors of justice like defendant McComber are not particularly common, but there have been enough of them

30

that the federal courts have worked out a clear approach for dealing with such offenders at sentencing.

Importantly, the courts have rejected a procrustean approach, whereby multiple acts or types of obstruction by a defendant must all be forced into only a single enhancement for obstruction under U.S.S.G. § 3C1.1. Instead, the courts have determined that when a defendant committed multiple acts or types of obstruction, this takes their case outside the "heartland" of typical cases falling within the scope of § 3C1.1 and merits some form of additional penalty. That may come in the form of either adding a second obstruction of justice enhancement, *see, e.g., United States v. Vaught*, 133 Fed. Appx. 229, 235 (6th Cir. May 23, 2005) (unpublished) (district court properly aggregated defendant's two acts of obstruction in imposing a four-level enhancement under § 3C1.1), or imposing an additional upward departure on top of the original § 3C1.1 enhancement pursuant to U.S.S.G. § 5K2.0(a). *See, e.g., United States v. Willis*, 523 F.3d 762, 768-70 (7th Cir. 2008) (where defendant committed two distinct acts of perjury, the Court should have imposed one enhancement under § 3C1.1, and then "should have analyzed the additional act of perjury as a basis for a higher or non-Guidelines sentence under the factors listed in 18 U.S.C. §3553(a)"); *United States v. Ventura*, 146 F.3d 91, 96-99 (2d Cir. 1998) (approving an additional upward departure beyond the enhancement afforded by § 3C1.1 where defendant committed multiple acts of obstruction); *United States v. Furkin*, 119 F.3d 1276, 1283-85 (7th Cir. 1997) (approving additional two-level upward departure for obstruction of justice where the defendant "committed eight of the nine types of conduct listed [in § 3C1.1], and some of the conduct he committed multiple times"); *United States v. Clements*, 73 F.3d 1330, 1342-43 (5th Cir. 1996) (district court properly applied both a § 3C1.1 enhancement and

31

an additional upward departure where the defendant "committed at least four instances of obstruction of justice"); *United States v. Wade*, 931 F.2d 300, 306 (5th Cir. 1991) (both two-level § 3C1.1 enhancement and additional upward departure were appropriate where the defendant was convicted on two separate counts of obstruction at trial and the record further demonstrated that he committed numerous additional uncharged acts of obstruction; "the two-level enhancement for obstruction of justice was inadequate given the egregious facts of this case"); *United States v. Wallace*, 417 Fed. Appx. 276, at *278 (4th Cir. March 17, 2011) (unpublished) (district court's decision to combine an enhancement under § 3C1.1 with a two-level upward departure based upon two different acts of obstruction was reasonable) (citing *Ventura* and *Furkin* with approval).  Thus, we contend that the defendant should receive an initial two-point enhancement for obstruction pursuant to § 3C1.1 based upon her conviction at trial on Count 20 for making false statements to the NSA-OIG investigators, and then an additional two-level upward departure under U.S.S.G. § 5K2.0(a) for creating the fake Guinther documents and for her false testimony from the witness stand at trial.

### III.   THE DEFENDANT'S RELENTLESS EFFORT TO SHIFT THE BLAME FOR HER OVERBILLINGS TO DWAYNE PRESTON BY PURSUING A CIVIL LAWSUIT AGAINST HIM WAS ANOTHER FORM OF OBSTRUCTION OF JUSTICE

In our previous sentencing reply brief (ECF # 311 at 18-20), we explained how the defendant had relentlessly persisted in pursuing a lawsuit in this court against her former CFO Dwayne Preston that was clearly intended to punish him for the defendant's mistaken assumption that he was the whistleblower who had exposed her fraudulent billings.  As he testified at trial, that lawsuit has cost Mr. Preston an astonishing $270,000 in order to defend himself – a sum that is many multiples of any reasonable

estimate of the harm he caused to ITK by his 40-minute intrusion into its Unanet

system and minor acts of altering its records on the night of July 19, 2017. We further

note that Judge Catherine Blake, who was presiding over the case of *ITK v. Preston*,

stated in her decision denying plaintiff's request for partial summary judgment that a

reasonable jury might conclude that a large portion of the expenses ITK had purportedly

incurred in investigating Preston's minor intrusion might actually have been intended

"to develop a defense for Ms. McComber against criminal charges" arising out of the

NSA-OIG's investigation of her. 2022 WL 4121414 at *5.

