**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No. 21-cr-00036-ELH** |
| **JACKY LYNN MCCOMBER** | * | |

**OBJECTIONS TO GOVERNMENT'S PROPOSED GUIDELINES
<u>ENHANCEMENTS AND PRESENTENCE INVESTIGATION REPORT</u>**

## TABLE OF CONTENTS

**Page**

BACKGROUND AND SUMMARY OF OBJECTIONS ............................................................... 1

ARGUMENT ............................................................................................................................ 3

I.    The Government's Assertion that Ms. McComber Obstructed Justice by Falsifying the Guinther Letter Defies Common Sense and the Evidence ......................... 3

II.   The Government's Additional Claims of Obstruction Are Also Meritless .................... 29

III.  There Was No Actual Loss Because the Government Received the Benefit of the Bargain, but if the Court finds a Loss Enhancement Applies, it Should be No Higher Than 10 Levels................................................................................................... 35

IV.  The Government's Restitution Amount is Similarly Flawed ......................................... 74

Ms. McComber, through undersigned counsel, submits the following objections to the government's proposed guidelines calculation and request for an upward departure or variance, ECF Nos. 286, 311 and 431, and to the Probation Services Report (PSR), ECF No. 376.[1]

## BACKGROUND AND SUMMARY OF OBJECTIONS

Ms. McComber will appear for sentencing on May 17, 2024, following her conviction for submitting false claims and making false statements in violation of 18 U.S.C. §§ 287 & 1001(a)(2). This submission addresses disputes under the advisory sentencing guidelines.  A sentencing memorandum addressing other 18 U.S.C. § 3553(a) factors is being filed concurrently.  Sent'g Mem.  As that memo explains, however the court resolves the guidelines disputes discussed here, a sentence of probation, to include a condition that the first term of four months is served on home confinement, is sufficient but not greater than necessary to effectuate the purposes of sentencing.

The parties agree that the base offense level for this offense is 6, pursuant to USSG §2B1.1(b)(1)(G), that because Ms. McComber has been convicted of false statements, a two-level enhancement for obstruction applies pursuant to USSG §3C1.1, and that Ms. McComber qualifies as a "Zero-Point Offender," and is eligible for a two-level decrease to her adjusted offense level.

The parties disagree about the loss in this case, and whether the Court should apply an additional two-point enhancement for obstruction through an upward departure or variance.  The government and United States Probation allege a loss of more than $250,000 but less than $550,000, triggering a 12-point enhancement under USSG §2B11(b)(1)(G).  *See* ECF No. 376, PSR ¶ 68.  (Specifically, the government alleges a loss of $306,186 based on its estimate of hours properly billed by Ms. McComber, and U.S. Probation alleges a loss of $388,878.69, which is the

---

[1] This is an amended version of the PSR, which was filed by U.S. Probation on November 7, 2023.

total of all invoices submitted by Ms. McComber.[2])   This loss amount would result in a

recommended sentencing range of *27 to 33 months*.

The government seeks "an additional two-level upward departure under U.S.S.G. §

5K2.0(a)" on the ground of alleged additional acts of obstruction, ECF No. 411 at 34; ECF No.

286 at 1, resulting in a total offense level of 20, and resulting guidelines range of *33 to 41 months*.

Neither the Probation Office's nor the government's recommended guidelines range

provides an appropriate sentence in this case for the following reasons:

- ***First,*** the government's request for an upward departure or variance is based on four categories of alleged obstruction that are not borne out by fact or as a matter of law: falsification of the "Guinther Letter," Ms. McComber's trial testimony, Ms. McComber's civil lawsuit against Dwayne Preston based on his admitted violation of 18 U.S.C. § 1030, and alleged false statements made by Ms. McComber to U.S. Probation during her presentence interview.  The Court should decline to upwardly vary or depart on any of these bases.  Ms. McComber's guidelines calculation already reflects a two-point obstruction enhancement, and a further increase is not merited.

- ***Second,*** the government has not satisfied its burden of proving loss by a preponderance of evidence. To arrive at its proffered loss amount, the government has seemingly picked a number at random, contending that Ms. McComber should be credited for only 15% of her off-site time.  Not only does the government offer no analysis as to how it arrived at that precise figure, the evidence upon which the government purportedly bases that estimate is admittedly flawed and incomplete.  It also ignores that the government received the full value of its bargain for the services rendered by Ms. McComber during the indictment period, and has thus suffered no actual loss. Even if the Court were to credit the evidence within the government's investigatory spreadsheet, it would not amount to $306,186 in loss.  At most, the government has offered evidence to support a loss estimate nearly half that, around $189,779.  That amount credits Ms. McComber's off-site work around 50%. But even that loss figure is too high, because there is extensive evidence (not considered by the government's investigatory spreadsheet) showing Ms. McComber doing work on the Ironbridge contract during the hours she billed to the Ironbridge contract off-site. In light of that evidence, Ms. McComber should be given credit for at least 60% of the hours she worked off-site, resulting in a loss figure no greater than $147,000. That correlates to an enhancement for loss that is no greater than 10 levels and a recommended guidelines range of between **15 to 21 months**.

---

[2] The PSR advises that Probation will "defer[] to the Court to advise if the loss amount should be calculated differently due to the nature of this case, pursuant to USSG § 6A1.3(b)."  ECF No. 376, PSR at 36.

**ARGUMENT**

**I.      The Government's Assertion that Ms. McComber Obstructed Justice by Falsifying the Guinther Letter Defies Common Sense and the Evidence**

Although Ms. McComber's guidelines calculation already reflects a two-level obstruction enhancement, the government seeks "an additional two-level upward departure or variance" based on Ms. McComber's alleged fabrication of the "Guinther Letter." ECF No. 286 at 11. This request ignores clear markers that the Letter is authentic and is contradicted by the evidence.

The evidence unequivocally shows that the substance of the Guinther Letter is consistent with contemporaneous communications between InfoTek ("ITK") and NSA, as is its formatting. The purported "anomalies" the government focuses on arise only in comparison to the very December 2011 letter from which the government contends Ms. McComber copied Cherril Guinther's signature—meaning the government's argument rests on the illogical premise that after copying the signature, Ms. McComber then introduced a number of other features in the purportedly fake letter that differs from the December 2011 letter but, coincidentally, appear in other NSA correspondence from the same time frame. The government also ignores that the substance of the Guinther Letter is *not* completely exonerating—as one would expect in a letter faked by the defendant in a criminal case—but rather narrowly authorizes the Ironbridge Program Manager ("PM") to work off-site at the on-site contractual rate, while NSA considered the off-site rate proposal that the undisputed evidence shows ITK provided just two weeks before the date of the Guinther Letter. And the government mischaracterizes the conclusions of the FBI Questioned Documents Examiner, whose analysis does not support the government's requested enhancement.

Because the government has not met its burden of proving that Ms. McComber fabricated the Guinther Letter, the Court should deny the government's request for an additional two-level upward departure or variance on this basis. The two-level enhancement that Ms. McComber is

3

already receiving for obstruction of justice is enough.

**A.** **Factual Background**

1. **ITK's 2012 Communications with NSA About the PM Shifting to an Off-Site Position with a New Rate**

The October 10, 2012 Guinther Letter granted written authorization for the Ironbridge PM to work off-site at the existing contractual on-site rate, effective October 1, 2012, while the government considered ITK's proposal for off-site rates for the next four option years. Ex. A at 2 (ECF No. 60-1). Previously, the Ironbridge PM was on-site. In July 2012, however, NSA requested that ITK provide "a proposal for off-site hours that your company believes will be needed for administration purposes in the PM category." Ex. G at 57 (DX 38). In a July 28, 2012 email to ITK's Vice President of Contracts, Craig Plunkett, Ms. Guinther wrote that "we will be requesting a proposal for the off-site PM hours." Ex. G at 22 (GX 27(e)). A month later, in late August, Mr. Plunkett followed up with Ms. Guinther, stating, "I was curious when you were going to officially ask ITK for a proposal for hours for a part time Program Management position since as of 9/30/2012 all support from a PM perspective will end. Let me know." Ex. C at 8. By the third week of September, Mr. Plunkett still had not heard anything. On September 21, 2021, he emailed Ms. Guinther again, asking for the status on "PM TTO and the request for a new rate since it will be an Off-Site rate." Ex. G at 26 (GX 27(h)).

The urgency of the situation was apparent in Mr. Plunkett's next email five days later, when he emailed Ms. Guinther asking, "I know that you are busy with end of the year stuff. However, I need to know where we stand on the subject contract?" *Id.* Time was of the essence, as Mr. Plunkett needed to know, "Are we showing up for work on Monday the 1st of October? Currently our TTO's end on 9/30/12. Also I have included a proposal for the Program Manager since he will now be Off-Site. If I do not hear from you this morning I will call you this afternoon."

4

*Id.* Mr. Plunkett attached a proposal for off-site PM rates through Option Year 4 of the contract (October 1, 2014 to September 30, 2015). *Id.* at 28–33.

Consistent with Mr. Plunkett's submission, the Guinther Letter stated:

Due to changes in mission needs in execution of contract H998230-11-C-1496/TTO 01, there is no longer a need for a full-time on-site program manager. Effective 01 October 2012, the government will provide one (1) less space at the Government's Site. The government will require your company to provide personnel to fulfill the requirements as set forth in the Statement of Work, entitled IRONBRIDGE, Appendix A entitled Labor Categories and Descriptions, and Technical Task Order #1 from off-site spaces supplied by contractor. Personnel are expected to be available on-site as needed. **The government is in receipt of your company's Firm Fixed Price/Level of Effort cost proposal for the change from on-site performance to off-site performance designation for the Senior Program Manager (Core)** *however it has not yet been reviewed*. **In the interim, your company agrees to fulfill the requirements of Senior Program Manager off-site,** *at the currently awarded on-site contract price rate* **to prevent an interruption in service to the NSOC Mission Organization**.

Ex. A at 2 (ECF No. 60-1) (emphases added). In other words, the Guinther Letter directed ITK to provide an off-site PM at the existing on-site rate while NSA reviewed the off-site rate proposal that Mr. Plunkett had provided two weeks earlier.

A week later, on October 18, 2012, Mr. Plunkett emailed Ms. Guinther, noting, "I am still waiting to hear about our new PM rate….just wanted to remind you." Ex. G at 40 (GX 27(i)). On October 26, 2012, Contracting Specialist Megan Collins sent Mr. Plunkett a modification to extend the period of performance for Ironbridge until the end of October, asking him to "send a signed copy of the mod and TTOs after you review." *Id.* at 42 (GX 27(j)). Mr. Plunkett sent Ms. Collins the signed modification later that day. *Id.* at 41. In the same email, he asked Ms. Collins to send him the fully executed copy after NSA signed, and also reminded her that,

ITK submitted a new rate for the PM position since it went part-time and ***the PM is now in an Off-Site position***. The Government also has this proposal and I wanted to know the status of that proposal as well. I was hoping to get this done before the end of October so that ITK could bill the new rate for October.

5

*Id.* (emphasis added).

Ms. Collins sent Mr. Plunkett the fully executed contract modification on November 7, 2012.  *Id.*  In her cover email, she noted, "Regarding your other two questions, Cheri and I have been discussing some things with the COR so I hope to have an update for you soon."  *Id.*  One month later, Mr. Plunkett still had not heard anything.  On December 7, 2012, he emailed Ms. Collins again to ask about the status of "the new PM rate that we submitted."  Ex. A at 7 (ECF No. 79-9(h)).  The communications appear to have trailed off there, but in the years that followed, the PM continued to work largely off-site—first during Raynett Colston's tenure, and then during Ms. McComber's tenure in 2016 and 2017.[3]

## 2. The Discovery of the Guinther Letter in February 2022 and the Questioned Documents Examination

The Guinther Letter was found on February 25, 2022, a year after Ms. McComber was indicted.  Ms. McComber's prior counsel, Clarke Ahlers, was reviewing four large bankers boxes from storage that contained files organized by former ITK employee Dwayne Preston when he found a copy of the Guinther Letter and fax cover sheet, folded into quarters.  ECF No. 60 at 2. Mr. Ahlers had never seen the Guinther Letter before, and it had not previously been produced in discovery.  *Id.*  The government almost immediately took the position that the Guinther Letter was a fake and, on May 20, 2022, transmitted the Letter to the FBI Questioned Documents Laboratory for examination.  In an accompanying letter, the government explained that "[t]he key question before us is whether the purported Guinther letter (along with its less important associated fax

---

[3] *See, e.g.*, Ex. H at 32 (Day 7 Trial Tr. 116:3-8) (Ms. Colston testifying that she worked off-site as a PM on Ironbridge and did not hide that fact from anybody, nor did she believe she was committing a fraud); Ex. I at 53 (Smith OIG Tr. 54:9-11) ("I was fine with Raynette being offsite and then letting Jacky, you know, 'Just let me know when you need to come onsite.'"); *id.* at 16 (Plunkett OIG Tr. 15:13–16:1) (testifying that that Ms. Colston's off-site versus on-site hours compared to Ms. McComber's were "comparable").

cover sheet) is a genuine document dating back nearly ten years, or whether it is a forgery that was created at a significantly later time."  Ex. B at 7.[4]

To facilitate the QDE analysis, the government provided a set of comparator documents it had selected from the ITK bankers boxes[5] that it believed were examples of other faxes NSA had sent to ITK during the same general time period, along with "internal company-generated records that may reflect something about the printers, ink, or paper that the company was using during this approximate time period between 2011-2013."  Ex. B at 8.  The government included a ***second*** copy of the Guinther Letter that had been separately located in the boxes, without a fax cover in a white three ring binder stapled to the November 2012 contract modification.  *See id.* at 7.

In addition, the government sent the QDE lab two other known examples of correspondence from Ms. Guinther to personnel at ITK —one dated December 19, 2011 (the "December letter"), and the other dated June 30, 2011.  *See id.* at 8.  The December letter did not originate from ITK's files.  Instead, Kelly Sulewski, an NSA contracting office chief, testified in August 2022 that she found the December letter when "asked [] to look at the [Ironbridge contract] file again to see if [the Guinther] letter was in the file."  *See* Ex. E at 7 (8/29/2022 Hr'g Tr. 91:19–20).  When she looked, she found "one other letter in the file"—the December letter.  *Id.* at 8 (94:13–20).  The government did not locate a copy of the December 2011 letter in the bankers boxes Mr. Ahlers provided (and, to defense counsel's knowledge, ITK did not otherwise produce

---

[4] The government now asserts that it made a more modest request that the QDE determine if the Guinther Letter and its accompanying fax had actually been faxed, or whether they had been altered or manipulated in some way.  ECF No. 431 at 20.  This is not reflected in the QDE's communication log.

[5] After Mr. Ahlers produced the Guinther Letter to the government for inspection, the government asked him to produce hard copies of comparable documents from ITK's contract files and the box in which the letter was found.  ECF No. 84 at 2.  There was a great deal of back and forth about this request, but ultimately, on May 18, 2022, Mr. Ahlers produced the four large bankers boxes of documents that he had been sorting through when he discovered the Guinther Letter.

the letter in discovery).

Linda Eisenhart, a forensic examiner in the FBI lab, examined the Guinther Letter and fax cover.  During her review, as the standards of her discipline require, she maintained meticulous notes relating to her impressions of the documents and her communications with the government. *See generally* Ex. B at 1–5.  Those notes reflect several conferences with the government, during which Ms. Eisenhart requested additional materials, gave updates on her conclusions, and modified the focus of her evaluation.

Most significantly, Ms. Eisenhart's examination was impeded because she had only two letters authored by Cherril Guinther as comparators: the December 2011 letter from NSA's files and a letter from June 2012.  From the outset of her review, Ms. Eisenhart told the government that she needed more than those two comparators—which were not even consistent with each other.  *See* Ex. B at 1 (June 3, 2022 call with agents).  The government told her they would look for "additional examples of letters Cherril A. Guinther sent as normal course of business to establish if there is a consistent formatting and template to her letters."  *Id.* at 2 (June 7, 2022 call).  They also told her that they would "see if they can find InfoTek's 'original' version of [the December letter] as well as NSA's original version."  *Id.*

Ultimately, the government was only able to provide Ms. Eisenhart with one of the documents it searched for: the original of the December 2011 letter, also located in NSA's files. [6] *See* Ex. B at 6 (QDE lab record receipt).  The government appears to have never located a copy of the letter in ITK's files or in the discovery provided by the defense.  Astonishingly, despite Ms. Guinther's testimony that her signature appeared on "hundreds of different letters" (ECF No. 377

---

[6] The government did later provide 59 additional pages of fax exemplars, but no additional letters written by Ms. Guinther.

at 68:13–20), the government also was never able to find examples of other correspondence from Ms. Guinther "to get [an] idea of normal formatting" that was "contemporaneous and broad reaching," Ex. B at 4–5.

Ms. Eisenhart testified that because she did not receive additional comparator correspondence, she was forced to abandon certain aspects of her examination:

> **The Court:** Was the information deficient for you to undertake the examination that you were making? Was there something you wanted that you didn't get?
>
> **Ms. Eisenhart:** Yes, and that's why I did request additional exemplars.
>
> **The Court:** But, in other words, once you made those requests, were you satisfied that you had what you needed to undertake the evaluation?
>
> **Ms. Eisenhart:** With respect to the conclusions I made, yes. There was some discussion of other things, such as the templates and the format of those, and that was not provided to me because there didn't seem to be a good sample of those so I just discontinued those examinations.

ECF No. 378 at 66:17–67:4; *see also id.* at 51:2–6.

On July 20, 2022, Ms. Eisenhart issued her final report. The report did not answer the government's original call to determine whether the Guinther Letter was genuine. *See* ECF No. 378 at 62:20–23 (confirming "That's right, I did not," when asked whether she "reach[ed] a conclusion about genuineness"). Nor was Ms. Eisenhart able to determine whether the Guinther Letter and its cover sheet had been altered, *id*. at 51:7–17, or even confirm whether they had been faxed. *See* ECF No. 431 at 20; *see* ECF No. 378 at 40:21–23. She could not determine whether the Guinther documents were printed on different devices than comparators, whether they deviated from formatting conventions for correspondence or facsimiles that NSA used in the same period, or whether the paper the Guinther Letter and its cover were printed on was from a different source than the comparators. *See* ECF No. 378 at 80:9–82:21.

