**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. ELH-21-036 |
| | ) | |
| JACKY LYNN McCOMBER, | ) | |
|   formerly known as | ) | |
|   Jacky Lynn Kimmel, | ) | |
| | ) | |
|     *Defendant.* | ) | |

**THE GOVERNMENT'S POSITION ON DEFENDANT MCCOMBER'S
REQUEST FOR REDACTIONS TO THE GOVERNMENT'S SENTENCING
REPLY BRIEF ADDRESSING THE CONSIDERATIONS SPECIFIED BY THE
<u>SENTENCING REFORM ACT (18 U.S.C. § 3553)</u>**

## <u>Introduction</u>

On Thursday morning, June 13th, government counsel filed its response (ECF # 478) to the defendant's memorandum (ECF #433) concerning the personal history and characteristics of the defendant, which are the first of the considerations a federal district court is required to consider at sentencing pursuant to the Sentencing Reform Act of 1984 (18 U.S.C. § 3553). Later, that day, defense counsel sent an email (ECF ??) complaining that they believed that significant portions of the government's memorandum and exhibits should have redacted and filed under seal to comply with the Court's Order of May 31st (ECF # 472) addressing the sealing issues presented by the defense's initial request on April 19th for a blanket sealing order covering its sentencing memorandum on the § 3553 factors and all of its associated exhibits in their entirety.[1]

---

[1]   Defense counsel subsequently indicated its willingness to allow certain portions of these materials to be unsealed, and this was what prompted the Court's Order of May 31st.

On June 14th, the Court issued an order (ECF # 479) directing the parties to confer with regard to the defense's request for redactions to the government's sentencing reply brief on the § 3553 considerations.[2]  Because the Court and defense counsel were aware that government counsel was away with his spouse on a previously scheduled vacation in a foreign country at that time, it was recognized that the redaction discussions would have to await his return, which occurred on the evening of Sunday, June 23rd, with Monday, June 24th his first day back in the office.  One of the defense attorneys subsequently sent government counsel an email on the afternoon of Tuesday, June 25th, setting out their redaction requests.  Because the sentencing hearing commenced the next morning at 10:00 a.m. and concluded on Friday, June 27th at approximately 5:15 p.m., government counsel is now responding to the defense's

---

[2]    Back on September 8, 2023, government counsel and his wife had signed up for a tour of Iceland with Smithsonian Associates that ran from June 13th through June 23rd, 2024.  At that point in this case, the defendant's sentencing was scheduled to occur on December 18th, 2023, six months in advance of the scheduled trip.  Over the succeeding months, however, as a result of various previously unanticipated developments, the defendant's sentencing date was successively moved back to February 6th (ECF # 371); March 7th (ECF # 399); and May 17th (ECF # 425).

On April 20th, with the sentencing set for Friday, May 17th, defense counsel (which numbers one Assistant Federal Public Defender (AFPD) and five attorneys from the D.C. office of the Weil Gotshal firm) filed sentencing materials (ECF # 433 and 435) that together totaled some 120 pages of briefs and associated reports and roughly 860 pages of exhibits.  Government counsel protested that with only one attorney working this matter on the government side, there was simply no way he could review and reply to this extraordinary mass of material by the then-scheduled due date of Friday, May 3rd, particularly when he had a major oral argument in *United States v. Randy Banks, et al.*, a RICO gang prosecution, that was scheduled in the Fourth Circuit on the morning of May 7th.  ECF # 440.  That prompted a further conference call among the parties on April 30th, during which it was decided to move the sentencing hearing dates back to June 26th-June 28th, with the government's response briefs first due on May 24th, and later on June 6th and June 12th.

requests below.  First, however, we will summarize the key principles of the Court's May 31st order on sealing.

