IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal No. ELH-21-036 |
| JACKY LYNN MCCOMBER | |
| *Defendant*. | |

**MEMORANDUM OPINION**

On February 15, 2023, a jury convicted defendant Jacky Lynn McComber of multiple fraud offenses. ECF 279. A change in defense counsel led to a long delay in sentencing. At sentencing on June 28, 2024 (ECF 491), the Court sentenced the defendant to a total term of thirteen months of imprisonment. *See* ECF 495. Defendant is due to self-surrender on November 7, 2024. *Id.*

This Memorandum addresses the motion filed by defendant (ECF 539, the "Motion"), seeking a stay of incarceration pending her appeal to the Fourth Circuit. The government opposes the Motion. ECF 541 (the "Opposition"). Defendant filed a reply. ECF 542 (the "Reply"). The government also filed correspondence addressing an assertion in the Reply concerning the position of the U.S. Probation Office ("USPO") with regard to defendant's Motion. ECF 545.[1]

---

[1] The defense claims that the USPO does not oppose defendant's request. ECF 542 at 1. The claim is supported by a text exchange between defense counsel and the probation agent. A copy of the text exchange was submitted by the defense to the Court, via email, in response to the Court's request for clarification (ECF 543).

The prosecutor subsequently spoke with the probation officer about the matter. ECF 544; ECF 545. The government also filed the text exchange as an exhibit on Sunday, November 3, 2024. *See* ECF 545-1. According to the government, the probation officer merely "sought to confine her response to standing by" her earlier report of August 14, 2024 (ECF 537), in which USPO noted defendant's compliance with pretrial release conditions. ECF 545 at 1; *see id.* at 3.

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

### I.     Background[2]

McComber was indicted on February 25, 2021 (ECF 1) and a Superseding Indictment followed on May 26, 2022. ECF 97. At the relevant time, McComber was the Chief Executive Officer, President, and sole shareholder of InfoTeK Corporation ("InfoTek" or "ITK").[3] She was charged with multiple offenses in connection with a government contract between the National Security Agency ("NSA" or the "Agency") and InfoTeK.

In particular, Counts One through Nineteen charged defendant with "Submission of False Claims," in violation of 18 U.S.C. §§ 287 and 2(b). Count Twenty charged defendant with making false statements, while under oath, to two agents of NSA's Office of the Inspector General ("OIG") during an investigative interview in October 2017, in violation of 18 U.S.C. § 1001(a)(2).

The case proceeded to a jury trial that began on January 19, 2023. *See* ECF 247. On February 15, 2023, the jury returned a verdict finding defendant guilty on all twenty counts. ECF 279.

---

The government also notes that in the USPO report of August 14, 2024 (ECF 537; ECF 545-2), the USPO opposed defendant's request to attend a wedding in Greece.

The position of USPO — whatever it may be — would pertain to defendant's risk of flight and danger to the community. These issues are not the basis of my ruling.

[2] The case has a long and contentious history. To the extent relevant, and in the interest of time and efficiency, I incorporate here the factual and procedural summaries set forth in my earlier opinions. *See* ECF 31, ECF 194, ECF 429-1, and ECF 467. In particular, I point to the factual summary of the government's case-in-chief, as set forth in ECF 429-1.

[3] Defendant's former husband, Robert Kimmel, previously was a co-owner of ITK.

The evidence at trial showed that the contract in issue, known as the "Ironbridge Contract," was awarded to ITK in 2011. *See* Gov't. Trial Exhibit ("GX") 28(a) (the "Contract," the "Ironbridge Contract," or "Ironbridge"). It was a multi-year contract involving highly technical software and application development services. *See*, *e.g.*, ECF 297 (Tr. 1/30/23, testimony of Cherrill Guinther), at 13; *id.* at 24, 25.[4] Because the technical work for the Contract was classified, ITK's employees had to perform all of the technical work at NSA's facility at Fort George G. Meade in Maryland.