In *United States v. Atif Malik*, Crim. No. JKB-16-0324 (D. Md.), Judge Bredar

encountered a similar situation where a physician who was facing a potential federal

criminal investigation had initiated a pre-emptive litigation against former employees of

his practice who were potential witnesses against him. At sentencing in that case –

where he imposed an eight-year term on the defendant – Judge Bredar made the

following observations, which we consider to be very pertinent in this case as well:

> Early in this sentencing hearing, the Court focused attention on
> this civil lawsuit that was filed that named Ms. Decker and others. The
> Court is troubled by its conclusion that this is an example of a party
> employing the civil justice system for some purpose very different from
> that which it was designed for, **and that is that the defendant is
> involved in the prosecution of this lawsuit at the same time that
> he's fully aware of his own deep involvement in serious
> fraudulent misconduct. What in God's name is going on with
> the effort to file suit himself in these circumstances? I'm left
> with the conclusion that he was going to use, was going to
> weaponize the civil justice system to his benefit, that that was
> his objective. That's a grievous escalation of misconduct
> designed to protect and cover tracks and throw authorities off
> the trail, and most significantly, dissuade witnesses from telling
> what they know and reporting misconduct** that has occurred in
> their presence.

*United States v. Malik*, Crim. No. JKB-16-0324, September 11, 2018 (ECF # 460).

## IV.   THE DEFENDANT MADE ADDITIONAL FALSE STATEMENTS TO THE PROBATION OFFICER DURING THE COURSE OF THESE SENTENCING PROCEEDINGS

In an apparent effort to garner sympathy from the Probation Officer and the Court, the defendant made numerous claims in her interview with USPO Paige Cameron to the effect that she had suffered from sexual abuse as a child (¶ 85) and had further been the subject of "abusive" behavior by her former husband, Robert Kimmel (¶s 92, 93, 94, & 97).  As we stated in our objections to the draft Pre-Sentence Report (PSR) that we filed on April 10, 2023, we believe that many of these allegations are of dubious credibility.  The only witnesses whom the defendant proffered to substantiate her allegations – one of her two sisters, her mother, and her therapist – may be understandably biased in favor of a sister and a daughter against a non-family member; may have had limited opportunities for observation; and, in the case of her therapist Ms. Ritz, was wholly dependent on the defendant's own statements to her and had no independent ability to verify them.  Moreover, as we have already seen, the defendant is an exceptionally unreliable witness, even when testifying under oath in the presence of others.  Given her intense animus towards her husband – an animus that he, in contrast, simply does not share, as is reflected by Mr. Kimmel's business emails produced in discovery in this case – and her evident emotional issues, we submit that there is very little reason to credit any statements about the defendant's relationship with her husband, or about the source of the emotional problems suffered by the couple's third child, that are based upon assertions or reports coming only from the defendant herself.

Accordingly, we submit that these contested and dubiously-sourced paragraphs from the PSR should be struck so that they do not mislead officials at facilities of the Bureau of Prisons in the future, when the defendant may well apply for compassionate

34

release if she receives a sentence of incarceration. At the very least, these self-serving and highly suspect statements by the defendant should be disregarded by this Court in considering the character and length of her sentence, particularly given the lack of any meaningful opportunity for Mr. Kimmel to contest them.[8]

## V.   THE GOVERNMENT'S ESTIMATE THAT THE DEFENDANT'S CRIMINAL CONDUCT RESULTED IN FRAUDULENT OVERBILLINGS TO THE NSA EXCEEDING $300,000 IS REASONABLE

Commentary Note 3(C) ("Estimation of Loss") to U.S.S.G. § 2B1.1 emphasizes that "The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and *estimate* the loss based upon that evidence." (Emphasis added.) That note goes on to state that "The estimate of the loss shall be based upon available information, . . . as appropriate and practicable," including such "general factors . . . as the scope and duration of the offense . . . ." *Id.*, Note 3(C)(vi). Accordingly, the Fourth Circuit has repeatedly stressed that the sentencing court need only make a "reasonable estimate of loss based on the available information in the record." *United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014); *see also*

---

[8]   When government counsel read these paragraph in the draft PSR in mid-April, he immediately recognized that they presented a picture of the Kimmel's relationship that was seriously at variance with much of what the investigators had learned from speaking to numerous witnesses and reviewing many of the defendant's emails. Accordingly, government counsel asked USPO Cameron to speak with Mr. Kimmel to get his response to these allegations. USPO Cameron agreed to do so, but expressed her understanding that the confidential character of her interview with the defendant would make it impossible for her to share anything specific that the defendant had said about her relationship with her former husband. Under those circumstances, USPO Cameron did interview Mr. Kimmel, but with no ability to apprise him of the specific allegations the defendant had made against him, the interview produced little aside from making it clear that Mr. Kimmel felt nothing like the same animus towards his former wife that she felt towards him – even though she was largely responsible for destroying the company that they had built together.

*United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017); *United States v. Pierce*, 409

F.3d 228, 234 (4th Cir. 2005); *United States v. Miller*, 316 F.3d 495, 503 (4th Cir.