Instead, Ms. Eisenhart could reach only two definitive conclusions. *See id.* at 81:1–3. First,

she concluded the signature on the Guinther Letter had originated—at an unknown point in time, and either directly or indirectly—from the December 2011 letter. *Id.* at 81:6–9, 17–19. But she could not say when the signature had been transferred, whether it had been transferred directly from the original December letter found in NSA's custody (and in NSA's Ironbridge file), or whether *any other aspects* of the Guinther Letter were altered or inauthentic. *Id.* at 47:4–23. As she made clear in her testimony, her "alteration" conclusion was limited to the signature on the Letter—not the entire document or its cover. *Id.* at 44:21–24. Second, she concluded that the Guinther documents had not been printed on the same device that had been used to print approximately 15 pages of comparators that had been printed in color. Ms. Eisenhart did not reach any other conclusions.

## B. <u>Argument</u>

Against this backdrop, the government asserts several arguments in support of its hypothesis that Ms. McComber fabricated the Guinther Letter. None is supported by the evidence.

### 1. The Content and Timing of the Guinther Letter Are Consistent with Contemporaneous Communications Between ITK and NSA

The government argues the substance of the Guinther Letter shows it is fake, based in large part on the August 2022 testimony of Ms. Sulewski. Ms. Sulewski testified that when she first saw the Guinther Letter in 2022, she "thought the content of the letter didn't make sense to how we would do business as a contracting officer when it came to this type of action," because "it didn't have any of the steps involved in this type of action, which would normally be requesting a proposal, conducting negotiations, and doing a modification to incorporate off-site rates." ECF No. 431 at 4 (Gov'ts Suppl. Sent'g Mem.). Ms. Sulewski thought the Guinther Letter was odd because "[u]nder normal circumstances, in my experience, there would have been a request for proposal to incorporate off-site rates for the time period that we were in and any remaining option

years on the contract."  *Id.* at 5 (Gov'ts Suppl. Sent'g Mem.).

Apparently unbeknownst to Ms. Sulewski, each of these steps *was* taken by NSA and ITK, except for the formal contract modification, which Mr. Plunkett asked NSA about repeatedly in the latter months of 2012.  As described above, *supra at* 4–6, in July 2012, NSA asked ITK to provide "a proposal for off-site hours that your company believes will be needed for administration purposes in the PM category."  Ex. G at 57 (DX 38).  In the ensuing months, ITK—primarily through Mr. Plunkett—continued to correspond with individuals at NSA, including Ms. Guinther, about shifting the Ironbridge PM off-site.  Ex. G at 22 (GX 27(e)); *id.* at 26 (GX 27(h)); Ex. C at 8.  And on September 26, 2012, Mr. Plunkett emailed Ms. Guinther a written proposal for off-site PM rates for the remaining four option years on the contract.  Ex. G at 26, 28 (GX 27(h)).  The Guinther Letter followed two weeks later.

These communications between Mr. Plunkett and Ms. Guinther also highlight an important aspect of the Guinther Letter that the government ignores:  The Guinther Letter is dated October 10, 2012, yet its authorization for off-site work is retroactive to October 1, 2012.  Ex. A at 2 (ECF No. 60-1).  It is implausible that someone fabricating a letter many years after the fact would back-date it in such an unusual way.  There would be nothing for Ms. McComber to gain from back-dating the Guinther Letter.  And there is a simple, obvious reason for the back-dating that supports the Letter's authenticity:  As Mr. Plunkett reminded Ms. Guinther in August and September 2012, ITK needed an answer about the status of the PM as soon as possible because the then-operative Technical Task Orders were set to expire on September 30, 2012, and "all support from a PM perspective w[ould] end" after that date.  Ex. C at 8; Ex. G at 26 (GX 27(h)).  It makes perfect sense that Ms. Guinther (or whoever wrote the Guinther Letter on her behalf) would back-date the authorization for an off-site PM to October 1, 2012.  It makes no sense that Ms. McComber would

go to such lengths to do the same a decade later.

Communications post-dating the Guinther Letter likewise support its authenticity. They flatly contradict Ms. Sulewski's testimony that the Letter was not accompanied by other steps that she would have expected, including negotiations about rates, as well as the government's assertion that "[t]here are no emails referencing any development such as that reflected by the purported letter." ECF No. 431 at 18–19. The Guinther Letter states that ITK will "fulfill the requirements of Senior Program Manager off-site, at the currently awarded on-site contract price," while NSA reviewed ITK's proposal for an off-site rate. Ex. A at 2 (ECF No. 60-1). In other words, NSA had not yet reviewed the rate proposal Mr. Plunkett provided on September 26, 2012, so the PM would work off-site at the (lower) on-site rate in the interim. After the Guinther Letter was issued on October 10, 2012, Mr. Plunkett continued to follow up with NSA about the PM rates. For example, on October 26, 2012, he wrote to Contracting Specialist Megan Collins, noting that "***the PM is now in an Off-Site position***" and asking for the status of the rate proposal he had provided. Ex. G at 41 (GX 27(j)) (emphasis added).

The government also emphasizes the fact that NSA and ITK executed a contract modification on November 7, 2012 that said nothing about an off-site PM, arguing this "would have been the ideal time to have incorporated a development as significant as changing the Program Manager's work location." ECF No. 431 at 19. (The separate copy of the Guinther Letter found in ITK's boxes was stapled to this November 2012 modification, *see supra* at 7). But the government does not mention Mr. Plunkett's correspondence with Ms. Collins, where he asked point-blank about the status of the PM off-site rates in the *same email* where he sent Ms. Collins the signed contract modification. Ex. G at 41 (GX 27(j)). Ms. Collins responded that she and Ms. Guinther had "been discussing some things with the COR so I hope to have an update for you

12

soon." *Id.*  One month later, on December 7, 2012, Mr. Plunkett emailed Ms. Collins *again* about

the status of "the new PM rate we submitted."  Ex. A at 7 (ECF No. 79-9(h)).  NSA apparently

still had not reached a decision on the proposal for an off-site rate, which explains why (consistent

with the Guinther Letter) ITK was providing an off-site PM at the cheaper, on-site rate pending

formal modification.

For this reason, the Court should not credit Ms. Guinther's testimony that the Guinther

Letter is suspect because, absent a formal contract modification, she would not have "been telling

the contractor to incur more cost because the Government pays a higher labor rate for offsite than

it does onsite," and "that would have been [an] Antideficiency Act [violation] on my part."  ECF

No. 377 at 50:15–20.  Whether or not the proper procedure was followed,[7] undisputedly authentic

contemporaneous communications show that ITK was acting consistently with the direction in the

Guinther Letter—i.e., providing an off-site PM at the on-site rate.

## 2. The Purported Anomalies in the Guinther Letter and Fax Cover Are Easily Debunked and Do Not Show These Documents Were Fabricated

The government next points to purported "anomalies" in the Guinther Letter and fax cover

sheet.  *See* ECF No. 431 at 5–11.  But the evidence shows that each of these so-called anomalies

is not, in fact, anomalous at all.

### a.  The Guinther Letter

Ms. Guinther initially insisted that no one at NSA could have written the Guinther Letter

because "we're very rigid, government" and "we have certain formats" that the Letter does not

adhere to.  ECF No. 377 at 48:1–10.  The government's supplemental sentencing memorandum

---

[7] Ms. Guinther admitted that she did *not* always execute a formal modification when authorizing
a location change.  *See, e.g.*, ECF No. 377 at 60:21–61:6 (testifying that in February 28, 2012, she
signed a letter authorizing an ITK Senior Web Developer to work off-site for two weeks).

likewise refers to "standard NSA protocol and procedure."   ECF No. 431 at 10.   But the government's own expert was unable to identify any standard form even from the small sample of NSA letters the government provided her.   *See supra* at 9.

Ms. Guinther backtracked during her cross-examination, conceding that while individual contracting officers may have formatting preferences, "the formatting is not a standard for NSA." ECF No. 377 at 79:12–15.   That is clear from other NSA letters that share a number of features with the Guinther Letter and depart from what Ms. Guinther initially claimed is standard.   For example, Ms. Guinther said it was unusual that the "unclassified, for official use only" designation appears only on the top of the Guinther Letter, not the bottom (*id.* at 48:18–21, 53:17–24), and that the Letter's subject line "did not reference the contract number, which we always reference it upfront."   *Id.* at 56:10–11.   Yet a letter from NSA to ITK in September 2013 (which Ms. Guinther agreed was an authentic NSA letter bearing her signature) had both features—no unclassified marking at the bottom and the contract number in the body of the letter instead of in the subject line.   *Id.* at 81:22–25, 85:18–22.   To be sure, Ms. Guinther noted that the September 2013 letter was "mass produced by the NSA" in light of a looming government shutdown, "[s]o it wasn't like the ones that we do individually in our office."   *Id*. at 80:13–17.   But she agreed that she signed it and that it was an authentic NSA letter (*id.* at 81:13–19), contradicting her assertions that the Guinther Letter departed from some standard NSA template or protocol and that her signature never would have appeared on a letter that had features inconsistent with her own preferences.

The September 2013 letter has additional characteristics that Ms. Guinther characterized as anomalous and indicative that no one at NSA wrote the Guinther Letter.   She testified that, unlike the Guinther Letter, NSA would not put "INFOTEK CORPORATION" in all capital letters because "InfoTek" is "how we have it in our database."   ECF No. 377 at 55:25–56:3.   And whereas

14

the Guinther Letter included the line "Attn: Craig Plunkett" directly below "INFOTEK CORPORATION" and above the company's address," "[w]e always have the attention to the person that it's going to at the end of the address." *Id.* at 56:6–7.  The September 2013 letter signed by Ms. Guinther, however, is addressed to "INFOTEK CORPORATION," with the "Attn: Craig Plunkett" line below that, above the address. *Id.* at 84:10–17.

It's the same story for other claimed anomalies in the Guinther Letter.  Ms. Guinther testified, "I always capitalize [the word] government," and "all of these" references to "government" in the Guinther Letter except one "are lower caps."  ECF No. 377 at 49:4–8.  She said she would not reference her own name and instead would write, "any questions direct to the undersigned."  *Id.* at 48:11–14; *see also id.* at 57:10–13.  And she said the telephone number formatting in the Guinther Letter is suspect because "[o]ur format for our numbers is the area code in parentheses, first three digits, then the dash, and the last four digits."  *Id.* at 48:15–17; *see also id.* at 57:14–19.  The September 2013 letter is like the Guinther Letter in all of these respects.  It does not capitalize "government."  *Id.* at 86:5–9.  It places entire phone numbers in a single set of parentheses, instead of just placing the area code in parentheses.  *Id.* at 86:19–25.  And it says, "please address any questions to Cheri Guinther," not "the undersigned."  *Id.* at 86:19–25.  Ms. Guinther also said it was odd that the date appears on the left-hand side of the Guinther Letter because the date always "ha[s] to be to the right of the document."  *Id.* at 55:23–24.  But a September 2013 letter to ITK signed by Megan Collins, the Contracting Specialist assigned to Ironbridge, has the date on the left-hand side, just like the Guinther Letter.  *Id.* at 90:4–6.  It is illogical that any of these features suggests that Ms. McComber falsified the Guinther Letter, but not the admittedly authentic September 2013 letters.

The government's supplemental submission does not mention most of this evidence.

15

Instead, the government contends that "Ms. Guinther was shown examples of Ms. McComber's own correspondence with the NSA, which displayed many of the same features in terms of formatting and punctuation as the purported Guinther Letter and fax sheet." ECF No. 431 at 10 (citing ECF No. 377 at 60–64). That is not remotely supported by the record. Ms. Guinther was shown two letters authored by Ms. McComber, one dated February 28, 2012, and the other dated July 23, 2012. *See* ECF No. 377 at 60:21–61:10, 62:2–15. In both letters, Ms. McComber separates phone number digits with dashes, *unlike* the Guinther Letter, which places entire phone numbers inside parentheses. *Compare* Ex. A at 6 *and* Ex. G at 19 (GX 27(d)), *with* Ex. A at 2 (ECF No. 60-1). In the February 28, 2012 letter, Ms. McComber writes at the end, "If you have any questions or concerns please contact the undersigned." Ex. A at 6. This is, of course, exactly how Ms. Guinther said she *herself* would have written a letter. ECF No. 377 at 48:11–14. In the July 23, 2012 letter, Ms. McComber uses her own name instead of "the undersigned." Ex. G at 19 (GX 27(d)). That is the *only* feature similar to the Guinther Letter—a single reference in one, but not both, of Ms. McComber's letters.

There is also another, common-sense problem with the government's theory. The government contends that Ms. McComber copied Ms. Guinther's signature from an authentic December 2011 letter. *See infra* at 21–22. If Ms. McComber had fabricated the Guinther Letter and copied the signature from the December letter, she likely would have copied other features of that letter, too. The opposite is true: The December letter has many of the features that Ms. Guinther identifies as missing from the Guinther Letter—including the capitalization of "InfoTek" and "Government," the placement of the "attention" line, the appearance of the contract number in the subject line, the formatting of phone numbers, and the direction to "please contact the undersigned." *See* Ex. A at 4. It makes no sense that Ms. McComber would copy only the

signature from the December letter and then introduce various inconsistencies in the body of the Guinther Letter that just happen to match features of other NSA letters.

### b. The Fax Cover Sheet

There is likewise no merit to the alleged "anomalies" that Ms. Guinther identified in the fax cover sheet accompanying the Guinther Letter.  Ms. Guinther admitted that the fax cover sheet is something she would *not* typically see.  *See* ECF No. 377 at 96:5–9.  She thus had no basis of knowledge to testify about what she views as normal in the cover sheet and what is not.  Mr. Plunkett, on the other hand—who *did* see plenty of fax cover sheets from NSA to ITK—testified that "for the most part it looked pretty normal."  *Id.* at 126:19–20.

In any event, the features Ms. Guinther identified in the fax cover are not anomalous.  For example, Ms. Guinther said it was odd that there is no fax line at the top of the page (or on the Guinther Letter).  ECF No. 377 at 53:17–19, 59:13–18.  But another fax from NSA to ITK, dated December 19, 2011, has no fax line either.  *See id.* at 95:7–8; Ex. A at 3 (ECF No. 79-2).  And, according to Ms. Eisenhart, "fax headers and footers can be turned on and off by the recipient."  ECF No. 378 at 31:4–7.  Ms. Guinther also speculated that the seal at the top of the page "looks like it's been pasted" because it has a vertical line on the left.  ECF No. 377 at 59:12–60:8.  The seal on the 2011 fax, however, has a similar line.  *Id.* at 97:25–98:6.  And although Ms. Guinther suggested it was odd that "only two of the four punched holes [at the top of the fax sheet] actually align" (*id.* at 59:19–21), Mr. Plunkett largely dismissed this as "not a big deal."  *Id.* at 126:22–25.[8]

Other alleged anomalies are easily debunked as well.  Ms. Guinther (who, again, admitted she typically did not see the fax cover sheet) was adamant that "[o]ne thing that stands out right

---

[8] Ms. Guinther also acknowledged that the Guinther Letter and fax cover sheet were found in files belonging to ITK, which she has not reviewed, and she conceded she is not familiar with ITK's file-keeping practices.  ECF No. 377 at 91:14–21.

away is we do not put signature blocks on our fax."  ECF No. 377 at 58:4–6.  The 2011 fax, however, has a signature block for the sender.  Ex. A at 3 (ECF No. 79-2).  Ms. Guinther also testified that the "PM" subject line in the Guinther Letter fax cover sheet is too cursory because "we would have been a little bit more detailed on what document we were faxing to them so that there was no doubt of, you know, what the subject was."  ECF No. 377 at 58:12–17.  Yet the subject line on the 2011 fax is completely blank.  *Id.* at 96:25–97:6.

Finally, Ms. Guinther's assertions about the phone and fax numbers on the cover sheet are not supported either.  Ms. Guinther said she found the formatting of these numbers suspect because the fax number 410-782-4869 has dashes between the area code and the number, whereas the phone number (301) 688-9613 has parentheses, consistent with "how we [NSA] format."  ECF No. 377 at 58:8–11; *see also id.* at 60:9–13.  But the fax number on the 2011 fax is the same, with no parentheses around the area code in the fax number.  *Id.* at 96:18–24.

### c.  *Ms. Guinther's Memory*

The objective problems with Ms. Guinther's testimony about the Guinther Letter and fax cover sheet are a sufficient basis to reject the government's claim.  But Ms. Guinther also gave reason for the Court to discount the accuracy of her testimony.  When she was asked basic questions about the 2012 time period, Ms. Guinther could not answer, casting serious doubt on her ability to recall a single letter from 2012.  For example, Ms. Guinther was asked if she ever communicated to ITK that NSA purportedly decided not to move forward with an off-site PM in 2012.  She responded, "I cannot tell you 11 years afterwards whether there was a conversation verbal or not."  ECF No. 377 at 77:23–24.  When asked whether she was out of the office during the second half of 2012, Ms. Guinther said she "d[id] not recall" and "cannot tell you 10 years ago the amount of time when I was out of the office."  *Id.* at 72:2–7.  When asked if she recognized a

fax cover sheet from 2011, Ms. Guinther stated, "I don't recognize it.  It was, what, 12 years ago sent."  *Id.* at 94:1–3.

Ms. Guinther also testified that during her career at NSA, she was the contracting officer for more than a hundred different contracts, and was typically responsible for "15 to 25" different contracts at any given time.  ECF No. 377 at 67:20–68:11.  And she agreed that her signature "appeared on hundreds of different documents related to the contracts that [she] oversaw," including "hundreds of different letters" and "hundreds of different modifications."  *Id.* at 68:13–23.  It simply is not credible that Ms. Guinther could vividly recall one letter, well over a decade later, among the hundreds of different documents on which her signature appeared.