### Relevant Principles Governing Sealing of Sentencing Materials

By way of background, the government has already discussed the principles governing sealing of sentencing materials (in particular) in federal criminal cases in its original protest against the defense's blanket sealing request for ECF 433 on April 22 and then in its more extensive letter-brief on May 16th (ECF # 460/461).  We accordingly incorporate that discussion by reference here.

As we read it, the Court's Opinion of May 31st (ECF # 467) identified the following standards as being applicable to sealing decisions in this case:

- **ECF # 433 (defendant's sentencing memorandum):** As to the text of the defendant's § 3553 factors sentencing memorandum (and, thus, by extension, to the government's reply brief), the Court approved the redaction (and filing under seal) of information that (a) either related to the health and personal lives of the defendant's children and other third parties and (b) information that concerned the defendant alone, if it related to family history; diseases and treatments; and sexual orientation and practices that were of "peripheral" importance to the Court's sentencing decision, ECF # 467 at 20.  [govt actually not aware of any of this kind of material]

- **ECF # 433-2 (the Social History Report):**  The Court approved the redaction of those portions of the "Social History Report" prepared by an LCSW who was a paid employee of the Office of the Federal Public Defender (OFPD) that (a) were necessary to protect the privacy of third parties, especially minors, as well as (b) sensitive aspects of the defendant's medical and personal history.  (The government had consented to the redaction of those portions of the report that described the defendant's relationship with her second former husband [1996-2015].)  ECF # 467 at 25.

- **ECF # 433-3 (22 character letters):**  The Court redacted portions of 12 of the 22 letters that contained sensitive information about third persons, but found that "wholesale sealing of these letters is unnecessary."  ECF # 467 at 25.

- **ECF # 433-4 & 5 (character letters):**  The Court agreed to seal an obituary concerning the death of the son of the defendant's companion and later third husband, as well as a summary local police report that summarized the conclusions of their investigation into the circumstances of his death.

- **ECF # 433-6 (excerpt from an NSA-OIG interview transcript of Dwayne Preston relating to his understanding of the circumstances of the death of the son of the-defendant's then-romantic companion and subsequent third husband).**  This material consisted of two pages of material from a lengthy OIG transcript that covered numerous other subjects.

- **ECF # 433-7 & 433-8 (mental health records of two of the defendant's minor children, which her counsel was relying on in support of her request for a non-incarceration sentence.)**  The government had not opposed the redaction of this material.

- **ECF # 433-9 (the government's objections to the PSR).**  The government had not opposed the redaction of this material.

- **ECF # 433-10 (NSA's 2018 Psychological Evaluation of the Defendant):**  The Court agreed with the defense's request that it seal this document in its entirety, which the defense had submitted in support of its request for a non-incarceration sentence.

We turn now to the specific redactions requested by the defense with regard to the government's reply brief relating to the § 3553 sentencing considerations (ECF # 478) and its associated exhibits requested by the defense in its email to government counsel on the afternoon of Tuesday, June 25th.

**The Defense's Requested Redactions
with Regard to the Text of the Government's Reply Brief**

In Ms. Chapla's email to government counsel at mid-afternoon on Tuesday, June 25th (**Exhibit 1**), she set out the defense's overall position on its requested redactions as follows:

> Attached and below are the defense's proposed redactions.  Yellow highlighting [Government: some may think this looks more like ocher] in the attached

indicates portions of the Reply that the defense proposes to seal.  These proposed redactions are consistent with the Court's prior order sealing portions of the defense's Sentencing Memorandum, Social History Report, and certain exhibits, including descriptions of Ms. McComber's relationship with her former husband Bobby Kimmel, material implicating the privacy interests of third parties, and excerpts from the NSA OIG interview of Dwayne Preston.  *See* ECF Nos. 467, 469, 470, 471, 433-6 & 433-10.

The government has prepared a response to each of the additional redactions requested by the defense, as set forth below.