The quality of ITK's technical work was not in issue at trial. However, defendant's duties with regard to the Contract were largely administrative; she did not perform any of the technical work for the Contract. The evidence focused on defendant's work as Senior Program Manager ("PM") with respect to the Contract and ITK's monthly billing to NSA for work allegedly performed by defendant during the period of March 2016 through September 2017. According to the government, defendant caused the submission of false and fraudulent claims to NSA "for services that were not in fact performed by [defendant] in connection with the IRONBRIDGE contract, to wit, the full amount of the hours listed in the invoices . . . ." ECF 97, ¶ 16.

ITK billed NSA for 2,603.5 hours of work allegedly performed by defendant during the relevant time. But, NSA's access control records reflected that defendant was only on-site at NSA for about 10% of the hours that she billed. Put another way, defendant was not at NSA for about 90% of the time for which ITK billed the Agency. In other words, defendant was off-site for 2,333 of the total hours that she billed. *See* GX 1(c) to GX 19(c); GX 21(a); ECF 293.

---

[4] I cite to the electronic pagination, which does not always correspond to the page number imprinted on a particular submission.

The government agreed that the PM could perform some administrative functions for the Contract while off-site, *i.e.*, not at the NSA complex. *See* ECF 390 at 14 n.2; ECF 97, ¶ 5. And, the jury was told: "The Government does not contend that the Defendant violated the law if she worked off-site." ECF 305 (Tr. 2/13/23, jury instructions), at 149. But, as noted, work as to classified matters could not be performed off-site; such work had to be performed at NSA. Moreover, communications with NSA personnel are generally classified, and there are limitations on how and where they can occur. *See* ECF 429-1 at 23-24 (citing to the trial record). Thus, according to the government, defendant's physical presence at NSA was relevant to the question of whether she was performing work for the Contract when she was not at NSA.

The Ironbridge Contract is what is known as a Firm Fixed Price Level of Effort contract ("FFP-LOE"). GX 28(a); ECF 429-1 at 16-19. In a FFP-LOE contract, the Agency specifies the labor categories, projects the number of hours needed for each labor category to perform the required work, and then allocates those hours. *See* ECF 429-1 at 17-18. The government utilizes an FFP-LOE contract when "there is reasonable assurance that the intended result . . . cannot be achieved by expending less than the stipulated effort." ECF 305 at 151.

Defendant argues that the Contract required ITK to provide a full time PM during much of the relevant time. GX 31(a)-31(n). The jury was instructed, ECF 305 at 151: "In considering whether the Defendant worked the amount of hours that were billed to NSA, you may consider the total number of hours originally estimated by NSA for the senior program manager position . . . ."

The hours billed by defendant did not exceed the hours estimated by the government. But, the evidence also established that the award of hours for the PM category was not a license to bill for those hours if the work took fewer hours than what had been allocated. ECF 429-1 at 17-19.

4

In April 2017, NSA's Jonathan Smith asked defendant for a status report with respect to the Contract. GX 24(e)(1). It was Smith's first such request to ITK in about six months. Notably, defendant asked Jason Doyle, ITK's technical lead for the Contract, to "mock up some quick points over the past six months" so that she could submit the report. *Id.* Doyle complied on April 4, 2017. GX 24(e)(2). And, that is the information that defendant provided to NSA. Compare GX 24(e)(3).

In October of 2017, defendant provided a recorded statement, under oath, to investigators from OIG. GX 20(b). It was played for the jury. McComber also testified at trial. ECF 302 (Tr. 2/7/23); ECF 303 (Tr. 2/8/23).

NSA paid ITK's monthly invoices, in the amount of $388,878.78. *See*, *e.g.*, GX 1(a) to GX 19(a); ECF 295 (Tr. 1/26/23, Agent Keith Benderoth testimony), at 181. The government is supposed to pay the invoices promptly, after verifying that the hours reflected on the invoice are in accordance with technical task orders for each labor category. ECF 292 (Tr. 1/23/23, Kelly Sulewski testimony), at 125-26.