2003).  Mathematical certainty or precision is not required.  However, we submit that

when all the evidence in the record here – both that adduced by the government, and

that produced by defense – is considered as a whole, it clearly establishes that the

defendant did relatively little legitimate billable work on the IRONBRIDGE contract

between March 2016 and September 2017.  This is particularly true given the testimony

of many witnesses, as detailed in the government's Rule 29 opposition, that relatively

little work could be done on the IRONBRIDGE contract from an off-site location.  ECF #

390 at 22-51 *passim.*

In fairness to the defendant, and as the government's overall investigative

spreadsheet (GX 21(a)) and the individual monthly spreadsheets (GXs 1(c) – 19(c))[9]

demonstrate, she spent a somewhat greater amount of time out at the NSA initially after

she assumed the Program Manager's position in mid-March, 2016.  Even then however,

she soon went largely AWOL from March 25th through April 6th while she was traveling

out-of-town to attend an Industry Day in South Carolina and then working what she

described as around-the-clock hours on ITK's unsuccessful bid for the ROAD RALLY

contract.  After that, her time at the NSA rapidly trailed off, as she clearly realized that

there was little she needed to do – or, indeed, could do – to help the contract operate

successfully.

---

9    At the end of the monthly spreadsheets (GX 1(c) – 19(c)), each spreadsheet provides
totals for that month comparing the number of hours the defendant was in access
control against the number of hours that she and ITK billed for her services.  In
contrast, the comprehensive spreadsheet (GX 21(a)) provides these respective totals for
the entire period from March 2016-September 2017.

As the monthly spreadsheet GX 3(c) reflects, for example, as early as May 2016, the defendant was in access control for only **21 hours/14 minutes**, while ITK billed for **142 hours** for her services as PM that month.  She was also not present in access control *at all* on May 4, 12, 13, 17, 19, 25, and 31.  By July 2016, as GX 5(c) reflects, she was not in access control *at all* on July 1, 5, 8, 11, 12, 13, 15, 18, 20, 22, 26, 28, and 29 – 13 days.  And she was in access control for a total of only **15 hours/46 minutes** that entire month, even as she reported and ITK billed **156 hours** for her services.  By September 2016, as shown by GX 7(c), she was in access control for only **9 hours/35 minutes** over the entire month, even as she reported and ITK billed for **168 hours** for her Program Manager services.  Moreover, out of the **21** work days that month, defendant McComber was not in access control on fully **16** of those days.  On the 5 days she did report to the NSA, her time in the facility ranged from a low of one hour to a high of three-and-a-half hours.

By January 2017, she reported to NSOC at the NSA on only **two days** the entire month – January 6th and January 24th.  (She reported to ITK's SILENT ROAR worksite on January 12th, but did not even bother to swing by NSOC at that time.)  Overall for January 2017 she reported and ITK billed for **146 hours** of her time on the IRONBRIDGE contract, even as she was actually in access control for just under **eight-and-a-half** hours.  GX 11(c).  Between January 25th and February 21st, as GXs 11(c), 12(c), and 21(a) demonstrate, a period of nearly a month, **she was not in access control at the NSC at all.**  Similarly, in June 2017 she was only in access control on **two days – June 8th and 29th** – with another three-week gap in between.  Although the total amount of time she was in access control on those two days totaled **3 hours /**

**12 minutes**, she reported and ITK billed for **170 hours** of her time as Program Manager at a rate of $150.35 an hour.

At trial, the government established the falsity of the defendant's billings of her time as Program Manager on the IRONBRIDGE contract first by presenting testimony from many of the key personnel on the contract, both from the NSA and from ITK, and secondly based upon investigative spreadsheets (GXs 1(c) – 19(c) & 21(a)) that combined the NSA's access control records showing the defendant's time on-site at Fort Meade with the information the government developed from other sources (such as those reflected in GXs 22(a), 22(f)(1)-(20), 22(g), 22(h), 22(i), 22(j), 22(k), 22(l), 22(m), 22(n), 22(o), and 22(p), consisting of emails and Lync messages, the defendant's desk calendars, expense reports, and bank records, among other things). The government presented this information primarily through two witnesses: Lori Hazenstab, the NSA-OIG agent who was assigned to the case from its inception through her retirement in August 2021 following the indictment, and Defense Criminal Investigative Service (DCIS) agent Keith Benderoth.

Ms. Hazenstab took the witness stand roughly halfway through the second day of the trial, and testified for the remainder of that day (January 24th, ECF # 293 at 109-182) and for all of the third day (January 25th, ECF # 294, at 5-192) – a total of roughly 8 hours of trial time. Mr. Benderoth then immediately followed her testimony on the fourth day (ECF # 295, at 6-243), testifying for the entire day. The testimony about these matters thus accounted for some 13 hours of trial time, as recorded in 497 pages of trial transcript. The government then returned Mr. Benderoth to the witness stand at the sentencing hearing, so the new defense team could have a chance to ask him any additional questions they had. His testimony on that further occasion on November

20th ran for roughly four hours and produced another 157 pages of transcript, for an overall total of 17 hours of questioning of the government's witnesses and just over 650 pages of transcript on the subject of how much time the defendant actually spent working on the IRONBRIDGE contract.  In addition to that, the new defense team further addressed these issues by filing a three-ring notebook with twenty exhibits in support of its replacement Rule 29 motion, which sought both to flyspeck the government's investigative spreadsheet and to demonstrate that the defendant always had unaccounted for hours in her day which would have been sufficient for her to have worked the hours on the IRONBRIDGE contract that she billed.  ECF # 359.