### 3.   The FBI Questioned Documents Examiner Report Undermines the Government's Obstruction Argument

The government also relies on the testimony and Report of Ms. Eisenhart, arguing it supports the government's position that Ms. McComber fabricated these documents.  ECF No. 431 at 19–26.  It does not.  Rather, Ms. Eisenhart's analysis in fact undermines the government's position.

#### a.   *Background on Questioned Document Examination*

The FBI requires that forensic document examiners conform to detailed protocols when they conduct, report on, and testify about their work.[9]  Those protocols require examiners to maintain careful contemporaneous notes, seek review from others, and carefully disclose the limitations of what their examinations and observations can and cannot show.  *See* Ex. B at 15 (questioned document examiners must provide testimony that is "properly qualified and [does] not

---

[9] *See* Ex. B at 22 ("This report conforms to the 'Department of Justice Uniform Language for Testimony and Reports for Forensic Document Examinations."); *see also* DOJ, ULTR for Forensic Document Examination, *available at* https://bitly.ws/3iivT (last viewed Apr. 18, 2024); Ex. B at 15 (Excerpts of Quality Assurance Manuals for the QDE unit).

exceed the limitations of any relevant method or discipline.").  These requirements reflect that "[i]n science, assertions that a metrological method is more accurate than has been empirically demonstrated are rightly regarded as mere speculation, not valid conclusions that merit credence." PCAST Report, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods at 55 (Sept. 2016), *available at* https://bitly.ws/VzoA.

Ms. Eisenhart testified that she carefully adheres to the standards governing her work:

**Ms. Richman**: I noticed yesterday that you took care to adhere to [the FBI's] standards in your testimony?

**Ms. Eisenhart**: Yes. That's important to me to make sure that I do, yes.

**Ms. Richman**:  And those standards reflect, in part, an effort to accurately report what forensic examinations, including questioned document examinations, can and cannot do, correct?

**Ms. Eisenhart**: Yes. As well as the way that we report our findings and testify to them.

ECF No. 378 at 9:22–10:7.  Consistent with protocol and to avoid stretching her findings beyond the empirical evidence, Ms. Eisenhart included precise language in each of her findings and attached a detailed discussion of the limitations of her findings and observations.  The Court should not disregard these boundaries.

### b.  The Government Ignores the Significant Limitations in Ms. Eisenhart's Analysis and Asks the Court to Draw Conclusions Not Supported by Her Work

The government asks the Court to draw a conclusion that Ms. Eisenhart expressly would not and could not: that together, certain observations by Ms. Eisenhart about the questioned documents' toner, formatting, and paper are sufficient to show that the Guinther Letter is not genuine.  In doing so, the government brushes past the many limitations its own examiner established as necessary to the reliability and validity of her findings and departs from the plain language of Ms. Eisenhart's report and testimony.

***The Signature.***   The government heavily emphasizes Ms. Eisenhart's conclusion that the signature on the Guinther Letter derived—directly or indirectly—from the December 2011 letter. ECF No. 431 at 21.   But the government says nothing about the who, when, why, or how that signature ended up on the Guinther Letter.   And the limited evidence that *does* exist supports the conclusion that someone *in NSA* placed the image of Ms. Guinther's signature on the Letter.

First, the December 2011 letter appears to have been the only letter from Ms. Guinther that was maintained in the Ironbridge file.   Ms. Sulewski testified that it was the "one other letter" found in the Ironbridge file.   *See* Ex. E at 8 (8/29/2022 Hr'g Tr. 94:16–17).   (Ms. Sulewski also testified that to compare the signatures, she used a "snippet tool" available on her NSA-issued device to easily "snip" the signature and copy it onto another document.   *Id.* at 9 (99:5–8.))

Nor could the government locate additional correspondence from Ms. Guinther.   Ms. Eisenhart's notes reflect that the government separately searched for "additional examples of letters Cherril A. Guinther sent as normal course of business to establish if there is a consistent formatting and template to her letters." *See* Ex. B at 2. But they had "trouble finding examples that [were] both contemporaneous and broad reaching," and what they found was "limited."  *Id.* at 5.

Two different scenarios are possible.   The first is that because the December 2011 letter was the only formal correspondence from Ms. Guinther maintained in NSA's Ironbridge file, it was the most readily available source of her signature for NSA personnel drafting correspondence on her behalf.   (Although there may have been invoices bearing her signature in the file, Ms. Guinther testified that she had "two types of signatures.  "One that when I'm really taking my time . . . and I have one that's really scratchy when I get real busy, and it gets a little bit sloppy."  *See* ECF No. 377 at 42:5–8.)  The record establishes that NSA retained the December 2011 letter and its original, in contrast to other materials that were missing from the Ironbridge file.  *See, e.g.*, Ex.

E at 11 (8/29/2022 Hr'g Tr. 127:13–14) (Ms. Sulewski testifying that appointment letters were missing, which she attributed to "poor administration of the contract file"); *see also* Ex. A at 28 (stating that NSA's Ironbridge files "appear[] to be . . . missing [a few] Contracting Officer's Representative letters").

The second scenario, is that Ms. McComber randomly selected a copy of the December 2011 letter—coincidentally, the ***sole example of Ms. Guinther's correspondence saved in NSA's Ironbridge file***—to use as the source for the signature on the Guinther Letter. This theory is not borne out by the evidence. The government did not locate a copy of the December 2011 letter in the bankers boxes Mr. Ahlers provided, nor to defense counsel's knowledge, was a copy produced by ITK in discovery.

Importantly, Ms. Eisenhart declined to expand her finding that the document included an "altered" signature to a broader conclusion that the Guinther Letter and its cover sheet were fake. She testified that her finding that "alterations were detected" was limited to the signature and did not pertain to the entire document. *See* ECF No. 378 at 44:23–24 ("[T]he alteration that I'm referring to is specific to the signature"). With respect to the entire document, and its cover fax, Ms. Eisenhart "did not reach a conclusion about genuineness." *Id.* at 62:2–23. This is not particularly remarkable considering that Contracting Specialist Megan Collins often prepared paperwork for Ms. Guinther. *See* Ex. I at 7 (Collins OIG Tr. 5:20–6:6). And in a digital age, it is not uncommon for people to reuse and image signatures in carrying out routine business tasks, even if they are sitting in the office next door.

***Graphic Arts.*** Ms. Eisenhart also performed a "graphic arts" examination to try to determine if the Guinther Letter had been printed by the same machines as the other comparator documents drawn from the bankers boxes. ***None*** of Ms. Eisenhart's graphic arts findings supports

the government's allegation that the Guinther Letter is fake.  To the contrary, her only definitive finding with respect to graphic arts was that the color document comparators (certain pages of items 4 and 9, along with items 5, 6, 7, and 8) were generated using different print processes than the black-and-white Guinther Letter and cover.  *See* Ex. B at 19, 21.[10]

Aside from that, although Ms. Eisenhart noted inconsistencies that *could* provide support for different sources, she could not reach a definite determination and explained to the Court that there were "limitations to the testing" that she could do.  Her findings were wholly inconclusive:

**Ms. Richman**: You couldn't say for sure they came from different machines?

**Ms. Eisenhart**: No, I could not.

**Ms. Richman**: You couldn't say for sure they came from the same machines?

**Ms. Eisenhart**: No, I could not.

ECF No. 378 at 54:1–6.

The government asks the Court to sidestep Ms. Eisenhart's clear and repeated statements that the inconsistencies she noted in her graphic arts conclusions were "not an exclusion saying [the documents] do not come from the same source."  ECF No. 377 at 181:17–19.  It focuses on inconsistencies that Ms. Eisenhart ultimately concluded were not sufficient to support an exclusion.  ECF No. 431 at 19–26.  But the meaning to be ascribed to those inconsistencies is firmly in Ms. Eisenhart's expert domain.

The government also emphasizes Ms. Eisenhart's observation that the Guinther Letter and its cover were printed using magnetic toner.  *Id.* at 24–25.  But Ms. Eisenhart explained that ***no conclusion could be reached*** from the detection of magnetic toner in these documents because of

---

[10] The government discusses this conclusion on page 23 of its supplemental submission but fails to note that each of the listed documents were printed using color toner.

"limitations associated with physical toner testing includ[ing] the possibility of quantity of iron in magnetic toner being below the limits of detection of the instrumentation—instrument, variability in batches of toner, and possibility of demagnetization."  ECF No. 378 at 59:11–15.

Even if Ms. Eisenhart *had* determined that the Guinther Letter and its cover were printed on a different machine than the comparators, that conclusion would only "indicate that it was not printed off of those particular machines and then it would really be outside the range of [her] expertise to explain if . . . one or more machines was typically used in that office."  She agreed that to actually ascribe significance to her testimony, it would "come down to factual testimony by some other witness."  ECF No. 377 at 180:19–181:6.  Here, the government has not introduced *any* evidence about the number or type of printers or fax machines that were used by ITK and its employees (either in the office or at home) during the relevant time period.  Moreover, Ms. Eisenhart's report appears to document that there were at least three different type of machines in use at ITK: a toner printer, an inkjet printer, and a color printer toner.  Testimony at the evidentiary hearing also established that there were multiple machines in use at NSA, perhaps explaining why several of the faxes had distinctive "flag pole" marks next to the seal.[11]  *See* ECF No. 377 at 64:8–9 (Ms. Guinther testified that they moved buildings during the relevant time period, resulting in different fax numbers); *see also id.* at 164:17–22 (Ms. Eisenhart explained that "trash marks" are "the unwanted, unintended printed marks that are left. . . . And they come from perhaps debris in the machine, some markings on the platen, which is that clear glass that you put the documents down on.").

*Paper.*  The government's discussion of Ms. Eisenhart's paper examination likewise does

---

[11] *See, e.g.*, Ex. A at 3 (ECF No. 79-2) (Dec. 19, 2011 Fax from Jeannine Shaffer to Kristen Amos); *id.* at 5 (ECF No. 79-5) (July 11, 2012 Fax from Jeannine Shaffer to Craig Plunkett).

not grapple with the limitations in her analysis.  ECF No. 431 at 25–26.  ***None*** of Ms. Eisenhart's

conclusions about paper supports the government's contention that the Guinther Letter is fake.

Although she noted inconsistencies in the paper characteristics, she also stressed that,

> It's important to note that even though these items of paper, they're paper in particular, shows differences in their optical characteristics.  From the times that we've had a chance to tour the papermaking facilities, we do know that sometimes the reams of paper can be put together from multiple rolls.  So there can be times when there will be variation in optical characteristics in between individual sheets in a ream.

ECF No. 377 at 188:3–189:22.

To the extent that the government argues Ms. Eisenhart's observations about the paper's

characteristics matter, it bears mention that she also saw ***similarities*** between the paper used for

the Guinther Letter and several of the comparators:

> **Ms. Richman**: And you also found that there were ways that 1 and 2 did correspond with documents 3, 5, and 10?
>
> **Ms. Eisenhart**: Yes, with respect to the paper.

ECF No. 378 at 82:4–6.  There is no claim that documents 3, 5 or 10 were not genuine,

contemporaneous documents at ITK.  If the Court places weight on *inconsistencies* between the

paper used for the Guinther Letter and the comparators, it must place equal weight on the

*consistencies* between the document.

### c.  *Ms. Eisenhart's Testimony Directly Contradicts Claims that the Formatting of the Guinther Letter Did Not Conform to a Standard Template*

Even more than the limited conclusions that could be drawn from Ms. Eisenhart's

examination, her testimony and written work directly *refute* claims by the government's witnesses

that the Guinther Letter deviated from a specific template or form used for letters or faxes at NSA,

further undermining their reliability and credibility.  *See supra* 9–10, 21.  As discussed, *supra* at

8, the government provided only two comparator letters authored by Ms. Guinther for her review.

Even between just those two documents, Ms. Eisenhart spotted inconsistencies.  *See* Ex. B at 1 ("Asked about Exhibits K and L, which are examples of templates used, noted they are not consistent and asked if these are the only two templates.")

Nor could Ms. Eisenhart determine that any sort of standard form existed for cover faxes— or even whether certain documents were faxes at all.  During her examination, she "noted multiple formats of fax cover sheets . . . used in files not in question."  ECF No. 378 at 56:7–9.  She also "noted three different type[s] of fonts in the fax headers."  *Id.* at 56:15–17.  And she declined to ascribe any significance to the presence or absence of headers or footers.  *Id.* at 31:4–7.  This testimony aligns with the other fax cover sheets Ms. Guinther was asked about, which likewise did not have fax headers.  *See supra* at 17.

> ### d.  The Government Asked Ms. Eisenhart to Ignore that a Second Copy of the Guinther Letter Was Found in Another Location

The government has minimized the fact that a separate copy of the Guinther Letter was located in a separate location, neatly organized in chronological order with the modification for November 2012.  *See* Ex. A at 8 (May 18, 2022 letter from C. Ahlers to J. McDonald).  If Ms. Guinther had fabricated the Guinther Letter and its fax cover, that would mean that she then created a separate second copy of it, located a binder of modifications organized in chronological order, and attached the Letter to the November contract modification.

The government did not investigate the authenticity of these copies.  Instead, it specifically instructed Ms. Eisenhart *not* to examine it.  *See* Ex. B at 2 (notes from a June 7, 2022 call between Ms. Eisenhart and the government); *see also* ECF No. 378 at 24:1–7; ECF No. 377 at 182:24– 183:4 ("I was told this is not something that needed to be further investigated.").  Pursuant to those instructions, Ms. Eisenhart did not examine the copies.  ECF No. 378 at 23:25–24:4.

### 4.  Mr. Plunkett's Testimony that He Did Not Find the Guinther Letter in His ITK Files Is Not Probative of Obstruction

The government attaches undue significance to Mr. Plunkett's testimony that he did not find the Guinther Letter in his Ironbridge contract files when he searched those files in the 2017/2018 timeframe.  *See* ECF No. 431 at 11–12.  Even assuming Mr. Plunkett was correct, there are many innocuous explanations that Mr. Plunkett himself acknowledged.  For example, he conceded that there may have been times that Ironbridge-related paperwork ultimately did not make it into his files and admitted that Ironbridge-related paperwork could have ended up in a different contract file.  ECF No. 377 at 145:4–10.  And he acknowledged that if he never received a document in the first place, it would not have been included in his Ironbridge files.  *Id.* at 145:11–13.  Mr. Plunkett also testified that during the relevant time period in 2012, he did not have a fax machine in his office—the fax machine he used was in "an open area" in ITK's office and was used by other ITK employees.  *Id.* at 134:25–135:12.  It is entirely plausible that Mr. Plunkett never received a copy of the Guinther Letter not because it was fabricated, but because Mr. Plunkett never received it.

For this reason, it is not surprising (or probative of obstruction) that Mr. Plunkett did not find the Guinther Letter when he searched his files.  Obviously, if he never received the Guinther Letter and/or did not put it in his contract file, he would not have found it.  Mr. Plunkett searched his own contract files; he did not search files maintained by others at ITK.  ECF No. 377 at 149:20–150:5.  And Mr. Plunkett's files also were moved multiple times between 2012 and 2017 and stored in locations where others could easily access them (e.g., outside of Mr. Plunkett's office in an unlocked file cabinet).  *Id.* at 146:7–148:15.

Mr. Plunkett's testimony also gave reason to doubt the strength and accuracy of his memory.  He did not recall key facts about the time period of the Guinther Letter that were reflected

in his emails with NSA (*supra* at 4–5).  For example, he did not recall when ITK provided NSA a rate proposal for an off-site PM, even when he was shown emails from that time period.  *Id.* at 135:24–137:5.  Nor did he recall whether he ever heard back from the government about the rate proposal he submitted.  *Id.* at 138:2–5.  It is dubious that Mr. Plunkett would not be able to recall higher-level details like these but somehow would be able to remember a specific piece of paper among the thousands of pages of paperwork that Ironbridge generated.  *See id.* at 143:18–25.

### 5. Mr. Ahlers' Decision Not to Introduce the Guinther Letter at Trial Was Based on Concerns About Delay and a Perceived Conflict of Interest

To the extent the government suggests Mr. Ahlers' decision to withdraw the Guinther Letter is evidence of obstruction (*see* ECF No. 311 at 13 n.4), this argument fails, too.  When Mr. Ahlers withdrew the Letter, he suggested it would have been helpful to Ms. McComber, but that he was nonetheless withdrawing it because he was concerned about further delays and needed "to get this case to trial."  Ex. E at 15 (9/21/2022 Hr'g Tr. 39:6–8).  Mr. Ahlers explained that, in his view, withdrawing the Guinther Letter would "save[] the government all that time they were going to spend proving that I'm a fraud and my client's a fraud on that letter and so forth."  *Id.* at 15 (39:9–14).

This decision came after the government made clear that it thought Mr. Ahlers "should be a witness at trial" to testify about the Guinther Letter and the circumstances of its discovery, which would "would prolong this matter" and would pit Mr. Ahlers' interests against those of his client.  *See* Ex. E at 3, 5–6 (8/29/2022 Hr'g Tr. 44:1–4, 49:12–50:2).  The record does not support the conclusion that Mr. Ahlers withdrew the Guinther Letter because he believed it was fabricated by Ms. McComber.  Instead, it is clear he did so to avoid a conflict that would require his removal from the case.

*         *         *

28

In sum, the government has not met its burden of proving that an upward variance is warranted based on the alleged fabrication of the Guinther Letter.  The government has not shown that the Guinther Letter was fabricated, and indeed much of the evidence suggests the opposite.

## II.    The Government's Additional Claims of Obstruction Are Also Meritless

### A.  <u>The Court Should Not Enhance Ms. McComber's Sentence Because She Testified at Trial.</u>

The government also seeks to enhance Ms. McComber's sentence based on her decision to testify at trial.  The government claims to "have identified a number of areas in her trial testimony where the defendant testified falsely," and asserts that this testimony, along with Ms. McComber's alleged falsification of the Guinther Letter, warrants "an additional two-level upward departure under U.S.S.G. § 5K2.0(a)."  ECF No. 431 at 28, 32.  But Ms. McComber should not be penalized for her decision to exercise her constitutional right to go to trial and testify in her defense.