**Page 1, fn. 1 (This is a lengthy footnote in which the government sets forth its overall criticisms of the methodology taken by the OFPD's LCSW Sandman in her Social History Report, particularly with regard to her failure to include any substantial information from the defendant's ex-husband, Robert Kimmel, to whom she was married for 16 years and in a relationship for the previous three.)**  It appears that the defense's complaint here may be that the government's reply directly quoted two sentences from Ms. Sandman's Social History Report -- in which she merely stated that "I interviewed Bobby as part of my investigation on Jacky and their relationship.  *Bobby admitted no fault* and expressed his opinion that Jacky is [reference to her mental state]."  ECF 433-2 (Exh. A) at 14 (emphasis added).  If it is the defense's position that any general reference at all to the defendant's relationship with her ex-husband should be redacted, we believe that goes well beyond the Court's Order of May 31st, and any redaction request based upon that interpretation should be denied.  More specifically, we believe these is no need to redact the first sentence quoted above.  As to the second sentence, perhaps defense counsel believes that Mr. Kimmel's alleged opinion that "Jacky is mentally ill" runs afoul of the Court's expressed view (first bullet point above) that anything related to "diseases" suffered by

the defendant should be redacted.  If that is the case, we have no objection to the redaction of those four words.  Also, in order to protect Mr. Kimmel's privacy interests, we have no objection to redacting the word "abusiveness" that appears four lines before the bottom.  Given the recognized principle that redactions to court filings should be narrowly drawn, , we believe those two redactions should be sufficient.

Beyond that, however, we submit that what really is going on here is that defense counsel is trying to spare LCSW Sandman from any public criticism for the approach that she took in preparing her report.  But Ms. Sandman is a paid employee of the OFPD, and her performance as an investigator in a litigation matter is subject to fair criticism in a court filing, just like the performance of police officers and other law enforcement agents is subject to routine and often severe criticism in the filings of defense counsel.  What is sauce for the goose is sauce for the gander.  The performance of investigators associated with the defense is no less subject to public criticism and evaluation than is that of investigators associated with the government.[3]

**Page 3, fn. 2:**  This footnote (which defense counsel also seek to have redacted in its entirety) makes reference to the defendant's security file in general terms; discusses how it came to be produced to the defense, at their request; and then notes that it included

---

[3]   We wish to emphasize that although we have strongly criticized Ms. Sandman's performance in this case, this is not the result of any ill will towards her.  Having handled many death penalty appeals during my service as a law clerk to an Eleventh Circuit judge back in 1983-84, I am keenly aware of how valuable a thorough, balanced presentation of mitigating evidence can be to judges, law clerks, and government attorneys in a case as well.  In our view, however, this report had serious deficiencies, and the caliber of an OFPD employee's investigative work is no more immune from public criticism than that of any government investigator is.  Moreover, in each instance, such criticism may hopefully serve as constructive and salutary function if it is fairly considered and not dismissed out-of-hand by the subject.

both positive and negative information about the defendant.  I have reviewed Judge Hollander's Order (ECF # 467) several times, particularly at pages 24-26 (which deals with the Social History Report, the character letters, materials relating to Colin McComber, and the psychological evaluation), and I find nothing in there that supports a need to apply a blanket redaction to any material that merely speaks in general terms about the contents of the defendant's security file.   Moreover, the defense's apparent request that any information reflecting that the security file also included negative information would be particularly inappropriate given that AFPD Richman's heavy emphasis in her sentencing remarks on the fact that the NSA gave her a security clearance and kept it in place until her indictment in this case.

In addition – and this will become relevant when we reach the defense's subsequent request (at pp. 8 & 10 below) for redactions of all negative information referenced by the government that were derived from the Security File – the defense's apparent position that any negative information relating to a defendant's past conduct from prior to the period covered by their crimes should be redacted is fundamentally inconsistent with the express language of 18 U.S.C. 3553(a)(1), which directs the sentencing court to consider "the history and characteristics of the defendant . . . ."  A defendant's past history is also certainly relevant to assessing the danger they may present of future recidivism, another mandatory consideration for the Court to take into account under section 3553(2)(C).  The suggestion that counsel cannot discuss these factors in public sentencing filings or (perhaps) in oral sentencing arguments before the Court I believe is wholly antithetical to the intent of the Sentencing Reform Act (SRA) and the requirement that sentencing decisions be openly arrived at and based, as much as possible, on public record information.