Sentencing was initially set for May 12, 2023. ECF 282. However, after trial defendant obtained a team of new lawyers.[5] As a result, sentencing was postponed. ECF 318, ECF 319. Other delays ensued. *See* Docket.

Sentencing hearings, some of which were evidentiary, were held in November 2023 and in June 2024. *See* ECF 377, ECF 378, ECF 379, ECF 489, ECF 490, ECF 491. On June 28, 2024, the Court sentenced defendant to a total term of thirteen months of imprisonment. ECF 491; ECF

---

[5] Defendant's trial attorney was privately retained. After trial, he sought and obtained leave to withdraw. ECF 317; ECF 326; ECF 327. Defendant was then provided with court-appointed counsel from the Office of the Federal Public Defender ("FPD"). And, the FPD has been joined by several pro bono lawyers from a prominent law firm in Washington, D.C.

493 (Judgment); ECF 495 (Amended Judgment). That sentence was well below the bottom of the sentencing Guidelines as calculated by the Court.[6]

At the sentencing hearing on June 28, 2024, over the government's objection, the Court took the uncommon step of allowing defendant more than four months to self-surrender. The Court set a reporting date for defendant of November 7, 2024, so that defendant could attend the wedding of her daughter during the first weekend in November 2024. *See*, *e.g.*, ECF 520 (Tr. 6/27/24), at 117; ECF 521 (Tr. 6/28/24), at 94-102; ECF 495 at 4. Notably, despite a vigorous and robust argument from the defense at the sentencing hearings in regard to a multitude of matters, the defense never requested release of defendant pending appeal.

Defendant's self-surrender date has been known to the defense since June 28, 2024. Yet, it was not until October 4, 2024, that defendant presented the Court with a "Motion For Stay Of Incarceration Pending Appeal." ECF 539.[7] Of course, the Court could not consider the Motion without first affording the government an opportunity to respond to it. The government filed its Opposition at 12:42 a.m. on Saturday, October 19, 2024. ECF 541. The defendant filed her Reply shortly before the close of business on Friday, October 25, 2024. ECF 542. Then, on Sunday, November 3, 2024, the government responded to a claim in defendant's Reply (ECF 542 at 1) as to the position of the USPO regarding defendant's Motion. *See* ECF 545.

---

[6] In effect, the leniency of the sentence fuels an argument of defendant for release pending appeal. Given the length of the sentence, defendant complains that she will have served the sentence before the appeal is decided. ECF 539 at 3.

[7] It is difficult to justify the defendant's delay in filing the Motion. Given defendant's impending self-surrender date of November 7, 2024, the Motion was essentially urgent when it was filed. Yet, the request could have been made as early as sentencing, and certainly in the weeks after sentencing. Like the attorneys, the Court is responsible for many other matters, including a jury trial held from October 28, 2024 to October 30, 2024.

## II. Discussion

### A.

I begin with a review of the pertinent statute: 18 U.S.C. § 3143.[8] It is titled "Release or detention of a defendant pending sentence or appeal". The Bail Reform Act of 1984 "creates a presumption against release pending appeal." *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002).

Defendant filed her appeal to the Fourth Circuit on July 12, 2024. ECF 517. The appeal is pending. Therefore, § 3143(b) of 18 U.S.C. is relevant. It is titled "Release or detention pending appeal by the defendant." The provision states, in part (italics added):

\*    \*    \*

**(1)** . . . [T]he judicial officer *shall* order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . be detained, unless the judicial officer finds—

**(A)**   by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

**(B)**   that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

    **(i)**    reversal,
    **(ii)**    an order for a new trial,
    **(iii)**    a sentence that does not include a term of imprisonment, or
    **(iv)**    a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the

---

[8] Fed. R. App. P. 9 is also pertinent, although it has not been cited by the lawyers. It directs the court to make its decision in accordance with, *inter alia*, 18 U.S.C. § 3143. *See* Fed. R. App. 9(c).

judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

As the statute makes clear, under § 3143(b)(1)(A), defendant bears the burden of establishing, by clear and convincing evidence, that she is not likely to flee and does not pose a safety danger if released.[9] Because the statute is in the conjuctive, however, the defendant must also satisfy the criteria set forth in § 3143(b)(1)(B).