In its response to the defendant's replacement Rule 29 motion (ECF # 390), the government pointed out what the new defense's team's motion had largely ignored — that virtually no witnesses who had worked on the IRONBRIDGE contract, whether from ITK or the NSA, supported her claim that she had actually put in 8 hours a day of billable work on it as the Program Manager for most of the days between mid-March 2016 and early September 2017.  And even more telling: although the defendant waived her Fifth Amendment privilege and took the stand in her own defense at trial, over the course of some six hours of testimony that produced roughly 230 pages of testimony, she provided remarkably few specifics about the work she actually did and when she did it, aside from claiming that she had produced monthly status reports that she said were no longer in existence.  ECF # 303 at 47-48.

The Court has recently been thoroughly marinated in all of this evidence once again as worked on its 69-page memorandum opinion rejecting the new defense teams' replacement Rule 29 motion.  ECF # 429.  While that motion and the Court's resulting opinion and order dealt with the sufficiency of the government's evidence to sustain all

of the defendant's convictions, and not with determining the amount of the loss, the information presented above and in the monthly and overall investigative spreadsheets also convincingly demonstrates that the defendant spent very little time actually working on the IRONBRIDGE contract over the 17 months between March 2016 and early September 2017.  Accordingly, this Court should find that the government's position – as presented in its Restitution submission (ECF # 288) back on April 28, 2023 – that the defendant should receive credit for only the following hours is a reasonable estimate:

| | |
|---|---|
| **Time the Defendant Reported and ITK Billed for:** | **2,603.5 hours** |
| **Time the Defendant was in NSA Access Control:** | **261 hours** |
| **Time in Access Control that the Government submits is a reasonable estimate of what was actually billable, after deducting time getting to the NSOC space and time spent in the SILENT ROAR space, but not deducting time for lunch:** | **200 hours (76%)** |
| **Time the Defendant spent outside of NSA Access Control:** | **2,342.5 hours** |
| **Time the Government suggests should be credited to the defendant for work supposedly performed off-site:** | **351.5 hours (15%)** |

Thus, the government submits that a reasonable estimate of the amount of the NSA's loss in this case is to give the defendant credit for a total of 551.5 of her billed hours, which translates to an average of roughly 30 hours per month – an average of 11 hours a month for her on-site time, and 18.5 hours for her off-site time.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
_____
Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov

*Counsel for the United States*

41

**EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 1(a) | The Purported Guinther Letter dated October 10, 2012 |
| 1(b) | The Facsimile Cover Sheet accompanying the Purported Guinther Letter |
| 2 | Excerpt from the transcript of the May 9, 2022 conference call where Mr. Ahlers explained the circumstances under which he ran across the questioned Guinther documents to the Court |
| 3 | Excerpts from the Testimony of NSA Employee Kelly Sulewski at the Motions Hearing on August 29, 2022 |
| 4 | Excerpts from the Testimony of former NSA Employee Cherril Guinther at the Evidentiary Sentencing Hearing on November 16, 2023 |
| 5 | The authentic December 19, 2011 letter from Cherril Guinther from which her signature was digitally transferred to the Purported Guinther Letter |
| 6 | Marked-up Version of the Purported Guinther Letter and its accompanying facsimile cover sheet showing anomalies not consistent with standard NSA letter formatting |
| 7 | Excerpts from the Testimony of former ITK Vice President for Contracts Craig Plunkett at the Evidentiary Sentencing Hearing on November 16, 2023 |
| 8 | Modification P0008, dated November 1, 2012 to the IRONBRIDGE Contract (Government Trial Exhibit 27(k)) |
| 9 | Excerpts from the Testimony of FBI Questioned Documents Examiner Lisa Eisenhardt at the Evidentiary Sentencing Hearing on November 16-17, 2023 |
| 10 | Records Demonstrating that Cherril Guinther was in Access Control at the NSA on both December 19, 2011 and October 10, 2012 |
| 11 | Government Sentencing Hearing Exhibit 15 (Power Point Slides Summarizing the Findings of Examiner Linda Eisenhart) |

| 12 | Excerpts from the Trial Testimony of Defendant Jacky McComber |
| 13 | Restitution Statement (ECF # 288) filed by the Government on April 28, 2023 |