Courts have held that a defendant's decision to go to trial and testify in their defense cannot automatically be grounds for a harsher sentence under the sentencing guidelines.  *See, e.g.*, *United States v. Bokel*, 185 F. App'x 234, 235 (4th Cir. 2006) ("We agree with [the defendant] and the government that [enhancing the defendant's] sentence [for obstruction of justice stemming from trial testimony] violated the Sixth Amendment under *Booker*."); *see also United States v. Ashers*, 968 F.2d 411, 413 (4th Cir. 1992) ("[T]he district court erred in imposing the obstruction of justice enhancement on the basis of [defendant's] perjured trial testimony.").  As the government acknowledges, the Supreme Court has made clear that "a finding of perjury is not automatically appropriate whenever a defendant takes the stand to testify in their own defense and is subsequently convicted by the jury of the charges against them."  ECF No. 311 at 15 (citing *United States v. Dunnigan*, 507 U.S. 87 (1993)); *accord United States v. Smith*, 62 F.3d 641, 646–47 (4th Cir. 1995) ("[A]n enhancement under § 3C1.1 does not apply automatically every time a criminal

defendant who testifies at trial is convicted.").

In other words, the government cannot merely point to a guilty verdict, which "means only that guilt has been proved beyond a reasonable doubt, not that the defendant has lied in maintaining his innocence." *United States v. Moore*, 484 F.2d 1284, 1287 (4th Cir. 1973). The Court "'must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or attempt to do the same under the perjury definition." ECF No. 311 at 16 (quoting *Dunnigan*, 507 U.S. at 95). This requires courts to find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.

None of the testimony the government points to meets this standard. First, several of the statements cited by the government are similar to the statements underlying Ms. McComber's false statements conviction. *See* ECF 431 at 28–29. Ms. McComber is already receiving a two-level enhancement in connection this category of statements.

To these statements, the government now adds the claim that Ms. McComber perjured herself by testifying about delivering "'monthly status reports, which were one of the required deliverables by the program manager[,] . . . to multiple CORs every month.'" ECF No. 431 at 28 (quoting ECF No. 303 at 47–48). The parties have long disputed the number and substance of status reports that Ms. McComber was required to and did submit. But the documentary evidence supports the truthfulness of Ms. McComber's testimony. In a February 23, 2017 email first produced to defense counsel in March 2024 following their trip to NSA to review documents responsive to a narrow set of search terms, Donald Pugh (the administrative COR for the Ironbridge contract) asked Ms. McComber if she "ha[s] copies of the last 2 status reports in 2016." Ex. F at 290. When she did not immediately respond (her calendar showed she was in meetings),

Mr. Pugh asked Craig Plunkett, Vice President of ITK for Contracts, if he had them.  *See id.*  Mr. Plunkett responded that he believed the status reports were "sent on the Classified side but either way [he] d[id] not have copies."  *Id.*  Beyond corroborating Ms. McComber's trial testimony, this document is significant for several reasons.  It shows that monthly status reports *were* being submitted in the six months leading up to the Jason Doyle email, discussed below.  Mr. Pugh is asking, in February 2017, for "the last 2 status reports in 2016," *id.*, showing the two emails (Mr. Doyle's and Mr. Pugh's) are clearly referring to two different status reports.  It also shows that these status reports—Ms. McComber's primary deliverable for the contract—exist somewhere on the high side at NSA, and ITK did not retain copies.  (Ms. McComber still has never received them from the government.)

This documentary evidence is supported by other testimony given by witnesses during the OIG investigation.  For example, Mr. Smith testified to the OIG that one of Ms. McComber's primary responsibilities was "assembl[ing]" "a couple of required status reports."  Ex. I at 46 (Smith OIG Tr. 27:19–20).  He explained that "[m]ost of the contractors . . . [were] poor writers, so [Ms. McComber] would kind of poke at them" to clarify "what [they] did" and then "rewrite it in the format that the government wanted."  *Id.* at 46–47 (27:22–28:04).  At trial, Mr. Smith testified that he could not recall "ever instruct[ing] anyone at InfoTek that the monthly status reports were no longer necessary."  Ex. H at 28 (Day 7 Trial Tr. 30:9–12).

Indeed, the COR could not have instructed Ms. McComber to dispense with the monthly status report requirement because, as Mr. Smith also acknowledged at trial, it was "a required component [of] the contract[]."  *Id.* (30:17–18).  The Contract Data Requirements List for the Ironbridge contract confirms this.  *See generally* Ex. C at 9–11 (N. Fiorey 7/17/2019 email to L. Hazenstab attaching Ironbridge CDRL); *see also id.* at 12 (showing that the PM was required to

submit monthly status reports).

The government relies on a single email taken out of context, which shows Ms. McComber telling Jason Doyle on April 4, 2017 that "[she] need[ed] [him] to mock up some quick points over the past six months on the program and send them to [her]" because although "Jon [Smith] had us stop doing these[,] . . . the COS [was  now] demanding them."  ECF No. 431 at 21, 28 (quoting GX 24(e)(1)).  As the defense has pointed out before, the government places too much emphasis on this single email about the so-called "technical status reports," because *there was more than one type of status report*.  Although the email the government cites indicates that there might have been a pause in a *technical* status report for a period of time before Mr. Smith started asking for them again, the record evidence shows there was no pause in the *other* types of status reports Ms. McComber was required to—indeed did—submit.

### B. Ms. McComber Did Not Make False Statements to the United States Probation Officer During Her PSI Interview.

The government's submission renews its claim that Ms. McComber made numerous false statements during her PSI interview about past abuse, including from her former husband, Robert Kimmel.  ECF No. 431 at 34; *see also* ECF No. 286 at 8–9 (alleging that Ms. McComber was not a "battered and confused wife" because she is an "aggressive and confident person who lashes out at others when she believes she's been wronged").  The government has even questioned Ms. McComber's account of her medical history and physical condition, on the ground that she is known to be devoted to physical fitness.  *Id.*[12]

These claims have no merit.  In particular, Ms. McComber's reports about Mr. Kimmel's

---

[12] As reflected in the Social History Report attached to Ms. McComber's submission on the §3553(a) sentencing factors, Ms. McComber has a well-established history of the medical issues she described to the U.S. Probation Officer during her interview, as confirmed by her mother, Maureen Ward, and sister, Tracy Concha.

abusive behavior is well supported and documented.  *See id.* at 4–7, 11.  As discussed in greater detail in Ms. McComber's Sentencing Memorandum, Elizabeth Sandman, LCSW-C, an investigator for the Federal Public Defender, found overwhelming evidence to support Ms. McComber's reports of Mr. Kimmel's abuse, including "[o]ver a dozen witnesses that [she] interviewed regarding Mr. Kimmel's treatment of Ms. McComber during and after their marriage [who] shared story after story about Mr. Kimmel belittling Ms. McComber, controlling her, humiliating her, and raging at her."  *See id.* at 4.  One of these witnesses is Dr. Teresa Hoffman, who has treated many thousands of patients in her 33 years of practice.  She has treated Ms. Kimmel for two decades and who has delivered around 15,000 babies.  Dr. Hoffman described Mr. Kimmel as the "worst person I have ever seen with control issues" based on his behavior during Ms. McComber's appointments and deliveries.  *See* Sent'g Mem., Ex. A at 11.

Ms. McComber told the truth to the Probation Officer during the PSI and should not receive an obstruction enhancement on the grounds of this report.  Nor should the Court strike these paragraphs of the PSI, as the government again requests after this Court already heard and rejected the same request.  *See* ECF No. 377 at 27:13.  The Court should consider this history and characteristics as it weighs the § 3553(a) factors governing sentencing.

### C. **Ms. McComber's Lawsuit Against Dwayne Preston, Who Admittedly Breached Her Systems in Violation of 18 U.S.C. § 1030, is Not Obstructive Conduct.**

Finally, the government argues that Ms. McComber's civil lawsuit against Dwayne Preston is also obstructive conduct.  But Ms. McComber's legal claims against Mr. Preston are not frivolous or obstructive.

The government does not—and cannot—dispute that Mr. Preston intruded into ITK's systems in violation of 18 U.S.C. § 1030, and then twice-perjured himself in sworn testimony to the government about that intrusion (including before the grand jury).  *See* Ex. A at 9 (ECF No.

229-6 (Non-Prosecution Agreement).  Nor can it contest that 18 U.S.C. § 1030(g) specifically provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  Such a civil action is permitted if one of five factors is present in the offense, including "damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security." *Id.* at (c)(4)(A)(i)(V).  Mr. Preston himself has not contested the legal basis for Ms. McComber's suit, and he did not file a motion to dismiss her complaint.

This stands in contrast to *United States v. Malik*, Crim. No. JKB-16-324, a case prosecuted and cited by Mr. Gray that he cites in support of his civil-litigation obstruction request.  There, the defendant engaged in "preemptive litigation against . . . . potential witnesses."  *Id.* at ECF No. 460, Sept. 11, 2018.  At sentencing, Judge Bredar concluded there was no "plausibl[] civil liability" for the parties Mr. Malik sued.  Here, by contrast, Mr. Preston has admitted his crime, and there is no question that violation triggers civil liability under 18 U.S.C. § 1030.

It is true that Ms. McComber disagrees with the government's assessment of the scope and harm caused by Mr. Preston's criminal conduct.  But that is precisely the issue to be decided in the civil litigation.  This Court need not—and should not—be called to relitigate that civil matter.

### III. There Was No Actual Loss Because the Government Received the Benefit of the Bargain, but if the Court finds a Loss Enhancement Applies, it Should be No Higher Than 10 Levels

There is a significant dispute in this case about the guidelines calculation related to the loss amount.  Probation and the government have determined that Ms. McComber has a total offense level of 20 and a criminal history category of I, which after a two-level decrease because Ms. McComber is a zero-point offender, corresponds to a guideline range of 27–33 months.  *See* ECF No. 376 ¶¶ 71, 75, 169.  That guidelines calculation is driven by application of a 12-level specific

offense characteristic under USSG §2B1.1(b), resulting in an offense level (18) that is *three times* greater than Ms. McComber's base offense level of 6.  ECF No. 286 at 2.

As many judges have recognized, the outsized impact of loss on the guideline calculation yields a flawed measure of culpability.  *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  Perhaps in light of these criticisms, the majority of people convicted of fraud receive sentences that are *below* the guideline range.  That alone is sufficient for this Court to afford loss less weight relative to consideration of the § 3553(a) factors.  But policy considerations aside, the government's loss estimate in this case cannot stand for the independent reason that it is not supported "by a preponderance of evidence."  *United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014).

The jury did not resolve the amount of loss in this case.  To convict Ms. McComber, the jury needed to find only that there was a material difference between the hours Ms. McComber invoiced the government and the hours she spent working on the Ironbridge contract.  In fact, the government said itself at the close of trial that there was no "need to determine the exact number of hours the Defendant worked each month."  Ex. H at 54 (Day 14 Trial Tr. 17:9–10).  And the government does not attempt to do so now, even as it seeks to triple Ms. McComber's adjusted offense level based on loss.

It is the government's burden to prove the loss amount, *see Catone*, 769 F.3d at 876, and the Court is required to "make factual findings sufficient to support the government's claim of the amount of fraud loss attributed to [the] defendant," *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006).  To be sure, the Court need not calculate loss to an exactitude.  "[A] sentencing court need only make a 'reasonable estimate of loss, given the available information[.]'" *United*

*States v. Savage*, 885 F.3d 212, 227 (4th Cir. 2018) (quoting *United States v. Miller*, 316 F.3d 495,

503 (4th Cir. 2003)); *see also Catone*, 769 F.3d at 876 (same); USSG §2B1.1(b) cmt. n.3(C).  But

"an estimate that is unsupported by any evidence cannot be reasonable," *Catone*, 769 F.3d at 877,

and "[a] defendant is entitled to have sentencing determinations made based on reliable evidence

rather than speculation or unfounded allegations," *United States v. Nelson*, 774 F.3d 1104, 1107

(7th Cir. 2014).

The court may not "arbitrar[il]y" pick a loss figure. *See United States v. Grant*, 211 F.

App'x 889, 896–97 (11th Cir. 2006) (vacating loss determination where the court randomly picked

a number and, "in a burst of candor, . . . stated its recognition that the $50,000 figure 'may sound

arbitrary.'").   But that is precisely what the government is inviting the Court to do.   The

government offers no concrete explanation for how it arrived at its 15% calculation for the hours

it credits Ms. McComber for her off-site work.  Although it relies on its investigative spreadsheet,

GX 21(a), that spreadsheet focused on Ms. McComber's daily activities and life events outside of

work and omitted evidence of Ms. McComber doing work on the Ironbridge contract off-site.

As discussed below, there is *extensive* evidence of Ms. McComber doing work off-site.[13]

It is undisputed that the contract was by all accounts high performing, which is evidence itself of

Ms. McComber's hard work.  Government contracts do not run themselves.  They have PMs for

---

[13] Defense counsel has appended some of this evidence in Exhibit F.  However, the evidence
included is not exhaustive.  Although we have offered evidence sufficient to show that the
government's proffered loss estimate is not reasonable, we have not endeavored to include each
and every piece of evidence because it is not Ms. McComber's burden to prove loss, and because
Ms. McComber is not in possession of all documents showing the work she did on the Ironbridge
contract. *See, e.g.*, Ex. E at 17 (1/30/24 Hr'g Tr. 110:8–13) (acknowledging that "the Government
was still trying to accommodate all of [Ms. McComber's discovery] requests" when "the decision
was made to go to trial"); *see also* Ex. F at 22 (Ms. McComber explaining to Mr. Doyle that she
found his email "in [her] trash[,]" and explaining that she recently "discovered . . . lots of things
[were] ending up directly in the[]" trash).

that very purpose.  As discussed in Ms. McComber's initial sentencing submission, ECF No. 290 (attached hereto as Ex. J), the NSA assigned the value of a PM that could keep the Ironbridge contract running effectively for 19 months to be $447,591: 2,977 hours (the pro-rata hours for full-time equivalent program management work) x $150.35 per hour (at the highest rate during the indictment period).  In the end, the government received more than it bargained for with the Ironbridge contract.  The "overall contract ceiling was $16,658,571.42 but the obligated amount on the contract totaled $15,985,382.21"—meaning it came in $673,189.21 "under budget."  Ex. C at 13.   That amount of savings for Ms. McComber's high performing (and apparently cost effective) contract is more than double the purported loss in this case.  The government has suffered no actual loss.  *See United States v. Harris*, 821 F.3d 589, 606 (5th Cir. 2016) ("The difference between the contract price and the fair market value of services rendered reflects the contracting agencies' losses under their respective contracts—the difference between what they paid and what they received.").

If the Court nevertheless feels that it must assign a loss amount, it should not adopt the government's arbitrary 15% calculation for Ms. McComber's off-site hours.  Even taking the government's investigative spreadsheet at face value, defense counsel's detailed review of the spreadsheet and its underlying evidence shows the resulting loss figure is no greater than $189,779. *See* Ex. D at 5.  The government has provided no evidence to support a loss figure that credits Ms. McComber anything less than 50.5% of the hours she billed off-site.  But even that percentage is too low.

As explained in greater detail below, there is extensive evidence of Ms. McComber doing work during the hours she billed off-site.  That evidence has not been considered by the government in calculating loss.  Coupled with the unreliability of the evidence that *is* portrayed on

the government's investigative spreadsheet, Ms. McComber should receive credit for *at least* 60%
of the hours she billed to the Ironbridge contract while working off-site, resulting in a loss amount
no greater than $147,000. *See* Ex. D at 4–5 (showing calculation if Ms. McComber is credited
60% of her off-site time). Under the guidelines, Ms. McComber's loss enhancement should
therefore be no greater than 10 levels. *See* §2B1.1(b)(1)(F).

### A. The government's loss estimate is not reasonable.

The government's loss estimate is not "reasonable" under any stretch of the imagination.
For starters, the total amount paid by the government for Ms. McComber's work on the Ironbridge
contract as PM during the indictment period is $1,503.49 less than the amount the government
asserts. The government's total relies on a September 2017 invoice for 88 hours, *see* Ex. G at 2
(GX 19(a)(1)), but the government rejected that invoice and ultimately decided to pay for 78 hours
of Ms. McComber's time for that period after receiving a detailed justification for those hours, *see
id.* at 3 (GX 19(a)(3)) (invoice eliminating PM hours pending examination of hours paid by gov.);
*id.* at 12 (GX 19(d)(3)) (T. Starr-Smith requesting updated invoice for Sept. 2017 PM hours after
review of work performed by Ms. McComber); *id.* at 4 (GX 19(a)(4)) (invoice for 78 hours paid
by gov.); *id.* at 16 (GX 19(e)) (invoice numbers and amounts paid by government).[14]

Even more problematic, to arrive at its proffered loss amount of $306,186, the government
has seemingly picked a number out of thin air.

Although the government does not dispute that Ms. McComber was allowed to work on
the Ironbridge contract off-site, ECF No. 286 at 5, and although the government is willing to credit

---

[14] Defense counsel's objections to the government's loss calculation, including its month-by-
month summary of invoices, is noted in the PSR. ECF No. 376 at 34. The parties have various
other factual disputes about paragraphs of the PSR which are not reflected herein, but are reflected
in the PSR.

almost all of the time Ms. McComber spent working "in access" at NSA (200 hours),[15] it nevertheless penalizes Ms. McComber for working off-site and argues Ms. McComber should only be given credit for "*15%* of the 2,342 hours that she billed to the IRONBRIDGE contract when she was not within access control at the NSA," *id.* at 7 (emphasis added). "That comes to an average of *18.5 hours a month* for [Ms. McComber's] off-site time," for a total monthly average (combined with her on-site hours) of "approximately 30 hours a month that was arguably properly [billed] to the Ironbridge contract." *Id.* (emphasis added). Not only has the government not "present[ed] the evidence necessary for the district court to make [a] determination" that the government's arbitrary loss calculation is proper, *Catone*, 769 F.3d at 877, as explained in greater detail below, the record evidence easily *disproves* it.