**Page 4, first three bullet points (information drawn from the Security Report that reflected negatively on her past history and conduct from the standpoint of acting with integrity, and which further revealed that one of her security reviewers had substantial reservations about her character and her attitudes towards rules):** The basis for this requested redaction is presumably the same as in the previous example, and we oppose it for the same reason. And, again, in light of the heavy reliance by AFPD Richman in her sentencing argument about the importance of the defendant's security clearance, redaction of this information would be particularly inappropriate.

**Page 5, middle of the page; Page 6, two paragraphs (negative information about the defendant's character and past conduct drawn from testimony to NSA-OIG investigators provided by former ITK President Paul Rooney and its former Chief Operations Officer, Shilo Weir):** Again, the defense seems to believe that anything that reflects negatively on the defendant's character or past conduct that is derived from a government investigative report or interview must be redacted or placed under seal. This apparent position may be based on the Court's decision in ECF # 472 agreed to place under seal a very short excerpt from Dwayne Preston's OIG testimony in which he noted that he had heard questions raised about the circumstances under which the son of the defendant's then-romantic companion drowned. We read this as relating to the matter of the child drowning, and not as indicating that the Court thereby intended to establish a general principle that any such information must be submitted under seal. To the contrary, that would be inconsistent with general principles recognized by decades of Supreme Court and lower court

precedent.  Fully fifty-five years ago, the Supreme Court recognized that in criminal

sentencing proceedings,

> Highly relevant – if not essential – to [the judge's] selection of an
> appropriate sentence is the possession of the fullest information possible
> concerning the defendant's life and characteristics.  And modern concepts
> individualizing punishment have made it all the more necessary that a
> sentencing judge not be denied an opportunity to obtain pertinent
> information by a requirement of rigorous adherence to restrictive rules of
> evidence properly applicable to the trial.

*Williams v. State of New York*, 337 U.S. 241, 247 (1949) (Black, J.).  That principle has

been codified for sentencing proceedings in the federal criminal courts by 18 U.S.C.

section 3661, which provides that: "No limitation shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense

which a court of the United States may receive and consider for the purpose of imposing

an appropriate sentence."  The Sentencing Guidelines also expressly recognize this

principle in U.S.S.G. § 1B1.4 ("the court may consider, without limitation, any

information concerning the background, character and conduct of the defendant, unless

otherwise prohibited by law").  And the courts have long recognized that the

government may properly present at sentencing a wide array of information about a

defendant's character and past conduct derived from many sources, including grand

jury testimony, affidavits, law enforcement reports, and summary testimony by law

enforcement officers.  *See, e.g.*, *Williams*, 337 U.S. at 246 (noting with approval the use

of affidavits in sentencing proceedings); *Francis*, 39 F.3d at 809-811 ("a sentencing

judge is free to consider a wide range of information, including hearsay evidence,

regardless of its admissibility at trial").  That should be particularly true of material like

the OIG investigative interviews, whose level of reliability, like that of grand jury

testimony, is enhanced by the fact that these witnesses were sworn and were testifying under oath.

**Bottom of page 8; Pages 9 and 10, virtually in their entirety; bottom of page 11 to end of the first full paragraph on page 14; bottom half of page 15 to end of page 16:** Once again, here the defense appears to be contending that any negative information about the defendant that pre-dates the charges in this case must be redacted. For the reasons set forth above in response to page 3 fn. 2, we disagree. Also, with regard the defendant's $588,000 in earnings in 2015, which the defense redacted in footnote 10, we are pretty confident that this amount was the subject of either testimony or an exhibit at trial, although I do not have the time to run down that reference right now and will endeavor to supply it to the Court as soon as I have time to do so.