**B.**

As to § 3143(b)(1)(A), McComber maintains that she does not pose a risk of flight or a danger to the community. ECF 539 at 3-5. She points out that she has been on pretrial release, without incident, since March 8, 2021; she previously held a security clearance for almost two decades; and she has strong ties to family in Maryland and to the community. Moreover, she notes that she never failed to appear for any of the numerous court proceedings held in this case. *Id.*

The government disagrees. In its Opposition, it argues, at length, that defendant presents both a risk of flight and a financial danger to the community. ECF 541 at 6-13; *see also* ECF 545. It suggests, *inter alia*, that the Fourth Circuit may not rule until 2026, and the long delay "would afford the defendant an extended time to either make plans for a departure . . . or to find a way to victimize someone else . . . ." ECF 541 at 8. Moreover, pointing to the Court's finding that defendant committed perjury in her testimony at trial, the government argues that defendant has a "proven track record of being willing to obstruct justice even while on release . . . ." *Id.* at 12.

---

[9] Defendant argues that the clear and convincing standard applies only to § 3143(b)(1)(A), because that language does not appear in § 3143(b)(1)(B). *See* ECF 542 at 4 n.1.

I am not persuaded by the government. To the contrary, I am satisfied that defendant has met the requirements of § 3143(b)(1)(A).[10]

**C.**

The crux of the matter concerns 18 U.S.C. § 3143(b)(1)(B)(i)-(iv).

The first portion of § 3143(b)(1)(B) pertains to the question of whether the appeal was filed for the purpose of delay. In my view, there is no merit to the government's claim that the appeal itself is for the purpose of delay. *See* ECF 541 at 13. Indeed, as the defendant observes, ECF 542 at 5, it has always been clear that, if convicted, defendant would pursue her right to an appeal. Therefore, I will focus on the remaining portion of § 3143(b)(1)(B).

The defense contends that the appeal is likely to result in a reversal of all twenty counts for which defendant was convicted. ECF 539 at 1. In particular, defendant maintains that the government failed to present sufficient evidence to support both the requisite scienter and material falsity elements of the false claims convictions and, by extension, the false statement conviction. *Id.* at 7-11.

In addition, defendant contends that the Court erred in calculating the Sentencing Guidelines with respect to the amount of loss. *Id.* at 11-13. She argues that the Court's erroneous loss calculation inflated the total offense level from 6 to 16. *Id.* at 7. With a criminal history category of I, the Court's loss calculation yielded Guidelines with a sentencing range of 21 to 27 months of incarceration. In defendant's view, however, the government suffered no pecuniary loss, and thus the Guidelines range should have been zero to six months. *Id.* at 2, 3, 12.

---

[10] Because I see no merit to the government's claims as to risk of flight and danger, and because of the expedited nature of this ruling, I decline to spend the time to recount in detail the government's contentions as to these issues.

Alternatively, she contends that the evidence supports an enhancement of less than the ten levels applied by the Court.

Defendant is also concerned that the resolution of the appeal will take longer than it will take her to serve her sentence of thirteen months. ECF 539 at 3. She asserts that her "sentence of incarceration for 13 months is likely to expire prior to any decision on her appeal" and therefore a stay "is necessary to avoid irreparable harm." *Id.*

As mentioned, defendant noted her appeal on July 12, 2024. ECF 517. The government suggests that briefing in this case will most likely be completed in the Fourth Circuit in February or March of 2025, making it unlikely that the matter will be heard or resolved during the current term. *See* ECF 541 at 7-8. Thus, with credits that defendant may earn while incarcerated, it is possible that defendant will complete her relatively short sentence before the Fourth Circuit decides the appeal.

In other words, in the absence of a stay, defendant could serve a sentence for convictions that could later be reversed. ECF 542 at 2; *see also* ECF 539 at 5. In essence, she asserts that this would result in a hollow victory if the convictions are reversed.