The government claims that its 15% figure is primarily based on the 81-page "investigative spreadsheet" it presented as Government Exhibit 21(a) at trial, and the "underlying documentary evidence on which [that spreadsheet] was based." ECF No. 286 at 6; *see also* ECF No. 431 at 36–37. But as argued in Ms. McComber's Motion for Judgment of Acquittal ("MJOA"), *see* ECF No.

---

[15] To arrive at 200 hours of on-site time, the government has subtracted 30 minutes from each of the 108 days that Ms. McComber was in-access at NSA—for a total of *54 hours*—to account for the time the government claims it would take Ms. McComber to transit the physical distance between the office where she worked and "NSA's security perimeter." ECF No. 286 at 4. But that is a vast over-inflation of the time it would take for Ms. McComber to transit to and from the office. For example, on March 23, 2016, it took only 4 minutes for Ms. McComber to get from "Gatehouse 2" to the "OPS1" building where the Ironbridge contract was located. *See* GX 21(a) at 1; *see also* Ex. H at 3–5 (Day 2 Trial Tr. 121:8–122:8, 123:1–3) (L. Hazenstab explaining calculation of "confirm hours"). And on April 26, 2016, it took only 6 minutes for Ms. McComber to get from the Pedestrian Gate to the Ironbridge contract space. Assuming it took the same amount of time to transit her way out, the total transit time for that day would be 12 minutes, not 30. Moreover, there is no evidence proving Ms. McComber was not doing PM work for Ironbridge while she was walking to and from the office. She frequently would walk and talk to people about Ironbridge-related business. *See, e.g.*, Ex. F at 237 (showing Ms. McComber and Mr. Doyle "step[ping] out" to discuss hiring); *id.* at 177 (taking a walk to discuss personnel issue with Ironbridge contractor); *id.* at 26 (showing Ms. McComber escorting new hires on NSA's campus).

359 at 15–24, and as reinforced by the testimony of Agent Benderoth at the evidentiary hearing on November 20, 2023, *see* ECF No. 379 at 64:20–65:3,[16] neither the government's spreadsheet nor the underlying evidence upon which it is purportedly based include anything about the hours Ms. McComber worked off-site.  The government has thus presented *no* evidence to support its 15% estimate, let alone proven it by a preponderance of the evidence.

Recognizing that "it is virtually impossible to reach a reasonable estimate of how much" the Ironbridge PM's "time was properly billed," ECF No. 311 at 9; *see also* Ex. H at 55–56 (Day 14 Trial Tr. 30:23–31:2 (government closing statement), the government props up its arbitrary loss calculation with uninformed witness testimony[17] and mischaracterization of Ms. McComber's duties and responsibilities as the PM on the Ironbridge contract.  But those efforts are belied by the record evidence, including the terms of the Ironbridge contract and witness testimony regarding the nature of the PM position and the hours Ms. McComber worked.  They are also belied by a mountain of evidence (including documents the defense has obtained only since trial) showing Ms. McComber was doing work on the Ironbridge contract during the time in which the government asks this Court to infer she was not.  Virtually none of this evidence showing Ms. McComber performing her duties as PM during the hours she charged to the Ironbridge contract while working off-site—and indeed, during hours she did *not* charge the Ironbridge contract—was

---

[16] Defense counsel will provide the Court with a courtesy copy of ECF No. 379 in entirety.

[17] The government relies on the same witness testimony it offered in support of its opposition to Ms. McComber's MJOA, *see* ECF No. 431 at 36 (citing ECF No. 390 at 22–51).  But as explained in Ms. McComber's MJOA Reply Brief, ECF No. 408 at 9–15, those witnesses predominantly admitted that they "'didn't have an understanding of what [Ms. McComber's] responsibilities would have been' as program manager," *id.* at 10 (quoting S. Weir trial testimony); *see also id.* at 14 (quoting R. Bryant trial testimony that he "did not even 'know what a program manager exactly has to do"); *id.* (discussing R. Shirley testimony and how she "testified that she was 'not really involved . . . with [Ms. McComber's] specific duties' and thus could not answer whether Ms. McComber was carrying out her program manager responsibilities.").

presented to the jury.[18]  But as the Court has recognized in the numerous post-trial discovery hearings in this case, the Court may nevertheless consider this evidence at this stage of the proceedings for the purpose of determining loss.

**1. The Program Manager position on the Ironbridge contract was a full-time job that could be done anywhere.**

To support its estimate of loss, the government paints a picture of there being "minimal administrative work" for Ms. McComber to do off-site and, contrary to the terms of the Ironbridge Contract, contends that "[Ms. McComber's] review of potential employee resumes' . . . and the occasional interviews that McComber conducted in order to have a reserve of candidates who could be called upon in the event of vacancies occurring on either the Ironbridge or Silent Roar contracts" were not properly billable to the Ironbridge contract.  ECF No. 286 at 7–8.  That is not true.

*First*, by the clear terms of the contract, Ms. McComber's *entire job* (not just a small portion) was administrative and unclassified.  The Statement of Work ("SOW")—the attachment to the Ironbridge contract that provides a job description for each labor category—says with respect to the "Contract Program Manager" that the PM "shall function as the official Point of Contact (POC) with the Government COR" (an administrative task).  Ex. G at 49 (GX 30(a)(5)).  The SOW goes on to explain that "[t]he []PM shall plan, organize, staff, control, and lead the combined efforts for managing the IRONBRIDGE contract and associated TTOs" (all administrative tasks) and then provides a list of examples of the "types of activities" that the PM is to provide assistance

---

[18] Some of this evidence could not have been presented to the jury by defense counsel because it was not produced by the government until after trial.  The government has produced approximately 269 documents, totaling over 2,200 pages across 13 productions, in response to the defense's sentencing-related discovery requests.  Documents received post-trial bear Bates numbers USAO-032516 and greater, and the defense has annotated those documents for ease of the Court's identification with a red asterisk mark next to the Bates number.

with.  *Id.*[19]

Although Ms. McComber's job description may seem vague to someone not well-versed in government contracts, the record evidence makes clear what Ms. McComber's position entailed and where her work could physically be done.  Regina Shirley—the technical Contracting Officer Representative ("COR-T") for a portion of the time Ms. McComber was serving as the Ironbridge PM and someone who had herself served as a PM in the private sector, *see* Ex. H at 18 (Day 5 Trial Tr. 68:5–7), testified in an interview with NSA's Office of the Inspector General ("OIG") on September 29, 2017, that to do their job, a PM "do[esn't] have to be [] in the [NSA's] building," because "[the government and the PM] can communicate completely through phones and emails." Ex. I at 39 (Shirley OIG Tr. 11:6–16).  And while "[t]he other contractors [on the team] have to be [] in the building all the time," since the work "they do is classified and they're working on it," the kind of work that Ms. McComber was doing, that is, "the maintenance of the contract[,] . . . that's not classified."  *Id.* at 42 (26:10–22).

What Ms. McComber had to do as the PM, Ms. Shirley explained, "[wa]s just manage the program, keep the contractors happy, make sure they [were] doing their job, make sure they [were] not going over in their hours," etc.  *Id.* at 39 (11:6–16).  Ms. Shirley emphasized that "just because [Ms. McComber] didn't come into the building," that did not "mean she wasn't working the contract . . . because" working off-site "is allowed," *id.* at 39 (16:5–9), and in fact, NSA's National Security Operations Center ("NSOC")—the mission the Ironbridge contract supported—"[did not]

---

[19] The more granular duties and responsibilities of the PM position were laid out by Ms. McComber to Cherril Guinther in a letter dated July 23, 2012, after the government proposed dropping the PM task order.  *See* Ex. C at 2.  After that letter (presumably seeing all the services the government would be losing out on) the decision was made to keep the PM full time.  The work done by the Ironbridge PM was also described in detail at the bottom of each monthly ITK invoice.  *See, e.g.*, Ex. G at 1 (GX 5(a)).

provide a seat for [her] position," *id.* at 42 (26:10–22).

Ms. Shirley's testimony is consistent with the testimony of Rob Bryant, the head of K3 (the umbrella organization over NSOC and the Ironbridge contract), who described Ms. McComber as someone who would "bend over backwards for the mission." Ex. H at 16 (Day 5 Trial Tr. 59:3–5). It is also consistent with testimony from Ms. McComber's predecessor as Ironbridge PM, Raynett Colston. Both Mr. Bryant and Ms. Colston testified that a substantial portion of the PM's role was "the care and feeding" of the contractors. *See* ECF 429 at 43, 47. Ms. Colston's testimony before the OIG, attached hereto in relevant part at Exhibit I, is even more elucidating on this issue. She explained that as the PM on the Ironbridge contract, as with the other PM positions she has held, "what you're doing" is "caring and feeding" and answering questions, and generally not "com[ing] onto the site at all." Ex. I at 11 (Colston OIG Tr. 8:10–15). Ms. Colston also testified that, as the Ironbridge PM, she would conduct "interview[s] if there were any openings" on the Ironbridge contract. *Id.* at 12–13 (14:22–15:2).

Donald Pugh, the administrative Contracting Officer Representative ("COR-A") for the Ironbridge contract during the indictment period, also testified in an interview with the OIG that Ms. McComber was in "a full-time program management position," Ex. I at 34 (Pugh OIG Tr. 17:16–17), and that her job was to serve as the "belly button to the program," *id.* at 33–34 (16:16–17:1). Mr. Pugh testified that he would talk to Ms. McComber if he "had any concerns about how the program was [going]," *id.* at 34 (17:1–4), and if he had any questions, "she'd get back with [him]," *id.* at 34 (17:6). The evidence bears that out. Mr. Pugh would frequently email Ms. McComber regarding matters pertaining to onboarding contractors, contract finances, and similar administrative issues, and Ms. McComber would invariably respond, often on days when the government's spreadsheet shows she was working off-site. *See, e.g.*, Ex. D at 68, 130–31, 147–48,

43

194, 261, 296–30).[20]

Mr. Pugh emphasized that "[a] program manager doesn't necessarily have to be in the SCIF to be a program manager," Ex. I at 35 (Pugh OIG Tr. 31:13–15), and when asked what Ms. McComber was "doing to support the contract for eight hours a day" when she was off-site, he explained, "I assume she's doing program management work"; that is, "managing the program, [] managing [her] people, [] making sure that the government is getting what they're supposed to be getting." *Id.* at 36 (32:9–16).

The testimony of the Ironbridge CORs is backed up by the OIG testimony of Craig Plunkett, the ITK Chief Financial Officer who, by the government's telling, "handled" much of the administrative work Ms. McComber was responsible for. ECF No. 286 at 7. But his OIG testimony and the record evidence tell a different story. Mr. Plunkett testified that "part of the reason why [he] was hired" was to "help [Ms. McComber] run the business" so she didn't "have to spend 100 percent of [her] time on it." Ex. I at 18 (Plunkett OIG Tr. 23:8–14). Mr. Plunkett appreciated the amount of work and dedication required for Ms. McComber to juggle her responsibilities as CEO of ITK and PM on Ironbridge—while also being a mother of four children; Mr. Plunkett helped "line things up [] for [Ms. McComber], or as much as possible to help make some of that easier." *Id.* at 20 (25:12–14). For example, Mr. Plunkett helped compile the monthly Ironbridge financial reports, but each report was then sent to Ms. McComber for review before submission to the government. *Id.* at 21–22 (26:13–27:5); *see* Ex. D at 71, 89, 156.

The only way Ms. McComber was able to juggle all of her demanding roles, Mr. Plunkett

---

[20] Jennifer Blake, the technical lead for NSOC, likewise testified to OIG that if Ms. McComber was needed, "she had a cellphone." Ex. I at 3 (Blake OIG Tr. 46:17). Specifically, for "personnel issues" the government always "dealt with the PM" and whenever they needed her they "would just call her cellphone." *Id.* at 3–4 (46:21–47:9). Ms. Blake could not "recall there being [a time when they] need[ed] Jacky and she" wasn't there. *Id.* at 4 (47:17–19).

explained, was by "work[ing] a lot of long hours."  Ex. I at 20 (Plunkett OIG Tr. 25:14–16).  While

a typical PM would be done with work for the day after putting in their eight hours, Mr. Plunkett

testified that was not the case for Ms. McComber, who, after working eight hours as a PM, then

"switche[d] hats" to perform her duties as CEO.  *Id.* at 20 (25:4–11).  This required many late

nights and early mornings.  Indeed, based on the time stamps of emails and text messages Mr.

Plunkett received from Ms. McComber, he knew that "[s]ome days [Ms. McComber] start[ed] at

4:00 in the morning and end[ed] about midnight."  *Id.* at 19 (24:14–19).[21]

When asked if Ms. McComber was giving "eight hours a day to Iron Bridge," Mr. Plunkett

answered with a resounding "Yes," stressing that he "truly believe[d] she [wa]s."  *Id.* at 23–24

(45:21–46:1).  Agent Hazenstab pressed Mr. Plunkett on his answer, asking him to clarify whether

he believed that to be true "[f]or each and every day that she billed?"  *Id.* at 24 (46:11).  He again

answered her "Yes, ma'am."  *Id.* at 24 (46:12).  Refusing to give up, Agent Hazenstab circled back

to that topic yet again later in the interview, asking for a *third time* (while reminding Mr. Plunkett

he was testifying "under oath"), *id.* at 30 (64:17), whether he "kn[e]w of any specific times where

she billed when [she] shouldn't have," *id.* at 30 (64:14–15).  And once again, his answer was "No,

[he did] not," to "[his] knowledge" know of any such times.  *Id.* at 30 (64:16).

*Second*, as the SOW and the witness testimony discussed above show, the tasks associated

with staffing the Ironbridge contract—including identifying and interviewing candidates—were

properly billable to the Ironbridge contract.  That did not change simply because a certain candidate

might have been qualified for, or under consideration for, more than one ITK contract.  Indeed,

---

[21] Mr. Plunkett's testimony is consistent with what Ms. McComber's friends and family have to say about her work ethic.  *See, e.g.*, Sent'g Mem., Ex. B (compiling letters of twenty-two people who have known Ms. McComber—many for decades—across a variety of settings) (filed under seal).

the government's contention that Ms. McComber could not bill for building up a "reserve of candidates" is refuted by an email from Rob Bryant to Ms. McComber (sent in the midst of discussions over hiring) telling her expressly that if she "want[ed] to keep folks on the 'bench,' [she could] chat with Jason [Clark] and Jon [Smith]," because they "[we]re ok with it."  Ex. F at 150.

And it makes sense why that would be the case. Hiring a government contractor at NSA is no simple task; it is a multi-step process with potential to derail at each step.  From finding a candidate who possesses the requisite technical skill and is acceptable to the customer, to ensuring the candidate possesses the required security clearance and polygraph, to negotiating an offer and start date, and then navigating in-processing with the government customer—all while keeping the candidate on the line—the stars basically have to align for each new hire.  As discussed in greater detail below, contractors left the Ironbridge contract unexpectedly, and new hires sometimes bailed for more attractive opportunities sometimes days after they started, and it paid to have a bench or a "Plan B" of qualified replacements.  Ex. F at 171.

*Third*, that Ms. McComber's position was mostly administrative and managerial in nature, and as a result did not leave a massive paper trail, is not evidence that she was not working the hours she billed the Ironbridge contract.  As the Court has acknowledged, Ms. McComber's position did not require a traditional work schedule or set hours.  *See* ECF No. 429 at 57.  Her duties required her to be available to respond to emergencies, address issues, or provide guidance at any time, including outside regular office hours.[22]  And the evidence shows she was doing just

---

[22] That the government customer considers such "on-call" services outside of regular business hours to be compensable can be seen in their mark-up of the Statement of Work for the Ironbridge II contract.  *See* Ex. C at 33 (explaining that the contractor should be compensated for "On-Call services").

that.  It also shows that the vast majority of the work Ms. McComber was doing involved verbal communications, such as phone calls or in-person discussions and interviews, rather than written documentation.  While those interactions may not leave a paper trail, they are nonetheless essential to the smooth functioning of the Ironbridge contract.

The government has presented *no* evidence that Ms. McComber did not fulfill her duties as PM, that the contract performed poorly under her management, or that Ms. McComber did not respond promptly to agency needs.  In fact, exactly the opposite: Mr. Gray has repeatedly acknowledged that the Ironbridge contract exceeded performance standards during Ms. McComber's tenure as PM, *see, e.g.*, ECF No. 410 at 23:13-18, and the COR testimony shows that Ms. McComber was always reachable when the government called on her, *see* Ex. H at 12 (Day 3 Trial Tr. 155:6–13) (L. Hazenstab) ("Q. Did your investigation find a single time that a government contracting officer's representative attempted to reach Ms. McComber and could not? A. No."), and they *did* call on her, *see, e.g.*, Ex. F at 28 (Mr. Bryant to Ms. McComber on a day she was working off-site: "Call Me."); *id.* at 38; *id.* at 292 (Ms. Blake explaining that she "spoke with Jacky about this earlier[,]" on day that Ms. McComber was offsite).

**2.  The record evidence shows that Ms. McComber performed the work for the hours she billed off-site.**

Although tragically not presented to the jury by the defense, there is *overwhelming* evidence showing Ms. McComber was fulfilling her duties as PM on the Ironbridge contract for the hours she billed NSA, even while working off-site.