**Page 18, n.3 (discussion of information contained in the PSR relating to substantial personal debts of the defendant's that appeared to reflect a free-spending life-style):** We submit that this information is relevant to both the defendant's character and past conduct and to the likelihood that she may commit further offenses where the motivation is financial gain in the future. And this footnote was specifically linked to our unchallenged discussion of the missing $2.341 million that ITK was paid by the NSA and that should have gone to Fuse Engineering during a time in 2019-20 when the defendant was the CEO and 100% owner of ITK, and the Sharkspeed contract was quite possibly the largest remaining contract the company had. However, we are willing to acquiesce to the redaction of the specific details included in this footnote, although we submit that the first sentence of this paragraph ("The list of

the defendant's liabilities included a number of other items of interest that appear to reflect an extraordinarily self-indulgent and spendthrift life-style.") should remain unredacted so that the subject matter of this footnote is clear.

**Page 22, top of page 22 through end of first full paragraph on page 23; second and third lines of first full paragraph on page 23; reference to name (N.H.) of a friend of the defendant's and entire bottom paragraph on page 23; second half of page 24 and footnote 15; first full paragraph on page 25 (the government's noting various points in rebuttal to the defense's claim that Ms. McComber was emotionally abused by her husband):**  With regard to the first paragraph in section IV at the bottom of page 22, this says no more than has already been said in open Court (notably at the start of the evidentiary sentencing hearings on November 16, 2023) and in various open court filings, such as the government's letter responding to the defense's massive filings on April 19th, and again in open court during the sentencing itself.

As for the discussion in the second and third sentences of the first full paragraph on page 23, which simply make the point that the defendant was no longer living with Mr. Kimmel when she became the PM on the Ironbridge contract for the second time in March 2016 and began misbilling her time (and indeed, they had not lived together for some time prior to that) and that the defendant and Mr. Kimmel had worked out the payment agreement for his 49% share of ITK in the late spring of 2016, all of this was the subject of testimony at trial, and the separation agreement was actually introduced into evidence.

As for the name of Ms. N.H. on page 23, AFPD Richman cited her letter and, we believe, mentioned her by name (certainly by her surname) during her final sentencing argument in addressing the defense's claims about Ms. McComber's supposed treatment by her husband before their separation in 2015.

As for the bottom paragraph of page 23, certainly by this point, and in light of AFPD Richman's final sentencing argument, the nature of the defense's claims about her relationship with Mr. Kimmel and its role in their sentencing mitigation argument have been fully aired.  It is also eminently fair for the government to be able to make the point that after all the claims by the defendant's family and friends in their letters about her having successfully built a business in a "male-dominated industry" (which she accomplished in part with the aid of contracting standards favoring Women-Owned Small Businesses), her marital issues did not prevent her from building ITK up *with the assistance of her husband* between 2006 and 2015.  It is likewise an entirely fair point to note that once Mr. Kimmel stepped aside from any ownership interest or management role in ITK in mid-2016 (he continued to act as a subcontractor for it on the Silent Roar contract long after that), the false claims submitted by the defendant to the NSA managed to set the company on the road to ruin within a matter of months – which ultimately served to render his 49% interest in the company, which he had also labored to build over a 12-year period) largely worthless.

With regard to the second half of the first full paragraph on page 24 and footnote 15, which addresses the defendant's hiring a forensics company in the spring of 2016 to snoop into her husband's and Dwayne Preston's emails (a year before his resignation and the "intrusion into the Unanet software of July 2017), all of that was addressed during the trial, and exhibits were introduced reflecting the Lync messages referred to in

this paragraph.  Moreover, Fraud Section attorney Peter Cooch specifically cross-examined the defendant about these matters at trial.  [cites, including ECF 299?  At 195-200?)].