**D.**

The statute requires that the appeal must raise "a substantial question of law or fact . . . ." *See* 18 U.S.C. § 3143(b)(1). And, it must be "likely" to result, *inter alia*, in a reversal, or a new trial, or a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment that is "less than the total of the time already served . . . ." *Id.*

Therefore, I must first "determine whether the question on appeal is a 'substantial' one." *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (per curiam). And, if it is, I must then determine "whether the substantial question is important enough to warrant reversal or a new

trial on all counts for which the district court imprisoned the defendant." *Id.*; *see also United States v. Miller*, 753 F.2d 19, 23 (3rd Cir. 1985); *United States v. Hickson*, RWT-09-213, 2011 WL 3422806, at *1 (D. Md. Aug. 3, 2011).

In *Steinhorn*, 927 F.2d at 196, the Fourth Circuit adopted the definition of "substantial question" as set forth in *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985). In particular, the Court recognized that a "substantial question" is one that is "a 'close' question or one that very well could be decided the other way." *Steinhorn*, 927 F.2d at 196 (cleaned up). Moreover, "[w]hether a question is 'substantial' must be determined on a case-by-case basis." *Id.* (citation omitted).

As noted, the primary issue on appeal concerns the sufficiency of the government's evidence at trial to prove scienter and material falsity. ECF 539 at 7. In my Memorandum Opinion of March 22, 2024 (ECF 429-1), denying defendant's motion under Fed. R. Crim. P. 29, I considered these same contentions. Of import, I reviewed the evidence presented in the government's case-in-chief and, on the basis of that evidence, I rejected the arguments that defendant now advances to support her claim of a likelihood of succeeding on appeal. The evidence, in my view, readily satisfied the elements of the crimes and was more than sufficient to sustain defendant's convictions.

I see no reason to revisit the assessment I previously made, as set forth in ECF 429-1. Therefore, I adopt the analysis in my Memorandum Opinion (ECF 429-1) in reaching the conclusion here that defendant's evidentiary contentions with respect to scienter and materiality are not likely to result in a reversal, an order for a new trial, or a revised sentence.

As to the issue of loss calculation, it arose in connection with sentencing. At sentencing, I spent considerable time in regard to the issue. *See* ECF 521 (Tr. 6/28/24), at 29-69. For the reasons discussed at sentencing, I see no merit to defendant's claim of error.

In any event, even under defendant's analysis, the Guidelines would be zero to six months. And, there is no basis to suggest that, with those Guidelines, the sentence could not have (or would not have) included any period of imprisonment. The Court knows full well that the Guidelines are merely advisory. Nor did I impose a Guidelines sentence. I was also mindful that defendant sought a disposition of probation. Although I could have awarded probation, I declined to do so.

As to the issue of loss, the jury was not asked to determine the amount of loss. Rather, the jury was asked to determine, *inter alia*, if there was a material difference between the hours for which defendant billed the government and the hours she worked on the Contract. But, the amount of loss is, of course, relevant to the Guidelines calculation, and the amount of loss was hotly contested.

At sentencing, the burden was on the government to prove loss by a preponderance of the evidence. *See*, *e.g.*, *United States v. Steffen*, 741 F.3d 411, 413 (4th Cir. 2013). Ultimately, though, "'the determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court' . . . ." *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017) (quoting *United States v. Rand*, 835 F.3d 451, 467 (4th Cir. 2016)). Notably, U.S.S.G. § 2B1.1(b) cmt. n.3(C) expressly provides that the court "need only make a reasonable estimate of the loss" that is "based on available information." *See United States v. Savage*, 885 F.3d 212, 227 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 238 (2018); *Stone*, 866 F.3d at 228; *United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014). Moreover, cmt. n.3(c) provides that "[t]he sentencing judge is in a unique position

12

to assess the evidence and estimate the loss based upon that evidence." *See also Stone*, 866 F.3d at 228.