***Staffing.***  As Mr. Pugh testified, a big portion of Ms. McComber's job as PM was "making sure that the government [wa]s getting what they [we]re supposed to be getting."  Ex. I at 36 (Pugh OIG Tr. 32:13-16).  And what the government was most concerned about "getting" was more people on the Ironbridge contract. Specifically, web developers.  Throughout her tenure as PM,

Ms. McComber was under immense and relentless pressure from Jonathan Smith, the PM on the government side of the Ironbridge contract, to fill vacancies quickly.  *See* Ex. F at 77–78, 80, 110; *id.* at 252–54 ("My government PM was screaming at me today. It wasn't pleasant . . . He is mad he isn't fully staffed yet and thinks I can just give birth to fully cleared programmers at will!"); *see also id.* at 75, 224–25.  At a time when there were not a lot of lateral moves happening, *see* Ex. F at 239, Ms. McComber struggled to find people to fill the vacant positions on the Ironbridge contract, largely due to the relatively low salary rate she could offer commensurate with the level of skill required, *see* Ex. F at 117 (equating mid-level "Java guys" to "unicorn[s] these days"); *see also id.* at 16, 144, 224–25, 227–29, 231, 236, 249, 255; *see also* Ex. H at 38 (Day 11 Trial Tr. 212:9–11) (J. McComber) ("There were so many contracts that could beat us easily with . . . paying greater salaries than what we could to these individuals."); *id.* at 41 (217:15–18) (equating hiring web developers to a "huge pond with this teeny, teeny little bit amount of fish and a thousand boats looking for them"); Ex. I at 29 (Plunkett OIG Tr. 51:3–10) (explaining that it was difficult to find "SharePoint personnel" because it takes "awhile to find the right people at the right salary").  And once candidates were identified, the remainder of the hiring and onboarding process took time—generally, "[r]ecruiting is an 8-10 week cycle."  Ex. F at 17, 23.

In August 2016, for example, ***on a day when Ms. McComber was working off-site***, she summarized the hiring challenges she was facing for Mr. Smith after one of his frequent inquiries for a status update on vacancies:

| | |
|---|---|
| **From:** | Jacky Kimmel |
| **To:** | Smith, Jonathan C |
| **Bcc:** | Rob Bryant <robbryant83@gmail.com> |
| **Subject:** | Re: replacement status |
| **Date:** | Tuesday, August 30, 2016 1:38:43 PM |

Working diligently on them but these are the two worst rates we have with the most competition in the market place today. We have an interview at 2 with a web developer so fingers crossed. We've interviewed tons of java developers but everyone of them is priced greatly higher than our rate on contract with zero profit. I've even extended 2 offers with a 10% loss for ITK just trying to get this filled and both took higher offers elsewhere. Any capability to use the chief architect labor category to fill the senior? That would give us more to work with. Even my head hunters say they can't help us fill given the salary available. Sorry, not great news but my reality.

Jacky L Kimmel
CEO/President InfoTeK
443-739-6575
www.infotekcorp.com

Sent from my iPhone

On Aug 30, 2016, at 11:55 AM, Smith, Jonathan C <jcsmil13@nsa.gov> wrote:

What is the status on the 2 replacements?

Ex. F at 145.

As the above email shows, Ms. McComber did sometimes utilize headhunters, such as "vsource"[23] to obtain more resumes of prospective employees. But their assistance only went so far (limited to sending resumes); it was expensive, *see, e.g.*, Ex. F at 220–22 (monthly invoices); Ex. I at 28 (Plunkett OIG Tr. 50:1–7) (discussing job fairs and hiring more generally and explaining "[i]t costs money" and is hard for "small companies" like ITK to compete "with the bigger companies"), and often times, it only created more work for Ms. McComber. Ms. McComber would give the agencies certain criteria, and they would send resumes she would then have to sift through. *See* Ex. H at 42 (Day 11 Trial Tr. 220:10–12). It was like trying to find a "needle in the haystack" to find cleared individuals who met NSOC's qualification requirements. *Id.* at 42

---

[23] *See* Ex. I at 26 (Plunkett OIG Tr. 48:5–7). V-Source is a service through DoDIntelJobs.com which "provide[s] one-on-one recruiting assistance." *See* DoDIntelJob, at https://dodinteljobs.com/v-source.aspx.

(220:8).  Sometimes Ms. McComber was able to fill positions with contractors from other ITK contracts, but that came with its own set of challenges; it did not necessarily make things easier. Staffing across contracts required countless hours talking to Mr. Smith, Mr. Clark, and Mr. Bryant to get approval for the shuffle, negotiating the personnel move with the leadership on the other contracts, negotiating with the candidates to get them to accept the moves, and that is all before the administrative requirements associated with in and out processing the respective contracts, moving clearances, and updating badging even begins.

The personnel shuffle Ms. McComber had to orchestrate in her very first week as Ironbridge PM in March 2016 is a prime example of the effort required to do an inter-contract personnel swap.  This example is just a sliver of what Ms. McComber dealt with to transition a single position, while at the same time, working to fill other positions on the Ironbridge contract, in addition to her other duties as PM.  *See* Ex. F at 21.

### a.  The March 2016 Hiring Crisis

In the days leading up to Ms. McComber taking over as PM, one of the Chief Architects on the Ironbridge contract, Mike Rabinovitz,[24] requested to be moved to another ITK contract. *See* Ex. F at 31.  Mr. Rabinovitz made clear that if ITK denied his request, he planned to leave the company.  Not wanting to lose him, ITK accommodated his request, but Mr. Smith was not happy at the prospect of losing the Chief Architect on the Ironbridge contract.  When Ms. Colston first told him about Mr. Rabinovitz leaving in her last few days as PM, Mr. Smith said "Mike is in a Key Position and cannot be removed from the contract without the government's approval." *Id.*

Even before taking over as PM, Ms. McComber sprang into action to facilitate a smooth transition for the unexpected opening.  Contrary to the government's bald assertion that Ms.

---

[24] Rabinovitz is sometimes referred to in the documents by his nickname, "Rabi."

McComber "went largely AWOL from March 25th through April 6th," ECF No. 431 at 36, Ms. McComber was working in high gear during this precise time period to resolve a personnel crisis.[25] She immediately identified a qualified replacement for Mr. Rabinovitz—Scott Robier, a contractor on another ITK contract supporting NSA's Infrastructure & Logistics organization ("I&L")—and also identified a backfill for Mr. Robier on I&L—an ITK employee named Karl Hazer.  As Ms. McComber testified at trial, she took the opportunity with the vacancies on the Ironbridge contract to "promote from within" ITK employees who "had been with the company for a number of years," and had received assistance from ITK for their "college education and master's degrees."  Ex. H at 36 (Day 11 Trial Tr. 206:1–5).

Before Ms. McComber could pitch such candidates, including Mr. Robier, to Mr. Smith, she had to spend time with them helping them update their resumes to accurately reflect their qualifications in a way that suited the NSOC staff; namely, Mr. Smith. *See* Ex. F at 250, 251.  On March 17, 2016—*a day when Ms. McComber did not charge a single hour to the Ironbridge contract*, *see* Ex. G at 17–18 (GX 22(c)1)—Ms. McComber sent Mr. Smith her considered proposal and requested approval for Mr. Robier to fill Mr. Rabinovitz's position, *see* Ex. F at 31. She explained that Mr. Robier had been looking for a similar position "for about a year," and was "perfect for [Ironbridge]." *Id.*  At the same time, Ms. McComber explained, she was in the process of interviewing for a Senior Web Developer to replace Jason Doyle, who was moving into the recently vacated Senior Technical leader position from one of two Chief Architect positions on the Ironbridge contract.  *Id.*; *see also* Ex. F at 35. Although this all meant there would be an inevitable

---

[25] The government also lists a string of other dates for which Ms. McComber was "not present . . . *at all*," ECF No. 431 at 37, but the evidence shows Ms. McComber was doing Ironbridge-related work on many of those days as well, *see, e.g.*, Ex. F at 6–7, 66, 78, 83, 86, 92, 97, 104, 110, 113, 115, 116–17, 120–24, 308–09.

period of "transition," Ms. McComber assured Mr. Smith that she "guarantee[d] [his] level of service w[ould] not decrease."  Ex. F at 31.

Over the following days, Ms. McComber worked diligently to ensure a smooth transition. She spoke to Mr. Smith about what would be required of Mr. Robier to fill Mr. Rabinovitz's position, and consulted Mr. Doyle on whether Mr. Robier could handle it.  *See, e.g.*, Ex. F at 235. At the same time, Ms. McComber had to keep Mr. Robier engaged and interested in the new role while she was jumping through the administrative "hoops" associated with hiring for this key position, *see* Ex. F at 250, for fear that he would change his mind or accept another offer, as was common in government contracting at the time, Ex. F at 73–74, 80, 171, 172–73, 257.

Ten days into these negotiations over backfilling Mr. Rabinovitz's position, on March 25, 2016, Ms. McComber, ***while working off-site*** (*see* GX 21(a) at 1, 2), asked Rob Bryant for Mr. Smith's number so she could "chat with him about Mike's replacement."  Ex. F at 46.  Behind the scenes, Ms. McComber was formulating a transition plan that would ensure the least amount of disruption to the government's operation and would make everyone happy.  There were a lot of moving pieces to transition this single position: Mr. Rabinovitz who was anxious to start his new job, Mr. Robier who was happy to replace Mr. Rabinovitz but also had a scheduled day off during the transition, Mr. Smith who did not want any gap in coverage for a key position on Ironbridge, as well as the government leads for Mr. Rabinovitz's new contract and Mr. Robier's old contract, who likewise wanted a smooth transition.

On March 30, 2016—another day when Ms. McComber was ***working off-site*** (*see* GX 21(a) at 2)—Ms. McComber emailed Mr. Smith to share the transition plan she had carefully developed.  She informed him that Mr. Rabinovitz would need to be at his new work site on Monday, April 4, 2016.  Ex. F at 37.  Mr. Robier, she explained, would not be available to start on

Ironbridge until Tuesday, because he had a scheduled day off on Monday.  She reminded Mr. Smith that both Mr. Rabinovitz and Mr. Robier would have to in-process their new positions and would have loose ends to "tie up" on their old positions during the transition, but the plan was for them to be "fully engaged [by] Monday [April] 11th."  *Id*.  Ms. McComber added that Jason Osborne—the contractor she had identified to fill Jason Doyle's prior position—would be moved "once his replacement [was] approved and through security." *Id.*; *see also id*. at 38 ("Jason please call my cell below to discuss the position on IB. Thank you").

But this plan did not work for Mr. Smith.  The next morning, he asked Ms. McComber when Mr. Robier's replacement, Karl Harzer, would be available to start on the I&L  contract and demanded that "[a]ll 3" (Mr. Rabinovitz, Mr. Robier, and Mr. Harzer) "will move at the same time." *Id.* at 36–37.  ***While working off-site*** (*see* GX 21(a) at 2), Ms. McComber responded, laying out for Mr. Smith all the challenges with meeting his demands:

-----Original Message-----
From: Jacky Kimmel [mailto:jacky@infotekcorp.com]
Sent: Thursday, March 31, 2016 9:43 AM
To: Smith, Jonathan C
Cc: Jason Doyle
Subject: Re: transitions

Jon I cannot hold Scott for his replacement as the customer receiving Mike must have him over there. That issue of transition is on Parsons the prime not ITK. I submitted Karl a month ago to the prime and they did not get around to interviewing him until just this week. They have to get him approved by the COR and CO then he can start. It should be next week but I cannot guarantee that.  You are holding me responsible for things that I've no control over. I have done my best and others have failed to follow through in a timely manner. It is my goal to ensure all losing and gaining customers have the least amount of downtime as possible. To this point is why Mike and Scott will toggle back and forth next week as both the NSOC and the GAO have unique access requirements which must be processed prior to an employee being able to be productive. Scott is aware there may be a lapse of a day or two for Karl but he is preparing a transition document and also will make himself available to ensure Karl's success in I&L. Had I known weeks ago that considering Osborne would cause such a delay, I would not have entertained the concept. It was the employee who inquired of us not the other way around. Both Mike and Scott planned to depart ITK without these moves. Please understand my position.
Thank you,

Jacky Kimmel
CEO of InfoTek Corporation
Board Member, BuyMarylandCyber (BMC)

Ex. F at 36. Mr. Smith's response?

| From: | Smith, Jonathan C |
| To: | Jacky Kimmel |
| Cc: | Jason Doyle |
| Subject: | RE: transitions |
| Date: | Thursday, March 31, 2016 11:29:36 AM |

If you want my approval, then you will need to follow the conditions I laid out.

*Id.*

Ms. McComber followed Mr. Smith's direction, all the while keeping her employees who were stuck waiting in limbo informed as much as she could. *See, e.g.*, Ex. F at 52, 33, 40 (giving Mr. Robier an update on a day she was working off-site, and telling him to "[g]ive [her] a call if [he] would like to discuss" and to "use [her] cell"). On April 7, Ms. McComber sent a revised request to Mr. Smith and Mr. Clark, requesting approval for Mr. Robier to "take the place of departing [Mr.] Rabinovitz," starting part-time April 5–8, "with full time approval for Monday the 11th." Ex. F at 61. Mr. Clark responded this time, saying it sounded fine to him as long "as the [part-time] combined hours d[id] not exceed 1 FTE during the period." *Id.* But that was not the end of it.

Unfortunately, the prime contractor on the I&L contract (Parsons Corporation) did not move quickly to approve Mr. Harzer to replace Mr. Robier, *see* Ex. F at 42, and the ripple effect from that delay disrupted Ms. McComber's plans and created more work for her, *see id.* at 50. Ms. McComber was working behind the scenes to try and expedite the process, *see id.* at 48–49, but some things were out of her control. Even after Mr. Harzer was finally approved on April 1, *see id.* at 48, the I&L COR requested a 3-day transition period, *see id.* at 55. As a result, there was an inevitable two-day gap in coverage on the Ironbridge contract before Mr. Robier started. *See id.*

At **3:41 AM** on April 7, 2016,[26] Ms. McComber sent an update to Messrs. Smith and Clark

---

[26] The timestamp on this email showing Ms. McComber doing work as PM in the middle of the night is not surprising. As the government's spreadsheet shows, Ms. McComber told Lauren Starr-

explaining the delay with Mr. Robier's replacement.

| From: | Jacky Kimmel |
|---|---|
| To: | Jonathan C Smith; Jason Clark |
| Bcc: | Robert Bryant |
| Subject: | Update and ITK steps with Parsons |
| Date: | Thursday, April 7, 2016 3:41:02 AM |

Jon and Jason,

ITK's CSSO provided Parsons the CPRL add form for Robier's backfill to I&L on Tuesday at 11:30 and we responded with the compelled form at 11:49. I also had Karl complete their NDA which was completed and returned by early afternoon Tuesday. Wednesday evening at 5 I emailed as we had heard nothing more since Tuesday. I was told the CPRL add needed to be approved by the COR and then she informed me the Parsons CSSO claimed to have not yet received the completed form. We forwarded the original email WITH the completed form at 7 this evening. I have asked 3 times for their process and have yet to be told what all it entails. Previously there were none of these types of issues. I told Parsons Robier must off board with them on Friday in hopes they get a little hustle in their processes. Rabi's customer wants him engaged starting Monday. Did you hear anymore from Walter.

Jacky Kimmel
CEO of InfoTek Corporation

Ex. F at 56.

She sent another update the next morning from her iPhone *while working off-site at 10:46 AM* (*see* GX 21(a) at 3):

-----Original Message-----
From: Jacky Kimmel [mailto:jacky@infotekcorp.com]
Sent: Friday, April 08, 2016 10:46 AM
To: Smith, Jonathan C; Clark, Jason M; Bryant, Robert
Subject: UPDATE ON STAFF MOVES

Jason, Jon and Rob,
Karl is starting this afternoon as Scott Robier's backfill. They had requested a 3 day transition which would had Scott in the NSOC full time beginning Thursday. Rabi's new COR has demanded absolutely she have him full time beginning Monday. As stated several times previously, the delay in Karl starting in I&L is absolutely Parsons fault and I've done all I could to expedite this process.

I would like your approval on this plan:
Ravi turns his NSOC in today and moves on. Robier's tab request is approved today. Robier will provide a transition in I&L through COB on Tuesday then report full time to NSOC on Wednesday morning. There would be a two day gap in his occupying Rani's former seat.

The above is a middle ground compromise.
Thank you.

Jacky Kimmel
CEO of InfoTek Corporation
Board Member, BuyMarylandCyber (BMC)

Wolfe she "ha[d] [not] slept since [the morning of April 6] b/c [she] had to pull an all nighter working [on a] proposal." GX 21(a) at 3.

Ex. F at 55.  Mr. Smith's response to Ms. McComber's email?  "Please give me a call." *Id.*[27]  The call Mr. Smith and Ms. McComber had while she was working off-site is just one of *many* communications between Ms. McComber and Ironbridge government customers that is not accounted for on the government's spreadsheet.  GX 21(a) at 3.  As this entire weeks-long saga to fill a *single* position shows: staffing the Ironbridge contract was itself a full-time job.

### b.  Unexpected Vacancies on the Ironbridge Contract

Mr. Rabinovitz's position was not the only unexpected vacancy Ms. McComber had to fill while serving as PM.  On May 20, 2016, a day which Ms. McComber **did not even bill to the Ironbridge contract**, she informed Mr. Smith that she had heard from her team that the Senior Web Developer on the contract, Sven Davison (a subcontractor with Eclipse Engineering), had "taken another job and [was] leaving" on "June 3." Ex. F at 67.[28]  Ms. McComber again acted quickly to identify a replacement.  That same day (**again, a day she did not charge the Ironbridge contract**), Ms. McComber asked Mr. Doyle to interview Richard Hutchings—another contractor on I&L (working for a different company)—for the position.  *See* Ex. F at 29.  Two days later, she proposed Hutchings to Mr. Smith, who instructed her to move forward and "advise [them] on [his] start date."  *See* Ex. F at 8.  This inter-contract personnel move again required Ms. McComber to

---

[27] The headache with the transition to fill this single position on the Ironbridge contract did not stop here.  Even after the three contractors were situated in their new positions, there were problems.  In early May, 2016, Mr. Robier reached out to Ms. McComber to notify her that she "might want to check in with Karl" because Mr. Robier was "getting emails and Lync messages from frustrated users about him not being able to do simple SharePoint task[s]."  Ex. F at 64.