With regard to the bottom paragraph of page 24 and the top of page 25 and Exhibit 9, which relate to Mr. Kimmel's very measured comments about his wife's drinking, which supported the conclusion ultimately reached by the NSA psychologist not to revoke her security license in 2018, we included this material not to subject her to "spite", but to show that in contrast to the extreme malice of her comments about him since the end of their marriage, he responded to the investigator's questions about her in a fair way that stressed the respects in which she acted prudently if she had been drinking by relying on Uber drivers or friends to get her home.  Finally, by this point, the NSA psychologist's inquiry has been referred to in open court repeatedly, both at trial and at sentencing, with the defense citing it and using it in cross-examination of Paul Rooney to try and suggest that he was filled with animosity towards the defendant and wanted to harm her.

As for the final statement by Mr. Kimmel that is referred to in the last sentence of this paragraph on page 25, which reflected that he stated that while he considered his wife to be "a good worker," he did not consider her trustworthy because she had made false allegations of abuse against her in the past, that again goes to allegations of his supposed abusiveness that have now been fully aired in open court at sentencing, as well as in discussion between the parties and the Court on the first day of the sentencing hearing.  (The government has no objection to sealing Exhibit 9, however, notwithstanding its generally positive tone towards the defendant and the weight it was

ultimately given by the NSA psychologist in finding that the defendant's drinking was not of a sufficiently problematic character to justify removing her security clearance.

**Page 25, first full paragraph through end of carryover paragraph on page 26 and footnote 16, as well as most of page 27 through the end of the carryover paragraph on page 28 (discussion of defendant's relationship with her first husband), and footnote 17 on page 27, discussing the one unsubstantiated complaint of improper physical contact that the defendant ever filed against her second ex-husband):**  As for the latter point, that is the subject of public court records in Howard County, and the points about the support of Mr. Kimmel by the couple's oldest daughter was discussed in the Security File.  Otherwise, however, we are willing to agree to the redaction of the material relating to her first husband, because while we believe this material is unquestionably highly relevant, and we have sought to protect his privacy by not even using his initials, we believe he is entitled to the additional privacy protection of having this material redacted.

**First full paragraph on page 28 through the end of the carryover paragraph on page 30 (our discussion of the error of the indication at the end of Ms. Sandman's Social History Report that the defendant's ex-husband and his current romantic companion had worn Halloween costumes in 2023 mocking the possibility that she would soon be serving time in prison):**  We suspect that the defense would claim that this material should be redacted because the Social History report was ordered redacted in part.  ECF # 467 at 24.  However, this portion of the Social History Report had nothing to do with "sensitive aspects of defendant's medical and personal history."  *Id.*  Nor does it relate to anything that

14

occurred between the defendant and her husband during their marriage, since they separated in 2015; were divorced in 2016 or early 2017; and her ex-husband and his current companion wore these costumes in October 2023.

Clearly, the real basis for the defendant's redaction request here is that this gratuitous and wholly unfounded slap at the defendant's ex-husband and his new romantic companion (and her mother) was a horrible embarrassment for the defense, and one that sharply exposed the biases and malice underlying the Social History Report. The Court noted in its Order concerning the defendant's motion to strike that it found this to be illuminating. ECF # 482 at 6. No redaction is appropriate for the simple purpose of covering up what the OFPD's investigator did here.