Section 2B1.1 of the Guidelines "covers economic crimes including fraud . . . ." *United States v. Limbaugh*, 2023 WL 119577, at *3 (4th Cir. Jan. 6, 2023). Under U.S.S.G. § 2B1.1(b)(1), a sentencing court must calculate the offense level for a defendant convicted of a crime involving fraud or deceit on the basis of the amount of loss resulting from the scheme. *See Savage*, 885 F.3d at 226; *Elliott v. United States*, 332 F.3d 753, 767 (4th Cir. 2003).

Effective November 1, 2024, the Guidelines were amended. Of pertinence here, certain definitions that were previously contained in the Commentary have been moved to the text of the Guidelines. The provision defining "Loss" is now found in § 2B1.1, under "Notes to Table," § A. The term "Actual Loss" is also contained in Notes to Table, and appears in § C(1). Similarly, "Intended Loss" appears at § C(ii). But, the content is unchanged. Therefore, the amendments have no bearing on the analysis.[11]

At the time of sentencing, commentary to the Guidelines provided that loss amount "is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b) cmt. n.3(A). Under U.S.S.G. § 2B1.1, Application Note 3A(i), "'*Actual loss*' means the reasonably foreseeable pecuniary harm that resulted from the offense." Under Application Note 3A(ii), "'*Intended loss*' (I) means the

---

[11] The Fourth Circuit made clear in *United States v. Moses*, 23 F.4th 347, 349 (4th Cir. 2022), that *Kisor v. Wilke*, 588 U.S. 558 (2019), did not overrule *Stinson v. United States*, 508 U.S. 36 (1993), in which the Court said that the Guidelines commentary is generally binding and authoritative. In *Limbaugh*, 2023 WL 119577, at *4, the Fourth Circuit observed that, even after *Kisor*, it "has routinely deferred to and relied on those commentary definitions in reviewing challenges to loss calculations." *See*, *e.g.*, *United States v. Graves*, 2022 WL 1073863, at *1-2 (4th Cir. Apr. 11, 2022) (per curiam) (stating that district court appropriately used intended loss to apply enhancement under § 2B1.1); *United States v. Sosa*, 773 F. App'x 140, 140-41 (4th Cir. 2019) (per curiam) (stating that district court properly applied Application Note 3(F)(i)'s $500 minimum in calculating intended loss under § 2B1.1).

pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation . . .)."; *see also Savage*, 885 F.3d at 227; *United States v. Miller*, 316 F.3d 495, 502 (4th Cir. 2003).

Application Note 3(E) is titled "Credits Against Loss."[12]  Note 3E(i) provides, in part, that loss is reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."

The time that defendant expended as PM on the Ironbridge Contract was charged to NSA at a rate of $148.13 an hour from March 14 through October 31, 2016, and then at a rate of $150.35 an hour beginning November 1, 2016, and continuing through September 30, 2017. ECF 288 at 2. During the relevant period of March 2016 through September 2017, ITK billed NSA for 2,603.5 hours of work on the Ironbridge Contract that defendant supposedly performed in her role as PM. NSA paid these charges, in the sum of $388,878.78.

There were about 326 days between March 15, 2016, and September 8, 2017, for which McComber billed time to NSA on the Ironbridge Contract as the PM. She was at NSA for some portion of 108 days. On 218 of those 326 days, however, McComber did not access the NSA campus at all. *See* ECF 429-1 at 29-31. And, for 204 of those days, defendant recorded on her

---

[12] In the recent amendment, this provision now appears at cmt. n.3(D).  The text is unchanged, however.

14

time sheets that she worked eight hours per day for the Contract. *Id.* at 30. In turn, ITK billed NSA for that time.

According to the government, the defendant inflated her billings by approximately $306,186. ECF 286 at 3; *see also* ECF 431 at 37.[13] The Presentence Report of April 24, 2024 (ECF 439) awarded a twelve level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(G), based on a loss of more than $250,000 but less than $550,000. *Id.* ¶ 68.