[28] Mr. Davison was not the only sub-contractor with Eclipse Engineering to give notice and leave the contract during the indictment period.  In August 2016, Dawn Snarski left because "her family perceive[d] that accepting employment with the government [wa]s a safer and better course for their future." Ex. F at 142–44.  That was after she accepted and rescinded the offer twice. *See id.* at 141, 144.  That perceived risk in government contracting was something that made it difficult for Ms. McComber to easily staff the Ironbridge contract.  In June 2017, Allison Lucas (a subcontractor with James Tech, *see* Ex. H at 38 (Day 11 Trial Tr. 209:10–13) submitted notice. *See* Ex. F at 305–06.

negotiate with the I&L leadership.  *See* Ex. F at 227–29, 256.  To accommodate the move of both Mr. Osborne and Mr. Hutchings off I&L and onto Ironbridge, I&L would have to de-obligate certain funds.  *See* Ex. F at 227, 262–68.

Once again, Ms. McComber had to jump through multiple hoops to make the transition happen.  *See* Ex. F at 8, 29, 67, 92.  This time, after quickly identifying a replacement, interviewing and obtaining customer approval, negotiating a funding adjustment to accommodate the move, and setting a start date, Mr. Hutchings backed out at the eleventh hour when the company he was working for came back with a "better project with more money than [ITK] offered."  Ex. F at 73–74.  Ms. McComber received that news on June 13, 2016, ***a day she was not in access at NSA***, *see id.*, just an hour after she confirmed to Mr. Smith that Mr. Hutchings would be starting in 2 weeks, *see* Ex. F at 77. She broke the news to Mr. Smith the next day, June 14, 2016, ***another day Ms. McComber was not in access at NSA***.  Ex. F at 80; *see also* GX 21(a) at 12.[29]  She shared that she was "very upset about his decision and the fact" that they had already moved his security clearance over to ITK and "wasted weeks waiting for his arrival."  Ex. F at 80.  She assured Mr. Smith that they would "begin interviewing again for the position."  *Id.*[30]

To make matters worse, when Mr. Osborne finally arrived to backfill Mr. Doyle's position that same week, he left after just three days when he too received "a better offer" somewhere else.  Ex. F at 244–45.  At that point, with a senior sharepoint developer and two senior web developer

---

[29] Typical of the rollercoaster that is government contract hiring, Richard Hutchings would eventually be reinstated on the Ironbridge contract.  Ex. F at 194 (Ms. McComber emailing Mr. Clark and Mr. Pugh asking for "any news [] on Richard's reinstatement being approved"); Ex. H at 40 (Day 11 Trial Tr. 214:16–17 (explaining that when Mr. Hutchings "was available again in December of 2016," ITK "[r]einterviewed him again.")).

[30] This is not the only time this would happen.  Kirk Doan did the same thing in October 2016. Ex. F at 257 ("I have decided to remain at Varen Technologies right now for reasons beyond my direct control.  I want to thank you all for all your help during the difficult time for me."); *id.* at 172–73 (Mr. Smith asking Ms. McComber about Kirk not coming).

positions open on Ironbridge, *see id.* at 247–48, and with Mr. Smith "breathing down [her] neck," Ex. F at 224–25; *see also* Ex. F at 80, 110, 224–25, 249, 252–53, Ms. McComber began canvasing her contacts for leads on potential candidates and started offering recruiting bonuses to anyone who could send candidates her way, Ex. F at 19, 232, 234, 238, 243–47, 284.

After months of hard work, including taking interviews while she was "on the road," Ex. F at 84, 241, Ms. McComber would eventually fill the vacant senior sharepoint developer position with Tiffany Metzger, *see* Ex. F at 77, 6–7, 84, 86, 110–12, and once again, problem solve a creative solution to fill one of the senior web developer positions.  On July 25, 2016, ***while working off-site the entire day,*** Ms. McComber pitched Mr. Smith on the prospect of moving up one of the sub-contractors on Ironbridge, Tyler Garee, to fill the position.  Ex. F at 128.  She explained that he had been in touch with Mr. Garee's company, who "requested he be considered to move to fill one of the open Senior Web Developer billets."  *Id.* at 128; *see also id.* at 121–24 (discussions after 7pm between Ms. McComber and president).  Ms. McComber also informed Mr. Smith that she had "spoken to Nate [Tilly] and [Mr.] Doyle [for] their thoughts" on Mr. Garee, *id.* at 128; *see also id.* at 117–18, and "both f[elt] he would be a great asset in that position," *id.* at 128.  In terms of the transition plan, Ms. McComber informed Mr. Smith that she was thinking they "would hold on the move until [Ms. Metzger] [wa]s onsite for 2 weeks[,] giving Tyler a mid-August start in the labor category[,] and during this time [they would] begin to source for a backfill for Tyler's current position."  *Id.*

The next day, ***again working off-site the whole day***, Ms. McComber put the wheels of that plan in motion.  Because Mr. Garee was already working on the Ironbridge contract in a Sharepoint position, he would need to be backfilled as well.  Ms. McComber was in discussion with the President of the subcontracting company that Mr. Garee worked for (Optimus Technology, Inc.),

who recommended a candidate named Pam Suarez for Mr. Garee's position. *See* Ex. F at 121–24.
Ms. McComber asked Mr. Doyle to report to the Ironbridge office at 4pm on Monday, August 1
to interview Ms. Suarez with her. *See id.* at 115.[31] Ms. McComber added that although she was
still waiting on Mr. Smith's final approval for Mr. Garee, she wanted to "have his potential backfill
vetted while [they] wait," *id.* at 115, because Mr. Smith had instructed that Mr. Garee was to "stay
in his current position until [Ms. McComber] ha[d] a backfill for him," *id.* at 128.

At 11:27 AM on August 3, 2016, ***while working off-site***, Ms. McComber sent Mr. Smith
and Mr. Clark an update on the plan for Mr. Garee and at the same time notified them that she had
interviewed a candidate for the other open senior web developer position and had extended an
offer.[32]

> To: Smith, Jonathan C
> Cc: Clark, Jason M
> Subject: backfill for Tyler G.
>
> Jon and Jason,
>
> As discussed last week.  We intend to promote Tyler into one of the open Senior Web Developer positions.  I have
> attached a resume for a candidate which we would like to propose for his backfill as the SharePoint Developer.
> Jason Doyle conducted the interview on Monday and feels she would be a solid fit with the team.  Please let me
> know if we have approval to proceed with adding Pam to the eCPRL.
>
> Thank you,
>
> Jacky L. Kimmel

---

[31] Ms. McComber also attended that interview, telling Mr. Kimmel on a lync message at [time] on
August 1, 2016, that she was leaving because she had "an interview at 3:30." Ex. F at 323. Neither
that lync message, nor the interview with Pam Suarez, appear on the government's spreadsheet.
*See* GX 21(a).

[32] Notably, the Government's spreadsheet shows that Ms. McComber was only in access at NSA
for 1.5 hours on August 3, 2016—the day that she interviewed the candidate for the second web
developer position and sent the comprehensive update to Messrs. Smith and Clark, *see* Ex. F at
132–33, 237—and the only thing annotated on the spreadsheet for that day is the word
SILENTROAR. *See* GX 21(a).

Ex. F at 133.

Ms. McComber worked hard to lock in a second web developer.  On August 4 she asked Mr. Doyle to meet with a candidate to "[s]ell her on the project," explaining that she had "already interviewed her" the day before, and thought she had done "pretty well" selling the position, so she wanted Mr. Doyle to "keep it going."  Ex. F at 237.  And Ms. McComber was still working at it on August 15, 2016, when she informed Mr. Bryant that *she would not be on-site that day* because she was still "trying to close [the] other developer."  Ex. F at 139.

These are just a few examples of many showing Ms. McComber's tireless efforts to identify, recruit, and hire candidates to fill vacancies on the Ironbridge contract during her tenure as PM.  As Ms. McComber testified at trial, there were many more, including Symantha Hennlein, *see* Ex. F at 154, 155, 159–60, 161, 286–87; Eric Bennett, *see id.* at 1, 10, 72,  90–91,  94, 114, 109; Robert Cummins, *see id.* at 163; Gabriel Fulton, *see id.* at 137–38; Larry Jewett, *see id.* at 57, 82, 84–85, 240, 241; Michael Peerman, *see id.* at 130–31, 134, 152, 158; Kenneth Kimmel, *see id.* at 125, 129, 131, 152; and Carl Arnold, *see id.* at 4, 5, 174, 193, 206, 217–18, 288, 289.

### c.   *Staffing the Ironbridge Contract Was a Complex Process*

Ms. McComber's responsibilities did not end at identifying candidates for the position, interviewing, and getting government approval.  There was a litany of other tasks that had to be completed to onboard a candidate, both on the contractor side and the government side, and Ms. McComber managed and facilitated each one.

Even after getting over the initial hurdle of finding a person who meets the technical qualifications, that person has to be recruited.  To attract talent, Ms. McComber had to make a name for her company.  Nobody wants to work for a place they have never heard of that does not have a good reputation.  Ms. McComber would then have to verify the candidate's security clearance and extend and negotiate an offer.  The candidate's commercial resume would have to

be tailored to the labor category requirements for the contract.  *See, e.g.*, Ex. F at 250–51.  Ms. McComber would get Mr. Doyle to review each of those resumes, and Mr. Smith required Mr. Doyle to interview every candidate, which Ms. McComber coordinated.  *See, e.g.*, Ex. F at 153. Mr. Smith would then have to approve of a candidate before Ms. McComber could send the resume to the other CORs.  From there, the process varied depending on where the new hire was coming from.

If the new hire was already NSA cleared and on an NSA contract, Ms. McComber would only need to send candidate security reinstatement paperwork for the candidate to complete (three forms), *see* [cite], and send an Electronic Contractor Position Roster Log ("eCPRL") request to the A-COR (Donn Pugh) to add the candidate, submit the required security forms to personnel security at NSA, and then wait approximately 4–8 weeks which was standard during 2016–2017, *see, e.g.*, Ex. F at 23.  For candidates that had an expired polygraph, that process could take up to 2–6 months, or longer if the polygraph was unsuccessful and had to be re-taken.  And those that were working for other intelligence agency's took longer still.  All of the time Ms. McComber spent managing candidates' and onboarded contractors' security clearances was billable. *See* Ex. I at 48 (Smith OIG Tr. 40:16–17) ("Security clearances would be part of overhead that would have to be billed for.").

Once a security clearance was approved, Ms. McComber helped the candidate navigate onboarding.  That entailed coordinating with the A-COR to ensure the candidates received their mandatory security briefings, *see* Ex. F at 30, 36, 37, 65, 68, 109, 132, 133, 151, 152, 154, 155, 168, 203, 204, submitting a badge sponsorship form to align with briefing, *see id.* at 6–7, 26, 129, 134, 151, 216, 219, 285; scheduling the first day of employment, *see id.* at 10, 36, 37, 40, 53, 54, 55, 97, 110–112, 128, 132, 133, 151, 153–55, 285–87, and ensuring the new employees had access

61

to all of the relevant systems, *see, e.g.*, *id.* at 40, 130–31.

*Training.* Part of Ms. McComber's duties in "plan[ning], organ[izing], staff[ing], and control[ling]," Ex. G at 49 (GX 30(a)(5)), the Ironbridge contract was making sure the Ironbridge contractors had the training necessary to do their jobs, especially in emerging technologies.  For example, beginning in July 2016, at NSOC's request, Ms. McComber started working on a three-vendor trade study related to the upgrade for Windshield.[33]  *See* Ex. H at 45, 48 (Day 12 Trial Tr. 9:17–20, 12:1–2).  The three vendors were OpenText, Adobe, and Microsoft.  *Id.* at 45 (9:17–20).  For Adobe in particular, Ms. McComber had to negotiate licenses to bring the software in and get it set up for use by the contractors, and then also coordinated free training for the Ironbridge staff, including Jason Doyle, Nate Tilly, Debbie Fisher, Scott Robier, which was a substantial value to the government.  *See id.* at 47 (Day 12 Trial Tr. 11:13–18).  From start to finish the testing, vetting, and feedback from test users for the trade study took nearly a year.  *See id.* at 48 (12:1–2); Ex. F. at 184, 197–202 (Ms. McComber linking up Microsoft team with Jason to discuss demo, while she is working off-site); *see also id.* at 184–85, 207–15, 308–12 (no access day JM checks in on team and says "Can I hear from each of you on how your AEM training is coming along?").

And there is evidence of Ms. McComber arranging other training opportunities for Ironbridge contractors on other days she was not working on-site, including arranging travel for her staff to go "TDY."[34]  *See, e.g.*, Ex. F at 175, 313–16.

*Finances.* The government contends that the "work of compiling and reviewing ITK's

---

[33] As explained in the SOW, Windshield is an on-line authoring tool that provides integrated intelligence/operational/technical snapshots that enable functionality.  *See* Ex. G at 49 (GX 30(a)(5)).

[34] TDY stands for "Temporary Duty" in military parlance. During TDY, service members and government contractors typically perform specific duties or tasks, such as training, before returning to their permanent duty station.

monthly bills to the NSA on IRONBRIDGE was handled not by McComber, but by ITK CFO Preston and (following his departure at the end of March 2016) by ITK's Vice-President for Contracts Craig Plunkett," ECF No. 286 at 7, but the documents show that it was Ms. McComber who was responsible for approving and transmitting those documents to the government, and who was ultimately responsible for their accuracy.  *See supra* at 45; *see also* Ex. F at 170 (Ms. McComber explaining: "As the PM, I am responsible for gathering and providing program data. Craig just provides backup when needed.")).  Specifically, Ms. McComber was responsible for approving and submitting the funds man hour expenditures reports ("FMHERs"), subcontractor invoices, and contract spend plans to ensure the financials for the Ironbridge contract were staying on target—all work that could be done off-site.  *See* Ex. I at 17 (Plunkett OIG Tr. 16:3–13); Ex. F at 14, 149, 156, 217, 218, 317, 319, 320.

For example, on September 6, 2016, *a day when Ms. McComber was off-site*, she sent the "Ironbridge Base Extension Forecast" to Jason Clark and explained:

| | |
|---|---|
| **From:** | Jacky Kimmel |
| **To:** | Jason Clark |
| **Subject:** | Financial work up |
| **Date:** | Tuesday, September 6, 2016 1:35:17 PM |
| **Attachments:** | IRONBRIDGE Base Extension Forecast-10-6-17.xlsx |
| | ATT00001.txt |

Per our discussion last week see the attached financials and you will see we have funds and I've also taken the liberty of looking to next year in the second document. Keeping the web and moving the senior to the chief architect, we still have a surplus for this year. Going to the next 12 months we will have about a 20k short fall yet we've not accounted for holidays, vacations or sick time so likely we will be right on target.

Ex. F. at 322.

Part and parcel of Ms. McComber's duties in managing the finances was overseeing timesheets and tracking "burn" rates.  *See* Ex. I at 46 (Smith OIG Tr. 27:16–17) (explaining that Ms. McComber "was responsible for all the timesheets and the accounting that would need to

occur"). As Mr. Smith explained to OIG, "timesheets . . . t[ook] time." *Id.* at 49 (41:5–12). Ms. McComber would first have to get the timesheets from her staff and then "translate that into the way that the contracting office wants it and submit it." *Id.* at 49 (41:7–11). She would review them and have to counsel people who were not filling the timesheets out properly. *See* Ex. F at 321 (emailing M. Peerman about an issue with his timecard); *see also id.* at 51, 58, 63, 79. Ms. McComber also frequently fielded questions about timecards. *See id.* at 195 (On a "no access" day, Tyler Garee reaches out to Jacky because he accidentally put 8 hours on his timesheet and asks for help fixing it); *id.* at 27, 62, 81, 135, 136, 146, 195.

As just one example of the effort Ms. McComber put into keeping track of time and burn rates, on March 24, 2017, ***a day Ms. McComber was working off-site***, she sent the below email to Rob Bryant, Jennifer Blake, and Jason Clark regarding the high burn rate for one of her subcontractors, Carl Arnold:

All,

I need some input as to the extensive after hours support Carl has reported. Who is calling him in? Do they have the authority to do so? Do they understand this burns hours allocated to him on the contract? I ask as Carl is just about out of hours for the month. He will be out on either Monday or Tuesday of next week. We were unaware of such support and possible overages of hours. I need to get a handle on this in order to give Carl guidance and also manage the contract burn rates. Last weekend he worked both days. Please advise.

Thank you,

Jacky L Kimmel

CEO/President InfoTeK

Ex. F at 14–15. Mr. Bryant responded he had been calling Mr. Arnold in, and he and Ms. McComber had several follow-up conversations while Ms. McComber was working off-site. *Id.*; *see also* Ex. F at 13. Whether there were enough funds to cover Mr. Arnold's position was a topic of intense discussion between Ms. McComber and the government customer from the day he was added. On October 27, 2016, for example—***a day that Ms. McComber worked off-site and took***

*6 hours of vacation time*—she was emailing with Jennifer Blake about the prospect of adding him to the Ironbridge roster and the nuanced considerations concerning the labor category and rates. [35] *See* Ex. F at 166–67; *see also, e.g.*, Ex. F at 176, 186–93.  And in July 2017, Ms. McComber was working on a modification of the Technical Task Order to get more hours allocated to Mr. Arnold. *See, e.g.*, Ex. F at 162 (C. Plunkett telling Mr. Arnold "As Jacky stated we will try and get additional hours from the Government . . . which as you know is not always easy").

**Status Reports**.  As discussed in Section I, *supra*, Ms. McComber was also required under the terms of the contract to submit monthly status reports.  *See* Ex. C at 12.  Mr. Smith explained in both his OIG testimony and at trial that Ms. McComber was responsible for the "required status reports" as PM, and "she would assemble them" with input "from the contractors and write them up in the right format."  Ex. I at 46 (Smith OIG Tr. 27:19–21).  He emphasized that the "status report could be done on or offsite[,] [i]t really didn't matter."  *Id.* at 51 (43:7–9).  Typically, Ms. McComber would "come in [to NSOC] and talk to the employees about their [input for the report]."  *Id.* at 51 (43:8–10).  "[O]nce she got a clear understanding of what they were doing, then she could write up the appropriate report."  *Id.* at 51 (43:13–15).