### The Defense's Requested Sealing of Various Government Exhibits to its Reply Brief

We will address these objections, and our responses, in tabular form.

| Government Exhibit | Basis for Defense Sealing Request | The Government's Response |
|---|---|---|
| ECF 478-1 (Shilo Weir NSA Interview Memorandum) | "[C]onsistent with the Court's prior order sealing an interview with the NSA OIG." | See discussion above at page 8. The Court did not order a blanket sealing of any material relating to an NSA interview transcript or an Agency investigative report. Such materials are commonly introduced in sentencing hearings, where the Federal Rules of Evidence do not apply. FED. R. EVID. 1101(d)(3). |

| ECF # 478-2 (Excerpts from Paul Rooney's NSA-OIG interview, but not the excerpts from his trial testimony) | "[C]onsistent with the Court's prior order sealing an interview with the NSA OIG" [although acknowledging that certain statements previously filed on the docket should not be redacted]. | See previous discussion in the text and above. |
| --- | --- | --- |
| ECF # 478-3 (Summary of Interview Conducted by NSA Security Officials with Craig Plunkett) | "[C]onsistent with the Court's prior order sealing an interview with the NSA OIG." | See previous discussion. |
| ECF # 478-4 & 478-7 | Previously stricken by the Court's Order on the defendant's Motion to Strike (ECF # 482). | |
| ECF # 478-5 (material from the defendant's Security File relating to the circumstances of her departure from the Baltimore City School System, as well as her employment issues with Kenfair Manufacturing and her relationship with her first husband. | "Should be sealed consistent with the Court's prior order sealing substantial portions of Ms. McComber's Social History Report to protect the privacy of third parties, as well as an interview with the NSA OIG." | The defense's objection here makes no sense. This material is not from the Social History Report prepared by the OFPD's investigator. Moreover, because this exhibit refers to negative information about the defendant, although the defense (and presumably its investigator) had received copies of the Security file, it was never referenced in the Social History report and, indeed, was altogether ignored.  And as we have seen, the Court never issued a blanket direction that all material derived from NSA-OIG investigative interviews should be redacted; |

| | | obviously, such material was extensively used by defense counsel at trial, and the propriety of using such material at sentencing under the broader standards governing the presentation of factual material there is well-established. |
|---|---|---|
| ECF # 478-8 (two NSA Lync messages totaling three pages showing that the defendant's ex-husband attempted to maintain a cordial relationship with her following their divorce) | "Should be sealed consistent with the Court's prior order sealing the portions of the Social History Report describing Ms. McComber's relationship with her former husband, Bobby Kimmel. *See* ECF Nos. 467 & 470." | The government requested redaction of the portions of the Social History Report discussing Robert Kimmel because those portions consisted of negative allegations against which we believed he should be protected as a third party whose opportunities to vindicate his interests in this criminal proceeding were limited.  These messages do not present any negative information about him. |
| ECF # 478-9 (excerpts from an interview of Robert Kimmel as part of the 2018 psychological assessment about her drinking). | "Should be sealed consistent with the Court's prior order sealing the portions of the Social History Report describing Ms. McComber's relationship with her former husband, Bobby Kimmel. *See* ECF Nos. 467 & 470." | We included this material because it showed that, contrary to the defendant's claims that he was always trying to destroy her or to bad-mouth her, in August 2018 he provided a fair and balanced assessment of her drinking habits that was supportive of her in many respects and, indeed, presented her |

|  |  | as acting responsibly when she thought she might have over-consumed.  However, on further consideration, we have no objection to sealing this exhibit. |
|---|---|---|
| ECF # 478-10 (portion of the Social History report discussing the 2023 Halloween Facebook post by Mr. Kimmel's current companion). | "Should be sealed consistent with the Court's prior order sealing this material in Ms. McComber's Social History Report. *See* ECF Nos. 467 & 470." | See discussion above. |

The government will file the defendant's version of the proposed redacted text of ECF # 478 separately, under seal.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/

_____

Jefferson M. Gray
Assistant U.S. Attorney

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4915
Jefferson.M.Gray@usdoj.gov

*Counsel for the United States*

## EXHIBITS

| **Exhibit Number** | **Description** |
|---|---|
| 1 | Defense Counsel's Email of Tuesday night, June 25th, concerning |

its position on redactions to the Government's Sentencing Reply Brief on the § 3553(a) Sentencing Factors