The defense argued that the government suffered no actual or pecuniary loss because the Contract came in almost $675,000 "under budget," ECF 435 at 39; ECF 435-4 at 14, and because "the government received exactly what it bargained for . . . ." ECF 435 at 71; *see also id.* at 36. Therefore, the defendant argued that the Court must subtract from the total Contract price the value of the services that the defendant rendered. *Id.* at 71 (citing U.S.S.G. § 2B1.1 cmt. n3(E)(i) and *United States v. Harris*, 821 F.3d 589 at 605 (5th Cir. 2016)).

Among other arguments, the defendant also pointed to NSA's designation of the PM position as a full-time equivalent and the award of 1800 hours per year for the labor category of PM. ECF 435 at 72. At $150.35 per hour, this would have a value of $400,382.05. *Id.* Yet, NSA paid ITK only about $388,000 for defendant's time. *Id.* at 73. Further, the defendant points out that all Contract obligations were performed as required under the Contract, to the satisfaction of the government. *Id.* Therefore, under § 2B1.1(b)(1), the defendant maintains that defendant's conduct did not result in a pecuniary loss. *Id.* at 71.[14]

---

[13] This calculation may have included ITK's bill for 88 hours for work by defendant in September 2017. But, NSA only paid for 78 hours. ECF 286 at 3.

[14] The defense also notes that the government paid the PM at an on-site rate, and off-site rates are higher. ECF 435 at 73 n.39; ECF 397 (Tr. 1/30/23, Cherrill Guinther testimony), at 56. There was no evidence as to the difference in the rate, however. And, in any event, the Contract

15

I am not persuaded by defendant's credit-against-loss argument. *See* ECF 435-12. Moreover, there is no merit to any argument that defendant was entitled to bill for hours that NSA allocated for the PM position under the Contract, merely because the hours were allocated by NSA. Nor was the jury required to conclude that the government's allocation of hours necessarily meant that it took that number of hours to actually do the work. And, the government's contemporaneous approval of ITK's monthly invoices did not preclude NSA from later conducting a more thorough review of the accuracy of the invoices from ITK.

As discussed, with an FFP-LOE contract, such as Ironbridge, the Agency provides an educated estimate or projection of the number of hours required for the work in a particular labor category. The Agency is specifying that it believes the work cannot be achieved by expending less than the stipulated effort. ECF 292 (Kelly Sulewski testimony), at 177-78. However, the evidence at trial also made clear that this is not a license for a contractor to bill for the hours that are allocated if the government's estimate was wrong or the work is not actually performed. *See*, *e.g.*, ECF 297 (Cherrill Guinther testimony), at 83; ECF 292 (Sulewski), at 119, 122; ECF 298 (Jonathan Smith testimony), at 172, 231; ECF 297 (Smith testimony), at 218. Indeed, a contractor must certify that the hours were worked when the government is invoiced. ECF 292 (Sulewski), at 121, 167; ECF 299 (Don Pugh testimony), at 47; ECF 298 (Jonathan Nace testimony), at 168, 172. Moreover, the failure of the government to reject ITK's invoices when they were submitted does not estop the government from pursuing a claim of fraudulent invoices discovered after the invoices were paid.

---

was never modified on this basis, even though NSA was aware that defendant was doing non-classified work off-site.

16

Further, a portion of the Contract initially included work for the Counter Terrorism Mission Management Center. That work was subsequently removed from the Contract. *See*, *e.g.*, ECF 297 at 39, 190-97. This obviously reduced the scope of the work of the Contract.

As I see it, the argument that there was no loss because the Contract came in under budget is a red herring. If the government were not fraudulently billed, the government's expenditure would have been even less than it paid. *See* ECF 435-12 at 4. In other words, the amount under budget would have been greater. It makes no sense to suggest that there was no loss merely because NSA spent less than what it had expected to pay.