**General Management**.  At the same time, Ms. McComber had to generally "manage the program, keep the contractors happy, [and] make sure they [were] doing their job."  Ex. I at 39 (Shirley OIG Tr. 11:9–16).  And the evidence shows Ms. McComber doing just that.  *See, e.g.*, Ex. F at 14, 28, 182, 59, 60, 87–88, 217, 218.  She frequently checked in on the Ironbridge contractors to make sure they were doing okay and were getting the resources they needed, and when needed, she was available to resolve conflicts.  Ms. McComber went out of her way to try to keep her

---

[35] The evidence also shows that Ms. McComber had a call with Mr. Arnold about the position on October 27, 2016 (the same day she took 6 hours of vacation time).  *See* Ex. F at 174.

contractors happy.  She would frequently meet with her staff for lunch and would send kind messages to build their morale.  *See, e.g.*, Ex. F at 182, 196, 113, 164.  Beyond that just being Ms. McComber's second nature, that level of care was also necessary to retain talent on the Ironbridge contract.  Ironbridge contractors were in high demand and were frequently being courted by other companies.  *See, e.g.*, Ex. F at 127, 180–81.

### 3.  The government's evidentiary spreadsheet is not reliable.

The Court should give little, if any, weight to the government's investigative spreadsheet in calculating loss.  The government contends that, taken together, the "investigative spreadsheet" and the "underlying documentary evidence on which it was based [] demonstrate[] that McComber spent at best relatively limited time working on the IRONBRIDGE contract."  ECF No. 286 at 6; *see also* ECF No. 431 at 40.  But as shown in Ms. McComber's motion for judgment of acquittal (MJOA) at pages 13–24, *see* ECF No. 359, which Ms. McComber repeats and incorporates by reference herein, there are significant gaps, flaws, and logical leaps in the government's portrayal of "evidence" on its investigative spreadsheet that render it completely unreliable and insufficient. *Id.* at 13.  And since the MJOA was filed, the glaring deficiencies with the investigative spreadsheet, *see id.* at 21–24, have only become more apparent.

At the evidentiary hearing held on November 20, 2023, the Court heard from DCIS Agent Keith Benderoth who was responsible for compiling the government's evidence and populating the investigative spreadsheet.  Consistent with the testimony of his partner Agent Lori Hazenstab at trial, *see* Ex. H at 8, 10 (Day 3 Trial Tr. 97:18–20, 102:16–19), Agent Benderoth explained that the spreadsheet was never intended to document the work that Ms. McComber was doing off-site. *See* ECF No. 379 at 30:15–18.  What it was intended to show—"what [Ms. McComber] was doing with her time outside of the NSA when she was not at the NSA" (ECF No. 379 at 8:6–7)—it does poorly.

The same underlying sources that the government used to populate its spreadsheet with non-billable activities are also replete with evidence of Ms. McComber performing her Ironbridge staffing duties that Agent Benderoth *did not include*.  Agent Benderoth acknowledged one of these examples at the evidentiary hearing—an email from June 2017 showing that Ms. McComber had interviewed Eric Bennett, a senior developer who was hired on the Ironbridge contract in August 2017, *see* ECF No. 379 at 75:16–18.  In the same email chain, Ms. McComber highlights Mr. Bennett's credentials and notes, "[w]e had to work hard to lock him in."  *See* Ex. F at 1.  When the Court asked Agent Benderoth whether he had an understanding of what Ms. McComber meant by that, Agent Benderoth confirmed he understood "could mean a number of things," including that "they had to negotiate his salary, and gone back and forth with that[;] [i]it could mean a lot of things."  ECF No. 379 at 106:8–14.  Nonetheless, Agent Benderoth acknowledged that the government's spreadsheet does not include *any* entries for Ms. McComber's interviews of Ironbridge candidates.  *Id.* at 78:18–21.[36]

Nor does the spreadsheet include, as Agent Benderoth testified, any entries for other key tasks Ms. McComber performed related to staffing the Ironbridge contract, including reviewing resumes, *id.* at 78:22–24, onboarding newly hired Ironbridge candidates, *id.* at 78:25–79:14, and training new Ironbridge employees, *id.* at 79:16–18. Agent Benderoth attempted to justify the government's wholesale omission of entries for resumes reviewed by Ms. McComber because "we don't know what resumes she did review."  *Id.* at 78:24.

---

[36] Agent Benderoth confirmed that he "did not include the emails that showed Ms. McComber was working on the Ironbridge contract because they were oftentimes one or two lines," explaining that "[t]hey were, like, 30 seconds, a minute of work."  ECF No. 379 at 40:2–6.  Notwithstanding the reality that a seemingly brief email may consume significantly more time than the seconds spent typing each word, it is simply *not true* that the government's evidence of Ms. McComber doing work mostly consisted of one-line emails.  *See supra* at 49, 55, 56, 60, 64, 65.

67

But as became abundantly clear at the evidentiary hearing, the government did not apply that same level of scrutiny for spreadsheet entries depicting non-billable activities.  For example, to populate spreadsheet entries for Ms. McComber's travel, Agent Benderoth testified that the government "usually got [Ms. McComber's] flight information from her calendar."  *Id.* at 53:12–13.  Yet Agent Benderoth acknowledged that because the calendar was produced as a PDF, "[u]nfortunately, . . . [the government couldn't] click on it and actually see more detail."  *Id.* at 54:1–3.  Notwithstanding the lack of discernible details, the government used the calendar as the basis for entries on its spreadsheet—even when the calendar contained information that was so conflicting that, as Agent Benderoth testified, the government had no way of "know[ing] if that was a ticket for [Ms. McComber] or that was a ticket for somebody else."  *Id.* at 53:4–55:7 (discussing spreadsheet entry reflecting travel to Nashville on December 15, 2016 despite identical evidence indicating it was equally possible that Ms. McComber's flight could have instead been the following day—a day that Ms. McComber took 8 hours of vacation leave).

Not only did the government include entries based on unreliable evidence, but Agent Benderoth also admitted that he "should have been a little bit more diligent" to ensure entries accurately reflected the corresponding dates (*id.* at 58:15–18), and bluntly stated he "was mistaken" when—more than once—he "accidentally put the [credit card] charge date and not the departure date" for certain travel, making it seem as if Ms. McComber was out of town longer than she actually was.  *Id.* at 66:22–67:2 (conceding the spreadsheet misrepresents dates of Ms. McComber's March 2017 trip to Las Vegas, falsely stating that Ms. McComber was in Las Vegas an additional day—a day that Ms. McComber billed 8 hours to Ironbridge); *see also id.* at 63:18–20 (acknowledging same error for March 2017 trip to San Antonio).  These are just some of the many errors that Agent Benderoth conceded appear on the government's spreadsheet—the key

document that it relies upon to support its theory of loss.

Accordingly, the court should not credit the government's spreadsheet in calculating loss.

**B.** **The government received the value of the services rendered and suffered no actual loss.**

Not only is the government's loss estimate not supported by a preponderance of the evidence, it also fails because the government received exactly what it bargained for and, thus, did not suffer any loss. "[T]he sole question under section 2B1.1(b)(1) is whether the defendant's fraudulent conduct resulted in *pecuniary loss* warranting a further increase in h[er] base offense level." *United States v. Crummy*, 249 F. Supp. 3d 475, 485 (D.D.C. 2017) (emphasis in original) (applying general rule for calculating loss).[37]   "And as the Guidelines make clear, to identify the actual pecuniary loss to a victim under section 2B1.1(b)(1), the Court must subtract from the total contract price *the value of the services that the defendant rendered*." *Id.* (emphasis added) (citing §2B1.1 cmt. n.3(E)(i)).   Specifically, Application Note 3(E) dictates that loss under §2B1.1(b)(1) "shall be reduced by . . . the fair market value of the . . . services rendered[] by the defendant . . . to the victim before the offense was detected."   §2B1.1 cmt. n.3(E)(i); *see also Harris*, 821 F.3d at 605 ("[T]he loss amount should have reflected not the total contract price, but rather the contract price less the fair market value of services rendered[.]").   "[T]he victim's loss will normally be the difference between the value he or she gave up and the value he or she received." *United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015); *United States v. Jones*, 475 F.3d 701, 706 (5th Cir. 2007)

---

[37] The government's arguments about *Crummy* at ECF No. 311 are entirely misplaced.  While the threshold question in *Crummy*—whether a Section 8(a) contract is considered a government benefit such that the "special rules" for determining loss apply—is not at issue here, the court concluded that the special rules did not apply and proceeded to calculate loss using the general rule by reducing the loss amount by the value of services rendered.  There is no dispute over whether this is a case involving government benefits triggering the special rules.  The general rule applies here, just as it did in *Crummy*.  The loss amount should be reduced by the value of the services rendered by Ms. McComber here, too.

("In the context of a contract, the court must credit the defendant for the value of the performed services.").

Here, the offense was "detected" on August 28, 2017, the date the whistleblower letter arrived at the NSA OIG office. So the question is the *value* of the work Ms. McComber performed from March 16, 2016 when she began work as PM on the Ironbridge contract, to August 28, 2017. That NSA received the value of the time billed by Ms. McComber from March 2016–August 2017 is evident from the clear terms of the contract and the undisputedly excellent performance of the Ironbridge contract under Ms. McComber's management.

The Ironbridge contract—a firm-fixed-price level-of-effort contract—**required** ITK to provide a full-time-equivalent (FTE) PM throughout the indictment period. *See* GX 31(a) through 31(n) (technical task orders requiring full-time PM for the period January 2016 through November 2017); *see also* Ex. G at 58–59 (GX 32(q)) (final contract modification showing that under a "Level of Effort" contract, "[t]he contractor agrees to provide the total level of effort [specified in hours]"). The pro-rata hours for FTE PM work over 17 months, at 1800 hours per year, was 2,663 hours. By law, as both Cherril Guinther and Mr. Smith testified, *see* Ex. H at 21 (Day 6 Trial Tr. 22:7–17) (C. Guinther), *id.* at 24 (217:18–24) (J. Smith), ITK was obligated to provide the hours awarded under the contract, as they were determined to be the hours necessary to achieve the intended result.[38] The highest hourly pay for the Ironbridge PM during the Indictment period was $150.35. At $150.35 x 2,663 hours, the government, thus assigned a value of $400,382.05 to the full-time Ironbridge PM position for the 17-month period before the "offense was detected." The

---

[38] The Government Accountability Office recently affirmed this principle in sustaining a bid protest, where it noted that "[a] [firm] fixed-price level-of-effort contract is generally intended for use in contracts … where the work required cannot be clearly defined," and the final work product "is usually a report showing the results achieved through application of the required level of effort." *Matter of Gen. Dynamics Info. Tech.*, File No. B-421525, at 5 (May 26, 2023).

amount the government actually paid for program management hours during that time period was: $387,375.29.

Not only was the amount actually charged lower than the estimated value, but it is undisputed that all services and tasks ordered by the government through bidding the Ironbridge contract were received to its full satisfaction. *See, e.g.*, ECF No. 410 at 23:13–18. There has never been an allegation that Ms. McComber failed to perform the duties required under the contract. Because the government determined the value of full-time PM of work (the services undisputedly rendered) for the 17-months "before the offense was detected" to be $400,382.05, and because the government estimates loss in this case to be $306,186, the pecuniary loss to the government in this case was *zero* under U.S.S.G. §2B1.1 cmt. n.3(E)(i).[39]

### C. In the alternative, loss is no greater than $189,779.

If the court is nevertheless inclined to assign a loss amount, that figure should be exponentially lower than the number offered by the government. Even if the Court were to take the government's spreadsheet at face value and credit all of the evidence portrayed therein in calculating loss, it would not come close to the loss amount offered by the government. Defense counsel's detailed review of the spreadsheet evidence—broken down month-by-month in a spreadsheet attached hereto as Exhibit D—shows that, even if the government's portrayal of the evidence on its spreadsheet were accurate and reliable (it is not) and giving the government every benefit of the doubt for the time Ms. McComber could have plausibly spent doing the other things

---

[39] NSA was also getting more value for its dollars because it was paying Ms. McComber on-site rates for work she was predominately doing off-site. As Ms. Guinther explained, "[o]ff-site rates are higher because [the contractor is] providing the electricity, the office space, and et cetera for the – for the contractor to work. When the government – when we're on the government site, we're paying for all of that. So it's built into their rate to cover those costs."). Ex. H at 23 (Day 6 Trial Tr. 56:1–5) (C. Guinther).

that the government contends she was doing in her off-site time, the government's loss amount should be more in the ballpark of $189,000–nearly *half* of what it is.

Defense counsel reviewed the government's evidence on a day-by-day basis using the same methodology detailed in Ms. McComber's MJOA.  *See* ECF No. 359 at 15–17.  That analysis shows that Ms. McComber should be credited with, at a minimum, a total of 1,384.5 hours (or 50.5%) of her off-site hours for the indictment period ("Credited Hours").  *See* Ex. D at 3.  In other words, there are 1,384.5 off-site hours for which the government has provided no evidence whatsoever that Ms. McComber did not do that work.  To determine the value of those Credited Hours for each month, defense counsel multiplied them by Ms. McComber's applicable contract rate for that month to arrive at total of $206,692.46.  *See id.*  Subtracting that amount from the total amount Ms. McComber billed to the Ironbridge contract ($387,375.29), yields an alleged loss amount of $180,607.65 for Ms. McComber's off-site time.

Combined with the credit the government gives Ms. McComber for her onsite time—200 hours, or $9,171.35, *see* ECF No. 431 at 40—the combined loss amount for on-site and off-site time, *considering only the government's evidence*, would be $189,779.

But the actual loss amount should be much lower still (if not zero).  It should be based on "a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss."  *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015) (internal citations omitted).  As discussed above, there is a mountain of evidence showing Ms. McComber was bending over backward to fulfill her duties and responsibilities as PM of the Ironbridge contract.  Ms. McComber was often working on the Ironbridge contract on nights, weekends, and vacation, *see, e.g.*, Ex. F at 31, 29, 67, 144, 216, 148, 94–95, on days that she was not charging hours to the Ironbridge contract.  In

light of this evidence that has been entirely omitted from the government's calculation, Ms. McComber should, *at a minimum*, be credited an additional 10% of her off-site time over what the government's investigative spreadsheet plausibly shows for a total of at least 60%, given that the government's spreadsheet omits all evidence of Ms. McComber doing work.

*       *       *

The government undisputedly got the benefit of its bargain with the Ironbridge contract, in no small part thanks to Ms. McComber. She was tasked with running the contract, and she *did so.* In light of the extensive evidence of Ms. McComber doing work during the time that she billed the Ironbridge contract off-site, combined with the unreliability of the government's investigate spreadsheet (the predominant basis for its 15% estimate), the government has not met its burden of proving its loss estimate by a preponderance of evidence.  To put into perspective the 18.5 hours of off-site work the government credits Ms. McComber *per month*:  that equates to just over two full work days, *for an entire month*.  As the attached evidence shows, it would have been virtually impossible for Ms. McComber to meet Mr. Smith's demands to staff the vacancies on the Ironbridge contract, much less to do so while otherwise keeping the contract running smoothly, if she was working less than three days a month off-site.  The reality is Ms. McComber was bending over backward to fulfill her duties and responsibilities as PM of the Ironbridge contract.  She is entitled to credit for that hard work.

Accordingly, if the Court is inclined to assign a loss amount, Ms. McComber asks that she be given credit for at least 60%, or 1,555.8 hours, of the time she billed for her off-site time. Combined with the 200 hours the government credits her on-site time, that results in a loss amount of **$146,890.46**.

### IV.    The Government's Restitution Amount is Similarly Flawed

In light of the above-described flaws in the government's loss estimate, its restitution

73

figure, which simply parrots the loss analysis (*See* ECF No. 288), cannot stand.  The restitution standard under 18 U.S.C. § 3663A is more exacting than the standard for determining loss under the Guidelines, and "[t]he government bears the burden of proving actual loss [for restitution purposes] by a preponderance of the evidence." *United States v. Harvey*, 532 F.3d 326, 339–41 (4th Cir. 2008); *see also United States v. Ubakanma*, 215 F.3d 421, 428 (4th Cir. 2000).  As explained above, *see supra* at 35–74, the government has offered no facts evincing how, despite the fact that the clear terms of the Ironbridge FFP-LOE contract required a set number of hours of work from Ms. McComber, the contract was by all accounts high performing, and there is a mountain of evidence showing Ms. McComber doing work off-site, the government has suffered any *actual* loss in this case.  Such an unsupported loss figure is patently insufficient to satisfy the government's "burden of demonstrating the amount of loss" for purposes of restitution.  *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018) (remanding for findings of fact to support the restitution order).

If the court determines that a loss did occur in this case, the amount of restitution should not exceed the loss estimate under the guidelines, *see* p.79 *supra* and therefore should be no greater than **$146,890.46**.

Dated: April 19, 2024

Respectfully submitted,

JAMES WYDA
Federal Public Defender

*/s/ Andrew S. Tulumello*
Andrew S. Tulumello (Bar No. 15494)
Claire L. Chapla (admitted *pro hac vice*)
Crystal L. Weeks (admitted *pro hac vice*)
Alli Katzen (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Fax: (202) 857-0940
Drew.tulumello@weil.com
Claire.chapla@weil.com
Crystal.weeks@weil.com
Alli.katzen@weil.com

*/s/ Patricia L. Richman*
Patricia L. Richman (Bar No. 803572)
(*signed by Andrew S. Tulumello with permission of Patricia L. Richman*)
ASSISTANT FEDERAL PUBLIC DEFENDER
6411 Ivy Lane
Suite 710
Greenbelt, MD 20770
Phone: (301)-344-0600
Fax: (301) 344-0019
Email: patricia_richman@fd.org

*Counsel for Defendant Jacky Lynn McComber*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2024, a copy of the foregoing was served via CM/ECF to parties in this matter.

/s/ Andrew S. Tulumello
Andrew S. Tulumello