Alternatively, defendant insists that the loss is "exponentially lower" than the amount claimed by the government. ECF 435 at 73. She contends that there is "a mountain of evidence showing Ms. McComber was bending over backward to full her duties and responsibilities as PM . . . ." *Id.* at 74. In her view, defendant should have been credited with 60% of her off-site time, which would result in a loss amount of no more than $147,000, and an enhancement of only eight levels under U.S.S.G. § 2B1.1(b)(1)(E)), rather than twelve levels. *See* ECF 435 at 40.[15]

Defendant's central argument is that, as to the amount of loss, "there is extensive evidence" of defendant "doing work during the hours she billed off-site." ECF 435 at 39. I disagree.

There was a mountain of evidence, as defendant suggests. But, that mountain showed that defendant was rarely at NSA, and she could only perform limited, administrative, non-classified work while off-site. Despite the limited nature of work that could be done off-site, defendant's billings were repeatedly for full eight-hour days.

---

[15] At ECF 435 at 40, defendant cited § 2B1.1(b)(1)(F) and stated the enhancement would be no more than ten levels. But, at argument on June 26, 2024, she clarified that she meant eight levels.

17

The NSA access records indicate precise times and locations of entry to and exit from NSA. For the most part, even when defendant went to NSA, she was never on site at NSA for very long. In calculating the amount of the loss, the government credited defendant with 108 days at NSA and 200 hours of work at NSA, which equals most of the time that she was in access at NSA. ECF 286 at 4. The billing system provided for billing in increments of 1/4 hours, or 15 minutes. In computing defendant's time, the government rounded up. So, if defendant's time at NSA showed 32 minutes, it was rounded up to 45 minutes.

A central aspect of the dispute concerned the government's decision to credit defendant with only 15% of her off-site hours. The defendant insisted that the government's award of 15% of defendant's 2,342 off-site hours was "arbitrary" (ECF 435 at 41) and not "'reasonable' under any stretch of the imagination." *Id.* at 40. She argued at sentencing that, in effect, the government allowed only 18.5 hours of work a month off site and, when combined with on-site time, a total of 30 hours per month. *Id.* As to the government's proffered loss amount of $306,186, the defendant claimed that "the government has seemingly picked a number out of thin air." *Id.*[16]

Defendant urged the Court to credit her, at a minimum, with no less than 50.5% of her off-site hours and as much as 60%. ECF 435 at 74, 75; ECF 435-5 at 7. For the total of 2,342.5 hours of off-site time billed for the PM, defendant also sought the higher hourly rate of $150.35 for all of the hours. ECF 435-5 at 7. Defendant requested credit for 1,555.8 hours of the time she billed for her off-site time. ECF 435 at 75. Combined with the credit for 200 hours of on-site time, this would result in a loss of about $146,890.46. *Id.*

---

[16] Defendant noted, *inter alia*, a discrepancy of $1,503.49, claiming that the government's amount included a September 2017 invoice for 88 hours. GX 19(a)(1). ECF 435 at 40. Yet, the government only paid for 78 hours. GX 19(a)(3); GX 19(d)(3); GX 19(a)(4); GX 19(e). I ruled in favor of defendant on this issue.

After a thorough review of the evidence, I gave credit to defendant wherever, by any stretch, it could be justified, as the record will show. Ultimately, the Court assessed an upward adjustment of ten levels, rather than the twelve levels sought by the government. This resulted in an offense level of 16, and Guidelines calling for 21 to 27 months of imprisonment. Yet, I sentenced defendant well below those Guidelines, to thirteen months of imprisonment.

The criteria have not been met as to 18 U.S.C. § 3143(b)(1)(B)(iii) or (iv).

### E.  Conclusion

I conclude that defendant has not shown that there is a substantial question of law or fact that is likely to result in a reversal of her convictions, a new trial, or a sentence that does not include a term of imprisonment, or a reduced sentence as set forth in 18 U.S.C. § 3143(b)(1)(B)(iv). Therefore, I shall deny the Motion.

An Order follows.


Date:  November 4, 2024                     /s/
                                            Ellen L. Hollander
                                            Senior United States District Judge